NOS.  2013-1625, -1631, -1632, -1633

_____

## UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

_____

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC., ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC. and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL, INC.,

*Defendant*.

_____

Appeals from the United States District Court for the Eastern District of Texas in case no. 10-CV-0473, Chief Judge Leonard Davis.

_____

## BRIEF OF *AMICUS CURIAE* THE INSTITUTE OF ELECTRICAL AND ELECTRONICS ENGINEERS, INCORPORATED IN SUPPORT OF NO PARTY

_____

December 20, 2013                    *(Counsel Listed on Inside Cover)*

Eileen M. Lach
IEEE
General Counsel and
  Chief Compliance Officer
3 Park Avenue
New York, NY 10016
Telephone:  212.705.8990

Michael A. Lindsay
DORSEY & WHITNEY LLP
50 South Sixth Street
Minneapolis MN 55402
Telephone:  612.340.7819

*Attorneys for The Institute of Electrical and Electronics Engineers, Incorporated*

Form 9

**FORM 9. Certificate of Interest**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

Ericsson, Inc., et al. _____ v. D-Link Systems, Inc., et al. _____

No. 2013-1625,-1631,-1632,-1633

## CERTIFICATE OF INTEREST

Counsel for the (petitioner) (appellant) (respondent) (appellee) (amicus) (name of party)
amicus_____ certifies the following (use "None" if applicable; use extra sheets if necessary):

1.      The full name of every party or amicus represented by me is:

The Institute of Electrical and Electronics Engineers, Incorporated

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

The Institute of Electrical and Electronics Engineers, Incorporated is a not-for-profit corporation and has no shareholders.

4. ☑   The names of all law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Eileen Lach, General Counsel and Chief Compliance Officer, The Institute of Electrical and Electronics Engineers, Incorporated; Michael Lindsay, Dorsey & Whitney, LLP.

12/20/2013 _____          /s/ Michael A. Lindsay _____
Date                            Signature of counsel
                                Michael Lindsay _____
                                Printed name of counsel

Please Note: All questions must be answered
cc: _____

124

## **STATEMENT REQUIRED UNDER FED. R. APP. P. 29(C)(5)**

No party's counsel authored this brief in whole or in part.  No party, party's counsel, or other person (other than amicus IEEE) contributed money that was intended to fund preparation or submission of this brief.

i

# TABLE OF CONTENTS

STATEMENT REQUIRED UNDER FED. R. APP. P. 29(c)(5)..............................i

TABLE OF AUTHORITIES ...........................................................................iv

INTEREST OF AMICUS ............................................................................1

SUMMARY .............................................................................................1

BACKGROUND: IEEE AND ITS STANDARDS DEVELOPMENT
      PROCESS ......................................................................................2

I.     IEEE and IEEE-SA.............................................................................2

II.    The IEEE-SA and Standards Development.......................................4

       A.    The IEEE-SA Standards Development Process....................5
       B.    Authorization of a Standard Development Project ..............6
       C.    Working Group....................................................................8
       D.    Sponsor Balloting ...............................................................10
       E.    SASB Review .......................................................................11

III.   IEEE-SA, Standards, and Patents ....................................................12

       A.    Essential Patent Claims ......................................................13
       B.    Identification of Holders of Essential Patent Claims .........13
       C.    Seeking Patent Commitments ............................................15

IV.   Protecting the Value and Integrity of Patent Commitments..........16

       A.    Patent Commitments Protect Against Potential Hold-Up...16
       B.    Patent Commitments Are Irrevocable.................................19
       C.    Patent Commitments Are Binding on Successors and Assignees ......19

ARGUMENT ............................................................................................21

I.     The SDO Technology-Selection Process Considers Alternative
     Technical Solutions Using a Competitive Process........................21

II.    Inclusion in a Standard Enhances the Value of a Patented Technology .......22

III.   SDOs Rely on the Provision of Patent License Commitments ....................22

IV.    Implementers Are Entitled to Enforce Patent Commitments..........................23

CONCLUSION .................................................................................................24

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Microsoft Corp. v. Motorola, Inc.*,
    696 F.3d 872 (9th Cir. 2012) ..........................................................................23

*In the Matter of Negotiated Data Solutions LLC*,
    FTC File No. 0510094 (Jan. 23, 2008)............................................................20

*In the Matter of Rambus, Inc.*,
    Docket No. 9302, 2006 WL 2330117 (F.T.C. Aug. 2, 2006)............................22

**Statutes**

Internal Revenue Code of 1986 § 501(c)(3) .............................................................2

Standards Development Organization Advancement Act of 2004 §
    102(5).................................................................................................................4

Standards Development Organization Advancement Act of 2004
    § 102(6).................................................................................................................4

**Articles, Speeches, and IEEE Rules and Publications**

Renata Hesse, Deputy Assistant Attorney Gen., Antitrust Div., U.S.
    Dep't of Justice, *The Art of Persuasion: Competition Advocacy at
    the Intersection of Antitrust and Intellectual Property* 4, *available
    at* http://www.justice.gov/atr/public/speeches/301596.pdf ..............................12

Deborah Platt Majoras, Fed. Trade Comm'n Chairman, Recognizing
    the Procompetitive Potential of Royalty Discussions in Standard
    Setting 5(Sept. 23, 2005), *available at*
    http://www.ftc.gov/speeches/majoras/050923stanford.pdf ..............................17

Gerald F. Masoudi, Deputy Assistant Attorney Gen., Antitrust Div.,
    U.S. Dep't of Justice, *Antitrust Enforcement and Standard Setting:
    The Vita and IEEE Letters and the "IP2" Report* 3 (May 10, 2007),
    *available at*
    http://www.justice.gov/atr/public/speeches/223363.htm ..................................16

IEEE Standards Ass'n, *Develop Standards,* IEEE.org, *available at*
http://standards.ieee.org/develop/index.html.......................................................5

IEEE Standards Ass'n, *Understanding Patent Issues During IEEE
Standards Development* (2012), *available at*
http://standards.ieee.org/faqs/patents.pdf ....................................................14, 24

IEEE Standards Association, Audit Committee (Audcom) Baseline
Operating Procedures, IEEE.org,
http://standards.ieee.org/about/sasb/audcom/bops.html.......................................8

IEEE-SA Standards Bd. Patent Comm., *Letter of Assurance for
Essential Patent Claims* (form) (Jan. 2012), *available at*
https://development.standards.ieee.org/myproject/Public/mytools/
mob/loa.pdf .........................................................................................................15

IEEE-SA Standards Board Bylaws (2012), *available at*
http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf........................8

IEEE-SA Standards Board Operations Manual (2013), *available at*
http://standards.ieee.org/develop/policies/sa_opman/sa_om.pdf .........................8

Letter from Thomas O. Barnett, Assistant Attorney Gen., U.S. Dep't
of Justice, to Robert A. Skitol, Esq., Drinker, Biddle & Reath, LLP
4-7, *available at*
http://www.justice.gov/atr/public/busreview/219380.pdf ..................................18

IEEE SASB Patent Comm., *PatCom Dialog*, IEEE.org,
http://grouper.ieee.org/groups/pp-dialog/index_old_080813.html ....................12

*Standards Essential Patent Disputes and Antitrust Law*, *Hearing
Before the Subcomm. on Antitrust, Competition Policy and
Consumer Rights of the Sen. Comm. on the Judiciary*, 113th Cong.,
webcast *available at*
http://www.judiciary.senate.gov/hearings/hearing.cfm?id=042c675
70e0fe19705acabbb8230ee0c.............................................................................13

U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement
and Intellectual Property Rights* 35 (2007), *available at*
http://www.justice.gov/atr/public/hearings/ip/222655.pdf................................16

**INTEREST OF AMICUS**

The Institute of Electrical and Electronics Engineers, Incorporated ("IEEE") submits this brief to help the Court understand the functioning of standards development organizations ("SDOs"), particularly the IEEE Standards Association ("IEEE-SA"), an unincorporated business unit of IEEE.[1] This amicus brief is not submitted in support of any party. IEEE-SA is the SDO to whom licensing assurances were given on patents that relate to IEEE-SA's 802.11 standard and that are at issue in this litigation. Consequently, IEEE has an interest in assisting this Court's understanding of the IEEE-SA standards development process.

**SUMMARY**

In framing an appropriate rule for instructing a jury on determination of a "reasonable royalty," this Court should consider not simply the interests of the parties, but also the role that patent commitments play in the standards development process. In the Background part of this brief, IEEE discusses the IEEE-SA standards development process in Section II; IEEE's process for seeking patent commitments in Section III; and the importance of the resulting patent

---

[1] The Board of Directors of IEEE and the Board of Governors of IEEE-SA authorized submission of this amicus brief. This brief represents the views of IEEE and IEEE-SA and not necessarily the views of all of their members. All parties have consented to the filing of this brief.

1

commitments in Section IV.  In the Argument part of this brief, IEEE offers several observations about the significance of patent commitments.

## BACKGROUND: IEEE AND ITS STANDARDS DEVELOPMENT PROCESS

### I.    IEEE and IEEE-SA

IEEE is an educational and scientific organization as described in section 501(c)(3) of the Internal Revenue Code of 1986, with more than 425,000 members in over 160 countries.  IEEE seeks to advance technological innovation and excellence for the benefit of humanity.  IEEE and its members impart knowledge, provide information, and seek to enrich a global community through widely cited publications, conferences, professional and educational activities, and standards development, all in the fields of electrical, electronics, communications and computer engineering, computer science, the allied branches of engineering, and in related arts and sciences.

One of IEEE's activities in service of its mission is the development of standards.  Through IEEE-SA, IEEE is a leading forum for development of standards that drive the functionality, capabilities, and interoperability of a wide range of products and services.  IEEE-SA has more than 1400 standards either completed or under development, and IEEE-SA is a central source of standardization in both traditional and emerging fields, particularly

telecommunications, information technology, and power generation. IEEE-SA conducts over 200 standards ballots every year, through which proposed standards are voted upon for technical accuracy, soundness, and acceptance. IEEE-SA thrives because of the technical diversity of its 20,000-plus participants, consisting of technology experts and interested parties from around the globe, and includes individuals affiliated with corporations, universities, government agencies, and other organizations.

IEEE-SA is governed by the IEEE-SA Board of Governors (BOG) and IEEE-SA President.[2] The IEEE-SA President serves as the chair of the BOG and as a member of the IEEE Board of Directors. The BOG oversees the operation of the IEEE-SA, including financial oversight and operational management. The BOG establishes the guidelines for the operation of the IEEE-SA and has many documented rules, procedures, and governance policies. In fulfillment of its mission, the IEEE-SA BOG has established several committees with specific areas of concentration in the oversight function.

One of the BOG committees is the IEEE-SA Standards Board (SASB). The SASB encourages and coordinates the development and revision of IEEE standards; approves the initiation of IEEE standards projects; and reviews

---

[2] Four of the eight BOG Members are elected by Members of the IEEE-SA; the other four are appointed by the BOG as additional members. The IEEE-SA President is elected by Members of the IEEE-SA who are also IEEE Members.

standards projects for consensus, due process, openness, and balance. The SASB gives final approval to IEEE standards prior to publication and processes appeals that arise in the standards development process. The SASB has a number of committees whose roles are described in the following section.

## II.    The IEEE-SA and Standards Development

SDOs develop standards to solve issues ranging from product compatibility to consumer safety and health. Standards also simplify product development and reduce costs that do not add value, thereby increasing a user's ability to compare competing products.[3] Standards also are fundamental building blocks for international trade. Only through the use of standards can the requirements of interconnectivity and interoperability be assured and the credibility of new products and new markets verified, thereby enabling the rapid implementation of new technologies.

Hundreds of nonprofit standards organizations throughout the U.S. have developed tens of thousands of standards.[4] Each SDO is governed by its own distinct set of rules and policies aimed at ensuring fair and open standards

---

[3] In this brief, "implementer" means someone who makes a product that complies with a standard, and "user" refers to someone who uses that product.

[4] *See* Standards Development Organization Advancement Act of 2004 § 102(5), (6), 15 U.S.C. § 4301 note (2012).

development processes. IEEE has its own organizational model for standards development, which is described below.

### A. The IEEE-SA Standards Development Process

The IEEE-SA has essentially two types of standards-development processes. First, the IEEE-SA has traditionally operated an individual-based process. In this program, the entire process is open to any individual who wants to participate, and the process works on the principle of one-person / one-vote. Second, for approximately the last nine years the IEEE-SA has also operated an entity-based program. Standards development groups in this program operate on the principle of one-entity / one-vote and are open to materially interested corporations and other entities, e.g., educational institutions and government agencies.[5]

IEEE standards follow a well-defined path from concept to completion, guided by a set of five basic principles: due process, openness, consensus, balance, and right of appeal.[6] The process is visually summarized in this chart:

---

[5] A given IEEE-SA standard will be developed under only one of these two processes. For example, the 802.11 standard at issue in this case (indeed, the entire family of 802 standards) has been developed under the individual method. The 1901-2010 Standard for *Broadband over Power Line Networks: Medium Access Control and Physical Layer Specifications* has been developed under the entity method.

[6] Material in this section is largely drawn from IEEE Standards Ass'n, *Develop Standards,* IEEE.org, *available at* http://standards.ieee.org/develop/index.html (last visited Dec. 17, 2013).



IEEE describes in Sections II.B through II.E below the process that this diagram depicts.[7]

## B. Authorization of a Standard Development Project

Standards projects are commenced when there is a need for an idea or concept to be standardized. The idea or concept can be broad or very specific. However, no standard is developed by one person alone; development of a standard requires group collaboration and consensus, which in turn require a process and neutral supervision.

Within the standards development work at IEEE, a sub-unit of IEEE (known as a "Sponsor") assumes responsibility for a particular standards idea. The

---

[7] The process for revision or withdrawal of a standard is not discussed in this brief.

Sponsor provides technical oversight for the standard and determines the scope and nature of the technical content.  Sponsors for IEEE standards are traditionally IEEE Societies and Committees, each of which specializes in a specific technology, industry sector, or other related interest.  Projects can also be sponsored by Standards Coordinating Committees (SCCs, which are typically created when more than one Society is interested in the subject matter) or the IEEE-SA Corporate Advisory Group.

A standards project does not formally exist until the SASB approves a Project Authorization Request (PAR).  A PAR is a concise, structured, and highly detailed document that essentially states the reason why the project exists and what it intends to do.  Often the members of a potential Working Group will have gathered to work on a PAR and to gain the support of their potential Sponsor.  This type of gathering, known as a study group, can exist for up to six months before a PAR needs to be submitted.  (New PARs can also be developed by existing Working Groups as additional projects.)

When presented with a PAR, the SASB determines whether the proposed standard development project falls within the technical scope of IEEE and the assigned Sponsor, whether the project appears to fulfill a technical and/or market need, and whether the project is likely to attract enough volunteers to develop the standard.

### C. Working Group

With PAR approval, the study group or other proposer that requested the project authorization forms a Working Group. Working Groups are open to participation by anyone.[8] Overall, Working Groups strive for broad representation of all interested parties and encourage global participation.

Working Groups must operate in compliance with the IEEE-SA requirements,[9] the Sponsor's Policy & Procedures (P&P), and the Working Group's own P&P. Some Sponsors allow each Working Group to develop its own P&P, which are subject to Sponsor review and approval and are subject to audit by the SASB. Other Sponsors develop a single Working Group P&P for each project type (individual or entity) that each Working Group of that type must adopt and follow. The IEEE-SA provides baseline P&Ps for Sponsors and Working Groups.[10]

---

[8] In standards projects based on the individual method, participation does not require membership in IEEE or IEEE-SA. In entity-based projects, the entity participant must be a member of IEEE-SA.

[9] These are generally set forth in the IEEE-SA Standards Board Bylaws (2012), *available at* http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf, and the IEEE-SA Standards Board Operations Manual (2013), *available at* http://standards.ieee.org/develop/policies/sa_opman/sa_om.pdf.

[10] *See* IEEE Standards Association, Audit Committee (Audcom) Baseline Operating Procedures, IEEE.org, http://standards.ieee.org/about/sasb/audcom/bops.html (last visited Dec. 17, 2013).

A Working Group usually has a hierarchy of officers (typically a chair, a vice-chair, and a secretary) to ensure that the work proceeds smoothly. The chair's role is to provide leadership and guidance during the standards development process, helping move a draft standard toward completion. The chair will plan the meetings and organize the work. Agendas for Working Group meetings are distributed beforehand, and the results of the group's deliberations are publicly available, usually through meeting minutes.

The Working Group does the detailed work of writing the draft standard. Typically, the group will identify the different sections that the draft standard will require. First, a scope and purpose statement is prepared based on the PAR information. Next, an outline is created. Often, this outline will serve as the structure for the standard as well, with the subjects in the outline becoming the clauses and subclauses in the document. Then the Working Group splits up the drafting work among Working Group members. Draft sections are primarily written outside the formal Working Group meetings and are then brought back to the Working Group to resolve problematic areas. The Working Group will have a technical editor who compiles the group's work into a single document.

Not everyone in a Working Group will agree on the best method for accomplishing an objective within a standard. Sometimes Working Group members will disagree on technical issues or on phrasing, but sometimes they will

disagree on fundamental technology approaches.  At a minimum, consensus means that a majority of the voting members of the Working Group must agree on an issue.  The Working Group's and/or the Sponsor's P&P will define the levels of approval (e.g., simple majority or super-majority) that are required for approval of a draft standard.

A draft standard can go through multiple drafts within the Working Group before it is ready to proceed to the next stage.  With each draft, the Working Group tries to narrow the differences among its members, through persuasion and compromise.  Voting can be conducted at meetings or through "Working Group ballots" (not to be confused with the "Sponsor ballots" discussed in the next section).  In a Working Group ballot, Working Group members can vote *Approve, Do Not Approve,* or *Abstain.*  Members can also offer comments on the draft and propose changes to address their comments, indicating whether resolution of the comment is necessary to change the member's vote.[11]

### D. Sponsor Balloting

Formal consensus balloting begins when the Sponsor decides that the draft of the developing standard (written by the Working Group) is stable.  The Sponsor forms a balloting group of persons interested in the standard.  While anyone can contribute comments, the only votes that count toward approval are those of the

---

[11] Procedures can vary by Sponsor and by Working Group within a Sponsor.

10

eligible members of the balloting group. IEEE-SA's rules require that a balloting group be balanced among interest categories. Balloters usually fall into one of several interest categories (e.g., manufacturers, users, academic, government, or general interest). No interest category can comprise over one-third of the balloting group.

A standard will not pass unless at least 75 percent of all ballots from a balloting group are returned and at least 75 percent of the returned ballots (excluding Abstentions) bear an "Approve" vote. Reaching consensus also includes receiving and resolving comments. The ballot resolution group responds to all comments received within the balloting period, whether submitted from within or outside of the balloting group.[12]

### E. SASB Review

The SASB approves or disapproves standards based on the recommendation of its Standards Review Committee (RevCom). This committee makes sure that Sponsors follow all procedures and guiding principles in drafting and balloting a standard. As with PARs, completed draft standards come before the SASB seven

---

[12] Once the ballot resolution group has examined and dealt with all comments, the Sponsor must recirculate the ballot if there is a need for that (for example, because new technical changes were introduced into the document).

11

times a year.  After approval, the standard is edited by an IEEE-SA staff editor,[13]

given a final review by the members of the Working Group, and published.

## III.   IEEE-SA, Standards, and Patents

IEEE-SA seeks to produce standards that any willing implementer can use

and that will become widely adopted.  IEEE-SA's patent policy permits the

inclusion of patented technology, because the best technological approach that the

standards-development participants select is or may be covered by a patent.

Inclusion of patented technology without the patent holder's commitment that it

will grant licenses to implementers on reasonable and non-discriminatory terms,

however, jeopardizes the goal of widespread adoption.[14]  Consequently, IEEE-SA

(like most SDOs) has adopted a patent policy intended to deal with this barrier.[15]

---

[13] The staff edit is non-substantive.

[14] *See* Renata Hesse, Deputy Assistant Attorney Gen., Antitrust Div., U.S. Dep't of Justice, *The Art of Persuasion: Competition Advocacy at the Intersection of Antitrust and Intellectual Property* 4 (Nov. 8, 2013), *available at* http://www.justice.gov/atr/public/speeches/301596.pdf (SDOs "often ask that patent holders voluntarily commit to license their standards-essential patents (SEPs) on [fair], reasonable, and non-discriminatory (F/RAND) terms. These F/RAND commitments make standards more attractive by reducing the possibility that SEP holders will try to block from the market a product compliant with the standard or extract exorbitant licensing fees.") (brackets in original).

[15] IEEE-SA periodically revisits its patent policy to adopt any revision, clarification, or update. The last major review occurred in 2005-2007, resulting in the patent policy as it currently exists.  IEEE-SA used a transparent process, including publication of drafts for public review and comment, consideration of drafts and comments at open meetings, and publication of responses to written comments.  Materials on the 2005-2007 policy review are available at IEEE SASB

## A. Essential Patent Claims

The SASB Bylaws define "Essential Patent Claim" as "any Patent Claim the use of which was necessary to create a compliant implementation of either mandatory or optional portions of the normative clauses of the [Proposed] IEEE Standard when, at the time of the [Proposed] IEEE Standard's approval, there was no commercially and technically feasible non-infringing alternative."[16]  In other words, if it is not possible to implement the standard without infringing a patent, then the patent is essential.

## B. Identification of Holders of Essential Patent Claims

The first step in IEEE-SA's policies is to identify the potential assertion of "essential" patent claims.[17]  IEEE-SA asks every participant in a standards development project, at every standards development meeting, to identify any

---

Patent Comm., *PatCom Dialog*, IEEE.org,  http://grouper.ieee.org/groups/pp-dialog/index_old_080813.html (last updated Feb. 9, 2007).  IEEE-SA is currently engaged in another policy review process.  Oral Testimony of John D. Kulick, Ph. D., Chair of the Standards Bd., The Institute of Electrical and Electronics Engineers, Incorporated (IEEE) Standards Ass'n, *Standards Essential Patent Disputes and Antitrust Law*, *Hearing Before the Subcomm. on Antitrust, Competition Policy and Consumer Rights of the Sen. Comm. on the Judiciary*, 113th Cong. (Jul. 30, 2013), webcast *available at* http://www.judiciary.senate.gov/hearings/hearing.cfm?id=042c67570e0fe19705aca bbb8230ee0c.

[16] IEEE-SA Standards Board Bylaws § 6.1 (brackets in original), *supra* note 9.

[17] If a patent is not technically or commercially necessary for a compliant implementation of the standard, then it is not covered by IEEE-SA's policy.

13

holders of potential essential patent claims of which the participant is personally aware, and to do so as early as possible in the standards development process.[18] IEEE-SA expects that Working Group participants will act in good faith and will identify any persons who might hold potentially essential patents (and disclose any known patents that might prove essential).[19]

IEEE-SA goes to great lengths to ensure that standards development participants are aware of IEEE's patent policy.  The SASB's Patent Committee (PatCom) has developed a set of materials that are available to all participants and other stakeholders (and to the general public).[20]  These include a slide-set that can be used to explain the policy at Working Group and other standards development meetings; a tutorial on the patent policy; and a set of FAQs, *Understanding Patent Issues During IEEE Standards Development*.

---

[18] IEEE-SA's current patent policy is set forth in sections 6.1 and 6.2 of the IEEE-SA Standards Board Bylaws, *supra* note 9.

[19]  An inherent limitation is that no set of written rules can hope to cover all conceivable circumstances.  While the written rules provide participants with substantial guidance, the cooperative nature of standards development means that an SDO's written rules should not be interpreted with strict literalism.  *See* IEEE Standards Ass'n, *Understanding Patent Issues During IEEE Standards Development* ¶ 17 (2012) ("IEEE-SA does expect that participants will conduct themselves in good faith"), *available at* http://standards.ieee.org/faqs/patents.pdf.

[20] PatCom's publicly available website is located at http://standards.ieee.org/about/sasb/patcom/.  This site provides a hyperlink to the Patent Materials, but they can also be found directly at http://standards.ieee.org/about/sasb/patcom/materials.html.

### C. Seeking Patent Commitments[21]

Once the holders of potentially Essential Patents are identified, IEEE-SA (through the Working Group Chair or the chair's designee) asks any person or entity so identified to state its licensing intentions through completion and submission of the IEEE Letter of Assurance (LOA) form.  The LOA form asks the patent holder to state its licensing intentions and provides a number of alternatives from which to choose.  For example, in part D.1.b, the holder can state that it is willing to "grant a license under reasonable rates to an unrestricted number of applicants on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination."[22]  While the IEEE-SA cannot compel a patent-holder to mark the form LOA to agree with part D.1.b (or even compel the patent holder to submit the LOA form at all), the absence of an LOA (or the submission of an LOA that indicates an unwillingness to provide any kind of assurance) is a factor that the IEEE-SA may consider when deciding whether to approve the draft standard.

---

[21] In IEEE-SA's parlance, this commitment is referred to as a "Letter of Assurance."

[22] IEEE-SA Standards Bd. Patent Comm., *Letter of Assurance for Essential Patent Claims* (form) (Jan. 2012), *available at* https://development.standards.ieee.org/myproject/Public/mytools/mob/loa.pdf. IEEE now requires that the assurance be given on the approved Letter of Assurance form.

## IV.   Protecting the Value and Integrity of Patent Commitments

Patent commitments play a critical role in the standards development process.  IEEE-SA has therefore taken steps to protect the value and integrity of the patent commitment made to IEEE-SA in LOAs.

### A.   Patent Commitments Protect Against Potential Hold-Up

Patent commitments like the IEEE LOA protect implementers of a standard against patent hold-up.  Hold-up can be defined as the ability of the owner of patented technology to extract higher royalties "after its technology has been chosen by the SSO[23] as a standard and others have incurred sunk costs which effectively increase the relative cost of switching to an alternative standard."[24]

---

[23] "SSO" stands for Standard Setting Organization, a term that some use in place of Standards Development Organization (SDO).

[24] U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights* 35 (2007), *available at* http://www.justice.gov/atr/public/hearings/ip/222655.pdf.  *See also* Gerald F. Masoudi, Deputy Assistant Attorney Gen., Antitrust Div., U.S. Dep't of Justice, *Antitrust Enforcement and Standard Setting: The Vita and IEEE Letters and the "IP2" Report* 3 (May 10, 2007), *available at* http://www.justice.gov/atr/public/speeches/223363.htm ("Patent hold up can be defined to involve a situation where all the following conditions exist: [1] after the standard is set, the holder of a patent essential to that standard identifies a patent, or attempts to impose licensing terms, that SDO members could not reasonably have anticipated; [2] it is not a commercially reasonable option to abandon the standard and attempt to create an alternative, due to the cost of the standard setting process itself or the cost of developing products incorporating the alternative standard; [3] and — most importantly —  if the other SDO members *had* anticipated the patent holder's demands, those SDO members could have chosen a different technology that avoided this patent.") (emphasis in original).

16

Consequently, IEEE uses the LOA process to ask patent holders if they are willing to grant licenses on Reasonable and Non-Discriminatory ("RAND") terms.

The term "reasonable," however, is inherently vague, and the ability of patent commitments to protect against hold-up is thus imperfect.[25] Sometimes this vagueness (and the consequent inability of parties to agree on a negotiated, "reasonable" license) will lead to expensive litigation whose cost and risk can impede the adoption of a socially valuable standard. Even without litigation, the *ex post* negotiation of license terms (that is, negotiations occurring after a technology's inclusion in a standard) can lead to higher royalty payments and ultimately higher prices to consumers.

In 2007, IEEE-SA adopted a provision to facilitate understanding of a patent holder's licensing position. IEEE-SA's current patent policy expressly permits (but does not require) the submitter of a patent commitment to provide with its commitment (i) a not-to-exceed license fee or rate commitment, (ii) a sample license agreement, or (iii) one or more material licensing terms. Other approaches

---

[25] *See, e.g.,* Deborah Platt Majoras, Fed. Trade Comm'n Chairman, Recognizing the Procompetitive Potential of Royalty Discussions in Standard Setting 5(Sept. 23, 2005), *available at* http://www.ftc.gov/speeches/majoras/050923stanford.pdf ("Experience has shown . . . that some agreements on RAND rates can be vague and may not fully protect industry participants from the risk of hold up.").

17

(such as VITA Standards Organization's policy for mandatory disclosure of maximum rates[26]) are also possible.

IEEE-SA recognizes that patent holders and implementers engage in actual negotiations and that, in patent infringement litigation, courts use the construct of a "hypothetical negotiation" against a background body of law.  To maintain its position as an impartial forum where both patent holders and implementers will seek to develop standards, however, IEEE-SA does not involve itself in license negotiations between implementers and patent-holders and does not make determinations of whether a particular royalty rate (or other license terms and conditions) is or is not reasonable.[27]  IEEE-SA has stated, however, that "the outcome of the standardization process is universally available, that is, broadly affordable to anyone and anybody."[28]

---

[26] This policy is discussed in a 2006 business review letter from the U.S. Department of Justice, Antitrust Division to counsel for VITA.  *See* Letter from Thomas O. Barnett, Assistant Attorney Gen., U.S. Dep't of Justice, to Robert A. Skitol, Esq., Drinker, Biddle & Reath, LLP 4-7 (Oct. 30, 2006), *available at* http://www.justice.gov/atr/public/busreview/219380.pdf.

[27] IEEE-SA Standards Board Bylaws § 6.2, *supra* note 9 ("The IEEE is not responsible for . . . determining whether any licensing terms or conditions provided in connection with submission of a Letter of Assurance, if any, or in any licensing agreements are reasonable or non-discriminatory.").

[28] Oral Testimony of John D. Kulick, Ph.D., *supra* note 15.

## B. Patent Commitments Are Irrevocable

A patent commitment must be durable for the standards development process to function.  If a patent-holder could withdraw a commitment, then a standards development group could not rely on it.  Years of joint effort would be wasted if the standards development effort had to be reversed.  Or if the standard had already been adopted, the reneging patent-holder would be able to extract monopoly profits from all implementers[29] because there would be no competing and non-infringing alternative for compliance with the standard; by definition the committed patent is "essential" for a compliant implementation of the standard.  Thus, under IEEE-SA rules, a patent commitment "is irrevocable once submitted and accepted."[30]

## C. Patent Commitments Are Binding on Successors and Assignees

The patent commitment needs to be durable even if the underlying patent is transferred.  From the perspective of IEEE-SA (and other SDOs) and would-be implementers of the standard, what matters is not the identity of the patent-holder, but the continuing validity of the commitment after transfer.  Permitting a commitment to evaporate upon transfer would mean that the commitment is not

---

[29] If the patent-holder produces its own compliant implementation, then the patent-holder might refuse to license to its rivals at all, and thus extract its monopoly profits directly from the users of compliant implementations.

[30] IEEE-SA Standards Board Bylaws § 6.2, *supra* note 9.

19

worth much. "Patent laundering" would confer on the successor the ability to extract supra-competitive royalties. The original holder would have an incentive to create that ability and to split the value with a successor. [31]

Consequently, the appropriate rule is simple and clear: a successor to a LOA should be bound by the same commitments as its transferor. Thus, IEEE-SA policy requires that the original provider of the commitment bind its successor to honor the commitment (who then needs to bind its successor to honor the commitment, and so on). [32]

---

[31] Statement of the Fed. Trade Comm'n, *In the Matter of Negotiated Data Solutions LLC*, FTC File No. 0510094 (Jan. 23, 2008), *available at* http://www.ftc.gov/sites/default/files/documents/cases/2008/01/080122statement.pdf (reneging on predecessor's prior licensing commitment enabled successor patent-holder "to increase the price of an Ethernet technology used by almost every American consumer who owns a computer. . . . [I]f [such] conduct became the accepted way of doing business, even the most diligent standard-setting organizations would not be able to rely on the good faith assurances of respected companies. The possibility exists that those companies would exit the business, and that their patent portfolios would make their way to others who are less interested in honoring commitments than in exploiting industry lock-in.").

[32] IEEE-SA Standards Board Bylaws § 6.2, *supra* note 9. ("The Submitter of a Letter of Assurance shall agree (a) to provide notice of a Letter of Assurance either through a Statement of Encumbrance or by binding any assignee or transferee to the terms of such Letter of Assurance; and (b) to require its assignee or transferee to (i) agree to similarly provide such notice and (ii) to bind its assignees or transferees to agree to provide such notice as described in (a) and (b).").

## **ARGUMENT**

As a neutral body, IEEE takes no position in the dispute between the parties on this appeal.  Without taking sides between the parties, however, IEEE does note that a jury charged with determining a reasonable royalty should be instructed appropriately on the significance of the patent holder's patent commitment.  IEEE invites the Court's attention to the following observations.

## I.    The SDO Technology-Selection Process Considers Alternative Technical Solutions Using a Competitive Process

By definition, a standard will result in a single technical solution to the problem at hand.  There usually are multiple available technologies, meaning that the alternative approaches must compete with each other for inclusion in the standard.  If an SDO is aware that a technology proposed for inclusion in a standard is or may be covered by an essential patent, the SDO may request or indeed require that the patent-holder provide assurance as to its licensing intentions.  In response, the patent-holder may state, for example, that it agrees not to assert its patents, that it will license on a royalty-free basis, that it will license on RAND terms, or that it will not license (or declines to respond).[33]  This information can play a critical role in the Working Group's selection of a technology and in the SDO's decision whether to approve a proposed standard.

---

[33] The IEEE patent policy requests voluntary submission of LOAs. The patent policies of some SDOs impose a RAND licensing obligation on members that fail to respond to a disclosure request when required under that policy.

21

## II.    Inclusion in a Standard Enhances the Value of a Patented Technology

In many circumstances there are multiple technical solutions to a given problem — different technical approaches to achieve a desired outcome. Thus, before a standard's adoption, a participating patent-holder typically faces competition from other available technologies (both patented and non-patented). The inclusion of the patented technology within the standard may not augment the scope of the patent, but it clearly augments the value of the patent.[34] Once the standard is adopted, the relevant patent-holder can have the right to exclude implementers not just from practicing within the scope of the patent but from practicing within that entire segment of the economy because the standard, if successful, has effectively reduced the competitively viable alternatives for that part of the economy.

## III.   SDOs Rely on the Provision of Patent License Commitments

SDOs seek patent licensing commitments because avoiding "hold-up" is critical to ensuring that a standard will be genuinely "open" to implementation by all interested parties, thereby enabling the growth of robustly competitive markets around the new technology that the standard encompasses.

---

[34] *See In the Matter of Rambus, Inc.*, Docket No. 9302, 2006 WL 2330117, at *19 (F.T.C. Aug. 2, 2006) ("A patent holder's market power may be materially enhanced once the patented technology is incorporated into a standard, as alternatives become less attractive relative to the chosen technology and less able to constrain its price."), *rev'd on other grounds,* 522 F.3d 456 (D.C. Cir. 2008).

During the development of a standard, sometimes it is clear that the patent-holder has proprietary technology that it seeks to include in the standard. But sometimes the patent-holder may not be able to determine whether it holds essential intellectual property without conducting a patent search. Sometimes a patent-holder will conduct such a search, but sometimes the patent-holder will choose to avoid the costs of a search and instead simply provide a commitment that, if any of its patents should prove essential, it will license the patents on RAND or royalty-free terms.

An appropriate rule will balance the benefit of assurances with the willingness of both patent-holders and implementers to participate in the standards development process. In all cases, the SDO must be able to rely on the assurance that is provided.

## IV.   Implementers Are Entitled to Enforce Patent Commitments

The ability of implementers to enforce patent commitments is critical both for ensuring voluntary compliance and providing a remedy for those circumstances in which a patent-holder fails to honor its commitment. Indeed, the proposition that implementers are entitled to enforce patent commitments ought to be unquestionable.[35]

---

[35] *Microsoft Corp. v. Motorola, Inc.,* 696 F.3d  872, 884 (9th Cir. 2012) ("The district court's conclusions that Motorola's RAND declarations to the ITU created a contract enforceable by Microsoft as a third-party beneficiary (which Motorola

This Court should not assume that SDOs will necessarily take a direct role in enforcing patent commitments. First, for SDOs to enforce patent commitments directly would impose costs on SDOs (and on the standards-development process) that are better borne by implementers and patent holders. Second, the technical knowledge embodied in the standard (and thus the ability to understand the role that a patent might play in that standard) will typically reside not in the SDO itself, but with the volunteers who developed the standard. Third, an SDO's direct enforcement of patent commitments would diminish the ability of an SDO to remain a neutral forum.[36]

## CONCLUSION

In framing an appropriate rule for instructing a jury on determination of a "reasonable royalty," this Court should consider not simply the interests of the parties, but also the role that patent commitments play in the standards development process.

---

concedes), and that this contract governs in some way what actions Motorola may take to enforce its ITU standard-essential patents . . . were not legally erroneous."). IEEE-SA has publicly stated that implementers of an IEEE standard are entitled to enforce patent commitments made to IEEE-SA. *Understanding Patent Issues During IEEE Standards Development*, *supra* note 19, at ¶ 30.

[36] SDOs should not be prohibited, of course, from seeking to enforce such commitments directly where the SDO believes it appropriate to do so. *Cf. id.* ("In certain circumstances and at its sole discretion, the IEEE may . . . seek to enforce the terms of an Accepted Letter of Assurance.").

24

Respectfully submitted,


Eileen M. Lach
IEEE
General Counsel and Chief Compliance Officer
3 Park Avenue
New York, New York 10016
Telephone:  212.705.8990

DORSEY & WHITNEY LLP

By /s/ Michael A. Lindsay
      Michael A. Lindsay
Suite 1500, 50 South Sixth Street
Minneapolis MN 55402
Telephone:  612.340.7819

*Attorneys for The Institute of*
*Electrical and Electronics Engineers,*
*Incorporated*

25

**CERTIFICATE OF COMPLIANCE**
**WITH FED. R. APP. P. 32(a)**

I hereby certify that the foregoing brief employs Times New Roman 14-point font using Microsoft Word 2010 for Windows (Version 16.0.6112.5000) and thus complies with the typeface and type style requirements of Fed. R. App. P. 32(a)(5) and (a)(6).

I further certify that the foregoing brief contains 5,490 words, exclusive of the cover pages, disclosure statements, tables of contents and authorities, and certificates of counsel as specified in Fed. R. App. P. 32(a)(7)(B)(iii).


Dated:  December 20, 2013          /s/ Michael A. Lindsay
                                   Michael A. Lindsay

# **CERTIFICATE OF SERVICE**

I hereby certify that, on this 20th day of December, 2013, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.


Dated:  December 20, 2013          /s/ Michael A. Lindsay
                                   Michael A. Lindsay