**Nos. 2013-1625, -1631, -1632, -1633**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

---

ERICSSON, INC., and TELEFONAKTIEBOLAGET LM ERICSSON,
*Plaintiffs-Appellees*,

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC., ACER AMERICA CORP., and GATEWAY, INC.,
*Defendants-Appellants,*

*and* DELL, INC.,
*Defendant-Appellant*,

*and* TOSHIBA AMERICA INFORMATION SYSTEMS, INC., and TOSHIBA CORP.,
*Defendants-Appellants*,

*and* INTEL CORP.,
*Intervenor-Appellant*,

*and* BELKIN INTERNATIONAL, INC.,
*Defendant*.

---

Appeals from the United States District Court for the Eastern District of Texas
No. 10-CV-0473, Chief Judge Leonard Davis

---

**CORRECTED BRIEF FOR AMICUS CURIAE AMERICAN ANTITRUST INSTITUTE SUPPORTING NEITHER PARTY**

---

RICHARD M. BRUNELL
General Counsel
AMERICAN ANTITRUST INSTITUTE
2919 Ellicott St., N.W.
Washington, D.C. 20008
202-600-9640

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for amicus American Antitrust Institute certifies as follows:

1. The full name of every party represented is:

   American Antitrust Institute

2. The names of the real parties in interest:

   Not applicable

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party represented:

   None

4. The names of all law firms and the partners and associates that have appeared for the party in the lower tribunal or are expected to appear for the party in this court.

   Not applicable

*/s/ Richard M. Brunell*
Richard M. Brunell

Dated: December 20, 2013

## TABLE OF CONTENTS

CERTIFICATE OF INTEREST .......... i

TABLE OF AUTHORITIES .......... iii

INTEREST OF AMICUS CURIAE .......... 1

INTRODUCTION AND SUMMARY .......... 2

ARGUMENT .......... 4

I. THE MAIN PURPOSE OF A RAND COMMITMENT IS TO PREVENT PATENT HOLDUP AND ROYALTY STACKING .......... 4

A. Supracompetitive Royalties for SEPs Harm Competition, Consumers, and Innovation .......... 7

B. The RAND Commitment Ensures That Royalties Are Not Supracompetitive .......... 9

II. UNMODIFIED, THE *GEORGIA-PACIFIC* FACTORS ARE NOT APPROPRIATE FOR DETERMINING RAND ROYALTIES .......... 11

A. The Hypothetical Negotiation Must Occur Before the Technology Is Incorporated into the Standard .......... 13

B. The Jury Must Be Instructed on Royalty Stacking .......... 16

C. The *Georgia-Pacific* Factors Must Be Modified in Other Ways .......... 17

CONCLUSION .......... 21

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C) ..........

CERTIFICATE OF SERVICE ..........

# TABLE OF AUTHORITIES


<u>Cases</u> <u>Page</u>

*Allied Tube & Conduit Corp. v. Indian Head, Inc.,*
486 U.S. 492 (1988) ....... 4

*Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.,*
456 U.S. 556 (1982) ....... 5

*Apple, Inc. v. Motorola, Inc.,*
No. 2012-1548 (Fed. Cir. Dec. 4, 2012) ....... 1

*Apple, Inc. v. Motorola, Inc.,*
869 F. Supp. 2d 901 (N.D. Ill. 2012) ....... 13n, 14

*Broadcom Corp. v. Qualcomm Inc.,*
501 F.3d 297 (3d Cir. 2007) ....... 5, 9, 21

*Garretson v. Clark,*
111 U.S. 120 (1884) ....... 19

*Georgia-Pacific Corp. v. U.S. Plywood Corp.,*
318 F. Supp. 1116 (S.D.N.Y. 1970) ....... 12n, 19n

*i4i Ltd. P'ship v. Microsoft Corp.,*
598 F.3d 831 (Fed. Cir. 2010), *aff'd,* 131 S. Ct. 2238 (2011) ....... 11n

*In re Innovatio IP Ventures, LLC Patent Litig.*
No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) ....... *passim*

*Lucent Techs. Inc. v. Gateway, Inc.,*
580 F.3d 1301 (Fed. Cir. 2009) ....... 12n, 19n

*Microsoft Corp. v. Motorola, Inc.,*
696 F.3d 872 (9th Cir. 2012) ....... 5, 9

*Microsoft Corp. v. Motorola, Inc.,*
No. C10-1823JLR, 2013 WL 2111217
(W.D. Wash. Apr. 25, 2013) ....... *passim*

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ..................................................................11

*Whitserve, LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ......................................................................11

Administrative Materials

Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies With Competition* (2011),
http://www.ftc.gov/sites/default/files/documents/reports/evolving-ip-marketplace-aligning-patent-notice-and-remedies-competition-report-federal-trade/110307patentreport.pdf ............12, 13n, 14

Statement of Fed. Trade Comm'n, *In re Motorola Mobility LLC,*
No. 121-0120, 2013 WL 124100 (Jan. 3, 2013) ............................................5

U.S. Dep't of Justice & Fed. Trade Comm'n,
*Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* (2007),
http://www.justice.gov/atr/public/hearings/ip/222655.pdf. ......................4n, 7

U.S. Dep't of Justice & U.S. Patent & Trademark Office,
*Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013),
http://www.justice.gov/atr/public/guidelines/290994.pdf..................4n, 7, 10

Other Authorities

Thomas F. Cotter, *Four Principles for Calculating Reasonable Royalties in Patent Infringement Litigation*,
27 Santa Clara Computer & High Tech. L.J. 725 (2011) ............................13

Daralyn J. Durie & Mark A. Lemley, *A Structured Approach to Calculating Reasonable Royalties*,
14 Lewis & Clark L. Rev. 627 (2010) .........................................................12

Joseph Farrell et al., *Standard Setting, Patents, and Hold-Up*, 74 Antitrust L. J. 603 (2007) ....................7

Herbert J. Hovenkamp, *Competition in Information Technologies: Standards-Essential Patents, Non-Practicing Entities, and FRAND Bidding* (Univ. Iowa Leg. Stud. Res. Paper, Nov. 2012), http://papers.ssrn.com/sol3/papers.cfm?abstract_id= ....................9, 15n

Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991 (2007) ....................6, 7, 15n

Mark A. Lemley & Carl Shapiro, *A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents*, 28 Berkeley Tech. L. J. 1135 (2013) ....................10, 14n, 15n, 17

Suzanne Michel, *Bargaining for RAND Royalties in the Shadow of Patent Remedies Law*, 77 Antitrust L. J. 889 (2011) ....................10n

Christopher B. Seaman, *Reconsidering the* Georgia-Pacific *Standard for Reasonable Royalty Patent Damages*, 2010 B.Y.U. L. Rev. 1661 ....................13, 16

Daniel G. Swanson & William J. Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power*, 73 Antitrust L. J. 1 (2005) ....................8

Case: 13-1625 Document: 69 Page: 7 Filed: 12/20/2013

## INTEREST OF AMICUS CURIAE

All parties have consented to the filing of this brief. The American Antitrust Institute (AAI) is an independent and non-profit education, research, and advocacy organization devoted to advancing the role of competition in the economy, protecting consumers, and sustaining the vitality of the antitrust laws. *See* http://www.antitrustinstitute.org. AAI is managed by its Board of Directors with the guidance of an Advisory Board consisting of over 125 prominent antitrust lawyers, law professors, economists and business leaders.[1] AAI has long been involved in intellectual property matters because properly defined intellectual property rights and remedies are important to well functioning competitive markets and consumer welfare. It has taken a particular interest in the use of patented technology in private standard setting by standard-setting organizations (SSOs), which has the potential to enhance competition but also can be subject to anticompetitive abuse. AAI filed an amicus brief in *Apple, Inc. v. Motorola, Inc.*, No. 2012-1548 (Dec. 4, 2012), arguing that injunctive relief normally should not be available as a remedy for infringement of a standard essential patent (SEP) that

[1] The Board of Directors alone has approved this filing; individual views of members of the Board of Directors or Advisory Board may differ from AAI's positions. Pursuant to Fed. R. App. P. 29(c)(5), amicus states that no counsel for a party has authored this brief in whole or in part, and no party, party's counsel, or any other person or entity—other than AAI or its counsel—has contributed money that was intended to fund preparing or submitting this brief.

is subject to a commitment by the patent holder to license the patent on reasonable and non-discriminatory (RAND) terms. AAI files this brief to ensure that, as with injunctive relief, RAND commitments are interpreted and enforced in a manner that precludes holders of SEPs from obtaining supracompetitive royalties based on market power conferred by the SSO's inclusion of the patented technology in the standard. Excessive royalties undermine the standard-setting process, harm competition and consumers, and impair innovation.

## INTRODUCTION AND SUMMARY

The district court upheld the jury's determination that defendants had infringed three of Ericsson's patents that are essential to the IEEE's Wi-Fi standard (802.11n) and that Ericsson committed to license on RAND terms. The jury's damages award effectively set a royalty of $.15 per infringing unit, which the district court adopted as the ongoing royalty rate. While defendants raise numerous issues on appeal, this brief addresses only the issue of whether the court properly instructed the jury how to assess damages. The brief argues that the 15 *Georgia-Pacific* factors used in determining a reasonable royalty for purposes of ordinary patent damages are not an appropriate basis for instructing a jury how to determine damages for infringement of a standard-essential patent encumbered by a RAND commitment, at least not without significant modification. Therefore, the district court's wholesale adoption of the *Georgia-Pacific* factors was error, which

Case: 13-1625 Document: 69 Page: 9 Filed: 12/20/2013

was not cured by the court additionally instructing the jury that any damages award be consistent with the patentee's RAND obligation, without explaining what the RAND obligation entails.

The brief explains that the purpose of the RAND commitment is to mitigate the problem of patent holdup, namely obtaining royalties on the basis that implementers are locked into the standard rather than on the basis of the value of the patented technology itself. That value is properly understood as the incremental value of the patented technology over the next best alternative at the time the technology was under consideration for inclusion in the standard (the ex ante value), subject to a "royalty stacking" constraint, i.e. that the combined royalties on all of the patented technologies included in the standard must not undermine implementation of the standard. The 15 *Georgia-Pacific* factors, which have been criticized by commentators as indeterminate at best for determining a reasonable royalty for patents generally, are particularly inadequate for setting a RAND royalty. The factors do not explicitly focus on the ex ante value at the time the standard is adopted nor expressly take into account royalty stacking. Moreover, several factors are plainly inconsistent with the RAND commitment. Notably, two district courts that recently undertook a thorough and independent determination of RAND royalties accepted that the main goal of the RAND commitment is to prevent holdup and royalty stacking, which required a substantial

Case: 13-1625 Document: 69 Page: 10 Filed: 12/20/2013

modification of the *Georgia-Pacific* factors. *See Microsoft Corp. v. Motorola, Inc.*, No. C10-1823JLR, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013) (Robart, D.J.); *In re Innovatio IP Ventures, LLC Patent Litig*., No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013) (Holderman, D.J.).

## ARGUMENT

### I. THE MAIN PURPOSE OF A RAND COMMITMENT IS TO PREVENT PATENT HOLDUP AND ROYALTY STACKING

There is widespread recognition that private standard setting through standard-setting organizations can enhance competition and consumer welfare, particularly by enabling interoperability among both competing and complementary products in the information technology and communications sectors. However, it is also well recognized that standard setting is subject to substantial dangers of anticompetitive abuse.[2] Indeed, the Supreme Court has cautioned that private standard setting is allowed "only on the understanding that it will be conducted in a nonpartisan manner offering procompetitive benefits" and in the presence of "meaningful safeguards" that prevent bias "by members with economic interests in stifling product competition." *Allied Tube & Conduit Corp.*

---

[2] *See, e.g.,* U.S. Dep't of Justice & U.S. Patent & Trademark Office, *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments* 3-4 (Jan. 8, 2013) ("*U.S. SEP Policy Statement*") (discussing benefits and risks of standard setting); U.S. Dep't of Justice & Fed. Trade Comm'n, *Antitrust Enforcement and Intellectual Property Rights: Promoting Innovation and Competition* 33-40 (2007) ("*DOJ and FTC 2007 IP Report*") (same).

Case: 13-1625 Document: 69 Page: 11 Filed: 12/20/2013

*v. Indian Head, Inc.*, 486 U.S. 492, 501, 506-07 (1988); *see Am. Soc'y of Mech. Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571-72 (1982); *see also* Statement of Fed. Trade Comm'n, *In re Motorola Mobility LLC*, No. 121-0120, at 1-2, 2013 WL 124100, at *37 (Jan. 3, 2013) ("standard setting often supplants the competitive process with the collective decision-making of competitors, requiring that we be vigilant in protecting the integrity of the standard-setting process").

One of the dangers of standard setting is that when an SSO incorporates patented technology into a standard, implementers become dependent on a license from the patentee in order to practice the standard and, if the standard is popular, to compete in the marketplace. The standard may then "threaten to endow holders of standard-essential patents with disproportionate market power." *Microsoft Corp. v. Motorola, Inc.*, 696 F.3d 872, 876 (9th Cir. 2012). "In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants," a condition "known as 'patent hold-up.'" *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 310 (3d Cir. 2007). As Judge Robart has explained, "When the standard becomes widely used, the holders of SEPs obtain substantial leverage to demand more than the value of their specific patented technology. This is so even if there were equally good alternatives to that technology available when the original standard was adopted." *Microsoft*, 2013 WL 2111217 *10; *see also Innovatio,* 2013 WL 5593609, at *3 (inclusion of

Case: 13-1625 Document: 69 Page: 12 Filed: 12/20/2013

technology in standard "allows the company to charge inflated prices that reflect not only the intrinsic value of its technology, but also the inflated value attributable to its technology's designation as the industry standard") (internal quotation marks omitted); *U.S. SEP Policy Statement* at 4 ("owner of . . . patented technology may gain market power and potentially take advantage of it by engaging in patent hold-up, which entails asserting the patent to . . . obtain a higher price for its use than would have been possible before the standard was set, when alternative technologies could have been chosen").

The holdup concern is magnified by the problem of royalty stacking, which arises when "multiple patents read on a single product, so that the downstream firm must deal with the stacking of royalties paid to two or more patent holders." Mark A. Lemley & Carl Shapiro, *Patent Holdup and Royalty Stacking*, 85 Tex. L. Rev. 1991, 2010 (2007); *see id.* at 2011, 2014 ("'royalty stacking' exacerbates the holdup problem" and "cause[s] prices to be *higher* than would be set by an integrated monopolist who owned all of the patents"). "In the context of standards having many SEPs and products that comply with multiple standards, the risk of the use of post-adoption leverage to exact excessive royalties is compounded by the number of potential licensors and can result in cumulative royalty payments that can undermine the standards." *Microsoft*, 2013 WL 2111217, at *11; *Innovatio*, 2013 WL 5593609, at *9 (royalty-stacking "concern arises because

most standards implicate hundreds, if not thousands of patents, and the cumulative royalty payments to all standard-essential patent holders can quickly become excessive and discourage adoption of the standard”).

### A. Supracompetitive Royalties for SEPs Harm Competition, Consumers, and Innovation

Allowing patent owners to obtain supracompetitive royalties for SEPs has several negative consequences. First, it may harm the standard-setting process by discouraging implementers from adopting the standard. *See U.S. SEP Policy Statement* at 4 (“it may induce prospective implementers to postpone or avoid making commitments to a standardized technology”); Lemley & Shapiro, *Patent Holdup*, at 2012 (“In the long run, if products are expected to be subject to some degree of holdup, the [implementer] may not find it worth incurring the costs necessary to develop, manufacture, and sell the [standardized] product.”).

Second, “[c]onsumers of the products using the standard would be harmed if those higher royalties were passed on in the form of higher prices.” *DOJ and FTC 2007 IP Report* at 36; *see Microsoft*, 2013 WL 2111217, at *10 (“In addition to harming firms that are forced to pay higher royalties, hold-up also harms consumers to the extent that those excess costs are passed onto them.”); *see also* Joseph Farrell et al., *Standard Setting, Patents, and Hold-Up*, 74 Antitrust L. J. 603, 645 (2007) (“[W]hen a standard used in a fairly competitive industry is subject to *uniform* hold-up, direct buyers may bear little of the cost, which falls

Case: 13-1625 Document: 69 Page: 14 Filed: 12/20/2013

primarily on final consumers.”). Moreover, to the extent the SEP holder is a leading downstream competitor of other implementers of the standard, supracompetitive royalties can harm downstream competition by raising rivals' costs, or even excluding rivals from the market entirely. *See* Daniel G. Swanson & William J. Baumol, *Reasonable and Nondiscriminatory (RAND) Royalties, Standards Selection, and Control of Market Power*, 73 Antitrust L. J. 1, 26-27 (2005).

Third, by raising the cost and reducing the output of downstream products that read on the standard, supracompetitive royalties obtained by one SEP holder harm *other* holders of SEPs that are essential to the standard (and all patent holders whose technologies are incorporated in the downstream products), as their royalties will be reduced. *See Microsoft,* 2013 WL 2111217, at *11 (“Hold-up by one SEP holder also harms other firms that hold SEPs relating to the same standard because it jeopardizes further adoption of the standard and limits the ability of those other holders to obtain appropriate royalties on their technology.”); *Innovatio*, 2013 WL 5593609, at *8 (noting that holdup can harm “other holders of standard-essential patents”). This too may make the standard-setting process less attractive and impair innovation.

**B. The RAND Commitment Ensures That Royalties Are Not Supracompetitive**

The commitment of a patent holder, before its technology is included in the standard, to license its patents on reasonable and non-discriminatory terms addresses these concerns.[3] "[O]ne of the primary purposes of the RAND commitment is to avoid patent hold-up" and "prevent[] patent holders from demanding excessive royalties that capture value beyond the value of the patented technology itself." *Innovatio*, 2013 WL 5593609, at *8, 9; *Microsoft*, 2013 WL 2111217, at *11; *see also Broadcom*, 501 F.3d at 313 ("To guard against anticompetitive patent hold-up, most [SSOs] require firms supplying essential technologies for inclusion in a prospective standard to commit to licensing their technologies on FRAND terms."); *Microsoft*, 696 F.3d at 876. "The RAND commitment also addresses royalty stacking and the need to ensure that the aggregate royalties associated with a given standard are reasonable." *Microsoft*, 2013 WL 2111217, at *11; *Innovatio*, 2013 WL 5593609, at *10. In short, the RAND commitment is designed "to reduce the occurrences of opportunistic conduct in the adoption of voluntary consensus standards, while encouraging participants to include the best available technology in standards." *U.S. SEP Policy Statement* at 5; *see also* Herbert J. Hovenkamp, *Competition in Information*

---

[3] Some SSOs use the legally equivalent term, "fair, reasonable, and non-discriminatory," or FRAND. *Microsoft,* 696 F.3d at 877 n.2.

Case: 13-1625 Document: 69 Page: 16 Filed: 12/20/2013

*Technologies: Standards-Essential Patents, Non-Practicing Entities, and FRAND Bidding* 12 (Univ. Iowa Leg. Stud. Res. Paper, Nov. 2012) ("The FRAND process permits SSOs to select a standard based upon performance characteristics on the assumption that all of the standards will be reasonably priced, without worrying too much about exactly what that price will be.").[4]

To be sure, "a RAND rate must be set high enough to ensure that innovators in the future have an appropriate incentive to invest in future developments and to contribute their inventions to the standard-setting process." *Innovatio*, 2013 WL 5593609, at *11. However, SEP holders have much to gain from having their technology included in a standard. *See U.S. SEP Policy Statement* at 5 ("patent holders that also sell products and services related to the standard benefit from expanded marketing opportunities, and patent holders that focus on licensing their inventions benefit from an expanded source of revenue"); Mark A. Lemley & Carl Shapiro, *A Simple Approach to Setting Reasonable Royalties for Standard-Essential Patents*, 28 Berk. Tech. L. J. 1135, 1140 (2013) ("[T]he FRAND

[4] It is important to note that the "patent holdup" at issue does not merely (or necessarily) refer to the patentee's exploitation of the sunk costs of a particular implementer, but rather to the exploitation of the sunk costs of an entire industry, which makes it costly, if not impossible, to a revise a standard to exclude the patented technology of a SEP holder that seeks excessive royalties. *See* Suzanne Michel, *Bargaining for RAND Royalties in the Shadow of Patent Remedies Law*, 77 Antitrust L. J. 889, 891-92 (2011) (noting prohibitive costs of modifying a standard "due to the need for newly manufactured products to be backward-compatible and interoperable with similar products already owned by consumers, resulting in industry 'lock in'").

commitment is at its base an agreement not to exercise the full scope of the patentee's rights in exchange for having its technology adopted as an industry standard, likely resulting in increased licensing opportunities.").

## II. UNMODIFIED, THE *GEORGIA-PACIFIC* FACTORS ARE NOT APPROPRIATE FOR DETERMINING RAND ROYALTIES

While "[t]his court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry," *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011), it has not required their use, *see Whitserve, LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012) ("We do not require that witnesses use any or all of the *Georgia-Pacific* factors when testifying about damages in patent cases."). Commentators have criticized use of the 15 factors,[5]

---

[5] "These factors include: (1) royalties the patentee has received for licensing the patent to others; (2) rates paid by the licensee for the use of comparable patents; (3) the nature and scope of the license (exclusive or nonexclusive, restricted or non-restricted by territory or product type); (4) any established policies or marketing programs by the licensor to maintain its patent monopoly by not licensing others to use the invention or granting licenses under special conditions to maintain the monopoly; (5) the commercial relationship between the licensor and licensee, such as whether they are competitors; (6) the effect of selling the patented specialty in promoting sales of other products of the licensee; (7) the duration of the patent and license term; (8) the established profitability of the product made under the patent, including its commercial success and current popularity; (9) the utility and advantages of the patent property over old modes or devices; (10) the nature of the patented invention and the benefits to those who have used the invention; (11) the extent to which the infringer has used the invention and the value of that use; (12) the portion of profit or of the selling price that may be customary in that particular business to allow for use of the invention or analogous inventions; (13) the portion of the realizable profit that should be credited to the invention as opposed to its non-patented elements; (14) the opinion testimony of qualified experts; and (15)

Case: 13-1625 Document: 69 Page: 18 Filed: 12/20/2013

especially as instructions for juries, because they are vague and confusing, provide no guidance on how the factors are to be weighed, and do not permit adequate judicial review. *See* Daralyn J. Durie & Mark A. Lemley, *A Structured Approach to Calculating Reasonable Royalties*, 14 Lewis & Clark L. Rev. 627, 628, 631-32 (2010) ("[A] non-exclusive fifteen-factor test that requires balancing and consideration of the interactions between the factors is likely to give little or no practical guidance to a jury. . . . The result is that juries regularly disregard the instructions, following their own (incorrect) instincts in deciding an appropriate measure of damages.");[6] Fed. Trade Comm'n, *The Evolving IP Marketplace: Aligning Patent Notice and Remedies With Competition* 184 (2011) ("Without . . . discipline, the *Georgia-Pacific* factors provide a grab bag for use by parties

---

the results of a hypothetical negotiation between the licensor and licensee." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 853 n.3 (Fed. Cir. 2010) (citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970)), *aff'd*, 131 S. Ct. 2238 (2011).

[6] As just one example, this Court has interpreted the *Georgia-Pacific* factors as embodying the "hypothetical negotiation or the 'willing licensor-willing licensee' approach, [which] attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs. Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009). However, *Georgia-Pacific* itself treats this as only one factor (number 15) that may be relevant. *See* Durie & Lemley at 643 (fifteenth factor is not a separate factor at all, but rather "represents the ultimate question all of the other factors are trying to establish"). Even if a jury is instructed, as here, to use the hypothetical negotiation as a framework, the jury undoubtedly will be confused when it is also instructed that the approach is merely one of the listed factors and that "[n]o one factor is dispositive." A1676.

Case: 13-1625 Document: 69 Page: 19 Filed: 12/20/2013

seeking to establish whatever reasonable royalty serves their purposes"); *see also* Thomas F. Cotter, *Four Principles for Calculating Reasonable Royalties in Patent Infringement Litigation*, 27 Santa Clara Computer & High Tech. L.J. 725, 730 (2011) ("the individual factors are often sufficiently vague as to provide almost limitless discretion to the trier of fact"); Christopher B. Seaman, *Reconsidering the* Georgia-Pacific *Standard for Reasonable Royalty Patent Damages*, 2010 B.Y.U. L. Rev. 1661, 1705 (noting that *Georgia-Pacific* test "was initially created for application by a court, not a jury").[7]

### A. The Hypothetical Negotiation Must Occur Before the Technology Is Incorporated into the Standard

Regardless of whether they are appropriate for ordinary patent damages, the *Georgia-Pacific* factors are not adequate for determining RAND royalties, for several reasons. First, insofar as *Georgia-Pacific* places the hypothetical negotiation at the time just before infringement, rather than before the decision of the SSO to incorporate the patented technology into the standard,[8] it fails to

[7] Judge Posner aptly notes that, according to *Georgia-Pacific,* the 15 factors are only "some" of the factors that are relevant, and he asks "how many additional factors may be lurking somewhere? And could a judge or a jury really balance 15 or more factors and come up with anything resembling an objective assessment?" *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 911 (N.D. Ill. 2012).

[8] Some argue that the "time of infringement" in the *Georgia-Pacific* analysis generally should be interpreted to mean the time of the design decision. *See* FTC, *The Evolving IP Marketplace* at 190-91. And while this makes eminent sense, a jury would be hard-pressed to undertake that interpretation on its own. Products

distinguish between the competitive value of the patent and its holdup value, and thus fails to address one of the fundamental purposes of the RAND commitment.[9] "The proper method of computing a FRAND royalty starts with what the cost to the licensee would have been of obtaining, just before the patented invention was declared essential to compliance with the industry standard, a license for the function performed by the patent. That cost would be a measure of the value of the patent qua patent." *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d at 913. As the FTC has noted, "A definition of RAND based on the ex ante value of the patented technology at the time the standard is set is necessary for consumers to benefit from competition among technologies to be incorporated into the standard—competition that the standard setting process itself otherwise displaces." FTC, *The Evolving IP Marketplace* at 194 ("Courts should cap the royalty at the incremental

---

that read on a standard will often be introduced (begin to infringe) well after the adoption of the standard.

[9] Notably, while the hypothetical negotiation under *Georgia-Pacific* assumes that the patent is valid and infringed, such an assumption does not apply to the hypothetical negotiation of the RAND royalty *as a matter of contract*. *See* Lemley & Shapiro, *Simple Approach,* at 1151 (reasonable royalty for RAND purposes is partly a function of the probability that the patents in the portfolio are actually valid and infringed); *see Microsoft*, 2013 WL 2111217, at *53 (skepticism whether patents are essential would be considered in hypothetical negotiation). Thus, evaluating whether an offer complies with RAND should take this uncertainty into account. However, if the RAND commitment is no bar to obtaining an infringement judgment, then the hypothetical negotiation appropriately would assume validity and infringement of those patents determined to be valid and infringed, and exclude from consideration those patents determined to be invalid or not infringed. *See Innovatio*, 2013 WL 5593609, at *7.

Case: 13-1625 Document: 69 Page: 21 Filed: 12/20/2013

value of the patented technology over alternatives available at the time the standard was defined.”).[10]

In adopting a substantially modified version of the *Georgia-Pacific* factors, the district courts in *Microsoft* and *Innovatio* recognized that this “pre-inclusion” ex ante vantage point is appropriate, although they also referred to the time of infringement. *See Microsoft*, 2013 WL 2111217, at *19 (“[T]he parties to a hypothetical negotiation under a RAND commitment would consider alternatives that could have been written into the standard instead of the patented technology. The focus is on the period before the standard was adopted and implemented . . . .”); *Innovatio*, 2013 WL 5593609, at *19 (following *Microsoft* and noting that the “relevance of possible alternatives [in] the hypothetical negotiation is obvious, as the presence of equally effective alternatives to the patented technology that could

[10] “The proper comparison is between the cost and value of the patentee’s component and the cost and value of the alternative, including patent royalties that would have to be paid on the alternative where appropriate.” Lemley & Shapiro, *Patent Holdup*, at 2039 n.153; *see also* Lemley & Shapiro, *Simple Approach*, at 1148 (“The key idea here is that a reasonable royalty should reflect what would happen as a result of well-informed ex ante technology competition.”). This ex ante vantage point is also appropriate because the patentee has the option of informing the SSO that it declines to make a RAND commitment (in which case its technology is unlikely to be selected) or announcing the maximum royalty that it will charge. *See* Hovenkamp at 12 (“SSO participants can always ‘bid’ for a higher royalty *ex ante*, and then the SSO can decide which technology to accept on the basis of the proffered price”).

have been adopted into the standard will drive down the royalty that the patent holder could reasonably demand”).[11]

### B. The Jury Must Be Instructed on Royalty Stacking

The *Georgia-Pacific* factors are also inadequate because they fail explicitly to address the second fundamental purpose of the RAND commitment, namely preventing royalty stacking. *See* Seaman at 1691 (“Georgia-Pacific … does not effectively address royalty stacking”). To be sure, as the district courts in *Microsoft* and *Innovatio* explained, a licensee in a hypothetical negotiation would take royalty stacking into account, and so those courts had no trouble incorporating stacking as a central focus of their analysis. *See Microsoft*, 2013 WL 2111217, at *20 (“With respect to stacking concerns, the parties attempting to reach an agreement would consider the overall licensing landscape in existence vis-à-vis the standard and the implementer’s products.”); *id.* at *86 (“anti-stacking principle is the primary constraint on the upper bound of RAND”); *Innovatio*, 2013 WL 5593609, at *9-10. However, the stacking concern is not completely captured in the bilateral hypothetical negotiation contemplated by *Georgia-Pacific* because SEP holders also *collectively* have an ex ante interest in preventing royalty

[11] The district courts in *Microsoft* and *Innvovatio* did note that “approaches linking the value of a patent to its incremental contribution to a standard are hard to implement,” *Microsoft*, 2013 WL 2111217, at *13; *Innovatio*, 2013 WL 5593609, at *37, but they had no problem considering ex ante alternatives to evaluate particular SEPs’ relative importance to a standard.

stacking and ensuring that the overall royalty burden of the standard is reasonable. *See* Lemley & Shapiro, *Simple Approach*, at 1150 (royalty stacking "reduces the collective returns to standard-essential patent owners *and* to implementers"). In any event, absent explicit instructions, a jury will not understand the significance of royalty stacking and may, for example, reasonably believe that *Georgia-Pacific*'s first factor—proof of an established royalty for the patents in suit—does not permit the RAND royalty to vary depending on the number of patents (and patentees) essential to the standard, as stacking concerns would otherwise suggest.[12]

---

[12] Indeed, it appears that the district court itself did not appreciate the significance of the royalty-stacking issue. The court rejected defendants' royalty-stacking argument because it was merely "theoretical," and they failed to show "an *actual* stack on 802.11n essential products." Mem. Op. & Order Regarding Post-Trial Filings at 36, Doc. No. 615 (Aug. 6, 2013). However, it is the *potential* for stacking that counts because RAND contemplates a maximum royalty burden for a standard and that any particular owner of a subset of essential patents is entitled only to a fair share of that burden. *See Microsoft*, 2013 WL 2111217, at *86 (in *hypothetical* negotiation, "[t]he parties would . . . consider other SEP holders and the royalty rate that each of these patent holders *might* seek from the implementer") (emphasis added); *Innovatio*, 2013 WL 5593609, at *37-39 (endorsing "top down" approach to calculating RAND royalty which involves calculating maximum appropriate royalty burden for standard and then allocating an appropriate share to the patents at issue). Moreover, the royalty rate set by the factfinder in this case will become a comparable used in future cases and (re)negotiations by other Wi-Fi SEP owners. *See Microsoft,* 2013 WL 2111217, at *74 (rejecting argument that, because widespread adoption of the relevant standards had not yet been impeded, royalty stacking was not an issue).

Case: 13-1625 Document: 69 Page: 24 Filed: 12/20/2013

### C. The *Georgia-Pacific* Factors Must Be Modified in Other Ways

In addition, several of the *Georgia-Pacific* factors are either flatly inconsistent with a RAND commitment or are irrelevant. Factor 4, which considers the licensor's policy of maintaining his patent monopoly by not licensing others or by granting licenses under special conditions designed to preserve the monopoly, "is inapplicable in the RAND context because the licensor has made a commitment to license on RAND terms and may no longer maintain a patent monopoly by not licensing to others." *Microsoft*, 2013 WL 2111217, at *18. Factor 5, which considers whether the licensor and licensee are competitors or not, "does not apply in the RAND context [because] the patentee no longer may discriminate against its competitors in terms of licensing agreements." *Id.* Factor 7, which considers the duration of the patent and the term of the license, "will have little influence on what constitutes a reasonable royalty under the RAND commitment" because "the term of the license would equate to the duration of the patent." *Id.* at *19. Accordingly, the district courts in *Microsoft* and *Innovatio* excluded these factors from their modified *Georgia-Pacific* analysis. *Id.* at *18-19; *Innovatio*, 2013 WL 5593609, at *5-6.

While the remaining *Georgia-Pacific* factors may be relevant to the RAND determination and understandable to juries if modified in ways suggested by the district courts in *Microsoft* and *Innovatio*, those factors that involve consideration

Case: 13-1625 Document: 69 Page: 25 Filed: 12/20/2013

of the benefits or profits earned by the licensee from the sale of the "product made under the patent" (factors 6, 8, 10, 11) are problematic insofar as they obscure the need to "apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features," *Garretson v. Clark*, 111 U.S. 120, 121 (1884), in a context where the SEP holder is not entitled to a royalty based on the value derived from the incorporation of the patented technology into the standard, or to discriminate among licensees. Thus, the district courts in *Microsoft* and *Innovatio* modified *Georgia-Pacific* factors 6, 8, 10, and 11 expressly to take into account "only the value of the patented technology and not the value associated with incorporating the patented technology into the standard." *Innovatio*, 2013 WL 5593609, at *5; *see Microsoft*, 2013 WL 2111217, at *18-19.[13] This means that it is a mistake for the factfinder to take into account, as a factor in the RAND analysis, the relative value of the functionality provided by the standard itself (here, Wi-Fi) to the licensee's products. *See Innovatio*, 2013 WL

[13] Of course, the apportionment requirement is embodied in *Georgia-Pacific* factor 13, which provides that the factfinder consider the "'portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer.'" *Lucent*, 580 F.3d at 1332-33 (quoting *Georgia-Pacific*, 318 F. Supp. at 1120).

5593609, at *14-15 (rejecting proposal to apportion value of disputed patents based in part on importance of Wi-Fi to end product).[14]

Finally, although the district court below purported to modify the *Georgia-Pacific* factors by instructing the jury to take into account Ericsson's RAND obligation, it adopted none of the modifications made in *Microsoft* and *Innovatio*, and indeed made no specific modifications at all. The district court did not attempt to explain how the jury was to understand what the RAND commitment entailed, when the court itself recognized that "RAND creates an obligation that must be followed, but it provides no guidance on how to follow that obligation." Mem. Op. & Order Regarding Post-Trial Filings at 50.

---

[14] Thus, Ericsson's effort to justify its proposed royalty rate by reference to the "importance of Wi-Fi functionality to a laptop or a router, the ability to take the end user product and set it up in your house and surf the web or watch movies or get sports scores," A1702, would seem to be improper.

## CONCLUSION

The proper determination of RAND royalties is essential to ensure that RAND commitments serve their purpose as "safeguards against monopoly power." *Broadcom*, 501 F.3d at 314. Jury instructions that follow the 15 *Georgia-Pacific* factors, modified only by an additional instruction reciting the RAND obligation, are improper. A proper RAND jury instruction should make clear that any methodology for determining a RAND royalty must reflect RAND's goals of preventing holdup and royalty stacking. Thus, the jury should be instructed that the SEP holder is to be compensated for the value of its technology in relation to the alternatives available to the SSO at the time the technology was included in the standard, and not the value attributable to the incorporation of the technology into the standard itself, subject to the constraint that the royalty may not exceed an appropriate share of the total royalty burden of implementing the standard, calculated so that implementation of the standard is not undermined.

Respectfully submitted,

*/s/ Richard Brunell*

RICHARD M. BRUNELL
General Counsel
AMERICAN ANTITRUST INSTITUTE
2919 Ellicott St., N.W.
Washington, D.C. 20008
(202) 600-9640

December 20, 2013

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitation of Fed. R. App. P. 29(d) because it contains it contains 5384 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Mac 2008 in 14 point Times New Roman font.

*/s/ Richard M. Brunell*

Dated: December 20, 2013

**CERTIFICATE OF SERVICE**

I hereby certify that, on December 20, 2013, I electronically filed the foregoing *Corrected Brief for Amicus Curiae American Antitrust Institute Supporting Neither Party* with the Clerk of the Court using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*/s/ Richard M. Brunell*

December 20, 2013