Nos. 2013-1625, -1631, -1632, -1633

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

---

ERICSSON, INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees,*

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants,*

and

DELL, INC.,

*Defendant-Appellant,*

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants,*

and

INTEL CORPORATION,

*Intervenor-Appellant,*

and

BELKIN INTERNATIONAL, INC.,

*Defendant.*

---

Appeals from the United States District Court for the Eastern District
of Texas in Case No. 10-CV-0473, Chief Judge Leonard Davis

---

## BRIEF OF MICROSOFT CORPORATION
## AS *AMICUS CURIAE* IN SUPPORT OF APPELLANTS

---

December 23, 2013                    (*Counsel Listed on Inside Cover*)

T. Andrew Culbert
David E. Killough
MICROSOFT CORPORATION
1 Microsoft Way
Redmond, WA 98052
(425) 882-8080

*Attorneys for Amicus Curiae Microsoft Corporation*

# CERTIFICATE OF INTEREST

Counsel for Microsoft Corporation certifies the following:

1.  The full name of every party or amicus curiae represented by me is:

> Microsoft Corporation

2.  The name of the real party in interest (if the parties named in the caption are not the real parties in interest) represented by me is:

> N/A

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

> None

4.   The names of all law firms and the partners or associates that appeared for the party or amicus curiae now represented by me in the trial court or agency or are expected to appear in this Court are:

> T. Andrew Culbert
> David E. Killough
> MICROSOFT CORPORATION
> 1 Microsoft Way
> Redmond, WA 98052

Dated: December 23, 2013          Respectfully submitted,

/s/ T. Andrew Culbert.
T. Andrew Culbert

Attorney for Microsoft Corporation

# TABLE OF CONTENTS

STATEMENT OF INTEREST OF *AMICUS CURIAE* ............................ 1

SUMMARY OF ARGUMENT ................................................. 2

ARGUMENT ............................................................ 3

I.    Any Analysis Regarding Standard-Essential Patents Must Take
      Proper Account of the RAND Licensing Commitment. ................. 3

      A.    Contractual RAND Licensing Commitments Impose
            Limitations on Owners of Standard-Essential Patents. ........ 4

      B.    Standard-Essential Patents As a Class Require Careful
            Treatment By Courts Because They Can Be Used to Hold Up
            Implementers. ............................................... 7

II.   The Court Should Not Endorse the District Court's Approach to
      the Determination of a RAND Royalty for Standard-Essential
      Patents. ....................................................... 12

      A.    Ericsson Waived Any Entitlement To Compensation Beyond
            a RAND Royalty. ............................................ 12

      B.    The District Court's Approach Undermines the Antitrust
            Safeguards In the Standard Setting Process. ................ 14

      C.    The District Court's Approach Was Legally Insufficient In
            Light Of Ericsson's RAND Licensing Commitments. ........... 15

CONCLUSION ......................................................... 18

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988) ............................................................. 4, 5, 15

*Apple, Inc. v. Motorola, Inc.*,
869 F. Supp. 2d 901 (N.D. Ill. 2012) ...................................... 17

*Apple, Inc. v. Motorola Mobility, Inc.*,
886 F. Supp. 2d 1061 (W.D. Wis. 2012) .................................. 6

*Broadcom Corp. v. Qualcomm, Inc.*,
501 F.3d 297 (3d Cir. 2007) .................................... 5, 11, 15, 17

*Grain Processing Corp. v. American Maize–Prods. Co.*,
185 F.3d 1341 (Fed. Cir. 1999) ............................................. 16

*Hanson v. Alpine Valley Ski Area, Inc.*,
718 F.2d 1075 (Fed. Cir. 1983) ............................................. 16

*LaserDynamics v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ........................................... 16, 17

*Microsoft Corp. v. Motorola, Inc.*,
696 F.3d 872 (9th Cir. 2012) ................................................... 6

*Microsoft Corp. v. Motorola, Inc.*,
864 F. Supp. 2d 1023 (W.D. Wash. 2012) ............................... 6

*Realtek Semiconductor Corp. v. LSI Corp.*,
No. C-12-03451-RMW, 2012 WL 4845628
(N.D. Cal. Oct. 10, 2012) ....................................................... 6

*Research in Motion Ltd. v. Motorola, Inc.*,
644 F. Supp. 2d 788 (N.D. Tex. 2008) .................................. 12

*ResQNet.com v. Lansa, Inc.*,
594 F.3d 860 (Fed. Cir. 2010) .............................................. 17

*Synqor, Inc. v. Artesyn Tech., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013) ........................................................ 16

*Whitserve LLC v. Computer Packages, Inc.*,
694 F.3d 10 (Fed. Cir. 2012) ............................................................ 16

*Zygo Corp. v. Wyko Corp.*,
79 F.3d 1563 (Fed. Cir. 1996) .......................................................... 16

OTHER AUTHORITIES

Stanley M. Besen and Joseph Farrell, "Choosing How to Compete:
Strategies and Tactics in Standardization,"
8 *J. Econ. Persp.* 117 (1994) ........................................................ 7, 8

Doug Lichtman, "Understanding the RAND Commitment,"
47 *Hous. L. Rev.* 1023, 1034 (2010) .............................................. 7, 8

Joseph Farrell *et al.*, "Standard setting, patents, and hold-up,"
74 *Antitrust L. J.* 603 (2007) .......................................................... 10

Mark A. Lemley and Carl Shapiro, "Patent Holdup and Royalty
Stacking," 85 *Texas L. Rev.* 1991 (2007) ...................................... 9, 11

Mark A. Lemley, "Intellectual Property Rights and Standard-
Setting Organizations," 90 *Cal. L. Rev.* 1889 (2002) .......................... 7

Scott K. Peterson, "Consideration of Patents during the Setting of
Standards," Remarks for Nov. 6, 2002 FTC and DOJ
Roundtable on SSOs (online at
http://www.ftc.gov/opp/intellect/021106peterson.pdf) ......................... 9

Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses,
Patent Pools, and Standard-Setting," in Adam B. Jaffe *et al.*,
*Innovation Policy and the Economy* (2001).......................................... 6

Daniel G. Swanson and William J. Baumol, "Reasonable and
Nondiscriminatory (RAND) Royalties, Standards Selection, and
Control of Market Power," 73 *Antitrust L. J.* 1 (2005) ...................... 10

**STATEMENT OF INTEREST OF *AMICUS CURIAE*[1]**

Microsoft Corporation ("Microsoft") is a worldwide leader in computer technology. Microsoft holds—and licenses—U.S. and foreign patents essential to various technical standards ("standard-essential patents") established by standard-setting organizations ("SSOs"). Like Defendants-Appellants and Intervenor-Appellant, Microsoft is also a defendant in actions alleging that Microsoft infringes standard-essential patents. Microsoft is concerned about any endorsement of the district court's approach to the resolution of disputes concerning standard-essential patents because the court bypassed the contractual reasonable and non-discriminatory ("RAND") licensing commitment. The contract limits a standard-essential patent holder to a RAND royalty—that is the very essence of the patentee's contractual undertaking. Microsoft, therefore, has a direct interest in ensuring that

---

[1] Microsoft submits this brief as an *amicus curiae* pursuant to Fed. R. App. Pro. 29(a) and Circuit Rule 29(c). Defendants-Appellants and Intervenor-Appellant consent to the filing of this brief. Microsoft contacted counsel for Plaintiffs-Appellees but had not heard a response in time, and accordingly has submitted a motion requesting leave to file this brief. No party or party's counsel authored the brief in whole or in part or contributed money intended to fund preparing or submitting it, and no person other than *amicus curiae* contributed money intended to fund its preparation or submission.

this Court reject the district court's approach that undermines the standard-setting process itself.

Microsoft's interest in this appeal goes beyond its interest as a party in other cases involving standard-essential patents. As an active participant in many SSOs, as well as an implementer of many technical standards in its products, Microsoft has an interest in ensuring that these standards are broadly implemented, and that the public is able to reap the benefits of standardization. These aims would be frustrated by adoption of the approach to damages taken in this case.

## SUMMARY OF ARGUMENT

When a patentee makes a contractual commitment to license on RAND terms, that contract controls any analysis of claims for a royalty for infringement of standard-essential patents. The district court failed to recognize the primacy of the contract. By treating the contractual RAND licensing commitment as nothing more than one unweighted factor for consideration among many other *Georgia-Pacific* factors, the court gave improper guidance to the jury as to the constraint the RAND obligation imposes on any recovery by the standard-essential patent holder. That approach ignores the patent-holder's waiver of any

2

compensation for infringement beyond a contractual RAND royalty. It also exacerbates antitrust concerns that the RAND commitment is intended to solve, and violates settled principles of damages law.

## ARGUMENT

### I.  Any Analysis Regarding Standard-Essential Patents Must Take Proper Account of the RAND Licensing Commitment.

United States patents confer on patent owners a bundle of rights. One such right is the right to exclude others from using the patented invention. The patentee also obtains the right to license the patent on whatever terms the market will bear. The law governing the assertion and enforcement of these rights is not at issue here. But when an infringement claim involves a patent declared essential to a technical standard and subject to a RAND licensing commitment, other considerations come into play. Contract and antitrust law substantially circumscribe the rights and remedies a patent owner otherwise might have. As the law is being developed at this intersection between contract, anti-trust and patent law, principles should be articulated cautiously. Precedents generally applied in patent litigation may not apply to RAND royalty determinations for standard-essential patents.

**A.    Contractual RAND Licensing Commitments Impose Limitations on Owners of Standard-Essential Patents.**

Many companies collaborate to create standardized technology. Such collective behavior by competitors ordinarily would be problematic, because, at root, standardization typically comprises both horizontal and vertical agreements to fix the technology that is available to consumers. *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 500 (1988). The effect of standardization is the exclusion of alternatives that would exist in the absence of the standard. The elimination of these alternatives reduces consumer choice and constrains competition. Agreements to standardize also vest enormous market power in companies that own patents essential to implementation of the standard. If the resulting market power is properly checked, then the potential value to consumers of standardized technology could outweigh the evils created by the collusive behavior. *Id.* at 500–01. There is, however, still a risk that owners of standard-essential patents will "hold up" those that invest in implementing the standard to extract royalties that reflect the value of standardization.

To address this danger and antitrust concerns, SSOs require specific licensing policies. Those licensing policies typically require

participants to make RAND licensing commitments, agreeing that any standard-essential patents they own will be made available on reasonable and nondiscriminatory terms to all those who wish to implement the standard. "[M]eaningful safeguards" against abuse, including RAND licensing commitments, are the basis for the judge-made antitrust exemptions under which those participating in SSO standard-setting processes operate. *Broadcom Corp. v. Qualcomm, Inc.*, 501 F.3d 297, 309–10, 313–14 (3d Cir. 2007) (violation of RAND license commitment "is actionable anticompetitive conduct"); *see Allied Tube*, 486 U.S. at 501 ("When, however, private associations promulgate [standards] . . . through procedures that prevent the standard-setting process from being biased by members with economic interests in stifling product competition, those private standards can have significant procompetitive advantages.") (citation omitted).

While RAND licensing commitments may shelter SSO participants from threshold antitrust scrutiny, that does not end all concern. A patent owner's failure to abide by its RAND licensing commitment can unravel the antitrust safeguard and cause substantial harm to competition and consumers. Unreasonable or discriminatory

pricing of licenses for standard-essential patents can be used to burden competitors.  Such discriminatory pricing also diminishes the reasonable choices for consumers.  *See* Carl Shapiro, "Navigating the Patent Thicket: Cross Licenses, Patent Pools, and Standard-Setting," in Adam B. Jaffe *et al.*, *Innovation Policy and the Economy* (2001) 128, 150 ("Antitrust risks associated with excluding a rival from the market . . . could arise if the companies promoting the standard block others from adhering to the standard or seek royalties from outsiders.").

Given these concerns, courts have widely recognized that RAND licensing commitments are enforceable contracts, and that standard-implementers are third-party beneficiaries entitled to enforce those commitments.  *See Microsoft Corp. v. Motorola, Inc.,* 696 F.3d 872, 884–85 (9th Cir. 2012); *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1030 (W.D. Wash. 2012); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1085 (W.D. Wis. 2012); *Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-03451, 2012 WL 4845628, at *4 (N.D. Cal. Oct. 10, 2012).  A patent owner's judicially-enforceable RAND licensing commitment is an unequivocal contractual commitment to license a

patent to *anyone* on reasonable and non-discriminatory terms and conditions.

**B.    Standard-Essential Patents As a Class Require Careful Treatment By Courts Because They Can Be Used to Hold Up Implementers.**

Establishing an interoperability standard is not a rigorous, scientific process driven by identifying the "best" technology in a particular field.  *See* Doug Lichtman, "Understanding the RAND Commitment," 47 *Hous. L. Rev.* 1023, 1034 (2010) (noting, by analogy, that once a default rule was established, "a patent related to the idea of driving on the left was worth very little.  A patent related to the idea of driving on the right was worth a fortune.  The change had nothing to do with the relative merits of these two technologies."); Mark A. Lemley, "Intellectual Property Rights and Standard-Setting Organizations," 90 *Cal. L. Rev.* 1889, 1897 (2002) ("[I]t may be more important that an industry coalesces around a single standard than which particular standard is chosen."); Stanley M. Besen and Joseph Farrell, "Choosing How to Compete: Strategies and Tactics in Standardization," 8 *J. Econ. Persp.* 117, 118 (1994) (noting that in standard-setting "victory need not

7

go to the better or cheaper product: an inferior product may be able to defeat a superior one").

SSOs do not necessarily canvass the technical literature, nor do they pick and choose among patents for ideas to incorporate into their standards.  Rather, technology is included in a standard through a collaborative process that draws heavily on prior standards.  That process may or may not involve evaluation of or selection among competing technical approaches.  *See* Joseph Farrell *et al.*, "Standard setting, patents, and hold-up," 74 *Antitrust L. J.* 603, 617 (2007) (SSO processes are "slow to move, rely on consensus, and typically . . . work on more advanced standards that build upon the prior standard"); Besen and Farrell, 8 *J. Econ. Persp.* at 118–19 ("Because buyers want compatibility with the installed base, better products that arrive later may be unable to displace poorer, but earlier standards.").

The SSO process rarely involves any inquiry as to whether an approach under consideration might arguably be covered by any patents.  *See* Lichtman, 47 *Hous. L. Rev.* at 1028 ("[S]tandard-setting is a process run by engineers, not lawyers."); Scott K. Peterson, "Consideration of Patents during the Setting of Standards," Remarks

for Nov. 6, 2002 FTC and DOJ Roundtable on SSOs (online at
http://www.ftc.gov/opp/intellect/021106peterson.pdf) at 8
("[C]onsideration of patent issues requires expertise that is not part of
the background of those who are typically most directly involved in the
standards setting activities.").  Standardization involves consensus,
compromises, and practical concessions that preclude any assumption
that a particular aspect of a standard reflects "the best available
solution" for the subject being addressed.  *See* Mark A. Lemley and Carl
Shapiro, "Patent Holdup and Royalty Stacking," 85 *Texas L. Rev.* 1991,
2016 (2007) (standardization in SSOs involves "consensus and
compromise"); Peterson, *supra*, at 3 (discussing "the likelihood that a
patented solution will offer significant advantage over alternatives,"
and noting that "[o]ften a protocol can be implemented in many ways
that have similar performance" for the standard under consideration).

Pursuant to SSO policies, participants typically are required to
make a RAND licensing commitment—an agreement to license their
standard-essential patents on reasonable and non-discriminatory terms
to anyone seeking to implement the standard.  *See* Daniel G. Swanson
and William J. Baumol, "Reasonable and Nondiscriminatory (RAND)

9

Royalties, Standards Selection, and Control of Market Power," 73 *Antitrust L. J.* 1, 5 (2005). Blanket declarations to license *any* such patents are typical, although patent owners may instead identify, or "declare," particular patents that *they* believe must be used in order to practice the proposed standard. *See* Farrell *et al.,* 74 *Antitrust L. J.* at 624–25. If a patent owner refuses to make a RAND licensing commitment, the SSOs may modify or abandon the proposed standard to avoid conferring exclusionary power on the patent owner.

By making a RAND commitment, a patent owner potentially can secure wide adoption of its technology. At the same time, if the patentee's assertions of essentiality are correct, the patentee effectively binds those who wish to implement the industry standard to use, and thereby infringe, its standard-essential patents.

As a result, if a patent is truly essential to a standard, its value becomes entangled in the value of the overall standard to implementers. But the value of the standard typically has no direct relationship with the value of the innovation captured in any particular patent's claims. *See* Lemley and Shapiro, 85 *Texas L. Rev.* at 2009 ("The technology does not have any greater inherent value when used as part of an industry

standard, but the patent holder can demand [multiple] times as much money once the industry has made irreversible investments."). Even if essential, a patent often pertains to a minuscule and insignificant aspect of the standard. But regardless of the patent's intrinsic value or its value to the standard, an implementer *must* infringe the essential patent if it wishes to implement the standard.

A patentee's attempt to capture the value conferred by standardization itself is the precise "patent hold up" that RAND licensing commitments are designed to prevent:

> An [SSO] may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. When this occurs, the patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants.

*Broadcom*, 501 F.3d at 310; *see also id.* at 312 (explaining that standards-adopters "rely on structural protections . . . to facilitate competition and constrain the exercise of monopoly power"). *See also Research in Motion, Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 791, 794

11

(N.D. Tex. 2008) (denying motion to dismiss antitrust complaint alleging that "Motorola's possession of an essential patent has turned Motorola into a gatekeeper" giving it the power to license "only at exorbitant rates"). Any attempt to fashion remedies for infringement of a standard-essential patent therefore must reflect the characteristics of the standard-setting process.

## II. The Court Should Not Endorse the District Court's Approach to the Determination of a RAND Royalty for Standard-Essential Patents.

### A. Ericsson Waived Any Entitlement To Compensation Beyond a RAND Royalty.

Ericsson made a contractual commitment to grant licenses on RAND terms to all implementers of the 802.11 standard, which includes all of the defendants here. In so doing, Ericsson surrendered statutory rights in order to gain a foothold in the standard. Absent its RAND licensing commitment, Ericsson could argue that practicing the standard had harmed it, and seek an injunction and damages pursuant to 35 U.S.C. § 284. But when it made its contractual RAND licensing commitment, Ericsson promised that it would exclude no one, and would make licenses available on RAND terms to every standard implementer, regardless of any competitive detriment to itself.

12

The right to exclude others from making, using, or selling an invention can be waived by contract. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 703 (Fed. Cir. 1992) ("This right to exclude may be waived in whole or in part. The conditions of such waiver are subject to patent, contract, antitrust, and any other applicable law, as well as equitable considerations such as are reflected in the law of patent misuse."). *See also Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1342 (Fed. Cir. 2007) ("[I]mplicit in the right to exclude is the right to waive that right."). A patent license is one example of such a waiver. *Morrow*, 499 F.3d at 1342. A RAND licensing commitment is another example—Ericsson waived its right to pick and choose who could use its patented technology. Moreover, Ericsson waived any argument that any such use constituted harm to Ericsson in excess of a RAND royalty.[2]

---

[2] For example, if Ericsson had lost sales of 802.11-compliant products to one of the defendants, even leaving aside any causal connection between infringement of standard-essential patents and those lost sales, Ericsson's RAND licensing commitments—in which Ericsson promised it would grant reasonable, *nondiscriminatory* licenses to even its closest competitors—waived any entitlement to recover lost profits as damages.

13

In seeking damages in excess of a RAND royalty through infringement litigation, Ericsson harms the SSO process and the standard. The RAND licensing commitment is intended to prevent that hold-up problem—to prevent standard-essential patent holders from using litigation to extract payments based on the value of practicing the standard itself rather than on the value of their particular contribution to the standard.

The district court's approach leaves all standard implementers vulnerable to hold up. The court failed to even recognize, let alone fulfill, its obligation to interpret Ericsson's contractual RAND licensing commitment for the jury as a matter of law. Instead, the court left the jury with next to no guidance concerning the limitations that the RAND commitment imposed on any damages recovery by Ericsson.

**B.    The District Court's Approach Undermines the Antitrust Safeguards In the Standard Setting Process.**

The antitrust concerns laid out in *Allied Tube* and *Broadcom* demand "meaningful safeguards" against abuses of the standard, including licensing policies that require RAND licensing commitments. *See Broadcom*, 501 F.3d at 309–10; *Allied Tube*, 486 U.S. at 501. But, the district court's approach fails to provide a "meaningful safeguard"

14

against abuse. Instead, it sidelined Ericsson's RAND licensing commitment as a sixteenth factor for consideration in determining a damages award. That allowed the jury to give Ericsson's contractual RAND licensing commitment whatever weight it saw fit. Ericsson's RAND licensing commitment should be enforced as a limitation on damages as a matter of contract law, but also enforced as a matter of the antitrust law that undergirds and constrains the standards system. If RAND licensing commitments imposed by the SSOs are effectively ignored when standard-essential patent holders enforce their patents in court, abuses of the market power created by standard-setting will overwhelm any procompetitive benefits. *See Allied Tube*, 486 U.S. at 500–01.

## C. The District Court's Approach Was Legally Insufficient In Light Of Ericsson's RAND Licensing Commitments.

As set out above, Ericsson's RAND licensing commitment limited it to no more than a contractually-determined RAND royalty. Ericsson waived any right to seek greater damages based on any alleged harm. However, even if viewed as a patent damages inquiry informed by the

15

presence of a contract (as opposed to an exclusively contractual inquiry), the district court's approach was legally inadequate.

This Court's precedents require damages theories "based on sound economic and factual predicates," *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012), exclude those "out of line with economic reality," *Whitserve LLC v. Computer Packages, Inc.*, 694 F.3d 10, 31 (Fed. Cir. 2012), and have long endorsed consideration of available alternatives, regardless of whether the alternatives are exact substitutes for the allegedly infringing technology. *See Synqor, Inc. v. Artesyn Tech., Inc.*, 709 F.3d 1365, 1381 (Fed. Cir. 2013) ("[T]he analysis must consider the impact of such alternative technologies on the market as a whole."); *Grain Processing Corp. v. American Maize–Prods. Co.*, 185 F.3d 1341, 1347 (Fed. Cir. 1999); *Zygo Corp. v. Wyko Corp.*, 79 F.3d 1563, 1571–72 (Fed. Cir. 1996); *Hanson v. Alpine Valley Ski Area, Inc.*, 718 F.2d 1075, 1081–82 (Fed. Cir. 1983).

"Sound economic and factual predicates" must be used to "discern the value of the patented technology to the parties in the marketplace." *LaserDynamics*, 694 F.3d at 67, 76. In a case involving a standard-essential patent, any royalty should *not* reflect the value conferred by

16

the inclusion of the patented technology in a standard, or every standard-essential patent holder could use the power conferred by the standard to extract that value.  More bluntly, a "reasonable royalty" is not the value of an agreement among competitors that would, but for the contractual RAND licensing commitment, constitute a blatant antitrust violation.  Recognizing these principles, one district court observed, "once a patent becomes essential to a standard, the patentee's bargaining power surges because a prospective licensee has no alternative to licensing the patent; he is at the patentee's mercy." *Apple, Inc. v. Motorola, Inc.*, 869 F. Supp. 2d 901, 923 (N.D. Ill. 2012). *See also Broadcom*, 501 F.3d at 310, 312.  "The *claimed invention's* footprint in the market place" relevant to a damages determination, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010), is not the *standard's* "footprint in the market place."  The district court's approach to damages in this case provided the jury with no such guidance, leaving it free to improperly award damages based on the value of the standard.

## CONCLUSION

This Court should not endorse the district court's improper treatment of Ericsson's RAND licensing commitment.

DATED:     Redmond, WA                    MICROSOFT CORPORATION
           December 23, 2013.

                                          By:  /s/ T. Andrew Culbert
                                               T. Andrew Culbert

                                               T. Andrew Culbert
                                               David E. Killough
                                               MICROSOFT CORPORATION
                                               1 Microsoft Way
                                               Redmond, WA 98052
                                               (425) 882-8080

19

# CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B).  The brief contains 3,121 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Word 2007 in 14-point Century Schoolbook font.

/s/ T. Andrew Culbert
_____

T. Andrew Culbert
Attorney for *Amicus Curiae*
Microsoft Corporation

December 23, 2013

# CERTIFICATE OF SERVICE

I hereby certify that on the 23rd day of December, 2013, I filed the foregoing Brief of *Amicus Curiae* Microsoft Corporation using the Court's CM/ECF system, which will provide notification to all registered users.

/s/ T. Andrew Culbert

T. Andrew Culbert
Attorney for *Amicus Curiae*
Microsoft Corporation