**No. 2013-1625, 2013-1631, 2013-1632, 2013-1633**

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

————————

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC., ACER AMERICA CORPORATION and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC. and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL INC.,

*Defendant*.

————————

**On Appeal from the United States District Court for the Eastern District of Texas, Case No. 10-CV-0473, Chief Judge Leonard Davis**

————————

**BRIEF OF *AMICUS CURIAE* QUALCOMM INCORPORATED IN SUPPORT OF AFFIRMANCE ON RAND ISSUES**

————————

(*Counsel Listed on Inside Cover*)

Roger G. Brooks
CRAVATH, SWAINE & MOORE LLP
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rgbrooks@cravath.com

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

# CERTIFICATE OF INTEREST

Pursuant to Rules 26.1 and 29(c)(1) of the Federal Rules of Appellate Procedure and Rule 47.4(a) of this Court's Rules, counsel for *amicus curiae* Qualcomm Incorporated certifies the following:

1.      The full name of every party or *amicus* represented by me is:

   Qualcomm Incorporated

2.      The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   N/A

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or *amicus curiae* represented by me are:

   None

4.      The names of all law firms and the partners or associates that appeared for the party or *amicus* now represented by me in the trial court or agency or are expected to appear in this Court are:

   Roger G. Brooks, Cravath, Swaine & Moore LLP


Dated:  February 27, 2014

                                        by  */s/ Roger G. Brooks*
                                            **Roger G. Brooks**


- i -

## TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST ................................................................ i

TABLE OF AUTHORITIES .................................................................. iii

INTEREST OF *AMICUS CURIAE* .........................................................1

SUMMARY OF ARGUMENT ..................................................................6

ARGUMENT........................................................................................7

I. BECAUSE RAND IS A CONTRACT, ITS MEANING SHOULD BE DETERMINED BY REFERENCE TO THE ACTUAL LANGUAGE OF THE RAND COMMITMENT AND THE INTENT OF THE PARTIES. ..........................................7

II. THE COURT SHOULD REJECT PROPOSED RULES DESIGNED TO SUPPRESS SEP VALUATION AS INCONSISTENT WITH THE RAND CONTRACT. ......................11

    A. A Rule That All Licenses Negotiated After Adoption of a Standard Should Be Presumed To Be "Unreasonable" Is Inconsistent with the RAND Contract and Is Inappropriate..........................................................12

    B. A Rule That a Reasonable Royalty Analysis "Must" Separately Consider "the Total Number of SEPs for that Standard" Is Inconsistent with the RAND Contract and Is Inappropriate.....................................................20

    C. A Rule That "Non Discriminatory" Means the Analysis "Must Look at Average Prices, Costs and Operating Profit Across All Industry Participants" Across All Relevant Times Is Inconsistent with the RAND Contract and Is Inappropriate. ...........................................23

    D. A Rule That Requires Determination of Royalties by Reference to the "Smallest Saleable Unit" Is Inconsistent with the RAND Contract and Is Inappropriate. ........................26

III. RAND COMMITMENTS DO NOT REQUIRE THE LICENSING OF COMPONENTS.................................................27

CONCLUSION .................................................................................32

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061 (W.D. Wis. 2012) ...................................................................................8

*Blayney (t/a Aardvark Jewellery) v. Clogeau St. David's Gold Mines Ltd.* [2002] EWCA Civ. 1007 (U.K.) ....................................................11

*Bose Corp. v. JBL, Inc.*, 274 F.3d 1354 (Fed. Cir. 2001)............................27

Cour de cassation [Cass.] [supreme court for judicial matters] com., Feb. 19, 1991, Annales de la Propriété Industrielle 1991, 89-12333 (Fr.) ....................................................................................10

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)...........................................................................10

*Goodyear Tire & Rubber Co. v. Dep't of Energy*, 118 F.3d 1531 (Fed. Cir. 1997) .....................................................................14

*Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1365 (Fed. Cir. 1999).................................................................................15

*LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51 (Fed. Cir. 2012)................................................................................16, 19

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009) .........27

*Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993 (W.D. Wash. 2012) ....................................................................................8

*Mondis Tech., Ltd. v. LG Elecs., Inc.*, Nos. 2:07-CV-565-TJW-CE, 2:08-CV-478-TJW, 2011 WL 2417367 (E.D. Tex. June 14, 2011) ........27

*Monsanto Co. v. McFarling*, 488 F.3d 973 (Fed. Cir. 2007) .................16, 19

*Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221 (Fed. Cir. 2011)...........15

*Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788 (N.D. Tex. 2008)...........................................................................8

*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010) ................ 19

*Sanofi-Synthelabo v. Apotex, Inc.*, 470 F.3d 1368 (Fed. Cir. 2006) ............. 10

**Statutes & Rules**

Fed. Cir. R. 29(c) ........................................................................................ 1

Fed. R. App. P. 29(a) .................................................................................. 1

Fed. R. App. P. 29(c)(5) .............................................................................. 1

**Other Authorities**

USDOJ & USPTO Policy Statement on Remedies for Standards-
    Essential Patents Subject to Voluntary F/RAND Commitments,
    dated Jan. 8, 2013, *available at*
    http://www.uspto.gov/about/offices/ogc/Final_DOJ-
    PTO_Policy_Statement_on_FRAND_SEPs_1-8-13.pdf ........................ 31

ETSI IPR Policy, dated Mar. 20, 2013, *available at*
    http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf .............. 9, 10, 31

IEEE-SA Standards Board Bylaws, last approved Dec. 2013,
    *available at*
    http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf ..... 10, 28

## INTEREST OF *AMICUS CURIAE*

Qualcomm Incorporated ("Qualcomm") submits this *amicus curiae* brief because Qualcomm has a critical interest in the proper interpretation and application of contractual commitments to license standard-essential patents ("SEPs") on reasonable and non-discriminatory ("RAND") terms, and an extensive familiarity with standard-setting organizations ("SSOs"), SEP licensing, and RAND commitments.[1]

Qualcomm stands in an unusual position with respect to this litigation and appeal. As the supplier of chips used in some of the accused products, Qualcomm indirectly participated in the defense, a Qualcomm witness appeared at trial in Appellants' case-in-chief, and Qualcomm owes certain indemnity obligations to some Appellants. Thus, Qualcomm has an indirect interest in a finding of no liability and a financial interest in minimizing any damages awarded. Qualcomm agrees unequivocally with Appellants' non-infringement and invalidity positions, and supports Appellants with respect to those issues. Qualcomm does not address those topics in this brief and

---

[1] Plaintiffs-Appellees have consented to the filing of this brief. Appellants have not. Accordingly, Qualcomm has filed a motion requesting leave to file this brief. *See* Fed. R. App. P. 29(a); Fed. Cir. R. 29(c). No party's counsel authored this brief in whole or in part. No party, party's counsel, or other person (other than Qualcomm) contributed money that was intended to fund preparing or submitting this brief. *See* Fed. R. App. P. 29(c)(5).

does not advocate any position concerning the jury's specific award of damages. However, Qualcomm has always been clear about Qualcomm's commitment to its independent views on RAND. Whatever decision this Court reaches with respect to RAND may have profound effects on related legal and policy issues, and may support or undermine incentives to innovate and contribute new technologies in industries that depend on standards. Qualcomm must address this set of issues, even if that means that its views on RAND may align in part with those of Plaintiffs-Appellees Ericsson, Inc. and Telefonaktiebolaget LM Ericsson (collectively, "Ericsson").

Qualcomm is a leading innovator in the cellular communications industry, an industry that has grown and prospered perhaps more than any other while relying on the voluntary RAND commitments made by innovators to SSOs. Qualcomm pioneered the use of code division multiple access ("CDMA") technology for the transmission of cellular communications, the technology that came to be the basis of all so-called "3G" cellular standards. Through RAND licensing, Qualcomm has made its countless 3G innovations widely available, and in return receives royalties and other consideration from its licensees. Qualcomm has reinvested billions of dollars of its licensing revenues to research and invent newer technologies. As a result, Qualcomm has also been one of the principal

developers of the "4G" technology that forms the basis for the long term evolution ("LTE") cellular standards now being deployed.

As the pioneer of CDMA and an extensive contributor to LTE, Qualcomm has developed an industry-leading portfolio of technologies that are protected by both SEPs and non-essential patents, consisting of approximately 36,000 patents worldwide, with some 50,000 patent applications pending. This portfolio represents decades of research and development, and Qualcomm invests roughly 20 percent of its annual revenues in R&D (amounting last year to approximately $5 billion in R&D).

Throughout these endeavors, Qualcomm was a risk taker. Qualcomm risked its future on the superiority of CDMA as a fundamental technology for cellular at a time when industry experts scoffed at the idea. While investing billions of dollars in researching and developing technology that contributed to the success of 2G, 3G, and 4G cellular systems worldwide, Qualcomm contributed its intellectual property ("IP") to standards through RAND commitments, and relied heavily on the stability of the mutual promises associated with a RAND contract. Relying on the meaning of RAND as a voluntary, contractual obligation, Qualcomm has licensed its portfolio to essentially all major handset manufacturers worldwide; it now has more than 250 3G licensees and more than 90 4G licensees.

Licensing fees and royalties account for approximately 30 percent of Qualcomm's revenues. If those revenues did not exist or were substantially lower, Qualcomm could not have made, nor continue to make, the risky investments in R&D at anything like the levels needed to develop next-generation cellular technologies.

However, Qualcomm is not only a research and licensing company. It is also the world's leading supplier of the wireless communications ("baseband") chips that are the heart of a cellphone. As a very large technology product company, Qualcomm is also a licensee, requiring licenses from others in the industry. Qualcomm's dual position as a major licensor and major licensee gives it an unusual and balanced view into the operation of RAND commitments and licensing within standards-dependent industries.

In addition, Qualcomm has been an extremely active participant in numerous SSOs for many years, including the Institute of Electrical and Electronics Engineers ("IEEE"), the European Telecommunications Standards Institute ("ETSI"), and others. Qualcomm has actively participated in deliberation about SSO policies regarding RAND licensing commitments and the licensing of SEPs. Qualcomm has also made hundreds of voluntary commitments to various SSOs to subject its patented

inventions to the RAND obligations specified by those SSOs—including SEPs covering immensely valuable inventions that make possible faster wireless data transfer, greater network capacity, lower power consumption in mobile devices, better cellular coverage, and more.

Qualcomm—and the cellular industry worldwide—has experienced extraordinary growth and success over the last two decades under existing SSO policies and the balanced incentives created by existing RAND licensing practices. In that time, the cellular industry has transformed from serving a small elite to now serving over seven billion subscriptions worldwide, with data speeds improved 100-fold since 2006, and devices that have become both far more powerful and less expensive. Critical to this success, and as a result of existing RAND licensing policies, access to the industry has been open to all; competition among device makers is fierce and new entrants frequent.

As both a driver and a beneficiary of this extraordinary story of investment, innovation, and rapid uptake of technology by consumers, Qualcomm has an acute interest in the accurate understanding and enforcement of RAND licensing obligations—particularly with respect to ensuring a balance between innovators and implementers. Despite the success of the standardized cellular industry at all levels of the value chain,

SEPs and RAND licensing have, in recent years, become subjects of intense controversy. Partisan advocates mix alarmist warnings with favored policy prescriptions having little to do with the terms of any SSO policy or RAND commitment. The chorus has largely been focused on lowering returns to innovators while decreasing costs for implementers. But losing sight of balance is unwise and inconsistent with RAND contracting. Qualcomm is concerned that courts carefully consider a balanced view of the issues because radical changes to a system that has—in the cellular industry at least—succeeded beyond anyone's imagination are not only unsupportable as a matter of contract law, but would cause significant harm and stifle incentives for future innovation.

Accordingly, Qualcomm submits this brief to provide important context concerning the operation of voluntary RAND licensing in an important standardized industry, and to address some of the arguments made by various *amici*.

## SUMMARY OF ARGUMENT

A RAND commitment is a voluntary, contractual obligation by an SEP holder to an SSO. As a matter of contract, under the terms of the policies of that SSO, the SEP holder agrees to make its SEPs available to industry participants on reasonable and non-discriminatory terms. Courts

- 6 -

called upon to interpret these RAND agreements should, as the District Court below did, recognize that the meaning of RAND in any given case will be drawn from the terms and intent of the relevant RAND agreement with the relevant SSO, the background patent law principles against which the RAND agreement was made, and the specific facts in evidence relevant to that agreement. *Amicus* Qualcomm respectfully suggests that mechanistic rules that are designed to ratchet down the value of an SEP regardless of its merits, and that are divorced from the terms and intent of the RAND agreement and from the record evidence, are not appropriate in RAND adjudication.

## ARGUMENT

**I.   BECAUSE RAND IS A CONTRACT, ITS MEANING SHOULD BE DETERMINED BY REFERENCE TO THE ACTUAL LANGUAGE OF THE RAND COMMITMENT AND THE INTENT OF THE PARTIES.**

Several *amici* rely on arguments arising from their *policy* views to criticize the District Court's handling of RAND issues. (*See, e.g.*, Br. of *Amici Curiae* Cisco Systems, Inc. *et al.*, dated Dec. 23, 2013 ("Cisco Br."), 13-20; Br. of Microsoft Corp. as *Amicus Curiae*, dated Dec. 23, 2013 ("Microsoft Br."), 14-17; Corrected Br. for *Amicus Curiae* Am. Antitrust Inst., dated Dec. 20, 2013 ("AAI Br."), 4-11.) But arguments detached from the fundamentally contractual nature of a RAND commitment are flawed.

- 7 -

There is no dispute that the RAND declarations made by SEP holders (such as Ericsson) to SSOs (such as IEEE) are *contracts*, which should be interpreted according to ordinary principles of contract law. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 999 (W.D. Wash. 2012); *Apple, Inc. v. Motorola Mobility, Inc.*, 886 F. Supp. 2d 1061, 1083 (W.D. Wis. 2012); *Research in Motion Ltd. v. Motorola, Inc.*, 644 F. Supp. 2d 788, 797 (N.D. Tex. 2008). As the District Court correctly recognized, a RAND declaration is a contractual "commitment from a patent holder". (Dist. Ct. Mem. Op. & Order, dated Aug. 6, 2013 [Dist. Ct. Dkt. #615] ("Op."), 45-46.) Many billions of dollars have been invested in R&D, and many thousands of patented technologies have been contributed to standards, in reliance on the *contractual* terms of RAND commitments, not implementer-favored policies. No antitrust claims, defenses, or issues were raised or tried in this case. Attempts by *amici* to inject supposed "competition" concerns into the analysis[2] are misguided.

---

[2] *See, e.g.*, AAI Br. 4 ("[S]tandard setting is subject to substantial dangers of anticompetitive abuse."); Cisco Br. 17 ("When holders of SEPs demand supra-competitive royalty rates based not on the actual value of their patented invention but instead on the hold-up value the invention gains once incorporated into a standard, they undermine the procompetitive benefits of standard setting."); Microsoft Br. 15 ("If RAND licensing commitments imposed by the SSOs are effectively ignored when standard-essential patent holders enforce their patents in court, abuses of the market power created by standard-setting will overwhelm any procompetitive benefits.").

Each RAND commitment is made in the context of the particular intellectual property rights ("IPR") policies of the particular SSO, and must be interpreted in that context. How a court should interpret a contract is well established: it should look to the express terms of the agreement and, where necessary, to other indicia of the intent of the parties. Here, the District Court correctly looked to the particular terms of IEEE's policies to determine the scope of Ericsson's obligations. (*See, e.g.*, Op. 46 ("There is no IEEE rule preventing restricted RAND commitments . . . .").)

The text of RAND commitments themselves is often brief, but the IPR policies of many internationally important SSOs—including IEEE, as well as the most influential SSO in the cellular industry, ETSI—explain the core "intent" of those IPR policies and of RAND contracts agreed to under those policies. While the terms and meaning of a RAND commitment are fact-specific questions and may vary from SSO to SSO, it is worth noting the stated goals of the policies of these leading SSOs by way of example.

*First*, major SSOs' IPR policies expressly state an objective that "IPR holders . . . should be *adequately and fairly rewarded* for the use of their IPRs in the implementation of STANDARDS".[3] Providing adequate returns

---

[3] *E.g.*, ETSI IPR Policy, dated Mar. 20, 2013, § 3.2 (emphasis added), *available at* http://www.etsi.org/images/files/IPR/etsi-ipr-policy.pdf.

to innovators is critical to motivating R&D investment and innovation.
Mainstream patent law outside the context of RAND shares this important
objective, as this Court has repeatedly recognized. *See, e.g.*, *Sanofi-
Synthelabo v. Apotex, Inc.*, 470 F.3d 1368, 1383 (Fed. Cir. 2006) ("[T]he
encouragement of investment-based risk is the fundamental purpose of the
patent grant . . . ." (internal quotation marks omitted)).

*Second*, the IPR policies of both IEEE and ETSI state a goal that
licenses to SEPs be "available" to implementers on "reasonable" terms (or in
the case of ETSI, "fair" and "reasonable" terms), including with "reasonable
rates".[4] Significantly, SSO policies invoking a "reasonableness" standard
for license terms were adopted against the background of an enormous and
longstanding body of law which defines how to determine "reasonable"
royalties—including *Georgia-Pacific* in the U.S. and similar law in other
jurisdictions.[5] Nowhere in the record or in the briefs of *amici* is there

---

[4] IEEE-SA Standards Board Bylaws, last approved Dec. 2013, § 6.2 (hereinafter, "IEEE IPR Policy"), *available at* http://standards.ieee.org/develop/policies/bylaws/sb_bylaws.pdf; *see also* ETSI IPR Policy §§ 3.3 ("ETSI shall take reasonable measures to ensure, as far as possible, that its activities . . . enable STANDARDS . . . to be *available* to potential users in accordance with the general principles of standardization." (emphasis added)), 6.1.

[5] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see, e.g.*, Cour de cassation [Cass.] [supreme court for judicial matters] com., Feb. 19, 1991, Annales de la Propriété Industrielle

evidence or fact-based argument that IEEE or any SSO (implicitly and without saying so) meant "some other type of 'reasonable'". The only proper inference is to the contrary. And indeed, thousands of sophisticated companies in many industries have had enormous success in reaching countless agreements on "reasonable" royalties without feeling the need to define or appeal to any "other type of 'reasonable'".

## II. THE COURT SHOULD REJECT PROPOSED RULES DESIGNED TO SUPPRESS SEP VALUATION AS INCONSISTENT WITH THE RAND CONTRACT.

The District Court gave an instruction that required the jury to give full effect to Ericsson's RAND commitment:

> "[B]ecause Ericsson has agreed that it is under an obligation to license the patents-in-suit on Reasonable and Non-Discriminatory ('RAND') terms, you must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations."[6]

This instruction left ample room for the litigants to present any admissible evidence that might be relevant to Ericsson's RAND contract, or to the jury's determination of "reasonableness". The question of whether

---

1991, 89-12333 (Fr.); *Blayney (t/a Aardvark Jewellery) v. Clogeau St. David's Gold Mines Ltd.* [2002] EWCA Civ. 1007 (U.K.).

[6] Final Jury Instructions, filed June 12, 2013 [Dist. Ct. Dkt. #504] ("Jury Instructions"), § 8.

Ericsson sought damages beyond this contractually agreed limitation was appropriately set up to be fully tried.

While *amici* give a nod to the contractual nature of a RAND obligation (*see* Microsoft Br. 6; Cisco Br. 3; AAI Br. 14 n.9), the rules they urge on this Court, and ask this Court to impose on juries, have no basis in that contract. *Amici* ignore the specific language of Ericsson's letters of assurance and the IEEE policies that form the basis for Ericsson's contractual RAND commitment. Instead, speculative and one-sided theories are advanced to impose a gauntlet of rules on a RAND royalty analysis, without reference to the contract or the intent of the parties at the time. Each such rule is a one-way ratchet that would necessarily work to devalue SEPs across the board, without regard to the actual value provided by the specific SEPs in specific circumstances. By contrast, the District Court properly looked to both the language and the intent of Ericsson's RAND commitment to determine the meaning of the RAND commitment, and appropriately instructed the jury to hold Ericsson to that commitment. (*See* Op. 45-46.)

**A.    A Rule That All Licenses Negotiated After Adoption of a Standard Should Be Presumed To Be "Unreasonable" Is Inconsistent with the RAND Contract and Is Inappropriate.**

*Amici* Cisco *et al.* assert that "a Court looking at previously-negotiated license terms in determining the value of an SEP generally should

consider only licenses executed before the patent was adopted into the standard; post-adoption licenses generally should be excluded, unless the patentee proves that they clearly evidence a RAND amount, and do not include any hold-up value". (Cisco Br. 19.)

It is worth considering what Cisco is really saying. Standards, and the use of RAND commitments to ensure the availability of licenses necessary to practice standards, are far from new; both have existed for many decades. Hundreds of SSOs and thousands of SSO participants rely on RAND licensing. Innumerable licenses have been negotiated after the adoption of a standard, and in light of a RAND commitment. Cisco is asking this Court to *presume* that all post-adoption licenses—negotiated in the context of a binding contractual commitment to provide "reasonable" terms—are in fact NOT "reasonable". Cisco is asking the Court to *presume* that whole industries have systematically "gotten it wrong" across decades, with licensees *virtually always* accepting "unreasonable" terms instead of insisting on "reasonable" terms consistent with RAND agreements, and with SSOs made up of both innovators and implementers (and companies that are

both) nevertheless continuing to adopt, perpetuate, and rely on RAND licensing policies. This is just topsy-turvy.[7]

There might be facts on which certain post-standardization licenses would not provide an appropriate yardstick of "reasonableness" by which to measure damages against a particular defendant. Indeed, some such issues are raised by the defense in this case. But those would be *facts*; every litigant would love to have a presumption to spare it the burden of proving its contentions, but for good reason presumptions are not lightly created. *See, e.g.*, *Goodyear Tire & Rubber Co. v. Dep't of Energy*, 118 F.3d 1531, 1539-40 (Fed. Cir. 1997). Cisco has not remotely made the case for a universal evidentiary presumption that all SSO-related licensees have been systematically duped for decades when entering RAND licenses.

To adopt such a presumption would also violate basic principles of reliance and fairness. As noted above, countless RAND commitments have been given by patentees in reliance on the terms of specific SSO policies. No SSO policy of which we are aware declares that post-adoption licenses negotiated under its "reasonableness" obligation shall be presumed to be

---

[7] Under its own proposed exclusionary rule, Cisco—a large, sophisticated company—would have this Court presume that all its post-standardization SEP licenses, whether as a licensor or licensee, violate the RAND obligation.

*un*reasonable.[8]  On the contrary, negotiating parties routinely look to licenses of the same portfolio or similar portfolios to set reasonable license terms—as both the "non-discriminatory" component of a RAND commitment and bodies of existing law such as *Georgia-Pacific* suggest they should.[9]  For this Court now to declare that "history is bunk"—that post-adoption licenses shall be presumptively *inadmissible* as evidence of reasonable terms—would be to radically rewrite the RAND contract and radically disrupt industry licensing practice.  Courts are not in the business of rewriting contracts to satisfy the self-interest or policy goals of one side.  *See, e.g.*, *Intergraph Corp. v. Intel Corp.*, 195 F.3d 1346, 1365 (Fed. Cir. 1999).

As a matter of fact, licenses to the patents in any given action—including licenses negotiated under the shelter of a RAND obligation after

---

[8] IEEE, writing as *amicus*, does not join Cisco in arguing that licenses negotiated under RAND obligations are so widely tainted by "hold-up" that a presumption of *un*reasonableness should be adopted against existing licenses.  IEEE merely recites the theoretical possibility that negotiation of terms following adoption of a standard "*can* lead to higher royalty payments", while correctly observing that RAND commitments themselves "protect against *potential* hold-up".  (Br. of *Amicus Curiae* IEEE, Inc., dated Dec. 20, 2013 ("IEEE Br."), 16-17 (emphases added).)

[9] *See Powell v. Home Depot U.S.A., Inc.*, 663 F.3d 1221, 1239 n.3 (Fed. Cir. 2011) (noting that the first and second *Georgia-Pacific* factors are "royalties the patentee has received for licensing the patent to others" and "rates paid by the licensee for the use of comparable patents").

adoption of a standard—are likely to be the *best* evidence of the true and reasonable value of the patents in many cases, for reasons the District Court explained.  (*See* Op. 29-30.)  *Georgia-Pacific* and this Court's body of law list many factors potentially relevant to determining a reasonable royalty, but give primacy to evidence of prior licenses covering the same patents.[10] Consistent with this principle, the District Court emphasized the record evidence that "Ericsson is a sophisticated licensing entity, with over 100 outstanding patent licenses", including "at least six previous licenses involving the asserted patents" (Op. 48), and concluded:  (a) that there was substantial evidence of multiple, comparable, royalty-bearing licenses to the very patents in suit that had been negotiated by Ericsson with "sophisticated" licensees; and (b) that "Ericsson did not violate its RAND obligations" by seeking damages measured by the royalties it had established in its day-to-day licensing business (Op. 26-51).

---

[10] *See, e.g.*, *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79-80 (Fed. Cir. 2012) ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."); *Monsanto Co. v. McFarling*, 488 F.3d 973, 978-79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree.").

*Amici* argue that these prior licenses are just more evidence of "hold up". (*See, e.g.*, Cisco Br. 19.) But, on the contrary, because of basic facts that the District Court identified, existing licenses negotiated by a licensee while it was protected by a RAND commitment *inherently* take into account all commercially appropriate considerations, including the possibility of "hold up" where that has any real relevance to a particular license.

*First*, the District Court correctly looked to the record evidence to find that "Ericsson's RAND obligations are public knowledge" and that "Ericsson's letters of assurance to the IEEE are publicly available, so any potential licensee would be able to determine whether Ericsson had RAND obligations". (Op. 35.) Indeed, RAND commitments are routinely publicly available, and are well known within relevant industries.

*Second*, again based on evidence rather than speculation, the District Court found that "The previous licensees were sophisticated parties, making it likely they would have been aware of Ericsson's RAND obligations during the negotiations", and that "there was substantial evidence that the prior licenses were negotiated within the framework of Ericsson's RAND obligations".[11] (Op. 35.)

---

[11] Indeed, the industry's lively awareness of RAND obligations is evinced by the fact that no fewer than ten different SEP implementers in Ericsson's field, as well as the SSO to whom Ericsson made its RAND

- 17 -

*Third* and importantly, the District Court pointed out that Ericsson's

sophisticated prior licensees, while they were negotiating, knew they had the

option of going to court to enforce their right to RAND terms, rather than

signing on to terms they did not believe to be RAND.  (*See* Op. 50 ("If two

parties negotiating a RAND license are unable to agree on the financial

terms of an agreement, it is entirely appropriate to resolve their dispute in

court.").)[12]  In other words, when negotiating under the shelter of a judicially

enforceable RAND commitment, sophisticated licensees *cannot be held up*

*or forced to accept non-RAND terms*.

For this reason, when sophisticated parties sign instead of litigating,

this reflects their judgment as to what is economically "reasonable" within

the meaning of the relevant contractual RAND commitment, *taking into*

*account anything and everything that a rational industry participant would*

*want to take into account*.  Applying this insight to the question of

---

commitment and an antitrust interest group, have filed *amicus* briefs on
RAND issues for this Court's consideration.  The District Court also cited
Ericsson's own internal processes focused on compliance with RAND
obligations in its discussion of lively industry awareness of the existence of
RAND commitments.  (*See* Op. 35.)

[12] While it is true that litigation is costly and uncertain, this cost and risk
at least equally affect the licensor, who may face resulting incentives to
agree to *less* than a reasonable royalty rather than face the cost and risk of
litigation, and may desire not to await the resolution of litigation to begin
receiving license fees.

attributable value or the demand driven by the invention, the District Court was correct to conclude that each prior license necessarily "represents the market's valuation of the . . . contributions of Ericsson's patents" and *only* "the portion of the . . . standard the third party licensees believed was covered by Ericsson's portfolio". (Op. 29-30 (citing *Monsanto*, 488 F.3d at 978-79; *LaserDynamics*, 694 F.3d at 67; *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)).)

The insight is broadly applicable. Sophisticated licensees obviously have ample interest in ensuring that the rate they agree to (i) does not represent "hold up" (under any meaningful definition of the term); (ii) does not create (or realistically threaten) a "royalty stack" unacceptable to the licensee; (iii) does not exceed the "value of the contributions" of the inventions; and (iv) does not use an unreasonable royalty base given the products and the patents.[13] In fact, it is licensees in the market which occupy the best position to evaluate whether they are being "held up"; which have crystal clear visibility into what other royalty demands are being made on their own standards-compliant products; and which are able to assess the true value of the relevant invention to their products in the marketplace. In

---

[13] "Actual licenses to the patents-in-suit are probative not only of the proper amount of a reasonable royalty, but also of the proper form of the royalty structure." *LaserDynamics*, 694 F.3d at 79-80.

short, existing licenses—including those negotiated *after* adoption of a standard—necessarily already take into account whatever concerns those licensees may have about "hold up" and "royalty stacking", along with the value contributed by the licensed inventions, the balance between the agreed royalty base and the royalty rate, and any other commercially significant factor that one might name.  As a result, historical licenses to the same or similar patents are the best evidence of the "reasonable" rate for a license consistent with RAND.  *Amicus* Microsoft's claim that the District Court "bypassed" RAND (Microsoft Br. 1), ignores the District Court's analysis and opinion.

### B.    A Rule That a Reasonable Royalty Analysis "Must" Separately Consider "the Total Number of SEPs for that Standard" Is Inconsistent with the RAND Contract and Is Inappropriate.

*Amici* argue that "the [reasonableness] analysis must account for the total number of SEPs for that standard, without requiring proof that the defendants already have paid multiple royalties to multiple patentees" (Cisco Br. 25), and, therefore, that "the jury must be instructed on royalty stacking" (AAI Br. 16; *see id.* 17 ("[A]bsent explicit instructions, a jury will not understand the significance of royalty stacking . . . .")).

No evidence was introduced that the IEEE IPR Policy or RAND commitment makes consideration of hypothetical royalty stacking a required component of the definition of "reasonable" within an IEEE RAND commitment. Nobody asserts that the evidence proved that it is industry practice, when negotiating licenses subject to IEEE RAND commitments, to make any effort at all to "account for the total number of SEPs for that standard" regardless of whether the licensee is actually "pa[ying] multiple royalties" or is ever likely to be asked to do so. In short, the proposed instruction has no connection to the RAND contract or the record evidence at all.

Nor is there any reason to suppose that rational industry participants *should* conduct such a mathematical "royalty stacking" analysis as part of determining a reasonable rate. The proposed analysis inherently supposes that there is some fixed share of the product price that can properly be charged for necessary IPR, and thus that the *more* patents a product practices, the *less* each patentee should receive, regardless of the varied importance of the patented technologies. But this makes no sense. IP is an input into a product like any other. Adding a second input does not reduce the value contribution of the first. Adding hand-crafted leather upholstery to a car does not reduce the value contribution (or the cost) of the engine.

Considered in the context of tangible components, the idea of using (much less requiring) a "cost stacking" analysis to determine how much a manufacturer should have to pay for a particular component is nonsensical. Likewise, the fact that a standard incorporates *more* value-adding patented technologies does not reduce the value added by (or the cost to develop) any one of those technologies. The value of an SEP will always be lost in this analysis; an approach that *necessarily* ignores the value of the specific contribution cannot be correct.

In fact, the proposed "royalty stacking" analysis requires a jury to *assume* that all SEP owners are likely to demand royalties, and to do so at an equivalent per-patent rate. But this is a fiction unsupported by evidence. Inventions (and patents) vary hugely in value; many patents declared as potentially essential to a standard are *never* licensed on any royalty-bearing basis; those that have been previously licensed are likely to be those recognized within the industry as most valuable. The first version of the 802.11 standard was released in 1997, yet no "evidence of *actual* . . . royalty stacking" was introduced below. (Op. 51.) If no identifiable "royalty stacking" has occurred after more than a decade, it is counterfactual rather than merely "speculative" to ask a jury to assume that it ever will. The instruction advocated by *amici* would actually *require* the jury to inject

- 22 -

speculation (or, in this case, counterfactual suppositions) into its damages analysis, in direct contradiction of the District Court's proper instruction to exclude "speculati[on]" and "guesswork" from that calculation.[14]

For all these reasons, a rule *requiring* the jury to be "instructed on royalty stacking" and to conduct an analysis "that account[s] for the total number of SEPs for that standard", regardless of the facts of the particular case, would be a grave error.

### C. A Rule That "Non Discriminatory" Means the Analysis "Must Look at Average Prices, Costs and Operating Profit Across All Industry Participants" Across All Relevant Times Is Inconsistent with the RAND Contract and Is Inappropriate.

*Amicus* Cisco asserts that the hypothetical negotiation analysis "must look at average prices, costs and operating profit across all industry participants", and that it must take into account the hypothesis that "the inventive value of the SEPs in a standard generally are worth more when the standard is new and less later on". (Cisco Br. 22-23.) All of this is said with a wave of the hand towards the "non-discriminatory" component of a RAND contractual commitment. (*Id.*)

None of this has any basis in the terms of the IEEE RAND contract (or that of any other major SSO), nor does Cisco point to any evidence in the

---

[14] Jury Instructions § 8.6.

record that could link these remarkably detailed contentions to any intent or understanding of the parties to a RAND commitment, or to any industry practice.

As to "average prices, costs and operating profit across all industry participants", the implicit point is to suggest that "reasonable" royalties must be capped at some proportion of average profits. For the reasons explained above (*see supra* Section II.B), no such rule makes sense: IP is an input to a product. If a manufacturer (or standard) chooses to make use of more IP, that does not decrease the value of the IP it uses; manufacturers are not entitled to dig into an "all you can eat" IP buffet for a fixed total cost regardless of the value contributed by that IP. Nor should the cost of IP necessarily be capped by the profit margins of a product any more than should the cost of any hardware input; the fact that cars often earn slim (or negative) profit margins does not entitle Chrysler to free body panels. The total cost of inputs will dictate the price at which the product can be sold profitably, not the other way around.

Indeed, if a RAND licensing policy facilitates easy entry and thus enables a highly competitive industry—as RAND licensing is intended to do (*see* IEEE Br. 16-18)—then one would *expect* average profit margins in that industry to be low, *whatever* the total cost of inputs may be. Again, slim

- 24 -

margins cannot automatically dictate the value of the inputs, including even the IP that makes the standard and the product possible.

Cisco's proposal also continues its theme of disconnecting a judicial "reasonableness" analysis from the real world and from anything the parties to a RAND commitment *could* ever have intended at the time of the RAND commitment. Neither the IEEE IPR Policy nor any SSO IPR policy of which *amicus* Qualcomm is aware requires an SEP owner to commit to rates governed by an analysis of "average prices, costs and operating profit across all industry participants" as part of its RAND contract. In fact, this type of information is essentially never available to negotiating parties. SSOs are populated with competitors. They do not exchange their "average prices, costs and operating profit"—and there would be a serious antitrust problem if they did any such thing. Cisco's argument that such information *must* be considered to measure compliance with the "non-discriminatory" aspect of RAND would thus require courts and juries to apply a definition of "non-discrimination" that negotiating parties *cannot* apply. This cannot be correct.

As to the supposed declining value of every patent over time, it is not at all clear what relevance Cisco is suggesting this hypothesis could have to a "non-discrimination" analysis. The implication is that all RAND licenses

become "unreasonable" shortly after execution.  Again, the goal appears to be to lay a foundation to argue that "reasonable" for purposes of a RAND analysis should always be lower than rates previously agreed in market-based negotiations—that infringers who have refused to enter into negotiated licenses should systematically get *better* rates than did companies that negotiated licenses in good faith.  This would be a strange definition of "non-discrimination", and would perversely motivate implementers to litigate rather than negotiate.

### D.    A Rule That Requires Determination of Royalties by Reference to the "Smallest Saleable Unit" Is Inconsistent with the RAND Contract and Is Inappropriate.

Cisco asserts that a "RAND royalty" analysis "must use the industry-wide average operating profit for the SSU [smallest saleable patent practicing unit] over the damages period", again vaguely linking this supposed requirement to "non-discrimination".  (Cisco Br. 23; *see id.* 6.) The unsuitability of any mandatory linkage to average profit margins in general has been explained above.  (*See supra* Section II.C.)  The attempt to make a "smallest saleable unit" rule a mandatory part of a RAND contract, despite the actual terms of the contract and the actual policies of the given SSO, conflicts with this Court's recognition that the appropriate royalty base for a "reasonable royalty" calculation is a fact-specific question.  *See, e.g.*,

*Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1336 (Fed. Cir. 2009);

*Bose Corp. v. JBL, Inc.*, 274 F.3d 1354, 1361 (Fed. Cir. 2001); *see also*

*Mondis Tech., Ltd. v. LG Elecs., Inc.*, Nos. 2:07-CV-565-TJW-CE, 2:08-

CV-478-TJW, 2011 WL 2417367, at *3 (E.D. Tex. June 14, 2011).  In the

cellular industry, the parties to major portfolio licenses have regularly set

royalties as a percentage of the average wholesale price of handsets.  Cisco

points to no contract language nor any other evidence that suggests that the

IEEE IPR Policy in particular mandates any specific royalty base, and the

fact that RAND obligations under at least some SSO IPR policies are *limited*

to "fully [standard-]conforming" devices (*see infra* Part III) is consistent

with an industry practice of using those "devices" themselves as the

appropriate royalty base.  The hypothesis that *all* SSO IPR policies and

RAND commitments under those policies should be judicially redefined in a

manner that would declare widespread industry practice and innumerable

existing licenses to be "unreasonable" cannot be maintained.

## III.   RAND COMMITMENTS DO NOT REQUIRE THE LICENSING OF COMPONENTS.

Seeking in essence to force a component-level royalty base through a

different attack, *amici* Broadcom *et al.* argue that Ericsson was required to

grant RAND licenses directly to chip suppliers such as Broadcom, asserting

that such component suppliers "are entitled to the benefit . . . of the RAND commitments". (Br. of *Amici* Wi-Fi Chip Cos. Broadcom Corp. *et al.*, dated Dec. 23, 2013, 6 n.3.)

Looking to Ericsson's actual RAND commitment—the only source of any obligation on the part of Ericsson to license anyone at all—the District Court found that Ericsson's agreement to grant RAND licenses was explicitly limited to "fully compliant" products "in its letters of assurance to the IEEE". (Op. 46.)

If IEEE considered this commitment to fall short of what its IPR Policy sought, it could have either worked to exclude the patented technologies from the standard, as its Policy allows it to do with regard to any technology for which it cannot obtain the desired RAND commitment,[15] or it could have raised the matter with Ericsson and sought a broader commitment. There is no indication IEEE did either of these things.

While not necessary to its conclusion, the District Court went on to find that there was in fact no evidence that Ericsson's defined RAND commitment *did* fall short of the breadth of commitment that the IEEE IPR

---

[15] *See* IEEE Br. 15 ("While the IEEE-SA cannot . . . compel the patent holder to submit the LOA [letter of assurance] form at all[], the absence of an LOA . . . is a factor that the IEEE-SA may consider when deciding whether to approve the draft standard."); IEEE IPR Policy § 6.2.

Policy aims for.  Instead, the Court found that "There is no IEEE rule preventing restricted RAND commitments".  (Op. 46.)  Further, the District Court found that Ericsson's understanding that a RAND commitment limited to "fully compliant" products is consistent with the IEEE IPR Policy was not idiosyncratic, but on the contrary, "other large companies have adopted similar policies of only licensing fully compliant products", and "There is nothing inherently wrong or unfair" with that practice.  (Op. 47.)

*Amicus* Qualcomm believes it is important for the Court to appreciate that limiting RAND commitments to fully compliant products is not merely permitted by IEEE's IPR Policy, it is also rational and in some settings very important.  In some cases, while a particular patent may read on a component (in this case, a chip), the *value* realized from that patented invention may vary widely depending on the final product in which the component is included.  For example, technology that enables very high cellular data rates may be used in all products compliant with a particular standard, but may deliver limited value in a "feature phone" used primarily for voice communications (which do not require high data rates), while delivering very high value in a sophisticated smartphone or "phablet" used extensively for uploading and downloading still or video images.  Thus, as has been recognized through widespread industry licensing practice, the

finished, fully standard-compliant product may provide the better locus for identifying the value realized from enabling IP.

In addition, a significant portfolio may and often does contain patents which read variously on components, sub-assemblies, finished devices, and on finished devices in operation within a larger system or network. That variety may exist even among claims in a single patent. An SSO IPR policy (or judicially imposed rule) that requires patentees to grant licenses to all comers could make licensing far more complex, requiring negotiations with participants at multiple levels in the product-and-service chain, and hugely complex determinations of which patents are practiced (and hence licensed) at each level in that chain.

Significantly, some major SSOs have adopted as a matter of formal SSO policy *precisely* the "fully compliant" limitation on RAND commitments that Ericsson adopted as a matter of individual choice under the flexible IEEE IPR Policy. Notable among these is ETSI, perhaps the most influential SSO relevant to the cellular industry. The ETSI IPR Policy asks SEP owners to commit to offer licenses on fair, reasonable, and non-discriminatory ("FRAND") terms to "any system or device *fully conforming*

to a STANDARD".[16]   Thus, SEP-holding members of ETSI are asked to

offer FRAND licenses only to systems, devices, methods, and/or operations

that are "fully conforming" (*i.e.*, fully compliant) with the standard in

question—which individual components often cannot be.  This different IPR

policy from a different SSO simply highlights that the District Court was

correct that the scope and meaning of a RAND commitment depends upon

the facts of the case—upon the words of the commitment actually given, and

upon the words of the specific SSO IPR policy to which that commitment

refers.  Courts should not ignore those terms and allow untethered policy

arguments to lead them into what the Department of Justice and Patent

and Trademark Office have described as "imposi[ng] . . . one-size-fits-all

mandates for . . . below-market licensing, which would undermine the

effectiveness of the standardization process and incentives for innovation".[17]

---

[16] ETSI IPR Policy § 15(4) (emphasis added).  The quoted language is from the definition of "EQUIPMENT", and the FRAND license obligation spelled out in § 6.1 of the Policy is defined as relating to "EQUIPMENT" or the manufacture of "EQUIPMENT".

[17] USDOJ & USPTO Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments, dated Jan. 8, 2013, 5-6, *available at* http://www.uspto.gov/about/offices/ogc/Final_DOJ-PTO_Policy_Statement_on_FRAND_SEPs_1-8-13.pdf.

## CONCLUSION

Qualcomm respectfully requests that this Court consider the perspectives offered above as it formulates an opinion that will likely have significant repercussions with respect to critical innovation incentives in the context of SSOs, SEPs, and standardized industries.

Dated:  February 27, 2014

Respectfully submitted,

CRAVATH, SWAINE & MOORE LLP

By:    */s/ Roger G. Brooks*
Roger G. Brooks
Worldwide Plaza
825 Eighth Avenue
New York, NY 10019
(212) 474-1000
rgbrooks@cravath.com

*Attorneys for Amicus Curiae*
*Qualcomm Incorporated*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 27, 2014, I electronically filed a copy of the Brief of *Amicus Curiae* Qualcomm Incorporated in Support of Affirmance on RAND Issues with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to the following counsel of record:

Douglas Aaron Cawley
Warren Lipschitz
Theodore Stevenson, III
McKool Smith, P.C.
300 Crescent Court
Suite 1500
Dallas, TX 75201

John Bruce Campbell
Kathy Hsinjung Li
McKool Smith, PC
300 W. 6th Street
Suite 1700
Austin, TX 78701

John M. Whealan
4613 Merivale Road
Chevy Chase, MD 20815

*Counsel for Plaintiffs-Appellees
Ericsson, Inc. and
Telefonaktiebolaget LM Ericsson*

Michael J. Newton
Shaun William Hassett
Dwayne C. Norton
Alston & Bird LLP
2828 N. Harwood St.
Suite 1800
Dallas, TX 75201

Frank G. Smith, III
Alston & Bird LLP
1201 West Peachtree Street
One Atlantic Center
Atlanta, GA 30309

*Counsel for Defendant-Appellant
Dell, Inc.*

John Joseph Feldhaus
Pavan Kumar Agarwal
Foley & Lardner LLP
Suite 600
3000 K Street, N.W.
Washington, DC 20007

*Counsel for Defendants-Appellants
Toshiba America Information
Systems, Inc. and
Toshiba Corporation*

Robert A. Van Nest
Steven A. Hirsch
Eugene Morris Paige
Matan Shacham
Keker & Van Nest LLP
633 Battery Street
San Francisco, CA 94111

Scott D. Baker
Doyle Bruce Johnson
Jonah D. Mitchell
Christine M. Morgan
Reed Smith LLP
101 Second Street
San Francisco, CA 94105

James Christopher Martin
Reed Smith LLP
435 Sixth Avenue
Pittsburgh, PA 15219

*Counsel for Defendants-Appellants
D-Link Systems, Inc., Netgear, Inc.,
Acer, Inc., Acer America
Corporation, and Gateway, Inc.*

William F. Lee
Mark Christopher Fleming
Lauren B. Fletcher
Joseph J. Mueller
Wilmer Cutler Pickering Hale and
Dorr LLP
60 State Street
Boston, MA 02109

James L. Quarles, III
Wilmer Cutler Pickering Hale and
Dorr LLP
1875 Pennsylvania Avenue, NW
Washington, DC 20006

Adam R. Alper
Kirkland & Ellis LLP
555 California Street
27th Floor
San Francisco, CA 94104

Greg Arovas
Kirkland & Ellis LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022

John C. O'Quinn
Kirkland & Ellis LLP
655 15th Street, N.W.
Washington, DC 20005

*Counsel for Intervenor-Appellant
Intel Corporation*

By:   */s/ Roger G. Brooks*
            **Roger G. Brooks**

- 34 -

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1.    this brief complies with the type-volume limitation set forth in Rules 29(d) and 32(a)(7)(B) of the Federal Rules of Appellate Procedure in that this brief contains 6,976 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Rule 32(b) of this Court's Rules; and

2.    this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2007 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated:  February 27, 2014

By:    _/s/ Roger G. Brooks_
**Roger G. Brooks**