Nos. 2013-1625, -1631, -1362, -1633

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

Plaintiffs-Appellees,

v.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

Defendants-Appellees,

*(For Continuation of Caption See Inside Cover)*

Appeals from the United States District Court for the Eastern District of Texas
in case no. 10-CV-0473, Chief Judge Leonard Davis.

## BRIEF OF *AMICI CURIAE* NOKIA CORPORATION AND NOKIA USA INC. IN SUPPORT OF APPELLEES

Daryl L. Joseffer
 *Counsel of Record*
Ethan P. Davis*
Karen F. Grohman
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
djoseffer@kslaw.com

*Attorneys for* Amici Curiae *Nokia Corporation and Nokia USA Inc.*

* Admitted only in New York and California; practice directly supervised by the principals of the firm.

Dated: February 27, 2014

and

DELL, INC.,

Defendant-Appellant,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

Defendants-Appellants,

and

INTEL CORPORATION,

Intervenor-Appellant,

and

BELKIN INTERNATIONAL, INC.,

Defendant.

## CERTIFICATE OF INTEREST

Counsel for *amici curiae* certifies the following:

1. The full names of every *amicus* represented by me are Nokia Corporation and Nokia USA Inc.

2. The names of the real parties in interest represented by me are Nokia Corporation and Nokia USA Inc.

3. Nokia USA Inc. is a wholly owned subsidiary of Nokia Corporation, which has no parent corporation. No publicly held companies own 10% or more of Nokia Corporation's stock.

4. The names of all firms and the partners or associates that appeared for the parties now represented by me in the trial court or are expected to appear in this court are:

King & Spalding LLP: Daryl L. Joseffer; Ethan P. Davis; Karen F. Grohman


This 27th day of February 2014.      */s/ Daryl L. Joseffer*
                                            Daryl L. Joseffer

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ............................................................................... ii

INTEREST OF THE *AMICI CURIAE* ................................................................ 1

INTRODUCTION .......................................................................................... 2

ARGUMENT ................................................................................................. 4

    I.      Whether Stacking And Holdup, Or Reverse Holdup, Are Concerns Depends On The Facts And Circumstances Of The Case. ................................................................................. 6

    II.    Defendants Presented No Evidence To The Jury That Stacking And Holdup Are Concerns In This Case.............................................. 9

    III.   Defendants' Requested Instructions Were Argumentative and Unnecessary In The Context Of The Jury Charge As A Whole. ........ 13

CONCLUSION ............................................................................................. 18

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases**

*Apple Inc. v. Motorola, Inc.*,
869 F. Supp. 2d 901 (N.D. Ill. 2012) ..................................................11

*Deffenbaugh-Williams v. Wal-mart Stores, Inc.*,
188 F.3d 278 (5th Cir. 1999)...........................................................16

*General Motors Corp. v. Walden*,
406 F.2d 606 (10th Cir. 1969)........................................................10

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
318 F. Supp. 1116 (S.D.N.Y. 1970).................................................5

*Hynix Semiconductor Inc. v. Rambus Inc.*,
609 F. Supp. 2d 951 (N.D. Cal. 2009) ............................................15

*Jurgens v. McKasy*,
927 F.2d 1552 (Fed. Cir. 1991).....................................................13

*Microsoft Corp. v. Motorola, Inc.*,
No. 10-18323, 2013 WL 2111217
(W.D. Wash. Apr. 25, 2013) ..........................................................12

*Nestier Corp. v. Menasha Corp.-Lewisystems Div.*,
739 F.2d 1576 (Fed. Cir. 1984).....................................................10

*Structural Rubber Prods. Co. v. Park Rubber Co.*,
749 F.2d 707 (Fed Cir. 1984)........................................................10

*Touchcom, Inc. v. Bereskin & Parr*,
574 F.3d 1403 (Fed. Cir. 2009)......................................................12

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011).......................................................5

*United States v. Achobe*,
560 F.3d 259 (5th Cir. 2008)..........................................................13

*United States v. Asibor*,
109 F.3d 1023 (5th Cir. 1997).........................................................13

*United States v. Davis*,
487 F.2d 112 (5th Cir. 1973)...........................................................16

*United States v. Langston*,
590 F.3d 1226 (11th Cir. 2009).......................................................10

*United States v. Lee*,
704 F.3d 785 (9th Cir. 2012).................................................................10

*United States v. Mata*,
491 F.3d 237 (5th Cir. 2007)........................................................... 13, 16

*United States v. Milk*,
281 F.3d 762 (8th Cir. 2002).................................................................10

*United States v. Porter*,
542 F.3d 1088 (5th Cir. 2008)...............................................................13

*Voda v. Cordis Corp.*,
536 F.3d 1311 (Fed. Cir. 2008)..............................................................13

*Z4 Techs. Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007)..............................................................15

**Other Authorities**

Brief of Nokia *et al.*,
*Apple Inc. v. Motorola, Inc.*,
No. 2012-1548 (Fed. Cir. May 6, 2013) (Dkt. No. 183)....................................1

Kieff, F. Scott & Anne Layne-Farrar,
*Incentive Effects from Different Approaches to Holdup Mitigation
Surrounding Patent Remedies and Standard-Setting Organizations*,
9 J. Competition L. & Econ. 1091 (2013)..........................................................7

Letter from Ambassador Michael B.G. Froman,
Office of the U.S. Trade Representative,
Executive Office of the President, to Irving A. Williamson,
Chairman, U.S. Int'l Trade Comm.,
Disapproving ITC Determination (Aug. 3, 2013)................................... 8, 10, 11

Remarks of Commissioner Joshua D. Wright,
Federal Trade Commission,
*SSOs, FRAND, and Antitrust: Lessons from the Economics
of Incomplete Contracts* (Sept. 12, 2013) ............................................ 4, 5, 6, 9

U.S. Dep't of Justice & U.S. PTO,
*Policy Statement on Remedies for Standards-Essential Patents
Subject to Voluntary F/RAND Commitments* (Jan. 8, 2013)..........................7, 8

## <u>INTEREST OF THE *AMICI CURIAE*</u>[1]

*Amici* are Nokia Corporation and Nokia USA Inc. ("Nokia"). Nokia is a leader in the telecommunications equipment and services industry. Through its extensive research and development efforts, Nokia has contributed to the development and success of a number of commercially viable standards —as evidenced by the thousands of globally granted patents, including fundamental standards-essential patents, awarded to Nokia. Additionally, Nokia is involved in many U.S. patent lawsuits, both as a protector of its patents and as a defender against claims of patent infringement and various royalty demands. For these reasons, Nokia understands the importance of applying balanced legal principles that protect important, standards-essential patents and the rights of innovators without unfairly intruding on the rights of others to participate in a standards-driven market. Nokia has participated as an *amicus* in other recent appeals, including on the issue of standards-essential patents. *E.g.*, *Apple Inc. v. Motorola, Inc.*, No. 2012-1548 (Fed. Cir. May 6, 2013) (Dkt. No. 183).

Ericsson consented to the filing of this brief; Defendants have not responded to Nokia's request for consent.

---

[1] No counsel for any party authored this brief in whole or in part, and no person or entity, other than *amici* or their counsel, made a monetary contribution intended to fund the preparation or submission of this brief.

## **INTRODUCTION**

Nokia submits this brief to address policy concerns regarding so-called royalty stacking and patent holdup issues, as well as the equal and opposing concern of reverse patent holdup. Defendants paint a decidedly one-sided picture. In their view, stacking and holdup inexorably result in systematically excessive royalties, and the district court abused its discretion by not instructing the jury to consider that supposed fact in rendering its damages award. Reality is different. In any given case, it is theoretically possible that stacking and holdup by the patentee present a real concern; it is also a very real possibility that an accused infringer has engaged in "reverse hold-up" by, for example, refusing to negotiate in good faith or in earnest for a license on reasonable terms. One cannot simply presume that either of those possibilities is an actuality. Instead, the relevance of stacking and holdup or reverse holdup to a damages award depends on the circumstances of the individual case. And in this case, the district court acted well within its discretion in rejecting Defendants' proposed one-sided jury instructions on their claims of stacking and holdup.

There is scant actual evidence supporting Defendants' allegation of systematic stacking and holdup problems in the marketplace, and actual patent holdup issues appear to be litigated infrequently. The requirement that holders of standard-essential patents ("SEPs") license those patents on reasonable and non-

discriminatory terms ("RAND") —or fair, reasonable and non-discriminatory terms ("FRAND"), depending on the applicable standard-setting organization ("SSO") policy —helps explain the lack of any concrete evidence of systemic problems. What is more, Defendants completely ignore the very real alternative possibility of reverse holdup, where putative licensees refuse to negotiate, unreasonably delay negotiating and entering into RAND licenses with the patent holder, or refuse to pay an appropriate RAND royalty, all the while continuing to implement the essential patented functionalities in their commercial products. In fact, in this very case, the district court found that it was *Defendants* who had violated their RAND obligation to negotiate for a license in good faith. Defendants have not even appealed that determination.

Because the RAND inquiry is contextual, district courts must determine on a case-by-case basis whether stacking, holdup, or reverse holdup concerns are implicated and, if so, what effect that should have on the jury instructions. Without actual evidence of a stack or a holdup that could potentially turn an otherwise reasonable award into an unreasonable one, there is no legal basis for giving *any* jury instruction on those issues, as the district court correctly concluded. Moreover, even if Defendants had been able to present some actual evidence of stacking or holdup in this situation to the jury, the district court would still have acted within

3

its discretion in denying the proposed jury instructions in this case because they were argumentative and unnecessary in the context of the jury charge as a whole.

## ARGUMENT

When a patent is essential to an industry standard, standard-setting organizations generally require the patent holder to agree to license the patent on RAND terms. The organizations typically do not mandate the specific RAND terms, or how to calculate an exact royalty rate that complies with RAND.

In this case, for example, Ericsson's RAND commitment was to charge "'reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination.'" Defs' Br. 21 (quoting A15067). As the district court explained, "RAND creates an obligation that must be followed, but it provides no guidance on how to follow that obligation." A101; *see also* Remarks of Commissioner Joshua D. Wright, Federal Trade Commission, *SSOs, FRAND, and Antitrust: Lessons from the Economics of Incomplete Contracts*, at 19–20 (Sept. 12, 2013) ("Wright Remarks"), *available at* http://www.ftc.gov/sites/default/files/ documents/public_statements/ssos-frand-and-antitrust-lessons-economics- incomplete-contracts/130912cpip.pdf; *cf.* IEEE Br. 18 (the SSO responsible for the RAND at issue in this case "does not make determinations" on whether a particular royalty rate is reasonable). Each RAND clause is "a selection made by sophisticated parties informed by a number of tradeoffs," and that allows for a

"rich variation" among the many different SSOs and their contracts. Wright Remarks, *supra*, at 10, 16; *cf.* IEEE Br. 4–5 (noting the differences among SSOs and their contracts).

Setting a reasonable royalty that complies with RAND requirements is therefore an inherently contextual task that requires a court, jury, or other competent tribunal to consider a number of factors that will depend on, among other things, the particular nature of the standard and the patents at issue. Consistent with this mandate, the district court in this case gave the jury extensive instructions about how to calculate a reasonable royalty. These instructions included the *Georgia-Pacific* factors, several of which are relevant to stacking and holdup issues. *See Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) ("This court has sanctioned the use of the *Georgia-Pacific* factors to frame the reasonable royalty inquiry."). In addition to those usual factors, the district court specifically instructed the jury to "ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations." A1674. As explained below, the district court did not abuse its discretion in declining to instruct the jury further about royalty stacking and patent holdup.

I.    **Whether Stacking And Holdup, Or Reverse Holdup, Are Concerns Depends On The Facts And Circumstances Of The Case.**

To hear Defendants tell the story, patent holders systematically enjoy excessive royalties by stacking patents and by threatening to hold up licensees. But there is no evidence of pervasive stacking or holdup problems in the marketplace. "Despite the amount of attention patent hold-up has drawn from policymakers and academics, there have been relatively few instances of litigated patent hold-up among the thousands of standards adopted." Wright Remarks, *supra*, at 20. This lack of concrete evidence may be attributable to reputational costs—that is, a "reputation for engaging in patent hold-up would make it more difficult to convince SSOs and their members to adopt a firm's technology in the future, which would reduce the firm's ability to earn licensing revenue in the future." *Id.* at 20–21.

The RAND framework also helps explain the lack of evidence of systematic stacking and holdup. By requiring patent holders to license their essential patents on reasonable and non-discriminatory terms, the RAND commitment prevents patent holders from extracting exorbitant royalties. *Id.* at 8. As the Department of Justice and the Patent and Trademark Office explained, "S[S]Os and their members rely on these voluntary F/RAND commitments to facilitate the bilateral licensing negotiations necessary for successful widespread adoption of a standard and to provide assurances to implementers of the standard that the patented

6

technologies will be available to parties seeking to license them." U.S. Dep't of Justice & U.S. PTO, *Policy Statement on Remedies for Standards-Essential Patents Subject to Voluntary F/RAND Commitments*, at 5 (Jan. 8, 2013) ("DOJ Policy Statement"), *available at* http://www.justice.gov/atr/public/guidelines/290994.pdf.

Moreover, Defendants' view conveniently ignores the phenomenon of "reverse holdup," which occurs when implementers of technology covered by standard-essential patents continue to commercialize their products but refuse to timely negotiate and enter into a license on offered RAND terms or to pay a RAND royalty rate as determined by a court or a competent third party. Using these tactics, "a potential licensee can delay good faith negotiation of a F/RAND license and the patent holder can be forced to accept less than fair market value for the use of the patent." Wright Remarks, *supra*, at 30; *see also* F. Scott Kieff & Anne Layne-Farrar, *Incentive Effects from Different Approaches to Holdup Mitigation Surrounding Patent Remedies and Standard-Setting Organizations*, 9 J. Competition L. & Econ. 1091, 1097 n.18 (2013).

The President shares these concerns about reverse holdup. He has recognized that "technology implementers" may cause harm by "constructive refusal to negotiate a FRAND license with the SEP owner or refusal to pay what has been determined to be a FRAND royalty." Letter from Ambassador Michael

7

B.G. Froman, Office of the U.S. Trade Representative, Executive Office of the President, to Irving A. Williamson, Chairman, U.S. Int'l Trade Comm., Disapproving ITC Determination, at 2 (Aug. 3, 2013) (the "President's Letter"), *available at* http://www.ustr.gov/sites/default/files/08032013%20Letter_1.PDF. So too the Department of Justice and the Patent and Trademark Office: "[I]f a putative licensee refuses to pay what has been determined to be a F/RAND royalty, or refuses to engage in a negotiation to determine F/RAND terms, an exclusion order could be appropriate." DOJ Policy Statement at 7.

This case illustrates the problem. As the district court found, "RAND licensing also includes an obligation to negotiate in good faith. This obligation is a two-way street. As potential licensees in a RAND negotiation, Defendants possessed an obligation to negotiate in good faith and earnestly seek an amicable royalty rate. They failed to do so." A102. Defendants have not even appealed the finding that it was *Defendants*, not the patent holder, who violated their RAND obligations to negotiate in good faith and seek a reasonable royalty for the continued use of their accused technology.

In the end, what Defendants call "inflated value" from alleged stacking or holdup by a patentee, Defs' Br. 75, may simply reflect the intrinsic value of a standard-essential patent. Technology incorporated into an industry standard may be superior to other alternatives and chosen for inclusion in the standard for that

reason. As a Federal Trade Commissioner explained, "SSOs compete to attract key players to join and contribute their technology to the standard." Wright Remarks, *supra*, at 26. "For some SEPs, the relevant market power will be inherent in the underlying technology and the patents themselves, rather than conferred upon the SEP holder by the SSO as the result of the standard-setting process." *Id.* Reducing royalty awards merely because a patent is essential to a standard could discourage patent holders from entering into RAND agreements, which "would lead to, in the short-term, SSOs more frequently selecting an inferior technology," or even "deprive consumers of the well-understood benefits of standardization" altogether. *Id.* at 27. Defendants offer no convincing reason to discard the value of patented technology simply because it is included in an industry standard.

## II. Defendants Presented No Evidence To The Jury That Stacking And Holdup Are Concerns In This Case.

The jury heard no evidence that stacking or holdup by Ericsson were problems in this case. Defendants made no attempt to calculate the aggregated cost to license everything required under the standard, A100—something presumably not too difficult, given the number of companies that *have* licensed the asserted patents and *do* market devices with WiFi, *see* Ericsson Br. 18–22. Nor did they introduce any licensee complaints about stacking or holdup concerns. A101. As the district court found, therefore, Defendants' arguments were purely theoretical. A87. Indeed, the evidence showed that it was *Defendants* who violated their

9

RAND obligations because they were unwilling to negotiate with Ericsson, as discussed above. A102.

It is black letter law that, "[i]n a jury trial, a court should not instruct on a proposition of law about which there is no competent evidence." *Nestier Corp. v. Menasha Corp.-Lewisystems Div.*, 739 F.2d 1576, 1579–80 (Fed. Cir. 1984). "Competent proof is needed, not mere 'conjecture and speculation.'" *Id.* (quoting *General Motors Corp. v. Walden*, 406 F.2d 606, 609 (10th Cir. 1969)). Without exception, the courts of appeals therefore agree that it is error to submit to "the jury [a] question . . . on which there was *no evidence*." *Structural Rubber Prods. Co. v. Park Rubber Co.*, 749 F.2d 707, 717 (Fed Cir. 1984) (emphasis in original); *accord, e.g.*, *United States v. Lee*, 704 F.3d 785, 792 (9th Cir. 2012); *United States v. Langston*, 590 F.3d 1226, 1236 (11th Cir. 2009); *United States v. Milk*, 281 F.3d 762, 770 (8th Cir. 2002).

The RAND context is no different. Recently, the President disapproved of ITC's decision to issue an exclusionary remedy on a RAND-encumbered patent because, among other things, ITC failed to require any evidence on the question of holdup and stacking, as well as reverse holdup, concerns. *See* President's Letter, *supra*. The President recognized that patent holdup and reverse holdup are both "public interest" concerns in theory. *Id.* at 2. But "whether [such] public interest considerations counsel against a particular exclusion order," he explained,

"depends on the specific circumstances at issue." *Id.* He thus instructed the Commission in future cases involving standards-essential patents subject to RAND obligations to "seek proactively to have the parties develop a comprehensive factual record . . . including information on . . . the presence or absence of patent hold-up or reverse hold-up." *Id.* at 3. After so doing, "the Commission should make explicit findings on these issues to the maximum extent possible." *Id.*

The district court's decision not to give the requested jury instructions was consistent with these principles. No case cited by Defendants holds otherwise. To be sure, the cases discuss holdup and stacking as issues in the RAND context. But they do not "recognize[]" that "generic damages *instructions*" "are inappropriate in a RAND case." *Cf.* Defs' Br. 29 (emphasis added). In fact, they have nothing to do with jury instructions.

In *Apple Inc. v. Motorola, Inc.*, for example, the district court announced that it would arrive at "[t]he proper method of computing a FRAND royalty" by calculating the cost of a license in the absence of the industry standard, to avoid holdup and stacking problems. 869 F. Supp. 2d 901, 913 (N.D. Ill. 2012). Similarly, in *Microsoft Corp. v. Motorola, Inc.*, the district court reasoned that "a proper methodology for determining a RAND royalty should address the risk of royalty stacking by considering the aggregate royalties that would apply if other SEP holders made royalty demands of the implementer." No. 10-18323, 2013 WL

11

2111217, at *12 (W.D. Wash. Apr. 25, 2013). The courts made these findings on the basis of the records in those cases and pursuant to their discretion as finders of fact. But neither *Apple* nor *Microsoft* addressed the question presented here, which is whether a district court must instruct the jury about stacking and holdup in every case, even where, as here, the jury heard no evidence on those issues. If those district court cases were read to suggest a per se rule about RAND rates, they would be inconsistent with the appellate case law discussed above, which forbids a district court from instructing a jury about issues on which there is no evidence.

*Amici* Wi-Fi Chip Cos. contend that "the patent holder, not the accused infringers, bears the burden of establishing the reasonable royalty or any other form of damages." Wi-Fi Chip Cos. Br. 11. But Ericsson discharged its burden of proof by presenting evidence of a reasonable royalty. Ericsson did not bear the additional burden of negating every theoretical defense, especially considering that "[i]t is difficult to prove a negative." *Touchcom, Inc. v. Bereskin & Parr*, 574 F.3d 1403, 1415 (Fed. Cir. 2009). Because Defendants did not come forward with evidence that stacking and holdup transformed an otherwise reasonable royalty into an unreasonable one in this case, they were not entitled to jury instructions on those defenses.

## III. Defendants' Requested Instructions Were Argumentative And Unnecessary In The Context Of The Jury Charge As A Whole.

Even if Defendants had presented a factual predicate for their requested jury instructions, the district court would not have abused its discretion in declining to give those instructions. "District courts enjoy substantial latitude in formulating jury instructions," *United States v. Porter*, 542 F.3d 1088, 1093 (5th Cir. 2008), which "must be considered as a whole in determining whether the jury was properly instructed," *Jurgens v. McKasy*, 927 F.2d 1552, 1563 (Fed. Cir. 1991).[2] The decision not to give a proposed instruction is reviewed only for abuse of discretion. *Porter*, 542 F.3d at 1093. And "'[a] trial judge is under no obligation to give a requested jury instruction that misstates the law, is argumentative, or has been covered adequately by other instructions.'" *United States v. Mata*, 491 F.3d 237, 241 (5th Cir. 2007) (quoting *United States v. Asibor*, 109 F.3d 1023, 1035 (5th Cir. 1997)); *see also United States v. Achobe*, 560 F.3d 259, 271 (5th Cir. 2008) (when "the instructions that the court approved . . . are not defective," then "the decision not to provide further specific instructions is reviewed for abuse of discretion").

---

[2] "This court reviews challenges to jury instructions under the law of the regional circuit where the district court sits." *Voda v. Cordis Corp.*, 536 F.3d 1311, 1328 (Fed. Cir. 2008). Because this case originated in the Eastern District of Texas, Fifth Circuit law governs.

The district court gave the jury a host of instructions explaining its obligations in determining a reasonable royalty rate. Ericsson Br. 65–66. In addition to the traditional *Georgia-Pacific* instructions, the court instructed the jury that Ericsson "is under an obligation to license the patents-in-suit on reasonable and non-discriminatory terms," and that its award could not exceed that "reasonable and non-discriminatory" amount. A1674. In the circumstances of this case, the jury charge adequately covered—in a fair and neutral fashion—the concerns Defendants identify. Defendants' proposed instructions, on the other hand, would have essentially directed the jury to adopt their theory of the case.

For instance, Defendants' concerns with patent holdup focus on the theoretical ability of patent holders to charge monopoly rates for their licenses. Defs' Br. 67. But the court instructed the jury that "[a] reasonable royalty is the amount of money a *willing* patent holder and a *willing* prospective licensee would have agreed upon." Ericsson Br. 70 (quoting A1675). The jury was thus asked to set a royalty rate by envisioning a prospective licensee who is not being held up, and instead is participating willingly. Nor does royalty stacking necessarily require a separate instruction in every case. Accused infringers have long raised royalty stacking concerns outside of the RAND context, and the courts have not adopted a per se rule requiring, or even encouraging, judges to give specific instructions on that issue. *See Hynix Semiconductor Inc. v. Rambus Inc.*, 609 F. Supp. 2d 951,

14

966–67 (N.D. Cal. 2009) ("[T]here is nothing new under the sun. Patent law has long grappled with species of holdup.").

Moreover, the district court held that Ericsson did not violate its RAND obligations, and Defendants have not appealed that finding—it is final. This is, then, not a case in which one would expect especially robust RAND instructions. Instead, this may be the last case in which a court would be expected (much less required) to give such instructions. Even so, the district court did direct the jury to "ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations." A1674.

In a similar situation, this Court rejected a challenge to a district court's decision not to provide additional, more specific jury instructions. The Court explained that even if the requester had some legal support for the more specific instruction, without any authority "*compelling* courts to provide such an instruction," the district court did not abuse its discretion in declining to do so. *Z4 Techs. Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1354–55 (Fed. Cir. 2007) (emphasis added). Jury instructions are designed for lay juries, and do not need to convey the law in the same detail that a court would consider. That is why a party does not have to request a jury instruction on a particular topic in order to preserve the right to move for judgment as a matter of law on that issue following the trial. *See*

15

*Deffenbaugh-Williams v. Wal-mart Stores, Inc.*, 188 F.3d 278, 284 n.5 (5th Cir. 1999).

Not only were the requested instructions unnecessarily specific in the context of this case, they were also argumentative. Courts are not required to give instructions that simply restate a party's arguments, assume one view of the facts of the case, or give undue emphasis to one side's theory of the case. *Mata*, 491 F.3d at 241. Yet Defendants now contend that the district court should have done just that.

For example, Defendants claim they requested an instruction directing the jury to "consider" patent holdup. Defs' Br. 74. But the requested instruction actually directed the jury to "*prevent* patent hold-ups," implying that there is in fact a holdup problem relevant to this case. *Id.* (quoting A6639) (emphasis added). These instructions are "more appropriate to a lawyer's jury argument than to a court's jury instructions as to the law." *Cf. United States v. Davis*, 487 F.2d 112, 126–27 (5th Cir. 1973). Of course, if Defendants were entitled to this one-sided jury instruction, Ericsson would have been entitled to jury instructions emphasizing its own themes, including reverse hold-up by Defendants.

Instructing the jury to prevent hold-up also would have been superfluous. Filing suit for infringement and asking a jury to award a reasonable royalty plainly

16

is not a form of holdup. It was the jury's task to determine a reasonable royalty consistent with RAND. By definition, such a royalty is not an improper holdup.

Likewise, the requested instructions on royalty stacking were designed to give content to the RAND standard beyond what the standard itself requires. Defendants wanted to instruct the jury to adjust the rate in this case according to some hypothetical "aggregate value" of all royalties required to license patents that cover a given standard (although they presented the jury with no evidence concerning what that value might be). Defs' Br. 77–78. But that is, again, simply Defendants' view on what they think the RAND standard should mean in the circumstances of this case. As discussed above, RAND standards are deliberately flexible and their application is therefore context-specific. *See* pp. 4–5, *supra.*

Especially in light of the absence of any evidence that holdups or stacking are real problems in this case, the court did not abuse its discretion in declining to further instruct the jury in this case.

## CONCLUSION

This Court should affirm the district court's decision not to give Defendants'

requested jury instructions on patent stacking and holdup.


DATED: February 27, 2014

Respectfully submitted.

/s/ Daryl L. Joseffer
Daryl L. Joseffer
*Counsel of Record*
Ethan P. Davis*
Karen F. Grohman
KING & SPALDING LLP
1700 Pennsylvania Avenue, NW
Washington, DC 20006
Telephone: (202) 737-0500
Facsimile: (202) 626-3737
djoseffer@kslaw.com
edavis@kslaw.com
kgrohman@kslaw.com

*Admitted only in New York and California; practice directly supervised by the principals of the firm

*Attorneys for* Amici Curiae *Nokia Corporation and Nokia USA Inc.*

18

## **CERTIFICATE OF COMPLIANCE**

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that the foregoing brief, exclusive of the exempted portions as provided in Fed. R. App. P. 32(a)(7)(B)(iii) and Fed. Cir. R. 32(b), contains 3,820 words and therefore complies with the type-volume limitations of Fed. R. App. P. 28.1(e)(2)(A)(i).


DATED: February 27, 2014

*/s/ Daryl L. Joseffer*
Daryl L. Joseffer

## CERTIFICATE OF SERVICE

In accordance with Fed. R. App. P. 25 and Fed. Cir. R. 25, this is to certify that I have this day served the foregoing Brief via the Court's CM/ECF on all counsel of record.

DATED: February 27, 2014

*/s/ Daryl L. Joseffer*
Daryl L. Joseffer