Nos. 13-1625, -1631, -1632, -1633

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ERICSSON, INC. and TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

*v.*

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC., ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and
DELL INC.,

*Defendant-Appellant*,

and
TOSHIBA AMERICA INFORMATION SYSTEMS, INC., and TOSHIBA COR-PORATION,

*Defendants-Appellants*,

and
INTEL CORPORATION,

*Intervenor-Appellant*,

and
BELKIN INTERNATIONAL, INC.,

*Defendant*.

**On Appeal from the United States District Court for the Eastern District of Texas, Case No. 10-cv-0473, Hon. Leonard Davis**

**CORRECTED BRIEF OF *AMICUS CURIAE* DOLBY LABORATORIES, INC. IN SUPPORT OF PLAINTIFF-APPELLEE**

*(Counsel Listed on Next Page)*

A/75928513.4

-i-

Richard S. Taffet
richard.taffet@bingham.com
Bingham McCutchen LLP
399 Park Avenue
New York, NY 10022

Patrick Strawbridge
patrick.strawbridge@bingham.com
Bingham McCutchen LLP
One Federal Street
Boston, MA 02110

*Attorneys for Amicus Curiae*
*Dolby Laboratories, Inc.*

A/75928513.4

# CERTIFICATE OF INTEREST

Pursuant to Circuit Rules 21(a)(2) and 47.4(a)(1), counsel for *amicus curiae* Dolby Laboratories, Inc. certifies the following:

1. The full name of every party represented by me is:

   Dolby Laboratories, Inc.

2. The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

   n/a

3. All parent corporations and any publicly held companies that own ten percent or more of the stock of the party represented by me are:

   n/a

4. The names of all law firms and the partners or associates that appeared for the party now represented by me in the trial court or agency or are expected to appear in this Court are:

   Richard S. Taffet, Bingham McCutchen LLP
   Patrick Strawbridge, Bingham McCutchen LLP

Dated:  February 27, 2014

By:  *s/ Richard S. Taffet*
     Richard S. Taffet

-ii-

A/75928513.4

# **TABLE OF CONTENTS**

**Page(s)**

CERTIFICATE OF INTEREST……………………………….………..…ii

TABLE OF AUTHORITIES…………………………………………….....v

CORPORATE DISCLOSURE STATEMENT…………………………...…...viii

STATEMENT REQUIRED BY RULE 29(c)(5) OF THE FEDERAL RULES OF APPELLATE PROCEDURE……………………………………......…viii

INTEREST OF *AMICUS CURIAE*…………………………………..…1

SUMMARY OF THE ARGUMENT………………………………..……..2

ARGUMENT……………………………………………………….5

I.    The Rand Obligation Is A Contract, And Its Scope Must Be Limited To Its Terms As Written………………………………………..5

II.   Courts Interpreting The Rand Commitment Should Be Careful Not To Disrupt The Successful, Consensus-Based Standards-Setting Process......8

III.  The District Court's Approach Properly Applied The RAND Commitment As Written, And Otherwise Enforced Generally Applicable Patent Law Based On The Facts Presented At Trial………………...………11

    A.    The District Court Appropriately Instructed The Jury On The Factors To Be Considered In Establishing A Reasonable Royalty, Including The Effect Of Ericsson's RAND Obligations...…………11

    B.    The District Court Correctly Rejected Defendants' Attempts To Alter Ericsson's Infringement Remedy Based On Unproven, Theoretical Concerns About Royalty Stacking And Hold-Up………...14

    C.    The District Court Correctly Admitted Ericsson's Evidence Of Comparable Licenses For The Patents At Issue…………………16

-iii-

1.    The District Court properly held that the licenses were sufficiently comparable despite some differences in their terms..................................................................................17

2.    The District Court properly rejected Defendants' assumption that the comparable licenses for the patents at issue failed to account for Ericsson's public RAND commitment………....19

D.    The District Court Properly Rejected Defendants' Attempts To Misread The IEEE IPR Policy To Require Component Licensing..................................................................................20

CONCLUSION…………………………………………………………...22

CERTIFICATE OF SERVICE………………………………………….....24

CERTIFICATE OF COMPLIANCE………………………………….....25

A/75928513.4

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
   694 F.3d 1312 (Fed. Cir. 2012)……………………………………...……..19

*Broadcom Corp. v. Qualcomm Inc.*,
   501 F.3d 297 (3d Cir. 2007)…………………………………………8, 13, 15

*Ericsson Inc. v. Samsung Elecs. Co.*,
   No. 2:06-CV-63, 2007 WL 1202728 (E.D. Tex. Apr. 20, 2007)…...……….5

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002)…………………………………………………...…..8

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F. Supp. 1116 (S.D.N.Y. 1970)…………………………………….…..12

*Grover v. Prickett*,
   420 F.2d 1119 (9th Cir. 1970)…………………………………….…………7

*i4i Ltd. P'ship v. Microsoft Corp.*,
   598 F.3d 831 (Fed. Cir. 2010)……………………………………..……….19

*In re Innovatio IP Ventures, LLC Patent Litig.*,
   No. 11-cv-9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)……...…….9, 13

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
   694 F.3d 51 (Fed. Cir. 2012)………………………………………………17

*Lucent Tech., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009)………………………………….……. 13, 15

*Melton v. Dep't of Health & Human Servs.*,
   212 Fed. App'x 988 (Fed. Cir. 2007)…………………………………22

A/75928513.4

*Microsoft Corp. v. Motorola, Inc.*,
 864 F. Supp. 2d 1023 (W.D. Wash. 2012)……………………………………..5

*Microsoft Corp. v. Motorola, Inc.*,
 No. C10-1823, 2013 WL 2111217 (W.D. Wash. Apr. 25, 2013)……..…9, 14

*Monsanto Co. v. McFarling*,
 488 F.3d 973(Fed. Cir. 2007)…………………………………………....17

*ResQNet.com, Inc. v. Lansa, Inc.*,
 594 F.3d 860 (Fed. Cir. 2010)…………………………………….…..18

*Rude v. Westcott*,
 130 U.S. 152 (1889)………………………………………………..18

*Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA*,
 619 F.3d 1364 (Fed. Cir. 2010)…………………………………...5, 6

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011)…………………………………….12

*Unisplay, S.A. v. Am. Elec. Sign Co.*,
 69 F.3d 512 (Fed. Cir. 1995)………………………...………………13, 15

*United States v. Winstar Corp.*,
 518 U.S. 839 (1996)………………………………………………...6

*Wordtech Sys. Inc v. Integrated Networks Solutions, Inc.*,
 609 F.3d 1308 (Fed. Cir. 2010)………………………………………15

STATUTES

35 U.S.C § 284 ……………………………………………….………7

OTHER AUTHORITIES

11 WILLISTON ON CONTRACTS § 32:2 (4th ed.)……………………………6

Michael J. Chapman, *Using Settlement Licenses in Reasonable Royalty Determinations*, 49 IDEA 313 (2009)……………………………………….……18

A/75928513.4

- vii -

Janko Roettgers, *Wifi to Overtake Wired Network Traffic by 2015*, Gigaom (June 1, 2011)……………………………………………………………………....10

Richard S. Taffet, *The FTC's Evolving IP Marketplace Report's Challenge to Inventiveness, Innovation, & Competitiveness*, THE ANTITRUST SOURCE (Feb. 2012)………………………………...…………………………………………15

A/75928513.4

## CORPORATE DISCLOSURE STATEMENT

Dolby Laboratories, Inc. does not have any parent corporations, and no publicly held corporation owns 10% or more of its stock.

## STATEMENT REQUIRED BY RULE 29(c)(5) OF THE FEDERAL RULES OF APPELLATE PROCEDURE

No party's counsel authored this brief in whole or in part. No party, a party's counsel, or other person (other than *amicus curiae* Dolby Laboratories, Inc.) contributed money that was intended to fund preparation or submission of this brief.

A/75928513.4

## INTEREST OF *AMICUS CURIAE*

For more than four decades, Dolby Laboratories, Inc. ("Dolby") has been a leading innovator in high-quality audio technology.  It has nearly 1,600 employees striving to continue its legacy of innovation, including technicians, engineers, researchers, and scientists.  Such efforts have led to Dolby or its employees being honored by 10 Academy Awards® from the Academy of Motion Picture Arts and Sciences, 14 Emmy® Awards from the Academy of Television Arts & Sciences, and a Technical Grammy® from the Recording Academy. [1]

Dolby's technological leadership is attributable to its continuing investment in research and development.  Thus, for fiscal year 2013, Dolby invested more than $168 million in research and development.  As a result of its sustained commitment to innovation and research, Dolby's patent portfolio today includes more than 3,700 issued patents worldwide.  Dolby's technologies have been incorporated in more than 8 billion licensed products for cinema, broadcast, home audio systems, cars, DVDs, headphones games, televisions, and personal computers, among other things, and Dolby earns the majority of its revenue by licensing its patented technologies.

Dolby also is a regular participant in standards-development activities through its membership in a number of leading standards-setting organizations

---

[1]     All parties consent to Dolby filing this brief as *amicus curiae*.

- 1 -

("SSOs").  Dolby thus has a keen understanding and interest in the overall standardization process, the purposes and scope of SSO intellectual property rights ("IPR") policies generally, and the interpretation of the commitment under those policies to license standards-essential patents ("SEPs") on reasonable and non-discriminatory ("RAND") terms.

Accordingly, Dolby has a compelling and continuing interest in the issues raised in this case, and overall in a properly functioning RAND-licensing environment that ensures standards users the reasonable opportunity to access standardized patented technology, while at the same time affording innovators such as Dolby adequate remedies in the event of infringement of their RAND-committed SEPs. Dolby believes that maintaining these remedies is integral to preserving innovators' incentives to continue inventing new technologies and contributing them to the standards process.  To do so requires a careful, fact-based approach for determining RAND royalties, like that taken by the District Court below, which avoids reliance on speculative or theoretical concerns that are unsupported by evidence and inconsistent with established law.

## SUMMARY OF THE ARGUMENT

The RAND commitment is a contract arising under an SSO's IPR policy when a party participates in standards-development activity.  Like any other contract, it should be interpreted according to its plain terms and the objective under-

- 2 -

standing of the parties at the time it was made.  The RAND commitment at issue in this case, which arises under the IPR policy of the Institute of Electrical and Electronic Engineers-Standards Association ("IEEE"), obliges an SEP owner to make licenses available on reasonable and non-discriminatory terms to those wishing to implement the relevant standard—here, IEEE's 802.11 wireless "WiFi" standard. The IEEE IPR policy does not otherwise restrict the SEP licensor's ability to benefit from and enforce its SEPs, including (if necessary) recovering "reasonable royalty" damages in the event of infringement consistent with applicable patent law.

If it were otherwise, and SSO IPR policies (and the IEEE policy specifically) were interpreted, contrary to their terms, to impose additional restrictions on RAND-committed SEPs, the value of such patents would be artificially and arbitrarily reduced, and innovators' incentives to contribute their SEPs or otherwise participate in future standards-setting efforts would be materially altered.  This would disrupt the SSOs' voluntary, consensus-driven process, and threaten to reverse the enormous gains in social welfare that have resulted from today's successful standardization regime.  This Court therefore should move cautiously and require factual evidence, rather than theory, to support any determination of RAND licensing terms, including an award of a reasonable royalty as a remedy for infringement.

That was precisely the approach taken by the District Court below.  The

A/75928513.4

District Court's analysis of Ericsson's RAND commitment carefully focused on the language of the applicable SSO IPR policy and the evidence presented at trial. Likewise, the District Court's instructions to the jury were consistent with the accepted, fact-specific methodology approved by this Court for the calculation of patent infringement, reasonable royalty damages, and accounted for the RAND obligation without considering speculation and guesswork about theoretical concerns regarding "royalty stacking" and "hold-up." Finally, the District Court properly affirmed the use of comparable licenses that covered the patents at issue, and which it determined were negotiated among sophisticated parties at a time when Ericsson's RAND commitments were publicly made.

A/75928513.4

## ARGUMENT

### I.    THE RAND OBLIGATION IS A CONTRACT, AND ITS SCOPE MUST BE LIMITED TO ITS TERMS AS WRITTEN.

A RAND commitment is a voluntary contract between an SSO and a patent holder, undertaken according to the terms of the SSO's IPR policies as part of the SEP holder's agreement to participate in the standards-setting process. *See, e.g.*, *Microsoft Corp. v. Motorola, Inc.*, 864 F. Supp. 2d 1023, 1031 (W.D. Wash. 2012) (holding that "a contract is formed through … any essential patent holder's[] commitment to the [SSO] to license patents on RAND terms"); *Ericsson Inc. v. Samsung Elecs. Co.*, No. 2:06-CV-63, 2007 WL 1202728, at *1 (E.D. Tex. Apr. 20, 2007) ("[T]he parties agree that the []RAND obligation is contractual and binds all of the [SSO] members."). Under principles of contract law, potential licensees may enforce an SEP holder's RAND commitment as "a third-party beneficiary to the agreements between [an SEP holder] and the [relevant SSOs] … ." *Microsoft*, 864 F. Supp. 2d at 1032.

Because a RAND commitment is contractual, traditional principles of contract law govern its interpretation. This includes the "fundamental precept of common law that the intention of the parties to a contract controls its interpretation." *Tri-Star Elecs. Int'l, Inc. v. Preci-Dip Durtal SA*, 619 F.3d 1364, 1367 (Fed. Cir. 2010) (citing *Beta Sys. Inc. v. United States*, 838 F.2d 1179, 1185 (Fed. Cir. 1988)) (quotation omitted). Often, the best evidence of this intention is the very

- 5 -

words used in the contract. *See id.* ("[T]he primary objective of contract interpretation is to give effect to the intent of the parties, which we presume rests in the language that they have chosen to employ.") (internal quotation marks and citation omitted).[2]  Courts cannot rewrite a contract to include new terms or expand the scope of an agreement; they "can only enforce the contract to which the parties themselves have agreed."  11 WILLISTON ON CONTRACTS § 32:2 (4th ed.).

In this case, the relevant contractual language arises from the IEEE IPR policy.  That policy describes how the holders of patents that are essential to an IEEE standard are to provide assurances that "a license for compliant implementation of the standard will be made available … under reasonable rates, with reasonable terms and conditions that are demonstrably free of any unfair discrimination." IEEE-SA Standards Board Bylaws ("IEEE IPR Policy") § 6.2.  The IEEE purposefully does not define what "reasonable rates" or "reasonable terms" are, leaving that to the negotiation of the parties. *Id.*; *see also Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-473, 2013 WL 4046225, *25 (E.D. Tex. Aug. 6, 2013) (noting that "RAND creates an obligation that must be followed, but it provides no guidance on how to follow that obligation," and that "[i]f two parties negotiating a RAND license are unable to agree to the financial terms of an agreement," courts may re-

---

[2] *See also United States v. Winstar Corp.*, 518 U.S. 839, 911 (1996) ("Under ordinary principles of contract law, one would construe the contract in terms of the parties' intent, as revealed by language and circumstance.").

A/75928513.4

solve their dispute).  This flexibility makes clear that a RAND agreement does not require all licenses to be offered on identical rates or terms, provided that the licenses are all "reasonable" under the circumstances and not the product of "unfair discrimination."  IEEE IPR Policy § 6.2 (emphasis added).

On its face, then, the RAND commitment is an agreement by a patentee to limit their fundamental right to exclusive use of their patented technology.  Beyond that significant compromise, however, nothing in the relevant provisions of the IEEE IPR policy indicates that patent holders are foregoing any other rights available under established patent law.  Specifically, the policy contains no language altering the method for calculating damages (or any other remedy) for patent infringement.

It is therefore imperative that courts resist attempts, like those urged by the Defendants here, to convert the RAND agreement into some sort of expansive waiver of patent remedies.  *See, e.g.*, *Grover v. Prickett*, 420 F.2d 1119, 1125–26 (9th Cir. 1970) (holding implied waivers of "of substantial rights … must be clear, decisive, and unequivocal"); *see also* 35 U.S.C § 284 (guaranteeing patent holder "damages adequate to compensate for the infringement, but in no event less than a reasonable royalty").  This is particularly important here, because patentees like Dolby have invested hundreds of millions of dollars in extensive, risky research and development efforts.  Given this substantial investment, courts must be "cau-

- 7 -

tious before adopting changes that disrupt the settled expectations of the inventing community" and "risk destroying the legitimate expectations of inventors in their property." *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 739 (2002).

## II. COURTS INTERPRETING THE RAND COMMITMENT SHOULD BE CAREFUL NOT TO DISRUPT THE SUCCESSFUL, CONSENSUS-BASED STANDARDS-SETTING PROCESS.

In addition to adhering to the text of the RAND commitment and IPR policies, courts addressing RAND obligations should be cognizant of the significant and ongoing success of the current standards-setting regime. Courts have long recognized that standardization "enhances consumer welfare and competition in the marketplace." *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 309 (3d Cir. 2007). By incentivizing both patent holders and implementers to voluntarily participate in the standards-setting process and negotiate licenses in good faith, the SSO process has resulted in tangible benefits for all market participants. The Court should thus be cautious when presented with expansive arguments—such as those advanced by Defendants here—that could dramatically reduce the incentives critical to securing innovators' continued participation in standards-setting efforts, and thus derail the current, successful standardization regime.

Preserving innovators' incentives by ensuring an adequate return is vital to the success of standardization efforts. To provide value to consumers, standards

- 8 -

must be able to attract and include optimal technical solutions. These solutions do not simply grow on trees. The development and perfection of modern technology in the information, telecommunications, and computing fields requires years of research and the investment of millions—if not billions—of dollars. Companies such as Dolby undertake these investments despite the distinct risk that some of these research and development efforts will fail; some of the resulting technology will be overtaken by competitors, and some solutions may ultimately be passed over for inclusion in a standard in favor of a competing method or solution.

Given these very substantial risks, SEP holders may not participate in standards-setting unless the recoverable RAND royalty provides a return sufficient to cover the sunk costs associated with research and development. It follows, therefore, that a RAND rate "must be set high enough to ensure that innovators in the future have an appropriate incentive to invest in future developments and to contribute their inventions to the standard-setting process." *In re Innovatio IP Ventures, LLC Patent Litig.*, No. 11-cv-9308, 2013 WL 5593609, at \*11 (N.D. Ill. Oct. 3, 2013). Minimizing the return associated with SEPs, on the other hand, "would discourage future innovators from investing in new technology and from contributing their technology to future standards." *Id.* at \*20; *see also Microsoft Corp. v. Motorola, Inc.*, No. C10-1823, 2013 WL 2111217, at \*79 (W.D. Wash. Apr. 25, 2013) ("Companies and SEP holders might not participate in the standard-setting

- 9 -

process or contribute their patents to the standard if they believe that they will not receive full and fair value for their patents.").

Risking such effects is particularly inappropriate in light of the unquestionable success of standardization efforts under the current RAND regime. By incentivizing both patent holders and implementers to participate in the standards-setting process and negotiate licenses in good faith, the SSO process has resulted in tangible benefits to consumers worldwide, including improved functionality, increased interoperability, delayed obsolescence, and greater competition among manufacturers. The standard at issue in this case, the 802.11 wireless, or "WiFi," standard, is an example of this success. The proliferation of 802.11 Wifi-compliant computers, printers, smartphones, tablets, and television receivers has revolutionized consumers' access to entertainment and information, and Wi-Fi is expected to account for nearly half (46.2%) of all Internet traffic by 2015.[3]

The 802.11 standard is just one example of the thousands of technical standards that have prospered under an understanding of RAND that respects its operative text, and preserves the balance of incentives necessary to benefit both SEP owners and standards implementers. A dramatic change in the scope of the RAND obligation could materially alter innovators' incentives to participate in standards-

---

[3] *See* Janko Roettgers, *Wifi to Overtake Wired Network Traffic by 2015*, Gigaom (June 1, 2011), *available at* http://gigaom.com/2011/06/01/cisco-wifi-vni-report.

- 10 -

setting, and thus reverse many of these gains. This change is simply uncalled for and unnecessary, as the District Court's decision below aptly demonstrates.

## III. THE DISTRICT COURT'S APPROACH PROPERLY APPLIED THE RAND COMMITMENT AS WRITTEN, AND OTHERWISE EN-FORCED GENERALLY APPLICABLE PATENT LAW BASED ON THE FACTS PRESENTED AT TRIAL .

During and after the trial below, the Defendants sought to use Ericsson's RAND obligation to eliminate or otherwise reduce their liability for infringement of the SEPs at issue. The District Court properly rejected these efforts, declining to impose any limitations on Ericsson's rights that were inconsistent with the IEEE IPR policy or established legal principles. Specifically, the District Court: (a) appropriately instructed the jury to consider Ericsson's RAND obligation as part of its factual evaluation of a reasonable royalty under the established test for determining damages for infringement; (b) rejected attempts to limit Ericsson's remedies based upon purely theoretical concerns about "royalty stacking" or "hold-up"; (c) properly admitted Ericsson's evidence of comparable licenses for the patents at issue; and (d) rejected attempts to misread the IEEE IPR policy to require licensing of components, rather than a "compliant implementation of the standard." Each of these aspects of the District Court's decision should be affirmed.

### A. The District Court Appropriately Instructed The Jury On The Factors To Be Considered In Establishing A Reasonable Royalty, Including The Effect Of Ericsson's RAND Obligations.

Defendants argued below that, in determining the reasonable royalty at trial,

- 11 -

A/75928513.4

the jury failed to account for Ericsson's RAND obligations.  *See Ericsson*, 2013 WL 4046225, at \*22.  But as the District Court commented, the Defendants presented "substantial RAND evidence" for the jury to consider in calculating the damages for infringement of the SEPs at issue.  *Id.* (noting that a significant portion of Defendants' damages argument was based on Ericsson's RAND obligations).  The District Court also explicitly instructed the jury that it "must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations."  *Id.*; *see also Ericsson Inc. v. D-Link Sys., Inc.*, No. 6:10-CV-479, Dkt. No. 504, at 28 (instructing the jury that, in addition to other *Georgia-Pacific* factors, it should consider Ericsson's RAND obligations).

This approach was entirely consistent with the highly fact-intensive inquiry that governs the calculation of infringement damages, and which is unaltered by the IEEE IPR policy.  The jury's analysis of damages in this case was based upon the established, multi-factor test to hypothesize a "reasonable royalty" under *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  This Court has "sanctioned the use of the *Georgia-Pacific*" analysis because its factors "properly tie the reasonable royalty calculation to the facts of the hypothetical negotiation at issue," *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011), and help ensure that the ultimate rate is "supported by

- 12 -

relevant evidence in the record," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 518 (Fed. Cir. 1995).

Nothing in the RAND commitment given by Ericsson to the IEEE requires a departure from this established approach. Certainly, the language of IEEE IPR policy does not in any way limit a licensor's available remedies under patent law for infringement. To the contrary, the RAND commitment itself requires precisely what the *Georgia-Pacific* analysis is designed to hypothesize: a "reasonable" royalty (or other terms), to be negotiated between the parties to the license. IEEE IPR Policy § 6.2. Indeed, this similarity is why other courts have generally adopted the *Georgia-Pacific* framework to calculate a RAND royalty. *See Innovatio*, 2013 WL 5593609, at *5 (adopting *Georgia-Pacific* framework for a RAND determination); *see also Broadcom*, 501 F.3d at 314 n.8 (collecting cases).

Nor have Defendants presented any legal basis sufficient to disturb the jury's factual findings on appeal. A "jury's decision with respect to an award of damages 'must be upheld unless the amount is grossly excessive or monstrous, clearly not supported by the evidence, or based only on speculation or guesswork.'" *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1310 (Fed. Cir. 2009) (quoting *State Contracting & Eng'g Corp. v. Condotte Am., Inc.*, 346 F.3d 1057, 1072 (Fed. Cir. 2003)).

- 13 -

**B.  The District Court Correctly Rejected Defendants' Attempts To Alter Ericsson's Infringement Remedy Based On Unproven, Theoretical Concerns About Royalty Stacking And Hold-Up.**

Defendants' other arguments below (which are again urged in this proceeding) challenging the jury's damages calculation are also inconsistent with a proper understanding of RAND-licensing obligations.

Defendants argue that the jury's royalty calculation was improper because it "failed to account for royalty stacking."[4] *Ericsson*, 2013 WL 4046225, at *18.  But as the District Court commented, Defendants presented no actual evidence that any royalty stacking was, in fact, taking place. *Id.*; *see also id.* at *26 (noting that "[a]ll of Defendants' concerns about royalty stacking were just that—concerns," and that "[f]aced with no actual evidence of stacking, Defendants were forced to argue hypothetically").  The District Court thus declined to set aside the jury verdict for its failure to account for "the danger that royalty stacking would impede or block the 802.11 standard." *Id.* at *18.

The District Court similarly rejected Defendants' argument that the royalty calculation failed to account for the possibility of "hold-up." [5]  Again, the District

---

[4] "Royalty stacking" has been broadly defined to refer to "the payment of excessive royalties to many different holders of SEPs." *Microsoft*, 2013 WL 2111217, at *11.

[5] Perhaps underscoring its theoretical, rather than factual, origin, there are many definitions of patent "hold-up."  Courts have described it as a patent holder's ability to "extract supracompetitive royalties from the industry participants" after

- 14 -

Court noted that the "Defendants did not present any evidence any licensee ever complained to Ericsson about hold-up," and that none of the witnesses testified that they were aware of any complaints or effects attributable to hold-up. *Id.* at *25; *see also id.* at *26 (reiterating that "Defendants failed to present any evidence of *actual* hold-up or royalty stacking") (emphasis in original).

The District Court's rejection of Defendants' speculation about royalty stacking and hold-up was sound, as a matter of law. As this Court has long held, "speculation and guesswork," like that offered by the Defendants below, have no place in the calculation of a reasonable royalty. *Lucent*, 580 F.3d at 1310; *see also Wordtech Sys. Inc v. Integrated Networks Solutions, Inc.*, 609 F.3d 1308, 1322 (Fed. Cir. 2010). Rather, the damages award must have "some factual basis … supported by relevant evidence in the record." *Unisplay*, 69 F.3d at 517. And if, as Defendants urge, royalty stacking *is* impeding the adoption of a standard—a doubtful proposition here, given the unquestionable success of the 802.11 WiFi standard—then it is not asking too much for some factual evidence to that effect.

In urging otherwise, the Defendants are attempting to alter, as a matter of

the standard is adopted, particularly when there has been some sort of "deceptive conduct in the standard-setting context … ." *Broadcom*, 501 F.3d at 312 (citing *In re Rambus, Inc.*, No. 9302, 2006 WL 2330117, at *4 (F.T.C. Aug. 2, 2006)); *see also, e.g.*, Richard S. Taffet, *The FTC's Evolving IP Marketplace Report's Challenge to Inventiveness, Innovation, & Competitiveness*, THE ANTITRUST SOURCE, at 5–6 (Feb. 2012) (explaining "that hold-up must include some 'intentional and deceptive conduct'").

- 15 -

law, the method for calculating patent damages in <u>any</u> case involving an SEP.  Unsurprisingly, the method they proffer would inevitably reduce the royalty available to SEP-owners.  *See, e.g.*, *Ericsson*, 2013 WL 4046225, at *18 (noting Defendants' arguments that under a methodology that accounted for the "dangers of royalty stacking," a "proper RAND rate should be limited to 'pennies or fractions thereof,'" rather than the $0.50 rate determined by the jury).  These arguments illustrate the underlying goal of those advocating this methodology: to impose arbitrary, unsupported limits on the royalties available to holders of RAND-encumbered SEPs.  Notably, neither of these conceptual concerns is textually recognized in the IEEE IPR policy.  And, without any actual evidence of the supposed effects from royalty stacking or hold-up, the District Court properly declined to reverse the jury's damages analysis.

**C.    The District Court Correctly Admitted Ericsson's Evidence Of Comparable Licenses For The Patents At Issue.**

The Defendants argued below that third-party license agreements offered by Ericsson were non-comparable for purposes of determining a RAND rate because, among other things, the other licenses were: (1) different both in terms of the additional patents they covered and their geographic scope; and (2) not negotiated with the RAND obligation in mind.  *Id.* at *16.  The District Court properly rejected both of these arguments, which were at odds with this Court's precedent regarding the fact-finder's discretion to consider comparable licenses and misread the nature

- 16 -

of the RAND commitment.

**1.    The District Court properly held that the licenses were sufficiently comparable despite some differences in their terms.**

The Defendants contended below that the licenses introduced by Ericsson were non-comparable because "[n]one of the licenses were limited to the asserted patents, and several licenses had a worldwide scope." *Id.* The District Court rejected these arguments, finding them "more appropriate for cross examination than for judgment as a matter of law." *Id.* at \*17 (citing *ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012)). The District Court further noted that the licenses all covered the patents at issue, and that Ericsson's witness "gave detailed testimony addressing the apportionment of those licenses." *Id.*

This approach was entirely consistent with this Court's decisions favoring the use of licenses that cover the patented technology to inform the reasonable royalty calculation. "Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012); *see also Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007) (noting that "an established royalty is usually the best measure of a 'reasonable' royalty … because it removes the need to guess at the terms to which par-

A/75928513.4

ties would hypothetically agree"); *Rude v. Westcott*, 130 U.S. 152, 165 (1889) ("It is undoubtedly true that where there has been such a number of sales by a patentee of licenses to make, use, and sell his patents as to establish a regular price for a license, that price may be taken as a measure of damages against infringers."). As the District Court noted, the licenses at issue below all involved the patents at issue, thus complying with this Court's instruction that a damages theory "link certain licenses to the infringed patent." *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 871 (Fed. Cir. 2010).

The District Court's approach also recognizes the nature of RAND licensing, which specifically leaves the terms of any license to the parties' bilateral negotiations. *See* IEEE IPR Policy § 6.2. This flexibility permits SEP owners and licensees to work together, using creative solutions that could include cross-licensing, portfolio licensing, and other non-monetary terms. As a result, negotiated RAND license agreements are likely to be tailored to the individual parties' needs and will contain some differences.[6] But that is no legal obstacle to a fact-finder's consideration of those licenses as comparable, so long as there is factual evidence supporting an apportionment of the relevant terms to the patents at issue. As this Court has noted, "[a]ny reasonable royalty analysis necessarily involves an element

---

[6] Michael J. Chapman, *Using Settlement Licenses in Reasonable Royalty Determinations*, 49 IDEA 313, 338 (2009) (noting that "[g]iven the number of different variables for any given pair of transactions, it is virtually impossible to find two identical transactions").

A/75928513.4

of approximation, and uncertainty." *i4i Ltd. P'ship v. Microsoft Corp.*, 598 F.3d 831, 857–58 (Fed. Cir. 2010) (affirming damages award and noting that "[g]iven the intensely factual nature of a damages determination and our deferential standard of review, we are not in a position to second-guess or substitute our judgment for the jury's"); *see ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012).

**2.    The District Court properly rejected Defendants' assumption that the comparable licenses for the patents at issue failed to account for Ericsson's public RAND commitment.**

The District Court also rejected Defendants' separate argument that the licenses offered by Ericsson were incomparable because "there was no evidence that the licenses were negotiated with Ericsson's RAND obligations in mind." *Ericsson*, 2013 WL 4046225, at *17. The District Court observed that there was simply no basis for assuming this to be true: "Ericsson's RAND obligations are public knowledge … , so any potential licensee would be able to determine whether Ericsson had RAND obligations." *Id.* Moreover, the comparable licenses offered by Ericsson all involved "sophisticated parties, making it likely that they would have been aware of Ericsson's RAND obligations … ." *Id.*

The District Court's findings on these points are sound and consistent with a proper understanding of a RAND commitment. The Defendants have not identified any basis for assuming that Ericsson's licensees would have been ignorant of

- 19 -

the RAND commitment for the SEPs at issue.  Indeed, the transparency provided by the voluntary standardization process, *see* IEEE IPR Policy § 6.2, is one of its primary features.  Moreover, the evidence presented to the jury established that Ericsson "was a sophisticated licensing entity, with over 100 outstanding patent licenses," and that it set its royalty rate based in part upon "feedback from third party licensees about the reasonableness of its rate."  *Ericsson*, 2013 WL 4046225, at *24.  Given this evidence, and the public nature of RAND commitments, there is no basis for presuming that licenses negotiated between sophisticated parties, as part of a licensor's established licensing program, are inconsistent with the RAND obligation.  Defendants' argument otherwise constitutes an attempt to place unsupported limitations on the available remedies for RAND-committed SEPs.  This Court should reject those arguments.

**D.**     **The District Court Properly Rejected Defendants' Attempts To Misread The IEEE IPR Policy To Require Component Licensing.**

The Defendants argued below that Ericsson breached its RAND obligation by failing to offer Intel a license because Intel's products were not "fully compliant" with the 802.11n standard.  *See Ericsson*, 2013 WL 4046225, *23–24.  Defendants raised this issue as grounds for reversing the jury's infringement damages award, *id.* at *16, as well as in support of a separate claim of breach of the RAND contract, *id.* at *24.  The District Court rejected these arguments in part because "there is no IEEE rule preventing restricted RAND commitments," and Ericsson

- 20 -

had given notice in its Letter of Assurance that it could license only fully compli-ant products. *Id.* at *23.[7] Nor is there any basis in the language of the IEEE IPR Policy to require licensing of only partially compliant implementations, further supporting the District Court's conclusion that "Ericsson did not violate its RAND obligations by refusing to license Intel." *Id.* at *24.

The District Court's analysis of the actual language of the IEEE IPR Policy, as well as the expressed intent of Ericsson when submitting its Letter of Assurance, was correct and consistent with the contractual nature of the inquiry. Nothing in the IPR policy requires an SEP-holder to license its patents to component manufac-turers. Indeed, the IEEE IPR Policy is to the contrary. According to the policy, the RAND obligation attaches only to "a license for compliant implementation <u>of the standard</u>"—not <u>part</u> of the standard. IEEE IPR Policy § 6.2 (emphasis added). Moreover, the policy also permits SEP holders to submit a Letter of Assurance that includes "one or more material licensing terms". *Id.*; *see also Ericsson*, 2013 WL 4046225, at *24 (recognizing that "an IEEE member may restrict or limit its partic-ipation in the process"). Ericsson was thus well within its rights to limit its RAND licensing to those parties seeking to implement the whole standard—which is why, as the District Court noted, "other companies have adopted the same 'fully compli-

---

[7] The District Court separately noted that these arguments were moot, in part because of Ericsson's pre-trial offer of a license to Intel on the same terms as all other defendants. *Ericsson*, 2013 WL 4046225, at *17.

A/75928513.4

ant' licensing policy as Ericsson." *Ericsson*, 2013 WL 4046225, at *23.

In light of this clear language, the Defendants' attempt to impose a requirement of component licensing amounted to an improper request that the District Court "rewrite the contract or insert words to which a party has never agreed." *Melton v. Dep't of Health & Human Servs.*, 212 Fed. App'x 988, 990 (Fed. Cir. 2007) (citing *Am. Capital Corp. v. F.D.I.C.*, 472 F.3d 859, 864–65 (Fed. Cir. 2006)).

## CONCLUSION

The District Court below correctly addressed issues involving RAND licensing by focusing on the contractual nature of RAND commitments. It also avoided imposing artificial and arbitrary limitations on owners of standards essential patents that would diminish the value of such patents, create disincentives for broad participation in the standards-setting process, and thereby create serious risks that the effectiveness of the extant standards-setting process will be diminished. The Court therefore should affirm the District Court's approach to the RAND obligation.

- 22 -

- 23 -

Dated:    February 27, 2014

Respectfully submitted,

BINGHAM McCUTCHEN LLP


By: *s/ Richard S. Taffet*

Richard S. Taffet
richard.taffet@bingham.com
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile:   (212) 752-5378

Patrick Strawbridge
patrick.strawbridge@bingham.com
One Federal Street
Boston, MA 02110
Telephone:  (617) 951-8000
Facsimile:   (617) 951-8736

*Attorneys for Amicus Curiae*
*Dolby Laboratories, Inc.*

A/75928513.4

- 24 -

## CERTIFICATE OF SERVICE

I hereby certify that on February 27, 2014, a copy of the Brief of *Amicus Curiae* Dolby Laboratories, Inc. was filed with the Clerk of the Court using the Court's CM/ECF system, which will automatically send email notification of such filing to all counsel of record.


By:    *s/ Richard S. Taffet*
      Richard S. Taffet

A/75928513.4

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rules of Appellate Procedure 29(c)(7) and 32(a)(7)(C), I hereby certify:

1. this brief complies with the type-volume limitation set forth in Rule 32(a)(7)(B) of the Federal Rules of Appellate procedure in that this brief contains 5,004 words, excluding those parts of the brief exempted from the type-volume calculation by Federal Rule 32(a)(7)(B)(iii) and Circuit Rule 32(b); and

2. this brief complies with the typeface and type-style requirements of Rules 32(a)(5) and 32(a)(6) of the Federal Rules of Appellate Procedure in that this brief is formatted in Microsoft Word 2010 using a proportionally spaced typeface in 14-point Times New Roman font.

Dated: February 27, 2014

By: _s/ Richard S. Taffet_
Richard S. Taffet

- 25 -

A/75928513.4