**2013-1625, -1631, -1632, -1633**

# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

ERICSSON, INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

*v*.

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL, INC.,

*Defendant*.

Appeals from the United States District Court for the Eastern District of Texas in case no. 10-CV-0473, Chief Judge Leonard Davis.

**NON-CONFIDENTIAL REPLY BRIEF FOR INTERVENOR-APPELLANT INTEL AND DEFENDANTS-APPELLANTS ACER, GATEWAY, NETGEAR, D-LINK, AND TOSHIBA**

March 24, 2014 *(Counsel Listed on Inside Cover)*

Case: 13-1625 Document: 171 Page: 2 Filed: 03/24/2014

ROBERT A. VAN NEST
STEVEN A. HIRSCH
EUGENE M. PAIGE
MATAN SHACHAM
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

CHRISTINE M. MORGAN
DOYLE B. JOHNSON
JONAH D. MITCHELL
SCOTT D. BAKER
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

JAMES C. MARTIN
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3546

*Attorneys for Defendants-Appellants Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc.*

JOHN J. FELDHAUS
PAVAN K. AGARWAL
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 600
Washington, DC 20007
(202) 672-5300

*Attorneys for Defendants-Appellants Toshiba Corporation and Toshiba America Information Systems, Inc.*

WILLIAM F. LEE
JOSEPH J. MUELLER
MARK C. FLEMING
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

JAMES L. QUARLES III
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000

GREG AROVAS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

ADAM R. ALPER
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1876

JOHN C. O'QUINN
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5191

*Attorneys for Intervenor-Appellant Intel Corporation*

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Intervenor-Appellant Intel Corporation certify as follows:

1. The full name of every party represented by us is:
Intel Corporation

2. The names of the real parties in interest represented by us are:
Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:
None.

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

KIRKLAND & ELLIS LLP: Adam Alper, Gregory S. Arovas, Oliver Bennett, Luke L. Dauchot, Michael W. De Vries, Jared D. Edgar, John R. Edwards, Sarah Forney, Lov Goel, Raghav R. Krishnapriyan, Peter C. Magic, Tim Majors, John C. O'Quinn, Sarah E. Piepmeier, Kevin Spark, Jeremy J. Taylor

PARKER, BUNT & AINSWORTH, P.C.: Robert C. Bunt, Robert M. Parker

POTTER MINTON P.C.: John F. Bufe, Allen F. Gardner, Michael E. Jones

SIDLEY AUSTIN LLP: Bryan C. Mulder, Stephanie P. Koh, Thomas D. Rein

WILMER CUTLER PICKERING HALE AND DORR LLP: Sameer Ahmed, Brittany Amadi, Megan Barbero, Mark C. Fleming, Lauren B. Fletcher, William F. Lee, Joseph J. Mueller, James L. Quarles III, Joshua Salzman

Dated: March 24, 2014

*/s/ William F. Lee*
WILLIAM F. LEE

# CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Appellants Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc. certify as follows:

1. The full name of every party represented by us is:
Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc.

2. The names of the real parties in interest represented by us are:
Not applicable.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:
D-Link Corporation is the parent company of D-Link Systems, Inc.

   Acer, Inc. owns 100% of Boardwalk Capital Holdings Limited, which owns 100% of Acer American Holdings Corp., which owns 100% of Gateway, Inc., which owns 99.92% of Acer America Corporation.

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

   KEKER & VAN NEST LLP: Robert A. Van Nest, Steven A. Hirsch, Corey A. Johanningmeier, Eugene M. Paige, Matan Shacham

   REED SMITH LLP: Scott D. Baker, John P. Bovich, Jonah D. Mitchell, William R. Overend, Adaline J. Hilgard, James C. Martin, Christine M. Morgan, James A. Daire, Seth B. Herring, Kirsten R. Rydstrom, Doyle B. Johnson

   YARBROUGH WILCOX, PLLC: Herbert A. Yarbrough, III, Debra Elaine Gunter

   FULBRIGHT & JAWORSKI: Dan Duncan Davison

   FREITAS TSENG & KAUFMAN LLP: Kaiwen Tseng

Dated: March 24, 2014

*/s/ Robert A. Van Nest*
ROBERT A. VAN NEST

## CERTIFICATE OF INTEREST

Pursuant to Federal Circuit Rule 47.4, counsel of record for Appellants Toshiba Corporation and Toshiba America Information Systems, Inc. certify as follows:

1. The full name of every party represented by us is:
   Toshiba Corporation and Toshiba America Information Systems, Inc.

2. The names of the real parties in interest represented by us are:
   Toshiba Corporation and Toshiba America Information Systems, Inc.

3. All parent corporations and any publicly held companies that own 10 percent or more of the stock of the parties represented by us are:

   Toshiba America Information Systems, Inc. is a wholly owned subsidiary of Toshiba America, Inc., which is a wholly owned subsidiary of Toshiba Corporation, which is a publicly held company

4. The names of all law firms and the partners or associates that appeared for the parties represented by us in the trial court, or are expected to appear in this Court, are:

   FOLEY & LARDNER LLP: John J. Feldhaus, Pavan K. Agarwal, Liane M. Peterson, Kevin Malaney, Andrew Cheslock, Jason J. Keener

   LAW OFFICES OF GUY N. HARRISON: Guy N. Harrison

Dated: March 24, 2014

*/s/ John J. Feldhaus*
JOHN J. FELDHAUS

Case: 13-1625 Document: 171 Page: 6 Filed: 03/24/2014

# TABLE OF CONTENTS

**Page**

CERTIFICATES OF INTEREST .......... i

TABLE OF AUTHORITIES .......... vi

TABLE OF ABBREVIATIONS .......... ix

INTRODUCTION .......... 1

ARGUMENT .......... 2

I. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '568 PATENT. .......... 2

II. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '215 PATENT. .......... 6

A. The District Court Misconstrued "Type Identifier Field." .......... 6

B. Even Under The District Court's Construction, Defendants' Products Do Not "Identify The Message Type … From A Number Of Different Message Types." .......... 8

III. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '625 PATENT, WHICH IS INVALID. .......... 10

A. The Accused Products' Transmitters Do Not Send A "Command To Receive" Packets. .......... 10

B. Petras Discloses A "Command To Receive" Packets. .......... 12

IV. DEFENDANTS DO NOT DIRECTLY INFRINGE OR INDUCE INFRINGEMENT OF THE ASSERTED METHOD CLAIMS .......... 13

V. THE COURT SHOULD REJECT ERICSSON'S ATTEMPT TO USE ITS OWN LICENSES AS AN EXCUSE FOR IGNORING THE ENTIRE MARKET VALUE RULE AND ERICSSON'S RAND COMMITMENT. .......... 15

Case: 13-1625 Document: 171 Page: 7 Filed: 03/24/2014

A. The District Court Erroneously Failed To Enforce The EMV Rule.....17

B. The District Court Erroneously Refused To Give Meaningful RAND Instructions.....25

1. The record supports Defendants' requested instructions.....26

2. The *Georgia-Pacific* factors did not suffice.....28

3. Courts should enforce RAND commitments, including through appropriate jury instructions.....30

VI. THE DISTRICT COURT ERRONEOUSLY EXPANDED THE ONGOING ROYALTY AWARD.....31

CONCLUSION.....33

ECF-3(B)(2) REPRESENTATION

CERTIFICATE OF SERVICE

CERTIFICATE OF COMPLIANCE

**CONFIDENTIAL MATERIAL OMITTED**

The material omitted on pages 18, 20-23, and 26 describes the terms of certain license agreements entered into by Ericsson and Ericsson's damages theory with respect to those licenses. The foregoing material was designated confidential by Ericsson pursuant to a protective order entered by the district court.

Case: 13-1625 Document: 171 Page: 8 Filed: 03/24/2014

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Allied Tube & Conduit Corp. v. Indian Head, Inc.*,
486 U.S. 492 (1988)....................16

*Broadcom Corp. v. Qualcomm Inc.*,
501 F.3d 297 (3d Cir. 2007)....................31

*Commil USA, LLC v. Cisco Systems, Inc.*,
720 F.3d 1361 (Fed. Cir. 2013)....................15

*Cross Medical Products, Inc. v. Medtronic Sofamor Danek, Inc.*,
424 F.3d 1293 (Fed. Cir. 2005)....................5

*Davis v. Wakelee*,
156 U.S. 680 (1895)....................33

*Finjan, Inc. v. Secure Computing Corp.*,
626 F.3d 1197 (Fed. Cir. 2010)....................5

*Fujitsu Ltd. v. Netgear Inc.*,
620 F.3d 1321 (Fed. Cir. 2010)....................3

*Garretson v. Clark*,
111 U.S. 120 (1884)....................17

*Global-Tech Appliances, Inc. v. SEB S.A.*,
131 S. Ct. 2060 (2011)....................14, 15

*Hilgraeve Corp. v. Symantec Corp.*,
265 F.3d 1336 (Fed. Cir. 2001)....................5

*IGT v. Bally Gaming International, Inc.*,
659 F.3d 1109 (Fed. Cir. 2011)....................11

*In re Innovatio IP Ventures, LLC Patent Litigation*,
No. 11 C 9308, 2013 WL 5593609 (N.D. Ill. Oct. 3, 2013)............16, 19, 27, 29

*K-2 Corp. v. Salomon S.A.*,
191 F.3d 1356 (Fed. Cir. 1999)....................6

Case: 13-1625 Document: 171 Page: 9 Filed: 03/24/2014

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012) ....................19, 24

*Lucent Technologies, Inc. v. Gateway, Inc.*,
580 F.3d 1301 (Fed. Cir. 2009) ....................15, 17

*Microsoft Corp. v. Motorola, Inc.*,
No. C10-1823JLR, 2013 WL 2111217
(W.D. Wash. Apr. 25, 2013)....................16, 19, 22, 29

*On Demand Machine Corp. v. Ingram Industries, Inc.*,
442 F.3d 1331 (Fed. Cir. 2006) ....................8

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ....................6

*Praxair, Inc. v. ATMI, Inc.*,
543 F.3d 1306 (Fed. Cir. 2008) ....................8

*Richardson v. Oldham*,
12 F.3d 1373 (5th Cir. 1994) ....................32

*SiRF Technology, Inc. v. International Trade Commission*,
601 F.3d 1319 (Fed. Cir. 2010) ....................14

*TiVo Inc. v. EchoStar Corp.*,
646 F.3d 869 (Fed. Cir. 2011) (en banc) ....................32

*Uniloc USA, Inc. v. Microsoft Corp.*,
632 F.3d 1292 (Fed. Cir. 2011) ....................17, 18, 24

*United States v. Andino-Ortega*,
608 F.3d 305 (5th Cir. 2010) ....................32

*z4 Technologies, Inc. v. Microsoft Corp.*,
507 F.3d 1340 (Fed. Cir. 2007) ....................5

**OTHER AUTHORITIES**

Long, David, *Jury Returns RAND-Royalty Rate Of 0.19 Percent Of WiFi Chip Sale Price (Realtek v. LSI)* (Feb. 27, 2014),
http://www.essentialpatentblog.com/2014/02/jury-returns-rand-royalty-rate-of-0-19-percent-of-wifi-chip-sale-price-realtek-v-lsi/ ....................17

*Realtek Semiconductor Corp. v. LSI Corp.*,
No. C-12-03451-RMW, Jury Verdict, Dkt. 324
(N.D. Cal. Feb. 26, 2014) ..........................................................................16, 17

Case: 13-1625 Document: 171 Page: 11 Filed: 03/24/2014

# TABLE OF ABBREVIATIONS

| **Abbreviation** | **Definition** |
|---|---|
| ’435 patent | U.S. Patent No. 6,330,435 |
| ’625 patent | U.S. Patent No. 6,424,625 |
| ’568 patent | U.S. Patent No. 6,466,568 |
| ’223 patent | U.S. Patent No. 6,519,223 |
| ’215 patent | U.S. Patent No. 6,772,215 |
| Acer | Defendants-Appellants Acer America Corporation and Acer, Inc. |
| Belkin | Defendant Belkin International, Inc. |
| Defendants | Acer, Belkin, Dell, D-Link, Gateway, Intel, NETGEAR, and Toshiba |
| Dell | Defendant-Appellant Dell Inc. |
| D-Link | Defendant-Appellant D-Link Systems, Inc. |
| Ericsson | Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson |
| EMV | Entire Market Value |
| Gateway | Defendant-Appellant Gateway, Inc. |
| IEEE | Institute of Electrical and Electronics Engineers |
| Intel | Intervenor-Appellant Intel Corporation |
| NETGEAR | Defendant-Appellant NETGEAR, Inc. |
| RAND | Reasonable And Non-Discriminatory |
| Toshiba | Defendants-Appellants Toshiba America Information Systems, Inc. and Toshiba Corporation |

Case: 13-1625 Document: 171 Page: 12 Filed: 03/24/2014

## INTRODUCTION

Much as it did before the district court, Ericsson offers only superficial responses to Defendants' arguments, in the hope that this Court will reflexively defer to the jury's verdict. But that verdict is tainted by multiple legal errors and lacks factual support, requiring reversal of the judgment below or at least a new trial.

As to infringement, Ericsson does not identify a single factual dispute regarding how Defendants' accused products operate. Instead, Ericsson's infringement theories depend on: how Defendants hypothetically ***could have*** implemented the 802.11n standard, rather than how their products actually work ('568 patent); an erroneous claim construction that ignores what even Ericsson characterizes as "the invention" ('215 patent); a failure to identify anything in the accused products corresponding to a particular claim element, and a substitute infringement theory that, if accepted, necessarily invalidates the asserted claim ('625 patent); and the mistaken premise that Defendants' ***product sales*** could infringe ***method claims*** ('215 and '625 patents). These errors compel reversal.

As to damages, the substantial amicus interest in this case demonstrates that Defendants' appeal raises more than "factual" or "substantial evidence" questions. Indeed, this appeal concerns two issues of fundamental importance to patent damages law: (i) enforcement of the EMV rule notwithstanding a patentee's

Case: 13-1625 Document: 171 Page: 13 Filed: 03/24/2014

concerted efforts to avoid it; and (ii) royalty determinations for patents that the patentee has declared "essential" to an industry standard and committed to license on reasonable and non-discriminatory ("RAND") terms. Here, the district court erred by allowing Ericsson to present a damages case based not on the value of the patented technology, but on the entire market value of expensive end products. The court further erred by failing to instruct the jury to consider hold-up and royalty-stacking concerns—concerns not reflected in the traditional *Georgia-Pacific* factors—when determining RAND damages. The damages judgment cannot stand.

## ARGUMENT

### I. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '568 PATENT.

Ericsson acknowledges that the "service type identifier" claimed in the '568 patent must "***identif[y]*** the type of information conveyed in the payload." Br. 9; *see* A272(13:16-17).[1] The "service type identifier" thus must match the type of information in the payload (*e.g.*, voice, video, data, multimedia); otherwise, it does not "identif[y]" information type. But the undisputed evidence demonstrates that Defendants' products do not work that way, nor are they capable of doing so. Instead, a packet with a given TID value can have ***any type of information*** in its payload, and a packet with a given type of information in its payload can have ***any***

[1] Emphases are added except where indicated.

***TID value***. Defs. Br. 32-34. As Ericsson's expert admitted, the TID value "[does not] necessarily reflect the type of data that's in the payload" (A1405(36:20-23)(Nettles)); thus, "an 802.11n system ***cannot determine from the TID value whether the data in the payload is video, voice, Internet, or multimedia***." A1647(34:17-21)(Nettles); *see* A1406(38:19-23)(Nettles) (agreeing that "whether the information conveyed in the payload is voice or video is not apparent from looking at the TID value"). These undisputed facts require judgment of non-infringement.

The ***informative*** designations listed in Table 9-1 of the 802.11n standard do not change this. As Defendants explained (Br. 35), and Ericsson does not dispute, Table 9-1 does not "actually set[] a compliance or conformance requirement." A1506(122:6-20). Instead, Table 9-1 at most shows how a manufacturer hypothetically ***could*** choose to assign different ***priority*** values to different data types. A1514(153:7-22); A1551(114:12-23). Nothing in the 802.11n standard requires the accused products to transmit packets with TID values that match information type. Under the standard, a packet with a TID value of "5" might carry "video" information, or it might not—the TID value simply does not provide that information. Ericsson accordingly cannot "establish infringement by arguing that the product … practices the standard." *Fujitsu Ltd. v. Netgear Inc.*, 620 F.3d 1321, 1327-1328 (Fed. Cir. 2010).

Case: 13-1625 Document: 171 Page: 15 Filed: 03/24/2014

Nor did Ericsson present any evidence that Defendants' products "actually use" the TID subfield to identify information type. Ericsson claims that certain software programs assign TID values using the informative designations in Table 9-1. But even "Ekiga," the single program on which Ericsson relied, does not work that way. With respect to Dr. Nettles's Ekiga testing, Ericsson focuses on instances in which packets containing "video" information happened to have a TID value of "5." Br. 30. Yet that same testing showed other instances in which "video" packets had a TID value of "0." A1572-A1573(76:24-77:3)(Gibson); A1647(33:19-34:21)(Nettles). Thus, even for the program on which Ericsson relies, the TID value does not correspond to—and therefore cannot identify—information type.[2]

Ericsson next points to an Intel manual, which it claims "instruct[s]" developers to create applications that assign TID values according to the informative designations in Table 9-1. Br. 31; *see* A8349. But there was no evidence that any such applications exist. And even if such hypothetical applications could be created, it would make no difference. There would still be no necessary correlation between TID value and information type—and, thus, no

[2] Ericsson also cites (Br. 30) Dr. Nettles's conclusory statements about "testing" other programs, but he offered no testimony about the results of those tests or even that the programs he tested are installed on Defendants' accused products. A1395-A1396(123:4-125:13).

way to determine ***from the TID value*** what type of information is in the packet's payload.[3]

In any event, Ericsson should not have been allowed to present its capability-based infringement theory to the jury. Whether capability is enough to infringe an apparatus claim depends on the claim language. *Finjan, Inc. v. Secure Computing Corp.*, 626 F.3d 1197, 1204 (Fed. Cir. 2010). While Ericsson focuses (Br. 34) on the claim language reciting a processor "for" performing certain steps, the limitation requires "a processor for arranging information for transmission including … providing at least one second field … which includes a service type identifier ***which identifies a type of payload information***." A272(13:12-18). Importantly, that language requires a "service type identifier" "***which identifies***" information type, not merely "for identifying" or "that can be used to identify" information type. Thus, although the claim language does not require the "processor" to be "active," *see Finjan*, 626 F.3d at 1205, it does require that, when activated, the processor ***must*** provide a "service type identifier which identifies a

[3] Moreover, assertions regarding Intel's instructions or "inten[t]" (Br. 31) are irrelevant, because Ericsson only accused Defendants of ***directly*** infringing ***apparatus*** claims for the '568 patent. *See Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1311-1312 (Fed. Cir. 2005). Ericsson's citations (Br. 33) to *z4 Technologies, Inc. v. Microsoft Corp.*, 507 F.3d 1340 (Fed. Cir. 2007), and *Hilgraeve Corp. v. Symantec Corp.*, 265 F.3d 1336 (Fed. Cir. 2001), are inapposite, as those cases involved ***indirect*** infringement of ***method*** claims.

Case: 13-1625 Document: 171 Page: 17 Filed: 03/24/2014

type of payload information." A272(13:16-17); *see K-2 Corp. v. Salomon S.A.*, 191 F.3d 1356, 1363 (Fed. Cir. 1999) ("The functional language is, of course, an additional limitation in the claim."). As explained above, however, Defendants' products simply do not—and cannot—provide an identifier "which identifies" information type.

Finally, contrary to Ericsson's mischaracterization (Br. 32), Defendants do not contend that infringement depends on customers' using the accused products in a way that ***always*** infringes. Rather, the accused products ***never*** infringe because they ***never*** provide a "service type identifier which identifies a type of payload information."

## II. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '215 PATENT.

### A. The District Court Misconstrued "Type Identifier Field."

Ericsson contends (Br. 40) that Defendants fail to identify "an express disclaimer or disavowal showing that the inventors intended the term 'type identifier field' to deviate from its plain and ordinary meaning." But neither party contended below that "type identifier field" had a "plain and ordinary meaning" in the art. *See* A8896-A8897; A9093. Rather, construction of "type identifier field" depends on how a skilled artisan would understand the term "in the context of the entire patent, including the specification." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (en banc). As Defendants explained (Br. 39-42), the

intrinsic evidence demonstrates that the claimed "type identifier field" must be (i) ***selected from*** multiple available feedback responses (ii) ***in order to minimize*** the size or number of feedback responses.

Ericsson offers no substantive response on the first requirement, other than a generic assertion about "read[ing] … limitations into the claims." Br. 39. At the same time, Ericsson acknowledges (Br. 11) that the "type identifier field" solved inefficiencies in the prior art—which used only a single feedback response type (A278(3:46-50))—by "allow[ing] devices in the network to employ ***different formats, or types, of feedback messages***." As Defendants explained (Br. 14-15, 39-42), and Ericsson does not dispute (*see* Br. 38-40), the intrinsic evidence shows that the "type identifier field" is selected from these different feedback response types. A278(4:48-54); A281(9:12-14); A5170.

Ericsson instead focuses on the second requirement, asserting (Br. 39) that minimizing the size and number of feedback responses are merely two of a number of the invention's advantages. Not so. Ericsson acknowledges (Br. 40) that the patent's title, abstract, and written description all "describe the advantage of minimization." And the specification makes clear that ***all*** of the invention's advantages—including saving bandwidth, minimizing protocol overhead, and increasing system capacity—flow from selecting the appropriate feedback response in response to incoming data "to optimize system performance."

Case: 13-1625 Document: 171 Page: 19 Filed: 03/24/2014

A278(4:48-62). The patent's "consistent emphasis" on this point indicates that minimizing feedback responses is not merely one of many objectives; it is a "fundamental feature of the invention." *Praxair, Inc. v. ATMI, Inc.*, 543 F.3d 1306, 1324 (Fed. Cir. 2008); *see On Demand Mach. Corp. v. Ingram Indus., Inc.*, 442 F.3d 1331, 1340 (Fed. Cir. 2006) ("[W]hen the scope of the invention is clearly stated in the specification, and is described as the advantage and distinction of the invention, it is not necessary to disavow explicitly a different scope."). The district court thus erred by not construing "type identifier field" to require selection so as to minimize feedback responses.

### B. Even Under The District Court's Construction, Defendants' Products Do Not "Identify The Message Type … From A Number Of Different Message Types."

During *Markman* proceedings, Ericsson repeatedly argued that the asserted claims require the ***receiver*** to choose among feedback response messages:

> [T]he invention is, as is expressed in the claims, ***giving the receiver a choice*** and constructing a message field that has a type identifier ***so it can express what it has chosen*** to use as a format for communicating the packets that have been dropped.

A6478:5-9; *see* A6473:21-A6474:2 ("[T]he invention is to build in ***choice at the receiver side*** of a type of feedback response format to use[.]"); A6474:17-18; A6477:17-22; A8 n.2. The district court accordingly construed the claims to require "***responsive to the receiving step***, generating a message field including a field that identifies the message type of the feedback response message ***from a***

Case: 13-1625 Document: 171 Page: 20 Filed: 03/24/2014

***number of different message types***." A9. After claim construction, Ericsson continued to acknowledge that "the '215 patent enables ***devices to choose between different feedback responses*** by using a type identifier field." A6523 (pre-trial brief); A7026 (pre-trial stipulation).

Ericsson concedes (Br. 35) that Defendants' products do not support a "choice" because they only use one feedback response type ("Compressed BlockAck"). It nevertheless argues infringement (Br. 12, 38) because the 802.11n standard (as opposed to the accused products) identifies three "available" feedback response types and, during the development process, "***product manufacturers***" choose the type that is "best for their products." This theory directly conflicts with both the claim language and the claim construction, which require the feedback response message type to be generated "from a number of different message types" by the ***receiver*** and "***responsive to the receiving step***"—*i.e.*, in response to incoming data packets. A281(10:19-27); A9. This requirement cannot be satisfied by an engineer designing a product before any data units are sent; rather, the claimed steps require that the "choice" be made ***by the device*** during operation after receiving data units. Indeed, that is the point of the claimed invention: customizing the feedback response based on real-time conditions "in such a way that it optimises the performance." A5170.

Finally, contrary to Ericsson's accusation of inconsistency (Br. 37), it was Ericsson that improperly reversed course below. When faced with Defendants' pre-trial motion to clarify this precise issue, Ericsson confirmed that it has "consistently alleged that the '215 patent enables ***devices to choose*** between different feedback responses by using a type identifier field." A6523. Given Ericsson's confirmation, Defendants withdrew their motion, knowing that Ericsson could not prove infringement under that theory. Ericsson then reversed course at trial, arguing to the jury that the "devices" need not choose between feedback responses. *See* Defs. Br. 45. The claim language and claim construction provided to the jury, however, foreclose any finding of infringement on that theory. The judgment accordingly should be reversed.

## III. DEFENDANTS' ACCUSED PRODUCTS DO NOT INFRINGE THE '625 PATENT, WHICH IS INVALID.

### A. The Accused Products' Transmitters Do Not Send A "Command To Receive" Packets.

As Ericsson acknowledges (Br. 14), the '625 patent addresses the "deadlock" problem, in which a missing packet prevents the transmitter and receiver from continuing their transmissions. To solve this problem, the asserted claim recites "a transmitter … commanding a receiver … to … receive" an out-of-sequence data packet. A254(10:13-25). As Ericsson concedes, the ***transmitter*** must "command" or "force" a receiver to do something it otherwise would not do:

Case: 13-1625 Document: 171 Page: 22 Filed: 03/24/2014

- "[T]he '625 Patent enables the ***transmitter*** to discard obsolete packets by ***commanding the receiver*** to no longer expect those obsolete packets." Ericsson Br. 15.
- "[T]he '625 Patent improves the standard ARQ protocol by ***forcing the receiver*** to accept out-of-sequence packets by moving its reception window forward." *Id.* 13.

Ericsson also concedes (Br. 41-44) that, in Defendants' products, the transmitter never needs to send a "command to receive" that forces the receiver to accept an out-of-sequence packet, because the receiver accepts packets whether or not they arrive in sequence. In other words, the accused products experience no "deadlock" problem and thus have no need for such a "command." Defs. Br. 49-50. Ericsson responds with two infringement theories that focus on how ***the receiver*** operates. Neither addresses the relevant issue.

***First***, Ericsson contends (Br. 41, 44) that Defendants' products feature a "command to receive" because the ***receiver*** is programmed to accept all packets. But this ignores the "transmitter commanding" part of the limitation; a ***receiver*** that does something it must do is quite different from a ***transmitter that commands*** a receiver to do something it otherwise would ***not*** do. *See IGT v. Bally Gaming Int'l, Inc.*, 659 F.3d 1109, 1121 (Fed. Cir. 2011) ("[T]he ***command*** causes an extra payment to the user that the gaming device ***would not have paid out***.").

Case: 13-1625 Document: 171 Page: 23 Filed: 03/24/2014

***Second***, Ericsson contends (Br. 43) that every data packet in an 802.11n-compliant device is inherently a "command to receive" because the receiver must accept it. But this again ignores the "transmitter commanding" part of the limitation. Moreover, the '625 patent treats ordinary data packets as prior art, contrasting them with packets having a specialized "command to receive." A242(Fig. 5); A244; A250(2:44-50). And in the very embodiment that Ericsson invokes (Br. 42-43), the ***transmitter*** commands receipt of the next packet by sending a Receiver Packet Enforcement Bit—a bit that Ericsson acknowledges (Br. 43) the accused products lack. A252(5:28-32); *see* Defs. Br. 18-19.

Ericsson accordingly has failed to identify substantial evidence showing that Defendants' products use the claimed "command to receive," thereby compelling reversal.

**B. Petras Discloses A "Command To Receive" Packets.**

With respect to anticipation, the sole issue is whether the discard message disclosed in Petras is a "command to receive" that forces the receiver to accept out-of-sequence packets. Ericsson's appellate arguments as well as the record evidence, including a key admission from Ericsson's expert, confirm that it is.

Ericsson acknowledges that "[t]he '625 Patent improves the standard ARQ protocol by forcing the receiver to accept out-of-sequence packets ***by moving its reception window forward***." Br. 13 (citing A252(5:15-27)); *see* Br. 14 (describing

Case: 13-1625 Document: 171 Page: 24 Filed: 03/24/2014

the window-shifting function). Similarly, Dr. Nettles agreed that "the effect" of Petras's discard message is "***to shift the window***," although he denied that this facilitates receiving out-of-sequence packets. A1622(100:7-14). But Ericsson cannot have it both ways: if the window-shifting that "forc[es] the receiver to accept out-of-sequence packets" in the '625 patent establishes infringement, then its disclosure in Petras must anticipate.

Ericsson further contends (Br. 45) that Petras's discard message is not a "command to receive" but rather "a notification that the transmitter has discarded a packet." However, Dr. Heegard explained that—while a discard message is "generally speaking" not a "command to receive" (A1593(160:17-19))—the specific discard message disclosed in Petras ***is*** a "command to receive" because it "***forc[es]***" the receiver to accept the next packet (A1586(130:20-132:21)). This is indistinguishable from Ericsson's infringement theory, in which "every single packet that carries data is a command." A1410-A1411(56:23-57:5). Thus, if Ericsson's infringement theory is accepted, Petras necessarily anticipates.

## IV. DEFENDANTS DO NOT DIRECTLY INFRINGE OR INDUCE INFRINGEMENT OF THE ASSERTED METHOD CLAIMS.

Ericsson does not dispute that it presented no evidence that Defendants themselves perform the asserted method claims of the '215 and '625 patents. Instead, Ericsson contends that Defendants are "deemed to be performing" the claimed methods because "the accused products automatically perform the

Case: 13-1625 Document: 171 Page: 25 Filed: 03/24/2014

infringing functionality without user intervention." Br. 48-49 (citing *SiRF Tech., Inc. v. ITC*, 601 F.3d 1319 (Fed. Cir. 2010)). But *SiRF* did not hold that a party performs a method merely by selling a device that automatically performs the claimed steps; it held only that an accused infringer cannot ***avoid infringement*** by performing one of the claimed steps in a remote device. 601 F.3d at 1329-1331. Here, unlike in *SiRF*, no evidence suggests that Defendants performed ***any*** steps of the method claims.

There is no induced infringement either, because Ericsson did not show "knowledge that the induced acts constitute patent infringement." *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2068 (2011). Ericsson has no response; it simply recites evidence that it believes shows that Defendants knew of "the Patents-in-Suit" and encouraged customers "to use 802.11(n)—which is the ***accused*** infringing operation." Br. 54. But knowledge of an "accused" operation is not knowledge that the operation ***constitutes*** infringement. Neither Ericsson nor the district court pointed to any evidence suggesting that Defendants actually knew that use of their products constituted infringement of the claimed methods. Rather, as this appeal shows, Defendants had ample reason to believe that their products'

Case: 13-1625 Document: 171 Page: 26 Filed: 03/24/2014

implementation of the 802.11n standard did ***not*** infringe. *See Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367-1368 (Fed. Cir. 2013).[4]

## V. THE COURT SHOULD REJECT ERICSSON'S ATTEMPT TO USE ITS OWN LICENSES AS AN EXCUSE FOR IGNORING THE ENTIRE MARKET VALUE RULE AND ERICSSON'S RAND COMMITMENT.

Ericsson's damages demand, and the district court's allowance of it, illustrate the profound danger of failing to enforce the EMV rule and RAND commitments. Supported by active licensors (Qualcomm, Nokia, and Dolby), Ericsson proposes an exception to the EMV rule that would allow a patentee to base a royalty on end products' entire market value whenever it has successfully coerced a few companies into agreeing to licenses structured that way. Ericsson further argues that it was entitled to forgo apportionment of the ***accused products*** in identifying a royalty base, but instead could "apportion" ***its own licenses***—without any showing that the licensed patents drove demand for those products. Ericsson's arguments do not address the threshold problem: Ericsson's prior licenses, like its royalty demand, were predicated on the entire market value of end products.

---

4 In *Lucent Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301 (Fed. Cir. 2009), Microsoft argued only that it did not encourage customers to perform the accused ***acts***, and this Court decided only that Microsoft "encourage[d] users to use the infringing tool." *Id.* at 1322-1323. The Court did not rule that an inducement verdict could stand without evidence of knowledge that the induced acts constituted infringement, nor could it under *Global-Tech*, 131 S. Ct. at 2068.

Ericsson's royalty demand was also inconsistent with its RAND commitment for patents that it declared essential to the IEEE 802.11 standard. As the IEEE (Br. 22) and the American Antitrust Institute (Br. 4-11) explain, standardization can inflate patent value, making proper patent valuation and the enforcement of RAND commitments especially important. Moreover, Ericsson's royalty demand here created clear royalty-stacking problems, as several chip suppliers explain (Wi-Fi Chip Cos. Br. 8-13). The positions of Ericsson and its amici would drain RAND commitments of any effect in court—eliminating the type of structural safeguard that the Supreme Court has held vital to ensuring that standard-setting is procompetitive rather than anticompetitive. *See Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492, 501 (1988).

The district court's errors clearly were prejudicial, as is evident from the stark difference between the damages award here ($0.05 per patent) and those in other recent Wi-Fi cases where courts rigorously applied EMV and RAND principles. *See Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at *100 (W.D. Wash. Apr. 25, 2013) (approximately 35 times lower); *In re Innovatio IP Ventures, LLC Patent Litig.*, 2013 WL 5593609, at *43 (N.D. Ill. Oct. 3, 2013) (approximately 10 times lower); *Realtek Semiconductor Corp. v. LSI Corp.*, No. C-12-3451-RMW, Jury Verdict, Dkt. 324 (N.D. Cal. Feb. 26, 2014)

Case: 13-1625 Document: 171 Page: 28 Filed: 03/24/2014

(approximately 30 to 50 times lower); *see* Defs. Br. 80.[5] The damages judgment here cannot be sustained.

### A. The District Court Erroneously Failed To Enforce The EMV Rule.

The Wi-Fi features that Ericsson accuses are wholly, and undisputedly, embodied in 802.11n chips that sell for a few dollars. A1296(62:18-63:1, 63:18-64:1)(Brismark); A1403(25:21-26:2, 27:4-7)(Nettles); A1441(19:8-22)(Bone). And the accused features do not "create[] the 'basis for customer demand'" for the accused end products. *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (quoting *Lucent*, 580 F.3d at 1336).

The Supreme Court's and this Court's precedent accordingly required Ericsson to "'separate or apportion'" its royalty base "'between the patented feature and the unpatented features.'" *Uniloc*, 632 F.3d at 1318 (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)). Ericsson did not perform this required "apportion[ment]"; instead, it derived its royalty demand from expensive end-product prices without any attempt to isolate the portion attributable to the

---

[5] In *Realtek*, the rate is likely to be, on average, approximately $0.00095 to $0.00165 per patent, assuming a price of $1.00 to $1.74 per chip. No. C-12-3451-RMW, Dkt. 324 (verdict determining ongoing RAND rate for two Wi-Fi patents to be 0.19% of Wi-Fi chip sales price); Long, *Jury Returns RAND-Royalty Rate Of 0.19 Percent Of WiFi Chip Sale Price (Realtek v. LSI)* (Feb. 27, 2014), http://www.essentialpatentblog.com/2014/02/jury-returns-rand-royalty-rate-of-0-19-percent-of-wifi-chip-sale-price-realtek-v-lsi/.

Case: 13-1625 Document: 171 Page: 29 Filed: 03/24/2014

accused features. A1325(11:8-13)(Petersson) ("Q. There's a rate of one-half of 1 percent; is that correct? A: Yes. Q: ***And this is the price of the end product, things that are sold to consumers?*** A: ***Yes***."); A1462(10:7-9)(Bone) [redacted]). To make matters worse, Ericsson repeatedly highlighted Defendants' end-product prices to the jury, in an attempt to make Ericsson's damages request seem reasonable by comparison. *See* Defs. Br. 59-61.

The district court had three opportunities—*Daubert*, jury instructions, and JMOL—to enforce the EMV rule, but never did. That was error, and Ericsson's attempts to defend the court's inaction fail.

***First***, Ericsson contends (Br. 62) that "[r]elying on comparable licenses does not implicate the entire market value rule." In other words, Ericsson posits a second situation (other than satisfying the EMV rule) when a patentee can base a royalty on a product's entire market value: by invoking licenses themselves based on products' entire market value. This Court has never suggested such an exception. On the contrary, a patentee seeking court-ordered damages may base a royalty on the entire market value of multi-feature products "***only where***" the patented features are "the basis for customer demand" or create "the value of the component parts." *Uniloc*, 632 F.3d at 1318 (internal quotation marks omitted).

Case: 13-1625 Document: 171 Page: 30 Filed: 03/24/2014

For good reason: the EMV rule is an essential protection against attempts to extract value to which patentees are not entitled. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) ("The entire market value rule arose and evolved to limit the permissible scope of patentees' damages theories."). The existence of past licenses is no guarantee that the patentee has not extracted value that is not "'reasonable' in light of the technology at issue." *Id.*

What Ericsson and its amici seek is the freedom to demand whatever they want in the marketplace, and then bootstrap any resulting agreements into justification for litigation damages. As early as *Daubert*, Ericsson acknowledged the "potential conflict" between licenses and the EMV rule, but argued that "the importance of the licenses has to trump the entire market value rule." A1937(91:4-9). Other recent 802.11 rate-setting decisions, which Ericsson does not acknowledge, have properly rejected such arguments. *E.g.*, *Innovatio*, 2013 WL 5593609, at *14, *31 (rejecting end-product-based royalty, despite allegedly comparable licenses based on end-product prices, because use of "end-products as a royalty base would include value far beyond the patented features of the 802.11 standard"); *Microsoft*, 2013 WL 2111217, at *2-4, *68-72 (rejecting end-product-based royalty, notwithstanding assertedly "comparable" licenses).

***Second***, Ericsson's claim that its expert performed an "[a]pportionment [a]nalysis" (Br. 58) does not cure the problem. Ericsson purported to apportion not

Case: 13-1625 Document: 171 Page: 31 Filed: 03/24/2014

product ***revenue***, but ***licenses*** between asserted and unasserted ***patents***. Ericsson cites no authority for its approach. The logical flaw is made clear by a simple example: if a patentee licenses two patents, and those patents (even taken together) do not drive consumer demand for the accused products, it would be inappropriate to base a royalty on the entire price of those products. The problem does not disappear simply by "apportioning" between the two patents, for the entire market value of the ***products*** was incorrectly included in the royalty base at the outset.

***Third***, Ericsson's prior licenses clearly demonstrate that Ericsson's damages demand in this litigation was improperly based on end products' entire market value. As the table in Ericsson's brief shows, the licenses are to end-product manufacturers (Br. 19, 58; *see* Br. 20-22; A1433(146:8-20); A15298-A15479; A17256-A17275), [redacted]:



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

| Licensee | Date(s) | Payment Terms for 802.11 Portion of License[8] | Effective Rate for 802.11 |
|---|---|---|---|
| **Hewlett-Packard** | January 2012 | [redacted] lump sum | [redacted] unit |
| **Buffalo** | November 2009 | [redacted] of device<br>(capped at [redacted] sale) | [redacted]/unit |
| **Blackberry** | January 2007<br>January 2011 | [redacted] of smartphone<br>[redacted] of tablet<br>(capped at [redacted]) | [redacted]/smartphone<br>[redacted]/tablet |
| **Option** | December 2003<br>January 2007 | [redacted] of device<br>(cap increased [redacted] for 802.11 products) | [redacted]/unit |
| **Ascom** | January 2007<br>January 2012 | [redacted] of device | [redacted]/unit |
| **Sonim** | December 2011 | [redacted] of device | [redacted]/unit |

Ericsson Br. 19 (highlighting added).[6] Ericsson does not even attempt to argue that the licensed patents justified EMV-based royalties.

Ericsson's entire licensing program exploits the very problem that this Court's EMV jurisprudence aims to prevent. Ericsson's policy is not to license Wi-Fi chip suppliers like "[redacted]" (A17284), but to license end-product sellers, because "[redacted]" (A15200). But just because Ericsson's license royalties do not reflect the actual,

[6] Defendants dispute the effective rate calculations in Ericsson's table. *See* A1631-A1632(5:20-6:17, 7:3-6, 8:24-9:2)(Perryman). The license rates are likely also inflated because virtually all post-date the alleged incorporation of Ericsson's patents into the 802.11n standard, meaning they may reflect hold-up value. *See infra* pp. 26-27.



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

Case: 13-1625 Document: 171 Page: 33 Filed: 03/24/2014

apportioned value of its patents, that does not mean that Ericsson can take the same approach when demanding court-ordered patent damages.

***Fourth***, Ericsson's end-product licenses are demonstrably ***not*** comparable or sufficiently reliable to prove any "market" value of Ericsson's patents. Ericsson cites its license to Hewlett-Packard, but concedes that the license [redacted]. A1469(39:10-40:15); A15366; A15369-A15370; A15405; *see Microsoft*, 2013 WL 2111217, at *68-72 (rejecting as non-comparable licenses that were "fairly broad cross-license[s]," not "negotiated … under the RAND obligation," or "agreement[s] fashioned under duress of litigation"). [redacted] A1319-A1320(14:5-17:6); *see* A17289 ([redacted]). Ericsson's sole support for its assertion that [redacted]

[redacted] is a spreadsheet that Ericsson created during this litigation. A1470-A1471(41:18-42:16, 43:7-24, 45:21-46:3).[7]

Ericsson's other licenses also are unreliable and not comparable. Ericsson claims that [redacted]; Ericsson admits (Br. 22) that Sonim has never sold a Wi-Fi product, and there is no indication it ever will. [redacted] A1467(31:15-21). And while Ericsson touts an alleged [redacted]. A1467(32:15-23).

These licenses are ***not*** reliable indicators of what major end-product manufacturers like Dell, NETGEAR, and Toshiba, much less a chip supplier like Intel, would reasonably pay in a hypothetical negotiation. Contrary to Ericsson's and its amici's claims, these problems cannot be remedied by cross-examination, especially under the time constraints imposed here (*see* Defs. Br. 6-7). Rather, the district court's critical gatekeeping function required excluding damages testimony based on these very different licenses.

---

[7] Hewlett-Packard's amicus brief rejects Ericsson's damages and RAND positions, and further shows why Ericsson is wrong.



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

Case: 13-1625 Document: 171 Page: 35 Filed: 03/24/2014

***Fifth***, Ericsson compounded its EMV violations by comparing its proposed royalty to end-product prices to make its damages request appear reasonable. While Ericsson concedes (Br. 63) that its witnesses "mentioned" end-product prices, it insists that these statements "do not implicate the entire market value rule." That is incorrect. Ericsson clearly and repeatedly elicited comparisons between its requested royalty and the entire value of end products. *E.g.*, A1325(12:19-21) (Ericsson's counsel eliciting Ms. Petersson's agreement that "***50 cents is a relatively small price of a thousand-dollar laptop***"); A1432(144:2-14); A1433(146:8-20).[8] The question is not whether a typical juror knows the price of a laptop (Ericsson Br. 63), but whether the juror would have compared that thousand-dollar product to Ericsson's damages request and found the latter "modest by comparison." *LaserDynamics*, 694 F.3d at 68. By inviting jurors to draw that comparison, Ericsson improperly sought to "artificially inflate the jury's damages calculation." *Id.*; *see Uniloc*, 632 F.3d at 1320.

As this analysis shows, the district court's multiple errors in refusing to enforce the EMV rule were contrary to law and prejudicial. At a minimum, a new damages trial is required.

---

[8] Ericsson's waiver assertions (Br. 63) lack merit. Before trial, Defendants moved to exclude Ericsson's damages calculations based on end products' market value, a motion that the district court denied. A35-A36. Defendants then lodged a continuing objection to such testimony. A1437-A1438(4:15-5:14).

### B. The District Court Erroneously Refused To Give Meaningful RAND Instructions.

The district court's cursory instruction to consider "Ericsson's obligation to license its technology on RAND terms" (A226) gave the lay jury no guidance as to what that obligation was or, more importantly, how it affected the remainder of the court's damages instructions. In particular, the court failed to instruct that a reasonable royalty should (i) be based on the inherent technical value of the patents, rather than the value of standardization, and (ii) avoid potential royalty-stacking problems. These omissions were prejudicial and require a new trial.

To begin with, Ericsson does not even acknowledge the two thorough district court opinions ruling that the *Georgia-Pacific* factors must be modified to account for the unique features of RAND-committed patents. *See* Defs. Br. 73-74 (discussing *Microsoft* and *Innovatio*). Instead, Ericsson argues that there was no evidentiary basis for such instructions here and that Defendants' requested instructions were merely redundant, but those arguments do not withstand scrutiny. Ericsson and its amici also inject broader questions of RAND policy that attack the fundamental premise of courts giving content to RAND commitments—not just here, but in all RAND cases. This Court should reject Ericsson's position in order to ensure that RAND commitments remain meaningful.

Case: 13-1625 Document: 171 Page: 37 Filed: 03/24/2014

### 1. The record supports Defendants' requested instructions.

Ericsson asserts (Br. 68) that Defendants failed to submit evidence supporting their requested RAND instructions. That is incorrect. Although Defendants introduced ***additional*** RAND evidence during a later bench trial, the district court acknowledged that "Defendants presented substantial RAND evidence to the jury." A95. Moreover, the proposed instructions were justified by Ericsson's own presentation during trial.

***First***, an instruction explaining patent "hold-up" plainly was necessary to correct Ericsson's repeated assertions that the jury should base its award on the value of the Wi-Fi standard, rather than on the patented technology's contribution to that standard. Defs. Br. 76-77. In closing, Ericsson argued that "[redacted]." A1702(6:13-20). Given Ericsson's strategy, the jury needed to be instructed that it should "***not take into account the value created to Ericsson by the existence of the standard*** itself as distinct from the value of Ericsson's technology claimed in the patents-in-suit." A6641. That instruction was particularly necessary because Ericsson did not contribute to the Wi-Fi standard (A1295(60:11-16)), and Ericsson's patents were at



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED

Case: 13-1625 Document: 171 Page: 38 Filed: 03/24/2014

best of marginal technical significance to the standard. A1513(149:8-13, 150:11-151:9); A1526(15:7-25).[9]

A hold-up instruction also was needed to alert the jury that Ericsson, when licensing its patents ***after*** standard-setting, was positioned to extract supra-competitive royalties. Indeed, the IEEE agrees (Br. 22, 24) that patents obtain greater value after incorporation into a standard, and notes that the IEEE itself is not positioned to police patentees' unfair exploitation of that inflated value.

***Second***, the record supported a royalty-stacking instruction. Testimony established that dozens of companies hold hundreds of other purportedly standard-essential Wi-Fi patents (A1607-A1608(39:19-42:7)), which Ericsson's expert conceded could produce aggregate royalties several times the relevant component's cost were Ericsson awarded royalties at the rates it demanded (A1442-A1444(22:15-29:21)). Ericsson dismisses this testimony as "theoretical" (Br. 71), but this testimony laid a foundation from which a properly-instructed jury could

---

[9] Ericsson argues (Br. 67) that the risk of "reverse hold-up"—the refusal to take a license—is "far more serious" than the risk of hold-up by the patentee. But no party is obligated to take a license simply because a patentee unilaterally claims to own standard-essential patents. Moreover, RAND royalties can be awarded by a court, making whole the owners of any patents that are truly standard-essential—and truly valid and infringed. *See Innovatio*, 2013 WL 5593609, at *11 ("the court is not persuaded that reverse hold-up is a significant concern in general").

Case: 13-1625 Document: 171 Page: 39 Filed: 03/24/2014

have found that it would be crippling if other holders of 802.11n-essential patents obtained royalties comparable to Ericsson's demand.

Ericsson likewise has no response to the critical point that the time to address potential royalty stacking is ***before*** excessive royalties overburden the standard. Defs. Br. 79-80. RAND commitments do not permit patentees to rush to the courthouse to demand excessive royalties before other patentees have licensed their patents and the "stack" is created. Moreover, royalty stacking in the Wi-Fi standard "is a very real phenomenon, not a theoretical one," given the cost structure and narrow profit margins in the 802.11 chip business, as explained by the amicus brief of several major chip suppliers. Wi-Fi Chip Cos. Br. 12.

### 2. The *Georgia-Pacific* factors did not suffice.

Contrary to Ericsson's argument, the existing *Georgia-Pacific* factors did not sufficiently address hold-up and royalty-stacking concerns. That a jury may consider—among many other factors—the infringer's profit margin (Ericsson Br. 70) is hardly equivalent to a specific instruction that the aggregate royalty on all standard-essential patents must be kept sufficiently low in order to keep the standard viable. That is especially true here, as the jury was also instructed—over Defendants' objection (A6671-A6674)—that an "infringer's net profit margin is ***not*** the ceiling by which a reasonable royalty is capped." A226.

Nor do the traditional *Georgia-Pacific* factors capture the dangers of hold-up. On the contrary, several factors—including Factors 6, 8, 9, 10, 11, and 15, each of which Defendants sought to delete or modify (*see* Defs. Br. 74-75)—dangerously imply that a patentee ***should*** receive hold-up value. *See Microsoft*, 2013 WL 2111217, at *18-19; *Innovatio*, 2013 WL 5593609, at *5-6. Thus, far from requesting a "specific application" of general *Georgia-Pacific* principles (Ericsson Br. 69), Defendants sought to avoid or mitigate the effects of those instructions that are antithetical to a RAND commitment.

Again, these errors were material and prejudicial: in *Microsoft* and *Innovatio*, where the courts modified the traditional *Georgia-Pacific* analysis, the royalties on 802.11 standard-essential patents were orders of magnitude lower than those awarded here. *See supra* pp. 16-17. Ericsson does not—and cannot—claim otherwise.[10]

[10] Ericsson seeks to distract from the jury instruction issue by referring to evidence submitted during the bench trial held ***after*** the jury was instructed. Br. 68 n.16. In its bench ruling, the district court held only that Ericsson's offer to license for $0.50 was an acceptable "starting point in the negotiations" and not so "unreasonable" as to constitute a refusal to negotiate in good faith. A102. The court did not itself calculate a RAND rate, but merely adopted the jury's determination (A96)—a determination reached following insufficient instructions.

Case: 13-1625 Document: 171 Page: 41 Filed: 03/24/2014

**3. Courts should enforce RAND commitments, including through appropriate jury instructions.**

Ericsson's amici also challenge the role of courts in enforcing RAND commitments in patent litigation. According to these amici, because a RAND commitment is contractual and that contract does not itemize the limitations that accompany a RAND commitment, courts should generally treat RAND commitments as lacking meaningful content—and let the marketplace do what it will. *See* Dolby Br. 7; Qualcomm Br. 9-11.[11] But if product manufacturers cannot enforce RAND commitments in the courtroom, they will have no leverage to do so in the marketplace. And RAND commitments are far too important to be rendered effectively unenforceable.

As the IEEE emphasizes (Br. 22), RAND commitments are "***critical***" to the success and viability of standard-setting. Federal regulators have similarly recognized the central role that RAND commitments play in protecting competition and interoperability standards that benefit consumers. Defs. Br. 71. If RAND commitments are to serve their critical function, it is not enough for courts

---

[11] The prospect that this Court will require instructions that properly reflect the RAND commitment is sufficiently threatening to those wishing to capitalize on the value inherent in having their technology embedded in a standard that Qualcomm—once a member of ***Defendants'*** joint defense group—has filed an amicus brief supporting ***Ericsson's*** damages position. *See* ECF No. 143.

Case: 13-1625 Document: 171 Page: 42 Filed: 03/24/2014

to instruct juries on the bare existence of the RAND commitment. As the American Antitrust Institute explains (Br. 21), courts must do more:

> The proper determination of RAND royalties is essential to ensure that RAND commitments serve their purpose as "safeguards against monopoly power." *Broadcom*, 501 F.3d at 314. … A proper RAND jury instruction should make clear that any methodology for determining a RAND royalty must reflect RAND's goals of preventing holdup and royalty stacking.

*See also* Microsoft Br. 17 ("The district court's approach to damages in this case provided the jury with no such guidance, leaving it free to improperly award damages based on the value of the standard."). A contrary conclusion—the one Ericsson and its amici seek—would be an abdication of any judicial role in ensuring that standard-essential patent holders adhere to their RAND commitments and do not extract excessive royalties.

## VI. THE DISTRICT COURT ERRONEOUSLY EXPANDED THE ONGOING ROYALTY AWARD.

The district court erroneously awarded Ericsson an ongoing royalty on ***all*** of Defendants' 802.11n-compliant products, including products that Ericsson ***removed*** from its list of "accused" products. Ericsson fails to respond to Defendants' argument that it is estopped from collecting royalties on products it abandoned before trial. Ericsson's waiver and failure-of-proof arguments (Br. 71-75) are meritless.

Case: 13-1625 Document: 171 Page: 43 Filed: 03/24/2014

***First***, Defendants never waived their objection to the ongoing royalty award's applicability to "all devices that are in compliance with 802.11n." A8886. In response to Ericsson's ongoing royalty motion, Defendants stated:

> Defendants ***do not agree*** with the proposed applicability of a post-verdict royalty to any end user device "that is compliant with the 802.11n standard, or any future 802.11 standard that incorporates equivalent functionality, through the life of the Infringed Patents." ***Ericsson's infringement proof at trial related to particular accused products, not to all 802.11n-compliant products.***

A7891 (citation omitted). At the post-trial hearing, Defendants only agreed that, if the court denied their damages JMOL motion, "an ongoing royalty of 15 cents would be appropriate." A1793(5:16-17). Defendants did not agree that the ongoing royalty would also apply to products Ericsson had removed from the case. Defendants thus never "intentionally relinquish[ed]" their challenge. *United States v. Andino-Ortega*, 608 F.3d 305, 308 (5th Cir. 2010).[12]

***Second***, contrary to Ericsson's assertion (Br. 75), Defendants need not prove that all of their 802.11n-compliant products "do not infringe." ***Ericsson*** had the burden of proving not only infringement, but also entitlement to an ongoing royalty. *See TiVo Inc. v. EchoStar Corp.*, 646 F.3d 869, 882 (Fed. Cir. 2011) (en

---

12 Defendants had no obligation to challenge the ongoing royalty ruling in a motion to alter or amend the judgment. *See Richardson v. Oldham*, 12 F.3d 1373, 1377 (5th Cir. 1994) ("Filing a Rule 59 motion is not a prerequisite to taking an appeal.").

banc). Ericsson did not even attempt to satisfy that burden—and relinquished its ability to collect royalties—for certain products that it withdrew from the case. Ericsson claims (Br. 74) that it excluded those products because Defendants purportedly had not produced relevant data or the product sales were *de minimis*. But ***why*** Ericsson chose to drop infringement accusations against certain products is irrelevant. Ericsson stipulated to which products were accused for each Defendant, and should be estopped from collecting royalties on products it chose to remove from the case. *See Davis v. Wakelee*, 156 U.S. 680, 689 (1895).

## CONCLUSION

The judgment should be reversed or, alternatively, remanded for a new trial.

Case: 13-1625 Document: 171 Page: 45 Filed: 03/24/2014

Dated: March 24, 2014

Respectfully submitted,

*/s/ Robert A. Van Nest*

ROBERT A. VAN NEST
STEVEN A. HIRSCH
EUGENE M. PAIGE
MATAN SHACHAM
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

SCOTT D. BAKER
CHRISTINE M. MORGAN
DOYLE B. JOHNSON
JONAH D. MITCHELL
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

JAMES C. MARTIN
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3546

*Attorneys for Acer, Inc., Acer America Corporation, Gateway, Inc., NETGEAR, Inc., and D-Link Systems, Inc.*

*/s/ John J. Feldhaus*

JOHN J. FELDHAUS
PAVAN K. AGARWAL
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 600
Washington, DC 20007
(202) 672-5300

*Attorneys for Toshiba Corp. and Toshiba America Information Systems, Inc.*

*/s/ William F. Lee*

WILLIAM F. LEE
JOSEPH J. MUELLER
MARK C. FLEMING
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

JAMES L. QUARLES III
WILMER CUTLER PICKERING
HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000

GREG AROVAS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

ADAM R. ALPER
KIRKLAND & ELLIS LLP
555 California Street, 27th Floor
San Francisco, CA 94104
(415) 439-1876

JOHN C. O'QUINN
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5191

*Attorneys for Intel Corporation*

Case: 13-1625 Document: 171 Page: 46 Filed: 03/24/2014

## ECF-3(B)(2) REPRESENTATION

Pursuant to this Court's Administrative Order Regarding Electronic Case Filing, the undersigned represents under ECF-3(b)(2) that counsel for Appellants D-Link Systems, Inc., NETGEAR, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Toshiba America Information Systems, Inc., and Toshiba Corporation have consented to their signatures on the Certificates of Interest and this brief.

Dated: March 24, 2014

*/s/ William F. Lee*
WILLIAM F. LEE

Case: 13-1625 Document: 171 Page: 47 Filed: 03/24/2014

**CERTIFICATE OF SERVICE**

I hereby certify that, on this 24th day of March, 2014, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Federal Circuit using the CM/ECF System, which will send notice of such filing to all registered CM/ECF users.

*<u>/s/ William F. Lee</u>*

March 24, 2014 William F. Lee

**Law Firm:** Wilmer Cutler Pickering Hale and Dorr LLP
**Address:** 60 State Street
**City, State, ZIP:** Boston, MA 02109
**Telephone:** (617) 526-6000
**FAX:** (617) 526-5000
**E-mail Address:** William.Lee@WilmerHale.com

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned hereby certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B)(i).

1. Exclusive of the exempted portions of the brief, as provided in Fed. R. App. P. 32(a)(7)(B), the brief contains 7000 words.

2. The brief has been prepared in proportionally spaced typeface using Microsoft Word 2010 in 14 point Times New Roman font. As permitted by Fed. R. App. P. 32(a)(7)(B), the undersigned has relied upon the word count feature of this word processing system in preparing this certificate.

Dated: March 24, 2014

*/s/ William F. Lee*
WILLIAM F. LEE