**2013-1625, -1631, -1632, -1633**

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

ERICSSON, INC. and
TELEFONAKTIEBOLAGET LM ERICSSON,

*Plaintiffs-Appellees*,

*v.*

D-LINK SYSTEMS, INC., NETGEAR, INC., ACER, INC.,
ACER AMERICA CORPORATION, and GATEWAY, INC.,

*Defendants-Appellants*,

and

DELL, INC.,

*Defendant-Appellant*,

and

TOSHIBA AMERICA INFORMATION SYSTEMS, INC.
and TOSHIBA CORPORATION,

*Defendants-Appellants*,

and

INTEL CORPORATION,

*Intervenor-Appellant*,

and

BELKIN INTERNATIONAL, INC.,

*Defendant*.

Appeals from the United States District Court for the Eastern District of Texas
in case no. 10-CV-0473, Chief Judge Leonard Davis.

**NON-CONFIDENTIAL JOINT APPENDIX**
**VOLUME I OF III**
**A1-A1937**

March 31, 2014                                        *(Counsel Listed on Inside Cover)*

CASE PARTICIPANTS ONLY

ROBERT A. VAN NEST
STEVEN A. HIRSCH
EUGENE M. PAIGE
MATAN SHACHAM
KEKER & VAN NEST LLP
633 Battery Street
San Francisco, CA 94111
(415) 391-5400

CHRISTINE M. MORGAN
DOYLE B. JOHNSON
JONAH D. MITCHELL
SCOTT D. BAKER
REED SMITH LLP
101 Second Street, Suite 1800
San Francisco, CA 94105
(415) 543-8700

JAMES C. MARTIN
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
(412) 288-3546

*Attorneys for Defendants-
Appellants Acer, Inc., Acer
America Corporation,
Gateway, Inc., NETGEAR,
Inc., and D-Link Systems, Inc.*

JOHN J. FELDHAUS
PAVAN K. AGARWAL
FOLEY & LARDNER LLP
3000 K Street, N.W. Suite 600
Washington, DC 20007
(202) 672-5300

*Attorneys for Defendants-
Appellants Toshiba
Corporation and Toshiba
America Information Systems,
Inc.*

WILLIAM F. LEE
JOSEPH J. MUELLER
MARK C. FLEMING
LAUREN B. FLETCHER
WILMER CUTLER PICKERING
   HALE AND DORR LLP
60 State Street
Boston, MA 02109
(617) 526-6000

JAMES L. QUARLES III
WILMER CUTLER PICKERING
   HALE AND DORR LLP
1875 Pennsylvania Ave., NW
Washington, DC 20006
(202) 663-6000

GREG AROVAS
KIRKLAND & ELLIS LLP
601 Lexington Avenue
Citigroup Center
New York, NY 10022
(212) 446-4800

ADAM R. ALPER
KIRKLAND & ELLIS LLP
555 California Street, 27th
Floor
San Francisco, CA 94104
(415) 439-1876

JOHN C. O'QUINN
KIRKLAND & ELLIS LLP
655 15th Street, N.W.
Washington, DC 20005
(202) 879-5191

*Attorneys for Intervenor-
Appellant
Intel Corporation*

MICHAEL J. NEWTON
SHAUN W. HASSETT
DWAYNE C. NORTON
ALSTON & BIRD LLP
2828 North Harwood Street
Suite 1800
Dallas, TX 75201

FRANK G. SMITH, III
ALSTON & BIRD LLP
1201 West Peachtree Street
Atlanta, GA 30309

*Attorneys for Defendant-
Appellant Dell Inc.*

DOUGLAS A. CAWLEY
THEODORE STEVENSON, III
WARREN LIPSCHITZ
MCKOOL SMITH, P.C.
300 Crescent Court, Suite
1500
Dallas, TX 75201
(214) 978-4000

JOHN B. CAMPBELL
KATHY H. LI
MCKOOL SMITH, P.C.
300 W. 6th Street, Suite 1700
Austin, TX 78701
(512) 692-8700

JOHN M. WHEALAN
4613 Merivale Road
Chevy Chase, MD 20815
(202) 994-2195

*Attorneys for Plaintiffs-
Appellees,
Ericsson Inc. and
Telefonaktiebolaget LM
Ericsson*

# TABLE OF CONTENTS

## VOLUME I

**Page**

**ORDERS AND JUDGMENTS**

Memorandum Opinion and Order Construing Claim Terms of United States Patent Nos. 6,772,215, 6,330,435, 5,987,019, 6,466,568, and 5,790,516, Dkt. No. 341 (Mar. 8, 2013) — A1-A23

Order Overruling Objections to Opinion of United States Magistrate Judge on Claim Construction, Dkt. No. 374 (April 16, 2013) — A24-A30

Memorandum Opinion and Order denying Dkt. 364, Defendants' *Daubert* Motion to Exclude the Opinions of Mr. John R. Bone Regarding Issues Related to Damages, Dkt. No. 443 (May 21, 2013) — A31-A37

Order regarding Dkt. 361, Motion to Strike David Cabello; Dkt. 402, Motion to Compel; Dkt. 425, Motion in Limine; Dkt. 426, Motion in Limine; Dkt. 427, Motion in Limine; Dkt. 431, Motion for Partial Summary Judgment, Dkt. No. 454 (May 24, 2013) — A38-A41

Memorandum Opinion and Order regarding Dkt. 431, Ericsson's Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses, Dkt. No. 524 (June 20, 2013) — A42-A51

Memorandum Opinion and Order regarding Post Trial Filings, Dkt. No. 615 (Aug. 6, 2013) — A52-A103

Final Judgment Pursuant to Fed. R. Civ. P. 54(b), Dkt. No. 616 (Aug. 8, 2013) — A104-A106

**Page**

**DISTRICT COURT DOCKET SHEET**

Civil Docket Sheet for *Ericsson Inc. et al v. D−Link Corporation et al.*, United States District Court for the Eastern District of Texas, Case No. 6:10-cv-00473-LED-KFG, printed December 6, 2013 — A107-A198

**JURY CHARGES AND VERDICT FORMS**

Final Jury Instructions, Dkt. No. 504 (June 12, 2013) — A199-A229

Jury Verdict Form on Infringement and Validity, Dkt. No. 508 (June 13, 2013) — A230-A234

Jury Verdict Form on Willfulness, Dkt. No. 510 (June 13, 2013) — A235-A236

**PATENTS-IN-SUIT**

U.S. Patent No. 6,424,625, marked as trial exhibit PX004 — A237-A256

U.S. Patent No. 6,466,568, marked as trial exhibit PX006 — A257-A272

U.S. Patent No. 6,772,215, marked as trial exhibit PX010 — A273-A283

**TRANSCRIPTS**

Transcript of Claim Construction Hearing (June 27, 2012) — A1001-A1213

Transcript of Trial, Day 1 - Morning Session (June 3, 2013) — A1214-A1239

Transcript of Trial, Day 1 - Afternoon Session (June 3, 2013) — A1240-A1280

**Page**

### TRANSCRIPTS (cont'd)

| | |
|---|---|
| Transcript of Trial, Day 2 - Morning Session (June 4, 2013) | A1281-A1315 |
| Transcript of Trial, Day 2 - Sealed Portion of Morning Session (June 4, 2013) **[FILED UNDER SEAL]** | A1316-A1322 |
| Transcript of Trial, Day 2 - Afternoon Session (June 4, 2013) | A1323-A1358 |
| Transcript of Trial, Day 2 - Sealed Portion of Afternoon Session (June 4, 2013) **[FILED UNDER SEAL]** | A1359-A1364 |
| Transcript of Trial, Day 3 - Morning Session (June 5, 2013) | A1365-A1396 |
| Transcript of Trial, Day 3 - Afternoon Session (June 5, 2013) | A1397-A1436 |
| Transcript of Trial, Day 4 - Morning Session (June 6, 2013) | A1437-A1459 |
| Transcript of Trial, Day 4 - Sealed Portion of Morning Session (June 6, 2013) **[FILED UNDER SEAL]** | A1460-A1475 |
| Transcript of Trial, Day 4 - Afternoon Session (June 6, 2013) | A1476-A1522 |
| Transcript of Trial, Day 5 - Morning Session (June 10, 2013) | A1523-A1553 |
| Transcript of Trial, Day 5 - Afternoon Session (June 10, 2013) | A1554-A1597 |
| Transcript of Trial, Day 6 - Morning Session (June 11, 2013) | A1598-A1629 |
| Transcript of Trial, Day 6 - Sealed Portion of Morning Session (June 11, 2013) **[FILED UNDER SEAL]** | A1630-A1638 |

Case: 13-1625 Case: 13-1625 Document: 179-1 Document: 177-1 Page: 6 Page: 6 Filed: 03/31/2014 Filed: 03/31/2014 (6 of 575)

CASE PARTICIPANTS ONLY

| | **Page** |
|---|---|
| **TRANSCRIPTS (cont'd)** | |
| Transcript of Trial, Day 6 - Afternoon Session (June 11, 2013) | A1639-A1665 |
| Transcript of Trial, Day 7 - Morning Session (June 12, 2013) | A1666-A1700 |
| Transcript of Trial, Day 7 - Sealed Portion of Morning Session (June 12, 2013) **[FILED UNDER SEAL]** | A1701-A1702 |
| Transcript of Trial, Day 7 - Afternoon Session (June 12, 2013) | A1703-A1751 |
| Transcript of Trial, Day 7 - Sealed Portion of Afternoon Session (June 12, 2013) **[FILED UNDER SEAL]** | A1752-A1756 |
| Transcript of Post-Trial Motion Hearing (July 16, 2013) | A1789-A1880 |
| Transcript of Pre-Trial Hearing (May 23, 2013) | A1881-A1914 |
| Transcript of Pre-Trial Motions Hearing (May 9, 2013) | A1915-A1942 |

## VOLUME II

| **COURT FILINGS** | |
|---|---|
| Original Complaint for Patent Infringement, Dkt. No. 1 (Sept. 14, 2010) | A5001-A5029 |
| First Amended Complaint for Patent Infringement, Dkt. No. 77 (June 8, 2011) | A5030-A5069 |
| Order Granting Dkt. 151, Intel Corporation's Motion to Intervene, Dkt. No. 205 (May 4, 2012) | A5070 |
| Defendants' Responsive Claim Construction Brief, Dkt. No. 225 (June 1, 2012) | A5071-A5112 |

- iv -

|  | **Page** |
|---|---|
| **COURT FILINGS (cont'd)** | |
| Exhibits to Defendants' Responsive Claim Construction Brief, Dkt. No. 226 (June 1, 2012) | A5113-A5322 |
| Defendant Dell Inc.'s Motion for Leave to File Its Second Amended Answer, Defenses & Counterclaims and Exhibits, Dkt. No. 301 (Dec. 20, 2012) **[FILED UNDER SEAL]** | A5360-A5608 |
| Ericsson's Response in Opposition to Dell's Motion for Leave to File Its Second Answer, Defenses, and Counterclaims and Exhibits, Dkt. No. 313 (Jan. 14, 2013) **[FILED UNDER SEAL]** | A5611-A5638 |
| Defendants' Daubert Motion to Exclude the Opinions of Mr. John R. Bone Regarding Issues Related to Damages and attachments, Dkt. No. 364 (Apr. 2, 2013) **[FILED UNDER SEAL]** | A5681-A5868 |
| Plaintiff's Response to Defendants' *Daubert* Motion to Strike the Expert Report of John R. Bone and Exhibits, Dkt. No. 378 (Apr. 4, 2013) **[FILED UNDER SEAL]** | A5869-A6236 |
| Plaintiff Ericsson's Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses and Exhibits, Dkt. No. 431 (May 14, 2013) **[FILED UNDER SEAL]** | A6275-A6317 |
| Defendant Dell Inc.'s Response to Plaintiffs' Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses and Exhibits, Dkt. No. 444 (May 21, 2013) **[FILED UNDER SEAL]** | A6318-A6402 |
| Defendants' Motion for Confirmation of Court's Claim Construction and attachments, Dkt. No. 448 (May 22, 2013) **[FILED UNDER SEAL]** | A6454-A6488 |

**Page**

**COURT FILINGS (cont'd)**

| | |
|---|---|
| Defendant Dell Inc.'s Sur-Reply to Plaintiffs' Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses and Exhibits, Dkt. No. 453 (May 23, 2013) **[FILED UNDER SEAL]** | A6489-A6515 |
| Plaintiff's Response to Defendants' Motion for Confirmation of Court's Claim Construction and attachments, Dkt. No. 460 (May 27, 2013) **[FILED UNDER SEAL]** | A6516-A6532 |
| Order Regarding Trial Times, Dkt. No. 467 (May 30, 2013) | A6533-A6534 |
| Amended Joint Submission of Proposed Jury Materials and attachments, Dkt. No. 475 (June 3, 2013) | A6535-A6670 |
| Defendants' Bench Memorandum in Opposition to Ericsson's Proposed Final Jury Instruction No. 33 and attachments, Dkt. No. 497 (June 11, 2013) | A6671-A6682 |
| Ericsson's Post-Trial Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest, Dkt. No. 527 (June 25, 2013) **[FILED UNDER SEAL]** | A6686-A6718 |
| Defendants' Federal Rule of Civil Procedure 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for a New Trial & Exhibits, Dkt. No. 528 (June 25, 2013) **[FILED UNDER SEAL]** | A6719-A7175 |
| Defendants' Response to Ericsson's Post-Trial Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest and Exhibits, Dkt. No. 579 (July 3, 2013) **[FILED UNDER SEAL]** | A7889-A7916 |
| Plaintiff Ericsson's Response in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law of Noninfringement and Invalidity and Motion for a New Trial & Exhibits, Dkt. No. 581 (July 3, 2013) **[FILED UNDER SEAL]** | A7917-A8151 |

**Page**

**COURT FILINGS (cont'd)**

Additional Exhibits in Support of Plaintiff Ericsson's Response in Opposition to Defendants' Renewed Motion for Judgment as a Matter of Law of Noninfringement and Invalidity and Motion for a New Trial, Dkt. No. 582 (July 3, 2013) **[FILED UNDER SEAL]** — A8152-A8363

Additional Exhibits in Support of Ericsson's Response to Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims, Dkt. No. 587 (July 3, 2013) **[FILED UNDER SEAL]** — A8769-A8845

Plaintiff Ericsson Inc. and Defendant Dell Inc.'s Joint Motion to Approve Supersedeas Bond and Enter Order Staying Execution of Judgment and Exhibits, Dkt. No. 651 (Oct. 4, 2013) **[FILED UNDER SEAL]** — A8846-A8872

Dell Inc.'s Rebuttal to Plaintiff Ericsson Inc.'s Arguments Regarding Joint Motion to Approve Supersedeas Bond and Enter Order Staying Execution of Judgment, Dkt. No. 660 (Oct. 11, 2013) **[FILED UNDER SEAL]** — A8879-A8885

Order Approving Supersedeas Bond and Staying Execution of Judgment, Dkt. No. 661 (Nov. 4, 2013) — A8886-A8887

Ericsson's Opening Claim Construction Brief and Exhibits, Dkt. No. 209 (May 8, 2012) — A8888-A9090

Ericsson's Reply Claim Construction Brief and Exhibits, Dkt. No. 230 (June 15, 2012) — A9091-A9104

Proposed Joint Final Pretrial Order and Exhibits A-J, Dkt. No. 417 (May 9, 2013) — A10001-A10435

Defendants' Reply in Support of Their Motion for Confirmation of Court's Claim Construction, Dkt. No. 462 (May 28, 2013) **[FILED UNDER SEAL]** — A10436-A10446

- vii -

**Page**

### VOLUME III

**TRIAL EXHIBITS**

| | |
|---|---|
| DX104 - Ericsson Presentation on 50B Licensing (Kasim Alfalahi Deposition Exhibit 17) [ERCDLINK0166067-00001 - ERCDLINK0166067-00026] **[FILED UNDER SEAL]** | A15001- A15026 |
| DX120 - 10/13/1997- Petras, et al., Petras ComNets Submission, "Candidate Protocol Stack (MAC+ LLC) for a Wireless ATM Air Interface", WG3 Temporary document WG3TD76 (12/29/2012 Disclosure of Dietmar Petras Exhibit II) [75748DOC0058940- 75748DOC0058965; ERCDLINK0404526-00001 - ERCDLINK0404526-00026] | A15027- A15053 |
| DX161 - 09/00/2002 -IEEE-SA Standards Board Bylaws, IEEE-SA [75747DOC5811449-75747DOC5811463] | A15054- A15068 |
| DX193 - 09/11/2002- Chesson, G., Kitchin, D., et al., "IEEE P802.11 Wireless LANs, Wireless Multimedia Enhancements (WME)" [75747DOC0025741- 75747DOC0025760] | A15069- A15088 |
| DX198 - 802.11-05/1095r2 [75747DOC5799697- 75747DOC5799733] | A15089- A15125 |
| DX252 - 01/00/2011 - Sarel, E. "L2Parser Overview" Intel Mobility Wireless Group, Intel Confidential [75685DOC020154- 75685DOC020186] **[FILED UNDER SEAL]** | A15126- A15158 |
| DX356 - 03/2000- Kitchin, D., "Wireless LAN QoS" Intel Wireless LAN Operation, 802.11-00/036 [75747DOC0001631 - 75747DOC0001635] | A15159- A15163 |
| DX479 - 05/19/2009 - U.S. Patent No. 7,535,858 [DEFS00026407- DEFS000264201] | A15164- A15177 |
| DX520 - Compilation Puma Peak Software Code **[FILED UNDER SEAL]** | A15178- A15178.2 |

**Page**

### TRIAL EXHIBITS (cont'd)

DX537 - Ericsson Patent Licensing and Profitability Powerpoint Presentation [ERCDLINK0010981] — A15179-A15209

DDX03 - Demonstrative slides used during the testimony of Jerry Gibson **[DDX03-39 FILED UNDER SEAL]** — A15210-A15297

PX0026 - 11/30/2009 - Global Patent License Agreement between Ericsson and Melco Holdings Inc. Systems, Inc. (01/04/2013 Bone Expert Report) [ERCDLINK0009359] **[FILED UNDER SEAL]** — A15298-A15314

PX0027 - 01/01/2007 - Amendment  No. 1 to the Global Patent License Agreement between Ericsson and Option N. V (01/04/2013  Bone Expert Report) [ERCDLINK0011241] **[FILED UNDER SEAL]** — A15315-A15320

PX0028 - 12/01/2003 - Global Patent License Agreement between Ericsson and Option N. V (01/04/2013 Bone Expert Report) [ERCDLINK0011242] **[FILED UNDER SEAL]** — A15321-A15332

PX0029 - 01/01/2007 - Summary of RIM Global Patent License Agreement between Ericsson and RIM (01/04/2013 Bone Expert Report) [ERCDLINK00011825-ERCDLINK00011839] **[FILED UNDER SEAL]** — A15333-A15347

PX0030 - 01/01/2007 - WLAN Patent License Agreement between Ericsson and Ascom (01/04/2013 Bone Expert Report) [ERCDLINK00011840- ERCDLINK00011854] **[FILED UNDER SEAL]** — A15348-A15362

PX0031 - 01/01/2012 - Global Patent Cross-License Agreement between Ericsson and Hewlett-Packard Company (01/04/2013 Bone Expert Report) [ERCDLINK0039162-ERCDLINK0039203] **[FILED UNDER SEAL]** — A15363-A15404

**Page**

## TRIAL EXHIBITS (cont'd)

PX0032 - 06/29/2012 - Hewlett-Packard Patent Purchase and Sale Agreement between Hewlett- Packard Development Company, L.P. and Hewlett-Packard Company (01/04/2013 Bone Expert Report) [ERCDLINK0039204 - ERCDLINK0039231] **[FILED UNDER SEAL]** — A15405-A15432

PX0033 - 12/31/2011 - Global Patent License Agreement between Ericsson and Sonim Technologies Inc. (01/04/2013 Bone Expert Report) [ERCDLINK0040416-ERCDLINK0040434] **[FILED UNDER SEAL]** — A15433-A15451

PX0037 - 12/21/2010 - Global Patent License Agreement between Ericsson and Research In Motion Limited (01/04/2013 Bone Expert Report) [ERCDLINK0042103 - ERCDLINK0042130] **[FILED UNDER SEAL]** — A15452-A15479

PX0283 - 2007 IEEE Standard 802.11 — A15480-A16712

PX0286 - 2009 IEEE Standard 802.11 — A16713-A17248

PX0293 - 01/29/2003 Letter of Assurance for Essential Patents to IEEE from Telefonaktiebolaget LM Ericsson — A17249-A17251

PX0294 - 04/18/2011 Letter of Assurance for Essential Patents to IEEE from Ericsson, Inc. — A17252-A17255

PX0464 - 01/01/2012 - ASCOM Global Patent License Agreement with Ericsson [ERCDLINK00595927-ERCDLINK00595946] **[FILED UNDER SEAL]** — A17256-A17275

DX081 - 05/23/2012- Ericsson Presentation "WLAN Licensing Strategy" (Nils Forslund Deposition Exhibit 11) [ERCDLINK0173832] **[FILED UNDER SEAL]** — A17276-A17288

**Page**

### TRIAL EXHIBITS (cont'd)

| | Page |
|---|---|
| DX186 - 12/21/2011- Email from Ives, B. to Johns, A Subject: Ericsson-HP patent license discussions- for settlement purpose [ERCDLINK0491259_00001- ERCDLINK0491259 00003] **[FILED UNDER SEAL]** | A17289-A17291 |
| PX0013 - Confidential Settlement, Release and License Agreement between Commonwealth Scientific and Industrial Research Organization and Intel Corporation, effective as of April 16, 2009 [17724DOC000001-17724DOC000026] **[FILED UNDER SEAL]** | A20001-A20026 |
| PX0015 - Settlement and Patent License Agreement between Commonwealth Scientific and Industrial Research Organization and Belkin International, Inc., effective April 24, 2009 [BELK00135787- BELK00135807] **[FILED UNDER SEAL]** | A20027-A20047 |
| PX0022 - Confidential Settlement, Release and License Agreement between Commonwealth Scientific and Industrial Research Organization and Intel Corporation, effective April 16, 2009 [DELL-LIC0000165- DELL-LIC0000189] **[FILED UNDER SEAL]** | A20048-A20072 |
| PX0024 - Settlement and Patent License Agreement between Commonwealth Scientific and Industrial Research Organization and D-Link Systems, Inc., effective September 2009 [DKS321761- DKS321780] **[FILED UNDER SEAL]** | A20073-A20092 |
| PX0041 – Settlement, Release, and Patent License Agreement between Commonwealth Scientific and Industrial Research Organization and NETGEAR, Inc., effective May 15, 2009 [NETGEARINC00388228- NETGEARINC00388250] **[FILED UNDER SEAL]** | A20109-A20131 |
| PX0052 – Release Agreement between Dell Inc. and Intel Corporation, effective April 16, 2009 [DELL-LIC0000153-DELL-LIC0000158] **[FILED UNDER SEAL]** | A20132-A20137 |

**Page**

**TRIAL EXHIBITS (cont'd)**

PX0238 - Excel Spreadsheet Value to HP                    A20138-
[ERCDLINK0169686] **[FILED UNDER SEAL]**              A20141

PX0244 - .txt file Printers:34 million 2009 HP sells     A20142-
[ERCDLINK0490768] **[FILED UNDER SEAL]**              A20143

## CONFIDENTIAL MATERIAL OMITTED

The material omitted on pages A1316-A1321, A1359-A1361, A1460-A1464, A1465-A1467, A1469-A1472, A1630-A1635, A1701-A1702, A1752-A1755, A5361-A5363, A5366-A5367, A5369, A5421-A5424, A5469-A5482, A5538-A5540, A5615, A5619, A5682, A5684-A5698, A5923-A5924, A5928-A5947, A5968-A5969, A5980-A5981, A6028, A6276, A6279-A6289, A6292-A6293, A6295-A6316, A6329-A6330, A6333-A6335, A6339-A6342, A6346-A6349, A6375-A6377, A6381, A6386-A6387, A6393-A6394, A6397-A6401, A6454-A6458, A6482, A6485-A6487, A6490-A6492, A6496-A6498, A6500-A6506, A6508-A6511, A6513-A6515, A6523, A6690, A6801-A6854, A7026, A7891, A7907-A7909, A7933, A8165-A8179, A8180-A8293, A8294-A8306, A8307-A8309, A8310-A8319, A8321, A8327-A8335, A8349, A8351-A8353, A8820-A8821, A8823, A8832, A8836, A8840, A8880-A8884, A10439, A15001, A15010, A15126, A15128, A15178.1-A15178.2, A15289, A15298-A15314, A15315-A15320, A15321-A15332, A15333-A15347, A15348-A15362, A15363-A15404, A15405-A15432, A15433-A15451, A15452-A15479, A17256-A17275, A17276, A17284, A17289, A20001-A20026, A20027-A20047, A20048-A20072, A20073-A20092, A20109-A20131, A20132-A20137, A20138-A20141, A20142-A20143 are documents that contain source code, documents disclosing confidential information relevant to ongoing or prospective business operations, documents disclosing confidential third-party information, and confidential agreements. The foregoing material was designated confidential by the parties pursuant to a protective order entered by the district court.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

| | | |
|---|---|---|
| **ERICSSON INC.,** *et. al.,* | § | |
| | § | |
| *Plaintiffs,* | § | |
| | § | **Civil Action No. 6:10-CV-473** |
| **v.** | § | **(LED/KFG)** |
| | § | |
| **D-LINK CORPORATION,** *et. al.,* | § | |
| | § | |
| *Defendants.* | § | |
| | § | |

**MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS OF
UNITED STATES PATENT NOS.
<u>6,772,215, 6,330,435, 5,987,019, 6,466,568, and 5,790,516</u>**

This claim construction opinion construes the disputed claim terms in U.S. Patent Nos.

6,772,215, 6,330,435, 5,987,019, 6,466, 568, and 5,790,516 as asserted in the above captioned case.

A *Markman* hearing was held on June 27, 2012, to construe the disputed terms of the various

patents. For the reasons stated herein, the Court adopts the constructions set forth below.

**CLAIM CONSTRUCTION PRINCIPLES**

"It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to

which the patentee is entitled the right to exclude." *Phillips v. AWH Corp.,* 415 F.3d 1303, 1312

(Fed. Cir. 2005)(quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 111,

115 (Fed. Cir. 2004)). The Court examines a patent's intrinsic evidence to define the patented

invention's scope. *Id.* at 1313-1314; *Bell Atl. Network Servs., Inc. v. Covad Commc'ns Group, Inc.,*

262 F.3d 1258, 1267 (Fed. Cir. 2001). Intrinsic evidence includes the claims, the rest of the

specification and the prosecution history. *Phillips*, 415 F.3d at 1312-13; *Bell Atl. Network Servs.,*

262 F.3d at 1267. The Court gives claim terms their ordinary and customary meaning as understood

1

**A1**

by one of ordinary skill in the art at the time of the invention. *Phillips*, 415 F.3d at 1312-13; *Alloc, Inc. v. Int'l Trade Comm'n*, 342 F.3d 1361, 1368 (Fed. Cir. 2003).

Claim language guides the Court's construction of claim terms. *Phillips*, 145 F.3d at 1314. "[T]he context in which a term is used in the asserted claim can be highly instructive." *Id.* Other claims, asserted and unasserted, can provide additional instruction because "terms are normally used consistently throughout the patent." *Id.* Differences among claims, such as additional limitations in dependent claims, can provide further guidance. *Id.*

"[C]laims 'must be read in view of the specification, of which they are a part.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995)). "[T]he specification 'is always highly relevant to the claim construction analysis. Usually it is dispositive; it is the single best guide to the meaning of a disputed term.'" *Id.* (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)); *Teleflex Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir 2002). In the specification, a patentee may define his own terms, give a claim term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. *Phillips*, 415 F.3d at 1316. Although the Court generally presumes terms possess their ordinary meaning, this presumption can be overcome by statements of clear disclaimer. *See Sci Med Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1343-44 (Fed. Cir. 2001). This presumption does not arise when the patentee acts as his own lexicographer. *See Irdeto Access, Inc. v. EchoStar Satellite Corp.*, 383 F.3d 1295, 1301 (Fed. Cir. 2004).

The specification may also resolve ambiguous claim terms "where the ordinary and accustomed meaning of the words used in the claims lack sufficient clarity to permit the scope of the claim to be ascertained from the words alone." *Teleflex, Inc.*, 299 F.3d at 1325. For example, "[a]

**A2**

claim interpretation that excludes a preferred embodiment from the scope of the claim 'is rarely, if ever, correct." *Globetrotter Software, Inc. v. Elam Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004)(quoting *Vitronics Corp.*, 90 F.3d at 1583). But, "[a]lthough the specification may aid the court in interpreting the meaning of disputed language in the claims, particular embodiments and examples appearing in the specification will not generally be read into the claims." *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1571 (Fed. Cir. 1988); *see also Phillips*, 415 F.3d at 1323.

The prosecution history is another tool to supply the proper context for claim construction because a patentee may define a term during the prosecution of the patent. *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1356 (Fed. Cir. 2004)("As in the case of the specification, a patent applicant may define a term in prosecuting the patent."). The well-established doctrine of prosecution disclaimer "preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution." *Omega Eng'g Inc. v. Raytek Corp.*, 334 F.3d 1314 (Fed. Cir. 2003). The prosecution history must show that the patentee clearly and unambiguously disclaimed or disavowed the proposed interpretation during prosecution to obtain claim allowance. *Middleton Inc. v. 3M Co.*, 164 F.3d 1372, 1378-79 (Fed. Cir. 1988)(quotations omitted). "As a basic principle of claim interpretation, prosecution disclaimer promotes the public notice function of the intrinsic evidence and protects the public's reliance on definitive statements made during prosecution." *Omega Eng'g, Inc.*, 334 F.3d at 1324.

Although, "less significant than the intrinsic record in determining the legally operative meaning of claim language, "the Court may rely on extrinsic evidence to "shed useful light on the relevant art." *Phillips*, 415 F.3d at 1317 (quotation omitted). Technical dictionaries and treatises

3

**A3**

Case 3:10-cv-00349-DRH-PMF    Document 187-1    Filed 03/31/2014    Page 18 of 23

may help the Court understand the underlying technology and the manner in which one skilled in the art might use claim terms, but such sources may also provide overly broad definitions or may not be indicative of how terms are used in the patent. *Id.* at 1318. Similarly, expert testimony may aid the Court in determining the particular meaning of a term in the pertinent field, but "conclusory, unsupported assertions by experts as to the definition of a claim term are not useful." *Id.* Generally, extrinsic evidence is "less reliable than the patent and its prosecution history in determining how to read claim terms." *Id.*

Determining the claimed function and the corresponding structure of means-plus-function clauses are matters of claim construction. *WMS Gaming Inc., v. Int'l Game Tech.*, 184 F.3d 1339, 1347 (Fed. Cir. 1999). Claim construction of a means-plus-function limitation involves two steps. *See Medical Instrumentation and Diagnostics v. Elekta*, 344 F.3d 1205, 1210 (Fed. Cir. 2003). The court must first identify the particular claimed function, and then look to the specification and identify the corresponding structure for that function. *Id.* "Under this second step, 'structure disclosed in the specification is corresponding structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim.'" *Id.* (citations omitted). "While corresponding structure need not include all things necessary to enable the claimed invention to work, it must include all structure that actually performs the recited function." *Default Proof Credit Card System, Inc. v. Home Depot U.S.A., Inc.*, 412 F.3d 1291, 1298 (Fed. Cir. 2005).

## OVERVIEW OF THE '215 PATENT

The '215 patent is entitled "Method for Minimizing Feedback Responses in ARQ Protocols" and the invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols. Data sent by a

**A4**

transmitter (such as a wireless router) to a receiver (such as a computer) is broken into data packets (also called "Protocol Data Units" or "PDUs") which have sequence numbers. '215 patent at 1:29-30. The receiver assembles the data packets back into the proper order using the sequence numbers. In a perfect world, the receiver would receive all the data packets in the proper order. However, frequently data packets get lost or corrupted during the transmission from the transmitter to the receiver and never make it to the receiver's buffer. Certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. '215 patent at 1:21-23. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an Automatic Repeat Request (ARQ) protocol. '215 patent at 1:23-25. The basic function of the ARQ protocol is to allow the receiver to request that the transmitter re-transmit those PDUs that were lost or contained errors during transmission. '215 patent at 1:34-37. The PDUs that are sent from the receiver back to the transmitter include control data needed for error control/recovery and are called "status PDUs" (S-PDUs).

Two main methods are currently used for coding the sequence numbers of the lost or corrupted data within the S-PDUs sent from the transmitter back to the receiver. One method is to use a list of sequence numbers to be re-transmitted. The second method is to use a bitmap to represent the sequence numbers to be re-transmitted. '215 patent at 2:48-52. However, a significant problem with the existing ARQ protocols is that they are static in construction and, in certain situations, this may lead to a waste of bandwidth, because a great deal of information is transmitted unnecessarily in the S-PDUs. '215 patent at 3:46-50.

Therefore, the inventors of the '215 patent recognized that a significant need existed for a method that can be used to minimize the size of S-PDUs in an ARQ protocol and for a method that

5

**A5**

can be used to maximize the number of sequence numbers in an S-PDU with limited size, if it is not possible to fit all potential sequence numbers into a single S-PDU. '215 patent at 4:33-38. The inventors summarized the invention as "a method for minimizing feedback responses in an ARQ protocol ... whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of [sequence numbers] in an S-PDU of limited size." '215 patent at 4:44-53.

## DISCUSSION

### I. Disputed terms of the '215 patent.

The disputed terms and their proposed constructions are set forth below.

#### a. "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" (claims 1, 15 and 25)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
| --- | --- |
| responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types | responsive to the receiving step, generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size of number of feedback responses |

Plaintiffs acknowledge that the proposed constructions are nearly identical, but argue that Defendants' proposed construction contains superfluous language and should be rejected. Plaintiffs' first objection to Defendants' proposed construction is that it requires the type of feedback response to be actively "selected from multiple available feedback responses", which, they argue, would import an entirely additional step (the step of selecting) into the claim, violating the canons of claim

6

**A6**

construction.

Plaintiffs also object to Defendants' requirement that the unclaimed "selecting" further accomplish the goal of "minimiz[ing] the size or number of feedback responses." Plaintiffs argue that while minimizing the size of number of feedback responses may be the benefit of the invention, not every benefit flowing from an invention is a claim limitation, citing *i4i, Ltd. Partnership v. Microsoft Corp.*, 598 F.3d 831, 843 (Fed. Cir. 2010), *aff'd* __U.S.__, 131 S. Ct. 2238, 180 L. Ed. 2d 131. They contend Defendants' construction adds only two, and not all, of the advantages set forth in the patent. According to Plaintiffs, Defendants do not point to any lexicography, disclaimer, or disavowal that allow the limitations to be included in the claims and, further, the patentee apparently chose to put "minimization of feedback responses" in the preamble where it is not a limitation.[1] They further argue that the claims define the invention, and that those claims do not include Defendants' proposed extraneous limitations.

Defendants respond that their construction captures the actual inventive concept claimed to overcome the prior art problems identified in the specification. They further argue that the solution to the problem (the static use of a particular type of response) not addressed by the prior art is to "select" a feedback response to optimize system performance. '215 patent at 9:12-14. They contend that "selecting" or "minimizing" is already part of the claim as part of the element requiring the construction of a feedback response "in response to" incoming data units. Defendants argue that this is not merely some benefit of the invention, it *is* the invention and the claims should be construed

---

[1] Plaintiffs contend that Defendants have never before claimed in their briefing that the preamble is a limitation and are essentially trying to back-door it in as a limitation now. *See Transcript of Claim Construction Hearing* (doc. #255), p. 16.

to capture the scope of the actual invention,[2] citing *Retractable Techs., Inc. v. Becton, Dickinson and Co.*, 653 F.3d 1296 (Fed Cir. 2011) (citing *Phillips v. AWH Corp.*, 415 F.3d 1303, 1323 (Fed. Cir. 2005)(en banc)).

This Court notes that there is currently a split among the judges on the Federal Circuit regarding the appropriate role of the specification in construing the claims of a patent. *See Retractable Technologies, Inc. v. Becton, Dickinson and Company*, 659 F.3d 1369 (Fed. Cir. 2011)(denial of re-hearing en banc). As stated above, Defendants urge that the claims should be construed in order to capture the actual scope of the invention. Judge Lourie is of the view that the claims are limited by the "invention" described in the specification. *Retractable*, 653 F.3d at 1305 ("In reviewing the intrinsic record to construe the claims, we strive to capture the scope of the actual invention, rather than strictly limit the scope of the claim to disclosed embodiments or allow claim language to become divorced from what the specification conveys is the invention."). However, Judge Moore along with Chief Judge Rader take the view that the claims define the metes and bounds of the patented invention and, although the specification may shed light on the plain and ordinary meaning of a claim term, it cannot be used to narrow the claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope. *Retractable*, 659 F.3d at 1360-71.

This Court is inclined toward Judge Moore's and Chief Judge Radar's view in *Retractable*. Defendants' proposed construction seems to fall on the side of reading limitations into the claims

---

[2] Ericsson disagrees that the advantage of minimizing the feedback response is the crux of the invention. It contends that the invention is "the creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identify to the transmitter which it is choosing." Transcript, p. 13.

**A8**

rather than reading the claims in light of the specification.  In addition, this Court agrees with Plaintiffs that Defendants' construction adds only two, and not all, of the advantages set forth in the patent.  "[T]he fact that a patent asserts that an invention achieves several objectives does not require that each of the claims be construed as limited to structures that are capable of achieving all of the objectives." *Phillips*, 415 F.3d at 1327 (internal quotations omitted).

Therefore, this Court finds that the term "responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field" means **"responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types."**

> b.     **"means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields" (claim 45)**

9

**A9**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| Recited Function: receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields<br><br>Corresponding Structure: the receiver of a peer entity, see '215:2:29-30, whereby different mechanisms can be used to indicate erroneous data units so as to optimize performance, see '215::5:53-56, and the mechanisms refer to any of the methods described for constructing a bitmap feedback response message disclosed at '215::3:17-28 and '215::6:8-48, any of the methods for constructing a compressed bitmap feedback response message disclosed at '215::6:49-54, any of the methods for constructing a list feedback response message disclosed at '215::2:63-3:16 and '215::7:28-51, and/or the method for constructing a feedback response message combining the list and bitmap methods, and any equivalents thereof. | Recited Function: receiving the plurality of first data units and generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size or number of feedback responses and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields<br><br>Corresponding Structure: (a) Fig. 4, Fig. 5, Fig. 6, Table 1, 3:6-13, 36-42, 4:1-54, 5:50-6:49, 6:55-64, 7:28-51<br><br>(b) Invalid under Section 112, paragraphs 2,6. |

Plaintiffs' contend that their proposed function for this term is the function explicitly recited in the claim and that they have identified corresponding structure that "actually performs" the recited function. Plaintiffs argue that Defendants' proposed recited function for this term is a different function and therefore is legally defective. Plaintiffs note that the substantive dispute regarding this

10

**A10**

term is related to a previous argument as to whether minimization or optimization is a required part of the function. Plaintiffs argue that the structure set forth at 3:6-13 and 3:36-42 deal with the calculation of the size of the S-PDU and has nothing to do with the actual construction of the message. Likewise, they contend that Table 1 has nothing to do with constructing the feedback response message.

Defendants agree that this debate is an extension of the initial debate, that is, what does this claim capture? Defendants again contend that the essence of the invention is that there be a minimization or optimization of the size or the number of the S-PDUs. Defendants argue that the claimed invention cannot be something that merely constructs a S-PDU to send back to the transmitter without the determination of which type of S-PDU (list, bitmap, etc.) would be optimal. According to defendants, this is all over the prior art.

The Court finds that Plaintiffs have proposed the correct function for this means-plus-function term. Although Defendants argue that the Court is not restricted to the actual language used in the claim to define the function, the Federal Circuit has made it clear that "[t]he statute does not permit limitation of a means plus function claim by adopting a function different from that explicitly recited in the claim." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). In addition, Plaintiffs have correctly identified the "corresponding structure" disclosed in the specification.

In a related argument, Defendants contend that claim 45 is invalid because Ericsson's proposals for corresponding structure do not include portions of the specification necessary to support their interpretation of the claimed function. *See Motion for Summary Judgment* [Clerk's doc. # 224, p. 16]. In other words, they assert that Plaintiffs' proposed structure is incomplete because it omits

11

**A11**

portions of the specification relating to the claimed optimization. Therefore, they contend that Plaintiffs' proposed structure is incomplete, and as such does not disclose an algorithm to support its construction of the "means for receiving . . .and constructing" element. During the hearing, Defendants "absolutely concede[d]" that there is adequate structure disclosed in the specification and that this issue is a claim construction issue and not a summary judgment indefiniteness issue. *See Transcript*, pp. 61-62.

This Court agrees with Plaintiffs and finds that there is no "optimization" claimed in the recited function, and it would be error to import any function other than what is explicitly recited in the claim. *See Micro Chem.*, 194 F.3d at 1258.

This Court finds that the recited function is: **"receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields."**

The corresponding structure is: **the receiver of a peer entity, see '215::2:29-30, whereby different mechanisms can be used to indicate erroneous data units so as to optimize performance, see '215::5:53-56, and the mechanisms refer to any of the methods described for constructing a bitmap feedback response message disclosed at '215::3:17-28 and '215::6:8-48, any of the methods for constructing a compressed bitmap feedback response message disclosed at '215::6:49-54, any of the methods for constructing a list feedback response message disclosed at '215::2:63-3:16 and '215::7:28-51, and/or the method for constructing a feedback response**

12

**A12**

**message combining the list and bitmap methods, and equivalents thereof."**

## OVERVIEW OF THE '435 PATENT

The '435 patent builds on what happens after an ACK message is sent to the transmitter from the receiver. As shown in the '215 patent, a receiver may request that the transmitter resend data packets that it (the receiver) didn't receive with an ACK message. The transmitter may continue to retransmit those data packets but it may be that the receiver still may not receive the data packets due to a continued corruption of the signal. The receiver may still wait on the data packets even though the data may be obsolete. The transmitter continues to store these data packets in the buffer because the receiver still has not acknowledged receipt of them. This causes the buffers of both the transmitter and the receiver to become full and the result is that the buffers cannot receive the next group of data packets. This causes unacceptable delay in real time applications such as streaming video and television.

The '435 patent attempts to address this problem by using a "discard notification message." The transmitter will hold a specified number of packets in its buffer until it receives and acknowledgment that the receiver got them. The receiver holds an incomplete set of packets in its buffer until the complete set is received. ACK messages are sent from the receiver to the transmitter and the transmitter keeps re-sending the data packets until a timer expires. The transmitter then sends a discard message to the receiver which tells the receiver that the transmitter deleted the old packets so they will not be resent. The receiver gets this message and then determines which packets have been discarded by the transmitter. It then removes these data packets from the list of those expected to be received from the transmitter. This allows the transmitter and receiver to transmit and receive other data packets without having to wait on the transmission of obsolete data packets.

13

**A13**

## II.     Disputed terms of the '435 patent.

### a.     "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded." (claim 1)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a control message in an Automatic Repeat Request Protocol that indicates data packets that the transmitter has discarded | message containing the identity of unacknowledged data packets the transmitter has discarded |

One dispute between the parties focuses on whether the discard message must actually contain the explicit identity of the discarded packets. Plaintiffs assert that it does not. Initially, Plaintiffs point out that Claim 1 requires that the receiver will compute "which data packets have been discarded by the transmitter based on the data packet discard notification message." In addition, Plaintiffs argue that dependent Claim 6 specifically requires that the data packet discard notification message include a sequence number field for each data packet to be discarded by the receiver. Plaintiffs further note that dependent Claim 3 requires that the discard message include a sequence number to indicate the first data packet to be discarded and a length field to indicate a number of data packets immediately preceding the first data packet, that are to be discarded by the receiver. According to Plaintiffs, the use of a length field in this context shows that the message itself does not explicitly indicate each packet to be discarded. Rather, the message need contain only enough information for the receiver to derive, in its computing step, which packets should be discarded. Defendants initially responded that "identify" carries the same meaning as "indicate". However, during the hearing, Defendants responded that they had no objection to the term "indicating".

"Indicating" and "identifying" are not used interchangeably in the '435 patent. Forms of "indicating" are used 29 times, always in the same context as the claim language. Forms of "identify"

14

**A14**

were used 13 times, mostly in the context of sequence numbers "identifying" discarded cells. The

plain language of Claim 1 and Claim 13 show that "identifying" and "indicating" are used differently

in this patent. This Court agrees with Plaintiffs on this particular point. "Indicates" should be used

instead of "containing the identity."

The second dispute focuses on whether the Defendant's addition of the word

"unacknowledged" in their construction is proper. Plaintiffs note that, in the present invention, the

discard message is triggered by both an NACK (a negative acknowledgment from the receiver to the

transmitter) and in a situation where the there is no acknowledgment from the receiver to the

transmitter (unacknowledged). '435 patent at 1:14-22. The so-called NACK embodiment is

illustrated at 4:53-67. Plaintiffs also argue that Defendant's addition of the word "unacknowledged"

in their construction reads out the preferred embodiment disclosed at 4:53-67.

Defendants respond that "unacknowledged" packets and "negatively acknowledged data

packets" refer to the same thing, that is, packets that have not been successfully received. In other

words, according to Defendants, "negatively acknowledged packets" are "unacknowledged packets."

This Court agrees with Plaintiffs. At worst, Defendants' construction does in fact exclude the

preferred embodiment set forth at 4:53-67. "A claim interpretation that excludes a preferred

embodiment from the scope of the claim is rarely, if ever, correct." *Globetrotter Software, Inc. v.

Elan Computer Group, Inc.*, 362 F.3d 1367, 1381 (Fed. Cir. 2004). At best, inserting

"unacknowledged" into the claim construction would be importing limitations into the claim which

is improper.

Finally, Defendants argue that "control message" and "Automatic Repeat Request" are

improper limitations to import into the claim. The Court notes that the claim calls for a "message"

15

**A15**

and not a "control message." The Court also notes that it agrees with Defendants that "in an Automatic Repeat Request protocol" is not necessary language to be included in the construction or helpful to the jury because of its existence in the preamble.

Therefore, this Court finds that the proper construction is: **"a message that indicates data packets that the transmitter has discarded."**

### OVERVIEW OF THE '019 AND '568 PATENTS

The '568 patent, which contains apparatus claims, is a division of the '019 patent, which contains method claims. Both patents contain the same specification and similar claim language. Both of these patents are entitled "Multi-Rate Radiocommunication Systems and Terminals" and describe ways to efficiently transmit a variety of different types of information. Different types of information often have different optimal transmission characteristics. For examples, users communicating by cellular telephone will desire rapid two-way communication and may not be concerned with minor transmission errors. On the other hand, a user downloading email will tolerate small delays but will expect better error control. To accommodate the different transmission characteristics, the '019 and the '568 patents teach that a wireless transmitter should send a service type identifier along with the user's payload information. The service type identifier informs the receiver of the transmission characteristics for the type of payload information being sent.

**III.    Disputed terms of the '019 and '568 patents.**

    **a.    "separate from said first field" (claim 19 of the '019, claim 1 of the '568)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| No construction necessary. | in a different portion of a radio channel from said first field |

16

**A16**

Plaintiffs contend that the limitation merely clarifies that the claim requires two distinct fields, i.e., the field with the payload information is not the same field as the service type identifier field. As such, Plaintiffs argue that there is no need to construe this straightforward limitation. Plaintiffs contend that Defendants seek to attempt to inject limitations from exemplary TDMA embodiments of the invention into the claim even though the claim itself is not limited to TDMA applications. According to Plaintiffs, none of the limitations of Claim 19 require that the two fields be in separate time slots or in separate portions of a radio channel.[3]

Defendants agree that there are necessarily two different fields. According to them, the dispute is what it additionally means for the first field to be separate from the second field. Defendants argue that the requirement that there be a "first" field and a "second" field show that the fields are distinct but there is an additional requirement that the second field be separate from the first field. Defendants contend that this is the crux of the "separate field", by transmitting the service type identifier separately from the payload information, the receiver can be informed of how to decode different service types having varying transmission characteristics without knowing what those transmission characteristics are.

The claim in question clearly requires a first field and a second field that are transmitted on a radio channel. As Plaintiffs correctly note, there is no restriction or limitation that the two fields be distanced apart on the radio channel. As the Court noted, and as the Defendants agree, the key is that the two fields just have to be transmitted separately. Although Defendants do not deny that the fields can be adjacent to each other, this Court notes that Defendants' proposed construction seems

---

[3] Claim 1 of the '019 requires that the second field be in "at least another one of successive time slots." Ericsson argues that Claim 19 is not drafted so narrowly.

17

**A17**

to imply that the two fields must be distanced from one another along the radio channel. This Court rejects Defendants' construction and determines that no construction is necessary.

b. "a service type identifier which identifies a type of payload information" (claim 19 of the '019, claim 1 of the '568)

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| an identifier which identifies transmission characteristics of payload information | an identifier that identifies the type of information (e.g. video, voice, or data) conveyed in the payload. |

Plaintiffs contend that their proposal recognizes that the inventors anticipated many more types of payload information than the few examples discussed in the patent and the patentee, instead of attempting to predict all of the various types of information that may be used in future radio communications, flexibly accounted for future developments. They contend that the service type identifier must inform the receiver about the transmission characteristics of the payload it is receiving so that it may handle the transmission correctly rather than merely knowing if the payload is a video or audio.

Defendants argue that there is a distinct difference between the type of service and how it is sent and that Plaintiffs disavowed "transmission characteristics" to distinguish the '019 over the Raith reference, which disclosed channel coding. They contend that Plaintiffs' attempt to inject the phrase "transmission characteristics" into the claim doesn't broaden the claim, but is an attempt to rewrite it. They argue that the service type identifier merely identifies the type of data conveyed in the payload and not the transmission characteristics of that data.

The language of the claim is clear in that the service type identifier identifies the type of payload information, not the transmission characteristics of that information. The specification also

18

**A18**

makes it clear that "the service type identifier informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate." '019 patent at 3:9-19. In another embodiment involving a multimedia connection where the transmission may rapidly between voice, data and video, "a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the information, e.g., how to decode the received bits." '019 patent at 9:32-38.

In addition, claim 22, which is dependent on claim 19, claims an additional step of changing the type of information from a first type to a second type. Claim 23, which is dependent on Claim 22, claims the method of claim 22 "wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data."

Further, it appears that Plaintiffs previously acknowledged that in some cases "it may not be possible to identify the type of payload information based upon an indication of channel coding since the type of channel coding identified may be employed for different types of information." '568 file history, May 10, 2002 Amendment, page 6 (Ericsson's Response to Examiner's Second Raith Rejection).

Therefore, this Court finds that the proper construction for this term is **"an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia."**

19

**A19**

## OVERVIEW OF THE '516 PATENT

When multiple devices transmit signals, those signals can interfere with each other. However, in frequency division multiplexing (FDM) the signals are assigned to different frequency bands and are transmitted on different frequencies. A special type of frequency division multiplexing is orthogonal frequency division multiplexing (OFDM). In the OFDM system there is a particular way of selecting the frequencies (called subcarriers) so that the frequencies do not interfere with each other. The subcarriers are spaced on a radio channel so that they do not overlap or interfere with other subcarriers so that multiple data symbols can be transmitted on a single channel simultaneously. Only a single subcarrier has a non-zero value at a given frequency. However, these signals can naturally become distorted due to frequency dispersion which causes the subcarriers to shift so that they have non-zero values at other frequencies which results in intersymbol interference (ISI). They overlap each other in an interfering manner and some transmitted information may be lost. To remedy this situation, the '516 patent teaches that a pulseshaping waveform can be used to modify the transmitted signal so that it approaches zero outside of its frequency.

**IV.    Disputed terms of the '516 patent.**

      **a.    "pulseshaping waveform" (claim 1)**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| a waveform that lessens the effects of both time dispersion and intersymbol interference of an OFDM signal | a waveform that changes the shape of said first data signal |

Plaintiffs contend that the defining feature of a pulsating waveform is that it lessens the effect of time dispersion and intersymbol interference and that all pulsating waveforms achieve these effects by increasing spectral decay. They argue that Defendants' proposed construction would include any

20

**A20**

waveform that changes the shape of a signal and that Defendants are broadening the construction to invalidate for prior art.

Defendants contend that Plaintiffs' proposed construction is not consistent with the well-known meaning of "pulseshaping" and merely lists the potential effects of pulseshaping. The argue that the dictionary definition of pulseshaping is "intentionally changing the shape of a pulse" and this is an ordinary meaning. They submit that lessening the effect of time dispersion and intersymbol interference may be an effect of using a pulseshaping waveform if the application of the technique achieves its goals, but is itself neither a requirement nor a result that will necessarily occur. They also note that Plaintiffs omit other potential effects of pulseshaping, such as the reduction of frequency dispersion and intercarrier interference. The argue that, according to a clear reading of the claim language, the pulseshaping waveform only needs to have a first amplitude greater than the second amplitude.

This Court notes that the parties' respective positions regarding the construction of this particular term are opposite those taken when arguing the first disputed term in the '215 patent. Again, this Court takes the view that the claims define the metes and bounds of the patented invention and, although the specification may shed light on the plain and ordinary meaning of a claim term, it cannot be used to narrow the claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope. *Retractable*, 659 F.3d at 1360-71.

In the specification, the patentee did not define the term "pulseshaping waveform". Nor did he give the term a different meaning that it would otherwise possess, or disclaim or disavow some claim scope. Claim 1 was drafted as a broad claim and the USPO allowed it as such. The Court declines the opportunity to now narrow the claim by importing some of the potential effects of

21

**A21**

pulseshaping into it. The patentee could have easily acted as his own lexicographer in defining "pulsating waveform" or could have limited the claim to waveforms applied to OFDM signals.

"Pulseshaping waveform" is construed to mean **"a waveform that changes the shape of said first data signal."**

b.   **"performing an N'-point inverse fast fourier transform (IFFT)"; Claim 6**

| Plaintiffs' Proposed Construction | Defendants' Proposed Construction |
|---|---|
| performing an N'-point IFFT such that N' refers to the number of IFFT points that are required as a result of the pulseshaping waveform used | performing an N'-point IFFT such that N' refers to an adjusted number of subcarriers [IFFT points] depending on the pulseshaping waveform used |

Plaintiffs complain that Defendants' proposed construction refers to N' as "subcarriers" when the claim uses N' to refer to the "points" of an IFFT. They also note that Defendants' construction refers to N' as "adjusted . . . depending on the pulseshaping waveform used." According to Plaintiffs, under this construction, determining whether an IFFT falls within the scope of this method step would require a comparison between the IFFT for a pulseshaping waveform actually used against some other pulseshaping waveform which is a comparison not required by the claims. Plaintiffs argue that N' does not always have to be an adjustment and the insertion of that term reads out the situation where there is a mild pulse shaping that does not result in a decreased number of subcarriers.

Defendants concede that it does not matter whether you use "subcarriers" instead of "IFFT points" and that this dispute may no longer be an issue since they are mathematically identical. They frame the issue as to using the word "adjusted" versus "required." Defendants argue that Plaintiffs' construction reads into the claim a required bandwidth. They argue that the correct definition is found in the patent at col. 7:7-10 and col. 5:10-11.

**A22**

Defendants are correct that the proper definition of N' is N'=N/alpha where alpha is a frequency adjustment factor that depends on the pulseshaping function w(t) used. '516 patent, Col. 7:7-10; Col. 5:10-11. However, the language at col. 6:5-8 which states that using a particular pulseshaping function "may" require adjustment in the choice of subcarriers chosen in order to maintain orthogonality during data transmission, is a concern. This certainly implies that the inventor recognized that there may be situations where mild pulseshaping occurs but the number of subcarriers remain the same.

Therefore, this Court construes "performing an N'-point inverse fast fourier transform (IFFT)" to mean **"performing an N'-point IFFT such that N' refers to the number of IFFT points which depend on the pulseshaping waveform used."**

The above-cited terms of the patents at issue should, therefore, be construed in accordance with this order.

**SIGNED this the 8th day of March, 2013.**

_____
KEITH F. GIBLIN
UNITED STATES MAGISTRATE JUDGE

23

**A23**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON, INC. *et al,* | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | Civil Action No. 6:10-cv-473 |
| v. | § | |
| | § | |
| D-LINK CORP. *et al,* | § | |
| | § | |
| *Defendants*. | § | |

## ORDER OVERRULING OBJECTIONS TO OPINION OF UNITED STATES MAGISTRATE JUDGE ON CLAIM CONSTRUCTION

Plaintiffs Ericsson, Inc. *et al* filed suit against Defendants D-Link Corp. *et al*, claiming infringement of nine patents. The case was referred to United States Magistrate Judge Keith F. Giblin pursuant to 28 U.S.C. § 636 for claim construction. Judge Giblin entered a memorandum opinion construing the disputed claim terms in the patents-in-suit. Doc. # 341. Both sides have filed objections to this Order. Docs. # 345, 347.[1]

Pursuant to Federal Rule of Civil Procedure 72(a) and 28 U.S.C. § 636(b), the court has reviewed the magistrate judge's claim construction order, the parties' objections, and the record as a whole, and concludes that the magistrate judge's claim construction order was neither clearly erroneous nor contrary to law.

---

[1]The court previously overruled one objection raised by Defendants, seeking reconsideration of the magistrate judge's construction of the means-plus-function claim 45 in the '215 patent, when adopting the magistrate judge's Report and Recommendation that Defendants' motion for summary judgment of invalidity be denied. Doc. # 356.

**A24**

CASE PARTICIPANTS ONLY Document: 171 Page: 39 Filed: 03/31/2014

**Plaintiffs' Objection**

Plaintiffs raise only one objection, to the magistrate judge's construction of the term "a service type identifier which identifies a type of payload information" in claim 19 of the '019 patent and claim 1 of the '568 patent. The magistrate judge construed this term to mean "an identifier that identifies the type of information conveyed to the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia." Doc. # 341 at 19.

Plaintiffs re-urge the construction they proffered at the claim construction hearing, namely "an identifier which identifies transmission characteristics of payload information." Doc. # 347 at 2. Plaintiffs argue that by rejecting this construction, the magistrate judge did not give proper weight to the intrinsic evidence.

The magistrate judge explained in his opinion that the claim language itself clearly states that the service type identifier identifies the type of payload information, *not* transmission characteristics of the payload information. The specification of the patents itself also makes it clear that the service type identifier "informs the mobile or base station of the type of information (e.g., voice, video, or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate." '019 patent at 3:9-19; *see also* claim 22 of the '019 patent (dependent from claim 19 and adding a step of changing the type of information—given as video, voice, and data—from a first type to a second type). To the extent that this is a preferred embodiment in the specification, the magistrate judge did not limit the construction to only voice, video, or data.

Plaintiffs make much of a statement by the patentee during prosecution of the '568 patent, where the patentee explained that "[d]ue to the different transmission characteristics associated with

2

**A25**

SEE DART CIRCULATION ONLY

the different types of information, it would be desirable to provide an ability for a transmitter to be able to inform a receiver of the type of information in a transmission payload." Doc. # 209-12 at Page ID# 5184. However, the specification is "the single best guide to the meaning of a disputed term." *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, –F.3d–, 2013 WL 1200270 at *8 (Fed. Cir. Mar. 26, 2013) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996)). Here, the specification of the '019 and '568 patents expressly differentiate between types of information in a payload (such as voice, video, and data), and the transmission characteristics of payload information (such as error protection or channel coding). *See, e.g.*, '568 patent at 2:27-55.

The court does not find that the magistrate judge's construction of this term was clearly erroneous or contrary to law, and overrules Plaintiffs' objections.

### Defendants' Objections

Defendants raise five objections to the magistrate judge's claim construction. One— the objection to the construction of means-plus-function claim 45 in the '215 patent—was previously overruled when the undersigned adopted the magistrate judge's Report and Recommendation that Defendants' motion for summary judgment of invalidity be denied. Doc. # 356. Another is not an objection to a specific claim construction at all—"the opinion in contrary to law because it does not give weight to the alleged inventions as described in the specifications"—and does not request any particular relief with respect to a particular claim term.[2]

---

[2]This dispute does arise in the context of Defendants' third, fourth, and fifth objections, which are specific to claim terms, and are discussed below.

3

**A26**

A. **Objection to "responsive to receiving step, construing a message field for a second data unit, said message field including a type identifier field."**

Defendants' third objection concerns the magistrate judge's construction of the term "responsive to the receiving step, construing a message field for a second data unit, said message field including a type identifier field." This term is found in claims 1, 15, and 25 of the '215 patent. The magistrate judge construed the term to mean "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types." Doc. # 341 at 9.

Defendants argue that the term should have been construed as they urged during claim construction: "responsive to the receiving step, generating a message field including a field identifying the type of feedback response that is selected from multiple available feedback responses in order to minimize the size of number of feedback responses." Doc. # 345 at 6. In other words, they seek to include the requirement that the message field include a field identifying the type of feedback response selected from multiple available feedback responses in order to minimize the size or number of feedback responses.

Defendants' position is that the magistrate judge's construction gives no weight at all to the specification, and that Plaintiffs agreed with Defendants that the "invention" here is the "creation of a choice in the receiver of multiple different formats of messages to use and then also the creation of a type identifier field which allows the receiver to identify to the transmitter what it is choosing." *Markman* Tr. at 13:18-22 [Doc. # 255]. Defendants neglect to point the court toward counsel's next sentences in the transcript: "But very clearly the applicant stopped and did not choose to include a

4

**A27**

requirement that the advantage be met as an element. And that's very clear and it's expressed in the patent and we believe error to read in something the applicant didn't include" Tr. at 13:22-14:1.

This is, as the magistrate judge noted at the claim construction hearing and in his opinion, the problem presented by the Federal Circuit's opinions in *Retractable Technologies, Inc. v. Becton, Dickinson, & Co.*, 653 F.3d 1296 (Fed. Cir. 2011), *opinion denying rehearing*, 659 F.3d 1369 (Fed. Cir. 2011). While the majority opinion states that claim construction should "strive to capture the scope of the actual invention, rather than strictly limit the scope of the claim to disclosed embodiments or allow claim language to become divorced from what the specification conveys is the invention," 653 F.3d at 1305, the dissenting opinion takes the position that the specification cannot be used to narrow a claim term unless the inventor acted as his own lexicographer or intentionally disclaimed or disavowed claim scope, 659 F.3d at 1360-71.

Here, the court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. The claim language itself does not include the limitations Defendants urge, and narrowing the claims as Defendants wish would be inappropriate. This is especially true as Defendants have cherry-picked only two of the advantages set forth in the specification to add to their construction, not all of them.

**B.      Objection to "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded."**

Defendants' fourth objection is to the magistrate judge's construction of "data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded." This term is found in claim 1 of the '435 patent. The magistrate judge construed the term to mean "a message that indicates data packets that the transmitter has discarded." Doc. # 341 at 16.

**A28**

CASE PARTICIPANTS ONLY

Defendants object to this construction, urging the construction they previously proffered: "message containing the identity of unacknowledged data packets the transmitter has discarded." Doc. # 345 at 8. Defendants again argue that the magistrate judge improperly failed to consider the specification when construing this term.[3]

The court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. Defendants' construction either imports limitations into the claim (by inserting "unacknowledged") or excludes the preferred embodiment in the '435 patent specification at 4:53-67 (by inserting "unacknowledged," this reads out the NACK embodiment set out in this passage). Defendants' objection is overruled.

## C.    Objection to "separate from said first field."

Defendants' final objection is to the court's construction of "separate from said first field." This term is found in claim 19 of the '019 patent and claim 1 of the '568 patent. The magistrate judge determined that no claim construction was necessary. Doc. # 341 at 18.

Defendants object, arguing that the magistrate judge should have adopted their proposed construction, "in a different portion of a radio channel from said first field." Doc. # 345 at 9. Defendants again argue that the magistrate judge improperly failed to consider the  specification when deciding not to construe this term and therefore eliminates the key feature of the patents (i.e., that the two fields have to be transmitted separately).

---

[3]Defendants also suggest the magistrate judge erred by not adopting an alternate construction urged by Defendants at the *Markman* hearing, which would "resolve the parties' dispute," citing to the transcript at 91:16-18. The transcript, however, indicates that Plaintiffs still had a problem with this alternate construction. Tr. at 96:25-98:23.

**A29**

This term is found in claims that require both a first field and a second field transmitted on a radio channel. There is no restriction or limitation in these claims that the two fields have to be some distance from each other on the radio channel, as Defendants' construction implies. The language of the claim itself conveys what Defendants wish to make clear: that the first and second fields are transmitted separately on a radio channel. Construing the term further is redundant and unnecessary. *See, e.g., United States Surgical Corp. v. Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997) ("The *Markman* decisions do not hold that the trial judge must repeat or restate every claim term in order to comply with the ruling that claim construction is for the court. Claim construction . . . is not an obligatory exercise in redundancy.").

The court cannot conclude that the magistrate judge's claim construction was clearly erroneous or contrary to law. Defendants' objection is overruled.

### Conclusion

After careful consideration of both parties' objections, the record as a whole, and the magistrate judge's claim construction opinion, the court concludes that the objected-to claim constructions are not clearly erroneous or contrary to law and OVERRULES both parties' objections.

**So ORDERED and SIGNED this 16th day of April, 2013.**

_____
**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

7

**A30**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | | |
|---|---|---|
| **ERICSSON INC., et al.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK CORPORATION, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## MEMORANDUM OPINION AND ORDER

Before the Court is Defendants'[1] Motion to Exclude the Opinions of Mr. John R. Bone Regarding Issues Related to Damages (Docket No. 364) ("Motion"). The Court heard oral argument on May 9, 2013. For the reasons set forth below, the Motion is **DENIED**.

## BACKGROUND

This is a standards case. The Plaintiff Ericsson[2] contends its asserted patents cover two features of the IEEE 802.11n standard. Ericsson's damages expert, John Bone, relied on previous Ericsson 802.11 licenses to determine a per unit royalty for each licensed product. Bone then applied his per unit royalty to the accused products to calculate a reasonable royalty. Defendants contend Bone's analysis violates the entire market value rule because Ericsson did not prove that the patented features were the basis for customer demand of the accused products.

---

[1] "Defendants" refers to D-Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation, Belkin International, Inc., and Intel Corporation.

[2] "Ericsson" refers to Ericsson Inc. and Telefonaktiebolaget LM Ericsson.

**A31**

Bone's damage model is based on eight previous Ericsson licenses involving the asserted patents. From the previous licenses, Bone established a per unit royalty. Bone applied his per unit royalty to Defendants' accused products to determine his reasonable royalty. Defendants' objection is predominately with Bone's per unit royalty. Defendants contend Bone's royalty includes revenues associated with non-infringing features.

## APPLICABLE LAW

Federal Rule of Evidence 702 allows a witness "qualified as an expert by knowledge, skill, experience, training, or education" to testify in the form of an opinion or otherwise if

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

As a preliminary matter, district courts are asked to act as gatekeepers and exclude expert testimony from trial that is irrelevant or unreliable. FED. R. EVID. 104(a); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999) (discussing *Daubert v. Merrell Dow Pharm.* 509 U.S. 579, 593–94 (1993)). "Reliability is determined by assessing 'whether the reasoning or methodology underlying the testimony is scientifically valid.' Relevance depends upon 'whether [that] reasoning or methodology properly can be applied to the facts in issue.'" *Knight v. Kirby Inland Marine Inc.,* 482 F.3d 347, 351 (5th Cir. 2007) (quoting *Daubert*, 509 U.S. at 592–93).

Courts will consider a nonexclusive list of factors to determine whether scientific expert testimony is reliable. *Daubert v. Merrell Dow Pharm.*, 509 U.S. 579, 593–94 (1993). These factors include: (1) whether others can or have objectively tested the expert's technique or theory; (2) whether the technique or theory has been subject of peer review and publication; (3) the known or potential error rate of the technique or theory when applied; (4) the existence and

2

**A32**

maintenance of standards and controls; and (5) whether the scientific community has generally accepted the technique or theory. FED. R. EVID. 702 (advisory committee notes, 2000 amendments); *Daubert*, 509 U.S. at 593–94.

However, the district courts are not "intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land,* 80 F.3d 1074, 1078 (5th Cir. 1996); FED. R. EVID. 702 (advisory committee notes, 2000 amendments). "Vigorous cross–examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596. Accordingly, if a party offering expert testimony can prove by a preponderance of the evidence that the expert is qualified, the expert's testimony is relevant, and the testimony is reliable, a court should not exclude it. *Id.* at 590–91.

**ANALYSIS**

Defendants argue Mr. Bone's report should be excluded because he fails to apportion his royalty base between accused features and non-accused features. Motion at 10. Defendants contend Bone's lack of apportionment is in essence an attempt to side-step the requirements of the entire market value rule. *Id*. Defendants also argue Bone's report squarely violates the entire market value rule because he impermissibly uses the value of end products in his royalty base. *Id*. at 1. Defendants contend the accused features are found entirely within the chipset, one of many components in the larger end products. *Id*. at 2. However, the patented features within the chipset do not form the basis for customer demand of the end products. *Id*. at 8. Thus, Bone cannot use the value of the end products in his royalty analysis. *Id*. Instead, Bone's royalty base must be limited to the value of the chipsets, which Defendants contend are the smallest salable patent-practicing units. *Id*. at 5.

**A33**

Ericsson makes two major arguments in support of Bone's report. First, Ericsson argues Bone's report does not implicate the entire market value rule. Docket No. 378 ("Response") at 9. Ericsson contends Bone's analysis is based purely on the number of units sold, not the price of the units sold. *Id*. Second, Ericsson contends Bone's report is consistent with other standards-based licenses of the same patents. *Id*. at 6. Ericsson asserts that a per unit royalty based on the number of products sold is common in standards licensing. *Id*. Further, Ericsson argues Bone's damages model ties the hypothetical negotiation to real world evidence. *Id*. at 8.

Defendants' apportionment argument ignores two different levels of apportionment in Bone's analysis. At the first level, Bone only considered revenue from the licensing of Ericsson's 802.11 portfolio. At the second level, Bone apportioned the 802.11 licensing revenue to extract the value attributed to non-asserted patents. Combined, these two levels limit the revenue pool to the market value of the asserted patents' contribution to the 802.11 standard.

The first level of apportionment reduced the revenue pool to the value of Ericsson's 802.11 contributions. On eight separate occasions, Ericsson licensed its 802.11 portfolio to third parties. *See* Docket No. 378, Ex. 1 ("Bone Report") at 37–38. Each license covered only a particular portion of the 802.11 standard—namely, the portion of the 802.11 standard the third party licensees believed was covered by Ericsson's portfolio. Defendants attempt to downplay the significance of these licenses, but they reflect a real-world valuation of Ericsson's 802.11 patents. *See Monsanto Co. v. McFarling*, 488 F.3d 973, 978–79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree."). The licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees

4

**A34**

would not have paid value for the portion of the standard not covered by Ericsson's patents. Consequently, the money paid under these licenses represents the market's valuation of the 802.11 contributions of Ericsson's patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.").

The six patents asserted in this case are not the entirety of Ericsson's 802.11 portfolio—they are only a subset of it.[3] However, Bone's second level of apportionment factors this into account. Bone stated he "very conservatively assumed that the Patents-in-Suit represent at least 50 percent of the total value of the Ericsson 802.11 Portfolio," and he reduced his per unit royalty accordingly. Bone Report at 90. While Defendants are free to cross-examine Bone on his valuation of the asserted patents in relation to the non-asserted Ericsson 802.11 patents, he makes a realistic and thorough attempt to apportion revenue to only the asserted patents.[4] *Compare VirnetX Inc. v. Cisco Sys., Inc.*, 2013 WL 789288, at *2 (E.D. Tex. Mar. 1, 2013) (Davis, J.). The end result of Bone's analysis is a royalty pool comprising money paid by third party licensees for the value of the asserted patents' contributions to the 802.11 standard. *See LaserDynamics,* 694 F.3d at 68 (requiring courts to examine only revenues associated with the patented components).

Defendants also argue Mr. Bone's analysis violates the entire market value rule by using the value of end products without proving the patented feature forms the basis for customer demand of the accused product. This argument fails for many of the same reasons as Defendants' apportionment argument. Bone's revenue base is not the market value of the end products. *See* Bone Report at 101 (providing a per unit royalty). Rather, it is the market value of the

---

[3] Ericsson owns 18 standard essential patents, six of which are asserted in this lawsuit. Bone Report at 24.
[4] Bone supported his 50 percent apportionment with approximately twenty pages of analysis. *See* Bone Report at 79–99.

5

**A35**

contribution of the asserted patents to the end products. This distinction is critical to the analysis. The licensing revenue from Ericsson's portfolio is attributable only to the value Ericsson's patents add to the licensees' end products; it is not attributable to the end products as a whole. It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents. Therefore, Mr. Bone's report does not implicate the entire market value rule. *See Versata Software, Inc. v. SAP Am., Inc.*, --- F.3d ----, 2013 WL 1810957, at \*12 (Fed. Cir. May 1, 2013) (finding that a plaintiff's damage model did not implicate the entire market value rule because it "merely accounted for all infringing sales"); *Fractus, S.A. v. Samsung Elecs. Co.*, 876 F. Supp. 2d 802, 833 (E.D. Tex. 2012) (Davis, J.).

Additionally, Bone's analysis calls for a per unit royalty on all sales of accused products. Bone Report at 34. As a per unit royalty, it does not fluctuate with the price of the end product. Regardless of the ultimate sale price of the end product, the royalty rate remains constant. This further illustrates that Mr. Bone does not rely on the value of end products in his analysis. *See SynQor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1383 (Fed. Cir. 2013) (determining that a plaintiff did not invoke the entire market value rule when it "never sought to justify its damages figure based on the price of the customer end products").

Lastly, Defendants argue Mr. Bone's report should be excluded because it fails to account for Ericsson's RAND obligations. Defendants first raised this argument at the hearing, and it has not been briefed by either side.[5] Further, Defendants did not cite any authority to support their position that failing to account for RAND obligations mandates striking Bone's report. For these reasons, Defendants' RAND arguments do not justify exclusion of Bone's report.

---

[5] Defendants' Motion only referenced Ericsson's RAND obligations in a footnote and in a string citation. *See* Motion at 12 n.4, 13. Defendants' Reply only references RAND in a footnote. *See* Docket No. 393 at 1.

6

**A36**

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Exclude the Opinions of John Bone

(Docket No. 364) is **DENIED**.

**So ORDERED and SIGNED this 20th day of May, 2013.**

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

7

**A37**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

|  |  |  |
|---|---|---|
| **ERICSSON INC., et al.,** | § | |
| | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK CORPORATION, et al.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

## ORDER

Before the Court are the following Motions: (1) Ericsson's Motion to Strike David Cabello (Docket No. 361); (2) Defendants' Motion to Compel Ericsson to Produce Certain Clawed Back Documents (Docket No. 402); (3) Ericsson's Motion for Partial Summary Judgment and/or to Exclude Dell's License Defense (Docket No. 431); (4) Ericsson's Motions in Limine (Docket No. 425); (5) Defendants' Motions in Limine (Docket No. 427); and (6) the Joint Motions in Limine (Docket No. 426). The Court heard oral argument on May 23, 2013. At the hearing, the Court resolved the Motions as follows:

- Ericsson's Motion to Strike David Cabello (Docket No. 361) is resolved as follows:
  - The Motion is **DENIED** with respect to testimony regarding the reasonableness of Defendants' expert reports. However, the Court **GRANTS** a motion in limine on the issue. The motion in limine covers events occurring after the lawsuit was filed.

1

**A38**

- o The Motion is **DENIED** with respect to Ericsson's contributions to the 802.11 standard.

- o The parties agreed that all remaining issues regarding Cabello's testimony would be governed by the Court's resolution of the motions in limine.

- Defendants' Motion to Compel Ericsson to Produce Certain Clawed Back Documents (Docket No. 402) is **GRANTED-IN-PART** and **DENIED-IN-PART**.

  - o Ericsson is **ORDERED** to produce Document One.

  - o Documents Two and Three are privileged and need not be produced.

- Ericsson's Motion for Partial Summary Judgment and/or to Exclude Dell's License Defense (Docket No. 431) is **GRANTED** with opinion to follow.

- Ericsson's Motions in Limine (Docket No. 425) are resolved as follows:

  1. **GRANTED**.

  2. **GRANTED** by agreement.

     a. Neither side may criticize Ericsson for the limited scope of Intel's intervention or the fact that Ericsson did not sue other customers of Intel.

     b. The fact that Intel intervened may be discussed, as can the fact that Intel intervened to protect their customers.

  3. **GRANTED**.

     a. The parties are **ORDERED** to meet and confer to attempt to reach an agreement on this motion.

  4. **GRANTED** by agreement.

  5. **DENIED**.

2

**A39**

  a. Defendants may present evidence of their own patents and contributions to the 802.11 standard.

  b. Defendants shall not present evidence or argue that their own patents prove non-infringement of Ericsson's patents.

6. **DENIED** by agreement.

  a. Defendants may discuss the references as strictly background art.

  b. Defendants cannot rely on the references to prove invalidity or compare the references to the asserted claims.

7. **GRANTED** by agreement.

8. **GRANTED** by agreement.

9. **GRANTED** by agreement.

10. **GRANTED** by agreement.

- Defendants' Motions in Limine (Docket No. 427) are resolved as follows:

1. **DENIED**.

  a. The parties agree not to present evidence of the overall revenues of the end products.

2. **DENIED**.

  a. The licenses may be addressed on cross-examination. If Ericsson addresses the licenses on cross-examination, Defendants may present evidence regarding the differences between the licenses and the hypothetical negotiation.

3. **GRANTED** by agreement.

4. **DENIED**.

3

**A40**

5. **DENIED AS MOOT**.

   a. This motion is addressed by Ericsson's motion in limine number three.

6. **WITHDRAWN**.

   a. Defendants agreed to withdraw this motion in limine.

   b. Defendants may submit a short rebuttal report by Monday, May 27, 2013 at 5 PM.

7. **GRANTED** by agreement.

- The Joint Motions in Limine (Docket No. 426) are **GRANTED**.

Ericsson is further **ORDERED** to reduce its number of asserted claims by Tuesday, May 28, at noon. The Court will conduct a bifurcated trial. The first portion of the trial will cover infringement, validity, and damages. If necessary, the second portion of the trial will cover willful infringement. The parties are **ORDERED** to file revised trial time estimates reflecting Ericsson's reduced claims and the bifurcated trial by Wednesday, May 29, at noon. The revised trial time estimates shall distinguish between the amount of time requested for the infringement/validity/damages portion of the trial and the willfulness portion of the trial.

**So ORDERED and SIGNED this 24th day of May, 2013.**



LEONARD DAVIS
UNITED STATES DISTRICT JUDGE

4

**A41**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **ERICSSON INC., ET AL.,** § | |
| § | |
| **Plaintiffs,** § | |
| § | |
| **vs.** § | **CASE NO. 6:10-CV-473** |
| § | |
| **D-LINK CORPORATION, ET AL.,** § | |
| § | |
| **Defendants.** § | |

### MEMORANDUM OPINION AND ORDER

Before the Court is Ericsson's Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses (Docket No. 431) ("Motion"). The Court heard oral argument on May 23, 2013. For the reasons set forth below, the Motion is **GRANTED**.

### BACKGROUND

This Motion involves three separate Ericsson[1] entities: LM Ericsson, Ericsson AB, and Ericsson Inc. Two of these entities—LM Ericsson and Ericsson Inc.—are the Plaintiffs in this suit. The third—Ericsson AB—is not a party. LM Ericsson, a Swedish company, is the corporate parent of Ericsson AB and Ericsson Inc. Ericsson AB is a Swedish company, and Ericsson Inc. is an American company. LM Ericsson is the owner of the patents-in-suit, and Ericsson Inc. possesses the exclusive enforcement rights to the patents in the United States. Ericsson AB maintains no ownership in the patents.

---

[1] This Motion uses "Ericsson" to refer collectively to the Plaintiffs LM Ericsson and Ericsson Inc. It also uses "Ericsson" to refer to all Ericsson corporate entities collectively. All references to an individual Ericsson entity are specified.

**A42**

In 2008, Dell entered into an agreement with Ericsson AB (the "Master Purchase Agreement" or "MPA") to purchase a series of products from Ericsson AB. *See* Docket No. 301, Ex. 2 ("MPA"). One of the provisions of the MPA was a release clause. The release clause states:

> Supplier will not commence any lawsuit or seek any judicial order affecting Dell or add Dell as a party to any pending legal or administrative proceeding that is not directly related to Dell's purchase of Products or that may prevent Dell from shipping any Dell or third party products.

*Id.* at 3. Dell contends this clause prohibits LM Ericsson and Ericsson Inc. from bringing the present infringement suit.

For the purposes of this Motion, the key word in the release clause is "Supplier." Supplier is explicitly defined in the MPA as Ericsson AB. *Id.* at 1. Accordingly, the MPA release clause on its face does not apply to the Plaintiffs LM Ericsson and Ericsson Inc.[2] However, Dell contends the MPA applies to LM Ericsson through agency law. Dell asserts that at the time LM Ericsson filed this lawsuit, LM Ericsson was acting as the agent of Ericsson AB. Because LM Ericsson was the agent of Ericsson AB, and Ericsson AB could not sue Dell because of the release clause, LM Ericsson is precluded from bringing this lawsuit against Dell.

<div align="center">

**APPLICABLE LAW**

</div>

**Summary Judgment Standard**

Summary judgment shall be rendered when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998). An issue of material fact is

---

[2] Dell conceded this point at oral argument.

<div align="center">

2

**A43**

</div>

genuine if the evidence could lead a reasonable jury to find for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine issue for trial exists, the court views all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Id.*; *Matsushita Elec. Indus. Co. v. Zenith Radio,* 475 U.S. 574, 587 (1986).

If the moving party has made an initial showing that there is no evidence to support the nonmoving party's case, the party opposing the motion must assert competent summary judgment evidence of the existence of a genuine fact issue. *Matsushita*, 475 U.S. at 586. Mere conclusory allegations, unsubstantiated assertions, improbable inferences, and unsupported speculation are not competent summary judgment evidence. *See Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996); *Forsyth v. Barr*, 19 F.3d 1527, 1533 (5th Cir. 1994). The party opposing summary judgment is required to identify evidence in the record and articulate the manner in which that evidence supports his claim. *Ragas*, 136 F.3d at 458. "Only disputes over facts that might affect the outcome of the suit under the governing laws will properly preclude the entry of summary judgment." *Anderson,* 477 U.S. at 248. Summary judgment must be granted if the nonmoving party fails to make a showing sufficient to establish the existence of an element essential to its case and on which it will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322–23.

**Agency Law**

Whether an agency relationship exists is a mixed question of law and fact. *Commercial Union Ins. Co. v. Alitalia Airlines, S.p.A.*, 347 F.3d 448, 462 (2d Cir. 2003).[3] There are two elements required to establish an agency relationship. *Id*. First, the principal must manifest its intent to grant authority to the agent. *Id*. Second, the agent must consent to the agency

---

[3] The MPA is governed by New York law, and both sides agree that New York law governs resolution of the agency issue.

3

**A44**

relationship. *Id*. Additionally, the principal must maintain control over key aspects of the undertaking. *Id*.

A principal can manifest its intent to grant authority in numerous ways. In this case, Dell alleges Ericsson AB granted authority to LM Ericsson through both actual and apparent authority. *See* Docket No. 444 ("Response") at 10. Actual authority and apparent authority are similar in that they both hinge on the behavior of the principal. However, they differ over from whose perspective the principal's behavior is viewed. Actual authority focuses on the conduct of the principal, viewed from the eyes of the potential agent. *Dinaco, Inc. v. Time Warner, Inc.*, 346 F.3d 64, 68 (2d Cir. 2003). Actual authority comes from direct manifestations from the principal to the agent, interpreted in light of all the circumstances surrounding those manifestations. *Highland Capital Mgmt. LP v. Schneider*, 607 F.3d 322, 327 (2d Cir. 2010) (quoting *Peltz v. SHB Commodities, Inc.*, 115 F.3d 1082, 1088 (2d Cir. 1997)). An agent has actual authority if the principal grants the agent power to act on the principal's behalf. *Id*.

Even if an agent lacks actual authority, it can still bind a principal through apparent authority. *Id*. at 328. Apparent authority exists when an agent lacks actual authority, but the principal's actions create the appearance of actual authority vested in the agent. *Id*. Similar to actual authority, apparent authority focuses on the actions of the principal. However, unlike actual authority, apparent authority views the principal's actions from the eyes of a third party. *Telenor Mobile Commc'n AS v. Storm LLC*, 584 F.3d 396, 411 (2d Cir. 2009). To establish apparent authority, a party must show: (1) the principal is responsible for the appearance of authority; and (2) the third party's reliance on the apparent authority is reasonable. *F.D.I.C. v. Providence Coll.*, 115 F.3d 136, 140 (2d Cir. 1997).

4

**A45**

## ANALYSIS

Ericsson makes three distinct arguments in support of its Motion. First, Ericsson argues Dell does not have a license to the Patents because LM Ericsson is not a signatory to the MPA. Motion at 4. The MPA specifically references Ericsson AB, which Ericsson believes indicates that the MPA does not bind other Ericsson entities. *Id*. Second, Ericsson contends Dell's own actions demonstrate that it did not believe LM Ericsson was bound under the MPA. *Id*. at 9. In December 2011, LM Ericsson and Dell negotiated a license for Ericsson's cellular patent portfolio. *Id*. Ericsson asserts that if Dell genuinely believed LM Ericsson was bound under the MPA, the 2011 license would have been unnecessary. *Id*.

Finally, Ericsson argues Dell cannot prevail on its agency theory. *Id*. at 7. Ericsson asserts that Dell is unable to meet the legal requirements of agency—namely, intent to grant authority by the principal and intent to be bound by the agent. *Id*. at 8. Ericsson contends LM Ericsson is the corporate parent of Ericsson AB, and there is no evidence the corporate parent acted as the agent of its subsidiary. Docket No. 446 ("Reply") at 2. Further, Ericsson argues there is no evidence LM Ericsson had authority as an agent. *Id*. Ericsson asserts that LM Ericsson is the patent owner and parent company, so it did not need permission from Ericsson AB to file this lawsuit. *Id*. at 3.

Dell bases its position on agency theory. Dell contends Ericsson is a "monolithic entity," and LM Ericsson is the agent of Ericsson AB. Response at 7–8. In support, Dell argues Ericsson AB granted LM Ericsson authority to sue for patent infringement on its behalf. *Id*. at 10. Additionally, Dell asserts that nearly all of Ericsson's daily intellectual property operations are performed by Ericsson AB employees, and an Ericsson AB employee made the decision to sue

5

**A46**

Dell for infringement. *Id.* at 7, 11. Dell also argues all Ericsson patents are transferred to LM Ericsson as a matter of course for nominal compensation. *Id.* at 11.

Further, Dell contends Ericsson AB maintains control over LM Ericsson. *Id.* at 12. Dell asserts that Ericsson's patent-related businesses operate as a single unit, and that employees of different Ericsson corporate entities commonly work together on licensing issues. *Id.* at 6. Lastly, Dell argues its cellular license with Ericsson does not undercut its position regarding the MPA. *Id.* at 13. Dell argues the cellular license was intended to protect Dell's customers, while the MPA only protects Dell itself. *Id.* at 14. Thus, the two licenses are non-contradictory. *Id.*

As discussed below, Dell's agency argument fails for two distinct reasons: (1) there is no evidence Ericsson AB granted LM Ericsson authority to sue; and (2) there is no evidence LM Ericsson accepted authority from Ericsson AB. Each alone is sufficient to grant Ericsson's motion for summary judgment.

**Grant of authority from AB to LM**

The first element of agency Dell cannot prove is the grant of authority from Ericsson AB to LM Ericsson. A cloud-level view of Dell's argument demonstrates how tenuous it is. Dell argues Ericsson AB is the principal, and LM Ericsson is the agent. However, LM Ericsson is the corporate parent of Ericsson AB. To prevail, Dell must prove the corporate parent/patent owner received authority *from its subsidiary/non patent owner* to bring this lawsuit. Dell did not present sufficient evidence to survive summary judgment on this issue.

A prerequisite of a principal granting authority is a principal having authority, and Dell cannot satisfy this threshold issue. *See* RESTATEMENT (SECOND) OF AGENCY § 7 (1958). LM Ericsson owns the patents—Ericsson AB does not. A principal cannot grant authority to an agent that the principal itself does not have. *Mouawad Nat'l Co. v. Lazare Kaplan Int'l Inc.*, 476 F.

6

**A47**

Supp. 2d 414, 423 (S.D.N.Y. 2007) ("Before a principal can confer actual or apparent authority on another to act on its behalf, the principal must itself possess the power that it is attempting to confer on the agent."); *see Highland Capital*, 607 F.3d at 327 (stating that an agent's authority is subject to whatever limitations the principal places on its power). Here, Ericsson AB is not the patent owner, and it could not have sued for infringement on its own. It would be illogical to hold that Ericsson AB authorized LM Ericsson to perform an act that Ericsson AB itself had no authority to do. *See Mouawad Nat'l*, 476 F. Supp. 2d at 423 ("It is axiomatic that where a principal does not possess the power to bind itself to a third person in contract, there is no power that the principal can confer on an agent that will enable the agent to enter the contract on the principal's behalf."). Granting authority is premised on having authority, and Ericsson AB never had authority to sue for infringement.

None of the evidence cited by Dell overcomes the fact that Ericsson AB had no authority to authorize LM Ericsson to bring suit. Dell asserts that all Ericsson patents are transferred to LM Ericsson as a matter of course, and that Ericsson's intellectual property group operates as a single entity. Dell further contends that employees of different Ericsson entities commonly work together. None of this evidence demonstrates that Ericsson AB owned the patents or possessed the right to determine when to file a lawsuit. It is bedrock corporate law that separate corporate entities are presumed separate, and Dell did not present sufficient evidence to overcome this presumption. *See Dole Food Co. v. Patrickson*, 538 U.S. 468, 474 (2003).

Dell relies on both actual and apparent authority to demonstrate that Ericsson AB granted authority to LM Ericsson to bring suit. The actual authority argument fails for many of the reasons recited above. Ericsson AB did not have the right to bring suit, so it could not have transferred that right to LM Ericsson.

7

**A48**

The apparent authority argument fails because Dell presented no evidence of reliance. One of the elements of apparent authority is that a third party reasonably relies on actions of the principal manifesting an agency relationship exists. *Providence Coll.*, 115 F.3d at 140. Dell's only evidence of reliance is an affidavit from a Dell in-house attorney stating that Dell viewed Ericsson as a "monolithic entity." *See* Response at 7. Dell's own interactions with Ericsson contradict this assertion. Dell signed the MPA with Ericsson AB. The MPA release clause specifies that it only binds Ericsson AB, not other related Ericsson entities. This is an express indication from Ericsson AB to Dell that it viewed separate Ericsson entities as distinct entities. If it did not, there would have been no reason to specify that the MPA only covered Ericsson AB. The fact that Ericsson AB went to such lengths to specify which Ericsson entities were bound by the MPA should have put Dell on notice that Ericsson viewed its corporate entities as separate units. *See Dinaco*, 346 F.3d at 69 (determining that a third party's reliance was unreasonable); *Providence Coll.*, 115 F.3d at 141 ("The general rule in New York is that a third party who deals with an agent does so at his peril, and must make the necessary effort to discover the actual scope of authority.").

Dell's own actions indicate it *also* viewed Ericsson's separate entities as separate units. In December 2011, three years after the MPA, Dell signed a second patent license with Ericsson. *See* Motion, Ex. 1. The signatory on this license was LM Ericsson, not Ericsson AB. Thus, Dell itself signed two different patent licenses with two different Ericsson entities. This undercuts Dell's assertion that it viewed Ericsson as a "monolithic entity."

**Acceptance of Authority by LM Ericsson**

Dell cannot meet the second element of agency for a similar reason. To establish an agency relationship, the agent must accept authority from the principal. *Commercial Union*, 347

8

**A49**

F.3d at 362. In this case, this means LM Ericsson must have accepted authority from Ericsson AB to sue for patent infringement. The flaw in this argument is that LM Ericsson maintained the authority to sue for infringement throughout. LM Ericsson is the patent owner, so it did not need to receive authority to sue from Ericsson AB—it already had that authority. *See Asymmetrx, Inc. v. Biocard Med., LLC*, 582 F.3d 1314, 1318 (Fed. Cir. 2009).

Dell's strongest piece of evidence is deposition testimony that an Ericsson AB employee—Kasim Alfalahi—made the decision to sue Dell for infringement. This testimony does nothing to address the underlying flaw in Dell's argument, namely that LM Ericsson did not need Mr. Alfalahi's permission (or Ericsson AB's permission) to sue Dell. There is no evidence LM Ericsson could not have sued but for Mr. Alfalahi's authorization. At most, Mr. Alfalahi's permission was a green light to sue, not a prerequisite to sue. Further, there is no evidence that Ericsson AB could have prevented LM Ericsson from bringing suit. *Cf. Israel Bio-Engineering Project v. Amgen, Inc.*, 475 F.3d 1256, 1264 (Fed. Cir. 2007) (noting that a *co-owner* may prevent other co-owners from bringing suit). This evidence is not sufficient to survive summary judgment when the patent owner sues for infringement.

The MPA release clause Dell relies upon unambiguously refers to Ericsson AB alone. Dell concedes this point. Five years later, Dell seeks a do-over on the MPA. Dell now contends the MPA release clause covers LM Ericsson not through the four corners of the contract, but through agency law. However, the equitable relief Dell seeks today was readily available in 2008. In negotiating the MPA,[4] Dell could have included LM Ericsson in the release clause.[5]

---

[4] The MPA resulted from a series of negotiations between Dell and Ericsson. It was not a form contract. Docket No. 453 at 2.

[5] The release clause specifically applies to Ericsson AB. *See* MPA at 3. However, other clauses within the MPA refer to Ericsson AB and its Affiliates. *See, e.g., id.* at 1. Thus, Dell itself distinguished between Ericsson AB individually and all Ericsson affiliates as a whole within the MPA. If Dell intended for the release clause to cover all Ericsson affiliates (including LM Ericsson), it could have specifically referenced Ericsson AB's affiliates within the release clause. Dell could also have defined "Supplier" as "Ericsson AB and its Affiliates." The MPA specifically

9

**A50**

Dell was a sophisticated party in 2008, and it is a sophisticated party today. It is not unreasonable or unfair to hold Dell to the bargain it struck in 2008.

## CONCLUSION

For all the foregoing reasons, Ericsson's Motion for Partial Summary Judgment and/or to Exclude Defendant Dell's License Defenses (Docket No. 431) is **GRANTED**.

So ORDERED and SIGNED this 20th day of June, 2013.

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

---

defines "Supplier" as "Ericsson AB." *Id*. However, the MPA defines "Dell" as "Dell Products L.P. and its Affiliates." *Id*. Thus, the MPA distinguishes between Dell (which includes its affiliates) and Ericsson AB (which only includes Ericsson AB).

10

**A51**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION**

|  |  |  |
|---|---|---|
| **ERICSSON INC., ET AL.,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **vs.** | § | **CASE NO. 6:10-CV-473** |
| | § | |
| **D-LINK SYSTEMS, INC., ET AL.,** | § | |
| | § | |
| **Defendants.** | § | |
| | § | |

### MEMORANDUM OPINION AND ORDER

Before the Court are the following motions:

- Ericsson's Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527);

- Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for a New Trial (Docket No. 528);

- Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529);

- Defendants' Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 539);

- Defendants' Motion for Judgment on Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 588); and

- Ericsson's Motion to Supplement the Record (Docket No. 589).

For the reasons stated below, Ericsson's Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527) is **GRANTED**. Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement

**A52**

and Invalidity) and Motion for a New Trial (Docket No. 528) is **DENIED**. Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529) is **DENIED**. Defendants' Motion for Judgment on Post-Trial Findings of Fact and Conclusions of Law (Docket No. 588) is **GRANTED** as set forth below. Ericsson's Motion to Supplement the Record (Docket No. 589) is **GRANTED**. All other pending motions in this case are **DENIED**.

## I.     Background

Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") brought this infringement action against the following Defendants: D-Link Systems, Inc. ("D-Link"); Netgear, Inc. ("Netgear"); Belkin International, Inc. ("Belkin"); Acer, Inc. and Acer America Corp. ("Acer"); Gateway, Inc ("Gateway"); Dell, Inc ("Dell"); Intel Corp.[1] ("Intel"); and Toshiba, Inc. ("Toshiba"). Ericsson alleged infringement of the following patents: 6,772,215 (the "'215 Patent"); 6,330,435 (the "'435 Patent"); 6,466,568 (the "'568 Patent"); 6,424,625 (the "'625 Patent"); and 6,519,223 (the "'223 Patent). Ericsson also alleged Defendants' infringement was willful. Defendants alleged they did not infringe, and that the '435 and '625 Patents were invalid based on anticipation.

The Court conducted an eight day jury trial in June 2013, resulting in the following infringement verdict:[2]

---

[1] Intel intervened in the case (Docket No. 205), and Ericsson amended its complaint to include Intel as a Defendant. *See* Docket No. 249.

[2] "Yes" means the jury found the Claim infringed; "no" means the jury found the Claim not infringed. Ericsson only asserted Claim 11 of the '223 Patent against Acer/Gateway, Dell, Toshiba, and Intel. Ericsson only asserted Claim 5 of the '568 Patent against D-Link, Netgear, and Belkin.

2

**A53**

26009

|  | **D-Link** | **Netgear** | **Belkin** | **Acer/Gateway** | **Dell** | **Toshiba** | **Intel** |
|---|---|---|---|---|---|---|---|
| **'568 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Claim 5** | Yes | Yes | Yes | N/A | N/A | N/A | N/A |
| **'625 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **'435 Patent** | | | | | | | |
| **Claim 1** | No | No | No | No | No | No | No |
| **Claim 2** | No | No | No | No | No | No | No |
| **'215 Patent** | | | | | | | |
| **Claim 1** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **Claim 2** | Yes | Yes | Yes | Yes | Yes | Yes | Yes |
| **'223 Patent** | | | | | | | |
| **Claim 11** | N/A | N/A | N/A | No | No | No | No |

Docket No. 508 at 2–3. The jury also determined the '625 and '435 Patents were not invalid, and it found damages of $435,000 for D-Link, $3,555,000 for Netgear, $1,170,000 for Acer/Gateway, $1,920,000 for Dell, $2,445,000 for Toshiba, and $600,000 for Belkin. *Id.* at 4–5. The Court bifurcated willfulness into a separate portion of the trial, conducted after the jury reached its infringement/validity verdict. The jury found that Ericsson failed to prove willful infringement. Docket No. 510.

3

**A54**

**II.    Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for New Trial (Docket No. 528)**

In this motion, Defendants challenge nearly every aspect of the infringement and invalidity portions of the case. First, Defendants contend Ericsson did not present sufficient evidence of direct infringement of the '215, '568, and '625 Patents. Next, Defendants contend Ericsson did not present sufficient evidence that any Defendant infringed the asserted method claims. Next, Defendants contend there was no evidence of indirect infringement. Finally, Defendants contend the jury erred in finding the '625 and '435 Patents not invalid.

### A. Judgment as a matter of law and new trial standards

Judgment as a matter of law is only appropriate when "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." FED. R. CIV. P. 50(a)(1). "The grant or denial of a motion for judgment as a matter of law is a procedural issue not unique to patent law, reviewed under the law of the regional circuit in which the appeal from the district court would usually lie." *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1332 (Fed. Cir. 2008). The Fifth Circuit "uses the same standard to review the verdict that the district court used in first passing on the motion." *Hiltgen v. Sumrall*, 47 F.3d 695, 699 (5th Cir. 1995). Thus, a jury verdict must be upheld, and judgment as a matter of law may not be granted, unless "there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* at 700. The jury's verdict must also be supported by "substantial evidence" in support of each element of the claims. *Am. Home Assurance Co. v. United Space Alliance*, 378 F.3d 482, 487 (5th Cir. 2004).

A court reviews all evidence in the record and must draw all reasonable inferences in favor of the nonmoving party. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150–51 (2000). However, a court may not make credibility determinations or weigh the

**A55**

evidence, as those are solely functions of the jury. *Id*. The moving party is entitled to judgment as a matter of law "only if the evidence points so strongly and so overwhelmingly in favor of the nonmoving party that no reasonable juror could return a contrary verdict." *Int'l Ins. Co. v. RSR Corp.*, 426 F.3d 281, 296 (5th Cir. 2005).

Under Federal Rule of Civil Procedure 59, a new trial may be granted to any party to a jury trial on any or all issues "for any reason for which a new trial has heretofore been granted in an action at law in federal court." "A new trial may be granted, for example, if the district court finds the verdict is against the weight of the evidence, the damages awarded are excessive, the trial was unfair, or prejudicial error was committed in its course." *Smith v. Transworld Drilling Co.*, 773 F.2d 610, 612–13 (5th Cir. 1985).

## B. Direct Infringement

### i. Applicable Law

To prove infringement, the plaintiff must show the presence of every element or its equivalent in the accused device. *Lemelson v. United States*, 752 F.2d 1538, 1551 (Fed. Cir. 1985). Determining infringement is a two-step process. First, the claim must be properly construed to determine its scope and meaning. Second, the construed claim must be compared to the accused device or process. *Absolute Software, Inc. v. Stealth Signal, Inc.*, 659 F.3d 1121, 1129 (Fed. Cir. 2011) (citing *Carroll Touch, Inc. v. Electro Mech. Sys., Inc.*, 15 F.3d 1573, 1576 (Fed. Cir. 1993)). "A determination of infringement is a question of fact that is reviewed for substantial evidence when tried to a jury." *ACCO Brands, Inc. v. ABA Locks Mfr. Co.*, 501 F.3d 1307, 1311 (Fed. Cir. 2007).

### ii. The '215 Patent

Claim 1 of the '215 Patent contains the following limitation:

5

**A56**

> Responsive to the receiving step, constructing a message field for a second data
> unit, said message field including a type identifier field.

'215 Patent, Claim 1, at 10:25–27. The Court construed the phrase to mean "responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message *from a number of different message types*." Docket No. 341 at 9 (emphasis added). Defendants contend they do not infringe because their products only transmit one type of feedback response message. Because their products only transmit one type of message, their feedback response messages are not identified from "a number of different message types."

Ericsson relied on the BlockAck Control field within the 802.11n standard to satisfy the type identifier field limitation. *See* Docket No. 528 at 5. The BlockAck Control field relates to communications between a transmitter and a receiver. Pursuant to the 802.11n standard, the receiver sends feedback response messages to the transmitter indicating which packets the receiver has already received. The standard contains three different types of feedback responses: Basic BlockAck, Compressed BlockAck, and Multi-TID BlockAck. Each response type has a two-digit identifier to indicate which of the three variants is being used.[3] Ericsson's expert (Dr. Nettles) testified that these two-digit identifiers satisfy the type identifier field limitation because they indicate which of the three types of feedback responses is contained in a particular message.

The issue at trial (and in Defendants' post-trial briefing) is Defendants' products only use Compressed BlockAck feedback response messages. Defendants contend their products do not have the ability transmit Basic BlockAck or Multi-TID BlockAck responses, so they cannot satisfy the "number of different message types" requirement. Docket No. 528 at 5. Defendants believe the element of "choice" is critical to satisfying the asserted Claims, and they assert that

---

[3] For example, the identifier for Compressed BlockAck is 01. *See* Docket No. 581 at 9.

6

**A57**

their receivers are incapable of choosing which type of feedback response message is transmitted because they always transmit responses in Compressed BlockAck form. *Id*. at 6.

Defendants also contend Ericsson cannot satisfy the asserted Claims by arguing Defendants' engineers chose which feedback response type to transmit when designing the product. *Id*. at 9. Instead, Defendants contend the "choice" must be made by the receiver in real-time while in operation. *Id*. at 10. Defendants argue any other result would vitiate the "from a number of different message types" limitation. Docket No. 592 at 2. According to Defendants, if Ericsson's infringement evidence is sufficient, the Claim scope would be identical regardless of whether the "number of different message types" language was included. *Id*.

Ericsson makes three arguments in support of the jury's infringement verdict. First, it argues Defendants previously conceded infringement was a factual matter for the jury. Docket No. 581 at 3. About a week before trial, Defendants filed a Motion for Confirmation of the Court's Claim Construction. *See* Docket No. 448. In that motion, Defendants sought confirmation that a device "where only one type of message is available" could not meet the "from a number of different types" limitation. *See id*. at 5. In its response, Ericsson stated its infringement theory—"even if the accused devices always choose to use a single Block ACK variant, they infringe the '215 Patent." Docket No. 460 at 6. Based on this statement from Ericsson, Defendants withdrew their motion. Docket No. 460. In their brief withdrawing the motion, Defendants stated "now that Ericsson has confirmed that it will not take a position inconsistent with the Court's claim construction or its assertions during the *Markman* proceedings, the only remaining issues appear to be disputes of fact." *Id*. at 4. Defendants further stated "Ericsson's allegations regarding the operation of Defendants' products…are issues of fact for the jury." *Id*. Ericsson contends Defendants should not be allowed to retreat from their

7

**A58**

previous admission that infringement was a fact issue by now arguing Ericsson's trial evidence was legally insufficient. Docket No. 581 at 4–5.

Ericsson characterizes its second argument as a claim construction argument. Ericsson argues Defendants are adding a "selecting" limitation to the Claim. *Id*. at 3. Ericsson asserts there is no requirement that a receiver "select" between a number of different feedback response types. *Id*. Instead, the Court's construction only requires the receiver to "identif[y]" the response type. *Id*. at 4.

Third, Ericsson contends it presented legally sufficient evidence to support an infringement verdict. *Id*. at 8. Ericsson argues the 802.11n standard uses the type identifier field to distinguish between three different types of feedback responses. *Id*. Ericsson asserts that the type identifier field is mandatory, and Defendants' transmitters always check the type identifier field when receiving feedback response messages. *Id*. Thus, Ericsson argues it presented sufficient evidence for the jury to find infringement. *Id*.

There is no real dispute how Defendants' products operate; the only disputed issue is whether Defendants' one-message products could satisfy the "from a number of different message types" requirement. The jury determined they did, and there is substantial evidence to support their verdict.

There are three different types of feedback responses available in the 802.11n standard. 6/5/13 a.m. Tr. at 40:10–13 (Nettles). To distinguish between the different types of feedback responses, each message contains a type identifier. *Id*. at 39:6–16. Dr. Nettles testified that this type identifier in Defendants' products satisfied the type identifier field limitation. *Id*. at 41:16–42:5. Dr. Nettles stated that each accused product transmits a type identifier in each feedback response message. *Id*. at 42:6–16. Dr. Nettles confirmed this infringed the '215 Patent because it

8

**A59**

indicates which type of message is transmitted, given a number of potential options. *Id.* at 41:24–42:3.

Defendants contend their products do not identify the message type from a number of different types because their products exclusively use Compressed Block Ack. However, this was an issue appropriately resolved by the jury. Dr. Gibson testified that the type identifier field is mandatory, and Defendants' products all check the type identifier field to determine the type of message. *See* 6/10/13 p.m. Tr. at 19:4–11. Dr. Nettles further testified that Defendants' products must include and check the type identifier field to ensure interoperability with other 802.11n-compliant products. *See* 6/5/13 a.m. Tr. at 43:3–5. Thus, even though Defendants' products only use Compressed Block Ack, each feedback message *must* contain a type identifier bit, and each receiver *must* check the type identifier bit. *See* 6/11/13 a.m. Tr. at 104:17–24 (Nettles) ("And they need to transmit that because there's a possibility that some other manufacturer will be transmitting some other value in that field, and they need to check that field to make sure that their products are processing BlockAcks that their products understand how to deal with. So it's important to process that field, even though they don't change it."). The type identifier bit indicates the message is in Compressed Block Ack form, one of three available options in the 802.11n standard. 6/10/13 p.m. Tr. at 18:24–19:7 (Gibson). This was Ericsson's infringement theory at trial, a theory the jury accepted, and there was substantial evidence to support it.

Much of Defendants' JMOL briefing is an attempt to re-litigate claim construction positions rejected by both the Magistrate Judge and this Court. During claim construction, Defendants argued the "type identifier field" limitation should be construed as identifying the type of feedback response "that is *selected* from multiple *available* feedback responses." Docket

9

**A60**

No. 341 at 6 (emphasis added). The Magistrate Judge rejected Defendants' proposed construction because it improperly imported limitations from the specification. *Id*. at 8–9. Defendants objected to the Magistrate Judge's construction because it failed to include their proposed limitations, and this Court rejected their argument. *See* Docket No. 374 at 5 ("The claim language itself does not include the limitations Defendants urge, and narrowing the claims as Defendants wish would be inappropriate."). Thus, there is no requirement the accused products "select" the type of feedback message or that there be multiple "available" types of messages. *Compare* 6/12/13 a.m. Tr. at 104:9–10 ("The multiple ACKs have to be available at the time of response.") (Defendants' closing argument). It is sufficient that the products "identif[y]" the message type from "a number of different message types." *See* Docket No. 341 at 9.

Defendants' motion for judgment as a matter of law that they do not infringe the '215 Patent is **DENIED**.

### iii.    The '568 Patent

Claim 1[4] of the '568 Patent requires "a service type identifier which identifies a type of payload information." The Court construed the phrase to mean "an identifier that includes the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia."

Ericsson relied on the TID subfield value in the 802.11n standard to meet the service type identifier limitation. *See* 6/5/13 a.m. Tr. at 115:4–117:21 (Nettles). Each TID subfield contains an integer ranging from 0 to 7. *See* PX283 at 253. These eight integers map to four access categories: 1 and 2 correspond to AC_BK; 0 and 3 correspond to AC_BE; 4 and 5 correspond to

---

[4] Ericsson asserted Claim 1 against all Defendants and Claim 5 against only the Router Defendants (D-Link, Netgear, and Belkin). *See* Docket No. 508. The jury found infringement of all asserted '568 Claims. *See id*. Claim 5 depends from Claim 1.

10

**A61**

AC_VI; and 6 and 7 correspond to AC_VO. Each access category is assigned a further "designation," which the 802.11n standard describes as "informative." AC_BK is designated Background, AC_BE is designated Best Effort, AC_VI is designated Video, and AC_VO is designated Voice. These "informative" designations are central to the parties' dispute. Defendants believe they do not infringe because the access category designations are not mandatory (i.e. voice data need not be designated "AC_VO" or "Voice"), while Ericsson asserts that Defendants infringe because their products are capable of using and in some instances actually use the "informative" classifications.

Defendants contend they do not infringe because the TID subfield does not identify the type of information contained in a packet's payload. Docket No. 528 at 12. Instead, Defendants contend the TID subfield value is only used to prioritize packets for transmission. *Id*. at 13. Defendants presented evidence that different types of information can be assigned the same TID value, and the same type of information can be assigned different TID values. *Id*. Thus, Defendants believe the TID subfield does not meet the service type identifier limitation because the TID subfield does not identify the type of information conveyed in the packet. *Id*.

Further, Defendants argue their products do not infringe even though the TID subfield value *may* correspond to the type of information in the payload. *Id*. at 14. Defendants contend merely having the capability of identifying the type of information is insufficient. *Id*. Defendants assert there is no requirement in the 802.11n standard that certain TID values be used with certain types of information. *Id*. Therefore, even though TID values may be configured to match their descriptive designations, there is no infringement because TID values do not have to be configured to match their descriptive designations. *Id*.

11

**A62**

Ericsson contends it presented sufficient evidence to support the jury's verdict. Docket No. 581 at 12. Ericsson argues when Defendants' products are used in accordance with the 802.11n standard, the TID value identifies the type of information in the payload. *Id*. at 13. In support, Ericsson cites internal Intel documents instructing customers to use TID values that match the type of data in the payload. *Id*. Further, Ericsson argues both Dr. Nettles and Dr. Gibson performed testing indicating where the TID values identified the type of data in the payload. *Id*. Ericsson argues this is sufficient evidence to support the jury's infringement verdict. *Id*.

Dr. Nettles testified that when devices are used in accordance with the 802.11n standard, the TID value identifies the type of information in the payload. 6/5/13 p.m. Tr. at 110:9–24; *see* 6/5/13 p.m. Tr. at 39:7–9 (noting the user can assign "any TID value that he or she chooses"). Dr. Nettles stated that while the categories were not mandatory, someone using the standard would actually use the given designations. 6/5/13 a.m. Tr. at 118:5–13; *see* 6/5/13 p.m. Tr. at 36:24–37:2 ("Q: So what they establish is how the system will treat them, not the kind of information conveyed in the payload? A: No, I can't agree with that in general."). Further, Dr. Nettles provided several specific examples of products where the TID values match the type of information in the payload. *See* 6/5/13 a.m. Tr. at 123:10–15, 124:3–8, 124:16–22. There was also evidence Intel encouraged its customers to follow the TID subfield designations for video and voice. *See* PX514 at 65; 6/10/13 p.m. Tr. at 50:8–53:10 (Gibson).

At best, Defendants' evidence showed their products can be configured in a non-infringing manner. In particular, Dr. Gibson presented testing data demonstrating that a particular TID subfield was not required to match the content of the payload. *See* 6/10/13 a.m. Tr. at 117:23–120:13. Conversely, Dr. Nettles identified instances where the TID values matched

12

**A63**

the payload content. *See* 6/5/13 a.m. Tr. at 123:10–15, 124:3–8, 124:16–22; 6/10/13 p.m. Tr. at 57:16–58:18 (Gibson). The jury was not required to find Dr. Gibson's testing data more influential than Dr. Nettles's product data.[5] Further, even though the TID subfield classifications are not mandatory, they are still included in the 802.11n standard. *See* PX283 at 253. It was entirely logical for the jury to conclude that Defendants would choose to follow even the "informative" portions of the standard.

Defendants' motion for judgment as a matter of law that they do not infringe the '568 Patent is **DENIED**.

### iv. The '625 Patent

Claim 1 of the '625 Patent requires:

> A transmitter in the data network *commanding a receiver* in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet;

'625 Patent, Claim 1, at 10:16–23 (emphasis added). Ericsson relied on transmitted data packets to satisfy the command to receive limitation. Dr. Nettles testified that data packets sent either individually (MPDUs) or aggregated (A-MPDUs) act as a command from the transmitter to the receiver to accept an out of sequence packet. Docket No. 528 at 16. Defendants contend this is insufficient evidence of a command to receive. *Id*. at 17. Defendants argue the normal operation of 802.11n receivers is to receive all packets, regardless of whether the packets are out of sequence. *Id*. Further, Defendants' receivers receive all data packets the same—there is no

---

[5] At the post-trial hearing, the Court repeatedly asked Defendants' counsel why the specific instances identified by Dr. Nettles where the TID subfield matched the content of the data were not sufficient to support the jury's verdict. Those questions were never directly answered. Instead, Defendants consistently reiterated their position that there could only be infringement if the TID subfield *was required* to match the type of data contained within it. This is not necessary to find infringement. *See z4 Techs., Inc. v. Microsoft Corp.*, 507 F.3d 1340, 1350 (Fed. Cir. 2007) (affirming an infringement verdict even though the accused products were capable of non-infringing modes of operation); *Golden Blount, Inc. v. Robert H. Peterson Co.*, 458 F.3d 1354, 1363 (Fed. Cir. 2006).

13

**A64**

special process for receiving out of sequence packets. *Id*. at 18. Because all packets are received the same, there is no need for a command to receive. *Id*. at 19.

Additionally, Defendants contend Ericsson cannot rely on the data packets themselves as commands to receive. Docket No. 528 at 21. Defendants argue Ericsson did not present any evidence of 802.11n programming forcing receivers to receive out of sequence packets. *Id*. Therefore, there is no evidence to support the jury's finding of infringement. *Id*. Finally, Defendants argue Ericsson did not present any evidence that the steps of Claim 1 (a method claim) were actually performed. *Id*. at 22. Defendants cite testimony from Dr. Nettles that Defendants "program their devices to do these steps without human intervention." *Id*. Defendants believe this statement is insufficient to prove direct infringement because Ericsson never demonstrated anyone actually performed the claimed method. *See id*. (citing *Cybersettle, Inc. v. Nat'l Arbitration Forum, Inc.*, 243 Fed. Appx. 603, 607 (Fed. Cir. 2007)).

In a footnote, Defendants also contend Ericsson failed to present sufficient evidence that the accused products command a receiver to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet. Docket No. 528 at 22, n.14. Defendants contend Ericsson failed to present any evidence the accused products send explicit BARs when a block acknowledgment is lost. *Id*. Likewise, Defendants assert that transmission of A-MPDUs does not meet the claim steps because A-MPDUs do not release expectation of receiving outstanding packets. *Id*.

Ericsson argues it presented substantial evidence of a command to receive out of sequence packets. Docket No. 581 at 17. Dr. Nettles testified that 802.11n receivers are programmed to treat all packets as commands to receive, so 802.11n-compliant products must receive all out of sequence packets. *Id*. Ericsson also contends the jury resolved Defendants'

14

**A65**

semantic arguments in Ericsson's favor. *Id*. at 19. Because all packets must be received, Defendants contend this indicates 802.11n devices do not need a command to receive. *Id*. Ericsson believes the opposite is true. *Id*. Ericsson argues 802.11n devices receive all packets because of the command to receive. *Id*. Ericsson posits that this is a fact issue the jury was entitled to resolve, and did resolve, in Ericsson's favor. *Id*. Accordingly, there is substantial evidence to support the verdict. *Id*.

Regarding the "at least one packet" limitation, Ericsson first argues Defendants waived this argument. *Id*. at 21. Ericsson contends Defendants never presented this issue in their JMOL at trial, and they did not make any argument about it to the jury. *Id*. at 22. Second, Ericsson argues it presented substantial evidence this limitation was met. *Id*. at 21. Ericsson asserts it demonstrated that the accused products command a receiver to release any expectation of receiving outstanding packets when a receiver receives an A-MPDU. *Id*. at 22. When a receiver receives an A-MPDU, it shifts the window forward, releasing any expectation of packets before the window. *Id*. Ericsson contends this same function discards packets below the window, so it satisfies the referenced claim language. *Id*.

Dr. Nettles testified that 802.11n receivers treat MPDUs and A-MPDUs as commands to receive out of sequence packets. 6/5/13 a.m. Tr. at 80:4–10. Each receiver contains programming instructing it to treat out of sequence packets as commands to receive, so the receiver knows to accept the packets. *Id*. at 82:4–17. Because of this programming, 802.11n receivers accept all packets. *Id*. at 83:7–13. Dr. Nettles further testified that 802.11n receivers operate similarly to a preferred embodiment in the '625 Patent. *See* 6/11/13 a.m. Tr. at 108:5–11. The '625 Patent contains an embodiment where each transmitted packet contains an enforcement bit. *Id*. Dr. Nettles hypothesized that in the embodiment, the system could be configured so the enforcement

15

**A66**

bit was always set to one. *Id*. If every enforcement bit was set to one, every packet would be a command to receive. *Id*. at 108:12–14. Dr. Nettles contends this is similar to the 802.11n system. *Id*. at 108:15–19. Since every "enforcement bit" is set to one, Defendants no longer need to transmit them. *Id*. However, every packet is still treated as a command to receive. *Id*.

Additionally, Dr. Nettles provided substantial testimony about the releasing expectations limitation. Dr. Nettles stated when a window of expected packets shifts, the receiver releases any expectation of receiving packets before the window. 6/5/13 a.m. Tr. at 87:14–17. Dr. Nettles presented two animations explaining how this occurred to the jury. *See id*. at 87:18–88:6. Dr. Nettles also testified that the receipt of an A-MPDU causes the window to shift. *Id*. at 92:6–15. This window shift causes the receiver to release expectation of receiving packets outside the window. *Id*.

Based on Dr. Nettles's testimony, there is substantial evidence to support the jury's verdict. Both sides presented competing evidence about the command to receive. Dr. Gibson testified that because 802.11n receivers accept all packets, there is no command to receive. *See* 6/10/13 a.m. Tr. at 30:14–24. Dr. Nettles testified that 802.11n receivers accept all packets *because* of the command to receive. *See* 6/5/13 p.m. Tr. at 57:3–5. This was a fact issue ripe for jury resolution, and there was substantial evidence to support their decision.

Defendants' motion for judgment as a matter of law that they do not infringe the '625 Patent is **DENIED**.

### v. Direct Infringement of Method Claims

Defendants argue Ericsson failed to present any evidence any Defendant infringed the asserted method claims. Docket No. 528 at 23. Defendants contend Ericsson's only evidence of direct infringement of the method claims is a statement from Dr. Nettles that Defendants' programming performs the asserted methods without user intervention. *Id*. at 24. Ericsson

16

**A67**

counters that it introduced substantial evidence to support the jury's verdict. Ericsson argues a manufacturer can be liable for direct infringement of a method claim through use by its customers. Docket No. 581 at 24. Further, Ericsson asserts that it presented evidence showing Defendants' customers used the accused products without modification. *Id*. at 25. Therefore, Ericsson believes Defendants are liable for direct infringement for both making and selling the accused products. *Id*.

Ericsson presented substantial evidence that Defendants directly infringed the asserted method claims. A method claim is directly infringed when someone practices the patented method. *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1359 (Fed. Cir. 2009). A manufacturer can directly infringe a method claim if its products "automatically perform the disputed steps" without user modification. *See SiRF Tech., Inc. v. Int'l Trade Comm'n*, 601 F.3d 1319, 1331 (Fed. Cir. 2010) (finding direct infringement when the accused products automatically performed every step of a method claim). This is exactly the type of evidence Ericsson presented at trial. Dr. Nettles testified that the accused products perform the patented methods automatically without user intervention. *See* 6/5/13 a.m. Tr. at 25:7–11 ('215 Patent); 78:25–79:10 ('625 Patent). This is not an issue of joint infringement, as Defendants contend. *See* Docket No. 592 at 8. Rather, Ericsson presented evidence Defendants directly infringed by performing all the steps of the asserted claims.

There was substantial evidence to support the jury's infringement verdict of the method claims. Defendants' motion for judgment as a matter of law that they do not infringe the asserted method claims is **DENIED**.

17

**A68**

## C.  Indirect Infringement

### i.    Applicable Law

Infringement is a question of fact that is reviewed for substantial evidence when tried to a jury. *Finisar Corp.*, 523 F.3d at 1332. Under 35 U.S.C § 271(b), a party is liable for infringement if it "actively induces infringement of a patent." "In order to prevail on an inducement claim, the patentee must establish first that there has been direct infringement, and second that the alleged infringer knowingly induced infringement and possessed specific intent to encourage another's infringement." *ACCO Brands*, 501 F.3d at 1312 (internal quotation marks omitted). Thus, to support a finding of inducement, there must be "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006). Furthermore, "[t]he plaintiff has the burden of showing that the alleged infringer's actions induced infringing acts," and that the infringer "knowingly induced infringement." *Id.* at 1306. A party has the requisite knowledge if it knew "that the induced acts constitute patent infringement," or was willfully blind to the infringement. A party is willfully blind if it believed there was a high probably that the acts constituted patent infringement and took deliberate steps to avoid learning of the infringement. *Global-Tech Appliances, Inc. v. SEB S.A.*, --- U.S. ----, 131 S. Ct. 2060, 2068, 2070 (2011); *see Smith & Nephew, Inc. v. Arthrex, Inc.*, 2013 U.S. App. LEXIS 1038, *10–12 (Fed. Cir. 2013).

A patentee may prove both indirect infringement and the underlying direct infringement by circumstantial evidence. *See Liquid Dynamics Corp. v. Vaughan Co.*, 449 F.3d 1209, 1219 (Fed. Cir. 2006). "There is no requirement that direct evidence be introduced, nor is a jury's preference for circumstantial evidence over direct evidence unreasonable per se." *Id.* Moreover, "[t]he drawing of inferences, particularly in respect of an intent-implicating question . . . is

18

**A69**

peculiarly within the province of the fact finder that observed the witnesses." *Rolls-Royce Ltd. v. GTE Valeron Corp.*, 800 F.2d 1101, 1110 (Fed. Cir. 1986); *see also Fuji Photo Film Co. v. Jazz Photo Corp.*, 394 F.3d 1368, 1378 (Fed. Cir. 2005) (declining to disturb jury's verdict because intent to induce infringement "is a factual determination particularly within the province of the trier of fact").

### ii.    Analysis

Defendants contend Ericsson failed to present sufficient evidence of indirect infringement for two reasons. First, Defendants believe Ericsson failed to prove direct infringement by Ericsson's customers for all the reasons recited above. Docket No. 528 at 24. Second, Defendants argue no reasonable jury could have found they intended for their customers to infringe the asserted claims. *Id*. at 25. Defendants contend Ericsson's proof regarding knowledge of infringement is lacking. *Id*. Defendants argue the evidence only demonstrated they were aware of Ericsson's lawsuit; they were not aware their products actually infringed. *Id*. at 26. Defendants contend they have maintained reasonable and consistent positions regarding non-infringement and invalidity throughout this trial, so Ericsson failed to prove the knowledge requirement of induced infringement. *Id*. at 27. Additionally, Defendants contend Ericsson failed to present any evidence that Defendants manifested a specific intent to encourage their customer's infringing acts. *Id*. at 28.

Ericsson argues its evidence was "more than sufficient" to support a finding of induced infringement. Docket No. 581 at 27. Ericsson cites eight different pieces of testimony, including testimony from Dr. Nettles, that operation in an infringing manner is "the whole reason for selling" Defendants' products. *See id*. at 27–28. Ericsson also cites evidence that Defendants submitted their products for 802.11n compatibility testing, and they advertised their products'

19

**A70**

802.11n compliance. *Id*. at 28. Ericsson believes this evidence "goes far beyond what has been found to be sufficient evidence to find inducement." *Id*.

There was substantial evidence to support a verdict of induced infringement. First, Ericsson presented substantial evidence of direct infringement by Defendants' customers.[6] *See Akamai Techs., Inc. v. Limelight Networks, Inc.*, 692 F.3d 1301, 1308 (Fed. Cir. 2012) (en banc) ("There can be no indirect infringement without direct infringement."). Dr. Nettles testified that end customers performed the patented methods when they used the accused products. 6/5/13 a.m. Tr. at 25:12–14. Ericsson also presented evidence that Defendants sold infringing units to end customers. *See* 6/6/13 a.m. Tr. at 10:21–12:2 (Bone). This is sufficient evidence to infer end customers used the infringing products. *See Liquid Dynamics*, 449 F.3d at 1219 (noting that a patentee may prove indirect infringement through circumstantial evidence).

Second, Ericsson presented substantial evidence Defendants "knowingly induced infringement and possessed specific intent to encourage another's infringement." *See Akamai Techs.*, 692 F.3d at 1308. The parties stipulated that Ericsson notified each Defendant of its infringement allegations before the suit was filed. 6/4/13 p.m. Tr. at 7:5–10:20; *see id*. at 7:1–4 (Petersson) ("Q: Did Ericsson contact each of the Defendants in this case about taking a license to Ericsson's Wi-Fi patents? A: Yes, we did."). After receiving notice, Defendants continued selling the accused products. *See* 6/6/13 a.m. Tr. at 11:18–21 (Bone). Dr. Nettles testified that Defendants' accused products comply with the 802.11n standard, and the accused products automatically infringe without user intervention. 6/5/13 a.m. Tr. at 25:21–26:2. Ericsson also presented evidence Defendants advertise their 802.11n compliance. *See* 6/6/13 p.m. Tr. at 175:18–176:13 (McFarland) (describing testing by the Wi-Fi Alliance). Defendants submit their

---

[6] Defendants also re-urge non-infringement arguments made previously in their Motion. *See* Docket No. 528 at 24. For the reasons set forth above, those arguments are without merit.

20

**A71**

products for independent compliance testing, then indicate on their packaging the products are compliant. *See* 6/4/13 p.m. Tr. at 123:15–22, 130:18–136:17 (Nettles); 6/5/13 p.m. Tr. at 144:15–24 (Bone). Taken together, this is substantial evidence of "specific intent to encourage another's infringement." *See DSU Med.*, 471 F.3d at 1306.

Defendants' motion for judgment as a matter of law regarding indirect infringement is **DENIED**.

### D. Invalidity

#### i. Applicable Law

Patents are presumed valid, and overcoming this presumption requires clear and convincing evidence. *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1354 (Fed. Cir. 2010) (*en banc*). A patent claim is invalid as anticipated if the claimed invention was known or used by others in this country, or patented or described in a printed publication in this or a foreign country, before the invention by the applicant. 35 U.S.C. § 102(a) (2006). Anticipation requires the presence in the prior art of each and every limitation of the claimed invention. *Amgen, Inc. v. Hoffman-La Roche Ltd.*, 580 F.3d 1340, 1366 (Fed. Cir. 2009).

#### ii. The '625 Patent

At trial, Defendants presented evidence that a submission to the European Telecommunications Standards Institute ("ETSI") by Dietmar Petras anticipated Claim 1 of the '625 Patent. *See* DX120 ("Petras Reference" or "Petras"). Ericsson argued the Petras Reference did not disclose a command to receive, as required by Claim 1. Defendants now contend they presented clear and convincing evidence the Petras Reference disclosed a command to receive, as well as every other limitation in Claim 1.

21

**A72**

Dr. Nettles testified at trial (and Ericsson argues now) that Petras was not anticipatory because it failed to show a command to receive an out of sequence packet. Docket No. 581 at 33. In particular, the discard message relied on by Defendants was not a command to receive; it was merely a notification the transmitter has discarded a packet. *Id*. Further, Ericsson contends Dr. Heegard admitted the Petras Reference did not need a command to receive. *Id*. at 34. Defendants contend their evidence demonstrates that in the Petras Reference, a discard message is a command to receive. Docket No. 592 at 9. Defendants argue the discard message forces the receiver to accept the packet to which the message is attached, but the receiver would not otherwise accept the packet. *Id*. at 9. Thus, Defendants believe the Petras Reference discloses every element of Claim 1. *Id*.

Anticipation of the '625 Patent presents a classic fact issue for the jury. At issue was whether a single reference disclosed a single limitation. Ericsson's expert testified it did not; Defendants' expert testified it did. After reviewing the evidence, the jury determined the Defendants failed to prove by clear and convincing evidence that the reference contained the limitation. Such a determination is squarely within the purview of the jury, and Defendants failed to present sufficient evidence to overturn the verdict. *See Palasota v. Haggar Clothing Co.*, 499 F.3d 474, 480 (5th Cir. 2007); *The Johns Hopkins Univ. v. Datascope Corp.*, 543 F.3d 1342, 1344 (Fed. Cir. 2008).

Dr. Nettles testified the Petras discard message in was not a command to receive. 6/11/13 a.m. Tr. at 99:23–100:2. According to Dr. Nettles, the only effect of the Petras discard notice is to shift the window of anticipated packets. *Id*. at 100:7–11. However, shifting the window has no impact on whether out of sequence packets are received. *Id*. at 100:12–14. Further, Dr. Nettles testified there was "definitely no disclosure" in the Petras Reference indicating a discard notice

22

**A73**

was a command to receive. *Id*. at 100:15–21; *see* 6/11/13 p.m. Tr. at 17:20–24 (Nettles) ("Q: And that's what they said—and that's what Dr. Heegard said represented a command to receive, right? A: That's what he identified. I don't agree with him.").

Dr. Heegard testified the discard message in Petras was a command to receive. *See* 6/10/13 p.m. Tr. at 142:22–143:15. According to Dr. Heegard, the Petras discard message acts like the enforcement bit in the '625 Patent, and it commands a receiver to accept out of sequence packets. *See id*. Ericsson presented evidence that Dr. Heegard's position conflicted with the analysis of Dr. Gibson, Defendants' non-infringement expert. Ericsson cross-examined Dr. Heegard on a statement from Dr. Gibson's expert report where Dr. Gibson stated that a "message that informs a receiver that the transmitter has discarded packets, does not command the receiver to receive any packets." 6/10/13 a.m. Tr. at 159:2–9. Dr. Heegard then conceded that discard messages are "generally speaking" not commands to receive. *Id*. at 160:16–19; *see id*. at 160:25–161:2 ("So generally is a discard message a command to receive, no. In this system, this message is a command to receive."). Thus, Dr. Heegard admitted his view of the Petras discard messages conflicted with the generally understood operation of discard messages. Given that Dr. Heegard's entire invalidity analysis was based on Petras discard messages being commands to receive, the jury was entitled to view this concession in Ericsson's favor.

Both sides presented competing views of the Petras reference, and the jury accepted Ericsson's view. *Cf. Goodman v. Harris Cnty.*, 571 F.3d 388, 398 (5th Cir. 2009) (quoting *United States v. Anderson*, 933 F.2d 1261, 1274 (5th Cir. 1991)) ("We accept all credibility choices that tend to support the jury's verdict."). There is sufficient evidence to support the jury's finding of no invalidity of Claim 1 of the '625 Patent. Defendants' motion for judgment as a matter of law is **DENIED**.

23

**A74**

### iii.    The '435 Patent

Defendants also relied on the Petras Reference to show anticipation of Claims 1 and 2 of the '435 Patent. At trial, Ericsson presented testimony that Petras did not disclose removing entries from a list of expected packets. Ericsson now argues this evidence was sufficient to support the jury's verdict. *See* Docket No. 581 at 35. Ericsson contends Dr. Heegard made inconsistent statements about the list of expected packets. *Id*. at 35. Ericsson believes Dr. Heegard first testified a buffer was the list, then later testified a buffer was not the list. *Id*. Regardless, Ericsson argues Dr. Heegard's final list does not track packets but instead makes timestamp calculations. *Id*. at 36. Therefore, because the Petras Reference does not teach removing entries from a list of expected packets, it is not anticipatory. *Id*.

Defendants contend no reasonable jury could have found Claims 1 and 2 not invalid in light of the Petras Reference. Docket No. 528 at 33. Dr. Heegard testified that the Petras Reference discloses a list that tracks which packets are expected or missing from the receiver's buffer. *Id*. at 34. Defendants argue this evidence mandated a finding of invalidity by the jury. *Id*.

Analysis of the '435 Patent is very similar to the analysis of the '625 Patent. Once again, Dr. Heegard testified the Petras Reference contained a particular limitation, and Dr. Nettles testified it did not. Both sides presented competing expert opinions, and the jury sided with Ericsson. This is no reason to disrupt the jury's verdict.

Ericsson presented substantial evidence to support the verdict. Dr. Nettles testified Petras failed to disclose removing entries from a list of expected packets. 6/11/13 a.m. Tr. at 101:5–13. Dr. Nettles explained that the figure identified by Dr. Heegard was something "you would never want to remove expectations from." *Id*. at 101:23–25. According to Dr. Nettles, the figure identified by Dr. Heegard is used to make calculations about timestamps. *Id*. at 102:2–6.

24

**A75**

Consequently, if an entry was removed from the list, the timestamp calculation would be incorrect. *See id*.

Dr. Heegard presented a somewhat muddled view of how he believed the Petras Reference actually disclosed a list of expected entries. On direct examination, Dr. Heegard testified the receiver keeps track of which packets "have been received and are sitting in the buffer." 6/10/13 p.m. Tr. at 137:13–17. Heegard explained that a receiver must "keep track of what things are received and they're sitting in the buffer, and it's got to keep track of what things it expects to receive." *Id*. at 137:18–22. On cross examination, Dr. Heegard then stated "the buffer's not the list." *Id*. at 162:23. Instead, one of ordinary skill would know to keep a list.[7] *Id*. at 163:3–15. Dr. Heegard further testified that the buffer was not the list, but "a list keeps track of a buffer." *Id*. at 164:21–22. On re-direct, Dr. Heegard clarified that Petras shows "a buffer and with a list keeping track of it." *Id*. at 166:22–23.

As is apparent from the quoted testimony, Dr. Heegard struggled to consistently articulate his reasoning for anticipation. Combined with the testimony of Dr. Nettles, there was more than enough evidence to support the jury's verdict of no invalidity of the '435 Patent. Defendants' motion for judgment as a matter of law is **DENIED**.

**E.  Motion for New Trial**

As an alternative to judgment as a matter of law, Defendants request a new trial on all validity and infringement issues. As discussed above, there was substantial evidence to support the jury's verdict of both infringement and no invalidity. Accordingly, Defendants' motion for a new trial on infringement and validity is **DENIED**.

---

[7] *See* 6/10/13 p.m. Tr. at at 164:14–17 ("The buffer has 1 and 3 in it. So I know, okay, 1 and 3 sitting in the buffer, 0 and 2 is missing. I keep track. 0 and 2 is missing. 1 and 3 is in the buffer. That's the list.") (Heegard).

25

**A76**

Case: 13-1625   Case: 13-1625   Document: 179-1   Page: 91   Filed: 03/31/2014   (91 of 575)
Case 13-1025cv CASE-PARTIED Additional Document:3/06115   Page: 26 of 51 Page 03/31/2014

26032

**III.    Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529)**

In this motion, Defendants challenge the jury's damage award. First, Defendants contend the damages violate the entire market value rule. Next, Defendants contend Ericsson's expert (Mr. Bone) relied on non-comparable licenses and failed to apportion between patented and non-patented features. Next, Defendants contend the damage award is inconsistent with Ericsson's RAND obligations and fails to account for royalty stacking. Finally, Defendants request a new trial on damages. Defendants contend the Court's jury instructions and verdict form contained prejudicial errors.

### A. Applicable Law

A patentee is entitled to damages for infringement under 35 U.S.C. § 284. The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.*, 341 F.3d 1370, 1381 (Fed. Cir. 2003). There are two alternative categories of infringement compensation—the patentee's lost profits, and the reasonable royalty the patentee would have received through arms-length bargaining. *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

To ascertain a reasonable royalty, patentees commonly consider a hypothetical negotiation in which the asserted patent claims are assumed valid, enforceable, and infringed, and attempt to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began. *Id.* at 1324–25; *see also Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1554 n.13 (Fed. Cir. 1995) (en banc). Calculation of a reasonable royalty requires determination of two separate and distinct amounts: 1) the royalty base, or the revenue pool implicated by the infringement; and 2) the royalty rate, or the

**A77**

percentage of that pool "adequate to compensate" the plaintiff for the infringement. *Cornell Univ. v. Hewlett-Packard Co.*, 609 F. Supp. 2d 279, 286 (N.D.N.Y. 2009).

The entire market value rule "recognizes that the economic value of a patent may be greater than the value of the sales of the patented part alone." *See King Instruments Corp. v. Perego*, 65 F.3d 941, 951 n.5 (Fed. Cir. 1995). "The entire market value rule allows a patentee to assess damages based on the entire market value of the accused product [if] the patented feature creates the 'basis for customer demand' or 'substantially create[s] the value of the component parts.'" *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1318 (Fed. Cir. 2011) (citing *Lucent*, 580 F.3d at 1336). "[T]he patentee . . . must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative," or show that "the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature." *Id.* (citing *Garreston v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884)); *see also Lucent*, 580 F.3d at 1336–67. For minor patent improvements, a patentee cannot justify using the entire market value of an accused product simply by asserting a lower royalty rate. *Uniloc,* 632 F.3d at 1319–20 (rejecting contrary interpretation of *Lucent*, 580 F.3d at 1338–39). Although a reasonable royalty analysis "necessarily involves an element of approximation and uncertainty," *Unisplay, S.A. v. Am. Elec. Sign Co.*, 69 F.3d 512, 517 (Fed. Cir. 1995), the Court must ensure the jury verdict is supported by sufficient evidence.

"A district court's duty to remit excessive damages is a procedural issue, not unique to patent law." *Imonex Servs., Inc. v. W.H. Munzprufer Dietmar Trenner GMBH*, 408 F.3d 1374, 1380 (Fed. Cir. 2005). In the Fifth Circuit, a decision on remittitur and new trial is within the

**A78**

sound discretion of the trial court. *See Volger v. Blackmore*, 352 F.3d 150, 154 (5th Cir. 2003). The standard is highly deferential, and damages are set aside "only upon a clear showing of excessiveness." *i4i Ltd. v. Microsoft Corp.*, 598 F.3d 831, 857 (Fed. Cir. 2010) (quoting *Duff v. Werner Enters., Inc.*, 489 F.3d 727, 730 (5th Cir. 2007)). An excessive award exceeds the "maximum amount calculable from the evidence." *Carlton v. H.C. Price Co.*, 640 F.2d 573, 579 (5th Cir. 1981).

### B. Entire Market Value Rule and Apportionment

Defendants first contend they are entitled to judgment as a matter of law because the jury's damages award violates the entire market value rule. Docket No. 529 at 2. Defendants contend Mr. Bone derived his $0.50 per unit royalty from the value of end products (i.e. routers and computers) instead of limiting his royalty base to the smallest salable patent-practicing unit. *Id*. at 3. Defendants argue the WiFi chips are the smallest salable unit, and there was no evidence the chips drove demand for the end products. *Id*. at 4. Accordingly, Defendants assert that Mr. Bone improperly relied on end-product revenues to arrive at his royalty. *Id*.

Ericsson argues Mr. Bone's analysis did not violate the entire market value rule because it did not implicate the entire market value rule. Docket No. 584 at 8. Ericsson contends Mr. Bone's royalty base was not the market value of the end products; it was the market value of the asserted patents' contributions to the end products. *Id*. at 9. Additionally, Ericsson contends both sides agreed on the proper royalty base—the stipulated number of accused products sold—and Defendants' own expert used router and computer sales as his base. *Id*. at 9.

Defendants next contend they are entitled to judgment as a matter of law because Mr. Bone failed to apportion between patented and unpatented features. Docket No. 529 at 6. Defendants argue Mr. Bone did not properly apportion Ericsson's portfolio rate to account for

28

**A79**

the value of the patented features as opposed to non-patented features. *Id*. As an example, Defendants cite testimony from Dr. Perryman that only 17.5% of a WiFi chip relates to 802.11n, and that 17.5% covers significantly more than the accused Quality of Service and Block Acknowledgment features. *Id*. Ericsson counters that Mr. Bone's analysis contained two distinct levels of apportionment to arrive at an appropriate royalty. Docket No. 584 at 10. Further, Ericsson argues the Court rejected an identical argument in Defendants' pre-trial *Daubert* motion, so there is no reason to reach a different result post-trial. *Id*.

Defendants' entire market value rule and apportionment arguments are nearly identical to those raised (and rejected) pre-trial. *See* Docket No. 443. These same arguments are once again rejected post-trial. Defendants' apportionment argument ignores two different levels of apportionment in Mr. Bone's analysis. At the first level, Bone only considered revenue from the licensing of Ericsson's 802.11 portfolio. At the second level, Mr. Bone apportioned the 802.11 licensing revenue to extract the value attributed to non-asserted patents. Combined, these two levels limit the revenue pool to the market value of the asserted patents' contribution to the 802.11 standard.

The first level of apportionment reduced the revenue pool to the value of Ericsson's 802.11 contributions. On multiple occasions, Ericsson licensed its 802.11 portfolio to third parties. *See* 6/5/13 p.m. Tr. at 148:6–20 (Bone). Each license covered only a particular portion of the 802.11 standard—namely, the portion of the 802.11 standard the third party licensees believed was covered by Ericsson's portfolio.[8] Defendants attempt to downplay the significance of these licenses, but they reflect a real-world valuation of Ericsson's 802.11 patents. *See* 6/5/13 p.m. Tr. at 146:15–17, 150:24–152:18 (Bone); *Monsanto Co. v. McFarling*, 488 F.3d 973, 978–

---

[8] 6/6/13 a.m. Sealed Tr. at at 3:10–7:3 (HP); 7:5–9:17 (Buffalo); 9:18–11:23 (RIM); 11:24–13:18 (Option); 13:19–14:22 (Ascom); 14:23–16:5 (Sonim).

29

**A80**

79 (Fed. Cir. 2007) ("An established royalty is usually the best measure of a "reasonable" royalty for a given use of an invention because it removes the need to guess at the terms to which parties would hypothetically agree."). The licensees would not have paid value for a license unless they believed Ericsson's patents covered at least a portion of the standard. Similarly, the licensees would not have paid value for the portion of the standard not covered by Ericsson's patents. Consequently, the money paid under these licenses represents the market's valuation of the 802.11 contributions of Ericsson's patents. *See LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (quoting *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 869 (Fed. Cir. 2010)) ("The trial court must carefully tie proof of damages to the claimed invention's footprint in the market place.").

The five patents asserted in this case are not the entirety of Ericsson's 802.11 portfolio—they are only a subset of it. However, Mr. Bone's second level of apportionment factors this into account. Mr. Bone reduced his rates "to account for the fact we're only dealing with five patents in this case." 6/6/13 a.m. Sealed Tr. at 18:24–19:1. He further testified that the five asserted patents comprise at least fifty percent of the value of Ericsson's 802.11 portfolio. *Id*. at 20:3–14. This was a realistic and thorough attempt to apportion revenue to only the asserted patents. *Compare VirnetX Inc. v. Cisco Sys., Inc.*, 2013 WL 789288, at *2 (E.D. Tex. Mar. 1, 2013) (Davis, J.). The end result of Mr. Bone's analysis is a royalty pool comprising money paid by third party licensees for the value of the asserted patents' contributions to the 802.11 standard. *See* 6/6/13 a.m. Sealed Tr. at 58:20–59:1 ("Q: Okay. Is there some indications to you in this case that Ericsson's portfolio is worth 50 cents? A: Yes. Q: And what is that? A: The actual agreements that companies were willing to pay for Ericsson's technology, the six agreements

**A81**

we've talked about."); *LaserDynamics,* 694 F.3d at 68 (requiring courts to examine only revenues associated with the patented components).

Defendants also argue Mr. Bone's analysis violates the entire market value rule by using the value of end products without proving the patented feature is the basis for customer demand of the accused product. This argument fails for many of the same reasons as Defendants' apportionment argument. Mr. Bone's revenue base is not the market value of the end products. Rather, it is the market value of the contribution of the asserted patents to the end products. This distinction is critical to the analysis. The licensing revenue from Ericsson's portfolio is attributable only to the value Ericsson's patents add to the licensees' end products; it is not attributable to the end products as a whole. It goes without saying that the licensees would not have paid value for portions of the 802.11 standard unrelated to Ericsson's patents. Therefore, Mr. Bone's report does not implicate the entire market value rule. *See Versata Software, Inc. v. SAP Am., Inc.,* --- F.3d ----, 2013 WL 1810957, at *12 (Fed. Cir. May 1, 2013) (finding that a plaintiff's damage model did not implicate the entire market value rule because it "merely accounted for all infringing sales"); *Fractus, S.A. v. Samsung Elecs. Co.,* 876 F. Supp. 2d 802, 833 (E.D. Tex. 2012) (Davis, J.).

Additionally, Mr. Bone's analysis calls for a per unit royalty on all sales of accused products. As a per unit royalty, it does not fluctuate with the price of the end product. Regardless of the ultimate sale price of the end product, the royalty rate remains constant. 6/5/13 p.m. Tr. at 147:16–17 ("So the value is on a per-unit basis regardless of whether it's in a router or a laptop.") (Bone). This further illustrates that Mr. Bone did not rely on the value of end products in his analysis.[9] *See SynQor, Inc. v. Artesyn Techs., Inc.,* 709 F.3d 1365, 1383 (Fed. Cir. 2013)

---

[9] Mr. Bone acknowledges that it would not have been appropriate to calculate damages as a percentage of the sales of end products like routers and computers. *See* 6/5/13 p.m. Tr. at at 147:8–17.

31

**A82**

(determining that a plaintiff did not invoke the entire market value rule when it "never sought to justify its damages figure based on the price of the customer end products").

Defendants' motion for judgment as a matter of law regarding the entire market value rule and lack of apportionment is **DENIED**.

### C. Ericsson's RAND Obligations

Next, Defendants contend they are entitled to judgment as a matter of law because the jury's damages award is inconsistent with Ericsson's RAND obligations. Docket No. 529 at 8. Defendants argue Ericsson is under a RAND obligation to provide licenses to an "unrestricted" number of licensees, but Ericsson refused to offer a license to Intel. *Id*. At Ericsson's request, the verdict form did not include a space to award damages against Intel. *Id*. Defendants contend this is equivalent to a refusal to offer a license to Intel, which runs contrary to Ericsson's RAND obligations. *Id*.

Ericsson contends Defendants waived this argument because Defendants never objected to the verdict form on the grounds that it did not contain a space to assess damages against Intel. Docket No. 584 at 11. Additionally, Ericsson contends this issue is moot because it has now offered a license to Intel. *Id*.

Defendants basically argue Ericsson breached its RAND obligations by not suing Intel, then not seeking damages against Intel after it intervened in the case. This argument fails for two reasons. First, Ericsson is the plaintiff. As the plaintiff, it is the master of its own case. Originally, Ericsson elected not to sue Intel, and Defendants cite no law requiring a patentee to *sue* all potential licensees.[10] After Intel intervened in the case, Ericsson elected not to pursue

---

[10] Defendants argue Ericsson must *license* an unrestricted number of users on fair and reasonable terms. *See* Docket No. 529 at 7.

32

**A83**

damages from Intel. *See* 6/5/13 p.m. Tr. at 145:12–146:7 (Bone). Once again, Defendants cite no authority that a plaintiff must seek damages from all Defendants in a case.

Second, this issue is moot because Ericsson offered Intel a license prior to trial. *See* 6/4/13 p.m. Tr. at 51:2–15 (Petersson). The license offer was on the same terms as Ericsson's offers to other Defendants, and it was at the same rate Ericsson sought against the other Defendants at trial. *See id*. Intel may argue the license offer was superficial, but Intel itself never meaningfully engaged in licensing talks with Ericsson after Ericsson's initial offer. *See id*. at 57:4–15. Intel cannot rely on its failure to negotiate to prove Ericsson's failure to make a legitimate license offer.

Defendants' motion for judgment as a matter of law that Ericsson breached its RAND obligation by not seeking damages against Intel is **DENIED**.[11]

### D. Non-Comparable Licenses

Next, Defendants contend they are entitled to judgment as a matter of law because Ericsson presented evidence of non-comparable licenses. Docket No. 529 at 8. Initially, Defendants argue Mr. Bone's $0.50 royalty rate is not found in any of the prior licenses. *Id*. Instead, it is an artificial value manufactured by Mr. Bone for the purposes of this litigation. *Id*. Defendants also argue the licenses are non-comparable because they cover different scopes. *Id*. None of the licenses were limited to the asserted patents, and several licenses had a worldwide scope. *Id*. at 10. Defendants next contend the licenses are non-comparable because they include value derived from Ericsson's "overall patent leverage in the cellular space." *Id*. at 12. Finally, Defendants assert that none of the licenses were comparable because none were negotiated with Ericsson's RAND obligations in mind. *Id*. at 9.

---

[11] There is further analysis of Ericsson's licensing policy towards Intel below in the Court's findings of fact and conclusions of law. *See infra*.

**A84**

Ericsson argues it only presented comparable licenses at trial, and the jury was in the best position to determine the degree of comparability of the licenses. Docket No. 584 at 11. Additionally, it argues Defendants' arguments about the value of the previous licenses are misplaced. *Id*. at 12–13. Ericsson contends third party licensees like Buffalo, HP, and RIM are in the best position to determine the value of Ericsson's 802.11n portfolio, so their licenses are highly relevant. *Id*. at 13.

Defendants' arguments regarding the comparability of Mr. Bone's licenses were more appropriate for cross examination than for judgment as a matter of law. *See ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1333 (Fed. Cir. 2012) ("The degree of comparability of the…license agreements as well as any failure on the part of [the plaintiff's] expert to control for certain variables are factual issues best addressed by cross examination and not by exclusion."). All of the licenses Mr. Bone cited contain the patents in suit, and he gave detailed testimony addressing his apportionment of those licenses.[12] *See* 6/5/13 p.m. Tr. at 149:5–14 (Bone); 6/6/13 a.m. Sealed Tr. at 3:10–27:7 (Bone); 6/4/13 a.m. Sealed Tr. at 3:11–12:16, 14:4–28:7 (Petersson); *LaserDynamics*, 694 F.3d at 79–80 ("Actual licenses to the patented technology are highly probative as to what constitutes a reasonable royalty for those patent rights because such actual licenses most clearly reflect the economic value of the patented technology in the marketplace."); *compare ResQNet*, 594 F.3d at 870 (vacating a damages award because the plaintiff relied on licenses with no relationship to the claimed invention). Defendants had the opportunity to cross-examine Mr. Bone about his apportionment, and they presented their own damages expert to rebut Mr. Bone's analysis. *See* 6/6/13 a.m. Sealed Tr. at 27:24–50:25 (Bone cross examination); 6/11/13 a.m. Sealed Tr. at 3:18–25 (Perryman). The

---

[12] Defendants contend Mr. Bone's analysis was flawed because he failed to rely on the Infineon license. *See* Docket No. 529 at 9–10. However, the Infineon license did not even contain the patents in suit.

34

**A85**

determination of which expert's apportionment was more credible was an issue for the jury, and there is no reason to re-open the jury's factual determination.

Defendants also argue the licenses are incomparable because "there is no evidence that the licenses were negotiated with Ericsson's RAND obligations in mind." *See* Docket No. 529 at 9. However, they cite no binding authority that a prior license is incomparable as a matter of law if it was not negotiated within the RAND framework. *See id*. at 8–13; Docket No. 593 at 4. Even if there were binding authority on the issue, Mr. Bone testified that the prior licenses were all negotiated within the framework of Ericsson's RAND obligations. 6/6/13 a.m. Tr. at 13:4–8. Ericsson also presented evidence that it considered its RAND obligations when establishing a $0.50 per unit royalty. 6/4/13 a.m. Sealed Tr. at 15:22–16:17 (Petersson); 6/4/13 p.m. Tr. at 14:11–25, 53:13–54:6 (Petersson).

Additionally, Ericsson's RAND obligations are public knowledge. Ericsson's letters of assurance to the IEEE are publically available, so any potential licensee would be able to determine whether Ericsson had RAND obligations. The previous licensees were sophisticated parties, making it likely they would have been aware of Ericsson's RAND obligations during the negotiations. Taken together, there was substantial evidence that the prior licenses were negotiated within the framework of Ericsson's RAND obligations.

Defendants' motion for judgment as a matter of law regarding the comparability of prior licenses is **DENIED**.

### E. Royalty Stacking

Defendants next contend they are entitled to judgment as a matter of law because the verdict failed to account for royalty stacking. Docket No. 529 at 13. Defendants believe "a legally proper damages model would necessarily account for the danger that royalty stacking

35

**A86**

26042

would block or impede the 802.11 standard." *Id*. at 14. Defendants argue one of Ericsson's RAND obligations is to account for the impact of royalty stacking, but said accounting is missing from Mr. Bone's analysis. *Id*. Defendants contend the "undisputed evidence" established that a proper RAND rate should be limited to "pennies or fractions thereof" per unit. *Id*.

Ericsson counters that Defendants' royalty stacking arguments are purely hypothetical. Docket No. 584 at 14. Ericsson argues Mr. Bone considered the possibility of royalty stacking, but he could not find any evidence that a rate of $0.50 per unit would create royalty stacking problems. *Id*. Additionally, Ericsson asserts that Defendants failed to present any evidence of actual royalty stacking on 802.11n-compliant products. *Id*. at 15.

The best word to describe Defendants' royalty stacking argument is theoretical. At trial, Defendants extensively cross-examined Mr. Bone regarding the impact of royalty stacking on standard-essential patents.[13] *See* 6/6/13 a.m. Tr. at 22:15–29:21 (Bone). At one point, Defendants' counsel even suggested a theoretical stack could be $23.30 on a $2.50 standard-essential chip. *See id*. at 29:12–21. However, given the opportunity to present evidence of an *actual* stack on 802.11n essential products, Defendants came up empty. Dr. Perryman did not testify the actual royalty stack was $23.30. Nor did he testify the actual stack was $16, as Defendants' counsel also hypothesized. *See id*. at 29:3–10. Instead, Dr. Perryman never identified an actual royalty stack; he never even attempted to determine the actual amount of royalties Defendants currently pay for 802.11 patents. *See* 6/11/13 a.m. Tr. at 64:19–65:3 ("Q: Did you try to figure out the cost per unit that these Defendants are paying for standard essential 802.11 patents? A: No, sir, I did not."). Further muddling Defendants' royalty stacking

---

[13] Mr. Bone testified that third party licensees considered royalty stacking during negotiations with Ericsson. *See* 6/6/13 a.m. Sealed Tr. at 17:3–20.

36

**A87**

argument, their infringement expert conceded that "very little of the standard is patented." *See* 6/10/13 p.m. Tr. at 5:16–23 (Gibson).

Defendants' motion for judgment as a matter of law regarding royalty stacking is **DENIED**.

### F. Method Claims

Next, Defendants contend they are entitled to judgment as a matter of law because the jury failed to properly account for the method claims found infringed. Docket No. 529 at 14. Defendants assert that damages should be limited to the demonstrated number of accused products that have been used in an infringing manner. *Id*. Defendants argue Ericsson did not provide any evidence regarding how often Defendants or their customers actually performed the claimed methods. *Id*. at 15. Thus, Ericsson's damages theories with respect to method claims are insufficient as a matter of law. *Id*.

Ericsson argues it presented substantial evidence to support the jury's damages award regarding the methods claims. Docket No. 584 at 15. Ericsson contends Dr. Nettles testified that Ericsson's method claims are infringed during normal operation of the devices. *Id*. Thus, it presented evidence that Defendants infringed by making and selling the accused products. *See id*. (citing *SiRF Tech.*, 601 F.3d at 1331).

As discussed above in the infringement section, Ericsson presented substantial evidence to support the jury's infringement verdict for the method claims. There was substantial evidence to support both direct and induced infringement by Defendants. Accordingly, Defendants' motion for judgment as a matter of law regarding method claim damages is **DENIED**.

### G. Defendants' Motion for Vacatur, Remittitur, or a New Trial

37

**A88**

In the alternative, Defendants ask the Court to either vacate or remit the jury's damages award or grant a new trial on damages. *See* Docket No. 529 at 16–21. Remittitur is within the sound discretion of the trial court and is only appropriate when the damages verdict is "clearly excessive." *See Alameda Films S.A. v. Authors Rights Restoration Corp.*, 331 F.3d 472, 482 (5th Cir. 2003). Most of Defendants' arguments in this section are identical to their JMOL arguments presented above.[14] For the reasons set forth above, there was substantial evidence to support the jury's verdict.

Defendants also present two additional arguments that they are entitled to a new damages trial. First, the verdict form did not include an entry for a paid-up lump sum license. Docket No. 529 at 22. The verdict form instructed the jury to determine the amount of damages that "would fairly and reasonably compensate Ericsson for infringement of the patents by the following Defendants up to the time of trial." *Id*. at 23. Defendants contend this was a prejudicial error requiring a new trial, going so far as to say their "Constitutional rights to have the jury decide the appropriate form of the reasonable royalty" had been violated. *See* Docket No. 593 at 8. Defendants assert that they presented evidence at trial a lump-sum license was the appropriate form of damages. *Id*. Second, Defendants argue the Court committing prejudicial error by instructing the jury "an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped." Docket No. 529 at 23. Defendants contend there was no evidence about their profit margins, so this instruction was improper. *Id*. at 24.

Regarding the lump sum license issue, Ericsson argues no new trial is needed. Docket No. 584 at 16. Ericsson contends Defendants' argument is illogical because both sides stipulated to the number of infringing sales. *Id*. Because both sides agreed at trial to the proper damages

---

[14] For example, Defendants contend a new trial is appropriate because: (1) the verdict was against the great weight of the evidence; (2) prejudicial error occurred by allowing Mr. Bone to testify; and (3) prejudicial error occurred because the Court admitted several non-comparable licenses.

38

**A89**

base, Defendants should not be permitted to challenge that stipulation after the fact. *Id*. Ericsson also argues Defendants failed to cite any authority indicating they are entitled to a jury determination of future royalties. *Id*. at 17. With regard to the jury instruction regarding Defendants' profit margins, Ericsson makes two arguments. First, it argues the instruction was an accurate statement of the law. *Id*. Second, Ericsson contends the instruction was necessary. *Id*. at 18. Ericsson contends Defendants' statements to the jury about the cost of the 802.11n chip necessitated the instruction. *Id*.

A new trial is not warranted based on the verdict form. The verdict form stated:

> What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate Ericsson for infringement of the patents by the following Defendants up to the time of trial?

Docket No. 508 at 5. Defendants contend this instruction constitutes prejudicial error because it prevented the jury from awarding a lump sum royalty. Docket No. 529 at 23. However, the jury was specifically instructed that a lump sum royalty was appropriate. *See* Docket No. 504 at 28. Further, Defendants cite no authority for the proposition that there is a constitutional right to have a jury award future damages. *See Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed. Cir. 1992) (affirming a district court's refusal to present the issue of future damages to the jury); *Telecordia Techs., Inc. v. Cisco Sys., Inc.*, 612 F.3d 1365, 1377–78 (Fed. Cir. 2010); *Paice LLC v. Toyota Motor Corp.*, 504 F.3d 1293, 1316 (Fed. Cir. 2007).

Nor is a new trial warranted based on the Court's instruction about profit margins. The Court gave the following instruction to the jury:

> An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised, if necessary, to accommodate a higher royalty rate. Requiring the infringer to do so, may be the only way to adequately compensate the patentee for the use of its technology.

39

**A90**

Case: 13-1625 Case 43-1625 Document: 179-1 Page: 105 Filed: 03/31/2014 (105 of 575)
Case 1:13-cv-... ... Document: 05/01/13 Page 105 of ... Filed: 03/31/2014

26046

6/12/13 a.m. Tr. at 43:18–24. This is an accurate statement of the law, taken almost verbatim from a recent Federal Circuit opinion. *See Douglas Dynamics, LLC v. Buyers Prods. Co.*, --- F.3d ----, 2013 WL 2158423, at *7 (Fed. Cir. May 21, 2013); *Rite-Hite*, 56 F.3d at 1555. Defendants do not contest the legal correctness of the statement. Rather, they argue there was no basis for giving the instruction because Ericsson did not present any evidence of Defendants' profit margins. *See* Docket No. 529 at 24; 6/11/13 p.m. Tr. at 81:10–23. However, Defendants repeatedly referenced the impropriety of a $0.50 royalty on a $2.50 chip. *See* 6/11/13 a.m. Tr. at 27:4–28:11, 46:5–15 (Perryman); 6/6/13 a.m. Tr. at 20:11–18 (Bone cross examination). These arguments are thinly-veiled references to Intel's profit margin. In light of these statements, it was not improper or prejudicial to give the instruction.

Defendants' motion for vacatur, remittitur, or a new trial on damages is **DENIED**.

## IV. Ericsson's Post-Trial Motion for a Compulsory Future Royalty and Pre-Judgment and Post-Judgment Interest (Docket No. 527)

In this motion, Ericsson requests an ongoing future royalty of $0.15 per unit. Ericsson also requests pre-judgment and post-judgment interest at the Texas statutory rate, compounded quarterly.

### A. Applicable Law

A court should award interest in patent cases after a finding of infringement. 35 U.S.C. § 284. The purpose of prejudgment interest is to place the patentee in as good a position as it would have been had the infringer paid a reasonable royalty instead of infringing. *Beatrice Foods v. New England Printing*, 923 F.2d 1576, 1580 (Fed. Cir. 1991). Prejudgment interest should be awarded unless there is a significant justification for withholding such an award, such as a delay in bringing suit against the infringer. *See Gen. Motors Corp. v. Devex Corp.*, 461 U.S. 648, 657 (1983); *Bio-Rad Labs. v. Nicolet Instrument Corp.*, 807 F.2d 964, 967 (Fed. Cir. 1986).

40

**A91**

The interest rate used to calculate prejudgment interest and the method and frequency of compounding are left to the discretion of the district court. *See Uniroyal, Inc. v. Rudkin-Wiley Corp.*, 939 F.2d 1540, 1545 (Fed. Cir. 1991); *Studiengesellschaft Kohle, m.b.H. v. Dart Indus., Inc.*, 862 F.2d 1564, 1579–80 (Fed. Cir. 1988) (citing *Bio-Rad Labs.*, 807 F.2d at 969). Interest should be awarded from the date of infringement to the date of judgment. *Nickson Indus., Inc. v. Rol Mfg. Co.*, 847 F.2d 795, 800 (Fed. Cir. 1988).

### B. Future Royalty

Ericsson contends it is entitled to an ongoing future royalty of $0.15 per unit. Docket No. 527. At the post-trial hearing, Defendants stated they did not oppose a $0.15 per unit future royalty if the Court denied their JMOL motions. Accordingly, the Court **GRANTS** Ericsson's motion for an ongoing royalty of $0.15 per unit.

### C. Pre-Judgment and Post-Judgment Interest

At the post-trial hearing, Defendants stated they would not oppose awarding interest to Ericsson. However, the parties debate which interest rate should be used.

Ericsson argues it should be awarded pre-judgment and post-judgment interest at the Texas statutory rate, compounded quarterly. Docket No. 527 at 5. Ericsson acknowledges that this Court generally awards interest at the prime rate, compounded quarterly. *Id*. However, Ericsson contends the prime rate is artificially low because of the Federal Reserve's recent efforts to combat the recession. *Id*. Therefore, Ericsson believes the Texas statutory rate more accurately reflects current market conditions. *Id*. at 6. Defendants believe the appropriate interest rate is the prime rate, compounded quarterly. Docket No. 579 at 5.

This Court's standard practice is to award interest at the prime rate, compounded quarterly. *See VirnetX Inc. v. Apple Inc.*, ---F. Supp. 2d----, 2013 WL 692652, at *19 (E.D. Tex.

41

**A92**

Feb. 26, 2013) (Davis, J.) (collecting cases). In keeping with its standard practice, the Court **GRANTS** Ericsson's motion for pre-judgment[15] and post-judgment[16] interest at the prime rate, compounded quarterly.

## V. Ericsson's Motion to Supplement the Record (Docket No. 589)

As stated at the hearing, Ericsson's motion to supplement the record is **GRANTED**. Defendants may respond by supplementing the record with brief portions of Mr. Bone's report.

## VI. Defendant's Motion for Judgment on Post-Trial Proposed Findings of Fact and Conclusions of Law (Docket No. 588)

On June 12, 2013, the Court conducted a bench trial on the issue of Ericsson's RAND obligations. *See* 6/12/13 p.m. Tr. at 6:15–194:4. Defendants now ask the Court to make three findings. *See* Docket No. 588 at 2. First, Defendants ask the Court to determine the RAND rate for Ericsson's 802.11n essential patents. Second, Defendants seek a determination that Ericsson breached its RAND obligations by refusing to license chip suppliers (i.e. Intel) on RAND terms and by demanding a royalty rate that exceeds RAND amounts. Third, Defendants request a determination that Ericsson is not entitled to injunctive relief. The Court will address each issue individually.

### A. Determination of a RAND Royalty

There is no need for the Court to determine an appropriate RAND royalty for the infringed patents because the jury already determined a reasonable royalty for those same patents, and the jury considered Ericsson's RAND obligations when rendering its verdict. In their post-trial briefing, Defendants asked the Court to determine an appropriate RAND rate for the patents in suit. *See* Docket No. 588 at 2. However, Defendants wavered on whether they

---

[15] Each Defendant is responsible for the following pre-judgment interest: $98,275 for Acer/Gateway; $127,626 for Dell; $22,508 for D-Link; $224,141 for Netgear; and $152,798 for Toshiba.

[16] Each Defendant is responsible for the following post-judgment interest, per day, from the date this judgment issues: $113 for Acer/Gateway; $182 for Dell; $41 for D-Link; $336 for Netgear; and $231 for Toshiba.

42

**A93**

would agree to actually *pay* the RAND rate determined by the Court. In essence, Defendants asked the Court to determine Ericsson's initial RAND offer, but they refused to make any assurances they would accept such an offer. This would have amounted to nothing more than an advisory opinion as to Ericsson's initial RAND license offer. *See Artic Corner, Inc. v. United States*, 845 F.2d 999, 1000 (Fed. Cir. 1988) ("At the heart of the 'case or controversy' requirement is the prohibition against advisory opinions."); *Teva Pharm. USA, Inc. v. Novartis Pharm. Corp.*, 482 F.3d 1330, 1337–38 (Fed. Cir. 2007).

Defendants cannot ask the Court to determine a RAND rate but refuse to be bound by it. At the post-trial hearing, the Court ordered the Defendants to notify it whether they would accept a RAND rate entered by this Court. Defendants responded that they would "accept a Court-determined RAND rate limited to the Subject Products and Subject Patents." *See* Docket No. 612 at 1. A RAND rate limited to the Subject Products and Subject Patents is another way of saying Defendants would accept the jury's verdict. The jury's verdict was limited to the asserted patents, and it was limited to the accused products. Thus, Defendants will only agree to pay a RAND rate for the territory already covered by the trial. Because there was substantial evidence to support the jury's verdict, there is no need for this Court to make its own factual determination of an appropriate royalty rate.

Defendants attempt to distinguish the jury verdict from the RAND case on three grounds: (1) Defendants presented additional evidence to the Court that was not presented to the jury; (2) Ericsson did not present a damages claim against Intel to the jury; and (3) the jury trial "was restricted in scope to the five U.S. patents-in-suit. It thus did not consider the appropriate RAND rate for Ericsson's worldwide portfolio of alleged 802.11 patents." Docket No. 599 at 11. The Court will address each argument in turn.

43

**A94**

First, Defendants contend the jury verdict does not dictate the RAND rate because Defendants presented additional evidence during the bench trial. This argument fails because Defendants presented substantial RAND evidence to the jury. 6/11/13 a.m. Tr. at 9:15–10:17 (Forslund); 6/11/13 a.m. Tr. at 75:9–77:11 (Perryman); 6/6/13 a.m. Tr. at 21:16–20 (Bone cross examination). By presenting additional evidence during the bench trial, Defendants attempted to hedge their RAND position post-trial. Essentially, Defendants sought to use RAND as their jury defense while keeping an equitable RAND defense in their back pocket. Thus, Defendants wanted to use RAND as their primary defense *and* their fallback position. There was no justification for doing so—all of the RAND evidence presented during the bench trial would have been equally appropriate during the jury trial.

Defendants presented significant RAND evidence during the jury portion of the trial. In fact, a significant portion of Defendants' damages argument was based on Ericsson's RAND obligations. Defendants requested multiple RAND instructions, two of which were given to the jury. In particular, the Court gave the following instruction:

> Moreover, because Ericsson has agreed that it is under an obligation to license the patents-in-suit on Reasonable and Non-Discriminatory ("RAND") terms, you must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations.

Docket No. 504 at 23. The Court also modified the traditional *Georgia-Pacific* factors in its instructions to include Ericsson's obligation to license its patents on RAND terms. *See id*. at 28. Defendants cannot now argue the jury's verdict failed to consider Ericsson's RAND obligations when they based their jury defense on RAND.

Second, Defendants contend the jury's verdict does not reflect the RAND rate because Ericsson did not present a damage calculation against Intel. Defendants cross-examined Mr. Bone on this exact issue. Defendants asked Mr. Bone if his royalty rate would apply to chips, and

44

**A95**

he responded that it would. *See* 6/6/13 a.m. Tr. at 20:11–18. Thus, Defendants' argument regarding Intel damages is incorrect.

Third, Defendants argue the jury did not consider the appropriate RAND rate for Ericsson's worldwide 802.11 portfolio. This argument rings hollow in light of Defendants' refusal to agree to pay a Court-determined worldwide RAND rate. Defendants contend the jury verdict is not a proper RAND rate because it is not a worldwide license, but Defendants refuse to agree to pay a worldwide RAND license. *See* Docket Nos. 612, 614. Defendants cannot have it both ways. Since Defendants refuse to agree to pay a Court-determined worldwide RAND license, they cannot use the lack of worldwide RAND evidence to distinguish the jury verdict.

For the foregoing reasons, the Court need not determine an appropriate RAND rate because the jury already made this determination. The appropriate United States RAND rate is $0.15 per product for the three infringed patents.

## B. Ericsson's RAND Obligation to License Intel

### i. Findings of Fact

Ericsson is a member of the IEEE. 6/3/13 p.m. Tr. at 137:8–9 (Brismark). As an IEEE member, Ericsson has an obligation to license its standard-essential patents on reasonable and non-discriminatory terms. *Id*. at 128:4–8. A RAND license offer must be "at a price which is reasonable in light of the contribution [the] technology gives to the end user who is using that standard." *Id*. at 128:16–19. A RAND offer must also be non-discriminatory, meaning a licensor may not discriminate against any particular licensee. *Id*. at 129:13–20.

An IEEE participant declares its patents standard-essential through letters of assurance. *Id*. at 141:1–10. A letter of assurance is a commitment from a patent holder to potential licensees that it will offer licenses on RAND terms. *Id*. Participation in standard setting is voluntary, and a

45

**A96**

company is not required to participate in the standard-setting process to hold standard-essential patents. *See* 6/12/13 p.m. Tr. at 29:14–31:24 (Shoemake). Further, because participation is voluntary, an IEEE member may restrict or limit its participation in the process. *See id*. at 32:20–24.

Ericsson committed to offer RAND licenses to "fully compliant" products, and it gave notice of this position in its letters of assurance to the IEEE. *See* 6/4/13 p.m. Tr. at 40:23–41:4, 52:3–21 (Petersson). Ericsson's objective in licensing only fully compliant products was to isolate a particular level of the supply chain and to license companies at that level. 6/12/13 p.m. Tr. at 148:8–149:11 (Brismark). By licensing end product manufacturers, Ericsson believed it was indirectly licensing chip manufacturers such as Intel. *See id*. Ericsson believed it complied with its RAND obligations because it did not discriminate against competitors. 6/3/13 p.m. Tr. at 129:21–130:4 (Brismark); *see* 6/12/13 p.m. Tr. at 34:7–14 (Shoemake). There is no IEEE rule preventing restricted RAND commitments, and other companies have adopted the same "fully compliant" licensing policy as Ericsson. *See* 6/12/13 p.m. Tr. at 137:5–8 (Perryman).

Ericsson offered Intel a license to the asserted patents in March 2013 at the rate of $0.50 per unit. 6/12/13 p.m. Tr. at 149:20–150:5, 166:1–8 (Brismark). Ericsson made this offer in an attempt to settle the pending litigation. *Id*. at 149:20–150:5; 6/4/14 p.m. Tr. at 51:13–15 (Petersson). After Ericsson made its initial offer to Intel, Intel requested a proposed draft license agreement. 6/12/13 p.m. Tr. at 166:16–22 (Brismark). Ericsson submitted a proposed agreement to Intel on April 25, 2013, but Intel never responded to the proposed agreement. *Id*. at 166:21–167:12. When Ericsson submitted the draft agreement to Intel, Ericsson was prepared to negotiate the final terms of the license. *Id*. at 167:3–6.

46

**A97**

### ii.  Conclusions of Law

Ericsson did not violate its RAND obligations by refusing to license Intel because it offered a license to Intel in March 2013. Ericsson offered a license to Intel at the same rate and terms as the remaining Defendants. Intel contends Ericsson's offer was illusory, but it presented no evidence to support this assertion. *Compare id*. at 167:3–12 (testifying that Ericsson was prepared to negotiate the terms of a potential license). After the trial, Ericsson amended its license offer to Intel to reflect the jury verdict. *See* PX628. Both of these offers were legitimate RAND offers to which Intel never countered. Ericsson therefore satisfied any RAND obligation to offer a license to Intel.

Defendants have no breach of contract remedy against Ericsson for its policy of licensing only "fully compliant" products.[17] Participation in standard-setting organizations such as the IEEE is voluntary, and parties are free to restrict or limit their level of participation. There is nothing inherently wrong or unfair with Ericsson's practice of licensing "fully compliant" products, and they gave notice of this position in their initial letter of assurance. Further, other large companies have adopted similar policies of only licensing fully compliant products. Defendants cite no IEEE rule or guideline requiring full participation in order to have standard-essential patents. Thus, Defendants have no right to equitable relief for Ericsson's practice of licensing only fully compliant products.

Ericsson did not violate its RAND obligations by refusing to license Intel.

---

[17] At the outset, this issue is moot because Ericsson offered a license to Intel, and there are no remaining Defendants asserting that Ericsson refused to offer them a license because their products were not fully compliant. *Cf.* 6/12/13 p.m. Tr. at 149:15–16 (Brismark) ("Ericsson has never attempted to block any chipset player.").

47

**A98**

## C. Ericsson's $0.50 RAND Rate

### i. Findings of Fact

Ericsson is a sophisticated licensing entity, with over 100 outstanding patent licenses. *See* 6/3/13 p.m. Tr. at 109:22–110:14 (Brismark); 6/4/13 a.m. Tr. at 132:23–25 (Petersson). It has an incentive to establish a reasonable licensing rate to maintain credibility in the licensing community. *See* 6/12/13 p.m. Tr. at 180:23–182:9 (Bone). For its 802.11 portfolio, Ericsson believes an appropriate royalty rate is $0.50 per unit. 6/3/13 p.m. Tr. at 133:4–11 (Brismark). Ericsson calculated this rate based on collaboration between technical and licensing experts, and it sought feedback from third party licensees about the reasonableness of its rate. *See* 6/4/13 a.m. Tr. at 127:24–129:22 (Petersson). Ericsson supported its rate with expert testimony from Mr. Bone. Mr. Bone relied on six previous licenses involving the asserted patents to determine an appropriate royalty rate. *See* 6/5/13 p.m. Tr. at 149:5–14 (Bone); 6/6/13 a.m. Sealed Tr. at 3:10–27:7 (Bone); 6/4/13 a.m. Sealed Tr. at 3:11–12:16, 14:4–28:7 (Petersson).

Ericsson considered its RAND obligations when determining its rate. 6/4/13 p.m. Tr. at 14:11–25 (Petersson). Ericsson has a team of employees tasked with monitoring Ericsson's compliance with its RAND obligations. *See* 6/12/13 p.m. Tr. at 142:8–24 (Brismark). These individuals attempt to determine the number of standard-essential patents, and they attempt to determine Ericsson's share of 802.11n patents. *Id*. at 142:25–143:15; *see* 6/4/13 p.m. Tr. at 21:4–12 (Petersson) ("We are, of course, taking into consideration that there are other patent holders in the standard when we set our rate."). This is an ongoing process shaped by feedback from potential licensees. 6/12/13 p.m. Tr. at 143:16–24 (Brismark); 6/4/13 p.m. Tr. at 53:13–54:6 (Petersson).

48

**A99**

There is no way to determine the exact number of standard-essential patents. *Cf*. 6/12/13 p.m. Tr. at 29:7–9 (Shoemake); *id*. at 134:9–15 (Perryman). The IEEE makes no determination whether the patents identified in a letter of assurance are essential to the standard, so companies may wrongly declare "non-essential" patents essential. *See* 6/6/13 a.m. Tr. at 23:11–25:4 (Bone) (discussing letters of assurance). Neither side attempted to determine the exact number of standard-essential patents. Dr. Shoemake testified about the number of patents related to the 802.11n standard, but he did not try to determine how many patents are standard-essential. *See* 6/12/13 p.m. Tr. at 29:4–9. Mr. Bone based his analysis on previous licenses—he made no attempt to determine the number of essential patents. Additionally, Dr. Gibson testified that very little of the 802.11n standard is actually patented. *See* 6/10/13 p.m. Tr. at 5:16–23.

Defendants did not present any evidence of an actual royalty stack on the asserted patents. Dr. Perryman did not attempt to calculate the actual royalties Defendants currently pay on 802.11n products. *See* 6/11/13 a.m. Tr. at 64:19–65:3. Dr. Perryman even refused to provide a maximum hypothetical royalty a company should be expected to pay on an 802.11 product. 6/12/13 p.m. Tr. at 139:2–11. Dr. Shoemake attempted to calculate the number of patents related to the 802.11n standard, but he did not opine on a potential royalty stack on those patents. *See* 6/12/13 p.m. Tr. at 27:6–12.

Dr. Perryman identified one license to the 802.11n standard (the CSIRO license). *See* 6/12/13 p.m. Sealed Tr. at 8:8–21. Dr. Perryman found that Intel's royalty obligation from the CSIRO license was $0.13. *Id*. at 9:15–22. However, Dr. Perryman could not identify any further royalty obligations on 802.11n products. *See id*. at 12:22–13:6; 6/12/13 p.m. Tr. at 34:21–23 (Shoemake).

49

**A100**

Defendants did not present any evidence any licensee ever complained to Ericsson about hold-up, and Mr. Brismark testified he never heard a licensee complain its royalty rate was the result of hold-up or lock-in. *See* 6/12/13 p.m. Tr. at 148:4–7 (Brismark); *id*. at 180:12–14 (Bone) ("Q: As part of your analysis, did you find that any of Ericsson's actual agreements included holdup? A: No."); *id*. at 183:2–8 (Bone); *id*. at 94:21–95:6, 96:13–22 (Leonard).

### ii. Conclusions of Law

The paradox of RAND licensing is that it requires a patent holder to offer licenses on reasonable terms, but it offers no guidance over what is reasonable. *See Microsoft Corp. v. Motorola, Inc.*, 2013 WL 2111217, at \*10 (W.D. Wash. Apr. 25, 2013). Thus, RAND creates an obligation that must be followed, but it provides no guidance on how to follow that obligation. This creates a situation ripe for judicial resolution. If two parties negotiating a RAND license are unable to agree to the financial terms of an agreement, it is entirely appropriate to resolve their dispute in court. *See Microsoft Corp. v. Motorola, Inc.*, 854 F. Supp. 2d 993, 1001–02 (W.D. Wash. 2012) ("Because the policies leave it to the parties to determine what constitutes a RAND license, when such a genuine disagreement arises, it appears to the court that the only recourse for the parties is to file a lawsuit in the appropriate court of law."). A patent holder does not violate its RAND obligations by seeking a royalty greater than its potential licensee believes is reasonable. Similarly, a potential licensee does not violate its RAND obligations by refusing a royalty the patent holder believes is reasonable. Instead, both sides' initial offers should be viewed as the starting point in negotiations. Even if a court or jury must ultimately determine an appropriate rate, merely seeking a higher royalty than a potential licensee believes is reasonable is not a RAND violation.

**A101**

RAND licensing also includes an obligation to negotiate in good faith. This obligation is a two-way street. As potential licensees in a RAND negotiation, Defendants possessed an obligation to negotiate in good faith and earnestly seek an amicable royalty rate. They failed to do so. Defendants' entire argument boils down to the fact that they believed Ericsson's initial RAND offer was too high. However, Ericsson's $0.50 offer was only the starting point in the negotiations. Defendants never meaningfully engaged Ericsson in RAND licensing negotiations after the initial offer. Further, the fact that the RAND rate was ultimately litigated in court does not make Ericsson's initial offer unreasonable. *Compare* 6/12/13 p.m. Tr. at 130:6–10 (Perryman) ("Q: Okay. Now, is Ericsson's 50-cent rate so high in relation to the chip price that from an economic perspective, it amounts to a refusal to deal? A: Given all the technology in the chips, absolutely, yes, sir."). Ericsson demonstrated the reasonableness of its offer by presenting substantial evidence of its licensing policies and its attempts to comply with RAND obligations.

Further, Defendants failed to present any evidence of *actual* hold-up or royalty stacking. Neither Dr. Perryman nor Dr. Shoemake calculated an actual royalty stack on the accused products or the 802.11n standard. Further, Dr. Perryman could only identify one "block" in the actual royalty stack. *See* 6/12/13 p.m. Sealed Tr. at 12:19–13:6. All of Defendants' concerns about royalty stacking were just that—concerns. Faced with no actual evidence of stacking, Defendants were forced to argue hypothetically. However, their hypothetical arguments would have carried more weight if Defendants presented any real evidence of stacking. Further, Ericsson presented evidence that it considered royalty stacking issues when it established its royalty rates. Accordingly, Ericsson's RAND rate did not fail to account for hold-up or royalty stacking.

Ericsson did not violate is RAND obligations by seeking a $0.50 per unit royalty.

51

**A102**

**D. Injunctions for the Patents in Suit**

Ericsson did not seek an injunction for the infringed patents. *See* Docket No. 527. Accordingly, there is no need for the Court to determine whether injunctions are available for the infringed patents. *See* Docket No. 588 at 15.

## VII. Conclusion

For all the foregoing reasons, Ericsson's Motion for a Compulsory Future Royalty and Pre- and Post-Judgment Interest (Docket No. 527) is **GRANTED**. Defendants' Rule 50(b) Renewed Motion for Judgment as a Matter of Law in Favor of Defendants (Non-Infringement and Invalidity) and Motion for a New Trial (Docket No. 528) is **DENIED**. Defendants' Renewed Motion for Judgment as a Matter of Law on Ericsson's Damages Claims or, in the Alternative, for Vacatur, Remittitur or a New Trial on Damages (Docket No. 529) is **DENIED**. Defendants' Motion for Judgment on Post-Trial Findings of Fact and Conclusions of Law (Docket No. 588) is **GRANTED** as set forth above. Ericsson's Motion to Supplement the Record (Docket No. 589) is **GRANTED**. All other pending motions in this case are **DENIED**. The Clerk of Court is **ORDERED** to terminate all other pending motions.

So ORDERED and SIGNED this 6th day of August, 2013.

**LEONARD DAVIS**
**UNITED STATES DISTRICT JUDGE**

52

**A103**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## TYLER DIVISION

| | |
|---|---|
| **ERICSSON. INC., ET AL.,** § | |
| § | |
| **Plaintiffs,** § | |
| § | |
| **vs.** § | **CASE NO. 6:10-CV-473** |
| § | |
| **D-LINK CORPORATION. ET AL.,** § | |
| § | |
| **Defendants.** § | |
| § | |

### FINAL JUDGMENT PURSUANT TO FED. R. CIV. P. 54(b)

On September 14, 2010, Ericsson Inc. and Telefonaktiebolaget LM Ericsson ("Ericsson") filed this action against D-Link Corporation[1] and D-Link Systems, Inc. ("D-Link"), Netgear, Inc. ("Netgear"), Acer, Inc. and Acer America Corporation ("Acer") and Gateway, Inc. ("Gateway"). Ericsson filed an amended complaint on June 8, 2011. The amended complaint added the following defendants: Dell, Inc. ("Dell"); Toshiba Corporation, Toshiba America, Inc.,[2] Toshiba America Information Systems, Inc., and Toshiba America Consumer Products, LLC ("Toshiba"); and Belkin International, Inc. ("Belkin"). Intel Corporation ("Intel") intervened in this action on June 22, 2012, and Ericsson brought a counterclaim against Intel on July 3, 2012. The Court conducted an eight day trial beginning June 3, 2013. Final judgment is now appropriate because all issues between Ericsson and the Defendants have been finally resolved by either the jury or the Court's Memorandum Opinion and Order (Docket No. 615).

---

[1] The Court dismissed D-Link Corporation on January 31, 2011. Docket No. 54.
[2] The Court dismissed Toshiba America, Inc. and Toshiba America Consumer Products, LLC on August 16, 2011. Docket No. 120.

**A104**

Therefore, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, consistent with the Court's Memorandum Opinion and Order, and the Court having expressly determined that there is no just cause for delay, the Court **ORDERS AND ENTERS FINAL JUDGMENT** as follows:

- Defendants D-Link, Netgear, and Belkin are found to infringe Claims 1 and 5 of U.S. Patent No. 6,466,568. Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,466,568.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claim 1 of U.S. Patent No. 6,424,625.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claims 1 and 2 of U.S. Patent No. 6,330,435.

- Defendants D-Link, Netgear, Belkin, Acer/Gateway, Dell, Toshiba, and Intel are found to infringe Claims 1 and 2 of U.S. Patent No. 6,772,215.

- Defendants Acer/Gateway, Dell, Toshiba, and Intel are found to not infringe Claim 11 of U.S. Patent No. 6,519,223.

- The Asserted Claims are valid.

- Defendants' infringement was not willful.

- The Court awards the following in damages to Ericsson for Defendants' infringement of the claims found infringed: $435,000 for D-Link; $3,555,000 for Netgear; $1,170,000 for Acer/Gateway; $1,920,000 for Dell; $2,445,000 for Toshiba; and $600,000 for Belkin.

- Ericsson is further awarded pre-judgment interest, post-judgment interest, and an ongoing royalty as detailed in the Court's Memorandum Opinion and Order.

2

**A105**

All relief not specifically granted herein is **DENIED**. All pending motions not previously

resolved are **DENIED**.

   **So ORDERED and SIGNED this 8th day of August, 2013.**

   _____
   **LEONARD DAVIS**
   **UNITED STATES DISTRICT JUDGE**

3

**A106**

Case: CASE WARTICH LAW IS ONLY Document: 127-01 4:29 Page: 121 - 1 filed: 03/31/2014

APPEAL,CASREF,JURY,LED2,MEDIATION,PATENT/TRADEMARK,PROTECTIVE−ORDER

**U.S. District Court [LIVE]**
**Eastern District of TEXAS (Tyler)**
**CIVIL DOCKET FOR CASE #: 6:10−cv−00473−LED−KFG**

| | |
|---|---|
| Ericsson Inc. et al v. D−Link Corporation et al | Date Filed: 09/14/2010 |
| Assigned to: Judge Leonard Davis | Date Terminated: 08/08/2013 |
| Referred to: Magistrate Judge Keith F. Giblin | Jury Demand: Both |
| Case in other court:  USCA Federal Circuit, 13−01625 | Nature of Suit: 830 Patent |
| USCA − Federal Circuit, 13−01631 | Jurisdiction: Federal Question |
| USCA−Federal Circuit, 13−01632 | |
| USCA−FEDERAL CIRCUIT, 13−01633 | |

Cause: 35:271 Patent Infringement

**Mediator**

**Honorable Robert Faulkner**                                 represented by   **Robert W Faulkner**
                                                                                                           JAMS Inc
                                                                                                           8401 N. Central Expressway
                                                                                                           Suite 610
                                                                                                           Dallas, TX 75225
                                                                                                           214/744−5267
                                                                                                           Fax: 214/720−6010
                                                                                                           Email: rfaulkner@jamsadr.com
                                                                                                           *ATTORNEY TO BE NOTICED*

**Technical Advisor**

**Gale R Peterson**                                               represented by   **Gale Roy Peterson**
                                                                                                           Cox Smith Matthews Incorporated − San
                                                                                                           Antonio
                                                                                                           112 East Pecan Street
                                                                                                           Suite 1800
                                                                                                           San Antonio, TX 78205
                                                                                                           210/554−5327
                                                                                                           Fax: 210/226−8395
                                                                                                           Email: grpeters@coxsmith.com
                                                                                                           *ATTORNEY TO BE NOTICED*

**Plaintiff**

**Ericsson Inc.**                                                    represented by   **Ada Elene Brown**
                                                                                                           McKool Smith PC − Dallas
                                                                                                           300 Crescent Court
                                                                                                           Suite 1500
                                                                                                           Dallas, TX 75219
                                                                                                           214−978−4088
                                                                                                           Fax: 214−978−4044
                                                                                                           Email: aebrown@mckoolsmith.com
                                                                                                           *ATTORNEY TO BE NOTICED*

                                                                                                           **Ashley Nicole Moore**
                                                                                                           McKool Smith − Dallas
                                                                                                           300 Crescent Court
                                                                                                           Suite 1500
                                                                                                           Dallas, TX 75201
                                                                                                           214/978−6337
                                                                                                           Fax: 214/978−4044
                                                                                                           Email: amoore@mckoolsmith.com
                                                                                                           *ATTORNEY TO BE NOTICED*

                                                                                                           **Bradley Wayne Caldwell**
                                                                                                           Caldwell Cassady &Curry, PC
                                                                                                           2101 Cedar Springs Road

**A107**

Suite 1000
Dallas, TX 75201
(214) 888−4848
Fax: 214−888−4849
Email: bcaldwell@caldwellcc.com
*TERMINATED: 02/14/2013*

**Brandon M Jordan**
McKool Smith PC − D.C.
1999 K Street, NW
Suite 600
Washington, DC 20006
202/370−8387
Fax: 202/370−8344
Email: bjordan@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Douglas A Cawley**
McKool Smith − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978−4972
Fax: 12149784044
Email: dcawley@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
McKool Smith − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978−4205
Fax: 214/978−4044
Email: hengelmann@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
McKool Smith − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75201
214−978−4252
Fax: 214−978−4044
Email: jblackstone@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**John Bruce Campbell , Jr**
McKool Smith, PC − Austin
300 West 6th St
Suite 1700
Austin, TX 78701
512/692−8730
Fax: 15126928744
Email: jcampbell@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
Caldwell Cassady &Curry, PC
2101 Cedar Springs Road
Suite 1000
Dallas, TX 75201
214−888−4848
Fax: 214−888−4849
Email: acurry@caldwellcc.com

**A108**

*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
McKool Smith − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75201
214/978−4213
Fax: 214/978−4044
Email: jnemunaitis@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Kathy H Li**
McKool Smith, PC − Austin
300 West 6th St
Suite 1700
Austin, TX 78701
512−692−8721
Fax: 512−692−8744
Email: kli@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Kevin Lee Burgess**
McKool Smith
300 W 6th St
Suite 1700
Austin, TX 78701
512/692−8704
Fax: 5126928744
Email: kburgess@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Ryan Abbott Hargrave**
McKool Smith − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75201
214−978−4000
Fax: 214−978−4044
Email: rhargrave@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
McKool Smith − Marshall
P O Box O
104 East Houston St., Suite 300
Marshall, TX 75670
903/923−9000
Fax: 903−923−9099
Email: sbaxter@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Travis Edward DeArman**
McKool Smith PC − Dallas
300 Crescent Court
Suite 1500
Dallas, TX 75219
214−978−4907
Fax: 214−978−4044
Email: tdearman@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
McKool Smith − Dallas
300 Crescent Court

**A109**

Suite 1500
Dallas, TX 75201
214/978−4974
Fax: 12149784044
Email: tstevenson@mckoolsmith.com
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Telefonaktiebolaget LM Ericsson**                    represented by **Ada Elene Brown**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Bruce Campbell , Jr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kathy H Li**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Lee Burgess**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Abbott Hargrave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Travis Edward DeArman**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A110**

V.

**Defendant**

**D−Link Corporation**                                    represented by   **Robert A Van Nest**
*TERMINATED: 01/31/2011*                                                   Keker &Van Nest LLP
                                                                           633 Sansome Street
                                                                           San Francisco, CA 94111
                                                                           415/391−5400
                                                                           Fax: 415/397−7188
                                                                           Email: rvannest@kvn.com
                                                                           *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Christine M Morgan**
                                                                           Reed Smith LLP − San Francisco
                                                                           101 Second Street
                                                                           Ste 1800
                                                                           San Francisco, CA 94105
                                                                           415/543−8700
                                                                           Fax: 415/391−8269
                                                                           Email: cmorgan@reedsmith.com
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Eugene M Paige**
                                                                           Keker &Van Nest LLP
                                                                           633 Sansome Street
                                                                           San Francisco, CA 94111
                                                                           415−391−5400
                                                                           Fax: 415−397−7188
                                                                           Email: emp@kvn.com
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Matan Shacham**
                                                                           Keker &Van Nest
                                                                           633 Battery Street
                                                                           San Francisco, CA 94111
                                                                           415/391−5400
                                                                           Fax: 415/397−7188
                                                                           Email: mshacham@kvn.com
                                                                           *ATTORNEY TO BE NOTICED*

**Defendant**

**D−Link Systems, Inc.**                                  represented by   **Robert A Van Nest**
                                                                           (See above for address)
                                                                           *LEAD ATTORNEY*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Adaline J Hilgard**
                                                                           Reed Smith LLP − San Francisco
                                                                           101 Second Street
                                                                           Ste 1800
                                                                           San Francisco, CA 94105
                                                                           415/659−5671
                                                                           Fax: 415/391−8269
                                                                           Email: ahilgard@reedsmith.com
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

                                                                           **Christine M Morgan**
                                                                           (See above for address)
                                                                           *PRO HAC VICE*
                                                                           *ATTORNEY TO BE NOTICED*

**A111**

Case: CASE DOCKET IS ONLY Document: 173-1  4:25 Page: 126  6 filed: 03/31/2014

**Christine Yang**
Law Offices of S J Christine Yang
17220 Newhope Street
Suites 101−102
Fountain Valley, CA 92708
714/641−4022
Fax: 714/641−2082
Email: cyang@sjclawpc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey A Johanningmeier**
Keker &Van Nest −San Francisco
633 Battery Street
San Francisco, CA 94111
415−391−5400
Fax: 415−397−7188
Email: cjohanningmeier@kvn.com
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
Yarbrough Wilcox, PLLC
100 E. Ferguson Street
Ste 1015
Tyler, TX 75702
903−595−3111
Email: debby@yw−lawfirm.com
*ATTORNEY TO BE NOTICED*

**Duncan Palmatier**
Law Offices of S J Christine Yang
17220 Newhope Street
Suites 101−102
Fountain Valley, CA 92708
714/641−4022
Fax: 714/641−2082
Email: dpalm@dpalmlaw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: fnanji@reedsmith.com
*TERMINATED: 01/24/2012*
*PRO HAC VICE*

**Herbert A Yarbrough , III**
Attorney at Law
100 E Ferguson
Suite 1015
Tyler, TX 75702
903/595−3111
Fax: 19035950191
Email: trey@yw−lawfirm.com
*ATTORNEY TO BE NOTICED*

**A112**

**James Daire**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: jdaire@reedsmith.com
*ATTORNEY TO BE NOTICED*

**John P Bovich**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: jbovich@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: jmitchell@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
Reed Smith − Pittsburgh
225 Fifth Ave
Ste 1200
Pittsburgh, PA 15222−2716
412/288−7284
Fax: 412/288−3063
Email: krydstrom@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matan Shacham**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: sbaker@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700

**A113**

Fax: 415/391−8269
Email: sherring@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Victoria Hao**
Law Offices of S J Christine Yang
17220 Newhope Street
Suites 101−102
Fountain Valley, CA 92708
714/641−4022
Fax: 714/641−2082
Email: vhao@sjclawpc.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R Overend**
Reed Smith LLP − San Francisco
101 Second Street
Ste 1800
San Francisco, CA 94105
415/543−8700
Fax: 415/391−8269
Email: woverend@reedsmith.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Netgear, Inc.**                     represented by **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey A Johanningmeier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dan Duncan Davison**
Fulbright &Jaworski − Dallas
2200 Ross Avenue
Suite 2800
Dallas, TX 75201
214/855−8000
Fax: 12148558200
Email: dan.davison@nortonrosefulbright.com
*TERMINATED: 12/15/2010*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A114**

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*
*PRO HAC VICE*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matan Shacham**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Acer, Inc.**                    represented by  **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**A115**

**Corey A Johanningmeier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*
*PRO HAC VICE*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaiwen Tseng**
Freitas Tseng &Kaufman LLP
100 Marine Parkway
Suite 200
Redwood City, CA 94065
650−593−6300
Fax: 650−593−6301
Email: ktseng@ftbklaw.com
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matan Shacham**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**A116**

**William R Overend**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Acer America Corporation**            represented by   **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey A Johanningmeier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*
*PRO HAC VICE*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaiwen Tseng**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matan Shacham**
(See above for address)

**A117**

*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Gateway, Inc.**                    represented by   **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Corey A Johanningmeier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*
*PRO HAC VICE*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

Jonah D Mitchell
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kaiwen Tseng**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Matan Shacham**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Defendant**

**Dell, Inc.**                    represented by **Michael J Newton**
Alston &Bird, LLP − Dallas
2200 Ross Ave
Ste 3601
Dallas, TX 75201
214−922−3423
Fax: 214−922−3863
Email: mike.newton@alston.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brady Randall Cox**
Alston &Bird, LLP − Dallas
2828 N. Harwood St
Suite 1800
Dallas, TX 75201
214−922−3443
Fax: 214−922−3843
Email: brady.cox@alston.com
*ATTORNEY TO BE NOTICED*

**Deron R Dacus**
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701
903/705−1117
Fax: 9037051117
Email: ddacus@dacusfirm.com

**A119**

*ATTORNEY TO BE NOTICED*

**Dwayne Cuthbert Norton**
Alston &Bird, LLP − Dallas
2828 N. Harwood St
Suite 1800
Dallas, TX 75201
214/922−3437
Fax: 214/922−3847
Email: dwayne.norton@alston.com
*ATTORNEY TO BE NOTICED*

**Frank G Smith , III**
Alston &Bird LLP − Atlanta
1201 West Peachtree Street
Atlanta, GA 30309
404/881−7240
Fax: 404/253−8184
Email: frank.smith@alston.com
*ATTORNEY TO BE NOTICED*

**Jason Woodard Cook**
Alston &Bird, LLP − Dallas
2828 N. Harwood St
Suite 1800
Dallas, TX 75201
214/922−3407
Fax: 214/922−3899
Email: jason.cook@alston.com
*ATTORNEY TO BE NOTICED*

**Kamran Jivani**
Alston &Bird LLP − Atlanta
1201 West Peachtree Street
Atlanta, GA 30309
404/881−4631
Fax: 404/881−777
Email: kamran.jivani@alston.com
*ATTORNEY TO BE NOTICED*

**Marsha Ellen Mullin**
Alston &Bird LLP − Los Angeles
333 South Hope Street
16th Floor
Los Angeles, CA 90071
213/576−1020
Fax: 213−576−1100
Email: marsha.mullin@alston.com
*ATTORNEY TO BE NOTICED*

**Peter Aaron Kerr**
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701
903−705−1089
Fax: 903−705−1117
Email: pkerr@dacusfirm.com
*ATTORNEY TO BE NOTICED*

**Shannon Marie Dacus**
The Dacus Firm, PC
821 ESE Loop 323
Suite 430
Tyler, TX 75701

**A120**

9037051117
Fax: 9037051117
Email: sdacus@dacusfirm.com
*ATTORNEY TO BE NOTICED*

**Shaun William Hassett**
Alston &Bird, LLP
2200 Ross Ave
Ste 3601
Dallas, TX 75201
214−922−3404
Fax: 214−922−3864
Email: shaun.hassett@alston.com
*ATTORNEY TO BE NOTICED*

**Stacey Garrett White**
Alston &Bird, LLP − Dallas
2828 N. Harwood St
Suite 1800
Dallas, TX 75201
214−922−3425
Fax: 214−922−3899
Email: Stacey.G.White@gmail.com
*TERMINATED: 02/12/2013*

**Defendant**

**Toshiba America, Inc.**
*TERMINATED: 08/16/2011*

**Defendant**

**Toshiba America Consumer Products, LLC.,**
*TERMINATED: 08/16/2011*

**Defendant**

| | | |
|---|---|---|
| **Toshiba America Information Systems, Inc.** | represented by | **John J Feldhaus**<br>Foley &Lardner<br>3000 K St NW<br>Ste 500<br>Washington, DC 20007−5019<br>202/672−5403<br>Fax: 12026725399<br>Email: jfeldhaus@foley.com<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Cheslock**
Foley &Lardner − Washington
3000 K Street NW
Suite 600
Washington, DC 20007−5143
202/945−6009
Fax: 202/672−5399
Email: acheslock@foley.com
*ATTORNEY TO BE NOTICED*

**Guy N Harrison**
Attorney at Law
P O Box 2845
Longview, TX 75606
903/758−7361
Fax: 19037539557
Email: guy@gnhlaw.com

**A121**

*ATTORNEY TO BE NOTICED*

**Jason J Keener**
Foley &Lardner − Chicago
321 N Clark Street
Suite 2800
Chicago, IL 60610
312−832−5109
Fax: 312−832−4700
Email: jkeener@foley.com
*ATTORNEY TO BE NOTICED*

**Kevin Malaney**
Foley &Lardner − Milwaukee
First Wisconsin Center
777 E Wisconsin Ave
Milwaukee, WI 53202−5367
414/319−7067
Fax: 414/297−4900
Email: kmalaney@foley.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Liane M Peterson**
Foley &Lardner − Washington
3000 K Street NW
Suite 600
Washington, DC 20007−5143
202−672−5300
Fax: 202/672−5399
Email: Lpeterson@foley.com
*ATTORNEY TO BE NOTICED*

**Pavan K Agarwal**
Foley &Lardner − Washington
3000 K Street NW
Suite 600
Washington, DC 20007−5143
202/945−6162
Fax: 12026725399
Email: pagarwal@foley.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Toshiba Corporation**                          represented by  **John J Feldhaus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Cheslock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason J Keener**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Malaney**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Liane M Peterson**
(See above for address)

**A122**

*ATTORNEY TO BE NOTICED*

**Pavan K Agarwal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guy N Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Defendant**

**Belkin International, Inc.**                    represented by    **Ryan K Yagura**
O'Melveny &Myers − LA
400 South Hope Street
Los Angeles, Ca 90071−2899
213/430−6189
Fax: 213−430−6407
Email: ryagura@omm.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dawn Sestito**
O'Melveny &Myers − LA
400 South Hope Street
Los Angeles, Ca 90071
213−430−6352
Fax: 213−430−6407
Email: dsestito@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric David Chan**
O'Melveny &Myers − LA
400 South Hope Street
Los Angeles, Ca 90071−2899
213/430−6388
Fax: 213/430−6407
Email: echan@omm.com
*TERMINATED: 09/14/2012*

**Guy N Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Kevin Murray**
O'Melveny &Myers − LA
400 South Hope Street
Los Angeles, Ca 90071−2899
213/430−6000
Fax: 213/430−6407
Email: kmurray2@omm.com
*ATTORNEY TO BE NOTICED*

**Kristopher Dawes**
O'Melveny &Myers LLP − Newport
Beach, CA
610 Newport Center Drive
17th Floor
Newport Beach, CA 92660
949/823−6921
Fax: 949/823−6994
Email: kdawes@OMM.com
*TERMINATED: 05/02/2012*
*PRO HAC VICE*

**A123**

**Vision L Winter**
O'Melveny &Myers − LA
400 South Hope Street
Los Angeles, Ca 90071−2899
213/430−6000
Fax: 213/430−6407
Email: vwinter@omm.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Intervenor**

**Intel Corporation**                    represented by  **Adam R Alper**
Kirkland &Ellis LLP − California
555 California St
24th Floor
San Francisco, CA 94104
415/439−1876
Fax: 415/439−1500
Email: adam.alper@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allen Franklin Gardner**
Potter Minton, a Professional Corporation
110 N College Avenue
Suite 500
Tyler, TX 75702
903/597−8311
Fax: 903−593−0846
Email: allengardner@potterminton.com
*ATTORNEY TO BE NOTICED*

**Bryan C Mulder**
Sidley Austin − Chicago
One South Dearborn St
Chicago, IL 60603
312−853−7923
Fax: 312−853−7036
Email: bmulder@sidley.com
*TERMINATED: 06/17/2013*

**Gregory S Arovas**
Kirkland &Ellis, LLP − NYC
601 Lexington Avenue
New York, NY 10022
212/446−4800
Fax: 212/446−4900
Email: greg.arovas@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared D Edgar**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415/439−1995
Fax: 415/439−1500
Email: jared.edgar@kirkland.com
*ATTORNEY TO BE NOTICED*

**John Frederick Bufe**
Potter Minton, a Professional Corporation

**A124**

110 N College Avenue
Suite 500
Tyler, TX 75702
903/597/8311
Fax: 9035930846
Email: johnbufe@potterminton.com
*ATTORNEY TO BE NOTICED*

**John Richard Edwards**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415/439−1492
Fax: 415/439−1500
Email: john.edwards@kirkland.com
*ATTORNEY TO BE NOTICED*

**Kevin Spark**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415/439−1400
Fax: 415/439−1500
Email: kevin.spark@kirkland.com
*ATTORNEY TO BE NOTICED*

**Lov Goel**
Davis Wright Tremaine − San Francisco
505 Montgomery Street
Suite 800
San Francisco, CA 94111
415−276−6538
Fax: 415−276−6599
Email: lovgoel@dwt.com
*TERMINATED: 09/11/2013*

**Luke L Dauchot**
Kirkland &Ellis LLP − Los Angeles
333 South Hope Street
29th Floor
Los Angeles, CA 90071
213/680−8348
Fax: 213/680−8500
Email: luke.dauchot@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael Woodrow De Vries**
Kirkland &Ellis LLP − Los Angeles
333 South Hope Street
29th Floor
Los Angeles, CA 90071
213−680−8400
Fax: 213−680−8500
Email: michael.devries@kirkland.com
*ATTORNEY TO BE NOTICED*

**Michael E Jones**
Potter Minton PC
110 N College
Suite 500
PO Box 359
Tyler, TX 75710−0359

**A125**

903−597−8311
Fax: 903−593−0846
Email: mikejones@potterminton.com
*ATTORNEY TO BE NOTICED*

**Oliver Bennett**
Kirkland &Ellis, LLP − NYC
601 Lexington Avenue
New York, NY 10022
212−446−4781
Fax: 212−446−6460
Email: oliver.bennett@kirkland.com
*ATTORNEY TO BE NOTICED*

**Peter C Magic**
Kirkland &Ellis, LLP − NYC
601 Lexington Avenue
New York, NY 10022
212/446−6410
Fax: 212/446−4900
Email: peter.magic@kirkland.com
*ATTORNEY TO BE NOTICED*

**Raghav R Krishnapriyan**
Kirkland &Ellis, LLP − Palo Alto
3330 Hillview Avenue
Palo Alto, CA 94304
650/859−7000
Fax: 650/859−7500
Email: raghav.krishnapriyan@kirkland.com
*ATTORNEY TO BE NOTICED*

**Robert Christopher Bunt**
Parker, Bunt &Ainsworth, P.C.
100 East Ferguson, Ste. 1114
Tyler, TX 75702
903/531−3535
Fax: 903/533−9687
Email: rcbunt@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Robert M Parker**
Parker, Bunt &Ainsworth, P.C.
100 E Ferguson
Suite 1114
Tyler, TX 75702
903/531−3535
Fax: 9035339687
Email: rmparker@pbatyler.com
*ATTORNEY TO BE NOTICED*

**Sarah E Piepmeier**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415/439−1976
Fax: 415/439−1500
Email: sarah.piepmeier@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stephanie P Koh**
Sidley Austin − Chicago
Bank One Plaza

**A126**

One South Dearborn Ave
Chicago, IL 60603
312−853−7038
Fax: 312−853−7036
Email: skoh@sidley.com
*TERMINATED: 06/17/2013*

**Thomas D Rein**
Sidley Austin − Chicago
Bank One Plaza
One South Dearborn Ave
Chicago, IL 60603
312/853−7117
Fax: 312/853−7036
Email: trein@sidley.com
*TERMINATED: 06/17/2013*

**Tim Majors**
Kirkland &Ellis LLP − Los Angeles
333 South Hope Street
29th Floor
Los Angeles, CA 90071
213.680.8400
Fax: 213.680.8500
Email: tim.majors@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Toshiba Corporation**                    represented by **John J Feldhaus**
                                            (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Andrew Cheslock**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

                                            **Pavan K Agarwal**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

                                            **Guy N Harrison**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Toshiba America Information Systems,**    represented by **John J Feldhaus**
**Inc.**                                    (See above for address)
                                            *LEAD ATTORNEY*
                                            *ATTORNEY TO BE NOTICED*

                                            **Andrew Cheslock**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

                                            **Guy N Harrison**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

                                            **Pavan K Agarwal**
                                            (See above for address)
                                            *ATTORNEY TO BE NOTICED*

**A127**

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Ericsson Inc.** | represented by | **Ashley Nicole Moore**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Bradley Wayne Caldwell**<br>(See above for address)<br>*TERMINATED: 02/14/2013* |
| | | **Douglas A Cawley**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Holly Elin Engelmann**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Jason Alan Blackstone**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **John Austin Curry**<br>(See above for address)<br>*TERMINATED: 01/29/2013* |
| | | **Justin Thomas Nemunaitis**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Samuel Franklin Baxter**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Theodore Stevenson , III**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Counter Defendant**

| | | |
|---|---|---|
| **Telefonaktiebolaget LM Ericsson** | represented by | **Ashley Nicole Moore**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Bradley Wayne Caldwell**<br>(See above for address)<br>*TERMINATED: 02/14/2013* |
| | | **Douglas A Cawley**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **Holly Elin Engelmann**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |
| | | **John Austin Curry**<br>(See above for address)<br>*TERMINATED: 01/29/2013* |
| | | **Justin Thomas Nemunaitis**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**A128**

Samuel Franklin Baxter
(See above for address)
*ATTORNEY TO BE NOTICED*

Theodore Stevenson , III
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Belkin International, Inc.**                    represented by    **Ryan K Yagura**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Dawn Sestito**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eric David Chan**
(See above for address)
*TERMINATED: 09/14/2012*

**Guy N Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**J Kevin Murray**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kristopher Dawes**
(See above for address)
*TERMINATED: 05/02/2012*

**Vision L Winter**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ericsson Inc.**                    represented by    **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A129**

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Telefonaktiebolaget LM Ericsson**          represented by          **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Dell, Inc.**          represented by          **Michael J Newton**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Brady Randall Cox**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Deron R Dacus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dwayne Cuthbert Norton**

**A130**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Frank G Smith , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Woodard Cook**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kamran Jivani**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Marsha Ellen Mullin**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter Aaron Kerr**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shannon Marie Dacus**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Shaun William Hassett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stacey Garrett White**
(See above for address)
*TERMINATED: 02/12/2013*

V.

**Counter Defendant**

**Ericsson Inc.**                    represented by    **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)

**A131**

*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

| | | |
|---|---|---|
| **Telefonaktiebolaget LM Ericsson** | represented by | **Ashley Nicole Moore**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

| | | |
|---|---|---|
| **Toshiba America Information Systems, Inc.** | represented by | **John J Feldhaus**<br>(See above for address)<br>*LEAD ATTORNEY*<br>*ATTORNEY TO BE NOTICED* |

**Andrew Cheslock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guy N Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pavan K Agarwal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Toshiba Corporation**                              represented by

**A132**

**John J Feldhaus**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Andrew Cheslock**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Pavan K Agarwal**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Guy N Harrison**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ericsson Inc.**                                     represented by     **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Telefonaktiebolaget LM Ericsson**                  represented by     **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)

**A133**

*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Acer America Corporation**                    represented by   **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*

**A134**

*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Acer, Inc.**                                    represented by  **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**

**A135**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Gateway, Inc.**                represented by    **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A136**

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ericsson Inc.**                                    represented by   **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Telefonaktiebolaget LM Ericsson**               represented by   **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)

**A137**

*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**D−Link Systems, Inc.**                    represented by    **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine Yang**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Duncan Palmatier**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)

**A138**

*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Victoria Hao**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ericsson Inc.**                    represented by    **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A139**

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Telefonaktiebolaget LM Ericsson**      represented by   **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Netgear, Inc.**      represented by   **Robert A Van Nest**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Adaline J Hilgard**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Christine M Morgan**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Dan Duncan Davison**
(See above for address)
*TERMINATED: 12/15/2010*

**Debra Elaine Gunter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A140**

**Eugene M Paige**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Furqan A Nanji**
(See above for address)
*TERMINATED: 01/24/2012*

**Herbert A Yarbrough , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Daire**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John P Bovich**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jonah D Mitchell**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Kirsten R Rydstrom**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Scott D Baker**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Seth B Herring**
(See above for address)
*ATTORNEY TO BE NOTICED*

**William R Overend**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter Defendant**

**Ericsson Inc.**                          represented by   **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)

**A141**

*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Defendant**

**Telefonaktiebolaget LM Ericsson**          represented by     **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Telefonaktiebolaget LM Ericsson**          represented by     **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A142**

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Abbott Hargrave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter Claimant**

**Ericsson Inc.**                        represented by    **Ashley Nicole Moore**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Bradley Wayne Caldwell**
(See above for address)
*TERMINATED: 02/14/2013*

**Douglas A Cawley**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Holly Elin Engelmann**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jason Alan Blackstone**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Austin Curry**
(See above for address)
*TERMINATED: 01/29/2013*

**Justin Thomas Nemunaitis**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Ryan Abbott Hargrave**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Samuel Franklin Baxter**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Theodore Stevenson , III**
(See above for address)
*ATTORNEY TO BE NOTICED*

**A143**

V.

**Counter Defendant**

| | | |
|---|---|---|
| **Intel Corporation** | represented by | **Adam R Alper** |

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Bryan C Mulder**
(See above for address)
*TERMINATED: 06/17/2013*

**Gregory S Arovas**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Jared D Edgar**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy John Taylor**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415−439−1400
Fax: 415−439−1500
Email: jeremy.taylor@kirkland.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**John Frederick Bufe**
(See above for address)
*ATTORNEY TO BE NOTICED*

**John Richard Edwards**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Spark**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Lov Goel**
(See above for address)
*TERMINATED: 09/11/2013*

**Luke L Dauchot**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Michael E Jones**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Oliver Bennett**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Peter C Magic**
(See above for address)

**A144**

*ATTORNEY TO BE NOTICED*

**Robert Christopher Bunt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Robert M Parker**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Sarah Forney**
Kirkland &Ellis − San Francisco
555 California St
27th Floor
San Francisco, CA 94104
415/439−1400
Fax: 415/439−1500
Email: sforney@kirkland.com
*TERMINATED: 09/11/2013*

**Sarah E Piepmeier**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stephanie P Koh**
(See above for address)
*TERMINATED: 06/17/2013*

**Thomas D Rein**
(See above for address)
*TERMINATED: 06/17/2013*

**Tim Majors**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/14/2010 | 1 | COMPLAINT *FOR PATENT INFRINGEMENT* against Acer America Corporation, Acer, Inc., D−Link Corporation, D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. ( Filing fee $ 350 receipt number 0540−2668787.), filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Civil Cover Sheet)(Stevenson, Theodore) (Entered: 09/14/2010) |
| 09/14/2010 | 2 | CORPORATE DISCLOSURE STATEMENT filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson identifying Corporate Parent None for Telefonaktiebolaget LM Ericsson; Corporate Parent Telefonaktiebolaget LM Ericsson for Ericsson Inc.. (Stevenson, Theodore) (Entered: 09/14/2010) |
| 09/14/2010 | | Judge Leonard Davis added. (mll, ) (Entered: 09/15/2010) |
| 09/15/2010 | 3 | Notice of Filing of Patent/Trademark Form (AO 120). AO 120 mailed to the Director of the U.S. Patent and Trademark Office. (Stevenson, Theodore) (Entered: 09/15/2010) |
| 09/15/2010 | 4 | NOTICE of Attorney Appearance by Samuel Franklin Baxter on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Baxter, Samuel) (Entered: 09/15/2010) |
| 09/15/2010 | 5 | NOTICE of Attorney Appearance by Douglas A Cawley on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Cawley, Douglas) (Entered: 09/15/2010) |
| 09/15/2010 | 6 | NOTICE of Attorney Appearance by Bradley Wayne Caldwell on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Caldwell, Bradley) (Entered: 09/15/2010) |

**A145**

| 09/17/2010 | 7 | E−GOV SEALED SUMMONS Issued as to Acer America Corporation. (kls, ) (Entered: 09/17/2010) |
|---|---|---|
| 09/17/2010 | 8 | E−GOV SEALED SUMMONS Issued as to Acer, Inc.. (kls, ) (Entered: 09/17/2010) |
| 09/17/2010 | 9 | E−GOV SEALED SUMMONS Issued as to D−Link Corporation. (kls, ) (Entered: 09/17/2010) |
| 09/17/2010 | 10 | E−GOV SEALED SUMMONS Issued as to D−Link Systems, Inc.. (kls, ) (Entered: 09/17/2010) |
| 09/17/2010 | 11 | E−GOV SEALED SUMMONS Issued as to Gateway, Inc.. (kls, ) (Entered: 09/17/2010) |
| 09/17/2010 | 12 | E−GOV SEALED SUMMONS Issued as to Netgear, Inc.. (kls, ) (Entered: 09/17/2010) |
| 10/05/2010 | 13 | APPLICATION to Appear Pro Hac Vice by Attorney Victoria Hao for D−Link Systems, Inc.. (mll, ) (Entered: 10/06/2010) |
| 10/05/2010 | 14 | APPLICATION to Appear Pro Hac Vice by Attorney Christine Yang for D−Link Systems, Inc.. (mll, ) (Entered: 10/06/2010) |
| 10/08/2010 | 15 | APPLICATION to Appear Pro Hac Vice by Attorney Duncan Palmatier for D−Link Systems, Inc.. (mll, ) (Entered: 10/08/2010) |
| 10/14/2010 | 16 | NOTICE of Attorney Appearance by Herbert A Yarbrough, III on behalf of D−Link Systems, Inc. (Yarbrough, Herbert) (Entered: 10/14/2010) |
| 10/14/2010 | 17 | NOTICE of Attorney Appearance by Debra Elaine Gunter on behalf of D−Link Systems, Inc. (Gunter, Debra) (Entered: 10/14/2010) |
| 10/14/2010 | 18 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re D−Link Systems, Inc. (Yarbrough, Herbert) (Entered: 10/14/2010) |
| 10/15/2010 | 19 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Netgear, Inc.(Davison, Dan) (Entered: 10/15/2010) |
| 10/15/2010 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 18 is granted pursuant to Local Rule CV−12 for D−Link Systems, Inc. to 11/18/2010. 30 Days Granted for Deadline Extension.( mll, ) (Entered: 10/15/2010) |
| 10/15/2010 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 19 is granted pursuant to Local Rule CV−12 for Netgear, Inc. to 12/2/2010. 45 Days Granted for Deadline Extension.( mll, ) (Entered: 10/15/2010) |
| 10/18/2010 | 20 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Ericsson Inc..( Caldwell, Bradley) (Entered: 10/18/2010) |
| 10/18/2010 | 21 | Defendant, Acer America Corporation's, Unopposed First Application for Extension of Time to Answer Complaint re Ericsson Inc..( Caldwell, Bradley) (Entered: 10/18/2010) |
| 10/18/2010 | 22 | Summons Returned Unexecuted by Ericsson Inc. as to D−Link Corporation. (mll, ) (Entered: 10/20/2010) |
| 10/18/2010 | 23 | Return of Service Executed as to D−Link Systems, Inc. on 9/28/2010, by personal service. (mll, ) (Entered: 10/20/2010) |
| 10/18/2010 | 24 | Return of Service Executed as to Gateway, Inc. on 9/27/2010, by personal service; answer due: 10/18/2010. (mll, ) (Entered: 10/20/2010) |
| 10/18/2010 | 25 | Return of Service Executed as to Netgear, Inc. on 9/27/2010, by personal service. (mll, ) (Entered: 10/20/2010) |
| 10/18/2010 | 26 | Return of Service Executed as to Acer America Corporation on 9/27/2010, by personal service; answer due: 10/18/2010. (mll, ) (Entered: 10/20/2010) |

**A146**

| 10/18/2010 | 27 | Summons Returned Unexecuted by Ericsson Inc. as to Acer, Inc.. (mll, ) (Entered: 10/20/2010) |
|---|---|---|
| 10/20/2010 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 20 is granted pursuant to Local Rule CV−12 for Gateway, Inc. to 12/3/2010. 45 Days Granted for Deadline Extension. (Filed by pltf on behalf of deft. Pltf requested 60 days; Local Rule CV−12 limits this extension to 45 days.) ( mll, ) (Entered: 10/20/2010) |
| 10/20/2010 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 21 is granted pursuant to Local Rule CV−12 for Acer America Corporation to 12/3/2010. 45 Days Granted for Deadline Extension. (Filed by pltf on behalf of deft. Pltf requested 60 days; Local Rule CV−12 limits the extension to 45 days.)( mll, ) (Entered: 10/20/2010) |
| 11/04/2010 | 28 | Joint MOTION for Extension of Time to File Answer re 1 Complaint, by Ericsson Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Text of Proposed Order)(Stevenson, Theodore) (Entered: 11/04/2010) |
| 11/04/2010 | 29 | Return of Service Executed as to Acer, Inc. on 10/14/2010, by personal service; answer due: 12/17/2010, by agreement of the parties. (mll, ) (Entered: 11/04/2010) |
| 11/16/2010 | 30 | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint re D−Link Systems, Inc. (Yarbrough, Herbert) (Entered: 11/16/2010) |
| 11/16/2010 | | Defendant's Unopposed Second Application for Extension of Time to Answer Complaint 30 is granted pursuant to Local Rule CV−12 for D−Link Systems, Inc. to 12/2/2010. 14 Days Granted for Deadline Extension.( mll, ) (Entered: 11/16/2010) |
| 11/30/2010 | 31 | ORDER granting 28 Motion for Extension of Time to Answer. The deadline for Acer Inc, Acer America Corporation, and Gateway Inc to answer or otherwise respond to pltf's Complaint is extended to 12−17−2010. Signed by Judge Leonard Davis on 11/30/10. cc:attys 11−30−10 (mll, ) (Entered: 11/30/2010) |
| 12/02/2010 | 32 | APPLICATION to Appear Pro Hac Vice by Attorney Jonah D Mitchell for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 12/02/2010) |
| 12/02/2010 | 33 | APPLICATION to Appear Pro Hac Vice by Attorney Scott D Baker for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 12/02/2010) |
| 12/02/2010 | 34 | APPLICATION to Appear Pro Hac Vice by Attorney Adaline J Hilgard for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 12/02/2010) |
| 12/02/2010 | 35 | APPLICATION to Appear Pro Hac Vice by Attorney John P Bovich for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 12/02/2010) |
| 12/02/2010 | 36 | APPLICATION to Appear Pro Hac Vice by Attorney William R Overend for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 12/02/2010) |
| 12/02/2010 | 37 | NOTICE of Attorney Appearance by Herbert A Yarbrough, III on behalf of Acer America Corporation, Acer, Inc., Gateway, Inc., Netgear, Inc. (Yarbrough, Herbert) (Entered: 12/02/2010) |
| 12/02/2010 | 38 | NOTICE of Attorney Appearance by Debra Elaine Gunter on behalf of Acer America Corporation, Acer, Inc., Gateway, Inc., Netgear, Inc. (Gunter, Debra) (Entered: 12/02/2010) |
| 12/02/2010 | 39 | Unopposed MOTION for Extension of Time to File Answer by D−Link Systems, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 12/02/2010) |
| 12/03/2010 | 40 | ORDER granting 39 Motion for Extension of Time to Answer. D−Link Systems and Netgear Inc have to 12−17−2010 to answer, move or otherwise respond to |

**A147**

| | | pltfs' Complaint. Signed by Judge Leonard Davis on 12/03/10. cc:attys 12−03−10 (mll, ) (Entered: 12/03/2010) |
|---|---|---|
| 12/13/2010 | 41 | Unopposed MOTION to Withdraw as Attorney by Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Davison, Dan) (Entered: 12/13/2010) |
| 12/15/2010 | 42 | ORDER granting 41 Motion to Withdraw as Attorney. Attorney Dan Duncan Davison terminated. Signed by Judge Leonard Davis on 12/15/10. cc:attys 12−15−10 (mll, ) (Entered: 12/15/2010) |
| 12/17/2010 | 43 | ANSWER to 1 Complaint, by Acer America Corporation, Acer, Inc., Gateway, Inc..(Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 44 | ANSWER to 1 Complaint, by D−Link Systems, Inc..(Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 45 | ANSWER to 1 Complaint, by Netgear, Inc..(Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 46 | CORPORATE DISCLOSURE STATEMENT filed by D−Link Systems, Inc. identifying Corporate Parent D−Link Corporation for D−Link Systems, Inc.. (Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 47 | CORPORATE DISCLOSURE STATEMENT filed by Netgear, Inc. (Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 48 | CORPORATE DISCLOSURE STATEMENT filed by Gateway, Inc. identifying Corporate Parent Acer American Holdings Corp. for Gateway, Inc.. (Yarbrough, Herbert) (Entered: 12/17/2010) |
| 12/17/2010 | 49 | CORPORATE DISCLOSURE STATEMENT filed by Acer America Corporation identifying Corporate Parent Gateway, Inc. for Acer America Corporation. (Yarbrough, Herbert) (Entered: 12/17/2010) |
| 01/12/2011 | 50 | Unopposed MOTION TO EXTEND DEADLINE TO INITIATE SERVICE OF PLAINTIFFS' ORIGINAL COMPLAINT ON DEFENDANT D−LINK CORPORATION re 1 Complaint, by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/12/2011) |
| 01/12/2011 | 51 | NOTICE of Attorney Appearance by Ashley Nicole Moore on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Moore, Ashley) (Entered: 01/12/2011) |
| 01/21/2011 | 52 | ORDER granting 50 Motion for Extension of Time. Pltf's deadline to initiate service of its Original Complaint on D−Link Corporation is extended to 2−11−2011. Signed by Judge Leonard Davis on 01/21/11. cc:attys 1−21−11 (mll, ) (Entered: 01/21/2011) |
| 01/28/2011 | 53 | Joint MOTION to Dismiss *WITHOUT PREJUDICE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(A)(2)* by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/28/2011) |
| 01/31/2011 | 54 | ORDER granting 53 Motion to Dismiss. All claims by pltf against deft D−Link Corporation are dismissed without prejudice, and without award of fees or costs. Signed by Judge Leonard Davis on 01/31/11. cc:attys 1−31−11 (mll, ) (Entered: 01/31/2011) |
| 03/01/2011 | 55 | MOTION to Change Venue *Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue, and Memorandum of Law in Support Thereof* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Affidavit Declaration of A. J. Wang in Support of Defendants' Joint Motion to Transfer Venue, # 2 Affidavit Declaration of Som Pal Choudhury in Support of Defendants' Joint Motion to Transfer Venue, # 3 Affidavit Declaration of Ming Wang in Support of Defendants' Joint Motion to Transfer Venue, # 4 Affidavit Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, # 5 Exhibit Exhibit A to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, # 6 Exhibit Exhibit B to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer |

**A148**

| | | |
|---|---|---|
| | | Venue, #_7_ Exhibit Exhibit C to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_8_ Exhibit Exhibit D to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_9_ Exhibit Exhibit E to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_10_ Exhibit Exhibit F to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_11_ Exhibit Exhibit G to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_12_ Exhibit Exhibit H to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_13_ Exhibit Exhibit I to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_14_ Exhibit Exhibit J to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_15_ Exhibit Exhibit K to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_16_ Exhibit Exhibit L to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_17_ Exhibit Exhibit M to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_18_ Exhibit Exhibit N to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_19_ Exhibit Exhibit O to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_20_ Exhibit Exhibit P to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_21_ Exhibit Exhibit Q to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_22_ Exhibit Exhibit R to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_23_ Exhibit Exhibit S to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_24_ Exhibit Exhibit T to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_25_ Exhibit Exhibit U to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_26_ Exhibit Exhibit V to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_27_ Exhibit Exhibit W to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_28_ Exhibit Exhibit X to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_29_ Exhibit Exhibit Y to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_30_ Exhibit Exhibit Z to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_31_ Exhibit Exhibit AA to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_32_ Exhibit Exhibit BB to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_33_ Exhibit Exhibit CC to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_34_ Exhibit Exhibit DD to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_35_ Exhibit Exhibit EE to Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, #_36_ Text of Proposed Order [Proposed] Order Granting Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue)(Overend, William) (Entered: 03/01/2011) |
| 03/01/2011 | _56_ | MOTION for Leave to File Excess Pages by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: #_1_ Text of Proposed Order Order Granting Defendants Unopposed Motion To Exceed Page Limits With Respect To Defendants Motion To Transfer Venue)(Overend, William) (Entered: 03/01/2011) |
| 03/08/2011 | _57_ | ORDER granting _56_ Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 03/08/11. cc:attys 3−08−11 (mll, ) (Entered: 03/08/2011) |
| 03/15/2011 | _58_ | ORDER that plaintiff file a notice that the case is ready for scheduling conference when all of the defendants have either answered or filed a motion to transfer or dismiss. The notice shall be filed within five days of the last remaining defendant's answer or motion. Signed by Judge Leonard Davis on 03/15/11. cc:attys 3−15−11(mll, ) (Entered: 03/15/2011) |
| 03/15/2011 | _59_ | NOTICE by Ericsson Inc. *NOTICE REGARDING SCHEDULING CONFERENCE* (Stevenson, Theodore) (Entered: 03/15/2011) |

**A149**

| 03/21/2011 | 60 | NOTICE of Attorney Appearance by Justin Thomas Nemunaitis on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Nemunaitis, Justin) (Entered: 03/21/2011) |
|---|---|---|
| 03/21/2011 | 61 | Unopposed MOTION to Seal *PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO TRANSFER VENUE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 03/21/2011) |
| 03/21/2011 | 62 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 55 MOTION to Change Venue *Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue, and Memorandum of Law in Support Thereof filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit B, # 18 Exhibit C, # 19 Exhibit D, # 20 Exhibit E, # 21 Text of Proposed Order)(Stevenson, Theodore) (Entered: 03/21/2011) |
| 03/23/2011 | 63 | ORDER granting 61 Motion to Seal Pltfs' Response to Defts' Motion to Transfer Venue. Signed by Judge Leonard Davis on 03/23/11. cc:attys 3−23−11 (mll, ) (Entered: 03/23/2011) |
| 04/01/2011 | 64 | Unopposed MOTION for Leave to File *Under Seal* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order Order Authorizing Filing Under Seal)(Overend, William) (Entered: 04/01/2011) |
| 04/01/2011 | 65 | SEALED PATENT REPLY to Response to PATENT Motion re 55 MOTION to Change Venue *Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue, and Memorandum of Law in Support Thereof filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc..* (Attachments: # 1 Affidavit Supplemental Declaration of Adaline J. Hilgard in Support of Defendants' Motion to Transfer Venue, # 2 Exhibit A, # 3 Exhibit B)(Overend, William) (Entered: 04/01/2011) |
| 04/01/2011 | 66 | Unopposed MOTION for Leave to File Excess Pages by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order Order Granting Defendants' Unopposed Motion to Exceed Page Limits with Respect to Defendants' Reply Brief re Motion to Transfer Venue)(Overend, William) (Entered: 04/01/2011) |
| 04/01/2011 | 67 | AFFIDAVIT in Support re 55 MOTION to Change Venue *Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue, and Memorandum of Law in Support Thereof Declaration of Timothy Donovan in Support of Defendants' Motion to Transfer Venue filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc..* (Attachments: # 1 Affidavit Declaration of Jennifer Khouri in Support of Defendants' Motion to Transfer Venue, # 2 Affidavit Declaration of Arif Maskatia in Support of Defendants' Motion to Transfer Venue, # 3 Affidavit Supplemental Declaration of A. J. Wang in Support of Defendants' Motion to Transfer Venue, # 4 Affidavit Declaration of Peg Wynn in Support of Defendants' Motion to Transfer Venue)(Overend, William) (Entered: 04/01/2011) |
| 04/04/2011 | 68 | ORDER granting 64 Motion for Leave to File Under Seal. Signed by Judge Leonard Davis on 04/04/11. cc:attys 4−04−11 (mll, ) (Entered: 04/04/2011) |
| 04/04/2011 | 69 | ORDER granting 66 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 04/04/11. cc:attys 4−04−11 (mll, ) (Entered: 04/04/2011) |
| 04/05/2011 | 70 | NOTICE of Attorney Appearance by Holly Elin Engelmann on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Engelmann, Holly) (Entered: 04/05/2011) |
| 04/14/2011 | 71 | Unopposed MOTION for Leave to File Excess Pages *FOR PLAINTIFFS' SURREPLY TO DEFENDANTS' MOTION TO TRANSFER VENUE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed |

**A150**

| | | |
|---|---|---|
| | | Order)(Stevenson, Theodore) (Entered: 04/14/2011) |
| 04/14/2011 | 72 | Unopposed MOTION to Seal *PLAINTIFFS' SURREPLY TO DEFENDANTS' MOTION TO TRANSFER VENUE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/14/2011) |
| 04/14/2011 | 73 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 55 MOTION to Change Venue *Motion of Defendants D−Link Systems, Inc., NETGEAR, INC., ACER, Inc., ACER America Corporation, and Gateway, Inc. to Transfer Venue, and Memorandum of Law in Support Thereof filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2)(Stevenson, Theodore) (Entered: 04/14/2011) |
| 04/19/2011 | 74 | ORDER granting 71 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 04/19/11. cc:attys 4−20−11 (mll, ) (Entered: 04/20/2011) |
| 04/19/2011 | 75 | ORDER granting 72 Motion to Seal pltfs' Surreply to defts' Motion to Transfer Venue. Signed by Judge Leonard Davis on 04/19/11. cc:attys 4−20−11 (mll, ) (Entered: 04/20/2011) |
| 05/03/2011 | 76 | ORDER setting Status Conference for 6/9/2011 01:30 PM before Judge Leonard Davis. Signed by Judge Leonard Davis on 05/03/11. cc:attys 5−04−11(mll, ) (Entered: 05/04/2011) |
| 06/08/2011 | 77 | AMENDED COMPLAINT against Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc., Dell, Inc., Toshiba America, Inc., Toshiba America Consumer Products, LLC.,, Toshiba America Information Systems, Inc., Toshiba Corporation, Belkin International, Inc., filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 06/08/2011) |
| 06/09/2011 | 78 | E−GOV SEALED SUMMONS Issued as to Belkin International, Inc., Dell, Inc., Toshiba America Consumer Products, LLC.,, Toshiba America Information Systems, Inc., Toshiba America, Inc., Toshiba Corporation, and emailed to pltf for service. (mll, ) (Entered: 06/09/2011) |
| 06/09/2011 | 79 | **6.9.11 Minute Entry − Status Conf:** for proceedings held before Judge Leonard Davis: Status Conference held on 6/9/2011. (Court Reporter Shea Sloan.) (Attachments: # 1 Attorney Sign−In Sheet) (rlf, ) (Entered: 06/09/2011) |
| 06/09/2011 | 80 | ORDER that parties are to submit agreed Docket Control and Discovery Orders to the Court by 6−24−2011. For purposes of computing the time deadlines under the local patent rules, the Court deems 6−24−2011 as the effective Rule 16 Initial Case Management Conference date, and thus plaintiff's PR 3−1 and 3−2 disclosures will be due 6−14−2011. Signed by Judge Leonard Davis on 06/09/11. cc:attys 6−10−11(mll, ) (Entered: 06/10/2011) |
| 06/13/2011 | 81 | E−GOV SEALED SUMMONS REISSUED as to Toshiba America, Inc.. (kls, ) (Entered: 06/13/2011) |
| 06/15/2011 | 82 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Belkin International, Inc..( Yagura, Ryan) (Entered: 06/15/2011) |
| 06/16/2011 | 83 | Return of Service Executed as to Dell, Inc. on 6/10/2011, by personal service; answer due: 7/1/2011. (mll, ) (Entered: 06/17/2011) |
| 06/16/2011 | 84 | Return of Service Executed as to Toshiba America Information Systems, Inc. on 6/10/2011, by personal service; answer due: 7/1/2011. (mll, ) (Entered: 06/17/2011) |
| 06/17/2011 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 82 is granted pursuant to Local Rule CV−12 for Belkin International, Inc. to 8/1/2011. 32 Days Granted for Deadline Extension.( mll, ) (Entered: 06/17/2011) |

**A151**

| 06/20/2011 | 85 | Defendant's Unopposed First Application for Extension of Time to Answer Complaint re Dell, Inc..( Hassett, Shaun) (Entered: 06/20/2011) |
|---|---|---|
| 06/20/2011 | 86 | Return of Service Executed as to Belkin International, Inc. on 6/10/2011, by personal service. (mll, ) (Entered: 06/20/2011) |
| 06/21/2011 | 87 | NOTICE of Attorney Appearance by John Austin Curry on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Curry, John) (Entered: 06/21/2011) |
| 06/23/2011 | 88 | NOTICE of Attorney Appearance by Guy N Harrison on behalf of Toshiba America Information Systems, Inc. (Harrison, Guy) (Entered: 06/23/2011) |
| 06/24/2011 | 89 | Agreed MOTION *To Extend Time to File Proposed Docket Control Order and Discovery Order* by D−Link Systems, Inc.. (Attachments: #1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 06/24/2011) |
| 06/24/2011 | | Defendant's Unopposed First Application for Extension of Time to Answer Complaint 85 is granted pursuant to Local Rule CV−12 for Dell, Inc. to 8/1/2011. 30 Days Granted for Deadline Extension.( mll, ) (Entered: 06/24/2011) |
| 06/24/2011 | 90 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson *NOTICE OF PROPOSED MEDIATOR PER COURT ORDER (DKT. NO. 80)* (Stevenson, Theodore) (Entered: 06/24/2011) |
| 06/27/2011 | 91 | *D−Link Systems, Inc.'s* ANSWER to 77 Amended Complaint, by D−Link Systems, Inc..(Bovich, John) (Entered: 06/27/2011) |
| 06/27/2011 | 92 | *Netgear Inc.'s* ANSWER to 77 Amended Complaint, by Netgear, Inc..(Bovich, John) (Entered: 06/27/2011) |
| 06/27/2011 | 93 | *Acer, Inc., Acer America Corporation and Gateway, Inc.'s* ANSWER to 77 Amended Complaint, by Acer America Corporation, Acer, Inc., Gateway, Inc..(Bovich, John) (Entered: 06/27/2011) |
| 06/28/2011 | 94 | ORDER granting 89 Motion for Extension of Time. Parties are granted through 7−08−2011 to file a proposed docket control order and discovery order with the Court. Signed by Judge Leonard Davis on 06/28/11. cc:attys 6−28−11 (mll, ) (Entered: 06/28/2011) |
| 06/28/2011 | 95 | NOTICE of Attorney Appearance by Deron R Dacus on behalf of Dell, Inc. (Dacus, Deron) (Entered: 06/28/2011) |
| 06/30/2011 | 96 | Agreed MOTION for Extension of Time to File Answer by Toshiba America Information Systems, Inc.. (Attachments: #1 Text of Proposed Order)(Harrison, Guy) (Entered: 06/30/2011) |
| 07/05/2011 | 97 | ORDER granting 96 Motion for Extension of Time to Answer. The deadline for deft Toshiba America Information Systems Inc to answer or otherwise respond to the Complaint is extended to 8−15−2011. Signed by Judge Leonard Davis on 07/05/11. cc:attys 7−05−11 (mll, ) (Entered: 07/05/2011) |
| 07/08/2011 | 98 | Joint MOTION FOR ENTRY OF DOCKET CONTROL AND DISCOVERY ORDERS by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Proposed Docket Control Order, #4 Proposed Discovery Order)(Stevenson, Theodore) (Entered: 07/08/2011) |
| 07/11/2011 | 99 | APPLICATION to Appear Pro Hac Vice by Attorney Furqan A Nanji for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 07/12/2011) |
| 07/13/2011 | 100 | APPLICATION to Appear Pro Hac Vice by Attorney Christine M Morgan for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 07/13/2011) |
| 07/14/2011 | 101 | DISCOVERY ORDER. Signed by Judge Leonard Davis on 07/14/11. cc:attys 7−15−11(mll, ) (Entered: 07/15/2011) |
| 07/14/2011 | 102 | DOCKET CONTROL ORDER. Signed by Judge Leonard Davis on 07/14/11. cc:attys 7−15−11(mll, ) (Entered: 07/15/2011) |

**A152**

| 07/14/2011 | | Deadlines set per 102 Docket Control Order: Amended Pleadings due by 4/12/2012; Respond to Amended Pleadings by 4−26−2012. Discovery due by 9/28/2012. Expert Witness List due by 10/29/2012; Rebuttal expert witnesses designated by 12−07−2012. Identify trial witnesses by 1/25/2013; Rebuttal Trial Witnesses identified by 2−05−2013. Joinder of Parties due by 12/9/2011, for defts. Jury instructions due by 3/29/2013. Mediation Completion due by 12/14/2012. **Robert Faulkner is appointed as Mediator in this cause.** Dispositive Motions due by 3/5/2013; Response to Dispositive Motions due 3−19−2013. Proposed Pretrial Order due by 3/29/2013. Jury Selection set for 6/3/2013 09:00AM before Judge Leonard Davis. Jury Trial set for 6/10/2013 09:00 AM before Judge Leonard Davis. Markman Hearing set for 6/28/2012 09:30 AM before Judge Leonard Davis. Pretrial Conference set for 5/23/2013 09:00 AM before Judge Leonard Davis. Expected Length of Trial is 10 days. (mll, ) (Entered: 07/17/2011) |
|---|---|---|
| 07/14/2011 | | CASE REFERRED to Mediator. Robert Faulkner is appointed as Mediator in this cause. (mll, ) (Entered: 07/17/2011) |
| 07/19/2011 | 103 | APPLICATION to Appear Pro Hac Vice by Attorney Vision L Winter for Belkin International, Inc. Fee pd., 6−4152. Approved 7/19/11. (mjc, ) (Entered: 07/20/2011) |
| 07/19/2011 | 110 | Return of Service Executed as to Toshiba America Consumer Products, LLC., on 6/14/2011, by personal service. (mll, ) (Entered: 07/25/2011) |
| 07/20/2011 | 104 | NOTICE of Attorney Appearance by Michael J Newton on behalf of Dell, Inc. (Newton, Michael) (Entered: 07/20/2011) |
| 07/20/2011 | 105 | NOTICE of Attorney Appearance by Frank G Smith, III on behalf of Dell, Inc. (Smith, Frank) (Entered: 07/20/2011) |
| 07/20/2011 | 106 | NOTICE of Attorney Appearance by Dwayne Cuthbert Norton on behalf of Dell, Inc. (Norton, Dwayne) (Entered: 07/20/2011) |
| 07/20/2011 | 107 | NOTICE of Attorney Appearance by Kamran Jivani on behalf of Dell, Inc. (Jivani, Kamran) (Entered: 07/20/2011) |
| 07/20/2011 | 108 | NOTICE of Attorney Appearance by Marsha Ellen Mullin on behalf of Dell, Inc. (Mullin, Marsha) (Entered: 07/20/2011) |
| 07/20/2011 | 109 | NOTICE of Attorney Appearance by Brady Randall Cox on behalf of Dell, Inc. (Cox, Brady) (Entered: 07/20/2011) |
| 08/01/2011 | 111 | *Dell, Inc.'s* ANSWER to 77 Amended Complaint, *and Defenses* by Dell, Inc..(Newton, Michael) (Entered: 08/01/2011) |
| 08/01/2011 | 112 | CORPORATE DISCLOSURE STATEMENT filed by Dell, Inc. (Newton, Michael) (Entered: 08/01/2011) |
| 08/01/2011 | 113 | ANSWER to 77 Amended Complaint, by Belkin International, Inc..(Winter, Vision) (Entered: 08/01/2011) |
| 08/01/2011 | 114 | CORPORATE DISCLOSURE STATEMENT filed by Belkin International, Inc. (Winter, Vision) (Entered: 08/01/2011) |
| 08/12/2011 | 115 | Joint MOTION to Dismiss *WITHOUT PREJUDICE PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 41(A)(2)* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 08/12/2011) |
| 08/12/2011 | 116 | NOTICE of Attorney Appearance by Jason Alan Blackstone on behalf of Ericsson Inc. (Blackstone, Jason) (Entered: 08/12/2011) |
| 08/15/2011 | 117 | *Original* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against All Plaintiffs by Toshiba Corporation, Toshiba America Information Systems, Inc..(Harrison, Guy) (Entered: 08/15/2011) |
| 08/15/2011 | 118 | NOTICE of Attorney Appearance by Pavan K Agarwal on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation (Agarwal, Pavan) (Entered: 08/15/2011) |

**A153**

| | | |
|---|---|---|
| 08/15/2011 | 119 | NOTICE of Attorney Appearance by John J Feldhaus on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation (Feldhaus, John) (Entered: 08/15/2011) |
| 08/16/2011 | 120 | ORDER granting 115 Motion to Dismiss without prejudice Plaintiffs' complaint against Defendant Toshiba America, Inc. and Defendant Toshiba America Consumer Products, LLC. Signed by Judge Leonard Davis on 8/15/11. (mjc, ) (Entered: 08/16/2011) |
| 08/18/2011 | 121 | APPLICATION to Appear Pro Hac Vice by Attorney Eric David Chan for Belkin International, Inc.. (mll, ) (Entered: 08/18/2011) |
| 08/26/2011 | 122 | APPLICATION to Appear Pro Hac Vice by Attorney Kristopher Dawes for Belkin International, Inc.. (mll, ) (Entered: 08/26/2011) |
| 08/29/2011 | 123 | ANSWER to 117 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 08/29/2011) |
| 08/31/2011 | 124 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** Unopposed MOTION for Joinder *in Motion to Transfer* by Belkin International, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Harrison, Guy) Modified on 9/1/2011 (mjc, ). (Entered: 08/31/2011) |
| 08/31/2011 | 125 | Unopposed MOTION to Seal *Exhibits to Joinder* by Belkin International, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Harrison, Guy) (Entered: 08/31/2011) |
| 08/31/2011 | 126 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** Sealed Document. (Harrison, Guy) Modified on 9/1/2011 (mjc, ). (Entered: 08/31/2011) |
| 08/31/2011 | 127 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** Sealed Document. (Harrison, Guy) Modified on 9/1/2011 (mjc, ). (Entered: 08/31/2011) |
| 09/01/2011 | | NOTICE of Deficiency regarding the 124 Motion for Joinder, 126 and 127 Sealed Documents submitted by Belkin International, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. Document does not contain a Certificate of Authorization to File Under Seal and 126 and 127 should be filed as Sealed Additional Attachments to Main Document. Correction should be made by one business day. (mjc, ) (Entered: 09/01/2011) |
| 09/01/2011 | 128 | NOTICE by Belkin International, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation *Joinder in Motion to Transfer* (Harrison, Guy) (Entered: 09/01/2011) |
| 09/01/2011 | 129 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 128 Notice (Other). (Harrison, Guy) (Entered: 09/01/2011) |
| 09/01/2011 | 130 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 128 Notice (Other). (Harrison, Guy) (Entered: 09/01/2011) |
| 09/01/2011 | 131 | ORDER granting 125 Motion to Seal. Signed by Judge Leonard Davis on 09/01/11. cc:attys 9−01−11 (mll, ) (Entered: 09/01/2011) |
| 09/02/2011 | 132 | NOTICE of Attorney Appearance by Jason Woodard Cook on behalf of Dell, Inc. (Cook, Jason) (Entered: 09/02/2011) |
| 09/16/2011 | 133 | NOTICE of Discovery Disclosure by Belkin International, Inc. */ Notice of Belkin International, Inc.'s Disclosure Pursuant to the Court's Discovery Order* (Winter, Vision) (Entered: 09/16/2011) |
| 09/16/2011 | 134 | NOTICE of Discovery Disclosure by Dell, Inc. *Notice of Dell Inc.'s Disclosure pursuant to the Court's Discovery Order* (Cox, Brady) (Entered: 09/16/2011) |
| 09/16/2011 | 135 | NOTICE of Discovery Disclosure by Acer America Corporation, Acer, Inc., Gateway, Inc. *Notice of Defendants Acer, Inc., Acer America Corporation and Gateway, Inc.'s Initial Disclosures Pursuant to the Court's Discovery Order* (Bovich, John) (Entered: 09/16/2011) |

**A154**

| | | |
|---|---|---|
| 09/16/2011 | 136 | NOTICE of Discovery Disclosure by D−Link Systems, Inc. *Notice of Defendant D−Link Systems, Inc.'s Initial Disclosures Pursuant to the Court's Discovery Order* (Bovich, John) (Entered: 09/16/2011) |
| 09/16/2011 | 137 | NOTICE of Discovery Disclosure by Netgear, Inc. *Notice of Defendant NETGEAR, Inc.'s Initial Disclosures Pursuant to the Court's Discovery Order* (Bovich, John) (Entered: 09/16/2011) |
| 09/19/2011 | 138 | NOTICE of Discovery Disclosure by Toshiba America Information Systems, Inc., Toshiba Corporation (Harrison, Guy) (Entered: 09/19/2011) |
| 09/19/2011 | 139 | Unopposed MOTION to Seal *PLAINTIFFS' RESPONSE TO DEFENDANTS TOSHIBA'S AND BELKIN'S JOINDER IN DEFENDANTS' MOTION TO TRANSFER VENUE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 09/19/2011) |
| 09/19/2011 | 140 | SEALED PATENT RESPONSE by Telefonaktiebolaget LM Ericsson, Ericsson Inc. to 128 Notice (Other), 55 Motion to Change Venue,,,,,,,,,,,,,,,,,,,,,*filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc..* (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9)(Stevenson, Theodore) (Entered: 09/19/2011) |
| 09/20/2011 | 141 | ORDER granting 139 Motion to Seal. Signed by Judge Leonard Davis on 09/20/11. cc:attys 9−21−11 (mll, ) (Entered: 09/21/2011) |
| 09/26/2011 | 142 | RESPONSE in Support re 139 Unopposed MOTION to Seal *PLAINTIFFS' RESPONSE TO DEFENDANTS TOSHIBA'S AND BELKIN'S JOINDER IN DEFENDANTS' MOTION TO TRANSFER VENUE / Reply in Support of Toshiba Corporation, Toshiba America Information Systems, Inc., and Belkin International, Inc.'s Joinder in Motion to Transfer Venue filed by Belkin International, Inc..* (Attachments: # 1 Exhibit A to Reply in Support of Joinder in Motion to Transfer Venue)(Dawes, Kristopher) (Entered: 09/26/2011) |
| 09/29/2011 | 143 | MEMORANDUM OPINION AND ORDER denying 55 Motion to Change Venue to the Northern District of California. Signed by Judge Leonard Davis on 09/29/11. cc:attys 9−29−11 (mll, ) (Entered: 09/29/2011) |
| 10/04/2011 | 144 | NOTICE of Discovery Disclosure by Ericsson Inc., Telefonaktiebolaget LM Ericsson (Stevenson, Theodore) (Entered: 10/04/2011) |
| 10/14/2011 | 145 | NOTICE by Dell, Inc. *of Compliance with P.R. 3−4(a)* (Newton, Michael) (Entered: 10/14/2011) |
| 10/14/2011 | 146 | NOTICE by Belkin International, Inc. */ Notice of Belkin International, Inc.'s Compliance with P.R. 3−4(a)* (Dawes, Kristopher) (Entered: 10/14/2011) |
| 10/17/2011 | 147 | Joint MOTION for Protective Order by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Stevenson, Theodore) (Entered: 10/17/2011) |
| 10/18/2011 | 148 | AGREED PROTECTIVE ORDER. Signed by Judge Leonard Davis on 10/18/11. cc:attys 10−18−11(mll, ) (Entered: 10/18/2011) |
| 10/24/2011 | 149 | NOTICE of Discovery Disclosure by Toshiba America Information Systems, Inc., Toshiba Corporation *Response to Plaintiff Second Interrogatories* (Harrison, Guy) (Entered: 10/24/2011) |
| 10/25/2011 | 150 | NOTICE of Attorney Appearance by Stacey Garrett White on behalf of Dell, Inc. (White, Stacey) (Entered: 10/25/2011) |
| 11/18/2011 | 151 | MOTION to Intervene by Intel Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Text of Proposed Order)(Parker, Robert) (Entered: 11/18/2011) |
| 11/21/2011 | 152 | NOTICE of Attorney Appearance by Robert Christopher Bunt on behalf of Intel Corporation (Bunt, Robert) (Entered: 11/21/2011) |

**A155**

| 11/29/2011 | 153 | APPLICATION to Appear Pro Hac Vice by Attorney Seth B Herring for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 11/29/2011) |
|---|---|---|
| 11/30/2011 | 154 | NOTICE of Attorney Appearance by Michael E Jones on behalf of Intel Corporation (Jones, Michael) (Entered: 11/30/2011) |
| 12/05/2011 | 155 | NOTICE of Attorney Appearance by John Frederick Bufe on behalf of Intel Corporation (Bufe, John) (Entered: 12/05/2011) |
| 12/05/2011 | 156 | RESPONSE to Motion re 151 MOTION to Intervene *filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 12/05/2011) |
| 12/09/2011 | 157 | Unopposed MOTION for Extension of Time to File − *Serve Invalidity Contentions* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 12/09/2011) |
| 12/12/2011 | 158 | ORDER granting 157 Motion for Extension of Time. Defts shall have to 12−12−2011 to serve their invalidity contentions. Signed by Judge Leonard Davis on 12/12/11. cc:attys 12−12−11 (mll, ) (Entered: 12/12/2011) |
| 12/13/2011 | 159 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Corporation, D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. *Notice of Defendants D−Link Corporation, D−Link Systems, Inc., Netgear, Inc., Acer, Inc., Acer America Corporation, Gateway, Inc., Dell Inc., Toshiba Corporation, Toshiba America Information Services, Inc., and Belkin International, Inc.'s Compliance with P.R. 3−3 and 3−4* (Herring, Seth) (Entered: 12/13/2011) |
| 12/15/2011 | 160 | REPLY to Response to Motion re 151 MOTION to Intervene *filed by Intel Corporation*. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Parker, Robert) (Entered: 12/15/2011) |
| 12/27/2011 | 161 | SUR−REPLY to Reply to Response to Motion re 151 MOTION to Intervene *filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Stevenson, Theodore) (Entered: 12/27/2011) |
| 01/24/2012 | 162 | Agreed MOTION to Amend/Correct *Docket Control Order to Extend Time to Exchange Claim Terms and Phrases* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 01/24/2012) |
| 01/24/2012 | 163 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. *of Withdrawal of Attorney Furqan A. Nanji* (Mitchell, Jonah) (Entered: 01/24/2012) |
| 01/26/2012 | 164 | ORDER granting 162 Agreed Motion to Amend docket control order. The Parties will comply with Patent Rule 4−1 and the date is extended from February 3, 2012 to February 10, 2012. Signed by Judge Leonard Davis on 1/26/2012. (gsg) (Entered: 01/26/2012) |
| 02/03/2012 | 165 | NOTICE of Change of Address by Deron R Dacus (Dacus, Deron) (Entered: 02/03/2012) |
| 02/13/2012 | 166 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. *Notice of Defendants' Compliance with P.R. 4−1* (Bovich, John) (Entered: 02/13/2012) |
| 02/15/2012 | 167 | Joint MOTION FOR ENTRY OF ORDER REGARDING ELECTRONICALLY STORED INFORMATION by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Defendants' Exhibit A, # 2 Defendants' Exhibit B, # 3 Defendants' Exhibit C, # 4 Defendants' Exhibit D, # 5 Defendants' Exhibit E, # 6 Text of Proposed Order)(Baxter, Samuel) (Entered: 02/15/2012) |
| 02/17/2012 | 168 | Joint MOTION for Leave to File Excess Pages by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 02/17/2012) |

## A156

| 02/21/2012 | 169 | ORDER granting 168 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 02/21/12. cc:attys 2−21−12 (mll, ) (Entered: 02/21/2012) |
| 03/05/2012 | 170 | ORDER terminating 167 Motion for Entry of Order Regarding Electronically Stored Information. The parties shall incorporate the changes as set forth in this order into their proposed order regarding electronically stored information and resubmit the proposed order within ten days. Signed by Judge Leonard Davis on 03/05/12. cc:attys 3−05−12 (mll, ) (Entered: 03/05/2012) |
| 03/07/2012 | 171 | Agreed MOTION to Amend/Correct 102 Order by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 03/07/2012) |
| 03/08/2012 | 172 | ORDER granting 171 Motion to Amend/Correct Docket Control Order. The deadline for complying with Patent Rule 4−2 is extended to 3−16−2012. Signed by Judge Leonard Davis on 03/08/12. cc:attys 3−08−12 (mll, ) (Entered: 03/08/2012) |
| 03/15/2012 | 173 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson re 170 Order on Motion for Miscellaneous Relief, *JOINT NOTICE OF REVISED ORDER* (Attachments: # 1 Text of Proposed Order)(Baxter, Samuel) (Entered: 03/15/2012) |
| 03/16/2012 | 174 | PROTECTIVE ORDER for Electronically Stored Documents. Signed by Judge Leonard Davis on 03/16/12. cc:attys 3−19−12(mll, ) (Entered: 03/19/2012) |
| 03/21/2012 | 175 | APPLICATION to Appear Pro Hac Vice by Attorney Kirsten R Rydstrom for Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (mll, ) (Entered: 03/23/2012) |
| 03/27/2012 | 176 | Unopposed MOTION to Amend/Correct *Defendants' Invalidity Contentions* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Attachment 1, # 2 Attachment 2, # 3 Attachment 3, # 4 Attachment 4, # 5 Attachment 5, # 6 Attachment 6, # 7 Attachment 7, # 8 Attachment 8, # 9 Text of Proposed Order)(Bovich, John) (Entered: 03/27/2012) |
| 03/28/2012 | 177 | ORDER granting 176 Motion to Amend/Correct Invalidity Contentions. Signed by Judge Leonard Davis on 03/28/12. cc:attys 3−28−12 (mll, ) (Entered: 03/28/2012) |
| 04/04/2012 | 178 | Joint MOTION to Amend/Correct 102 Order *to Extend Time to File Patent Rule 4−3 Joint Claim Construction and Prehearing Statement* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 04/04/2012) |
| 04/05/2012 | 179 | ORDER granting 178 Motion to Amend/Correct Docket Control Order. The deadline for complying with Patent Local Rule 4−3 is extended to 4−16−2012. Signed by Judge Leonard Davis on 04/05/12. cc:attys 4−05−12 (mll, ) (Entered: 04/05/2012) |
| 04/12/2012 | 180 | AMENDED ANSWER to 77 Amended Complaint, *AFFIRMATIVE DEFENSES*, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by Belkin International, Inc.. (Dawes, Kristopher) (Entered: 04/12/2012) |
| 04/12/2012 | 181 | *Dell Inc.'s First Amended* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by Dell, Inc..(Newton, Michael) (Entered: 04/12/2012) |
| 04/12/2012 | 182 | *Toshiba Corp and TAIS, Inc's First Amended* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by Toshiba America Information Systems, Inc., Toshiba Corporation.(Harrison, Guy) (Entered: 04/12/2012) |
| 04/12/2012 | 183 | *First Amended* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by Acer America Corporation, Acer, Inc., Gateway, Inc..(Yarbrough, Herbert) (Entered: 04/12/2012) |
| 04/12/2012 | 184 | *First Amended* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by D−Link Systems, Inc..(Yarbrough, Herbert) (Entered: 04/12/2012) |

**A157**

| 04/12/2012 | 185 | *First Amended* ANSWER to 77 Amended Complaint,, COUNTERCLAIM against Ericsson Inc., Telefonaktiebolaget LM Ericsson by Netgear, Inc..(Yarbrough, Herbert) (Entered: 04/12/2012) |
|---|---|---|
| 04/16/2012 | 186 | **\*\*\*DISREGARD. TO BE REFILED BY ATTORNEY\*\*\*** NOTICE of Attorney Appearance by Ryan Abbott Hargrave on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Hargrave, Ryan) Modified on 4/17/2012 (gsg). (Entered: 04/16/2012) |
| 04/16/2012 | 187 | JOINT CLAIM CONSTRUCTION AND PREHEARING STATEMENT PURSUANT TO PATENT RULE 4−3 filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Exhibit A−1, # 3 Exhibit A−2)(Baxter, Samuel) (Entered: 04/16/2012) |
| 04/17/2012 |  | NOTICE of Deficiency regarding the Attorney Appearance submitted, entry 186 . No certificate of service. Attorney to refile. (gsg) (Entered: 04/17/2012) |
| 04/17/2012 | 188 | NOTICE of Attorney Appearance by Ryan Abbott Hargrave on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Hargrave, Ryan) (Entered: 04/17/2012) |
| 04/19/2012 | 189 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. re 187 Claim Construction Brief *of Submission of Exhibits for Inclusion in the Parties' Joint Claim Construction and Pre−Hearing Statement (Dkt. 187)* (Attachments: # 1 Exhibit A−1 − IEEE 1993 − Pulse Shaping, # 2 Exhibit A−1 − IEEE 1996 − Pulse Shaping, # 3 Exhibit A−1 − McGraw 1997 − Pulse Shaping, # 4 Exhibit A−1 − Modern 1997 − Pulse Shaping, # 5 Exhibit A−2 − EIA−TIA IS−54B May 1990, # 6 Exhibit A−2 − Facts on File Dictionary of Telecommunications 1991 (field), # 7 Exhibit A−2 − Illustrated Dictionary of Electronics 1994 (field), # 8 Exhibit A−2 − Information Age Dictionary 1992 (field), # 9 Exhibit A−2 − IS−136 PN−3474.1, # 10 Exhibit A−2 − IS−136.1 800 MHz TDMA Cellular − Digital Control Channel (1−130), # 11 Exhibit A−2 − IS−136.1 800 MHz TDMA Cellular − Digital Control Channel (131−261), # 12 Exhibit A−2 − IS−136.1 800 MHz TDMA Cellular − Digital Control Channel (262−392), # 13 Exhibit A−2 − IS−136.1 800 MHz TDMA Cellular − Digital Control Channel (393−554), # 14 Exhibit A−2 − IS−136.2 800 MHz TDMA Cellular − Traffic Channels and FSK Control Channel (1−130), # 15 Exhibit A−2 − IS−136.2 800 MHz TDMA Cellular − Traffic Channels and FSK Control Channel (131−231), # 16 Exhibit A−2 − IS−136.2 800 MHz TDMA Cellular − Traffic Channels and FSK Control Channel (232−332), # 17 Exhibit A−2 − IS−136.2 800 MHz TDMA Cellular − Traffic Channels and FSK Control Channel (333−402), # 18 Exhibit A−2 − Oxford Reference Dictionary of Computing 1990 (field), # 19 Exhibit A−2 − US5175867, # 20 Exhibit A−2 − US5230003, # 21 Exhibit A−2 − Webster's New World Dictionary of Computer Terms 1994 (field))(Yarbrough, Herbert) (Entered: 04/19/2012) |
| 04/19/2012 | 190 | Joint MOTION to Amend/Correct 102 Order *to Extend Time to Propose Technical Advisors* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 04/19/2012) |
| 04/26/2012 | 191 | ORDER granting 190 Motion to Amend Docket Control Order. Signed by Judge Leonard Davis on 4/26/12. (mjc, ) (Entered: 04/26/2012) |
| 04/26/2012 | 192 | ANSWER to 183 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |
| 04/26/2012 | 193 | ANSWER to 180 Amended Answer to Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |
| 04/26/2012 | 194 | ANSWER to 181 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |
| 04/26/2012 | 195 | ANSWER to 184 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |
| 04/26/2012 | 196 | ANSWER to 185 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |

**A158**

| 04/26/2012 | 197 | ANSWER to 182 Answer to Amended Complaint, Counterclaim by Ericsson Inc., Telefonaktiebolaget LM Ericsson.(Stevenson, Theodore) (Entered: 04/26/2012) |
|---|---|---|
| 04/26/2012 | 198 | Joint MOTION to Amend/Correct 191 Order on Motion to Amend/Correct by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/26/2012) |
| 04/27/2012 | 199 | Unopposed MOTION For Leave Regarding Filing of Amended Pleadings by Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Feldhaus, John) (Entered: 04/27/2012) |
| 04/27/2012 | 200 | ORDER granting 198 Motion to Amend/Correct Docket Control Order. The deadline for proposing technical advisors is extended to 4−30−2012. Signed by Judge Leonard Davis on 04/27/12. cc:attys 4−27−12 (mll, ) (Entered: 04/27/2012) |
| 04/30/2012 | 201 | ORDER granting 199 Motion for Leave Regarding Filing of Amended Pleadings. Signed by Judge Leonard Davis on 04/30/12. cc:attys 4−30−12 (mll, ) (Entered: 04/30/2012) |
| 04/30/2012 | 202 | Joint MOTION to Continue *Deadline to Propose Technical Advisors* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Mitchell, Jonah) (Entered: 04/30/2012) |
| 05/01/2012 | 203 | ORDER granting 202 Motion to Continue and Extend Time. The deadline for proposing technical advisors is extended to 5−09−2012. Signed by Judge Leonard Davis on 05/01/12. cc:attys 5−01−12 (mll, ) (Entered: 05/01/2012) |
| 05/01/2012 | 204 | NOTICE by Belkin International, Inc. */ Notice of Withdrawal of Attorney Kristopher M. Dawes* (Yagura, Ryan) (Entered: 05/01/2012) |
| 05/04/2012 | 205 | ORDER granting in part 151 Motion to Intervene. Signed by Judge Leonard Davis on 05/04/12. cc:attys 5−04−12 (mll, ) (Entered: 05/04/2012) |
| 05/04/2012 | 206 | Joint MOTION to Amend/Correct 102 Order, Set/Reset Scheduling Order Deadlines, Set/Reset Hearings,,,,,, by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/04/2012) |
| 05/07/2012 | 207 | ORDER granting 206 Motion to Amend/Correct Docket Control Order, and resetting certain deadlines. Signed by Judge Leonard Davis on 05/07/12. cc:attys 5−07−12 (mll, ) (Entered: 05/07/2012) |
| 05/08/2012 | 208 | Letter Brief filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation (Attachments: # 1 Exhibit 1 − Letter Brief)(Bovich, John) (Entered: 05/08/2012) |
| 05/08/2012 | 209 | OPENING CLAIM CONSTRUCTION BRIEF filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12)(Stevenson, Theodore) (Entered: 05/08/2012) |
| 05/09/2012 | 210 | Joint MOTION to Amend/Correct 200 Order on Motion to Amend/Correct by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/09/2012) |
| 05/10/2012 | 211 | ORDER granting 210 Motion to Amend/Correct Docket Control Order. The deadline for proposing technical advisors is extended to 5−14−2012. Signed by Judge Leonard Davis on 05/10/12. cc:attys 5−10−12 (mll, ) (Entered: 05/10/2012) |
| 05/14/2012 | 212 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. *Joint Notice Regarding Agreed Technical Advisor* (Attachments: # 1 Exhibit A)(Morgan, Christine) (Entered: 05/14/2012) |
| 05/16/2012 | 213 | ORDER appointing Gayle R. Peterson to the position of technical advisor in this case, with his costs to be assessed equally between Plaintiff and Defendants and timely paid as billed. Signed by Judge Leonard Davis on 05/16/12. cc:attys |

**A159**

| | | |
|---|---|---|
| | | 5−16−12(mll, ) (Entered: 05/16/2012) |
| 05/18/2012 | 214 | Joint MOTION to Amend/Correct 174 Protective Order *to Extend the Deadline to Finalize the Selection of Email Terms and Custodians* by Acer America Corporation, Acer, Inc., D−Link Corporation, Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 05/18/2012) |
| 05/22/2012 | 215 | Letter Brief filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 05/22/2012) |
| 05/23/2012 | 216 | ORDER granting 214 Joint Motion to Amend the Protective Order. It is ordered that the deadline to finalize the selection of email terms and custodians is extended from 5/18/2012 to 5/29/2012. Signed by Judge Leonard Davis on 5/23/2012. (leh, ) (Entered: 05/23/2012) |
| 05/25/2012 | 217 | Letter Brief filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation (Attachments: # 1 Exhibit 1 − Defendants' Reply Letter Brief)(Bovich, John) (Entered: 05/25/2012) |
| 05/29/2012 | 218 | Joint MOTION to Amend/Correct *Protective Order to Extend the Deadline To Finalize the Selection of Email Terms and Custodians* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Morgan, Christine) (Entered: 05/29/2012) |
| 05/29/2012 | 219 | Additional Attachments to Main Document: 218 Joint MOTION to Amend/Correct *Protective Order to Extend the Deadline To Finalize the Selection of Email Terms and Custodians*.. (Morgan, Christine) (Entered: 05/29/2012) |
| 05/30/2012 | 220 | ORDER granting 218 Motion to Amend/Correct Protective Order. The deadline to finalize the selection of email terms and custodians is extended to 6−05−2012. Signed by Judge Leonard Davis on 05/30/12. cc:attys 5−30−12 (mll, ) (Entered: 05/30/2012) |
| 05/30/2012 | 221 | Unopposed MOTION for Leave to File Excess Pages by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order [Proposed] Order Granting Unopposed Motion for Leave to Exceed Page Limitations)(Morgan, Christine) (Entered: 05/30/2012) |
| 05/30/2012 | 222 | ORDER granting 208 Notice of Compliance − Letter Brief for permission to file a motion for summary judgment of indefiniteness. Signed by Judge Leonard Davis on 05/30/12. cc:attys 5−30−12(mll, ) (Entered: 05/30/2012) |
| 05/31/2012 | 223 | ORDER granting 221 Motion for Leave to File Excess Pages. Signed by Judge Leonard Davis on 05/31/12. cc:attys 5−31−12 (mll, ) (Entered: 05/31/2012) |
| 06/01/2012 | 224 | MOTION for Summary Judgment *of Invalidity of Claim 1 of the 468 Patent and Claim 45 of the 215 Patent* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America, Inc., Toshiba Corporation. (Attachments: # 1 Affidavit Declaration of Adaline J. Hilgard In Support of Defendants Motion For Summary Judgment of Invalidity of Claim 1 of the 468 Patent And Claim 45 of the 215 Patent, # 2 Exhibit Exhibit A, # 3 Exhibit Exhibit B, # 4 Exhibit Exhibit C, # 5 Exhibit Exhibit D, # 6 Exhibit Exhibit E, # 7 Exhibit Exhibit F, # 8 Text of Proposed Order [Proposed] Order Granting Defendants Motion For Summary Judgment of Invalidity of Claim 1 of the 468 Patent and Claim 45 of the 215 Patent)(Hilgard, Adaline) (Entered: 06/01/2012) |
| 06/01/2012 | 225 | DEFENDANTS RESPONSIVE CLAIM CONSTRUCTION BRIEF filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America, Inc., Toshiba Corporation. (Hilgard, Adaline) (Entered: 06/01/2012) |
| 06/01/2012 | 226 | Additional Attachments to Main Document: 225 Claim Construction Brief.. (Attachments: # 1 Exhibit B − 435 patent, # 2 Exhibit C − 435 patent PH, # 3 |

**A160**

| | | Exhibit D − 215 patent, # 4 Exhibit E − Prov. Appln. No. 60/128,517, # 5 Exhibit F − 5,987,019, # 6 Exhibit G − 6,466,568, # 7 Exhibit H − 568 PH, 7/12/01 OA, # 8 Exhibit I − 568 PH, 2/6/02 OA, # 9 Exhibit J − 019 PH, 8/2/98 Rejection, # 10 Exhibit K − 568 PH, 11/21/01 Amend, # 11 Exhibit L − 019 PH, 11/4/98 Amend, # 12 Exhibit M − 568 PH, 5/10/02 Amend, # 13 Exhibit N − 5,790,516, # 14 Exhibit O − The IEEE Standard Dictionary of Electrical and Electronics Terms, 6th ed. 1996, # 15 Exhibit P − McGraw−Hill Electronics Dictionary, 6th ed. 1997, # 16 Exhibit Q − Modern Dictionary of Electronics, 6th ed. 1997, # 17 Exhibit R − 468 patent)(Hilgard, Adaline) (Entered: 06/01/2012) |
|---|---|---|
| 06/05/2012 | 227 | Joint MOTION to Continue *Deadline to Finalize Selection of Email Terms and Custodians* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Consumer Products, LLC.,, Toshiba America Information Systems, Inc., Toshiba America, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Mitchell, Jonah) (Entered: 06/05/2012) |
| 06/06/2012 | 228 | ORDER granting 227 Motion to Continue. The deadline to finalize the selection of email terms and custodians is extended to 6−11−2012. Signed by Judge Leonard Davis on 06/06/12. cc:attys 6−06−12 (mll, ) (Entered: 06/06/2012) |
| 06/14/2012 | 229 | ORDER REFERRING CASE to Magistrate Judge Keith F. Giblin to conduct pretrial proceedings. Signed by Judge Leonard Davis on 06/14/12. cc:attys 6−14−12(mll, ) (Entered: 06/14/2012) |
| 06/15/2012 | 230 | REPLY CLAIM CONSTRUCTION BRIEF filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 06/15/2012) |
| 06/15/2012 | 231 | RESPONSE in Opposition re 224 MOTION for Summary Judgment *of Invalidity of Claim 1 of the 468 Patent and Claim 45 of the 215 Patent filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/15/2012) |
| 06/15/2012 | 232 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. *Joint Notice of Estimate of Time Needed for Markman Hearing* (Morgan, Christine) (Entered: 06/15/2012) |
| 06/18/2012 | | NOTICE of Hearing: Markman Hearing set for 6/28/2012 at 9:30 a.m. before Judge Leonard Davis is RESCHEDULED to 6/27/2012 at 10:00 AM in Ctrm 6 (Beaumont) before Magistrate Judge Keith F. Giblin. (sal) (Entered: 06/18/2012) |
| 06/21/2012 | 233 | ORDER REFERRING CASE to Magistrate Judge Keith Giblin for claim construction disposition. Signed by Judge Leonard Davis on 06/21/12. cc:attys 6−21−12 (mll, ) (Entered: 06/21/2012) |
| 06/21/2012 | 234 | STIPULATION *and Joint Motion to Dismiss and Grant Partial Judgment by Ericsson Inc., Telefonaktiebolaget LM Ericsson and* by D−Link Systems, Inc.. (Attachments: # 1 Text of Proposed Order)(Bovich, John) (Entered: 06/21/2012) |
| 06/21/2012 | 235 | STIPULATION *and Joint Motion to Dismiss and Grant Partial Judgment by Ericsson Inc., Telefonaktiebolaget LM Ericsson and* by Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Bovich, John) (Entered: 06/21/2012) |
| 06/21/2012 | 236 | REPLY to Response to Motion re 224 MOTION for Summary Judgment *of Invalidity of Claim 1 of the 468 Patent and Claim 45 of the 215 Patent Defendants' Reply Brief re Motion for Summary Judgment of Invalidity of Claim 45 of U.S. Patent No. 6,772,215 filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation.* (Hilgard, Adaline) (Entered: 06/21/2012) |
| 06/22/2012 | 237 | Intervenor COMPLAINT *against Ericsson Inc. and Telefonaktiebolaget LM Ericsson,* filed by Intel Corporation.(Parker, Robert) (Entered: 06/22/2012) |
| 06/22/2012 | 238 | APPLICATION to Appear Pro Hac Vice by Attorney Adam R Alper for Intel Corporation. $100 Pro Hac Vice fee paid, Receipt No. 6−9221. (dlc, ) (Entered: 06/22/2012) |

**A161**

| 06/22/2012 | 239 | APPLICATION to Appear Pro Hac Vice by Attorney, Sarah E Piepmeier for Intel Corporation. $100 Pro Hac Vice fee paid, Receipt No. 6−9221. (dlc, ) (Entered: 06/22/2012) |
|---|---|---|
| 06/25/2012 | 240 | NOTICE of Attorney Appearance by Peter Aaron Kerr on behalf of Dell, Inc. (Kerr, Peter) (Entered: 06/25/2012) |
| 06/25/2012 | 241 | ***FILED IN ERROR. PLEASE DISREGARD.*** NOTICE of Attorney Appearance by Jason J Keener on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation (Keener, Jason) Modified on 6/27/2012 (gsg). (Entered: 06/25/2012) |
| 06/25/2012 | 242 | Unopposed MOTION to Amend/Correct *Invalidity Contentions* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Exhibit Ex 1 − Second Amended Invalidity Contentions, #2 Exhibit Ex 2 − Claim Chart, #3 Text of Proposed Order Proposed Order)(Keener, Jason) (Entered: 06/25/2012) |
| 06/25/2012 | 243 | APPLICATION (APPROVED) to Appear Pro Hac Vice by Attorney Luke L Dauchot for Intel Corporation. (pkb, ) (Entered: 06/25/2012) |
| 06/25/2012 | 244 | APPLICATION (APPROVED) to Appear Pro Hac Vice by Attorney Tim Majors for Intel Corporation. (pkb, ) (Entered: 06/25/2012) |
| 06/27/2012 | | NOTICE of Deficiency regarding the Attorney Appearance, entry 241 submitted. No certificate of service. Correction should be made by 1 business day. (gsg) (Entered: 06/27/2012) |
| 06/27/2012 | 245 | NOTICE of Attorney Appearance by Jason J Keener on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation (Keener, Jason) (Entered: 06/27/2012) |
| 06/27/2012 | 246 | Minute Entry for proceedings held before Magistrate Judge Keith F. Giblin: Markman Hearing held on 6/27/2012. (Court Reporter Tonya Jackson.) (ttp, ) (Entered: 06/28/2012) |
| 06/29/2012 | 247 | Letter Brief filed by Acer America Corporation, Acer, Inc., Dell, Inc., Gateway, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation (Attachments: #1 Exhibit 1− Letter Brief)(Newton, Michael) (Entered: 06/29/2012) |
| 06/29/2012 | 248 | APPLICATION (APPROVED) to Appear Pro Hac Vice by Attorney James Daire for Acer America Corporation, Acer, Inc.,D−Link Systems, Inc.,Gateway, Inc. and for Netgear, Inc. (pkb, ) (Entered: 06/29/2012) |
| 07/03/2012 | 249 | ANSWER to 237 Intervenor Complaint, COUNTERCLAIM against Intel Corporation by Telefonaktiebolaget LM Ericsson, Ericsson Inc..(Stevenson, Theodore) (Entered: 07/03/2012) |
| 07/09/2012 | 250 | APPLICATION (APPROVED) to Appear Pro Hac Vice by Attorney Gregory S Arovas for Intel Corporation. (pkb, ) (Entered: 07/09/2012) |
| 07/10/2012 | 251 | Unopposed MOTION for Extension of Time to File Response/Reply as to 247 Notice of Compliance − Letter Brief by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 07/10/2012) |
| 07/11/2012 | 252 | RESPONSE to Notice of Compliance − Letter Brief re 247 Notice of Compliance − Letter Brief filed by Toshiba Corporation, Gateway, Inc., Dell, Inc., Acer America Corporation, Acer, Inc., Toshiba America Information Systems, Inc. Filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc. by Telefonaktiebolaget LM Ericsson, Ericsson Inc.. (Attachments: #1 Exhibit 1)(Stevenson, Theodore) (Entered: 07/11/2012) |
| 07/13/2012 | 253 | NOTICE by Intel Corporation *of Compliance of P.R. 3−3 and 3−4* (Parker, Robert) (Entered: 07/13/2012) |

**A162**

| 07/18/2012 | 254 | Letter Brief filed by Dell, Inc. (Attachments: # 1 Exhibit Defendants' Reply Letter Brief)(Newton, Michael) (Entered: 07/18/2012) |
|---|---|---|
| 07/23/2012 | 255 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Claim Construction Hearing held on 06.27.2012 before Judge Keith Giblin. Court Reporter: Tonya Jackson, Telephone number: 409.654.2833.<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 8/16/2012. Redacted Transcript Deadline set for 8/27/2012. Release of Transcript Restriction set for 10/25/2012. (tj, ) (Entered: 07/23/2012) |
| 07/23/2012 | 256 | ***WITHDRAWN PER ORDER 315 .***<br>MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Corporation, D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. Responses due by 8/9/2012 (Attachments: # 1 Exhibit Ex 1, # 2 Exhibit Ex 2, # 3 Exhibit Ex 3, # 4 Exhibit Ex 4, # 5 Exhibit Ex 5, # 6 Exhibit Ex 6, # 7 Exhibit Ex 7, # 8 Exhibit Ex 8, # 9 Exhibit Ex 9, # 10 Exhibit Ex 10, # 11 Exhibit Ex 11, # 12 Exhibit Ex 12, # 13 Exhibit Ex 13, # 14 Exhibit Ex 14, # 15 Text of Proposed Order Proposed Order)(Keener, Jason) Modified on 1/23/2013 (mjc, ). (Entered: 07/23/2012) |
| 07/24/2012 | 257 | RESPONSE to 249 Answer to Intervenor Complaint, Counterclaim by Intel Corporation. (Jones, Michael) (Entered: 07/24/2012) |
| 07/26/2012 | 258 | Joint MOTION to Amend/Correct 174 Protective Order *to Extend Date for Substantial Completion of Email Production* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 07/26/2012) |
| 08/03/2012 | 259 | NOTICE by Intel Corporation re 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1 INTEL'S NOTICE OF JOINDER* (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Parker, Robert) (Entered: 08/03/2012) |
| 08/09/2012 | 260 | NOTICE of Attorney Appearance by Liane M Peterson on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation (Peterson, Liane) (Entered: 08/09/2012) |
| 08/09/2012 | 261 | Joint MOTION to Amend/Correct 174 Protective Order by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 08/09/2012) |
| 08/09/2012 | 262 | Joint MOTION FOR ENTRY OF DEPOSITION ORDER by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Stevenson, Theodore) (Entered: 08/09/2012) |
| 08/09/2012 | 263 | ORDER granting 242 Motion to Amend/Correct Invalidity Contentions. Signed by Judge Leonard Davis on 08/09/12. cc:attys 8−09−12 (mll, ) (Entered: 08/09/2012) |
| 08/09/2012 | 264 | ORDER granting 251 Motion for Extension of Time to File Response/Reply. Signed by Judge Leonard Davis on 08/09/12. cc:attys 8−09−12 (mll, ) (Entered: 08/09/2012) |
| 08/09/2012 | 265 | ORDER granting 258 Motion to Amend/Correct Protective Order. Signed by Judge Leonard Davis on 08/09/12. cc:attys 8−09−12 (mll, ) (Entered: 08/09/2012) |
| 08/09/2012 | 266 | ORDER granting 262 Motion for Entry of Deposition Order. Signed by Judge Leonard Davis on 08/09/12. cc:attys 8−09−12 (mll, ) (Entered: 08/09/2012) |

**A163**

| 08/10/2012 | 267 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1 filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: #1 Exhibit A, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Text of Proposed Order)(Stevenson, Theodore) (Entered: 08/10/2012) |
|---|---|---|
| 08/21/2012 | 268 | REPLY to Response to Motion re 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1 filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation*. (Attachments: #1 Affidavit Keener Declaration, #2 Exhibit Exhibit 16, #3 Exhibit Exhibit 17, #4 Exhibit Exhibit 18)(Keener, Jason) (Entered: 08/21/2012) |
| 08/21/2012 | 269 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 268 Reply to Response to Motion, Exhibit 15. (Keener, Jason) (Entered: 08/21/2012) |
| 08/23/2012 | 270 | Joint MOTION for Extension of Time to Complete Discovery *re Email Productions* by Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Text of Proposed Order)(Harrison, Guy) (Entered: 08/23/2012) |
| 09/04/2012 | 271 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1 filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: #1 Declaration of Ryan Hargrave, #2 Exhibit 1, #3 Exhibit 2)(Stevenson, Theodore) (Entered: 09/04/2012) |
| 09/07/2012 | 272 | NOTICE of Attorney Appearance − Pro Hac Vice by Jared D Edgar on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3768636. (Edgar, Jared) (Entered: 09/07/2012) |
| 09/08/2012 | 273 | NOTICE of Attorney Appearance − Pro Hac Vice by Kevin Spark on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3770590. (Spark, Kevin) (Entered: 09/08/2012) |
| 09/10/2012 | 274 | NOTICE of Attorney Appearance − Pro Hac Vice by Peter C Magic on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3772426. (Magic, Peter) (Entered: 09/10/2012) |
| 09/10/2012 | 275 | NOTICE of Attorney Appearance − Pro Hac Vice by Lov Goel on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3772525. (Goel, Lov) (Entered: 09/10/2012) |
| 09/10/2012 | 276 | NOTICE of Attorney Appearance − Pro Hac Vice by John Richard Edwards on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3772893. (Edwards, John) (Entered: 09/10/2012) |
| 09/10/2012 | 277 | ORDER that pltf pay $29,419.53 and defts pay $29,419.52 to Gale R Peterson for services rendered and expenses incurred through 7−27−2012 as Technical Advisor to the Court, for a total amount of $57,566.25. Signed by Judge Leonard Davis on 09/10/12. cc:attys 9−11−12(mll, ) (Entered: 09/11/2012) |
| 09/12/2012 | 278 | Unopposed MOTION to Withdraw as Attorney */ Defendant Belkin International, Inc. Respectfully Requests that Eric David Chan be Removed as Counsel of Record in this Case as He is No Longer Employed With O'Melveny &Myers LLP* by Belkin International, Inc.. (Attachments: #1 Text of Proposed Order)(Winter, Vision) (Additional attachment(s) added on 9/14/2012: #2 Corrected Proposed Order) (gsg, ). (Entered: 09/12/2012) |
| 09/14/2012 | 279 | ORDER granting 261 Motion to Amend/Correct Protective Order. Signed by Judge Leonard Davis on 09/14/12. cc:attys 9−14−12 (mll, ) (Entered: 09/14/2012) |
| 09/14/2012 | 280 | ORDER granting 270 Motion for Extension of Time to Complete Discovery. Signed by Judge Leonard Davis on 09/14/12. cc:attys 9−14−12 (mll, ) (Entered: 09/14/2012) |

**A164**

| 09/14/2012 | 281 | ORDER granting 278 Motion to Withdraw as Attorney. Attorney Eric David Chan terminated. Signed by Judge Leonard Davis on 09/14/12. cc:attys 9−14−12 (mll, ) (Entered: 09/14/2012) |
|---|---|---|
| 09/18/2012 | 282 | Joint MOTION to Amend/Correct 102 Order, Set/Reset Scheduling Order Deadlines, Set/Reset Hearings,,,,,, by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 09/18/2012) |
| 09/19/2012 | 283 | MOTION for Issuance of Letters Rogatory by Ericsson Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Request for International Judicial Assistance (Letter Rogatory), # 4 Text of Proposed Order)(Stevenson, Theodore) (Entered: 09/19/2012) |
| 09/19/2012 | 284 | MOTION for Issuance of Letters Rogatory by Ericsson Inc.. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Request for International Judicial Assistance (Letter Rogatory), # 4 Text of Proposed Order)(Stevenson, Theodore) (Entered: 09/19/2012) |
| 09/27/2012 | 285 | NOTICE of Attorney Appearance − Pro Hac Vice by J Kevin Murray on behalf of Belkin International, Inc.. Filing fee $ 100, receipt number 0540−3802313. (Murray, J) (Entered: 09/27/2012) |
| 10/03/2012 | 286 | ORDER denying 282 Motion to Amend/Correct Docket Control Order. The CourtORDERS the parties to resubmit an Amended Docket Control Order that provides the Court sufficient time to consider the parties' dispositive motions prior to the Pretrial Conference. Signed by Judge Leonard Davis on 10/03/12. cc:attys 10−03−12 (mll, ) (Entered: 10/03/2012) |
| 10/10/2012 | 287 | ORDER granting 283 Motion for Issuance of Letters Rogatory, and Request for International Judicial Assistance. Signed by Judge Leonard Davis on 10/05/12. cc:attys 10−10−12 (mll, ) (Entered: 10/10/2012) |
| 10/10/2012 | 288 | ORDER granting 284 Motion for Issuance of Letters Rogatory, and Request for International Judicial Assistance. Signed by Judge Leonard Davis on 10/05/12. cc:attys 10−10−12 (mll, ) (Entered: 10/10/2012) |
| 10/17/2012 | 289 | Joint MOTION to Amend/Correct 102 Order *, Set/Reset Scheduling Order Deadlines, Set/Reset Hearings* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Attachments: # 1 Text of Proposed Order)(Morgan, Christine) (Entered: 10/17/2012) |
| 10/19/2012 | 290 | ORDER granting 289 Motion to Amend/Correct Docket Control Order. Signed by Judge Leonard Davis on 10/19/12. cc:attys 10−19−12 (mll, ) (Entered: 10/19/2012) |
| 10/19/2012 | 291 | Unopposed MOTION for Protective Order *REGARDING BROADCOM SOURCE CODE* by Ericsson Inc.. (Attachments: # 1 Exhibit A, # 2 Text of Proposed Order)(Stevenson, Theodore) (Entered: 10/19/2012) |
| 10/22/2012 | 292 | SUPPLEMENTAL PROTECTIVE ORDER FOR PRODUCTION OF BROADCOM SOURCE CODE. Signed by Judge Leonard Davis on 10/22/12. cc:attys 10−22−12(mll, ) (Entered: 10/22/2012) |
| 11/02/2012 | 293 | Joint MOTION to Dismiss *WITH PREJUDICE AND GRANT PARTIAL JUDGMENT* by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 11/02/2012) |
| 11/08/2012 | 294 | ORDER granting 293 Motion to Dismiss. All claims by pltfs against Defendants Acer, Inc. and Acer America Corporation, Gateway, Inc., Dell, Inc., Toshiba Corporation, Toshiba America Information Systems, Inc., are dismissed with prejudice, as to US Patent No. 6,173,352; all counter−claims by defts are dismissed without prejudice. Signed by Judge Leonard Davis on 11/08/12. cc:attys 11−08−12 (mll, ) (Entered: 11/08/2012) |
| 11/14/2012 | 295 | Joint MOTION to Amend/Correct 290 Order on Motion to Amend/Correct *Docket Control Order* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed |

**A165**

| | | Order)(Parker, Robert) (Entered: 11/14/2012) |
|---|---|---|
| 11/14/2012 | 296 | NOTICE of Attorney Appearance by Kevin Lee Burgess on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Burgess, Kevin) (Entered: 11/14/2012) |
| 11/15/2012 | 297 | ORDER granting 295 Motion to Amend/Correct Docket Control Order. Signed by Judge Leonard Davis on 11/15/12. cc:attys 11−15−12 (mll, ) (Entered: 11/15/2012) |
| 12/12/2012 | 298 | NOTICE of Attorney Appearance − Pro Hac Vice by Raghav R Krishnapriyan on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−3913771. (Krishnapriyan, Raghav) (Main Document 298 replaced on 12/17/2012) (pkb, ). (Entered: 12/12/2012) |
| 12/14/2012 | 299 | Joint MOTION to Amend/Correct 102 Order by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 12/14/2012) |
| 12/17/2012 | 300 | ORDER granting 299 Motion to Amend/Correct Docket Control Order and Extend the deadline for Mediation Completion. Signed by Judge Leonard Davis on 12/17/12. cc:attys 12−17−12 (mll, ) (Entered: 12/17/2012) |
| 12/20/2012 | 301 | SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims* by Dell, Inc.. (Attachments: # 1 Affidavit of Dwayne C. Norton, # 2 Exhibit Ex01 2012−12−20 Dell 2nd Amended Answer and CC, # 3 Exhibit Ex02 DellEricssonMPA, # 4 Exhibit Ex03 Dell 3−1 Disclosures, # 5 Exhibit Ex04 2012−08−13 Richey ltr Brismark Ericsson breach of MPA with Dell, # 6 Exhibit Ex05 2012−08−06 Dell Resp to 4th Set Common Rogs 4−18 CONF−OAEO, # 7 Exhibit Ex06 2012−08−21 Dunstan ltr Richey re MPA applicability, # 8 Exhibit Ex07 2012−09−27 Ericsson Resp to Dell 1st Set of Specific ROGS (No 1), # 9 Exhibit Ex08 Brismark, Lars Gustav 2012−09−09 v2 HC, # 10 Exhibit Ex09 2003−01−29 Nordolf ltr IEEE re Ericsson license of essential patents, # 11 Exhibit Ex10 2011−04−18 Lovgren ltr IEEE re Ericsson license of essential patents, # 12 Exhibit Ex11 Diachina, John 2012−10−15 HC−AEO, # 13 Exhibit Ex12 Raith, Alex 2012−10−26 HC−AEO−full, # 14 Exhibit Ex13 Anson, Chad 2012−10−18 full, # 15 Exhibit Ex14 Brismark, Lars Gustav 2012−09−07 v1 HC, # 16 Exhibit Ex15 2012−08−27 Dell 1st Set Specific Rogs to Ericsson, # 17 Exhibit Ex16 2012−10−09 Dell 30b6 Depo Ntc to Ericsson, # 18 Exhibit Ex17 2012−10−12 Dell 1st Set RFAs to Ericsson − OAEO, # 19 Exhibit Ex18 2012−06−22 Ericsson 1st 30b6 Depo Ntc to Dell, # 20 Exhibit Ex19 2012−06−22 Ericsson 4th Set ROGs (14−18) to Dell, # 21 Exhibit Ex20 2012−10−17 Dell 1st Supp Resp to Ericsson 4th Set Rogs C−OAEO)(Norton, Dwayne) (Entered: 12/20/2012) |
| 12/26/2012 | 302 | SEALED ADDITIONAL ATTACHMENTS to Main Document: 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims*. (Attachments: # 1 Text of Proposed Order)(Norton, Dwayne) (Entered: 12/26/2012) |
| 12/27/2012 | 303 | NOTICE of Attorney Appearance by Eugene M Paige on behalf of Acer, Inc., D−Link Corporation, D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. (Paige, Eugene) (Entered: 12/27/2012) |
| 12/27/2012 | 304 | NOTICE of Attorney Appearance by Robert A Van Nest on behalf of Acer America Corporation, Acer, Inc., D−Link Corporation, D−Link Systems, Inc., Gateway, Inc., Netgear, Inc. (Van Nest, Robert) (Entered: 12/27/2012) |
| 01/03/2013 | 305 | NOTICE of Attorney Appearance by Kaiwen Tseng on behalf of Acer America Corporation, Acer, Inc., Gateway, Inc. (Tseng, Kaiwen) (Entered: 01/03/2013) |
| 01/03/2013 | 306 | NOTICE of Attorney Appearance − Pro Hac Vice by Matan Shacham on behalf of Acer America Corporation, Acer, Inc., D−Link Corporation, D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. Filing fee $ 100, receipt number 0540−3936600. (Shacham, Matan) (Entered: 01/03/2013) |
| 01/03/2013 | 307 | Unopposed MOTION FOR LEAVE TO AMEND INVALIDITY CONTENTIONS by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 01/03/2013) |

**A166**

| 01/04/2013 | 308 | Unopposed MOTION FOR LEAVE TO AMEND INFRINGEMENT CONTENTIONS by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/04/2013) |
|---|---|---|
| 01/04/2013 | 309 | Unopposed MOTION for Extension of Time to File Response/Reply as to 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims* by Ericsson Inc.. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/04/2013) |
| 01/04/2013 | 310 | ORDER granting 307 Motion for Leave to Amend Invalidity Contentions. Signed by Judge Leonard Davis on 01/04/13. cc:attys 1−04−13 (mll, ) (Entered: 01/04/2013) |
| 01/04/2013 | 311 | ORDER granting 308 Motion for Leave to Amend Infringement Contentions. Signed by Judge Leonard Davis on 01/04/13. cc:attys 1−04−13 (mll, ) (Entered: 01/04/2013) |
| 01/07/2013 | 312 | ORDER granting 309 Motion for Extension of Time to File Response/Reply. Signed by Judge Leonard Davis on 01/07/13. cc:attys 1−07−13 (mll, ) (Entered: 01/07/2013) |
| 01/14/2013 | 313 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims filed by Ericsson Inc..* (Attachments: # 1 Declaration of Ryan Hargrave, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/14/2013) |
| 01/18/2013 | 314 | Unopposed MOTION to Withdraw 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 01/18/2013) |
| 01/23/2013 | 315 | ORDER granting 314 Motion to Withdraw 314 Unopposed MOTION to Withdraw 256 MOTION to Strike *Plaintiffs' Infringement Contentions, or in the Alternative, to Compel Amended Contentions Compliant with Patent Local Rule 3−1.* Defendants' Motion to Strike 256 is hereby withdrawn. Signed by Judge Leonard Davis on 1/23/13. (mjc, ) (Entered: 01/23/2013) |
| 01/25/2013 | 316 | SEALED REPLY to Response to Motion re 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims filed by Dell, Inc..* (Norton, Dwayne) (Entered: 01/25/2013) |
| 01/28/2013 | 317 | Unopposed MOTION to Withdraw as Attorney by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 01/28/2013) |
| 01/29/2013 | 318 | ORDER granting 317 Motion to Withdraw as Attorney. Attorney John Austin Curry terminated. Signed by Judge Leonard Davis on 01/29/13. cc:attys 1−29−13 (mll, ) (Entered: 01/29/2013) |
| 02/01/2013 | 319 | Sealed Document. (Attachments: # 1 Affidavit Dwayne Norton, # 2 Exhibit 1, # 3 Exhibit 2)(Norton, Dwayne) (Entered: 02/01/2013) |
| 02/07/2013 | 320 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims filed by Ericsson Inc..* (Stevenson, Theodore) (Entered: 02/07/2013) |
| 02/11/2013 | 321 | Unopposed MOTION to Withdraw as Attorney *for Stacey White* by Dell, Inc.. (Attachments: # 1 Text of Proposed Order)(White, Stacey) (Entered: 02/11/2013) |
| 02/12/2013 | 322 | ORDER granting 321 Motion to Withdraw as Attorney. Attorney Stacey Garrett White terminated. Signed by Judge Leonard Davis on 02/12/13. cc:attys 2−12−13 (mll, ) (Entered: 02/12/2013) |

**A167**

| 02/13/2013 | 323 | Unopposed MOTION to Withdraw as Attorney by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 02/13/2013) |
| --- | --- | --- |
| 02/14/2013 | 324 | ORDER granting 323 Motion to Withdraw as Attorney. Attorney Bradley Wayne Caldwell terminated as counsel of record for Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson. Signed by Judge Leonard Davis on 2/14/13. (mjc, ) (Entered: 02/14/2013) |
| 02/21/2013 | 325 | NOTICE of Attorney Appearance − Pro Hac Vice by Jeremy John Taylor on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4009981. (Taylor, Jeremy) (Entered: 02/21/2013) |
| 03/01/2013 | 326 | Joint MOTION to Amend/Correct 102 Order *to Extend Close of Expert Discovery* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 03/01/2013) |
| 03/01/2013 | 327 | SEALED Letter Brief filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/01/2013) |
| 03/01/2013 | 328 | SEALED Letter Brief filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/01/2013) |
| 03/01/2013 | 329 | SEALED Letter Brief filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/01/2013) |
| 03/01/2013 | 330 | SEALED Letter Brief re Motion for Summary Judgment of Invalidity of '625 (Kemp) filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1 − Ltr Brief re MSJ of Invalidity re '625)(Jones, Michael) (Entered: 03/01/2013) |
| 03/01/2013 | 331 | SEALED Letter Brief re Motion to Strike Opinions and Testimony of John Bone filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1 − Letter Brief re Mtn to Strike John Bone)(Jones, Michael) (Entered: 03/01/2013) |
| 03/01/2013 | 332 | SEALED Letter Brief re Motion to Strike Nettles filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1 − Letter Brief re Mtn to Strike Nettles)(Jones, Michael) (Entered: 03/01/2013) |
| 03/04/2013 | 333 | ORDER granting 326 Motion to Amend/Correct Docket Control Order. The new deadline for close of expert discovery is 3−22−2013. Signed by Judge Leonard Davis on 03/04/13. cc:attys 3−04−13 (mll, ) (Entered: 03/04/2013) |
| 03/06/2013 | 334 | RESPONSE to Notice of Compliance − Letter Brief SEALED re 332 SEALED Notice of Compliance − Letter Brief, filed by D−Link Systems, Inc., Dell, Inc., Acer America Corporation, Toshiba America Information Systems, Inc., Belkin International, Inc., Toshiba Corporation, Netgear, Inc., Gateway, Inc., Intel Corporation, Acer, Inc. Filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc. *filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc.*. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/06/2013) |
| 03/06/2013 | 335 | RESPONSE to Notice of Compliance − Letter Brief SEALED re 330 SEALED Notice of Compliance − Letter Brief, filed by D−Link Systems, Inc., Dell, Inc., Acer America Corporation, Toshiba America Information Systems, Inc., Belkin International, Inc., Toshiba Corporation, Netgear, Inc., Gateway, Inc., Intel Corporation, Acer, Inc. Filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc. *filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc.*. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/06/2013) |

**A168**

| | | |
|---|---|---|
| 03/06/2013 | 336 | RESPONSE to Notice of Compliance − Letter Brief SEALED re 331 SEALED Notice of Compliance − Letter Brief, filed by D−Link Systems, Inc., Dell, Inc., Acer America Corporation, Toshiba America Information Systems, Inc., Belkin International, Inc., Toshiba Corporation, Netgear, Inc., Gateway, Inc., Intel Corporation, Acer, Inc. Filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc. *filed by Telefonaktiebolaget LM Ericsson, Ericsson Inc..* (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 03/06/2013) |
| 03/06/2013 | 337 | RESPONSE to Notice of Compliance − Letter Brief SEALED re 329 SEALED Notice of Compliance − Letter Brief filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson Filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1− Letter Brief in Response)(Yarbrough, Herbert) (Entered: 03/06/2013) |
| 03/06/2013 | 338 | SEALED Letter Brief filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1 − Responsive Letter Brief re Cabello)(Jones, Michael) (Entered: 03/06/2013) |
| 03/06/2013 | 339 | SEALED Letter Brief filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1 − Responsive Letter Brief re MPSJ re Aachen)(Jones, Michael) (Entered: 03/06/2013) |
| 03/08/2013 | 340 | Trial Witness List by Ericsson Inc.. (Stevenson, Theodore) (Entered: 03/08/2013) |
| 03/08/2013 | 341 | MEMORANDUM OPINION AND ORDER CONSTRUING CLAIM TERMS signed by Magistrate Judge Keith F. Giblin on 03/08/2013. (ksd ) (Entered: 03/08/2013) |
| 03/08/2013 | 342 | REPORT AND RECOMMENDATIONS re 224 MOTION for Summary Judgment *of Invalidity of Claim 1 of the 468 Patent and Claim 45 of the 215 Patent* filed by D−Link Systems, Inc., Dell, Inc., Acer America Corporation, Toshiba America, Inc., Toshiba Corporation, Netgear, Inc., Belkin International, Inc., Gateway, Inc., Acer, Inc. signed by Magistrate Judge Keith F. Giblin on 03/08/2013. (ksd ) (Entered: 03/08/2013) |
| 03/09/2013 | 343 | NOTICE by Intel Corporation *SERVICE OF TRIAL WITNESS LIST ON BEHALF OF ALL DEFENDANTS* (Parker, Robert) (Entered: 03/09/2013) |
| 03/14/2013 | 344 | NOTICE of Attorney Appearance by Michael Woodrow De Vries on behalf of Intel Corporation (De Vries, Michael) (Entered: 03/14/2013) |
| 03/22/2013 | 345 | RESPONSE to 341 Order *filed on behalf of Defendants* by Intel Corporation. (Parker, Robert) (Entered: 03/22/2013) |
| 03/23/2013 | 346 | NOTICE by Intel Corporation *DEFENDANTS' NOTICE OF SERVICE OF TRIAL REBUTTAL WITNESS LIST* (Parker, Robert) (Entered: 03/23/2013) |
| 03/25/2013 | 347 | RESPONSE to 341 Order *OBJECTIONS TO MAGISTRATE JUDGE GIBLIN'S MEMORANDUM OPINION AND CLAIM CONSTRUCTION ORDER filed by Ericsson Inc..* (Stevenson, Theodore) (Entered: 03/25/2013) |
| 03/25/2013 | 348 | NOTICE by Ericsson Inc. *NOTICE OF SERVICE OR REBUTTAL TRIAL WITNESS LIST* (Stevenson, Theodore) (Entered: 03/25/2013) |
| 03/25/2013 | 349 | OBJECTION to 342 Report and Recommendations by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Yarbrough, Herbert) (Entered: 03/25/2013) |
| 03/25/2013 | 350 | Joint MOTION to Amend/Correct 102 Order *DOCKET CONTROL ORDER* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 03/25/2013) |

**A169**

| 03/26/2013 | 351 | ORDER granting 350 Motion to Amend/Correct Docket Control Order. Signed by Judge Leonard Davis on 03/26/13. cc:attys 3−26−13 (mll, ) (Entered: 03/26/2013) |
|---|---|---|
| 03/26/2013 | 352 | ORDER REGARDING LETTER BRIEFS. All briefing on the underlying motions shall be completed by 5−02−2013. Parties are ORDERED to meet and confer and submit a briefing schedule within seven days. The Court hereby sets the underlying motions for hearing on 5−09−2013, at 9:30 AM. Signed by Judge Leonard Davis on 03/26/13. cc:attys 3−26−13(mll, ) (Entered: 03/26/2013) |
| 03/27/2013 | 353 | Emergency SEALED MOTION *For Leave to File Letter Brief Seeking Leave to File Motion for Summary Judgment of Non−Infringement* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A − Letter Brief, # 2 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 03/27/2013) |
| 03/27/2013 | 354 | NOTICE of Attorney Appearance − Pro Hac Vice by Dawn Sestito on behalf of Belkin International, Inc.. Filing fee $ 100, receipt number 0540−4065340. (Sestito, Dawn) (Entered: 03/27/2013) |
| 03/27/2013 | 355 | ORDER granting 353 Sealed Motion for Leave to File a Letter Brief. Ericsson shall file a responsive letter brief by 4−03−2013 at 12:00 p.m. Signed by Judge Leonard Davis on 03/27/13. cc:attys 3−27−13 (mll, ) (Entered: 03/27/2013) |
| 03/27/2013 | 356 | ORDER adopting 342 Report &Recommendations of the US Magistrate Judge; overruling defendant's objections, and denying 224 Motion for Summary Judgment. The Court also adopts 341 the Magistrate Judge's claim construction. The Court will address the parties' other objections regarding the remainder of the magistrate judge's claim construction opinion by separate order. Signed by Judge Leonard Davis on 03/27/13. cc:attys 3−27−13 (mll, ) (Entered: 03/27/2013) |
| 03/28/2013 | 357 | NOTICE by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation *of Request for Daily Transcript and Real Time Reporting* (Jones, Michael) (Entered: 03/28/2013) |
| 03/28/2013 | 358 | NOTICE by Ericsson Inc. *NOTICE OF REQUEST FOR DAILY TRANSCRIPT AND REALTIME REPORTING OF TRIAL PROCEEDINGS* (Stevenson, Theodore) (Entered: 03/28/2013) |
| 03/28/2013 | 359 | NOTICE of Attorney Appearance by Brandon M Jordan on behalf of Ericsson Inc. (Jordan, Brandon) (Entered: 03/28/2013) |
| 04/02/2013 | 360 | Joint MOTION for Entry of Amended Docket Control Order by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 04/02/2013) |
| 04/02/2013 | 361 | Opposed SEALED PATENT MOTION *(DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO* by Ericsson Inc.. (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/02/2013) |
| 04/02/2013 | 362 | SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART UNDER 35 U.S.C. SECTION 102* by Ericsson Inc.. (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3 Part 1, # 5 Exhibit 3 Part 2, # 6 Exhibit 4, # 7 Exhibit 5, # 8 Exhibit 6, # 9 Exhibit 7, # 10 Exhibit 8, # 11 Exhibit 9, # 12 Exhibit 10, # 13 Exhibit 11 Part 1, # 14 Exhibit 11 Part 2, # 15 Exhibit 12, # 16 Exhibit 13, # 17 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/02/2013) |
| 04/02/2013 | 363 | Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES* by Ericsson Inc.. (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # |

| | | |
|---|---|---|
| | | 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/02/2013) |
| 04/02/2013 | 364 | SEALED PATENT MOTION *DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES* by Intel Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Exhibit S, # 20 Text of Proposed Order)(Parker, Robert) (Entered: 04/02/2013) |
| 04/02/2013 | 365 | SEALED PATENT MOTION *DEFENDANTS MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES* by Intel Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M, # 14 Exhibit N, # 15 Exhibit O, # 16 Exhibit P, # 17 Exhibit Q, # 18 Exhibit R, # 19 Text of Proposed Order)(Parker, Robert) (Entered: 04/03/2013) |
| 04/03/2013 | | **NOTICE of Hearing on Motion.** In accordance with Docket No. 352, the following motions are set for hearing: 363 Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES,* 364 SEALED PATENT MOTION *DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES,* 362 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART UNDER 35 U.S.C. SECTION 102,* 365 SEALED PATENT MOTION *DEFENDANTS MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES,* 361 Opposed SEALED PATENT MOTION *(DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO.* **Motion Hearing set for 5/9/2013 09:30 AM before Judge Leonard Davis.** (cwk) Modified on 4/3/2013 (cwk). (Entered: 04/03/2013) |
| 04/03/2013 | 366 | AMENDED DOCKET CONTROL ORDER. Signed by Judge Leonard Davis on 04/03/13. cc:attys 4−03−13 (mll, ) (Entered: 04/03/2013) |
| 04/03/2013 | 367 | SEALED PATENT RESPONSE TO DKT. 353 by Ericsson Inc. to 355 Order on Sealed Motion *filed by Ericsson Inc.*. (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 04/03/2013) |
| 04/03/2013 | 368 | NOTICE of Attorney Appearance − Pro Hac Vice by Andrew Cheslock on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation. Filing fee $ 100, receipt number 0540−4076513. (Cheslock, Andrew) (Additional attachment(s) added on 4/3/2013: # 1 Sealed Attachement) (pkb, ). (Entered: 04/03/2013) |
| 04/04/2013 | 369 | ORDER that parties meet and confer to establish a briefing schedule regarding defts' motion for summary judgment of non−infringement. The sur−reply is due by 5−02−2013. The Court hereby sets the underlying motion for hearing (along with Docket Nos. 361 thru 365) on 5−09−2013 at 9:30 AM. Signed by Judge Leonard Davis on 04/04/13. cc:attys 4−04−13(mll, ) Modified on 4/4/2013 (mll, ). (Entered: 04/04/2013) |
| 04/05/2013 | 370 | NOTICE by Ericsson Inc. *NOTICE OF COMPLIANCE WITH THE COURT'S ORDER (DOC. NO. 369)* (Stevenson, Theodore) (Entered: 04/05/2013) |
| 04/08/2013 | 371 | SEALED MOTION *For Summary Judgment of Non−Infringement of U.S. Patent Nos. 5,987,019 and 6,466,568* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Declaration of Matan Shacham, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Text of Proposed Order)(Yarbrough, Herbert) (Entered: |

**A171**

| | | |
|---|---|---|
| | | 04/08/2013) |
| 04/09/2013 | | **NOTICE of Hearing on Motion** 371 SEALED MOTION *For Summary Judgment of Non−Infringement of U.S. Patent Nos. 5,987,019 and 6,466,568,* 301 SEALED MOTION *for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims* : **Motion Hearing set for 5/9/2013 09:30 AM before Judge Leonard Davis.** (cwk) (Entered: 04/09/2013) |
| 04/10/2013 | 372 | NOTICE of Attorney Appearance − Pro Hac Vice by Kevin Malaney on behalf of Toshiba America Information Systems, Inc., Toshiba Corporation. Filing fee $ 100, receipt number 0540−4085991. (Malaney, Kevin) (Entered: 04/10/2013) |
| 04/11/2013 | 373 | RESPONSE to 347 Response to Non−Motion *DEFENDANTS' RESPONSE TO ERICSSON'S OBJECTIONS TO MAGISTRATE JUDGE GIBLIN'S CLAIM CONSTRUCTION ORDER filed by Intel Corporation.* (Parker, Robert) (Entered: 04/11/2013) |
| 04/16/2013 | 374 | ORDER OVERRULING OBJECTIONS TO OPINION OF UNITED STATES MAGISTRATE JUDGE ON CLAIM CONSTRUCTION. Signed by Judge Leonard Davis on 04/16/13. (mll, ) (Entered: 04/16/2013) |
| 04/16/2013 | 375 | NOTICE of Attorney Appearance − Pro Hac Vice by Bryan C Mulder on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4094636. (Mulder, Bryan) (Entered: 04/16/2013) |
| 04/16/2013 | 376 | NOTICE of Attorney Appearance − Pro Hac Vice by Stephanie P Koh on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4094654. (Koh, Stephanie) (Entered: 04/16/2013) |
| 04/16/2013 | 377 | NOTICE of Attorney Appearance − Pro Hac Vice by Thomas D Rein on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4094744. (Rein, Thomas) (Entered: 04/16/2013) |
| 04/17/2013 | 378 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 364 SEALED PATENT MOTION *DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES filed by Ericsson Inc..* (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/17/2013) |
| 04/17/2013 | 379 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 365 SEALED PATENT MOTION *DEFENDANTS MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES filed by Ericsson Inc..* (Attachments: # 1 Declaration of Ashley N. Moore, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/17/2013) |
| 04/17/2013 | 380 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 371 SEALED MOTION *For Summary Judgment of Non−Infringement of U.S. Patent Nos. 5,987,019 and 6,466,568 filed by Ericsson Inc..* (Attachments: # 1 Declaration of Brandon Jordan, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Text of Proposed Order)(Stevenson, Theodore) (Entered: 04/17/2013) |
| 04/17/2013 | 381 | SEALED RESPONSE to Motion re 363 Opposed SEALED PATENT MOTION *TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES* filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Declaration of Seth Herring, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W, # 25 Exhibit X, # 26 Exhibit Y, # 27 Exhibit Z, # 28 Text of Proposed Order)(Yarbrough, Herbert) (Entered: 04/17/2013) |

**A172**

| | | |
|---|---|---|
| 04/17/2013 | 382 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 361 Opposed SEALED PATENT MOTION DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO Opposed SEALED PATENT MOTION DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO filed by Intel Corporation on behalf of Defendants. (Attachments: # 1 Affidavit Dec. of Tim Majors, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Text of Proposed Order)(Parker, Robert) (Entered: 04/17/2013) |
| 04/17/2013 | 383 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 362 SEALED PATENT MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART UNDER 35 U.S.C. SECTION 102 filed by Intel Corporation on behalf of Defendants. (Attachments: # 1 Affidavit Declaration for Piepmeier, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Text of Proposed Order)(Parker, Robert) (Entered: 04/18/2013) |
| 04/19/2013 | 384 | NOTICE by Intel Corporation DEFENDANTS' NOTICE OF COMPLIANCE REGARDING TRIAL EXHIBIT LIST AND DEPOSITION DESIGNATIONS (Parker, Robert) (Entered: 04/19/2013) |
| 04/22/2013 | 385 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson NOTICE OF COMPLIANCE REGARDING TRIAL EXHIBIT LIST AND DEPOSITION DESIGNATIONS (Stevenson, Theodore) (Entered: 04/22/2013) |
| 04/24/2013 | 386 | NOTICE of Attorney Appearance by Allen Franklin Gardner on behalf of Intel Corporation (Gardner, Allen) (Entered: 04/24/2013) |
| 04/24/2013 | 387 | SEALED PATENT REPLY to Response to PATENT Motion re 362 SEALED PATENT MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART UNDER 35 U.S.C. SECTION 102 filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit A)(Stevenson, Theodore) (Entered: 04/24/2013) |
| 04/24/2013 | 388 | SEALED PATENT REPLY to Response to PATENT Motion re 363 Opposed SEALED PATENT MOTION TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Declaration of Justin Nemunaitis, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5)(Stevenson, Theodore) (Entered: 04/24/2013) |
| 04/24/2013 | 389 | SEALED PATENT REPLY to Response to PATENT Motion re 361 Opposed SEALED PATENT MOTION (DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLOOpposed SEALED PATENT MOTION (DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Declaration of Brandon Jordan, # 2 Exhibit 3, # 3 Exhibit 4)(Stevenson, Theodore) (Entered: 04/24/2013) |
| 04/24/2013 | 390 | SEALED REPLY to Response to Motion re 371 SEALED MOTION For Summary Judgment of Non−Infringement of U.S. Patent Nos. 5,987,019 and 6,466,568 filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Declaration of Eugene Paige, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E)(Yarbrough, Herbert) (Entered: 04/24/2013) |
| 04/24/2013 | 391 | SEALED PATENT REPLY to Response to PATENT Motion re 365 SEALED PATENT MOTION DEFENDANTS' MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES filed by Intel Corporation ON BEHALF OF DEFENDANTS. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Parker, Robert) (Entered: 04/24/2013) |
| 04/24/2013 | 392 | Opposed SEALED PATENT MOTION DEFENDANTS' MOTION TO STRIKE DR. NETTLES UNTIMELY SUPPLEMENTAL EXPERT REPORT by Intel Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Parker, Robert) (Entered: 04/24/2013) |

**A173**

| 04/24/2013 | 393 | SEALED PATENT REPLY to Response to PATENT Motion re 364 SEALED PATENT MOTION DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES filed by Intel Corporation on behalf of Defendants. (Attachments: # 1 Affidavit Majors Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G)(Parker, Robert) (Entered: 04/24/2013) |
|---|---|---|
| 05/01/2013 | 394 | Agreed MOTION to Amend/Correct 102 Order MOTION TO AMEND THE DOCKET CONTROL ORDER by Intel Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 05/01/2013) |
| 05/02/2013 | 395 | ORDER granting 394 Motion to Amend/Correct Docket Control Order. Signed by Judge Leonard Davis on 05/02/13. (mll, ) (Entered: 05/02/2013) |
| 05/02/2013 | 396 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 365 SEALED PATENT MOTION DEFENDANTS MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 05/02/2013) |
| 05/02/2013 | 397 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 371 SEALED MOTION For Summary Judgment of Non−Infringement of U.S. Patent Nos. 5,987,019 and 6,466,568 filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Declaration of Brandon Jordan, # 2 Exhibit 1)(Stevenson, Theodore) (Entered: 05/02/2013) |
| 05/02/2013 | 398 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 364 SEALED PATENT MOTION DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 05/02/2013) |
| 05/02/2013 | 399 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 363 Opposed SEALED PATENT MOTION TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Declaration of Seth Herring, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3)(Yarbrough, Herbert) (Entered: 05/02/2013) |
| 05/02/2013 | 400 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 361 Opposed SEALED PATENT MOTION DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO filed by Intel Corporation on behalf of Defendants. (Attachments: # 1 Affidavit Tim Majors Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C)(Parker, Robert) (Entered: 05/02/2013) |
| 05/02/2013 | 401 | SUR−REPLY to Reply to Response to Motion re 362 SEALED PATENT MOTION FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART UNDER 35 U.S.C. SECTION 102 FILED ON BEHALF OF DEFENDANTS filed by Intel Corporation. (Parker, Robert) (Entered: 05/02/2013) |
| 05/03/2013 | 402 | SEALED PATENT MOTION DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE CERTAIN CLAWED BACK DOCUMENTS by Intel Corporation. (Attachments: # 1 Affidavit DeVries Declaration, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Text of Proposed Order)(Parker, Robert) (Entered: 05/03/2013) |
| 05/03/2013 | 403 | SEALED PATENT DOCUMENT − DEFENDANTS' IDENTIFICATION OF PRIOR ART PURSUANT TO 35 U.S.C. § 282 (Parker, Robert) (Entered: 05/03/2013) |
| 05/06/2013 | 404 | DEMAND for Trial by Jury by Intel Corporation. (Jones, Michael) (Entered: 05/06/2013) |

**A174**

| 05/06/2013 | 405 | DEMAND for Trial by Jury by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 05/06/2013) |
|---|---|---|
| 05/06/2013 | 406 | DEMAND for Trial by Jury by Acer America Corporation, Acer, Inc., Gateway, Inc.. (Yarbrough, Herbert) (Entered: 05/06/2013) |
| 05/06/2013 | 407 | DEMAND for Trial by Jury by D−Link Systems, Inc.. (Yarbrough, Herbert) (Entered: 05/06/2013) |
| 05/06/2013 | 408 | DEMAND for Trial by Jury by Netgear, Inc.. (Yarbrough, Herbert) (Entered: 05/06/2013) |
| 05/06/2013 | 409 | DEMAND for Trial by Jury by Dell, Inc.. (Norton, Dwayne) (Entered: 05/06/2013) |
| 05/06/2013 | 410 | DEMAND for Trial by Jury by Belkin International, Inc.. (Murray, J) (Entered: 05/06/2013) |
| 05/07/2013 | 411 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 392 Opposed SEALED PATENT MOTION *DEFENDANTS' MOTION TO STRIKE DR. NETTLES UNTIMELY SUPPLEMENTAL EXPERT REPORT filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: # 1 Exhibit A, # 2 Exhibit 1, # 3 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/07/2013) |
| 05/08/2013 | 412 | Agreed MOTION to Amend/Correct 366 Order on Motion for Miscellaneous Relief by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/08/2013) |
| 05/09/2013 | 413 | Joint MOTION FILED BY THE PARTIES TO EXCEED LIMITS ON TRIAL EXHIBIT LISTS by Intel Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 05/09/2013) |
| 05/09/2013 | 414 | ORDER granting 412 Motion to Amend/Correct. Joint proposed Jury Instructions due by May 15, 2013. Signed by Judge Leonard Davis on 5/9/2013. (gsg) (Entered: 05/09/2013) |
| 05/09/2013 | 415 | ORDER granting 301 Sealed Motion for Leave to File; denying 362 Sealed Patent Motion for Partial Summary Judgment; denying 363 Sealed Patent Motion to Strike Expert Testimony; denying 365 Sealed Patent Motion to Exclude; denying 371 Sealed Motion for Summary Judgment; denying 392 Sealed Patent Motion to Strike Expert Testimony. The Court will hear further argument regarding Motion 361 at the pre−trial hearing on May 23, 2013. Signed by Judge Leonard Davis on 5/9/2013. (gsg) (Entered: 05/09/2013) |
| 05/09/2013 | 416 | Proposed Findings of Fact by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Parker, Robert) (Entered: 05/09/2013) |
| 05/09/2013 | 417 | Proposed Pretrial Order by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Parker, Robert) (Entered: 05/09/2013) |
| 05/09/2013 | 420 | Minute Entry for proceedings held before Judge Leonard Davis: **Motion Hearing held on 5/9/2013** re 363 MOTION TO EXCLUDE EXPERT TESTIMONY RELATING TO UNDISCLOSED NON−INFRINGING ALTERNATIVES filed by Ericsson Inc.; 364 DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES filed by Intel Corporation; 362 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT THAT CERTAIN REFERENCES ARE NOT PRIOR ART filed by Ericsson Inc; 392 DEFENDANTS' MOTION TO STRIKE DR. NETTLES UNTIMELY SUPPLEMENTAL EXPERT REPORT* filed by Intel Corporation; 365 DEFENDANTS MOTION TO STRIKE PORTIONS OF THE EXPERT REPORT OF DR. SCOTT NETTLES filed by Intel Corporation; 371 SEALED MOTION *For Summary Judgment of Non−Infringement filed by D−Link* |

**A175**

| | | |
|---|---|---|
| | | *Systems, Inc., Dell, Inc., Acer America Corporation, Toshiba America Information Systems, Inc., Belkin International, Inc., Toshiba Corporation, Netgear, Inc., Gateway, Inc., Intel Corporation, Acer, Inc.;* 301 *SEALED MOTION for Leave to File Dell's Second Amended Answer, Defenses and Counterclaims filed by Dell, Inc.;* 361 *MOTION (DAUBERT) TO STRIKE THE EXPERT REPORT AND EXCLUDE THE TESTIMONY OF DAVID CABELLO filed by Ericsson Inc. (Court Reporter Shea Sloan) (Attachments: #1 Attorney Sign In Sheets) (rlf) (Entered: 05/10/2013)* |
| 05/10/2013 | 418 | NOTICE of Attorney Appearance − Pro Hac Vice by Oliver Bennett on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4132799. (Bennett, Oliver) (Entered: 05/10/2013) |
| 05/10/2013 | 419 | Sealed Document_ Dell's Second Amended Answer and Counterclaims to Ericsson's First Amended Complaint. (Newton, Michael) (Entered: 05/10/2013) |
| 05/13/2013 | 421 | ORDER granting 413 Motion to Exceed Limits on Trial Exhibit Lists. Signed by Judge Leonard Davis on 05/13/13. (mll, ) (Entered: 05/13/2013) |
| 05/13/2013 | 422 | NOTICE of Attorney Appearance − Pro Hac Vice by Sarah Forney on behalf of Intel Corporation. Filing fee $ 100, receipt number 0540−4135996. (Forney, Sarah) (Entered: 05/13/2013) |
| 05/13/2013 | 423 | NOTICE of Attorney Appearance by John Bruce Campbell, Jr on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Campbell, John) (Entered: 05/13/2013) |
| 05/13/2013 | 424 | NOTICE of Attorney Appearance − Pro Hac Vice by Corey A Johanningmeier on behalf of Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. Filing fee $ 100, receipt number 0540−4136714. (Johanningmeier, Corey) (Entered: 05/13/2013) |
| 05/13/2013 | 425 | MOTION in Limine by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/13/2013) |
| 05/13/2013 | 426 | Joint MOTION in Limine by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/13/2013) |
| 05/13/2013 | 427 | Opposed SEALED PATENT MOTION *DEFENDANTS' MOTIONS IN LIMINE* by Intel Corporation. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Text of Proposed Order)(Parker, Robert) (Entered: 05/13/2013) |
| 05/13/2013 | 428 | Unopposed MOTION for Leave to File *PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/13/2013) |
| 05/13/2013 | 429 | Proposed Findings of Fact by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 05/13/2013) |
| 05/14/2013 | 430 | ORDER granting 428 Motion for Leave to File Proposed Findings of Fact and Conclusions of Law. Signed by Judge Leonard Davis on 05/14/13. (mll, ) (Entered: 05/14/2013) |
| 05/14/2013 | 431 | SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT AND/OR TO EXCLUDE DEFENDANT DELL'S LICENSE DEFENSES* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Exhibit A, #2 Exhibit 1, #3 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/14/2013) |
| 05/15/2013 | 432 | Joint MOTION to Amend/Correct 414 Order on Motion to Amend/Correct by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/15/2013) |
| 05/17/2013 | 433 | NOTICE of Attorney Appearance by Shannon Marie Dacus on behalf of Dell, Inc. (Dacus, Shannon) (Entered: 05/17/2013) |

**A176**

| 05/17/2013 | 434 | NOTICE of Attorney Appearance by Travis Edward DeArman on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (DeArman, Travis) (Entered: 05/17/2013) |
|---|---|---|
| 05/17/2013 | 435 | NOTICE of Attorney Appearance by Ada Elene Brown on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Brown, Ada) (Entered: 05/17/2013) |
| 05/20/2013 | 436 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson *PLAINTIFFS' REQUESTED TIME FOR JURY SELECTION AND TRIAL* (Stevenson, Theodore) (Entered: 05/20/2013) |
| 05/20/2013 | 437 | NOTICE by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation *Requested Time for Jury Selection and Trial* (Parker, Robert) (Entered: 05/20/2013) |
| 05/20/2013 | 438 | Proposed Jury Instructions by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C)(Stevenson, Theodore) (Entered: 05/20/2013) |
| 05/20/2013 | 439 | SEALED PATENT RESPONSE to PLAINTIFFS' MOTION IN LIMINE − DKT. 425 filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H)(Parker, Robert) (Additional attachment(s) added on 5/23/2013: #9 Text of Proposed Order) (gsg, ). (Entered: 05/20/2013) |
| 05/20/2013 | 440 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 402 SEALED PATENT MOTION *DEFENDANTS' MOTION TO COMPEL PLAINTIFFS TO PRODUCE CERTAIN CLAWED BACK DOCUMENTS filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: #1 Declaration of Ada Brown, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/20/2013) |
| 05/20/2013 | 441 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 427 Opposed SEALED PATENT MOTION *DEFENDANTS' MOTIONS IN LIMINE filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson*. (Attachments: #1 Declaration of Brandon Jordan, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Exhibit D, #6 Exhibit E, #7 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/20/2013) |
| 05/21/2013 | 442 | ORDER granting 432 Motion to Amend/Correct. Joint proposed jury instructions due May 20, 2013. Signed by Judge Leonard Davis on 5/21/2013. (gsg) (Entered: 05/21/2013) |
| 05/21/2013 | 443 | MEMORANDUM OPINION AND ORDER denying 364 SEALED PATENT MOTION *DEFENDANTS DAUBERT MOTION TO EXCLUDE THE OPINIONS OF MR. JOHN R. BONE REGARDING ISSUES RELATED TO DAMAGES* filed by Intel Corporation. Signed by Judge Leonard Davis on 5/20/13. (mjc, ) (Entered: 05/21/2013) |
| 05/21/2013 | 444 | SEALED RESPONSE to Motion re 431 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT AND/OR TO EXCLUDE DEFENDANT DELL'S LICENSE DEFENSES* filed by Dell, Inc.. (Attachments: #1 Exhibit A − Hanson Decl w att, #2 Exhibit B − Alfalahi, Kasim 2013−01−29 depo excerpt, #3 Exhibit C − Iwerback, Andrea 2012−12−11 depo excerpts, #4 Exhibit D − Brismark, Lars Gustav 2012−09−09 depo excerpts, #5 Exhibit E − Johns, Anna 2013−01−25 depo excerpts, #6 Exhibit F − 2013−04−03 Ericsson Supp Privilege Log, #7 Text of Proposed Order)(Newton, Michael) (Entered: 05/21/2013) |
| 05/22/2013 | 445 | Joint MOTION Concerning Juror Questionnaire by Intel Corporation. (Attachments: #1 Exhibit A − Juror Questionnaire, #2 Text of Proposed Order)(Bufe, John) (Entered: 05/22/2013) |
| 05/22/2013 | 446 | SEALED PATENT REPLY to Response to PATENT Motion re 431 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT AND/OR TO* |

A177

| | | |
|---|---|---|
| | | *EXCLUDE DEFENDANT DELL'S LICENSE DEFENSES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: #1 DECLARATION OF TRAVIS DeARMAN, #2 Exhibit A, #3 Exhibit B, #4 Exhibit C, #5 Exhibit D, #6 Exhibit E, #7 Exhibit F)(Stevenson, Theodore) (Entered: 05/22/2013) |
| 05/22/2013 | 447 | Unopposed MOTION TO EXCEED LIMIT ON DEPOSITION DESIGNATIONS by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Text of Proposed Order)(Parker, Robert) (Entered: 05/22/2013) |
| 05/22/2013 | 448 | Opposed SEALED PATENT MOTION *FOR CONFIRMATION OF COURT'S CLAIM CONSTRUCTION* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Text of Proposed Order)(Parker, Robert) (Entered: 05/22/2013) |
| 05/22/2013 | 449 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson re 441 Sealed Patent Response to Sealed Patent Motion, *NOTICE OF SUPPLEMENTAL AUTHORITY SUPPORTING ERICSSON'S RESPONSE TO DEFENDANTS' MOTION IN LIMINE* (Stevenson, Theodore) (Entered: 05/22/2013) |
| 05/22/2013 | 450 | NOTICE of Attorney Appearance by Kathy H Li on behalf of Ericsson Inc., Telefonaktiebolaget LM Ericsson (Li, Kathy) (Entered: 05/22/2013) |
| 05/22/2013 | 451 | Proposed Pretrial Order *(Amended)* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C, #4 Exhibit D, #5 Exhibit E, #6 Exhibit F, #7 Exhibit G, #8 Exhibit H, #9 Exhibit I, #10 Exhibit J)(Stevenson, Theodore) (Entered: 05/22/2013) |
| 05/23/2013 | 452 | Joint MOTION to Dismiss by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #1 Text of Proposed Order)(Parker, Robert) (Entered: 05/23/2013) |
| 05/23/2013 | 453 | SEALED SUR−REPLY to Response to Motion re 431 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT AND/OR TO EXCLUDE DEFENDANT DELL'S LICENSE DEFENSES* filed by Dell, Inc.. (Attachments: #1 Exhibit 1 Brismark Depo Excerpts, #2 Exhibit 2 DELLERIC3362282−83 and DELLERIC3362291−95, #3 Exhibit 3 signed MPA DELLERIC3362271−74, #4 Exhibit 4 Who owns IP Sweden)(Newton, Michael) (Entered: 05/23/2013) |
| 05/23/2013 | 459 | Minute Entry for proceedings held before Judge Leonard Davis: Final Pretrial Conference held on 5/23/2013. (Court Reporter Shelly Holmes.) (Attachments: #1 Sign In Sheets) (cwk) (Entered: 05/24/2013) |
| 05/24/2013 | 454 | ORDER granting in part and denying in part 361 Sealed Patent Motion to Strike David Cabello; granting in part and denying in part 402 Sealed Patent Motion to Compel; granting in part and denying in part 425 Motion in Limine; granting 426 Motion in Limine; granting in part and denying in part 427 Sealed Patent Motion in Limine; granting 431 Sealed Patent Motion for Partial Summary Judgment. Signed by Judge Leonard Davis on 05/24/13. (mll, ) (Entered: 05/24/2013) |
| 05/24/2013 | 455 | ORDER granting 445 Motion Concerning Juror Questionnaire. Signed by Judge Leonard Davis on 05/24/13. (mll, ) (Entered: 05/24/2013) |
| 05/24/2013 | 456 | ORDER granting 447 Motion to Exceed Limit on Deposition Designations. Signed by Judge Leonard Davis on 05/24/13. (mll, ) (Entered: 05/24/2013) |
| 05/24/2013 | 457 | ORDER AND PARTIAL JUDGMENT OF DISMISSAL WITH PREJUDICE. Motion to Dismiss 452 is GRANTED. Plaintiffs' claims against Defendants and Intel for infringement of U.S. Patent No. 5,790,516 are dismissed WITH PREJUDICE. Intel's claims and Defendants' counterclaims for a declaratory judgment of non−infringement are dismissed WITH PREJUDICE. Intel's claims and Defendants' counterclaims for declaratory judgment of invalidity are dismissed WITHOUT PREJUDICE. Signed by Judge Leonard Davis on 05/24/13. (mll, ) |

**A178**

| | | (Entered: 05/24/2013) |
|---|---|---|
| 05/24/2013 | 458 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings held on 5/23/13 (Pre−Trial Hearing) before Judge Leonard Davis. Court Reporter/Transcriber: Shelly Holmes, CSR,Telephone number: (903) 663−5082 (shellyholmes@skynetcountry.com). <P>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov<P>** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/17/2013. Redacted Transcript Deadline set for 6/27/2013. Release of Transcript Restriction set for 8/26/2013. (sholmes, ) (Entered: 05/24/2013) |
| 05/27/2013 | 460 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 448 Opposed SEALED PATENT MOTION *FOR CONFIRMATION OF COURT'S CLAIM CONSTRUCTION filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: # 1 Exhibit 1, # 2 Text of Proposed Order)(Stevenson, Theodore) (Entered: 05/27/2013) |
| 05/28/2013 | 461 | NOTICE by Ericsson Inc., Telefonaktiebolaget LM Ericsson *NOTICE OF COMPLIANCE WITH COURT'S CLAIM REDUCTION ORDER* (Stevenson, Theodore) (Entered: 05/28/2013) |
| 05/28/2013 | 462 | SEALED PATENT REPLY to Response to PATENT Motion re 448 Opposed SEALED PATENT MOTION FOR CONFIRMATION OF COURT'S CLAIM CONSTRUCTION filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Parker, Robert) (Entered: 05/28/2013) |
| 05/28/2013 | 463 | SEALED PATENT DOCUMENT. PLAINTIFFS' REPLY TO DELL'S SECOND AMENDED COUNTERCLAIMS (DKT. #419) (Stevenson, Theodore) (Entered: 05/28/2013) |
| 05/29/2013 | 464 | NOTICE by Ericsson Inc. *PLAINTIFFS' REVISED REQUESTED TIME FOR JURY SELECTION AND TRIAL* (Stevenson, Theodore) (Entered: 05/29/2013) |
| 05/29/2013 | 465 | NOTICE by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation *Revised Request for Time For Jury Selection and Trial* (Yarbrough, Herbert) (Entered: 05/29/2013) |
| 05/29/2013 | 466 | Unopposed MOTION to Withdraw 448 Opposed SEALED PATENT MOTION *FOR CONFIRMATION OF COURT'S CLAIM CONSTRUCTION* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 05/29/2013) |
| 05/30/2013 | 467 | ORDER REGARDING TRIAL TIMES. Signed by Judge Leonard Davis on 05/30/13. (mll, ) (Entered: 05/30/2013) |
| 05/30/2013 | 468 | ORDER granting 466 Motion to Withdraw; withdrawing 448 Sealed Patent Motion for Confirmation of Court's Claim Construction. Signed by Judge Leonard Davis on 05/30/13. (mll, ) (Entered: 05/30/2013) |
| 05/31/2013 | 469 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Motion Hearing Proceedings held on 5/9/13 before Chief Judge Leonard Davis. Court Reporter: Shea Sloan, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely** |

**A179**

| | | |
|---|---|---|
| | | **electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 6/24/2013. Redacted Transcript Deadline set for 7/4/2013. Release of Transcript Restriction set for 9/2/2013. (sms, ) (Entered: 05/31/2013) |
| 05/31/2013 | 470 | NOTICE by Ericsson Inc. *SUPPLEMENTAL NOTICE OF COMPLIANCE WITH THE COURT'S CLAIM REDUCTION ORDER* (Stevenson, Theodore) (Entered: 05/31/2013) |
| 06/02/2013 | 471 | **\*\*\*FILED IN ERROR PER ATTORNEY. SEE ENTRY 472 FOR CORRECTED FILING.\*\*\*** STIPULATION *re Product Units* by Toshiba America Information Systems, Inc., Toshiba Corporation. (Harrison, Guy) Modified on 6/3/2013 (gsg). (Entered: 06/02/2013) |
| 06/02/2013 | 472 | Sealed Document. Sealed Stipulation Regard Accused Product Units by Toshiba (Harrison, Guy) Modified on 6/3/2013 (sm, ). (Entered: 06/02/2013) |
| 06/02/2013 | 473 | SEALED PATENT DOCUMENT. STIPULATION REGARDING ACCUSED PRODUCT UNITS OF DELL, INC. (Stevenson, Theodore) (Entered: 06/02/2013) |
| 06/02/2013 | 474 | SEALED PATENT DOCUMENT. STIPULATION REGARDING NOTICE DATES (Stevenson, Theodore) (Entered: 06/02/2013) |
| 06/03/2013 | 475 | Proposed JOINT Jury Instructions by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E)(Stevenson, Theodore) (Entered: 06/03/2013) |
| 06/03/2013 | 476 | Unopposed MOTION Motion to Approve Translator by Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Exhibit A Translator Resume, # 2 Text of Proposed Order)(Harrison, Guy) (Entered: 06/03/2013) |
| 06/03/2013 | 482 | Minute Entry for proceedings held before Judge Leonard Davis: **Jury Selection held on 6/3/2013; Jury Trial (Day 1) held on 6/3/2013.** (Court Reporter Shea Sloan &Judy Werlinger) (Attachments: # 1 Attorney Sign In Sheets) (rlf) (Main Document 482 replaced on 6/5/2013 to make correction) (rlf). (Entered: 06/04/2013) |
| 06/03/2013 | 483 | Sealed Document. Juror Questionnaires. (rlf) (Entered: 06/04/2013) |
| 06/04/2013 | 477 | SEALED PATENT DOCUMENT. STIPULATION REGARDING ACCUSED PRODUCT UNITS OF BELKIN INTERNATIONAL, INC. (Stevenson, Theodore) (Entered: 06/04/2013) |
| 06/04/2013 | 478 | Additional Attachments to Main Document: 477 Sealed Patent Document.. (Attachments: # 1 Authorization to File Under Seal)(Stevenson, Theodore) (Entered: 06/04/2013) |
| 06/04/2013 | 479 | SEALED PATENT DOCUMENT.STIPULATION REGARDING ACCUSED PRODUCT UNITS OF NETGEAR, INC.(Stevenson, Theodore) (Entered: 06/04/2013) |
| 06/04/2013 | 480 | SEALED PATENT DOCUMENT. STIPULATION REGARDING ACCUSED PRODUCT UNITS OF ACER, INC., ACER AMERICA CORPORATION, GATEWAY, INC. (Stevenson, Theodore) (Entered: 06/04/2013) |
| 06/04/2013 | 481 | SEALED PATENT DOCUMENT.STIPULATION REGARDING ACCUSED PRODUCT UNITS OF D−LINK SYSTEMS, INC. (Stevenson, Theodore) (Entered: 06/04/2013) |
| 06/04/2013 | 484 | ORDER granting 476 Motion for Approval of Interpreter. Jared Taylor is approved as an interpreter and translator for Japanese witnesses for the trial in this matter and Toshiba shall bear all costs associated with translation. Signed by Judge Leonard Davis on 6/4/13. (mjc, ) (Entered: 06/04/2013) |

**A180**

| 06/04/2013 | 485 | Minute Entry for proceedings held before Judge Leonard Davis **Jury Trial held on 6/4/2013 (Day 2).** (Court Reporter Shea Sloan &Judy Werlinger) (rlf) (Entered: 06/05/2013) |
|---|---|---|
| 06/05/2013 | 486 | Minute Entry for proceedings held before Judge Leonard Davis **Jury Trial (Day 3) held on 6/5/2013.** (Court Reporter Shea Sloan &Judy Werlinger) (rlf) (Entered: 06/06/2013) |
| 06/06/2013 | 487 | Minute Entry for proceedings held before Judge Leonard Davis **Jury Trial (Day 4) held on 6/6/2013.** (Court Reporter Shea Sloan &Judy Werlinger) (rlf) (Entered: 06/06/2013) |
| 06/06/2013 | 488 | MOTION for Judgment as a Matter of Law *on Non−Infringement* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/06/2013) |
| 06/06/2013 | 489 | SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/06/2013) |
| 06/10/2013 | 495 | Minute Entry for proceedings held before Judge Leonard Davis: **Jury Trial (Day 5) held on 6/10/2013.** (Court Reporter Shea Sloan &Judy Werlinger.) (rlf) (Entered: 06/11/2013) |
| 06/11/2013 | 490 | MOTION for Judgment as a Matter of Law by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/11/2013) |
| 06/11/2013 | 491 | MOTION for Judgment as a Matter of Law *Renewed Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law in Favor of Defendants (Non−Infringement)* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/11/2013) |
| 06/11/2013 | 492 | MOTION for Judgment as a Matter of Law *Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law in Favor of Defendants (Willfulness)* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/11/2013) |
| 06/11/2013 | 493 | MOTION for Judgment as a Matter of Law *Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law in Favor of Defendants (Invalidity of the '435 and '625 Patents)* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/11/2013) |
| 06/11/2013 | 494 | SEALED PATENT MOTION *Renewed Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law in Favor of Defendants (Damages)* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/11/2013) |
| 06/11/2013 | 496 | Minute Entry for proceedings held before Judge Leonard Davis: **Jury Trial (Day 6) held on 6/11/2013.** (Court Reporter Shea Sloan &Judy Werlinger.) (rlf) (Entered: 06/11/2013) |
| 06/11/2013 | 497 | TRIAL BRIEF *DEFENDANTS' BENCH MEMORANDUM IN OPPOSITION TO ERICSSON'S PROPOSED FINAL JURY INSTRUCTION NO. 33* by Acer America |

**A181**

| | | |
|---|---|---|
| | | Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A)(Parker, Robert) (Entered: 06/11/2013) |
| 06/12/2013 | 498 | TRIAL BRIEF *PROFFER IN SUPPORT OF INCLUSION OF AN INSTRUCTION ON INDUCEMENT IN THE FINAL JURY CHARGE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Stevenson, Theodore) (Entered: 06/12/2013) |
| 06/12/2013 | 500 | Minute Entry for proceedings held before Judge Leonard Davis: **Jury Trial (Day 7) held on 6/12/2013.** (Court Reporter Shea Sloan &Judy Werlinger.) (rlf) (Entered: 06/13/2013) |
| 06/12/2013 | 504 | Jury Instructions. (rlf) (Entered: 06/13/2013) |
| 06/12/2013 | 512 | Minute Entry for proceedings held before Judge Leonard Davis: SEALED Conference held on 6/12/2013. (Court Reporter Shea Sloan &Judy Werlinger.) (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 499 | Unopposed MOTION to Withdraw as Attorney *Brian Mulder, Stephanie Koh, and Thomas Rein* by Intel Corporation. (Attachments: # 1 Text of Proposed Order)(Jones, Michael) (Entered: 06/13/2013) |
| 06/13/2013 | 501 | MOTION for Judgment as a Matter of Law *Federal Rule of Civil Procedure 50(a) Motion for Judgment as a Matter of Law in Favor of Defendants (Willfulness)* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/13/2013) |
| 06/13/2013 | 502 | RESPONSE in Opposition re 490 MOTION for Judgment as a Matter of Law *filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation.* (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/13/2013) |
| 06/13/2013 | 503 | Minute Entry for proceedings held before Judge Leonard Davis: **Jury Trial (Day 8) completed on 6/13/2013.** (Court Reporter Shea Sloan &Judy Werlinger.) (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 505 | Jury Instructions (On Willfulness). (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 506 | SEALED Jury Questions to Witnesses.(rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 507 | SEALED Jury Notes. (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 508 | **JURY VERDICT (INFRINGEMENT AND VALIDITY).** (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 509 | Sealed Document. VERDICT FORM (Infringement and Validity). (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 510 | **JURY VERDICT (WILLFULNESS).** (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 511 | Sealed Document. Verdict (Willfullness). (rlf) (Entered: 06/13/2013) |
| 06/13/2013 | 513 | NOTICE OF RESPONSE re 287 Order on Motion for Issuance of Letters Rogatory (Attachments: (1) Letter Rogatory and Attachments, (2) Letter Rogatory −− Translation)(mll, ) (Entered: 06/14/2013) |
| 06/17/2013 | 514 | ORDER REGARDING POST−TRIAL BRIEFING. Signed by Judge Leonard Davis on 06/17/13. (mll, ) (Entered: 06/17/2013) |
| 06/17/2013 | 515 | **PLAINTIFFS' Exhibit Lists for Exhibits Admitted at Trial 6.3.2013 − 6.13.2013.** MAIN DOCUMENT IS Plaintiff's Exhibit List 1 (Plaintiffs' Pre−Admitted Ehibit List for June 3, 2013.) # 1 Plaintiffs' Exhibit List 2 (Plaintiffs' Pre−Admitted Exhibit List for June 4, 2013), # 2 Plaintiffs' Exhibit List 3 (Plaintiffs' Pre−Admitted Exhibit List for June 5, 2013), # 3 Plaintiffs' Exhibit List 4 |

**A182**

| | | |
|---|---|---|
| | | (Plaintiffs' Pre−Admitted Exhibit List for June 6, 2013), #_4_ Plaintiffs' Exhibit List 5 (Plaintiffs' Pre−Admitted Exhibit List for June 10, 2013), #_5_ Plaintiffs' Exhibit List 6 (Plaintiffs' Pre−Admitted Exhibit List for June 11, 2013), #_6_ Plaintiffs' Exhibit List 7 (Plaintiffs' Pre−Admitted Exhibit List for the June 12, 2013 BENCH TRIAL), #_7_ Plaintiffs' Exhibit List 8 (Plaintiff Ericsson's FINAL ADMITTED TRIAL EXHBIT LIST), #_8_ Plaintiffs' Exhibit List 9 (Plaintiff Ericsson's DEMONSTRATIVE EVIDENCE TRIAL EXHIBIT LIST), #_9_ Plaintiffs' Exhibit List 10 (Plaintiffs' Amended Admitted Exhibit List for the June 12, 2013 BENCH TRIAL)(rlf) (Entered: 06/17/2013) |
| 06/17/2013 | 516 | **Defendants' Exhibit Lists for Exhibits Admitted at Trial 6.3.2013 − 6.13.2013.** MAIN DOCUMENT is Defendants' Exhibit List 1 (Defendants' List of Pre−Admitted Exhibit List for June 3, 2013). #_1_ Defendants' Exhibit List 2 (Defendants' List of Pre−Admitted Exhibits for June 4, 2013), #_2_ Defendants' Exhibit List 3(Defendants' List of Pre−Admitted Exhibits for June 5, 2013), #_3_ Defendants' Exhibit List 4 (Defendants' List of Pre−Admitted Exhibits for June 6, 2013), #_4_ Defendants' Exhibit List 5(Defendants' List of Pre−Admitted Exhibits for June 10, 2013), #_5_ Defendants' Exhibit List 6 (Defendants' Supplemental List of Pre−Admitted Exhibits for June 11, 2013), #_6_ Defendants' Exhibit List 7 (Defendants' List of Pre−Admitted Exhibits for June 12, 2013 BENCH TRIAL), #_7_ Defendants' Exhibit List 8 (Defendants' Admitted Trial Exhibit List), #_8_ Defendants' Exhibit List 9 (Defendants' List of Admitted Demonstrative Exhibits), #_9_ Defendants' Exhibit List 10 (Defendants' List of Admitted Demonstrative Exhibits − June 12, 2013 BENCH TRIAL), #_10_ Defendants' Exhibit List 11 (Defendants' Trial Exhibit List − June 12, 2013 BENCH TRIAL −in addition to all exhibits admitted for Jury Trial), #_11_ Defendants' Exhibit List 12 (Defendants' List of Pre−Admitted Exhibits for June 13, 2013 WILLFULNESS TRIAL), #_12_ Defendants' Exhibit List 13 (Defendants' Supplemental WILLFULNESS TRIAL Exhibit List − in addition to all exhibits admitted for Jury Trial)(rlf, ) (Entered: 06/17/2013) |
| 06/17/2013 | 517 | ***FILED IN ERROR PER ATTORNEY. SEE ENTRY 518 FOR CORRECTED FILING.*** Unopposed MOTION TO REDACT JUNE 12, 2013 TRIAL TRANSCRIPT by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1_ Text of Proposed Order)(Stevenson, Theodore) Modified on 6/17/2013 (gsg). (Entered: 06/17/2013) |
| 06/17/2013 | 518 | Unopposed SEALED PATENT MOTION *TO REDACT JUNE 12, 2013 TRIAL TRANSCRIPT* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1_ Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/17/2013) |
| 06/17/2013 | 519 | ORDER granting _499_ Motion to Withdraw as Attorney. Attorney Thomas D Rein; Stephanie P Koh and Bryan C Mulder terminated. Signed by Judge Leonard Davis on 06/17/13. (mll, ) (Entered: 06/17/2013) |
| 06/18/2013 | 520 | Unopposed MOTION to Seal *Certain Trial Exhibits* by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #_1_ Text of Proposed Order)(Parker, Robert) (Entered: 06/18/2013) |
| 06/18/2013 | 521 | MOTION to Seal *CERTAIN TRIAL EXHIBITS* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1_ Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/18/2013) |
| 06/19/2013 | 522 | ORDER denying _518_ Sealed Patent Motion to Redact the June 12, 2013 Trial Transcript. The Court will allow Ericsson to file a motion requesting portions of the transcript be sealed. The motion should identify sections of the transcript to be sealed that contain Ericsson's purported confidential information. Signed by Judge Leonard Davis on 06/19/13. (mll, ) (Entered: 06/19/2013) |
| 06/19/2013 | 523 | Joint MOTION for Post Trial Briefing Schedule by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: #_1_ Text of Proposed Order)(Parker, Robert) (Entered: 06/19/2013) |

**A183**

| 06/20/2013 | 524 | MEMORANDUM OPINION AND ORDER granting 431 SEALED PATENT MOTION *FOR PARTIAL SUMMARY JUDGMENT AND/OR TO EXCLUDE DEFENDANT DELL'S LICENSE DEFENSES* filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. Signed by Judge Leonard Davis on 06/20/13. (mll, ) (Entered: 06/20/2013) |
|---|---|---|
| 06/20/2013 | 525 | Unopposed SEALED PATENT MOTION *TO SEAL JUNE 12, 2013 TRIAL TRANSCRIPT* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/20/2013) |
| 06/20/2013 | 526 | ORDER granting 523 Motion for Post−Trial Briefing Schedule. Signed by Judge Leonard Davis on 06/20/13. (mll, ) (Entered: 06/20/2013) |
| 06/25/2013 | 527 | SEALED PATENT MOTION *POST−TRIAL MOTION FOR A COMPULSORY FUTURE ROYALTY AND PRE−JUDGMENT AND POST−JUDGMENT INTEREST* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Stevenson, Theodore) (Entered: 06/25/2013) |
| 06/25/2013 | 528 | SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Exhibit L, # 14 Exhibit M, # 15 Exhibit N, # 16 Exhibit O, # 17 Exhibit P, # 18 Exhibit Q, # 19 Exhibit R, # 20 Exhibit S, # 21 Exhibit T, # 22 Exhibit U, # 23 Exhibit V, # 24 Exhibit W)(Parker, Robert) (Entered: 06/25/2013) |
| 06/25/2013 | 529 | SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 06/25/2013) |
| 06/26/2013 | 530 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 529 SEALED PATENT MOTION FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J, # 11 Exhibit K, # 12 Exhibit L, # 13 Exhibit M)(Parker, Robert) (Entered: 06/26/2013) |
| 06/26/2013 | 531 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES*. (Attachments: # 1 Exhibit N, # 2 Exhibit O, # 3 Exhibit P, # 4 Exhibit Q, # 5 Exhibit R, # 6 Exhibit S, # 7 Exhibit T)(Parker, Robert) (Entered: 06/26/2013) |
| 06/26/2013 | 532 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES*. (Attachments: # 1 Exhibit U, # 2 Exhibit V, # 3 Exhibit W, # 4 Exhibit X, # 5 Exhibit Y, # 6 Exhibit Z)(Parker, Robert) (Entered: 06/26/2013) |
| 06/26/2013 | 533 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES*. (Attachments: # 1 Exhibit AA, # 2 Exhibit BB, # 3 Exhibit CC, # 4 Exhibit DD, # 5 Exhibit EE, # 6 Exhibit FF, # 7 Exhibit GG, # 8 Exhibit HH, # 9 Exhibit II)(Parker, Robert) (Entered: 06/26/2013) |

**A184**

| 06/26/2013 | 534 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES.* (Attachments: #1 Exhibit JJ, #2 Exhibit KK, #3 Exhibit LL, #4 Exhibit MM, #5 Exhibit NN)(Parker, Robert) (Entered: 06/26/2013) |
|---|---|---|
| 06/26/2013 | 535 | ORDER granting 525 Sealed Patent Motion to Seal Transcript. The Clerk is directed to seal from the publicly available version of the transcript of the 6−12−2013 trial those specific items identified in Plaintiffs' Unopposed Motion. Signed by Judge Leonard Davis on 06/26/13. (mll, ) (Entered: 06/26/2013) |
| 06/27/2013 | 536 | ORDER granting 520 Motion to Seal Certain Trial Exhibits; granting 521 Motion to Seal Certain Trial Exhibits. Parties are ORDERED to re−submit their exhibits to the Court on CDs within seven days. The parties shall submit separate CDs containing sealed and non−sealed exhibits. The parties shall submit two copies of each CD, for a total of four CDs per side. Signed by Judge Leonard Davis on 06/27/13. (mll, ) (Entered: 06/27/2013) |
| 06/28/2013 | 537 | ***DOCUMENT FILED IN ERROR. PLEASE DISREGARD.*** Proposed Findings of Fact by Intel Corporation. (Parker, Robert) Doc sealed by Court. Modified on 7/1/2013 (mjc, ). (Entered: 06/28/2013) |
| 06/29/2013 | 538 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 537 Motion for Judgment on Defendants' Post Trial Proposed Findings of Fact and Conclusions of Law. (Attachments: #1 Exhibit 1, #2 Exhibit 2, #3 Exhibit 3, #4 Exhibit 4, #5 Exhibit 5, #6 Exhibit 6, #7 Exhibit 7, #8 Exhibit 8, #9 Exhibit 9, #10 Exhibit 10, #11 Exhibit 11, #12 Exhibit 12, #13 Exhibit 13, #14 Exhibit 14, #15 Exhibit 15, #16 Exhibit 16, #17 Exhibit 17, #18 Exhibit 18, #19 Exhibit 19, #20 Exhibit 20, #21 Exhibit 21, #22 Exhibit 22, #23 Exhibit 23, #24 Exhibit 24, #25 Exhibit 25, #26 Text of Proposed Order)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 539 | SEALED PATENT DOCUMENT Defendants' Post−Trial Proposed Findings of Fact and Conclusions of Law. (Parker, Robert) (Additional attachment(s) added on 7/5/2013: #1 Authorization to Seal) (gsg, ). (Entered: 06/29/2013) |
| 06/29/2013 | 540 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Affidavit Declaration of Tim G. Majors, #2 Exhibit 1, #3 Exhibit 2, #4 Exhibit 3, #5 Exhibit 4, #6 Exhibit 5, #7 Exhibit 6, #8 Exhibit 7, #9 Exhibit 8, #10 Exhibit 9, #11 Exhibit 10, #12 Exhibit 11, #13 Exhibit 12, #14 Exhibit 13, #15 Exhibit 14, #16 Exhibit 15, #17 Exhibit 16, #18 Exhibit 17, #19 Exhibit 18, #20 Exhibit 19, #21 Exhibit 20)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 541 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Exhibit 21, #2 Exhibit 22, #3 Exhibit 23, #4 Exhibit 24, #5 Exhibit 25, #6 Exhibit 26, #7 Exhibit 27, #8 Exhibit 28, #9 Exhibit 29, #10 Exhibit 30, #11 Exhibit 31, #12 Exhibit 32, #13 Exhibit 33, #14 Exhibit 34, #15 Exhibit 35, #16 Exhibit 36, #17 Exhibit 37, #18 Exhibit 38, #19 Exhibit 39, #20 Exhibit 40)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 542 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Exhibit 41, #2 Exhibit 42, #3 Exhibit 43, #4 Exhibit 44, #5 Exhibit 46, #6 Exhibit 47, #7 Exhibit 48, #8 Exhibit 49, #9 Exhibit 50, #10 Exhibit 51, #11 Exhibit 52, #12 Exhibit 54, #13 Exhibit 55, #14 Exhibit 56, #15 Exhibit 57, #16 Exhibit 58, #17 Exhibit 59, #18 Exhibit 60)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 543 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Exhibit 61)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 544 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Exhibit 62−1, #2 Exhibit 62−2, #3 Exhibit 62−3)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 545 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #1 Exhibit 63, #2 Exhibit 64, #3 Exhibit |

| | | |
|---|---|---|
| | | 65−1, #_4 Exhibit 65−2, #_5 Exhibit 65−3, #_6 Exhibit 66, #_7 Exhibit 67, #_8 Exhibit 68, #_9 Exhibit 69, #_10 Exhibit 70)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 546 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 71, #_2 Exhibit 72, #_3 Exhibit 73)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 547 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 74−1, #_2 Exhibit 74−2)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 548 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 75−1, #_2 Exhibit 75−2)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 549 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 76, #_2 Exhibit 77, #_3 Exhibit 78, #_4 Exhibit 79, #_5 Exhibit 80)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 550 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 81, #_2 Exhibit 82, #_3 Exhibit 83, #_4 Exhibit 84, #_5 Exhibit 85, #_6 Exhibit 86, #_7 Exhibit 87, #_8 Exhibit 88, #_9 Exhibit 89, #_10 Exhibit 90)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 551 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 91, #_2 Exhibit 92, #_3 Exhibit 93, #_4 Exhibit 94, #_5 Exhibit 95−1, #_6 Exhibit 95−2)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 552 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 96, #_2 Exhibit 97, #_3 Exhibit 98, #_4 Exhibit 99, #_5 Exhibit 100)(Parker, Robert) (Entered: 06/29/2013) |
| 06/29/2013 | 553 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 539 Sealed Patent Document. (Attachments: #_1 Exhibit 101, #_2 Exhibit 102, #_3 Exhibit 103, #_4 Exhibit 104, #_5 Exhibit 105, #_6 Exhibit 106, #_7 Exhibit 107, #_8 Exhibit 108)(Parker, Robert) (Entered: 06/29/2013) |
| 07/01/2013 | | ***FILED IN ERROR. Document #_537 Proposed Findings of Fact. PLEASE IGNORE. TO BE REFILED AS A MOTION.*** (mjc, ) (Entered: 07/01/2013) |
| 07/01/2013 | 554 | ***DEFICIENT FILING. DISREGARD.***SEALED PATENT DOCUMENT DEFENDANTS' MOTION FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES # 537). (Parker, Robert) Modified on 7/5/2013 (gsg). (Entered: 07/01/2013) |
| 07/01/2013 | 555 | Unopposed MOTION to Seal *ADDITIONAL TRIAL EXHIBITS* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1 Text of Proposed Order)(Stevenson, Theodore) (Entered: 07/01/2013) |
| 07/03/2013 | 556 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Pre−Trial and Voir Dire Proceedings Morning Session of Trial held on 6/3/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov** Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |

**A186**

| 07/03/2013 | 557 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session held on 6/3/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| --- | --- | --- |
| 07/03/2013 | 558 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/4/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 559 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session held on 6/4/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 560 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/5/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 561 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Proceedings Afternoon Session held on 6/5/13 before Chief Judge Leonard Davis. Court Reporters: Shea |

**A187**

Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov

**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**

Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013)

| 07/03/2013 | 562 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/6/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 563 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session held on 6/6/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 564 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/10/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 565 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session held on 6/10/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov |

**A188**

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 566 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/11/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 567 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session held on 6/11/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 568 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Morning Session held on 6/12/13 before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 569 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings Afternoon Session before Chief Judge Leonard Davis. Court Reporters: Shea Sloan and Judy Werlinger, shea_sloan@txed.uscourts.gov |

**A189**

| | | |
|---|---|---|
| | | **NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 570 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Trial Proceedings held on 6/13/13<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 7/29/2013. Redacted Transcript Deadline set for 8/8/2013. Release of Transcript Restriction set for 10/4/2013. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 571 | Sealed Transcript No. 1. 6/4/13 − Morning Session of Trial. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 572 | Sealed Transcript No. 2. 6/4/13 − Afternoon Session of Trial (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 573 | Sealed Transcript Nos. 3−5. 6/6/13 − Morning Session of Trial. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 574 | Sealed Transcript Nos. 6 and 7. 6/11/13 − Morning Session of Trial. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 575 | Sealed Transcript No. 8. 6/12/13 − Morning Session of Trial (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 576 | Sealed Transcript No. 9 and 10. 6/12/13 − Afternoon Session of Trial (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 577 | Sealed Transcript No. 11. 6/12/13 − Morning Session of Trial (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 578 | Sealed Transcript. (sms, ) (Entered: 07/03/2013) |
| 07/03/2013 | 579 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 527 POST−TRIAL MOTION FOR A COMPULSORY FUTURE ROYALTY AND PRE−JUDGMENT AND POST−JUDGMENT INTEREST filed by Acer America Corporation, Acer, Inc., Belkin International, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Text of Proposed Order)(Parker, Robert) (Entered: 07/03/2013) |
| 07/03/2013 | 580 | ***FILED IN ERROR. DISREGARD.*** Additional Attachments to Main Document: 539 Sealed Patent Document.. (Attachments: # 1 Exhibit Certificate of Authorization to File Under Seal)(Parker, Robert) Modified on 7/5/2013 (gsg). (Entered: 07/03/2013) |
| 07/03/2013 | 581 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 528 SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR* |

**A190**

| | | |
|---|---|---|
| | | *OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F, # 7 Exhibit G, # 8 Exhibit H, # 9 Exhibit I, # 10 Exhibit J)(Stevenson, Theodore) (Entered: 07/03/2013) |
| 07/03/2013 | 582 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 581 Sealed Patent Response to Sealed Patent Motion,,,. (Attachments: # 1 Exhibit K, # 2 Exhibit L, # 3 Exhibit M, # 4 Exhibit N, # 5 Exhibit O, # 6 Exhibit P, # 7 Exhibit Q, # 8 Exhibit R, # 9 Exhibit S)(Stevenson, Theodore) (Entered: 07/03/2013) |
| 07/03/2013 | 583 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 581 Sealed Patent Response to Sealed Patent Motion,,,. (Attachments: # 1 Exhibit T, # 2 Exhibit U, # 3 Exhibit V, # 4 Exhibit W, # 5 Exhibit X, # 6 Exhibit Y, # 7 Index of Exhibits, # 8 Text of Proposed Order)(Stevenson, Theodore) (Entered: 07/03/2013) |
| 07/03/2013 | 584 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: # 1 Exhibit A, # 2 Exhibit PX0026, # 3 Exhibit PX0027, # 4 Exhibit PX0028)(Stevenson, Theodore) (Additional attachment(s) added on 7/5/2013: # 5 Text of Proposed Order) (gsg, ). (Entered: 07/03/2013) |
| 07/03/2013 | 585 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 584 Sealed Patent Response to Sealed Patent Motion,. (Attachments: # 1 Exhibit PX0029, # 2 Exhibit PX0030, # 3 Exhibit PX0031, # 4 Exhibit PX0032)(Stevenson, Theodore) (Entered: 07/03/2013) |
| 07/03/2013 | 586 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 584 Sealed Patent Response to Sealed Patent Motion,. (Attachments: # 1 Exhibit PX0033, # 2 Exhibit PX0037, # 3 Exhibit PX0071, # 4 Exhibit PX0293)(Stevenson, Theodore) (Entered: 07/03/2013) |
| 07/03/2013 | 587 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 584 Sealed Patent Response to Sealed Patent Motion,. (Attachments: # 1 Exhibit PX0294, # 2 Exhibit PX0308, # 3 Exhibit PX0464, # 4 Exhibit PX0541, # 5 Exhibit PX0553, # 6 Exhibit PX0558, # 7 Exhibit PX0559, # 8 Exhibit PX0560, # 9 Exhibit PX0561, # 10 Text of Proposed Order)(Stevenson, Theodore) (Entered: 07/04/2013) |
| 07/05/2013 | | NOTICE of Deficiency regarding the Sealed Document submitted, entry 554 . Incorrect Docket Event. (gsg) (Entered: 07/05/2013) |
| 07/05/2013 | 588 | SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Text of Proposed Order)(Parker, Robert) (Entered: 07/05/2013) |
| 07/05/2013 | 589 | SEALED PATENT MOTION *TO SUPPLEMENT THE RECORD REGARDING THE COURT'S DETERMINATION OF DEFENDANTS' BREACH OF RAND DEFENSE* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit PX0627, # 2 Exhibit PX0628, # 3 Exhibit PX0629, # 4 Exhibit PX0630, # |

**A191**

| | | |
|---|---|---|
| | | 5 Exhibit PX0631, #6 Exhibit PX0632, #7 Text of Proposed Order)(Stevenson, Theodore) (Entered: 07/05/2013) |
| 07/09/2013 | 590 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 588 SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554) filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: #1 Text of Proposed Order)(Baxter, Samuel) (Entered: 07/09/2013) |
| 07/09/2013 | 591 | SEALED PATENT DOCUMENT.PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING DEFENDANTS' ALLEGED EQUITABLE DEFENSES (Baxter, Samuel) (Entered: 07/09/2013) |
| 07/09/2013 | 592 | REPLY to Response to Motion re 528 SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation.* (Attachments: #1 Exhibit X, #2 Exhibit Y, #3 Exhibit Z, #4 Exhibit AA)(Parker, Robert) (Entered: 07/09/2013) |
| 07/09/2013 | 593 | SEALED PATENT REPLY to Response to PATENT Motion re 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Toshiba America Information Systems, Inc., Toshiba Corporation.* (Attachments: #1 Exhibit OO, #2 Exhibit PP, #3 Exhibit QQ, #4 Exhibit RR, #5 Exhibit SS, #6 Exhibit TT, #7 Exhibit UU, #8 Exhibit VV, #9 Exhibit WW)(Parker, Robert) (Entered: 07/09/2013) |
| 07/09/2013 | 594 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 590 Sealed Patent Response to Sealed Patent Motion,,. (Attachments: #1 Exhibit A, #2 Exhibit PX0224, #3 Exhibit PX0237, #4 Exhibit PX0293, #5 Exhibit PX0294, #6 Exhibit PX0448, #7 Exhibit PX0627, #8 Exhibit PX0628, #9 Exhibit PX0629, #10 Exhibit PX0630, #11 Exhibit PX0631, #12 Exhibit PX0632)(Stevenson, Theodore) (Entered: 07/09/2013) |
| 07/09/2013 | 595 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 591 Sealed Patent Document. (Attachments: #1 Exhibit A, #2 Exhibit PX0004, #3 Exhibit PX0006, #4 Exhibit PX0010, #5 Exhibit PX0026, #6 Exhibit PX0027, #7 Exhibit PX0028, #8 Exhibit PX0029, #9 Exhibit PX0030, #10 Exhibit PX0031, #11 Exhibit PX0032, #12 Exhibit PX0033, #13 Exhibit PX0037, #14 Exhibit PX0071, #15 Exhibit PX0224, #16 Exhibit PX0237, #17 Exhibit PX0238, #18 Exhibit PX0244, #19 Exhibit PX0293, #20 Exhibit PX0294, #21 Exhibit PX0308, #22 Exhibit PX0448, #23 Exhibit PX0464, #24 Exhibit PX0511, #25 Exhibit PX0515, #26 Exhibit PX0541, #27 Exhibit PX0553, #28 Exhibit PX0558, #29 Exhibit PX0559, #30 Exhibit PX0560, #31 Exhibit PX0561, #32 Exhibit PX0627, #33 Exhibit PX0628, #34 Exhibit PX0629, #35 Exhibit PX0630, #36 Exhibit PX0631, #37 Exhibit PX0632)(Stevenson, Theodore) |

**A192**

| | | (Entered: 07/09/2013) |
|---|---|---|
| 07/11/2013 | | Set Deadlines/Hearings: Post Veridct Motion Hearing set for 7/16/2013 09:00 AM before Judge Leonard Davis. (rlf) (Entered: 07/11/2013) |
| 07/12/2013 | 596 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 529 SEALED PATENT MOTION *FOR JUDGMENT AS A MATTER OF LAW ON ERICSSONS DAMAGES CLAIMS OR, IN THE ALTERNATIVE, FOR VACATION, REMITTITUR OR A NEW TRIAL ON DAMAGES filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: #1 Exhibit A)(Stevenson, Theodore) (Entered: 07/12/2013) |
| 07/12/2013 | 597 | SUR−REPLY to Reply to Response to Motion re 528 SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL* SEALED PATENT MOTION *50(b) RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAWIN FAVOR OF DEFENDANTS (NON−INFRINGEMENT AND INVALIDITY) AND MOTION FOR A NEW TRIAL filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Stevenson, Theodore) (Entered: 07/12/2013) |
| 07/12/2013 | 598 | SEALED PATENT REPLY to Response to PATENT Motion − REPLY IN SUPPORT OF MOTION FOR JUDGMENT ON POST−TRIAL FINDINGS OF FACT AND CONCLUSIONS OF LAW filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation − RE DKT. 588. (Attachments: #1 Exhibit 109, #2 Exhibit 110, #3 Exhibit 111, #4 Exhibit 112, #5 Exhibit 113, #6 Exhibit 114, #7 Exhibit 115)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 599 | SEALED PATENT REPLY TO RESPONSE re 539 SEALED PATENT DOCUMENT re Findings of Fact and Conclusions of Law. (Parker, Robert) Modified on 7/12/2013 to correct the linkage (gsg). (Entered: 07/12/2013) |
| 07/12/2013 | 600 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 599 Sealed Patent Response to Sealed Patent Motion. (Attachments: #1 Exhibit A, #2 Exhibit B, #3 Exhibit C)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 601 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 599 Sealed Patent Response to Sealed Patent Motion. (Attachments: #1 Exhibit D, #2 Exhibit E)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 602 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 599 Sealed Patent Response to Sealed Patent Motion. (Attachments: #1 Exhibit F−1, #2 Exhibit F−2)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 603 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 599 Sealed Patent Response to Sealed Patent Motion. (Attachments: #1 Exhibit G Part 1, #2 Exhibit G Part 2−1, #3 Exhibit G Part 2−2)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 604 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 599 Sealed Patent Response to Sealed Patent Motion. (Attachments: #1 Exhibit H, #2 Exhibit I, #3 Exhibit J, #4 Exhibit K, #5 Exhibit L, #6 Exhibit M, #7 Exhibit N, #8 Exhibit O)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 605 | SEALED PATENT ADDITIONAL ATTACHMENTS to Main Document: 598 Sealed PATENT Reply in Support of Motion for Judgment on Post−Trial Proposed Findings of Fact and Conclusions of Law. (Attachments: #1 Affidavit Tim Majors Declaration)(Parker, Robert) (Entered: 07/12/2013) |
| 07/12/2013 | 606 | SEALED PATENT RESPONSE to SEALED PATENT MOTION re 589 SEALED PATENT MOTION TO SUPPLEMENT THE RECORD REGARDING THE |

**A193**

| | | |
|---|---|---|
| | | COURT'S DETERMINATION OF DEFENDANTS' BREACH OF RAND DEFENSE.filed by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Text of Proposed Order)(Parker, Robert) (Entered: 07/12/2013) |
| 07/15/2013 | 607 | SEALED PATENT SUR−REPLY to Reply to Response to PATENT Motion re 588 SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554)* SEALED PATENT MOTION *FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW (REPLACES DOCKET 554) filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Stevenson, Theodore) (Entered: 07/15/2013) |
| 07/16/2013 | 608 | Minute Entry for proceedings held before Judge Leonard Davis: **Post−Verdict Motion Hearing held on 7/16/2013.** (Court Reporter Shea Sloan.) (Attachments: # 1 Attorney Sign In Sheets) (rlf) (Entered: 07/16/2013) |
| 07/18/2013 | 609 | SEALED PATENT DOCUMENT. ERICSSON'S SUBMISSION TO SUPPLEMENT THE RECORD (Attachments: # 1 Exhibit PX0633)(Stevenson, Theodore) (Entered: 07/18/2013) |
| 07/18/2013 | 610 | SEALED PATENT DOCUMENT − DEFENDANTS SEALED SUBMISSION TO SUPPLEMENT THE RECORD. Attachments: # 1 Exhibit 1)FILED ON BEHALF OF Defendants D−Link Systems, Inc., NETGEAR, Inc., Acer America Corporation, Acer, Inc., Gateway, Inc., Dell Inc., Toshiba America Information Systems, Inc., and Toshiba Corporation, and Intervenor Intel Corporation (Parker, Robert) (Entered: 07/18/2013) |
| 07/18/2013 | 611 | **\*\*\*PLEASE DISREGARD. SEE DOCUMENT 612 FOR CORRECT PLEADING\*\*\*** STIPULATION *REGARDING SCOPE OF BENCH TRIAL AND DEFENDANTS' NOTICE REGARDING BENCH CLAIMS* by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation. (Parker, Robert) Modified on 7/18/2013 (mll, ). (Entered: 07/18/2013) |
| 07/18/2013 | 612 | NOTICE by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Toshiba America Information Systems, Inc., Toshiba Corporation *REGARDING SCOPE OF BENCH TRIAL AND DEFENDANTS' NOTICE REGARDING BENCH CLAIMS* (Parker, Robert) (Entered: 07/18/2013) |
| 07/18/2013 | 613 | SEALED PATENT DOCUMENT.ERICSSON'S NOTICE AND RESPONSE TO DEFENDANTS' JULY 18, 2013 FILINGS (Attachments: # 1 Exhibit 1)(Stevenson, Theodore) (Entered: 07/18/2013) |
| 07/23/2013 | 614 | DEFENDANTS' SEALED PATENT REPLY TO ERICSSON'S NOTICE AND RESPONSE TO DEFENDANTS' JULY 18, 2013 FILINGS by Acer America Corporation, Toshiba Corporation, Toshiba America Information Systems, Inc., Acer, Inc., Gateway, Inc., D−Link Systems, Inc., Dell, Inc., Intel Corporation, Netgear, Inc. to 613 Sealed Patent Document (Attachments: # 1 Exhibit A)(Parker, Robert) (Entered: 07/23/2013) |
| 08/06/2013 | 615 | MEMORANDUM AND OPINION AND ORDER **DENYING** 528 SEALED PATENT MOTION, **GRANTING** 527 SEALED PATENT MOTION, **DENYING** 501 MOTION for Judgment as a Matter of Law, **DENYING** 488 MOTION for Judgment as a Matter of Law, **DENYING** 491 MOTION for Judgment as a Matter of Law, **DENYING** 494 SEALED PATENT MOTION, **DENYING** 529 SEALED PATENT MOTION, **DENYING** 490 MOTION for Judgment as a Matter of Law, **DENYING** 493 MOTION for Judgment as a Matter of Law, **DENYING** 589 SEALED PATENT MOTION, **DENYING** 489 SEALED PATENT MOTION |

**A194**

| | | |
|---|---|---|
| | | *FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES, **DENYING** 492 MOTION for Judgment as a Matter of Law, **GRANTING** 588 SEALED PATENT MOTION FOR JUDGMENT ON POST−TRIAL PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, **DENYING** motion 555 . Signed by Judge Leonard Davis on 8/6/2013. (gsg) Modified on 8/6/2013 (gsg). (Entered: 08/06/2013)* |
| 08/08/2013 | 616 | FINAL JUDGMENT. The Court awards the following in damages to Ericsson for Defendants' infringement of the claims found infringed: $435,000 for D−Link; $3,555,000 for Netgear; $1,170,000 for Acer/Gateway; $1,920,000 for Dell; $2,445,000 for Toshiba; and $600,000 for Belkin. Ericsson is further awarded pre−judgment interest, post−judgment interest, and an ongoing royalty as detailed in the Courts Memorandum Opinion and Order. All relief not specifically granted herein is DENIED. All pending motions not previously resolved are DENIED. Signed by Judge Leonard Davis on 08/08/13. (mll, ) (Entered: 08/09/2013) |
| 08/14/2013 | 617 | **TEXT ONLY ORDER:** Plaintiff's Unopposed Motion to Seal Additional Trial Exhibits 555 filed 7.1.2013 was inadvertently denied in the Court's Memorandum Opinion and Order on 8.6.2013. The Court does grant said motion 555 and **ORDERS that Defendants' Exhibit DX052 be sealed.** (Note: DX052 is the same document as PX0071, which was previously ordered sealed). By Judge Leonard Davis on 8/14/2013. (LED/rlf) (Entered: 08/14/2013) |
| 08/20/2013 | 618 | Joint MOTION TO ENTER STIPULATION AS ORDER AND TO EXTEND TIME TO FILE A BILL OF COSTS by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit A − Stipulation, # 2 Text of Proposed Order)(Parker, Robert) (Entered: 08/20/2013) |
| 08/21/2013 | 619 | ORDER granting 618 Motion To Enter Stipulation As Order and to Extend the Deadline for Filing a Bill of Costs. The temporary stay of execution as to the final judgment and the deadline for Ericsson to file a bill of costs, is extended to 8−30−2013. Signed by Judge Leonard Davis on 08/21/13. (mll, ) (Entered: 08/21/2013) |
| 08/29/2013 | 620 | PROPOSED BILL OF COSTS filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Agreed Bill of Costs)(Stevenson, Theodore) (Entered: 08/29/2013) |
| 08/29/2013 | 621 | Joint MOTION Joint Motion to Enter Stipulation as Order to Stay Execution of Judgment by Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Exhibit A − Stipulation, # 2 Text of Proposed Order)(Harrison, Guy) (Entered: 08/29/2013) |
| 09/04/2013 | 622 | ORDER granting 621 Motion to Enter Stipulation as Order. A temporary stay of execution as to the final judgment is extended until 9−09−2013. Signed by Judge Leonard Davis on 09/04/13. (mll, ) (Entered: 09/04/2013) |
| 09/04/2013 | 623 | NOTICE OF APPEAL − FEDERAL CIRCUIT as to 616 Final Judgment and 615 Memorandum Opinion and Order by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. Filing fee $ 455, receipt number 0540−4297908. (Morgan, Christine) Modified on 9/5/2013 (dlc, ). (Entered: 09/04/2013) |
| 09/05/2013 | | Transmission of Notice of Appeal, 616 Final Judgment, 615 Memorandum Order and Certified Copy of Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 623 Notice of Appeal − FEDERAL CIRCUIT, (dlc, ) (Entered: 09/05/2013) |
| 09/05/2013 | 624 | NOTICE OF APPEAL − FEDERAL CIRCUIT by Toshiba America Information Systems, Inc., Toshiba Corporation, as to 616 Final Judgment and 615 Memorandum. Filing fee $ 455, receipt number 0540−4299570. (Harrison, Guy) Modified on 9/6/2013 (dlc, ). (Entered: 09/05/2013) |
| 09/05/2013 | 625 | NOTICE OF APPEAL − FEDERAL CIRCUIT by Dell, Inc. as to 454 Order granting Partial Summary Judgment, 524 Memorandum and 616 Final Judgment. |

**A195**

| | | |
|---|---|---|
| | | Filing fee $ 455, receipt number 0540−4299678. (Newton, Michael) Modified on 9/6/2013 (dlc, ). (Entered: 09/05/2013) |
| 09/05/2013 | 626 | ACKNOWLEDGMENT OF RECEIPT on 9/5/13, by U S Court of Appeals for the Federal Circuit as to 616 Final Judgment, 615 Memorandum &Opinion, 623 Notice of Appeal − FEDERAL CIRCUIT, and certified copy of docket sheet. (dlc, ) (Entered: 09/05/2013) |
| 09/05/2013 | 627 | NOTICE OF APPEAL − FEDERAL CIRCUIT by Intel Corporation as to 616 Final Judgment and 615 Memorandum Opinion. Filing fee $ 455, receipt number 0540−4299957. (Parker, Robert) Modified on 9/6/2013 (dlc, ). (Entered: 09/05/2013) |
| 09/06/2013 | 628 | NOTICE of Docketing Notice of Appeal from USCA−Federal Circuit re 623 Notice of Appeal − FEDERAL CIRCUIT, filed by Netgear, Inc., D−Link Systems, Inc., Gateway, Inc., Acer America Corporation, Acer, Inc. USCA Case Number 13−1625 (Attachments: # 1 Official Caption)(dlc, ) (Entered: 09/06/2013) |
| 09/06/2013 | | Transmission of 624 Notice of Appeal, 625 Notice of Appeal, 627 Notice of Appeal, 616 Final Judgment, 615 Memorandum, 454 Order, {524] Memorandum, and Certified Copy of Docket Sheet to US Court of Appeals, Federal Circuit by separate email. re 627 Notice of Appeal − FEDERAL CIRCUIT, 625 Notice of Appeal − FEDERAL CIRCUIT, 624 Notice of Appeal − FEDERAL CIRCUIT, (dlc, ) (Entered: 09/06/2013) |
| 09/06/2013 | 629 | ACKNOWLEDGMENT OF RECEIPT on 9/6/13, by U S Court of Appeals for the Federal Circuit as to 627 Notice of Appeal − FEDERAL CIRCUIT, 615 Memorandum, 616 Judgment, and Certified Copy of Docket Sheet. (dlc, ). (Entered: 09/06/2013) |
| 09/06/2013 | 630 | ACKNOWLEDGMENT OF RECEIPT on 9/6/13, by U S Court of Appeals for the Federal Circuit, as to 624 Notice of Appeal − FEDERAL CIRCUIT, 616 Judgment, 615 Memorandum, and Certified copy of Docket Sheet. (dlc, ) (Entered: 09/06/2013) |
| 09/06/2013 | 631 | Joint MOTION TO ENTER STIPULATION AS ORDER by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Dell, Inc., Ericsson Inc., Gateway, Inc., Intel Corporation, Netgear, Inc., Telefonaktiebolaget LM Ericsson, Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Proposed Stipulation, # 2 Text of Proposed Order)(Parker, Robert) (Entered: 09/06/2013) |
| 09/06/2013 | 632 | ACKNOWLEDGMENT OF RECEIPT on 9/6/13, by 5th Circuit Court of Appeals as to 625 Notice of Appeal − FEDERAL CIRCUIT, 454 Order, 524 Memorandum Opinion, 616 Judgment, and certified copy of Docket Sheet. (dlc, ) (Entered: 09/06/2013) |
| 09/10/2013 | 633 | NOTICE of Docketing Notice of Appeal from USCA−Federal Circuit re 625 Notice of Appeal − FEDERAL CIRCUIT filed by Dell, Inc. USCA Case Number 13−1631 (dlc, ) (Entered: 09/10/2013) |
| 09/10/2013 | 634 | NOTICE of Docketing Notice of Appeal from USCA−FEDERAL CIRCUIT re 624 Notice of Appeal − FEDERAL CIRCUIT, filed by Toshiba Corporation, Toshiba America Information Systems, Inc. USCA Case Number 13−1632 (dlc, ) (Entered: 09/10/2013) |
| 09/10/2013 | 635 | Unopposed MOTION to Withdraw as Attorney *Lov Goel and Sarah Forney* by Intel Corporation. (Attachments: # 1 Text of Proposed Order)(Parker, Robert) (Entered: 09/10/2013) |
| 09/11/2013 | 636 | ORDER granting 635 Motion to Withdraw as Attorney. Attorney Sarah Forney and Lov Goel terminated. Signed by Judge Leonard Davis on 09/11/13. (mll, ) (Entered: 09/12/2013) |
| 09/16/2013 | 637 | NOTICE of Docketing Notice of Appeal from USCA−FEDERAL CIRCUIT re 627 Notice of Appeal − FEDERAL CIRCUIT filed by Intel Corporation. USCA Case Number 13−1633. (dlc, ) (Entered: 09/16/2013) |

**A196**

| 09/16/2013 | 638 | ORDER granting 631 Motion To Enter Stipulation as Order. A temporary stay of execution as to the final judgment is extended until 9−23−2013. Signed by Judge Leonard Davis on 09/16/13. (mll, ) (Entered: 09/16/2013) |
|---|---|---|
| 09/16/2013 | 642 | NOTICE of Response to Letter Rogaotry re Judicial Assistance in Taiwan (Attachments: # 1 Letter Rogatory (English), # 2 Letter Rogatory (Chinese))(mll, ) (Entered: 09/18/2013) |
| 09/18/2013 | 639 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT of Post−Verdict Motion Hearing Proceedings held on 7/16/13 before Judge Leonard Davis. Court Reporter: Shea Sloan. shea_sloan@txed.uscourts.gov<br><br>**NOTICE RE REDACTION OF TRANSCRIPTS: The parties have seven (7) business days to file with the Court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript will be made remotely electronically available to the public without redaction after 90 calendar days. The policy is located on our website at www.txed.uscourts.gov**<br><br>Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER.. Redaction Request due 10/14/2013. Redacted Transcript Deadline set for 10/24/2013. Release of Transcript Restriction set for 12/20/2013. (sms, ) (Entered: 09/18/2013) |
| 09/18/2013 | 640 | STATUS REPORT *(Joint Status Report Concerning Ericsson−Belkin Settlement* by Belkin International, Inc.. (Yagura, Ryan) (Entered: 09/18/2013) |
| 09/18/2013 | 641 | Federal Circuit TRANSCRIPT REQUEST by Intel Corporation before Judge Leonard Davis, (Parker, Robert) (Entered: 09/18/2013) |
| 09/18/2013 | 643 | FEDERAL CIRCUIT TRANSCRIPT REQUEST by Acer America Corporation, Acer, Inc., D−Link Systems, Inc., Gateway, Inc., Netgear, Inc.. (Mitchell, Jonah) (Entered: 09/18/2013) |
| 09/19/2013 | 644 | FEDERAL CIRCUIT TRANSCRIPT REQUEST by Toshiba America Information Systems, Inc., Toshiba Corporation. (Feldhaus, John) (Entered: 09/19/2013) |
| 09/19/2013 | 645 | TRANSCRIPT REQUEST by Dell, Inc.. (Newton, Michael) (Entered: 09/19/2013) |
| 09/26/2013 | 646 | Joint MOTION TO ENTER STIPULATION AS ORDER by Ericsson Inc., Intel Corporation, Telefonaktiebolaget LM Ericsson. (Attachments: # 1 Exhibit A − Proposed Stipulation, # 2 Text of Proposed Order)(Parker, Robert) (Entered: 09/26/2013) |
| 09/30/2013 | 647 | ORDER granting 646 Motion to Enter Stipulation as Order. The execution of judgment is stayed until final resolution of the appeal process in the Federal Circuit, and Intel will not be required to post bond or other security pending appeal in the Federal Circuit. Signed by Judge Leonard Davis on 09/30/13. (mll, ) (Entered: 09/30/2013) |
| 10/04/2013 | 648 | **\*\*\*FILED IN ERROR, PLEASE IGNORE\*\*\***Sealed Document. (Attachments: # 1 Exhibit Exhibit A Supersedeas Bond, # 2 Exhibit Exhibit B Stipulation re Stay of Enforcement, # 3 Text of Proposed Order)(Harrison, Guy) Modified on 10/4/2013 (sm, ). (Entered: 10/04/2013) |
| 10/04/2013 | | **\*\*\*FILED IN ERROR, WRONG EVENT USED, ATTY MUST REFILE. Document # 648, Sealed Document. PLEASE IGNORE.\*\*\***<br><br>(sm, ) (Entered: 10/04/2013) |
| 10/04/2013 | 649 | Unopposed SEALED MOTION *For Approval of Supersedeas Bond and to Stay Enforcement* by Toshiba America Information Systems, Inc., Toshiba Corporation. (Attachments: # 1 Exhibit Exhibit A Supersedeas Bond, # 2 Exhibit Exhibit B Stipulation re Bond and Stay of Enforcement, # 3 Text of Proposed Order)(Harrison, Guy) (Entered: 10/04/2013) |
| 10/04/2013 | 650 | Agreed SEALED MOTION *To Approve Stipulation To Waive Supersedeas Bond and To Stay Execution of Final Judgment Pending Appeal* by D−Link Systems, |

**A197**

| | | |
|---|---|---|
| | | Inc., Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1_ Exhibit A − Stipulation on Waiver of Supersedeas Bond and Stay of Execution of Judgment, #_2_ Text of Proposed Order)(Yarbrough, Herbert) (Entered: 10/04/2013) |
| 10/04/2013 | 651 | Joint SEALED MOTION *To Approve Supersedeas Bond and Enter Order Staying Execution of Judgment* by Dell, Inc., Ericsson Inc.. (Attachments: #_1_ Exhibit A − Dell Supersedeas Bond, #_2_ Exhibit B − Stipulation Regarding Stay, #_3_ Exhibit C − Ericsson Proposed Order Staying Execution of Judgment, #_4_ Exhibit D − Dell Proposed Order Staying Execution of Judgment)(Newton, Michael) Modified on 10/11/2013 (mll, ). (Entered: 10/04/2013) |
| 10/04/2013 | 652 | Unopposed SEALED MOTION *to Waive Supersedeas Bond and to Stay Execution of Final Judgment Pending Appeal* by Netgear, Inc.. (Attachments: #_1_ Exhibit A − Stipulation, #_2_ Text of Proposed Order)(Morgan, Christine) (Entered: 10/04/2013) |
| 10/04/2013 | 653 | Unopposed SEALED MOTION *to Approve Supersedeas Bond* by Acer America Corporation, Acer, Inc., Gateway, Inc.. (Attachments: #_1_ Exhibit A − Supersedeas Bond, #_2_ Exhibit B − Stipulation, #_3_ Text of Proposed Order)(Morgan, Christine) (Entered: 10/04/2013) |
| 10/10/2013 | 654 | ORDER granting 653 Sealed Motion for Approval of Supersedeas Bond. Any enforcement of the Court's Final Judgment is STAYED until final resolution of the appeal process in the Federal Circuit. Signed by Judge Leonard Davis on 10/10/13. (mll, ) (Entered: 10/11/2013) |
| 10/10/2013 | 655 | ORDER granting 652 Sealed Motion to waive supersedeas bond and to stay execution of final judgment pending appeal. Signed by Judge Leonard Davis on 10/10/13. (mll, ) (Entered: 10/11/2013) |
| 10/10/2013 | 656 | **\*\*\*FILED IN ERROR. SEE 659 FOR CORRECT DOCKET ENTRY\*\*\*** ORDER granting 651 Sealed Motion to Appove Stipulation to Waive Supersedeas Bond and Stay Execution of Final Judgment Pending Resolution of Appeal. Signed by Judge Leonard Davis on 10/10/13. (mll, ) Modified on 10/11/2013 (mll, ). (Entered: 10/11/2013) |
| 10/10/2013 | 657 | ORDER granting 649 Sealed Motion to Approve Supersedeas Bond and Stay Enforcement of Final Judgment pending resolution of the appeal process in the Federal Circuit. Signed by Judge Leonard Davis on 10/10/13. (mll, ) (Entered: 10/11/2013) |
| 10/11/2013 | 658 | RESPONSE to Motion re 651 Joint SEALED MOTION *To Approve Supersedeas Bond and Enter Order Staying Execution of Judgment filed by Ericsson Inc., Telefonaktiebolaget LM Ericsson.* (Attachments: #_1_ Text of Proposed Order)(Nemunaitis, Justin) (Entered: 10/11/2013) |
| 10/11/2013 | 659 | ORDER granting 650 Sealed Motion to Waive Supersedeas Bond and Stay Execution of Final Judgment Pending Resolution of Appeal. Signed by Judge Leonard Davis on 10/10/13. (mll, ) (Entered: 10/11/2013) |
| 10/11/2013 | 660 | SEALED RESPONSE to Motion re 651 Joint SEALED MOTION *To Approve Supersedeas Bond and Enter Order Staying Execution of Judgment* filed by Dell Inc. (Newton, Michael) (Entered: 10/11/2013) |
| 10/18/2013 | | **TRIAL EXHIBITS (6.3.2013 − 6:11.2013):** 1 Envelope of Public Exhibits Stored in Clerk's Office; 2 Envelopes of Sealed Exhibits Stored in Vault in Clerk's Office. (rlf) (Entered: 10/18/2013) |
| 11/04/2013 | 661 | ORDER granting 651 Sealed Motion to Approve Supersedeas Bond and Stay Execution of Judgment. Signed by Judge Leonard Davis on 11/04/13. (mll, ) (Entered: 11/04/2013) |
| 12/06/2013 | 662 | Emergency SEALED PATENT MOTION *FOR RELIEF FROM THE PROTECTIVE ORDER* by Ericsson Inc., Telefonaktiebolaget LM Ericsson. (Attachments: #_1_ Exhibit 1, #_2_ Exhibit 2, #_3_ Exhibit 3, #_4_ Exhibit 4, #_5_ Text of Proposed Order)(Stevenson, Theodore) (Entered: 12/06/2013) |

**A198**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON INC., ET AL., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| vs. | § | Civil Action No. 6:10-cv-473 |
| | § | |
| D-LINK CORP., ET AL., | § | |
| | § | |
| Defendants. | § | |

**FINAL JURY INSTRUCTIONS**

**1.    Introduction**

MEMBERS OF THE JURY:

You have heard the evidence in this case.  I will now instruct you on the law that you must apply.  It is your duty to follow the law as I give it to you. On the other hand, you the jury are the judges of the facts. Do not consider any statement that I have made during the trial or make in these instructions as an indication that I have any opinion about the facts of this case.

After I instruct you on the law, the attorneys will have an opportunity to make their closing arguments. Statements and arguments of the attorneys are not evidence and are not instructions on the law.  They are intended only to assist you in understanding the evidence and the parties' contentions.

1

**A199**

## 1.1    General Instructions

A verdict form has been prepared for you.  You will take this form to the jury room and when you have reached unanimous agreement as to your verdict, you will have your foreperson fill in, date, and sign the form.

Answer each question on the verdict form from the facts as you find them. Do not decide who you think should win and then answer the questions accordingly.  A corporation and all other persons are equal before the law and must be treated as equals in a court of justice.  With respect to each question asked, your answers and your verdict must be unanimous.

In determining whether any fact has been proved in this case, you may, unless otherwise instructed, consider the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who may have produced them.

## 1.2.    Considering Witness Testimony

You the jurors are the sole judges of the credibility of all witnesses and the weight and effect of all evidence.  By the Court allowing testimony or other evidence to be introduced over the objection of an attorney, the Court did not indicate any opinion as to the weight or effect of such evidence.

When the Court sustained an objection to a question addressed to a witness, you must disregard the question entirely, and may draw no inference from the

2

**A200**

wording of it or speculate as to what the witness would have testified to, if he or she had been permitted to answer the question.

At times during the trial it was necessary for the Court to talk with the lawyers here at the bench out of your hearing, or by calling a recess. We met because often during a trial something comes up that does not involve the jury. You should not speculate on what was discussed during such times.

In determining the weight to give to the testimony of a witness, you should ask yourself whether there was evidence tending to prove that the witness testified falsely concerning some important fact, or whether there was evidence that at some other time the witness said or did something, or failed to say or do something, that was different from the testimony the witness gave before you during the trial.

You should keep in mind, of course, that a simple mistake by a witness does not necessarily mean that the witness was not telling the truth as he or she remembers it, because people may forget some things or remember other things inaccurately. So, if a witness has made a misstatement, you need to consider whether that misstatement was an intentional falsehood or simply an innocent lapse of memory; and the significance of that may depend on whether it has to do with an important fact or with only an unimportant detail.

In deciding whether to accept or rely upon the testimony of any witness, you may also consider any bias of the witness.

3

**A201**

## 1.3    How to Examine the Evidence

Certain testimony in this case has been presented to you through a deposition. A deposition is the sworn, recorded answers to questions asked a witness in advance of the trial. Under some circumstances, if a witness cannot be present to testify from the witness stand, the witness testimony may be presented, under oath, in the form of a deposition. Sometime before this trial, attorneys representing the parties in this case questioned this witness under oath. A court reporter was present and recorded the testimony. This deposition testimony is entitled to the same consideration, and it is to be judged by you as to credibility and weight and otherwise considered by you insofar as possible the same as if the witness had been present and had testified from the witness stand in court.

While you should consider only the evidence in this case, you are permitted to draw such reasonable inferences from the testimony and exhibits as you feel are justified in the light of common experience. In other words, you may make deductions and reach conclusions that reason and common sense lead you to draw from the facts that have been established by the testimony and evidence in the case.

The testimony of a single witness may be sufficient to prove any fact, even if a greater number of witnesses may have testified to the contrary, if after considering all the other evidence you believe that single witness.

There are two types of evidence that you may consider in properly finding

4

**A202**

Case 1:10-cr-00654-HB Document 277-1 Filed 03/31/2014 Page 217

the truth as to the facts in the case. One is direct evidence such as testimony of an eyewitness. The other is indirect or circumstantial evidence—the proof of a chain of circumstances that indicates the existence or nonexistence of certain other facts. As a general rule, the law makes no distinction between direct and circumstantial evidence, but simply requires that you find the facts from a preponderance of all the evidence, both direct and circumstantial.

The parties have stipulated, or agreed to, some facts in this case. When the lawyers on both sides stipulate to the existence of a fact, you must, unless otherwise instructed, accept the stipulation as evidence, and regard the fact as proved.

## 1.4 Objections to Evidence

Attorneys representing clients in Courts such as this one have an obligation in the course of trial to assert objections when they believe testimony or evidence is being offered that is contrary to the rules of evidence. The essence of a fair trial is that it be conducted pursuant to the rules of evidence and that your verdict be based only on legally admissible evidence.

So, you should not be influenced by the objection or by the Court's ruling on it. If the objection is sustained, then ignore the question. If the objection is overruled, then you may treat the answer to that question just as you would treat the answer to any other question.

5

**A203**

### 1.5    Expert Witnesses

When knowledge of a technical subject matter may be helpful to the jury, a person who has special training or experience in that technical field (he or she is called an expert witness) is permitted to state his or her opinion on those technical matters. However, you are not required to accept that opinion. As with any other witness, it is up to you to decide whether the witness's testimony is believable or not, whether it is supported by the evidence, and whether to rely upon it.  In deciding whether to accept or rely upon the opinion of an expert witness, you may consider any bias of the witness.

### 2.    Contentions of the Parties

I will first give you a summary of each side's contentions in this case.  I will then tell you what each side must prove to win on these issues.

Plaintiffs Ericsson Inc. and Telefonaktiebolaget LM Ericsson (collectively "Ericsson") contend that the Defendants D-LINK Systems (hereinafter "D-LINK"), Netgear, Inc. (hereinafter "Netgear"), Acer, Inc. and Acer America Corp. (collectively "Acer"), Gateway, Inc. (hereinafter "Gateway"), Dell Inc. (hereinafter "Dell"), Toshiba Corporation and Toshiba America Information Systems, Inc. (collectively "Toshiba"), Belkin International, Inc. (hereinafter "Belkin") and Intel Corp. (hereinafter "Intel") (collectively "Defendants," hereinafter), make, use, sell, offer to sell, and/or import into the United States Defendants' accused 802.11n-

6

**A204**

compliant products that practice or embody one or more claims of the following

patents:

US Patent No. 6,466,568 ('568) / Claims 1 and 5

US Patent No. 6,424,625 ('625) / Claim 1

US Patent No. 6,330,435 ('435) / Claims 1 and 2

US Patent No. 6,772,215 ('215) / Claims 1 and 2

Ericsson also contends that Defendants Acer, Gateway, Dell, Toshiba, and

Intel infringe certain claims of the following patent:

US Patent No. 6,519,223 ('223) / Claim 11.

These claims have been referred to as the "Asserted Claims" and these

patents have been referred to as the "Patents-in-Suit."

Ericsson also contends that Defendants are inducing their customers and/or

end-users to directly infringe certain claims of the Patents-in-Suit. Ericsson is

seeking damages for the alleged infringement of the Defendants.

In response to Ericsson's contentions, Defendants contend that neither they

nor their customers or end-users have infringed the Patents-in-Suit. Defendants

further contend that they have not induced direct infringement of the Asserted

Claims. Defendants also contend that at least certain of the Asserted Claims of the

'435 and '625 patents are invalid as being anticipated by the prior art. Defendants

also contend that Ericsson is not entitled to damages for any infringement.

7

**A205**

## 3. Burdens of Proof

In any legal action, facts must be proved by a required amount of evidence known as the "burden of proof." The burden of proof in this case is on Ericsson for some issues and on the Defendants for other issues.

Ericsson has the burden of proving infringement and damages by a preponderance of the evidence. Preponderance of the evidence means the evidence persuades you that a claim is more likely true than not true. If the proof establishes that all parts of one of Ericsson's infringement claims are more likely true than not true, then you should find for Ericsson as to that claim.

The Defendants have the burden of proving invalidity by clear and convincing evidence. Clear and convincing evidence means evidence that produces in your mind a firm belief or conviction as to the matter at issue. Although proof to an absolute certainty is not required, the clear and convincing evidence standard requires a greater degree of persuasion than is necessary for the preponderance of the evidence standard. If the proof establishes in your mind a firm belief or conviction, then the standard has been met.

In determining whether any fact has been proved by the preponderance of the evidence or by clear and convincing evidence, you may, unless otherwise instructed, consider the stipulations, the testimony of all witnesses, regardless of who may have called them, and all exhibits received in evidence, regardless of who

8

**A206**

may have produced them.

## 4.    The Claims

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."  The patent claims are the numbered sentences at the end of each patent.  The claims are important because it is the words of the claims that define what a patent covers. The figures and text in the rest of the patent provide a description and/or examples of the invention and provide a context for the claims, but it is the claims that define the breadth of the patent's coverage.  Each claim is effectively treated as if it was a separate patent, and each claim may cover more or less than another claim. Therefore, what a patent covers depends, in turn, on what each of its claims covers.

You will first need to understand what each claim covers in order to decide whether or not there is infringement of the claim and to decide whether or not the claim is invalid.  The law says that it is the Court's role to define the terms of the claims and it is your role to apply these definitions to the issues that you are asked to decide in this case.  Therefore, as I explained to you at the start of the case, the Court has determined the meaning of the claims, and I will provide to you the definitions of certain claim terms.  You must accept the definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and

9

**A207**

validity.

## 4.1   How a Claim defines what it covers

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a device or a method satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent.  Each claim may be narrower or broader than another claim by setting forth more or fewer requirements.  The coverage of a patent is assessed claim-by-claim.  In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations."  When a thing (such as a product or a process) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.  In other words, a claim covers a product or process where each of the claim elements or limitations is present in that product or process.

Sometimes the words in a patent claim are difficult to understand, and therefore it is difficult to understand what requirements these words impose.  It is my job to explain to you the meaning of the words in the claims and the requirements these words impose.

As I just instructed you, there are certain specific terms that the Court has defined, and you are to apply those definitions.

10

**A208**

Case 1:16-cv Case 12-1625 Document 179-1 Page: 223 Filed: 03/31/2014 (222 of 575)
Case 1:16-cv-CASE-3 HARD-RICHARD Document Document 672113 Page 2230 of 3 filed 03/34/2014
15644

By understanding the meaning of the words in a claim and by understanding that the words in a claim set forth the requirements that a product or process must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim. Once you understand what each claim covers, you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

## 4.2 Claim Interpretation

I will now explain to you the meaning of some of the words of the claims in this case. In doing so, I will explain some of the requirements of the claims. As I have previously instructed you, you must accept the definition of these words in the claims as correct. For any words in the claim for which you have not been provided with a definition, you should apply their common meaning. You should not take the definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

| Term | Construction |
| --- | --- |
| Responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field | Responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response message from a number of different message types |

11

**A209**

| Data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded | A message that indicates data packets that the transmitter has discarded |
| --- | --- |
| A service type identifier which identifies a type of payload information | An identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia. |

## 5.     Direct Infringement

I will now instruct you on the specific rules you must follow to determine whether Ericsson has proven that the Defendants have infringed one or more of the asserted claims of one or more of the patents-in-suit involved in this case.

### 5.1    Literal Infringement

If any person makes, uses, or offers to sell, sells in the United States or imports into the United States what is covered by the claims of a patent without the patent owner's permission, that person is said to infringe the patent.  This type of infringement is called direct infringement.  To determine direct infringement, you must compare the accused products or methods with each of the Asserted Claims of the Asserted Patents, using my instructions as to the meaning of the patent claims.

A patent claim is directly infringed only if the accused product or method includes each and every element or steps in that patent claim.  If the accused

12

**A210**

product or method does not contain one or more of the limitations recited in a claim, then that product or method does not directly infringe that claim. If you find that the accused product or method includes each element or step of the claim, then that product or method infringes the claim even if such product or use contains additional elements or steps that are not recited in the claim.

An accused system or product directly infringes a claim if it is reasonably capable of satisfying the claim elements even though it may also be capable of non-infringing modes of operation. If a claim requires only that the system or product have the capacity to perform a function, one who makes a system or product with that capability without the patent owners' authority is a direct infringer even though the maker's customers do not use the capacity.

A patent claim is directly infringed only if the accused product or method includes each and every element in that patent claim, as I will instruct you shortly. If the accused product or method does not contain one or more of the limitations recited in a claim, then that product or method does not directly infringe that claim.

A person may directly infringe a patent even though in good faith the person believes that what it is doing is not an infringement of any patent and even if it did not know of the patent. Direct infringement does not require proof that the person copied a product or the patent.

You must consider each of the asserted claims of the patents-in-suit

13

**A211**

individually. You must be certain to compare such accused product or method with each claim that such product or method is alleged to infringe. Such accused product or method should be compared to the limitations recited in the patent claims, not to any preferred or commercial embodiment of the claimed invention.

Taking each asserted claim of the Asserted Patents separately, if you find that Ericsson has proved by a preponderance of the evidence that each and every limitation of that claim is present in the Defendant's accused products or methods, then you must find that such product or method infringes that claim.

A claim limitation is literally met if it exists in the accused product or method just as it is described in the claim language, either as I have explained that language to you or, if I did not explain it, as the language would be understood by one of skill in the art. You must determine separately for each asserted claim whether or not there is infringement.

## 5.2 Infringement of Dependent Claims

So far, my instructions on infringement have applied to what are known as independent claims. The patents-in-suit also contain dependent claims. Each dependent claim refers to an independent claim. A dependent claim includes each of the requirements of the independent claim to which it refers and one or more additional requirements.

In order to find infringement of dependent claim of any of the patents-in-

14

**A212**

suit, you must first determine whether any of the independent claims have been infringed. If you decide that the independent claim has not been infringed, then the dependent claim cannot have been infringed. If you decide that the independent claim has been infringed, you must then separately determine whether each additional requirement of the dependent claim has also been included in the accused product. If each additional requirement has been included, then the dependent claim has been infringed. Conversely, if the Defendants' products or conduct omit any additional requirement recited in Ericsson's asserted patent claims, the Defendants do not infringe that claim.

Ericsson must prove that it is more likely than not that a patent claim has been infringed.

## 6.    Indirect Infringement – Inducing Patent Infringement

A party induces patent infringement if it purposefully causes, urges, or encourages another to infringe the claims of a patent. Inducing infringement cannot occur unintentionally. This is different from direct infringement, which can occur unintentionally.

Ericsson has alleged that the Defendants have induced infringement by their customers. To prove that these Defendants induced patent infringement, Ericsson must prove that it is more likely than not: (1) that customers or end-users of the Defendants have directly infringed the asserted patent claims; and (2) that the

15

**A213**

Defendants have actively and knowingly aided and abetted that direct infringement.

A Defendant is liable for active inducement of infringement of a patent claim if:

(1)    The particular Defendant takes action during the time the patent is in force which encourages acts by someone else;

(2)    The encouraged acts constitute direct infringement of that claim;

(3)    The particular Defendant (a) was aware of the patent, and knew that the encouraged acts constitute infringement of the patent; or (b) was willfully blind to the infringement of the patent.  Willful blindness requires that the Defendant subjectively believed there was a high probability that the encouraged acts constituted infringement of the patent and took deliberate actions to avoid learning of the infringement;

(4)    The particular Defendant had the intent to encourage infringement by someone else; and

(5)    The encouraged acts are actually carried out by someone else.

In order to prove active inducement, Ericsson must prove that each of the above requirements is met. Further, proof of each element must be by a preponderance of the evidence, i.e., that it is more likely than not that each of the above requirements has been met.

16

**A214**

In considering whether a Defendant has induced infringement by others, you may consider all the circumstances, including whether or not it obtained the advice of a competent lawyer, whether or not it knew of the patents when designing and manufacturing its products, and whether or not it removed or diminished the allegedly infringing features. You may not assume that merely because they did not obtain an opinion of counsel, the opinion would have been unfavorable.

Intent to cause a third party to perform acts which result in direct infringement may be demonstrated by evidence of active steps taken to encourage the third party to do so, such as advertising an infringing use or instructing how to engage in an infringing use. It is not sufficient that a Defendant was aware of the act(s) that allegedly result in direct infringement of the patent claim or merely encouraged the acts themselves. Rather, you must find that the particular Defendant specifically intended to cause its customers to engage in the acts that constitute direct infringement and that the Defendant knew or was willfully blind that the action would cause direct infringement.

If you do not find that the accused infringer specifically meets these intent requirements by a preponderance of the evidence, then you must find that the accused infringer has not actively induced the alleged infringement.

## 7. Invalidity

The Defendants have challenged the validity of the asserted patent claims of

17

**A215**

the '435 and '625 patents. The Defendants must prove that a patent claim is invalid by clear and convincing evidence. Evidence of material prior art which is not cumulative of prior art cited to or by the PTO may be more probative in meeting the standard than the prior art that was cited to or by the PTO. An issued patent is accorded a presumption of validity based on the presumption that the United States Patent and Trademark Office acted correctly in issuing the patent. From the issuance of the patent, it is presumed that a claimed invention is new, useful, and not obvious, and satisfies the other legal requirements for a valid U.S. patent. Each claim of a patent is presumed valid independently of the validity of the other claims. The presumption of validity remains intact and the burden of proof remains on the Defendants throughout this litigation. In other words, the burden never shifts to Ericsson to prove that its patents are valid.

For a patent to be valid, the invention claimed in the patent must be new, useful, and not obvious. A patent cannot take away from people their right to use what was known when the invention was made. In addition, the patent must comply with certain statutory requirements of disclosure.

I will now explain to you the Defendants' grounds for invalidity in detail. In making your determination as to invalidity, you should consider each claim and each ground for invalidity separately.

18

**A216**

## 7.1    Anticipation – Publicly Used or Known, or Previously Published

The Defendants contend that the asserted claims of the '435 and '625 patents are invalid because the claimed invention is not new.  For a claim to be invalid because it is not new, all of its requirements must have been described in a single previous publication or patent that predates the claimed invention.  In patent law, such previous publication or patent is called a "prior art reference."  If a patent claim is not new, we say it is "anticipated" by a prior art reference.  The Defendants must prove a claim is anticipated by clear and convincing evidence.

The disclosure in the prior art reference does not have to be in the same words as the claim, but all of the requirements of the claim must be there, either stated or necessarily implied, so that someone of ordinary skill in the field of the claimed invention looking at that one reference would be able to make and use at least one embodiment of the claimed invention.

Anticipation also occurs when the claimed invention inherently (necessarily) results from practice of what is disclosed in the written reference, even if the inherent disclosure was unrecognized or unappreciated by one of ordinary skill in the field of the invention.

The Defendants can show that a patent claim was not new if the claimed invention was already patented or described in a printed publication anywhere in the world before date of invention of the asserted claim.

19

**A217**

The Defendants can also show that a patent claim was not new if the claimed invention was already described in another published U.S. patent application or issued U.S. patent that was based on a patent application filed before the date of the patent holder's application filing date, or, the date of invention. The dates of invention for the patents-in-suit are as follows:

For the '435 patent — March 18, 1999

For the '625 patent — October 28, 1998

Defendants contend that the '435 and '625 are invalid. If a patent claim is not new as explained above, you must find that claim invalid.

## 7.2 Anticipation – Printed Publication

A patent claim is invalid if the invention defined by that claim was described in a printed publication anywhere in the world before it was invented by the patent applicant.

Printed publications may include issued patents as well as articles, treatises, and other written materials. A reference is a "printed publication" if it is reasonably accessible to those interested in the field, even if it is difficult to find. An electronic publication, including an on-line or internet publication, is a "printed publication" if it is at least reasonably accessible to those interested in the field, even if it is difficult to find.

A printed publication must be reasonably accessible to those members of the

20

**A218**

Case: 13-1625 Case: 13-1625 CASE PARTICIPANTS ONLY Document: 179-1 Document: 172-1 Page: 233 Page: 233 Filed: 03/31/2014 Filed: 03/31/2014 (233 of 575)

15654

public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public. The date that a printed publication becomes prior art is the date that it becomes reasonably accessible to the public.

So long as the printed publication was available to the public, the form in which the information was recorded is unimportant. The information must, however, have been maintained in some permanent form, such as printed or typewritten pages, magnetic tape, microfilm, photographs, or photocopies.

For a claim to be anticipated by a prior art publication, all of the claimed requirements must have been either (1) disclosed in a single prior art reference or (2) implicitly disclosed in a single prior art reference as viewed by one of ordinary skill in the field of the invention. The disclosure in a reference does not have to be in the same words as the claim, but all of the requirements of the claim must be described in enough detail, or necessarily implied by or inherent in the reference, to enable someone of ordinary skill in the field of the invention looking at the reference to make and use at least one embodiment of the claimed invention.

A prior art publication also invalidates a patent claim when the claimed invention necessarily results from practice of the subject of the publication, even if the result was unrecognized and unappreciated by one of ordinary skill in the field of the invention.

**A219**

A printed publication will anticipate if it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation. Factors to be considered in determining whether a disclosure would require undue experimentation include: (1) the quantity of experimentation necessary; (2) the amount of direction or guidance disclosed in the printed publication or patent; (3) the presence or absence of working examples in the printed publication or patent; (4) the nature of the invention; (5) the state of the prior art; (6) the relative skill of those in the art; (7) the predictability of the art; and (8) the breadth of the claims.

**8. Damages**

I will now instruct you on damages. If you find that the Defendants have infringed one or more valid claims of the patents-in-suit, you must determine the amount of money damages to which Ericsson is entitled. By instructing you on damages, I do not suggest that one or the other party should prevail. These instructions are provided to guide you on the calculation of damages in the event you find infringement of a valid patent claim and thus must address the damages issue.

In this case, Ericsson has sued D-Link, Netgear, Belkin, Acer/Gateway, Dell, and Toshiba. Intel has intervened in this case to defend its chips used by some of its customer defendants. Accordingly, in answering Question #4, you will

22

**A220**

be determining what amount of money would fairly and reasonably compensate Ericsson for infringement, if any, by each Defendant, except Intel. Any damages for Intel's infringement, if any, will be included in whatever damages, if any, you find for each of its customer defendants.

The amount of damages must be adequate to compensate Ericsson for the infringement, but it may not be less than a "reasonable royalty." At the same time, your damages determination must not include additional sums to punish the Defendants or to set an example. You may award compensatory damages only for the loss that Ericsson proves was more likely than not caused by the Defendants' infringement. Moreover, because Ericsson has agreed that it is under an obligation to license the patents-in-suit on Reasonable and Non-Discriminatory ("RAND") terms, you must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations.

## 8.1    Damages – Burdens of Proof

Where the parties dispute a matter concerning damages, it is Ericsson's burden to prove that it is more probable than not that Ericsson's version is correct. Ericsson must prove the amount of damages with reasonable certainty, but need not prove the amount of damages with mathematical precision. However, Ericsson is not entitled to damages that are remote or speculative.

**A221**

## 8.2    When Damages Begin

The amount of damages Ericsson can recover is limited to those acts of infringement that occurred after Ericsson gave each Defendant notice that it infringed the patent. Actual notice means that Ericsson communicated to the Defendants a specific charge of infringement of the patent by the accused products. This notice is effective as of the date given.

Your job is to calculate damages from the date that each Defendant received actual notice. You should not award damages for Ericsson against any infringement by a Defendant occurring before that Defendant first received actual notice.

## 8.3    Reasonable Royalty - Definition

If you find that any claim of the Asserted Patents is both valid and infringed, then Ericsson is entitled to damages adequate to compensate for the infringement of that patent, but in no event less than a reasonable royalty for the use made of the invention by the Defendant. A royalty is the amount of money a licensee pays to a patent owner to make, use or sell the patented invention.  A reasonable royalty is the amount of money a willing patent holder and a willing prospective licensee would have agreed upon at the time of the infringement for a license to make the invention.   It is the royalty that would have resulted from an arms-length negotiation between a willing licensor and a willing licensee, assuming that both

24

**A222**

parties understood the patent to be valid and infringed and that the licensee would respect the patent. Unlike a real world negotiation, in the hypothetical negotiation, all parties are presumed to know that the patent is infringed and valid. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began may be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

In making your determination of the amount of a reasonable royalty, it is important that you focus on the time period when the Defendant first infringed the patent and the facts that existed at that time. Your determination does not depend on the actual willingness of the parties to this lawsuit to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered negotiations for royalties at the time of the infringing activity. The Defendant's actual profits may or may not bear on the reasonableness of an award based on a reasonable royalty.

In deciding what is a reasonable royalty that would have resulted from the hypothetical negotiation, you may consider the factors that the patent owner and the alleged infringer would consider in setting the amount the alleged infringer

25

**A223**

should pay.

I will list for you a number of factors you may consider. This is not every possible factor, but it will give you an idea of the kinds of things to consider in setting a reasonable royalty.

1.      The royalties received by the patentee for licensing of the patents-in-suit, proving or tending to prove an established royalty.

2.       Royalties paid for other patents comparable to the asserted patents.

3.      The nature and scope of the license, as exclusive or nonexclusive; or as restricted or non-restricted in terms of territory, or with respect to the parties to whom the product may be sold.

4.      Whether or not the licensor had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use the invention or by granting licenses under special conditions designed to preserve that exclusivity.

5.      The commercial relationship between the licensor and licensee, such as whether they are competitors in the same territory and the same line of business, or whether they are inventor and promoter.

6.      Whether being able to use the patented invention helps in making sales of other products or services.

7.      The duration of the patent and the term of the license.

26

**A224**

8.      The profitability of the patented invention, and whether or not it is commercially successful or popular.

9.      The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

10.     The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

11.     The extent of the licensee's use of the patented invention and any evidence probative of that use.

12.     The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

13.     The portion of the profits that is due to the patented invention, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes, or features or improvements developed by the licensee.

14.     Expert opinions as to what would be a reasonable royalty.

15.     The amount that a licensor and a licensee would have agreed upon if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which an accused infringer would have been willing to pay as a

27

**A225**

royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a patent owner if it would have been willing to create a license.

16.    Ericsson's obligation to license its technology on RAND terms.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors. The framework which you should use in determining a reasonable royalty is a hypothetical negotiation between normally prudent business people.

## 8.4    Damages – Lump Sum Royalty

A second way to calculate a royalty is to determine a one-time lump sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future. This differs from payment of an ongoing royalty where a royalty rate is applied against future sales as they occur. When a one-time lump sum is paid, the infringer pays a single price for a license covering both past and estimated future infringing sales.

It is up to you, based on the evidence, to decide what type of royalty is appropriate in this case.

## 8.5    Infringer's Profit Margin

An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped. The infringer's selling price can be raised if necessary to

28

**A226**

accommodate a higher royalty rate. Requiring the infringer to do so may be the only way to adequately compensate the patentee for the use of its technology.

## 8.6    Damages may not be Punitive or Speculative

You must not award Ericsson more damages than are adequate to compensate for the infringement. Nor shall you include any additional amount for the purpose of punishing a defendant or setting an example. Nor may you include damages that are speculative, damages that are only possible, or damages that are based on guesswork.

## 9.    Instructions for Deliberations

You must perform your duties as jurors without bias or prejudice as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion. All parties expect that you will carefully and impartially consider all the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life. A corporation is entitled to the same fair trial as a private individual. All persons, including corporations, and other organizations stand equal before the law, regardless of size or who owns them, and are to be treated as equals.

29

**A227**

Case 1:16-cv-... Case 12-1625 Document 179-1 Page: 242 Filed: 03/31/2014 (242 of 575)
Case 1:16-cv-CASE HEARD ... Document 6721-13 Page 242 of 3 Filed 03/31/2014
15663

When you retire to the jury room to deliberate on your verdict, you may take this charge with you as well as exhibits which the Court has admitted into evidence. Select your Foreperson and conduct your deliberations. If you recess during your deliberations, follow all of the instructions that the Court has given you about/on your conduct during trial. After you have reached your verdict, your Foreperson is to fill in on the form your answers to the questions. Do not reveal your answers until such time as you are discharged, unless otherwise directed by me. You must never disclose to anyone, not even to me, your numerical division on any question.

Any notes that you have taken during this trial are only aids to memory. If your memory should differ from your notes, then you should rely on your memory and not on the notes. The notes are not evidence. A juror who has not taken notes should rely on his or her independent recollection of the evidence and should not be unduly influenced by the notes of other jurors. Notes are not entitled to any greater weight than the recollection or impression of each juror about the testimony.

If you want to communicate with me at any time, please give a written message or question to the Court Security Officer, who will bring it to me. I will then respond as promptly as possible either in writing or by having you brought into the courtroom so that I can address you orally. I will always first disclose to

30

**A228**

the attorneys your question and my response before I answer your question.

After you have reached a verdict, you are not required to talk with anyone about the case unless the Court orders otherwise. You may now retire to the jury room to deliberate.

31

**A229**

Case 6:10-cv-00473-LED Document 571 Filed 03/26/2014 Page 244 of 575

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | | |
|---|---|---|
| ERICSSON INC., et al., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | Civil Action No. 6:10-CV-473-LED |
| | § | |
| D-LINK CORPORATION., et al. | § | |
| | § | |
| Defendant. | § | |

## FINAL VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's Charge.

1

**A230**

Case 3:10-cv-00473 Document 570-1 Page 245 Filed 03/31/2014

1.  Did **Ericsson** prove by a preponderance of the evidence that Defendants **D-LINK Systems, Inc.**, **Netgear, Inc.**, and **Belkin International, Inc.** infringe the following claims of the following patents?

Write "Yes" or "No" for each Claim.

| | D-LINK Systems, Inc. | Netgear, Inc. | Belkin International, Inc. |
|---|---|---|---|
| **'568 Patent** | | | |
| Claim 1 | yes | yes | yes |
| Claim 5 | yes | yes | yes |
| **'625 Patent** | | | |
| Claim 1 | yes | yes | yes |
| **'435 Patent** | | | |
| Claim 1 | No | No | No |
| Claim 2 | No | No | No |
| **'215 Patent** | | | |
| Claim 1 | yes | yes | yes |
| Claim 2 | yes | yes | yes |

2

**A231**

Case 3:10-cv-00473-LEARRHGI-PAdusmoNL3oBocuinen0e157-1    Pages 246 Paged: 03/332014

2.  Did **Ericsson** prove by a preponderance of the evidence that Defendants **Acer/Gateway, Dell, Inc., Toshiba**, and **Intel Corp.** and infringe the following claims of the following patents?

Write "Yes" or "No" for each Claim.

|  | **Acer/Gateway** | **Dell, Inc.** | **Toshiba** | **Intel Corp.** |
|---|---|---|---|---|
| **'568 Patent** | | | | |
| Claim 1 | Yes | yes | yes | Yes |
| **'625 Patent** | | | | |
| Claim 1 | yes | Yes | yes | yes |
| **'435 Patent** | | | | |
| Claim 1 | No | No | No | No |
| Claim 2 | No | No | No | No |
| **'215 Patent** | | | | |
| Claim 1 | Yes | Yes | Yes | Yes |
| Claim 2 | Yes | Yes | Yes | Yes |
| **'223 Patent** | | | | |
| Claim 11 | no | no | no | no |

3

**A232**

Case 3:10cv-004xSL-BRH CI PADUSHONL3OB cuilect06/157-3   Page: 247   Filed: 03/36/2014

3.   Did **Defendants** prove by clear and convincing evidence that any of the listed claims of the following patents are invalid?

   **If you find the claim invalid, answer "Yes;" otherwise, answer "No."**

   <u>'625 Patent</u>

   Claim 1        NO

   <u>'435 Patent</u>

   Claim 1        NO
   Claim 2        NO

4

**A233**

4.     What sum of money, if paid now in cash, do you find from a preponderance of the evidence would fairly and reasonably compensate **Ericsson** for infringement of the patents by the following Defendants up to the time of trial?

**Answer with the Amount:**

| Defendant | Amount |
|---|---|
| D-LINK | $ 435,000 |
| Netgear | $ 3,555,000 |
| Acer/Gateway | $ 1,170,000 |
| Dell | $ 1,920,000 |
| Toshiba | $ 2,445,000 |
| Belkin | $ 600,000 |

JURY FOREPERSON

5

**A234**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| | |
|---|---|
| ERICSSON INC., et al., | § |
| | § |
| Plaintiff, | § |
| | § |
| vs. | § Civil Action No. 6:10-CV-473-LED |
| | § |
| D-LINK CORPORATION., et al. | § |
| | § |
| Defendant. | § |

## WILLFULNESS VERDICT FORM

In answering these questions, you are to follow all of the instructions I have given you in the Court's Charge.

1.    Did **Ericsson** prove by clear and convincing evidence that **D-LINK Systems Inc.'s, Netgear's, and Belkin International, Inc.'s** infringement was willful?

**Answer "Yes" or "No" for each patent below.**

| | D-LINK Systems, Inc. | Netgear, Inc. | Belkin International, Inc. |
|---|---|---|---|
| '568 Patent | No | No | No |
| '625 Patent | No | No | No |
| '215 Patent | No | No | No |

1

**A235**

2.    Did **Ericsson** prove by clear and convincing evidence that **Acer/Gateway's, Dell, Inc.'s, Toshiba's, and Intel Corp.'s** infringement was willful?

**Answer "Yes" or "No" for each patent below.**

|              | Acer/Gateway | Dell, Inc. | Toshiba | Intel Corp. |
|--------------|--------------|------------|---------|-------------|
| '568 Patent  | No           | No         | No      | No          |
| '625 Patent  | No           | No         | No      | No          |
| '215 Patent  | No           | No         | No      | No          |

2

**A236**

US006424625B1

## (12) United States Patent
### Larsson et al.

(10) Patent No.: **US 6,424,625 B1**
(45) Date of Patent: **Jul. 23, 2002**

(54) **METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST**

(75) Inventors: **Peter Larsson**, Euro Asia View; **Mikael Larsson**, Doer Park, both of (SG)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/179,952**

(22) Filed: **Oct. 28, 1998**

(51) Int. Cl.$^7$ ............................................... **H04L 12/26**
(52) U.S. Cl. ...................................... **370/236**; 370/410
(58) Field of Search ................................ 370/389, 394, 370/410, 426, 428, 429, 470, 471, 473, 236; 714/748, 749, 750

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,344,171 A | * | 8/1982 | Lin et al. .................... 714/751 |
| 4,726,027 A | * | 2/1988 | Nakamura et al. .......... 714/748 |
| 5,483,545 A | * | 1/1996 | Darmon et al. ............ 714/748 |
| 5,826,028 A | | 10/1998 | Bennett et al. |
| 6,163,861 A | * | 12/2000 | Yoshioka et al. .......... 714/712 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| WO | 98/42108 | 9/1998 |

### OTHER PUBLICATIONS

Heliomar M. de Lima and Otto Carlos M.B. Duarte, "A Go–Back–N Protocol with Multicopy Retransmission for High Speed Satellite Communications", 1994, pp. 859–863.

F. Argenti and G. Benelli, "An ARQ Protocol For Mobile Radio Systems", 1992, pp. 1323–1326.

Nachum Shacham and Byung Cheol Shin, "A Selective–Repeat–ARQ Protocol for Paralle Channels and Its Resequencing Analysis", Apr. 1992, pp. 773–782.

Standard Search Report dated Jul. 16, 1999.

* cited by examiner

*Primary Examiner*—Kwang B. Yao
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Techniques are provided for use with automatic repeat request (ARQ) schemes in a data network to minimize a bandwidth used by a receiver and a transmitter in the network to transfer data packets, by discarding outdated packets that have not yet been successfully transferred. In accordance with an embodiment of the invention, a bit is set in the ARQ packet header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent. In accordance with another embodiment of the invention, after data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets that are yet to be sent to the receiver, so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

**19 Claims, 12 Drawing Sheets**



Ericsson, Inc. v. D-Link, et. al

**PX0004**

6:10-cv-473

**A237**



A238



FIG. 2 (PRIOR ART)

**A239**



Retransmission from N(R) up to TSN. BSN is set to N(R).

**FIG. 3D**
(PRIOR ART)

Erroneous or lost LLC PDUs. A NACK with N(R)=ESN is issued.

**FIG. 3C**
(PRIOR ART)

LLC PDUs sent. All are received.

**FIG. 3B**
(PRIOR ART)

**FIG. 3A**
(PRIOR ART)

**A240**



**U.S. Patent**     Jul. 23, 2002     Sheet 5 of 12     US 6,424,625 B1



## FIG. 5
### (PRIOR ART)



## FIG. 6
### (PRIOR ART)

**A242**

A243



ESN 1,2,3 are missing. NACK(s) is/are sent for all outstanding packets.

**FIG. 7A**
(PRIOR ART)

ESN1 has been retransmitted and correctly received. ESN2 is currently being retransmitted. BSN is set to ESN1 - 1, i.e. NACK with cumulative PACK for preceeding packets.

**FIG. 7B**
(PRIOR ART)

ESN1-3 has successfully been received. Some more new packets have also been sent.

**FIG. 7C**
(PRIOR ART)

Case: 13-1625  Case: 13-1625  Document: 179-1  Document: 177-1  Page: 258  Page: 258  Filed: 03/31/2014  Filed: 03/31/2014  (258 of 575)

CASE PARTICIPANTS ONLY

**U.S. Patent**      Jul. 23, 2002      Sheet 7 of 12      US 6,424,625 B1



FIG. 8



FIG. 9

**A244**

CASE PARTICIPANTS ONLY Document: 177-1



FIG. 10A

A245

**U.S. Patent**     Jul. 23, 2002     Sheet 9 of 12     US 6,424,625 B1



FIG. 10B

**A246**

Case: 13-1625 CASE PARTICIPANTS ONLY Document: 177-1 Page: 261 Filed: 03/31/2014 (261 of 575)



# FIG. 11

**U.S. Patent**          Jul. 23, 2002          Sheet 11 of 12          US 6,424,625 B1



# FIG. 12

**A248**



## FIG. 13

US 6,424,625 B1

**1**

# METHOD AND APPARATUS FOR DISCARDING PACKETS IN A DATA NETWORK HAVING AUTOMATIC REPEAT REQUEST

## FIELD OF THE INVENTION

The present invention relates to Automatic Repeat Request (ARQ) techniques for transferring data in fixed/wireless data networks.

## BACKGROUND OF THE INVENTION

ARQ techniques are commonly used in data networks to ensure reliable data transfer and to protect data sequence integrity. Data packets are encoded with an error detecting code, so that when a transmitter in the data network sends or transfers data packets to a receiver in the data network, the receiver receiving the data packets can detect corrupted, erroneous or lost packets and thereby request that the transmitter retransmit the affected data packets. The integrity of a data sequence is normally protected by sequentially numbering packets and applying certain transmission rules.

There are three main ARQ schemes: Stop-and-Wait; Go-Back-N; and Selective Reject (sometimes referred to as Selective Repeat). All three methods provide mechanisms for transferring packets to a receiver in a data network in an appropriate order. In terms of throughput efficiency as a function of the signal to noise ratio, generally Selective Reject is most efficient, Stop-and-Wait is least efficient, and Go-Back-N is intermediate. Also, various mixtures of the Selective Reject and Go-Back-N techniques exist, and fall between pure Selective Reject and pure Go-Back-N techniques in both efficiency and complexity.

With respect to Go-Back-N, several different variants exist which differ in terms of how they use positive acknowledgments (PACKs), negative acknowledgments (NACKs), retransmission timers, polling schemes, etc.

One type of Go-Back-N technique uses both PACKs and NACKs that have the following characteristics:

A PACK for a data packet having a sequence number N(R) gives a cumulative positive acknowledgment for data packets having sequence numbers before N(R), but does not positively acknowledge the data packet having the sequence number N(R), as shown for example in FIG. 1A.

The NACK positively acknowledges all data packets before the data packet it negatively acknowledges. The data packet which the NACK negatively acknowledges is indicated by N(R), as shown for example in FIG. 1B.

FIG. 2 shows a simplified ARQ transmitter window, in which five variables are used to keep track of a transmitter state. The five variables include: a bottom sequence number, BSN; a top sequence number, TSN; a maximum top sequence number, $TSN_{MAX}$; an instant sequence number, ISN; and an expected sequence number, ESN.

BSN denotes the oldest packet in the transmitter buffer, and can also indicate that all packets before the BSN packet have been acknowledged or discarded. Packets prior to the packet indicated by TSN have been sent. ESN denotes the expected sequence number of a packet to be received. ISN indicates the sequence number of the next packet to be sent. When a packet is sent for the first time, TSN and ISN will be identical. However, when a retransmission is performed, ISN will start over from the first retransmitted packet and progress in consecutive order, one packet at a time, up to TSN. TSN cannot exceed $TSN_{MAX}$, which is defined by the window size W. Assuming that a sequence number field has

**2**

k bits, $2^k$ different sequence numbers can be created. Thus, the maximum size W of the window shown in FIG. 2 is $2^k-1$.

Operation of the Go-Back-N technique using both PACKs and NACKs can be envisioned by imagining a clockwise consecutive modulo $2^k$ sequence numbering superimposed upon the circumference of the circles shown in FIGS. 3A–3D. FIG. 3A shows a circle indicating a state where no packets have yet been sent, and TSN, ESN, BSN and ISN all have the same value, i.e., point to the same packet. The circle shown in FIG. 3B indicates that (TSN-BSN) packets have been sent and also received, since ESN=TSN. An erroneous or lost packet causes ESN to stop progressing forward, although more packets have been sent. For example, in FIG. 3C packets up to the packet indicated by TSN and ISN have been sent, but ESN indicates a prior packet which was not received. After a packet is lost or an erroneous packet is received, the ARQ receiver sends a NACK to the ARQ transmitter to inform the ARQ transmitter about the lost or erroneous packet. The NACK includes a returned sequence number N(R) that is set equal to ESN, thereby acknowledging that all previous packets were correctly received. BSN and ISN are set equal to ESN (and N(R)) so that BSN moves forward and ISN moves backward to the sequence number representing the lost or erroneous packet. Thereafter, as shown in FIG. 3D, ISN and ESN move forward together as the lost or erroneous packet is retransmitted, and as the succeeding packets are also retransmitted.

FIGS. 4A–4D illustrate use of a PACK. For example, FIG. 4A shows a state where nothing has yet been sent, and TSN=ISN=BSN=ESN. FIG. 4B shows a situation where all sent packets have been correctly received. FIG. 4C shows that a timer-initiated PACK is sent, conveying the sequence number N(R) of a packet between BSN and TSN=ESN= ISN. As shown in FIG. 4D, after the PACK is sent, BSN is set to N(R).

Sending PACKs ensures that sequence number starvation does not occur. Since TSN may not pass BSN, if the transmitter does not receive PACKs, it may continue to send data packets up to $TSN_{MAX}$. However, if data packets up to $TSN_{MAX}$ are sent but no PACKs are received, then $TSN_{MAX}$ cannot progress and sequence number starvation occurs. The transmitter must wait until it receives a PACK, which will allow BSN and thus $TSN_{MAX}$ to progress.

FIG. 5 shows a general example of an ARQ data packet 510. The packet 510 typically includes an ARQ header 512 and a data portion 516. The header 512 contains a k-bit sequence number 514, and can be located at the front of the packet 510 as shown in FIG. 5, or at any predefined position within the packet 510.

FIG. 6 shows an exemplary ACK message 610, with an identifier field 612 that identifies the responding terminal sending the ACK message 610, a NACK/PACK type indicator 614 indicating whether a PACK or a NACK is being sent, and finally a sequence number field N(R) 616 that indicates for which sequence number the ACK message 610 is valid.

In a Selective Reject scheme, a sender window having a size of $2^{k-1}$ or less is normally used in order to avoid certain ambiguities which appear in conjunction with an automatic (timer-initiated) retransmission. The receiver window size in a Selective Reject scheme can include up to $2^{k-1}$ positions, instead of just one position as in a Go-Back-N scheme. In Selective Reject a range of packets can be received since the receiver window can include up to $2^{k-1}$ positions.

As long as packets are received correctly, they are sent or forwarded to the next higher layer. When an outstanding

**A250**

CASE PARTICIPANTS ONLY Document: 177-1    Page: 265    Filed: 03/31/2014

US 6,424,625 B1

**3**

packet is detected, i.e., a packet that has been sent but not received or not correctly received, the sending of subsequent packets up to the higher layer is halted and a list of correct and missing packets is built up. A NACK is used to initiate a request for a retransmission of the outstanding packet or of a multitude of outstanding packets. When the first detected outstanding packet is correctly received, that packet and all subsequent packets are sent to the higher layer, until the next outstanding packet is detected and the process repeats with respect to the new outstanding packet.

FIG. 7A, for example, shows a situation wherein three packets are outstanding. The outstanding packets are denoted by ESN1, ESN2 and ESN3. The receiver sends one or several NACKs indicating the sequence number of these outstanding packets. In FIGS. 7B and 7C, the transmitter has received the one or several NACKs and in response retransmits the outstanding packets. The transmission of new packets can proceed to the $TSN_{MAX}$ limit, which of course can also occur when no NACKs are received. In particular, FIG. 7B shows a situation where ESN1 has been retransmitted and correctly received, and ESN2 is currently being retransmitted. BSN has also been set to ESN1. In other words, the NACK for ESN1 functions as a cumulative positive acknowledgment for packets preceding ESN1, and BSN is adjusted accordingly.

Sometimes, NACKs fail to reach the transmitter for unknown reasons. In such a situation, after a specified or predetermined time has expired, packets in the sender buffer that have not been acknowledged (by either a NACK or a PACK) can be automatically retransmitted.

NACKs can be efficiently sent by sending a NACK and explicitly indicating the oldest NACK's sequence number, here represented by ESN1, and using a bitmap to thereafter represent correctly received packets and missing packets. This type of NACK performs a cumulative PACK for the packets preceding the sequence number which is NACKed. Other NACK options can also be used, for example NACK options where a cumulative positive ACK is not performed or sent for the packets preceding the sequence number which is NACKed.

The Selective Reject and Go-Back-N techniques differ in the sense that Selective Reject does not require packets to be sent in any particular order, while the Go-Back-N receiver needs to receive packets in consecutive sequence number order.

Normally, in data networks it is desirable to transfer all packets without any packet loss. Sometimes, however, sending significantly delayed packets provides no benefit, for example where the delay causes the information in the packets to become outdated and therefore useless to the receiver. Examples of delay sensitive applications are, e.g., telephony, video conferencing and delay sensitive control systems.

Furthermore, non-time-critical applications commonly issue higher level retransmissions whenever they detect an absence of responses or acknowledgments from the receiving end, which can give rise to situations where the ARQ buffers are filled with not-yet-successfully transmitted data, and/or with newly retransmitted data. This can be avoided if data is associated with a validity time, and the validity time is set to be slightly shorter than the retransmission time for the application. However, in practice it can be difficult or impossible to discern which retransmission time is used, since the lower level (LLC) is unaware which application is at the top level. In such a situation one has to assume a certain application and specially design the communication system based on that assumption.

**4**

For certain service classes and after a certain transfer delay time, discarding of data packets is allowed in Asynchronous Transfer Mode (ATM). An ARQ in conjunction with ATM can use transfer delay information provided by the ATM layer in order to adjust connection-specific discard timers in the ARQ function. However, the ARQ in the receiver may detect missing or incomplete packets and require retransmission.

In summary, current ARQ methods do not recognize and allow for situations where data packets have a limited lifetime, and therefore fail to minimize bandwidth usage by not sending (or resending) significantly delayed or outdated data packets.

### SUMMARY OF THE INVENTION

In accordance with exemplary embodiments of the invention, ARQ techniques are provided that minimize bandwidth usage by accounting for data packets that have an arbitrary but limited lifetime. The lifetime can either be assumed to be fixed, or can be deduced from ATM layer information. In particular, exemplary embodiments of the invention variously illustrate enhanced Go-Back-N and also Selective Reject techniques that discard outdated data packets, and which embody principles that can be applied to Stop-and-Wait techniques to discard outdated data packets.

In accordance with an embodiment of the invention, a bit is set in the ARQ header to force the receiver to accept packets subsequent to one or more erroneous or unreceived packets that have been discarded and not resent.

In accordance with another embodiment of the invention, when a NACK has been received and data packets have been discarded, sequence numbers are reassigned to the non-discarded data packets so that a transmitted stream of the non-discarded packets will have consecutive sequence numbers.

In accordance with another embodiment of the invention, at a packet discard the transmitter monitors the receiver state. If a packet is expected which has already been discarded, then the transmitter resynchronizes by renumbering data packets or by commanding the receiver to accept an arbitrarily chosen sequence number.

### BRIEF DESCRIPTION OF THE DRAWINGS

Other objects and advantages of the invention will become apparent to those skilled in the art from the following detailed description of preferred embodiments, when read in conjunction with the accompanying drawings. Like elements in the drawings have been designated by like reference numerals.

FIGS. 1A and 1B illustrate a prior art Go-Back-N technique.

FIG. 2 illustrates a window in a prior art Go-Back-N technique.

FIGS. 3A–3D illustrate a transmission sequence in a prior art Go-Back-N technique.

FIGS. 4A–4D illustrate use of a positive acknowledgment in a prior art Go-Back-N technique.

FIG. 5 illustrates a prior art example of an ARQ data packet.

FIG. 6 illustrates a prior art example of an acknowledgement message.

FIGS. 7A–7C illustrate use of a negative acknowledgment in a prior art Selective Reject technique.

FIG. 8 illustrates a receiver packet enforcement bit in accordance with an embodiment of the invention.

US 6,424,625 B1

5

FIG. **9** illustrates operation of an embodiment of the invention.

FIGS. **10**A and **10**B illustrate operation of an embodiment of the invention.

FIG. **11** illustrates operation of an embodiment of the invention.

FIG. **12** illustrates operation of an embodiment of the invention.

FIG. **13** illustrates operation of an embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

In accordance with an exemplary embodiment of the invention involving a communications system wherein a transmitter and a receiver are exchanging data packets, at a packet discard procedure, the progress of a bottom part of a sender window of the transmitter is reported to the receiver in order to allow the receiver to properly skip packets which do not exist anymore because they have been discarded. Thus, the receiver can be commanded to skip or overlook the packets which have been discarded, or in other words, to release any expectation of receiving the packets which have been discarded. To prevent ambiguity problems, special rules are defined for, and followed by, the receiver and the transmitter.

In the case where the transmitter discards a packet, it orders the receiver to accept the next packet, by setting a certain Receiver Packet Enforcement Bit (RPEB) in the ARQ header of the next packet and sending the packet to the receiver. When the receiver receives the packet, the RPEB bit will cause the receiver to accept the packet. FIG. **8** shows an ARQ packet **810** with an ARQ header **812** and a data portion **818**. The header **812** includes a receive packet enforcement bit RPEB **814**, and a k-bit sequence number N(S) **816**. Alternatively, a plurality of enforcement bits can be sent separately from the ARQ packets together with implicit or explicit indications as to which ARQ packet each enforcement bit belongs.

This enforcement function of sending an RPEB associated with a particular ARQ packet, can be used a variety of situations. For example, a situation can arise where a NACK associated with an ARQ packet designated by a sequence number N(R) is sent by the ARQ receiver and properly received by the ARQ transmitter. If the NACK is valid for one discarded data packet, then the next data packet to be retransmitted can have an RPEB set to TRUE.

In another example situation, a retransmission timer expires and one or more data packets have been discarded. The next incoming data packet to be transmitted, or the first data packet to be retransmitted, can have an RPEB set to TRUE.

The system can be further configured so that in all other situations, the RPEB associated with a data packet is set FALSE.

In particular, when the system uses a Go-Back-N type packet exchange, two types of packet enforcement schemes can be used. The first type is a general method with an arbitrary window size W, and the second type is a special case of the general method. In the special case, the window size is $W=2^{k-1}$, i.e., half the maximum sequence number.

In the method of the special case, ambiguities can be circumvented by applying very simple rules. The method of the special case employs a new variable, DSN. DSN is shown, for example, in FIG. **9**, and indicates that all previous

6

packets have been acknowledged as having been properly transmitted and received. In FIG. **9**, all packets from DSN through BSN-1 have been discarded due to a packet discard time-out. A packet discard time-out can occur, for example, when the oldest packets in the buffer have been in the buffer for a predetermined amount of time, and are discarded upon expiration of the predetermined amount of time. When the old packets are discarded, the value of BSN is incremented until it points to the oldest remaining (i.e., undiscarded) packet in the buffer. FIG. **9** shows BSN pointing to the oldest remaining packet in the buffer. After the predetermined amount of time expires, the value of TSN is greater than or equal to the new value of BSN. This indicates that packets from BSN through TSN-1 have been sent. TSN indicates the next new packet to send, and ISN has the same function as indicated earlier, namely, to indicate the sequence number of the next packet to be sent. ESN (e.g., ESN1) indicates the sequence number of the next packet that the receiver expects to receive. To prevent ambiguities, TSN must not pass $TSN_{MAX}$. In this alternative, $TSN_{MAX}$ is $DSN+2^{k-1}$.

Although the data packets between DSN and BSN have been discarded as shown in FIG. **9**, for some unknown reason either the previous ACKs have not made their way from the ARQ receiver to the ARQ transmitter or the ARQ packets from ESN1 up to TSN have not been received. That explains why ESN1 is in the sequence of sequence numbers representing discarded ARQ packets, or in other words, why the receiver is expecting a sequence number which has been discarded. At this juncture either a retransmission timer initiates the retransmission, or a NACK is properly received. In both cases, the RPEB is set to TRUE for the next packet to be transmitted. If the difference between N(S) and ESN (for example, ESN1) is less than $2^{k-1}$ and RPEB=TRUE at a packet reception, then the packet will be accepted and forwarded to higher layer as long as the data carried in the packet is also correct.

FIG. **9** also shows that no ambiguity will occur when $TSN_{MAX}$ is defined as $DSN+2^{k-1}$. When ESN (ESN1) lags behind BSN, the receiver can always be forced to receive an ARQ packet whose RPEB=TRUE. If ESN (ESN1) is leading BSN and the RPEB for a received ARQ packet is TRUE, then the packet shall not be accepted. This can be determined by discerning whether BSN-ESN exceeds $W=2^{k-1}$. If a NACK is received in the ARQ transmitter for a higher sequence number than TSN, then a fault has occurred and a reinitialization or a restart is likely to take place. In a reinitialization or a restart, all counters and/or variables are reset to a certain value so that the ARQ can restart anew. For example, the variables can be set so that TSN=ISN=BSN=ESN=DSN, and so forth.

FIGS. **10**A and **10**B show the variable definitions more precisely, by showing two cases. FIG. **10**A shows a case where the content in the buffer is low, and FIG. **10**B shows a case where the buffer is very full. FIGS. **10**A and **10**B also indicate that an upper limit (fixed or dynamic) may exist for the packet buffer. There may also be packets which have been received from the higher layer, but were not allowed to be transmitted since TSN might have reached $TSN_{MAX}$. Such packets would be pending for transmission, and indicated by pending sequence number PSN shown in FIG. **10**B. As soon as clearance is given to proceed, the pending packets will be transmitted. Clearance is given when a NACK or PACK is properly received, thereby causing DSN and perhaps also BSN to progress forward. This allows $TSN_{MAX}$ to progress forward also.

The more general case, on the other hand, requires more complex rules. The function of the ARQ transmitter with an

Case: 13-1625    CASE PARTICIPANTS ONLY Document: 177-1    Page: 267    Filed: 03/31/2014

US 6,424,625 B1

**7**

arbitrary window size representing a more general case is next described.

FIG. 11 shows an arbitrary state of the ARQ. The general case differs from the special case described above in that the window size (W) is defined using BSN rather than DSN. This gives the greatest possible distance between the last acknowledged packet (DSN) and the highest sent packet (TSN). As in the special case, TSN may not pass $TSN_{MAX}$. $TSN_{MAX}=BSN+W$, where $1 \leqq W \leqq 2^{k-1}$.

Below, the sign $\leqq$ is used. It is used more in the "before" and "after" sense than in the ordinary mathematical sense, since we are using modulus arithmetic. For example, assume k=8 bits, BSN=192 and W=128. This yields $BSN+W=(192+128)\mod 2^{k}=64$. TSN can be, e.g., 254, which is before BSN+W, even though mathematically $254>(192+128)\mod 2^{k}=64$.

Some important conditions are $TSN \leqq DSN-1$, $TSN \leqq TSN_{MAX}$, and $DSN \leqq BSN \leqq TSN$, where $TSN_{MAX}=BSN+W$. W can assume an arbitrary value between 1 and $2^{k}-1$. However, the receiver and transmitter must both use the same arbitrary value for W.

A packet shall be accepted, apart from the normal Go-Back-N function, when $N(S)-ESN<2^{k}-W$, RPEB= TRUE and the data in the packet are correct.

An additional rule for the general case is that in order to avoid ambiguity problems, BSN-DSN shall always be less than $2^{k}-W$. If a situation arises where $(BSN-DSN)=2^{k}-W$, then typically either a resynchronization will take place, or a notification indicating bad link performance will be sent to the control and management layer. The control and management layer can then implement a countermeasure to handle the problem.

In another exemplary embodiment of the invention illustrated for example in FIG. 12, a Selective Reject type packet exchange is used that relies on the same basic principles described above with respect to the special and general cases for use with a Go-Back-N type packet exchange. Namely, a receive enforcement bit such as the RPEB described above with respect to other embodiments, is sent to facilitate discarding of packets from a transmitter buffer.

In this embodiment, the basic rules include $DSN \leqq BSN \leqq TSN \leqq TSN_{MAX}$ and $TSN_{MAX}-DSN=2^{k-1}$. The variable definitions are the same as those described above with respect to other embodiments. Some additional rules on how to handle NACK, PACK and automatic retransmission of packets will also be described below.

In a situation where a number of packet retransmissions have taken place, a packet discard time-out can occur that will cause the oldest, not-yet-acknowledged packets in the buffer to be discarded. This can be seen, for example, in FIG. 12, where the packets having sequence numbers between DSN and BSN have been discarded.

After the old packets have been discarded from the transmitter buffer, two things can happen. Either a packet retransmission command is invoked by a timer expiration, or a NACK is received for a sequence number falling between DSN and BSN. First, consider the NACK case.

Assume that one use of NACK includes the following characteristics. When a NACK is sent, the oldest not-yet-received packet is explicitly indicated by its sequence number. Packets with sequence numbers preceding this oldest, outstanding packet are at the same time positively acknowledged by this NACK message. Accompanying this NACK can be a) a bitmap of length n indicating outstanding packets, wherein, for example, those bits that are set to one

**8**

indicate outstanding packets, or b) a number N of explicitly indicated sequence numbers for which packets have not been received, or c) some combination of a) and b).

In a first case, with reference to FIG. 12, if a NACK is received for ESN1 in the interval DSN to BSN and the covered ACK range for the NACK is less than BSN-ESN1 and at least one packet is not yet discarded ($TSN \neq BSN$), then the packet indicated by BSN with RPEB set to True, is retransmitted. Note that the transmitter can also send a short control message, in order to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a second case, if a NACK is received for ESN1 located in the interval between DSN and BSN and the covered ACK range for the NACK is less than BSN-ESN1 and all packets have been discarded, i.e. BSN=TSN, then a pending packet with RPEB=TRUE is sent. However, if no packet is pending for transmission, then the system either a) waits until the next packet is received from the higher layer and then sends this packet with RPEB=TRUE, or b) informs the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded; thereby conserving bandwidth.

In a third case, if a NACK is received for ESN1 in the interval DSN to BSN, and the covered ACK range for the NACK is greater than BSN-ESN1, and at least one packet is not yet discarded, and at least one outstanding packet exists that has a sequence number $\geqq BSN$, then the first outstanding packet after BSN, as indicated by the NACK message, is retransmitted with RPEB=TRUE.

In a fourth case, if a) a NACK is received for ESN1 in the interval between DSN and BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) at least one packet exists that has been sent but not acknowledged either positively or negatively and which has a sequence number after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geqq BSN$, then the first packet after the packets indicated in the NACK message is retransmitted with RPEB=TRUE. A shorter message than the packet can be used instead to inform the receiver that packets have been discarded, thereby saving bandwidth.

In a fifth case, if a) a NACK is received for ESN1 in the interval DSN to BSN, and b) the covered ACK range for the NACK is greater than BSN-ESN1, and c) no packet exists after the packet indicated by the NACK message, and d) there are no outstanding packets indicated in the NACK message with sequence numbers $\geqq BSN$, then a packet which is pending for transmission is sent with RPEB= TRUE. In other words, when all packets having sequence numbers N(S) in the range from BSN to TSN (i.e., $TSN \leqq N(S) \leqq BSN$) have been positively acknowledged, then a packet which is pending for transmission is sent with RPEB=TRUE. However, if no packet is pending for transmission, then the system waits until the next packet is received from the higher layer and then sends this next packet with RPEB=TRUE, or alerts the receiver that there are currently no more packets to send. A shorter message than the packet can be used instead to alert the receiver that packets have been discarded, thereby saving bandwidth.

In a sixth case, when a timer-initiated retransmission of a packet occurs, and ISN=BSN, then RPEB should be set to TRUE. Otherwise, RPEB should be set to FALSE. Alternatively, RPEB can be set to TRUE when ((ISN=BSN) and (BSN≠DSN)), and can otherwise be set to FALSE.

**A253**

CASE PARTICIPANTS ONLY

US 6,424,625 B1

9

When a correct packet with RPEB=TRUE is received, then all packets preceding this packet and up to the next outstanding packet will be released from the buffer and forwarded to the higher layer. The application or the other layers decide whether the packets can be used or not, if delay and assembly requirements are met.

In the case where a window of size $<2^{k-1}$ is used, no additional discard capability concerns are necessary to consider, beyond the ordinary requirement imposed by Selective Reject itself.

In another embodiment of the invention for use with a Go-Back-N scheme, it is assumed that resynchronization takes place only when a NACK is received and N(R)<BSN. Then the transmitter will have full knowledge of the receiver state, i.e., ESN is known. Note that there exists a case where a NACK as described above is received and the receiver can wait one round-trip delay period to ensure full knowledge of the receiver state. In other words, when a retransmission of the NACKed packet has just been performed and it is not known if the packet has passed all buffers and other delay-causing functions, the receiver can wait one round-trip delay period. Here, renumbering of packets sequence number can be performed, such that the first ARQ packet sent after the renumbering will carry the same sequence number as that of the packet to which the NACK referred.

In FIG. 13, a NACK is received for a discarded packet, since ESN precedes BSN. Consequently, all subsequent packets from BSN and onwards are renumbered such that the BSN packet starts with ESN, the BSN+1 packet is renumbered to ESN+1, and so on. Note, renumbering is not performed for timer-initiated retransmissions.

In another embodiment of the invention for use with a basic Go-Back-N scheme, the receiver and the transmitter are resynchronized at each discard occasion. In this embodiment, ARQ packets can only be discarded if they have not previously been acknowledged.

The resynchronization is initiated by the transmitter, since it knows when a discard has been performed. The transmitter ask for a sequence number, up to which (but not including) the receiver has accepted ARQ packets. If the sequence number is before the last discarded sequence number, then the transmitter commands the receiver to start over from some arbitrarily chosen, but predefined, sequence number. The next sent packets are numbered upwards from this arbitrarily chosen sequence number. As an alternative, only the transmitter is resynchronized, such that the first packet sent after the resynchronization has the same sequence number as the next packet expected by the receiver.

In various embodiments of the invention, a magnitude of W can be defined when a call is initially set up between a transmitter and a receiver within a data network, in accordance with the particular application involved. For example, when the transmitter is initialized by a higher layer of software in the data network, it can select the magnitude of W and inform the receiver of this magnitude, and vice versa. The information indicating the magnitude of W can be sent from the transmitter to the receiver (or vice versa) using a control message.

In summary, the various embodiments of the invention increase throughput of a communications system using ARQ packets by discarding outdated packets. In addition, the various embodiments of the invention reduce a risk that the ARQ buffer in the transmitter will overflow. Those skilled in the art will also recognize that the principles described above with respect to the various embodiments of the invention can be applied to Stop-and-Wait ARQ schemes.

10

It will be appreciated by those skilled in the art that the present invention can be embodied in other specific forms without departing from the spirit or essential characteristics thereof, and that the invention is not limited to the specific embodiments described herein. The presently disclosed embodiments are therefore considered in all respects to be illustrative and not restrictive. The scope of the invention is indicated by the appended claims rather than the foregoing description, and all changes that come within the meaning and range and equivalents thereof are intended to be embraced therein.

What is claimed is:

1. A method for discarding packets in a data network employing a packet transfer protocol including an automatic repeat request scheme, comprising the steps of:

a transmitter in the data network commanding a receiver in the data network to a) receive at least one packet having a sequence number that is not consecutive with a sequence number of a previously received packet and b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet; and

the transmitter discarding all packets for which acknowledgment has not been received, and which have sequence numbers prior to the at least one packet.

2. The method of claim 1, wherein each of the at least one packet includes a receive enforcement bit, and the step of commanding comprises the steps of:

setting the receive enforcement bit for each of the at least one packet to a TRUE value; and

sending the at least one packet to the receiver.

3. The method of claim 1, wherein the step of commanding comprises the steps of:

setting a receive enforcement bit to a TRUE value for each at least one packet; and

sending the at least one receive enforcement bit set to TRUE together with identification of a transmitter sending the packets and the sequence numbers of the packets in a control message to the receiver.

4. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

defining a maximum top sequence number equal to a value (DSN+$2^{k-1}$), where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and N(S)−ESN<$2^{k-1}$, where N(S) is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and N(S)−ESN≧$2^{k-1}$.

5. The method of claim 1, wherein the method pertains to a go-back-n automatic repeat request scheme and further comprises the steps of:

constraining a top sequence number TSN according to the rules (TSN≦DSN−1), (TSN≦BSN+W) and (1≦W≦$2^{k-1}$), where k is a number of bits in a sequence

CASE PARTICIPANTS ONLY

US 6,424,625 B1

**11**

number field for a packet in the data network, DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, BSN is a bottom sequence number indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and W is a window size known to both the receiver and the transmitter, within which packets are tracked;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN<2^k-W$, where $N(S)$ is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received;

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN \geq 2^k-W$; and

constraining BSN according to the rule $(DSN \leq BSN \leq TSN)$.

6. The method of claim **1**, wherein the method pertains to a selective repeat automatic repeat request scheme and further comprises the steps of:

constraining a bottom sequence number BSN indicating a sequence number of an oldest packet stored in a transmit buffer of a transmitter in the data network, and a top sequence number TSN according to the rules $(DSN \leq BSN \leq TSN \leq TSN_{MAX})$, where DSN is a sequence number indicating that all packets having sequence numbers previous to DSN have been acknowledged by a receiver in the data network as having been received, $TSN_{MAX}$ is a maximum top sequence number, $(TSN_{MAX}-DSN=2^{k-1})$, and k is a number of bits in a sequence number field for a packet in the data network;

accepting a received packet when a receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN<2^{k-1}$, where $N(S)$ is a sequence number of the received packet and ESN is an expected sequence number of a next packet to be received; and

performing one of a) a restart of the automatic repeat request scheme and b) reporting a failure event to a management control system when the receive enforcement bit for the received packet is set to TRUE and $N(S)-ESN \geq 2^{k-1}$.

7. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) $TSN \neq BSN$, setting a receive enforcement bit for the packet indicated by BSN and resending the packet indicated by BSN from the transmitter to the receiver.

8. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is less than a difference between BSN and the sequence number of the first packet, and c) $TSN=BSN$,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to

**12**

TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

9. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, and c) $TSN \neq BSN$, setting a receive enforcement bit for a first outstanding packet after BSN and resending the first outstanding packet from the transmitter to the receiver.

10. The method of claim **6**, further comprising the steps of:

when a) a first packet having a sequence number after DSN and before BSN is negatively acknowledged, b) a number of packets that are prior to the first packet and not positively acknowledged is greater than a difference between BSN and the sequence number of the first packet, c) at least one packet exists after the first packet, and d) there are no negatively acknowledged packets having sequence numbers after BSN, setting a receive enforcement bit for a first packet after BSN and resending the first packet after BSN from the transmitter to the receiver.

11. The method of claim **6**, further comprising the steps of:

when a first packet having a sequence number after DSN and before BSN is negatively acknowledged, and all packets having sequence numbers greater than or equal to BSN and less than TSN have been positively acknowledged,

if a packet is pending for transmission, then setting a receive enforcement bit for the pending packet to TRUE and sending the pending packet from the transmitter to the receiver;

if no packets are pending for transmission, then performing one of a) waiting until a packet is received from a higher layer and b) informing the receiver that no packets are pending.

12. The method of claim **6**, further comprising the steps of:

when a timer-initiated retransmission of a packet occurs, and ISN=BSN, setting a receive enforcement bit for the packet to TRUE; and

when a timer-initiated retransmission of the packet occurs, and $ISN \neq BSN$, setting the receive enforcement bit for the packet to FALSE; wherein

ISN indicates a sequence number of a next packet to be sent.

13. The method of claim **6**, further comprising the steps of:

when (ISN=BSN) and $(BSN \neq DSN)$, setting a receive enforcement bit for the packet to TRUE, and otherwise setting the receive enforcement bit for the packet to FALSE, where ISN indicates a sequence number of a next packet to be sent.

14. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

US 6,424,625 B1

| 13 | 14 |

discarding at least one packet from a transmitter;

receiving a NACK for the at least one packet from a receiver; and

assigning consecutive sequence numbers to non-discarded packets adjacent to the at least one packet.

15. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the transmitter and the receiver so that the last packet received by the receiver and the next packet to be transmitted by the transmitter have consecutive sequence numbers.

16. The method of claim 15, wherein the step of resynchronizing comprises the steps of:

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, assigning the expected sequence number to the packet to be sent next from the transmitter.

17. The method of claim 15, wherein the step of resynchronizing comprises the steps of:

determining what sequence number the receiver expects to receive next; and

when the expected sequence number is different from the sequence number of the packet to be sent next from the transmitter, commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

18. The method of claim 15, wherein the step of resynchronizing comprises the step of commanding the receiver to expect a sequence number of a next packet to be sent from the transmitter to the receiver.

19. A method for discarding packets in a data network employing a packet transfer protocol including a go-back-n automatic repeat request scheme, comprising the steps of:

a transmitter in the data network discarding at least one packet that has been sent by the transmitter but has not been acknowledged by a receiver in the data network as received;

after discarding the at least one packet, resynchronizing the receiver and the transmitter by determining what sequence number the receiver next expects, and consecutively renumbering packets pending at the transmitter starting with the expected sequence number.

*    *    *    *    *

US006466568B1

## (12) United States Patent
### Raith et al.

(10) Patent No.: **US 6,466,568 B1**
(45) Date of Patent: **Oct. 15, 2002**

(54) **MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS**

(75) Inventors: **Alex Krister Raith**, Durham; **James Ragsdale**, Raleigh; **John Diachina**, Garner, all of NC (US)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/399,771**

(22) Filed: **Sep. 21, 1999**

### Related U.S. Application Data

(62) Division of application No. 08/725,643, filed on Oct. 15, 1996, now Pat. No. 5,987,019.

(51) Int. Cl.[7] .................................................. G06F 11/00
(52) U.S. Cl. ........................ 370/347; 370/328; 370/471; 455/422
(58) Field of Search ................................ 370/320, 342, 370/335, 347, 280, 294, 328, 329, 321, 330, 337, 479, 468, 469, 470, 471, 472; 455/422, 561, 575

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 5,177,740 A | 1/1993 | Toy et al. |
| 5,182,753 A | 1/1993 | Dahlin et al. |
| 5,230,003 A | 7/1993 | Dent et al. |
| 5,299,235 A | 3/1994 | Larsson et al. |
| 5,570,467 A | 10/1996 | Sawyer |
| 5,603,081 A | 2/1997 | Raith et al. |
| 5,757,813 A | * 5/1998 | Raith ........................ 370/468 |
| 5,770,927 A | 6/1998 | Abe |
| 5,930,706 A | * 7/1999 | Raith ........................ 455/422 |

#### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| EP | 399612 | 11/1990 |
| EP | 605312 | 7/1994 |
| EP | 642233 | 3/1995 |
| WO | WO 95/01012 | 1/1995 |
| WO | WO 96/21998 | 7/1996 |

* cited by examiner

*Primary Examiner*—Wellington Chin
*Assistant Examiner*—Frank Duong
(74) *Attorney, Agent, or Firm*—Burns, Doane, Swecker & Mathis, L.L.P.

(57) **ABSTRACT**

Variances in bandwidth used by a radiocommunication connection are adapted to by changing the type of information being transmitted. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. Bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. Alternatively, the FOC information may be associated with a connection or connections which are different from that supported by the payload or data field containing the FOC.

**7 Claims, 8 Drawing Sheets**





Ericsson, Inc. v. D-Link, et. al
**PX0006**
6:10-cv-473

A257

75753DOC002832



FIG. 1

75753DOC002833

CASE PARTICIPANTS ONLY   Case: 13-1625   Document: 177-1   Page: 273   Filed: 03/31/2014

**U.S. Patent**          Oct. 15, 2002          Sheet 2 of 8          US 6,466,568 B1



FIG. 2

ONE FRAME = 1944 BITS (972 SYMBOLS) = 40 ms. (25 FRAMES PER SECOND)

| SLOT 1 | SLOT 2 | SLOT 3 | SLOT 4 | SLOT 5 | SLOT 6 |

ONE SLOT

FIG. 3
PRIOR ART

| 28 | 12 | 130 | 12 | 130 | 1 | 11 |
|----|----|-----|----|-----|---|----|
| SYNC | SACCH | DATA | CDVCC | DATA | RSVD =1 | CDL |

0        27   39        169   181        311   312   323

**A259**

75753DOC002834

**U.S. Patent**     Oct. 15, 2002     Sheet 3 of 8     US 6,466,568 B1

## FIG. 4A



## FIG. 4B

## FIG. 5





**A260**

75753DOC002835

## FIG. 6

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | FOC |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | FOC |

## FIG. 7A

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | FOC | DATA | CDL |
| SLOT 3 | SYNC | FOC | DATA | FOC | DATA | CDL |

## FIG. 7B

| SLOT 1 | SYNC | SACCH | DATA | CDVCC | DATA | CDL |
|--------|------|-------|------|-------|------|-----|
| SLOT 2 | SYNC | FOC | DATA | CDVCC | DATA | CDL |
| SLOT 3 | SYNC | FOC | DATA | CDVCC | DATA | CDL |

**A261**

75753DOC002836

**U.S. Patent**      Oct. 15, 2002      Sheet 5 of 8      US 6,466,568 B1



FIG. 8A

FIG. 8B

**A262**

75753DOC002837



FIG. 8C

75753DOC002838

Case: 13-1625 Case: 13-1625 CASE PARTICIPANTS ONLY Document: 179-1 Document: 177-1 Page: 278 Page: 278 Filed: 03/31/2014 Filed: 03/31/2014 (278 of 575)



FIG. 9

75753DOC002839

Case: 13-1625   CASE PARTICIPANTS ONLY  Document: 177-1   Page: 279   Filed: 03/31/2014

**U.S. Patent**          Oct. 15, 2002          Sheet 8 of 8          US 6,466,568 B1

*FIG. 10* PRIOR ART

| 6 | 6 | 16 | 28 | 122 | 12 | 12 | 122 |
|---|---|-----|------|------|-------|-------|------|
| G | R | DATA | SYNC | DATA | SACCH | CDVCC | DATA |

*FIG. 11*

| DATA | SYNC | DATA | SACCH | CDVCC | DATA |
|------|------|------|-------|-------|------|

| DATA | SYNC | DATA | FOC | FOC | DATA |
|------|------|------|-----|-----|------|

**A265**

75753DOC002840

US 6,466,568 B1

**1**

# MULTI-RATE RADIOCOMMUNICATION SYSTEMS AND TERMINALS

## RELATED APPLICATION

This application is a divisional, of application Ser. No. 08/725,643 filed Oct. 15, 1996 now U.S. Pat. No. 5,987,019.

This application is related to U.S. Pat. No. 6,028,854, entitled "Radiocommunication Systems and Terminals with Increased Payload Bandwidth".

## BACKGROUND

Applicant's invention relates generally to radiocommunication systems, e.g., cellular or satellite systems, that use digital traffic channels in a multiple access scheme, e.g., time division multiple access (TDMA) or code division multiple access (CDMA).

The growth of commercial radiocommunications and, in particular, the explosive growth of cellular radiotelephone systems have compelled system designers to search for ways to increase system capacity without reducing communication quality beyond consumer tolerance thresholds. One way to increase capacity is to use digital communication and multiple access techniques such as TDMA, in which several users are assigned respective time slots on a single radio carrier frequency.

In North America, these features are currently provided by a digital cellular radiotelephone system called the digital advanced mobile phone service (D-AMPS), some of the characteristics of which are specified in the interim standard IS-54B, "Dual-Mode Mobile Station-Base Station Compatibility Standard", published by the Electronic Industries Association and Telecommunications Industry Association (EIA/TIA). Because of a large existing consumer base of equipment operating only in the analog domain with frequency-division multiple access (FDMA), IS-54B is a dual-mode (analog and digital) standard, providing for analog compatibility in tandem with digital communication capability. For example, the IS-54B standard provides for both FDMA analog voice channels (AVC) and TDMA digital traffic channels (DTC), and the system operator can dynamically replace one type with the other to accommodate fluctuating traffic patterns among analog and digital users. The AVCs and DTCs are implemented by frequency modulating radio carrier signals, which have frequencies near 800 megahertz (MHz) such that each radio channel has a spectral width of 30 kilohertz (KHz). A subsequent standard, referred to as IS-136, adds specifications for digital control channels. This standard document, in particular the version identified as PN-3474.1, dated Dec. 15, 1995 and published by EIA/TIA, is incorporated here by reference.

In a TDMA cellular radiotelephone system, each radio channel is divided into a series of time slots, each of which contains a burst of information from a data source, e.g., a digitally encoded portion of a voice conversation. The time slots are grouped into successive TDMA frames having a predetermined duration. According to IS-54B and IS-136, each TDMA frame consists of six consecutive time slots and has a duration of 40 milliseconds (msec). Thus, each frame can carry from one to six traffic channels (e.g., one to six radio connections). The number of connections which can be supported by each TDMA frame depends on the desired information transmission rate. For example, if the connections are used to support the transmission of voice information, the number of slots used per channel depends on the source rates of the speech coder/decoders (codecs) used to digitally encode the conversations. Such speech

**2**

codecs can operate at either full-rate or half-rate, with full-rate codecs being expected to be used until half-rate codecs that produce acceptable speech quality are developed.

Thus, a full-rate DTC requires twice as many time slots in a given time period as a half-rate DTC, and in IS-54B, each radio channel can carry up to three full-rate DTCs or up to six half-rate DTCs. Each full-rate DTC uses two slots of each TDMA frame, i.e., the first and fourth, second and fifth, or third and sixth of a TDMA frame's six slots. Each half-rate DTC uses one time slot of each TDMA frame. During each DTC time slot, 324 bits are transmitted, of which the major portion, 260 bits, is due to the speech output of the codec, including bits due to error correction coding of the speech output, and the remaining bits are used for guard times and overhead signalling for purposes such as synchronization.

In addition to voice information being transmitted on the traffic channels, various other types of data can and will be transmitted thereon. For example, facsimile (fax) transmissions are commonly supported by radiocommunication systems. Similarly, packet data transmissions, which divide information streams into packets rather than providing dedicated (i.e., "connection-oriented") channels for each information stream, will be supported in radiocommunication systems. Other types of information transmission, e.g., video or hybrid voice, data and video to support internet connections, will likely be supported in the future.

These various types of information communication (also referred to herein as different "services") will likely have different optimal transmission characteristics. For example, services between a remote user and the internet may benefit by providing a greater bandwidth in the downlink (i.e., from the internet to the remote station) than in the uplink, since many users spend a significant portion of their connection time downloading information from the internet rather than uploading thereto. Thus, it may be desirable in such cases to allocate a triple rate connection in the downlink (e.g., all six time slots of an IS-136 TDMA frame) but only a full rate connection in the uplink (e.g., two time slots of an IS-136 frame). This inequality between uplink and downlink bandwidth is referred to herein as an "asymmetrical" connection. In addition to bandwidth considerations, other transmission characteristics may also be impacted. For example, different services may require different degrees of error protection. Thus, for example, an optimal channel coding for the transmission of voice information might be rate $\frac{1}{2}$ since voice information transmission is typically not provided with a procedure for retransmission, while optimal channel coding for the transmission of data, e.g, facsimile, might be rate $\frac{5}{6}$ since retransmission procedures are typically provided. Other transmission characteristics, for example, the ability to tolerate delay in the reception of information, may also vary between services. All of these differences in transmission characteristics should be considered together when determining an optimal specification for the air interface.

Accordingly, it would be desirable to provide techniques for transmitting information between remote stations and the system in radiocommunication networks that provide sufficient flexibility for the anticipated variety of information communication services described above, while also providing sufficient compatibility with existing technology so that equipment used by the existing consumer base will not become obsolete.

## SUMMARY

According to exemplary embodiments of the present invention, the type of information transmitted in the uplink

**A266**

75753DOC002841

US 6,466,568 B1

**3**

or downlink may vary depending upon the transmission rate. For example, in a TDMA environment, a first downlink time slot associated with a double- or triple-rate connection may have a first format, while a second time slot associated with the same connection may have a second format different from the first format. The different formats take into account the need to transmit certain types of information at only full rate, and not double- or triple-rate.

According to some exemplary embodiments, bandwidth in the second (or third) time slot can be used to carry information in a fast out-of-band channel (FOC). The FOC may provide information relating to the same connection as the payload or data field in that time slot, e.g., a service type identifier which informs the mobile or base station of the type of information (e.g., voice, video or data) being conveyed in the payload. This information can be used by the receiving equipment to aid in processing the information conveyed in the payload, e.g., by knowing the channel coding rate. These exemplary embodiments find particular application to multimedia communications where the type of payload may vary rapidly, e.g., on a slot-by-slot basis, or even within each slot.

Various exemplary mapping techniques for associating the FOC information with each time slot or each block of data which may be interleaved over two or more time slots are also described herein. These exemplary mapping techniques also account for the fact that there may not be FOC information provided in each time slot.

According to other exemplary embodiments of the present invention, the FOC information may be associated with a connection or connection which is different from that supported by the payload or data field containing the FOC. For example, in asymmetrical connections, e.g., where a mobile station transmits in a different number of slots per frame than it receives, a downlink channel may carry payload to a first mobile station in the data fields in several time slots of a frame but the FOC may provide control information to one or more other mobile stations which are not interested in the payload. All of these mobile stations may share the same frequency on the uplink, e.g., the one or more other mobile stations may transmit packet data and use the FOC to receive retransmission requests.

### BRIEF DESCRIPTION OF THE DRAWINGS

The features and advantages of Applicants' invention will be understood by reading this description in conjunction with the drawings, in which:

FIG. 1 is a block diagram of an exemplary cellular radio telephone system in which the present invention may be applied;

FIG. 2 illustrates an exemplary TDMA frame structure;

FIG. 3 illustrates a conventional downlink traffic channel time slot format;

FIG. 4A illustrates triple rate downlink frame usage;

FIG. 4B illustrates full rate uplink frame usage;

FIG. 5 illustrates a base station and three mobile stations communicating therewith;

FIG. 6 illustrates downlink time slot formats according to a first exemplary embodiment of the present invention;

FIG. 7A illustrates downlink time slot formats according to a second exemplary embodiment of the present invention;

FIG. 7B illustrates downlink time slot formats according to a third exemplary embodiment of the present invention;

FIGS. 8A–8C illustrate exemplary mappings of FOC information to payload according to various exemplary embodiments of the present invention;

**4**

FIG. 9 is a flowchart illustrating an exemplary, alternative usage of an FOC field by a mobile station according to the present invention;

FIG. 10 is a conventional format for all uplink traffic channel time slots; and

FIG. 11 is an exemplary format for two or more uplink traffic channel time slots according to an exemplary embodiment of the present invention.

### DETAILED DESCRIPTION

The following description is scripted in terms of a cellular radiotelephone system, but it will be understood that Applicant's invention is not limited to that environment. Also, the following description is in the context of TDMA cellular communication systems, but it will be understood by those skilled in the art that the present invention may apply to hybrid access methodologies, e.g,. those including TDMA and Code Division Multiple Access (CDMA).

FIG. 1 represents a block diagram of an exemplary cellular mobile radiotelephone system, including an exemplary base station **110** and mobile station **120**. The base station includes a control and processing unit **130** which is connected to the MSC **140** which in turn is connected to the PSTN (not shown). General aspects of such cellular radiotelephone systems are known in the art, as described by the above-cited U.S. patent applications and by U.S. Pat. No. 5,175,867 to Wejke et al., entitled "Neighbor-Assisted Handoff in a Cellular Communication System," and U.S. patent application Ser. No. 07/967,027 entitled "Multi-Mode Signal Processing," which was filed on Oct. 27, 1992, both of which are incorporated in this application by reference.

The base station **110** handles a plurality of traffic channels through a traffic channel transceiver **150**, which is controlled by the control and processing unit **130**. Also, each base station includes a control channel transceiver **160**, which may be capable of handling more than one control channel. The control channel transceiver **160** is controlled by the control and processing unit **130**. The control channel transceiver **160** broadcasts control information over the control channel of the base station or cell to mobiles locked to that control channel. It will be understood that the transceivers **150** and **160** can be implemented as a single device, like the traffic and control transceiver **170** in the mobile station, for use with control channels and traffic channels that share the same radio carrier frequency.

The traffic channels can be used in a dedicated, connection-oriented manner to transmit information, e.g., for a voice connection, where each channel is used continuously for a period of time to support transmission of a single stream of information or in a packet-oriented manner where each channel can be used to send independent units of information associated with different information streams. When used in the former sense, control channels and traffic channels will be referred to herein as DCCHs and DTCs, respectively. When used in the latter sense, control channels and traffic channels win be referred to herein as PCCHs or PDTCs, respectively. For more information regarding packet data radiocommunication systems generally, the interested reader is referred to U.S. patent application Ser. No. 08/544,836, entitled "Packet Channel Feedback", filed on Oct. 18, 1995, the disclosure of which is expressly incorporated here by reference.

After an idle mobile station **120** has located a control channel, e.g., by using digital control channel location information found on a traffic channel, it can then read the control information transmitted on that control channel, e.g.,

CASE PARTICIPANTS ONLY

**A267**

CASE PARTICIPANTS ONLY

US 6,466,568 B1

**5**

paging messages, using its traffic and control channel transceiver **170**. Then, the processing unit **180** evaluates the received control channel information, which may include, for example, paging messages or requests to measure signals strengths on identified channels. When a connection between the mobile station **120** and the system is desired, the transceiver **170** will tune to an appropriate traffic channel as described below.

An exemplary organization of the information transmitted on each radio channel, i.e., the channel bursts, or time slots, in accordance with Applicant's invention is shown in FIG. **2**. The consecutive time slots on a radio channel are organized in TDMA frames of, for example, six slots each so that a plurality of distinct channels can be supported by a single radio carrier frequency. Each TDMA frame in this example has a duration of 40 msec and supports six half-rate logical channels, three full-rate logical channels, or greater bandwidth channels as indicated in the following table. Each slot can, for example, have a duration of 6.67 msec and carry 324 bits (162 symbols), which have positions in each slot that are conventionally consecutively numbered 1–324.

| Number of Slots | Used Slots | Rate |
|---|---|---|
| 1 | 1 | half |
| 2 | 1, 4 | full |
| 4 | 1, 4, 2, 5 | double |
| 6 | 1, 4, 2, 5, 3, 6 | triple |

Currently, IS-136 defines a downlink DTC slot format as illustrated in FIG. **3**. Therein, the numbers above each field denote the number of bits associated therewith. For example, the SYNC field is used for synchronization equalizer training and time slot identification. The SACCH (Slow Associated Control Channel) is a signalling channel used, for example, for transmission of control and supervision messages between the mobile station and the base station. The two DATA fields are used to transmit the "payload" of the slot, e.g., user information or control channel information as part of the FACCH (Fast Associated Control Channel). The CDVCC (Coded Digital Verification Color Code) is a cell identifier that identifies the base station which is transmitting to the mobile station. The CDL (Coded Digital Control Channel Locator) is a pointer which can be used to indicate on which frequency, or set of frequencies, a digital control channel is likely to be found. Conventionally, this downlink format is used for each time slot in a TDMA frame, i.e., all six time slots for systems operating according to IS-136. According to the present invention, however, it may be desirable to provide alternative slot formats to accommodate the different communication services provided above.

Consider again the situation where it is desirable to provide a triple rate connection in the downlink (i.e., base-to-mobile direction) and a full rate connection in the uplink (i.e., mobile-to-base direction). This situation is shown in FIGS. **4A** and **4B**. Therein, FIG. **4A** illustrates a downlink frame wherein all six time slots are allocated to a particular mobile, as denoted by the cross-hatching of each of time slots 1–6. FIG. **4B** illustrates a corresponding uplink frame. Note that only slots **1** and **4** are allocated to the particular mobile station which is using all of the time slots of FIG. **4A**. Thus, the remaining time slots **2**, **3**, **5** and **6** are unallocated and, conventionally, would go unused.

Bandwidth being a precious commodity, exemplary embodiments of the present invention provide techniques for using unallocated bandwidth in a single link without

**6**

adversely impacting compatibility with existing air interface specifications, e.g., IS-136. According to a first exemplary embodiment described below, the unused uplink time slots can be used to send packet data. Packet data communications support independent usage of uplink and downlink frequencies. Accordingly, packet data can be sent on the unused time slots in the uplink from one or more other mobile stations to the base station. Consider FIG. **5**. Therein, mobile station **500** is allocated the downlink and uplink time slots illustrated in FIGS. **4A** and **4B** for communicating with base station **505**. To fully utilize the bandwidth resources according to the present invention, another mobile station **510** transmits packet data to base station **505** in a PDTC comprising time slots **2** and **5** of FIG. **4B**, while a third mobile station **520** transmits packet data to base station **505** on a PDTC comprising time slots **3** and **6**.

If either of the mobile stations **510** and **520** require downlink bandwidth, then a downlink channel may be assigned on some other frequency, since mobile station **500** is using all of the time slots of the frequency represented by FIG. **4A**. Alternatively, it may be the case that, for a particular time period during a packet data connection which is referred to herein as an "activity burst", one or both mobile stations **510** and **520** only need to transmit packet data and, therefore, do not require downlink bandwidth for the purposes of receiving packet data. Nonetheless, mobile stations **510** and **520** will still need to receive overhead information from base station **505**, e.g., relating to which packets were not received and whether each mobile station is allowed to transmit in a particular frame. Assigning a downlink PDTC purely for the transmission of such overhead information is spectrally inefficient. One solution would be to provide this overhead information to mobiles **510** and **520** on a PCCH and require the mobile stations to return to the PCCH periodically, e.g., after transmitting packets on the PDTC during the activity burst which lasts, for example, one second.

However, according to exemplary embodiments of the present invention, another technique for providing overhead information to mobile stations **510** and **520** using one or more downlink time slots whose data or "payload" fields are being used to transmit information to mobile station **500**. Specifically, the downlink time slot format illustrated in FIG. **3** can be altered to (1) provide overhead information regarding packet data communications to mobile stations **510** and **520**, without (2) significantly altering mobile station **500**'s ability to receive triple rate downlink information. FIG. **6** illustrates downlink time slot formats according to this exemplary embodiment of the present invention.

Therein, three downlink slot formats are illustrated for an exemplary traffic channel according to the present invention. These three slot formats might correspond, for example, to slots **1**, **2** and **3** of FIG. **4A**. Slots **4**, **5** and **6** would have the same format as slots **1**, **2** and **3**, respectively, for this exemplary embodiment. Unlike conventional systems, e.g., those currently specified by IS-136, the downlink formats illustrated in FIG. **6** differ within the frame. Specifically, while time slot **1** has the same slot format as conventional downlink traffic time slots (see, e.g., FIG. **3**), time slots **2** and **3** differ in that the SACCH, CDVCC and CDL fields of slot **1** have each been replaced by an FOC (fast out-of-band channel) field. It will be noted that, for the purposes of simplicity, the RSVD bit illustrated in FIG. **3** has been omitted. However, this bit may also be reserved and included in downlink slot formats according to the present invention.

In the example described above, mobile station **500** is using a triple rate downlink connection, i.e., it is reading the

**A268**

75753DOC002843

US 6,466,568 B1

**7**

data fields of each of time slots **1, 2** and **3** in FIG. **6**. However, some of the other fields provided in the conventional downlink time slot format of FIG. **3** need not be transmitted in each time slot under these circumstances. For example, the type of overhead signalling that occurs on the SACCH is such that mobile station **500** need not receive the SACCH at triple rate. That is, mobile station **500** may only need to receive one SACCH burst every three time slots. Thus the field that is normally used for SACCH information in slots **2** and **3** can be replaced by FOC information according to the present invention. The CDVCC field includes information that aids in the identification of the radio link and is conventionally used for radio link control, e.g., tearing down of a connection. However, this information can be provided to the mobile station over the control channel at call-setup and, accordingly, need not be transmitted by the base station in each downlink time slot. Various techniques are described below to avoid problems caused by omitting the CDL information from some downlink time slots.

Omitting these fields in time slots **2** and **3** (as well as **5** and **6**) provides an opportunity to inform the other mobile stations, e.g., mobile stations **510** and **520**, of information pertaining to their uplink connections, without assigning a new PDTC or forcing mobile stations **510** and **520** to revert periodically to listening to the PCCH. For example, the FOC fields can be used to inform mobile station **510** or mobile station **520** that a previously transmitted packet was not properly received and should be retransmitted. Note that since the FOC information is "out-of-band" (i.e., is not encoded as part of the data), mobile stations **510** and **520** advantageously need not be aware of the channel coding and interleaving needed to read the data fields in time slots **2** and **3**.

Many variations of the foregoing exemplary embodiment are possible and contemplated by the present invention. For example, although the foregoing example is provided in terms of an asymmetrical connection wherein the downlink is triple rate and the uplink is full rate, any asymmetrical connection lends itself to application of the present invention. For example, the downlink may be double rate and the uplink full rate, whereupon the FOC fields would replace the SACCH, CDVCC and CDL fields in only one of slots **2** and **3** illustrated in FIG. **6**.

Moreover, it may not be desirable to replace all three of the SACCH, CDVCC and CDL fields with FOC information. For example, it may be determined that 36 bits of FOC information is not needed. Alternatively, for compatibility reasons, it may be determined that one or more of the SACCH, CDVCC and CDL fields should be maintained in each downlink slot. Thus, for example, downlink slot formats for the triple rate downlink/full rate uplink example provided above could instead be as illustrated in one of FIGS. **7A** and **7B**. Therein, the FOC replaces only the SACCH and CDVCC in FIG. **7A** and only the SACCH in FIG. **7B**. Those skilled in the art will appreciate that many more variations exist, such as time slot **2** or **3** being the "master" channel having the conventional slot format of FIG. **3** instead of slot **1**.

As mentioned above, exemplary embodiments of the present invention wherein the base station **505** only transmits the CDVCC and/or the CDL in some downlink slots of a traffic channel may cause difficulties for mobile stations that expect this information in all time slots on a downlink traffic channel. For extensive information relating to the CDL and mobile functionality relating to locating digital traffic channels, the reader is referred to U.S. patent appli-

**8**

cation Ser. No. 08/331,711 entitled "Method and Apparatus for Locating a Digital Control Channel in a Radiocommunication System", filed on Oct. 31, 1994, the disclosure of which is incorporated here by reference. In brief, the CDL field is used by unconnected mobile stations (e.g., at power-up) to locate a control channel if the first channel to which it tunes is a traffic channel. According to one exemplary technique, a mobile station reads the field corresponding to the CDVCC in the time slot to which it first tunes on a frequency. This conventional mobile station will identify this field as either a CDVCC (implying a traffic channel per the format of FIG. **3**) or a coded superframe phase (CSFP) (implying a control channel per IS-136). If a traffic channel, the mobile station will then use the CDL information as a pointer to search another channel number, or set of channel numbers, for a control channel.

Thus, if the CDVCC information is replaced by FOC information on some downlink time slots, a conventional mobile station reading this field for the purpose of identifying the channel as either a control channel or a traffic channel may misidentify a traffic channel as a control channel. Alternatively, the mobile station might read the FOC information as valid CDVCC data (thus correctly identifying the channel as a traffic channel) and then look for the CDL, which is not present (thus moving to an incorrect channel number or set to search).

Both of these problems can be avoided according to exemplary embodiments of the present invention by recognizing that both the CSFP and the CDVCC according to IS-136 are (12,8) encoded data words, i.e., 8 bits of data encoded to 12 bits that have particular characteristics. Specifically, the CDVCC is a 12,8) code word that remains the same in each time slot associated with a particular channel and has non-inverted checkbits, while the CSFP is a (12,8) code word that has inverted checkbits and acts as an upcounter. Since the universe of (12,8) codewords having these characteristics is relatively small as compared with the number of total number of 12 bit binary words, the FOC information can be made distinct from the CDVCC and CSFP to avoid confusion. Specifically, the base station can transmit FOC information in the field which conventionally been used in downlink channels as either the CSFP or the CDVCC (i.e., bits 169–181 in FIG. **3**), which is carefully tailored to avoid similarity with a (12,8) codeword having these characteristics by adding filler bits to distinguish therefrom as will be readily appreciated by those skilled in the art.

Of course, those mobile stations (or other receiving equipment) which are designed with the present invention in mind will be aware that the SACCH, CDVCC and CDL information can be located at a pre-defined full-rate portion of a multi-rate channel, which pre-defined portion is referred to herein as the "master channel". The master channel may, as in the afore-described examples, be transmitted on time slots **1** and **4**, or alternatively on time slots **2** and **5** or **3** and **6**. In any case, a mobile station which has been suitably programmed to be aware of master channels can simply tune to a master channel to find CDL information.

The present invention also has application in situations other than asymmetrical data/packet data situations described above. For example, in order to ensure complete compatibility, and for ease of implementation, it may be desirable to adopt the downlink slot format of slot **2** in FIG. **6** for situations in which packet data is transmitted in both the uplink and downlink, i.e., for uplink and downlink PDTCs as well as downlink DTCs and uplink PDTCs. That is, base stations according to the present invention which

**A269**

75753DOC002844

US 6,466,568 B1

9

transmit packet data traffic channels can use this downlink format for transmitting to mobile stations. Moreover, this aspect of the present invention is also applicable to situations wherein the connection is not asymmetrical.

Another area in which the present invention finds application is in multimedia communication. As described above, it is anticipated that future radio communications will need to support intermingled voice, data and video service, wherein the type of information to be transmitted may vary rapidly, e.g., time slot by time slot and wherein the different services may require different levels of channel coding. One technique for dealing with this type of situation is to use call control signalling (e.g., over the FACCH) to identify which type of instantaneous service is to be supported over the channel. Another alternative is simply to allow the base station to transmit information pertaining to different services on a slot-by-slot basis, and require the mobile station to discriminate between the different services based on the differences in channel coding. See, for example, U.S. Pat. No. 5,230,003 to Dent and Raith, the disclosure of which is expressly incorporated here by reference. This procedure is currently used to determine whether FACCH information or voice information is carried in the DATA field of a particular downlink time slot. However, as the number of services expands beyond two, the complexity of discriminating between services in this manner becomes excessive.

Thus, according to another exemplary embodiment of the present invention, the FOC fields may also serve the purpose of service type identifier. In this embodiment, the FOC can provide information regarding the type of service which the associated payload is currently supporting, the channel coding and/or interleaving associated therewith. For example, in a multimedia connection information transfer may rapidly vary between voice, data and video information. In such a case, a change in the FOC can inform the mobile station of the type of information being transmitted, so that the mobile station will know how to process the received information, e.g., how to decode the received bits. As will be apparent from reviewing FIG. 6, FIG. 7A and FIG. 7B, exemplary embodiments of the present invention do not provide FOC fields in each time slot received by the mobile station in order to maintain full-rate transmission of SACCH, CDVCC and CDL. That is, using again IS-136 as an illustrative example, a mobile station receiving data at triple-rate will read FOC information in time slots **2, 3, 5,** and **6**, but not slots **1** and **4**. Thus, it is desirable to provide a mapping between the FOC information received in time slots **2, 3, 5,** and **6** and the information payload received by the mobile station in all six time slots.

More specifically, exemplary embodiments of the present invention provide a service type indicator for each block of information transmitted to the mobile station. These blocks of information are commonly referred to as "Layer 2 frames" which include, for example, speech frames associated with voice connections and radio link protocol (RLP) frames associated with data, e.g., fax, connections. Layer 2 frames, which are thus contained within the DATA fields of one or more downlink time slots, should not, however be confused with TDMA frames, which consist of a plurality of time slots. The number of time slots in which each Layer 2 frame is contained will vary depending upon the size of the Layer 2 frames and the amount of interleaving associated with a particular system.

For the purposes of illustration, the exemplary mappings provided below are described in the context of interleaving over two time slots, i.e., each Layer 2 frame is spread over two time slots. However, those skilled in the art will

10

appreciate that Layer 2 frames could be interleaved over more than two time slots in which case the mappings described below would also change accordingly.

Several exemplary associations between the FOC information and the Layer 2 frames for a triple-rate connection are illustrated in FIGS. **8A–8C**. Therein, the six larger blocks **80–85** refer to the payload portion of each of the six time slots in a TDMA frame. For example, as shown in any of FIGS. **6**, **7A** and **7B**, the payload portion includes the information contained in both DATA fields of a time slot. Within each payload portion parts of two Layer 2 frames are carried, as denoted by the letters A–G. As seen in FIGS. **8A–8C**, each Layer 2 frame in this example is interleaved over two time slots. Above the six payload portions are the four FOC portions **86–89** which are contained in slots **2, 3, 5** and **6**, respectively. For example, each FOC portion **86** could, for example, be 36 bits as shown in the exemplary embodiment of FIG. **6**, 24 bits as shown in the exemplary embodiment of FIG. **7A** or 12 bits as shown in the exemplary embodiment of FIG. **7B**.

The arrows in each of FIGS. **8A–8C** denote the mapping between the bits in each FOC portion and Layer 2 frames in each time slot. In particular, an arrow from an FOC portion **86–89** drawn to a time slot **80–85** implies that the FOC portion includes bits which identify the service type of the Layer 2 frame which begins in that time slot. For example, in FIG. **8A**, the arrow leading from FOC SLOT **2** block **86** to PAYLOAD SLOT **1** block **80**, indicates that some of the bits contained in the FOC field(s) of slot two are used to convey an identification of the service type of Layer 2 frame B to the recipient equipment (mobile or base station). Thus, according to the exemplary mapping of FIG. **8A**, Layer 2 frame C has bits in both FOC blocks **86** and **87** relating to an indication of its service identity, while Layer 2 frames B and D have identifying bits only in one of blocks **86** and **87**, respectively.

The way in which the identifier bits are divided between FOC **86** and FOC **87** can vary. For example, a straightforward approach might be to include the complete identifier for Layer 2 frame B, redundancy associated with that identifier, the complete identifier for Layer 2 frame C and redundancy associated with that identifier in FOC **86**. At the same time FOC **87** would include, the complete identifier for Layer 2 frame C, redundancy associated with that identifier, the complete identifier for Layer 2 frame D and redundancy associated with that identifier. As will be appreciated by those skilled in the art, redundancy is provided to allow for correction of errors created during transmission of the bits over the air interface. For ease of reference, this division of bits is referred to using the following notation:

FOC **86** includes: Ib, R{Ib}, Ic, R{Ic}

FOC **87** includes: Ic, R{Ic}, Id, R{Id}

wherein, for example, "Ib" refers to the identifier information associated with Layer 2 frame B and "R{Ib}" refers to the redundancy provided for identifier information associated with Layer 2 frame B.

This exemplary division of bits provides two complete identifiers for Layer 2 frame C, implying unequal redundancy, i.e., less redundancy for Layer 2 frames B and D. Another possible division of identifier bits, using the same notation above (and noting that division by 2 implies simply half of the bits associated with that information), would be:

FOC **86** includes: Ib, R{Ib}, (Ic, R{Ic})/2

FOC **87** includes: (Ic, R{Ic})/2, Id, R{Id}

Using this exemplary division of bits, equal redundancy is achieved. Similar comments and bit divisions apply to FOC

**A270**

75753DOC002845

US 6,466,568 B1

**11**

88 and 89 with respect to identifying the service types of Layer 2 frames E, F and G.

FIG. **8B** illustrates another exemplary mapping according to the present invention. Therein, like reference numerals are used to refer to like bits as described with respect to FIG. **8A**. The only differences between FIG. **8B** and FIG. **8A** are that an additional arrow connects FOC block **86** to the payload of slot **3** and that an additional arrow connects FOC block **87** to the payload of slot **1** (analogous additional arrows are associated with FOC blocks **88** and **89** as well). As discussed above, this means that according to the exemplary mapping of FIG. **8B**, bits in FOC blocks **86** and **87** are also provided which relate to the service identity of the Layer 2 frames B and D, respectively. Accordingly, an exemplary bit division between FOC blocks **86** and **87** (as well as **88** and **89** but for Layer 2 frames E, F and G) is as follows:

FOC **86** includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

FOC **87** includes: (Ib, R{Ib})/2, (Ic, R{Ic})/2, (Id, R{Id})/2

This exemplary embodiment provides an equal amount of redundancy for each Layer 2 frame service type indicator, as well as time slot interleaving of all indicators. However, the receiver will need to wait longer than in the aforedescribed embodiment to take advantage of all of the redundancy.

A third exemplary mapping is illustrated in FIG. **8C**. Therein, like reference numerals are used to refer to like bits as described with respect to FIGS. **8A** and **8B**. The only differences between FIG. **8C** and FIG. **8B** are that an arrow connects FOC block **87** to the payload of slot **4** (instead of slot **1** in FIG. **8B**). Similarly, FOC block **89** has an arrow which points to the first time slot in the next TDMA frame. As discussed above, this means that according to the exemplary mapping of FIG. **8C**, bits in FOC block **87** are also provided which relate to the service identity of the Layer 2 frame E. Accordingly, an exemplary bit division between FOC blocks **86** and **87** (as well as **88** and **89** but for Layer 2 frames E, F, G and A) is as follows:

FOC **86** includes: Ib, R{Ib}, Ic, R{Ic}, Id, R{Id}

FOC **87** includes: Ic, R{Ic}, Id, R{Id}, Ie, R{Ie}

This exemplary embodiment has less delay involved in decoding the identifier information than the exemplary embodiment of FIG. **8B** since, e.g., all of the identifier information for Layer 2 frame B will have been received by time slot **2**. Those skilled in the art will readily appreciate that other mappings are possible and are considered to be within the scope of the present invention.

As described above, the FOC can be used in the downlink in different ways. Specifically, if a mobile station is assigned to an asymmetrical data connection, then the FOC is not associated with the connection and may be used in the manner described above to provide feedback relating to one or more uplink packet data connections. Alternatively, if the mobile station is assigned a multimedia connection, then the FOC can instead serve as a signalling channel associated with the connection that provides out-of-band information regarding the connection itself. In the former case, the mobile station which is receiving, for example, at double- or triple-rate need not read the FOC since the information provided therein relates to a connection associated with another mobile station. In the latter case, the mobile station needs to read the FOC since its information pertains to the mobile station's connection. At call set-up or handoff, the mobile station can be informed, e.g., as part of the channel assignment message, which type of connection is being set-up. If, for example, the mobile station is informed that a non-multimedia (e.g., an asymmetrical data) connection is

**12**

being set-up, then that mobile station will know that it should ignore the FOC information.

This handling of the FOC by a mobile station is illustrated in the flow chart of FIG. **9**. Therein, at decision block **90**, the mobile station determines whether the new (greater than full-rate) connection is a multimedia connection. If so, then the flow proceeds to block **92**, wherein the mobile station recognizes that because the connection is multimedia, the FOC provides instantaneous service type information for that mobile station's downlink connection and should be read. The mobile then proceeds to use the FOC information in processing the payload at block **94**.

If the connection is not a multimedia connection, e.g., it is an asymmetrical data/fax connection wherein the mobile will be receiving at double- or triple-rate, then the flow follows the "No" branch leaving decision block **92**. Thus, the mobile station will then recognize at block **96** that the FOC fields in some of the downlink time slots should be ignored since that information is used to provide feedback to other mobile stations regarding their uplink connections. Note, block **96** is not meant to imply that all mobile stations would ignore the FOC, only the mobile station receiving the double- or triple-rate downlink information on that frequency. This mobile station will then read the payload of the slots associated with the additional bandwidth, while ignoring the FOC fields at block **98**.

To this point, the discussion has focused on adjustments which can be made to transmission formats in the downlink. However, there may also be situations where the mobile station transmits in more time slots in each frame than it receives. Thus, it is desirable to optimize the uplink traffic channel format for these situations as well.

FIG. **10** illustrates a conventional uplink traffic channel format as currently specified by IS-136. Therein, the bit sizes of each field are specified by the numbers above each field. Similarly identified fields, including DATA, SYNC, CDVCC, and SACCH, are used in the manner described above with respect to the conventional downlink traffic channel format of FIG. **3**. Guard time field (G) and ramp time field (R) are provided to provide the base station some time between received time slots from different mobiles and to avoid spectral splatter. Unlike the downlink, the uplink has no CDL field since the base station has no need of such information.

However, the base station need not receive SACCH and/or CDVCC information in each uplink time slot when connected at greater than full rate to a mobile station. Thus, according to exemplary embodiments of the present invention, one or both of these fields can be filled with FOC information in a manner analogous to that described for the downlink. Accordingly, an exemplary uplink format according to the present invention may be as illustrated in FIG. **11**. Therein, for double-rate transmission in the uplink, the slot format for the first (and fourth) slot in an exemplary six slot frame system will be as shown in the top row, while the format for the second (and fifth) slot will be as shown on the bottom. For triple-rate transmission in the uplink the third and sixth slots will have the same format as shown in the bottom row of FIG. **11**. Thus, for example, 24 bits of FOC information per time slot can be provided in the uplink to, for example, identify the service type of the payload being transmitted by the mobile station. As in the exemplary embodiments for the downlink, it may be desirable to maintain one of the SACCH or the CDVCC in additional time slots, in which case FOC information may be provided only in one of the two fields shown in the bottom row of FIG. **11**.

**A271**

75753DOC002846

US 6,466,568 B1

**13**

It is, of course, possible to embody the invention in specific forms other than those described above without departing from the spirit of the invention. The embodiments described above are merely illustrative and should not be considered restrictive in any way. The scope of the invention is determined by the following claims, rather than the preceding description, and all variations and equivalents which fall within the scope of the claims are intended to be embraced therein.

What is claimed is:

1. A communication station comprising:

a processor for arranging information for transmission including providing at least one first field in which payload information is disposed and providing at least one second field, separate from said first field, which includes a service type identifier which identifies a type of payload information provided in said at least one first field; and

a transmitter for transmitting information received from said processor including said at least one first field and said at least one second field.

**14**

2. The communication station of claim 1, wherein said processor is also for changing said type of payload information from a first type to a second type during a connection involving said communication station and adjusting a value of said service type identifier to correspond to the second type of information.

3. The communication station of claim 2, wherein said first type of information is one of video, voice and data and said second type of information is different one of video, voice and data.

4. The communication station of claim 1, wherein said information is multimedia information.

5. The communication station of claim 1, wherein said communication station is a base station.

6. The communication station of claim 1, wherein said communication station is a mobile station.

7. The communication station of claim 1, wherein said processor is also for mapping said service type identifier to said at least one first field.

*   *   *   *   *

**A272**

75753DOC002847

US006772215B1

# (12) United States Patent

## Rathonyi et al.

(10) Patent No.: **US 6,772,215 B1**
(45) Date of Patent: **Aug. 3, 2004**

(54) **METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS**

(75) Inventors: **Bela Rathonyi**, Malmö (SE); **Joachim Sachs**, Aachen (DE); **Michael Meyer**, Aachen (DE); **Per Beming**, Stockholm (SE); **Mathias Johansson**, Sollentuna (SE); **Christiaan Roobol**, Hässelby (SE); **Erik Schön**, Tokyo (JP); **Kazuhiko Inoue**, Tokyo (JP)

(73) Assignee: **Telefonaktiebolaget LM Ericsson (publ)**, Stockholm (SE)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **09/537,146**

(22) Filed: **Mar. 29, 2000**

**Related U.S. Application Data**

(60) Provisional application No. 60/128,517, filed on Apr. 9, 1999.

(51) Int. Cl.[7] .............................................. G06F 15/16
(52) U.S. Cl. ............................................ 709/230; 370/229
(58) Field of Search ............................ 709/230; 370/229, 370/232, 394, 395.1, 349

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | | | |
|---|---|---|---|---|
| 4,439,859 A | | 3/1984 | Donnan | 371/32 |
| 5,477,550 A | * | 12/1995 | Crisler et al. | 714/748 |
| 5,566,170 A | * | 10/1996 | Bakke et al. | 370/392 |
| 5,673,252 A | * | 9/1997 | Johnson et al. | 370/449 |
| 5,752,078 A | * | 5/1998 | Delp et al. | 710/7 |
| 5,754,754 A | | 5/1998 | Dudley et al. | 395/182.16 |
| 5,799,012 A | * | 8/1998 | Ayerst et al. | 370/336 |
| 5,968,197 A | * | 10/1999 | Doiron | 714/748 |
| 5,991,299 A | * | 11/1999 | Radogna et al. | 370/392 |
| 6,034,963 A | * | 3/2000 | Minami et al. | 370/401 |
| 6,069,886 A | * | 5/2000 | Ayerst et al. | 370/336 |
| 6,317,430 B1 | * | 11/2001 | Knisely et al. | 370/394 |
| 6,359,877 B1 | * | 3/2002 | Rathonyi et al. | 370/349 |
| 6,473,399 B1 | * | 10/2002 | Johansson et al. | 370/229 |
| 6,542,490 B1 | * | 4/2003 | Ahmadvand et al. | 370/338 |

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| EP | 0 768806 A2 | 4/1997 |

**OTHER PUBLICATIONS**

Throughput analysis of some ARQ protocols in the presence of feedback errors by Cam et al.; IEEE; vol. 45 No. 1, Jan. 1997.*

Richard Cam and Cyril Leung; *Throughput Analysis of Some ARQ Protocols in the Presence of Feedback Errors;* IEEE Transactions on Communications; Jan. 1997; vol. 45, No. 1; pp. 35–44.

ISR, PCT/SE/ 00/00677, Completed Aug. 23, 2000.

* cited by examiner

*Primary Examiner*—Frantz B. Jean

(57) **ABSTRACT**

A method for minimizing feedback responses in an ARQ protocol is disclosed, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

**64 Claims, 3 Drawing Sheets**

| type=LIST |
|---|
| LENGTH=0 |
| LENGTH=4 |
| $SN_1$=1 |
| $SN_2$=25 |
| $SN_3$=50 |
| $SN_4$=95 |



Ericsson, Inc. v. D-Link, et. al

**PX0010**

6:10-cv-473

**A273**

**U.S. Patent**     Aug. 3, 2004     Sheet 1 of 3     US 6,772,215 B1



FIG.1
PRIOR ART

FIG. 2
PRIOR ART

FIG.3
PRIOR ART

FIG. 6

FIG. 5

FIG.4

**A274**

75753DOC002861

U.S. Patent    Aug. 3, 2004    Sheet 2 of 3    US 6,772,215 B1

| type=ACK |
| SN |

FIG. 7

| Type=BITMAP' |
| FSN |
| LENGTH |
| Bitmap |
| Type=LIST' |
| LENGTH |
| SN$_1$ |
| L$_1$ |
| ... |
| SN$_{LENGTH}$ |
| L$_{LENGTH}$ |
| Type=BITMAP' |
| LENGTH |
| bitmap |
| Type=NO_MORE |

FIG. 8

| Field | Field Value | | Field size |
| | Decimal | Bits | |
| --- | --- | --- | --- |
| LIST' | N/A' | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| SN$_1$ | 51 | 000000110011 | 12 |
| L$_1$ | 27 | 11011 | 5 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 9

| Field | Field Value | | Field size |
| | Decimal | Bits | |
| --- | --- | --- | --- |
| LIST' | N/A | 01 | 2 |
| LENGTH | 0 | 00000 | 5 |
| LENGTH | 4 | 00100 | 5 |
| SN$_1$ | 1 | 000000000001 | 12 |
| SN$_2$ | 25 | 000000011001 | 12 |
| SN$_3$ | 50 | 000001100100 | 12 |
| SN$_4$ | 95 | 000001011111 | 12 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG.10

| Field | Field Value | | Field size |
| | decimal | Bits | |
| --- | --- | --- | --- |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 2 | 00010 | 5 |
| FSN | 27 | 000000011011 | 12 |
| Bitmap | 28-43 | 0001111011101011 | 16 |
| LIST' | N/A | 01 | 2 |
| LENGTH | 2 | 00010 | 5 |
| SN$_1$ | 91 | 000001011011 | 12 |
| L$_1$ | 3 | 00011 | 5 |
| SN$_1^2$ | 101 | 000001100101 | 12 |
| L$_2$ | 0 | 00000 | 5 |
| NO_MORE | N/A | 00 | 2 |

FIG. 11

A275

75753DOC002862

**U.S. Patent**  Aug. 3, 2004  Sheet 3 of 3  US 6,772,215 B1

| Field | Field Value | | Field |
|---|---|---|---|
| | decimal | Bits | size |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 11 | 01011 | 5 |
| FSN | 3 | 000000000011 | 12 |
| Bitmap | 4-10 | 1110111 | 88 |
| | 11-20 | 0111101111 | |
| | 21-30 | 1111111111 | |
| | 31-40 | 1101111111 | |
| | 41-50 | 1111011111 | |
| | 51-60 | 1111011111 | |
| | 61-70 | 1111101111 | |
| | 71-80 | 1111111011 | |
| | 81-90 | 1011111111 | |
| | 91 | 0 | |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 12

| Field | Field Value | | Field |
|---|---|---|---|
| | decimal | Bits | size |
| LIST' | N/A | 01 | 2 |
| LENGTH | 1 | 00001 | 5 |
| SN$_1$ | 10 | 000000001010 | 12 |
| L$_1$ | 20 | 10100 | 5 |
| BITMAP' | N/A | 10 | 2 |
| LENGTH | 1 | 00001 | 5 |
| Bitmap | 31-38 | 01011011 | 8 |
| ACK | N/A | 11 | 2 |
| SN | 101 | 000001100101 | 12 |

FIG. 13

**A276**

75753DOC002863

Case: 13-1625    Case: 13-1625    Document: 179-1    Document: 177-1    Page: 291    Page: 291    Filed: 03/31/2014    Filed: 03/31/2014    (291 of 575)

CASE PARTICIPANTS ONLY

US 6,772,215 B1

## 1

## METHOD FOR MINIMIZING FEEDBACK RESPONSES IN ARQ PROTOCOLS

### CROSS-REFERENCES TO RELATED APPLICATIONS

This Application for Patent claims the benefit of priority from, and hereby incorporates by reference the entire disclosure of, co-pending U.S. Provisional Application for patent Ser. No. 60/128,517, filed Apr. 9, 1999.

### BACKGROUND OF THE INVENTION

1. Technical Field of the Invention

The present invention relates in general to the telecommunications field and, in particular, to a method for minimizing feedback responses in Automatic Repeat Request (ARQ) protocols, such as, for example, selective-repeat ARQ protocols.

2. Description of Related Art

When data is conveyed between nodes in a telecommunication network, certain algorithms are used to recover from the transmission of erroneous data and the loss of data on the transmission links between the nodes. An algorithm commonly used to recover from the transmission of erroneous data is referred to as an ARQ protocol.

The existing ARQ protocols (i.e., algorithms) include two peer entities that communicate with each other over transmission links. Each such entity includes a receiver and a sender. The units of data conveyed between the peer entities are commonly referred to as Protocol Data Units (PDUs). The ARQ protocols include certain rules for sending and receiving PDUs, as well as rules for the structure of the PDUs. As such, the name "Automatic Repeat Request" indicates the basic function of the protocol: the receiver requests the sender to retransmit those PDUs that were lost or contained errors during transmission.

The receiver can inform the sender about which PDUs were correctly received (i.e., receiver acknowledges correctly-received PDUs) and/or which PDUs were incorrectly received. When the sender receives this information, it retransmits the "lost" PDUs. In other words, an ARQ protocol is a set of rules that allow the use of efficient retransmission mechanisms between a sending side and receiving side in a communication system. These rules specify, for example, how and in what form the PDUs are to be constructed so that the receiving side can interpret the conveyed PDUs correctly and respond to them accordingly.

Three main types of information elements (PDUs) can be transferred between two ARQ peer entities: user data; error recovery control data; and common control data. These three types of PDUs can be found in all of the existing ARQ protocols. A user data PDU contains at least user data and a sequence number. An error recovery control data PDU contains various control information needed for error recovery and control functions such as positive and negative acknowledgments. A common control data PDU contains common control data.

In the known High Level Data Link Control (HDLC) protocol, which forms the basis for many existing ARQ protocols, the three types of PDUs are called, respectively, information frames (I-frames), supervisory frames (S-frames), and unnumbered frames (U-frames). Examples of HDLC-derived ARQ protocols are the Radio Link Protocol (RLP) used in the Global System for Mobile Communications (GSM), the Radio Link Control (RLC) and Logical Link Control (LLC) protocols used in the General Packet

## 2

Radio Service (GPRS), the Infrared Link Access Protocol (IrLAP) used in IrDA systems, and the LAP-B protocol used in X.25 systems. Notably, PDUs that include user data and at least a sequence number are denoted herein as Data-PDUs (D-PDUs), and PDUs that include control data needed for error control/recovery are denoted herein as Status-PDUs (S-PDUs).

In most communication systems, user data information is conveyed in both directions between the peer entities. A common feature included in an ARQ protocol is the possibility of including error control information in the user data PDUs. This capability is known as "piggybacking". For example, an acknowledgment is included in all I-frames (i.e., D-PDUs) of HDLC-derived protocols. The acknowledgment informs the peer entity about the sequence number of the last (in-sequence) correctly received PDU.

The most common existing ARQ protocols implement one or more mechanisms to recover from errors on a transmission link, such as a Stop-and-Wait ARQ, Go-back-N ARQ, and Selective-Repeat ARQ. The use of these mechanisms and ARQs in general is well known.

FIG. 1 is a sequence diagram that illustrates the use of ARQ protocols. As shown, two ARQ peer entities 10, 12 are communicating with each other. The arrows in FIG. 1 indicate the transmission of PDUs between the two entities, and the content of each PDU is described directly above the respective arrow. Referring to FIG. 1, a sequence of transmitted D-PDUs and S-PDUs is shown. A D-PDU includes user data, a sequence number (SN), and possibly piggybacked error control information. An S-PDU includes status information but no user information. A sequence number (SN=x) is associated with a D-PDU to identify that specific D-PDU. An acknowledgment (ACK=x) is used to acknowledge any PDU with a SN<x. A negative acknowledgment (NAK=x) is used to acknowledge that a PDU (with an SN=x) has not been correctly received.

Two types of error control feedback responses are shown in FIG. 1. For one of the feedback responses (e.g., S-PDU, ACK=2) 14, the second ARQ peer entity 12 has acknowledged that it has received the PDUs with the SN=0 and SN=1. For the second type of feedback response (e.g., S-PDU, NAK=3) 16, the second peer entity 12 has indicated that the PDU with the SN=3 was corrupted and should be retransmitted by the first peer entity 10.

As discussed above, the S-PDUs are special PDUs which are transmitted between peer entities. An S-PDU includes information about the SNs of corrupted PDUS. Two main methods are currently used for coding the SNs within S-PDUs. One such method is to use a list of SNs to be retransmitted. The second method is to use a bitmap to represent the SNs to be retransmitted. As such, apart from representing SNs, an S-PDU also includes a format identifier which can be used by a receiver to distinguish between the different PDU formats (i.e., D-PDUs and S-PDUs).

The list method used for coding SNs includes the SNs of the erroneous PDUs in the S-PDU. If the length of the list is not predefined and thereby known, this length information is indicated in the S-PDU. For example, a length field can be included in the S-PDU. FIG. 2 shows such an S-PDU, which can be created by a receiver using a list method for coding SNs.

Referring to FIG. 2, a receiver can create an S-PDU with the contents shown, if the sender has transmitted a sequence of D-PDUs with SNs=0–15, and the PDUs with SNs=3, 5, 6, 7 and 8 have failed (not been correctly received). For example, the first two elements in the list (after the length

## A277

75753DOC002864

US 6,772,215 B1

**3**

field) indicate that the D-PDU with SN=3 was erroneous. The third and fourth elements in the list indicate that the D-PDUs with SNs=5–8 were erroneous. The final element is included to acknowledge the remaining PDUs (SNs up to 15).

The size of the S-PDU depends on the number of bits used to represent the PDU format identifier field, the length field and the SN field. As such, the size of an S-PDU can be calculated by the expression:

$$PDU.SIZE_{LIST} = size(pdu.format.field) + size(length.field) + no.listelements * size(seq.no.field). \quad (1)$$

For example, this list method is used in the SSCOP protocol, wherein two S-PDU formats exist and are denoted by the term "STAT" for a variable list length, and "USTAT" for a list with a limited number of elements (e.g., 2 elements).

FIG. 3 shows an S-PDU which can be created by a receiver using a bitmap method for coding SNs. When a bitmap is used to indicate SNs, the receiver creates the S-PDU from the SN of the last in-sequence correctly received D-PDU and a bitmap. This SN is referred to as a Start SN (SSN). Consequently, this S-PDU implicitly acknowledges all D-PDUs received up to the value of the SSN. Each location in the bitmap is used to address a specific S-PDU relative to the SSN. Typically, the size of the bitmap is fixed to the size of the ARQ receiver window and does not have to be explicitly indicated. If the bitmap is not fixed, the length has to be indicated.

The bitmap shown in FIG. 3 shows an S-PDU created from the example described above with respect to FIG. 2, and a window size of 16. As such, each location in the bitmap can have one of the two values, 0 or 1: A "1" means that SN=(SSN+bit_position) has been correctly received; and a "0" value means that SN=(SSN+bit_position) has not been correctly received. Of course, the meaning of the "0" and "1" values can be interchanged. The size of an S-PDU when using such a bitmap can be derived from the following expression:

$$PDU.SIZE_{BITMAP} = size(pdu.format.field) + size(SSN.field) + size(bitmap.field). \quad (2)$$

Both the RLC and LLC protocols in the GPRS system use such an expression and convey bitmaps between peer entities for error control purposes.

A significant problem with existing ARQ protocols is that they are static in construction (e.g., fixed length messages are used). In certain situations, this approach leads to a waste of bandwidth resources, because a great deal of overhead information is transmitted unnecessarily. For example, such situations can occur in systems having a large number of D-PDUs being transmitted between two ARQ peer entities, and these D-PDUs have to be acknowledged and selectively requested for retransmission. For some error control situations, the existing solutions introduce a significant amount of unnecessary overhead. The following example illustrates such a situation.

In the Wideband-Code Division Multiple Access (WCDMA) system currently being standardized for the so-called 3rd Generation Cellular Communication System, one ARQ protocol used is an RLC protocol. The SN set includes the values 0–4095, which means that each SN is coded with 12 bits. An assumption can be made that for high data rates, a relatively large set of SNs will have to be addressed in some S-PDUs. Also, assume that the status of 100 D-PDUs (SN=1–100) needs to be communicated between the RLC peer entities in an S-PDU.

**4**

Table 1 below shows the number of bits needed to code an S-PDU using the list and bitmap methods described above. Different error circumstances are provided to highlight the large difference in the number of bits required for the two methods. Assume that the following element sizes are used: bitmap=128 bits; length=5 bits; and one PDU format identifier=1 bit (for distinguishing between a D-PDU and an S-PDU). As such, the different S-PDU sizes shown in Table 1 are calculated in accordance with Equations (1) and (2) above, respectively.

As illustrated by rows 2–5 in Table 1, both of the existing solutions have problems with efficiently building small S-PDUs for error circumstances shown. The length of the LIST does not depend so much on the number of erroneous D-PDUs, but rather on the distribution of the errors within the window used. This fact becomes evident by comparing rows 1 and 2 in Table 1.

TABLE 1

| | Erroneous D-PDUs (SN) | # SN | Size of S-PDU (bits) | |
|---|---|---|---|---|
| | | | LIST | BITMAP |
| 1 | 51–77 | 27 | 42 | 141 |
| 2 | 1, 25, 50, 95 | 4 | 114 | 141 |
| 3 | 27–30, 35, 39, 41, 91–93 | 10 | 138 | 141 |
| 4 | 3, 7, 11, 16, 33, 45, 55, 66, 78, 82, 91 | 11 | 282 | 141 |
| 5 | 10–29, 31, 33, 36 | 23 | 114 | 141 |

A general statement of the problem to be solved is to determine how to efficiently represent (encode) in a message the status of an arbitrary amount and distribution of n numbers from a set of m numbers. As such, a significant need exists for a method that can be used to minimize the size of S-PDUs in an ARQ protocol Also, a significant need exists for a method that can be used to maximize the number of SNs in an S-PDU with limited size, if it is not possible to fit all potential SNs into a single S-PDU. As described in detail below, the present invention successfully resolves the above-described problems and other related problems.

SUMMARY OF THE INVENTION

In accordance with an embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. In particular, these different mechanisms can be combined in a single S-PDU. The S-PDUs are constructed so as to optimize system performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

An important technical advantage of the present invention is that radio interface bandwidth resources can be saved.

Another important technical advantage of the present invention is that protocol overhead can be minimized.

Still another important technical advantage of the present invention is that system capacity can be increased.

Yet another important technical advantage of the present invention is that the number of feedback responses in a selective-repeat ARQ protocol can be minimized.

BRIEF DESCRIPTION OF THE DRAWINGS

A more complete understanding of the method and apparatus of the present invention may be had by reference to the

**A278**

75753DOC002865

US 6,772,215 B1

**5**

following detailed description when taken in conjunction with the accompanying drawings wherein:

FIG. 1 is a sequence diagram that illustrates the use of ARQ protocols;

FIG. 2 is a diagram that shows an S-PDU which can be created by a receiver using an existing list method for coding SNs;

FIG. 3 is a diagram that shows an S-PDU which can be created by a receiver using an existing bitmap method for coding SNs;

FIG. 4 is a bitmap message for use in an S-PDU, constructed in accordance with a first embodiment of the present invention;

FIG. 5 is a diagram of a message with the fields and contents of the LIST S-PDU for row 2 in Table 1, constructed in accordance with the first embodiment of the present invention;

FIG. 6 is a diagram of the fields of a LIST' message in an S-PDU, constructed in accordance with the first embodiment of the present invention;

FIG. 7 is a diagram that shows the contents of an "ACK" message constructed in accordance with the second embodiment of the present invention;

FIG. 8 is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method of the second embodiment;

FIG. 9 is a diagram that shows the contents of row 1 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. 10 is a diagram that shows the contents of row 2 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. 11 is a. diagram that shows the contents of row 3 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention;

FIG. 12 is a diagram that shows the contents of row 4 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention; and

FIG. 13 is a diagram that shows the contents of row 5 of Table 1 in a combination S-PDU, constructed in accordance with the second embodiment of the present invention.

DETAILED DESCRIPTION OF THE DRAWINGS

The embodiments of the present invention and their advantages are best understood by referring to FIGS. 1–13 of the drawings, like numerals being used for like and corresponding parts of the various drawings.

Essentially, in accordance with a first embodiment of the present invention, a method for minimizing feedback responses in an ARQ protocol is provided, whereby different mechanisms can be used to indicate erroneous D-PDUs and construct S-PDUs. The S-PDUs are constructed so as to optimize performance in accordance with certain criteria. One such criterion used is to minimize the size of the S-PDUs. A second such criterion used is to maximize the number of SNs included in an S-PDU of limited size.

Specifically, hereinafter, the basic components being described are messages. For this embodiment, such a message can be described by using a Type, Length, Value (TLV) syntax. In other words, each message includes three fields. One field includes type information, the second field includes length information, and the third field includes a value. The size of the type field is preferably non-zero, while the sizes of the other two fields can be zero.

**6**

Notably, as mentioned earlier, all existing bitmap solutions include information about the sequence number (herein called the SSN) of the last received in-sequence D-PDU in a constructed S-PDU. The SSN indicates that no errors exist prior to that sequence number. In other words, the SSN is used to acknowledge all D-PDUs having SNs up to that of the SSN.

For this exemplary embodiment, a basic message to be used for minimizing feedback responses in an ARQ protocol can be constructed as follows. Using a BITMAP method for this embodiment, the SN included in a constructed S-PDU indicates the SN of any (not necessarily the first) erroneous D-PDU from the set of SNs. The status of the subsequent SNs are indicated in the bitmap. Although the SN of the first erroneous D-PDU is used in this exemplary embodiment, it should be understood that any D-PDU (from the SN set) can be used in the bitmap method instead. In that case, the bitmap also has to include the status (0 or 1) of the SN included in the constructed S-PDU. As such, a "BITMAP" message can be created with a type identifier field, a first SN (FSN) field, a bitmap length field, and a bitmap field. FIG. 4 illustrates a bitmap message with such fields for use in an S-PDU, in accordance with the first embodiment of the present invention.

Referring to the bitmap message shown in FIG. 4, a number of methods can be used to represent the length of the bitmap (LENGTH field). For one method, a predefined number of bits can be used to represent the size of the bitmap in a basic data unit. Such a data unit can have any granularity and include, for example, one or more bits, bytes, words, etc. For example, if a byte is used as the basic data unit, the value, x, in the LENGTH field means that 8*x SNs are covered by the bitmap. This resulting value also represents the size of the bitmap in bits.

For a second method used to represent the length of the bitmap, a different SN can be used to indicate the last SN covered by the bitmap. The size of the LENGTH field is then equal to the size of the FSN field. As such, the size of the bitmap can be calculated by subtracting the FSN value from the LENGTH value.

A third method that can be used for representing the length of the bitmap is to fix the size of the bitmap so that no LENGTH field is required in the S-PDU. Alternatively, the size of the LENGTH field can be set to zero. Also, the size of the FSN field can also be set to zero if the SN that the bitmap covers is signalled remotely. Such a method is described in more detail below.

Notably, a conventional data compression method can be used to compress the information in the bitmap field. As such, both normal and compressed bitmaps can be included in one S-PDU. In this case, the value of the type field for the compressed bitmap would be different than that for a normal bitmap.

As mentioned earlier, a significant drawback of the existing LIST methods is that two SNs are required for each error group. An error group comprises a single error or several consecutive errors of D-PDUs. In order to resolve such a problem using a LIST method in accordance with this exemplary embodiment, only erroneous SNs are listed. In other words, a new LIST type can be defined wherein only single errors are listed. Consequently, the size of a resulting S-PDU can be significantly reduced for certain error situations, in comparison with the existing LIST solutions.

Another method that can be used to reduce the size of S-PDUs, in accordance with this embodiment, is to combine an existing LIST method (2 SNs per error group) with the

**A279**

CASE PARTICIPANTS ONLY

US 6,772,215 B1

**7**

above-described single error SN LIST method to create the list message. For example, the existing LIST method can be improved significantly by introducing the following rules for creating the LENGTH field value:

(1) A zero value means that a single error SN LIST method is applied. A second (new) length field is included directly after the original LENGTH field to indicate the number of single erroneous SNs that follow directly after the second field. All list elements represent single erroneous SNs, and no acknowledgment is provided while using this list method.

(2) An odd value implies that the last list element is an acknowledgment.

(3) An even value (excluding zero) implies that the last element is not an acknowledgment. Consequently, following the above-described rules in accordance with this embodiment, the (LIST) S-PDU for row 2 in Table 1 now contains the fields and contents shown in FIG. **5**. As such, if the field sizes shown in row 2 of the example illustrated by Table 1 were to be used with respect to the embodiment illustrated by FIG. **5**, then the total size of the S-PDU would be 59 bits. Consequently, in accordance with the present invention, the number of bits needed for the resulting S-PDU is significantly smaller than the number of bits (114) needed for the existing LIST solution.

FIG. **6** is a diagram that illustrates another method that can be used to reduce the size of an S-PDU using a LIST method. The method used in accordance with this embodiment is to include a field after each list element which determines the length of the error, instead of indicating the length of the error with an "ending" SN. In most systems, the size of the length field would then be substantially smaller than the size of the SN field. Furthermore, typically there is no need to represent very large consecutive, erroneous D-PDUs (i.e., a large error group) in an S-PDU.

Referring to FIG. **6**, the fields of a new message (denoted as LIST') in an S-PDU are shown. The new length field introduced after each $SN_i$ is denoted $L_i$ for $1 \leq I \leq LENGTH$. Notably, a value of zero can be used for $L_i$ to further improve the functionality of the resulting LIST' message. As such, the following alternatives can be used:

(1) A zero value for $L_i$ means that $SN_i$ is an acknowledgment (i.e., Li is not pointing out an error).

(2) A zero value represents the end of the LIST' message. The first LENGTH field can be omitted if the interpretation of the last SN has been predefined. For example, the last SN can be restricted so as to always be an acknowledgment (e.g., as in the first alternative), or the length can be predefined (e.g., so as to point out a single error).

In accordance with a second embodiment of the present invention, a number of different message types can be combined to create an S-PDU. These message types can be added in any arbitrary order in the S-PDU, and there is no rule on the number of messages or the type of message that can be included in the S-PDU. For this exemplary embodiment, each such message includes a type identifier, and the length is either fixed or indicated by a length field for each specific message. The first type identifier preferably has a predefined position in the resulting S-PDU. The rest of the type identifiers can be located at arbitrary locations depending on the sizes of the included messages. For example, the messages, LIST', BITMAP' and ACK can be included in the S-PDU.

The number of such messages that can possibly be included in an S-PDU determines the size (bits) of the type

**8**

identifier field used in the S-PDU. For example, the size of such a type identifier field can be determined by the following expression:

$$ize(type. field) = \lfloor \log_2(\text{number of possible messages}+1)\rfloor, \quad (3)$$

where the operator $\lfloor \ \rfloor$ rounds the argument off to the next highest integer value. The "+1" part of the argument is used so that a type identifier can be used to indicate that no other messages are included in an S-PDU. This special identifier is denoted herein as a "NO_MORE" message. As such, in accordance with Equation (3), the size of the type field is 2 bits for three different messages, because $\lfloor \log_2(4)\rfloor 2$.

The contents of an "ACK" message constructed in accordance with this embodiment are shown in FIG. **7**. The ACK message shown includes a type identifier field and SN. This ACK message marks the end of an S-PDU, and all prior D-PDUs not indicated to be erroneous within this S-PDU are acknowledged by the SN. Consequently, when such an ACK message is included in an S-PDU, there is no need to include a NO_MORE message to terminate the combined S-PDU.

Assume that a LIST' message with an acknowledgment feature (i.e., a zero value for $L_i$ means that $SN_i$ is an acknowledgment) is used (with a LENGTH field). When a BITMAP' message is included directly after a LIST' message, the size of the FSN field is zero. As such, the first SN which is represented in the bitmap is $SN_{LENGTH}+L_{LENGTH}$. Furthermore, a zero in the LENGTH field of the LIST' message means that an additional LENGTH field is included, and the message is constructed as shown in FIG. **5** with no $L_{SNi}$ fields.

Another way to obtain the above-described LIST feature is to define a new type (denoted, for example, "LIST"). However, the size of the type field can be affected, which can result in a larger S-PDU. In any event, there is a trade-off (which is system dependent) to consider in selecting the exact rules to follow for the combination method described above.

FIG. **8** is a diagram that illustrates how an S-PDU can be constructed in accordance with the combination method described above. As shown, the resulting S-PDU includes two BITMAP' messages and one LIST' message. The second BITMAP' message does not include an FSN field (or, the size of the FSN field is zero). Consequently, the first element in the bitmap represents the SN having the value, $SN_{LENGTH}+L_{LENGTH}$.

In order to demonstrate the advantages of the above-described combination method, it can be applied to the example described above with respect to Table 1. As such, Table 2 shows different messages (along with their corresponding bit values) which can be combined in an S-PDU, in accordance with the second embodiment of the present invention. For this embodiment, each S-PDU starts with one of the type identifiers shown. Also, the sizes of the LENGTH and $L_{SNi}$ fields are fixed to 5 bits.

Consequently, these fields can each hold a value between $0-32(2^5)$ Notably, although the sizes of the fields are fixed, their sizes are not necessarily equal, as in this example (i.e., the size of the LENGTH field in the BITMAP' message can be different than the size of the LENGTH field in the LIST' message). The value of the LENGTH field in the BITMAP' message corresponds to the size of the bitmap in bytes (i.e., a maximum of 8*32=256 SNs can be addressed in a single S-PDU). All of the fields containing an SN value have a size of 12 bits (i.e., the FSN, SN and SSN fields).

**A280**

75753DOC002867

US 6,772,215 B1

9 | 10

### TABLE 2

| Type Identifier | Value |
| --- | --- |
| NO_MORE | 00 |
| LIST' | 01 |
| BITMAP' | 10 |
| ACK | 11 |

FIG. 9–13, respectively, are diagrams that show the contents of an S-PDU for each row shown in Table 1 for the above-described example. For this embodiment, the combination is selected so as to minimize the total size of the S-PDU.

As illustrated by the example described above with respect to Table 1, FIG. 9 shows the contents of row 1 in the resulting (combination) S-PDU, FIG. 10 shows the contents of row 2, and FIG. 11 shows the contents of row 3. Note that by including an ACK type instead of the list element $SN_i$ in FIG. 11, an additional 5 bits can be saved with respect to the total size of the S-PDU. FIG. 12 shows the contents of row 4 in the resulting S-PDU, and FIG. 13 shows the contents of row 5. As such, the contents of the entire coded S-PDU can be obtained by concatenating all values from the "bits" column. For example, the contents of row 1 of the S-PDU (FIG. 9) would appear as:

"0100001000000110011110111000001100101".

Table 3 shows the sizes of the S-PDUs constructed in accordance with the existing LIST and BITMAP methods, and also the combination method described above in accordance with the second embodiment. The sizes of the S-PDUs are calculated by adding the "Field size" columns in FIGS. 9–13. As illustrated by Table 3, the size of the S-PDU resulting from the combination method of the present invention is significantly smaller than the S-PDUs resulting from the existing solutions.

### TABLE 3

| | Size of S-PDU (bits) | | |
| --- | --- | --- | --- |
| | State-of-the-art solutions | | Combination |
| | LIST | BITMAP | solution |
| 1 | 42 | 141 | 38 |
| 2 | 114 | 141 | 74 |
| 3 | 138 | 141 | 78 |
| 4 | 282 | 141 | 121 |
| 5 | 114 | 141 | 53 |

In many ARQ protocols, the size of the D-PDUs is predefined and can have limited set of different values. Padding can be used if the amount of user data provided to the sending ARQ entity is smaller than the size of the D-PDU. Padding is a technical whereby nonsensical data is used to fill up the remaining empty locations in the D-PDU. For example, if a D-PDU can be filled with 20 bytes of user data, and the sending ARQ entity has only 14 bytes of user data, the rest of the D-PDU can be filled or padded with 6 bytes of padding data. The length of the user data part is indicated in the D-PDU. The RLC protocol in the GPRS and W-CDMA systems use this type of padding function.

The combination method of the second embodiment can also be used efficiently with piggybacking. For example, an ARQ entity can piggyback status information after the end of the last user data byte, if enough space exists to fill the padding fields with a status message. A NO MORE type identifier is used whenever there is no status information to be included in a D-PDU which contains padding bytes. This piggybacking scheme advantageously reduces the number of packets being exchanged between two ARQ entities and, consequently, saves system capacity. The cost for such a piggybacking scheme is relatively low, because no field is reserved in the D-PDU for the piggybacking scheme, which is the case for existing ARQ protocols that use piggybacking.

Although embodiments of the method and apparatus of the present invention have been illustrated in the accompanying Drawings and described in the foregoing Detailed Description, it will be understood that the invention is not limited to the embodiments disclosed, but is capable of numerous rearrangements, modifications and substitutions without departing from the spirit of the invention as set forth and defined by the following claims.

What is claimed is:

1. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of a sequence number field, a length field, and a content field.

2. The method of claim 1, wherein said message field comprises a bitmap message.

3. The method of claim 1, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

4. The method of claim 1, wherein said sequence number field includes any sequence number from said plurality of first data units.

5. The method of claim 1, wherein said length field comprises a length value for said content field.

6. The method of claim 1, wherein said content field comprises a bitmap.

7. The method of claim 1, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

8. The method of claim 1, wherein said second data unit comprises information about missing or erroneous said first data units.

9. The method of claim 1, wherein the size of said length field is zero and a predefined bitmap size is used.

10. The method of claim 1, wherein said length field indicates a final sequence number in a bitmap.

11. The method of claim 1, wherein said length field comprises a value of zero.

12. The method of claim 1, wherein a size of said sequence number field equals zero.

13. The method of claim 1, wherein at least one of said plurality of first data units is used to piggy-back said message field.

14. The method of claim 1, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

15. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing a message field for a second data unit, said message field including a type identifier field and at least one of, a length field,

**A281**

75753DOC002868

Case: 13-1625 Case: 13-1625 Document: 179-1 Document: 171 Page: 296 Page: 296 Filed: 03/31/2014 Filed: 03/31/2014 (296 of 575)

CASE PARTICIPANTS ONLY

US 6,772,215 B1

11

a plurality of erroneous sequence number-fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

16. The method of claim 15, wherein said message field comprises a list message.

17. The method of claim 15, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

18. The method of claim 15, wherein said length field comprises a value of zero.

19. The method of claim 15, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

20. The method of claim 15, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

21. The method of claim 15, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

22. The method of claim 15, wherein said second data unit comprises information about missing or erroneous said first data units.

23. The method of claim 15, wherein at least one of said plurality of first data units is used to piggy-back said message field.

24. The method of claim 15, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

25. A method for minimizing feedback responses in an ARQ protocol, comprising the steps of:

sending a plurality of first data units over a communication link;

receiving said plurality of first data units; and

responsive to the receiving step, constructing between one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

26. The method of claim 25, wherein said one to several message fields further comprise an acknowledgment message.

27. The method of claim 25, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

28. The method of claim 25, wherein said one to several message fields further comprise a no more message.

29. The method of claim 25, wherein said one to several message fields include a bitmap message.

30. The method of claim 25, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

31. The method of claim 25, wherein said length field comprises a length value for said content field.

32. The method of claim 25, wherein said content field comprises a bitmap.

33. The method of claim 25, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

34. The method of claim 25, wherein said second data unit comprises information about missing or erroneous said first data units.

12

35. The method of claim 25, wherein the size of said length field is zero and a predefined bitmap size is used.

36. The method of claim 25, wherein said length field indicates a final sequence number in a bitmap.

37. The method of claim 25, wherein said length field comprises a value of zero.

38. The method of claim 25, wherein a size of said sequence number field equals zero.

39. The method of claim 25, wherein said one to several message fields include a list message.

40. The method of claim 25, wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

41. The method of claim 25, wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

42. The method of claim 25, wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

43. The method of claim 25, wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

44. The method of claim 25, wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

45. A system for minimizing feedback responses in an ARQ protocol, comprising:

a first peer entity;

a second peer entity; and

a communication link coupled between said first peer entity and said second peer entity for communicating data therebetween;

said first peer entity including means for sending a plurality of first data units over said communication link to said second peer entity;

said second peer entity including means for receiving said plurality of first data units, and constructing one to several message fields for a second data unit, said one to several message fields including a type identifier field and at least one of a sequence number field, a length field, a content field, a plurality of erroneous sequence number fields, and a plurality of erroneous sequence number length fields, each of said plurality of erroneous sequence number fields associated with a respective one of said plurality of erroneous sequence number length fields.

46. The system of claim 45, wherein said one to several message fields further comprise an acknowledgment message.

47. The system of claim 45, wherein the last of said one to several message fields includes an acknowledgment of all SNs not indicated erroneous by all other of said one to several message fields in said second data unit.

48. The system of claim 45, wherein said one to several message fields further comprise a no more message.

49. The system of claim 45, wherein said one to several message fields include a bitmap message.

50. The system of claim 45, wherein said sequence number field includes a sequence number indicating an erroneous first data unit from said plurality of first data units.

51. The system of claim 45, wherein said length field comprises a length value for said content field.

52. The system of claim 45, wherein said content field comprises a bitmap.

53. The system of claim 45, wherein said plurality of first data units comprises a plurality of ARQ protocol units including user data.

**A282**

75753DOC002869

US 6,772,215 B1

13

54. The system of claim **45,** wherein said second data unit comprises information about missing or erroneous said first data units.

55. The system of claim **45,** wherein the size of said length field is zero and a predefined bitmap size is used.

56. The system of claim **45,** wherein said length field indicates a final sequence number in a bitmap.

57. The system of claim **45,** wherein said length field comprises a value of zero.

58. The system of claim **45,** wherein a size of said sequence number field equals zero.

59. The system of claim **45,** wherein said one to several message fields include a list message.

60. The system of claim **45,** wherein at least one value for said plurality of erroneous sequence number length fields comprises zero.

14

61. The system of claim **45,** wherein said length field comprises an odd value indicating that the last SN is an acknowledgment.

62. The system of claim **45,** wherein said length field comprises an even value indicating that the last SN is not an acknowledgment.

63. The system of claim **45,** wherein said ARQ protocol comprises a selective-repeat ARQ protocol.

64. The system of claim **45,** wherein at least one of said plurality of first data units is used to piggy-back said one to several message fields.

* * * * *

75753DOC002870

Case 13-1625 CASE PARTICIPANTS ONLY Document 139-1 Page 298 Filed 03/31/2014

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL   |  DOCKET NO. 6:10CV00473

                       |  JUNE 27, 2012

VS.                     |  10:05 A.M.

D-LINK CORPORATION,   |
ET AL                |  TYLER, TEXAS

------------------------------------------------------------

VOLUME 1 OF 1, PAGES 1 THROUGH 213

REPORTER'S TRANSCRIPT OF CLAIM CONSTRUCTION HEARING

BEFORE THE HONORABLE KEITH GIBLIN
UNITED STATES MAGISTRATE JUDGE

------------------------------------------------------------

APPEARANCES:

FOR THE PLAINTIFFS:    THEODORE STEVENSON, III
                     BRADLEY WAYNE CALDWELL
                     ASHLEY NICOLE MOORE
                     MCKOOL SMITH
                     300 CRESCENT COURT
                     SUITE 1500
                     DALLAS, TEXAS 75201

FOR THE DEFENDANTS:    LUKE L. DAUCHOT
                     KIRKLAND & ELLIS, LLP
                     333 SOUTH HOPE STREET
                     29TH FLOOR
                     LOS ANGELES, CALIFORNIA 90071

                     ADAM R. ALPER
                     KIRKLAND & ELLIS, LLP
                     555 CALIFORNIA STREET
                     27TH FLOOR
                     SAN FRANCISCO, CALIFORNIA 94104

among a number of alternatives.

Now, Mr. Stevenson wants to say minimization is an advantage. I beg to differ. It's not that it's an advantage. It's the point. Why are you selecting four? You're choosing among alternatives. Which alternative are you going to pick? The answer to that is the one that minimizes. That's not an advantage. It's how you go about picking. That's the algorithm that they've included in claim 45, which we'll get to.

So, that's the point. It's not the advantage. It's the way you go about selecting, if you will. Why? Why?

So, with that, your Honor, I'll rest, unless the court has some additional questions.

THE COURT: I don't have any. Let's go to the next claim.

MR. STEVENSON: The next claim is claim 45. This is a claim that is written in means-plus-function format, and I have the competing constructions up here which I'm not going to walk through in detail. I will put them up there to suggest that the dispute between the parties primarily centers around the structure that we read in to accomplish the function.

First, the law briefly. Means-plus-function claim elements are governed by 35 U.S.C. § 112 ¶ 6.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                DOCKET NO. 6:10cv473
    -vs-                     )
                Tyler, Texas
                )  8:57 a.m.
D-LINK CORPORATION, ET AL        June 3, 2013

TRANSCRIPT OF PRE-TRIAL, VOIR DIRE OF THE JURY PANEL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
            MS. SHEA SLOAN
            shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Jury Panel out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  I understand the parties have a matter before the jury comes up; is that correct?  Some matters to take up?

MR. VAN NEST:  Your Honor, we simply have some agreed-upon exhibits, I think, that could be read into the record.  That could be done now or --

THE COURT:  Okay.  We'll do that in front of the jury.

MR. VAN NEST:  -- whenever you want to do it.

THE COURT:  Uh-huh.

MR. VAN NEST:  Mr. De Vries is here, and I think we have an agreement on a number of exhibits.

THE COURT:  This is your normal tender of exhibits?

MR. VAN NEST:  That's right.

MR. JONES:  Yes, Your Honor.

THE COURT:  Okay.  All right.  We'll do that when we start the evidence.

MR. VAN NEST:  That's fine.

THE COURT:  Okay.

Page 3

MR. VAN NEST:  I think that's all we have this morning.

THE COURT:  Was there anything else?  I understood --

MR. CAWLEY:  We do.  We have a few objections to the exhibits that will come through -- well, actually, we won't come to them today, but we do have some issues that have been joined on exhibits --

THE COURT:  Okay.  Well, anything that needs to be taken up this morning then?

MR. CAWLEY:  No.  No.

THE COURT:  Okay.  All right.

MR. VAN NEST:  The only other thing, Your Honor, I just might mention --

THE COURT:  Okay.

MR. VAN NEST:  -- excuse me -- is that we have an agreement with respect to the openings.  We've looked at each other's slides, and we're not going to make any objections, but no one is waiving any objection to evidence based on slides.

If Mr. Stevenson shows a slide, we'll maintain our objection later on.  And likewise, if I show a slide, he maintains his objection.  But the slides will be fine, and they're agreed to.

THE COURT:  Okay.  Let me make sure I

Page 4

1 (Pages 1 to 4)

A1214

used Wi-Fi?

JUROR HOWARD: Yes.

MR. CAWLEY: You do? What do you use it for?

JUROR HOWARD: Use it for my iPhone.

MR. CAWLEY: Your iPhone. Okay.

JUROR HOWARD: Sorry.

MR. CAWLEY: Okay. And how about you, Ms. Branham?

JUROR BRANHAM: I use it just to search entertainment, just to look up -- just to look up --

MR. CAWLEY: Okay. Sure.

JUROR BRANHAM: -- information.

MR. CAWLEY: Okay. Sure. Do you have a -- what kind of computer do you use?

JUROR BRANHAM: We use Dell, but I mostly use my iPhone --

MR. CAWLEY: Okay.

JUROR BRANHAM: -- to search.

MR. CAWLEY: Okay.

JUROR BRANHAM: I'm not a computer --

MR. CAWLEY: Okay. Let me ask you -- let me ask you this question: I want you to -- do you have a laptop computer?

JUROR BRANHAM: Yes, we do.

Page 41

MR. CAWLEY: Does it have Wi-Fi?

JUROR BRANHAM: Yes.

MR. CAWLEY: All right. Let me ask you to suppose that for whatever reason you're in the market for a new laptop. Maybe you spilled coffee on your old one or maybe you've got someone that you want to give it away to and you're ready for a new one.

JUROR BRANHAM: Uh-huh.

MR. CAWLEY: So you shop around wherever you -- you would like to shop for a laptop and you find a laptop and it's got everything you want. It's got memory you want and the size of screen you want. It's got all the features you want, including Wi-Fi, and it cost a thousand dollars. And we can get laptops cheaper these days, but let's just say that that one with everything you want on it is going to cost a thousand dollars.

But you also learn that there's another laptop, the same maker, same features, everything about it is exactly the same, except it doesn't have Wi-Fi and it cost $900.

JUROR BRANHAM: I would have to take the Wi-Fi.

MR. CAWLEY: Would you pay an extra hundred dollars to get Wi-Fi?

Page 42

JUROR BRANHAM: Yes.

MR. CAWLEY: Okay.

JUROR BRANHAM: Uh-huh.

MR. CAWLEY: Who agrees with Ms. Branham? Who -- who would be willing to pay another hundred dollars to get Wi-Fi in their laptop computer?

Is there anyone who disagrees? Anyone who says, you know, Wi-Fi's okay, but for a hundred dollars, I'll do without it?

No hands raised? Okay.

Have any of -- thank you, Ms. Branham. I'm sorry.

Have any of you worked for a company that makes wireless equipment, or have any of your family members -- and wireless is a pretty broad term these days. It can include things like cell phones, Wi-Fi, Bluetooth.

Yes, ma'am, thank you for raising your hand, Ms. Chambers.

JUROR CHAMBERS: I worked for 28 years for AT&T.

MR. CAWLEY: Oh.

JUROR CHAMBERS: I didn't actually assemble telephones, but I did --

MR. CAWLEY: Sure.

Page 43

JUROR CHAMBERS: -- operation works and testing --

MR. CAWLEY: Okay. Testing.

JUROR CHAMBERS: -- when they would test new equipment.

MR. CAWLEY: Great, yeah.

JUROR CHAMBERS: Like when they had the war in Iran --

MR. CAWLEY: Yes, ma'am.

JUROR CHAMBERS: -- they tested new equipment for people to call from there --

MR. CAWLEY: Right.

JUROR CHAMBERS: -- into the states.

MR. CAWLEY: Right. Okay. Great.

JUROR CHAMBERS: I did that type thing, but I had never, like, assembled a phone.

MR. CAWLEY: Yeah. Yeah. Okay. Thank you for letting us know about that.

Anybody else worked for a company that has been in the wireless business?

Yes, ma'am? That's Ms. Williamson.

JUROR WILLIAMSON: I worked for Cox Communication. I was director of marketing.

MR. CAWLEY: Okay.

JUROR WILLIAMSON: We did telephony.

Page 44

11 (Pages 41 to 44)

A1224

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 302    Filed: 03/31/2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL            )
                     DOCKET NO. 6:10cv473
    -vs-                          )
                         Tyler, Texas
                     )  12:21 p.m.
D-LINK CORPORATION, ET AL        June 3, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

All right.  Members of the Jury, I hope you had a good lunch.

I'm going to give you some preliminary jury instructions at this time I'll just ask you to please pay attention to, and realize you're welcome to take notes.  Realize, though, that all of these will be given to you again at the end of the case in much greater detail, but this is just -- just to help you get started and kind of understand some of the terminology and things we'll be dealing with.  Some of it has been covered in the patent video, but this may be in a little bit greater detail.

Ladies and Gentlemen of the Jury, congratulations.  You have now been sworn as the jury who will hear and decide this case.

You're role as the jury is to decide all disputed questions of fact, and it is my role as the Judge to decide all questions of law and procedure.

I will provide you with instructions on the rules of law and procedure that you must follow in making your decision.  I am now giving you some

Page 3

preliminary instructions; and at the end of the trial I will give you more detailed, final instructions on the law and procedure you must follow in reaching a verdict in this case.

I will give you my preliminary instructions, and then you will hear the attorneys' opening statements.  An opening statement is an overview of what each side expects the evidence to show.  But what the attorneys say is not evidence.  It is only intended as a road map or an overview to help you understand the evidence as you hear it during the course of the trial.

After we have completed opening statements, the Plaintiff will then begin presentation of its evidence.  And then after that, the Defendants will present their evidence.  And then finally, the Plaintiff will present any rebuttal evidence near the end of the case.

Once all of the evidence is in, I will then give you my final instructions, after which both -- both sides will then present their closing arguments.

And, finally, you will then retire to the jury room to begin your deliberations and reach your verdict.

During the course of the trial, you

Page 4

1 (Pages 1 to 4)

A1240

CASE PARTICIPANTS ONLY

802.11n standard infringe Ericsson's patents if the sellers of those devices have not agreed to pay Ericsson a reasonable royalty.

Some, but not all, of the patents that are at issue in this case came out of Ericsson's work in cellular products; and years later when the companies working on the 802.11n standard chose which technologies to include, it included a number of Ericsson's patented ideas.

As early as 2003, Ericsson informed the IEEE and its members through a letter of assurance that it had patents related to the progression of the standard. And that letter, which was public, assured all the members of the IEEE that Ericsson would permit its patents to be used by the standard and all they asked for was a reasonable and non-discriminatory royalty. Ericsson then reaffirmed its commitment to the IEEE as recently as 2011.

Now, I expect the Defendants will tell you that they shouldn't have to pay a royalty in this case. And one reason they will give is that Ericsson didn't participate in IEEE meetings related to the 802.11n standard. But the companies who did participate included Ericsson's patented technology, and it doesn't matter for patent infringement whether Ericsson attended

Page 45

the meetings when the standard was voted on.

Let's talk next about licenses. I mentioned a reasonable royalty a couple of times, and I'm sure you're probably wondering how much is that? The standard rate that Ericsson charges for a license to its essential 802.11n patents is 50 cents per device for laptops and routers. That's a one-time payment. It's good for the lifetime of the device, regardless of how often it's used, and the price is the same regardless of whether it's a 100-dollar router or 1,000-dollar laptop.

A number of companies that make 802.11n wireless equipment have already accepted and agreed to pay Ericsson a royalty, and let me give you some examples.

One company is Buffalo Technologies. Buffalo Technologies is a maker of wireless routers and access cards, and they compete with some of the Defendants in this case. They're sold at Best Buys, Walmart, several other stores. Buffalo Technology has licensed Ericsson's 801.11n patents.

Another licensee is RIM, now known as BlackBerry -- maker of the BlackBerry phones. Those phones contain both cellular radios and 802.11n Wi-Fi radios. And BlackBerry has licensed Ericsson patents for both cellular, as well as 802.11n radio

Page 46

transmissions.

And Hewlett-Packard, one of the largest computer and laptop companies in the world, has also licensed Ericsson's 802.11n essential patents to cover that feature in the laptop and desktop computers. And there are other licensees that you will hear about in this case.

All of these companies sell devices that practice the 802.11n standard. And these licenses followed long negotiations. During the negotiations, Ericsson presented and explained why its patents were essential for compliance with the standards. And the companies with whom Ericsson negotiated concluded that selling devices that operate under the 802.11n standard would require a license, and they agreed to pay Ericsson a royalty.

Now, the calculations for the payments of each one of these licenses vary. Some licenses are calculated on a percentage of the sales price. Other licenses are calculated as a lump-sum payment at the time of signing, based on projected sales. And some are a mixture of both methods. But all of them work out to be an effective royalty rate of around 50 cents per unit.

Christina Petersson, an Ericsson employee

Page 47

involved in negotiation of these license agreements, will testify in this case; and she'll explain those terms to you.

Let's talk now about the Defendants, their products, and proof we will submit of infringement.

Three of the Defendants in this case make routers: NETGEAR, D-Link, and Belkin. You probably have a wireless router in your house or apartment.

A wireless router is basically a conductor of the band; and it's the device that you take and plug into your Internet connection, put the Internet wire in the back of wireless router, and then it's what sends out the wireless Internet out of your house or apartment.

Three of the Defendants in this case make computers: Toshiba, Dell, and Acer. And all of these products have 802.11n radios in them, and all are capable of working on -- working with any of the routers.

To conduct an analysis of infringement by the Defendants, Ericsson retained the services of a professor of electrical engineering from the University of Texas. His name is Dr. Scott Nettles.

Dr. Nettles performed an analysis, and he

Page 48

12 (Pages 45 to 48)

A1251

CASE PARTICIPANTS ONLY

special deal, it saves money.

Now, I think Intel will try to justify its request for a special deal by telling you that it sells its chips for a few dollars apiece. And obviously, Intel is going to tell you that because they want to invite you to make the comparison of 50 cents versus a 3-dollar chip.

But that's not the right comparison because Intel's chips are worthless if they're not used in a computer. And the real comparison is 50 cents in light of the importance of Wi-Fi functionality to a laptop or a router, the ability to take the end user product and set it up in your house and surf the web or watch movies or get sports scores.

And Intel's request that it and its customers pay less than a penny isn't fair to Buffalo, Hewlett-Packard, BlackBerry, the other companies who have already agreed to license Ericsson's patents. And it's not fair to Ericsson.

As I told you at the beginning of my remarks, this is a case about a company and its people who have revolutionized the way we communicate. On behalf of Ericsson, we look forward to presenting our case to you, and we thank you in advance for your consideration.

Page 53

THE COURT: Thank you, Mr. Stevenson.

All right. The Court will recognize Mr. Van Nest for purposes of opening statement.

Mr. Van Nest.

MR. VAN NEST: Thank you, Your Honor.

And, good afternoon, Ladies and Gentleman.

My name is Bob Van Nest, and I am very proud to be here today speaking on behalf of all of the Defendants that were introduced to you this morning.

They are, as you probably know, some of the most innovative, creative, and successful technology companies in the world today.

Now, I've got an especially hard task because we're in that mid-afternoon pocket after a nice big lunch and a long day and a lot of sitting on the benches, so I'm going to try to move through this with some slides and have some animations. We're really going to try to get into the technology and give you a preview of what's to come.

The first thing I want to say, though, is thank you very much for being here. We really appreciate your service as jurors. We understand you have busy lives. And you can see from our full courtroom today, this is a very important dispute for

Page 54

everyone here. And, again, we appreciate your helping us to resolve it.

Ericsson's technology had nothing to do with the success of Wi-Fi; nothing at all. And they're here claiming credit for work they never did. None of the Defendants' Wi-Fi products are using Ericsson's patents or technology. And there hasn't been any infringement of a single Ericsson patent.

We're going to show you, when we get into the technology, how those Wi-Fi products work. And they work in a fundamentally different way than the technology claimed in Ericsson's patents.

Now, the standard that Mr. Stevenson talked about, the Wi-Fi standard, the 802.11, that came out of an effort by the whole Wi-Fi industry to create a standard for Wi-Fi products that could be simple, fast, and affordable for everybody, the idea was, whether you were using a laptop by Dell or laptop by Toshiba or an iPhone or an Android phone, that everybody could communicate together on the same standard.

And the folks that did that were the people that make the chips for these products; companies like Intel, companies like Broadcom, companies like Atheros. They are the ones that came together in the IEEE and contributed their engineers, their idea --

Page 55

their ideas, their know-how, their hard work. They're the ones that put all these things together and created the standard. And they did it without any contribution whatsoever from Ericsson.

Now, what has it enabled us to do?

Mr. Jones held up some chips this morning that were in a -- in a package. I'm holding up -- you can barely see it -- most of us need glasses to see this far. That chip, believe it or not, performs all the functions of Wi-Fi, all of them, and that's because based on the standard, all of these companies: Intel Broadcom, and Atheros have been able to make these so that they are simple, fast, and affordable.

This chip costs an average of about $2.40. Many of them cost less than $2. And these are the chips that Dell, Toshiba, Acer, NETGEAR put in their devices to run all the Wi-Fi.

Now, that has enabled us to create a world where we often get Wi-Fi for free, anywhere from McDonald's to Motel 6 because these chips have become so inexpensive and so available to all the companies that want to incorporate them and put Wi-Fi in their products.

Now, I say Ericsson played no role. What I mean is Ericsson's technology is not in the standard.

Page 56

14 (Pages 53 to 56)

**A1253**

'215.

Now, the '215 I mentioned, we've been talking about these acknowledgments, the ACs that go back, the green arrow acknowledging 2, 3, and 4. There are lots of different ways that a system can acknowledge getting a packet. And this packet requires that the receiver make a choice of which type of feedback it's going to send.

There is no choice in 802.11. That's why this particular limitation, that element, is not met. Just like the oblong -- the round isn't met by a football. Because in 802.11, the designers said you don't need it.

We don't want more than one time. We're hardwired to send only one. So there's no choice at all for the receiver in that instance.

And the final ARQ patent is the '223. Mr. Stevenson called it a timing patent, but he left out the most important element of it. It requires segmenting the packets.

The packets we've been looking at, 1, 2, 3, 4, 5, this patent says the system will run better if you chop them up into smaller pieces. The 802.11n designers said: That makes no sense. We're trying to send more data each time, not smaller packets.

Page 77

And so 802.11 actually forbids you from segmenting. Forbids it. Does not allow it. So their patent requires it. It's not allowed in 802.11.

Final patent I'm going to mention is the '568. Let's move on to that one.

Now, the '568 calls for a very specific type of signal. And we've been talking about packets. Every packet has a header, which has routing information in it and a payload, which from the name, you can guess is the data that you're sending.

So if you're sending video, the payload is video. If you're sending a phone call, the payload is phoning. If you're sending an Internet site, the payload is Internet data. If you're sending multimedia, the payload is multimedia. That's true of every packet system.

Now, this packet requires -- and actually, Judge Davis read this one. He read -- let's look at the next slide.

He read that this patent requires an identifier that identifies the type of information conveyed in the payload. And examples are video, voice, data, and multimedia. Those are the examples, and the identifier has to identify those.

So let's imagine that our path is a

Page 78

truck. The cab is the header, and the body of the truck is the payload. So if I have payload -- if I have video in my payload, my cab has to say video as this one does. If I have multimedia in the payload, the cab has to say multimedia. If I have voice in the body -- in the payload, it has to say voice.

802.11n thinks that's too complicated. We're much more simple. The packet -- the patent requires that the cab label the payload, as it does on the left.

But in 802.11 there is no such thing. All they do is label priority. They don't care what's in the payload. You're either fast lane, middle lane, slow lane. All these packets are trying to get out at the same time.

THE COURT: Mr. Van Nest, you have about three more minutes.

MR. VAN NEST: I actually have a few more on my note, Your Honor, but I'll move it up.

THE COURT: Well, let me double-check.

MR. VAN NEST: Well --

THE COURT: Oh, you're right. You do. Excuse me. My mistake. You have about eight more minutes.

MR. VAN NEST: Thank you, Your Honor.

Page 79

Eight is a lot better than three.

Depends on who you are, right? You guys might not agree with that.

[Laughter]

MR. VAN NEST: Now, how are we going to prove that our products are different from what's called for in the patents?

We're bringing witnesses here live. We're bringing the engineers. And they're going to bring the source code. They're going to bring the product descriptions. They're going to bring the 802.11 standard. They're going to testify from this witness stand as to how our products work and why they are different.

And in addition to that, we asked Dr. Jerry Gibson, one of the pioneers in Wi-Fi, to analyze this issue. He was educated here in Texas at AMI and SMU.

And Dr. Gibson will be here to testify that in 802.11, there is no command to receive. There is no computation of discarded packets. There is no multiple type of feedback. There is no segmenting. And there's nothing that identifies the payload. He has analyzed the source code, the product descriptions. He's talked to the engineers. He's done

Page 80

20 (Pages 77 to 80)

**A1259**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 306    Filed: 03/31/2014

one that would be underneath the Rule; is that correct?

All right. Well, you'll need to leave the courtroom at this time, and we will call you when it's time for you to testify.

All right. Plaintiff may call their first witness.

MR. CAWLEY: Thank you, Your Honor. As our first witness, we will call to the stand Mr. Gustav Brismark.

THE COURT: All right. Mr. Brismark.

MR. CAWLEY: May we proceed, Your Honor?

THE COURT: Yes, you may.

MR. CAWLEY: Thank you.

GUSTAV BRISMARK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN,

DIRECT EXAMINATION

BY MR. CAWLEY:

Q. Would you please introduce yourself to the jury?

A. My name is Gustav Brismark.

Q. Why are you here, Mr. Brismark?

A. I'm here as a representative of Ericsson in this case.

Q. Where do you live?

A. I live in Sollentuna, which is a suburb of Stockholm --

Page 89

Q. Okay.

A. -- in Sweden.

Q. So the court -- the Court Reporter is very curious about how the name of your town is spelled, but maybe we can straighten that out with her later and for now say you live in a suburb of Stockholm, Sweden; is that right?

A. Yes, that's correct.

Q. Did you grow up in Sweden?

A. Yes, I did.

Q. Where is Sweden?

A. Sweden is in Europe, in the northern parts of Europe.

Q. Northern part of Europe. Is -- is English your native language, Mr. Brismark?

A. No, it's not. It's Swedish.

Q. I notice you have a little bit of an accent, at least to us. I'm sure if you're talking to somebody like me who -- who is from Texas, we -- we have a little bit of an accent, too, I bet?

A. Yeah. And I have a little bit of a cold, too, so --

Q. Okay. Sorry to hear that.

A. -- hurts my voice, I apologize.

Q. Okay. That's fine. But even though you --

Page 90

you didn't learn to speak English growing up as your first language, are you comfortable testifying in English in court today?

A. Yes, I am.

Q. Is this your first time to come to Texas?

A. No, it's not. I've been here before.

Q. Why?

A. Doing business. I'm with Ericsson, and we have an office in Texas.

Q. Okay. And is it your first time to come to Tyler?

A. Yes, it is.

Q. Okay. Well, welcome -- welcome to Tyler. Before we ask you to tell the jury a little bit more about the company -- your company Ericsson, let's find out at least just a little bit more about you. Can you tell us about your family?

A. Sure. I have a wife and two daughters -- twin daughters, age 19.

Q. Twin daughters, age 19. Wow. Okay.

A. Yes.

Q. And where did you go to school?

A. I went to school in -- in my hometown, Sandviken, north of Stockholm and -- and to the University in Uppsala and actually in the U.S., as well.

Page 91

Q. Okay. You went to university in another Swedish town called Uppsala?

A. Correct. Yes.

Q. Okay. And part of your university education was in the United states?

A. Yes. I had a scholarship my last year of -- of my university studies.

Q. Where was that?

A. That was in Cleveland, Ohio, at the Case Western Reserve.

Q. Case Western Reserve in Cleveland?

A. Yes.

Q. Okay. And what did you receive a degree in?

A. I have a Master of Science in physics engineering.

Q. Okay. So you have a Master's degree in physics engineering; is that -- is that right?

A. Yes.

Q. Okay. Do you have any patents in your name?

A. I do.

Q. Okay. And more than one?

A. Yeah. I have slightly more than ten, I think.

Q. More than ten patents have been issued in your name?

Have you also written technical articles in

Page 92

23 (Pages 89 to 92)

**A1262**

the field of electronic communication?

A. Yes.

Q. Now, you've already told us that you work at Ericsson. How long have you worked at Ericsson?

A. A long time. I have worked at Ericsson my whole career and started in 1986.

Q. 1986. And what is your job at Ericsson today and for the last few years?

A. So today, since 2004, I am in charge of what is called patent portfolio management and strategy.

Q. Patent portfolio management and strategy.

A. Yes.

Q. Now, let's -- let's -- just as a little more background, when you began your career at Ericsson, were you working as an engineer?

A. Yes, a research engineer.

Q. Were you helping to do research and development for Ericsson?

A. Yes. Actually my first assignment was to take part in a project developing a prototype for what would become the GSM system receiver.

Q. Okay. Early -- early cell phone prototype?

A. Yes.

Q. Okay. And for a number of years is it fair to say that you worked at Ericsson as an engineer doing

Page 93

actual research and development for new products and new inventions; is that accurate?

A. Yes, that's very accurate.

Q. But then in 2004, even though you continued to work for Ericsson, you sort of changed careers a little bit; is that fair?

A. Yes.

Q. And -- and you began to help Ericsson to manage its intellectual property?

A. Yes, that's true.

Q. And tell us what you mean by that phrase, "intellectual property"?

A. It stands for intellectual property rights, and it's the asset Ericsson has which proves we have many inventions which we have brought to -- to the industry and which we share with others.

Q. Okay. So we -- we have an expression in English that we sometimes here call real property, which means land or personal property which means televisions and cars. Is intellectual property things like copyrights and patents?

A. Yes.

Q. And -- and are Ericsson's patents something that you help to manage as part of your job?

A. Yes, that's correct.

Page 94

Q. Okay. Before we find out a little bit more about that, let -- let's ask you, as the first witness, the first person we've met who works at Ericsson, to tell us a little bit more about the company itself.

What is the business of Ericsson?

A. Ericsson is a -- you could say a telecommunications company.

Q. Okay. And over its history has -- has Ericsson been involved in basically all aspects of the telecommunications business?

A. I would say so, yes.

Q. And is Ericsson in particular these days in what is sometimes called the wireless business?

A. That's correct. I think telecommunication is, today, more or less wireless in some way in all of the industry.

Q. Okay. What -- what do you mean in this context by wireless?

A. I mean in this context, the main area of business would be cellular telephony.

Q. Cellular means our cell phones and -- and how they work, right?

A. Yes.

Q. And what other kinds of wireless communications are there?

Page 95

A. There are many other -- others. But if we talk about two-way communication, which -- which we heard about earlier, you could mention technologies like Bluetooth --

Q. Bluetooth?

A. -- or short range or Wi-Fi for that matter.

Q. Okay. Or Wi-Fi. And then all of these are -- are different kinds of wireless communications technology; is that what you're telling us?

A. Yes.

Q. Now, who -- who today are Ericsson's customers?

A. Our customers would be the carriers or -- or operators that provide services to end users, so companies like Sprint or AT&T or Verizon in the U.S.

Q. Now, we're liable to hear those words a little bit during the trial, so let's make sure we understand what they mean. You -- you mentioned the -- the word carrier or operator?

A. Yes.

Q. And do both of those things refer to companies that we're all familiar with like AT&T and Verizon and Sprint?

A. Yes.

Q. Okay. And you're telling us that those

Page 96

24 (Pages 93 to 96)

**A1263**

companies buy equipment from Ericsson?

A. Yes, they do.

Q. What -- what kind of equipment does Ericsson sell to those, what we usually would call, cell phone companies?

A. Ericsson sells all of the equipment that is needed in order for our phones to connect to each other via Ericsson equipment, so to speak.

Q. Okay. So -- so Ericsson no longer makes the cell phone that we hold in our hand, right?

A. Right.

Q. But where is the equipment that Ericsson makes and sells to the cell phone companies? Where is it located?

A. Well, what you see is what's on top of the masts along the highway and so forth, but it's also the nodes or the boxes that stand below the mast and -- and all the networks that would connect these masts together and -- and make sure the call ends up where it should end up, with your friend.

Q. Okay. When you -- when say mast, are you referring to an antenna?

A. Yes.

Q. That's one of those things we often see by the -- by the highway, antenna with some bars around it?

Page 97

A. Yeah, that's right.

Q. So Ericsson makes that?

A. Ericsson makes that.

Q. And does Ericsson make the -- basically computer equipment that's in the little building at the base of the antenna?

A. Yes.

Q. And does Ericsson make the equipment that the telephone company has in a building somewhere that helps to manage those phone calls?

A. Yes. That's correct.

Q. Okay. Who benefits from Ericsson's products?

A. Ultimately, it's the end user -- the user of the phone that benefits because of the fact that we can actually talk to each other and talk to anybody you want to talk to.

But the direct beneficiary would be the carrier then who would be able to offer this service to end users.

Q. Okay. How much of the world's cell phone traffic is carried or handled by Ericsson equipment?

A. Around 40 percent of all the traffic worldwide goes through an Ericsson network.

Q. Okay. How many employees work for your company?

Page 98

A. On a global basis, we are around 110,000 employees.

Q. Okay. And in how many countries does your company Ericsson do business?

A. Ericsson is present in around 180 countries.

Q. A hundred and 80 countries around the world? What areas of the world?

A. All of the continents, all -- all parts of the world would have Ericsson presence.

Q. I see. Now, where is Ericsson's U.S. headquarters?

A. Our headquarters here in the U.S. is located in Texas -- in Plano, just north of Dallas.

Q. Uh-huh. And I -- I mentioned earlier that Ericsson actually began in Sweden, but today where is Ericsson's second largest presence?

A. It's here in the U.S., and we have around 12,000 employees working for Ericsson.

Q. In Plano or in the United States anyway?

A. In the United States --

Q. Okay.

A. -- yes.

Q. Now, who started this company that is today called Ericsson?

A. It was a fellow called Ericsson. His first

Page 99

name was Lars Magnus.

Q. First name was Lars Magnus Ericsson?

A. Yes.

Q. Do you have a picture of him you can show us?

A. I do.

Q. Okay. Is that -- is that Mr. Ericsson?

A. That would be him, yes.

Q. And -- and when did he start this company?

A. He started Ericsson in 1876.

Q. And what -- what did he start it to do?

A. In the beginning he was working repairing telephones for -- which were branded by other companies, but very soon he started understanding that he could make improvements on these telephones, so he started producing telephones for himself and selling them.

Q. I see. Has Ericsson, the company, kept some of those very early telephones made by a Lars Magnus Ericsson?

A. Yes.

Q. Do you have a picture of one you can show us?

A. Yes.

Q. Is that one?

A. That's an early phone from the 1800s, yes.

Q. That's actually a telephone?

A. Yeah. It's mainly made out of wood, but it

Page 100

25 (Pages 97 to 100)

A1264

contains some metal also; otherwise, it wouldn't work.

Q. Okay. Now, Mr. Brismark, of course, the case we're talking about today involves patents -- Ericsson patents. Were patents important to Ericsson even as far back as the late 1800s?

A. Yes, indeed it was.

Q. Can you tell us about that?

A. Well, Lars Magnus Ericsson, as I said, he found ways of improving the telephone very early on, and -- and he started filing patents on his inventions. And that made him also grow in business.

Q. Okay. And let me -- let me show you a picture and ask you, tell us -- tell us what this next picture is?

A. This picture would be a -- a drawing out of the patent which Mr. Ericsson filed for.

Q. All the way back to 1880?

A. Yes.

Q. Not one of the patents in this lawsuit, I guess, right?

A. I think it has expired.

Q. It's probably expired. Since they only last 17 years, I guess so.

Now, in addition to telephones -- and I guess -- I guess these old telephones that -- that

Page 101

you've told us about all worked with wires, right?

A. Yes.

Q. A wire that connected one telephone to another or maybe went through a switchboard, I suppose, correct?

A. Correct, yes.

Q. But did Ericsson also fairly early on get into the business of -- of developing and designing and selling radios?

A. Yes, we did. We went into radio as early as 1920 -- in the '20s.

Q. In the '20s?

A. Yeah.

Q. Do you have any pictures of early radios that were designed and sold by Ericsson?

A. Yes, we have one here --

Q. Okay.

A. -- which is the one Mr. Stevenson showed earlier was maybe -- or to say it's radio, but this is also radio from 1924.

Q. Okay. This is one of the earliest radios that Ericsson developed?

A. Yes.

Q. Now, did Ericsson's experience in telephones on the one hand and radios like this and the one that Mr. Stevenson showed on the other, help it to become a

Page 102

pioneer in what we now call wireless communications?

A. Yes. I would absolutely say that Ericsson's pioneering in mobile phones and cellular.

Q. Okay. Explain to us how those things came together.

A. Well, Ericsson had a very strong R&D in -- in telephony and switching, and I think combining that with our wireless capabilities made us think of -- of the possibility of providing phone service, maybe not by phones having in your pockets initially, but at least movable, in cars.

Q. Okay. You used a phrase there. I want to make sure we all understand. You said R&D. That's a -- that's a phrase we hear from time to time -- some of us anyway, but what does R&D stand for?

A. It stands for research and development.

Q. Okay. So if during the trial we hear various people referring to R&D, they're talking about research and development?

A. Yes.

Q. Okay. You -- you've described to us some of the early cell phones that Ericsson pioneered that we all enjoy now.

Do you have any pictures of -- of some early Ericsson cell phones?

Page 103

A. Yes, I do.

So what we see on this picture here would be on the upper left is a phone which is intended to be installed into a car.

While in the lower right we see one of the early portable phones, even though not as small as today, still portable, running on a battery.

Q. Okay. Now, has Ericsson developed other wireless communication systems besides the cellular phones you just told us about?

A. Yes, Ericsson has. And -- and one example of that would be the Bluetooth technology which was developed by Ericsson.

Q. Bluetooth? What is Bluetooth?

A. Bluetooth is a technology which I think most of us have used because it's in more or less every mobile phone and -- and in many other devices, as well.

Q. Okay. Sometimes if we're on a computer, we're on a cell phone, we may see a little indicator that says Bluetooth. What -- what does Bluetooth do?

A. Bluetooth was originally intended to be a way of replacing the wire or the cord between a hands-free operated airplane and phone, so it's intended for short range radio, but it's also intended for -- for speech.

So it was initially optimized for that

Page 104

26 (Pages 101 to 104)

**A1265**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 310    Filed: 03/31/2014

purpose, to operate maybe a meter or two and to be very reliable so that you wouldn't lose the voice while still being able to have your phone in your pocket and maybe something connected to your -- your ears with a plug and so forth.

Q. Okay. Or maybe connected to your car if you're driving?

A. Yes.

Q. And can it also be used, for example, to connect a -- a laptop computer to a printer or some other device?

A. Yes. That's one of the further developments of the Bluetooth standard. It developed to be more capable of other type of data communication, as well.

Q. Who invented Bluetooth?

A. It was a team of engineers working for Ericsson, mainly in -- in Lund and in Research Triangle Park in the U.S. --

Q. Okay.

A. -- on a device side.

Q. Ericsson engineers working in a Swedish town called Lund? I actually know how to spell that. L-u-n-d, right?

A. Yes, that's correct.

Q. Okay. Working in Lund and in North

Page 105

Carolina --

A. Yes.

Q. -- invented Bluetooth?

A. That's correct.

Q. This is a great opportunity. I have someone from Ericsson on the stand, and I get to ask this question: How in the world did you come up with the name Bluetooth?

A. Well, I wasn't part of it, but I heard it sideways. And Bluetooth is the name of a Viking king who was uniting countries in Scandinavia, so I think the idea of uniting companies or countries around things would -- would be the micron to the name of this.

Q. Okay. Now, a minute ago, we -- we discussed R&D, this concept of doing research and development

How does Ericsson go about developing the ideas that you've just told us about?

A. We have a central research organization which have as their main responsibility to look into the future and research on -- on technologies that will be part of our future wireless industry.

Q. Are many of these people who do research and development at Ericsson engineers?

A. Yes.

Q. About how many?

Page 106

A. Ericsson has today around 24,000 R&D engineers.

Q. 24,000. And do they also have scientists?

A. Yes.

Q. So how many people in total are occupied at Ericsson doing research and development for the future?

A. It's 24,000 who have that as their main duty.

Q. You used to be one of those people until you moved into patent management?

A. Yeah, I'm no longer an R&D engineer, that's correct. I used to be.

Q. Has -- has Ericsson always made substantial investments in research and development?

A. Yes. That's clearly part of our history, and -- and it's still true today.

Q. How much money does Ericsson spend on doing research and development?

A. On a yearly basis we spend around 5 billion U.S. dollars on R&D.

Q. 5 billion -- 5 billion U.S. dollars every year?

A. 5 billion U.S. dollars, yes.

Q. Now, does some of this research and development lead to new and better Ericsson products?

A. Yes, it does.

Page 107

Q. But does Ericsson know that some of its inventions will never end up in an actual Ericsson product?

A. We do, absolutely, and that's part of what we expect also in the industry where we are acting.

Q. Why -- why do you say that?

A. Because telecommunication and -- and communication as such is an industry where it's built on sharing ideas within the industry and -- and moving the state of the art forward, I would say, joint effort you could say.

Q. Okay. Well, tell us a little bit more about that. Let me make sure that I understand.

If Ericsson is -- is spending this money on doing research and development and it comes up with an idea that for whatever reason it doesn't use in an Ericsson product, is it Ericsson's policy to keep those ideas secret?

A. No, it's not.

Q. What does it do instead?

A. Ericsson would file for patents and -- and disclose our ideas to -- to the public that way.

Q. And when -- among other things, when you file for a patent, eventually does that information about the patent become available for the whole world to read and

Page 108

27 (Pages 105 to 108)

**A1266**

learn from?

A. Yes.

Q. Why does Ericsson choose to freely disclose its inventions?

A. Because being one of the main players in -- in telecommunication and -- and wireless communication, we need to operate like that, and the whole industry operates like that. Would we not, we would have a situation with a number of proprietary solutions and not have today's situation with interoperability between different manufacturers and -- and where you're able to connect in between different brands, so to speak.

Q. Okay. You've told us about an enormous amount of money that Ericsson spends on research and development. How -- how does Ericsson pay for this research and development?

A. We pay for the R&D partly by selling products and services where we make a profit.

Q. Okay.

A. And partly also from revenues which we generate by doing licensing of our technology to others.

Q. What do you mean by that, licensing your technology to others?

A. As Ericsson has an extensive R&D and a very significant patent portfolio which we offer to others to

Page 109

use, it means we also get a fair return on -- on those patents when they are licensed to other players.

Q. Okay. So you -- Ericsson expects that for some of its ideas, it will get patents and it will offer to let others use those patents, not try and stop them, but ask for a fair payment for that so that it can fund more research and development to help it come up with new inventions. Is that all accurate?

A. That's all accurate, yes.

Q. How many agreements does Ericsson have today licensing its patents to others?

A. Ericsson has today more than 100 agreements in place, based on licenses to other companies in our industry.

Q. So that's at least a hundred instances in which other companies have -- have taken licenses to Ericsson patents?

A. Yes.

Q. And that's all Ericsson patents, right? You're not just talking about the five patents that are in this lawsuit?

A. No, that's -- that would be all of our portfolio.

Q. Okay. And is this a two-way street? Does it sometimes happen that if Ericsson wants to make a

Page 110

product and it learns that it needs to license a patent from another company to be able to make that product, does Ericsson sometimes enter into agreements to pay royalties to others?

A. Yes, and that -- that is usually an important part of our agreements, to ensure that also Ericsson gets a license for our product sales.

Q. Now, Mr. Brismark, I want to change the subject a little bit and talk about something that we heard about a bit in the opening and I'm sure we're going to hear some testimony about, and that's a subject called standards.

Are you familiar with standards in the technology field?

A. Yes, I am.

Q. Now, I guess standards is a word that a lot of use in ordinary life. We talk about people who have high standards or maybe people who have low standards, but this is something a little different, isn't it?

A. Yes.

Q. Tell us what a standard is in -- in the world of technology.

A. A standard is you could say an agreement on how to solve a communication solution so that in order to make the communication efficient for everybody, you

Page 111

agree on how to do it and that is standard.

Q. Okay. Give us an example, if you can, of a technology standard that most of us would be familiar with that illustrates what you're talking about.

A. So from your ordinary daily life, maybe in your home, I think we all have the possibility to watch a film on TV at home, and there are multiple standards involved in that process, one being a standard in between the companies that develop the film and want to store it. Then you store it so it can be later on played on your TV screen, and that's a standard, so that everybody can do it the same way and make it more efficient for us.

The DVD is also a standard in such, which is more the standard on how to put this format onto a disk and then to play it from the disk onto your TV screen.

Both of those examples are standards, and it makes it possible for us to buy a film without thinking of which type of disk it is or which type of box I have at home and -- and it's going to work anyways.

Q. Tell us now, how are standards important in the field we're talking about in this case of -- of electronic or digital communications wirelessly?

A. Well, Ericsson started its business by selling phones in pairs. And what standards does is that we,

Page 112

28 (Pages 109 to 112)

**A1267**

CASE PARTICIPANTS ONLY

today, don't even think about the brand of the other phone or -- or who you want to call. You can call anyone. And if I have a Sony phone and I want to connect to my AT&T carrier while talking to my friend who is maybe having an iPhone and -- and connected via Sprint, it all works. So we have solved that level of complexity and made it simple for the last two to communicate.

Q. Okay. So even though we're talking about different companies, different makers, it's the standard that they all -- someone has all agreed on and that they all practice that lets all that work together; is that what you're telling us?

A. Yes.

Q. Now, there's more than one standard, right?

A. Yes, there is.

Q. I mean, you've told us about DVDs. I guess that's a completely different standard than cell phones, right?

A. Yes.

Q. And even within the field of wireless communications, are there various standards?

A. Yes.

Q. And do some of these standards have names?

A. Yes. It would be 2G, we talked about that

Page 113

earlier, or GSM as it's also called.

Q. Uh-huh.

A. Or we have 3G or WCDMA, and the latest technology which is now being deployed on the market would be a 4G standard, which is also called LTE.

Q. Okay. So if we're watching TV and we see a commercial for Verizon, let's say, and they say on TV we have the nation's largest 3G network, that -- that name 3G is actually referring to a certain standard?

A. Yes.

Q. And that's different than 2G?

A. Exactly.

Q. It's different than 4G?

A. And 4G would be the latest evolution and -- and the reason for this evolution also within 3G is that you want to provide high bit rates and higher speeds to the end user, so to speak.

Q. Okay. What -- what standard in cellular communication is Ericsson working on now?

A. Of course, we are -- are looking ahead and -- and starting to -- to research on what we call 5G, but Ericsson also spends significant effort into improving existing standards, like improving 4G and also improving 3G today.

Q. How long will it be before we see 5G phones?

Page 114

A. I think it will not be on the market the coming five years at least, but maybe when we're approaching 2020.

Q. Now, explain to us, if you would, why do companies, some of which must be competitors, work together to agree on standards?

A. I think we do so because we as an industry have realized that our whole industry is based on interoperability and by agreeing, we make the pie larger and it will benefit all the players, including the end user to get a bigger choice. And I think also lower cost in -- in the process.

Q. Now, you used a word there, and you've used it on -- a couple of times -- forgive me for asking you about it -- interoperability. What does that mean?

A. Interoperability would mean that two things work together. They can talk, and they com -- can communicate, as opposed to not understanding each other, as if I would be -- start speaking Swedish here, I think that would not be interoperable.

Q. Probably you're not very -- not very interoperable in this courtroom. We -- we already kicked out Ms. Petersson. She was the only other person here who could understand it.

A. That's right.

Page 115

Q. Now, you've told us there are different kinds of standards, and you've told us some of their names.

Are there different groups that develop standards?

A. Yes, there are.

Q. And are there many different groups that work on standards in the field of wireless networking?

A. Yeah, there are plenty of groups.

Q. Which groups, in particular, has Ericsson been most active participating in?

A. Our main focus has been in the cellular field, and there we work in standardization bodies like ETSI and 3GPP -- or 3G Partnership Project would be one of the major activities where we have our focus.

Q. Okay. The first thing you said was ETSI. Is that E-T-S-I?

A. Correct, yes.

Q. What does that stand for?

A. Stands for the European Telecommunications Standards Institute.

Q. And -- and are these two groups you've just given us examples of where Ericsson has spent a lot of time and energy in helping to develop cellular standards?

A. Yes.

Page 116

29 (Pages 113 to 116)

**A1268**

Q. And Ericsson is a member of the IEEE, correct?

A. Yes.

Q. And has Ericsson agreed, along with a lot of other companies, that it will make certain commitments not only to the IEEE, but to the whole world --

A. Yes, we have.

Q. -- about how it will treat Ericsson's own patents if those ideas are put into the standard?

A. Yes, we have.

Q. Can you explain to us what that commitment is?

A. That commitment which Ericsson has made is -- is called a RAND commitment, and it stands for reasonable and non-discriminatory terms and conditions. That's a commitment to -- to offer a license to the market.

Q. Okay. This is something we're liable to hear a lot about in this case, so I'm going to take a minute.

Did you say RAND, R-A-N-D?

A. Yes, I did.

Q. All right. I'll write that on this board, R-A-N-D.

So is this shorthand for the companies -- for the commitment that companies like Ericsson make about their patents if they end up in the standard?

A. Yes.

Page 127

Q. What do these letters stand for in R-A-N-D?

A. It stands for reasonable and non-discriminatory.

Q. Reasonable and non-discriminatory. So in this case, if we hear about RAND, that's what we're talking about is the commitment that the licenses for patents be reasonable and non-discriminatory?

A. Correct.

Q. All right. Let's take them one at a time, and I would like you to explain what it means.

Reasonable. What does reasonable -- we know what the word reasonable means, but what does it mean in the context of licensing patents that may be in a standard?

A. Well, it means that -- as Ericsson, giving such a commitment, we commit to offer a license at a price which is reasonable in light of the contribution our technology gives to the end user who is using that standard. And also acknowledging the fact that there may be other patent holders out there who have patents on the same standard.

So it needs to be reasonable for a user who wants to put a product on the market to have them collect not only Ericsson's license, but also from the other companies.

Page 128

to explain to us.

You've told us about how the standard-setting body, the engineers meet and they come up with the best ideas that they put into the standard. My question is: What happens if one of those best ideas is patented?

A. That's a very common situation. And for that to be a workable situation, you also have this part of the standardization agreement, you could say, that you have the -- a policy related to -- to patents where companies can declare that they're willing to share their patented ideas.

Q. Okay. Before we get to that, again, let's just make sure we understand basically how it all fits together.

If the IEEE decides to put an idea into the standard and that idea is patented, can the IEEE use it for free?

A. No.

Q. Okay. If a company like one of the Defendants in this lawsuit decide they want to practice an IEEE standard, they want to make a product like a Wi-Fi product that does what the IEEE has decided is the best way of doing it, do they get to do it for free if it's patented?

A. No.

Page 125

Q. All right. So does the patent holder still retain their rights in a patent even if that patented idea has been chosen to go into the standard?

A. Yes. The commitment would be to offer a license, but with a fair return.

Q. Well, let's talk about the commitment now.

First of all, are all patent owners obligated to make any commitment to the standard-setting body?

A. No. Well, if you're a member, you're obligated to -- to give a commitment. But you don't -- you're not obligated to give a commitment to license.

Q. Okay. So but let's make sure we understand. Thank you for that clarification. Let's suppose we're talking about somebody who's not a member of the IEEE, for example. They don't come to the meetings. They don't participate, but they do have a patented idea; and the IEEE chooses that idea to put in the standard.

Is the person who owns that patent obligated to do anything about the standard?

A. In that scenario, there's no obligation whatsoever.

Q. Okay. But you're telling us that for people who choose to participate in the IEEE, they're expected to make some further commitment than that?

A. Yes.

Page 126

32 (Pages 125 to 128)

**A1271**

Q. So you told us reasonable means at least two things. It's -- it's reasonable and fair in consideration of what the patent -- Ericsson's patent contributes to the standard and the product, correct?

A. Yes.

Q. And, second, it has to take into account others who may have patents who might also want to charge a royalty in the same product?

A. Yes.

Q. Okay. That's reasonable.

And -- I think we can probably handle "and" on our own, so I will skip over it.

The next two words are non-discriminatory. What does that mean in this context?

A. That means that when Ericsson offers licenses to users of their technology, we will treat everybody in a similar way, and nobody should be discriminated against anyone else.

Q. In other words, no special deals?

A. That's correct.

Q. So that anybody who competes with someone else who -- who needs a license can come to Ericsson, and they're going to get basically the same deal as anybody else who they're competing with?

A. That is correct. Knowing, however, that any

Page 129

deal is -- is different from another. One may contain many different terms. So reasonable and non-discriminatory needs to -- look up on all the terms that are part of the deal.

Q. Okay. So a lot of these -- you're telling us a lot of these agreements that we'll probably hear about more tomorrow are pretty complicated?

A. Yes.

Q. So it's -- it's not -- it doesn't mean -- non-discriminatory doesn't mean that they're identical down to the penny, I suppose?

A. Exactly.

Q. But basically there's no special deals, and everybody's paying more or less the same?

A. Yes, that's correct.

Q. Now, is there a process amongst standard-setting bodies where companies like Ericsson can say: We have patents that are needed for this standard, and we want to let you know that we have them?

A. Yes, there is.

Q. Okay. Is that -- is that sometimes called declaring a patent essential to a standard?

A. Correct. Yes.

Q. Okay. And declaring, I guess, just means saying it, right? Publicly, putting it in writing so

Page 130

people know it?

A. Yeah.

Q. And to declare a patent essential to the standard means what?

A. It means that you inform in writing the standardization body in question that you believe that you have patents which users of the standard will need.

And if you, as Ericsson has done, permit for RAND purposes or RAND terms, then the organization would also know that they are available to license.

Q. So that the people working on the standards will know, well, the idea we're putting in may be patented; but the good news is that the owner of the patent, Ericsson, has given the whole world a commitment that they can license this and use it on reasonable and non-discriminatory terms. Is that fair?

A. Yes, that's fair.

Q. Now, about how many of Ericsson's patents has it declared essential to some standard?

A. All in all, if you look at all different standards, it's around 1,000 patents have been declared.

Q. Okay. And has Ericsson agreed to let others use those patents for the standard RAND license fee?

A. Yes, we have, for the purpose we discussed.

Q. And tell us again, who is supposed to pay that

Page 131

fee?

A. The company that puts the product on the market for the end user. And it's the company that would usually pay for this.

Q. It's not the standards-setting body, like IEEE or others, right?

A. No, it's not.

Q. It's the companies who decide, yes, I want to make a product that uses the idea, and, oh, by the way, there's an Ericsson patented feature in the standard, so they are the ones who are obligated to pay the fee. Is that correct?

A. That's right.

Q. Now, does Ericsson have a fee that it charges typically for its patents that are essential to the cellular standard?

A. Yes.

Q. And what's that fee approximately?

A. It's -- for typical standard, depending on the situation, it's around 2 percent.

Q. Around 2 percent?

A. Of whatever the product is.

Q. Whatever the product is? Okay.

But --

A. And it's --

Page 132

33 (Pages 129 to 132)

A1272

Q. -- cellular standards are not what we're talking about in this case, correct?

A. No. That's correct.

Q. Okay. In this case, we're talking about the Wi-Fi standard. Does Ericsson have a standard RAND licensing fee for Wi-Fi products?

A. Yes.

Q. What is that?

A. It's one-half of a percent capped at 50 cents for a phone product. For other products, like routers or laptops, we have a fixed fee of 50 cents.

Q. 50 cents.

And just to skip ahead, the vast majority of the products that are involved in this lawsuit are laptops and routers. So tell us again, what is Ericsson's standard RAND rate that it agrees it will let anyone use its Wi-Fi patents for that rate?

A. Yes. 50 cents.

Q. 50 cents?

A. Yeah.

Q. Per device?

A. Per device.

Q. Is that 50 cents a month or 50 cents a year or what?

A. It's a one-time payment for that device.

Page 133

Q. Okay. One-time payment of 50 cents per laptop, for example, to be able to use Ericsson's Wi-Fi patents?

A. Yes.

Q. Now, how did Ericsson arrive at that rate?

A. We do an assessment where we initially try to understand Ericsson's patented technology and the value of this technology for the end product, and we also try to understand the landscape of patents from all the others in order to come up with an initial rate, which we then use in our negotiations with other companies.

And based on the feedback in this process and what the market accepts in terms of signing deals on, we may adjust our rate to make sure it's indeed in line with our RAND commitment.

Q. How many people at Ericsson work on the process of trying to make sure that your Wi-Fi rate, for example, is fair and non-discriminatory?

A. It's a group of five to seven people, me included.

Q. And how long have they worked on and paid attention to trying to make sure that the Wi-Fi rate is reasonable?

A. We first started our licensing program for Wi-Fi in 2003. So since then, this has been a

Page 134

talked-about process. I was not involved myself at the beginning, but I am today.

Q. Now, I noticed when you told us about Ericsson's standard rate for cellular patents versus Wi-Fi patents, Wi-Fi was cheaper. Why is that?

A. Because Ericsson has a significantly larger portfolio for cellular, and that's why we also charge a higher rate there.

Q. You told us a few minutes ago, Mr. Brismark, that part of the reasonable feature of this RAND commitment is that you have to consider the fact that others may also have patents that would also be applicable to the product that a license fee would have to be paid for.

Does Ericsson attempt to keep track of that in setting a reasonable rate?

A. Yes. We try to keep track of others, and especially, again, by negotiating with other players in the industry gives us a good understanding of who has essential patents that would be relevant to the same technologies that Ericsson is also licensing out rights to.

Q. All right. And have other companies agreed -- not all companies, but many, agreed to pay these rates for using Ericsson's Wi-Fi patents?

Page 135

A. Yes, indeed.

Q. Okay. Well, we'll learn more about that tomorrow and in the days to come.

Let me get a little more specific now and talk to you about -- I've been asking you some questions about all kinds of standards, different standards that Ericsson is familiar with and that we may be familiar with, but many of them are not involved in this case.

And now I want to focus on the Wi-Fi standard, the standard that is particularly involved in this case.

A. Yes.

Q. Now, we've heard an explanation of this, and I hate to repeat ourselves; but if we all don't understand what you mean by Wi-Fi, we are really missing the boat.

So tell us, what is Wi-Fi?

A. Wi-Fi is a short range radio technology, which was developed late '90s, early '200s (sic), and which was intended for communication between computers initially and computer communicating with a router and so forth, short range.

Q. Okay. Are there Wi-Fi standards?

A. Yes, there are.

Q. What organization conducted the meetings that you've described to us to develop the Wi-Fi standards?

A. It's the IEEE organization.

Page 136

34 (Pages 133 to 136)

**A1273**

Q. Okay. What is -- tell us again, what does IEEE stand for?

A. It stands for the Institute for Electronic and Electrical Engineers.

Q. Okay. And that's a professional organization of engineers and companies that employ engineers?

A. Yes.

Q. Ericsson is a member of IEEE?

A. Yes, Ericsson is.

Q. And all the Defendants are members of the IEEE?

A. Yes.

Q. Okay. And when the IEEE decided to develop a standard for Wi-Fi, did it give what would become that standard, a name or a number to identify it?

A. Yes. So the project name within IEEE is 802.11.

Q. 802.11.

A. Yes.

Q. So is it fair to say that throughout this case, when we talk about Wi-Fi and we talk about 802.11, it's basically the same thing?

A. Yes, I would say so.

Q. Now, did Ericsson learn that there were going to be meetings to develop a Wi-Fi standard?

Page 137

A. Yes.

Q. At that time, though, did Ericsson make any products, or plan at that time to make any products that would use the Wi-Fi standard?

A. At that time, we did not.

Q. Okay. So this is something Ericsson learned would be happening; but at least in terms of your products and your plans for products back then -- this is 10 years ago or more -- it wasn't something that was, at least on the horizon, for Ericsson to actually be making products for. Is that accurate?

A. That's correct.

Q. But even though Ericsson didn't have plans to make Wi-Fi products, did it have patents that it thought would be useful for the Wi-Fi standards?

A. Yes. Since we had already researched similar types of problems or requirements in 3G and -- or 3G and 2G standardization activities before, we had solutions which we believed would also be preferred solutions in a Wi-Fi network.

Q. Okay. I think I understood that, but explain it again. Explain it a little more.

And, again, the problem I want to make sure we understand is, Ericsson didn't plan to make any Wi-Fi products as we'll hear in a minute. Ericsson didn't

Page 138

plan to send people very often to the meetings on Wi-Fi.

Why would Ericsson have patents that would be useful for Wi-Fi?

A. Because the technologies which you perform research on are not standard-specific. They are specific to certain problems you need to solve in order to make efficient networks. And Ericsson had conducted such research in various different projects at the time.

Q. So had Ericsson been doing research and development for years in how the radio and the cell phone handset would communicate with the phone company's equipment --

A. Yes.

Q. -- and back?

A. Yes.

Q. And was that problem, Ericsson thought, similar to how the radio and a laptop would communicate with a router and back?

A. Yes. For -- for all of the research related to introducing data communication into cellular had relevance for the type of problems you would also meet in Wi-Fi, especially when you want to go to higher data rights.

Q. Okay. Now, did Ericsson participate in the Wi-Fi standards meetings?

Page 139

A. Not regularly, no.

Q. Did it occasionally?

A. It happened, yes.

Q. Why didn't it participate regularly?

A. Because Wi-Fi was not the strategic choice or the strategic area of development for Ericsson at the time.

Q. You weren't planning on making a Wi-Fi product at that time?

A. Correct.

Q. Okay. Now, even though Ericsson didn't regularly participate in the Wi-Fi meetings, did Ericsson tell the people working on the Wi-Fi standards that it had essential Wi-Fi patents?

A. Yes, we did.

Q. Let me ask you to look now, please, at Plaintiff's Exhibit 293.

MR. CAWLEY: Let's blow up about the first third of it, so we can all read it.

Q. (By Mr. Cawley) Do you recognize this?

A. Yes.

Q. What is this that we're looking at?

A. This is a letter of assurance to the IEEE.

Q. Okay. You used a phrase -- we'll probably hear it several times in the case -- a letter of

Page 140

35 (Pages 137 to 140)

A1274

CASE PARTICIPANTS ONLY

assurance. What is a letter of assurance?

A. It's the commitment we talked about earlier, the commitment or the letter where you are first informed that you have patents that are essential to the standard, and they also inform on which terms you're willing to make them available to others.

Q. Okay. You're assuring people at the IEEE that you'll abide by this commitment for your patents that are essential to the standard; is that right?

A. Yes, we did.

Q. Now, I see in the letter under C: IEEE standards are proposed. IEEE standards.

The first thing I see is 802.11. We've talked about that, about what that means, but it's followed by an "a," and then there's one that says "b" and "c" and "f" and "g" and "h" and "i." What do those letters mean?

A. They stand for different releases of the 802.11 specification.

Q. So there's different versions or amendments to the specification that are worked on at different times?

A. Yes. The earlier versions, like "a," had much lower throughput and also capabilities in terms of providing certain type of services compared to the later versions, and especially "n," which we'll talk about

Page 141

later.

Q. Okay. But this letter of assurance -- and what was the -- what year was this letter sent?

A. It was sent in 2003.

Q. 2003.

Did this letter of assurance from 2003, Plaintiff's Exhibit 293, assure everyone, the IEEE and anyone who wanted to make a product compliant with these standards, that all of these standards would get the same RAND commitment?

A. Yes, that's correct.

Q. Now, if we scroll down a little bit in this document under Section D --

MR. CAWLEY: And I'm sorry. I need to go back to the previous page, the first page and I want to highlight now the bottom half of the document that starts with D.

Q. (By Mr. Cawley) All right. This was a part of the document that Ericsson sent to the IEEE, correct?

A. Correct.

Q. And you see that it has four numbered sentences or paragraphs with little check boxes by them, right?

A. Yes.

Q. Box No. 1, for example, if you check it, means

Page 142

that the patent holder -- and that would be Ericsson here -- is prepared to grant a free license.

A. Yes.

Q. But that didn't get checked, did it? Ericsson didn't agree that it would provide a free license.

A. Correct.

Q. And No. 4, on the other hand, says: I don't know that there are any patents that may be relevant to the standard. And Ericsson didn't check that box, did it?

A. Correct.

Q. And No. 3 says that the patent holder -- that would be Ericsson -- is unwilling to grant a license.

We're just going to stay out of this progress -- and do whatever we want with our patents, right?

A. Correct.

Q. But Ericsson didn't check that one.

A. That's correct.

Q. What did they check?

A. So we checked No. 2, which is the box you check if you're willing to offer a license on RAND terms, reasonable and non-discriminatory.

Q. Yes, sir.

Now, tell us again, why was Ericsson willing

Page 143

to make this commitment? After all, it owned the patents. It had the right to stand completely outside of this process and say: We're going to take anything we can get. We don't have to be reasonable. We can discriminate and make special deals all over the place.

Why did Ericsson choose to make this commitment that it would license on reasonable and non-discriminatory terms?

A. Because Ericsson believes in the standardization process as such and the related open innovation around it. And we also believe that it's important to have an incentive for the innovators to share their technology with others and get a fair return.

Q. Yes, sir. Thank you.

Now, after a few years, did the Wi-Fi standard continue to change?

A. Yes.

Q. And are you aware that the IEEE began to work on a new version of the 802.11 called 802.11n?

A. Yes.

Q. And what is your understanding of when that process began?

A. That process began around '04, '05, '06, that timeframe, and continued until 2009 when the "n"

Page 144

36 (Pages 141 to 144)

**A1275**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                             DOCKET NO. 6:10cv473
        -vs-                 )
                             Tyler, Texas
                          ) 8:55 a.m.
D-LINK CORPORATION, ET AL        June 4, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas 75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas 78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                     MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California 90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California 94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas 75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Jury out.)

THE COURT: Please be seated.

All right. I understand there's a matter before we bring the jury in.

MR. JONES: Yes, Your Honor. The first one, I think, is really simple, a ruling to deal with 14 exhibits. And I really don't think you need to hear argument. We --

THE COURT: Is that microphone on, Mr. Jones? I think it's the little button at the base of the microphone.

MR. JONES: Is it on, Your Honor?

THE COURT: That's good.

MR. JONES: Thank you. Thank you. Somehow I'll learn to operate something.

Anyway, I think you can make one ruling to deal with 14 exhibits. There are certain licenses that the Defendants have argued on Daubert motions and motions in limines that they are not comparable and, therefore, should not come into evidence.

We want to preserve our objection and object to them coming into evidence for the reasons that we've stated in those arguments due to the fact they're not comparable.

Page 3

But in light of the Court's prior rulings, it seems to be obvious what the ruling of the Court will be on that. If I could, I would read those exhibits into the record.

THE COURT: All right.

MR. JONES: They are Exhibits 26, 27, 28, 29, 30, 32, 31, 33, 37, 307, 308, 309, 310, and 469.

THE COURT: Are those Plaintiffs' exhibit numbers?

MR. JONES: Those are Plaintiffs' exhibits, yes, Your Honor.

THE COURT: Okay. Your objection's overruled.

MR. JONES: Thank you, Your Honor.

THE COURT: Anything further before we bring the jury in?

MR. DE VRIES: Your Honor, just briefly, this is Mike De Vries.

There are certain exhibits that are related to the examination of Ms. Petersson today. One of them is the document that was discussed on the record yesterday. It was a notice letter to HP. There are some other related documents. If it would please the Court, we could take those up -- up now briefly.

THE COURT: All right. Uh-huh.

Page 4

1 (Pages 1 to 4)

**A1281**

CASE PARTICIPANTS ONLY

So, anything else before --

MR. DAUCHOT: Your Honor, if I could -- just one point. The concern on the part of the Defendants, of course, is that we have a whole lot of drama surrounding these license agreements which, as Your Honor knows, is a -- is a hot-button issue in this case.

In order to -- to tamp that -- that appearance down and -- and take out some of the potentially prejudicial effect, would it make sense to have -- if they get into the licenses, have that done after a break and so that when -- when the -- these exhibits are introduced, that we don't have the jury thinking that this is some real important matter here that the courtroom needs to be cleared for? Just to -- to tamp that appearance down a bit and --

THE COURT: Response?

MR. DAUCHOT: -- and mitigate the prejudice.

MR. CAWLEY: Well, Your Honor, like -- like all lawyers who prepare witnesses, there's a certain sequence that I think helps the jury understand Ms. Petersson's testimony. I'd be glad to ask the Court or notify the Court; and if the Court wants to take a break at the point when we reach this, I don't have any

Page 13

objection.

THE COURT: All right. I'm going to deny that request. I just -- I think it would leave more questions in the jury's mind if they take a break and they come back and the courtroom is empty than it would if we -- if I explain it to them. I do this in cases all the time when we get to this type of information. So I don't think it's going to create a great problem.

All right. Bring the jury in, please.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right. Good morning, Ladies and Gentleman of the Jury.

JURORS: Good morning.

THE COURT: Welcome back. Day two. We're about to begin. And you look bright-eyed and a lot more rested than you did at the end of the day yesterday, so I hope you got a good night's sleep and are ready to go again.

Mr. Cawley, if you'd like to put your witness back on the stand.

MR. CAWLEY: Thank you, Your Honor. Mr. Brismark, would you take the stand again, please?

Page 14

THE WITNESS: Does this work?

GUSTAV BRISMARK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (CONTINUED)

BY MR. CAWLEY:

Q. Good morning, Mr. Brismark.

A. Good morning.

Q. Yesterday you told us, I believe, that there is a group of people within Ericsson that are responsible for managing Ericsson's patents. Is that -- do I remember that correctly?

A. Yes, that's correct.

Q. And you're a member of that group?

A. Yes.

Q. And have been for roughly the past 10 years?

A. That's correct.

Q. I think --

A. Since 2004.

Q. I think I may have misspoken yesterday, and I think I -- the reason I think this, is because you told me so last night. But I may have referred to you yesterday as the head of that group, but that's not -- you're not the head of the group, are you?

A. I'm head of the portfolio management group, yes.

Q. Okay. But -- but there's a larger group

Page 15

within Ericsson that is also responsible for the protection of Ericsson's patent portfolio.

A. Yes.

Q. And just so we understand, this group of people, how many people are we talking about?

A. We talk about roughly 200 people.

Q. 200 people.

This -- this group of people, these are not the engineers we talked about yesterday that are doing research and development?

A. That's correct, yes.

Q. These are not people who themselves are -- are getting -- inventing things that become patented?

A. Correct.

Q. These are people who are responsible for managing Ericsson's thousands of patent assets, fair?

A. Yes.

Q. Okay. And that's part of your job.

A. That's part of my job, yes.

Q. You used to work in research and development, but for the last 10 years, you haven't been doing that. You have 10 patents to your name that came from your years doing research and development, but for the past 10 years, you've been sort of not working in the -- in the fields of technology, but working in an office

Page 16

4 (Pages 13 to 16)

**A1284**

helping to take care of Ericsson's patents?

A. Correct.

Q. Okay. Now, in that capacity, do you have responsibility for -- how many patents, would you say?

A. Ericsson today has 33,000 granted patents, and it's been growing over the past years. So in the beginning of 2004, it was less. Maybe twenty-five or so. But it's been growing since then.

Q. Okay. So -- so it's thousands of patents?

A. Yes.

Q. Now, given that you're responsible for the management of thousands of patents, I assume that it's not really part of your job to become highly knowledgeable about any one of them; is that a fair statement?

A. Yes, that's fair, and it would be impossible to have detailed knowledge on all of them.

Q. Okay. So -- but what I'd like to ask you to do this morning is, we've heard something about the five patents in this case from lawyers in opening statement; but since you're the first witness, I'd like to ask you to give us just a very high-level introduction to the patents in this case.

We've heard that later in the trial we'll hear from a professor at the University of Texas who has

*Page 17*

studied these patents and studied the Defendants' products; and that that testimony is going to be very detailed and probably will take several hours.

But I'm not going to ask you to do that. What I'm going to ask you to do is just to introduce us to the patents and to tell us a little bit about them and how they came about, and very generally, what they relate to.

And let's start with Plaintiff's Exhibit 4, which is the '625 patent.

A. Yes.

Q. Who invented the idea in the '625 patent?

A. It was two guys named Peter Larsson and Mikael Larsson.

Q. Do you know Peter Larsson?

A. I do know Peter Larsson, yes.

Q. Can you show us a picture of him?

A. I can do that. So this would be Peter Larsson in person.

Q. Tell us about him. What's Peter Larsson like?

A. We worked at Ericsson research, both of us, and I know him from there. And Peter is also one of the persons within Ericsson who has been named inventor of the year, which is an award given to inventors having outstanding performance.

*Page 18*

Q. Okay. What -- what -- tell us something else about him. What do you -- what do you know about Peter Larsson based on having worked with him years ago?

A. Well, I know that he -- he's a very thoughtful person. He is thinking a lot about sustainability and environment; and among other things, he would, whenever possible, rather take the train than an airplane, if he's traveling, if that is an option --

Q. Okay.

A. -- and also when --

Q. Okay.

A. Yeah.

Q. Thank you.

A. Yeah.

Q. So what was Peter working on back in the late '90s?

A. At that time, he was working at Ericsson's lab in Singapore.

Q. Singapore. Okay.

Now, where -- is he a Swede? Is he from Sweden originally?

A. He's Swedish.

Q. Okay. And he's an engineer, I guess?

A. Yes.

Q. And what was he working on in Singapore in the

*Page 19*

late '90s?

A. So he was in a contract. At the time, Ericsson was setting up a lab in Singapore, and the objective of the project he was working on was to create an office environment with computers calculating and having high-performance wireless LAN in that office.

Q. All right. And in the course of doing that work, working on a wireless LAN for an office, what did he invent?

A. He invented, in the '625 patent, a synchronization technique. It's related to synchronization of networks that communicate at high speed.

And as we talked earlier about retransmission of lost packets, what he invented in this patent is a way of making the transmitter work more efficiently in order to stay synchronized.

Q. Okay. And when was his patent published?

A. It was published on July 23rd, 2002.

Q. How could his invention be important for Wi-Fi?

A. It's important because in a wireless LAN or short-range data radio network, when you go to higher speeds, his inventions will enable those higher speeds by -- by having more efficient communication and better

*Page 20*

5 (Pages 17 to 20)

**A1285**

throughput.

Q. Okay. Now, yesterday you were -- you were sitting in the courtroom for the opening statements by the lawyers, weren't you?

A. Yes.

Q. And the lawyer for the Defendants who gave the opening statement made quite a big point of pointing out that the word Wi-Fi doesn't even appear in the '625 patent.

Do you remember that?

A. Yes.

Q. Were you surprised to hear that?

A. No.

Q. Why not?

A. Because to my understanding, Wi-Fi as a label for the 802.11 standard was introduced in 2009.

Q. You mean 1999?

A. I mean 1999. Sorry.

Q. Okay. 1999.

And when was the filing date of this patent?

A. The filing date was October 28th, 1998.

Q. So this idea was conceived before the name Wi-Fi was even invented; is that right?

A. Yes.

Q. Okay. Now, let me ask you about the second

Page 21

patent that we'll hear about in this case. It's the '568 patent, and it is Plaintiff's Exhibit 6.

A. Yes.

Q. Who invented the ideas in this patent?

A. This patent was invented by Krister Raith and colleagues of Krister.

Q. Krister Raith is his name. Is Mr. -- do you know Mr. Raith?

A. Yes, I do.

Q. Would you show us his picture?

A. Yeah. This is Krister Raith, yes.

Q. Okay. Is Mr. Raith originally from Sweden?

A. He is. And he was working in the research group, which I joined in 1986, and he was the guy to be friends with in order to be able to get to the coffee table during breaks, because he was in control of the money there.

Q. Okay. He ran the coffee concession in the office?

A. Yes, he did.

Q. All right. And do you still know Mr. Raith?

A. Yes, I do.

Q. Where does he live now?

A. He lives today in San Diego.

Q. What did Mr. Raith and his co-inventors invent

Page 22

that was awarded the '568 patent?

A. What they invented and what the '568 patent was for, was the need for having different optimization for different type of services in a wireless data network that offered multiple types of services going over the interface.

So by introducing an identifier, the system could optimize better and use better optimization for different service types.

Q. I see. When was this patent published?

A. This was published in October of 2002.

Q. Is all that information on the face of the patent?

A. Yes.

Q. Why are these ideas in -- in this patent important for Wi-Fi?

A. They are important, because they --

MR. AROVAS: Your Honor, I object. I believe we're getting into opinion testimony.

May I approach?

THE COURT: Yes, you may.

(Bench conference.)

MR. AROVAS: We actually talked about this this morning. My concern of this witness is, this witness is not an inventor in any of the five patents.

Page 23

He testified he didn't even read the patents in their entirety.

And he was not disclosed as an expert, and so when he -- if he wants to challenge and say what the invention is, that's one thing; but when he starts to say why is it relevant to Wi-Fi, he's effectively doing an infringement analysis. He's saying his invention is relevant to the accused product, and that would be opinion testimony.

So what we discussed today is, if he wants to say, at a very high level, because he's not an inventor, he's not -- this is not fact testimony. This is generally what this was about, fine, we'll let that go.

But when he starts to say, how is it relevant to Wi-Fi, he's basically saying, why is this invention important to be used in Wi-Fi, which is effectively opinion testimony on infringement.

MR. CAWLEY: Well, it's not -- it's not that close to an opinion of infringement. He's one of skill in the art. They've taken his deposition. He's not talking about claims. He's not comparing claims to accused products. He hasn't seen the accused products. He's just generally testifying as an Ericsson employee, and I believe this would be relevant to Wi-Fi.

Page 24

6 (Pages 21 to 24)

**A1286**

THE COURT: Overruled.

(Bench conference concluded.)

Q. (By Mr. Cawley) Mr. Brismark, let me repeat my question to you. How is this patent we were just talking about, the '568 patent, important for Wi-Fi?

A. It's important because Wi-Fi as developed from its first release into what it is today where you have the possibility and the mechanisms to support different type of services with different requirements, which was not the case in the beginning.

This is a way of making that possible in a Wi-Fi system. And the inventor foresaw that need when he made this invention.

Q. All right. Thank you, sir.

Let's move now to the next patent of the five. This is the '223 patent. It is Plaintiffs' Exhibit 8.

Who invented the idea that is protected by this patent?

A. So the inventors of this patent is Stefan Reiner (sic) and Reiner Ludwig.

Q. Can you show us a picture of Mr. Wager?

A. Yes, I can do that. So we have Mr. Wager here in this picture.

Q. The inventors we have seen so far are Swedes. Is Mr. Wager from a different country?

Page 25

A. Mr. Wager is from Germany.

Q. Germany?

A. Yes.

Q. And does he work in -- in Germany now --

A. Yes.

Q. -- for Ericsson?

A. He has a research lab in Aachen in Germany.

Q. In Aachen. And did -- what -- what did Mr. Wager and his co-inventors invent that became the '223 patent?

A. They invented a methodology where you would introduce a timer for how long to continue doing retransmissions if packets were not being acknowledged by the receiver.

Q. Okay. And did Ericsson submit this idea in the form of the patent to the 3G standard-setting body?

A. Yes.

Q. Let me show you Plaintiffs' Exhibit 204 and ask you what this is.

A. So this is a contribution to the working group -- two of the radio access network standardization activity related to 3G.

Q. Okay. In other words, this is -- this is a document that Ericsson sent to the 3G standard-setting body saying we want to declare our patents essential

Page 26

to -- essential to the standard that you're developing?

A. No. This is a contribution which was -- is more a technical contribution, describing one of the solutions that Ericsson proposed to --

Q. I see.

A. -- the standardization activity for inclusion into the standard.

Q. So that Ericsson is proposing that this is something that that body might want to consider adopting as part of the standard?

A. Correct, yes.

Q. Now, we heard a little bit about this yesterday, again, in the opening. I want to make sure because I'm afraid there's some terminology here that may be confusing.

You told us that this was a contribution that Ericsson made to the 3G standard. Does that phrase, or word really, a contribution, have a particular meaning in this context?

A. Yes. You usually refer to -- you use the word contribution when you talk about input paper or proposed solution of a certain technology which you propose to be included into a standard.

Q. Okay. So I want to make sure we all understand that because I'm afraid there's some

Page 27

potential confusion there about the word contribution.

Are you saying that usually when it's used by people in this field who are knowledgeable about standard-setting, it means a written proposal that certain technology be adopted into a standard? That's a contribution?

A. Yes.

Q. But there's another way we could use the word, I guess, that we normally use it, that when you contribute to something, you just sort of help along the way, so the person who types up the standard contributes to it, right?

MR. AROVAS: Objection. I don't think the witness can testify as to his opinion.

THE COURT: Overruled.

Q. (By Mr. Cawley) You can answer.

A. Yes, I agree.

Q. Okay. So -- so when you -- when you indicate that this is a contribution that Ericsson made to the standard, you're using it in that specialized way of a written submission of technology?

A. Yes. It doesn't say anything -- whether or not a contribution would be actually included in the standards, so it's mainly referring to the paper as such.

Page 28

7 (Pages 25 to 28)

A1287

Yesterday we explained this idea, a commitment that companies can make and that Ericsson in this case has made to license the patents to people who need to use them on reasonable and non-discriminatory terms.

A. Yes.

Q. You just used, though, and then I followed your lead and also used, an expression, FRAND, which would be spelled F-R-A-N-D. What does that mean?

A. That's the term that is used in ETSI, the other standardization body we talked about. And the F stands for fair.

Q. Fair, reasonable, and non-discriminatory?

A. Yes.

Q. So is it -- is it typical that in -- people -- when people in Europe where ETSI is located are licensing patents, they talk about FRAND, with an F in front of it, and people in the United States have traditionally talked about RAND?

A. That's my understanding, yes.

Q. But are they really significantly different commitments?

A. No. I actually use FRAND and RAND commitments being the same.

Q. Okay. Great.

Now, back to the '215 patent. You said

Page 33

that -- that Ericsson agreed to license that patent on FRAND terms?

A. Yes.

Q. And was it voted into the standard -- 3G standard?

A. Yes, it was.

Q. Is it also important for Wi-Fi?

A. Yes.

Q. Why do you say that?

A. Because Wi-Fi has also developed, since its first release up until the release 11n, and today has similar type of -- of performance which means that this invention is -- is used and -- and has -- is benefit to the Wi-Fi standard.

Q. All right, sir. Now, the last patent is the '435 patent -- that is Plaintiffs' Exhibit 3. Who invented this idea?

A. This was invented by Mr. Lazraq and Mr. Khan, both from Sweden.

Q. They're both from Sweden? What did Mr. Lazraq and Mr. Khan invent?

A. They invented an invention which is also related to -- to synchronization of sender and receiver in a situation where you have lost packets and confirmations and so forth where the -- it would help

Page 34

the receiver to work more efficiently.

Q. And when was the patent published?

A. It was published in 2001, December.

Q. December 2001.

And is this idea, the idea that is in this patent, also important for Wi-Fi?

A. Yes, it is.

Q. And why is that?

A. It's also providing means for -- for better throughput in a high throughput network.

Q. Okay. Now, thank you for -- for introducing us to those patents, Mr. Brismark. I know we'll hear a lot more about them in -- in the days to come.

On the patent video that the jurors heard yesterday morning before they came up to the courtroom, there was some discussion about something called the state of the art. Are you familiar with that term?

A. Yes.

Q. I guess most of us -- we hear it sometimes when someone says, wow, that stereo system is the state of the art or that jet plane is the state of the art.

What do you understand that to mean?

A. I understand it to mean the level where the technology at this point in time, the best solution you can find for solving a certain problem at this point in

Page 35

time.

Q. Okay. Now, when were the five patents -- the five Ericsson patents you just described to us that are in this case, when were they the state of the art?

A. They were state of the art in -- in the late '90s -- mid-to-late '90s.

Q. Okay. Can we see that if we look at the face of the patents, that all of them were filed with the Patent Office in the late '90s?

A. Yes, by looking at the filing dates, you will see that.

Q. Now, does Ericsson enter into agreements with its employees, you and all its other employees, that if the employee invents something while they're working for Ericsson, that the employee will agree to assign their patent rights to the company Ericsson?

A. Yes.

Q. Is that -- is that in your understanding a pretty typical agreement for people who work for technology companies and are paid to develop things?

A. Absolutely. That's my understanding.

Q. And have the inventors -- all of the inventors of the five patents in this case assigned their patent rights to Ericsson?

A. Yes, they have.

Page 36

9 (Pages 33 to 36)

**A1289**

Do you have that?

A. Yes.

Q. Okay. And DX 98 is all staff meeting from May 2005 on wireless LANs, right?

A. Yes, it's from 2005.

Q. Right.

A. Correct.

Q. One of the authors is -- I might get this wrong -- Nhils Forslund; is that right?

A. That is correct.

Q. And he works for you, right?

A. He works for me, yes.

Q. Okay. And so actually this document has a chronology of what Ericsson was doing in the area of wireless LANs, right?

A. Could you repeat the question?

Q. Well, let's take a look at it. If you look at the second page of the document, you'll see that there's a chronology -- and I'll put it on the screen -- of what Ericsson -- here's the top of the page. And we look down a little bit, and we see there's a chronology of what Ericsson was doing in wireless LANs, right?

A. Yes.

Q. Okay. And what we see is, if we want to know what Ericsson was up to back then -- the H2 project,

Page 53

that refers to HiperLAN, right?

A. Yes, that's correct.

Q. Okay. That was closed when 802.11 succeeded, right?

A. That is most likely the timing when -- when ETSI decided to discontinue the standardization, yes.

Q. Okay. And you testified on direct that Ericsson wasn't really interested in making an 802.11 product, right?

A. We had noted that as part of our core strategy in -- in the late '90s, early 2000s; that's correct.

Q. In fact, this is early 2000. So what we can see in the internal Ericsson document, when H2, the European WLAN stan -- wireless LAN standard was closed down, right, the R&D project team started to focus on developing 802.11a equipment, right?

A. Yes, that's correct. Around 2002, 2003, I think Ericsson had a unit which was focusing on wireless LAN for enterprise use.

Q. Right. And so actually what really happened is the European standard went nowhere. Ericsson went to 802.11, and Ericsson moved its development to try to make 802.11a equipment, right?

A. For a limited period of time, we had an activity focusing on -- on finding a market for products

Page 54

on 802.11 in the enterprise area, yes.

Q. Okay. And so what happened to that project, though, is that was shut down, too, right?

A. That was discontinued later on, yes.

Q. Right. And, in fact, we see that in the chronology laid out in the document that -- but this R&D project was also closed down sometime around 2001 to 2002 and -- when the profit seemed too small, right?

A. Yes. I think that refers to the internal Ericsson R&D project. However, the program on investigating being on the market continued a bit longer than that.

Q. Okay. And it was shut down, right?

A. Excuse me?

Q. And it was eventually shut down, right?

A. Yes, it was discontinued.

Q. Right. And, in fact, the document says that the WLAN R&D within Ericsson stopped, as is explained here, right?

A. Yes.

Q. Okay. And so where we are in the chronology is HiperLAN ends, Ericsson goes to 802.11, Ericsson's interested in making a 802.11 product, and Ericsson starts attending 802.11 meetings, right?

A. That would be a correct description of the

Page 55

chronology. I agree, yes.

Q. Okay. And it's a fact, isn't it, that when Ericsson decided to put their focus in 802.11, Ericsson started sending engineers to the 802.11 meetings, right?

A. We did. However, it was a very limited effort, I would say, compared to other efforts within Ericsson.

Q. Okay. And the 802.11 -- you talked about standards. The 802.11 standards are a collaborative process, right?

A. It is, yes.

Q. Yeah. And anybody who wants, can join and come to the 802.11 meetings, right?

A. Yes.

Q. And the way it works is that when you want to build a standard, you want to pick the best technology for what you're trying to do, right?

A. That's the methodology I -- I talked about yesterday, yes.

Q. Right?

A. That's the way you make decisions.

Q. And all the engineers from all these different companies, they can contribute whatever technology they think is going to be best for that standard, right?

A. Yes.

Page 56

14 (Pages 53 to 56)

**A1294**

Q. And then the engineers vote on it, right?

A. They do.

Q. And they decide what they think is right for the standard they want to build, right?

A. Yes.

Q. And sometimes there's very vigorous debate comparing all the different alternatives, right?

A. That may be the case. That's correct, yes.

Q. Right. And, in fact, Ericsson, when they were asked, 802.11 made a proposal of technology of what they thought should go into 802.11, right?

A. Yes, that's right. Ericsson proposed to take in the entire Layer 2 of -- of HiperLAN 2 into Wi-Fi as a proposal.

Q. Right. Exactly. And that's DX 58 in your binder. I'll put it on the screen so you can see it. DX 58. And we can look at the cover.

And what DX 58 is, is the Ericsson proposal to the IEEE, right? Is that right?

A. Yes. And this was very early on in the Wi-Fi development --

Q. If --

A. -- if I recall it right.

Q. -- if you'd just stick to the questions, Mr. Brismark, please?

Page 57

A. I'm sorry.

Q. This is the Ericsson contribution to the Wi-Fi standard, right?

A. That is my understanding, yes.

Q. Right? And we can tell. It actually -- right up here in the top has an IEEE 802.11 document number, right?

A. Yes.

Q. And it was made by an Ericsson engineer, Gunnar Rydnell, right?

A. Yes.

Q. All right. And we can see it's got an Ericsson e-mail address, right?

A. Correct.

Q. And this is Ericsson proposing HiperLAN technology to the 802.11, right?

A. Yes.

Q. Okay. And isn't it a fact that this contribution was rejected by the members of 802.11 because the engineers thought it was complex and not needed for what they wanted to do, right?

A. I don't know their rationale for rejection, but it was rejected. That's my understanding.

Q. Okay. Well, you obviously testified a lot about the IEEE. You're aware that Ericsson put up a

Page 58

corporate designee, a representative to speak about exactly what happened at the development at IEEE, right?

A. Yes.

Q. And that's a gentleman by the name of Iwerback, right?

A. That's correct, yes.

Q. Okay. And he was put up by Ericsson to explain what happened with this, right?

A. Yes, that's my understanding.

Q. Okay. And he testified on behalf of Ericsson, as you know, that the engineers at the IEEE rejected the sole Ericsson proposal because they thought it was too complex and wasn't needed, right?

A. Yes. But if you ask me, I cannot testify on that because I don't know the rationale for rejecting the proposal.

Q. Okay. Well, you certainly wouldn't disagree with the corporate representative of Ericsson who explained why Ericsson's proposal was rejected by the IEEE, right?

A. No.

Q. Okay. And, in fact, you have never even gone to an IEEE meeting, right?

A. That's correct.

Q. And never even read the IEEE 802.11 standard,

Page 59

right?

A. I haven't personally read the specification, that's correct.

Q. Okay. And, in fact, this case we've been talking about 802.11n, in particular, right? Is that right?

A. Could you repeat the question?

Q. In this case, we've been focused on 802.11n, right?

A. Yes.

Q. And, in fact, if we look at all of 802.11n, it's a fact that Ericsson has never made a single contribution to the 802.11n standard?

A. I believe that's correct.

Q. That was accepted into the standard, correct?

A. I believe that's correct, yes.

Q. Okay. And just so we have the timing down, you talked about the five patents-in-suit and you told us when they were filed, right?

A. I did.

Q. All right. And, in fact, those patents are filed in different dates, '97, '98, '99. But every one of those patents was filed and on the shelf at Ericsson at the time they went to the 802.11 meetings and made the proposal; isn't that right?

Page 60

15 (Pages 57 to 60)

**A1295**

A. Could you specify the question, please?

Q. Isn't it a fact that every one of the patents in this case that we're talking about had already been filed and were on the shelf at Ericsson before Ericsson went to the 802.11 meetings and made its rejected proposal, right?

A. Well, I don't know the meaning of "on the shelf." But as I explained earlier, some of them were actually used in 3G, so they were --

Q. Can you please, Mr. Brismark -- Mr. Brismark, can you please answer my questions?

A. And it will be nice --

Q. I'm asking about the IEEE. I'm not asking about the ETSI cellular standards.

It is a fact, Mr. Brismark -- and we can go through every one of the patents and we can look at the filing dates -- every one of the patents was filed with the Patent Office by Ericsson before Ericsson attended the 802.11 meetings, right?

A. That is correct.

Q. All right. And so Ericsson had those patent app -- filed applications submitted with the Patent Office, they had them in Ericsson's offices when they were going to the IEEE to propose whatever they wanted to propose for the IEEE standards. Right?

Page 61

A. That is correct, yes.

Q. Okay. And Ericsson -- it was an open standard, and Ericsson could have proposed whatever it wanted, right?

A. Absolutely.

Q. And Ericsson did propose what it wanted to see in that standard, right?

A. We made one proposal, yes, that's right.

Q. And that was rejected, right?

A. That's my understanding, yes.

Q. And as we sit here today, there isn't a single Ericsson contribution proposal of technology that was accepted into the IEEE 802.11n standard, right?

A. I believe that to be correct, yes.

Q. Okay. Now, let's talk very quickly -- the Wi-Fi standard and where it goes, right?

A. Okay.

Q. Now, as you've explained, wireless standards can be very complicated, right?

A. Yes, they are.

Q. Okay. And they can have hundreds of technologies in them, right?

A. That's correct, yes.

Q. And they can, in fact, have thousands of sub technologies, right?

Page 62

A. I would agree to that, as well, yes.

Q. Okay. And so when we think about the Wi-Fi standard, I think you saw it -- if I can just grab my chips over here. Yeah. We saw earlier in the case what a Wi-Fi chip looks like.

I'll put it on the ELMO so we can see it. I'll put my thumb next to it so we can get a sense of size, right?

And this little black square in the middle, that's a Wi-Fi chip, right?

A. I wouldn't know, but I believe you that it is.

Q. Okay. So that's been identified as one of the Intel Wi-Fi cards; and that's -- assuming that's correct, that's what a Wi-Fi chip would look like, right?

A. Assuming that's correct, then I would agree, yes.

Q. Okay. And what happens is the 802.11 standards that we're talking about here are actually implemented in this chip, right?

A. Yes, they are, to a large extent. That's what I understand.

Q. Right. And so that's what happens. So all these hundreds of technologies get shrunk down and put into that one little chip, right?

Page 63

A. Yes.

Q. Okay. And, in fact, the Wi-Fi companies themselves have hundreds, if not thousands, of engineers; is that right?

A. I believe I'm not the right person to testify on that.

Q. Do you have any doubt that Intel, for example, has hundreds, if not thousands, of engineers?

A. No, I don't.

Q. Okay. And Intel is just one of the Wi-Fi companies making the Wi-Fi chips, right?

A. That's my understanding, yes.

Q. Right. And, in fact, those Wi-Fi chip companies put billions of dollars of their own R&D into developing their products and technologies, right?

A. I don't know the amount of money that is put into R&D.

Q. Do you have any doubt that Intel spends billions of dollars in R&D?

A. I would not have a doubt, no, that's correct.

Q. Okay. And Intel is just one of the many Wi-Fi chip companies, right?

A. Yes.

Q. Okay. And so we know that these -- the Wi-Fi standard goes into this chip, right?

Page 64

16 (Pages 61 to 64)

**A1296**

Case: 13-1625 Case: 13-1625 Document: 179-1 Document: 177-1 Page: 327 Page: 327 Filed: 03/31/2014 Filed: 03/31/2014 (327 of 575)

CASE PARTICIPANTS ONLY

A. Yes.

Q. And we saw in the opening a bunch of licenses, right? You were here for the opening?

A. I was here at the opening, yes.

Q. Okay. And at the opening we saw a slide -- a slide that looked like this?

A. Yes.

Q. Right? And it listed Ericsson 802.11n licenses?

A. Yes, that's some of them.

Q. All right. And, in fact, there's not a single chip maker listed on that list of licensees, right?

A. Correct.

Q. And, in fact, there's lots of chip makers that make the chips that make all these Wi-Fi products actually do Wi-Fi, right?

A. Yes.

Q. Okay. There's Broadcom, right, chip maker, right?

A. Correct.

Q. Qualcomm, Atheros, right?

A. Correct.

Q. Ralink, right?

A. Yes.

Q. Realtek, right?

Page 65

A. Yes.

Q. And there are more, right?

A. Excuse me?

Q. And there are more, right?

A. I don't know them.

Q. Okay. And none of those, Qualcomm, Broadcom, Atheros, Ralink, Realtek, Intel have agreed to take a license of these patents, right?

A. That is correct.

Q. Okay. And, in fact, Intel, one of the chip makers of the Wi-Fi chips, had to ask to get into this case, right?

A. My understanding is that Intel intervened this --

Q. Yes.

A. -- process.

Q. So you put the lawsuit together. You're one of the people who said you approved the lawsuit, right?

A. Yes.

Q. Okay. And you didn't sue Intel, did you?

A. No, we sued the end user product.

Q. Right. You sued Intel's customers, right? You sued Intel's customers, among other customers, right?

A. We sued the end user product manufacturers.

Page 66

Q. That use Intel parts, right?

A. Some of them do. I don't know if all of them do.

Q. You have no doubt you sued Intel's customers, right?

A. Some of the companies that we sued are customers of Intel. I have no doubt of that.

Q. Okay. And Intel -- but you didn't sue Intel, right?

A. Excuse me?

Q. You didn't sue Intel, right?

A. No, we did not.

Q. All right. And Intel is the company that makes the chip that the Wi-Fi standard actually goes on, right?

A. Correct.

Q. And Intel had to ask and voluntarily come into this case, right?

A. I don't think they had to.

Q. Well --

A. My understanding is they voluntarily did so.

Q. Intel decided to put itself in the line of fire in this case and subject itself to all the issues that are being decided in this case voluntarily. It wasn't sued, right?

Page 67

A. Yes, my understanding they did so voluntarily.

Q. Okay. And it's a fact, isn't it, right, Intel -- what Intel came here to say, what Intel is saying in this case, as one of the designers of the actual products, the chips, that In -- that Wi-Fi -- that, in fact, these five Ericsson patents are not essential at all and that the Wi-Fi standard is different; isn't that correct?

A. I believe Intel is claiming that, yes.

Q. Okay. So now while we're talking about patents, I want to stick with this issue of essential patents and go into that in a little bit more detail. Okay?

A. Okay.

Q. Now, just so we have the terminology right, generally speaking, when we're talking about an essential patent, we're talking about a patent that covers the standard, meaning that you can't practice the standard without infringing the patents, right?

A. That is correct, yes.

Q. Okay. Now, you'd agree with me just calling a patent essential doesn't make it essential? You actually have to take that patent and do a detailed analysis against the standard, right?

A. Correct.

Page 68

17 (Pages 65 to 68)

A1297

have essential patents, okay?

A. Okay.

Q. And I think you showed us one of the letters of assurance. And this is actually your exhibit. It's PX 294.

You know this document, right?

A. Yes.

Q. Okay. And it's a letter of assurance for essential patent claims, and you pointed it out and this is to the Institute of Electronic -- Electrical and Electronic Engineers. That's the IEEE, right?

A. That is correct, yes.

Q. Right. And this is from Ericsson, right?

A. Yes.

Q. Okay. And let's look at what -- this is actually a form that the IEEE has. I'm going to blow up the language I want to focus on, see if I can make it any bigger. There we go.

And the fact is that these are declarations by the company, but the IEEE doesn't, in fact, do anything to determine whether these are declarations of patents that are really essential or declarations of patents that are going to turn out to be non-essential, right?

A. That's correct.

Q. And, in fact, we see that in the language, and

Page 73

it's very important language that is in every letter of assurance in the IEEE.

And it says: The IEEE takes no position with respect to the validity or essentiality of patent claims.

Right?

A. Correct.

Q. Okay. And so we know that this is just a submission of a form from a company like Ericsson to the IEEE saying Ericsson believes it may have essential patents, but the IEEE is not doing any analysis or agreeing with Ericsson that any of those patents are actually used in the standard, right?

A. That is correct.

Q. Okay. And you showed us a letter from the IEEE to Ericsson as Exhibit 511. You talked about that in your direct, as well, right?

A. I did, yes.

Q. Okay. And if we look at that letter from the IEEE, it has a date -- I'll make this again bigger -- March 30th, 2011, right?

A. Yes.

Q. Okay. When was this case filed, what year?

A. This case we talk about here?

Q. Yes.

Page 74

A. Was filed in 2010.

Q. Right. So this letter is almost a -- a year after this case was filed, right?

A. That is correct.

Q. Right. And what the IEEE actually says in its letter to Ericsson is: It has been brought to my attention that Ericsson may have essential patent claims.

Right?

A. Correct, yes.

Q. So the IEEE wasn't making any determination that the Ericsson patents in this case were, in fact, essential, right?

A. That's correct.

Q. In fact, the IEEE never even looked at the issue, right?

A. The IEEE didn't do any analysis of patents. That's my understanding, yes.

Q. Right. And, in fact, the reason this was sent is because Ericsson filed this lawsuit claiming it had essential patents; and the IEEE said, you claim you may have some essential patents, we're not dealing with that issue at all, but if you end up being right, we want to make sure there's an obligation to license. Right?

A. I don't know -- that was a very long statement

Page 75

or question, so could you please repeat your question?

Q. You would agree with me the letter was sent after this lawsuit, right?

A. Yes.

Q. Okay. And the letter was sent actually because somebody raised, with the IEEE, the fact that Ericsson had filed a case where Ericsson said the patents were essential, right?

A. I don't know who writes within IEEE, so I couldn't answer that question.

Q. Okay. So you have no idea why this letter was sent then, right?

A. I know we received it. I don't -- don't know why it was sent.

Q. Okay. So you would agree with me that after the -- before the letter was sent, this case had been filed and Ericsson said it had essential patents, right?

A. Yes.

Q. The five patents in this case, right?

A. Correct.

Q. Okay. And before it was sent, the Defendants actually said: You're wrong. We believe that we designed our own technology, and, in fact, those patents are not essential. Right?

A. I don't know that.

Page 76

19 (Pages 73 to 76)

A1299

CASE PARTICIPANTS ONLY

Q. Okay. You don't know that in this case every one of the Defendants has said that the IEEE standard is different than Ericsson patents?

A. No, I don't know if they stated that as clearly. I don't think they admitted -- admitted in our negotiations, but --

Q. Do you have any doubt that the whole reason we're here is that the Defendants are saying that the standard is different and they designed their own technology, after hearing Mr. Van Nest's opening?

A. I think there are multiple areas where there's disagreement.

Q. Do you have any -- would you please answer my question?

Do you have any doubt, after hearing Mr. Van Nest's opening, that the reason the Defendants are here is they're saying they designed their own technology, their own standard; and, in fact, the Ericsson patents are not essential to and do not cover the 802.11 standards?

A. Yes, I have doubts regarding that.

Q. Okay. Well, we'll let the defense witnesses explain that, okay?

A. Okay.

Q. But let's take a look at your testimony about

Page 77

this letter. And I want to be very clear.

So you were asked: And now -- they're talking about this letter from IEEE that we were just looking at. And now the IEEE --

MR. AROVAS: Make it even a little bigger.

Q. (By Mr. Arovas) And now the IEEE is telling Ericsson: Gosh, we've come up with this new standard, and you have some essential patent claims. Will you give us another letter of assurance and let us tell everybody that you're willing to license those essential patents and RAND terms?

And you said yes, right?

A. Yes.

Q. So the fact is -- this is -- and this is your trial testimony from yesterday, right?

A. That is correct.

Q. Okay. The fact is, the IEEE wasn't saying anything of the sort; isn't that right?

A. They did not say that we have essential patent, that is correct.

Q. All right. So when you testified under oath yesterday that the IEEE in this letter was saying that Ericsson had essential patents, that is completely wrong, right?

Page 78

A. I would agree to that, yes.

Q. All right. So the IEEE wasn't saying anything of the sort. What the IEEE was saying: You say you have some essential patents; we're not going to analyze the issue to figure it out. Right?

A. Correct.

Q. Okay. And, in fact, the very first time that we're going to have an opportunity in a court to figure out the answer to that question about whether these patents are essential or not, is right here in this trial, right?

A. Yes.

Q. Okay. Let me ask you just a few more questions about patents while we're on that topic.

You would agree with me that one of the ways to figure out who has the essential patents in a particular standard is who has been active in making contributions to that standard, right?

A. Sometimes, yes.

Q. Okay. And that's actually something that you explained in your deposition, that that's one of the ways to figure out who may have essential patents, right?

A. In some standardization activities, that would be true, yes.

Page 79

Q. Right. And, in fact, in the 802.11 standards themselves, there have been over 35,000 technical contributions to make up those standards, right?

A. I don't know.

Q. And there's been over 2,000 technical contributions to 802.11n, right?

A. I don't know that either.

Q. Okay. And it's a fact, isn't it, that the chip makers are the major contributors of technology to the 802.11 standard, right?

A. I wouldn't be able to answer that question either. I'm sorry.

Q. Well, you would certainly know that the chip makers are Broadcom, Qualcomm, Intel, companies like that, right?

A. Yes. I know they participate.

Q. Okay. And certainly the people who are familiar with the IEEE can tell us much better than you can who was making the technical contributions that made up the standards that we care about in this case, right?

A. I would agree to that, yes.

Q. Okay. But you will agree with me that you do know that component suppliers like the chip makers have essential patents, right, to the 802.11 standards, right?

Page 80

20 (Pages 77 to 80)

**A1300**

A. Could you repeat the question?

Q. You would agree with me, wouldn't you, that component suppliers are holders of essential patents in the wireless LAN space, right?

A. I wouldn't know that for sure as I haven't been part of investigating that or analyzing that or neither has my company.

MR. AROVAS: Actually, let's play Clip LB 4, if we could.

Q. (By Mr. Arovas) And I'm going to just play for you a question and answer that you were asked in your deposition under oath, right?

(Video clip playing.)

QUESTION: Are any component suppliers major holders of patents in the wireless LAN space?

ANSWER: I do believe that there are companies in the component space who have essential patents, yes.

(End of video clip.)

Q. (By Mr. Arovas) Okay. And it's a fact -- that that was your testimony, right?

A. Yes.

Q. Under oath, right?

A. Yes.

Q. Okay. And it's a fact, isn't it, that Intel

Page 81

is one of the companies that's been quite active in the 802.11 standardization; is that right?

A. That's my understanding, yes.

Q. And you believe that Intel actually has a position -- is in a position to have a large number of essential patents to the 802.11 standards, right?

A. I believe, but I don't know.

Q. Okay. And, of course, this isn't just a discussion that we're having here; this issue of who has the essential patents in the wireless LAN space is something that's been discussed internally at Ericsson, right?

A. Yes.

Q. Right?

A. Yes.

Q. In fact, if we look at Defendants' Exhibit 81 -- and I'll put it on the screen and make it smaller again, so we can see what document we're talking about.

You should have it in your binder, Mr. Brismark.

A. Yes, I have.

Q. Okay. You see Defendants' Exhibit 81. And that's an Ericsson internal document that was produced for the first time in this case, right?

Page 82

A. Yes.

Q. Okay. And if we look inside that document to try to figure out what was discussed, we'll see a page called: Situation analysis: Exposure. Right?

A. Yes.

Q. And this is actually a page where Ericsson's talking about, well, hey, wait a second; we may be worried about other people's essential patents, right?

A. It discusses to which extent Ericsson's sales of wireless LAN products is exposed to different companies' products, yes.

Q. Well, right. And that's because, when Ericsson decided it wanted to get back in the Wi-Fi business, it actually bought a company called BelAir to get the products and expertise to enter -- or re-enter Wi-Fi, right?

A. That's correct.

Q. Okay. And what we can see here, if we look at what Ericsson said in its internal documents, actually, the wireless LAN patents are mainly held by chipset suppliers. That's what it says, right?

A. Yes, that's what it says.

Q. Thank you.

MR. AROVAS: No further questions.

MR. CAWLEY: Redirect, Your Honor?

Page 83

THE COURT: Yes, you may.

REDIRECT EXAMINATION

BY MR. CAWLEY:

Q. Mr. Brismark, I just want to ask you a few questions to clarify some of the things you've just been asked about.

Why haven't you personally spent time reading the 802.11 standard?

A. I haven't done it personally because of the fact that we have -- well, I have an organization of portfolio managers and technical experts, and the analysis has been done by the experts and the teams that I -- which I manage.

Q. All right. So are there people on your team that you're responsible for managing who divide up responsibility for various standards that they are going to become familiar with?

A. Yes, that's the situation we're in.

Q. And if you need to know what's in those standards, can you talk to basically an expert in-house whose job it is to know about those standards?

A. Yes.

Q. And in addition to the standards that we already talked about on your direct examination, do you remember when Intel's lawyers just rattled off -- I

Page 84

21 (Pages 81 to 84)

**A1301**

Q.   Not a contribution for 802.11n as in November?

A.   Correct.

Q.   What was the date of this document, this submission, this contribution that was rejected?

A.   The date of the contribution was May 8th in the year of 2000.

Q.   2000.

What is your understanding of when IEEE first began working on 802.11n?

A.   They started working on "n," in my understanding, three to four years after this contribution.

Q.   Three to four years after --

A.   Yes.

Q.   -- this contribution was rejected?

A.   Yes.

Q.   Okay.  Let's look at, quickly, Defendants' Exhibit 85.  This is a document -- or something you prepared, wrote for a presentation within Ericsson?

A.   Yes.

Q.   And on Page 11, let's remember, that you stated at the bottom there that:  Many of the patents and patent applications declared to be essential to a standard are not essential.

A.   Yes.

Page 89

Q.   When you wrote that, were you referring to the industry practice as a whole or to Ericsson in particular?

A.   I was referring to the industry's practice as a whole.  And in particular, some companies, we believe, have different practices.

Q.   Okay.  Other companies that you believe have taken advantage of the standard-setting process, or at least been careless?

A.   Yes.

Q.   Okay.  Finally, let's turn to Plaintiffs' Exhibit 294.

A.   249?

Q.   294.

A.   Plaintiffs'.  Okay.

Q.   You were asked some questions about this both on your direct and cross-examination.  Tell us what this document is again.

A.   This document is a letter of assurance from Ericsson to the IEEE where we commit to license our essential patents to 802.11n under RAND conditions.

Q.   And did this assurance -- this is the second letter of assurance, right?  There was one originally in 2003?

A.   Yes.

Page 90

Q.   And this is the letter of assurance that Ericsson gave in response to the request that we saw from the IEEE saying:  It's come to our attention that you may have standard essential patent claims?

A.   Correct.

Q.   Was this letter of assurance limited to certain patents?

A.   No.

Q.   It didn't identify any specific patents at all, did it?

A.   No, it did not.

Q.   What was the nature of the assurance in this letter?

A.   The nature of this assurance is that Ericsson is willing to license any patent we may own now or in the future which is essential to the 802.11n standard.

Q.   Thank you, Mr. Brismark.

MR. CAWLEY:  I'll pass the witness, Your Honor.

THE COURT:  All right.  Any recross?

MR. AROVAS:  Yes.  Just very, very briefly, Your Honor.

THE COURT:  All right.

RECROSS-EXAMINATION

BY MR. AROVAS:

Page 91

Q.   Let's go back very quickly -- let me get the camera up -- to this document.

A.   Yes.

Q.   Okay.  The Ericsson contribution to 802.11.

Now, this case, we're talking about --

A.   Excuse me.  Could you help me with the exhibit number?

Q.   Oh, Exhibit 58.  It's the one that you just discussed with Mr. Cawley a few seconds ago?

A.   Yes, I know.  I just didn't remember the reference number.

Q.   Okay.

A.   I'm sorry.

Q.   And it's a fact that in this case, Ericsson's accusing two features QoS and block acknowledgment in the 802.11 standards, right?

A.   Those are important features which our patents relate to, yes.

Q.   That's -- that's -- that's what Ericsson is accusing in this case.  Those are the two specific technologies we're going to talk about in this case, right?

A.   That may be the case.

Q.   You understand that, right?

A.   I understand that our patents are related to

Page 92

23 (Pages 89 to 92)

**A1303**

those features, yes.

Q. Okay. Okay. And so it's a fact, isn't it, that the technology, okay, for 802.11n, for those two features comes out of 802.11e, the very standard that Ericsson made a proposal to, right?

A. That's not clear to me.

Q. So you wouldn't know -- you wouldn't know one way or the other, right?

A. I don't know whether it was included -- what was included in 11e, no.

Q. Okay.

A. That's correct.

Q. But certainly we're going to have a lot of IEEE witnesses coming to this case, and they would know better than you, right?

A. I think they know better than me on this question, absolutely.

Q. Okay. But the fact is that what we do know is Ericsson was -- knew how to make proposals to the IEEE, right?

A. I apologize. Could you repeat the question?

Q. It's a fact Ericsson knew how to make proposals to the IEEE, right?

A. Yes, we did.

Q. Ericsson could have proposed whatever

Page 93

technology it wanted, right?

A. Yes, we could do that.

Q. Okay. And at the end of the day, for all of the IEEE standards -- they build one on top of another -- there isn't a single contribution, either directly or indirectly, that's used in 802.11n -- contribution from Ericsson that was accepted by the IEEE, right?

A. Correct.

Q. Thank you.

MR. AROVAS: No further questions.

THE COURT: Any further redirect?

MR. CAWLEY: No further questions, Your Honor.

THE COURT: All right. Thank you.

All right, Ladies and Gentleman of the Jury, if you would, pass down your witness sheet for the -- any questions you might have for the witness.

(Pause in proceedings.)

THE COURT: All right, Ladies and Gentleman. We're going to take our morning break at this time, and so I'm going to -- we're going to be in recess until five minutes till 11:00.

So enjoy your morning break. Please remember my instructions. Don't discuss this case among

Page 94

yourselves or with anyone else, and we'll see you back here at five till 11:00.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. Please be seated.

We had one question for the witness, which reads: At the time the IEEE received Ericsson's letter of assurance, did the IEEE double-check/verify that Ericsson actually had a valid claim, question mark?

And then that is X'd out, and then further it says: Answered in cross. Thank you.

So I think that question was answered, but I wanted to share it with the parties.

All right. We'll be in recess until five till.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right. We didn't have -- we had one question for that witness, but it was answered on cross-examination, the person said, so we don't have any further questions for the witness.

Page 95

Let me ask -- I failed to ask at the beginning of the day, does either side have any exhibits that they wish to offer for today that are unobjected to?

MS. MOORE: Yes, Your Honor, we do. However, we had a number of objections for a significant number of exhibits dropped this morning right before trial, so we'd like to put together a final list and give it to Your Honor perhaps right after lunch.

THE COURT: Okay. That will be fine.

MS. MOORE: Thank you.

THE COURT: All right. Thank you.

MR. DE VRIES: And good morning, Your Honor. We do have a list on behalf of the Defendants of preadmitted exhibits that have been agreed to.

THE COURT: All right. And what is that titled?

MR. DE VRIES: Defendants' List of Preadmitted Exhibits for June 4th, 2013.

THE COURT: All right. We'll mark that as Defendants' Exhibit List No. 2. Are there any objections to the exhibits contained on that list?

MS. MOORE: No, Your Honor.

THE COURT: All right. They're admitted.

All right. You may call your next

Page 96

24 (Pages 93 to 96)

**A1304**

ANSWER: No. Now it's optional, actually.

QUESTION: And when did you join Ericsson?

ANSWER: '89.

QUESTION: How did that happen?

ANSWER: I applied for a job as a hardware designer directly after the military service.

QUESTION: And what were you doing -- at Ericsson before the work that led to your patent?

ANSWER: I've been working with the ATM and building ATM switches for quite some years. And, also, I had worked with a similar system, which was NTT DOCOMO.

And so the combination of ATM as a background and experience of wireless made a good starting point.

QUESTION: And what work were you doing when you arrived at your invention?

ANSWER: Sorry.

QUESTION: What work were you doing when you arrived at your invention?

ANSWER: We were working with medium access control layer of this prototype of wireless ATM.

And Peter was the one that come up with

Page 101

the problem. I think he was listening to some multicast presentation of one of the institutes where he -- I think he thought that presentation was extremely boring, so his mind was wandering off to something else.

And then he come up with the problem that discarding -- or that discarding packets when we have ARQ might be a problem. And then we were starting to work on the solution for that.

QUESTION: And you mentioned Peter. At what point, did you meet Peter Larsson?

ANSWER: I met him just before we went down to Singapore. That was '9 -- probably -- probably the beginning of '97.

QUESTION: So the work on your patent was done in Singapore?

ANSWER: Yes, it was.

QUESTION: How did it -- how did it come to pass that you went to Singapore?

ANSWER: I think Ericsson had an interest to try to institute --

THE REPORTER: Try to institute...

ANSWER: -- institute a Singapore list of universities to see if they were good to cooperate with.

QUESTION: How was your experience in Singapore?

Page 102

ANSWER: Very good. It was a very nice stay there. It's warm, a bit humid, but very easy living, actually.

QUESTION: So you met Mr. Larsson when you went down to Singapore. And how long did it take for the two of you to come up with the invention?

ANSWER: You mean after we have understood the problem?

QUESTION: Yes.

ANSWER: I'm not really sure. But I guess it took a few months at least. So we spent a number of days, weeks even, I would say, in front of a whiteboard going back and forth with scenarios and alternatives and trying to understand how it should be -- behave, the mechanism, in order to make it bulletproof when it comes to fault situations and so on.

QUESTION: And could you summarize what it was that you two arrived at as the invention?

ANSWER: What we did was a mechanism that allows an ARQ mechanism to discard packets and still move on forward without having to retransmit everything in case it's outdated.

QUESTION: And at what point in your collaboration did you decide that you had something worth patenting?

Page 103

ANSWER: I think we understood that right away; that the problem as such is worth taking a patent on.

QUESTION: And what did you do to see that your solution would work?

ANSWER: How it worked?

QUESTION: Uh-huh.

ANSWER: We -- we went through it on the -- on the whiteboard. I think Peter even made an SDL diagram on the solution.

QUESTION: How?

ANSWER: An SDL. That's kind of a shot where you go through it in details, the step next to the actual code. Sometimes you even can compile an SDL diagram to code. So you actually -- you build it.

QUESTION: And was there anything unique about the way that you used ARQ discard as opposed to what had been done before?

ANSWER: Yes. Actually -- actually, the extra thing is that they can force the receiver to move on and change the window -- reception window and don't expect (sic) packets that have been discarded. That's what's new.

QUESTION: And you talked about reception windows and packets. And I was wondering if you could

Page 104

26 (Pages 101 to 104)

**A1306**

ANSWER: I see it.

QUESTION: And so you would agree that what's being talked about here is a command to receive a packet and a command to release expectations of receiving prior packets?

ANSWER: Yeah. For me, command is that their transmitter tells the other side that they can't accept anything else than the number that is in the packet.

QUESTION: You would agree that the command here is stated in two separate parts, right, the (a) and the (b) that we just read?

ANSWER: Yes.

QUESTION: So there's a command to receive one packet, and then there's a command to release expectation of receiving, prior to that one packet?

ANSWER: Yes.

QUESTION: Okay. And you -- you believe that that -- in addition to discarding packets of which acknowledgment has not been received and which have sequence numbers prior to at least one packet, that that constitutes the solution that you were talking about earlier?

ANSWER: Claim 1 is according to the

Page 109

solution that we talked about.

QUESTION: And so is the command to receive and release expectations a solution to that situation where the window is stuck because there's a packet that keeps needing to get retransmitted?

ANSWER: Yes.

QUESTION: So looking at Figure 2 again, if you had a system that was designed where you could receive a packet, let's say Sequence No. 7, beyond TSN Max and shift the window automatically with just a regular packet, you wouldn't need the command that you're talking about in Claim 1, correct?

ANSWER: Yes. If you had that, then you wouldn't need it.

QUESTION: Are you aware of any products that Ericsson sells today that embody or practice the '625 patent.

ANSWER: No.

QUESTION: Are you aware of any products sold in the past that embody or practice the '625 patent?

ANSWER: No.

QUESTION: You don't believe you invented BlockAck?

ANSWER: No.

Page 110

QUESTION: Do you know what BlockAck is?

ANSWER: Not really. But I know that I didn't patent it.

QUESTION: Do you have an understanding of what segmentation is?

ANSWER: Yes.

QUESTION: What is it?

ANSWER: You get longer masses and break it into smaller masses. Or smaller packets. That's the correct term.

QUESTION: Have you ever received any other kind of honor or recognition for your work as an inventor at Ericsson?

ANSWER: No.

QUESTION: Are you aware of any standards that embody or practice the '625 patent?

ANSWER: I don't know.

QUESTION: You're not aware of any?

ANSWER: I'm not aware. I haven't read it.

QUESTION: Have you heard of any praise for the '625 patent or the invention of the '625 patent outside of Ericsson?

ANSWER: I haven't heard any.

QUESTION: Okay. That's -- that's not my

Page 111

question. My question is, sitting here today, can you identify an Ericsson product that uses what you believe is the '625 invention?

ANSWER: No. I don't know any product that implemented that.

QUESTION: You testified that you can't point to a single product that you have ever used that embodies your invention, correct?

ANSWER: Yes. I don't know of any product using the patent.

QUESTION: And you've never read all of 802.11?

ANSWER: No.

QUESTION: So sitting here today, you are not qualified to provide any kind of testimony on what it discloses and how it relates to your patent, correct?

ANSWER: Correct.

(End of video clip for Defendants.)

THE COURT: All right.

MR. CAWLEY: Ladies and Gentleman, next you will see the video deposition of Alex Krister Raith. Mr. Raith is an engineer at Ericsson and a named inventor on the '568 patent.

Ericsson's designated 7 minutes and 29 seconds of testimony. Defendants have designated

Page 112

28 (Pages 109 to 112)

**A1308**

lot of information from these licensees. And that's kind of a sanity check that the rate we're discussing is -- is appropriate.

Q. Okay. So let me -- let me make sure that I kind of understand the process.

First of all, how do you even get in contact with another company who might need to take a license to Ericsson's patents?

A. We send them a letter, usually, pointing out that we have patented ideas in the area where they are conducting business. That's the way it starts. And then we would have meetings to follow up.

Q. Okay. And what -- what kind -- what are those meetings typically like at the beginning?

A. At the beginning, most of the times they start out by technical discussions where our technical people explain our patented ideas to the user. And usually the user explains his product. This can be a tough fight in between the two. When we have concluded that there is a use in the product, we discuss the potential royalty -- the potential payment or compensation to Ericsson that would be paid.

Q. Where do these meetings usually take place?

MR. DAUCHOT: Excuse me, Your Honor. Objection on 402 grounds and hearsay, as well. May we

Page 129

approach for side-bar?

THE COURT: All right.

(Bench conference.)

MR. DAUCHOT: Your Honor, on behalf of the Defendants, these discussions with other parties in the context of these negotiations is hearsay. These are out-of-court statements offered for the truth of the matter asserted, and so it's classic hearsay to which I don't see an exception. That's Point No. 1.

Point No. 2, for 402 grounds on I don't see what those discussions -- they are any relevance to what's going on in this case along the lines of what I discussed this morning with Your Honor, relative to HP in particular.

And No. 3, we are getting into 403, which is clearly unfair prejudice. Given Your Honor's rulings on Daubert or in limine -- I'm sorry, under Rule 408 -- I mean, this is unfairly prejudicial for those reasons.

MR. CAWLEY: Well, Your Honor, first of all, it's not hearsay. It's not being offered for the truth of what's asserted. It's being offered to the jury about what a licensing discussion is like. We haven't tied it to any particular Defendant or any party. She's just giving a general discussion of how licensing works.

Page 130

THE COURT: Okay. Keep it general -- general discussion.

(End of bench conference.)

Q. (By Mr. Cawley) Ms. Petersson, you were explaining to us how the licensing process typically works, and I think you just told us that typically it starts with technical meetings between Ericsson and the company that you're talking to?

A. Yes.

Q. Where do meetings like that typically take place?

A. Usually they take place at the office -- head office of the potential user. So it's us having to travel to their offices usually. It sometimes happens that they come to Stockholm, as well.

Q. Okay. And so do you -- do those kind of meetings take place all over the world?

A. They do, yes.

Q. And I think you told us that once there -- there have been some meetings on the technical terms, then there may be some additional meetings on the business terms?

A. Yes, that would -- after the conclusion that the user is actually using -- using our patented idea, it moves on into the -- what we call the business

Page 131

discussions where the potential compensation that is supposed to be paid to Ericsson are discussed.

Q. Okay. And then there -- there finally, I guess, would be maybe meetings or at least an exchange of -- of written documents?

A. Yes, there would be.

Q. Okay.

A. Not always, but most of the times, yes.

Q. And -- and those written documents are usually referred to as a license agreement?

A. Yes. The license agreement is always concluded in writing.

Q. Now, how long -- you've told us about quite a few discussions that might take place, quite a few meetings that might take place to negotiate a license agreement.

How long does that usually take?

A. It might go very quickly. Sometimes it can take years.

Q. Years?

A. I would say approximately around a year is the -- the -- perhaps the average.

Q. Okay. How many license -- excuse me, patent license agreements does Ericsson have?

A. We have today around 100 license agreements.

Page 132

33 (Pages 129 to 132)

A1313

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                                          DOCKET NO. 6:10cv473
     -vs-                          )
                                          Tyler, Texas
                                   )
D-LINK CORPORATION, ET AL        June 4, 2013

SEALED PORTION NO. 1 FROM TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:      MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Courtroom sealed.)

(This portion of the proceedings is
SEALED and filed under separate cover.)

THE COURT:  All right.  Please let me
know when we can unseal the courtroom.

MR. CAWLEY:  Thank you, Your Honor.  I
will.

May I proceed?

Page 3

1 (Pages 1 to 4)

**A1316**

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**



**A1319**

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



**A1320**

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



**A1321**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL )
DOCKET NO. 6:10cv473
-vs- )
Tyler, Texas
) 12:53 p.m.
D-LINK CORPORATION, ET AL June 4, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas 75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas 78701

COURT REPORTERS: MS. JUDITH WERLINGER
MS. SHEA SLOAN
shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California 90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California 94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas 75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER: All rise.

THE COURT: All right. You may bring the jury in.

(Jury in.)

THE COURT: Please be seated.

All right, Mr. Cawley.

MR. CAWLEY: Thank you, Your Honor.

CHRISTINA PETERSSON, PLAINTIFFS' WITNESS,
PREVIOUSLY SWORN

DIRECT EXAMINATION (CONTINUED)

BY MR. CAWLEY:

Q. Ms. Petersson, before the lunch break, you had just told us about a number of license agreements that Ericsson entered into for its Wi-Fi patents.

Were the licenses that you just told us about, for companies that sold end products to users?

A. Yes, they were. They were what we called ready-to-use devices, which is a device that can actually be used by a consumer directly when it's sold.

Q. And were the amounts that these companies paid as royalties based, at least in part, on the prices of the products that they sold to the end users?

A. Yes, that's correct.

Page 3

Q. Were any of the companies that you told us about chip makers?

A. No, they were not.

Q. Has Ericsson licensed any chip makers to its Wi-Fi patents?

A. No. It has happened that we have -- we have license agreement from the '90s, one agreement from the beginning of 2000, as well.

Q. Okay.

A. But they would usually cover our entire portfolio, so it wouldn't be Wi-Fi specific, no.

Q. Okay. Since 2003, when -- when you told us you -- Ericsson began this licensing effort, has it licensed any chip makers to its Wi-Fi patents?

A. No, we have not.

Q. Why not?

A. Because if you license the chipset manufacturer, you cannot use the same patent against its customers. So you can only license once in the value chain, is the way we call it.

Q. Uh-huh.

A. So you have to elect to either license on the chipset level --

Q. Uh-huh.

A. -- or you license on the ready-to-use device

Page 4

1 (Pages 1 to 4)

**A1323**

level. And the reason why we do it on the ready-to-use device product is that that's where you actually see the use of the technology.

Q. So is -- in your experience is a computer chip that we saw yesterday very useful to most consumers?

A. No, at least not to me.

Q. Okay. Now, let's make sure this -- this is an important concept, so I want to make sure we understand.

If, in this case, Ericsson were to have licensed Intel that makes Wi-Fi chips, could Ericsson also ask for a license from Intel's customers who buy Intel chips and put it into their products?

A. No, we could not. Provided that our invention is used by the chipset, we say that the rights are exhausted when the chips are sold. So that you can no longer sign a cross-license in between us and the chipset manufacturers' customer which is in standard environments the -- the usual proceeding is that you sign cross-licenses that covers both companies' patent portfolios.

Q. Okay. Thank you.

And let's reduce this down to dollars and cents -- mostly from Intel's perspective, cents, I think, because I have a feeling that later on in this trial we're going to hear someone hired by Intel say

Page 5

that the reasonable royalty for the chip should be 1 or 2 cents?

A. Yes.

Q. Okay. Now, if that happened, if Ericsson entered into an agreement with Intel to license them to use Ericsson's Wi-Fi patents for 1 cent -- 1 penny, how much would Ericsson be able to recover from the other Defendants that buy Intel's chip and put it in their products?

A. The -- the most likely answer is zero.

Q. Zero?

A. Yes.

Q. Okay. And why has Ericsson decided that it would rather license the end users than the chip makers?

A. First -- first of all, it's because we enter into cross-licenses. We are ourselves a maker of ready-to-use products, so we enter into cross-license agreements with those type of -- of companies. And also, because we feel that we are entitled to the value of the technology, and the value of the technology you see in the end product.

Q. Okay. Thank you, ma'am.

Now, let's talk a little bit more about Ericsson's relationship with the Defendants in this case.

Page 6

Did Ericsson contact each of the Defendants in this case about taking a license to Ericsson's Wi-Fi patents?

A. Yes, we did.

MR. CAWLEY: Now, Your Honor, at this time, I must ask the Court's permission to read a boring document into the record that has been agreed to.

THE COURT: All right. You may proceed.

MR. CAWLEY: Thank you, Your Honor.

This is a stipulation regarding notice dates, and it's about two pages long.

Plaintiffs Ericsson, Inc. -- and, Your Honor, could -- could I explain to the jury, or ask the Court, what a stipulation is?

THE COURT: Yes. Ladies and Gentleman of the Jury, a stipulation is an agreement entered into between the parties as to what certain facts in the case are.

So these facts are not going to be disputed facts. The parties have gotten together and agreed to these facts, and it saves time with proof and that type of thing. And you'll be bound by their stipulation.

MR. CAWLEY: Thank you, Your Honor.
Plaintiffs Ericsson, Inc. and

Page 7

Telefonaktiebolaget LM Ericsson, collectively the Plaintiffs, and Defendants, D-Link Systems, Inc.; NETGEAR, Inc.; Acer, Inc.; Acer America Corporation; Gateway, Inc.; Dell, Inc.; Toshiba Corporation; Toshiba America Information Services, Inc.; and Belkin International; and Intervenor, Intel Corporation, collectively the Defendants, hereby stipulate to the following facts:

1. The following patents are at issue in this suit. United States Patent No. 6,330,435, the '435 patent; United States Patent No. 6,424,625, the '625 patent; United States Patent 6,466,568, the '568 patent; United States Patent No. 6,519,223, the '223 patent; and the United States Patent No. 6,772,215, the '215 patent. These patents are collectively known as the patents-in-suit.

Ericsson has asserted that each of the Defendants infringe the '568, '625, '435, and '215 patents, and that Intel and those Defendants using Intel-supplied chipsets, infringe the '223 patent. Defendants deny that they infringe any valid claim of the patents-in-suit.

On March 22nd, 2004, Ericsson identified the '435 patent and '625 patent to D-Link's parent company as relevant to earlier versions of the 802.11

Page 8

2 (Pages 5 to 8)

**A1324**

CASE PARTICIPANTS ONLY

standards. At that time Ericsson did not make the infringement allegations that it makes in this case.

Ericsson informed D-Link of its infringement allegations in this case for all of the patents-in-suit on September 14th, 2010.

Ericsson and D-Link discussed Ericsson's claims, but they could not reach an agreement.

On September 21st, 2004, Ericsson identified the '435 patent, the '625 patent, and the '568 patent to NETGEAR as relevant to earlier versions of the 802.11 standards. At that time Ericsson did not make the infringement allegations that it makes in this case. Ericsson informed NETGEAR of its infringement allegations in this case for all of the patents-in-suit on October 2, 2008.

Ericsson and NETGEAR discussed Ericsson's claims, but they could not reach an agreement.

On November 13th, 2009, Ericsson informed Acer and Gateway of its infringement allegations for all of the patents-in-suit.

Ericsson and Acer and Gateway discussed Ericsson's claims, but they could not reach an agreement.

On March 21, 2010, Ericsson informed Dell of its infringement allegations for all of the

Page 9

patents-in-suit.

Ericsson and Dell discussed Ericsson's claims, but they could not reach an agreement.

On December 13, 2010, Ericsson informed Belkin of its infringement allegations for all of the patents-in-suit.

Ericsson and Belkin discussed Ericsson's claims, but they could not reach an agreement.

On November 11, 2009, Ericsson provided Plaintiffs' Exhibit 71 to Toshiba during a meeting. Ericsson contends that it provided notice of its infringement allegations on that date. Toshiba contends that Plaintiffs' Exhibit 71 did not provide Toshiba notice of infringement of the patents-in-suit because it did not communicate to Toshiba a specific charge of infringement of the patents-in-suit by the accused products.

Instead, Toshiba contends that it received notice of Ericsson's infringement allegations on May 21, 2010.

Q. (By Mr. Cawley) Now, Ms. Petersson, what is Ericsson asking for in this case?

A. We are asking for fair compensation from the companies making these ready-to-use devices.

Q. And what's your view and Ericsson's view of a

Page 10

fair rate for that compensation?

A. That would be 50 cents per unit in relation to phones. For instance, it would be half a percent capped at 50 cents, and with a floor at 25 cents.

Q. Okay. Let -- let me make sure that I understand all that.

Let's start with the last thing you said. There's a rate of one-half of 1 percent; is that correct?

A. Yes.

Q. And this is the price of the end product, things that are sold to consumers?

A. Yes.

Q. One-half of one percent. But there's a maximum of 50 cents?

A. Yes, there is.

Q. And also a minimum?

A. Yes, of 25 cents.

Q. 25 cents minimum?

A. Yes.

Q. Okay. And that applies to some things you told us like handsets or other things?

A. Yes, it does.

Q. Effectively under that formula, what is the rate for laptop computers?

Page 11

A. The rate for laptop computer would be 50 cents.

Q. And why is that?

A. Because the laptop is so high-priced that the half percent would -- would hit the cap of the 50 cents.

Q. Would always be up to the cap of 50 cents?

A. Yes, it would.

Q. What's the rate for routers?

A. The rate for routers is 50 cents.

Q. Also 50 cents. Why is that?

A. In comparison to the laptop, which has a number of uses, we have concluded that since the router only has the use for Wi-Fi, they should be paying the higher rate, the 50 cents.

Q. Okay. So the -- you're telling us the laptop can be used for writing letters and watching movies and a whole host of things besides Wi-Fi?

A. Yes.

Q. And that's why 50 cents is a relatively small price of a thousand-dollar laptop, for example?

A. Yes.

Q. The router, on the other hand, might cost $50?

A. Yes.

Q. But you're saying that there's -- that the rate -- Ericsson's rate that it asks for -- for routers

Page 12

3 (Pages 9 to 12)

A1325

is still 50 cents because basically Wi-Fi is all that the router does?

A. Yeah, that's correct.

Q. Okay. Now, are these rates that you've just described to us, part of Ericsson's RAND commitment?

A. They are, yes.

Q. Does Ericsson believe that they're reasonable?

A. We do believe they're reasonable, yes.

Q. And does Ericsson at least try hard to enter into licenses that are non-discriminatory, no special deals?

A. Yes, that's correct.

Q. Now, you'd agree with me, wouldn't you, that these -- some of these license agreements are pretty complicated?

A. They are, yes.

Q. And there's a number of parts to them, as we've heard. There's the Wi-Fi license, but there also may be licenses to other technology that's not Wi-Fi.

A. Correct.

Q. And sometimes Ericsson gets a cross-license, right?

A. Yes.

Q. It -- it gets a license back from the company that it's negotiating with?

Page 13

A. Yes.

Q. We've even seen some instances where Ericsson bought some patents in connection with the agreement?

A. Yes.

Q. So is it -- is it sometimes difficult either to make sure or even to figure out if the agreement that you finally negotiate is exactly 50 cents?

A. Yes, that's correct.

Q. So --

A. That would be hard, yes.

Q. So since -- since Ericsson has -- has made this commitment that it will be -- it will not discriminate, it will not give special deals, and even -- even though that's hard to accomplish, how does Ericsson try to accomplish it?

A. We try to do that by -- by making it our -- our own internal analysis, of course, to see what in the end the -- the user will pay.

However, we also have to acknowledge that FRAND or RAND is a range. It will never be an exact figure, because this is subject to discussions between us and the licensee, and many times the licensees have particular requests on how to structure the -- the royalty clause, and we consider whether that -- we still find that this is within the same ballpark range.

Page 14

Q. Okay. And Ericsson is -- is willing to negotiate with the parties to try and find an agreement that works for everybody?

A. Yes, we are.

Q. But let's suppose someone comes to Ericsson and says, well, we want a license to your Wi-Fi patents, but we want a special deal. We're big, we're a powerful company, whatever reason, we want a special deal, what does Ericsson do about that?

A. Then we would have concern around our commitment, because part of RAND is to act non-discriminatory. And since we have already entered into agreements with many companies, it -- that would risk them being discriminated, because they would have a different position on the market since they would be paying a higher fee.

Q. Right. And so Ericsson is committed it won't do that?

A. Yes.

Q. All right. Now, finally, let me ask you just a couple of questions about Intel.

Has -- before this lawsuit began, did -- was Intel one of the companies that Ericsson contacted about taking a license to Wi-Fi?

A. No, it was not.

Page 15

Q. Why not?

A. Because Intel is a component manufacturer, and we started discussing with Intel's customer.

Q. With the customers?

A. Yes.

Q. With -- with the end users? And let's be sure. The customers don't -- don't just buy chips -- Wi-Fi chips from Intel, they buy it from many other companies, as well; is that fair?

A. Yes, that's fair. So the customer would be the laptop manufacturer.

Q. Okay. Now, when Ericsson decided, for the reasons that Mr. Brismark told us about earlier this morning, that it had to file this suit, did it sue Intel?

A. No, we did not.

Q. Why not?

A. Because, again, we were not trying to collect any fee from Intel, but we were aiming at or trying to discuss with its customer.

Q. Okay. Thank you, Ms. Petersson.

MR. CAWLEY: Your Honor, I'll pass the witness.

THE COURT: Thank you.

Cross-examination.

Page 16

4 (Pages 13 to 16)

**A1326**

CASE PARTICIPANTS ONLY

on the bottom part of it. One, here.

MR. DAUCHOT: And actually let's go to Page 2, David. We've covered the other language. I'll get right to the -- all right.

Q. (By Mr. Dauchot) Now, it states here the submitter, and that's Ericsson, correct?

A. Yes, that's correct.

Q. Will grant a license under reasonable rates to an unrestricted number of applicants --

A. Correct.

Q. -- on a worldwide basis with reasonable terms and conditions that are demonstrably free of unfair discrimination?

A. Yes.

Q. Do you see that?

A. Yes, I do.

Q. All right. Now, that doesn't say that the submitter will grant a license under unreasonable rates to an unrestricted number of applicants, except for chipset makers, does it?

A. No. It doesn't say that, no --

Q. All right.

A. -- explicitly.

Q. Now -- well, did the -- does that language appear in here, ma'am?

Page 25

A. No.

Q. It does not? Now, it's Ericsson's position today that 50 cents per unit per laptop is a -- is a reasonable rate to pay, correct?

A. Yes, that's correct.

Q. And as your -- and as Ericsson's counsel mentioned, that will be subject of expert testimony on the part of Mr. Bone --

A. Yes.

Q. -- correct?

Now, you understand that when Mr. Bone calculated the RAND rate, that his calculation came out exactly to what Ericsson figured out internally back in -- I think as early as, what, 2009, correct? The 50-cent rate?

A. Yes, I think -- I believe that's correct. I haven't seen that report, though, so...

Q. You referred to it -- that's what your expert's --

A. Yes.

Q. -- going to be testifying to?

A. Yes.

Q. Fair point.

All right. Now, in arriving at the 50-cent rate, do you understand that Mr. Bone assumed that the

Page 26

negotiation for the 50-cent rate, the chipset maker would not be in the negotiation room. Do you understand that?

A. Yes, I understand that.

Q. All right. And, in fact, that's because Ericsson, as I think you alluded to earlier, had a policy of licensing the OE -- licensing at the OEM level, licensing at the customer level, but not at the Intel level, correct?

A. Yes. The customer being the ready-to-use device -- again, the laptop manufacturer.

Q. Correct. And that's even though Ericsson signed a letter of assurance along the lines of what the Members of the Jury are looking at, right --

A. Yes.

Q. -- an unrestricted number of applicants?

A. That's correct.

Q. All right. Now, in fact, Ericsson has internally recommended against licensing chip makers because that would jeopardize its licensing program. Do you understand that?

A. I understand that it has multiple reasons, but that is one of the reasons.

Q. All right. Now, it wasn't always the case that Ericsson had a policy against licensing chipset

Page 27

makers; am I right about that?

A. That's hard for me to respond to because I -- I know that we have entered into a very few number of licenses for chipsets, so I don't think you can say that it was ever our policy to license on the chipset level.

Q. Well, you're not doing that today, correct?

A. Correct.

Q. All right. But there was a time when you did, correct?

A. There was a time when we entered into a couple of agreements.

Q. That's right. And let's go back to that time. That was back in 2002, correct?

A. That was -- was back in 2002, yes.

Q. And back --

A. We entered into one agreement.

Q. Correct. And that agreement was with a company called Infineon, correct?

A. Yes. Originally it was with one of our subsidiaries because we sold off our own component business. In those days, Ericsson sold components themselves, and we sold that business to the company called Infineon.

Q. All right. So the -- the rate went to Infineon, correct?

Page 28

7 (Pages 25 to 28)

**A1329**

All right?

A. Yes.

Q. Now, to suggest a target royalty on the chips was 2 percent of sales revenue. Do you see that?

A. Yes.

Q. All right. So if we take that on a per unit basis, what's the -- the average price of today's chipsets, roughly 2.50 -- $2.50?

A. If you say so.

Q. All right. And 2 percent of that is, what, 5 cents?

A. If you say so.

Q. All right.

A. I would need a calculator, I think.

Q. You could -- I think you could take my word for it on that math. Anyway, that was the mind-set back in 2004. But as you understand, the price of a chipset since back then has dropped dramatically, correct?

A. That's my understanding, yes.

Q. All right. So chipsets have -- over the course of time, the prices on a chipset have fallen, fallen, fallen?

A. Yes, they have.

Q. All right. So that if you stuck with your policy back then of licensing the chipset maker and you

Page 33

stuck to that today, you'd be making a lot less money than you may have been making back in 2002 and 2004; am I correct?

A. If this was our policy, yes.

Q. All right. So -- and back then you also had the letters of assurance where you promised to unrestricted members in the industry, including chipset makers, to license your patents on a RAND basis, correct?

A. Correct.

Q. All right. Now, let's look at Exhibit 104 -- DX 104.

MR. DAUCHOT: Now, could we turn to Page 10, please, David?

When I refer to David, I'm speaking to my colleague here, David. He's -- he's always with me helping here with the exhibits. Okay. We have it up there.

Q. (By Mr. Dauchot) And let's take a step back.

MR. DAUCHOT: David, can you go back to Page 8 for me? Thanks.

Q. (By Mr. Dauchot) All right. So part of this presentation is called Licensing the Value-Chain, right?

A. Yes.

Q. All right. And then the next page, what we

Page 34

see at the top of the value-chain, if you will, is the chip. Do you see that?

A. Yes, I see that.

Q. All right. And at the bottom of it we have the OEM, right?

A. Yes, correct.

Q. And OEMs mean that the NETGEARs, the Dells, and -- and the D-Links and other Defendants like that in this case, correct?

A. Yes, that's correct. I see you have HP and Dell in there as examples.

Q. The chip is Intel?

A. Yes.

Q. And companies like Broadcom?

A. Yes.

Q. And companies like Qualcomm?

A. Yes.

Q. All right. Now, if we flip to the next page, what Ericsson's concluded as part of its licensing strategy and its policy not to license the chipset makers is that if you license the chipset makers, you stand to make a little dollar?

A. Yes.

Q. And if you license the OEMs, the Dells, the NETGEARs, the D-Links, and the like, we're talking

Page 35

bigger dollars, correct?

A. Correct.

Q. Now, did the letter of assurance that Ericsson signed twice, in 2003, I believe, and then again in 2010, state -- or 11 --

MR. DAUCHOT: Thanks, Justin.

Q. (By Mr. Dauchot) -- 2011, state that Ericsson need only license an unrestricted number of industry members if -- if it suits them from a -- from a dollar standpoint, that -- that they have the authority just to target the -- the parties out there where they stand to make the bigger dollars? Does that say that in that letter of assurance, yes or no, ma'am?

A. It says that we will license fully compliant products.

Q. And it states that you will license to unrestricted?

A. Numbers to fully compliant products, yes.

Q. All right. Now, you won't deny, will you, Ms. Petersson, that your patenting group adopted this strategy to maximize profits -- namely, the strategy of not going to chipset makers for a license; am I correct?

A. Yes, you're correct. You can see on the slide at the bottom, it says license to OEM. It has two reasons. No. 2, which is our main reason, to secure

Page 36

9 (Pages 33 to 36)

A1331

cross-license for Ericsson products. That would be the cross-license for our own products. And, 2, of course, to maximize our return on investment in these ideas.

MR. DAUCHOT: And can we go back to DX 537, please, David? And can we go to Page 22? And can we blow up the --

Q. (By Mr. Dauchot) Again, the issue is where to license. Do you go to Intel, the folks who actually make the chipsets on which the 802.11 technology sits, or do you go to the customers, right?

A. Yes.

Q. That's the question.

And then at the bottom of the page --

MR. DAUCHOT: Can you blow that up for me, David? Thank you.

Q. (By Mr. Dauchot) It says: One big advantage -- and that's the last line -- one big advantage with this strategy is also that it is likely that the royalty income will be higher since we calculate the royalty on a more expensive product.

A. Correct, that's what it says there.

Q. And I believe -- I think your counsel referred to a thousand-dollar laptop, right?

A. Yes, correct.

Q. And we can all agree that a thousand-dollar

Page 37

laptop is more expensive than a two-and-a-half-dollar chip?

A. That we can agree.

Q. And when we look at the 50-cent royalty that Ericsson is trying to impose on the cost of Wi-Fi technology, it's fair to say that the 50 cents looks a whole lot better in the context of the thousand-dollar laptop than it does in the context of the two-and-a-half-dollar chip. Can we say that?

A. I -- I don't want to judge on that necessarily.

Q. Okay. Now, you referred the members of the jury to this concept of patent exhaustion.

A. Yes --

Q. Right?

A. -- I did.

Q. Okay. And as you mentioned, the patent exhaustion concept is if you -- if you -- once you license the chipset makers, those licenses extend down to the customers. The customers get the benefit of those licenses, right?

A. Yes, correct.

Q. Okay. Now -- so that if -- if you make a deal with Intel or a Broadcom or a Qualcomm or anybody who makes a chipset and you have them in that negotiation

Page 38

room, that deal is going to mean that it goes downstream to the customers, as well, correct?

A. Yes. For the inventions being implemented into that chip, yes.

Q. All right. Now, when Ericsson does that, from Ericsson's perspective, it loses, right?

A. It loses from two perspectives.

Q. Could you answer my question? It loses, correct?

A. Correct.

MR. DAUCHOT: All right. Now, can we put up Exhibit 104, please? I'm sorry, David. I meant Exhibit 104. Yep, there you go. And can you go to Page 14 for me? All right.

Q. (By Mr. Dauchot) So let's take --

MR. DAUCHOT: Again, go back one page, David. There you go.

Q. (By Mr. Dauchot) So this is a part of the presentation that deals with patent exhaustion, right?

A. Right.

Q. And if we go to the next page at Page 14. All right. You see that? As an infrastructure player, Ericsson loses if licensing on the chip level. Do you see that?

A. Yes.

Page 39

Q. All right.

A. That is the cross-license that we are concerned about in relation to our own products.

MR. DAUCHOT: Well, can we go back to Exhibit 537, please, David? Can we go back to Exhibit 537, David? Thanks. And Page 22. The bottom of the page, can we blow up that sentence beginning with "one big advantage"?

Q. (By Mr. Dauchot) All right. You're not denying that, are you, Ms. Petersson?

A. No. I'm saying that there are two reasons. You were showing me one reason here, and you just showed me the other reason.

Q. All right. But you're not denying that one big advantage, from Ericsson's perspective, is that if its chipset maker stays out of the negotiation room policy will make it likely that the royalty will be higher since you're dealing with folks who make a more expensive product? You're not denying that, are you?

A. No, correct. Because it's the -- the product that can be used that we see the value of our technology.

Q. Okay. And the LOA, Ms. Petersson, again, the promise that you made to the industry doesn't state, does it, that you're only required to license folks if

Page 40

10 (Pages 37 to 40)

A1332

they make the very expensive product; am I right?

A. It doesn't say when they make the very expensive products, but it states that we make the obligation to license fully compliant products.

Q. Okay. And you're not taking the position that the chipset at issue here, that the 802.11 standard -- that the chipset that's being accused in this case as being part of what's in the -- the OEM products is not compliant with 802.11, are you?

A. It is compliant.

Q. All right. So just -- we're clear?

A. Yes, it is compliant.

Q. It is compliant?

A. It cannot be used, though --

Q. But it is fully --

A. -- in the context of being a consumer.

Q. But it is fully compliant, correct, ma'am?

A. It is compliant.

Q. All right.

A. It is maybe not fully complaint.

Q. Now, let's --

A. Fully compliant for me is when a product can actually be used.

Q. Okay. For you?

A. Yes.

Page 41

Q. Personally?

A. No. That's -- that's our commitment, that we have to license fully compliant products. And fully compliant products are products that can actually be used by the consumer.

Q. And the Intel chipset is fully compliant with the 802.11 standard, correct?

A. Not correct.

Q. So you're taking the position that the Intel chipset that is in the products being sold here by the Defendants does not comply with 802.11n?

A. It complies.

Q. Okay.

A. It is not fully compliant.

Q. All right. Let's look at the aggregation issue. You understand that from a standard essential patent perspective, Ericsson has the responsibility to consumers and the industry to not block the 802.11 standard, correct?

A. Correct.

Q. All right. Now, part of that responsibility means that the rate you actually impose on the 802.11 technology has to be such that it considers all of the other patents associated with that technology, correct?

A. The way we phrase it is that we believe that a

Page 42

patent holder who has a FRAND or RAND commitment has to take into consideration when it sets its rate that there are also other patent holders in the same area.

Q. All right. Now, there are, in fact, other patent holders in this same area, correct?

A. That's my understanding, yes.

Q. And from -- Ericsson -- Ericsson understands that most of the 802.11-related patents are going to be with the chipset makers. Ericsson knows that, correct?

A. That is not known to me, I'm afraid.

Q. To you personally?

A. I -- yes.

Q. Okay.

A. It's not known to me.

Q. All right. You're not denying that WLAN patents are mainly held by chipset suppliers, are you?

A. I don't know.

Q. You don't know?

A. No.

Q. Okay.

MR. DAUCHOT: Can you put up DX 81 at Page 6, please?

Q. (By Mr. Dauchot) And you see the third bullet point?

A. Yes, I do.

Page 43

Q. All right. You don't have an opinion about that, one way or the other?

A. No. I'm afraid not. I don't.

Q. All right. And that's an Ericsson document, correct?

A. Yes.

Q. All right. Now, in trying to figure out whether or not your 50-cent rate complies with this aggregation concept, Ericsson did take into account the other parties out there in the market who might have patents, correct?

A. Correct.

Q. And part of that policy, again, was before you set the 50-cent rate, you want to make sure you take into account others out there who might have licenses to this technology.

A. That's our belief, yes, that you need to do that.

Q. The point is -- the point being that if you just consider your own patents, if you will, the patents that you think are compliant and you ignore everything else, next thing you know you have somebody trying to practice the standard and you -- you have stacking. You have patent on top of patent on top of patent with royalty rates that aren't going to allow the Wi-Fi

Page 44

11 (Pages 41 to 44)

A1333

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 349    Filed: 03/31/2014

standard to get practiced.

A. Yes, exactly.

Q. All right.

A. You cannot fully ignore that there are other patent holders in the same area.

Q. All right.

MR. DAUCHOT: Now, David, can you put up Exhibit 65, DX 65, at Page 2, please?

Q. (By Mr. Dauchot) All right. Now, when we were together in Stockholm, I think you told me that this was the analysis on the stacking issue, right?

A. Yes.

Q. Now, if we look at the -- and this is the analysis that Ericsson used, to arrive at its 50-cent rate, correct?

A. Correct.

Q. All right. Now, if we look -- and there's a pie chart here where Ericsson tried to consider who else in the business was -- may have had patents associated with the 802.11 technology, correct?

A. Correct.

Q. All right. And this analysis was done in 2000 and -- was it '9?

A. (Pause) Yes, correct.

Q. You were prompted.

Page 45

A. (Laughed)

Q. In 2009.

Now, again, this is to make sure that whatever rate you come up with, that when you stack the numbers up, it doesn't get too expensive, correct?

A. That's a best-effort thing that we do internally to make sure that we do consider that there are other patent holders in the same area.

Q. All right. Now, in 2009, Ericsson knew that Intel manufactured Wi-Fi chips, correct?

A. I don't know, but I would -- I would -- that's my guess; but I don't know, I'm afraid.

Q. And Intel knew -- or I'm sorry -- Ericsson knew that Broadcom made chips, right?

A. I don't know.

Q. But you would suppose?

A. Yes.

Q. I mean, it wasn't a secret that Broadcom --

A. No, no.

Q. -- was out there making a lot of --

A. No, no. It's just not known to me personally.

Q. Fair point.

Qualcomm as well?

A. Yes.

Q. All right. And none of these major chipset

Page 46

makers are included in your chart, correct?

A. I believe -- actually, it's my belief that Qualcomm were not making chips in the Wi-Fi area in 2009.

Q. Okay. But certainly, Intel and Broadcom.

A. Yes.

Q. All right. And they're not on this pie chart, correct?

A. No. Correct.

Q. All right. Now, Panasonic is not a Wi-Fi chip supplier; am I correct?

A. Correct.

Q. Nor is Nortel, correct?

A. I think not, no.

Q. All right. And AT&T -- nor is AT&T, right?

A. No, definitely not.

Q. All right. Nor is anybody else on this pie chart, correct?

A. Correct.

Q. All right. Let's focus for a moment on the licenses that you -- that you referenced earlier today.

One thing I'd like to make clear, though, is that when these licenses were entered into, these are licenses that are entered into -- into after Ericsson started adopting its policy of not licensing chipset

Page 47

makers, correct?

A. Correct.

Q. All right. So none of the licenses that you mentioned were licenses with chipset makers -- with the chipset maker in the negotiation room, correct?

A. Correct.

Q. All right. Now, from Ericsson's perspective, if you did allow the chipset makers into the negotiation room, you would come out with a lower dollar number, right?

A. I cannot answer that because I don't know.

Q. Well, let's look at DX 104 again at Page 10. The small dollar is with the chipset manufacturer; the big dollar is with the OEM, right?

A. Yes.

Q. Okay. Let's turn to the HP license about which you testified. And in particular, let's talk first about the three or so documents that you talked about, the internal analyses.

You with me?

A. Yes.

Q. Okay. And I think we referred -- actually, I want to focus in on two of them, PX 238, which was the internal numbers, right?

A. (No response.)

Page 48

12 (Pages 45 to 48)

**A1334**

Case: 13-1625  Case: 13-1625  Document: 179-1  Document: 177-1  Page: 350  Page: 350  Filed: 03/31/2014  Filed: 03/31/2014  (350 of 575)

CASE PARTICIPANTS ONLY

Q. And then there was PX 244.

MR. CAWLEY: Your Honor, I apologize for interrupting, but I think that Counsel is about to get into the same confidential information that we had to ask the Court to clear the courtroom before. So if that's the case...

THE COURT: All right. Do you intend to go into that?

MR. DAUCHOT: I do, Your Honor. And I thank Counsel for reminding me.

THE COURT: All right. Very well.

Ladies and gentlemen, I am hereby sealing the courtroom again, so if you're -- as earlier, if you're not an attorney or expert witness or party covered by the protective order in this case, you will need to leave the courtroom at this time. We'll let you back in just as soon as they finish with this part of the testimony.

And, Counsel, I'd ask you to advise me when we get to that point.

(Courtroom sealed.)

(This portion of the proceedings is SEALED and filed under separate cover.)

(Courtroom unsealed.)

THE COURT: All right, Mr. Cawley.

Page 49

MR. CAWLEY: Thank you, Your Honor.

THE COURT: You may proceed.

REDIRECT EXAMINATION

BY MR. CAWLEY:

Q. Ms. Petersson, I just have a few matters that I'd like to clear up.

A. Okay.

Q. First of all, I want to understand and make sure that the jury understands the whole story --

A. Yes.

Q. -- about Ericsson's policy of licensing chip makers.

A. Yes.

Q. Now, you've told us that for many years Ericsson had a policy that it wouldn't license chip makers, correct?

A. Correct.

Q. And told us why. I have not asked you again. You told us why, right?

A. Yes, I did.

Q. And when this lawsuit began, Ericsson didn't sue Intel, correct?

A. Correct.

Q. And you told us that's because of -- you didn't -- didn't seek a license from them?

Page 50

A. Correct.

Q. Okay. But isn't it true that the whole story is that recently Ericsson has offered a license to Intel?

A. That's also correct, yes.

Q. What terms has Ericsson offered to license Intel?

A. For 50 cents.

Q. Per chip -- per chipset?

A. Yes.

Q. For 50 cents per chipset?

A. Yes.

Q. Why has Ericsson made that exception to its policy not to license chip makers?

A. In an effort to try and settle this lawsuit.

Q. Okay. Now, let's talk about that commitment, as well.

MR. CAWLEY: If you would, please, pull up Plaintiffs' Exhibit 293.

Q. (By Mr. Cawley) Now, do you recognize this as the first letter of assurance that Ericsson sent in 2003?

A. Yes, I do.

Q. And you tried to give some explanation about this on cross-examination, and I want to -- I want to

Page 51

give you a little bit fuller opportunity to do so.

A. Yes.

Q. Attached to the letter that we see right here --

A. Yes.

Q. -- was there another -- it's not really another letter, but -- but a third page of this letter. Lets go to that third page.

Did Ericsson send this, along with its letter of assurance?

A. We did, yes.

Q. Let me just read part of it. Ericsson will, upon written request of any Applicant, grant such Applicant a personal, non-exclusive license on fair, reasonable, and non-discriminatory terms for only that portion of any product that is fully compliant with the IEEE 802.11 standards.

What does that mean, Ms. Petersson?

A. That means that we committed to license products that actually uses the standard in the sense that it can be used for Wi-Fi transfer.

Q. All right. So when you said on cross-examination several times that a chip may comply with the standard but not fully comply, could you explain to us what you mean?

Page 52

13 (Pages 49 to 52)

**A1335**

CASE PARTICIPANTS ONLY Document: 177-1  Page: 351/20

course, that they can get more -- more users into the system. They're paying a lot for -- for their Spectrum, a lot for -- for their -- their -- several billion U.S. dollars to -- to get the Spectrum.

And, of course, we want to use that very efficiently and help our -- our customers to use that very efficiently, so -- to get many users in there. And every bit counts.

It's so important that -- that you try to minimize the number of bits transmitted over the radio interface between the -- the cell phone and the radio tower and the -- and the switches in the network.

QUESTION: Was there something new about your approach?

ANSWER: Definitely. I mean, we -- we could give the -- the choice on what content to send in -- in -- in this retransmission protocol that would -- would lead to fewer bits being transmitted.

And that was something new. And that's why we got the patents. And that helps you and me and our customers today to have a better quality and better performance of the -- the cell -- cellular systems and -- and the cell phones we use.

QUESTION: Is there a particular technique that permits the choice?

Page 69

ANSWER: Yeah. I think we talked about that a lot. And -- and -- we talked about this -- this type identifier field. That's really the -- the -- the key element here, giving you the choice of -- of using a bit map or a list or a -- or a combination thereof.

And that would -- would ultimately lead to -- to less bits being transmitted, more capacity, more users simultaneously using the -- the -- the system we're building and better quality, better performance for -- for you and me as users of -- of the system.

QUESTION: Had anybody used a type identifier field before you?

ANSWER: No.

ATTORNEY: Objection to form.

QUESTION: And what did you do to see that your invention would work?

ANSWER: I think we -- we tried the approach out on different scenarios and -- and different types of -- of cases. We -- we looked at it theoretically and potentially also using advanced simulations.

We -- we submitted parts of the invention to -- to 3GPP, the standardization community, to get -- to get feedback from -- from other companies and -- and it proved to be a very popular idea that ultimately made

Page 70

it into the standards specification.

QUESTION: Can you tell me about the process of submitting a proposal to 3GPP and how that gets put into a standard?

ANSWER: Yeah. There -- at the time, there were very many companies -- I think it was on the order of 50 or more -- from all over the world. As I told, the global -- first global standard. A lot of delegates going, on the order of hundreds of people from all these companies.

And all companies submit contributions. It's about the best ideas winning. And the best ideas go -- go into the spec. And it's -- it's a lot of discussions, a lot of debate about the merits of the different contributions and proposals, and ultimately, the best proposals go into the specs.

So we're really proud of -- of our -- our idea ultimately ending up in the global 3GPP specification. That -- that helps us all to communicate using our cell phones.

QUESTION: And are you proud of your invention?

ANSWER: I'm -- I'm really proud. And this is -- this is something I -- I -- I'm happy to tell my kids about. And -- and -- being an inventor and

Page 71

getting a patent, that's -- yeah, it's really, really fantastic.

QUESTION: Do you know what a block acknowledgment message is --

ANSWER: No.

QUESTION: -- in the context of 802.11?

ANSWER: No, I don't.

QUESTION: Do you know who contributed the block acknowledgment technique in the 802.11 --

ANSWER: No.

QUESTION: -- standard?

ANSWER: No, I don't.

QUESTION: Do you have sufficient knowledge of the 802.11 standard to testify as to whether the 802.11 standard infringes the '215 patent?

ANSWER: No, I don't.

QUESTION: Have you ever read the --

ANSWER: No, I don't.

QUESTION: Have you ever read the 802.11 standards?

ANSWER: No, I have not.

QUESTION: Have you ever attended an 802.11 standards meeting?

ANSWER: No, I have not.

QUESTION: Have you ever submitted a

Page 72

18 (Pages 69 to 72)

**A1340**

started when the data enters the data link layer.

QUESTION: Has Ericsson ever honored you or Mr. Ludwig for your contributions in the '223 patent?

ANSWER: On this specific patent?

QUESTION: Yes.

ANSWER: Not that I recall, no.

QUESTION: Okay. And has anyone outside of Ericsson ever praised you or Mr. Ludwig for the ideas of the '223 patent?

ANSWER: No. Not that I remember, no.

QUESTION: Okay. And then the transmitter would take the service data unit at the data link layer and package it in PDUs, or protocol data units, for transmission out to the receiver; is that correct?

ANSWER: It segments the SDU. So it splits it up in smaller parts.

QUESTION: Okay. So I'll rephrase that using your -- the way that you put it.

In connection with your patent and the cellular systems that you were working on, the transmitter will take the service data unit, or SDU, and segment it or, in other words, split it up into smaller parts to be placed into smaller packet data units, or PDUs; is that correct?

Page 81

ANSWER: It's correct, but they may also be bigger.

QUESTION: Okay. Which may be bigger?

ANSWER: PDUs.

QUESTION: Okay.

ANSWER: It's not restricted to -- to the situation that they are smaller.

QUESTION: Okay.

ANSWER: They can also be bigger.

QUESTION: Okay. So let me do that again then.

In your patent and in the cellular systems that you were working on at the time, the transmitter takes the service data unit, or SDU, and segments it or, in other words, splits it up into smaller parts to be placed into packet data units or PDUs; is that correct?

ANSWER: Yeah. The PDU doesn't have to be smaller than the SDU.

QUESTION: Right.

ANSWER: Also -- you can also concatenate several SDUs into one PDU --

THE REPORTER: I'm sorry. Would you repeat that?

ANSWER: You can also concatenate several

Page 82

SDUs into one PDU so that the PDU becomes larger than the SDU.

QUESTION: So let's put concatenation aside and focus on segmentation.

The segmenting or segmentation that we were -- that you're talking about in your patent, that's splitting up the SDU into multiple PDUs, right?

ANSWER: Yes.

QUESTION: Okay. Do -- do you have a belief as to whether your patent is infringed by any 802.11 products?

ANSWER: No.

QUESTION: Are you familiar with the -- an 802.11n technology called BlockAck?

ANSWER: No.

QUESTION: Do you know who contributed the timer in 802.11 to the 802.11 standard?

ANSWER: No.

QUESTION: Do you know who contributed the discard functionality in 802.11 to the 802.11 standard?

ANSWER: No.

QUESTION: The selective repeat ARQ protocol we talked about earlier, that -- that came before your patent, right?

Page 83

ANSWER: Yes.

QUESTION: And that involves use -- usage of a transmit window and a receive window for the selective repeat ARQ protocol?

ANSWER: Yes.

QUESTION: Okay. So -- so the use of windows for transmitting and receiving data packets in connection with ARQ, that was known before your patent?

ANSWER: Correct.

QUESTION: Segmenting, the concept of segmentation, that technique, as it's used in telecommunications, did that come before your patent, your '223 patent?

ANSWER: Yes.

QUESTION: We talked a little bit earlier about 3G. Do you remember discussing that?

ANSWER: Yes.

QUESTION: Do you think your '223 patent would be beneficial to other wireless technologies outside of 3G?

ANSWER: Yes.

QUESTION: Do you think your patent could apply to wireless technologies outside of 3G?

ANSWER: Yes.

QUESTION: Mr. Wager, a few moments ago

Page 84

21 (Pages 81 to 84)

A1343

A. I have.

Q. Are you always retained by plaintiffs?

A. No, sir. I work for both the plaintiffs and the defendants.

Q. And what conclusions did you reach in this case?

A. In this case, I reached the conclusion that the five patents-in-suit are infringed and also that they're valid.

Q. And are you going to explain, over the course of the next several hours, how you reached your conclusions and walk us through your analysis?

A. Yes, sir. That's exactly what I'm going to do.

Q. And before we get into that, I'd -- just so it's clear, are you being retained and compensated for your time in this case?

A. Oh, yes, sir, absolutely.

Q. At what rate?

A. $450 an hour.

Q. Before we get into the details of the patents, I'd like to ask you to give us a tutorial, please, on wireless networks.

A. Okay. I can do that.

Q. And I understand that you've put together a

Page 93

video animation that might help us understand some of the concepts that we're going to need to know to then get into the patents and understand the patents.

A. Yes, sir, that's correct.

Q. All right.

MR. STEVENSON: So can we please bring up that tutorial?

Q. (By Mr. Stevenson) All right. Tell us what we're seeing here, Dr. Nettles.

A. Well, this is a picture of a wireless network. And in the upper left-hand corner, we see something called a base station.

Q. What is -- what is that base station?

A. Well, the base station is the device that forms the wireless network but also connects to the wired network.

So the most familiar kind of base station to most people would be a router, and it would typically connect to your cable modem or your DSL connection. And you can see the little wire that's connects to the wired network there.

Q. So that would be like one of these type of routers that you would buy?

A. Yes, sir, exactly.

Q. Okay. Like a NETGEAR or a D-Link or a Belkin?

Page 94

A. Those are all good examples of router vendors, yes, sir.

Q. And so when you get it out of the box, what's that little wire you plug it into in the back?

A. Well, that would typically be your cable modem or your DSL connection.

Q. Okay. And many of us probably have done that. You plug your Internet into the back of your wireless router and that lets it go around your house wirelessly?

A. Exactly.

Q. Now let's look at the terminals at the bottom. What are those?

A. Well, those are the devices that the base station is going to communicate with. So those would be laptops or even desktops. They might be phones. They might be tablets.

These days other devices are connecting wirelessly. So televisions, thermostats. I've even seen a scale like you weigh yourself on that connects wirelessly.

Q. All right. And the base station, does it have a radio unit in it?

A. Yes, sir. Both the base station and the terminals are two-way radios.

Q. And those black things, I assume, are the

Page 95

antennas for the radio?

A. Yes, sir, they are exactly that.

Q. And let me ask you this: Are there any comparisons you can draw between this type of network, which we've characterized as being a home wireless network, and a cellular network?

A. Yes, sir. The architectures are slightly different; but as we've depicted it here, quite similar. But because they're going to be communicating data across the -- the radio waves, a lot of the problems are very similar.

So the problems that we see in cell networks for communicating data are often the same problems that we see in -- in wireless LANs.

Q. Let's start the animation sequence, and I think this plays -- yes, it does. I'm assuming these are radio waves?

A. Yes, sir. They're an animation of radio waves.

Q. I'm curious. When -- let's go back to the home network example when you've got your NETGEAR router or your D-Link router or your Belkin router sitting in your closet, let's say, and you might have several computers, or if you're at my house, you know, the kids with a tablet.

Page 96

24 (Pages 93 to 96)

**A1346**

Do -- does everything have to talk to the router, or can the terminals talk in between each other and just have a private conversation?

A. In the architectures that we're using right now, the conversations go from the terminals to the router and from the router to the terminals.

Q. And what happens if people talk at the same time on this network -- the -- the devices?

A. Well, that creates radio interference; and as everyone knows, when radios interfere, it's hard to understand. So that would typically create errors if they were talking simultaneously.

Q. So everybody has to take a little turn?

A. That's exactly correct.

Q. Now, we've been talking a lot in this case so far about -- or at least a little bit about packets. Remember, I talked about them in opening.

Can you tell us what a packet is?

A. A packet is really just a fixed quantity of information that computer networks use to communicate with.

Q. Is it just these kind of computer networks that use packets, or is it other kinds of computer networks?

A. Well, they're the fundamental basis of the

Page 97

entire Internet and of computer networking in general.

Q. Cellular, too?

A. Cellular, too, yes, sir.

Q. Why?

A. One of the easy-to-understand reasons is that if you break the information up into relatively small pieces, it makes it easier to share.

Remember, we talked about how things could interfere with each other. If we break it up, then it's easy to allow, for example, terminal 1 to speak for a little while, then terminal 2, then terminal 3, then maybe the base station. It makes it easy to share this communication mechanism.

And that's really one of the fundamental reasons for using packets.

Q. So -- so one of these terminals that has a lot to send can't hog it all?

A. That's exactly right.

Q. Try to spread it around?

A. Yes, sir.

Q. Well, what -- what happens if, let's say, one of these terminals has a lot of information to send, like, let's say, it's a picture?

A. Okay.

Q. You know, like a big high-resolution picture

Page 98

you took of, you know, your kids, and you're trying to send it out over the Internet. How does that happen without the terminal doing it, hogging all the airwaves?

A. Well, if we had a picture that had a lot more information in it than would fit in one packet -- let's actually just think about it as being a real picture.

What we would literally do is, we would tear that real picture into pieces, say nine pieces, and we would label those pieces, upper left-hand corner, upper middle, and then we'd put each piece of the picture into its own individual envelope, and we would address that individual envelope.

Q. And then who do you -- who do you send the nine envelopes to?

A. Well, you send -- you send the nine envelopes to whoever the receiver is. And when they get the nine envelopes, they open the envelopes, and they take out the piece of the picture, and they put the one that's labeled upper left-hand corner in the upper left-hand corner and upper -- middle upper in the upper, and they reassemble the picture.

Q. And so does that carry over into the electronic world where this tearing up of large chunks of data into packets happens electronically?

A. Yes, sir, except you might tear it up into

Page 99

thousands or millions of packets.

Q. Okay. Can we show some packets on your animation?

A. We can.

Q. Okay. What are the blue dashes that are now replacing the radio waves?

A. Well, they're our visual representation of packets.

Q. Are these packets -- are they actually carried on the radio waves?

A. Yes, sir. The radio waves actually digital -- the digital information is encoded into radio, and that's what the radio part of these networks do, is to send the packets digi -- by radio.

Q. These aren't replacing radio waves; they're just sort of a logical way we can think about how the information is going along?

A. Yes, sir. There's really radio waves underneath all of this.

Q. Okay. Are packets different sizes?

A. Typically, yes, sir, they are.

Q. What's inside a packet?

A. Well, there's a lot of different information inside of packets, but remember I mentioned this idea that we would put an address on the envelope.

Page 100

25 (Pages 97 to 100)

**A1347**

Case: 13-1625 Case: 13-1625 Document: 179-1 Page: 355 Filed: 03/31/2014 Document: 177-1 Page: 355 Filed: 03/31/2014 (355 of 575)

CASE PARTICIPANTS ONLY

So packets invariably have addresses, and then they invariably have -- well, they typically have data, so...

I think we have a blow-up of this maybe.

Q. Right. That's the one that's been flashing.

All right. Just so we know what we're looking at, what is the zoom-out that's in the blue box?

A. It's showing us that one of these packets has two compartments. One compartment holds the address. And in this case, it's video data that's being held there. We call these compartments typically fields rather than compartments.

Q. And in the real world -- I know this is a simplification as we're going to get into the case -- do packets have more than one or two fields?

A. Yes, sir. They have many fields, typically.

Q. Now, if we looked at that packet that says video data, would we expect to get the whole video or just a piece of it?

A. For a video, it would be typically a very small piece.

Q. And how -- how fast are these packets going?

A. Well, conservatively, hundreds of times a minute. In practice, maybe thousands or tens of thousands times a minute.

Page 101

Q. And then they get transmitted at the speed of light, obviously.

A. They're on the radio, so that's how fast they move through the radiofrequency, yes, sir.

Q. Now, we hear a lot today about bandwidth. Can you explain to us about bandwidth and what it is?

A. Bandwidth is just the amount of information that can be transmitted at any one time. So how many words can people say a minute? How many packets can be sent a second? It's usually expressed in terms like bits per second or bytes per second or packets per second.

Q. What -- what limits bandwidth?

A. Well, ultimately, in a -- in a radio-based network like this, the laws of physics limit the amount of bandwidth that's available.

Q. What law of physics is it that limits bandwidth?

A. Well, it has to do with the number of bits that you can transmit per hertz of frequency. It's a little complicated.

Q. Well, I mean, if that's the case, why have cell phones and home networks gotten faster over the years?

A. That's because we're just really learning how

Page 102

to build these kind of radio-based networks. And so we haven't approached the limits that physics imposes.

Instead, what's happening is, every -- well, really probably even every month, engineers and physicists and computer scientists are learning how to build these networks better and better so that they come closer and closer to the physical limits.

Q. Do those have to do with the rules of the networks and the protocols that you use?

A. Ultimately, improving the rules can definitely improve the utilization and how close we get to those limits, yes, sir.

Q. Let's keep going with the animation.

And now we see some red packets that have gotten introduced. What are those?

A. Well, those are control packets. So in addition to the packets that carry the actual real data, we have to send some packets back and forth just to make the network work; information that the sender and receiver needs to send back and forth to keep in sync.

Q. And the first part of the animation that was all just blue packets, now red packets have come in, but in the real world, are there always these red packets with control information being sent around?

A. Yes, sir, there are.

Page 103

Q. But the data, the stuff you really want, is that in the red packets, or is that in the blue packets?

A. It's in the blue packets.

Q. So to get better network performance, what is your goal, as far as the size of the red packets and how often you send them out?

A. You'd like to make the red packets as small as possible, and you'd like to send them out as infrequently as possible.

Q. Now, how does this all stay organized? How do all the receivers and the transmitters know when to talk and what to send and how to interpret what they're getting?

A. Well, there's -- there's a rule book, as we've been discussing.

Q. Is that the standard?

A. Yes, sir, that's the standard. That's basically a blueprint for how this kind of network is going to work.

Q. Do all the devices have to have the same blueprint or rule book?

A. Yes, sir, they do.

Q. And what if they don't?

A. Well, they -- they won't be able to communicate successfully.

Page 104

26 (Pages 101 to 104)

A1348

Q. How do the devices on the network know the rules?

A. Well, I mean, these aren't people. They can't really know anything. So really the engineers and computer scientists that work for the companies have to build them so that they follow the rules. So they're programmed really to follow the rules.

Q. So we saw that standard before. Is drafting the standard the end of it, or do you then have to program the standard into the devices?

A. Drafting the standard is the beginning of it. Putting them into the devices is perhaps the hard part.

Q. Do the inventions in this case deal with what the rules should be for a network?

A. Yes, sir, they do.

Q. And how detailed are those rules?

A. The -- the rules have to be detailed enough that if you follow them and someone else builds a system that also follows them, they'll be able to communicate successfully. They'll have to be using the rules in the same way. So they're -- they're quite detailed.

Q. I've got here the 802.11n 2007 standard version.

A. Yes, sir.

Q. It's --

Page 105

A. I have one here, too. This is the 2007 one.

Q. And I was going to ask you -- I forgot -- you've got some binders in front of you in a cart. What are those?

A. Those are the reports that I've written in this case.

Q. You -- the reports about infringement and the patents?

A. Yes, sir, they are.

Q. So that's -- that's your work, so you have it to refer to during the questioning?

A. That's correct.

Q. And then you've got a copy, I assume, of the 802.11 standard in front of you?

A. Yes, sir, both the 2009 and then the -- and the 2007 version.

Q. Why -- and this may be a very obvious question, but why does this need to be so long and elaborate?

A. Well, it has to specify everything about these systems so that you can build one and so that they can interoperate.

So this standard, for example, contains everything about how the radios have to work and then also everything about how -- what I've referred to as

Page 106

the MAC layer, the media access control layer, how it has to work.

So there's just a lot of details to build a very complicated engineering system like this.

Q. Is that standard publicly available?

A. Yes, sir.

Q. Anybody can download it?

A. Yes, sir.

Q. And if you're a company and you download that and build a device according to it, follow it, what should your expectation be?

A. If you follow it faithfully, you should be expected -- you should expect to be able to interoperate with other people who have built -- who have built devices that follow the standard faithfully.

Q. Now, I want to talk a little bit about -- now that we've gotten the concepts out, I want to put Ericsson's inventions into this concept of these.

A. Okay.

Q. I want to talk about the patents in the case and what aspects of the network they touch upon.

Can you tell us at a -- just a high level, and then we'll get into specifics, what aspects of the network Ericsson's patents pertain to?

A. Well, they -- they touch really eventually on

Page 107

every aspect of the media access control levels, so both the sending and receiving of data, how we make the data reliable, how we deal with data which needs to have different characteristics with respect to delay. All of those aspects are part of the patents.

Q. What I'd like to ask you to do is, let's go through a -- let's make up a hypothetical transmission from a base station to a terminal, terminal 4, and walk through that, and let's just talk about where Ericsson's inventions come into the mix.

A. Okay.

Q. And then we'll use that as a -- segue later to go on when we talk about the patents as a reminder for -- for -- to keep us oriented on what we're doing.

So let's pretend we're streaming video from the Internet to a terminal.

A. Okay.

Q. So let's just start at the beginning.

Where is the Internet coming into the system?

A. It's coming in through the little black wire that we see attached to the base station.

Q. All right. And -- and is it coming in as packets there, too, or is it something different?

A. It's going to be packets.

Q. Okay. When it gets to the base station, what

Page 108

27 (Pages 105 to 108)

**A1349**

CASE PARTICIPANTS ONLY

does the base station do?

A. It's going to transmit those packets to wherever they eventually go to; in this case, to terminal 4.

Q. Does it just pass them right through, or does it rearrange them somehow?

A. It depends a little bit. They could do either one of those two things.

Q. Okay. Then the base station converts them into radio?

A. Yes, sir.

Q. And then when the radio waves get sent out, are they just heard by terminal 4 or all the terminals hear?

A. So they're -- because it's radio, it's broadcast. And so, in fact, all the terminals will hear the broadcast from the base station.

Q. Now, how does the base station -- so we're pretending the base station is sending video to the terminal?

A. Yes, sir.

Q. And then the terminal is, let's say, you know, you're sitting at your kitchen table having a video stream to you.

A. Okay.

Page 109

Q. Sitting there, video streaming to you, coming from the router that's maybe two moves away.

A. Okay.

Q. We talked in opening a little about lost packets and that sort of thing. Does that happen in these sort of systems?

A. Oh, yes, sir. Losing packets is common.

Q. What causes packets to get lost?

A. Well, there could be interference. You might turn on your microwave oven. Maybe you've got your base station too far away from where you're trying to watch the video. All of those things could cause packets to be lost.

Q. Bouncing off walls and that kind of thing?

A. Yes, sir.

Q. Okay. And how does the base station then, who's sending the video to the terminal, know if packets are getting lost and which ones they are?

A. Well, it asks the terminal which packets it's received.

Q. Okay. Can we show that on the...

A. We can. It's one of these are control packets.

Q. One of the red ones that carries the question?

A. That's right. So if we --

Page 110

Q. It stopped, and it's flashing.

A. That's right. So the one that's flashing is the questioner of which ones did you get?

Q. Okay. So basically what we're talking about here is, this red packet isn't actually carrying the data; it's a way for the base station and terminal to talk to each other about how things are going?

A. Exactly.

Q. Okay. Now, what is the base station sending the video asking the terminal?

A. It's asking, did you get everything that I sent to you since the last time I asked you what you -- what you received.

Q. Okay. Let me ask you about this question before we move on. It asks: Did you get all the packets in the last group I sent?

So can this question be asked about a group of packets?

A. Yes, sir. And in the case that we're looking at here, that will typically be what will happen. We'll ask about a bunch of packets all at once.

Q. And is the goal of that to have fewer of these control red packets?

A. Yes, sir. Rather than answering for each packet, we're going to answer for a group of packets at

Page 111

once.

Q. All right. Let's go on and see -- does the terminal answer?

A. Yes, sir. It's required to answer by the rules.

Q. And so it doesn't have a choice.

A. No, sir, it doesn't.

Q. Okay. Let's look at what the answer might be. What's he responding with?

A. Well, in this case, the response says, which packets were received. But it also tells which packets weren't received.

Q. He got 1, 2, 4, 7, 8, but missed 3, 5, and 6.

A. That's right.

Q. When we get into the patents, is there -- and the infringement stuff in the standard, is there a word that we're going to use to describe this sort of response message?

A. There is. We're going to call it a block acknowledgment, because it's acknowledging the receipt of messages, and it's acknowledging the receipt of a group or block of messages. That's why it's called block acknowledgment.

Q. So what now can the base station now do that it's learned three of its packets got dropped?

Page 112

28 (Pages 109 to 112)

**A1350**

A. They're part of the blueprint.

Q. So we said there were two Ericsson inventions related to this -- you know, keeping the receiver and transmitter coordinated or in sync. I'm using those synonymously. You just told us what the receiver is doing on its side. What does the other invention pertain to?

A. The other invention is focused on the transmitter and on the kind of messages that the transmitter sends to the receiver.

And in that invention, when the transmitter decides that it's going to drop a packet rather than retransmit it, it needs to do two things.

It needs to send a command to the receiver to receive a packet that's out of order, and it also has to send a command to the receiver to -- well, it's similar to this release expectations idea; basically to move the set of frame -- the set of packets it's expecting so that it's no longer expecting the ones that are before the one that's out of order.

So that's the ones that haven't been received. The whole point is to deal with the fact that certain ones haven't been received without forcing the system to continue to wait for that one to be retransmitted, to -- to move along.

Page 117

Q. Okay. And I know these are hard concepts to explain. We're going to get, I think, a little bit of repetition here. As we go into the patents, I think we'll talk about this again on each individual patent. So this isn't our only chance to learn all this. But let me go back to your last answer.

Basically, the transmitter has got to go ahead and tell the receiver what it's doing so the receiver can deal with its list and computations.

MR. VAN NEST: Objection. This is leading, Your Honor, with an expert, and that's not appropriate.

THE COURT: Overruled.

A. Yes, sir, exactly. In fact, in the patent we were just talking about, it just -- it doesn't just tell the receiver; it actually sends commands.

Q. (By Mr. Stevenson) Okay. Now, can these packets in the network carry different types of information?

A. Yes, sir.

Q. What types of information might they carry?

A. Well, we've been talking a lot about video, but we've also talked some about voice, and obviously, they're going to carry just regular data: Web pages, your e-mail, that kind of information.

Page 118

So those are three sort of especially important kinds of information.

Q. Does having three different types of information, or maybe even more, cause any additional issues in the rules of the network?

A. Well, yes, sir. These different kinds of information might tolerate delay differently, and you'd really like to set up the rules of the network so that you can accommodate that.

Q. What do you mean when you say tolerate delay differently?

A. Well, let me give an example.

If you think about your e-mail, doesn't really matter if your e-mail comes this instant or in 10 seconds or in 30 seconds or even a minute later. It's not very sensitive to mail -- to delay.

But imagine having a phone conversation where every time someone says a word, there's a delay of even half a second. It would be almost impossible to have a phone conversation under that circumstance.

And so for phone conversations, delay is very important. For video, it's not quite as important as for phones. And for a lot of data, you know, you don't want your e-mail to be two days late, but two seconds late is fine.

Page 119

Q. What kind of things can cause delays like that in a network?

A. Imagine -- we talked a little bit about bandwidth. Imagine that one of these terminals wants to send more information per minute than there is bandwidth to do it.

Then, you know, just like in the grocery store where there's a line and a queue, and you have to wait for the checker; there are queues in these terminals and base stations, and things have to wait in those queues, and that can cause delays.

Q. Is there an Ericsson invention related to dealing with different types of data on the network?

A. Yes, sir, there is.

Q. What's that invention?

A. That involves -- the key invention there is a service type identifier which gives the network a way of labeling the packets so that we can say what kind of data they have in them so that the network can then treat the different kinds of data differently in an appropriate manner.

Q. So how many patents is Ericsson asserting in this case that relate to these concepts that you've discussed?

A. In total, there are five patents-in-suit.

Page 120

30 (Pages 117 to 120)

**A1352**

Q. And have you analyzed all five patents, and are you prepared to offer opinions on them?

A. Yes, sir, I am.

Q. Let's now shift gears and talk about the Defendants and their products. And we have a -- I think we're going to be using this through your testimony as our menu or our table of contents.

A. Yes, sir.

Q. Something I created.

So let's talk about the Defendants.

Have you analyzed the Defendants' products for purposes of determining whether they infringe?

A. Yes, sir, I have.

Q. How many different types of products are made by the Defendants?

A. There are two main kinds. There are routers, and then there are computers, both desktops and laptops.

Q. Let's talk about the individual Defendants.

Are these the Defendants that make the routers?

A. Yes, sir. Belkin, D-Link, and NETGEAR make routers.

Q. And which Defendants make personal computers?

A. Acer, Dell, and Toshiba.

Q. And is it just laptops at issue here, or is it

Page 121

also desktop computers?

A. It's also desktops.

Q. Are all the devices, the laptops, desktops, routers, that you analyzed 802.11n compliant?

A. Yes, sir, they are.

Q. And do your opinions in this case extend to all the 802.11n routers, computers of the Defendants?

A. In general, I think there's one opinion that has to do just with the routers.

Q. Okay. Now, what products does Intel make?

A. They don't make any of the products that you actually buy and use, but they make the chips that go inside of those products.

Q. Is Intel the only manufacturer of chips for these devices in this case?

A. Oh, no, sir, not at all.

Q. So who are some other companies whose chipsets may be found in the accused products?

A. Broadcom; Atheros, which sometimes has been referred to as Qualcomm; Realtek; and Ralink are the chip manufacturers that are involved in this case.

Q. So let's talk about these chips. If I was to tear open this router --

A. Yes, sir.

Q. -- take the cover off, would I be able to see

Page 122

the chips?

A. Yes, sir, you should be able to.

Q. And is it one manufacturer per device, typically, or might you have an Atheros and a Broadcom and an Intel in the same device?

A. Typically, it would be one manufacturer per device.

Q. Can all the devices we've talked about, the routers and the access points and the computers, be used together interoperably?

A. Yes, sir. I mean, that's really the point of having a standard, is so that everything can interoperate, and you can buy different manufacturers' devices and have them work together.

Q. Okay. All the devices in this case advertise as being and practicing the 802.11n standard?

A. Yes, sir, they are.

Q. And are these devices certified as Wi-Fi compliant?

A. Yes, sir, they are. Just to be clear, not every single device is certified, but a great many of them are certified.

Q. Okay. And I want to talk with you a little bit more about that in a second.

A. Yes, sir.

Page 123

Q. Let's turn now to the 802.11n standards.

A. Okay.

Q. First, I want to understand the numbering convention a little better. Why couldn't they call it something simpler than 802.11?

A. Well, you'd have to ask the IEEE for a definitive answer, but 802 actually refers to a whole group of standards that all involve something called Ethernet, and 802.11 is called wireless Ethernet.

Q. Let me ask you -- stop you there.

So there's -- so a standard related to -- you called it Ethernet. That's some other data standards, right?

A. Well, all the ones that say 802 dot are -- all have to do with Ethernet in various forms.

Q. And that -- so there's -- there's other numbers, dot numbers?

A. Yes, sir.

Q. Okay. We're -- we're talking about dot 11.

A. That's right.

Q. Is that a specific flavor or a subset of all the other 802 data standards?

A. Yes, sir. That's -- that's wireless Ethernet, and the marketing term for that is Wi-Fi.

Q. And who is responsible for the 802.11

Page 124

31 (Pages 121 to 124)

**A1353**

standard?

A. The IEEE.

Q. And tell us what the IEEE is.

A. Well, the IEEE is a professional organization of electrical engineers and electronics engineers that -- actually, they cover all sorts of areas of technology, but in particular, they create standards in this particular area of computer networking and wireless computer networking.

Q. How many -- how many members are there in the IEEE?

A. There are over 400,000. They claim to be the largest professional organization in the world.

Q. Are you a member?

A. Yes, sir.

Q. Now, 802.11n is the flavor or type of 802.11 we're talking about in this case. Can you explain to us how that last letter -- what that represents, the "n"?

A. Originally, there was 802.11 without any letters, and that evolved into 802.11d. And then that actually also evolved into 802.11a. I don't know why they didn't keep things in order. Then there was 802.11g. Now there's 802.11n.

And then there are other letters, which they don't really -- they're not whole networks. They don't

Page 125

work independently. But I think we heard about 802.11e earlier today.

So there are other letters which are sort of -- sort of add-ons to the letters that I just mentioned.

Q. And in general, as the letters go on, are we -- is that going along in time?

A. Yes, sir. As technology advances, we add to the standard, we improve the standard, and we give it a new name.

Q. And how does 802.11n compare to the prior versions of standard before it?

A. Well, the most important difference to you and me is that it's a lot faster.

Q. Does it have a longer range, too?

A. Yes, sir, it does.

Q. So you could basically put your router further away in your house and still get signal than you could previously with the other versions?

A. Yes, sir, that's correct.

Q. And when you say faster, what does faster mean just from the user experience?

A. Well, 802.11 might not be able to even support voice; certainly not video. Faster means that we can have video -- maybe we can stream video, which is

Page 126

hi-def. Maybe it's 60 frames per minute. Basically, faster means more bandwidth in this context, a better -- and therefore, a better user experience.

Q. When was 802.11n officially approved?

A. In 2009.

Q. And are the Ericsson patents at issue here essential to the 802.11 standard?

A. Yes, sir, they are.

Q. Let's now turn to how you conducted your infringement analysis in this case.

What was your first step?

A. My first step was -- I guess the obvious one -- to read the patents. And eventually what you need to do is, you need to read the patents, and in particular, you need to read the claims of the patents.

And each one of the claims -- and we're going to talk about this a lot -- has a series of sentences or paragraphs that are called limitations. We'll call them elements sometimes.

And to infringe the patent, you have to meet each one of these limitations. And so that's one of the next steps. Once you read the patent, you start thinking about whether or not the accused products meet each of these limitations.

There's another important part, which is that

Page 127

certain terms that are in the patent are defined by the Court, and it's important that you apply those terms when you're trying to understand what these claim limitations mean.

Q. And so I'm going to give everybody a preview of the future to come, and is this something you used in your work?

A. Yes, sir. That's Claim 1 of the '215 patent -- well, actually, Claim 1 and 2 of the '215 patent.

Q. So what we're going to be doing, I think, over the remainder of your examination is talking with you about the evidence and walking the jury through each one of the claim elements.

A. That's exactly correct.

Q. And the boxes are there to check them off as we do the --

A. That's right, because we want to make sure that we meet every one of the limitations, and we want to make sure we explain to the jury carefully why each one is met. Because, otherwise, if -- if not each one of them is met, there's no infringement.

Q. Okay. And in determining whether there's infringement of a patent, do you need proof the Defendants copied it?

Page 128

32 (Pages 125 to 128)

**A1354**

A. No, sir. There's no requirement of copying at all.

Q. Or stole anything?

A. No, sir. There's no -- no -- no stealing is required. I have never been in a patent case, I don't think, where stealing was even accused -- was suggested.

Q. So at the rock bottom, what is it that determines infringement?

A. Does the system either do or is it a machine that does the individual limitations of a single claim.

Q. Okay. Approximately how many hours did you spend analyzing the standard and the evidence and the claims in this case?

A. For infringement, around 500 hours is a good estimate.

Q. Okay. What was your primary source of proof about how the -- about the infringement analysis for what you compared to the claims?

A. Well, in this case, we have the fact that the Defendants all practice the 802.11 standard. And we have the standard, and the standard is very detailed about how it works.

And so for this case, my most -- I wouldn't say important, but the first place I looked for for proof is the standard.

Page 129

Q. And that's my question. Is the standard written in sufficient detail that you could read it and apply it to the claims for your infringement analysis?

A. For almost all of the limitations, yes, sir.

Q. In addition to looking at the standard, did you do a specific product analysis for the individual Defendants?

A. Yes, sir, I did.

As part of the discovery process, I was given access to the Defendants' technical documents, and also, we've seen some depositions today; also, the depositions that have been taken in this case.

And so in essentially every patent case, that's one of the important sources of evidence: Technical documentation and deposition testimony of -- from the parties. And so I looked at both of those kinds of evidence.

Q. Now, did you also look at any information from organizations that do compliance testing for Wi-Fi?

A. Yes, I did. There's a group called the Wi-Fi Alliance that tests to see -- it tests for just interoperability issues.

So it actually takes different Wi-Fi products and tests to see if they work together.

Q. Can you tell us what the Wi-Fi Alliance does?

Page 130

A. Well, it -- it takes -- takes Wi-Fi products and -- and tests to see if they -- if -- if they work together, and it tests specific -- specific aspects of those products.

So, for example, there's a whole set of tests called WMM that had to do with quality of service.

Q. Does the Wi-Fi Alliance test for compliance of products with the 802.11n standard?

A. I think it's more correct to say that they -- that they test for interoperability. But interoperability is very strong evidence that they comply with the standard. Because if they don't comply with the standard, there's no way they can -- they can work together.

Q. All right. And does the Wi-Fi alliance issue a certificate at the conclusion of the testing?

A. Yes, sir, they do.

MR. STEVENSON: And I believe we have one that we've uploaded, and it hasn't been objected to, into evidence, PX 549. May we see that, please?

Q. (By Mr. Stevenson) Is this one of the interoperability testing certificates?

A. Yes, sir. This tells us that it's been tested for a, b, g, n, also for WMM, and also some optional capabilities, as well.

Page 131

Q. And have you looked at a number of these in this case?

A. Yes, sir. I looked at tens or hundreds.

MR. STEVENS: And I have a list of ones we've put into evidence just as exemplars of these.

They are PX 103 through 117, PX 121, PX 130, PX 136 to 142, PX 156 to 162, and PX 548 through 549, if the jury would later like to see them.

Q. (By Mr. Stevens) Have you seen evidence that the Defendants in this case have participated in Wi-Fi certification?

A. Well, yes, sir. The products that are being certified are from the Defendants -- I mean, not all -- I mean, there are other products, too, but the Defendants -- the ones that you just mentioned are going to be the Defendants' products.

Q. And as part of doing your report and your analysis, have you seen deposition testimony from representatives of the Defendants where they talk about interoperability testing?

A. Yes, sir.

Q. And I'd like to show you some of that just so we can have you look at what you reviewed in putting your report together.

A. Okay.

Page 132

33 (Pages 129 to 132)

**A1355**

Q. And just, you know, read the -- read it and just explain to us what it means. I'll try to move fast because it may get a little redundant.

This is the Defendants -- the deposition of A. J. Wang. And it's -- although it was a video deposition, we also have a reported transcript, so just in the interest of time, I'm going to use that. It's from November 14th, 2002. I'm going to show you Page 36. And I've highlighted a bit of it.

Would you go ahead and read that and tell us what it means?

A. Yes, sir. So this is a representative from D-Link, and he's explaining that the Wi-Fi Alliance takes their products and either the Wi-Fi Alliance itself tests them or it contracts with a lab to test them. And D-Link would submit a product to the Wi-Fi Alliance to test for compliance, and if the products passed these tests, then they'll become certified.

Q. Let me show you another part of this. It's from Page 119. Is D-Link saying that it generally sends all of its products to get certification from the Wi-Fi Alliance?

A. Yes, sir, that's exactly what D-Link is saying.

Q. Now, we also had a deposition of NETGEAR on

Page 133

a -- on the same topic. This is the deposition of Bhavani Ganesan. I'm going to show you Page 63. Is this about the same question and answer about certification, the interoperability value?

A. Yes, sir. It's going into a little more detail about how the Wi-Fi Alliance operates, but it's saying the same basic idea.

Q. And frequently is it the chipsets that get interoperability tested?

A. Well, no, sir. The chipsets have to be in a product to really be able to be tested for interoperability.

Q. Okay.

A. So these are -- these are actually the -- in this case, these are the routers.

Q. All right. And does the Wi-Fi Alliance -- as he says, do you agree they come up with test plans and interoperability programs and the certification program?

A. Yes, sir, that's exactly what they did.

Q. And did the NETGEAR representative say most of their products go through that certification?

A. Yes, sir, that's exactly what he said.

Q. We'll turn next to Belkin, and this is the deposition from November 16th, 2012, of Li-Ter Mike Chen.

Page 134

And was he asked about why do they include a Wi-Fi certification on the package of the product?

A. Yes, sir. He's explaining that it says that they're certified and, therefore, the product is interoperable.

Q. Let's turn to some of the computer makers. The deposition of Toshiba was taken October 26th, 2012, and the representative was Masa Okumura.

A. Yes, sir.

Q. I believe that this witness was asked: For all the products you sell in the U.S. with 802.11n functionality, do you make sure they're all certified by the Wi-Fi Alliance? And what was the response to that?

A. He said for the products that are sold today, that that's exactly what they do.

Q. And that's driven by customer demand?

A. Exactly.

Q. Two more to go. Let's look at Acer. This is the November 6th, 2012, deposition of Yung-Sen Lin.

The question asked here is: If Acer products specified 802.11n functionality, wouldn't Acer expect for its manufacturers to provide a chip that conforms with those standards?

And the witness said: We'd require a solution that passes Wi-Fi Alliance testing.

Page 135

A. Yes, sir, that's what he said.

Q. And then the witness gives a description similar to the other ones about Wi-Fi Alliance has a testing plan.

A. Exactly.

Q. And the last one is Dell. This is the October 18, 2012, deposition of Scott Bamford. He mentions, doesn't he, that it's an important factor when Dell considers buying chipsets is -- that they're Wi-Fi Alliance certified.

A. Yes, sir. He's says he's got to have that.

Q. Then at the bottom of Page 37, he says:

There's some requirements that 802.11 chipsets have to meet in order for Dell to even consider using them. And one of them is what?

A. One of them is that they have to be Wi-Fi Alliance certified.

Q. Now, in addition to looking at the Wi-Fi certification testing reports, did you perform testing of the individual chip components for each of the manufacturers in this case that are involved in selling 802.11n chipsets?

A. Yes, sir, I did.

Q. Did you test chips from each manufacturer?

A. Yes, sir.

Page 136

34 (Pages 133 to 136)

A1356



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL          )
                DOCKET NO. 6:10cv473
    -vs-                       )
                Tyler, Texas
                               )
D-LINK CORPORATION, ET AL          June 4, 2013

SEALED PORTION NO. 2 FROM TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
MS. SHEA SLOAN
shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Courtroom sealed.)

(This portion of the proceedings is
SEALED and filed under separate cover.)

THE COURT:  All right.  You may proceed.

MR. DAUCHOT:  Thank you, Your Honor.

Page 3

1 (Pages 1 to 4)

**A1359**



Page 5

2 (Pages 5 to 8)

CASE PARTICIPANTS ONLY

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL      )
                DOCKET NO. 6:10cv473
   -vs-             )
                Tyler, Texas
            ) 9:00 a.m.
D-LINK CORPORATION, ET AL      June 5, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  Please be seated.

Good morning, Ladies and Gentleman of the Jury.

JURORS:  Good morning.

THE COURT:  Good to see you this morning. You look bright-eyed again.  We'll see what you look like at the end of the day today.

Very well.  Mr. Stevenson, you may proceed.

MR. STEVENSON:  Thank you.

THE COURT:  Oh, before you do, do either side have any exhibits they wish to offer today?

MS. MOORE:  Yes, Your Honor.

At this time, Plaintiffs offer their exhibit list titled Plaintiff's Preadmitted Exhibit List for June 5th, 2013.

THE COURT:  All right.  They will be marked as Plaintiff's Exhibit List No. 3.

Do Defendants have any objections to the exhibits listed thereon?

MR. DE VRIES:  We do not, Your Honor.

Page 3

THE COURT:  All right.  They are admitted.

All right.  Do Defendants have a similar list?

MR. DE VRIES:  We do, Your Honor.  Thank you.

At this time, Defendants offer Defendants' List of Preadmitted Exhibits for June 5th, 2013.

THE COURT:  All right.  Is there any objection to those?

MS. MOORE:  No, Your Honor.

THE COURT:  Those will be marked as Defendant's Exhibit List No. 3, and they are admitted.

All right, Mr. Stevenson.  You may proceed.

MR. STEVENSON:  Thank you, Your Honor.

SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS,
PREVIOUSLY SWORN
DIRECT EXAMINATION (CONTINUED)
BY MR. STEVENSON:

Q.  Dr. Nettles, are you ready?

A.  Yes, sir, I am.

Q.  All right.  I'd like to get into the claims today, but before we embark upon that, I thought it

Page 4

1 (Pages 1 to 4)

A1365

might be a little bit helpful to maybe spend a few minutes with a refresher of what we heard last night before we left.

A. Sounds good to me.

Q. So this is our diagram of the network.

A. Yes, sir.

Q. And the base station is what? Remind us again.

A. That's your router in your home in 802.11.

Q. And in 802.11, these terminals were what?

A. They would be laptops or desktops or tablets or all sorts of devices that would connect wirelessly.

Q. And remind us about what these blue dashed lines are that we saw yesterday, please.

A. The blue dashed lines are really rectangular boxes that carry the data that the user's actually interested in.

Q. Are these the things we will be talking about that are packets?

A. Yes, sir, they're packets.

Q. And are they carried on the radio waves along the wireless network?

A. Exactly.

Q. If people have their laptops on in this room right now with 802.11, are there packets flying around

Page 5

in the air?

A. Yes, sir, there are.

Q. And what do the packets carry?

A. Well, they carry -- the blue ones carry user data, along with a bunch of fields with other information.

Q. And these packets would be where, if you were sending the picture to somebody, pieces of that picture might be torn up and put inside to be sent across the network?

A. Yes, sir, that's exactly correct.

Q. And are the inventions we're going to be talking about today dealing with the way packets are created and dealt with by the transmitters and receivers?

A. Yes, sir, they are.

Q. And do all the members of the network have to understand, have a common agreement, on what the form of the packets are going to be?

A. Yes, sir. That's an aspect of the standard.

Q. Yesterday we looked into some packets, I think we zoomed in on a packet, and we saw some compartments.

Remind us the word you used to describe what those compartments are.

A. I used the word field, but I'll probably use

Page 6

that word and the word compartment today.

Q. Okay. And are those compartments important in a packet network such as this?

A. Oh, yes, sir. They're -- they're very important. Exactly how big they are, exactly where they are, exactly what their constants are, that's a lot of what the standard is about.

Q. And, again, does every member of the network need to agree on where the compartments are in the packets and what they do?

A. Yes, sir. Otherwise, they won't be able to communicate.

Q. And I think we'll be dealing with some inventions that talk about those fields or compartments, right?

A. Yes, sir, we will.

Q. Okay. Well, let's move on now to the '215 patent.

MR. STEVENSON: And I believe this is at Tab 6 in the jury notebook as Plaintiffs' Exhibit 10.

Q. (By Mr. Stevenson) When was this patent filed for?

A. This patent was filed on April 9th, 1999.

Q. How can you tell that?

A. Well, what we are seeing here is the front of

Page 7

the packet -- of the patent. It's easy to get them mixed up. The front of the patent. And we -- there's some blowouts here that have some specific information.

So the first blowout says: Provisional application filed on April 9, 1999.

Q. And dates are important when it comes to patents, right?

A. Very important, yes, sir.

Q. The date the patent issued was?

A. August the 3rd, 2004.

Q. And can you explain to us, just in a nutshell, how we ought to think about this patent, and then we're going to obviously unpack that and talk about it in detail, but give us a headline for the patent.

A. Well, if you'll remember, we talked a little bit about block acknowledgements. That's the way that the receiver is going to tell the transmitter what information was successfully received and what information was not successfully received.

And this patent concerns providing flexibility in the standard to have different kinds of responses and specifically with a type identifier field, which is going to help provide that flexibility.

Q. Okay. What were the inventors working on when they came up with this invention?

Page 8

2 (Pages 5 to 8)

**A1366**

A. They were working on 3G cellular standards.

Q. That's the 3G cellular standards that would be in one of these phones?

A. Yes, sir.

Q. Why would an invention for a 3G cellular standard be also applicable to Wi-Fi or 802.11n?

A. Well, these are all wireless networks, and especially when they're sending data, they work in very similar ways, and in particular, both 3G networks and 802.11 have these protocols that involve these acknowledgements. They're call ARQ protocols.

Q. Do both cellular and 802.11 networks use data -- excuse me -- use ARQ protocols?

A. Yes, sir, they both do.

Q. What does that stand for, ARQ?

A. That stands for automatic repeat request.

Q. Okay. And could you tell us what that means in lay terminology?

A. Well, it's really the protocol we've already been talking about. It's a protocol whereby, in our specific case, the transmitter is going to send a request to the receiver to tell it what it received, and the receiver's going to respond, and then the transmitter is going to, again, in our case, optionally retransmit.

Page 9

And that whole process of sending and acknowledgement and the retransmitting and then maybe sending another acknowledgement, that's what an ARQ protocol is.

Q. Okay. And so cellular phones, as well as home Wi-Fi, do those things?

A. Yes, sir, they do.

Q. Do both use packets?

A. Yes, sir, they do.

Q. And do both have acknowledgements of packets?

A. Yes, sir. That's part of the ARQ protocol.

Q. Do both cellular networks and Wi-Fi have to deal with dropped packets and that sort of thing?

A. Yes, sir. Again, they're both wireless, so...

Q. And my phone can be on the cellular system, right, to make cellular calls, but, simultaneously, I think I can connect to Wi-Fi.

A. Yes, sir, that's correct.

Q. Are those using, like, you know, kind of different networks?

A. They're using different networks, yes, sir.

Q. At the same time?

A. At the same time.

Q. Okay. So you told us that this patent deals with that response that we saw on the animation

Page 10

yesterday, which is when the base station says, did you get all my packets, and then the terminal says, yeah, I got 1, 2, 4, 9, dropped 3 and 6?

A. Yes, sir, that's correct.

Q. Okay. And so are we -- is this patent dealing with that response back to the base station?

A. Yes, sir, exactly.

Q. What triggers this response that we're talking about?

A. In this case, there's a request. So the response is called a block acknowledgement, and the request is called a block acknowledgement request.

Q. Okay. And does this patent deal with the format of the response of that acknowledgement?

A. Yes, sir, it does.

Q. And why is the response format important?

A. Well, we'd like to have a number of possible different formats as part of the standard so that we can have flexibility in the system.

Q. When can a transmitter send this acknowledgement -- excuse me -- send a request?

A. Well, typically, it's sent after it's sent a group of packets that it wants to know whether or not they've been received or not.

Q. Now, explain to me, please -- you mentioned

Page 11

this invention gives flexibility. How does it do that?

A. Well, it allows the protocol to define a number of different possible responses and for the receiver to indicate which of those possible responses it's actually using in the block acknowledgement.

Q. Why not just have one?

A. Because really if we had one, we'd be saying that one size fits all; and one size, in this case, doesn't fit all.

Q. Is there in the patent an indication of different types of message formats and how the packets indicate which one is being used?

A. Oh, yes, sir, that's -- since that's the primary point of the invention, that's very clearly described in the patent.

Q. And what is that called in the patent?

A. That's called the type identifier.

Q. What does the type -- well, what is the type identifier? Is that one of the compartments that's in the packet going back?

A. Yes, sir, exactly.

Q. And we're talking here about the red packets rather than the orange ones?

A. Yes, sir. The red packets, they're going from the receiver to the transmitter.

Page 12

3 (Pages 9 to 12)

**A1367**

Q. And we see these three steps here?

A. That's right.

Q. So we should go through each three of the steps and see if those are met in the standard in the product.

A. That's right.

Q. Who have you found -- well, let me ask this: Does the programming that the Defendants put in their products perform this method automatically without user intervention?

A. Yes, sir, it does.

Q. And in addition to the Defendants, who else performs the method that you found?

A. The users of the devices the Defendants sell.

Q. Who's responsible for that?

A. The Defendants.

Q. Why is that?

A. The Defendants induce the users to practice this method by basically selling something that does the method and encouraging them to use it.

Q. And have you seen evidence that the Defendants intend that their devices be used for 802.11n?

A. Yes, sir. That -- that's -- that's the whole reason for selling them.

Q. And when 802.11n devices connect, do they

Page 25

connect at the highest speed they can, as in 802.11n?

A. Yes, sir, they do.

Q. Let's look at the first two steps here. Let's take them together. The first is sending a plurality of first data units over a communication link. And the next is receiving said plurality of data units.

A. Yes, sir.

Q. What devices perform these steps on the network?

A. The transmitter will send the plurality of data units. That's really saying that the transmitter sends packets, and the receiver will receive those packets.

Q. And -- and, again, as a reminder, although in one of these networks you have a router and either laptops or other devices, all of them are capable of transmitting and receiving, right?

A. Oh, yes, sir, and all of them actually do transmit and receive in the normal process of using the network.

Q. What are the data units that are referred to here, the first data units?

A. Those are the packets we've been looking at.

Q. The blue packets?

A. Yes, sir.

Page 26

Q. And are a plurality sent?

A. Yes, sir. It wouldn't be a very useful network if you only sent one packet.

Q. And would they be received after being sent at least --

A. Not always, but usually, yes, sir.

Q. Have you found these two elements met by the Defendants with regard to their accused products?

A. I have.

Q. I'm going to check those off as we go. Let's go to the next element. It says: Responsive to the receiving step, constructing a message field for a second data unit, said message field, including a type identifier field and at least one of a sequence number, field length, field, and content field.

A. Yes, sir.

Q. Let's parse this out.

This step has to be done responsive to the receiving step?

A. That's right.

Q. And have you found that is true in the Defendants' products?

A. Yes, sir, I have.

Q. Then it has to construct a message field for a second data unit?

Page 27

A. Yes, sir.

Q. Now, let's stop there.

What's the second data unit?

A. The second data unit in this particular case is going to be the block acknowledgement that the receiver is going to send.

Q. And what does a block acknowledgement do?

A. It acknowledges a group of packets and which ones have been received and which ones haven't.

Q. Okay. And has the Court given us a construction for this particular term?

A. Yes, sir, it has.

Q. And is that construction contained in the jury notebook at Tab 1, as well as on the screen here?

A. Yes, sir.

Q. And I think we made -- it says definition here. We may use construction and definition interchangeably. Would you read the Court's construction or definition to us?

A. Responsive to the receiving step, generating a message field, including a field that identifies the message type of the feedback response message from a number of different message types.

Q. Okay. Did you apply that in your work here?

A. Yes, sir. I'm required to.

Page 28

7 (Pages 25 to 28)

**A1371**

Q. Now, you called this a block acknowledgement, the --

A. Yes, sir.

Q. -- second data unit. What does a block acknowledgement do within the standard in the products?

A. Well, it's a way of acknowledging more than one packet at a time.

Q. Okay. This is the message in the tutorial you gave us about I received 1, 2, 5, and 9 and missed 3 and 6?

A. Exactly.

Q. Does the standard have rules about when receivers send block acknowledgements?

A. Yes, sir, it does.

Q. And when is that?

A. Well, when -- when it's -- the receiver is asked to send them, because it's gotten a block acknowledgement request.

Q. Okay. Does the receiver have to follow the rules?

A. Yes, sir, it does.

Q. How many different types of block acknowledgement requests are there?

A. There are two types of block acknowledgement requests.

Page 29

Q. Okay. What are those called?

A. We call them explicit and implicit.

Q. Does the standard define the type of response message that can be sent?

A. Yes, sir, it does. It defines a set of types.

Q. Okay.

MR. STEVENSON: Can we go to the next slide, please?

Q. (By Mr. Stevenson) All right. Is this a copy, or at least a slide that has the first page of the standard?

A. Yes, sir. This is the amendment from 2009 that basically set up 802.11n.

Q. Is this Plaintiffs' Exhibit 286?

A. Yes, sir, it is.

Q. And can we go into this and see which -- where those definitions are?

A. We can.

Q. Okay. We had something pop up, and we're going to be seeing a lot of this in the slides. I want to make sure that we're all understanding what we're seeing.

And have you got a copy of your standard in front of you?

A. I do.

Page 30

Q. Okay. And it may help you to look at that, whichever is better for you.

What are we seeing sort of pulled up on this slide as a call-out in front of the cover page of the standard?

A. Well, that's a figure that appears on Page 30 of the actual standard.

Q. Is this something you made up as an animation, or is this actually a -- a picture of the document?

A. This is -- this is a Xerox copy of the -- of the document.

Q. All right. And so this long rectangle with compartments is what -- can you relate it back to us or what we're -- what would be here?

A. It's the second data unit.

Q. The second data unit?

A. Yes, sir.

Q. And it would be one of these orange squares?

A. Yes, sir, one that's going from the receiver to the transmitter.

Q. So what we've done is we've -- we've zoomed in on the orange square now to look deep inside it, and this is -- this isn't an animation. This is really what's in the standard as to the compartments in that orange square?

Page 31

A. Yes, sir. And this is really what's going to be transmitted over the radio waves eventually, as well.

Q. So we're going to look into the orange square.

What are we looking for to see if there's infringement?

A. We're looking for this type identifier field.

Q. Okay. Will you show us -- can we zoom in on this -- on the standard and see where you found the type identifier field?

A. Yes, sir. If you'll -- if you'll notice, one of the compartments right in the middle is called BA control, and that's going to be where the type identifier field is.

Q. Okay. Is that a single compartment, or is it a -- compartments within a compartment?

A. So as we said, these are complicated systems, so often the compartments have compartments nested inside of them. So this is one of those kinds of compartments. So we should look inside to see the actual type identifier field.

Q. Okay. Sort of like those Russian gift-within-a-gift-within-a-gift things?

A. Yes, sir.

Q. All right. So we're now into now -- so what you've done is you've zoomed into what's inside that

Page 32

8 (Pages 29 to 32)

**A1372**

control field?

A. That's right.

Q. Is that more compartments?

A. Yes, sir. These are the compartments that are inside of that -- that control field. And this is actually on Page 31 of the standard.

Q. And that's Figure 7-16?

A. Yes, sir, it is.

Q. Okay.

A. And what we see here is that there are two fields that are highlighted, the multi-TID field and the compressed bit map field. And those two fields taken together are the TID that's described in the claim.

Q. There's numbers that say bits under the bottom of that?

A. Yes, sir.

Q. What do those numbers refer to?

A. Well, that's telling us that the very first bit of this field is the BlockAck policy and that the next two bits are the multi-TID and compressed bitmap and that -- and those are the ones we've identified as the TID. And then there are 9 that are reserved.

That's so that later on, if we want to change the standard, we can add stuff there.

Q. Okay. You said TID a couple of times --

Page 33

A. Type identifier.

Q. Type identifier?

A. Yes, sir.

Q. All right.

A. Sorry.

Q. Is that the type identifier that is called out in the claim?

A. Yes, sir, it is.

Q. The TID is the type identifier?

A. Yes, sir.

Q. And do you have to take these two compartments -- the multi-TID and the compressed bitmap together for your code?

A. You do.

Q. Okay. How many numbers go in that first compartment, the multi-TID?

A. Only a 0 or a 1.

Q. What about the next one, the compressed bitmap?

A. Only a 0 or a 1.

Q. So we have four variations of this, different types?

A. Yes, sir, exactly.

Q. In addition to a type identifier field, there has to be at least one of a sequence number, a blank

Page 34

field, and a content field. Can you show us where those are in the standard?

A. Yes, sir. If you look just to the right of the BA control field, there's something called a BA information field on the top figure.

Q. Now, that's -- that's in yellow now.

A. Yes, sir. And so that's -- that's where -- that's where the -- there's actually going to be a sequence number and a content field in the BA information field.

Q. Okay. Can you zoom into the BA information field?

A. Yes, sir, we can.

Q. Okay. Let's see what's in there.

There's two compartments or sub compartments within that?

A. Yes, sir. This is a figure from Page 33, and the first sub compartment is starting sequence control. That's a sequence number. And the second field is the BlockAck bitmap. That's a kind of content field. In fact, it's a content field that is a bitmap.

Q. All right. So does that satisfy this requirement of the content field?

A. Yes, sir, it does.

Q. Now, let's -- let's put our English grammar

Page 35

hats on for a minute.

It says -- the claim requires the message field include the type identifier field -- we've seen that?

A. Yes, sir.

Q. And at least one of them, a sequence number field, a length field, and a content field?

A. That's right.

Q. So for this part of the claim, at least one of, how many of these three selections need to be present for it to be met?

A. Just one.

Q. Why is that?

A. Well, because that's what "at least one of" means.

Q. So type identifier field, plus at least one of any of the following three selections, and this is true?

A. Yes, sir.

Q. Which one of the three selections does the standard use for the second part of that sentence?

A. The standard actually has two of them. It has a sequence number and a content field.

Q. Now, are there rules in the standard about what information has to go into each one of these slots?

A. Yes, sir. I mean, the rules are about what

Page 36

9 (Pages 33 to 36)

**A1373**

CASE PARTICIPANTS ONLY

are the possible things that can go there.  But in particular, there's very specific things in the standard about what can be in that type identifier field.

Q.  And is there some guidance given in there?

A.  Oh, yes, sir.  There's -- there's a table that explains what the possible values are and what they mean.

Q.  Here's what I think might be helpful for all of us at this stage is if we take this information we've seen here now and put it back into the format of that first animation you showed us, maybe it would be a little more helpful to us?

A.  Yes, sir.  It won't be as abstract then.

Q.  Right.  Okay.  So this is what we showed at the beginning to sort of introduce the patented idea.  Now we have this for purposes of the claim comparison.

A.  Exactly.

Q.  Is this back to the base station and terminal that we're seeing?

A.  Right, and -- and the transmitter and receiver.

Q.  And now instead of trying to depict how the patent works, are you trying to depict how the standard works?

A.  Yes, sir, I am, and -- and how the devices

Page 37

work that follow the standard.

Q.  So let's go ahead and roll forward with this.  All right.  We've seen some blue packets?

A.  Yes, sir.

Q.  So those are the information packets that are being sent?

A.  That's right.

Q.  And we have a yellow packet after it, which is --

A.  That's actually the BlockAck request.  So that's saying I'd like to get a BlockAck.

Q.  Block acknowledgement is a BlockAck?

A.  Sorry.  Block acknowledgement.

Q.  Okay.  All right.  Then does the terminal respond?

A.  Yes, sir, it does.

Q.  And what is the BA?

A.  That's a block acknowledgement.

Q.  That's what we just looked at with all the fields that nest within each other from the standard?

A.  Exactly.

Q.  Let's see how that works now.  Can we zoom into the block acknowledgement?  Is -- and this is compartments within it?

A.  Yes, sir.

Page 38

Q.  And have you shown -- are you just showing now the compartments that matter to the claims and taking out the remainder from the standard to show what's important?

A.  That's exactly right.

Q.  What's the first compartment you're showing?

A.  That's that type identifier that we talked about which is really two fields in that BA control field.

Q.  All right.

A.  So two bits.

Q.  And is there something that that would correspond to that's in the standard?

A.  Yes, sir.  That particular value says that it's a compressed BlockAck or a compressed block acknowledgement.

Q.  Okay.  We just saw some things pop up on this, and I want to make sure everyone knows what they are.  The type identifier that you pointed to, 01, remember before when we were talking about the patent, we went and looked that up in a table?

A.  Exactly.

Q.  Now we're talking about how the standard works.  Does that type identifier you found in the

Page 39

standard match up to a table in the standard?

A.  It does.

Q.  What's the number of that table?

A.  That table is -- that table is Table 7-6K, and that's Page 32 of the 209 stand -- 2009 standard.

Q.  In your example, you have the type identifier as 01.  What would that match up to in the table?

A.  That matches up to compressed BlockAck or compressed block acknowledgement.

Q.  Are there other message types other than compressed BlockAck that are allowed by the standard?

A.  Yes, sir, there are two other kinds, plus a reserved.

Q.  Okay.  And, again, those are identified on this chart, right?

A.  Yes, sir, exactly.  Those are the choices in the system.

Q.  And is this chart on the bottom of your animation, is that, again, taken directly -- is that a picture from the standard itself?

A.  Yes, sir.  It's on Page 32.

Q.  So if the jury later wanted to get Exhibit 286 and go to this page, they could see this lower half of the slide verbatim?

A.  Oh, yes, sir.  And on pages close to that,

Page 40

they could see the other things we've been looking at.

Q. Tell me what the other message types are that are defined by the standard.

A. There's a basic block acknowledgement -- that's another kind of bitmap -- compressed BlockAcks or bitmaps. Reserved means sometime in the future we might want to use that value; but right now we don't have a use for it because standards need to evolve, and so you often have reserved things.

And then the last one is called a Multi-TID BlockAck.

Q. Okay. And what does that do?

A. It lets you acknowledge more than one TID. That's another aspect of the system we'll talk about later on. So what it really is, is a list of bitmaps.

Q. Now, the Court's definition states that responsive to the receiving step, generating a message field, including a field that identifies the message type of the feedback response from a number of different messages.

Are there a number of different messages here in the standard?

A. Yes, sir, absolutely.

Q. Does the type identifier that you've identified, the -- the two numbers identify the type of

Page 41

feedback message response from one of the options in the standard?

A. Yes, sir. That's exactly its purpose.

Q. Is this element met by the Defendants?

A. Oh, yes, sir, it is.

Q. We checked off all three elements of Claim 1. And what does that allow you to conclude, Dr. Nettles?

A. That the claim is infringed and, therefore, that the patent is infringed.

Q. Do the Defendants' products send a type identifier in every block acknowledgement response?

A. Yes, sir, they do.

Q. And do the receivers construct them to respond to which packets they've received -- previously received?

A. Yes, sir, they do.

Q. Now, in addition to looking at the standard, did you do anything to double-check your analysis?

A. Yes, sir, I did.

Q. What did you do?

A. Well, I looked at documents. I looked at deposition testimony. I looked at the code. And I did testing.

Q. Did you test some representative models of the chipsets used by the Defendants to confirm they send a

Page 42

type identifier?

A. Yes, sir, I did.

Q. And would this type identifier be necessary for interoperability with other devices?

A. Yes, sir, it is.

Q. Let's go on to Claim 2 now.

Claim 2 is in a little bit different format. Can you explain to us what kind of format it's in?

A. It's called a dependent claim, so that means it depends on a different -- another claim.

Q. What -- what does it mean to depend on another claim, Dr. Nettles?

A. It means that to show that that claim is infringed, we first have to show that the claim that it depends from is infringed. In this case, we have to show that Claim 1 is infringed, and then we also have to show that any additional limitations that have been added are met.

Q. Is one way we can think of Claim 2 requires for infringement the -- every element of Claim 1, plus whatever is added by Claim 2?

A. Yes, sir, that's exactly what it means.

Q. So is it fair that Claim 2 would be narrower in scope necessarily than Claim 1?

A. Yes, sir.

Page 43

Q. Let's see what Claim 2 modifies. Again, we have to link up, I think, the -- the English here.

It says: The message type -- excuse me, I'm sorry, the message field comprises a bitmap message.

A. Yes, sir.

Q. So what -- what is this -- is this saying that when we get to this message field over here, that before -- in the -- in the main claim could be met by one of -- at least one of a sequence number, length filed, or content field, any one of these, is that narrowing this down for a particular selection?

A. Yes, sir, it's -- it's basically saying that the content field has to include a bitmap.

Q. And if the content field isn't a bitmap, is Claim 2 infringed?

A. No, sir, it's not.

Q. So this is basically saying that to perform this method, it has to be a bitmap every time, not something else?

A. That's right.

Q. Do the Defendants' devices that comply with the standard use a bitmap as the message type?

A. Yes, sir, they do.

Q. And we saw that compressed BlockAck in the prior slide. Is that a bitmap?

Page 44

11 (Pages 41 to 44)

**A1375**

A. Yes, sir, it includes a bitmap.

Q. Do the Defendants use a bitmap every time?

A. Yes, sir, they do.

Q. So they -- they select a bitmap consistently in their products?

A. Yes, sir.

Q. Have you found this element to be met?

A. I have.

Q. Do the Defendants infringe Claims 1 and 2 of the '215 patent?

A. They do.

Q. And are these claims, Dr. Nettles, essential to compliance with the 802.11n standard?

A. They are.

Q. Anything else to add on this patent, or can we move on to the next one?

A. We can move on.

Q. The next patent I would like to discuss would be the '435 patent.

A. Yes, sir.

MR. STEVENSON: Mr. Diaz, would you go back one slide?

Q. (By Mr. Stevenson) And just to remind everyone where we are in the order or table of contents, we've talked about the '215. We've got two coordination

Page 45

patents coming up, '435 and '625, and then two other patents. And I -- I may have called these the synchronization patents in opening. I call them coordination here, and that's just -- that's not a term in the claims. That's just my shorthand for it.

A. Yes, sir.

Q. All right. Let's go to the '435.

What is the filing date of this patent?

A. This was filed on March 18th, 1999.

Q. And what date did it issue?

A. December 11th, 2001.

Q. And we have the Examiners there. Who were those?

A. William Trost and Congvan Tran.

Q. So those are the people who work at the Patent Office as Examiners who reviewed these patents?

A. Yes, sir, that's exactly what it is.

Q. I think we have different Examiners on each one?

A. We do.

Q. What does this patent -- excuse me, what does this patent deal with?

A. We talked earlier about the idea that sometimes the transmitter needs to discard a packet. And when the transmitter does that, it has to

Page 46

inform the receiver of that so that they can stay in sync. And this patent involves what the receiver does to stay in sync with the transmitter.

Q. Okay. Let me go back to our example and hopefully it will be helpful and we can see where in the flow of packets this one fits in.

Now, we talked before about the message going back from the terminal to the base station. The patent just talked about saying here are the packets I didn't get?

A. That's right.

Q. Now, where does this patent pick up in that sequence of actions?

A. When the transmitter gets that block acknowledgement that says that some of the packets were missing, it has a choice. It can either retransmit those packets or it can decide to drop those packets.

But if it decides to drop the packets, the receiver is still waiting -- I mean, it told it -- the receiver told the transmitter, I haven't gotten this packet, so the receiver is waiting for that packet. So the transmitter needs to tell the receiver that it's not going to send that packet, and the receiver needs to forget about that packet.

Q. Why would the transmitter ever want to not try

Page 47

to retransmit a lost packet?

A. Well, we talked about this specific example of a movie or a phone call.

Sometimes it's better to just drop information and not re-transmit it and avoid creating a pause than it is to try to re-transmit it over and over again and make a disruptive pause.

Q. And in these ARQ type systems, who decides when they're going to stop trying to retransmit lost packets?

A. The transmitter is going to make that decision.

Q. Now, does the transmitter need to stay coordinated or in sync with the receiver when it's making these decisions about not retransmitting lost packets?

A. Yes, sir, it does.

Q. What does the Ericsson invention teach that the receiver has to do?

A. Well, the receiver is going to have to -- so the transmitter's going to have to send some information to the receiver, and then the receiver's going to have to compute which packets are no longer going to be retransmitted. And then it has to release its expectations of ever receiving those packets. Basically

Page 48

12 (Pages 45 to 48)

**A1376**

it has to forget about those packets.

Q. Okay. And then does it have it to keep some sort of record of this?

A. Well, yes, sir. So all the time it's keeping a record of which packets it expects, and then it has to update that record.

Q. Let's go through the claim on the foam board, and I think talk about it. I think the first couple will be quick, and then we have to dig into the details of the next few.

Is this another method claim?

A. Yes, sir, it is.

Q. And who performs, if you found this method?

A. The Defendants perform this method.

Q. And how do they perform the method?

A. Well, they program their systems to automatically perform this method without any user intervention.

Q. And in addition, do the Defendants, for the reasons you mentioned before, induce end users to do this, as well?

A. Oh, yes, sir.

Q. This is a method that's complementary to the selective repeat, automatic repeat request protocol.

And I know the preamble we don't have to check

Page 49

off, but just so people don't get confused or lost in this and wonder what's going on, can you explain what that lead-in generally means?

A. Well, it's -- yeah, could -- could you turn it? I --

Q. I'm sorry.

A. I don't have a -- I haven't memorized the exact language.

So this is explaining that -- this is a method that involves the discarding of these packets, as we've been talking about, and the transmitter and receiver have to coordinate. And --

Q. It says it's complementary. What does that mean?

A. Well, that -- I think what it really means is -- is this is -- this is an additional way an ARQ protocol can work.

Q. Okay. And -- and Ericsson isn't claiming in this case they invented the block acknowledgement?

A. Oh, no, sir.

Q. Or the ARQ protocol?

A. Oh, no, sir.

Q. Rather, these are specific enhancements and improvements to those particular things that have been around?

Page 50

A. Oh, yes, sir.

Q. The first element is transmitting a data packet discard notification message from the transmitter to the receiver, indicating data packets the transmitter has discarded.

And then the next step is receiving the data packet discard notification message?

A. Yes, sir.

Q. Tell us how that -- those two steps are met by the Defendants?

A. The transmitting step is met when the transmitter sends a block acknowledgement request, either an implicit one or an explicit one. And the receiving step is met when the receiver receives that block acknowledgement request.

Q. And, again, how many types of block acknowledgement requests are there?

A. There are two.

Q. And what are the two types of block acknowledgement requests?

A. Explicit and implicit.

Q. Now, did -- where did you get -- get the word implicit from?

A. It's in the standard.

Q. And can we show the -- the slide in the

Page 51

standard just so we could verify where you got that terminology?

A. Yes, sir. I think there's a slide that shows Page 136.

MR. STEVENSON: Can you go to the next one, Mr. Diaz? Well, let's just -- we'll just move on up. Maybe we could look at the standard. Can you pull up 9.10.7.5 from the standard, which is PX 286?

A. And go to Page 136.

MR. STEVENSON: Okay. There we go. Can you zoom in on that, Mr. Diaz?

Q. (By Mr. Stevenson) And I just want to show where it is -- where it calls this an implicit BlockAck request.

A. So if we look at the second line of the second paragraph.

MR. STEVENSON: I think you were there, Mr. Diaz. Second paragraph.

THE WITNESS: Blow up the second paragraph.

A. Now, if we look at the second line, we see it says: i.e., implicit BlockAck request or implicit block acknowledgement request.

MR. STEVENSON: There we go. We found it.

Page 52

13 (Pages 49 to 52)

**A1377**

Q. (By Mr. Stevenson) All right. What's the difference between an implicit and an explicit block acknowledgement request?

A. Could I -- could I give an example?

Q. Sure.

A. Suppose you're going to invite somebody to a party, so you send the party invitation; but you want to know whether or not they're going to attend the party. There's two ways that you could go about finding that out.

A few days after you send a party invitation, you could send them another piece of mail or you could call them on the phone and you could say, are you coming to the party? Let me know. That would be an explicit request, so that would be an explicit acknowledgement request for a party.

But the other way -- and probably the way you would do it first -- is you'd write RSVP on the invitation and then the person who got the invitation would know that they should send back an answer to tell you whether or not they're coming or not. So that would be an implicit request because it's part of the actual invitation, not a completely separate request.

Q. Does each of those two types of requests meet the claim elements?

Page 53

A. Yes, sir, they do.

Q. Does the system have to have both to infringe or just one, in your view?

A. Just one.

THE COURT: All right. Mr. Stevenson, if you're at a breaking place, I believe we'll take our morning break at this time, and we will be on break until 10:15.

Be in recess.

COURT SECURITY OFFICER: All rise.

(Jury out.)

(Recess.)

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right. You may proceed, Mr. Stevenson.

Q. (By Mr. Stevenson) All right. We were talking about the implicit and explicit block acknowledgement requests when we left; and just to pick back up, the block acknowledgement request is the transmitter of packets asking the receiver, what did you get and not get. Right?

A. That's right.

Page 54

Q. And we have two kinds of implicit and explicit, the RSVP and the regular?

A. That's correct.

Q. So let me ask about each one separately. And, again, does each one independently potentially infringe the claims?

A. Yes, sir, that's correct.

Q. Okay. So let me ask about each one separately, and we'll just go through them separately and discuss them as we go along.

How does the explicit block acknowledgement request indicate data packets the transmitter has discarded?

A. It's going to contain a sequence number, so a number that indicates someplace in the sequence of packets that we've been sending, and it's going to indicate that any packets below that sequence number are no longer being processed by the transmitter.

Q. And now let me ask the same question as to the implicit block acknowledgement request.

A. It's also going to contain sequence numbers, packets; and based on the sequence numbers in the packets in the implicit block acknowledgement request, the receiver is going to be able to compute which packets the transmitter is no longer going to transmit.

Page 55

Q. And we're going to talk a little more in detail in the next patent about these implicit and explicit block acknowledgements, but could you just give us an idea of when this implicit one is used?

A. Well, the implicit one is part of something called an A-MPDU.

Q. Okay. And just say that out for us so we're not all wondering.

A. Yes, sir. Well, that stands for aggregated MPDU. MPDU is the, I guess, unfortunate name that the standard gives to the packets that we've been talking about. And the A part means aggregated. So what that means is, really, we're going to send a bunch of packets as a group rather than one at a time.

Q. Okay. We're going to have a bunch of acronyms as we go along. Let me get you to say them out, and then let's just give an explanation for it that we can all understand, a shorthand for it.

We have an A-MPDU we're going to talk about, right?

A. Yes, sir.

Q. And that's an aggregated MPDU.

A. Yes.

Q. The A is. Now, what's the MPDU part stand for?

Page 56

14 (Pages 53 to 56)

**A1378**

A. Well, that stands for MAC protocol data unit, and that's the kind of packets that the MAC, which is what we're talking about, sends and receives.

Q. MAC protocol data unit. Okay. And that's a packet.

A. That's right.

Q. And what does MAC mean?

A. That means media access control.

Q. And that's another --

A. Yes, sir.

Q. What is a media access control?

A. The -- in these systems, you have to have some system for figuring who gets to talk when, who controls the floor, basically. And so that's media access, who gets to access the media. That's the radio waves.

Q. Is this --

A. And that's what the MAC does.

Q. Is this media access control, is this inside of each computer and router on the network?

A. Yes, sir. It's -- it's part of the 802.11 standard and its implementations.

Q. Is this how they decide who gets to talk when, so they don't talk over each other?

A. That's exactly what's it for.

Q. Okay. So now, having done all that, so nobody

Page 57

is wondering what do these mean, can we just say that as a shorthand subject -- if we ever need to refine it more later, let's refine it, but just as a shorthand, so it's understandable, an implicit block acknowledgement gets sent out with a group of packets?

A. Yes, sir. That is completely correct.

Q. And then let's go back to the claim elements.

The first step is: Transmitting a data packet discard notification message from the transmitter to the receiver indicating data packets the transmitter has discarded.

A. That's right.

Q. Is that either the implicit or the explicit block acknowledgement request?

A. Yes, sir, it is.

Q. And then would you expect those to be received by the packet -- received by the receiver?

A. Yes, sir, barring some error.

Q. So let's talk about the next two elements, and let's talk about those together.

The next element -- and this is, again, Claim 1 of the '435 patent -- is: The computing which data packets have been discarded by the transmitter based on the data packet discard notification message and then removing entries from a first list indicating the data

Page 58

packets expected to be received from the transmitter wherein the entries correspond to data packets identified in the computing step.

A. Yes, sir.

Q. Okay. I want -- that's a lot. I'd like to back up and talk about those in a little bit more explanatory detail.

Can you tell us generally what -- how this is done in the standard?

A. The standard defines something called a window, and the window involves which packets it's expecting to receive. And one of the manifestations of the window is in something called the scoreboard, and the scoreboard has a way of keeping track of actually a number of different windows all together.

Q. Okay. That's a lot of information. Let's see if we can --

A. I'm sorry.

Q. Oh, I know, and it's my job to try to unpack it.

Let's do this. Can we show in the standard the evidence that you relied on? And then what I want to do is, after showing all that, let's go back and look at an animation that you've put together so we can understand it a little more visually.

Page 59

A. Yes, sir, we can do that.

Q. First, let's just get this out on the table, as far as the information goes.

The defense counsel said in opening that 802.11 -- 802.11n doesn't have to compute discard packets. I don't know if you remember that --

A. Yes, sir. I --

Q. -- in the transcript.

A. I saw that in the transcript, yes, sir.

Q. Is that correct?

A. No, sir, it's not.

Q. Is there a computation in the standard?

A. Yes, sir.

Q. Can we see that computation in the standard?

A. Yes, sir, we can.

MR. STEVENSON: Will you pull up the standard, Mr. Diaz?

Q. (By Mr. Stevenson) Where should we go to?

A. We should go to 9.10.7.3, which is on Page 30 -- Page 134.

Q. Okay.

A. And if we look at Section B. So Section B is talking about when you get the implicit block acknowledgement.

Q. Okay. Is that the computation you were

Page 60

15 (Pages 57 to 60)

**A1379**

sequence numbers, and so we're going to store a packet with sequence number 1 in 1 and 2 in 2, et cetera.

Q. Can we show that?

A. Yes, sir, we can.

Q. And before we start, you put on there a dotted green box. What does that represent?

A. Well, I mentioned earlier that there was an idea of a window. So the window keeps track of, in the receiver, what packets it's currently expecting to receive. And so we see right now that the receiver's expecting to receive packets 1 through 6.

Q. Okay. Now, beneath it is our scoreboard?

A. Yes, sir.

Q. And explain what is shown on the scoreboard.

A. Well, the scoreboard is keeping track of which packets have actually been received and which packets haven't; and right now, we haven't received any packets, and so it says, no, for all of those packets.

Q. Now, can we put this into action and then see how packets show up and what happens to them?

A. We can.

Q. All right.

MR. STEVENSON: Let's start that.

Can you rewind that? That may have gone on a little bit fast. Carefully.

Page 65

Q. (By Mr. Stevenson) We saw a blue box come in from the left and drop into 1 and X. What does that indicate?

A. Well, that indicates that that packet was actually lost for some reason and didn't actually arrive.

Q. So let's -- let's make sure we all understand what we're seeing with reference to this.

One of these packets is coming into the terminal; and before it got there, it got lost.

A. Yes, sir. Probably because it was interfered with somehow.

Q. Microwave?

A. Microwave oven would be a good example.

Q. So what you've shown is X, an "X" there, because there was a slot in the terminal waiting to get the packet, never showed up?

A. That's right.

Q. Okay. Maybe better luck with the next one. What happens, let's say, with the next one here?

A. So we see the 2 come in and it's actually received, so it goes into the slot. And we also see that the scoreboard now says, yes, to indicate it was received.

Q. And is the terminal doing computations to

Page 66

update this scoreboard for the yeses that we're seeing here?

A. Oh, yes, sir.

Q. Okay. Let's show -- let's show what happens next.

A. So 3 is received. Again, it's updated in the scoreboard.

Q. Okay. What happens next?

A. 4 comes in. It's received. Again, it's updated in the scoreboard.

Q. Next slide.

A. 5 -- 5 is lost, also.

Q. Another microwave zap?

A. And then 6. It's received. So the scoreboard now indicates that the same information that we see in the -- in the actual buffers there, that 1 and 5 were not received.

Q. All right. So now our window is all taken into account. We have 2 missing packets?

A. That's right.

Q. Out of 6 possible packets?

A. That's right.

Q. What happens next?

A. Well, next we see an explicit block acknowledgement is going to come, and the first thing

Page 67

that's going to happen --

Q. Okay. Let's back up a little bit.

MR. STEVENSON: Can we back up that -- that movement?

Q. (By Mr. Stevenson) So you said an explicit block acknowledgement comes.

A. Yes, sir. I think actually in this animation it's -- it's any kind of block acknowledgement.

Q. Okay. So it could be an explicit or an implicit?

A. Yes, sir.

Q. Okay. And that would be sent by the base station in this example, if that's who is transmitting?

A. That's right.

Q. And that would be sent down to the terminal. Is that the -- the block acknowledgement request -- excuse me, I may be confused. Is this the block acknowledgement request we're talking about?

A. Yes, sir.

Q. Okay. So that comes from the base station down to the terminal, and it's indicating or it's asking which packets didn't you get; is that right?

A. That's right.

Q. Okay. What does that do, that request to the window?

Page 68

17 (Pages 65 to 68)

A1381

Case: 13-1625 Case: 13-1625 Document 179-1 Page: 378 Filed: 03/31/2014 Document: 177-1 Page: 378 Filed: 03/31/2014 (378 of 575)

CASE PARTICIPANTS ONLY

A. Yes, sir. There's typically a number of different windows, and they indicate different -- different things.

So the labels here say something about what the windows -- these particular spaces in this buffer mean.

Q. Why do we need all this detail?

A. Well, remember the goal of the patent specification is actually to teach someone who -- who knows how to build these kinds of networking systems to actually build the invention. And these are very complicated systems, and they need to be very detailed. Otherwise, the system might break. I think we've heard deadlock referred to. Getting all the details right are part of how you avoid deadlock.

Q. Let's turn now to the claim. This is Claim 1 of the '625.

A. Yes, sir.

Q. I believe that's on the next to the last page of the patent.

A. Yes, sir.

Q. It's actually in Column 10.

Is this another method claim?

A. Yes, sir, it is.

Q. And what is the method that's being claimed?

Page 77

A. It's a method for discarding packets in a data network. And then it goes on to explain that it's a packet transfer protocol. It includes an automatic repeat request scheme. That's ARQ scheme, and then it says what the steps are.

Q. Let's go through these steps. And maybe the best thing we can do is read these all the way through just so we know what we're going to be looking for, and then I may ask you a bunch of questions about how to understand them.

A. Okay.

Q. The first one is a transmitter in the data network commanding receiver in the data network to (a) receive at least one packet having a sequence number that is not consecutive with the sequence number of a previously received packet. And (b) release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet.

A. Yes, sir.

Q. Then the next one is the transmitter discarding all packets for which acknowledgement has not been received, and which have sequence numbers prior to the at least one packet.

A. Yes, sir.

Q. Which of the Defendants' devices practice this

Page 78

method?

A. All of them.

Q. And, again, are the Defendants responsible for performance of the method?

A. Yes, sir, they program their devices to do these steps without human intervention.

Q. And do end users of the devices also perform these steps of the method?

A. Yes, sir. And they're induced by the Defendants, as we discussed before.

Q. So let's talk about now the elements.

What have you found to be the first command we talk about here?

A. The first command is when you send a packet which is not consecutive with a subsequent packet.

Q. Is that, again, the transmitter sending the packet?

A. Yes, sir, the transmitter is sending the packet.

Q. Do all accused devices have transmitters and capable of transmitting?

A. Yes, sir, they are.

Q. So we have a command -- or two things, receiving at least one packet out of sequence, and then (b) releasing expectation?

Page 79

A. Yes, sir.

Q. Okay. Let's talk about those separately.

A. Okay.

Q. What have you found satisfies the receive at least one packet having a sequence number that is not consecutive with the sequence number of a previously received packet limitation?

A. That's met when you send an MPDU or an A-MPDU which is not consecutive with a previously delivered packet.

Q. Okay. And what makes that a command?

A. Well, the system doesn't have any choice about whether or not to accept that packet or not. It's -- it's required to do that, and that's what makes it a command.

Q. Okay. Can you tell us where that is in the standard?

A. Yes, sir. If we look at the 2009 standard -- I'm sorry, I don't know the Exhibit Number for that.

Q. I believe it's 286 -- PX 286.

A. If we look at Page 137, and if we look at Section 9.10.7.6.1 at the top, it actually has a discussion of 9.10.7.6.2 and 9.10.7.6.3, and 9.10.7.6.2, which is just below, is where we would find the commands to receive. And then part of the command -- part of the

Page 80

20 (Pages 77 to 80)

**A1384**

next -- the next element -- the next subpart in B is going to be in 10.6.2 and part of it's going to be in 7.6.3, which is, again, below.

Q. Okay. That was a lot. Maybe what might be helpful -- and it's obviously -- we've got to get through this and explain it.

Maybe we could look at this and get a character or flavor for what kind of information we're seeing and then let the jury see how it's written and then we may have to, I think, go into an animation to explain this in a little more understandable format.

MR. STEVENSON: Mr. Diaz, can you go to one-page mode, please, and just take a look at that?

Can you go back -- I think we were -- maybe go to a single page so we can see a little bit.

A. And do you want to look at 6.2?

Q. (By Mr. Stevenson) Yes, let's scroll down and see what we're looking at. I mean, these are essentially detailed rules for conduct of the system, right?

A. Exactly.

Q. Okay.

MR. STEVENSON: Can we go to 6.2 and zoom in on that? And then let's go to the next page and take a look at that, please.

Page 81

A. We want to keep this one, also.

Q. (By Mr. Stevenson) Okay.

A. If we -- if we can do that.

Q. I think we can. Which is -- which is the command here to receive an out-of-sequence packet?

A. Well, it's -- it's a combination of two spots. The top spot, which is in 6.2 (a) is saying what happens when you get a packet where the sequence number is inside of the window. And No. 1 says: Store the received MPDU in the buffer. And the (b) step that's just below it on the screen is what happens when the sequence number is outside of the window, above the window, and it also says: Store the received MPDU in the buffer.

And so together, those say whether or not it's in the window or out of the window. You have to store the MPDU, and that's the receive.

Q. And where's the command to release expectation?

A. If we look at the (b) part that's at the bottom for the implicit block acknowledgement request, it's Steps 2 and 3. That's basically changing the way the window works.

And now, if we look a little further down on that page, we'll see where the explicit block

Page 82

acknowledgement request is.

So blow up the section which is 7.6.3.

Q. Okay.

A. And that's the explicit block acknowledgement request. And there it's in Section (a), 1 and 2. Those define how the -- the command about expectations.

Q. Okay. Are these commands?

A. Yes, sir. Again, you don't get to ignore them.

Q. And how are the commands communicated into the accused devices?

A. Well, the programmers build the devices to work this way.

Q. So if you're building a device that you want to be interoperable and work according to the standard, you have to basically program these commands into your device?

A. Yes, sir.

Q. Okay. Now, we've seen a lot of rules and window moves. I'd like to step back from the standard for a minute, and I know you prepared an animation where we can see visually how this works and maybe that will help us understand better.

A. Yes, sir, I think it will.

Q. All right. What are we seeing here?

Page 83

A. Well, here, again, we're seeing part of the internals of the receiver with this buffer -- with these slots. That's just like in the previous animation, but now we're actually seeing the base station which is going to act as a transmitter.

Q. Okay. And it's transmitting packets?

A. Oh, yes, sir. That's how we can transmit in these systems.

Q. Okay. And is this what we're going to see, like, before the packets come and get slotted in?

A. That's right.

Q. Is there a window?

A. Yes, sir, there is. And we see it. It's the same window actually as we saw before.

Q. Okay. And this is, again, looking at the receivers?

A. That's right. This is inside the receiver's brain, if you -- if you will.

Q. All right. Can we start showing packets going in again to the window?

A. We can. Now we see they really come from the transmitter. Again, the first one's lost. The second one is received. And because the first one was lost, this one isn't consecutive with -- we don't see 0 in the picture, but 0 is the previous one. So this is actually

Page 84

21 (Pages 81 to 84)

**A1385**

CASE PARTICIPANTS ONLY Document: 177-1   Page: 380   Filed: 03/31/2014

A. Well, now we're talking about -- again, this is a transmitter-sort-of-focused claim, and now what we're saying is that once the transmitter tells the receiver that it's no longer interested in retransmitting certain packets, it can just throw away the packets that are below the point that it said now I'm -- it's saying I'm -- now I'm interested in this spot, but nothing before it, and so the transmitter can discard everything that's before it.

Q. So once the window moves on and the packet isn't going to be transmitted ever again, what happens to it?

A. Well, the transmitter's going to discard it because it's going to re-use that space for other packets.

Q. Any point in keeping it?

A. No, sir, not at all.

Q. And is this element met by the accused devices?

A. Yes, sir, it is.

Q. I wanted to ask you some questions about the Defendants' products and their practices.

Do the Defendants use both in their products, implicit block acknowledgement requests and explicit block acknowledgement requests?

Page 93

A. Yes, sir, they do.

Q. When are implicit block acknowledgement requests used?

A. When you send one of these A-MPDUs, one of these groups of packets together, my understanding is that those are almost always sent as implicit BlockAck requests.

Q. Okay. And do all the Defendants' products send A-MPDUs?

A. Oh, yes, sir. That's one of the important innovations of 802.11n is sending these packets in groups. It's more efficient.

Q. When are explicit block acknowledgement requests used in the Defendants' products?

A. Well, one of main times is when you send an implicit block acknowledgement request and then that causes a block acknowledgement to be sent, well, block acknowledgements can get lost, also. And so if the block acknowledgement gets lost, then you have to ask again and the systems ask again by sending an explicit block acknowledgement request.

Q. Have you checked the source code for the domestic chip manufacturers to verify the accused devices follow the standard as advertised?

A. Yes, sir.

Page 94

Q. And have you seen implicit block acknowledgements sent during your testing of representative chipsets used in the Defendants' products.

A. Yes, sir.

Q. And same question for explicit block acknowledgement requests.

A. Yes, sir.

Q. Which one is more frequent, implicit or explicit?

A. Oh, the implicit, sir, are much more frequent.

Q. And -- and what's the order of magnitude or the ratio, approximately?

A. Well, it -- it really depends on the conditions, but a hundred times more frequent, a thousand times more frequent, 10,000 more -- times more frequent.

Q. Okay. And what about the conditions influences how many explicit block acknowledgement requests will be sent?

A. Well, if you have conditions where it's likely for the block acknowledgements to get lost, it makes it more likely that you're going to send an explicit block acknowledgement request to fix the fact that a block acknowledgement got lost.

Page 95

Q. Can you give me a real-world example? When does that kind of thing happen?

A. Probably the easiest to understand case is if you're communicating at the edge of your transmission range. So it's very easy to lose packets at the edge of the transmission range. That's one of the places it's most likely to see explicit block acknowledgement requests.

Q. So if I have -- let's say I have a router.

A. Okay.

Q. And I had an Internet a connection, I'd plug it in right here at the podium.

A. Okay.

Q. Put it right here.

A. Okay.

Q. I guess this is where the radio is, right?

A. It's where one of them is, yes, sir.

Q. And then whatever I'm talking with, if it's a laptop or my phone is on Wi-Fi, if I'm real close, I have pretty good reception?

A. If you're real close, you have great reception.

Q. So I'm not going to get very many block acknowledgement requests that are explicit in that circumstance?

Page 96

24 (Pages 93 to 96)

**A1388**

A. I wouldn't expect you to.

Q. Okay. Now let's say I was walking away and I go down the hall and further down the hall and further down the hall. I mean, sooner or later, I'm going to get out of range of this thing, right?

A. Right.

Q. And I'm going to have nothing.

A. Right.

Q. But if I get pretty far away, but I can still get some radio reception, then what happens to the frequency of block acknowledgement responses that are the explicit type?

A. I would expect to see it go up.

Q. Are these things essential to compliance with the 802.11n standard?

A. Yes, sir, they are.

Q. And, again, in the infringement analysis you've done, does it matter to you at all whether or not Ericsson was present or not present at 802.11 meetings when these were being put into the standard?

A. No, sir. Infringement analysis really is exactly what we've been doing: Looking to see if the products meet the claims.

Q. Let's now move on to the next patent. And this is going to be the '568 patent.

Page 97

MR. STEVENSON: It's at Tab 4 in the jury notebook.

A. Thank you.

Q. (By Mr. Stevenson) When was this patent filed for, Dr. Nettles?

A. It was filed on October 15th, 1996.

Q. And what is the date this patent issued?

A. October 15th, 2002.

Q. And who are the Examiners on it?

A. Wellington Chin and Frank Duong.

Q. Can you give us a headline encapsulation of what this patent is about?

A. This packet -- this patent is about the fact that different kinds of data in the network need different treatment, and so there needs to be a way of identifying the kind or type of data that is in a packet so that it can be given a different treatment.

Q. And is this -- what type of data are you talking about, as far as different kinds?

A. Well, in the -- the claim construction examples, include video, voice, just regular data. Those are examples in the -- in the standard also.

Q. And I believe we can all turn to Tab 1 to look at the claim construction for the '568 patent. And the Court was construing the service type identifier, which

Page 98

we're going to talk about in a minute, which identifies the type of payload information.

A. That's right.

Q. And how did the Court define that?

A. As an identifier that identifies the type of information conveyed in the payload. Examples of types of information include, but are not limited to, video, voice, data, and multimedia.

Q. Okay. Well, let's talk a little bit about the setting in which the inventors came up with the invention.

What is that?

A. They were working on cell phone standards. And remember, this patent was filed in 1996.

So at that time, cell phones really -- all they could do is voice. But they were looking forward to a time when cell phones would be able to do voice and video and web pages and e-mail, just -- just like cell phones do today.

Q. And what kind of issues can be created by sending different types of data over the same network?

A. Different kind of -- kinds of data in particular have different delay tolerances. And so if you want to take into account the tolerance for delay, there needs to be extra -- there needs to be new

Page 99

functionality in the network to allow you to do that.

Q. Can you give us an example?

A. The example we've been talking about most frequently is with voice or video.

If your e-mail is delayed by a minute or two, it's not a big deal. If there's a one-second pause in a video that you're watching, then that's probably annoying.

If there's a one-second pause every minute in a phone conversation, that's -- probably makes it pretty hard to have a phone conversation. And if it's every few seconds, it's impossible to have a phone conversation.

Q. Can you have phone conversations over these wireless networks?

A. Yes, sir. I mean, that's one of the main things we do over them.

Q. How do you do that?

A. Well, that's -- I mean, that's what cell phones do. But you can also do that over the data network by using what we call Voice over IP technology. That's a way of doing phone calls over the Internet.

Q. Okay. And when I asked my question before, I was really referring -- and I didn't ask it well -- to the wireless Wi-Fi networks.

Page 100

25 (Pages 97 to 100)

A1389

A. If we look at Page 13, we see Figure 7-1. This is the MAC frame format. Again, frame is another word we use for packet.

Q. Let's all understand what we're seeing here. Let's make sure we're all on the same page, so to speak. This is one of the diagrams out of the actual standard?

A. Oh, yes, sir. It's on Page 13.

Q. And, again, this is a verbatim copy, right?

A. Yes, sir.

Q. Not something you created as a demonstrative; this is the actual evidence.

A. Yes. This was -- yes, sir. This was scanned from the -- from a copy of the standard.

Q. And this is called the MAC frame format.

A. Yes, sir.

Q. What's a MAC frame?

A. Well, again, MAC is the media access control layer. That's what -- essentially, everything we've been talking about so far, where all of that functionality resides.

And frame is just a different word for packet. And format just means how is the packet laid out into compartments.

Q. Is this one of those blue things or one of the orange things?

Page 109

A. Well, actually, this is a general one, but this is basically one of the blue things.

Q. Okay. So this is the overall look at a blue packet?

A. Yes, sir.

Q. And this is actually not -- the control information, this has the data that's the video or video, right?

A. That's right.

Q. And does every one of these packets have the format that's defined there?

A. Yes, sir, the ones that carry data do.

Q. I mean, do they all have to be consistently the same?

A. Well, yes, sir, or otherwise, there's -- I mean, again, it's -- everything has to be consistent for people to be able to talk.

Q. Okay. So next -- can you show us where we can look into the compartments of the packet to find the first field and the second field that's recited in the claims?

A. Yes, sir. If you look at the field that says frame body, that's the payload. That's the first field.

Q. Okay. Why do you call that payload?

A. Well, that's the place in the -- in the frame

Page 110

that you would deposit the data. And we call the data the payload. That's just the terminology.

Q. Okay. And can you tell from looking at this diagram -- the way it's drawn, they're all the same size box? In reality, are they all the same sizes in the real packets that fly around?

A. Oh, no, sir. In fact, that's an important part about this picture, is that it shows -- above it shows a number, and the number says how many bytes that compartment can be.

And, in fact, one of the reasons that it's clear that the frame body is the payload is because it says it can be from 0 bytes all the way up to 7,955 bytes.

So that's where -- remember, we talked about the packets being variable size? That's where the variable size happens.

Q. Okay. And bytes being a computer term for?

A. 8 bits.

Q. And bits being a computer for?

A. 1s and 0s.

Q. Okay. So this is -- this is a lot of 1s and 0s in the frame body, and those 1s and 0s are going to correspond to whatever content is being sent?

A. Exactly.

Page 111

Q. So that -- that's your payload?

A. That's right.

Q. And is payload a pretty typical word that people who deal with these kind of packets use to describe the content?

A. Yes, sir. It's not the only word, but it would be typical. Everybody would understand that word.

Q. So we talked about the payload information in the first field. Now, what we need to know next is, is there a second field, separate from the first field?

A. Yes, sir.

Q. Have you identified that second field?

A. I have.

Q. And can we show it on here?

A. We look at the QoS control field.

Q. Is that separate from the payload field?

A. It is.

Q. Does that field include a service-type identifier which identifies a type of payload information provided in said at least one first field?

A. Yes, sir, it does.

Q. And we have "at least one" again. What does "at least one" mean?

A. "At least one" means -- sorry. I need to --

Q. Just in ordinary parlance, does that mean one

Page 112

28 (Pages 109 to 112)

A1392

or more?

A. Yes, sir, it does.

Q. So you could have one payload -- or more important, two or three payloads and meet this claim?

A. Oh, yes, sir. It's just that in this case we only have one payload.

Q. But that -- that -- the payload and the -- and the -- the first and second field, payload and the other one, have at least one field?

A. Yes, sir.

Q. What is inside the QoS control field you've identified?

A. Well, it's another one of these nested compartments. We have to look inside.

Q. What does QoS stand for?

A. That stands for quality of service.

Q. What does quality of service generally mean?

A. It's the term we use when we want to distinguish between different kinds of data and we want to give them different qualities of service. Like we want to give very good quality of service to voice and pretty good quality of service to video and best effort quality of service to data.

Q. Okay. So now you zoomed in on what's inside the QoS control, and we have another format chart.

Page 113

A. That's right.

Q. And that's from where in the standard?

A. That's Table 7-4. That is on Page 16 of the standard.

Q. Of the --

A. 2009 standard.

Q. PX 286?

A. Yes, sir.

And what that's showing is that in that field, the first four bits -- those are bits 0 through 3 -- are a TID.

Q. Okay. Let me -- let me stop you there, and ask you: You say bits 0 to 3?

A. Yes, sir.

Q. When it says bits, are you talking about data bits?

A. Yes, sir.

Q. And under that, then, there's a list of six rows.

A. Yes, sir.

Q. Each of them says TID in it.

A. That's right.

Q. What's that referring to?

A. Well, each of the rows is a different kind of packet that all have this same basic format inside of

Page 114

them. So the column to the left of the TID column describes exactly what those different kinds of packets are.

Q. Okay. Does TID stand for something?

A. Type identifier.

Q. And does that type identifier correspond, in your opinion, to the service-type identifier that is required for the elements of the claim?

A. Yes, sir, it does.

Q. Do all 802.11n devices have to follow this packet format?

A. Yes, sir, they do.

Q. Is there anything in the standard that would map the TID value to the type of information it would contain?

A. Oh, yes, sir. There's a table.

Q. All right.

MR. STEVENSON: Can we show that table?

Q. (By Mr. Stevenson) We jumped to another slide here.

A. Yes, sir.

Q. Which exhibit is this from?

A. This is from PX 0283. That's the earlier 2007 standard.

Q. And explain how these 2009 and 2007 standard

Page 115

books you have interrelate.

A. Well, the -- the 2007 standard stands on its own. It's complete. But the 2009 standard is basically a revision. So it says how to revise the 2007 standard to be the 2009 standard. So it has all the additions.

If there's a change, it will show the deletions. But if it's not an addition or a change, it's going to be in the 2007 standard.

Q. Okay. So this one is in the 2007, and it carries forward to the 2009?

A. That's right.

Q. And, again, is this -- this isn't something you created. Is this verbatim from the standard?

A. Yes, sir, it is.

Q. Explain what this chart is, please.

A. Well, this is a chart that's showing what the possible values for that TID field are. That's the UP, the user priority field, in this table. And we see highlighted at the bottom 4, 5, 6, and 7.

And if we look to the right, we'll see that 4, 5, 6, and 7 are AC_VI, which is a designation for video, and then AC_VO, which is a designation for voice.

Q. Okay. Let me -- let me ask you to walk back through that with me just to make sure I've understood it. In the left - second to the left column, the one

Page 116

29 (Pages 113 to 116)

**A1393**

I'm pointing to with the blue arrow -- that column.

A. Yes, sir.

Q. Where would those numbers go in the prior slide that we looked at?

A. They would go in the TID field that we saw.

Q. So the TID field is going to be a 0, 1, 2, 3, 4, 5, 6, or 7?

A. Yes, sir.

Q. And does that number -- would that go into the QoS control field that we looked at in the -- in the packet?

A. Yes, sir. The TID field that we looked at is a subfield of the QoS control field.

Q. Then in the AC field, we have AC_VI -- AC_VI AC_VO, AC_VO.

A. Yes, sir.

Q. What do those refer to?

A. Those are the particular names the standard gives to the -- these particular priorities. So AC_VI are -- is priority 4 and 5, and AC_VO is priority 6 and 7.

Q. Now, defense counsel said in opening that this 802.11n doesn't identify what's in the payload. And I think we saw a slide of a milk truck in the fast lane.

Do you remember that?

Page 117

A. I saw that slide, yes.

Q. Well, is that right?

A. Well, I mean, this table says voice and video, doesn't say milk truck, but it doesn't say fast lane?

Q. Okay. So what is the significance of the table saying voice or video within the standard?

A. Well, this table is telling someone who would use this capability that if they want to carry voice, they should give it a UP of 6 or 7. And if they want to carry video, they should give it a UP of 4 or 5.

Q. So if you wanted to take advantage of the quality of service capabilities, you could do that?

A. Yes, sir.

Q. Okay. Are all the -- excuse me. In what part of the computer is this performed, this element?

A. Well, this is -- this is performed in the MAC.

Q. That's the media access controller layer?

A. Yes, sir, it is.

Q. And is that one of the lower layers or lower levels of the -- what I'll call the transmission stack?

A. Yes, sir. We're going to see a picture of that in a few minutes, but it's the -- it's the second lowest layer.

Q. Do all the accused computers in this case have the capability of transmitting this TID field as part of

Page 118

the packets they transmit?

A. Yes, sir, they do.

Q. Is the same true for the router?

A. Yes, sir, it is.

Q. How do the routers meet these functional limitations?

A. Well, they also have a processor that arranges these fields and creates these payload fields, puts payloads in them, creates this type identifier field, puts this value in them in really the same way as the computers and laptops do.

Q. Have you found the first element to be met in the Defendants' products?

A. Yes, sir.

Q. Let's talk about the second elements. A transmitter for transmitting information received from said processor, including said at least one first field and said at least one second field.

So you've got another one here that requires the first and second fields that we've defined up here to be transmitted -- well, at least a transmitter for transmitting them.

Do the accused devices have a transmitter?

A. Yes, sir. I mean, that's -- that's part of the main point of them, is to be a transmitter and a

Page 119

receiver.

Q. And do they actually transmit the first field and second field along with every transmission?

A. Yes, sir, they do.

Q. Do you find that element to be met?

A. Yes, sir, I do.

Q. Let's move on to Claim 5. What kind of claim is Claim 5?

A. It's another one of these dependent claims. It's still an apparatus claim.

Q. Okay. So this -- is this the same thing we've done before where we go through and see if No. 1 and No. 2 are met and then we have to add on -- there's a next element -- what is in Claim 5?

A. Yes, sir, exactly.

Q. So the first two elements carry over and now we just need to see if 5 is true?

A. Yes, sir.

Q. In your opinion, which Defendants infringe Claim 5?

A. The router Defendants.

Q. Just the router Defendants?

A. Yes, sir.

Q. And why just the router Defendants?

A. Because this limitation requires a base

Page 120

30 (Pages 117 to 120)

**A1394**

station, and the routers are base stations.

Q. What is a base station?

A. A base station is something which connects a wired network and a wireless network. So your router is an example. The things that you see on the cell towers are examples.

Q. I've heard of cellular base stations before.

A. Yes, sir.

Q. Are -- are these routers and access points we're dealing with in this case, these Defendants, are they fairly called base stations, also?

A. Yes, sir. I think the Defendants call them that.

Q. Is this term -- terminology equally applicable to cellular, as well as Wi-Fi?

A. Absolutely.

Q. Have you seen evidence that the Defendants actually refer to their routers and access points as base stations?

A. I have.

Q. Did you put it on the slide?

A. Yes, sir, I did.

So this is for NETGEAR.

Q. It is PX 0509?

A. Yes, sir. And it says: There are various

Page 121

types of access points, also referred to as base stations, used in both wireless and wired networks.

Q. Do you find Claim 5 to be met in the accused devices?

A. In the router accused devices, yes, sir.

Q. Thank you.

Is the capability in these claims to transmit the first field and the second field essential to compliance with the 802.11 standard?

A. Yes, sir, it is.

Q. And how does this capability improve the performance of Wi-Fi networks?

A. The performance of Wi-Fi networks is -- this lets you do quality service. So this lets you prioritize voice and video, and that's going to improve the -- the performance in the sense that you'll get better performance for the things that you care about having a low delay, and the things that tolerate delay better will -- you'll be allowed to have a little bit more delay, so...

Q. Are there programs that actually use this capability that is within the routers and the computers?

A. Yes, sir, there are.

Q. And is this -- are these marketed as QoS devices? Is that how they're described in the market?

Page 122

A. Yes, sir. They'll mention something about QoS, or there will be some QoS aspect that you'll have to -- that they'll tout.

Q. All right. Are there a lot of programs or applications currently in the market that take advantage of this capability?

A. No, sir. Really just a handful.

Q. Okay. Have you identified some, though?

A. Yes, sir, I have.

Q. Which ones have you identified that use this capability?

A. Well, one example would be a program called CSipSimple, which runs on Android phones.

Q. CSipSimple?

A. Yes, sir.

Q. And how do you get that if you have an Android phone?

A. It's a free application.

Q. What does it let you do?

A. Well, it lets you -- it's another one of these programs that lets you make the free foreign phone calls over the Internet.

Q. Okay. And that runs on Android?

A. That particular one does.

Q. And does that take advantage of this

Page 123

capability?

A. It does.

Q. Are you aware of others that run on computers that take advantage of this capability?

A. Yes, sir. The Skype program I mentioned before and a program called Ekiga, when running on the Linux operating systems, takes advantage of these capabilities.

Q. Okay. And what does Ekiga do?

A. It's -- it's, again, another one of these Voice over IP phones, although I think it's more focused on making video calls.

Q. Okay. Like a video conference thing for your computer?

A. Yes, sir.

Q. Okay. And does Windows have any programs or applications that take advantage of this capability?

A. Yes, sir. Under Windows 7 and Windows 8, actually, there's a facility called QA that once you start it, Windows Media will take advantage of this quality of services to, for example, stream video to an XBox using quality of service.

Q. And does it do that the whole time, or does it do it adaptively?

A. It does it adaptively. So it won't always

Page 124

31 (Pages 121 to 124)

**A1395**

take advantage of this facility. Only when it thinks it's advantageous to do so.

Q. And how did you determine that these programs are actually taking advantage of this capability?

A. I ran them.

Q. Okay. And did you see some testing done by Defendants' experts where they ran some of these programs as well?

A. Yes, sir, I did.

Q. And were they able -- were you able to see another test where they saw this capability being taken advantage of by the programs?

A. In certain cases, yes, sir.

Q. Okay. And let me ask you this: I know you said it's a handful of programs currently being offered; but does the fact that it is currently a handful of programs using this and taking advantage of this feature, affect your opinion on whether the computers and routers infringe this apparatus claim?

A. No, sir, not at all. This -- this claim is infringed because of the capability of doing this.

Q. Okay. Is there anything we need to talk about more on the '568 patent?

A. Not that I can think of.

Q. Let's go to the next patent.

Page 125

THE COURT: How long do you anticipate this patent will take?

MR. STEVENSON: 25 or --

THE COURT: All right. I think we better break for lunch. We've been going a pretty long time now, so...

All right, Ladies and Gentleman of the Jury. I -- we will take our lunch break at this time.

Please remember my instructions. Don't discuss the case amongst yourselves or with anyone else. Enjoy your lunch, and we'll see you back here at 12:25.

We'll be in recess.

COURT SECURITY OFFICER: All rise.

(Jury out.)

(Lunch recess.)

Page 126

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.

/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.: 3081
Expiration Date: 12/31/14

/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.: 731
Expiration Date 12/31/14

Page 127

32 (Pages 125 to 127)

A1396

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL      )
                DOCKET NO. 6:10cv473
  -vs-              )
                Tyler, Texas
            )  12:27 p.m.
D-LINK CORPORATION, ET AL      June 5, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

---

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

---

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

All right, Mr. Stevenson.  You may continue.

SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION (CONTINUED)

BY MR. STEVENSON:

Q.  Dr. Nettles, let's turn to our last patent, the '223 patent, which I call the timer patent.  This one is contained in Tab 5 of the jury notebook.

What is the date of filing of this patent?

A.  It's filed April -- April 6th, 1999.

Q.  And when was the patent issued?

A.  February 12th (sic), 2003.

Q.  Who's the Examiner?

A.  Ken Vanderpuye.

Q.  And what is this patent related to and what does it do?

A.  Well, this patent is related to this question we've been talking about concerning discarding packets.  And what it does is improves on previous techniques for deciding when to discard the packet.

Page 3

---

Q.  So would this be something that is taking place inside the transmitter?

A.  Yes, sir.

Q.  And how does this relate to the notion of deciding whether or not to discard -- excuse me, not to discard -- how does this relate to the notion of whether or not to try to retransmit a packet?

A.  Well, this is an improvement on how you would decide not to retransmit a packet.

Q.  So if the receiver is transmitting something -- excuse me.

If the transmitter is transmitting a bunch of packets and gets back one of those acknowledgements saying some of the packets didn't get received, now the transmitter has a choice, either try to re-do it, or move on?

A.  Yes, sir, that's correct.

Q.  Does this patent deal with improving the way the transmitter makes that choice?

A.  That's exactly what it deals with.

Q.  And how does it -- what is the improvement?

A.  Well, the improvement involves using a timer to time the lifetime of the packet, and in particular, exactly where in the system to start the timer.

Q.  Okay.  Well, why don't we now step back and

Page 4

1 (Pages 1 to 4)

**A1397**

India, right?

A. Yes, sir, that's correct.

Q. Done in a facility you never even visited?

A. Yes, sir, that's correct.

Q. Done by people who at least as of a month ago you couldn't even identify for us, right?

A. Yes, sir, that's correct.

Q. You never went to supervise, you never went to observe. You sent it over there, and you got the results back, correct?

A. Well, I interacted with them by phone, but, yes, that's correct.

Q. Now, the work was done by what you call a litigation support company, right?

A. I don't think that's what I said, but, yes, sir, that's correct.

Q. All right. And that's a company that helps people that they know are in lawsuits with other people, right?

A. Yes, sir.

Q. Now, some of the testing that you did was done on products that aren't even accused of infringement, right?

A. Yes, sir.

Q. And that's because, in your view, all that

Page 25

matters is the chips, right?

A. Yes, sir, that's correct.

Q. You said this case is about the chips; that's what matters, and so that's what I tested. Right?

A. No, sir, I can't agree with that.

Q. Well, what you said was it's the Wi-Fi chips that are at issue in this case, and that's what I tested?

A. Yes, sir, I agree with that.

Q. So, for example, you would agree that many, many, many of the laptops that are accused of infringement in this case run on what we all know as Microsoft Windows, right?

A. Yes, sir. That's the most common operating system.

Q. And in your initial set of tests that you had done in India and put in your report, you didn't even test a device running Windows, right?

A. Yes, sir, that's correct.

Q. What you did instead was you tested a device running something called Fedora 16 --

A. Yes, sir --

Q. -- right?

A. -- that's correct.

Q. And as far as you know, there's no accusation

Page 26

whatsoever in this case that any device running Fedora 16 infringes, right?

A. Yes, sir, that's correct.

Q. And, again, the reason you didn't care what the laptop software was, is that you believe the issue in this case is the Wi-Fi chips, right?

A. Yes, sir, I'd agree with that.

Q. Now, I want to get right into the '568, and I want to put the claim up.

MR. VAN NEST: Your Honor, may I approach the board?

THE COURT: Yes, you may.

Q. (By Mr. Van Nest) See if I can get this up high enough for our jurors to see.

The '568, that's one of the patents we've been hearing about in the case, right?

A. Yes, sir, it is.

Q. I believe this one is behind Tab 4, and you refer to this as the service-type identifier patent, correct?

A. Yes, sir.

Q. As I think you've said, the job for our jurors on determining infringement is to determine whether each and every claim of -- each and every element of this claim are found in the products, right?

Page 27

A. Yes, sir, that's the required analysis.

Q. So the comparison is between the claim and the Defendants' products: The laptops and so on, correct?

A. Yes, sir.

Q. And I noticed that during the three or four hours that you were up on the stand, we saw a lot from the standard; but we didn't really see much information about the products. Right?

A. No, sir, I can't agree with that.

Q. But you would agree that the comparison that we're to make in determining infringement is between the claim and the products, right?

A. Yes, sir.

Q. Okay. So you mentioned in connection with the '568, something called quality of service, right?

A. Yes, sir, I did.

Q. That's treating different packets differently?

A. Yes, sir. It's a specific example of that.

Q. Giving them different priority?

A. Yes, sir.

Q. Now, certainly Ericsson didn't invent quality of service. That's been around for a long time, right?

A. Oh, absolutely, sir.

Q. Yeah. And Ericsson didn't invent prioritization of data packets either?

Page 28

7 (Pages 25 to 28)

A1403

A. No, of course, not.

Q. I think the words you used were this patent and others were specific enhancements and improvements to what existed before, right?

A. I did say that in some cases, yes.

Q. So in the case that we have here, the key disputed term is this service type identifier which we see highlighted in yellow on the board, right?

A. Yes, sir, I would agree with that.

Q. That's sort of the key to this invention, and that's the term that we're debating in this case?

A. Yes, sir.

Q. So that element must be found in the Defendants' products in order to establish infringement, right?

A. As defined by the Court, yes, sir.

Q. And even if all the other elements are there, if this one is missing, there's no infringement, right?

A. Absolutely.

Q. So you'd agree with me that if our jurors conclude that that element cannot be found in the products on this particular patent, the answer is no infringement?

A. Yes, sir.

Q. Right?

Page 29

Now, Judge Davis has defined the claim and we have that at the bottom, and that's the definition that you've applied in doing your analysis, correct?

A. Yes, sir, it is.

Q. And that's the definition that we all have to apply in determining whether there's infringement in this case, right?

A. That's correct.

Q. And the definition of service type identifier is something that identifies the type of information conveyed in the payload, right?

A. Yes, sir.

Q. And the examples the Court gave were video, voice, data, and multimedia -- not limited to that, but those are the examples that appear in the Court's definition, correct?

A. Exactly.

Q. And I think the examples you gave this morning during your testimony were voice and e-mail and data and the like, just as we have here in the claim?

A. Yes, sir.

Q. Right?

And you heard Mr. Raith, one of the inventors was here yesterday. He talked about -- wasn't here, it was on video -- voice, video, maps, and graphics,

Page 30

correct?

A. Yes, sir.

Q. And you'd agree that those are all the kinds of information: Video, voice, data, multimedia -- they're all the kind of information that can be carried in these patents we've been talking about, right?

A. Yes, sir.

Q. They appear in the payload of those little packets that are moving back and forth on our video, your video, and all the videos we've shown, right?

A. Absolutely.

Q. Now, you have identified a feature in the Defendants' products that you say is the service type identifier, right?

A. Yes, sir, I have.

Q. And that's the TID field, correct?

A. Yes, sir.

Q. What I would like to do is get a second easel.

MR. VAN NEST: Could I get a second easel up over here, please?

Q. (By Mr. Van Nest) Now, the TID field -- I'll put this here. The TID field is the feature that you have identified in Defendants' products that, according to you, is the service type identifier, correct?

A. Yes, sir, that's correct.

Page 31

Q. Now, you've been referring to that all morning --

MR. VAN NEST: Can I have a pencil?

Q. (By Mr. Van Nest) -- all morning as a type identifier, right?

A. Yes, sir.

Q. Actually that's not correct.

In the standard, it's called a traffic identifier, right?

A. Yes, sir, actually I think that's correct.

Q. So -- because you -- this morning we were talking about a service type patent and a type identification patent. You called this a type identifier. It's actually a traffic identifier, right?

A. I think that's what the standard calls the TID, yes, sir.

Q. And that's because it's related to the priority that the traffic gets; isn't that right?

A. No, sir. I think it's because it's related to the type of the traffic.

Q. Now, this TID subfield that you've identified, that's the only element in Defendants' products that you claim is the service type identifier, right?

A. Yes, sir, that's correct.

Q. So that's the thing that the jurors have to

Page 32

8 (Pages 29 to 32)

**A1404**

focus on, this TID traffic identifier?

A. Yes, sir, I agree with that.

Q. And that traffic identifier has to identify the type of information conveyed in the payload, right?

A. Yes, sir.

Q. Now, the -- the TID subfield in Defendants' products is actually used to establish priority, isn't it?

A. That's one of its uses, yes, sir.

Q. In other words, the value that's assigned in the TID field determines what the priority is for the data, right?

A. Yes, sir, in part.

Q. And that priority determines what queue -- what transmission queue the packet receives as it comes into the transmitter, right?

A. Actually I believe it's as it goes out of the transmitter, but --

Q. Fair enough.

A. -- you're correct.

Q. And the higher the number, the greater the priority?

A. Yes, sir.

Q. So a 7 or a 6 or a 5, those priorities are higher than a 0, a 1, or a 2, right?

Page 33

A. Yes, sir.

Q. And those priorities determine how quickly that packet moves out of the transmitter to the receiver?

A. In part, that's correct.

Q. That's the whole -- that is at least the primary purpose, if not the only purpose, of the TID subfield, right?

A. No, sir, I can't agree with that.

MR. VAN NEST: Now, could we put up 9-1 from the standard?

Q. (By Mr. Van Nest) We looked at this this morning. You showed this to our jurors this morning.

And this is from the standard?

A. Yes, sir, it is.

Q. And your understanding is -- your conclusion is that the Defendants' products work in accordance with this?

A. Yes, sir.

Q. Right?

And on the second to the left column there --

MR. VAN NEST: If we can highlight the top.

Q. (By Mr. Van Nest) -- UP, that stands for user priority, right?

Page 34

A. Yes, sir, it does.

Q. And those values below it, those are the TID values that go in the TID subfield?

A. Yes, sir.

Q. And those priorities correspond to what are called access categories in the Column 2 to the right, right --

A. Yes, sir.

Q. -- AC?

A. Yes, sir, that's correct.

MR. VAN NEST: Can we highlight that, the top of that?

Q. (By Mr. Van Nest) And the way the system works if you have a priority of 2 --

MR. VAN NEST: Let's highlight 2.

Q. (By Mr. Van Nest) -- you have an access category of AC_BK, right?

A. Yes, sir.

Q. And if you have an access -- if you have a priority value of 5, you have an access category of AC_VI, right?

A. Yes, sir, that's correct.

Q. And those categories determine where you are in the queue and the transmitter, right?

A. Which queue?

Page 35

Q. Which queue? So let's take a look at Figure 9-1 -- excuse me, 9-17. This is also a picture from the standard, and what we're seeing on the page here is four queues from left to right, correct?

A. Yes, sir.

Q. And the purpose of the TID value is to assign packets to one or the other of those queues, right?

A. That's one of its purposes, yes, sir.

Q. And the number that the TID value represents, those all line up with the queues we see on the page, right?

A. Yes, sir, that's correct.

Q. The higher the number, the faster the queue?

A. It's not quite correct, but generally speaking, yes, sir.

Q. Now, those TID values, then, reflect how the data is going to be treated in the device, right?

A. Yes, sir. That's the purpose of this invention.

Q. They determine how the data's to be treated; but they don't necessarily reflect the type of data that's in the payload, right, sir?

A. I would agree with that.

Q. So what they establish is how the system will treat them, not the kind of information conveyed in the

Page 36

9 (Pages 33 to 36)

**A1405**

payload?

A. No, I can't agree with that in general.

Q. So looking at a -- let's back up, then.

MR. VAN NEST: Could I play from Dr. Nettles' deposition from Page 351, Lines 15 through 21, please?

(Video clip playing.)

QUESTION: Access categories relating to the designations in the designation column of Table 9-1 do not necessarily reflect the type of information in the payload of packets that are transmitted from applications?

ANSWER: Right. What they rep -- what they reflect is how 802.11 is going to treat that data.

(End of clip.)

Q. (By Mr. Van Nest) Do you stand by that testimony, Dr. Nettles?

A. Yes, sir, I do.

Q. So it is not apparent to the system, looking at the TID value, whether the data in the payload is video, voice, multimedia, or otherwise, correct?

A. What part of the system are you referring to?

Q. The transmitter, the receiver, or any part thereof?

A. I don't think I can agree with you in general

Page 37

about that.

MR. VAN NEST: Let's play from Dr. Nettles' deposition, Page 346, Line 18 to 347, Line 4.

(Video clip playing.)

QUESTION: Is it correct that -- that nothing in the accused devices that implement 802.11 functions looks at the payload of a data packet and, from that, identifies the type of information that's actually in the payload in order to figure out which user priority to put in the TID field?

ANSWER: I mean, that's -- that's correct. There's really no -- I mean, the way the layered system works, whether or not it's voice or video or whatever, is not apparent from examining it.

(End of video clip.)

Q. (Mr. Van Nest) Do you stand by that testimony, Dr. Nettles?

A. Oh, yes, sir, I do.

Q. So whether the information conveyed in the payload is voice or video is not apparent from looking at the TID value, correct?

A. At the 802.11, yes -- level, yes, sir, correct.

Q. Now, if you look at a TID value of zero, for example, you can't tell whether the information in the

Page 38

payload is voice, video, data, or multimedia, can you?

A. That's correct.

Q. And just because you're using a TID value of 6, you can't tell whether that data in the payload is video or voice or something else, correct?

A. Yes, sir.

Q. Because the user -- the user has the choice of assigning any TID value that he or she chooses, right?

A. Yes, sir.

Q. They're not bound to assign a 6 to video data, correct?

A. Oh, no, sir, not at all.

Q. They're not bound to assign a 4 to voice data, right?

A. Yes, sir.

Q. They can assign any value they want, and that's why the system can't determine, from the TID value alone, whether or not the data conveyed in the packet is video, voice, multimedia, or anything else, correct?

A. Yes, sir.

Q. Let's move on to the '215.

That's what you call the type identifier patent.

Now, this is a patent that relates to ARQ,

Page 39

correct?

A. Yes, sir, it is.

Q. And I think you said this this morning; but just to be sure, Ericsson didn't invent ARQ technology, did they?

A. Oh, no, sir.

Q. That's been around for quite a long time?

A. Yes, sir.

Q. And they didn't invent BlockAcks, right?

A. No, sir.

Q. They didn't invent aggregated packets or sending packets in groups?

A. No, sir.

Q. That's been around.

Again, what they claim to have invented are specific enhancements and improvements to the ARQ system, correct?

A. Yes, sir, that's correct.

Q. Now, this patent is a method claim, so as you said this morning, in order to establish infringement, the products have to perform each one of the methods -- each one of the steps contained in the claim, correct?

A. Yes, sir. That's how the analysis works.

Q. So, again, you're comparing the claims to the products?

Page 40

10 (Pages 37 to 40)

**A1406**

Q. And you did some testing, correct?

A. Yes, sir.

Q. And what you originally identified in your report as the command to receive was an aggregated packet and a block acknowledgement request, right? Two things.

A. The block acknowledgement request is the next part.

Q. You identified a block acknowledgement request as something that commands the receiver to receive a packet, right?

A. I'll take your word for it.

Q. Well, no, don't take -- again, I don't want to put you in that position.

MR. VAN NEST: Let's put the report up. It's DX 499.1, Paragraph 88.

Q. (By Mr. Van Nest) This paragraph talks about a command to receive and release expectations, correct?

A. Yes, sir. And what I was saying before is that the block acknowledgement request is part of the releasing expectations.

MR. VAN NEST: Let's highlight the last sentence of the paragraph.

Q. (By Mr. Van Nest) What you said in your report was: Both of these types of commands contain a starting

Page 53

sequence number which commands the receiver to receive a packet, correct?

A. Yes, sir, that's what it says.

Q. And then following the publication of this report, you changed your opinion and testified under oath that a block acknowledgement request was not sufficient to establish or qualify as a command to receive, correct?

A. Yes, sir, I believe that's correct.

Q. So within a month or two of publishing this report in a deposition, which we requested, you said under oath, a BAR, that thing I identified, the block acknowledgement request, is not sufficient to constitute a command to receive, correct?

A. I believe that's correct.

Q. And today, now that we're in court, you also have abandoned any idea that a block acknowledgement request can constitute a command to receive data packets out of order, correct?

A. An explicit block acknowledgement -- excuse me -- an explicit block acknowledgement request, yes, sir, that's correct.

Q. You're relying on something called an A-MPDU to meet this requirement, right?

A. Yes, sir.

Page 54

Q. An A-MPDU, that is an aggregated packet, right?

A. Yes, sir.

Q. That's what you're relying on now to constitute this command to receive, right?

A. Yes, sir.

Q. Now, I apologize. I showed this to our jury in the opening. And I know you weren't here, but you read the transcript. Did you get a copy of the slides, too?

A. I did.

Q. Good. So you saw the whole thing, right?

A. Yes, sir.

Q. So I have a transmitter here, and I have a receiver here; fair enough?

A. Fair enough.

Q. And I have packets here on the left in front of the transmitter, and I have packets proceeding over to the receiver, correct?

A. Yes, sir.

Q. Now, an aggregated packet, an A-MPDU, that's just a group of packets, as you've been saying all day, right?

A. Yes, sir.

Q. And this group is a representation of that;

Page 55

fair enough?

A. That's fair.

Q. So it's a group of packets, and the purpose of it is to get data from the transmitter to the receiver, right?

A. Yes, sir.

Q. And in a system where you're using aggregated packets, groups, that's the only way to get the data over there, right?

A. Well, you could send just a single packet, but yes, sir.

Q. Well, let me back up, Dr. Nettles.

What I said was, when you're using frame aggregation, the whole idea is to move faster, right?

A. Yes, sir.

Q. And you move faster by putting the blocks together.

A. Yes.

Q. And when the blocks are together, the system goes faster because you're sending four at a time, not one at a time, right?

A. Oh, absolutely.

Q. And so what you're now telling the jury is, a command to receive is a standard, routine set of aggregated packets that take data from the transmitter

Page 56

14 (Pages 53 to 56)

**A1410**

to the receiver, right?

A. Yes, sir.

Q. So in your world, every single packet that carries data is a command, right?

A. Yes, sir.

Q. Now, in the old days, in the old days -- let's go back to the 1990s. They teach the 1960s now in college, which is shocking to many of us, but I just want to go back to the '90s.

In the '90s, the receivers that existed in these systems had some severe limitations on what kind of packets they could receive, right?

A. I -- I don't really know what you're referring to right now.

Q. Well, I'm going to refer to your report in a minute, but let me ask you first, the -- the ARQ systems that existed in the '90s, they rejected packets that were either out of order or outside the window you talked about this morning, correct?

A. They didn't reject packets that were out of order, but they did reject packets that were outside of the window.

Q. Okay. And you talk about that some -- in your report, that the older ARQ systems rejected packets that were outside the window.

Page 57

A. Oh, yes, sir, I did talk about that.

Q. Right. And in some cases, that can cause a problem like deadlock if packets are discarded by the transmitter and the receiver can't take packets outside the window, right?

A. Potentially.

Q. And one of the patents that you're calling the coordination patent, the '435, it actually talks about deadlock --

A. Yes, sir.

Q. -- right?

That's one of the problems the inventors of the '625 and the '435 were trying to solve --

A. Yes, sir.

Q. -- right?

A. I agree.

Q. Deadlock.

And deadlock occurs as a result of these limitations that the receiver has on what packets it can receive, right?

A. That could be one reason, yes, sir.

Q. And in the patent, one purpose of this command to receive is to force, to force the receiver to take the packet, even if it's outside the window, right?

A. Yes, sir. In the embodiment in the packet

Page 58

(sic), that's correct.

Q. Right. And --

A. Patent.

Q. Now, let's clarify that, too, because we kind of slipped.

You said embodiment. That's an example --

A. Yes, sir.

Q. -- right?

And -- and there is an example of the invention in the patent --

A. On, yes, sir.

Q. -- which you called an embodiment, right?

A. That's what it's called, yes, sir.

Q. That's what it's called. I just want our jurors to follow that. Embodiment means example. And actually, in the '625, there's only one example, right?

A. Yes, sir.

Q. And that example carries with it something called an enforcement bit, right?

A. Yes, sir, it does.

Q. It actually shows a separate bit that's the enforcer that forces the receiver to take packets it wouldn't otherwise take, right?

A. Yes, sir, that's correct.

Page 59

MR. VAN NEST: Could I have Figure 5 from the patent, please, since we're on this?

Q. (By Mr. Van Nest) Now, this is a figure from the patent, the '625, Dr. Nettles?

A. Yes, sir, it is.

Q. Okay. And you're familiar with it --

A. I am.

Q. -- obviously.

And what it depicts is a standard, ordinary, vanilla data packet, right?

A. Yes, sir.

Q. So we have there --

MR. VAN NEST: Jeff, could we show --

Q. (By Mr. Van Nest) We have an ARQ header. That's the header you were talking about this morning, right?

A. Yes, sir, that's correct.

Q. And then to the right of that, we have the payload. That's where the data is. That's the payload, right?

A. Yes, sir, that's correct.

Q. And then we have something called a sequence number, right?

A. Right.

Q. A k bit sequence number.

Page 60

15 (Pages 57 to 60)

**A1411**

Case: 13-1625   Case: 13-1625   Document: 179-1   Page: 394   Filed: 03/31/2014   Document: 177-1   Page: 394   Filed: 03/31/2014   (394 of 575)

CASE PARTICIPANTS ONLY

Now, that is described as prior art.

MR. VAN NEST: Can you highlight that under Figure 5, please?

Q. (By Mr. Van Nest) Prior art, right?

A. Oh, yes, sir.

Q. Now, prior art means it's out there before the invention --

A. Yes, sir, that's what it means.

Q. -- right?

The inventor can't invent the prior art; the prior art was there before the invention.

A. Yes, sir, that's correct.

Q. So what this is telling anybody who reads the patent, an engineer, an expert, a member of the IEEE, a member of ETSI, any one of these folks, that a common standard data packet, that is in the prior art and you can use it, right?

A. Yes, sir.

Q. Now, the only difference between this packet and those packets is there's a group of them, right?

A. No, sir, I can't agree with that.

Q. These packets don't have any enforcement bit?

A. That's right.

Q. They have a sequence number, right?

A. Yes, sir.

Page 61

Q. They have a header, right?

A. Yes, sir.

Q. They have a payload, right?

A. Yes, sir.

Q. And they are, in a modern system, the only way to transmit data in a group form from the transmitter to the receiver, right?

A. In 802.11, that's correct.

MR. VAN NEST: Now let's go to Figure 8 of the patent and highlight that.

Q. (By Mr. Van Nest) Now, this is -- this is what the inventors describe as an example of how to practice their invention, right?

A. Yes, sir, it is.

MR. VAN NEST: And could we highlight that RPEB?

Q. (By Mr. Van Nest) Now, the stuff that I didn't highlight, that's not new, right? That's just like what was in Figure 5.

A. Yes, sir, I agree with that.

Q. So you have an ARQ header and a payload and a sequence number. That's just a plain vanilla data packet that goes back for years, right?

A. Yes, sir.

Q. Now, what the inventors gave as the only

Page 62

example in their patent of this command invention was a packet with what's called a PDU enforcement bit, right?

A. Yes, sir, that's correct.

Q. And you can see it there, RPEB. That stands for receive PDU enforcement bit, right?

A. Yes, sir, that's correct.

Q. That forces the receiver to take a packet that it wouldn't otherwise take. That's the point of it.

A. Oh, yes, sir, absolutely.

Q. And I think we had some testimony from Mr. Larsson on that.

MR. VAN NEST: Do we have a board that shows Mr. Larsson's testimony on the forcing a receiver?

No. Let's take that one down. That's not quite what I -- what I had in mind, but...

Q. (By Mr. Van Nest) Okay. Do you recall Mr. Larsson yesterday testifying on the video that his invention involved forcing a receiver to take bits, take packets?

A. I'm sorry. I don't remember the video that well.

Q. Fair. We saw a lot of video, and we heard a lot of testimony, so I can't fault you for that.

Now, wouldn't you agree with me, Dr. Nettles, that if a receiver could receive a packet any way, out

Page 63

of order, or outside its window, you wouldn't need a command to force it to do so, right?

A. No, sir. The command would be built into the packet.

Q. I don't think you heard my question correctly, Dr. Nettles. I just want to be sure.

If your receiver was set up so that it could take packets in any order, inside or outside its window, that kind of receiver wouldn't need a command to force it to take the packet, would it?

A. Well, it wouldn't need one of these enforcement bits, no, sir.

Q. Again, that wasn't my question either.

If a receiver, by its very rules, was set up so that it was required to take any packet in any order inside or outside its window, you wouldn't need a command to force it to do that. Right?

A. No, sir. I really can't agree with you about that.

MR. VAN NEST: Let's play from Dr. Nettles' deposition from Page 104, Lines 14 through 23.

(Video playing.)

QUESTION: If a receiver could receive a packet that a transmitter was sending to it, is it

Page 64

16 (Pages 61 to 64)

**A1412**

correct that you would not need the command to receive in the '625 patent to command or force the receiver to receive that packet?

ANSWER: I mean, that almost seems like a tautology. If it could receive it, then would you need to insist that it receives it? No, because it could already receive it.

(End of video clip.)

Q. (By Mr. Van Nest) Do you stand by that testimony, Dr. Nettles?

A. Absolutely.

Q. Okay. And you know, as well, that the inventor of the '625, the one we saw on video yesterday, Mikael Larsson, agrees that if the receiver can take the packet anyway, you don't need a command, right?

A. Again, I don't really remember exactly what the --

MR. VAN NEST: Let's put --

A. -- what he said.

MR. VAN NEST: -- put Mr. Larsson's testimony up that we just looked at a minute ago.

Q. (By Mr. Van Nest) So looking at Figure 2 again, if you had a system that was designed where you could receive a packet, let's say Sequence No. 7, beyond TSN Max, and shift the window automatically with just a

Page 65

regular packet, you wouldn't need the command you're talking about in Claim 1, correct?

Yes. If you had that, then you wouldn't need it.

That's what he said. Do you agree with that?

A. I agree that that's what he said, yes.

Q. Okay. And you also said that if a receiver could already receive a packet, you wouldn't need a command to receive it, right?

A. Yes, sir.

Q. And you said that repeatedly in your deposition. Not just once, but a number of times, right?

A. I'll take your word about the repeatedly.

Q. You want to see --

MR. VAN NEST: Let's show one more --

A. Okay.

MR. VAN NEST: -- from his deposition transcript at Page 103, Line 24.

(Video playing.)

QUESTION: Now, if the -- if the receiver could already receive a packet, why would you need a command to force the receiver to receive that packet?

ANSWER: Well, you might not need that command, but you might need the rest of the patent.

Page 66

(End of video clip.)

Q. (By Mr. Van Nest) Now, Dr. Nettles, we're here talking about, of course, 802.11n receivers, correct?

A. Yes, we are.

Q. And those are the receivers that are found in the Defendants' products, the ones that you examined and the ones that you're accusing of infringement, right?

A. Yes, sir, that's correct.

Q. And you know that under the rules that have been established for those receivers, they can take a packet within their window in any order whatsoever, right?

A. Yes, sir, they can.

Q. So, with respect to packets that are sent within the window, it doesn't matter whether they come 5, 6, 7, 8; 6, 5, 7, 8; 8, 7, 6, the receiver will take them whatever order they come in, right?

A. Yes, sir, that's correct.

Q. And that's the rule that the receiver in an 802.11 device has to follow, correct?

A. Yes, sir.

Q. And it is also the case that in an 802.11n receiver, if the packets that come are outside the window, the receiver is required to move the window to accept it, right?

Page 67

A. Oh, yes, sir.

Q. That's automatically done, correct?

A. Oh, yes, sir.

Q. The rules require that if the window is expecting packets 5, 6, 7, 8, and it gets packets 7, 8, 9, and 10, it automatically moves and it receives those packets, right?

A. Oh, yes, sir, absolutely.

Q. Would you agree with the statement that a receiver in an 802.11 device is always ready to go?

A. Yes. Yes, sir.

Q. Okay. And that's because it's got the green light to take packets in any order inside or outside the window, right?

A. Yes, sir, that's correct.

Q. Now, did you learn or have you learned --

MR. VAN NEST: I'll withdraw that question. Excuse me.

Q. (By Mr. Van Nest) I know you've looked at a lot of deposition testimony, and you've looked at a lot of documents and so on in your analysis, but did you become aware in your review that even the inventors of the '625 patent in Ericsson concluded it was too complicated, too complex, and too time-consuming to actually use in a product.

Page 68

17 (Pages 65 to 68)

**A1413**

CASE PARTICIPANTS ONLY   Document: 177-1   Page: 396   Filed: 03/31/2014

A. I think what I recall is that they did not use it in a product, but I don't remember exactly that conclusion.

Q. Well, let's start there.

So -- so you know, at least, that with respect to this command patent, Ericsson and the inventors and the engineers decided not to use it in a product, right?

A. Yes, sir, I do.

Q. And as far as you know -- and I'll accept your claim that the --

MR. VAN NEST: Withdraw that.

Q. (By Mr. Van Nest) As far as you know, Ericsson has never used it in a product, correct?

A. Yes, sir, that's correct.

Q. And the reason the Ericsson engineers didn't use it in a product was that they concluded, after testing it, that it was too complex, too complicated, and too time-consuming for a product that they wanted consumers to buy, right?

A. No, sir, I can't agree with that.

Q. Well, let's put up --

MR. VAN NEST: Could we put up the portion of the transcript from Mr. Larsson, Peter Larsson?

Q. (By Mr. Van Nest) Now, you know who Peter

Page 69

Larsson is, right?

A. Yes, sir.

Q. He's one of the inventors of the '625, right?

A. Yes, sir.

Q. He works at Ericsson.

A. Yes, sir.

Q. He works at Ericsson today.

A. I think that's correct, yes, sir.

Q. Have you ever met him?

A. No, sir.

Q. He's not here in Texas, is he?

A. Not to the best of my knowledge.

Q. Okay. And what he concluded was: The project leader at the wireless ATM research project believed that the idea of sending a command to receive and release expectations was too complicated, too complex, and too time-consuming?

Yes.

Does that -- is that consistent with what you know about the background of the efforts to actually use this patent?

A. Yes, sir, it's consistent.

Q. Okay. And in any future prototyping that Ericsson did, they decided: Get rid of this thing. We don't want a command to receive or to command. It's too

Page 70

darn complicated to ever work in a product, right?

A. I don't know exactly what they concluded, but I'll take your word.

Q. All right. Let's talk about the '435 patent. The good news is, we've only got two to go. We've only got two to go.

I know this is dense, and so we'll pause for just a minute. This is the other half of the coordination patent that you talked about this morning, right?

A. Yes, sir, it is.

Q. This is also a patent which, although you're calling it coordination, we don't see that word anywhere in the claim, right?

A. That's correct.

Q. Anywhere in your 5,000-page report, that word doesn't appear.

A. Yes, sir, that's correct.

Q. Do you know if it appears anywhere in the patent?

A. I don't know that.

Q. Okay. Certainly, if it does, none of us remember, right?

A. Yes, sir.

Q. Now, the problem that the inventors of this

Page 71

patent were trying to solve was deadlock, right?

A. Yes, sir.

Q. Deadlock is something that existed in a time when the receiver couldn't accept the packet out of its window, right?

A. Yes, sir.

Q. And in 802.11n receivers are not subject to deadlock because, as we've established, they have the green light; they're ready to go; they can take whatever packet comes, right?

A. In part, yes, sir.

Q. So this patent came into existence to solve a problem that no longer exists in the receivers that the Defendants build and sell, right?

A. No, sir, I can't agree with that.

Q. Now, I think we've established that an 802.11 receiver can take packets inside its window in any order, right?

A. Yes, sir, absolutely.

Q. And when it gets packets outside its window, it automatically moves on, right?

A. Yes, sir, that's correct.

Q. It automatically takes those packets and keeps on rolling so the system won't slow down or stop, right?

A. Yes, sir.

Page 72

18 (Pages 69 to 72)

A1414

Q. That's the routine; normal, day-in/day-out operation of these receivers, right?

A. Yes, sir. That's what we showed.

Q. And that computation --

MR. VAN NEST: Strike that.

Q. (By Mr. Van Nest) The element that we are disputing -- let's back up just a minute. I'm getting ahead of myself.

The limitation that we are debating on the '435 patent in this trial is the one that requires the receiver to do a computation, correct?

A. I'll -- I don't know what you're disputing, but I assume, since you're telling me that, that's correct.

Q. I thought you read the opening statement.

A. Well, I didn't know -- I didn't --

Q. That's all right. Let me --

A. I didn't -- I didn't know that that was meant to completely limit you, but, okay, that's fine. I accept that.

Q. This is complicated enough.

A. Okay.

Q. You want more?

A. Fair enough.

Q. You want more? No. We're going to stay with

Page 73

this one.

A. Okay.

Q. This is what I -- this is what I talked to the jurors about in the opening, and I'm proud to stay with it.

So one of the requirements of the '435 is that you send a discard notice over to the receiver, right?

A. Yes, sir.

Q. And the thing that you're relying on is that the discard notice is just an ordinary, good old-fashioned, everyday set of facts, right?

A. One of them, yes, sir.

Q. Okay. Then the receiver has to commute -- excuse me -- compute which data packets have been discarded by the transmitter, correct?

A. Yes, sir.

Q. So the idea here is, the computation that the receiver has to make is a computation of which packets on the transmitter side have been discarded by the transmitter, right?

A. Yes, sir.

Q. And it's clear as a bell in your testimony and in the claim and in the claim language that it's computing which of these packets have been discarded.

That's what's required, right?

Page 74

A. Yes, sir, I agree with that.

Q. Now, I think we established a minute ago that when the receiver receives packets that are outside the window, it automatically moves on anyway, right?

A. Yes, sir, that's correct.

Q. That so-called calculation that you showed us this morning and went through it, that is simply the basis upon which the window moves automatically when it gets a regular group of aggregated packets, right?

A. Yes, sir, that's correct.

Q. There's nothing special about that, is there?

A. Nothing special, no, sir.

Q. Again, your claim is that every single ordinary vanilla packet that moves from one side to the other is somehow a discard notice and forcing a computation, right?

A. Yes, sir, it is.

Q. Even though, in an 802.11n receiver, it is set up under the rules to move on no matter what kind of packets and in what order it gets, right?

A. Yes, sir, that's correct.

Q. And I guess with respect to the '435, the same rule is true: If Claim 1 is not infringed, automatically Claim 2 is not infringed either, correct?

A. Yes, sir, that's correct.

Page 75

Q. All right. Let's talk about the '223, which is behind Tab 5. It's the last -- it's the last patent we're going to discuss.

MR. VAN NEST: And actually, let's put it up for just a moment.

Q. (By Mr. Van Nest) Now, the '223 patent -- well, let me back up.

On each of the patents that we've been talking about up until now, the '625, the '435, the '215, and the '568, your opinion as to Intel chips is the same as it is for Broadcom chips and Atheros chips and Realtek chips and everybody's chips, right?

A. Yes, sir.

Q. So with respect to those four patents, your, quote, read, your opinion -- put it that way -- your opinion on infringement doesn't vary from one product to another, right?

A. That's correct.

Q. This patent is different, right?

A. Yes, sir.

Q. On this particular patent, your opinion is that Intel chips infringe; but Broadcom chips, Atheros chips, Realtek chips, Ralink chips, they don't infringe this patent, right?

A. That's correct.

Page 76

19 (Pages 73 to 76)

**A1415**

Q. Dr. Nettles, over the years during your career, have you attended IEEE meetings?

A. Yes, sir, many of them.

Q. And they have a journal. Do you read that?

A. They have lots of journals. I read it, and I've actually published papers there.

Q. And how many years have you been doing that?

A. Twenty.

Q. Okay. Why haven't you joined the IEEE years ago?

A. It's kind of one of those things I never got around to doing.

Q. Okay. And why did you join recently?

A. Well, I was concerned that people might mistake the fact that I wasn't an IEEE member for not being qualified to testify in this case.

Q. Okay. Well, do you feel you are qualified to testify?

A. Oh, yes, sir.

Q. And how long have you been teaching this exact material at the university level to graduates and undergraduates?

A. I have been teaching networking and wireless networking almost every semester since 1998.

Q. And have you built some wireless networks of

Page 89

your own?

A. Oh, yes, sir.

Q. Let's talk now about the '215 patent. And I think the issue that was raised by Defendants is -- in the questioning, that they use in their actual implementations, one message type, it's the compressed block acknowledgement or the bitmap.

A. Yes, sir, that's correct?

Q. Okay. So I want to ask you about that.

Now, where do the choices reside within the system?

A. Well, they reside within the standard.

MR. STEVENSON: And could we see Slide 19, please?

Q. (By Mr. Stevenson) Okay. Are these the choices?

A. Yes, sir, in 802.11, these are the choices.

Q. How many choices are there?

A. There are three, plus one that's reserved.

Q. Basic BlockAck, compressed BlockAck, and Multi-TID BlockAck?

A. Yes, sir, exactly.

Q. Now, you got asked some questions and shown some of your deposition.

A. Yes, sir.

Page 90

Q. And I think the -- the tenor of the question was if all the choices aren't programmed into a receiver, does that meet the claim?

A. Yes, sir.

Q. Let's see what you actually said in your deposition, because then they played the deposition.

A. Okay.

Q. Let's see what you were asked. The question was: To be clear, a system that can only use one message type, it can't choose to use other message types; that is not covered by the claims of the '215 patent.

Is that correct?

A. Yes, sir, that's the question.

Q. The word there is system in the question. Do you see that?

A. Oh, yes, sir.

Q. What do you understand by system?

A. Well, system means the actual implementation, the thing that's running and doing 802.11.

Q. The -- the entire system, right?

A. Yes, sir.

Q. And -- and that's the standard basically, isn't it?

A. Ultimately, yes, sir.

Page 91

Q. Okay. And you answered, you said: If there's only one message type, there can't be identifying from a number of different message types. But if there's more than one message type and the system just uses one consistently, that system can definitely infringe the patent.

A. Yes, sir, that's what I said.

Q. Let me go back to the 802.11 standard.

Does the standard allow systems to have multiple types of responses, multiple message types?

A. Yes, sir, and it has a type identifier so that that's possible.

Q. Okay. And I want to ask you about that, because that's what I don't really get.

If what they're saying is true and they just hardwire until one choice, one bitmap, it's the same thing every time, why do they need a type identifier?

A. Because they have to obey the standard.

Q. But isn't the point of the type identifier to tell the guy receiving the message which of the choices you've decided on?

A. Yes, sir, exactly.

Q. Well, if everybody's got hardwired in one choice and one choice only, what's the point of creating a field and putting a number in there and transmitting

Page 92

23 (Pages 89 to 92)

**A1419**

request.

Q. Okay. And does the patent disclose that that would be sufficient to meet the elements of this claim?

A. Yes, sir.

Q. Explain.

A. Well, I mean, the first command is -- so what the patent explains is that there are different embodiments of the -- there are different ways of potentially meeting the claim.

So the fact that the patent talks about the enforcement bit doesn't mean that there aren't other ways to create commands.

And here, the command to receive a packet out of order is a command, because the system is designed so that there is no option.

The system is designed so that these things are commands, and similarly toward the BARs.

Q. So the way the patent works is they have an example in there, right?

A. Yes, sir.

Q. And let's all be real clear what an example in a patent is.

Is there a difference between the example that you write up to build the patent and the claim itself?

A. Absolutely.

Page 101

Q. And you understand it is wholly improper to try to say you don't infringe a patent by comparing what a Defendant does to the example in the patent?

A. That's my understanding, yes, sir.

Q. Okay. You understand the only legal way of doing it is compare it to the claim?

A. Yes, sir.

Q. Okay. Now, in the patent itself, tell us about -- it -- it mentions an enforcement bit. Is that sent along with the packet?

A. Yes, sir, it is.

Q. Okay. Now let's say, though, that this command you wanted to write into the receiver.

A. Yes, sir.

Q. And, in fact, isn't that what the standard does?

A. That's exactly what the standard does.

Q. Explain what the standard provides and how that gets written in as a command to the receiver?

A. Well, we actually showed this. It probably was a little hard to understand.

But the standard says that if the MPDU or A-MPDU is received inside the window, that it must be received. And that's true whether or not it's in sequence or out of sequence. So when it's out of

Page 102

sequence, it's the out-of-sequence command. And the patent also explains that if the MPDU or A-MPDU is past the end of the window, that you will shift the window and you will receive the packets.

So the two cases both say you have to receive the packet, and that's a command.

Q. Did you show the jury in your direct examination these commands that are in the standard?

A. Yes, sir, I did.

MR. STEVENSON: Mr. Diaz, can you pull up PX 286?

Q. (By Mr. Stevenson) And I think we're -- I seem to remember this being Page 134. Let's take a look. That's a slight guess.

Keep going down, Mr. Diaz, I think it's a couple of more pages. 9.10.7.6. Keep going down.

A. Yes, sir, it's 137.

Q. (By Mr. Stevenson) 137.

MR. STEVENSON: Can you zoom in, Mr. Diaz, on the bottom, 9.10.7.6.2 that Mr. Nettles showed us earlier?

Q. (By Mr. Stevenson) Is this one of the commands?

A. It's -- it's part of the command. It says that if it's inside of the -- inside of the window, that

Page 103

you're going to store it.

Q. All right. Is this mandatory?

A. Oh, this is mandatory, yes, sir.

Q. Not -- not an element of choice on the part of the receiver involved?

A. No, sir.

Q. And explain to the jury what this is commanding the receiver to do.

A. Well, it's saying that -- the (a) says if the sequence number -- that's the label on the packet -- is inside of the window, that's WinStart and WinEnd, the first thing you do is you store the received MPDU in the buffer.

Q. Now, if you're a company and you want to make 802.11 compliant equipment, you go look at the standard and then you've got to build something, fair?

A. Yes, sir.

Q. And that thing you're building is going to have a processor in it of some sort?

A. Yes, sir.

Q. What do you have to code up the processor to do?

A. Well, in this case you have to code up the processor to store the MPDU, if it's in this range.

Q. Is that what -- is that -- is that coding up

Page 104

26 (Pages 101 to 104)

**A1422**

what makes the MPDU a command?

A. Well, that, plus the fact that there's a second case that does exactly the same thing.

Q. What are you referring to?

A. Well, the second case is the (b) part. So that says what happens if it's outside of the window.

Q. Okay. Let's scroll down and look at the (b) part.

So the (a) part says if -- what did the (a) part say? I don't want to --

A. The (a) part said if it was inside the window, then you store it.

Q. The (b) part says what?

A. That if you're past the window, you store it. So both cases require that you store it. So in both cases, it's a command. You don't have any option.

Q. Okay. And in these systems, do the transmitters and receivers have to play by this same set of rules?

A. Yes, sir.

Q. Does the transmitter understands when it transmits a packet out of sequence, the receiver's got to take it?

A. Yes, sir. I mean, it doesn't really understand it, but it's programmed that way. The

Page 105

programmers understood it.

Q. All right. But the transmitter on the transmitter side, whoever is responsible for the transmitter, whichever manufacturer it is, knows that when they transmitter an out of sequence MPDU, it's got to be accepted?

A. Yes, sir, they do.

Q. And -- and if you have a standard, you know the transmitters and receivers are playing by the same set of rules?

A. That's correct.

Q. That's what's meant by synchronization or coordination?

A. Yes, sir.

Q. Now, similarly for the '435 patent, is there also a computation built into it?

A. In the claims? Yes, sir.

Q. So we're going to go to the '435 now. And it's a different wording in the claims. This is the receiver side.

This is the receiver side that is written a little bit differently, isn't it?

A. Yes, sir, it is.

Q. And what this requires is computing which data packets have been discarded. I think that's the element

Page 106

that defense counsel zoomed in on as the one he discussed with you.

A. That's right.

Q. So you need a computation on the receiver side?

A. Yes, sir.

Q. Command from the transmitter, computation receiver?

A. That's right.

Q. And what does the receiver have to compute under that claim?

A. Well, it has to compute which packets have been discarded by the transmitter.

Q. Okay. How -- does the standard prescribe how the computation is supposed to be carried out?

A. No, sir, not at all.

Q. What -- what is prescribed about the computation?

A. That it's done and that it computes from the information that comes in which packets have been discarded.

Q. Okay. Can we look at the rule book to see what the receiver has to do in order to make a computation?

A. Yes, sir, we can.

Page 107

Q. And I wrote that down. It was 9.10.7.3 --

MR. STEVENSON: Can you --

Q. (By Mr. Stevenson) -- of 286.

MR. STEVENSON: Can you pull that up, Mr. Diaz?

Q. (By Mr. Stevenson) Are these the rules that the receiver has to abide by with regard to getting packets?

A. Yes, sir. In particular, the (b) section talks about it when it's the A-MPDU that is the discard notification. And the (c) section talks about it when it's the explicit BlockAck that's the discard notification.

Q. Okay. Let me stick on this. So let me make sure I understand this. The receiver has to go through this in order to decide what to do with the packet, right?

A. Yes, sir. And in particular, which packets to -- to discard.

Q. How do you do that without making a computation?

A. You don't.

Q. Let me ask you next about the '568.

This is an apparatus claim. Do you remember, Dr. Nettles?

Page 108

27 (Pages 105 to 108)

**A1423**

THE COURT: All right. Any recross?

MR. VAN NEST: Can I have just a few minutes, Your Honor?

THE COURT: All right.

(Pause in proceedings.)

MR. VAN NEST: I'll be brief. Famous last words, right?

RECROSS-EXAMINATION

BY MR. VAN NEST:

Q. Good afternoon again, Dr. Nettles.

A. Good afternoon.

Q. I just want to go over a couple of things that you covered with Mr. Stevenson.

Back on the '215, I think you said earlier that -- just to clarify the parties' positions and where we are -- you've confirmed through all your testing and your examinations and your review that the products that you're accusing of infringement, they only send one kind of acknowledgement?

A. That's correct.

Q. Every single time they send one, right?

A. Yes, sir, that's correct.

Q. So with respect to the product, the receiver in the products doesn't have a choice. It must send the -- the bitmap -- the compressed bitmap that you know

Page 113

is -- exists in the products, right?

A. Yes, sir. It also has to send the TID field --

Q. Right.

A. -- that says it's a compressed bitmap.

Q. But in terms of choosing from a number of different message types, the receiver in the products that you're accusing, it doesn't have that choice, right?

A. Well, the programmers made that choice.

Q. That wasn't my question.

The receiver in the product that you're accusing, it doesn't have a choice from among a number of different message types; it must send the one that it has, right?

A. It will always send a compressed BlockAck, yes, sir.

Q. Now, I think you testified earlier that the whole crux of the invention involves the creation of choice in the receiver of multiple different message types, right?

A. Yes, sir, I think you showed me some testimony of that sort.

Q. And you said: I would tend to agree that the crux of the invention is the creation of choice in the

Page 114

receiver of different message types, right?

A. Yes, sir.

Q. And that's what the inventor told us yesterday when he came here by video, right?

A. Yes, sir.

Q. He said the key element of my invention is having a choice of message type to send, right?

A. Yes, sir, he did.

Q. That choice doesn't exist in any of the receivers that any of the Defendants in this case sell, does it?

A. No, sir, I can't agree with that.

Q. Now, let's go on to the '435, if I can put that back up.

Now, with respect to the '435, the claim element that we are disputing is this now-familiar computing step, right?

A. Yes, sir.

Q. The receiver has to compute which data packets have been discarded by the transmitter, right?

A. That's correct.

Q. So I think we have this clear, but the computing that is required by the claim, is that the receiver compute not what it's going to discard but what packets have been discarded by the receiver -- by the

Page 115

transmitter, right?

A. Yes, sir, that's correct.

Q. Now, isn't it the case that the computing step of this claim requires an identification of at least all of the packets that have been discarded by the transmitter?

A. Yes, sir, I think that's correct.

Q. And you testified to that effect in your deposition, right?

A. Yes, sir, I did.

Q. But when a BlockAck request is sent from the transmitter to a receiver in an 802.11n system, that request will not allow the receiver to identify which of the previously-acknowledged packets the transmitter has discarded, will it?

A. No, sir, it won't.

Q. So in that instance, the receiver is not able to calculate all of the packets that have been discarded by the transmitter, right?

A. Actually, I -- I apologize. I -- I think I misunderstood your question.

Was the previous question involving the packets that had been acknowledged?

Q. It did.

A. Then -- then, yes, the receiver will be able

Page 116

29 (Pages 113 to 116)

**A1425**

factors are irrelevant based on the facts of the case.

Q. Okay. Well, in going through and analyzing these factors and considering the proper royalty rate, what sources of information did you consider?

A. So I considered a variety of sources. Spent a lot of time reviewing employee testimony. So this would be testimony of not just Ericsson employees, but also the testimony of the Defendants' employees.

I've also looked at many court filings. That would include interrogatory, interrogatory responses, things of that nature. I've reviewed the patents in the case.

I've also looked at various business records, including the license agreements, which I've referred to already. But that would also include royalty reports, business plans, e-mail correspondence, a whole host of business records.

I've also considered articles, publications, press releases. I've done some independent research as well.

And I've also considered the expert reports. So there have been expert reports submitted by the technical experts. You've heard from Dr. Nettles. You'll hear from some later.

I've also considered the expert reports of

Page 141

the -- there are other financial experts that are -- that will be testifying.

Q. And how much time did you spend investigating this matter?

A. I've spent several -- several hundred hours working on this.

Q. And how much does your firm charge an hour for your time?

A. $495 an hour.

Q. Okay. Well, let's get into your analysis.

How do you categorize the Defendants in this case?

A. So we have two different types of Defendants. We have the computer makers, and we have the laptop -- excuse me -- the computer makers and the router makers.

So as you see here on the slide, we have -- on the left-hand side, you have companies such as Dell, Toshiba, and Acer.

On the right-hand side, you have the router Defendants: NETGEAR, Belkin, and D-Link.

Q. Okay. Now, let's make sure we're clear. Does Dell, Toshiba, and Acer -- are the accused products only computers?

A. No. So Dell, Toshiba, and Acer do sell things other than laptops. You know, for example, they may

Page 142

sell Blu-ray players, but 95 percent of all of the products that infringe are computers.

Q. Okay. How about for the router Defendants? Do they just sell routers that are accused in this case?

A. No. So they do sell routers, adapters, range extenders, other products. But for the router Defendants, I believe 97 percent of all the products that infringe Ericsson's patents are either routers or adapters.

Q. Okay. Now, why, for purposes of your analysis, did you break the Defendants up into these two groups?

A. Well, I think it's important for one main reason. And Ms. Petersson actually alluded to this in her testimony. And that is, you know, Wi-Fi has a different significance for a router than it does for a computer.

If you think about it, a router has one primary purpose and that is to enable someone to have Wi-Fi connectivity. While there are other features in a router, the main thing someone would buy a router for is to get Wi-Fi, you know, in their home or their office. Okay?

Now, computers, Wi-Fi is also important, but it's one of a number of features that is -- that are

Page 143

embedded into a computer.

And so I wanted to make sure that when doing my analysis, I properly considered the fact that Wi-Fi has a different -- different level of importance to the end product.

Q. Okay. And does that different number of features, does that also bear on the price point of these products?

A. It does.

So, for example, routers typically sell -- at least the ones sold by the Defendants here, range in price from 30 to $60; and for computers that are sold by the Defendants in this case, average 500 to a thousand dollars apiece.

Q. All right. Now, I understand they have some different features, and computers have more features. Routers are basically there for Wi-Fi. But do all of these products -- do the Defendants for all of these products advertise that their products provide 802.11n capability?

A. Yes, generally speaking. Whether it's on the box or it's on promotional materials, technical specs, you can -- you can identify generally whether it has Wi-Fi and what type of Wi-Fi it has.

Q. Now, we haven't talked about one Defendant,

Page 144

36 (Pages 141 to 144)

**A1432**

and that's Intel. What's -- what's Intel's role in this case? How do they fit in?

A. So Intel, as we've heard, is a component supplier. So they supply a chip to the router companies and the laptop Defendants, and that -- it is what, in part, enables these products to use Wi-Fi.

Q. How did they end up in the case?

A. Well, Ericsson did not file suit against Intel. Intel asked the Court to intervene or to get involved in the case. And I don't believe any of the other chip makers asked to be involved in the case.

Q. Did you calculate a reasonable royalty that Intel should pay?

A. I did not.

Q. Why not?

A. Because based on my review of the agreements and looking at the standard practice within the industry, the agreements would typically be between Ericsson and the companies that make the end user products.

So in this case, it would be the Belkins and the D-Links and the -- you know, the Defendants in this case.

Q. Well, I think you just said it, but how do you -- how do you know that would be the case?

Page 145

A. Because that's the -- that's what Ericsson has actually done. I mean, they -- and that's industry practice, where they -- the actual agreements that they did -- where they did enter into agreements with other companies, those agreements were with companies that made computers and end user products like routers and other devices.

Q. Now, in opening, Defendants' counsel suggested that the royalty rate should be based on the price of Intel's chip today. Why is that not appropriate?

A. Because the price of the chip is not relevant in determining the royalty. Regardless of where Wi-Fi -- or better yet, the Ericsson's patents related to Wi-Fi, regardless of where it resides, whether it resides in a chip or something beyond a chip, companies have nevertheless been willing to pay Ericsson a market rate for their technology.

And the market rate they've been willing to pay is in the neighborhood of 50 cents per unit, and that's based on the sales of the end user products.

Q. Mr. Bone, what about the truck antenna example Defendants used in opening? Are you asking this jury to award a percentage of the price of the truck on an antenna?

A. No. That example is, you know, a little

Page 146

bit -- I don't want to say misleading, but it's -- it's -- if the market has determined the value of the technology -- so, in other words, if you saw the picture where they highlighted the antenna, if the markets determine the value of the antenna to be 50 cents, then, you know, to ask Ford or GM to pay a 50-cent rate is not unreasonable.

Now, it would be a different story if the rate was expressed as a percent of the revenue. So, in other words, you said, okay, well, if I took the -- a very -- a rate for an antenna, and I took that and applied it to the entire price of the truck, I agree that would not be -- that would not be proper.

And that's not what we've done in this case. That's why the analysis is focused on a per-unit basis. So the value is on a per-unit basis regardless of whether it's in a router or a laptop.

Q. Okay. Well, why not calculate an amount that Intel needs to pay as a reasonable royalty?

A. So I understand that if -- if the jury finds the Defendants infringe Ericsson's technology and you determine a royalty, then it's my understanding that the Court would not require any additional royalty from Intel based on the sales made by the Defendants.

Q. Okay. Now, for the accused devices that are

Page 147

in this case, what percentage of those use Intel chips?

A. Based on my analysis, 9 percent of the products that infringe use Intel chips.

Q. 9 percent?

A. 9 percent.

Q. Okay. Now, you mentioned that this is a unique case and that there's a number of cases that have licensed Ericsson's patented technology in the real world. What types of companies have permission to use Ericsson's patented technology today?

A. So you see a number of them here on the screen, and I'll quickly go through them.

So -- and a number of these, Ms. Petersson already mentioned: RIM, which is also known as BlackBerry, has taken a -- taken a license to Ericsson's patents.

HP has entered into a license for the 802.11 patents with Ericsson.

Option, Buffalo, Ascom, Nokia, Motorola, and Sonim.

Q. And so we'll go through those one by one, but just as an overview, do some of these companies compete with the Defendants in this case?

A. Yes, they do. So a number of these companies, like for example, HP, make computers. I don't know if

Page 148

37 (Pages 145 to 148)

A1433

we have an HP computer here.

So we have an HP computer here, and those computers compete with the computers that the Defendants make.

Q. Okay. Now, the licenses here that these companies have taken, are they just for Ericsson's Wi-Fi or 802.11 portfolio?

A. Well, they -- a couple of them are just for the 802.11 portfolio, but others include rights to the 802.11 portfolio plus other patents.

But the agreements, or at least the ones I focused on, are structured in a way that I was able to identify and tease out the value of the 802.11 -- the value for the 802.11 patents.

Q. Okay. You kind of preempted my next question there.

For these -- for these companies, did you rely on all of these licenses in calculating the reasonable royalty rate?

A. No. Two of the -- two of the agreements, particularly, the Nokia agreement and the Motorola agreement, were parts of much bigger business deals.

And so the terms of the agreements were so complex -- and I didn't have information from which to actually tease out or understand the value for the

Page 149

802.11 technology, so those two agreements were not helpful at the end of the day.

Q. Okay. I understand this case is unique in that you have these real-world licenses, but why do you focus on those?

A. Well, the -- the agreements -- the actual -- I think they're very instructive in terms of what the market rate is for Ericsson's technology. And so in a way they are -- what I would describe as comparable license agreements.

Q. Okay. Is a patent a simple thing to assign value to?

A. No. You know, it's funny -- well, not funny.

But you can't go into Walmart or Best Buy and look on the shelf and see what Ericsson is -- is willing to license their 802.11 portfolio for. So there's not a readily-accessible way to determine that.

So what financial analysts like me do is we go to and we look at what other companies have been willing to pay for the technology.

And to the extent we can identify what other people have paid, that's an indication of the market value for the technology.

Q. Are there any other reasons why looking at these market rates is important?

Page 150

A. Yeah. So there's several reasons why I think market rates are very instructive, and this is really important.

First off, market rates will tell you how much the technology is worth relative to everything else that's in a product.

Now, the Defendants will try to paint the picture that, you know, the Wi-Fi or the Ericsson's 802.11 patents really aren't worth much in light of all the other features in the routers or the laptops, but that doesn't make sense when you think of all the companies that have been willing to pay Ericsson a rate for that technology.

So another reason why a market rate is helpful is that it takes into consideration options -- the design-around options. You may hear the other side -- the Defendants talk about, well, you know, we had really inexpensive ways to work around these patents, so that's a -- that's a way of determining how much something's worth is what my other options are.

Well, the Defendants -- excuse me, the companies that actually took a license from Ericsson use the same chips that are used in the Defendants' products, so they theoretically would have the same design-around options.

Page 151

But -- so that doesn't seem to make sense because despite that, companies -- a number of companies were nevertheless willing to pay Ericsson a rate for their technology -- again, in the neighborhood of 50 cents per unit.

And another reason why that's important -- and this is the last one -- is that it takes into consideration the price of components. So, again, you've -- I think we heard in opening, and I'm sure we'll hear it later, that it's crazy to think that a 50-cent royalty -- that somebody would pay a 50-cent royalty when the chip only costs $2, okay?

Well, again, the companies that you see in the screen buy the same chips that the Defendants use and they pay the same price for those chips; yet despite that, they were willing to pay a market rate for Ericsson technology -- again, in the neighborhood of 50 cents per unit.

Q. Now, did these companies, when entering into negotiations with Ericsson and taking a license, did they know what each other paid? Did HP know what RIM paid and what Buffalo paid and vice versa?

A. No.

So all of these negotiations and the license agreements that come out of the negotiations are all

Page 152

38 (Pages 149 to 152)

**A1434**

confidential. So RIM had no idea what Buffalo or what -- what Ascom or Option or Sonim paid. And so, you know, they -- they each went into these negotiations independently. They couldn't benefit from knowing what other companies paid.

Despite that, the companies actually reached an agreement, and they've all entered into agreements and paid rates that are in the same ballpark. So what that tells me is that you have a number of companies that came in, entered into negotiations with Ericsson, and put a similar value on their technology.

Q. Well, what about in the 2007 hypothetical negotiations that you need to deal with? Would the Defendants know what these companies paid?

A. Yes. So this is another reason why a hypothetical negotiation is different, and it has an impact on what the parties would have agreed to.

So, unlike all the companies you see on the screen here who didn't have the benefit of what other people paid in the hypothetical negotiation, the Court requires us to consider all information.

And the way they describe that, it's like -- they say it's like playing poker with your cards face up. Everybody knows everybody's negotiating, all the information. And so in the hypothetical negotiation,

Page 153

Dell, D-Link, Buffalo, they would all know the rates that RIM, HP, Buffalo -- excuse me, I misspoke, I put Buffalo on both sides. But let me restate that.

So the Defendants in this case, Dell -- and then Dell and Toshiba and Acer and the router Defendants, NETGEAR, Belkin, and D-Link, would all benefit and they would all know what these other companies paid. They'll know what RIM paid. They'll know what HP paid.

Q. Buffalo already has a license, right?

A. Buffalo has a license, yes.

Q. Now, does that -- does that make sense in -- in terms of the timing, we'll get into these licenses, but some of them are after 2007, right? How would the Defendants in a 2007 negotiation know what these Defendants -- or what these licensed companies paid?

A. Right. So that's another one of these assumptions and things that make the hypothetical negotiation different. And, that is, we have the benefit of peeking forward.

So, although the hypothetical negotiation would have occurred in 2007, they have the benefit of peeking forward. They call it the book of wisdom. And this actually comes from a Supreme Court case, and I'm not -- but it allows folks like me, financial experts,

Page 154

to consider information beyond the date of the hypothetical to determine what the parties would have agreed to.

Q. Okay. Let me back up to something you said a little while ago. You mentioned comparables and using these licenses and market rates as comparables. What did you mean by that?

A. So what I mean by comparables is that it's the use of something else -- or looking to some other -- I can use an example. I don't know if we have a slide for that.

Q. Yes.

A. Okay. Let's assume for a moment that I've got a 2005 GMC Sierra that I'm looking to sell, okay? But I have no idea how much I could sell the truck for.

Well, one way I could do that is go on to a website and look for comparables. In other words, look for other trucks that have similar attributes to help me figure out how much I should sell my truck for.

So in this case, if I've got a high-mileage 2005 Sierra truck, I might compare it with the 2007 Sierra truck that I see here on the screen.

It also has high mileage, so I might say, well, $11,500 might be a good starting point, but, you know, my car is two years older. So I would probably

Page 155

have to bring the price down a little bit, okay?

So that's an example of how you might use a comparable as a basis for determining the value of something.

Q. Okay. And if you need to bring it down a little bit, what -- what are you doing there? Are you making an adjustment?

A. Yes. So what we do -- and so I guess to make the connection between this and what I'm doing in any analysis is that I've looked at the actual agreements that the parties have entered into. And since these are all bilateral negotiations -- in other words, they're one-on-one negotiations and they factor in a bunch of different things, that -- and there is a variance in the rates, they need to be adjusted up or down, depending on the differences in those agreements and how they would compare with the licenses that the Defendants in this case would take.

Q. Okay. Well, before we get to our adjustments, let's -- or our trucks or each of the licenses, and to do that, let's walk through them one by one and talk about the terms.

THE COURT: Counsel, I think it's close enough to 4:00. It sounds like this might be a good stopping place.

Page 156

39 (Pages 153 to 156)

**A1435**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL      )
                          DOCKET NO. 6:10cv473
        -vs-               )
                          Tyler, Texas
                          )  9:00 a.m.
D-LINK CORPORATION, ET AL      June 6, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:      MS. JUDITH WERLINGER
                      MS. SHEA SLOAN
                      shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Mr. Jones, I understand there's an issue.

MR. JONES:  I believe there are two issues, Your Honor.

Mr. Bone -- first thing, we just need some guidance from the Court.  Mr. Bone and I tried to coordinate our examination, and what I believe we have -- and you certainly correct me if I'm wrong -- is when he gets through with the sealed portion, there will be about 10 minutes for him to wrap up.  He asked me about mine; and as we were coordinating, I said I have about 5 to 10 minutes to introduce me getting back into the sealed --

THE COURT:  Could you speak to the microphone?

MR. JONES:  I'm sorry, Your Honor.  I apologize.

Then I have about 5 to 10 minutes introduction before I get into the sealed portion of those license agreements.

THE COURT:  Oh, okay.

Page 3

MR. JONES:  Our suggestion, and it's merely a suggestion, was that you might want to keep it sealed the entire time so we don't run in and run out.

But we were just wanting to inform the Court of -- that we had coordinated, and that was kind of the time that we were going to be looking at.

THE COURT:  Okay.  Well, I'm not a fan of sealing the courtroom.

MR. JONES:  I understand, Your Honor.

THE COURT:  So we're not going to keep it sealed when it doesn't need to be sealed.

MR. JONES:  Okay.  Thank you, Your Honor.

THE COURT:  That's how we'll deal with that.

MR. JONES:  And -- and one other thing.

Obviously, we are now going into testimony about the licenses that we have contended are not comparable as broad general cross-licenses for the reasons set out in our Motion in Limine and Dauberts -- further reasons besides the fact that they are broad general cross-licenses.

We are also about to commence testimony about calculations for royalty rates from these, and they're based on the price of the products in total and percentage royalties and caps.  And we believe that that

Page 4

1 (Pages 1 to 4)

A1437

is improper for violating the entire market value rule and testimony about improper apportionment.

For those reasons, we are going to object to that testimony.

But instead -- and we already know Your Honor's ruling -- and in light of your rulings on the Dauberts and Motions in Limines, but we would ask for a continuing objection so we don't have to object to all those questions.

THE COURT: Any objection to that?

MR. CAMPBELL: No, Your Honor.

THE COURT: All right. You may have the continuing objection.

MR. JONES: Thank you, Your Honor.

THE COURT: All right. Anything further before we bring the jury?

(No response.)

THE COURT: All right. Bring the jury in.

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated.

Good morning, Ladies and Gentleman of the Jury. Y'all always look so much better in the morning than you do in the afternoon, and it's understandable.

Page 5

All right. You may -- may proceed, Counsel.

MR. CAMPBELL: Thank you, Your Honor.

JOHN BONE, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

CROSS-EXAMINATION (CONTINUED)

BY MR. CAMPBELL:

Q. Mr. Bone, you might just remind the jury where we're at in terms of what we discussed yesterday and where we're headed now.

A. I believe where we left off is we were just about to go into the license agreements that Ericsson has entered into with a number of other companies to license their technology.

Q. Okay.

MR. CAMPBELL: And, Your Honor, at this point, we need to go into the financial terms of those licenses which have all been designated attorneys' eyes only.

THE COURT: All right. At this time we'll seal the courtroom. If you're not an attorney or an expert witness who is subject to the protective order that's been entered in this case, then you need to leave the courtroom at this time. We'll let you know when you can come back in.

So please leave the courtroom if you're

Page 6

not covered by the Court's protective order.

(Pause.)

THE COURT: I'm glad none of you jurors tried to leave.

[Laughter]

(Courtroom sealed.)

(Sealed Portion No. 4 of the Trial filed under separate cover.)

(Courtroom unsealed.)

THE COURT: You may proceed.

MR. CAMPBELL: Thank you, Your Honor.

Q. (By Mr. Campbell) Okay, Mr. Bone. So let's talk about one last factor. You talked about it yesterday -- what a hypothetical negotiation entails and what a real-world negotiation entails.

How does the differences there affect where you believe the parties would settle within the range of rates that you calculated?

A. So in the real-world negotiations, there was no assumption of validity infringement, so each of the companies, Buffalo, RIM, HP, walked into the negotiation not assuming that they infringed valid patents.

In the hypothetical negotiation, as I've said earlier, they would walk into the room knowing that they infringed valid patents, and that would have the effect

Page 7

of increasing the rate.

An analogy?

Q. Yeah. What -- do you have an analogy to explain that?

A. I think a helpful analogy to think of this is that right now the Defendants have said that they -- they don't infringe the technology. And so if you put them in a room today, they probably wouldn't agree to, you know, come up with a rate, or they'd be very -- they would be willing to pay only a very small amount.

But if you put the -- if after the trial and if -- let's assume that the jury finds that the patents are valid and infringed; and if you put the Defendants in a room with Ericsson knowing that they infringe valid patents, that would change how much they would be willing to pay. That would increase the amount that they would be willing to pay for the technology.

Q. Okay. So you have these real-world licenses. You took those into consideration. You made a number of adjustments for comparability. Considered a number of other factors.

After all that work, did you determine a reasonable royalty that Ericsson and the Defendants would agree to?

A. I did.

Page 8

2 (Pages 5 to 8)

A1438

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 408    Filed: 03/31/2014

So based on that, I concluded that a royalty rate for the routers would range from 34 cents to 59 cents; and that the royalty rate for the computer Defendants would range from 25 cents to 88 cents.

Q. And did you determine where within that range you believe the reasonable royalty would fall?

A. Well, I believe -- anywhere within that range, I think, is reasonable. I think a reasonable conclusion, though, is the 50-cent reference rate that Ericsson has. And I think -- and that's squarely within the middle of the rates.

Q. Okay. Now, let's just question that for a minute. The -- the licenses we talked about, we don't want to go into the financial details, but those were for an entire portfolio.

This case has five patents-in-suit. Does that make sense that the reference rate of 50 cents for an entire portfolio and the rate for five patents-in-suit would be the same?

A. Well, on the face it doesn't sound like it, but it does when you consider the difference between the assumptions you have to make in a hypothetical. And there are a number.

For example, as -- as you've said, you'd have to make some adjustment for the fact that we're only

Page 9

dealing with five patents, as opposed to the whole portfolio. Now, that would have a downward adjustment to the rate.

But there are several factors that would increase the rate to go up. For example, they're only getting the U.S. rights, which are the more valuable rights. That would tend to increase the rate. They would not be getting grant-back, so that would have to increase the rate again.

And -- and then the difference between the hypothetical and the real world, the whole assumption about walking into the room knowing that they infringe valid patents, that would tend to increase the rate even more.

So it's my opinion, based on my analysis, that I think a 50-cent rate under the hypothetical is a reasonable conclusion for the five patents-in-suit.

Q. Okay. Okay. So now that we have a royalty rate, we need a royalty base; is that right?

A. That's correct.

Q. Okay. And what did you determine the royalty base is in this case?

A. So based on the records that the Defendants provided, I determined the actual devices that used the -- that infringed the technology, and they amount to

Page 10

what you see here in the tables.

So, for example, D-Link, over the period of time, sold 2.9 million routers.

Q. Okay. And is this -- is this all the Wi-Fi products that the Defendants have sold?

A. No.

Q. Okay. Well, when does this start? When did you start calculating the royalty base?

A. So this calculation only begins when the Defendants receive notice from Ericsson that they infringed every single patent in this case. So they actually were selling products before then, but I've only included those sales after they were informed that they infringed the patents.

Q. Well, can a company infringe a patent even if it's not on notice of the patent?

A. That's my understanding.

Q. Okay. But how many of these -- how many of these devices in your list here are before the Defendants had notice?

A. None.

Q. Okay. Okay. And we don't need to read this into the record, but we do need to read into the record the exhibits that this comes from, and this comes from PX 499 to 502, 508, 510, 541, 553, 554, 557 through 561;

Page 11

is that correct?

A. That's correct.

Q. Okay. Okay. Now, let's make sure -- you talked yesterday about a number of factors that you need to consider in your reasonable royalty analysis. Do you recall that?

A. I do.

Q. Okay. Let's make sure we cover all of those and have considered all of those.

Have you considered the royalty rates paid for the use of the patents by other companies that have permission to use Ericsson's Wi-Fi patents?

A. I have. That's a lot of what we've been talking about.

Q. Okay. What about royalty rates for comparable patents paid by the infringer, have you considered that?

A. Yes, I did. The Defendants produced 400 agreements -- license agreements, and there were license agreements with a handful of companies that licensed Wi-Fi technology. And based on my review of those license agreements, I did not find those to be comparable.

Q. Okay. What about the nature and the scope of the license, did you consider that factor?

A. Yes. So we've talked about that to some

Page 12

3 (Pages 9 to 12)

A1439

extent. This is going to be a non-exclusive license, and it would only be for world -- excuse me, U.S. rights.

Q. Okay. How about Ericsson's licensing policies, did you consider that?

A. Yep, we talked about that. We talked about the fact that they have a RAND commitment, and we also talked about the reference rate.

Q. Okay. What about the commercial relationship between Ericsson and the infringer Defendants?

A. Well, we haven't talked about that specifically, but that's something I considered. Ericsson and the Defendants do not compete and -- but -- but the -- Ericsson's licensees, the companies that entered into the license agreements do -- do compete with the -- with the Defendants.

Q. Okay. How about the profitability, success, and popularity of the products covered by the patents?

A. Yes, I have considered that. That -- this factor is accounted for when you look at the market rates. The market rates consider this factor.

Q. Okay. What about the advantages over prior devices and benefits of the patented invention?

A. Yes. In the same way, the market rates account for these very factors.

Page 13

Q. Okay. What about the extent of use of the patents by the infringer?

A. So we just talked about that. That would be the royalty base with the number of infringing units that the Defendants sold.

Q. Okay. And what about the portion of the profit due to the invention?

A. That would also be accounted for in the market rates.

Q. Okay. And what about the duration of the patents?

A. So patents generally have a 20-year life, and based on the date of filing, they expire between 2016 and 2020.

Q. Okay. Okay. So let's wrap it up. You calculated a reasonable royalty rate, you've calculated a royalty base. How do we determine the total reasonable royalty?

A. So in this example, we have -- or in this slide we have a calculation where we've applied the 50-cent rate to the infringing sales. So in this case, let's use D-Link as an example. You take 2.9 million routers -- infringing routers that were sold, multiply it by the 50 cents per unit to get 1.4 million in royalties due -- or damages.

Page 14

Q. Okay. And this might be a little bit tedious, but we need a clear record. How does that work out for the rest of the Defendants? Can you go through that for me?

A. Sure.

So for Belkin, if you take the 4 million routers -- infringing routers multiplied by the 50 cents, you get $2 million.

For NETGEAR, if you take the 23.7 million routers, multiply it by 50 cents, you get 11.8 million.

For Acer/Gateway, if you take the 7.8 million computers that infringe, multiply it by 50 cents, you get $3.9 million.

For Dell, if you take 12.8 million computers, multiply it by 50 cents, you get 6.4 million.

And for Toshiba, if you take the 16.3 million computers, multiplied by 50 cents per unit, you get 8.1 million.

Q. Thank you, Mr. Bone.

A. Thank you.

THE COURT: All right.

Cross-examination.

MR. JONES: Thank you, Your Honor.

Here, you wanted another notebook, didn't you?

Page 15

THE WITNESS: Yeah. Thank you.

MR. JONES: There you go.

Your Honor, for the Court.

THE COURT: Thank you.

MR. JONES: Mr. Campbell.

CROSS-EXAMINATION

BY MR. JONES:

Q. Good morning, Mr. Bone. Welcome to Texas.

A. Thank you. Good morning.

Q. I'd like to just first start out with kind of making sure we talk about the process we've been through and make sure the jury understand it.

You were hired by the Plaintiffs to be their expert in this case, right?

A. That's correct.

Q. Then you do a lot of work, look at thousands of documents, right, sir?

A. That's correct.

Q. Then you form your opinions, right, sir?

A. Yes, sir.

Q. And then the next step is you write reports, and I think it happened in the early part of this year. You write reports that fully and accurately set forth your opinions and the basis therefor, right, sir?

A. That's correct.

Page 16

4 (Pages 13 to 16)

**A1440**

CASE PARTICIPANTS ONLY   Document: 177-1   Page: 410   Filed: 03/31/2014

Q. So when I refer to your reports, that's what I'm referring to; fair enough?

A. Fair enough.

Q. Okay. And then after that, you give a deposition and you were kind enough -- you hosted me in Chicago like I'm hosting you in Tyler today, right, sir?

A. Yes, sir.

Q. It was colder then, wasn't it?

A. It was.

Q. And I took your deposition, and I was given the opportunity to ask you questions about your opinions, right, sir?

A. Yes, sir.

Q. And we -- and when we refer to your deposition, that's what we're talking about, right?

A. Correct.

Q. Okay. Great. Now, another kind of housekeeping deal. Make sure we all understand it.

You've assumed that the patents are valid and infringed, right?

A. That's correct.

Q. You have no dog in that fight, no opinion on that, right, sir?

A. That's correct.

Q. Okay. But you've assumed that.

Page 17

And you would agree with me that if a patent's invalid, then damages are zero, right, sir?

A. That's correct.

Q. And if a patent is not infringed, then damages for that patent are zero, right, sir?

A. That's correct.

Q. Thank you, sir.

Now, you have talked about your rates. And in your report you stated a range of rates, right?

A. That's correct.

Q. And in your report, you said that for Belkin, NETGEAR, and D-Link -- and those are those router Defendants, right, sir?

A. That's correct.

Q. -- that the lowest of the range of reasonable royalty rates would be 34 cents. Do I have that right?

A. That's correct.

Q. Okay. Now, with regard to the computer Defendants, Acer, Dell, and Toshiba, you told us in their reports that the lowest royalty -- reasonable royalty that you saw in that range would be 25 cents per unit, right, sir?

A. That's correct.

Q. Thank you, sir.

Now, this chipset right here, this is a Wi-Fi

Page 18

chip. You've seen these before. You've been in the courtroom, right, sir?

A. I have, yes.

Q. This is one made by Intel, and it costs about $2.50, right, sir.

A. That's my understanding.

Q. Okay. Thank you, sir.

Now, Dr. Nettles yesterday, he told us, did he not, that it was the chips that were at issue in this case, right, sir?

A. I believe that was his testimony.

Q. And he also told us that when you want to decide whether or not these patents that you're talking about, these five patents are infringed, it was the chips that he tested, right, sir?

A. I believe that's correct, yes.

Q. And with regard to 802.11n Wi-Fi, that's where all the magic takes place. I don't understand it all; maybe you do. But that's where the magic takes place for 802.11n Wi-Fi; it's on this chip, right, sir?

A. I'm not a technical person, but that is my understanding.

Q. Okay. So if we want that laptop, like the one you got in front of you right here, to do Wi-Fi, it's got to have one of these chips in it --

Page 19

A. That's --

Q. -- fair enough?

A. Fair enough.

Q. Okay, great.

Now, with regard to this particular chip, in your deposition, you told me that the lowest possible reasonable royalty for it could be as low as 25 cents, right, sir?

A. That's correct.

Q. Thank you, sir.

Now, at this point in time, are you telling me that the reasonable royalty for this chip should be 50 cents?

A. Yes.

Q. So your -- your position is that the reasonable royalty for this chip that costs $2.50, it should be 50 cents, right, sir?

A. It's within my range, yes.

Q. Okay. And, in fact, you're also saying -- because there's -- you know, again, about procedures in this case, there's another expert that's going to testify in this case, Dr. Perryman, right?

A. Correct.

Q. And he's an economist, right, sir?

A. I don't recall his credentials.

Page 20

5 (Pages 17 to 20)

A1441

Q. Okay. Great. No problem. We'll let him do that.

Okay. But his royalty rate for this chip is around a penny, right, sir?

A. That's what I understand, yes.

Q. So your royalty rate is 50 times his royalty rate; is that correct?

A. I'll trust your math.

Q. Okay. Great.

Now, did you do any analysis of the gross profit margin concerning this chip?

A. No, sir.

Q. Did you do any analysis of the net profit margin concerning this chip?

A. No, I did not.

Q. Now, at the time of your deposition, did you tell me that you had not determined the highest royalty rate that could be charged by Ericsson that would meet its RAND obligations?

A. I think that's correct.

Q. Okay. You've made no determination like that, right, sir?

A. No.

Q. Thank you.

MR. JONES: Now, Your Honor, I need to go

Page 21

into the license agreements at this time and would request that the courtroom be sealed.

THE COURT: We'll seal the courtroom again, with the Court's apologies. If you're not covered by the protective order that's been entered in this case, you need to leave the courtroom at this time.

(Pause.)

(Courtroom sealed.)

(Sealed Portion No. 5 of the Trial filed under separate cover.)

(Courtroom unsealed.)

MR. JONES: May I begin, Your Honor?

THE COURT: Yes, you may.

MR. JONES: Thank you, sir.

Q. (By Mr. Jones) Now, the next issue I'd like to talk about just a little bit is a royalty stacking.

When we talk about royalty stacking, what are we talking about?

A. Royalty stacking is an issue -- or can be an issue if there are numerous companies that have patents on a particular technology and a company has to take licenses from everybody that has patents on that technology.

Q. Thank you, sir.

Now, in your report, you conclude that with

Page 22

regard to this matter, royalty stacking is a theoretical, not an actual issue; is that right?

A. That is correct.

Q. Now, let's talk about that just for a second. You know that in the 802.11 standard process -- you've heard the testimony, as the jury -- that certain companies, during the process, will give letters of assurances that say: We will license our patents.

You know that, don't you, sir?

A. Yes.

Q. How many companies wrote letters of assurance concerning 802.11-compliant chips?

A. A lot. I don't remember the number offhand.

Q. Okay. In Dr. Perryman's report -- again, he's the economic expert for the Defendants. You know Dr. Perryman. You've seen his reports, right?

A. Yes, I have.

Q. Okay. He said that there were 121 companies that wrote 274 letters of assurance. Does that sound right?

A. I'll take your word for it.

Q. Thank you.

Now, how many wrote letters of assurances for 802.11n?

A. I don't recall offhand.

Page 23

Q. Okay. He said in his report 32 companies with 32 letters of assurance. Does that sound right -- about right?

A. That sounds -- that sounds about right.

Q. How many -- let me ask you this: How many patents were declared essential in that process to 802.11 through those letters? Do you know that figure?

A. Some are blanket, so you can't really tell, but there were a lot.

Q. Okay. He said at least 977. Do you disagree with that?

A. No.

Q. Okay. Then how many patents were declared essential to the 802.11n standard in those letters of assurance?

A. A lot were declared by the companies, yes.

Q. He said at least 233. Would you agree with that?

A. I'm trying to recall his analysis, but I believe that's what he said.

Q. Okay. Now, with regard to -- and do you disagree with that figure? Do you contest that figure, that there are 233 patents that have been declared -- at least that have been declared essential to 802.11n?

A. Again, I'd have to see his analysis to confirm

Page 24

6 (Pages 21 to 24)

A1442

that. I know he had -- he made some estimates, and without seeing it, it's hard for me to say.

Q. Is that -- is that figure in the ballpark?

A. I don't know.

Q. Okay. All right. Fair enough.

Well, let's move on then. Let me -- let me ask you this: You would agree with me, when we look at the standard, we don't see in the standard a list of all the patents that apply, right?

A. That's correct.

Q. And you would also agree with me that we can't go to any minute of a committee meeting of the 802.11 where they list all the patents that apply to their standards, right?

A. That's correct.

Q. Okay. Now, did you -- in all of your work on damages and the aspects of these products, did you determine the Defendants' contribution to 802.11?

A. In part, through the analysis of the rates that other companies were willing to pay.

Q. Well --

A. So to some extent, yes.

Q. Well, let's go -- let's -- do you remember we talked about that on your deposition?

A. Vaguely.

Page 25

Q. Okay. Great. Well, let's try to remind you.

MR. JONES: Let's go to Slide 2?

Q. (By Mr. Jones) And if go to Slide 2, during your deposition, I asked you: Were any of the Defendants involved in the 802.11 standard-making process before the IEEE?

And I'm saying -- I'm just trying to think through what I recall from that. Does your report discuss that at all?

And you said: I don't believe it does, right?

A. That's correct.

Q. All right. Thank you, sir.

Do you know what standard essential patents were declared by the Defendants during this process?

A. During which process?

Q. 802.11 -- 802.11n. Let's go to it specifically, since that's what we're dealing with in this case.

A. I believe it was a blanket -- blanket disclosure.

Q. And do you know which Defendants made that?

A. I'm sorry. I may have misunderstood your previous question.

Q. Do you know which Defendants declared certain essential patents and wrote letters of assurance?

Page 26

A. I believe all of them did.

Q. Thank you, sir.

THE COURT: Mr. Jones, let me ask you, how much longer you would anticipate?

MR. JONES: Well, a little bit, Your Honor.

THE COURT: All right. Why don't we go ahead and take our morning break at this time then.

We'll be in recess until 10:35.

COURT SECURITY OFFICER: All rise.

(Jury out.)

(Recess.)

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right. You may proceed, Mr. Jones.

MR. JONES: May it please the Court.

Q. (By Mr. Jones) We were talking about 802.11n essential patents. You do not have an opinion on Ericsson's actual share of 802.11n patents, right, sir?

A. That's correct.

Q. And you also have expressed no opinion in your report or your deposition about the actual share of the patents on 802.11n that are owned by the Defendants,

Page 27

right, sir?

A. That's correct.

Q. Now, we do know --

MR. JONES: Could we bring up Slide 6?

Q. (By Mr. Jones) This is a document -- it's Defendant's Exhibit 81. And it's from a presentation that was made by Ericsson. It's called their WLAN Licensing Strategy, and it's dated May the 13th, 2012.

And you've looked at these documents of Ericsson, right, sir?

A. I have.

Q. Okay. And it says that wireless local area network patents are mainly held by chipset suppliers, right?

A. That's what it says, yes.

Q. So expressed in this document, that's their view, right, sir?

A. That's correct.

Q. Thank you, sir.

MR. JONES: And you can take that down.

Q. (By Mr. Jones) Now, if we assume that there are five patent holders that have patents applicable to this chip, and they all get a 50-cent rate, like you're calculating for Ericsson, that would come out to be collective royalties of $2.50, right, sir?

Page 28

7 (Pages 25 to 28)

**A1443**

A. If they each got 50 cents, yes.

Q. Okay. Great.

And if we were to assume that there are 32 companies that gave letters of assurance, and each of those companies got a 50-cent rate for their patents, then the royalties from those patents collectively would be $16 on this chip, right?

A. If those assumptions held --

Q. Yeah.

A. -- that would be true.

Q. Sure.

And if we were to assume that there are 233 patents and they each get 10 cents per patent per unit royalty rate, then on this particular chip, those royalties total -- total -- totally would be $23.30, right?

A. If those assumptions held, that would be the case, yes.

Q. And this chip, as we've already established, costs $2.50, right, sir?

A. At the current price, I think that's correct.

Q. Thank you, sir. I appreciate it.

Now, you looked at 400 licenses from the Defendants; and you, as the Plaintiffs' expert, found none of them instructive to you on your rate, right,

Page 29

sir?

A. That's right.

Q. Thank you, sir.

Now, you've read the depositions of the inventors, right, sir?

A. Yes, sir.

Q. Okay. You've also heard their testimony, correct?

A. Yes.

Q. Okay. Now, in all of the documents that you reviewed, you've not cited to anything in your report where the inventors valued their patents, right, sir?

A. That's correct.

Q. Thank you, sir.

Now, there's another expert that's going to testify in this case, a Mr. Matthew Shoemake. And you've read his reports, right?

A. I have.

Q. And he has extensive experience with regard to IEEE committee meetings and things like that, right, sir?

A. I think that's fair to say.

Q. Thank you, sir.

At your deposition, you could tell me nothing in his report that was factually incorrect about how he

Page 30

said the IEEE viewed RAND, right, sir?

A. That's correct.

Q. Thank you, sir.

Now, finally, laptops have many components and many features, right, sir?

A. Yes. I said that earlier, yes.

Q. Right. Thank you, sir.

And you've done no survey-type analysis to show us which of those components or which of those features drive sales, right, sir?

A. That is correct.

Q. Okay. Same thing's true about routers. They have numerous features, correct? I think you and I, at your deposition, agreed there were lots of features; fair enough?

A. We did agree to that, yes.

Q. And you've done no survey work or that type of analysis to determine what drives sales for routers, right, sir?

A. That's correct, because I didn't need to.

Q. And then finally, you agree with me that these chips, they have features beyond the patented features, correct?

A. I agree.

Q. Okay. And you've done no survey work or other

Page 31

type of analysis to determine what drives sales of these chips, right, sir?

A. That's correct.

Q. Thank you, sir.

MR. JONES: Your Honor, I pass the witness.

THE COURT: All right. Redirect?

MR. CAMPBELL: Thank you, Your Honor. Mr. Jones, can I borrow your exhibit?

MR. JONES: You sure can.

If you lose it, you owe me $2.50.

MR. CAMPBELL: $2.50. All right.

REDIRECT EXAMINATION

BY MR. CAMPBELL:

Q. $2.50, Mr. Jones says I would owe him for this. Let's say I don't lose it, and he sells me this chip for $2.50, what can I do with this?

A. Not much, unless you put it in something.

Q. Need to build a computer or a router, don't I?

A. That's correct.

Q. I -- well, what -- well, if I just put this on this table, take it home, what's it going to do for me?

A. Not much.

Q. $2.50.

Remind me, when does the hypothetical

Page 32

8 (Pages 29 to 32)

**A1444**

usually attached to the outside of a -- a notebook, but some were trying to put them inside a notebook, too, some -- some of our customers.

Q. All right. Now, if you had cellular wireless communication, why Wi-Fi?

A. We really had two things we wanted to accomplish that was different -- different. Is we wanted to get on a trajectory of very low cost, so we could have high -- high -- high attach rates of -- of wireless to a notebook, and we wanted universal access, so wherever you went for that network, you could attach.

So we called it interoperability. Here, we wanted every Wi-Fi network to be interoperable.

Q. And when you speak about universal access, can you explain to the jurors what that -- what that would mean to them?

A. Yes. So I guess I'll -- I'll -- what it means for me, especially being here, is I can go to a Starbucks coffee shop; and if I see Wi-Fi advertised and I open my notebook, I can connect to that Wi-Fi. I don't care whose chip or whose router -- now that we all know what routers are -- in Starbucks.

Or actually, I go to Einstein Bagels for my breakfast in the morning. They have free Wi-Fi. I don't know whose Wi-Fi's chip. I don't know who --

Page 53

whose Wi-Fi system, but it just works.

Q. All right, sir. What was -- can you explain what -- what Intel's ultimate goal was, at least when you were there, with respect to the Wi-Fi -- the Wi-Fi chips?

A. Well, a handful of us were trying to communicate what we were trying to accomplish, so we came up with something we coined, the five-minute rule.

Wasn't a marketing campaign or anything. It was just something we were trying to accomplish. And the five-minute rule is simply if you're walking in a city, we wanted Wi-Fi to be something that you could walk five minutes and get connected.

Or if you're in a suburb like a few blocks out of this city, within five minutes you could drive to a coffee shop or a diner and get a Wi-Fi connection.

Q. Now, Dr. Nettles, yesterday in his testimony, testified about Wi-Fi being available to our -- to our soldiers in Afghanistan. Do you remember that testimony?

A. Yes, I do, sir.

Q. Do you have any familiarity with that, sir?

A. Some good and some bad.

Q. All right, sir. Is -- does the five-minute rule apply out there?

Page 54

A. Not quite.

Q. How do you know that?

A. I know that because my son served -- my oldest son served in Afghanistan, and I had no connection. If he was on a major base, which we couldn't get Wi-Fi connections in Afghanistan during his tenure a few years ago, it didn't work. The only way I could communicate with him was through satellite, so we still have a lot of work left to do.

Q. Now, who is the person at Intel who decided to place the Wi-Fi technology on the Intel chips?

A. As the general manager of the group, it was my responsibility.

Q. All right, sir.

What I'd like to do is focus a little bit on the chip. We've heard quite a bit about it, and I think that Mr. Jones was referring to it.

MR. DAUCHOT: And, Your Honor, the chip has been marked as Exhibit 528. It's on the exhibit list, and with the Court's permission, could I distribute that chip to the members of the jury so they could just hold it in their hands?

THE COURT: Excuse me?

MR. DAUCHOT: Would it be okay if I have the Court's permission to distribute the chip to the

Page 55

jurors so they can hold it in their hands?

THE COURT: Yes, you may.

MR. DAUCHOT: All right. Thanks.

I'm going to take two out. You can pass it down.

THE COURT: I'll just caution the jury, please don't eat any of those chips.

[Laughter]

MR. VAN NEST: That's the ultimate free Wi-Fi.

Q. (By Mr. Dauchot) Here, Mr. Johnson, I'll hand you a copy.

A. Yeah.

MR. DAUCHOT: I think I have an extra copy for the Court.

Your Honor, are you interested in having one or --

THE COURT: I'm fine. Thank you.

A. Yes, sir --

Q. (By Mr. Dauchot) All right. Hold on. Let's make sure everyone has them.

All right, sir. So we have distributed Exhibit 528 -- or copies of it to the Members of the Jury. And you have one in your hands.

What are we looking at?

Page 56

14 (Pages 53 to 56)

**A1450**

A. Well, so -- just so we're all on the same orientation, if you could put it so the little gold edge is facing down, and I'll start at the top.

If you go to the very top, you're going to see two little round buttons or little round circles. That's where the antennas from the notebook connect, so they're often in the screen. And then the wires have to come through the hinge and they hook it up to those round buttons. That's how you get the signal into the notebook.

And then the center of this, the big black -- big black component, that's the chip that Intel designs, and is where the majority of the engineering goes into.

Q. Now, Mr. Johnson, if I could interrupt you one second.

There's a question from the jurors on the question of where of the -- if the software is actually on the chip. And if you could just explain that to us.

A. Yeah. And so there's -- there's many types of software, but there's really, really critical software that we write that sits on the chip.

Q. And where is that on the chip, as the jurors are looking at it?

A. Oh, it is inside the chip, and there's a portion of the chip that's memory. Just like our brain

Page 57

has memory, there's a little bit of memory on the chip so the software can sit inside that.

Q. All right. And you were going to explain the black center?

A. Yeah, so the black center is how we manifest our product. That's -- that's the core of the Wi-Fi product that we sell.

However, to put it in -- to put it into a --

Q. You just need to back away from --

A. I'm sorry. I'm sorry. Can you guys hear me okay?

Okay. So -- so then the reason we put on this green -- I'll call it a green carrier or a module -- and now if you look at the very bottom, you see these gold -- we call them gold fingers. Those snap into a socket on the board of a notebook or tablet.

And so there's two reasons for that. Reason 1 is these computer OEMs we've been talking about, unfortunately don't only -- only want to buy from one supplier. They want a choice from several suppliers, and that's how they get best pricing and best features.

And then the second thing is the standards are evolving, and they may choose to put a different versions of the standard in at different times, especially during transitions. So that's why it's on a

Page 58

module.

Q. All right. And just to give the jurors a sense -- I mean, so these chips wind up on the circuitry of computers.

And I remember during opening statement -- or I'm sorry -- during voir dire, I think counsel for Ericsson proposed to the jury, you go to a store, and you get a laptop with a chip, and you get a laptop without a chip, which one would be more appealing to you.

A. Yes.

Q. Do you remember that line of questioning?

A. Yes, sir.

Q. Did that question strike you as odd at all?

A. Yes, because --

Q. Why so?

A. Because if not every, virtually every notebook has Wi-Fi. People don't buy notebooks without Wi-Fi anymore.

Q. All right. And why is that?

A. Because it's at extremely low cost, so you can have -- basically, the computer OEMs don't even think about including it anymore.

And then, secondly, for all of us, if it says Wi-Fi, you can connect. So you don't have to know it's

Page 59

a Wi-Fi from Company A or a Wi-Fi from Company B. If it's Wi-Fi, it's Wi-Fi. So you can just use it. Those are the two fundamental reasons in my view.

Q. All right. Now, Mr. Johnson, you introduced us to the notion of what Intel, and for that matter, other chip makers were trying to accomplish, and this is the low-cost interoperability.

What did it take to achieve that?

A. It takes really -- I guess I would summarize it in two things, is we, as a company, have to independently design and innovate what we want to accomplish in Wi-Fi.

So when we're going from this generation to the next, it takes some of our best engineers' hard-working innovation to create that next technology of Wi-Fi.

Q. And what else does it take?

A. The second thing, which is very critical, is they have a process -- we've been calling it IEEE. They are members of a standards body where they can go together to share their ideas and innovations with the other engineers from other companies to come up and conclude an interoperable standard for the next version.

Q. All right. How much has Intel spent on R&D just -- just for the Wi-Fi part?

Page 60

15 (Pages 57 to 60)

**A1451**

CASE PARTICIPANTS ONLY

A. Yes. So --

Q. Not total, because we've heard total R&D numbers from Ericsson, and I just want to focus strictly on the -- on the Wi-Fi.

A. Yeah. So for the group I manage and then continued on after me, it's approaching $2 billion --

Q. All right.

A. -- for R&D.

Q. Okay. Now, how many engineers does Intel have working or has had -- has Intel had working on Wi-Fi over the years?

A. Well, under -- under my watch, we were at about 650 engineers plus or minus 25, based on when you would have looked at the group.

Q. Now has Intel been awarded patents for the tech -- for the Wi-Fi technologies that it has developed?

A. Yes. We've had -- we have patents for Wi-Fi.

Q. All right. Mr. Johnson, I want to focus a little bit on the second prong of it.

So you have the -- the innovation that happens inside the shop, and then you mentioned the collaboration.

Can we focus on that? Just generally, what's the process? Because we're going to hear more from --

Page 61

from others as well. But just very generally, high level.

A. I'll stay at the general level because there's experts coming that live this day to day.

But they're -- they're -- IEEE has a great process, with a lot of discipline, on how to gather people's inputs; people's inputs being engineers from each of the companies.

And then they have a process for making selections down to a recommendation that eventually they all ratify as the standard. And so everyone has to listen to each other's ideas and then compromise.

Q. All right. So what do we -- what we have on the one hand is, we have the in-house innovation -- and against your competitors, right?

A. Yes. We are competitors at the end of the day.

Q. And then on the other hand, you have this collaborative step that's required to achieve the low-cost interoperability.

Can you generally describe for the jurors how those two competing interests get harmonized? How do you -- how do those competing interests get resolved, at least from your experience?

A. From my experience, I guess I would say it's a

Page 62

balanced approach. You -- you absolutely want your ideas to be accepted because then you might have a little bit of a lead on the next product but not a lot -- not a big lead, but a little bit of a lead.

And so what typically happens is, these things start coming together. We start having some log jams. And so let's say the chipset companies can't quite agree on the approach to take, but then we could escalate it to me, and my counterparts at, say, Atheros, or someone like that, and we would talk and say: Hey, we've got to resolve the log jam.

Or an equipment manufacturer may want their proprietary features that only they support in our components. And we would have to explain to them, no, we're an open standard; we collaborate.

So I guess at the end -- I'm going too long.

Q. No, no, no. That's all right.

A. I guess my summary is, it's tough for engineers to give up their ideas, but we always have to come back to interoperability trumps self-interest.

Q. All right, sir. I want to shift back to the standard-setting groups.

And did Intel have any formal leadership roles in those standard-setting organizations, any particular 802.11, the stuff you worked on?

Page 63

A. Yeah, I'll focus on 802.11, or, again, I'll state general.

You know, there are chairmanships of standards. There are authors of specific parts of the standards. There's -- people read and ratify those parts. And then there's people that agree to adopt them.

And so Intel had several different leadership positions throughout the history of 802.11n. And, in fact, we have one of those folks that have been extremely involved coming here to testify this week.

Q. Who's that?

A. This is Duncan Kitchin.

Q. All right. There was a little bit of discussion over the price of Wi-Fi, and I think that was the unsealed portion, so I don't know if you were seated here when that was discussed, the price of Wi-Fi chips dropping.

A. Yes, I did. I heard that.

Q. Can you -- do you have any experience with that? First from the business perspective.

A. Yeah. I'll give -- I'll just give you the experience I had when I was running the Wi-Fi group.

In 2002, before we launched the first Wi-Fi product with our chip -- and these are general. I don't

Page 64

16 (Pages 61 to 64)

**A1452**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                            )        DOCKET NO. 6:10cv473
  -vs-                      )
                            )        Tyler, Texas
D-LINK CORPORATION, ET AL        June 6, 2013

SEALED PORTIONS NOS. 3, 4, 5 FROM TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:    MS. JUDITH WERLINGER
                    MS. SHEA SLOAN
                    shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

SEALED PORTION NO. 3 OF TRIAL

(Courtroom sealed.)

(This portion of the proceedings is

SEALED and filed under separate cover.)

THE COURT:  All right.  Counsel, you may

proceed.

MR. CAMPBELL:  Thank you, Your Honor.



Page 3

1 (Pages 1 to 4)

**A1460**

CONFIDENTIAL MATERIAL FILED UNDER SEAL; REDACTED



Page 5

A1461

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



Page 9



Page 13

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



Page 17

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



A1467

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



**A1469**

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



Page 41

11 (Pages 41 to 44)



Page 45

A1471

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                   DOCKET NO. 6:10cv473
  -vs-                       )
                   Tyler, Texas
                   ) 12:34 p.m.
D-LINK CORPORATION, ET AL        June 6, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:    MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

---

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California  94111

Page 2

---

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Is there a matter before we bring the jury in?

MR. STEVENSON:  There is, Your Honor.

During the pretrial conference, Ericsson moved in limine to preclude Intel from raising its own patents as a defense to infringement.  Now it wants to introduce its own patents, I believe at least one, through this next witness.

The Court listened to argument on that and said they may be relevant to other things and instructed Intel that it could put in evidence of its own patents that pertained to this standard, but would be precluded from arguing that that's a basis for non-infringement.

And at that time, the Court indicated it may consider also granting a limiting instruction.  I've presented to the Court a limiting instruction.  We tried to reach an agreement, but we have slightly different competing versions, and I would request that the Court, at the time the witness gets into the Intel patent, read the limiting instruction to the jury.

Page 3

---

THE COURT:  Okay.  And the first page is Plaintiffs' proposal, and the second page is Defendants' proposal?

MR. STEVENSON:  Yes, Your Honor.

THE COURT:  Both sides agree that an instruction is appropriate?

MR. DE VRIES:  Your Honor, we believe that the instruction may not ultimately be necessary in light of the way that we intend to present this evidence.  We, of course, intend to comply fully with Your Honor's motion in limine ruling.

The concern we have with the instruction proposed by the Plaintiffs, however, if one is to be given, is that it's legally incorrect.  It says things that are actually just not consistent with the law.

For instance, the fact that the patents are themselves legally relevant to intent, the intent element of induced infringement.

So we've presented an alternative proposal that we believe is consistent with the law.

THE COURT:  Okay.  All right.

MR. DE VRIES:  And then further, Your Honor, we also believe that if a limiting instruction is to be read, it should be more appropriately be read during the context of the final instructions.

Page 4

1 (Pages 1 to 4)

A1476

Case: 13-1625  Case: 13-1625  Document 179-1  Page: 429  Filed: 03/31/2014  Document: 177-1  Page: 429  Filed: 03/31/2014  (429 of 575)

CASE PARTICIPANTS ONLY

If one is to be given now, however, we have another instruction that we think should be read at the same time. We've presented it to opposing counsel; and with your permission, I can walk it up to you right now.

THE COURT: All right.

MR. DE VRIES: Your Honor, what this instruction relates to is the licenses that have been offered into evidence by Ericsson, licenses to the patents-in-suit.

To the extent that the jury is under the misperception that the fact that Ericsson has licensed its patents to others and that that may impact whether Defendants infringe, we think that it would be appropriate to give a limiting instruction, the one that we've proposed in particular, at the same time.

Alternatively, as I said, I think it would be more appropriate to reserve these instructions for the final instructions.

THE COURT: All right. You may proceed with the testimony, and when we get to a point that either side feels that an instruction is necessary, please approach the bench.

MR. DE VRIES: And, Your Honor, one other thing, if I may. I understand that there are some

Page 5

exhibits that Ericsson, at least potentially, plans to use in connection with the next witness.

Those were disclosed for the first time on the night of the 24th (sic) in an exhibit list. We were asked about them sometime after midnight last night. We would object to their use during the testimony as being late disclosed.

We reached an agreement that impeachment exhibits were to be admitted or included on the exhibit list early in the process. These came at the last moment, and we think it would be unduly prejudicial.

THE COURT: They were given to you after the -- on -- on the 24th of May?

MR. DE VRIES: Of June, Your Honor. So just about 36 hours ago.

THE COURT: Today is like the 5th -- the 5th of June -- what?

MR. DE VRIES: I'm sorry. Today is the 6th.

THE COURT: Uh-huh.

MR. DE VRIES: On the night of the 4th, about midnight, we received notice of these exhibits for the first time.

MR. STEVENSON: They're Intel patents, Your Honor. I think one of them is a patent written by

Page 6

this witness. We may or may not use it. It's for impeachment only; and depending on where the testimony goes, we may want to raise it or not and depending on what the answer is.

THE COURT: Okay. Well, approach the bench before you do.

All right. Bring the jury in, please.

MR. DE VRIES: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right. Who will Defendants' next witness be.

MR. VAN NEST: Your Honor, Defendants call Duncan Kitchin.

THE COURT: Who?

MR. VAN NEST: Duncan Kitchin.

THE COURT: All right. Duncan Kitchin. Have you been sworn, Mr. Kitchin?

THE WITNESS: No, I have not.

THE COURT: All right. Raise your right hand and be sworn, please.

(Witness sworn.)

MR. AROVAS: Your Honor, we have a few

Page 7

exhibits to use with the witness; and if the Court would like, we can hand up a set of a few binders to the Court.

THE COURT: Okay.

DUNCAN KITCHIN, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. AROVAS:

Q. Good afternoon, Mr. Kitchin.

A. Good afternoon.

Q. Can you tell us who you work for?

A. I work for Intel Corporation.

Q. And what's your position at Intel?

A. I'm a principal wireless technologist.

Q. And can you tell us about how long you've been with Intel?

A. About 14 years.

Q. Now, we're going to get into some of the details a little bit later, but in this case we've been talking a lot about the 802.11 Wi-Fi standards.

And can you tell the jury whether you've been personally involved in the development of those standards?

A. Yes. I've been involved with those standards for -- for many years.

Q. And we've also talked about certain particular

Page 8

2 (Pages 5 to 8)

A1477

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 430    Filed: 03/31/2014

Q. Okay. And -- and so we've talked a lot about wireless technologies. Is there just one way to, let's say, go faster or one way to get lesser errors or one way to get more range?

A. No, not at all. What you will typically find is that for any given feature, there will be multiple competing proposals that will be brought to the -- to the -- to the standards meeting, and there will be a lot of discussion about which the best way to do it is.

And it may be that people will -- will go away and go do some more work and go do some more analysis, depending on the questions that came up. It's -- it's extremely unusual for somebody to just bring a proposal and it be immediately voted on to go into the standard. You'll often have two or three different ways of doing the same thing.

And then they'll go off and talk about it, and maybe the two different proposals will resolve their differences by agreeing that, yeah, this one is better than that one. Or sometimes -- and this frequently happens -- they will come up with a merged joint proposal.

So they'll take some features from this one and some features from that one and come up with something that they think is the best way of doing it

Page 21

and then come back and re-present it.

Q. Okay. And so are all the members free to propose whatever technology they want?

A. Yes.

Q. And then it gets debated?

A. That's right.

Q. And the group makes a decision on which way they want to go, right?

A. That's correct.

Q. And so sometimes a proposal wins and sometimes it doesn't?

A. That's correct.

Q. Okay. And so how many engineers in general over the years -- just approximately -- from Intel have been involved in this 802.11 process, in addition to yourself?

A. You know, I don't know exactly. It's quite a lot. It's probably several dozen.

Q. And have you held any leadership roles in 802.11?

A. Yes. So one of the standards that was mentioned on that timeline, 802.11e, I was vice chair of that -- that standards group. So in practice, I chaired a lot of those -- those meetings.

Q. And how about some of your colleagues at

Page 22

Intel, did they hold any leadership roles?

A. So, I think there's about a dozen Intel contributors who've held various officer positions in the 802.11 group.

Q. Okay. And are there detailed records that are created as you create these standards and pick among the technologies?

A. Yes. The record keeping is actually very formalized. Every one of the these proposals that I talked about, even the ones that don't get accepted, just when you bring a proposal or presentation, even if it's just a couple of PowerPoint slides, will be issued with a number, and that goes into the -- into the records.

And at every one of these meetings, you have a secretary who's taking minutes, so recording every present -- presentation that gets made. There will often be a recording of some of the discussion that happened in those minutes, and every vote that gets taken will be written down in those minutes.

Q. Okay. Now, who were the types of -- or what were the types of companies that tended to contribute the most technology to the 802.11 standards?

A. Well, generally speaking, it tends to be the chip manufacturers who bring most of the proposals.

Page 23

Q. And why do you think that is?

A. Well, because that's where the technology is actually implemented. So it's the chip manufacturers who typically have the most insights into -- into what are going to be the best technologies.

Q. Okay. And do you remember Ericsson contributing any technology that was accepted into the 802.11 standards?

A. No, not that I remember.

Q. Okay. Now, is there just one technology in 802.11n, or is there a lot of stuff?

A. No. There's a -- there's a very large number of different technologies that all kind of work together.

Q. Okay. And have you compiled either a partial list of some examples of the types of technologies that go into 802.11?

A. Right. So I put together a list of some of the -- some of the things that are in there. I think there's several different dozen technologies.

Q. Okay.

MR. AROVAS: So let's put that up, which I think is Slide 4.

Q. (By Mr. Arovas) And if you could just explain to all of us what we're taking a look at.

Page 24

6 (Pages 21 to 24)

**A1481**

A. So this is just a list that I put together of some of the different technologies that are in 802.11.

And for each one of these, you could -- you could point to someplace in the standard where there is a description of what this is and what it does.

Q. Okay. And so here you have, you know, roughly 70-plus technologies; is that right?

A. Something like that. I think there's several dozen.

Q. And these are categories, so they're also many, many sub-technologies that go under each of these?

A. Oh, sure. I mean, a lot of these are actually very complex, and there's an awful lot behind a lot of these.

Q. Okay. And so we've been talking about prioritization and QoS, or quality of service, and block acknowledgement. Are those among these many different types of technologies that were included in 802.11n?

A. Yes. And I think I have those two listed. So I think you see BlockAck is kind of about two-thirds of the way down the first column, and the prioritization is somewhere on the third column.

Q. Okay. And so what I'd like to do is, I'd like to talk about those two technologies.

A. Uh-huh.

Page 25

Q. First, I'd like to give us a little bit of context, so we understand how maybe an overall network might look, okay?

MR. AROVAS: So if we could put up Slide 5.

A. Okay.

Q. (By Mr. Arovas) And if you could describe, from a network perspective, what, at a very high level, is going on with Wi-Fi.

A. Okay. So what's going on here is, you have -- on the left here is shown a Wi-Fi router. It's this little box that you plug into an Internet connection, and it has a Wi-Fi chip, which is shown on the slide here, and it has radios in it.

And that broadcasts a signal which announces that it's there. You have other devices. In this case, shown in the slide, there's a -- there's on laptop, which is also shown here having a Wi-Fi chip in it.

And so that laptop can detect that broadcast signal that indicates that there's a Wi-Fi router, and having detected it, can then send messages backwards and forwards and use that wireless connection to connect to the Internet.

Q. I see.

And can you tell the jury where in these

Page 26

products is that Wi-Fi actually getting implemented?

A. So it's in those chips, which is why -- it's shown on the slide. You can see it. There's a little diagram that shows Wi-Fi chips in there. That's where all the Wi-Fi is implemented.

Q. Okay. And so when you're at the 802.11 meetings, was there a certain design philosophy or objective you had in putting together the standard and selecting these various technologies?

A. Sure. I mean, ultimately, the -- the goal of these standards is to get to a product that we can actually manufacture and sell. And the philosophy, in terms of getting to that product, is to do something that's as simple and streamlined and cost-effective as possible.

Q. And why did you want to do that?

A. Just because that gives us the best chance of getting a good product into the market.

Q. Okay. Did that contrast with some other wireless standards or wireless -- or wireless approaches?

A. Sure. I mean, there are ways you could do there that are going to be much more complex, but that introduces some potential problems that are likely to really slow things down and also make it difficult to

Page 27

actually manufacture products that are going to be reliable.

Q. Okay. And -- and was that -- did that make it easier to make it more streamlined when you came up with the standard?

A. No. It doesn't really work like that. I mean, the -- the way that we design these things in trying to get them as simple as possible, there's actually a lot of work that goes into cutting out things that we don't -- don't need and solving problems in a way that avoids introducing complexity. That often is a more difficulty way of doing it.

Q. Okay. So now let's turn to the two features. Let's start with QoS. And can you tell the jury if you were personally involved in the development of QoS in 802.11?

A. Yes. So QoS was specifically assigned to the 802.11e task group, and I was vice chair of that task group. I actually chaired most of the technical meetings, and I made a large number of contributions of technology to that -- to that committee.

Q. Okay. And so we've been using a lot of acronyms. Can you tell all of us, what does QoS stand for?

A. So QoS stands for quality of service. It kind

Page 28

7 (Pages 25 to 28)

**A1482**

So this is the 2007 version, which includes the 802.11e, which was -- which was approved in 2005.

Q. Okay. And so does this standard include some reference to the use of user priorities that you've been talking about?

A. Yes, it does. It's in -- it's in this standard.

Q. Okay. So if we could hop to Page 253 of the standard, and at the top of the page is a Table 9.1.

A. Okay.

Q. I'd like to ask you a few questions about this.

First, were you involved in creating this table?

A. Yes. So this -- I mean, the table got modified a little bit, but the original -- the original version of this table came from a proposal that I submitted to -- to the -- to the task group.

Q. Okay. So in the far left, we see something that says -- a heading that says priority. Do you see that?

A. That's correct.

Q. And can you explain to the jury what that's referring to?

A. So this is just kind of showing the general

Page 37

concept that each of these -- each row in the table is showing a different priority level, and it just starts with lowest at the top and goes to highest at the bottom.

Q. Okay. And are those priority numbers the next column over where it says UP?

A. Right. So this is -- it says here 802.1d priority. That's another word. There are a lot of different terms that get used, but they're essentially talking about the same thing. This is the -- this is the priority.

Q. Okay. And so does the priority that's assigned have anything to do with the type of the data that goes in the packet?

A. No. It's independent of the type of the data.

Q. Okay. So we heard some testimony earlier in this case -- if we look on the far right-hand side of this table at the bottom, it says video, video, voice, voice. Do you see that?

A. Yes, I see that.

Q. Okay. And can you tell us whether -- can you tell the jury whether that is referring to any sort of fixed or established relationship between priority and type of data that goes into the packet?

A. No, there's not a fixed relationship. This is

Page 38

just an example.

Q. Okay. So what I'd like to do next is -- is take a look at the queues --

A. Okay.

Q. -- and put all the pieces together so we can understand how the user priority is used in real IEEE 802.11 products.

And so let's take a look at DX 193 next.

A. Okay.

Q. And if you could describe for the jury what DX 193 is.

A. So this is -- this is a proposal that was submitted to the 802.11 task group, a task group for inclusion in the standard.

Q. Okay. And were you involved in this?

A. Yes. So I wrote the original draft of this document.

Q. And what was your involvement in the IEEE community in trying to get this technology adopted?

A. Okay. So at the time this was submitted, there were quite a lot of different proposals floating around, and some of these -- there was -- there was still an argument about complexity versus simplicity.

And I knew that most of the chip makers would -- would sign on to a proposal that really did the

Page 39

simplest possible thing, and I wrote up something as a proposal, and then I took it to key influences, and you see this list of people here.

What essentially happens, I wrote a document. I took it to all these people and asked them to sign on to it as co-sponsors essentially. And so you see this list. It's actually in alphabetical order that I put on as I got people to kind of sign on to kind of co-sponsor this -- this proposal.

Q. And does this proposal, was this ultimately adopted into the 802.11 standards?

A. Yes, it was.

Q. Okay. And does it show a picture of what these different queues looked like?

A. Yes. This is -- this is actually where that -- where that figure first appears.

MR. AROVAS: And if we could put that up on the screen.

Q. (By Mr. Arovas) So the 14th page of the contribution. Can you describe for the jury what we see in Section 3.4.1?

A. Okay. So this is -- this is kind of the formalized diagram that looks very much like that slide that we showed earlier. This is the -- this is the actual diagram from this -- from the proposal that was

Page 40

10 (Pages 37 to 40)

**A1485**

submitted to the standard for doing this.

Q. Okay. And how does this compare to what makes it in the final standard?

A. This appears in the -- in the 2007 standard, more or less identically. I think there's an additional label that's added to the standard. Otherwise, it's exactly the same.

Q. Okay. So what I'd like to do is to ask you to annotate and explain how these queues will work in the 802.11 standard.

MR. AROVAS: And, Your Honor -- Your Honor, with the Court's permission, I'd like the witness to approach the easel.

THE COURT: All right.

MR. AROVAS: Now, I hope everybody can see.

Q. (By Mr. Arovas) And are you -- we're going to get you a microphone.

Are you a righty or a lefty?

A. Lefty.

Q. Lefty. Okay.

A. Okay. So I'll try to explain what this is.

Q. Okay. So let's -- let's start by understanding what we're looking at. We just looked at your proposal, and it had a bunch of queues. And is

Page 41

this a figure from the actual standard?

A. Yes. This is -- this is from the actual standard.

Q. So this is -- this is a blowup or an enlargement of exactly what we would find in the official 802.11 standard; is that right?

A. Yes, that's correct.

Q. And that's Figure 9.17, right?

A. 9-17.

Q. Sorry. 9-17.

And so can you start -- I just want to start at a high level. We've seen some graphics and other demonstrations of how 802.11 works, that you have the packets going from a transmitter to a receiver?

A. Right.

Q. Okay. And this would be the queue in one chip, either on the transmitter side or the receiver side, right?

A. So this is all inside the transmitter side.

Q. So just the transmitter?

A. Just the transmitter.

Q. Okay. And so this transmitter would be preparing packets to send it over the air to the receiver, right?

A. That's right.

Page 42

Q. Okay. So let's start by understanding where the packets come in and where do the packets go out.

A. All right. So what this is showing, if you look up at the top, this is where the packets come in.

And then what's going on in this diagram is, it's deciding from all those packets that it might have at any given time, which one am I going to send next.

And at some point, there will be packets that go out the bottom here.

Q. Okay. So they start at the top --

A. They start at the top.

Q. -- and filter through the queues, and they go out through the bottom; is that right?

A. That's right.

Q. Okay. Now, where in this figure is user priority used?

A. Okay. So there's really only one place that user priority gets used here, and it's right up at the top. I'll just mark this up here. It says MSDU, comma, UP.

And if I can just kind of translate that a little bit, MSDU is a term that the standard uses to mean a packet, and the UP is the user priority.

Q. Okay. So UP is the same UP we saw elsewhere in the standard. It's the user priority; is that right?

Page 43

A. Right. It's that -- it's that first or second column in the table that has the numbers between 0 and 7.

Q. Okay. And so now can you -- now that we have the context, can you describe for the jury, and draw whatever you want on the board, about how the packets would filter through this queue architecture?

A. Sure. Okay.

So there's really three things that are shown here. And I'll start at the top and go through each one one at a time.

So what you see at the top here, you get a whole bunch of these packets that come in, and there's a -- there's a chain of these packets that are coming in. Each one of these packets is marked with a user priority. It's a number. So you get this MSDU user priority. You get a whole bunch of these.

So let's say we get 5 and we get 3. The first box that we see, it says: Mapping to access category.

Now, access category is the terminology that we came up with to refer to these four queues. So each one of these is an access category.

So what this box is doing is it's deciding which queue does each packet go into. And it does that purely by looking at that user priority. That's the

Page 44

11 (Pages 41 to 44)

A1486

only thing it gets to look at.

So it looks at, say, this first one, and it says 5. So it decides, well, user priority 5 goes into this access category. And so the packet ends up in this bucket.

The next one says user priority 3. This box decides it goes into, let's say, this one, and so the packet goes into here. And as more packets come in, these buckets start to fill up.

What happens then, we've got these four queues; they're essentially these buckets that fill up with the packets. And the packets get taken out of these buckets one at a time from the bottom. So the first packet that arrives always goes out first.

And the last thing that we have here, this third block, is this thing at the bottom.

Now, exactly what this is doing is a little bit complex, and I don't want to get into that too much, but essentially what it's doing, at any given point, when it needs to send a packet, it has some way of deciding which of these queues do I take a packet from.

And in general, it will tend to take packets from the higher priority side first rather than the lower priority side so that way the higher priority packets, the ones that are marked with a higher user

Page 45

priority, will tend to get sent first.

Q. Okay. So, now, in this case, we've heard a lot about types of data, voice, video, multimedia, that sort of thing. So where will the voice packets go in the way -- in the 802.11 system?

A. You can't actually tell. The only thing that you look at is this user priority. It's just a label that gets put on it to say which queue it should go into.

So the voice packets could end up over here; they could equally end up over here. There's nothing in the Wi-Fi system that knows about where, say, voice packets would go.

Q. Okay. How about the video packets? Where do the video packets go? Do they just go in one queue?

A. No. Same thing. So the only thing this looks at is just this number. So the video packets might end up in here; they might end up in here.

And the system doesn't actually know at any given time what these packets are; it just knows how many it's got.

Q. So then is there any relationship -- so we heard about all these numbers, 0 through 7. You put a 3 up here, a 5, as two examples.

Is there any relationship in the Wi-Fi system

Page 46

between those numbers and the type of data, the voice or video, that goes into the packet?

A. No, there is no relationship at all.

Q. So why doesn't Wi-Fi care about the type of data that's in the packet?

A. It's just simpler to do it that way. The only thing that we have to do is, we have -- in this box, you have a number that comes along with the packet and says, this is the priority.

And then we have that table that we showed earlier that says, given that number, you can look it up. If you get a 5, it goes in this queue. You get a 3, it goes in this queue. You get it from that table, and it makes it very, very simple.

Q. Okay. So if somebody were to say that there's -- that that number, 3 or a 5, that user priority tells you or identifies the type of data that's in the packet, would that be correct or incorrect for the 802.11 standards?

A. That would be incorrect.

Q. And would that be correct or incorrect for the Intel products?

A. That would be incorrect for the Intel products.

Q. Okay. And if somebody were to say that the

Page 47

Wi-Fi products or the 802.11 standards use that number as a way of telling the difference between video and voice or different types of data, would that be correct or incorrect?

A. That would be incorrect.

Q. Okay. So now what I'd like to do is move on to the other technology, block acknowledgement. And for that, you can return to the witness box, please.

MR. AROVAS: I got it.

Q. (By Mr. Arovas) So we're going to change gears a little bit, and we're going to talk about the second technology, block acknowledgement. And is that one of the many technologies that's in 802.11n?

A. Yes, it is.

Q. Okay. And starting at a high level, can you tell the jury what is block acknowledgement?

A. It's a -- it's a system that allows you to send a large number of packets from a transmitter to a receiver and then get an acknowledgement for all of those and where they go.

Q. Okay. So let's first get a sense of what the basic pieces are of the block acknowledgement system. And so is there a diagram in the standard that shows us the basic parts that are used in block acknowledgement?

A. Yes, there are a few different diagrams.

Page 48

12 (Pages 45 to 48)

A1487

CASE PARTICIPANTS ONLY

A. So I think this -- the next slide depicts that -- that situation.

Q. Okay. So let's look at that.

And so when -- when would this situation come up that not all of the packets arrive at the receiver?

A. So there's -- there's a lot of reasons this might happen. The radio transmission might run into interference. You might have a situation where the signal suddenly faded for some reason. These are mobile devices. They can move around. So we do encounter that situation where the signal just gets weaker for some reason.

So what we've shown here is that third packet with the big red X through it, we're saying -- in this example, let's say Packet No. 3 did not arrive successfully at the other end.

Q. Okay. So then what would be the next step in this process when one of the packets doesn't get there?

A. So the next step would be exactly the same thing. It would be sending that BlockAck request.

Remember, at this point the transmitter can't tell what the receiver got; it's just sending out these messages. So it's got to go and ask, what -- what did you get?

Q. I see. Okay. So that's the -- the next

Page 53

slide, we see, again, the BAR, the BlockAck request going from the transmitter on the left to the receiver on the right. And the receiver didn't receive Packet 3, which is the X?

A. Right, that's correct.

Q. So can you describe for the jury what happens next?

A. So what happens next is the receiver's going to respond with a -- a BlockAck as it's being asked -- asked for. And I think if you go to the next slide, it will show it.

But in this case, because 3 didn't arrive, it says, okay, I got 1, 2, and 4.

Q. So if all of them had arrived, it would have said 1, 2, 3, 4; since 3 didn't arrive, 3 is missing from the response?

A. That's right.

Q. Okay. So now, what I'd like to do is -- with this as a background, I'd like to talk about certain specific features in the 802.11 standard and product and understand how -- what happens and what doesn't happen, okay?

A. Okay.

Q. So first, have you ever heard of something called deadlock?

Page 54

A. Yes.

Q. And when a packet --

MR. AROVAS: In fact, let's -- let's go back to Slide 11.

Q. (By Mr. Arovas) Okay. Slide 11, we have the transmitter sending the data to the receiver and No. 3 isn't making it, right?

A. (Nods head affirmatively.)

Q. And can you describe for us whether there's any deadlock in the Wi-Fi system, the 802.11 approach, and if so or if not, why?

A. So in the way that the Wi-Fi system is designed, there is no deadlock condition. We specifically designed it to make sure that would just never happen.

Q. And why is that?

A. So the problem arises if the receiver has some fixed idea of which packets it's required to receive.

If, say, in this case it had determined in advance it wanted to see 1, 2, 3, and 4, and it's not going to look to receive 5, 6, 7, 8 until it's got all four of those successfully.

Now potentially we have this problem. If the transmitter gives up trying to re-send this Packet 3 where it's not going to move on, it won't receive 5, 6,

Page 55

7, 8. So it has to be specifically told. And that's what a deadlock is.

Now, in this particular situation, we decided with 802.11 we would just design it so that that never occurred in the first place. So there is no deadlock. So it just doesn't have the rule that says that you have to wait until you've got all four of those before you can receive 5, 6, 7, 8.

Q. Okay. So here in this picture, you've shown four data packets, 1 through 4?

A. Right.

Q. Okay. And 5 through 8 aren't shown?

A. Right.

Q. Where would they fit into this?

A. Well, it would be just whatever -- whatever data comes next. I mean, there will be a continuous flow of these packets going from the transmitter to the receiver, so it's just going to keep increasing this number. So you go 5, 6, 7, 8, and then you keep going after that.

Q. And in the real world when these transmissions are occurring, is it just a few packets, is it hundreds, thousands, millions? How many packets are actually being transmitted?

A. It's -- typically you expect tens of thousands

Page 56

14 (Pages 53 to 56)

A1489

of packets a second. It's -- it's quite a lot.

Q. Tens of thousands per second?

A. Right.

Q. Okay. So we've just shown 1 through 4, but then there will be 5 through 8, and 9 through 12 -- I'm going to lose it soon --

A. Right.

Q. -- and then 13 through whatever, right?

A. Right, and then 14,000 through 15,000.

Q. Right. Okay. It keeps going. And so -- so if -- if -- if one of the packets doesn't get there, does that hold up the Wi-Fi system, or does it just keep going?

A. No, it just keeps going.

So the receiver just receives whatever packets you send to it.

Q. And -- and to keep going, does it need any special command or, you know, any special transmission to cause the receiver to take those packets?

A. No. It just receives -- receives the packets as you send them to it. As long as you keep increasing the numbers, it just receives the packets.

Q. And was that an intentional design decision and goal within IEEE to do it that way, as opposed to receiving some sort of -- or needing some sort of

Page 57

command to receive?

A. Sure. Sure. By taking out that need to have the synchronization between the transmitter and receiver on what numbers it's expecting, it just takes care of this problem. It just never occurs in the first place.

Q. Okay. So now I'd like to ask about something that happens to packets that -- that sometimes don't make it, called discarding. Are you familiar with discarding of packets?

A. Yes.

Q. What is discarded?

A. So the idea here is in this situation where we have this Packet 3 that didn't arrive, after we've done that acknowledgement, what's going to happen is the transmitter is going to -- to have another go at sending that Packet 3.

And if it doesn't work a second time, it will maybe try a third time; but there is a limit that gets imposed. After you've tried a certain number of times, you just give up and you just throw the packet away.

MR. AROVAS: So to talk about this, let's go to Slide 12, if we could.

Q. (By Mr. Arovas) And what we see on Slide 12 is, again, the transmitter on one side, the receiver on the other side, and we're talking about Packets 1

Page 58

through 4, right?

A. Yep, that's right.

Q. And the red X, can you remind us what the red X indicates?

A. So that's indicating that that Packet 3 didn't arrive successfully.

Q. Okay. And so you were mentioning discarding of Packet 3. Where would that happen?

A. So that would be at the transmitter. If the transmitter eventually gives up, it will just throw the packet away.

Q. Okay. And so we had some questions earlier in this case about whether the receiver on the -- on the right-hand side is going to calculate or figure out what packets that the transmitter on the left-hand side of this picture is actually discarding.

And can you tell us, just first starting at a high level, does the receiver calculate what packets the transmitter is discarding?

A. No, it doesn't do that.

Q. And is there a reason?

A. There's no reason for it to know. It's just unnecessary.

Q. Okay. So --

A. Receiving the packets.

Page 59

Q. We heard the term coordination and synchronization. So in the 802.11 system, the way it was designed and the products that use that, does the receiver need to stay synchronized or coordinated with what packets are actually being discarded in the transmitter, requiring it to make a calculation of discarded packets?

A. No, that's not necessary. The way -- the way that it's set up, you receive the packets. And you figure out what you're doing from the packets you receive. So you don't need to worry about what the transmitter might have discarded, and you actually don't know. There are a lot of situations where it can't tell.

Q. You're saying there are situations where the receiver can't even tell what the transmitter may have done?

A. That's right, it doesn't have the information to compute it, even if it wanted to.

Q. And why can the system work without perfectly coordinating or synchronizing between the receiver and the transmitter what packets are discarded in the transmitter?

A. So it just passes on whatever packets it can. If the packet's being discarded, it's being discarded.

Page 60

15 (Pages 57 to 60)

**A1490**

A. That's correct.

Q. Okay. And where -- when this packet comes from the top, it goes down and filters through all these layers. At what layer does Intel initialize the timestamp?

A. So the -- the Intel product actually starts at the top of the MAC layer, so that's where that timestamps gets -- gets written.

Q. And that would be --

A. No, one above that.

Q. Right over here?

A. That's correct.

Q. So initialize timestamp; is that correct?

A. Yes, that's correct.

Q. Let me slide this over a little bit. My apologies to everybody. I'll make it a little smaller.

So -- okay. So now that we've looked at the -- the different layers -- and so can you tell us one way or the other, does the -- do the Intel products initialize the timestamp when the packet hits the data link layer, the top of the data link layer?

A. No. It has to go through the logical link layer first.

Q. And can you give us -- can you give the jury a sense of how significant is that logical link layer?

Page 69

A. Well, the logical link layer is actually another one of the standards, and we have talked so far about 802.11. There's another standard called 802.2 that defines what that logical link layer is, and it's another one of these standards you can go and look up.

It's like a -- I think it's about a 250-page standard. It defines a whole bunch of things. And what this is doing primarily is that where you have different packets that the system needs to send and it needs to be able to multiplex and demultiplex those packets, that's what the -- the logical link layer does.

Q. Okay. And so was there a significant amount of processing of the packet that occurs in a logical link layer?

A. There may be. There are some occasions where it may need to go and so some lookups to work out how to translate an Internet address into a MAC address. That's one of the things that it does.

Q. Okay. And how big is this -- this standard, the document that describes all the things that the logical link layer does?

A. It's like I said, I think the 802.2 standard is about 250 pages. I have to go look it up, but it's about that kind of size.

Q. Okay. So what I'd like to do now is go back

Page 70

to the slides.

MR. AROVAS: And if we could pull up Slide 10.

Q. (By Mr. Arovas) Ask you a couple of questions about this.

And so I notice that you have a label on the top in the middle that says compressed BlockAck. Can you describe for the jury what a compressed BlockAck is?

A. So a compressed BlockAck is something that was introduced in the 802.11n standard, and it's a smaller version of the block acknowledgement message than what had been contemplated previously, particularly because the 802.11n standard doesn't permit the use of fragments. So that was something that could be taken out.

Q. Okay. And you mentioned that there's a certain type of -- that the compressed BlockAck is a type of block acknowledgement, right?

A. So there -- there are different formats of block acknowledgement messages, yes.

Q. In the Intel products, are there any other types of block acknowledgements that are used?

A. No, only the compressed block acknowledgement is used.

Q. And why is that?

Page 71

A. That's the only format that the standard actually permits you to use in this case.

Q. Okay. So is there any choice that's permitted between different types of block acknowledgements?

A. No, there isn't. The standard says you have to use compressed BlockAcks for -- for block acknowledgements in 802.11n --

Q. Okay.

A. -- in this situation.

Q. And so if you were to run the -- these products to send thousands, tens of thousands, hundreds of thousands, millions of these block acknowledgements, will you see anything other than a compressed BlockAck?

A. No, they just don't have the capability. The chip just doesn't -- doesn't know how to generate that kind -- anything other than a compressed BlockAck.

Q. Okay. So let me switch gears now and talk about the development of block acknowledgement. And you tell us who were the main contributors that actually created the block acknowledgement technology in 802.11.

A. So, again, as with the other things we've been talking about, it was primarily the -- the chip manufacturers who contributed to that.

Q. And did you personally do work on that?

A. Yes, I did.

Page 72

18 (Pages 69 to 72)

A1493

Q. 10,000?

A. Oh, more than that. I mean --

Q. Hundred thousand?

A. In terms of pages?

Q. Yes.

A. It's going to be in the hundreds of thousands, yes.

Q. So hundreds of thousands of pages. This is a box that holds about 3,000 pages, one of these banker's boxes? We've got a lot of them here.

A. I don't have an estimate.

Q. Okay. So if I wanted to ask you about the code and I wanted to bring all the code in and have you look at look at it and find something, I would need about 300 of these boxes?

A. Sure, if you brought all of it.

MR. STEVENSON: No further questions.

THE COURT: All right. Thank you.

MR. AROVAS: Your Honor, may I ask just one?

THE COURT: Yes, you may.

REDIRECT EXAMINATION

BY MR. AROVAS:

Q. Mr. Kitchin, if Mr. Stevenson wanted to show you the code on the calculation, how many pages would

Page 113

that take?

A. Possibly one.

MR. AROVAS: No further questions.

THE COURT: All right. Anything further?

MR. STEVENSON: Nothing further.

THE COURT: All right. Thank you.

All right, Ladies and Gentleman of the Jury, if you will please pass down your witnesses -- your witnesses -- your questions for this witness.

All right. I'm going to let you go ahead and take your break now. We'll be in recess until 10 minutes until 3:00.

Please remember the Court's instructions.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. Please be seated.

All right. The first question is: Who decides what user priority number to use? Are there criteria to determine what number to assign? Those two are related.

Plaintiff have any objections to those?

MR. STEVENSON: No.

THE COURT: Defendants?

MR. AROVAS: No, Your Honor.

THE COURT: All right. You feel you can

Page 114

answer that?

THE WITNESS: Sure.

THE COURT: Next question is: Can other types of data -- data other than voice, be in VO and other things other than video be in VI?

Plaintiff have any objections?

MR. STEVENSON: I think that calls for an opinion.

MR. AROVAS: I think the question is about the products, and he can talk about the products and the standards, which is what he's been talking about in his entire testimony.

THE COURT: Can you answer that question?

THE WITNESS: Yes, I can answer that.

THE COURT: Okay. All right. We'll -- I'll overrule the objection, and we'll ask both those questions when we come back.

Be in recess.

COURT SECURITY OFFICER: All rise.

(Recess.)

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated.

All right, Mr. Kitchin. I have a couple of questions from the jury. The first one is really two

Page 115

questions. Who decides what user priority number to use, and are there criteria to determine what number to assign?

THE WITNESS: So there are different situations that arise here, but the general answer is that the priority number that's attached to the packets is decided by the application.

So if you have in your computer, say, like an e-mail or a web browser, that's the program that's going to decide what priority to attach to those packets.

I don't know about any criteria. It can decide, essentially however it wants, what it's going to use for those priority tags.

THE COURT: All right. And the next question is: Can other types of data, other than voice, being VO, and other types of data, other than video being VI?

THE WITNESS: Yes. Absolutely, they can. As I said before in the previous question, the application software can decide to mark the packets however it wants. So it can direct the packets to go into whichever queue it wants.

We have -- I mean, when we were doing this, we had discussed lots of different things that

Page 116

29 (Pages 113 to 116)

**A1504**

CASE PARTICIPANTS ONLY Document: 177-1 Page: 439 Filed: 03/31/2014

Q. So an e-mail would go in here, too?

A. Yes, that's correct.

Q. If I had background information and the packet had a 5, where would that go?

A. It would go in that same queue.

Q. Background would go here?

In fact, is it the case that every single type of information, whatever it may be, whatever anybody invents in the world, if it gets a 5, will go in here?

A. Yes, that's correct.

Q. All right. And if it got a 1, it would go here?

A. Yes, I think that's right.

Q. And so is there any relationship between this number, this TID subfield, and the type of data?

A. No. No. There is no fixed relationship between those two.

Q. And is that the reason you called it -- does that have to do with the reason you called it a traffic identifier?

A. Yes, that's correct. It's just specifying different lanes.

Q. And let me just show you that table again.

Let me see if I can find it. And I'll just put it on the document camera really quickly.

Page 121

And you had mentioned before in your testimony that this was just an example to give people a sense of what could happen at a point in time. Do you recall that?

A. Yes, that's correct.

Q. And I want to point out under this column, it says designation, and it says informative. And what does that mean in the standards lingo?

A. So informative is a designation that we attach to parts of the text that are not actually setting a compliance or conformance requirement.

Q. Does that have anything to do with it being just an example of what might happen?

A. Right. Right. That's usually what that means.

Q. And is this a requirement --

A. No.

Q. -- of how that works?

A. No, it's not. The informative designation means that it's not a requirement.

Q. Thank you.

MR. AROVAS: No further questions.

THE COURT: All right. Thank you.

You may step down.

Who will be your next witness?

Page 122

MR. VAN NEST: Your Honor, the Defense calls William McFarland.

THE COURT: All right. William McFarland.

MR. VAN NEST: And Mr. Mitchell will be examining him.

THE COURT: All right.

All right. Have you been sworn, Mr. McFarland?

THE WITNESS: I have not.

THE COURT: All right. If you will, please raise your right hand and be sworn.

(Witness sworn.)

THE COURT: All right. You may have a seat.

MR. MITCHELL: Your Honor, may I proceed?

THE COURT: Yes, you may.

MR. MITCHELL: Good afternoon. My name is Jonah Mitchell. I'm here speaking on behalf of Defendants.

WILLIAM JOHN MCFARLAND, DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MITCHELL:

Q. Good afternoon, Mr. McFarland.

Can you please tell us your name and where you

Page 123

live?

A. My name is William John McFarland. I live in Los Altos, California.

Q. Now, Mr. McFarland, the first thing I want to do is remind you to keep your pace down. The Court Reporter's been really -- working really hard for us today and other days. I know she would appreciate it. So let's try and keep the pace slow.

A. All right.

Q. Can you tell us a little bit about where you're from and where you went to school?

A. So I'm originally from Wauwatosa, a small town in Wisconsin. I left to go to college. I did my undergraduate at Stanford University. I got a Bachelor's degree in electrical engineering. And then I went to graduate school at the University of California Berkeley, and I got a Master's degree in electrical engineering there.

Q. We've had people from all over the world, but I think you might be the first from Wauwatosa. And I'm going to venture a guess you may be the last.

Can you tell us a little bit what it was like growing up in Wauwatosa?

A. Well, it was a lot of fun, actually. I had a lot of friends that lived right up and down the block

Page 124

31 (Pages 121 to 124)

A1506

belabor it too much; but I would like to spend a little time discussing Atheros's role in the 802.11 standards.

Can you tell the jury briefly about Atheros's role in 802.11?

A. So I think I was the first person from Atheros to attend an 802.11 meeting. That was in the year 2000.

At that time, just myself and one other person went.

Since that time, I think we've probably had representatives at virtually every single 802.11 meeting that's been held. We've participated or reviewed documents and voted on virtually all of the versions, the new enhancements that have been made.

So we've really participated very heavily across the entire time period.

Q. How many people from Atheros would typically attend?

A. It varies some from meeting to meeting. I've been at meetings where 15 to 20 Atheros employees were all at the meeting. Typically, these days we send around a dozen.

Q. And why do you send so many people?

A. There's a lot going on. Often, there is multiple versions of the standard being worked on at once. We are bringing proposals. We're actually coming

Page 133

up with ideas of how to do things, and we're offering those ideas up to be part of the standard.

And that requires a lot of work to kind of do simulations, to prove these things out, and to convince people that what we're doing are the best ideas and they really deserve to be in the standard. It takes a lot of people.

Q. Mr. McFarland, who have been the leaders of the 802.11 standardization efforts?

A. I would describe it kind of as the chipset manufacturers. Again, that's -- includes Atheros, but also Intel, Broadcom, Texas Instruments; as I've mentioned, a number of companies that actually make these little components that implement it.

Those are the devices that actually have to implement all the little details, exactly how it works.

And so they're the people that best understand the whole system and actually have to build all those tiny details and get it right so that it actually works correctly.

So those are, naturally, the people that do kind of the heavy lifting, as I describe in the standards organizations.

Q. Mr. McFarland, turning to 802.11n in particular, were you involved in the development of that

Page 134

amendment?

A. I was. I was attending all the meetings across that time period, and I worked on some of the proposals that we made about what 802.11n should be like.

Q. And did the standards body start from scratch on 802.11n?

A. No. One of the things that 802.11 is very good about is they like to make sure that any new enhancement works well with whatever has come before.

And so when you work on something like 802.11n, you always start off of something you've done before. In particular, 802.11n really was based off of 802.11g and 802.11e, which had come even before that.

Q. Mr. McFarland, how did 802.11n improve on the earlier standards?

A. There were a large number of different enhancements. It's quite a big step forward, I think, on the whole. Many of those enhancements have to do with increasing the throughput, increasing the speed of communication so we can send more data in a shorter amount of time.

It's a long list of things. There's a thing called MIMO technology. This is where you have multiple antennas at the transmitter and the receiver that allows

Page 135

you to send multiple data streams in parallel, kind of as if you had multiple wires connecting two things together. You can imagine that would allow you to transmit data faster. It's the same concept except in wireless.

It also included the ability to put together what we call channel binding, two channels of information. Normally, we use a 20 megahertz wide channel; but in this mode, we could put two together and double the amount of data that we're sending.

(Bumped microphone.) Sorry.

It included some techniques for improved reliability. So there's a thing in there called an LDPC code. It's an error correction code. It's a way that we can correct errors that might come into the signal as we're transmitting it across and kind of fix those up in the receiver so that it's more reliable in its communication.

So lots of enhancements covering reliability, greater speed, many different things were put in.

Q. I'm starting to get a sense of why 802.11 uses so many acronyms. A lot of technologies there. Probably too many to cover in one afternoon; is that right?

A. I could go on for a long time describing them

Page 136

34 (Pages 133 to 136)

A1509

Case: 13-1625 Case: 13-1625 Document: 179-1 Page: 441 Filed: 03/21/2014 Document: 177-1 Page: 441 Filed: 03/31/2014 (441 of 575)

CASE PARTICIPANTS ONLY

can be useful in the device that they're going into. They might have, for example, other types of communications on them.

Some of our chips have, for example, Ethernet, where there's a wired connection for a wired Ethernet. And that's included on the chip.

Others have, perhaps, a USB connection. You might be familiar with those little USB cables.

Sometimes you use those to connect a printer or a camera or something to the device.

Q. Mr. McFarland, you mentioned a couple of other functionalities, USB and Ethernet. Are those governed by the 802.11 standards or something else?

A. They have their own standards bodies and their own standards.

MR. MITCHELL: And can we put up Defense Exhibit 477?

Q. (By Mr. Mitchell) Mr. McFarland, can you tell us what this -- this excerpt reflects?

A. Yes. So this would be the very first page of one of our datasheets. It appears to be for the AR9344.

Our datasheets -- the entire datasheet would be a stack of like 300 pages that describes in great detail exactly how our chips work. It's something we give to our customers so they know how to program our

Page 141

chip and how to get it to do all of the things that it's supposed to do.

The very first page, as shown here, would be just kind of an overview, includes a basic description of the chip and lists out the features that the chip might have.

Q. Does that include some of those features that you just described?

A. It does.

For example, I can see in this list that we actually support on this chip five of those connections to the wired Ethernet connection.

It also lists that it has that USB capability. It, you know, lists other things about interface to memory and so forth.

Q. Okay. Mr. McFarland, I would like to move now to another area.

There's been some discussion in this case about something called aggregated MAC protocol data units or A-MPDUs. Are you familiar with those?

A. Yes, I am.

MR. MITCHELL: Your Honor, may I approach the board?

THE COURT: Yes, you may.

Q. (By Mr. Mitchell) Can you see that okay,

Page 142

Mr. McFarland?

A. I can, yes.

Q. Okay.

MR. MITCHELL: And hopefully, everyone over there can as well.

Q. (By Mr. Mitchell) Mr. McFarland, you can use this, if you like, to help illustrate some concepts of the questions I'm going to ask you, but what I'd like you to do is give us a brief description of what A-MPDUs are.

A. So A-MPDUs are the fundamental way that we transmit data in 802.11n. Probably more than 90 percent of the packets that we send are these A-MPDUs.

What they are is they're kind of like a super packet. They're -- sometimes we call it a frame. They're a packet which has inside of it a bunch of little packets.

If you send the little packets one at a time, it's kind of inefficient. There's a bunch of wasted time before you send the packet, a bunch of wasted time after you send the packet. If you send just a short message, it's kind of a lot of wasted time and not so much good stuff.

So what we do is, we put a bunch of packets together so that we only have one set of wasted time

Page 143

before and after for a much larger amount of information that we're sending across. That makes it more efficient. It brings the throughput up. The data rate is higher. You can get more information across.

Now, the tricky thing about it a little bit is that these packets can be a little bit scrambled up. They can be out of order, kind of reversed around. Sometimes some of them fail or some of them can be missing.

And so at the receiver side, you see that we take this packet in, and there's a bunch of kind of empty slots indicated in the memory. And that's where we kind of stitch this thing back together, putting it in the right order, waiting to fill in gaps that we're missing and so forth.

So we kind of try to piece this whole thing back together so that when we're done, it's nice and all in order and ready to go.

And one of the things about this receiving system is that we receive these packets whenever they come to us. Whatever order they're in, whether there's missing packets or not, we take these packets in and we start trying to put them back together into order.

We're not picky about the order they're sent in or when they come or whatever. We take whatever

Page 144

36 (Pages 141 to 144)

**A1511**

comes.

Q.   So sending an A-MPDU is something that Atheros's 802.11n chipsets do in normal operation?

A.   That's right.  That's the most typical operation we do.

Q.   Now, would you consider an A-MPDU to be a command?

A.   No.  I -- to me, it's not a command at all. It's a normal data packet.  It's the majority of what we send.  It's just how we move data across.

Q.   And you discussed the receiver a little bit.

In Atheros's 802.11n chipsets, does the computer have to compute what the transmitter has discarded?

A.   No.  We don't do any computation of that sort. In fact -- I mean, we don't make any attempt to figure out what the transmitter has discarded.  This discard term kind of has to do with these packets that might have failed or are missing.

The transmitter might try them again.  It's kind of up to the transmitter to decide how many times it wants to try it again before it gives up and says, okay, that one is never going to make it.

And we really don't -- as the receiver, we don't make any attempt to figure out, you know, whether

Page 145

they're given up on or not.  We do the best we can to get the packets back in order and to fill in all the holes.  In the end, if there are still holes left, that's just the way it is.  There's nothing we can do about it.

So we don't make any attempt to predict, calculate, otherwise figure out what's been discarded at the transmitter.

Q.   Mr. McFarland, we've discussed Atheros's contributions to the IEEE 802.11 standards a little bit earlier with respect to block acknowledgements.  Let's discuss the operation of block acknowledgements in Atheros's 802.11n chipsets a little more.

First of all, let's set some -- a foundation for us here.  Can you tell us a little bit about what block acknowledgements are?

A.   Yeah.  So block acknowledgements are messages that come from the device that you're trying to get the data to, back to the device that's trying to send that data.

And those messages going backwards kind of tell the transmitter which of those packets it's received correctly so far and which ones it still hasn't gotten.  That's how the transmitting side can know which ones to try sending again.

Page 146

Q.   Do Atheros's 802.11n chips send block acknowledgements?

A.   We do.

Q.   What kind of block acknowledgement does Atheros's 802.11n chips use?

A.   We send what's called the compressed BlockAck.

Q.   Are there any other kinds?

A.   The standard provides for two other types of BlockAck.  As I recall, one is called the basic BlockAck, and the other one is called the Multi-TID BlockAck.

But our chips actually can't do those at all. The chip is kind of hardwired.  The actual digital logic is set to do only one type.  So we can't really transmit or receive those other types of packets.

Q.   So do Atheros's 802.11 chips ever choose another kind of block acknowledgement?

A.   We don't.  We only handle the one type, and that's what we always transmit, and it's the only type that we can handle receiving as well.

Q.   Tell us a little bit about Atheros's 802.11 chips are designed this way.

A.   Well, we took a look at the other types of BlockAcks in the spec, and what we realized is that they don't really provide any benefit.  They don't do

Page 147

anything better for the consumer.  You, as a person using it, wouldn't see any advantage to having these other types.

In supporting multiple different ways of doing the same thing, more or less, is not helpful for us.  It causes us to have more circuitry, the chip gets bigger. It gets more expensive.  It would have taken more time to develop, more testing.  It would have been more expensive to get it all designed and put together.

So the implementation that we did, the way we designed it was to do only the one type.  That made our chip simpler and faster.  We don't have to calculate or do anything fancy about deciding what to do.  It makes it kind of just very fast and efficient.

Q.   Thank you.

Let's now turn to block acknowledgement requests or BARs.

Do you know what a block acknowledgement request is?

A.   I do.

Q.   And do -- can you tell us a little bit again what those are, to orient everyone?

A.   Sure.  So yet another packet.  In this case, this is a packet that you would send to request the other side to send you a block acknowledgement.  Right?

Page 148

37 (Pages 145 to 148)

**A1512**

So we have the data packets. Then we have the block acknowledgement that says which packets have been received correctly or not.

And then there's this other -- yet a different kind of packet called the block acknowledgement request which can ask for one of those block acknowledgements to be sent.

Q. Do Atheros's 802.11n chipsets use BAR?

A. We will respond to a BlockAck request if we get one. We'll send the BlockAck back. We are able to transmit them, but we do so very rarely. Generally, we don't bother to transmit them. It's kind of just extra overhead. They're not really needed.

Q. Thank you.

Returning again to the subject of A-MPDUs, does the transmission of an A-MPDU command a receiver to move on and accept other packets, even though a data packet may still be missing?

A. No. Again, our receiver is kind of always open for business. So whenever a packet arrives, we receive it and do the best we can with it. The packets can come in any order. There can be missing packets. However they come in is how we receive them, and we process them all.

So we have kind of a consistent behavior. The

Page 149

way we do things is always the same, no matter what we receive; and we're kind of always doing that.

Q. Now, does an A-MPDU allow the receiver to compute which packets the transmitter has discarded in Atheros's 802.11n chipsets?

A. No. We don't do any computation about what's been discarded. As I explained before, we don't -- we don't even make any attempt. It's not something we think about in a way, what's been discarded or not discarded. It doesn't make any difference to us.

Q. And how about a BAR? In Atheros's 802.11n chips, does a BAR command a receiver to move on and accept other data packets even though a data packet may still be missing?

A. No. The only thing that a BAR does is to request a block acknowledgement. And in response to it, we will send a block acknowledgement.

But, again, our chips are always ready to receive things. We don't get into a state where we're kind of frozen and need to be unfrozen. So the BAR really just triggers the response.

Q. And tell us again, why is the receiver designed this way?

A. I think it's just a more reliable and efficient way to do things. Sending these BlockAck

Page 150

requests is extra overhead. Those packets don't have any information in them. So having to send them is just overhead. It slows things down.

It's also not very reliable. If that -- if you were to say, okay, I'm going to design a system where I have to wait until this BlockAck request packet comes, I mean, what if that packet gets lost? What if there's some noise? What if it's not received well? Then you're stuck.

I think I can kind of describe it maybe by making an analogy. Say you were meeting up with a group of people to go to the movies, and the idea is to all get together and go and get seats together at the beginning. But some of the people say, hey, you know, I might be late.

Now, that's a certain situation, and you could have a few different ways of thinking about how to deal with that situation. One agreement you could have is, okay, we'll wait for you until you call and say you're not going to make it.

That's an okay arrangement, and sometimes people do that; but you can see that's a little risky. You know, what if the person forgets to call? What if their cell phone is all out of battery power? Then you're all standing outside waiting forever. You don't

Page 151

get to see the movie.

So we don't do it that way. We do it a different way. The agreement we have is more like, okay, wait for us as long as you can; but if the movie's starting or the seats are starting to fill up, go in and leave me behind. I'll try to catch up with you when I can.

So that's the way that we do it. We don't have a special phone call, a special command that comes. We don't stop and wait and get locked up. We go: All right. We'll wait as long as we can. When we really need to have those packets, then we move on.

Q. All right. I think I have one other question in this area.

Does a BAR allow the computer to compute which packets a transmitter has discarded in Atheros's 802.11n chipsets?

A. No. Again, it doesn't -- again, we don't do any computations. We don't try to understand what's been discarded or what hasn't been discarded.

Q. Thank you.

I'd like to turn your attention to another area. Quality of service or QoS, are you familiar with those terms?

A. I am.

Page 152

38 (Pages 149 to 152)

A1513

Q. Do Atheros's 802.11n chipsets implement quality of service?

A. They do.

Q. And are you familiar with the quality of service or QoS control field?

A. I am.

Q. And I'd like to focus particularly -- in particular on the traffic identifier or TID subfield of the QoS control field, okay?

A. Okay.

Q. Okay. Can you tell us how that works?

A. Sure. So this is a little four-bit field, and it can have different values in it. And that field specifies the priority level that a packet is supposed to be sent at.

So quality of service means some things are more important. We really want to get those across. Some things are less important. Maybe -- maybe they're a little less important.

And so what that indicates when it's in the packet is it indicates the priority level that that packet is being transmitted with.

Q. And in Atheros's 802.11n chips, does a TID subfield value tell you the data type that's contained in the packet; for example, voice or video?

Page 153

A. It does not. Any type of content can be placed at any priority level at any given moment. The most important thing to send might be a data packet. And so we might give that the highest priority level. And so there's not a correspondence between the priority and the type of stuff that's inside the packet.

Q. Thank you.

I've got a similar question to the ones I've asked you earlier. Why is the system designed that way?

A. Well, first off, actually, looking inside of a data packet and figuring out what kind of information is in it is actually not that easy, and it would require a lot of extra circuitry, extra costs, and it would be slow. It would take time.

It's even more difficult than you might think at first, because often data communicated across the Internet is scrambled or encrypted for privacy. And at that point, when you look at it, it's really hard to tell what's inside of there.

So it's really impractical to think that the wireless communication system could look at these packets and know what's inside of them. And I think it would be, you know, kind of very clumsy.

I can make maybe an analogy here, too. Again, a communication system, maybe you can think of it kind

Page 154

of like a highway, and you might -- when you have prioritization, you might have a fast lane and a medium lane and a slow lane.

You can imagine the kind of traffic jam you'd have. If you had a system where you said, okay, every truck that comes by, we stop the truck, open it up, and we look at what's inside the truck before we let the truck use the fast lane or the slow lane or whatever, it's really not practical.

So instead, we -- we do what would be more common, is we kind of -- we kind of trust the packets themselves. If the packet itself says, I'm a high-priority packet, then we say, okay, you can go ahead and use the fast lane.

So what we do in practice is, when a packet comes to us from an application that you're running, that packet may be marked as high priority or low priority, and we simply look at that already-marked priority; and we say, okay, that's the priority we're going to send it at. We don't make any attempts to, you know, kind of look inside and figure out what's in there.

Q. Thank you, Mr. McFarland.

Now, I neglected to ask you earlier, but who are Atheros's customers?

Page 155

A. We have a wide range of customers. We sell to people who make smartphones. We sell to people who make PCs and laptops. We sell to people who make consumer electronics gear, things like televisions, Blu-ray players.

And we sell to people who make what we call infrastructure products. Those are the wireless access points and stuff that's -- maybe there's one here. I don't know -- up on the wall, the thing that these mobile devices are all communicating with, and we make those access points as well.

Q. Mr. McFarland, are you familiar with a company by the name of BelAir Networks?

A. I am. BelAir Networks is a customer of Atheros Communications. It was acquired by Ericsson a few years ago.

Q. So Atheros supplies 802.11n chips to BelAir?

A. We do.

Q. And it did before Ericsson acquired BelAir?

A. We did, yes.

Q. And it continues to do so today?

A. Yes. They are still a customer.

Q. Thank you, Mr. McFarland.

MR. MITCHELL: I pass the witness.

THE COURT: All right. Redirect -- or

Page 156

39 (Pages 153 to 156)

**A1514**

Case: 13-1625 Case: 13-1625 Document: 179-1 Document: 177-1 Page: 445 Filed: 03/31/2014 Page: 445 Filed: 03/31/2014 (445 of 575)

CASE PARTICIPANTS ONLY

Would you like for me to read it again?

MR. CAMPBELL: Yes, please.

THE COURT: If the receiver does not calculate what packets failed, isn't that a huge error?

How does the receiver figure out what didn't get there was important or needed?

MR. CAMPBELL: No objection.

MR. MITCHELL: No objection.

THE COURT: All right. Can you answer that question?

THE WITNESS: I can. So first off, the receiver --

THE COURT: You can -- you can answer it when --

THE WITNESS: Okay.

[Laughter]

THE COURT: All right. Next one: Isn't the block request asking the receiver to tell them what didn't come through, hyphen, calculate, in quotes.

Is there any objection to that question?

MR. CAMPBELL: No, Your Honor.

THE COURT: Any objection?

MR. MITCHELL: No.

THE COURT: Can you answer that question?

THE WITNESS: I can.

Page 173

THE COURT: Okay. All right. Very well.

I'll also tell you whatever critics say that juries do not understand patent -- aren't smart enough to understand patent cases, ought to hear some of the questions they ask. Some of them are pretty good.

All right. Anything further before we bring the jury back in?

All right. Bring the jury in, please.

MR. AROVAS: Your Honor --

THE COURT: Yes.

MR. AROVAS: -- just one. I neglected to release Mr. Kitchin.

THE COURT: I'm sorry?

MR. AROVAS: I neglected to release the last witness, Mr. Duncan Kitchin.

THE COURT: Okay. Yeah, he's released.

MR. AROVAS: Thank you, Your Honor.

THE COURT: Bring the jury in.

COURT SECURITY OFFICER: All rise.

(Jury in.)

THE COURT: Please be seated.

All right. Mr. McFarland, I have some questions for you here.

First, do the A-MPDUs contain implicit BlockAck requests that alleviate the need for the

Page 174

explicit BAR?

THE WITNESS: So they do not. An added complication, to explain, is that when you first connect to that access point, when you first say I'm going to talk with you, there are different types of acknowledgement agreements that you can make.

And all of the discussion here has been based on the assumption you've made the agreement, which is called the immediate BlockAck. And in that agreement, what you're saying is that each time one of these A-MPDU ends, I will send immediately that block acknowledgement.

And so what triggers the sending of the block acknowledgement is simply the end of the A-MPDU, because you've previously made an agreement that that's how you're always going to do it.

THE COURT: Okay. Thank you.

What is the difference in Wi-Fi certification and the 802.11n standard?

THE WITNESS: So to begin with, it's two different organizations.

The 802.11 standard is driven by an organization called the IEEE, or the Institute of Electronics and Electrical Engineers. And they define a standard. But they don't do anything about checking

Page 175

products. Does a product implement this standard or not and so forth.

There's a separate organization called the Wi-Fi Alliance. That's just a group of companies that have agreed to get together and try to ensure that these products will work well together.

And they do a test. The test is fairly simple. They really just check to see that the products work well together. And if they do, you get what's called the Wi-Fi sticker, that little logo that says Wi-Fi on the outside of the box of what you might be buying. And that's supposed to kind of guarantee to the user that these devices will work well together.

Now, when the Wi-Fi Alliance does this testing, they make decisions about what modes of operation, what features, and so forth the devices are going to have to support.

And in practice, they may decide certain parts of the spec are too complicated or not worth doing; and they say you don't have to do those, you can leave those out, and you'll still work together well, so we'll still give you the sticker and certify you as Wi-Fi.

So it's not quite a one-to-one correspondence between everything that's in the 802.11

Page 176

44 (Pages 173 to 176)

A1519

standard and what it takes to get a Wi-Fi certification.

THE COURT: Okay. Thank you.

When presenting for inclusion to the 802.11a standard, does anyone check for patent infringement before selecting ideas to include?

THE WITNESS: So individual companies or individual people participating in the organization -- in the standards process, they may be doing checking or they may not. I can't speak for all these individuals that are involved.

There is no systematic or organizationally-based approach. The IEEE doesn't have a staff or someone who's checking into this. So that kind of checking is done really only by the individuals or individual companies that are participating and contributing the ideas and voting on things.

THE COURT: All right. Next question: If the receiver does not calculate, in quotes, what packets failed, isn't that a huge error? How does the receiver figure out what didn't get there was important or needed?

THE WITNESS: So let's see, there's a couple of parts, I think, to answering this. So first off, the receiver knows what it hasn't gotten yet. It doesn't have to do a calculation to know that. It just

Page 177

kind of looks at where it still has holes and where it's been putting those packets and trying to put them back together in the right order and sees, ah, I got a missing spot; it's still missing.

So without having to do any calculation, it can tell that it's missing something.

Now, the question of what happens, based on the fact that something is missing, is a little bit complicated. And in truth, sometimes there can be a real problem from the fact that a packet never got through.

But for the most part, even above the 802.11 connection, this wireless connection, there are other protocols above and beyond that, protocols that have to do with sending traffic, for example, all the way across the Internet.

Those protocols will do retransmission of the missing pieces themselves. So it's kind of like there is multiple layers of trying to fix the problem up.

And the reason there are multiple layers is because at the bottom layer, we can fix problems very fast, but we don't fix every problem.

The last few problems that are left have to be fixed kind of using these protocols that are for

Page 178

communicating all the way across the Internet. That's a lot slower, but it's very reliable.

So we can usually get everything fixed up by the time we're done. We try to fix up as much as we can at the bottom levels where it's fast and leave as few things as possible left over to be fixed at the higher levels for later.

THE COURT: All right. And the final question: Isn't the block request asking the receiver to tell them what didn't come through, dash, calculate, in quotes, question mark?

THE WITNESS: I think it's a little bit like the previous question. You're exactly right on.

The BlockAck request is exactly asking the device to say what packets it has not received yet.

It turns out that that doesn't require a calculation, and it really doesn't have anything to do with whether the transmitter has discarded or given up on anything.

All the receiving device has to do is to look in its memory and see where it has a hole or it has something that never came in, and that's how it tells back to the transmitter I'm still missing this piece.

Again, it's not making any assumptions about what was discarded at the transmitter, and it's

Page 179

not doing really a calculation of any sort.

THE COURT: Okay. Thank you.

All right. Follow-up questions from the Plaintiff?

MR. CAMPBELL: Couple of questions.

THE COURT: All right.

RECROSS-EXAMINATION

BY MR. CAMPBELL:

Q. Just a few follow-up questions, Mr. McFarland. And I want to go back to the first question that was asked by the jury because the answer seemed -- seemed -- seems opposite to me what I expected.

The Qualcomm chips, they send A-MPDUs, correct?

A. That's correct.

Q. And an A-MPDU is an implicit block acknowledgement request, correct?

A. I -- it's a standard data packet. It's -- as I was saying, greater than 90 percent of what we send. It's -- it's a data packet.

Q. Is it an implicit block acknowledgement request?

A. Maybe it depends on the definition of implicit. We have an agreement when we go into this -- when we go into the immediate BlockAck mode, that at the

Page 180

45 (Pages 177 to 180)

**A1520**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 447/20    Filed: 03/31/2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL          )
                               )    DOCKET NO. 6:10cv473
          -vs-                 )
                               )    Tyler, Texas
                               )    9:03 a.m.
D-LINK CORPORATION, ET AL          June 10, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:    MS. JUDITH WERLINGER
                    MS. SHEA SLOAN
                    shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

All right.  Good morning, Ladies and Gentleman of the Jury.  Welcome back.  And we're about to proceed with Day No. 5, I guess, so you may proceed, counsel.

MR. VAN NEST:  Good morning, Your Honor. The Defendants call Dr. Jerry Gibson.

THE COURT:  Okay.

Have you been sworn?

THE WITNESS:  I have not.

THE COURT:  All right.  If you will, please raise your right hand.

(Witness sworn.)

THE COURT:  All right.  You may have a seat.

Before you start, Mr. Van Nest, let me ask if the parties have any documents they wish to offer.

Plaintiff have any?

MS. MOORE:  Plaintiffs offer at this time Plaintiff's Pre-admitted Exhibit List for June 10th, 2013.

Page 3

THE COURT:  All right.  And that will be marked as Plaintiff's Exhibit List No. 5.

Is there any objection to the exhibits listed on that exhibit?

MR. DE VRIES:  No, there's, Your Honor.

THE COURT:  All right.  They're admitted.

Does Defendant have a similar list?

MR. DE VRIES:  Yes, we do, Your Honor.

Defendants at this time offer Defendants' List of Pre-admitted Exhibits for June 10th, 2013.

THE COURT:  All right.  We'll mark that as Defendant's Exhibit No. 5.

And is there any objection to the exhibits listed thereon?

MS. MOORE:  No, Your Honor.

THE COURT:  All right.  Those exhibits are admitted.

All right.  Counsel, you may proceed.

MR. AROVAS:  Good morning, Your Honor. Ladies and Gentleman.

JERRY GIBSON, Ph.D., DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. AROVAS:

Q.  Good morning, Dr. Gibson.

A.  Good morning.

Page 4

1 (Pages 1 to 4)

**A1523**

group of students I had at Texas -- at the University of California-Santa Barbara. And on the left shows, in 1993, I founded the Multimedia Communications and Networking Lab at Texas A&M University. And that was very active into '97 when I moved to S.M.U. in Dallas. And some of the students moved with me, and also re-established a lab there with some new students.

And then when I went to the University of California-Santa Barbara, everything had truly evolved into wireless networks, and so I called this lab the Video and Voice Over Networks Lab and ViVoNets Lab. And that's where we do work on research for voice and video over wireless networks.

And I guess I should mention the heading here says quality of service and automatic repeat request.

Well, when you send voice and video, that's what you're concerned with. You're concerned with quality of service. How -- how well your voice conversation is going when you're talking on a phone; how well you're getting the video you're trying to stream; or how well the video conference is going.

Q. Okay. So your research has specifically involved QoS and ARQ?

A. Yes, that's correct.

Q. Okay. So now -- now let's get to the specific

Page 13

topic at hand here, which is the five patents. And can you tell us first when were you first approached to do some work on this case?

A. Just about a year ago.

Q. And very approximately, how many hours have you put in, working on this?

A. I think about 300 hours.

Q. What was your standard rate for that work?

A. Five ninety-five an hour.

Q. And were you asked to look at a particular question regarding whether or not the five patents we're looking at here are used in the 802.11n standards and products using that standard?

A. Yes, I was.

Q. And can you tell us if you came to any conclusions?

A. Yes. My conclusion was that the five patents-in-suit are not infringed by the 802.11n standards; and, in fact -- if we can go to the next slide.

As shown on the left of this, a quick summary of what 802.11n products achieve, for what they do, they're really simple, and that's -- that's been something that I think has -- has been strived for; that they've been trying to do in 802.11n.

Page 14

And also, 802.11 is fast in that you get really good performance out of these chips and robust. And robust means lots of things, but what I mean here is that robust -- they're robust in that you can put them in a lot of different environments and they work really well.

Now, in contrast, the Ericsson patents are about different things really. If you look at the middle bullet point on the right first, these patents seek to solve problems that are avoided by the 802.11n approach. And because of that, they add unnecessary steps and complexity that 802.11n doesn't need.

And then at the bottom -- so that -- the end result is unnecessary overhead that you don't need in 802.11n.

Q. Okay. So when you look at -- and we're going to get into each of the patents individually. But when you look at them collectively, you compare it to the 802.11 approach, is there a significant difference in the approach and the technology that was adopted because of that?

A. Yes, there is. And the difference is that 802.11n has these characteristics. On the left, it's just -- it's just simpler than -- and operates very effectively without the Ericsson patents.

Page 15

Q. Okay. And was there certain key evidence that you saw and that you relied on in coming to these conclusions?

A. Yes. I think it's on the next slide. Key evidence -- I looked at everything. And so, of course, the important thing -- we've heard this here in this trial -- is that the patents are important -- the claims of the patents are important. So I looked at the patent claims and the Court's claim construction.

Of course, I looked at the 802.11n standards, went back and -- and reviewed it and made sure I understood what was going on and what was accused in this case.

And it's the products that are accused, so I looked at the product documents and the source code and did my own -- my own testing. And that was really interesting and fun to do.

And then I also, of course, talked to engineers that were involved in the companies in producing the 802 -- 802.11n products.

Q. Okay. So what I'd like to do is transition to talking generally about how 802.11 works. And since we've obviously heard a lot of testimony to date, I'm not going to start -- or ask you about the very beginning. I do want to try to set some context, so if

Page 16

4 (Pages 13 to 16)

A1526

Case: 13-1625  Case: 13-1625  Document: 179-1  Document: 177-1  Page: 449  Page: 449  Filed: 03/31/2014  Filed: 03/31/2014  (449 of 575)

CASE PARTICIPANTS ONLY

Q. Okay. And to have infringement, you have to have each and every element in the product, right?

A. Yes, that's correct.

Q. And that's because this claim is the description of the invention, and if you're missing part of the invention, you're not using the invention, right?

A. Yes, that's correct.

Q. Okay. And so when we talk about command to receive, the requirement for command to receive is right in black and white -- now it's red and black -- in the -- in the claim itself is: Commanding a receiver in the data network to receive. And that's the command to receive?

A. Yes. That's what I was referring to.

Q. Okay. Now, you mentioned earlier this issue of consecutive or inconsecutive -- or not consecutive packets. And so is that requirement that this command to receive goes with the situation of not consecutive packets --

A. Yes.

Q. -- in the claim itself?

A. Yes. And you can see it in this claim element.

Q. And is that what we have underlined right here; that is not consecutive?

Page 29

A. Yes.

Q. Right. So it's commanding to receive at least one packet having a sequence number that is not consecutive with the sequence number of a previously received packet.

And so that would be -- is basically that the packets are not -- not in order or, you know, 2 is not following -- 3 is not following 2, and 4 is not following 3; that sort of thing?

A. Yes, that's correct.

Q. And that's where the command to receive comes up in that situation?

A. Yes.

Q. Okay. Now, when you look at the 802.11 products, does this situation come up that you would need -- when the packets are not consecutive, that you would need some sort of command to deal with that?

A. No, you do not. In the video I showed, packet 3 was lost and the tran -- the receiver continued to receive packets 5 through 8 even though they were out of sequence; they were past packet 3.

And so IEEE 802.11n products, they just continue to receive and put in the receiver buffer any packets that show up.

Q. Okay. And I want to distinguish between the

Page 30

situation of consecutive and not consecutive, okay?

So in the IEEE -- forgetting about the claim for a second, the IEEE standards, does it treat the situation differently when you have consecutive packets or when you have not consecutive packets?

A. In the IEEE 802.11n product?

Q. Yes.

A. No. It just continues to accept packets, if I understand your question.

Q. And so would there be any reason to need some sort of special command-to-receive procedure in the IEEE 802.11 products to deal with it if it treats them all the same, whether they're consecutive or not consecutive?

A. You don't need a special command to receive, because it just treats them all the same.

Q. Okay. So now what I'd like to do is ask you about the patent and understand some of the background of where this need for a command to receive comes up in the patent; then look at the IEEE and go through some of the evidence and try to understand, what do we -- what can we look at that tells us how IEEE works and why you concluded it was different, okay?

A. Okay.

Q. Okay. So let's start with the patent. And do

Page 31

you have a short video showing us what the problem of -- what the patent was trying to address with these not consecutive packets?

A. Yes, I do.

THE WITNESS: So if we could go to that video.

A. So here -- here's the setup, and on the left, it just shows -- now, it's a much simplified diagram from what we had before, but it shows now nine packets to be transmitted at the transmitter, and they're ready to go.

And so if we get started: Here packets 1, 2 and 3 are transmitted, but packet 3 is an error. And so in the receiver buffer, we have packets 1 and 2 received correctly. Packet 3 was lost.

So now, in the '625 patent, the problem it's trying to address is that -- and the solution they're trying to address -- or the problem they're trying to address was that in these systems, the lost packet would cause the system to go into deadlock.

And so nine consecutive packets, packets 4 and on, could not be received. And so I've depicted a stop sign that says, okay, the other packets can't be received out of sequence. And this is what's being addressed in the claim language.

Page 32

8 (Pages 29 to 32)

**A1530**

order the packets, is that something that comes up for the first time in the '625 patent; or is that something that was used for a long time?

A. No. Sequence numbers have been used in the wired Internet for a very long time; and they're just a natural portion of packet switch networks and wireless networks, of course, too.

Q. All before the '625 patent?

A. All going back to the '70s.

Q. Okay. So let's take a look at -- and compare -- does the patent have a picture of what you would call a traditional data packet?

A. Yes.

Q. So let's compare that to what we see with the data packet with the command to receive, which is the next slide.

And can you describe the difference we see between the two data packet structures?

A. Yes. Now, both of these figures are from the '625 patent specification, and on the right is the '625 patent solution, the example solution that's in the patent. And on the left shows what's called ordinary data packets. That's what the '625 patent calls this situation.

And you see, there's the data labeled 516, the

Page 37

payload. There's the ARQ header, and there's the k bit sequence number. That's in front of the payload. And Figure 5 is labeled prior art, which means it existed before this patent.

Q. Okay. And just so it's -- it's clear -- so there's nothing special about the use of sequence numbers themselves, right?

A. No.

Q. Okay. And what's happening here is something in addition to the use of sequence numbers is being added, which is this command to receive, to deal with the situation of when the sequence numbers get out of order and you get the stop sign in systems that have that problem.

A. That's correct. And that's what's being described in the patent specification here.

Q. Okay. So now going to the next slide and taking the 802.11n products on one side and the '625 patent on the other, what is the difference in the two approaches?

A. So 802.11n is on the left, the situation that I described earlier, and you -- and you'll recall that there Packet 3 was lost. A new A-MPDU came in, having Packets 5 -- MPDUs 5 through 8, and they just went in, they were received, they just went into memory. All the

Page 38

packets that were received correctly were forwarded on, and the fact that there was a lost Packet 3, there's no information there and that was just sent on, too.

And so 802.11n products just continue to work when they receive packets that are out of order.

On the right, though, is the '625 approach from the claim. It -- it must use a command to receive to avoid this deadlock problem, and that's what's depicted on the right.

Q. Okay. And so I want to be very clear about this. We have the green light on one side. We have the stop sign on the other.

Does the situation with the stop sign come up with packets that aren't consecutive in the 802.11 approach, or does it not even exist, the problem?

A. The problem doesn't exist.

Q. So would there be any reason -- if you're treating the sequential packets and the packets that are not sequential in 802.11 the same, is there any reason that you would need a command to receive?

A. No, you don't need a command to receive. And if you put one in there, you just add complexity you don't need.

Q. Okay. And so let's actually jump to Slide 34. I want to ask you about some inventor testimony. And

Page 39

did you look at some inventor testimony in this case?

A. Yes, I did.

Q. And Mr. Larsson is one of the inventors of the '625 patent. We have his picture over on the right-hand side?

A. Yes.

Q. And did you see any testimony from him to talk about this issue; that if you had a system that just kept going and didn't get that stop sign, it would just keep accepting the packets whether there would be any need for command to receive?

A. Yes. This is a -- an excerpt from the Larsson deposition that's labeled small print down below, and he was asked the question: Okay. If you had a system where you could send regular, old packets like the one in Figure 5 -- that's from the patent specification -- outside of the edge of the receiver's window and it would just accept them, would you need a command to the receiver to receive packets out of order? And he says, no.

Q. Okay. And the reason is you have to have a problem to have the command to overcome; is that right?

A. That's correct.

Q. So if you never get that stop sign, if you never stop because the packets are out of order, then

Page 40

10 (Pages 37 to 40)

**A1532**

you don't need a command to get yourself past the stop?

A. Yes.

Q. Yes?

And is that the case for Wi -- or for 802.11n that it doesn't have that problem?

A. 802.11n doesn't have the problem, so it doesn't need the solution.

Q. Okay. So now what I'd like to do is take a look at some of the -- the technical documents that talk about how 802.11n works and we're going to look at it in two levels, okay? At one level, I want to just look at the packet itself.

You know, we looked at the example in the patent. I'd like to look at the packet itself and see what's in that packet; is there anything in there that would be an explicit command to receive.

And then what I'd like to look at is how the system works, the -- the 802.11 standard is set up and find out is there something about the way the system is put together that could be a command to receive, okay?

A. Okay.

Q. So let's start with the packet.

MR. AROVAS: And go to Slide 33.

Q. (By Mr. Arovas) And what do we see in the picture on Slide 33?

Page 41

A. In Slide 33, this is taken from the 802.11 standard that's labeled below the 2007 standard. And what it shows is the sequence control field which is at the front of the A-MPDU that's transmitted in 802.11n.

And you see, there's only two things there, what's called a fragment number -- but I've highlighted what's called the sequence number. And so what's there is just is the sequence number, and that -- this is just the situation that the patent showed in its Figure 5.

And with the sequence number, and that's all that's there, there's no command to receive.

So when you received an A-MPDU, you have a sequence number and there's no command to receive. It's not needed.

Q. Okay. And so the sequence number is just the ordinary sequence number that's been used since way before the '625 patent?

A. Yes, that's correct.

Q. Okay. And so there's nothing explicit in the packet that would be a command to receive?

A. That's correct.

Q. Okay. So now let's take a look at how the system works and say, okay, well, is there something somehow in the system that would cause it to be interpreted, implicitly or explicitly, as a command to

Page 42

receive, okay?

A. Okay.

Q. And so what I'd like to do actually -- take a break from the slides for a second, switch over to the document camera, and take a look at a document that's Defendants' Exhibit 252. And it's something called the L2Parser overview.

And is this one of the technical documents that you reviewed and talked to the engineers about when you were preparing and working on this question of whether or not the patent was being used in the standard and the products?

A. Yes, it is.

Q. Okay. And let's take a look -- just so we can orient ourselves at a high level, I'd like to look at a bird's-eye view of the architecture of the chip and how it works. So I'm going to put another page from Exhibit 252 on the screen. I'm going to blow it up so we can all see it as best as possible.

And this is called the -- the RX flow, and RX stands for receive; is that right?

A. That's correct.

Q. And so when we talk about receiving a packet, this RX is talking about the flow of how the packet comes in from the outside and actually gets on to the

Page 43

chip?

A. Yes, that's correct.

Q. So if we look at that, we could then understand what is really required, is a command to receive required to take that packet on to the chip and use it or is it not?

A. Okay. Yes.

Q. Okay. So can you tell us, just starting from the beginning, where are things coming in and where are the packets going out?

A. Okay. So if we look at this diagram, it's kind of complicated. But if you look on the lower right where it says DSP TOP, and you see a TX and an RX. And so the packets -- the packets are coming in -- they're being received at the RX, and they come in and they actually follow this fat arrow.

And this fat arrow says the packets come in, they go into the RX receive buffer, they go through what's called the L2Parser, they continue, and they're put in the received first in/first out buffer, then they're just passed on.

Q. Okay. So if we take a look at -- just so I make sure everybody knows where we are, the N is over here --

A. That's correct.

Page 44

11 (Pages 41 to 44)

**A1533**

Q. -- the real small RX?

A. Yes.

Q. And then there's these sequence of fat arrows?

A. Yes.

Q. Okay. And then what we have is that the pack -- that the packet takes when it comes off the air, it gets received, it's going to follow these fat arrows just from one side to the other?

A. That's correct.

Q. And that's what we call the receive packet, right?

A. Yes, that's correct.

Q. Okay. And I want to be very clear about this. We have a claim here that says you have to have a special command. You have to have a command to receive to deal with this problem when you have packets that are not consecutive.

Does the chip even distinguish between consecutive and not consecutive packets when it makes the decision to take the packet in and send it through this received path?

A. It does not. It just receives the packets as they come in, whether they're in out -- in order or out of order.

Q. Right. So if you get an in-order packet, it

Page 45

just follows the receive path as accepted by the chip?

A. Yes.

Q. If you get an out-of-order packet, is it just taken in by the chip and received?

A. Follows the same receive path and just taken in by the chip.

Q. And so if you're going to do exactly the same thing, no matter what you get, consecutive or non-consecutive packet, would there be any reason to even have a command to receive?

A. You don't need a command to receive in this case.

Q. Would there be any stop sign or other problem that you need a command to receive to get over?

A. No.

Q. So you're just doing the same thing in both cases?

A. Yes.

MR. AROVAS: And so if we go back to the slides and we look at Slide 34.

Q. (By Mr. Arovas) When we talk -- looked at the inventor and he was talking about a system that just takes data packets in, without that stop sign, wouldn't need a command to receive; is that consistent with 802.11?

Page 46

A. Yes, that's what 802.11 does.

Q. Okay. So now we've heard in this case a lot about Windows, and I think it's important to understand how Windows fit into the operation of the system and what part of this is relevant in determining the only thing we have to figure out in this case, which is, is there a command to receive that's going to be used to deal with this not consecutive packet situation.

A. Yes.

Q. Okay. And so since we've heard about Windows, what I'd like to do is take a step back and say, first, just understand what is a window.

A. Okay.

MR. AROVAS: So if we can go to Slide 35.

A. Yes.

Q. (By Mr. Arovas) And can you describe for the jury, first, just generally what is a window?

A. Right. So this is a situation we've seen before. There's four packets -- 1, 2, 3, and 4 -- and memory at the router. And over on the right side are four packets. 1, 2, and 4 have been received, and there's -- Packet 3 was lost. But that collection of packets here is just 4 on each side. That -- that constitutes a window.

Q. Okay. So if we look at the left, you have

Page 47

Packets 1 through 4, that's a window, size 4, begins at 1, ends at 4?

A. That's correct.

Q. And we have the same thing at the receive side?

A. Yes.

Q. Okay. And so did you put together a short video that shows how this operates in action?

A. Yes. I have a video, and if we could go to that.

Q. As before, if you could just narrate for us -- for the jury, how it is that this windowing operates in the 802.11 approach.

A. Okay. So if we proceed with the video, what we see is now Packets 1, 2, 3, and 4 are sent. Packet 3 is lost, as we've seen before.

And now here are the windows that I was just talking about, the transmitter window on the left and the receiver window on the right. And they're different here. What's in them is different.

And now, if we continue -- now, the beginning on the right-hand side, the start of the window is 1, and the end of the window is 4.

And now we proceed. The receiver sends a block acknowledgement for Packets 1, 2, and 4. It

Page 48

12 (Pages 45 to 48)

**A1534**

it?

A. Okay.

Q. And so can you explain that, please?

A. Yes. Well -- I'll move over here.

What you see is, this is the sequence number of the patent. We've been talking about sequence numbers. Here this -- here the sequence number is compared to the beginning of the window, WinStart, and the end of the window, WinEnd, and the sequence number is between those two numbers, so it's in the window.

And so in that case what happens, it goes here and the standard says store the received MPDU in the buffer, so it takes the MPDU that is received and puts it in the buffer -- this says, when the sequence number is in the window.

Now, then it goes on and says, okay, what happens if the sequence number is beyond the end of the window, WinEnd here, and this is a very big number here, so it's beyond the end of the window. What does it do when the sequence number is beyond the end of the window? So what it does here is that it says store. So store the received MPDU in the buffer.

So what happens in both cases, the 802.11n products just store the MPDU.

Q. And will it do something different in terms of

Page 53

whether it accepts and stores the packet if it's in sequence or not in sequence?

A. No. If it's -- if it's in sequence or not in sequence, as I've shown, it just stores the MPDU in the receiver buffer.

Q. Okay. So next, I'd like to put back up that picture that we were looking at before. We can just put it on top.

And this shows the received flow of how the packets actually come in to the chip -- in this case, it's an Intel chip?

A. Yes, that's correct.

Q. And can you take us through that receive flow and -- and explain, is there any reason or any difference between whether it's in sequence or out of sequence that would cause the need for a command to receive?

A. Okay. So this was up on the ELMO. So what happens is this is where the -- it's kind of unstable here.

This is where the packets are received, and there's nothing to stop them from just going right on in to the receive path. So they come through here. They go through this L2Parser and right on in to the receive FIFO buffer, it's called. There's nothing to stop them.

Page 54

It operates just as was indicated in the standard.

Q. Okay. So those packets could be received, which means stored, in the buffer and the buffer is memory?

A. That's correct.

Q. And so those packets are going to be captured off the air and put on the chip, regardless of whether it's in sequence or not in sequence?

A. That's correct.

Q. And does it even need to check whether it's in sequence or not in sequence to do that -- to receive it off the air and put it into memory on that chip?

A. No, it's not checked.

Q. Okay. And now we heard a lot about the scoreboard from Dr. Nettles. Does the scoreboard and the tracking of what made it and what didn't make it have anything to do with whether or not that packet, off the air, is going to be accepted, stored, and received onto this chip?

A. No, it does not. The scoreboard is all up here, and it's not in the flow of the packets coming through the receiver pipeline.

Q. Okay. And now here we're looking at an Intel chip.

Is the same operation true for the other

Page 55

chips?

A. Yes, the same operation for the Broadcom and Qualcomm chips.

Q. Okay. And so now, Dr. Gibson, if you would return to the witness stand, I'd like to just show you one small portion of code.

MR. AROVAS: On Slide 39.

A. Yes.

Q. (By Mr. Arovas) And on Slide 39 there's a section of code. Is that some of the Intel code?

A. Yes. It's the Intel code.

Q. Okay. And so does this have sections that relate to whether you're in the window or out of the window?

A. Yes. You see this -- this double slash, that's a comment that's in the code, and it says check "if" in the window.

And so that's what that "if" and what's in parenthesis is doing, it's checking to see if the new sequence number is in the window. And if it is, it goes to right below there that's highlighted and it says shift not needed.

So you don't have to shift the window if the packet is inside the window when it's received.

And then below, it says, okay, if this "if" is

Page 56

14 (Pages 53 to 56)

**A1536**

CASE PARTICIPANTS ONLY

not satisfied, it drops down to this "else" statement and it says, okay, a shift is needed here. That's highlighted over on the right. And so the window is shifted by this calculation at the bottom.

But this -- this is basically the scoreboard calculation, and it's not in the receive path.

The -- in order to do this calculation, the chip already has to have the package received and it already has the sequence numbers.

Q. Okay. So just so we're crystal-clear, we've heard so much about the scoreboard and keeping track of what's going on; and you're looking at some of the scoreboard code. But the packet comes in, no matter what, whether it's in sequence, out of sequence, in the window, not in the window, it's received by the chip?

A. That's correct.

Q. And so is there any reason that you would need implicit or explicit command to receive in this kind of architecture the way 802.11 works?

A. You don't need a command to receive in 802.11n.

Q. Okay. So let's go back to the claim.

MR. AROVAS: Slide 40.

Q. (By Mr. Arovas) And can you tell us, based on this, looking at the packet, looking at the standard,

Page 57

looking at how the architecture works, what conclusion did you come to as to whether this element that we have in red is found in the 802.11n products?

A. Yes. So I've shown this claim element marked out, and that's because it's clearly -- command to receive is not needed and not found in the 802.11 products that I show over here -- the chips that I show over here on the right.

Q. So then can there be infringement?

A. There can't be infringement.

Q. And is this a significant difference?

A. It's a significant difference as we've seen.

Q. So now, let's move on to the next patent, which is the '435 patent.

And did you start with the claims there, as well?

A. Yes. So we go to the next slide.

This is Claim 1 out of the '435 patent, and I've highlighted the element computing which data packets have been discarded by the transmitter, based on the data packet discard notification message.

Now, the Court has a definition for data packet discard notification. That's at the bottom. And it says: A message that indicates data packets that the transmitter has discarded.

Page 58

So if -- if -- over at the right I've said that this claim element requires the receiver computing which packets were discarded by the transmitter.

So this is a little bit different idea. So if you look at the element above, it says: Receiving the data packet discard notification message. So you're at the receiver, and then you compute which packets have been discarded by the transmitter.

Q. So --

A. The requirement is what's here over in the box on the right.

Q. Okay. So let me do this, like I did last time. I'm going to put the claim up, and that way we have the claim to refer to as we go through all the evidence. And in red, once again, we have the element that we're focusing on over here, the computing step. Okay?

A. Okay.

Q. And before we go through that, I want to try to frame the issue for the jury, and I'm going to go back to the document camera and I'm going to put on the camera a question and answer that was asked by Mr. Van Nest on cross-examination of Dr. Nettles. And he was asked about the '435 patent. We see it right over there.

Page 59

A. Yes.

Q. Right?

And then we -- just see if there's agreement or disagreement at this point, so we can frame the question that we have to answer on this patent.

The question was -- this is from the trial testimony, cross-examination: In any event, in connection with the '435 patent, if the receiver cannot compute all of the packets that were discarded by the transmitter, then there's no infringement, right?

And the answer is: That's my understanding, yes, sir.

Do you agree on this point with Dr. Nettles that, in fact, if the receiver -- right, the -- the device receiving the packets can't compute all of the packets that are being discarded by the transmitter, the device at the other side of the system, then, in fact, there would be no infringement under this claim?

A. Yes, I agree.

Q. Okay. And when we look at the claim -- I want to make sure that we have the context for this -- when we're talking about computing, we're not just talking about any kind of computing; we're talking about computing something very particular; is that right?

A. That's correct.

Page 60

15 (Pages 57 to 60)

**A1537**

it says responsive to the receiving step generating a feedback response message from a number of different message types.

So there's more than one.

Q. So we have that right down here: From a number of different message types. Right?

A. That's correct.

Q. And so when you looked at -- can you describe for the jury, when you looked at the 802.11 products in this case, do they choose from a number of different message types?

A. No, there's only one message type.

Q. Okay. So let's very quickly take a look at the problem, as we did with the other patents -- the problem and solutions so we have some context.

And can you describe, with regard to the '215, the problem and an example of the solution given in this specification?

A. Yes. I've highlighted an excerpt from the specification, and it says -- of the '215 patent: A significant problem with existing ARQ protocols is that they are static in construction. Fixed length messages are used.

And the solution -- and these -- the Figure 4, Figure 5, and Figure 8, I would call them tables, but

Page 105

they're figures on the right. They show a bitmap, a list, and a combination of a bitmap and a list; and these are examples of the -- a number of different message types given in the patent which would constitute the solution to the problem they're talking about.

Q. Okay. So in this specific example in the -- the specification of the patent, there were three types to choose between. One type is the bitmap, and that's in the reddish color. Then the second one was the list. And the third one in green was the combination.

A. Yes, that's correct.

Q. Okay. And so if we look at the next slide, what's the difference between the 802.11n products in this case and the Ericsson '215 patent?

A. Well, the difference is in the 802.11n products, there's only one type of acknowledgement message, and that's the compressed BlockAck -- block acknowledgement.

And the '215 patent, on the right, requires generating an acknowledgement message from a number of message types, and in this particular example, from the patent specification. It's a list bitmap or a combination of the two.

Q. Okay. So now let's go to the next slide and look at how the 802.11n products work. And using the --

Page 106

the familiar transmitter and receiver we've been looking at, can you tell the jury whether or not there are -- there's a choice from a number of different message types, as we know is required, for this test we're trying to use to determine whether or not the claim is in the 802.11 product -- "n" products?

A. Yes. So what we see here is we're now familiar with this diagram and we see Packet 3 is lost. I'm talking about the block acknowledgement being sent back before -- 1, 2, and 4 -- but the specific name for the block acknowledgement used in the 802.11n standard and products is compressed block acknowledgement. That's the only one that's used.

So every time the receiver sends a block acknowledgement, it has to send a compressed block acknowledgement. There's no choice.

Q. Okay. Now, I'd like to take a look at the standard of Slide 73, and what we have on the screen is Table 7-6K, BlockAck related to BlockAck. And that's a table that comes right from the standard?

A. Yes, that's correct.

Q. And so did you look at whether all of this table was actually even implemented in the 802.11n products in this case?

A. Yes, I did.

Page 107

And so -- and I've indicated that. You see in blue, the compressed block acknowledgement I was just talking about, that's the only acknowledgement message supported. The products don't implement these other messages.

And so what I've shown is the basic BlockAck, this reserved slot, and the multi-TID, it's called, block acknowledgement. They're not supported in the products, so there's only one block acknowledgement, the compressed block acknowledgement.

Q. Okay. And in all the testimony of Dr. Nettles, did he -- although he pointed to this table, did he point out any use or support of the other types in the products that we're talking about in this case?

A. Not that I recall.

Q. Okay. And so did you also do some testing yourself to see whether you could find these other types in the products?

A. Yes, I did.

Q. Okay. And so if we go to the next slide, can you explain what you did and what results you got?

A. So there's my infamous picture from before, but what we have here are testing results. And of all the testing results, there were over 400,000-plus acknowledgement messages that I could see. And the

Page 108

27 (Pages 105 to 108)

A1549

Case: 13-1625   Case: 13-1625   Document: 179-1   Page: 456   Filed: 03/31/2014   Document: 177-1   Page: 456   Filed: 03/31/2014   (456 of 575)

CASE PARTICIPANTS ONLY

Can you explain to the jury how this identifier was used in this example in the patent to deal with this problem that you were starting to get different error coding for different types of data?

A. Yes. So on the left, I've shown a collection of these different types of data packets -- voice, video, and data -- and now they're sent through -- over the wireless medium. And this -- this element of the claim adds a service type identifier at the front of each of these packets in order to tell the receiver how to decode these packets.

So when it gets over the receiver, the receiver looks at this service type identifier, it says, okay, I know how to decode this packet, it's a voice packet, and so it does that and then we get the voice information back.

Q. And so I want to focus on that box in the -- the far -- the right top, okay?

So what this identifier was doing is because you have different coding for voice, video, and data, you could just look at the identifier and you'd know what it was, the type, right?

A. Yes, that's correct.

Q. So you'd know which type of coding you had to do to --

A. Yes.

Q. -- to uncode -- to decode, right?

A. Yes, that's correct.

Q. And you could do that without having to actually analyze the packet itself and deduce what type of coding was used?

A. Yes, that's correct.

Q. So it gave you an easy way of knowing what type of information was inside, just by looking at that identifier?

A. Yes.

Q. Okay. And so when we look at the next slide, when we look at the 802.11n products and what Mr. Nettles -- Dr. Nettles was pointing to was the TID, the traffic identifier field, can you tell us whether that's the same or different as the identifier that's required by the claims?

A. The traffic identifier field in 802.11n products doesn't identify what's in the payload. All it does is relate to user priority -- the priority that's given to the packets.

So it doesn't identify whether or not there's voice, video, or data in that payload.

Whereas, the '568 patent approach, it has this service type identifier, and it's required to identify

the type of information. That's the improvement of -- of this '568 patent, and so I've shown that on the right.

Q. Okay. And so now let's go to the next slide, and is this a picture of the different priority queues in the standard itself that's used in 802.11n?

A. Yes, there is. So this is Figure 9.17 from the 802.11n-2007 standard. So what it shows is these kind of buckets down at the bottom across the middle of the bottom, those are what are called queues, kind of waiting lines.

And then up at the top you can see MSDU and UP.

MSDU is the data coming into the MAC layer that we're going to make PDUs out of, and UP stands for user priority. So that information comes in. The user priority says which one of these buckets you go into -- the packets go into for transmission.

Q. Okay.

MR. AROVAS: And, Your Honor, with the Court's permission, may the witness approach the easel?

THE COURT: Yes, he may.

Q. (By Mr. Arovas) What I'd like to do, Dr. Gibson, is put on the easel -- I'll wait for you to here -- get all wired up.

A. Get rigged up here.

Q. Okay. So what I've put on the easel is a copy of Figure 9.7 -- 17 that's been used earlier in this case, and those are queues from the standard itself, right?

A. Yes. That's -- this is the diagram that's been marked on that I was just talking about.

Q. Okay. So you were here when there was testimony about marking up the document?

A. Yes, I was.

Q. Okay. And so can you tell us, where do the packets come in, where do they go out, and does the processing have anything to do in these queues with what type -- what type of information is conveyed in that packet as we know is required?

A. Okay. So here's where the information comes in. That's the MSDU, and this can be voice, video, or data. And here's the user priority. So a user priority comes in for the voice, video, or data.

Based on this user priority, these -- this data comes in and goes into a different one of these queues. So different user priorities for a different one of these queues.

And then what happens is the -- the PDUs go through here, and they eventually come out and this is

when they're transmitted.

Q. Okay. And so where does the voice go? Does it go to just one queue?

A. No. The voice -- the voice data comes in. Depending on the user priority, it could go to any of these queues. So the user priority -- for example, for voice, the user priority could be best effort which would be a slow or fast, or it could be fastest.

Q. Okay. So does that TID subfield of the user priority have anything to do with the type of data that's actually in the packet?

A. No. If you look at the TID subfield, you don't know what type of data's in the packet.

Q. Okay. So if I went through every one of those queues, and Mr. Kitchin went through the third one and he said voice, video, e-mail, background, any type of information you can invent can go in the third queue, would that be the same for the first, the second, and the fourth?

A. Yes. Right. The same -- like the best effort queue could have voice, video, e-mail, whatever payloads going through it.

Q. Okay. And so did you also do some testing?

A. Yes, I did.

Q. Okay. So if you could return to the witness

stand.

MR. AROVAS: And if we could go to the next slide, 86.

A. Okay.

Q. (By Mr. Arovas) And can you describe for us what testing you did?

A. Yes. So this shows testing -- I used the laptops that I've referred to earlier, and also -- and these laptops were either running Windows 7 Home Premium, Windows 7 Professional, Windows XP. And also I think it was the tablet that ran the Android operating system. So these are different operating systems.

And so then what I did was I ran different -- I don't know if we have a summary on -- okay, I'll just talk to this.

You can see I ran YouTube in this case, I think both video and audio. Pandora is streaming audio application. Browsed the Internet and used Skype. And I believe I -- in this test, I used both video and audio conversations. And in every case, when I monitored what was going on, the traffic identifier field was always zero. And zero corresponds to just best effort.

Q. Okay. And is that the typical default operation, as you tested it, is that TID would be zero?

A. Yes, that's correct.

Q. For everything, whether it's video, voice, or something else?

A. Yes, that's correct.

Q. Okay. And so what I want to focus on here is does the TID -- if I -- if I took that screen -- I can't do it here on the board -- but if I covered up everything, except that TID number, where it says equal -- TID equals zero on the right-hand side, and I just told you TID 0, what's inside? Could you answer that question?

A. No, you wouldn't know.

Q. TID 7, what's inside?

A. No.

Q. TID 5, what's inside?

A. You wouldn't know. No one would know.

Q. Okay. And can you -- in the software -- in the operating systems, or can you put other software on the devices, where you could force certain programs to use other TIDs, like 3 or 5 or 7?

A. Yes. You can -- you can add software. You can turn on software and use special software to then assign -- always assign a certain user priority to a certain application, which means certain voice or video applications, and that would force that user priority. And that's the only way you would know in that case.

Q. So you could, for example, force YouTube to go into 7, right?

A. Yes.

Q. But I want to focus on what matters for the test.

Even if you do that, will that TID subfield tell you the type of information conveyed in the packet?

A. No, it won't. Because you know that that's not done all the time. That's not the usual mode. So if you just look at the TID subfield, all you know is the number that corresponds to a user priority. You don't know what's in that payload, what's in that packet.

Q. Okay. So then going to the next slide, what is the conclusion with regard to the '568 patent with regard to 802.11n?

A. The conclusion is that 802.11n products do not infringe the '568 patent.

Q. Okay. And going to the last slide, 88, I'm trying to finish where we started. We've gone through five patents.

Did you find whether the claims of those five patents are found in 802.11n products?

A. The claims of Ericsson's patents are not found in the 802.11n products.

**A1552**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                             )   DOCKET NO. 6:10cv473
        -vs-                 )
                             )   Tyler, Texas
                             )   12:41 p.m.
D-LINK CORPORATION, ET AL        June 10, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas 75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas 78701

COURT REPORTERS:    MS. JUDITH WERLINGER
                    MS. SHEA SLOAN
                    shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

---

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California 90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California 94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas 75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

---

PROCEEDINGS

COURT SECURITY OFFICER:  All rise for the jury.

(Jury in.)

THE COURT:  All right.  Please be seated.

All right.  I hope everyone had a good lunch and a nice relaxing break.  I actually gave you 10 more minutes than I intended to, but it's okay.

All right, Mr. Stevenson.  You may proceed.

MR. STEVENSON:  Thank you, Your Honor.

JERRY GIBSON, Ph.D., DEFENDANTS' WITNESS,
PREVIOUSLY SWORN
CROSS-EXAMINATION

BY MR. STEVENSON:

Q.  Good afternoon, Dr. Gibson.

Now, were you here for opening statements?

A.  Yes, I think I was.

Q.  Do you remember that in Defendants' opening, they argued that the 802.11 standard came from patented technology of companies like Intel and Atheros and Broadcom?

A.  You know, I don't remember specifically that.

Q.  You don't remember them saying that they put their patented technology into the standard to make it

Page 3

---

more valuable?

A.  Well, I think I remember that, but I, obviously, don't remember the whole thing.

Q.  All right.  And the truth of the matter, sir, is, the 802.11 standard really is not innovative, is it?

A.  That's right.  It's about implementation.

Q.  Implementation means agreeing upon what to use, doesn't it?

A.  Yes.

Q.  And the 802.11 standard was about agreeing on what, from the existing technology, to use, wasn't it?

A.  Well, I mean, I wasn't on the standards body; but in general, I think all the participants have to agree.

Q.  All right.  But they didn't innovate; they agreed to use existing technologies, correct?

A.  Well, in general, I think that -- in general, that's correct.  I think that the new innovations are out there, and then the implementations are what matters when you get to actually making the product work.

Q.  And we saw a slide, didn't we, with piles of patents for each company?  You remember that slide?

A.  No, I don't remember that slide.  I'm sorry.

Q.  Well, I won't put it up, but the truth is, not much of the 802.11 standard is even patented, is it?

Page 4

1 (Pages 1 to 4)

CASE PARTICIPANTS ONLY

A. Pardon me?

Q. That was one of the things you reviewed in this case, wasn't it?

A. Yes.

Q. Do you recall Mr. Kitchin testifying as follows at Page 171 of his deposition: Do Intel's products receive the basic BlockAck or Multi-TID BlockAck variants.

So he's talking about these two right here, right? Basic BlockAck and Multi-TID. Is that what he's talking about in the question?

A. Just let me read it here.

That's what -- yes, that's what it looks like.

Q. Okay. And what he says is: So subject to the definition of receive, what happens in Intel's products, Intel's products may receive a frame, should it be transmitted to it, that BlockAck frame might contain any -- any of these variants.

A. I --

Q. Is that true?

A. I see that, and when I --

Q. Then he goes on to say: In the event a frame, other than a compressed BlockAck is received, it would be discarded --

A. Yes.

Page 17

Q. -- right?

A. And what I was talking about, should it be transmitted to it, I don't know if it would be transmitted to it. I don't know products that do that. So that's what I was talking about.

Q. Well, you don't know there aren't any, do you?

A. I mean, I don't know -- I don't know of any that do it, so I -- I haven't seen any.

Q. You haven't done a search?

A. No, I haven't done a search.

Q. So you're just unaware of how many products may be out there that are currently implementing Multi-TID?

A. That's correct.

Q. And that's a power-saving feature, correct?

A. That's correct.

Q. But what has to happen in the devices, sir, is, when they receive a block acknowledgement, they have to look for these two bits every time, don't they?

A. They receive those two bits, yes, they do.

Q. But they have to look at them, right, to see what they're getting?

A. Yes.

Q. So to wrap up, would you say it's fair to say that the standard defines a number of message types for

Page 18

block acknowledgements, specifically three?

A. In this table, there are three message -- there are three block acknowledgement frame variants.

Q. And each block acknowledgement that is sent contains a field that indicates which one of the three variants are being sent, correct?

A. That's correct.

Q. The message has to have that field, right?

A. Yes.

Q. It's mandatory, right?

A. Yes.

Q. And that field cross-references the variants that are in this table, right?

A. Yes.

Q. Okay. Let's move on now to the '435 patent.

Now, this is the patent that deals with what happens in the receiver when the transmitter decides to stop retransmitting lost packets, right?

A. Yes.

Q. And I believe in your direct testimony, as a headline, you asserted that you don't think there's infringement because, in these cases, the receivers are not computing the packets the transmitter's discarded, right?

A. That's correct.

Page 19

Q. All right. Let's talk about that a little bit. Now, let's first talk about computing and what computing is.

You're aware that both parties have produced a lot of graphics, animations to try to explain things.

A. I've seen a lot of that, animations. I've produced some myself.

Q. You have some; we've got some; but the truth is, inside of the computer modules that are doing this, the world is not a bunch of blue squares and garbage cans; it's actually logic, right?

A. Well, logic and processors and -- yes. I do a lot of that.

Q. And I remember the representative from Intel passing around some chips, some of these modules that are Wi-Fi modules?

A. You said two things. You're talking about the boards with the chips on it and the chips separately?

Q. Well, I'm talking about the Wi-Fi modules that he passed around. Remember everybody got to pass it around and look at it?

A. You're talking about the chips themselves when you say modules? That's what -- that's what I remember. That's why I don't know what you're --

Q. Well, all I'm saying is, there's a little

Page 20

5 (Pages 17 to 20)

A1558

about?

A. Yes.

Q. And the frame body would be the payload, that's where the voice, video data, whatever, would be stuck in?

A. Yes.

Q. And then this patent has a QoS control field, right?

A. Yes.

Q. You agree with me, don't you, that if you blow out this QoS control field, one of these seven numbers -- excuse me, eight numbers is going to be in it?

A. Yes.

Q. Those are the type identifiers or the traffic identifiers?

A. Traffic identifiers.

Q. And those numbers have to be in every packet that goes out, don't they?

A. Yes.

Q. That field has to be populated, doesn't it?

A. It does.

Q. Now, do you recall last week there was a question from the jury about whether there's criteria available for developers and programmers on how to use

Page 49

this?

A. I don't recall that.

Q. Okay.

A. Yeah.

Q. Can we answer that question anyway?

A. Let's -- let's try.

Q. Let's try.

Are you aware that Intel has created documents that actually advise programmers who program for Intel wireless modules, how to implement these fields?

A. I don't remember that.

Q. Okay. Would you like to see that document and we can discuss it?

A. If you're going to ask me about it, let's -- let's look at it.

Q. That's Plaintiffs' Exhibit 514. You may have it in your binder, or we can look at it on the screen.

A. Okay. There we go.

Q. It's called an Intel Wi-Fi adapters system developer kit. You've heard of system developer kits before, haven't you?

A. Yes, I have.

Q. It's what a manufacturer will create and provide to the market so they can program for the devices that the manufacturer makes?

Page 50

A. Yes.

Q. And this is a document where Intel actually is intending others to use it and read what's in it so they can program drivers or other things for their products; fair?

A. Yes.

Q. Okay.

MR. STEVENSON: Let's look at Page 9.

And just to clarify, would you zoom in, Mr. Diaz, on the second paragraph? It's a small one, just that sentence.

Q. (By Mr. Stevenson) It says: Unsurprisingly, this document prepares you to create a device driver for the Wi-Fi adapter.

And describes some flows, doesn't it?

A. It says it describes four major flows, yes.

MR. STEVENSON: And I think below that a little bit, Mr. Diaz, there's another section that plains -- if you'll go down.

Q. (By Mr. Stevenson) As you follow the steps through the manual, right under all the chapters, it's basically saying if you read this and you follow the steps, you'll get all the information you need to write and verify the operation of your device driver.

A. Yes.

Page 51

Q. Now, let's go to Page 65.

MR. STEVENSON: And will you zoom in on the first -- thank you.

Q. (By Mr. Stevenson) Here we have a discussion about quality of service mapping, don't we?

A. Yes. Let me look at it here a little bit.

Q. Sure. Tell me when you're ready to answer questions.

A. Okay. You tell me the question first, and then I'll...

Q. I will tell you the question first.

A. Okay.

Q. Intel, in this document, is explaining the four access categories, isn't it?

A. Yes.

Q. And it's describing them as voice, video, as well as best effort and background, isn't it?

A. Now, what you're referring to is -- yes, you're referring to the BK, BE, VI, and VO as access categories that you're then going to map to another -- to the table -- I guess we've already seen the table.

Q. Yes. And, in fact, we can go down a little bit in this document and see what Intel tells people about the table. And don't they tell people in the quality of service mappings right beneath it -- in the

Page 52

13 (Pages 49 to 52)

A1566

table right under it, don't they tell people, the developers, that if you have VO, that that's -- VO stands for voice, right?

A. In this table.

Q. That would be a TID of 7 or 6?

A. Either one of them, that's correct.

Q. And if it's VI for video, it's a 4 or a 5, isn't it?

A. Well, that -- that's what they have in this table, that's correct.

Q. Now, let me ask you some questions about your quality of service testing. You did some testing in this case, and you talked about it, didn't you?

A. Yes.

Q. And that testing was relevant to this particular patent?

A. Yes.

Q. And the frequency with which applications use this feature?

A. Pardon me. Say that again. I interrupted.

Q. No, that's okay. I may have talked over you. I apologize for that.

A. Okay.

Q. You -- you did some testing into the frequency which with -- with which applications utilize this

Page 53

feature, didn't you?

A. What I tested was to put in -- if we're -- if we're talking about the same experiments, I put in various applications like Skype and audio streaming and -- and searching the web and so on. Is that what we're talking about? And looked for the traffic identifier number.

Q. I'll show you --

A. Yeah.

Q. -- what the --

A. Uh-huh, that's the one. Yes.

Q. Right. And you showed that slide, didn't you?

A. Yes, I did.

Q. Now -- and I think you said this -- this was the case for everything, didn't you?

A. In all the tests I ran, that's what I got.

Q. Do you recall, sir, running an Ekiga video call?

A. I may have run an Ekiga video call. I don't remember. I remember I tried to use Ekiga that time for video and voice. I don't remember exactly if it connected or not, but I may have tried to do that.

Q. Well, you -- you installed -- don't you remember setting up a network? You installed two computers with a router?

Page 54

A. Yes, I installed eight computers and a tablet with three routers, so --

Q. I'm talking --

A. -- I'm just trying to narrow it down a little bit.

Q. All right. Well, I'm talking about a particular test where you ran the Ekiga video conferencing program. Do you remember doing that?

A. As I said, I think I remember doing that, but I'm not totally clear. It was a few months ago.

Q. Well, let's set up -- let me jog your memory. We'll set up the test setup. When I read your report, you had a Toshiba computer -- Toshiba laptop and a Dell laptop and a Belkin wireless router, and you were trying to do a video conference between them. Do you remember that?

A. That makes sense.

Q. Okay. And -- and you -- what you did is, you got an application that actually snips the packets in the air and records them and you can look at data for them, right?

A. You're talking about the wire -- Wireshark application, right?

Q. Wireshark?

A. Yes.

Page 55

Q. You did a Wireshark on it?

A. I did.

Q. And you -- you turned over to us your Wireshark data. Do you remember that?

A. Yes, all of it.

Q. Let's look at your Wireshark data, and this is actually in your report?

A. Well, we'll see.

Q. Page 794 --

A. Yeah.

Q. Excuse me, yes, Page 794 at 7-172.

MR. STEVENSON: And can you zoom in on the highlighting?

Thank you.

Q. (By Mr. Stevenson) What you wrote here is for Ekiga, a video call produced packets with a TID subfield of 5, which corresponds to the video access category, right?

A. That's correct.

Q. So what you said before, that it was -- everything had a 0, that isn't true?

A. Can I -- can you -- I guess you don't have the rest. I was going to scan down and just look at the frame check sequence and stuff like that, to make sure the frame was correct.

Page 56

14 (Pages 53 to 56)

**A1567**

Q. Sure. We'll get you a copy of your report.

A. Okay.

Q. But while we're doing that, do you see the blowout -- I mean, this is -- this is actually from your report, right?

A. Right.

Q. This is your -- this is your work, isn't it?

A. Yes.

Q. And you said that video call-produced packets with the TID subfield of 5, which corresponds to the video access category.

MR. STEVENSON: Your Honor, may Mr. Lipschitz approach the witness to give him a copy?

THE COURT: You may.

MR. STEVENSON: Thank you.

Q. (By Mr. Stevenson) And then before you look at your report, I'd just like to ask you, in your report, don't you zoom in on the actual packet where it says QoS control TID 5, Priority: 5 (video) (video)?

A. Yes.

Q. And -- and if we go back to the chart we've been looking at, 5 is video, isn't it?

A. Yes.

Q. So that's just dead wrong, right?

A. Yes.

Page 57

Q. Ekiga is using this invention, isn't it?

A. In this -- in this call, Ekiga assigned a TID of 5.

Q. It's using the invention, right?

A. Ekiga is using the invention, you said?

Q. Yes. That's what you tested, right?

A. Yes.

Q. Okay. Now, do you need to look at the rest of your report to --

A. I was just going to verify if the frame check sequence was -- said the packet was correct. That's all because I just -- you know, a long time ago and I don't remember, but I don't -- I can't read it. It's too small.

Q. Okay.

A. I can't --

Q. Do you want to change any of your testimony?

A. No. No. No.

Q. Okay. Let's go on to the '223 patent, and I think finished with that.

Now, in this patent -- this is a patent -- the '223, that deals with the timer to -- to -- what I call the discard timer, and you've identified two elements. One is the notes -- you say there was no segmenting, and the other, the timer doesn't start when

Page 58

the packet's received by the data link layer?

A. That's correct.

Q. I'll write both of those down.

Let's talk first about the timer.

During your direct testimony, I think you made the point that there's got to be a specific spot where the timer starts, right?

A. Yes.

Q. And you identified that as when the data link layer is entered, right?

A. That's what the claim said.

Q. Okay. And you said that the timer is actually started, I believe when the -- when it enters the MAC layer, right?

A. Well, what I said was if -- if the claim refers to a timer in the 802.11 chip, it can't be before the MAC layer.

Q. How do you know, to be able to give sworn testimony, exactly where the timer's initialized?

A. You're talking about in the chip?

Q. Yes.

A. The chip only covers the MAC layer below the first entry into the data link layer.

Q. Well, my question is -- to be able to give sworn testimony about where the timer starts, what did

Page 59

you do to review how the chip actually works and where the timer is? For instance, did you look at source code?

A. Well, let me go back.

The -- the Wi-Fi chip only covers the MAC layer and the file layer, and the -- and the patent requires as soon as you go from the network layer to the data link layer, at that moment the timer has to be set.

Q. Okay. Did you review source code to verify whether your testimony's accurate?

A. I -- what -- what would be inaccurate about that?

Q. Well, we will talk about that. But my question is, did you review source code before testifying to make sure what you're swearing to is accurate?

A. Well, I looked at source code. I'm not sure what you're going to show me, so...

Q. Okay. Well, may I show you the source code and get you to show us where in the code certain things happen?

A. Sure.

MR. STEVENSON: May I approach, Your Honor?

THE COURT: Yes, you may.

Page 60

15 (Pages 57 to 60)

**A1568**

Q. Okay. So there's a separate layer -- 802.2 with a separate specification, a separate set of rules, a separate set of procedures that's going to exist over and above the 802.11, right?

A. Yes.

Q. Okay. And that logical link layer, that's going to be where the -- the top of the data link layer?

A. That's the beginning of the data link layer.

Q. Okay. And so if we see, the timer or the timestamp that was pointed to was actually in the 802.11 wireless LAN product, right?

A. Yes.

Q. And as we saw from Mr. Kitchin's testimony, that that is initiated at the top of the MAC layer, not the top of the data link?

A. That's correct.

Q. And so let's move on to some of the other patents now, and we'll just go in reverse order. So let's take the '568 patent. I'm going to get the claim out; and I want to talk to you about, again, what is the question we're trying to answer here.

MR. AROVAS: Let's put the claim on the board.

Q. (By Mr. Arovas) And actually, Mr. Stevenson's questions confused me a little bit because actually I

Page 73

thought -- it seemed to be proving the point that we were trying to make, but let's go through it and try to understand.

First, every one of the -- these questions we have to answer, you take the claims and you compare them against the products, right?

A. That's correct.

Q. And that's how you get the answer.

And so we know from the claims that they have to have the service type identifier, and that identifier, it has to be an identifier that identifies the type of information conveyed in the payload. And that's the test that we have to use.

A. Yes, that's correct.

Q. Okay. And when we looked at the board that Mr. Kitchin has used -- and I'll grab that so we can look at that at the same time. We were trying to answer the question -- because this is the test that we have to use -- about whether from that identifier you can tell the type of information that's in the payload.

And I asked you a question, when we were talking about your testing, where you had taken a standard configuration and gotten all 0s, whether other software products could also give you other TID values.

Do you remember talking about that?

Page 74

A. Yes, I said that.

Q. And what did you explain to me there?

A. Well, the user priority comes in with the MSDU, and -- and there's no hard-and-fast rule about whether or not voice, video, data, background information goes into one of these user priority locations.

So what can happen is, voice can appear in any one of these queues. It can -- it can have any one of these user priorities, and by just looking at the TID field, you don't know.

Q. And so the issue here is not whether you can get different TID numbers. The question is whether the TID, or the identifier that they're pointing to, is telling you the type of information?

A. That's correct.

Q. And so when we were talking on direct examination, we looked at you could do -- run some software and you could get a TID value of 0, right?

A. Yes. And I think that was -- yes.

Q. Okay. And that's -- this is actually a copy of your report?

A. Yes.

Q. And there's no secret about this thing. This is a report you prepared and you gave to -- to Ericsson,

Page 75

right?

A. That's correct.

Q. Okay. And you showed your results and you said, well, I can do a test and I can send voice, video -- I think it was -- you did YouTube, Pandora. YouTube was video, and Pandora was audio. Internet Explorer and Skype, right?

A. That's correct.

Q. And they could all come out, if the software chose, as a TID of 0?

A. Yes.

Q. And that TID of 0 would go in here up at the top, and it would be treated as a priority, right?

A. Yes.

Q. Because what is the TID? Is it describing the type, or is it describing the priority?

A. It's describing the priority.

Q. Now, you also could get the software to give you different numbers. And if we just flip it over, some of the other results -- and this is right in your own materials you gave to Ericsson -- you can get a TID of 5, as well?

A. That's correct.

Q. Okay. But what is that TID? If I cover up everything else, I say you just know the TID, can you

Page 76

19 (Pages 73 to 76)

A1572

Case: 13-1625    Case: 13-1625    Document: 179-1    Page: 464    Filed: 03/31/2014    Document: 177-1    Page: 464    Filed: 03/31/2014    (464 of 575)

CASE PARTICIPANTS ONLY

tell me anything about the content --

A. No. Especially not on my testing because for video, I got a 5 and I got a TID of 0 for video.

Q. And so did you find that you could put any type of information with any type of traffic identifier?

A. Yes.

Q. So you could have a 1, and it could be video, voice, or anything, right?

A. Yes. The way to say it would be any one of those user priorities could be assigned to any of the different types of information.

Q. Right. Now, the example that Mr. Stevenson mentioned, he didn't bring up the fact that it was running something called Fedora 16?

A. Yes.

Q. And Fedora 16 -- can you tell us what Fedora 16 is?

A. Yes. Fedora 16 was an operating system that I didn't really know about before I saw Dr. Nettles' testing. And so it's an operating system running on a laptop here.

Q. Okay. And is that used on any of the accused products in this case?

A. No.

Q. So does that actually have any relevance to

Page 77

whether the accused -- how the accused products are operated?

A. No, it does not.

Q. Okay. But even if you take that and you take the -- and you look at the various TID numbers, traffic identifier numbers, whether it's a 0, whether -- whether it's a 0, 1, a 2, a 3, 4, 5, 6, 7, would it give you any information about the type of information required?

A. No.

Q. And for every one of those numbers, can it have voice, video data, any type?

A. In every one of those queues, every one of those priorities.

Q. So when we go back to the question that we have to answer here, which is, is this claim element met, meaning is there an identifier that identifies the type of information conveyed in the payload, does that identifier exist in 802.11?

A. No, it does not.

Q. Okay. So now, let's go on to the next patent and look at the questions that you got on the '625.

And the '625 is the command to receive patent, right?

A. Yes.

Q. So let's take a look at the claim there, as

Page 78

well. I'll put it up so we can refer to it.

And you got a lot of questions about in sequence or out of sequence packets. And I'm going to start by just understanding why the out of sequence packets matter.

And so if we look at the claims themselves, do the claims themselves and the language you're supposed to use for this comparison talk about a command to receive for packets that are not consecutive?

A. Yes.

Q. And when you do your comparison, is this the language you use when you look at the products to say is it the same or is it different?

A. Yes.

Q. Okay. And so let's take a look at some of what we saw. I want -- what I really want to focus on here, okay, because I want to make sure that the record is clear and you have an opportunity to explain to the jury, this issue of programming. Now, everything a computer system does is programmed, right?

A. That's right.

Q. And that's been true for every computer system since the very first one to -- to any one that exists today, right?

A. That's correct.

Page 79

Q. Okay. So the question we have to answer is are they set up in a way where it will need something called a command to receive to deal with packets that are not consecutive, right?

A. Yes.

Q. So we have to see if that particular programming exists in the computer.

A. Yes.

Q. Now, we know, because we saw Mr. Stevenson show this on the -- some of the questions he was asking you, that you were shown a command to receive, and that can be included in a packet or it could be separate, right?

A. Yes.

Q. And the patent says you can do it either way?

A. Yes.

Q. But we know that in the example in the patent, it's a bit that is added to the normal data packet, right?

A. In this example, that's correct.

Q. So is that in addition to the sequence number, or is it the sequence number itself?

A. It's in addition to the sequence number.

Q. Okay. And that's actually described -- that's the RPEB that's described in this specification of the

Page 80

20 (Pages 77 to 80)

A1573

patent, right?

A. That's correct.

Q. Okay. So that's the example -- an example of the command to receive provided in the patent?

A. Yes.

Q. Now, does the patent contrast that with the ordinary sequence-based patent?

A. Yes, it does.

Q. And let's take a look at that. And if you could remind us what's the difference between the packet that the patent shows us with the command to receive and the -- what we would call the prior art data packet?

A. Right. So these are both from the patent.

And the one on the left shows the prior art data packet, and it has no RPEB. It has no command to receive. That's the standard conventional way to do things. And so the '625 patent added the command to receive at the front of the sequence number.

Q. Okay. So they both have the sequence number. That's in the blue. And what was added is this command to receive?

A. That's correct, right.

Q. Now -- so we have to answer this question that is the system -- this is the question for -- for -- to figure out if this claim is covering the 802.11. Is the

Page 81

system programmed in a way that it has a command to receive to deal with packets that are not consecutive?

A. That's the question, yes.

Q. All right. And what Ericsson keeps trying to suggest is just because you take all the packets, you must have a reason to take all the packets, therefore you need a command to receive. Does that logic make any sense?

A. That's what I hear them saying, but it doesn't make any sense to me. If you receive a packet, you receive a packet.

Q. And let's take a look at that very issue that came up in the depositions in this case.

And is this one of the slides you used when we went through the material together?

A. Yes, it is.

Q. Okay. And over on the right, there's a quote.

And who's that from?

A. That's from Peter Larsson, one of the inventors of the '625 patent.

Q. And was he being asked about this very situation, the inventor of the '62 (sic) patent, that if you had a system that was just programmed to accept all the time, would you need a command to receive as required by the claims?

Page 82

A. And that's what he was asked, and he said, no, you would not.

Q. So can you explain to us, using the picture of the normal data packet, what Mr. Larsson is explaining about why you wouldn't need a command to receive?

A. Well, if your system would just accept the packet with the sequence number in front of it and nothing else, then there's no need for the command to receive. The system would just continue to operate normally.

Q. Right. And so if we contrast that with the '625 solution, right, you had a situation where there was a stop sign and you needed a command to receive, right?

A. That's correct.

Q. So the stop sign would also -- if you're going to use the '625, the stop sign would also have to be programmed into the system?

A. That's correct.

Q. Okay. And is there any stop sign programmed into the 802.11 products?

A. Well, in the claim, it is.

Q. In the claim it is, but in the 802.11 products, is there a stop sign programmed in?

A. Not in the 802.11n products, no, there's no

Page 83

stop sign.

Q. And without the stop sign, is there even a need for a command to receive?

A. No, there's not.

Q. And so let's go back to the diagram that we looked at before. I'll put it up --

A. Yeah.

Q. -- on the board over here. Can you see that, Dr. Gibson?

A. I can.

Q. You know, I can actually put -- I can put a copy on the screen, as well, so we can all see.

And this is the -- a diagram of the internals of what one of these Wi-Fi chips might look like?

A. Yes.

Q. Okay. And what we were trying to figure out is what is it that you need to receive packets when they're out of sequence, and did you look at that question?

A. Yes, I did.

Q. And when you look at how the chip was actually set up and how the boxes were connected together, did you see something that was instructive about whether it would need to be a command to receive or whether this was programmed to have a stop sign where you would need

Page 84

21 (Pages 81 to 84)

**A1574**

a command to receive to actually take those packets in?

A. Well, it never has a stop sign because the packets just follow this fat arrow all the way through the buffer and are received.

And because they're just received, there's no stop sign. It doesn't need a command to receive.

Q. And so those fat arrows, right, this -- so this is -- where does it come in? It comes in over here?

A. Where I have the blue -- the Rx, yes.

Q. Okay. So this is the -- over on this side right over here?

A. Yes.

Q. And then it will follow these fat arrows -- this arrow --

A. Yes.

Q. -- and this arrow and this arrow and this arrow and this arrow?

A. Yes.

Q. And this is a memory which stores packets?

A. It's a buffer that stores the patents.

Q. And there's actually some memory here, the Rx E?

A. That's correct.

Q. And the Rx stands for received, right?

Page 85

A. That's correct.

Q. So this is actually how the chip takes in, off the air, the packets?

A. Yes.

Q. And as Mr. Larsson was explaining, the inventor of the '625, is this a system that is just set up to take packets all the time, regardless of whether the sequence number is in sequence or out of sequence?

A. Yes. It's just set up to take packets no matter what.

Q. So can you describe for the jury whether there would ever be a situation where it would need or even could use a command to receive to do that?

A. Well, it would never need the command to receive. We've seen it just receives packets in sequence, out of sequence, just continues to receive packets.

(Pause in proceedings.)

Q. Okay. So now let me move on to the '435 patent, and let's start where we start with all the others, with the claims. I want to be very careful here to make sure we're talking about the right functionality when we're trying to figure out whether there is -- the requirements of the claim are actually met. Okay?

So let's start with where I started last time

Page 86

and figure out what the question is. And we saw from Dr. Nettles that in the '435 patent, if the receiver cannot compute all of the packets -- all of the packets that were discarded by the transmitter, then there's no infringement.

And you agree with that, that there would be no infringement if the receiver can't calculate all of the packets discarded by the transmitter; is that correct?

A. I agree. Yeah, I do agree.

Q. And so obviously, these are computer systems, right?

A. Yes.

Q. And computer systems will do various computations as they do their business, right?

A. Yes.

Q. Now, what I want to do is I want to focus on what the claim is talking about. And keep in mind that you have the receiver computing the packets that have been discarded by not anybody, but the transmitter, right?

A. Yes.

Q. Okay. So does that require the receiver to make a specific type of computation about what is being discarded in the transmitter?

Page 87

A. Yes, it does.

Q. And those are two devices at opposite ends of the system, right?

A. That's correct.

Q. Now, let's look at the situation where you've talked about where this block acknowledgement is being sent from the receiver to the transmitter and a block acknowledgement is lost?

A. Yes.

Q. Okay. If that doesn't get there and the system times out, will the transmitter then discard the packets?

A. Yes.

Q. And can you tell us, is there anything in the receiver, programming or code, that has the receiver calculating all these different packets that are discarded by the transmitter?

A. No, there's nothing in the receiver that's trying to calculate what's been discarded by the transmitter.

Q. And so I want to be very clear about this, because Mr. Stevenson asked about, well, you could get another A-MPDU -- and I want to make sure we're not just throwing words around. If you had another A-MPDU, that would be another block of data going from here to here,

Page 88

22 (Pages 85 to 88)

**A1575**

Q.   Okay.  And what we're looking at now is Defendants' Exhibit 120, correct?

A.   Right.

Q.   What's the date of that submission?

A.   So, again, it's in European style, so the date of this is October 13th of 1997.

Q.   How does it compare, the filing dates of both the patents?

A.   That date is earlier than -- than -- more than a year from the earliest of those two.

Q.   And why would this submission have been disclosed publicly?

A.   If you're submitting proposals to -- to an international standards body, that is -- would be considered a public disclosure, because the whole purpose of writing standards and sub -- well, the first step is to solicit -- the first step is to actually make requirements.  This is what we want to do.

The second step is to ask for proposals.  These proposals are distributed among the users and among anybody interested to try to decide if what they're proposing would -- would meet the requirements and be the best solutions.

So when you -- when you're submitting something to a standards body, an international

Page 121

standards body like ETSI, it's a public disclosure, because everybody that wants to can read it and study it and try to decide whether it should be accepted for the standard or not.

Q.   What did the submission describe that's relevant to the patents in this case?

A.   Well, the submission is fairly long.  I think it's about 26 pages, and it describes their complete MAC solution.

But with respect to the patents we're discussing, there's about, I'd say, three pages that are interesting, mostly Page 14 with a little from Page 13 and Page 15.

Q.   Okay.  If you could look at Page 14.  Could you describe to the jury what that's telling you about the problem they were trying to solve?

A.   So in -- this part of the proposal is discussing this deadlocking problem.  It tells you that there's a problem that could arise and how it is solved in their -- the way that they put their system together.

Q.   And if you could look at the paragraph just above the figure there.

A.   Right.  This figure is -- is a pretty important figure in the sense that if you understand this figure, you can kind of understand how it works, or

Page 122

it at least gives you an example of how it would work.

If you look in the text just above this figure, it's talking about -- the problem is -- is the following:  There are certain situations where in an ARQ protocol base with selective reject, that the transmitters send some packets, and some of them don't get through.

So the receiver is expecting to get those packets later.  And the way that they get those packets is, it sends a request.  It says:  I'm missing certain packets.  Please send them to me.

Now, that's fine.  The transmitter can send those packets, if it still has them.  But the way a lot of networks, in particular this network, worked is that packets would expire and be discarded.

So you can get a situation where the receiver is expecting to receive some packets; it's requesting them; yet the transmitter can't fulfill that request because it's discarded the packets.

And so you would get into this deadlock situation, which is an infinite loop where the receiver is requesting information, and the transmitter can't serve that request.

Q.   And where does it mention that in the paper, Dr. Heegard?

Page 123

A.   It says:  If the receiver is not informed by the discarding of the cell, it will request the retransmission of this cell by sending selective reject acknowledgements infinitely; and the operation of the protocol fails.

Q.   And what was the solution they came up with for that problem?

A.   The solution they came up with was to send a packet with a discard message attached -- attached to it.

Q.   Okay.

MR. PAIGE:  Your Honor, we have a demonstrative made of Figure 11 to allow Dr. Heegard to explain to the jury how it works.

May I approach the witness and the easel?

THE COURT:  Yes, you may.

THE WITNESS:  Is it working?

All right.  Can you hear me?

All right.  Good.

Q.   (By Mr. Paige) So, Dr. Heegard, this is Figure 11 from Defendants' Exhibit 120, correct?

A.   That's right.  This figure comes from the ETSI brand submission.

Q.   And if you could just explain to the jury, what is happening on the top and bottom lines?

Page 124

31 (Pages 121 to 124)

**A1584**

So when -- there's a comment here -- or an event. ATM cell of I(2) is discarded, and then he puts an arrow here.

So what -- what the -- the folks that wrote this are trying to tell us is that in this system, what happens is, because there was a lot of dots on the channel, it's -- it's like yogurt.

When you look at the yogurt package, when it's expired, you throw it out. Same thing happens. It happens in the order that the packets came in. So it happens in the same order as the sequence number.

So the author shows, oh, at some point (2) expires, but that actually means that sometime earlier, (1) expired, and sometime earlier (0) expired.

Q. And I see an arrow going from top to bottom with I(0). What does that tell you, right after those three dots?

A. So after the sender -- the receiver asks for (0) and asks for (2), but that didn't get through, some time went by, the sender tries to service the request for (0) and it sends (0), which is shown successfully being received.

So at this point...

Q. And then there's an I(4) next to that. What does that mean?

Page 129

A. So the sender doesn't know that you are missing (2) because it didn't get through. And so now that it's -- thinks it's satisfied you with (0), it goes back and says, okay, well, I'm going to send you the next one, so it sends you (4). So (4) gets sent.

Q. And then what are the next three dots after the I(4), Dr. Heegard?

A. So this is where you have a potential for deadlock. Some time goes by, and finally, the receiver is given the opportunity to send another request. It's asking for a second time for (2).

Unfortunately, it expired at the transmitter, so the transmitter doesn't have (2) anymore. So it needs to resolve that problem.

If there wasn't the solution that they propose and you just kept to this kind of basic protocol, then it would never -- this receiver would get stuck and couldn't get past (2), because it would continue to ask for (2); yet the sender doesn't have (2) to send it.

Q. And so what happens to solve that deadlock problem, Dr. Heegard?

A. So until this occurs, the sender doesn't even know there's a problem, but he knows there's a problem when the receiver says: Please send me (2). It receives that. It says: Uh-oh, there's a problem. (2)

Page 130

is unavailable.

So some time later when he gets a chance to send, what he does is, he sends the next packet that he wants to send, I(5), with -- with what -- they use the term piggyback. They put another piece -- this is one packet that's composed of the I(5) packet of information, plus a discard notification with a number in it, a single number; in this case, (2).

What that packet means is that it tells the receiver that the transmitter has discarded (2), and it also tells the receiver that it could figure out by some computation that not only is (2) gone but (1) and (0) are gone, because they expire in order.

Q. And so once it receives that packet with the discard message, what does the receiver do?

A. At this point, the receiver now accepts (5). It always -- whenever there's a discard message, it always accepts the message.

Q. And why is that?

A. In the -- in the language of the patent, it's a command to receive. When the sender sends this message to the receiver, it's forcing it to accept I(5).

And, furthermore, it knows that there's room for it, because by sending a discard message, it knows that it's going to free up some space. Because when it

Page 131

requested (2), there was -- it's like a reservation for -- when you're trying to fill seats at the table, you have five seats at a table, you have some people sitting in three of the seats, and you have two seats that are empty, and those two are reserved for people to show up, that's the situation you've gotten yourself into. You continue to try to wait for those people to fill those seats.

This is telling you, number (2) is not coming. That means that seat is going to be free.

Q. And does that relate to any kind of reception window, the idea that there's only so many seats there?

A. It's the fact that the -- in these selective reject protocols, the basic idea is to have a window, and if it's -- if an I frame comes in and it's within the window, you receive it, you accept it; if it's outside the window, say it's past, then you would reject it because you don't have any room for it.

Q. That's called a fixed reception window, Dr. Heegard?

A. That is a fixed reception window.

Q. Thank you for that explanation. Let me -- let you go back to your seat, and we can discuss the patents now.

A. Okay. (Complies.)

Page 132

33 (Pages 129 to 132)

A1586

N minus 1, N minus 2, and so forth have been discarded by the transmitter.

Q. How does it keep track of these packets that it's received and expects to receive?

A. So the submission talks about a buffer.

Q. Uh-huh.

A. And so the buffer is where -- I don't know if we can look at that. I think it's in -- there it is.

So as I mentioned, this analogy before where you have chairs to fill, there's a buffer. And the buffer -- the point of the buffer is to hold the messages that have been received.

And so the receiver must keep track of what those packets are. So it keeps track of which packets are -- have been received and are sitting in the buffer, and it also must keep track of which packets it is expecting to receive.

So in the example, for a while it was expecting (0) and (2). So it's keeping track of two things. It's got to keep track of what things are received and they're sitting in the buffer, and it's got to keep track of what things it expects to receive.

Q. Okay. So, in your opinion, Dr. Heegard, does the Petras ETSI submission disclose all elements of Claim 1 of the '435 patent?

Page 137

A. Yes, it does.

Q. Now, Ericsson's also asserted Claim 2 of the '435 patent. And could you tell me whether the Petras ETSI submission also discloses that further limitation of the data packet discard notification message contains a field indicating a format of the message?

A. Right. To practice -- this is called a dependent claim. To practice Claim 2, you have to do everything in 1, and you also have to do 2.

So 2 just says that there is a -- the method of Claim 1 whereas the data packet of the discard notification message contains a field indicating the format of the message.

So if you look at these packets in the figure, they all have the form of there's a message, an I frame, and then there's something that could be piggybacked on to it. And the receiver knows the difference between, for example, a discard packet or a selective reject packet.

And so there is something in the packet that tells it it's a discard packet.

Q. And is there any figure in the Petras ETSI submission that's informative of that?

A. Yeah. There's a figure that shows the general format. I think -- can we look at that? There we go.

Page 138

Jumps ahead of me.

The -- they show us different kinds of packets and how they would be distinguished at the receiver. They all have a type.

So they chose different kinds of packets.

They show the type, and the receiver would see the type, and that would tell what kind of packet it is and tells it the format, like how many frame -- how many fields there are and so forth.

Q. So based on your analysis, does the Petras ETSI submission disclose all of the elements of Claim 2 of the '435 patent?

A. Yes.

Q. Okay. Let's talk about the '625 patent now, Dr. Heegard.

A. Okay.

Q. Put this up for you here.

Now, when -- when was the application for the '625 patent filed?

A. The '625 patent, which is titled Method and Apparatus for Discarding Packets in a Data Network Having Automatic Repeat Request, was filed in October 28th in 1998.

Q. And what does the -- how does that compare to the data on which the Petras ETSI submission was

Page 139

submitted?

A. It's a little over a year past the date of the ETSI submission.

Q. Okay. What does the '625 patent, Claim 1, describe as the solution to the problem the inventors were trying to solve?

A. So the problem that they're addressing is the same problem, and they give a -- what they consider a different way to deal with that problem.

Q. Okay. And what is that solution they claim is a problem?

A. So in this situation where you have a receive window and you have some packets you've received and some are missing and you're expecting to receive them, if the transmitter is unaware of what you're doing, it can send you a packet that might fall in that range, in which case you would fill in the missing slot; or it might send you a packet out of the range, in which case you'll reject it.

So a normal operation, the transmitter doesn't know whether you'll take it or not, depending -- it just depends on whether your window is -- it falls within the window or outside the window.

Q. And what do they call the thing they said would make it take the packet?

Page 140

35 (Pages 137 to 140)

**A1588**

Case: 13-1625  Case: 13-1625  Document: 179-1  Page: 470  Filed: 03/31/2014  Document: 177-1  Page: 470  Filed: 03/31/2014  (470 of 575)

CASE PARTICIPANTS ONLY

A. So when they realized that the receiver is in a situation that it's requesting information that has been expired at the transmitter, what it does is, it sends an I frame of data with a discard notification on it with the understanding that when a discard message is -- is attacked -- tacked on to an I frame, that the receiver will be forced to receive that particular packet.

Q. And in the patent itself, the '625 patent, Claim 1, how does it describe the thing that solves this problem?

A. They call that commanding a receiver to receive.

Q. And the example of the command to receive or to receive in the patent, just an example is the enforcement that we've heard about earlier today, right?

A. Right. In the patent, they talk about an enforcement bit. So the one example in the patent, they have a bit and it's -- I think it's an E -- or -- I don't know. It's an acronym they made up. They call it an enforcement bit. It's one bit that comes along.

And -- and when the bit is, that tells the receiver that you can take the packet or not, depending upon whether it's inside or outside the window. But when the bit is set to be 1, the receiver is forced to

Page 141

always take the packet, and --

Q. Okay. And this command to receive that you're talking about, was it new at the time of the filing for the patent?

A. No, it wasn't.

Q. Why do you say that?

A. Because the ETSI -- Petras ETSI submission, the discard message acts just like that enforcement bit.

Q. Okay. Well, let's go through it element by element using the claim board.

And where do you find the first -- the preamble: A method for discarding packets in a data network employing a packet transfer protocol, including an automatic repeat request scheme?

A. Well, again, if you look at, say, the figure, it's clearly an ARQ system with a sender and a receiver, and there is discarding of packets because there's a message called a discard packet.

Q. And when you say ARQ, you mean automatic repeat request?

A. Right.

Q. Okay. Now, the first part of that, a transmitter in the data network commanding a receiver in the data network to receive at least one packet having a sequence number that's not consecutive with a sequence

Page 142

number of a previously received packet, where can that be found in the system of the Petras ETSI submission?

A. So the submission describes in sufficient detail that you could implement this protocol, and they give this example. And there are many examples that you could -- you could -- could come out of this.

So when the discard message -- it has a particular form, and the form is, when the discard message says accept packet -- if it says, discard N, so if -- so like 2, and if the message that's at -- that it's piggybacked on is N plus 1, say 3, if the -- if the message is one up from the discard message and it turns outline -- and if it happened to be that the previous transmission, which was I(5), N failed to get through, then you'll practice exactly that -- that condition.

Q. In other words, when the discard message being sent across is right after the one that didn't get received, that would be nonconsecutive?

A. Right. When it happens at the end.

Q. Okay. And then the second step of a transmitter on a data network commanding a receiver to release any expectation of receiving outstanding packets having sequence numbers prior to the at least one packet, where do you find that in the Petras ETSI submission?

Page 143

A. So when you were in this submission where the I frame you're sending is N plus 1 and you're discarding N, then the receiver has just discarded N, which is the one before N plus 1 and everything before it.

Q. Why is it discarding everything before it necessarily, Dr. Heegard?

A. Because they expire in the same order that the sequence number. So if someone tells me that N is expired, then I know from that protocol that all the previous ones, N minus 1 and so forth were also discarded.

Q. So they live in the same order. So if you discard 2, you would also know that 1 and 0 had been discarded as well?

A. That's right.

Q. Okay. And where do you find the last element of the transmitter discarding all packets for which acknowledgement has not been received and which have sequence numbers prior to the at least one packet?

A. So in that case, when the message that you're sending is -- is one more than the discard, then you've just discarded everything before that one message.

Q. Okay. So based on your analysis, Dr. Heegard, does the Petras ETSI submission disclose to the public all elements of Claim 1 of the '625 patent?

Page 144

36 (Pages 141 to 144)

A1589

A. Yes, it does.

Q. Thank you, Dr. Heegard.

MR. PAIGE: I have no further questions.

THE COURT: All right.

Cross-examination.

CROSS-EXAMINATION

BY MR. STEVENSON:

Q. Good afternoon, Dr. Heegard.

A. Good afternoon.

Q. Now, you understand that the two patents that you're asserting are invalid, were awarded after years of examination at the Patent Office, right?

A. They were examined by the Patent Office, yes.

Q. And they were studied by trained Examiners?

A. All branded patents have been studied by Patent Examiners, sure.

Q. And because of that, the patents are presumed in this matter to be valid?

A. A patent is presumed to be valid if it's been granted, sure.

Q. It's presumed to be valid, right?

A. Sure.

Q. And that means that the Defendants in this case bear the burden of proof in asserting invalidity, right?

Page 145

A. I agree with that, yes.

Q. It means the Defendants have to come forward and prove the patent is invalid in order to prevail on their defense, right?

A. That's right.

Q. And if the Defendants don't put on any evidence of invalidity, the presumption carries, and the patent is considered valid, right?

A. If you don't -- if you don't make an argument that a patent is invalid, then it's valid.

Q. And the burden on the Defendants for showing invalidity, you understand, is clear and convincing evidence, right?

A. Right.

Q. So as you know in this case, Ericsson bears the burden of showing infringement, right?

A. Yes.

Q. And Ericsson's burden of showing infringement is by a standard called a preponderance of the evidence.

A. Right. That's a -- that's a little lower bar.

Q. Right. Lower bar; more likely than not.

A. Right.

Q. But because of the presumption of validity, the Defendants' burden in this case to show the patent is invalid is by a higher standard, isn't it?

Page 146

A. It is a higher standard.

Q. And it's clear and convincing evidence, right?

A. Clear and convincing.

Q. And the Defendants have to show by clear and convincing evidence that every single element in every asserted claim of those two patents is literally present in this reference, don't they?

A. When you're trying to show infringement, if you're trying to argue that you don't infringe, you just have to show you don't do one of the steps; whereas, if you're trying to show that something is invalid, the way I like to think about it is, you try to convince yourself that if you practice what the art did, you would be infringing the patent. That means you do all the steps.

And if it happened to be publicly available before the patents were applied for, then the patent would be invalid.

Q. Well, sir, you mentioned infringement. This isn't an infringement analysis; you're asserting invalidity.

Do you understand that?

A. In my opinion, this -- this prior art reference, if it was later in time, would be infringing the patent.

Page 147

Q. Okay. But you understand, there's a different burden of proof for infringement and invalidity in a federal lawsuit?

A. I totally agree with that.

Q. Are you trying to get out of the burden of proof?

A. Not at all.

Q. All right. The question, though, is whether every element in the claims, every single element, is present in the accused publications, right?

A. That is the question.

Q. And you mentioned one of the theses, in your examination, I think DX 281. Do you remember referring to that?

A. It's Dr. Vornefeld's thesis?

Q. Yes.

A. Master's thesis?

Q. Yes.

A. Sure.

Q. And that's not even a publication, is it?

A. Yes, it is a publication.

MR. STEVENSON: Well, let's look at the first page of it, and let's zoom in at the bottom.

Q. (By Mr. Stevenson) It says: This paper is for internal use only. All copyrights reserved by the

Page 148

37 (Pages 145 to 148)

**A1590**

a chipset customer of Intel?

A. I heard that.

Q. Okay. Let's turn to the claims.

A. Of?

Q. And let's go first to the '625 -- excuse me -- the '435 -- I'm sorry. Let's go first to the '625 patent that you have up in front of you.

Now, this patent requires a command to receive; is that right?

A. That's right.

Q. And really, Dr. Heegard, to be invalid, every single element of that claim has got to be met in this accused device, doesn't it?

A. That's my understanding, yes.

Q. So I'm going to focus on command receive just briefly.

A. Right.

Q. Now, you've claimed that the discard message in the Petras reference is that command.

A. When it -- yes.

Q. And a discard message is basically a message that notifies a receiver that the transmitter has discarded packets, fair?

A. That's right.

Q. Now, you are aware that Dr. Gibson is also an

Page 157

expert in this case, right?

A. Yes.

Q. And, in fact, you probably -- I assume you talked with him and collaborated with him before trial on your reports?

A. Not really.

Q. Have you worked with Dr. Gibson in the past?

A. I do -- I have, yeah. I know him quite well, actually.

Q. How frequently do you and Dr. Gibson work together?

A. We've never really worked together. We know each other from conferences or friendly. I might have -- might have -- I can't remember. I might have written something in one of the books or -- I'm not sure if I did or not. I don't think I did.

Q. Are y'all friends?

A. We're friendly, yeah.

Q. Well, are you aware that Dr. Gibson has stated in his expert report in this case that a packet discard message is not a command to receive packets?

A. I would have to see that, because I would be surprised if that's the case.

Q. Well, let's put it up.

MR. STEVENSON: Would you pull up PX 492

Page 158

at 192?

Q. (By Mr. Stevenson) This is from Dr. Gibson's report. He says: Other Ericsson witnesses confirmed that, contrary to Dr. Nettles conclusion, an alleged message that informs a receiver that the transmitter has discarded packets, does not command the receiver to receive any packets.

Do you see that?

A. I do see that.

Q. And do you understand that in this case, on the non-infringement side of it, Dr. Gibson has argued that, for instance, a block acknowledgement request is not a command to receive packets?

A. So --

Q. Are you aware of that, sir?

A. That's fine. I don't have a problem with that.

Q. And let me ask you about your latter diagram.

A. Sure.

Q. And as I understand it, what happens is in this the sender sends the first packet to the receiver, right?

A. Tries to.

Q. And it's lost?

A. Right.

Page 159

Q. Okay. Then the sender sends a second packet to the receiver?

A. Right.

Q. That's an out of sequence packet, right?

A. It sends -- it was sent in sequence.

Q. But from the receiver's standpoint, it's missing 0, now it gets 1. It's out of sequence, isn't it?

A. Right.

Q. There's no packet discard notification being sent prior to this packet, is there?

A. Not in this example.

Q. What's the command to accept No. 1?

A. This example doesn't have a command to accept 1.

Q. Isn't the packet itself the command?

A. No. There's no -- there's no delete -- so you're asking me if a discard message is a command to receive, and generally speaking it's not. But in this particular scheme, this system, which has a discard message, it is, because this discard message is tacked on to a message and it's -- and when this system is working and there's a discard message, it is a command to receive.

So generally is a discard message a command to

Page 160

40 (Pages 157 to 160)

**A1593**

receive, no. In this system, this message is a command to receive.

Q. Dr. Heegard --

A. And there's --

Q. -- it's an out of sequence packet, isn't it?

A. One is out of sequence.

Q. There's no discard message before 1, and it gets received, correct?

A. If you don't have a discard -- if you don't have a command to receive, the receiver may or may not receive it.

Q. Well, it received it in this case?

A. If the ER -- if the ER bit in that patent was 0, it may or may not be received. If it's 1, it's forced to receive. A command to receive says you must receive it. You are forced to receive it. Not that under other circumstances you will never receive.

Command to receive doesn't mean you only receive when you're commanded to. It means if you're commanded to receive, you will receive.

Q. In this example, Dr. Heegard, what's the command for Packet No. 1? Is it the packet itself?

A. You don't -- you don't need a command to receive.

Q. Because it's a selective reject repeat, right?

Page 161

A. Because there is room in the receiver to store 1. That's how it received it.

Q. This is a selective reject repeat, isn't it?

A. Yes, it is.

Q. So is 802.11, isn't it?

A. No.

Q. You disagree?

A. It's not.

Q. Let's go back now to the list.

Now, the '435 patent requires a list, doesn't it?

MR. VAN NEST: Excuse me.

A. We switched patents now?

Q. (By Mr. Stevenson) Yes, sir.

A. Okay.

MR. STEVENSON: Thank you, Mr. Van Nest --

MR. VAN NEST: You're welcome.

MR. STEVENSON: -- for risking yourself.

Q. (By Mr. Stevenson) Now, what you pointed to in this patent, Dr. Heegard, is the list as a buffer, right?

A. The buffer's not the list.

Q. What have you pointed to as the list?

A. The list is the mechanism that an engineer

Page 162

would know you would have to keep track of what's in the buffer and what's missing.

Q. Okay. Well, have you pointed to a list in this reference, or is that something that's missing?

A. It's not missing. It's in there.

Q. What's it called in this reference?

A. He doesn't -- he doesn't use the word list, but he talks about a buffer.

Q. Ah.

A. And one skilled in the art would know that when you have packets coming in and some of them are missing and the protocol is such that when you have a window, you need to know what you received and what you're going to expect, that you have to have a list that keeps track of that.

Q. Okay. Well, I may be confused, Dr. Heegard.

Are you -- when you're applying this patent against the claim, are you saying that there's something missing, but they probably would have had a list; or are you pointing to a buffer and saying that's the list or something altogether different?

A. An engineer or a person in the art would know that when you have the situation where you have a window and you're keeping track of what you received, that what you received would be in a buffer, which is explicitly

Page 163

described there; and that you would keep track of what's in the buffer and what am I expecting that, for example, I didn't get 2, so I'm expecting 2.

So somewhere I'm keeping track that 2 -- that earlier in this scheme or in this example, 0 and 2 are missing. And so at some point I was keeping track of 0 and 2 as missing pieces and I need to know, those are the two that I'm going to ask for a request. Because at some -- in fact, I do, I send the request for 0, and then I send a request for 2. That's the list I keep track, 0 and 2 is missing. I have 1 and 3. That's the list.

Q. Inside the buffer?

A. The buffer has 1 and 3 in it. So I know, okay, 1 and 3 sitting in the buffer, 0 and 2 is missing. I keep track. 0 and 2 is missing. 1 and 3 is in the buffer. That's the list.

Q. Okay. So are you aware that Dr. Gibson has taken the position in this case that a buffer is not a list?

A. I didn't -- I just -- I agree with that, a buffer isn't a list. A list keeps track of a buffer.

Q. Thank you.

MR. STEVENSON: No further questions.

THE COURT: Thank you.

Page 164

41 (Pages 161 to 164)

A1594

Redirect?

MR. PAIGE: Very briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. PAIGE:

Q. Dr. Heegard, at the beginning of his questions, counsel for Ericsson asked you a number of questions about Defendants' Exhibit 281, the Vornefeld thesis.

A. Okay.

Q. Is that the piece of prior art you're relying on in this case to say the patents are invalid?

A. No, it isn't.

Q. What is the piece of prior art we're talking about?

A. It's the ETSI submission that was submitted to the ETSI group in October of '97.

Q. And he didn't ask any questions about whether that was a publication, did he?

A. No, he didn't.

Q. Okay. Now, we also heard some questions about whether the HP license shows that these patents are valid. Do you have an understanding as to how many patents were licensed in the HP license?

A. I don't know the number. I think it was a cross-license on a number of patents.

Page 165

Q. Was it Ericsson's entire portfolio?

A. I think I heard that.

Q. Are you aware of any evidence that HP took into account these two patents in deciding to enter into that license?

A. I haven't heard anything to that effect.

Q. Okay. Now, I've heard a lot of questions about whether or not there was a list in the Petras ETSI submission.

Are you -- are you aware of anything in that paper that points to a list?

A. There is in the submission a list that's demonstrated -- that's shown.

Q. And where is that found, sir?

A. If you look at the ETSI -- Petras ETSI submission on one of the last pages. Maybe we can put it on the screen.

So as I mentioned, I think this is like a 26-page document. I think this is Page 24.

Q. And that's Figure 17 of Defendants' Exhibit 120?

A. Right. In Figure 17, they show a buffer and with a list keeping track of it.

Q. Okay. And we talked a little bit about -- or counsel talked a little bit about the fact that 1 was

Page 166

received and then 3 was received out -- you know, out of sequence.

Why does that happen in the Petras ETSI submission?

A. Well, when the -- the window is such that there are missing slots and you receive a packet that would fit in the window, you receive it. So when you -- if you think of starting out with five empty chairs and people come in and you seat them, but at some point all the chairs are filled or there could be reserved chairs.

So the problem occurs when there's no chairs left.

But when -- when you're trying to fill the five chairs, you don't -- you'll take things out of order, you just start filling the chairs.

Q. So if the chairs were full, would 3 have been able to come into the receive window?

A. If the chairs were full, then -- and it was sent without a discard message attached to it, it would -- the receiver would reject it.

Q. Thank you, Dr. Heegard.

MR. PAIGE: No further questions.

THE COURT: All right. Thank you.

MR. STEVENSON: Nothing further.

THE COURT: All right. If the jury would

Page 167

please pass down their questions for this witness.

(Pause.)

THE COURT: All right. Ladies and Gentleman of the Jury, let me take just a short five-minute break and we'll come back and I'll give you your further instructions for the day and we'll wrap it up.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: Please be seated.

All right. The question for Dr. Heegard is: Were Dr. Peters' (sic) submissions granted a patent, question mark? If not, what does it matter to the issue at hand, period. Ericsson did receive a patent.

Plaintiff have any objections to the question?

MR. STEVENSON: I'm not sure this witness has the foundation to answer the first one, whether this was actually patented or not.

THE COURT: Do you -- do you know the answer?

THE WITNESS: I don't know the answer to that.

MR. STEVENSON: Then the second and third

Page 168

42 (Pages 165 to 168)

A1595

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                DOCKET NO. 6:10cv473
   -vs-                       )
                Tyler, Texas
                ) 9:04 a.m.
D-LINK CORPORATION, ET AL        June 11, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

COURT SECURITY OFFICER:  All rise.

(Jury in.)

THE COURT:  Please be seated.

Good morning, Ladies and Gentleman.

JURORS:  Good morning.

THE COURT:  We're ready for our final day of testimony, so I'm glad you're here.  You look ready to go, so please pay close attention.

You may proceed, Mr. Van Nest.

MR. VAN NEST:  Good morning.

Thank you, Your Honor.

Good morning, Ladies and Gentleman.

Your Honor, we're going to begin the morning with a couple of short video depositions.

THE COURT:  Okay.

MR. VAN NEST:  This first one will be the video deposition of Dr. Dietmar Petras.  Dr. Petras is one of the authors of the Petras ETSI submission, and he is a co-inventor on the Walke patent.

And the time on this, Your Honor, is 6 minutes and 48 seconds; 6 minutes and 40 seconds will be charged to the Defendants, and 8 seconds will be charged to the Plaintiff.

THE COURT:  Okay.  All right.

Page 3

(Video playing.)

QUESTION:  Could you please introduce yourself for the video?

ANSWER:  Yes.  My name is Dietmar Petras.

QUESTION:  Do you have Exhibit 10 to your disclosure statement?

ANSWER:  Yes.

QUESTION:  And that is a patent that ends in No. '280?

ANSWER:  Yes.

QUESTION:  Is this a patent on which you are a listed inventor with Dr. Walke?

ANSWER:  Yes.

QUESTION:  Why don't you just explain to me in English?  It doesn't have to be an exact translation.

ANSWER:  Yes.  So the subject of this patent is methodologies and cellular mobile system on wireless, broadband access of mobile stations with an ATM interface to an ATM network, where the special purpose is the error correction mechanism with Automatic Repeat Request protocol.

QUESTION:  Dr. Walke, who is listed on the patent with you, who is he?

ANSWER:  Dr. Walke is a professor here at

Page 4

1 (Pages 1 to 4)

**A1598**

personally presented this paper?

ANSWER: No, I don't.

(End of video clip.)

THE COURT: All right. Who will your next witness be?

MR. VAN NEST: Your Honor, we're going to play one more very short video deposition, and this will be the testimony of Mr. Nihls Forslund. Mr. Forslund is a director of patent portfolio management at Ericsson.

And the time on this one totals 1 minute, 26 seconds; a minute 12 for Defense and 20 -- and 14 seconds for Plaintiff.

THE COURT: THE COURT: All right.

(Video playing.)

QUESTION: Is Ericsson willing to provide FRAND licenses to chipset suppliers for Wi-Fi technologies?

ANSWER: I believe that is not the policy.

QUESTION: And you write, quote, okay, but remember we have promised to be, quote, fair and reasonable, close quote, in other words, equally mean to everyone?

ANSWER: Right.

QUESTION: Exclamation point?

Page 9

ANSWER: Right.

QUESTION: Did I read that correctly?

ANSWER: Let me see the translation, the original version.

Yes. Seems so, yes.

QUESTION: You'd agree with me, wouldn't you, Mr. Forslund, that being mean to potential licensees is not consistent with Ericsson's RAND and FRAND obligations?

ANSWER: I don't know if I can comment on that, one way or the other, actually.

QUESTION: You can't comment, one way or the other, whether it's --

ANSWER: I mean, theoretically, if you're saying -- I mean, the term "mean" here is if you say you are equally mean to everybody, you're not discriminating to anyone, right?

QUESTION: Do you think being mean to individuals is consistent with Ericsson's RAND and FRAND obligations?

ANSWER: I think being "mean" is a very unfortunate personal expression I used here, so it's not something which Ericsson would use. It's a completely personal -- personal expression.

(End of video clip.)

Page 10

THE COURT: All right. Who will be your next witness?

MR. VAN NEST: Your Honor, the Defendants call Dr. Ray Perryman.

THE COURT: All right. Dr. Perryman.

While Dr. Perryman is coming up, let me inquire if either side has exhibits they wish to offer this morning. We'll get that out of the way.

MR. NEMUNAITIS: Yes, Your Honor, Ericsson offers Plaintiffs' Pre-admitted Exhibit List for June 11, 2013, and Plaintiffs' Demonstratives 1 through 12.

THE COURT: All right. We'll mark that list as Plaintiffs' Exhibit List No. 6.

Is there any objection to those exhibits?

MR. DeVRIES: We -- I don't know that we've seen the list of the demonstratives. I don't expect there to be an objection to the demonstratives, but we'd request an opportunity to review those.

THE COURT: All right. The Plaintiffs' Exhibit List No. 6, the exhibits contained thereon, are admitted.

As to the demonstratives, they've just been marked.

MR. DE VRIES: Thank you, Your Honor.

Page 11

And Defendants have a similar list.

THE COURT: All right.

MR. DE VRIES: It's Defendants' Supplemental List of Pre-admitted Exhibits for June 11, 2013.

THE COURT: All right. And we'll mark that as Defendants' Exhibit List No. 6.

Are there any objections to the exhibits contained thereon?

MR. NEMUNAITIS: No, Your Honor.

THE COURT: Those exhibits are admitted.

Dr. Perryman, were you sworn the first day?

THE WITNESS: Yes, Your Honor, I was.

THE COURT: All right. You may proceed, Mr. Jones.

MR. JONES: Thank you, Your Honor. May it please the Court.

RAY PERRYMAN, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. JONES:

Q. Dr. Perryman, would you please introduce yourself to the jury?

A. My name is Ray Perryman.

Page 12

3 (Pages 9 to 12)

**A1600**

patent cases like this before?

A. I have, yes, sir.

Q. And can you tell us about that experience?

A. Sure. Going back 25 years or so, I have probably worked on 25 or 30 patent cases and testified in court maybe 7 or 8 times, something like that.

Q. Thank you, sir.

MR. JONES: And could we go to -- I believe it's the next slide, Slide 5?

Q. (By Mr. Jones) Could you tell us about some of the areas that you have dealt with in those patent cases?

A. Sure. The basic process, as you've heard, is figuring out what the technology is worth in the marketplace, what an appropriate compensation would be.

So you use essentially the same techniques no matter what the industry.

So I have been privileged to work in a lot of industries, telecommunications, oil and gas, lighting controls, pharmaceuticals, a variety of things.

Q. Thank you, sir.

MR. JONES: And we can take that down now.

Q. (By Mr. Jones) Now, are you paid for this work?

Page 17

A. I am, yes, sir.

Q. And have you been paid for this work in all of the patent cases you've just told us about?

A. Yes, sir, I have.

Q. Are you being paid for your work in this particular case?

A. Yes, sir, I am.

Q. And how much -- what's your rate? What are you charging, sir?

A. $750 an hour.

Q. Now, are you the only economist that will testify in this case?

A. Yes, sir.

Q. Why is it important to have an economist evaluate the issues that we're talking about in this case?

A. Well, the issues we're talking about are fundamentally economic issues. Economists study markets, consumers, producers, governments; and basically, we're trying to determine what's the appropriate market value for this technology and what the market would tell us it's worth.

And then we also study negotiations, because a lot of economics involves labor and management negotiations or trade agreements among countries or

Page 18

patent agreements for contracts or whatever.

So all these things really are -- are in the wheelhouse of what economists do.

Q. Thank you, sir.

Now let's turn our attention from your qualifications to what you've done in this case. What have you been asked to do in this case, sir?

A. Well, I've been asked to determine the appropriate compensation if the patents are found to be valid and infringed.

Q. Now, when we talk about the appropriate compensation, with regard to license agreements, are there two common forms that this compensation can take?

A. Yes, sir.

Q. Describe those two forms to us.

A. One of them is called a lump sum, and it's just a one-time payment. You pay, and then you -- you bought the rights to use the technology.

The other one is what's called a running royalty, and that one is usually charged as a certain number of cents or a certain percentage, or whatever, per unit.

Q. We've seen a number of licenses in this case that have been talked about. With regard to those licenses, were a lot of them lump sums? Have we heard

Page 19

that word, lump-sum royalty payment or lump-sum balancing payment?

A. Yes, sir. That's the most general practice in the industry.

Q. Now, what form of payment do you believe would be applicable in this case based upon the conclusions you've reached?

A. Well, I've calculated both, but I believe the lump sum would be the most appropriate, most likely outcome of the negotiation.

MR. JONES: Now, could we go to Slide 6?

Q. (By Mr. Jones) What conclusion did you reach about the appropriate measure of damages, the appropriate measure of compensation in this case for these five patents?

A. It would be 0.9 cents, almost a penny per unit.

Q. And the total figure?

A. The total was almost $1.5 million for all the Defendants.

MR. JONES: Now, if we could, if we could go to Slide 7.

Q. (By Mr. Jones) Does this show what it would be on a per-Defendant basis?

A. Yes, sir, it does.

Page 20

5 (Pages 17 to 20)

A1602

CASE PARTICIPANTS ONLY

Q. Thank you, sir.

MR. JONES: Then if we could go to the next slide.

Q. (By Mr. Jones) Does this slide, Slide 8, show us a comparison between your rate and Mr. Bone's rate?

A. It does, yes, sir.

MR. JONES: And then finally, if we could go to Slide 9.

Q. (By Mr. Jones) Does this show you a comparison of your figures -- damages figures to his damages figures?

A. Yes, sir.

Q. Now, I would like to ask this: When we look at Slide 9, why is there a spot where you have written in a figure for Intel, and it's blank with regard to Mr. Bone?

A. Well, since Intel became a party in the case, what I did was, if the chip in the device that we're talking about that's accused was an Intel chip, I attributed that amount to Intel.

If it wasn't, I -- I attributed it to the -- the other Defendants who have presumably bought their chips from someone else.

Mr. Bone didn't do that. He -- he only focused on the Defendants themselves. Hence, the Intel

Page 21

units got lumped into his others.

Q. Now, continuing to keep our attention on this chart, is this an apples-to-apples comparison? When we look at his figures and your figures, are we comparing the same things?

A. No, sir, we're not.

Q. And explain why not, sir.

A. Well, as I think I mentioned, mine are a lump sum. Pay it once and -- and you've bought the right to use the technology.

Mr. Bone's figures are only up to the date -- up to the date of trial or up to a very recent date, what it is thus far, and they would continue to go on in the future and become larger.

Q. So his figure of 50 cents per unit, if that was the outcome of the hypothetical negotiation that you analyzed, the negotiation would have resulted in that figure being paid into the future; is that right?

A. Yes, sir.

Q. Thank you, sir.

Now, would you agree -- Mr. Bone said there was a huge difference between your figures and his figures. Would you agree with him on that?

A. That I would certainly agree with, yes, sir.

Q. He also said that it wouldn't be fair to just

Page 22

split the difference. Would you agree with him on that?

A. Absolutely, I would.

Q. And why is that?

A. Well, obviously, we -- we have come up with completely different types of analyses, even though we used the same basic structure, and a completely different set of numbers; and obviously, one of us is right, and one of us is wrong.

Q. Now, I would like to do two things here today. I'd like to discuss with you the economic evidence you see in this case that is important to determine who's right and who's wrong; and then, secondly, I'd like you to describe how you calculated the appropriate damages in this case.

Can you do both of those things?

A. Certainly, yes, sir.

Q. The first economic evidence I want to zero in on is the price of the chips, the price of the Wi-Fi chips, the 802.11n chips we've been talking about in this case.

Now, in the year this lawsuit was filed, 2010, what was the average price of these chips?

A. About $2.41.

Q. Now, the first thing I'd like to do is talk to you about why that might be important.

Page 23

Have you reviewed the expert reports in this case from the liability experts?

A. I have, yes, sir.

Q. Both sides?

A. Yes, sir.

Q. Have you reviewed their deposition testimony?

A. Yes, sir, I have.

Q. Both sides?

A. Yes, sir.

Q. Have you also been here for the trial and listened to the testimony?

A. I have, yes, sir.

Q. Now, where is the patented technology applicable to these five patents located as a result of the testimony that you've seen and the evidence you've seen in this case?

A. Well, everything I've seen from the experts, even from -- from Ericsson personnel, has indicated that the -- that the technology resides on the chip.

Q. Now, did the Plaintiffs' expert himself say that what was at issue in this case is the chip?

A. Yes, sir, he did.

Q. Okay. Now, what is the concept that you economic experts deal with in cases like this of the smallest saleable unit? What is that concept all about?

Page 24

6 (Pages 21 to 24)

**A1603**

Case: 13-1625   Case: 13-1625   Document: 179-1   Page: 479   Filed: 03/31/2014   Document: 177-1   Page: 479   Filed: 03/31/2014   (479 of 575)

CASE PARTICIPANTS ONLY

that correct?

A. That's correct, yes, sir.

Q. Now, do these chips -- these Wi-Fi chips have more functionality and technology on them than merely what is claimed by the technology of these five patents?

A. Oh, yes, sir, considerably.

Q. Okay. And is that undisputed?

A. Yes, sir, that's undisputed.

Q. Now, what do you as an economist do when you evaluate what should be paid for a royalty when there is more technology on that chip than merely the five patents' technologies?

A. Well, it's a concept we call apportionment, and what it basically means is try to separate out of all the technology that's there what portion of it is a result of these -- of these five patents and what would be appropriate compensation for that.

Q. Now, are you trying to figure out what would be the fair part of that $2.41 price that should go for the technology of the five patents-in-suit?

A. Yes, sir.

Q. Okay. Now, we talked about that --

MR. JONES: Could we bring up Slide 18, please?

Q. (By Mr. Jones) We talked about the fact that

Page 33

Wi-Fi chips have many functionalities besides 802.11; is that right sir.

A. Yes, sir.

Q. And, of course, this information you're getting from the liability experts, their testimony, their depositions, and documents; fair enough?

A. Absolutely, yes, sir.

Q. So, for example, if we look at just one Wi-Fi chip here, this is with regard to Atheros -- an Atheros chip, there's going to be a data sheet that will tell us all about the technologies and functionalities of that particular chip, right, sir?

A. Yes, sir. A lot of stuff on the chip.

Q. And this is in evidence in the case as Defendants' Exhibit 47 -- 477. There are data sheets on these chips, right?

A. Yes, sir, there are.

Q. And they're going to discuss all the things they do, right?

A. Yes, sir.

Q. And certainly this here is just some major features that don't relate to these patents; it's not a complete list in any shape, form, or fashion?

A. Right. These are just some major ones that the technical folks told me about when I asked them.

Page 34

Q. Thank you, sir. I appreciate it.

Now, when we look at these particular chips and we're trying to do this apportionment, how did you go about apportioning the technologies that relate to other things on this chip besides 802.11? How did you go about doing that?

A. Well, in that case, what I did was, I talked to one of the technical experts, a gentleman by the name of Dr. Matt Shoemake who was -- he's a TI engineer, he was chairman of one of the 802.11 standards boards, he's built and designed chips, very knowledgeable guy. And I asked him to walk me through what part of the chip is 802.11 and what part of it is other things.

MR. JONES: And could we go to Slide 19?

Q. (By Mr. Jones) And what did he tell you about this when you talked to him about it, and what -- he also put this in his report?

A. Yes, sir, he did.

Q. Thank you, sir.

A. Yeah, it's in his report, and he -- he indicated that about 35 percent of the technology on the chip is actually 802.11 technology of some sort.

Q. Now, we've now apportioned down to the 802.11 technology.

Do -- do these chips -- when we look at 802.11

Page 35

technology, is there more 802.11 technology than just what concerns what we're dealing with in this case, 802.11n?

A. Yes, sir.

MR. JONES: And could we go to Slide 21?

Q. (By Mr. Jones) What does -- what does this show us about that subject matter?

A. Well, basically the --

MR. JONES: Next slide, please. Perfect. We'll just stay on that one. Thank you so much.

A. I think I need the other one actually.

Q. (By Mr. Jones) Okay. Go ahead. All right. Sorry.

A. Yeah. Well, the first thing that -- or the other thing I was told by the technical folks is that at most, half of what 802.11 is is actually 802.11n. And so I took my 35 percent and I cut it in half and that would be the most of the chip that would actually be 802.11n technology.

Q. Thank you, sir.

Now, so -- so you apportioned down to 17. -- 17.5 percent for 802.11n technology?

A. That's correct.

Q. Let's go back and let's talk about why you had to do that. Make sure we understand this step.

Page 36

9 (Pages 33 to 36)

A1606

MR. JONES: Could we go back to the previous slide -- or go back -- excuse me, Slide 21.

Yes, thank you.

Q. (By Mr. Jones) Let's talk about this slide which tells us why we had to do it.

A. Sure.

Q. Now --

A. Well -- I'm sorry.

Q. Okay. Let me ask a question and then you take off on it.

What does -- what is there included in 802.11n that does not concern the five patents-in-suit, based upon you're talking to the liability experts?

A. Well, there's -- there's a lot of things that go into 802.11n once you get down to what piece of it that is. And there's a list here of some of the major things they've told me.

One, the MIMO is the thing that gave it a lot of speed and throughput. That's -- I think that's the major secret sauce in 802.11n, as far as an advancement.

The 20 and 40 megahertz channels were very important, the traffic management.

But, anyway, there's a lot of different things in there. And the two that -- that we've highlighted in yellow here, quality of service and block

Page 37

acknowledgement, are the two pieces that Ericsson's patents are alleged to have some impact on.

Q. Now, we have heard testimony in this case, haven't we, about the extent of the use of the patented technologies of these five patents of what Ericsson claims applies to this. We've heard testimony about the extent of that use, haven't we?

A. We have, yes, sir.

Q. Okay. For example, did Duncan Kitchin testify that there were at least 70 features related to 802.11n?

A. Yes, sir.

Q. Did he testify to that?

A. Yes, sir, he did.

Q. And, of course, the two here that we see we've highlighted in yellow dealing with these fat -- five patents is block acknowledgement and quality of service, correct?

A. Yes, sir.

Q. Did -- did Dr. Gibson testify that his testing showed that block acknowledgement requests, BAR's frames are rarely used?

A. Yes, sir.

Q. Did he also testify that his testing showed that quality of service is not used when 802.11n is in its normal configuration?

Page 38

A. Yes, sir, he did.

Q. Okay. Now, you've listened to that, but then you've relied --

MR. JONES: If we could go back to Slide 20.

Q. (By Mr. Jones) -- you've relied upon the technical experts to separate all that out for you; fair enough?

A. Yes, sir. Yes, sir.

Q. Thank you, sir.

Let's move on.

So after you got this 17.5 percent figure, what did you do next?

A. Well, the next thing I did was -- was try to get some indication of what percentage of the 17.5 percent was Ericsson's technology.

Q. And in order to do that --

MR. JONES: Could we go to Slide 22?

Q. (By Mr. Jones) Now, did you know that there were other companies out there that had 802.11 patents besides Ericsson?

A. Oh, yes, sir. The examples here are all chip makers, and they have the bulk of the technology.

Q. And there are other patents out there besides the five that we're dealing with, right, sir?

Page 39

A. Oh, yes, sir.

Q. And these are just the chip makers that we see here?

A. That's correct.

Q. Okay.

A. Yes, sir.

MR. JONES: If we could go to Slide 23.

Q. (By Mr. Jones) How did you analyze the portion that was Ericsson's?

A. Well, I did a few things, given the information we had to work with. One was there were a total of 32 letters sent by companies -- letters of assurance sent by companies specifically for 802.11n.

Some of the older ones still applied, but just specific for 802.11n, Ericsson was one of those companies.

And if you think that's -- they're about an average company which some of this evidence would suggest to the contrary; but if you assume that, you get 3.1 percent, roughly.

I also looked at the allegedly covered patents, and I said -- and I did this very conservatively. I took the average number that were disclosed in these letters, and it turned out to be about 6 or 7. Most of the letters don't disclose how

Page 40

10 (Pages 37 to 40)

**A1607**

many and list them because most of them are people like Intel and Broadcom that have a lot of patents.

So this is a very conservative number, but I came up with 233. I took the 8 that Ericsson said that they had, which would give me a 3.4 percent number.

Q. Now, with regard to 802.11, do we see that in this column immediately to the left of the one you've just been talking about?

Do we see that there were 121 companies that -- that -- that sent letters of assurances concerning 802.11, collectively, right?

A. Yes, sir. And they sent 274 letters. If I had gone by -- on that basis, Ericsson only sent two, it would be less than 1 percent. But I -- again, I tried to be conservative in favor of Ericsson in doing this.

Q. And then you -- you saw there were 274 letters of assurances applicable to 802.11?

A. Correct, yes, sir.

Q. And there were 977 patents that you calculated as a minimum that were applicable to the 802.11 standard in toto; is that fair?

A. Yes -- yes, sir. There's a lot more than that, but that's -- that was our conservative estimate.

Q. Now, did you consider any other evidence on this particular point, and with -- in that regard, I'm

Page 41

referring specifically to the tech IP study?

A. I did, yes, sir.

Q. And what did you learn from that study?

A. Well, the tech IP study is -- is an industry study that sought to identify 802.11 patents for the top 12 technology holders in the industry. And they came up with a total of almost 1500 patents in -- in that group.

Ericsson was not one of the top 12. But TI was No. 12, and they had 44 patents.

So I said what if Ericsson had 43. I mean, they've only told us about eight, but I said I'm going to give them the benefit of the doubt. They just missed getting in the report. They -- 44 got in the report. I said, if you assume they have 43, then the percentage there is about 2.9 percent.

And so that gave me another indicator that if I make conservative assumptions, I end up at around 3 percent every time.

Q. And we know in actuality from the testimony in this case that they only claimed to have 8, right, sir?

A. That's correct, yes, sir.

Q. Thank you, sir.

MR. JONES: Now, if we could go to Slide 24.

Q. (By Mr. Jones) Taking all of this information

Page 42

together, what percentage did you come up with for Ericsson's total share of 802.11n intellectual property rights?

A. It was about 3 percent of the total.

Q. Then what did you do next in your calculations of your figures?

A. We have one more step here. That was for the eight patents. There's only five in this case, so I had to adjust for that.

MR. JONES: Could we go to Slide 25?

A. Yes, sir. And even though it's a little -- I was generous here. I gave 75 percent for the five patents. That's actually -- it's actually less than 75 percent. But if I do that and take 75 percent of the 3 percent, I'm left with the patents-in-suit representing 2.25 percent of the 802.11n portion of the chip.

Q. (By Mr. Jones) So now after you came to this conclusion about the apportionment and the economic terms, the fair share for the patented technology of these five patents, did you then use that information to determine your rate and your damages figures?

MR. JONES: Could we go to Slide 26?

Q. (By Mr. Jones) And could you show us how you did that?

A. Yes, sir. And it's down to pretty simple

Page 43

multiplication now; but first of all, I start with 2.41, the price of the chip.

Now, that's conservative because that says you could use all of the price of the chip just to pay for technology. And obviously, they have to make it, they have to ship it, they have to market it, they have to do a lot of things.

But I assume if we could take the entire $2.41 times the 17.5 percent that is actually 802.11n times the 2.25 percent, which is Ericsson's portion of that, and that would tell us that the market is -- is rewarding the -- or would reward the Ericsson technology with at most, 0.9 cents.

Q. Now, if you use that .9 cents and you apply it to the sales and projected sales of these Defendants, is that how you came up with your damages lump-sum payment that you've calculated, sir?

A. Yes, sir, it is.

Q. Thank you, sir.

Let's go back -- we'll kind of end where we started out.

MR. JONES: Let's go back to Slide 9 to this comparison.

Q. (By Mr. Jones) Now, you've told me that there's a big difference -- we all can see that. You've

Page 44

11 (Pages 41 to 44)

A1608

told me that it's not fair to split the difference.

Let me ask you this: Did Mr. Bone say in his report and his testimony the lowest rate that he thought would be reasonable or a RAND rate concerning Intel?

A. He did not address Intel, no, sir.

Q. Okay. Did he say what the lowest rate would be for these five patents-in-suit that would be reasonable?

A. Yes, sir, he did.

Q. And what was that rate?

A. He said it could be as low as 25 percent for some products.

Q. And was that 25 --

A. 25 cents --

Q. -- cents --

A. -- I'm sorry.

Q. -- or 25 percent?

A. -- 25 cents, I'm sorry.

Q. Now, if you use the lowest rate that he said would be reasonable, not the 50-cent rate, because he's told us 25 cents could be -- could be reasonable. If you use that rate, what does it do to his figures?

A. Well, it cuts them in half, but they're still very, very large figures.

Q. Thank you, sir.

Page 45

Now, let me ask you this: You know, you've provided an economic analysis, and I appreciate that.

MR. JONES: You can take this slide down now.

Q. (By Mr. Jones) You've provided an economic analysis for you about who's right. What does your common sense tell you about who's right in this case?

A. Well, hopefully most of the time economics and common sense come together. I hope so. But I think anybody's common sense would tell you that -- that you simply can't pay 50 cents a unit on a product that's going to sell for a dollar, $2, and the prices are dropping over time. That -- you just -- it's just not sustainable for one very, very small piece of what is a lot of technology.

Q. Thank you, sir. I appreciate your time.

MR. JONES: I pass the witness, Your Honor.

THE COURT: All right.

Cross-examination.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q. Good morning, Dr. Perryman.

A. Good morning.

Q. I don't think we've met before. My name is

Page 46

John Campbell. I'm an attorney representing Ericsson. I have a few questions for you.

A. My pleasure. Thank you, sir.

Q. I understand that you made some conservative assumptions in favor of Ericsson and came up with almost a penny for a royalty; is that right?

A. That's correct, yes, sir.

Q. Okay. Now, let's talk about your calculation of the royalty rate and the assumptions you've made.

We've got a number of the patents -- licenses to the patents, but you rely on a number of assumptions to calculate your almost a penny, correct, sir?

A. Well, I did the appropriate economic apportionment type analysis. I also analyzed the licenses that I found and that Mr. Bone found.

Q. Okay, sir. That wasn't my question. My question was: You rely on a number of assumptions to come up with your almost-a-penny rate, correct, sir?

A. Certainly there are assumptions involved that favor Ericsson, yes, sir.

Q. Was the answer yes, you relied on a number of assumptions?

A. I thought I said, yes, sir.

Q. Okay. I -- I just want to make sure.

Now, I'm not talking about the assumption of

Page 47

infringement and validity. You made that assumption, correct, sir?

A. Yes, of course.

Q. And Mr. Bone made that assumption, correct, sir?

A. Yes, sir, he did.

Q. That's -- that's required, right?

A. Absolutely, yes, sir.

Q. Okay. You assumed that 35 percent of the chip relates to 802.11n -- or 802.11, correct, sir?

A. Well, honestly, I wouldn't call that an assumption. The folks who design and build these chips walked me through a process and -- and told me that's what the answer was.

Q. Okay. Well, you filed a number of reports in this case, correct, sir?

A. Yes, sir.

Q. Okay. Let's look at your report at Page 201.

And you say: Based on the opinion of Dr. Matthew Shoemake and focusing solely on apportionment of the technology, I make a conservative assumption that about 35 percent of the chip's component value is attributable to 802.11 technology value contributions.

Is that your report, sir?

A. Yes, sir, based on -- on what Dr. Shoemake

Page 48

12 (Pages 45 to 48)

A1609

Q. Okay. And the price you used is $2.41, right?

A. For just the 802.11 chip, that was the average price, yes, sir.

Q. Now, even if we use your worldwide numbers, the "n" chipset was commanding $10 additional over the prior "g" chip in 2007, correct, sir?

A. The first month or -- the first few months it came out, more than likely it did sell at a premium.

They usually do for a month or -- for few months, yes, sir.

Q. It was commanding a 10-dollar premium, correct, sir?

A. Usually the first few units sold do. I -- I don't recall those numbers, but I have no reason to doubt that.

Q. Okay. Well, they're in your report, right? If we bring up Page 133, you've got a table that shows the difference in price between the 802.11n chips versus other chips, right, sir?

A. Yes, sir. That's what you normally find when they first come out, a little bit of premium, falls very rapidly.

Q. It was a 10-dollar premium, correct, sir? Shows there in the third line, n-g, 2007, price difference $10.04, correct, sir?

Page 53

A. That's correct, yes, sir.

Q. Okay. Now, one difference between the "n" chip and the "g" chip is the increased MAC efficiency; is that right?

A. I believe that's one of the things the technical experts mentioned.

Q. Well, that was mentioned in your report, too, correct, sir?

A. If it was -- I'm sure it was; but if it was, it came from the technical folks. I don't know how to build these things.

Q. Okay. Well, if we look at Page 167, you say: Overall whereas 802.11n has about a 70 percent MAC efficiency, 802.11g has a 55 percent MAC efficiency, correct, sir?

A. Yes, sir, and it's footnoted to some technical person or report.

Q. Okay. And you understand, though, as having sat in the courtroom, that the patents in this case are inventions related to the MAC layer, correct, sir?

A. I understand that the -- the inventions are -- are primarily on the MAC layer, yes, sir.

Q. Okay. And now finally, the -- even the third-party report that you rely on, this ABA -- ABI report, in 2007, listed the 802.11n chip was selling for

Page 54

$13.69, correct?

A. When it first came out, that sounds about right.

Q. Okay. In any event, if the jury believes the proper reasonable royalty rate is 50 -- rate is 50 cents, that would be based on a hypothetical negotiation that took place in 2007, correct?

A. Yes, sir.

Q. Okay. Now, let's talk about the share of Ericsson's patents. You said that -- I think I wrote this down right -- that there are thousands of patents in these chips, correct, sir?

A. Yes, sir.

Q. Have you done an analysis to determine the number of patents that are in these chips?

A. I haven't done such an analysis. Wouldn't be -- wouldn't be able to. Some of the technical folks have.

Q. Okay. The point is you're not aware -- you're not aware of the number of truly standard essential patents in these chips, are you?

A. I doubt anyone is truly aware of the exact number, but -- but, again, I -- I've looked at the technical experts, and I didn't use any numbers anywhere close to those thousands to get to my analysis.

Page 55

Q. Okay. Well, let's talk about the numbers you did use.

You assumed for purposes of your analysis that Ericsson's patents are standard essential patents, correct?

A. Well, it really doesn't matter if they are or not. I apportioned them based on -- on their contribution to the standard. So I guess implicitly I did assume they were essential.

Q. Well, you said in your report that you assumed they were standard essential patents, didn't you, sir?

A. I -- I don't recall if I did. It shouldn't make any difference because I was getting to the technology that contributes, so it really shouldn't matter one way or the other.

Q. You don't recall whether you said that in your report or not?

A. I don't, but, again, it -- it doesn't matter.

Q. Okay. Now, you know, right, that the -- you relied on the letters of assurance to make your estimates, correct, sir?

A. In one -- in one instance, I did, yes, sir.

Q. Okay. And you know the letters of assurance don't tell us the actual number of standard essential patents, don't you?

Page 56

14 (Pages 53 to 56)

**A1611**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 484    Filed: 03/31/2014

A. I wouldn't be capable of doing that analysis; but, no, sir, I haven't.

Q. Okay. Well, now let's talk about -- since -- since we haven't done those -- that analysis and trying to make estimates, let's talk about what we know, okay?

Instead of trying to drive estimates, let's paint a picture of the PC market.

HP is No. 1 in sales -- PC sales in 2010, correct, sir?

A. I believe so, yes, sir.

Q. Okay.

MR. CAMPBELL: If we could bring up the slides here.

Q. (By Mr. Campbell) And in 2010, Dell was No. 2, correct, sir?

A. That sounds right, yes, sir.

Q. Okay. Well, you -- you cite -- you cite a market report in your report that shows that HP had 26 percent of the market of PC manufacturers in the second quarter of 2010, correct, sir?

A. I have no reason to doubt that.

Q. Okay. And Dell had 24 percent at that time, correct, sir?

A. I believe so, yes, sir.

Q. And Acer had 11 percent at that time, correct,

Page 61

sir?

A. Correct.

Q. And Toshiba had 9 percent?

A. Yes, sir.

Q. Apple had 9 percent?

A. Yes, sir.

Q. Okay. And then a bunch of others -- Mr. Jones says we don't know which ones are in business and they might be out of business and we -- the list isn't -- isn't accurate. But all those go in 21 percent of the others, correct, sir?

A. Yes, sir.

Q. Okay. So in this case, we have 70 percent -- well, we have -- HP is licensed, they're No. 1 at 26 percent, correct, sir?

A. They do have a license, yes, sir.

Q. Okay. And then in this case, we have three of the next top four PC makers; is that right?

A. Yes, sir.

Q. Okay. Now -- so when -- when Mr. Jones presented this slide, I think he suggested to Mr. Bone -- and maybe I just misunderstood -- but the top 10 in sales are the first ones listed.

They're not listed in order, are they, sir? At least not --

Page 62

A. It was a different point in time, but I don't -- it doesn't appear that they were.

Q. Okay. At least not based on the 2010 data, right, sir?

A. Correct.

Q. Okay. So now, these -- these three PC makers that make up -- that are in this case that make up a good portion of this market, they've been selling 802 n 11 (sic) related products for six years, correct, sir?

A. Yes, sir.

Q. Okay. And Intel's also in this case, correct, sir?

A. Yes, sir.

Q. And Qualcomm was here to support its customers, correct, sir?

A. I'm -- I'm -- I'm aware Qualcomm's here, yes, sir.

Q. Okay. Now, if someone owned a standard essential patent to 802.11n, wouldn't we expect they would have approached one of these Defendants by now?

A. Could you repeat that?

Q. If someone had a standard essential patent related to 802.11n, wouldn't they have, in the last six years, approached either Dell, Acer, Apple, Intel,

Page 63

Qualcomm, one of these Defendants at this point?

A. Well, some people want a licensed patent, some don't. Some -- some make them available -- I don't know how to answer that question. I just don't understand it. I'm sorry.

Q. Okay. All right. Well, let's -- let's -- let's think about what the royalty stack is then actually here.

You did get access to all the licenses from these Defendants, correct, sir?

A. Yes, sir.

Q. Okay. But despite having all of the acc -- the access to all of those licenses and all the documents and all those people that you talked to, you don't know how many licenses Defendants actually have signed, for standard essential patents, do you?

A. Well, I guess I don't know with a hundred percent certainty what patents are essential, no, sir.

Q. Well, sir, I'm asking you, have you attempted to determine how many licenses of each of the Defendants they've signed for standard essential 802.11 patents?

A. Oh, including cross-licenses and everything, no, sir, I did not try to make that calculation.

Q. Didn't try to figure that out.

Do you -- did you try to figure out the cost

Page 64

16 (Pages 61 to 64)

**A1613**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 485    Filed: 03/31/2014

A. Some of them better than others probably, but I would agree so, yes, sir.

Q. Okay. And you would agree that a router maker like Buffalo knows its business, correct, sir?

A. I would certainly hope so. I have no firsthand knowledge.

Q. They know the price of their products and the way people use their products, correct, sir?

A. You would think so, yes, sir.

Q. You would think they would know the value of Wi-Fi to their products, correct, sir?

A. You would think they'd know the value of Wi-Fi, as well as the value of relationships and a lot of other things, yes, sir.

Q. Okay. And so if they value having permission using Ericsson's technology at a rate of 50 cents per device, they would be in the best position to make that determination, wouldn't they, sir?

A. Well, if they determined to pay that much, all things considered in the -- in the relationship, which might be multiple things, I would think they would be in a position to make that determination. They would also be subject to bargaining as well, obviously.

Q. They would be in the best position to make that determination, correct, sir?

Page 81

A. Subject to everything I just said, yes, sir.

MR. CAMPBELL: Thank you, sir.

THE COURT: All right. Anything further?

MR. JONES: No, Your Honor. No further questions.

I would like to the submit to the Court as demonstratives, DDX 5-1 to DDX 5-28.

THE COURT: All right. Those will be marked as demonstratives.

All right, if the jurors will pass down their questions, please.

(Pause in proceedings.)

THE COURT: All right. We're going to take just another short break. If you'll follow my instructions, and we'll have you back here in just a moment.

COURT SECURITY OFFICER: All rise.

(Jury out.)

THE COURT: All right. Please be seated.

All right. The first question is: Are Intel chips in all Defendants' products?

Plaintiff have -- or Defendant have any objection to that?

MR. JONES: No, Your Honor.

THE COURT: The Plaintiff?

Page 82

MR. CAMPBELL: No, Your Honor.

THE COURT: All right. Next question:

In your opinion, do you think suppliers would buy Wi-Fi chips regardless of price to supply to customers who now demand Wi-Fi?

Any objection from Defendants?

MR. JONES: No, Your Honor.

THE COURT: Plaintiffs?

MR. CAMPBELL: No, Your Honor.

THE COURT: Next one: Why are other laptop and chip makers not a defendant in this case if they don't have a license and are using the same technology as the Defendants?

Defendants?

MR. JONES: Can I consult my boss for a second, Your Honor?

(Pause in proceedings.)

MR. JONES: Your Honor, this is going to involve a lot of speculation on a lot of people's attitudes about a lot of things, so we would object to that question.

MR. CAMPBELL: I would agree.

THE COURT: All right. The Court will sustain the objection to that question.

Next one: If you want to find a patent

Page 83

with technology you want to license, how do you do that?

Is there a library? How do you know you get all patents you need?

Defendants?

Do you want me to read it again?

MR. JONES: I think I understand it. I think it's outside the scope of this witness's knowledge, but...

THE COURT: Plaintiffs?

MR. CAMPBELL: Okay. I would concur with Mr. Jones.

THE COURT: All right. I'll sustain the objection to those.

All right. Bring the jury back in, please.

COURT SECURITY OFFICER: All rise for the jury.

(Jury in.)

THE COURT: Please be seated.

All right, Dr. Perryman. The first question is: Are Intel chips in all of the Defendants' products?

THE WITNESS: No, they are not.

THE COURT: All right. The next question: In your opinion, do you think suppliers would

Page 84

21 (Pages 81 to 84)

**A1618**

buy Wi-Fi chips regardless of price to supply to customers who now demand Wi-Fi?

THE WITNESS: No. There are limits on it. Clearly, a concept we haven't talked much about is called lock-in.

Clearly, if you have a -- get everybody producing the chip investing in the machinery to produce the chip and everything else and then someone comes along and asserts additional -- I would say much more money, it puts the industry in a very difficult position.

But these are very big companies that buy sometimes millions, sometimes hundreds of millions of chips, and they have a lot of bargaining power, and they have determined over time what they're willing to pay for these chips and what the market will bear for these chips.

THE COURT: All right. Thank you. Mr. Jones, any follow-up questions?

MR. JONES: No, Your Honor.

THE COURT: All right. Mr. Campbell?

MR. CAMPBELL: No, sir.

THE COURT: All right. Thank you, Dr. Perryman. You may step down.

THE WITNESS: Thank you, Your Honor.

Page 85

THE COURT: All right. Who will Defendants' next witness be?

MR. JONES: Your Honor, before that, I made another mistake. I basically didn't refer to the exhibit number, but with regard to the e-mail from Mr. Ives that we referred to dated 12/21/2011, it's DX 186, Your Honor, for the record.

THE COURT: Thank you. All right. Okay. All right. Who will Defendants next witness be?

MR. VAN NEST: Your Honor, we're going to play another short video.

THE COURT: All right.

MR. VAN NEST: And this video deposition will be Mr. Andreas Iwerback. Mr. Iwerback is the senior manager of patent assertions at Ericsson.

The time on this is about -- not about. It's 9 minutes, 47 seconds. The Plaintiff is responsible for 2 minutes and 15 seconds, and the Defendants are responsible for 7 minutes and 32 seconds.

THE COURT: Okay.

MR. VAN NEST: Thank you, Your Honor. (Video playing.)

QUESTION: All right. Good morning.

ANSWER: Good morning.

Page 86

QUESTION: Could you please state your name for the record?

ANSWER: Yes. My name is Andreas Iwerback.

QUESTION: Okay. And what is your position at Ericsson?

ANSWER: My current position at Ericsson is senior manager of patent assertions.

QUESTION: Senior manager of patent assertions?

ANSWER: Yes.

QUESTION: Okay. Have you ever had your deposition taken before?

ANSWER: No, I haven't.

QUESTION: Let's focus on "a" for a second. Did Ericsson have any involvement with the 802.11a standard?

ANSWER: Not to my knowledge.

QUESTION: Did Ericsson have any involvement in the 802.11b standards?

ANSWER: Not to my knowledge.

QUESTION: Okay. Ericsson didn't make any contributions to the 802.11a standards?

ANSWER: I don't think so.

QUESTION: Ericsson didn't make any

Page 87

contributions to the 802.11b standards?

ANSWER: Not to my knowledge.

QUESTION: Okay. And has Ericsson had any involvement in the development of the 802.11n standards?

ANSWER: No, I don't believe so.

QUESTION: Has -- did Ericsson make any contributions to the 802.11n standards?

ANSWER: No, not to my knowledge.

QUESTION: Is it correct that Ericsson is unaware of any of its employees' involvement at the time that any of task group "e," task group "h," or task group "g" of the 802.11 standards were decided? Is that a correct statement?

ANSWER: Yes, I believe so.

QUESTION: Okay. And is it correct that Ericsson made no contributions to 802.11g?

ANSWER: That's correct.

QUESTION: Is it correct that the only contribution that Ericsson made to any 802.11 standard was one contribution made by Gunnar Rydnell to 802.11e?

ANSWER: Yes. To my knowledge, that's correct.

QUESTION: And did Ericsson ever have anyone who chaired an 802.11 working group or task group

Page 88

22 (Pages 85 to 88)

**A1619**

about it is, there's no way that I or somebody of skill in the art could use this article to really successfully build a system.

Q. Why couldn't you use the article to build a system?

A. Well, because it's -- it's not what we call enabling, because it just doesn't have enough detail to actually tell you, you know, exactly how you would build a system that would avoid, for example, deadlock.

Q. When you're looking at prior art and determining whether it invalidates a patent, why does it matter whether it's enabling?

A. Because it's required to be enabling. Just like the patent has to allow you to build the invention, prior art also would have to allow you to build the invention. So you need a level of detail that's -- that's significant.

Q. And if prior art isn't enabling, what's the conclusion you draw?

A. Well, it -- it can't invalidate if it's not enabling.

Q. Okay. What things are missing, for instance, information that you would need to see to actually build a system that works according to the Petras disclosure?

A. Well, for example, there's no real discussion

Page 97

of how to set up the transmitter windows or the receiver windows or exactly how those windows communicate or coordinate. There are details missing about the exact nature of the messages.

There's no description of any algorithms that would be involved, no pseudocode like we've been seeing in the patents; just a lot of technical detail that you would expect to see if it was really something you could build a system from.

Q. And have you seen any evidence anywhere that anybody actually tried to take this disclosure and build a system and see if it actually worked?

A. No, sir, I haven't.

Q. Were you here for the testimony of Dr. Heegard?

A. I was.

Q. And did you see him go through the reference with regard to the claims of the patent?

A. I did.

Q. So let's talk about that analysis.

What do you understand the point of doing something like that is, comparing the reference to the claims?

A. Well, it's just like the infringement analysis. Each one of the limitations has to be found

Page 98

explicitly disclosed in the reference.

Q. And what if it's not?

A. Well, then it's not invalidating.

Q. Okay. Did you independently review this reference to compare it to the claims?

A. Yes, sir, I did.

Q. Did you also listen to Dr. Heegard's testimony about this?

A. I did.

Q. Okay. Let's talk about the '625 first.

Did you find any claim elements in the '625 that weren't disclosed in the reference?

A. Yes, sir. This doesn't disclose the command to receive a packet which is out of sequence.

Q. So you're referring to this Limitation (a) (indicating) --

A. Yes, sir, I am.

Q. -- on the board?

What did Dr. Heegard identify as meeting that claim limitation when he compared the publication to it?

A. He identified the discard message, which is piggybacked on a data frame.

Q. Okay. Do you think that's a command to receive?

A. No, sir, it's not. There's no disclosure here

Page 99

that that's -- in this reference or anywhere that that's a command to receive. It's just a discard message.

Q. Did you see some statements from Dr. Gibson's report on this?

A. Oh, yes, sir. Dr. Gibson is very clear that a discard message is not a command to receive.

Q. On a technical basis, how is this discard notification different than a command to receive?

A. Well, what the discard message does is informs you that some particular packet has been discarded. And the effect of that is going to be to shift the window.

But it really doesn't have any impact on whether or not out-of-order packets are going to be received or not.

Q. Now, have you carefully read this reference looking to see if the discard notification is ever described or disclosed or explained as a command to receive?

A. Well, yes, sir, I have read it carefully. As I said, it's very brief; but there's definitely no disclosure of that -- of that fact.

Q. As a result of this missing element, does the Petras disclosure anticipate or render invalid the '625 patent?

A. No, sir, it does not.

Page 100

25 (Pages 97 to 100)

**A1622**

CASE PARTICIPANTS ONLY

Q. Let's move on and talk about the '435 next.

Did you perform a similar analysis of the Petras paper comparing it to the '435 patent?

A. Yes, sir, I did.

Q. Did you try to compare the elements of '435 to Petras?

A. Yes, sir, I did.

Q. What conclusion did you reach?

A. Well, again, there's an element that's missing.

Q. What element is that?

A. Well, it's the element that involves a list that you have to remove expectations from.

Q. Okay. Do you recall what Dr. Heegard pointed to in the reference as what he was contending this list was that satisfied this element?

A. Yes, sir. He -- he pointed to a figure in the reference which was actually outside of the section that was on ARQ.

And when I looked at that figure, first, it's not really clear that that's even meant to be a data structure that would be implemented in the computer; but even if it were, it's a list -- it would be a list of things that you would never want to remove expectations from.

Page 101

And so --

Q. Why not?

A. Oh, because it's -- the purpose of this -- this list is to make a calculation about timestamps.

And if you actually removed things from it, that calculation would become incorrect.

Q. Does the patent require removing entries from a list?

A. Well, and -- and from a list of a specific kind. So yes, sir.

Q. So that the omission of that disclosure leads you to conclude what?

A. That it is not -- is not an invalidating reference.

Q. So in your view, is the '435 patent valid or invalid?

A. It is valid.

Q. Okay. Dr. Nettles, I'd like now to talk about the '215 patent and switch gears to talk about infringement, and I'd like to get you to respond to some of the points that the Defendants have made through their case.

A. Yes, sir.

Q. First, the '215 patent, what do you understand the Defendants' argument to be with regard to

Page 102

non-infringement?

A. They're saying that because they only use compressed BlockAck, that they don't infringe the patent.

Q. Now, we received during the testimony a jury question, and I'd like to pose it to you. And the question was -- and I may be paraphrasing it a bit -- is: Does the choice of acknowledgement apply only to time of response or the choice of acknowledgement type from a standard at the time of programming?

What's your answer to that question?

A. Well, I think that either of those cases would be infringing. So as long as a manufacturer chooses something that is from the 802.11 standard, that would be infringement.

Q. Can you explain why you say that, Dr. Nettles?

A. Yes, sir. This -- this claim -- if we look at the -- at the preamble, we can -- we can see this. Just to be clear, the preamble is not a limitation, but it does set some context for the claim.

And we see that it's a method for improving, basically, an ARQ protocol. And so that tells me that it's about the standard. It's about how you improve some aspect of the standard.

Q. And let me -- let me stop you there and ask

Page 103

you, why does the word ARQ protocol connote to you or make you think about this as a standard-type patent?

A. Because the standard in this case is where we're specifying how the protocols work. And this is specifying how the protocol would work in general, things like what the packet formats would be.

Q. Has this patent been used in other standards?

A. Yes, sir. It's been used in 3G.

Q. Okay. And let me ask you this question: If the Defendants here are using the compressed BlockAck option from the standard, why do they need to transmit those two bits, that field, the type identifier field, if they're all just using the compressed BlockAck?

A. Yes, sir. The -- in -- in 802.11, and what they're transmitting, it's actually the Multi-TID and compressed BlockAck field.

And they need to transmit that because there's a possibility that some other manufacturer will be transmitting some other value in that field, and they need to check that field to make sure that their products are processing BlockAcks that their products understand how to deal with.

So it's important to process that field, even though they don't change it.

Q. Is this because it's a global standard, and

Page 104

26 (Pages 101 to 104)

A1623

Case: 13-1625    Case: 13-1625    Document: 179-1    Page: 489    Filed: 03/31/2014    Document: 177-1    Page: 489    Filed: 03/31/2014    (489 of 575)

CASE PARTICIPANTS ONLY

there's a lot of manufacturers making things that have to talk together?

A. Exactly for that reason.

Q. Okay. And why is this patent useful?

A. Well, again, we just talked about how there is a global manufacturing taking -- taking advantage of the general standard.

This gives flexibility to the manufacturers to choose to implement different kinds of BlockAcks, maybe to bring products to market that would differentiate themselves from other people in the market.

So flexibility is the big advantage.

Q. Okay. Let's move on to the '625 patent next.

What arguments have the Defendants made with regard to this patent?

A. Here, they say there's no command to receive an out-of-sequence packet.

Q. Do you agree?

A. No, sir, I don't.

Q. What have you found is the command in the 802.11n products?

A. Well, I found that the A-MPDUs and the MPDUs, the packets themselves, are the commands.

Q. How can a packet be a command?

A. Well, we should understand that in these

Page 105

systems, the systems have been programmed to follow the rules of the standard. And so because of the programming, there's really no choice as to whether or not -- what's going to happen when the packet comes in.

So if we look back at our electric eye at the grocery store example that was introduced yesterday, that grocery store door is programmed. It's designed so that when you come up to it, it will automatically open, that you will command it to open. It doesn't have a choice. You don't have to do anything additional.

And the same thing is true here. Exactly what happens to the packets when they come into the system is -- is programmed in. It's not something there's any flexibility about.

Q. Now, let me ask you to describe for us the -- we call it the preferred embodiment or the example in the patent.

A. Yes, sir.

Q. And before I want -- to ask you to describe it, you understand, don't you, that when you write a patent, you have to give an example or a best way of carrying out your invention.

A. Yes, sir, I do understand that.

Q. But then when the Patent Office awards you claims, they can be broader and cover more things than

Page 106

just your specific disclosure.

A. Oh, yes, sir. That's a very important aspect of this.

Q. With that caution in mind, would you explain to us how the '625 example discloses or describes the command?

A. Yes, sir. In the '625 example, a packet is a command, but there's a special bit, a 1 or a 0, in the packet that says whether or not this packet is actually going to act as a command.

Q. Okay. Here's my question now: That 1 or 0, that 1 bit in that packet in the example of the patent --

A. Yes, sir.

Q. -- that one bit, is that enough for the receiver to make a decision of whether to make it out of sequence or not?

A. Yes, sir. As described in the example, that's exactly enough.

Q. Now, does the receiver have to have something in it programmed in so that 1 or 0 makes any sense?

A. Oh, of course. I mean, these are computers. They don't just look at stuff and figure things out; they have to be creative to understand those kinds of things.

Page 107

Q. And in the case of the Defendants, do they program in their receivers to make decisions about patents?

A. Yes, sir, of course. They have to.

Q. What kind of parallels can you draw between the preferred embodiment and what the Defendants are doing?

A. Well, I think the most obvious parallel is, you could imagine that you just always set the bit to 1. So every packet is a command, not just the ones that you set to 1.

So if there was always a 1, then every packet would be a command, and that would be just like what the Defendants are doing.

Q. And if they're doing that, why bother transmitting the bit anymore?

A. Exactly. Once you decide it's always a 1, you don't need to transmit it. And now we have exactly the system that we're talking about in the accused products.

Q. Okay. So we've seen this example in the slides from the Defendants a lot, of this traffic light.

A. Yes, sir.

Q. Okay. Where's that traffic light programmed in?

A. Well, it's -- it's part of the logic that

Page 108

27 (Pages 105 to 108)

A1624

makes up these systems. I mean, I -- you know, these are complicated systems. So exactly where it is, we would have to go into a lot of detail. But it's part of the programming.

Q. Okay. Now, do you recall seeing the Defendants provide some deposition testimony from Peter Larsson?

A. I did.

Q. And I want to show that to you. I think we've seen this a couple of times.

This is the testimony where he was asked: If you had a system where you could -- you could send regular, old data packets like the one in Figure 5 outside the top edge of the receiver's window and it would just accept them, would you need a command to the receiver that it should accept the packet with a sequence number out of order?

And he said: No.

Do you remember seeing that?

A. Yes, sir. We've seen this a number of times.

Q. But have you ever been shown or have Defendants shown the jury the next question and answer from the deposition?

A. The Defendants have not shown this part.

Q. Okay. Read that and explain its significance

Page 109

in understanding the prior question and answer, please.

A. So the -- the subsequent question is: Why not?

And the answer is: Because if the transmitter sends packet -- I think that should have been a packet -- outside the expected -- the receiver window, something went wrong, and the ARQ will not work, and it has to restart.

And what I -- what I understand about that is that Mr. Larsson understood the question to be -- to be different than it's allowed to do it. He understood it to be this is an error condition. I think really it's the result of a poor hypothetical question from the attorney.

Q. So if you -- if you have a restart or an error condition, is there any point in sending a command.

A. No, sir. I mean, I just don't think that Mr. Larsson was addressing the question that -- the question of whether or not the command would be necessary outside the window. I think he was addressing the question of whether or not this system that was described to him was broken, and he says it's broken.

Q. Let me ask you this: We've heard a lot about deadlock.

A. Yes, sir.

Page 110

Q. Did the '625 solve a deadlock problem?

A. Yes, sir, it did.

Q. Does 802.11n suffer from deadlock problems?

A. No, sir, not -- not this particular deadlock problem, not at all.

Q. Why doesn't it?

A. Well, it -- it uses the invention of the '625 to avoid that deadlock situation.

Q. Is this an important invention?

A. Well, yes, sir, it is.

Q. Okay. Let me ask you next about the '435 patent.

What argument do you understand Defendants are making to contend they don't infringe this patent?

A. Well, here they're saying that the receiver doesn't compute the packets that the transmitter has discarded.

Q. Okay. Do the receivers that are at issue in this case make that computation of packets the transmitter has discarded?

A. Oh, yes, sir, they have to.

Q. Will you please explain to us how they do that?

A. In these systems, there's both a receive window and a transmit window, and those two windows

Page 111

are -- are coordinated. And when the receive window shifts, then the receiver's actually -- in addition to calculating what packets are now below its window, it's also calculating what packets are below the transmitter's window.

Q. Well, Dr. Nettles, the Defendants have asserted that the receiver doesn't care what the transmitter has discarded or not discarded. Do you agree with that?

A. No, sir, I don't agree with that at all. The trans -- the receiver cares a lot about what has been discarded by the transmitter. And the reason is because anything that's below the transmitter's window has been discarded, and it would be an error.

In fact, it would result in exactly the deadlock we've been talking about, if the receiver was to wait for one of those discarded packets or to repeatedly ask the transmitter to retransmit it because the transmitter has discarded it.

So it's actually very important that the -- that the receiver know what packets have been discarded. I mean, I think that's really the point of the invention.

Q. Okay. Let -- let me ask you to step us through this just step-by-step, so we make sure we -- we

Page 112

28 (Pages 109 to 112)

**A1625**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                             DOCKET NO. 6:10cv473
    -vs-                     )
                             Tyler, Texas
                             )
D-LINK CORPORATION, ET AL        June 11, 2013

SEALED PORTIONS NOS. 6 and 7 FROM TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas 75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas 78701

COURT REPORTERS:        MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California 90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California 94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas 75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Courtroom sealed.)

(Pause in proceedings.)

Page 3

1 (Pages 1 to 4)

**A1630**



Page 5

2 (Pages 5 to 8)

A1631



Page 9

**A1632**



Page 13

**A1633**



Page 17

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                             )    DOCKET NO. 6:10cv473
      -vs-                   )
                             )    Tyler, Texas
                             )    12:49 p.m.
D-LINK CORPORATION, ET AL        June 11, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:     MS. JUDITH WERLINGER
                     MS. SHEA SLOAN
                     shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

                                              Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California  94111

                                              Page 2

P R O C E E D I N G S
        COURT SECURITY OFFICER:  All rise.
        (Jury in.)
        THE COURT:  Please be seated.
        All right, Mr. Stevenson.  You may
proceed.
        MR. STEVENSON:  Thank you, Your Honor.
     SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS,
        PREVIOUSLY SWORN
     DIRECT EXAMINATION (CONTINUED)
BY MR. STEVENSON:
    Q.  Dr. Nettles, I'd like to now talk with you
about the second non-infringement position for the '223
patent advanced by Defendants and that regards where the
timer begins.
    A.  Yes, sir.
    Q.  In Intel's products, where does the timer
start?
    A.  It starts when the SDU -- the MSDU has been
received by the data link layer.
    Q.  And what -- what is another word for the data
link layer that you've seen in the parlance of the code
for Intel's product?
    A.  In Intel's products, the data link layer
really starts when the MAC starts.

                                              Page 3

    Q.  MAC, M-A-C?
    A.  Yes, sir, medium access control.
    Q.  Okay.  So when the packet enters the MAC,
that's when the timestamp starts, right?
    A.  Yes, sir, when it's received.
    Q.  Okay.  Now, counsel for Defendants, during the
examination of Mr. Kitchin, created this handwritten
demonstrative.  Do you recall seeing it?
    A.  I do.
    Q.  And I believe the suggestion was that Intel
doesn't infringe this patent because above the MAC layer
where the timer starts, there's another layer in their
products called the logical link layer.  You remember
that argument in testimony?
    A.  Yes, sir.  It's sometimes referred to as the
LLC.
    Q.  LLC.  What does stand for?
    A.  Logical link control.
    Q.  Is this drawing an accurate representation of
the way Intel's products actually work?
    A.  No, sir, it's not.
    Q.  What have you done to confirm or disprove this
drawing and whether it is an accurate representation?
    A.  Well, I looked at the code.
    Q.  The source code for Intel's products.

                                              Page 4

                                    1 (Pages 1 to 4)

A1639

Case: 13-1625 Case: 13-1625 Document 179-1 Page: 497 Filed: 03/31/2014 Document 177-1 Page: 497 Filed: 03/31/2014 (497 of 575)

CASE PARTICIPANTS ONLY

some of my deposition testimony, but that's correct.

Q. Now, you gave us an analogy of a grocery store door, that if you stand on the pad and the door opens, that's a command to open the door? Is that what you said this morning?

A. Actually I think the grocery store had an electric eye; but, yes, sir, that's basically what I said.

Q. So you -- you walk in the door, you hit the electric eye, the door opens, and in your view, in your world, in your testimony, that's a command to receive -- a command to open, right?

A. Yes, sir, because the door is designed and programmed that way.

Q. Now, I take it if the door is always open, you don't need a command to open it, do you?

A. I would agree with that.

Q. Now, you've identified again today a standard data packet that -- with a sequence number as something that infringes the '625 patent, right?

A. Yes, sir, that's correct.

Q. Now, as a matter of fact, in the '625 patent itself, the inventors describe exactly that thing as prior art that they did not invent, right?

A. No, sir, I can't agree with that.

Page 21

MR. VAN NEST: Could we have Figure 5 from the '625 patent up, please?

Q. (By Mr. Van Nest) I've -- I've correctly displayed Figure 5 from the patent, right?

A. Yes, sir.

Q. This is the '625 patent, right?

A. Yes, sir.

Q. Written by the inventors and approved by the Patent Office, right?

A. Yes, sir.

Q. And what's being depicted here is a data packet with data, a header, and a sequence number, right?

A. That's correct.

Q. And the inventors of the '625 patent said that's in the prior art. We didn't invent that. Didn't they?

A. Yes, sir, that's correct.

Q. All right. Let's turn to the '435 patent. That's the one that requires a computation -- and I just want to be sure that -- whoops, I'm sorry, Dr. Nettles.

A. Okay.

Q. You all right?

A. It didn't hit me.

Q. Good. Lucky these are light, or we would all

Page 22

be in trouble.

Now, the '435 patent, this is the one that requires computing which data packets have been discarded by the transmitter, right?

A. Yes, sir, that's correct.

Q. We had some discussion about that also on Wednesday. I want to put my animation board up here.

MR. VAN NEST: May I approach here, Your Honor?

THE COURT: Yes, you may.

Q. (By Mr. Van Nest) Just to be clear, what's required by this claim is that the receiver on the right compute the packets that have been discarded at the transmitter, right?

A. Yes, sir, that's correct.

Q. And as I think you said last week, if the receiver cannot compute all of the packets that were discarded by the transmitter, there's no infringement, correct?

A. Yes, sir, that's correct.

Q. You also testified that when a BlockAck request is sent from the transmitter to the receiver, that request will not allow a receiver to identify which of the previously acknowledged packets have been discarded. Didn't you give that testimony just on

Page 23

Wednesday?

A. Yes, sir, I did.

Q. And you further said the same is true when you send an A-MPDU. When that message is sent from the transmitter to the receiver, that message will not allow the receiver to determine or identify which of the previously acknowledged packets have been discarded.

You gave that testimony, as well?

A. Yes, sir. I think that was in reference to packets that had actually been discarded because of time-outs, not because of receiving ACKs.

Q. But you're standing on that testimony from last week right, Dr. Nettles, right?

A. Oh, yes, sir.

Q. Now, you were here when Dr. Kitchin was examined, were you not?

A. Yes, sir. I think it's Mr. Kitchin.

Q. Mr. Kitchin, from Intel?

A. Yes, sir.

Q. And he was asked whether or not the Intel chips performed this computation, and he said no, right?

A. Yes, sir, I believe that's correct.

Q. He denied that the Intel chips performed a computation in the receiver of packets discarded in the transmitter, right?

Page 24

6 (Pages 21 to 24)

A1644

defined it, constructing a message field for a second data unit, right?

A. That's correct.

Q. So Step 3, which can't happen until there's been data received in Step 2, is I construct a message field in response to that, right?

A. Yes, sir, that's correct.

Q. So the way this claim is laid out, Step 3 happened after Step 2 because it has to respond to Step 2, right?

A. Oh, absolutely, yes, sir.

Q. And you said that this patent requires generating a message from among a number of different message types, right, as part of that third step?

A. Well, yes, sir, that's part of the claim construction.

Q. That's right. And you -- you accept that and you acknowledge that, right?

A. Well, I applied the claim construction, absolutely.

Q. And so what must happen in order for this claim to be infringed is that after a packet is received by the receiver, the receiver has to generate a message field which identifies a type from a number of different message types, right?

Page 29

A. Yes, sir, that's exactly correct.

Q. Now, in the products that you reviewed of Intel, Atheros, Broadcom, and everybody else, the receiver is only capable of generating one message type, a compressed BlockAck, right?

A. Well, yes, sir. But that compressed BlockAck -- the Multi-TID and compressed BlockAck field identifies the message type or the feedback response. That's what's required.

Q. Dr. Nettles, the devices you analyzed and tested over and over and over again, only generated one message type, right?

A. Oh, yes, sir.

Q. They didn't generate more than one; they generated only one, right?

A. That's correct.

Q. And that only one was a compressed BlockAck, which is the only one those receivers are capable of generating, right?

A. Oh, yes, sir. I agree with that completely.

Q. All right. Let's talk about the '568. I thought I heard Mr. Stevenson state -- say that somehow Mr. Gibson had admitted that Ekiga was using the invention. Did you hear that?

A. That was my understanding of Dr. Gibson's

Page 30

testimony, yes, sir.

Q. But that's not what he said, is it?

A. Well, that was my understanding.

Q. Dr. Gibson was here all day -- seemed like all day to me -- testifying that there is no infringement of this claim or any other, right?

A. He did testify to that, yes, sir.

Q. Just so we get on the same page, we're now talking about the '568, the service type identifier patent, right, identifying the type of data conveyed in the payload, correct?

A. Yes, sir.

Q. You know that's not what Dr. Gibson said, don't you?

A. Well, my understanding is that he explained that when he tested Ekiga -- and we saw evidence to this effect -- that it generated a TID of 5 which corresponded to video.

Q. Let's actually --

MR. VAN NEST: Can we put up Dr. Gibson's testimony from yesterday?

Q. (By Mr. Van Nest) Mr. Stevenson asked him: Ekiga is using this invention, isn't it?

And the answer was: In this call, Ekiga assigned a TID of 5.

Page 31

Question: It's using the invention, right?

Answer -- he's asking back if he heard it right.

Ekiga is using the invention, you said?

Question: Yes. That's what you tested, right?

Yes.

That was the testimony that Dr. Gibson gave yesterday here in court, right?

A. Yes, sir.

Q. Now, as a matter of fact, you also tested Ekiga as part of your work in preparing to offer opinions in this case, right?

A. I did.

Q. And you -- you set up a -- let's back up a minute. Ekiga is a video conferencing system like Skype?

A. Yes, sir, that's correct.

Q. You can use video or voice or both, right?

A. That's correct.

Q. And you set it up to use both. Is that what was in your experiment?

A. I think we experimented with both, but primarily video.

Q. Primarily video. So you were running video?

Page 32

8 (Pages 29 to 32)

A1646

A. Yes, sir.

Q. And you ran a series of packets which you knew, because you set the thing up, had video data in them, right?

A. Yes.

Q. You knew that ahead of time?

A. Yes, sir.

Q. You set it up that way to see how the test would come out, right?

A. Yes, sir.

Q. And you ran it with this Wireshark or some other technique that would detect what the TID value was in the packets, right?

A. Yes, sir.

Q. And the results showed that you got different TID values for the same type of data, right?

A. I think for Ekiga it was consistent; but yes, sir, that's correct in general.

Q. In general, with your Ekiga testing -- let's stick right on Ekiga -- sometimes the TID value was 5 and sometimes it was 0, right?

A. Yes, sir.

Q. So for the same type of packet that you knew was video, sometimes the TID value was 5 and sometimes the TID value was 0. That's what your tests showed,

Page 33

right?

A. Yes, sir.

Q. And doesn't that just prove what you told me last week, which is that an application can assign any TID value it wants to any kind of data, right?

A. Yes, sir.

Q. If the application is running video, it doesn't have to use a 4. It can use a 0 or a 1, right?

A. Yes, sir.

Q. And someone running voice, they can assign a 7, a 5, a 1, a 2, or a 3; anything they want, right?

A. Yes, sir.

Q. And the system will run those packets, whatever TID value they have, regardless of what's inside the packet, right?

A. Yes, sir, that's correct.

Q. And as you told me last week point-blank, that's why an 802.11n system cannot determine from the TID value whether the data in the payload is video, voice, Internet, or multimedia, right?

A. Yes, sir.

Q. Now, let's turn to the '223. Last patent.

Now, I thought I heard you testify just a little while ago that you think fragmenting and segmenting are two different things. Is that what I

Page 34

heard you say?

A. Yes, sir, they're related, but they're different.

Q. Now, last week you said they both involve -- they both involve breaking things down into smaller units and reassembling them, right? Didn't you tell me that?

A. In general, that's correct.

Q. And you're standing by that testimony, too?

A. I am.

Q. And you know full well that the inventors of the '223, when they used the word segmenting, they meant splitting up data packets into smaller units, right?

A. That's not my understanding from reading the claims.

Q. Let's take a look at the deposition of Mr. Wager at Page 107, Line 22 through 108, Line 2.

Mr. Wager is one of the inventors of the '223, correct?

A. Yes, sir, that's correct.

Q. He also didn't show up to testify, right?

A. That's correct.

Q. What he says, though, is that: The transmitter would take the service data unit at the data link layer and package it in PDUs, or protocol data

Page 35

units, for transmission out to the receiver; is that correct?

Answer: It segments the SDU, so it splits it up in smaller parts.

That's what the inventor thought he invented in the '223, right?

A. That's what he says in this testimony, yes, sir.

Q. And he gives additional testimony -- additional testimony in which he confirms, looking at the patent itself, that segmenting means splitting PDUs up, right?

A. Yes, sir.

Q. Let's take a look at the Wager depo, Page 114, Lines 13 through 19.

Now he's looking at the patent, Figure 2.

The question is: All right. So now the SDU in Figure 2, what we see is that the SDU is split up into multiple PDUs?

Yes.

Okay. And that's what we referred to as segmenting.

Answer: Yes.

Right?

A. Yes, sir, that's what he says here.

Page 36

9 (Pages 33 to 36)

out method and system claims, and that is because, as Your Honor knows, the proof required for each of those is slightly different.

And in our version, which we would -- obviously, which we submitted and requested would be adopted, we believe that it would be appropriate to instruct the jury that for the method claims that are at issue here, which is Claim 1 of the '625, Claims 1 and 2 of the '435 and Claim 1 of the '215, that there should be an instruction that each step is performed in the United States by one person or by someone else who is acting under the direction and control of that person.

THE COURT: Okay.

MS. PIEPMEIER: That was included in our proposal, and we would request that it be adopted.

THE COURT: All right. Response?

MR. CAMPBELL: Your Honor, I think your proposed construction -- or proposed instructions make clear how the jury is supposed to compare the claims to the accused product for both system and method claims.

I'm not sure that there's any confusion within what the Court's instructions have or what's being proposed to be changed, but I think it's proper the way that it is.

THE COURT: All right. Objection is

Page 85

overruled.

MS. PIEPMEIER: One final objection, Your Honor, on this instruction. We would -- our original proposal did not include the language regarding a patent being infringed if -- if the product is reasonably capable of infringing. We believe that that instruction is -- would not be proper, especially for the method claims, but for both the method and the system claims.

THE COURT: And where is that?

MS. PIEPMEIER: That is in the first full paragraph on Page 13, an accused system or product directly infringes a claim if it is reasonably capable of satisfying the claim elements even though it may also be capable of non-infringing modes of operation. And then it continues for that paragraph.

THE COURT: Response?

MR. CAMPBELL: Your Honor, that's an accurate statement of law under the Federal Circuit law.

We can pull the law if Your Honor wants. I believe that's the Spalding case, but that's an accurate statement of law and should be part of the instructions.

THE COURT: All right. Objection is overruled.

Response -- or next?

Page 86

MS. PIEPMEIER: Thank you, Your Honor.

On No. 6, indirect infringement, inducing patent infringement. This was originally submitted, I believe, as agreed; but Defendants would like to raise an objection because there's been a failure of proof on indirect infringement, and we believe it would be improper to put that issue before the jury.

THE COURT: Okay. What is your objection, specifically?

MS. PIEPMEIER: Specifically, the only evidence that has come into the record at all that could potentially be related to inducing is the date of notice; and also a few lines from Dr. Nettles that are extremely cursory, which I can read if Your Honor would like to hear them, but do not set forth any of the elements that are required to demonstrate induced infringement.

And there has been -- because there has been such a failure of proof on that issue, we believe it would be improper to include an instruction on it.

THE COURT: Okay. Response?

MR. CAMPBELL: Your Honor, I disagree. There's been plenty of evidence for a jury to find inducement. There's been a stipulation on the notice dates of when the Defendants knew of these patents.

Page 87

There's been testimony from Mr. Bone on advertising of these products as complying with the standard and how to use these products to support Wi-Fi.

There's more than enough evidence in the record to support a jury verdict of inducement.

THE COURT: All right. I'm going to take that one under advisement. If it's not in there, I sustain the objection; if it is in there, I overrule the objection.

MS. PIEPMEIER: Thank you, Your Honor.

May I add one more thing on that? If Your Honor is inclined to keep the instruction, we would request that Intel not be included because that was not within the scope of Dr. Nettles' report or presumably his testimony since I understand that to be based on his report.

THE COURT: Response?

MR. CAMPBELL: Your Honor, again, I think there's plenty of evidence in the record that Intel was -- was provided notice, as well as that they intend people to use these to connect to Wi-Fi. They advertise them in that way. They know that that's the way that this is going to occur.

THE COURT: All right. That objection will be overruled, if I keep it in.

Page 88

22 (Pages 85 to 88)

**A1660**

limitation on the damages for direct infringement of a method claim; namely, that damages are only available, for instance, as a direct infringement occurring in the United States.

We object that these are not included; and if it's Your Honor's pleasure, I have a proposed instruction that include those issues that I could pass up to the Court.

THE COURT: All right. If you would hand it up, please.

All right. Response?

MR. CAMPBELL: Your Honor, I haven't had a chance to read this; but if it's similar to what was proposed before, it really goes to, you know, what it takes to infringe, which the instructions already deal with quite well, as to what it takes to infringe a patent; and that damages begin once infringement begins.

I think it's only confusing to break this out into direct and indirect infringement and talk about method claims and apparatus claims when the instructions already make it clear what needs to be found for infringement. We don't need to do that again in the damages section.

THE COURT: All right. Response to that?

MR. DE VRIES: We think that it --

Page 97

there's a separate damages-related point, Your Honor. I think that the jury will misunderstand that if it finds even one instance of direct infringement, which, frankly, we don't believe is there; but putting that aside, that it should -- that it will believe that it should award all -- damages on all sales.

That's just not the law. The law requires proof of actual instances of direct infringement, or in some circumstances, categories. We think it's necessary to have this instruction to avoid that error.

THE COURT: All right. I'm going to overrule the objection. I believe it's covered by the infringement instructions.

What's next?

MR. DE VRIES: Your Honor, this is in the nature of making sure that we've adequately preserved our objections.

For the reasonable royalty definition, Defendants had submitted a proposed instruction on reasonable royalty. We believe that our proposed instruction is more consistent with Ericsson's admitted RAND obligations.

We understand that the Court has not adopted that, and we just wanted to note for the record

Page 98

that we object to what was adopted for that reason.

THE COURT: All right. The objection is noted.

MR. DE VRIES: And then without waiving those objections, Your Honor, on Page 25 of that reasonable royalty objection, in the first full paragraph at the very bottom of that page that begins "in making your determination," I think there's a minor -- maybe perhaps a typo in the second line.

It says: When the Defendant infringer first infringed the patent.

I think perhaps that should say: When the Defendants first or when the Defendant first infringed the patent.

THE COURT: Yes. Okay. I'll strike the word "infringer."

MR. DE VRIES: I think -- just two more things, Your Honor, and then a quick note on the verdict form.

The first is that we submitted a proposed instruction for the entire market value rule. We recognize that Your Honor has previously ruled on related issues.

We do think here it's important that the jury be presented with the law that says that the entire

Page 99

market value rule does not apply unless certain types of evidence have been -- has been shown. We don't think that's been shown here, and we would propose that the Court adopt our instruction.

I, again, have a copy of that, if it would please Your Honor, for me to bring it up.

THE COURT: All right. The objection is overruled.

MR. DE VRIES: Okay. And then, finally, on the instructions, Your Honor, you'll recall that during trial we handed up to the Court and also to opposing counsel a proposed limiting instruction about licenses.

I think this is a very important one, Your Honor. Throughout this trial, we have heard an awful lot about the licenses that the -- that Ericsson has signed with other companies.

I think given the way that that's been presented to the jury and the repetition with which it's been presented to the jury, it's very important that the jury be instructed that that -- that those facts are in no way relevant to the infringement determination.

I have more copies of what we handed up earlier, but we would ask Your Honor to please include that instruction.

Page 100

25 (Pages 97 to 100)

**A1663**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                DOCKET NO. 6:10cv473
   -vs-               )
                Tyler, Texas
            )  9:03 a.m.
D-LINK CORPORATION, ET AL        June 12, 2013

TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:      MS. JUDITH WERLINGER
            MS. SHEA SLOAN
            shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

---

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

---

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Good morning.

JURORS:  Good morning.

THE COURT:  We are about to the end of the trial.  You've heard the Voir Dire a week ago Monday, the openings statements, you've heard all the evidence, now you're about to hear the Court's charge. And then immediately after that, you will hear the closing arguments from the parties.

So, please pay attention to my jury instructions.

Please realize that a copy -- a written copy of these will be sent to -- with you to the jury room, so you're welcome to take notes; but don't feel like you have to write everything I say down because there's quite a bit of it.

I would anticipate this will probably take about 45 minutes for me to go through these instructions.

We will take a short break then, let you stretch your legs, then we will come back and hear the closing arguments.

Page 3

---

I've given each side I believe an hour --

Isn't that correct?

MR. CAWLEY:  That's correct.

THE COURT:  -- an hour per side for closing arguments, so that will take about two hours.

All right, members of the jury, you have now heard all the evidence in the case, and I am now going to instruct you on the law which you must apply.

It is your duty to follow the law as I give it to you.

On the other hand, you the jury are the sole judges of the facts.  Do not consider any statement that I have made during the trial or make in these instructions as any indication that I have any opinion about the facts of the case.  Again, that is your sole province.

After I instruct you on the law, the attorneys will have an opportunity to present their closing arguments.  Remember that the statements and the arguments of the attorneys are not evidence and are not instructions on the law.  They are merely intended to assist you in understanding the evidence and the parties' contentions and what the parties believe the evidence shows and what they believe your verdict should be.  But again, they are not evidence and they are not

Page 4

1 (Pages 1 to 4)

A1666

you will be able to understand the scope of coverage for each claim.

Once you understand what each claim covers, you are prepared to decide the issues that you will need -- that you will be asked to decide, such as infringement and invalidity.

I will now explain to you the meaning of some of the words of the claims in this case. In doing so, I will explain some of the requirements of the claims.

As I have previously instructed you, you must accept the definition of these words in the claims as correct. For any words in the claim for which you have not been provided with a definition, you should apply their common meaning.

You should not take the definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity. These issues are yours to decide.

Now, at Tab 2, you'll see the construction that the Court has given for those three terms. I'm not going to read those to you at this time. They will be included in your charge as well.

Now let me instruct you about direct

Page 21

infringement.

There are specific rules you must follow to determine whether Ericsson has proven that the Defendants have infringed one or more of the asserted claims of one or more of the patents-in-suit involved in this case.

First, let me visit with you about what we call literal infringement.

If any person makes, uses, or offers to sell or sells in the United States or imports into the United States what is covered by the claims of a patent without the patent owner's permission, that person is said to infringe the patent.

This type of infringement is called direct infringement. To determine direct infringement, you must compare the accused products or methods with each of the asserted claims of the asserted patents using my instructions as to the meaning of the patent claims.

A patent claim is directly infringed only if the accused product or method includes each and every element or steps in the patent claim.

If the accused product or method does not contain one or more of the limitations recited in the claim, then that product or method does not directly

Page 22

infringe that claim.

If you find that the accused product or method includes each element or step of the claim, then that product or method infringes the claim even if such product or use contains additional elements or steps that are not recited in the claim.

An accused system or product directly infringe -- infringes a claim if -- if it is reasonably capable of satisfying the claim elements, even though it may also be capable of non-infringing modes of operation.

If a claim requires only that the system or product have the capacity to perform a function, one who makes a system or product with the capability without the patent owners' authority is a direct infringer even though the maker's customers do not use the capacity.

A patent claim is directly infringed only if the accused product or method includes each and every element in that patent claim, as I will instruct you shortly.

If the accused product or method does not contain one or more of the limitations recited in a claim, then that product or method does not directly infringe that claim.

Page 23

A person may directly infringe a patent even though, in good faith, the person believes that what it is doing is not an infringement of any patent and even if it did not know of the patent.

Direct infringement does not require proof that the person copied a product or the patent. You must consider each of the asserted claims of the patents-in-suit individually.

You must be certain to compare such accused product or method with each claim that such product or method is alleged to infringe.

Such accused product or method should be compared to the limitations recited in the patent claims and not to any preferred or commercial embodiment of the claimed invention.

Taking each asserted claim of the asserted patents separately. If you find that Ericsson has proved by a preponderance of the evidence that each and every limitation of that claim is present in the Defendants' accused products or methods, then you must find that such product or method infringes that claim.

A claim limitation is literally met if it exists in the accused product or method just as it is described in the claim language, either as I have explained that language to you; or, if I did not explain

Page 24

6 (Pages 21 to 24)

**A1671**

the field, even if it is difficult to find.

An electronic publication, included -- including an online or Internet publication, is a printed publication if it is at least reasonably accessible to those interested in the field, even if it is difficult to find.

A printed publication must be reasonably accessible to those members of the public who would be interested in its contents. It is not necessary that the printed publication be available to every member of the public. The date that a printed publication becomes prior art is the date that it becomes reasonably accessible to the public.

So long as the printed publication was available to the public, the form in which the information was recorded is unimportant. The information must, however, have been maintained in some permanent form, such as printed or typewritten pages, magnetic tape, microfilm, photographs, or photocopies.

For a claim to be anticipated by a prior art publication, all of the claim's requirements must have been either: One, disclosed in a single prior art reference. Or, two, implicitly disclosed in a single prior art reference as viewed by one of ordinary skill in the field of the invention.

Page 33

The disclosure in a reference does not have to be in the same words as the claim, but all of the requirements of the claim must be described in enough detail, or necessarily implied by or inherent in the reference, to enable someone of ordinary skill in the field of the invention looking at the reference to make and use at least one embodiment of the claimed invention.

A prior art publication also invalidates a patent claim when the claimed invention necessarily results from practice of the subject of the publication, even if the result was unrecognized and unappreciated by one of ordinary skill in the field of the invention.

A printed publication will anticipate if it contains a description of the invention covered by the patent claims that is sufficiently detailed to teach a skilled person how to make and use the invention without undue experimentation.

Factors to be considered in determining whether a disclosure would require undue experimentation would include:

(1) the quantity of the experimentation necessary;

(2) the amount of direction or guidance disclosed in the printed publication or patent;

Page 34

(3) the presence or absence of working examples in the printed publication or patent;

(4) the nature of the invention;

(5) the state of the prior art;

(6) the relative skill of those in the art;

And (7) the predictability of the art;

And No. (8) the breadth of the claims.

Now, that concludes my instructions on invalidity.

We next turn to the question of damages, which is the fourth question you will answer in the verdict form.

If you find that the Defendants have infringed one or more valid claims of the patents-in-suit, then you must determine the amount of money damages to which Ericsson is entitled.

By instructing you on damages, I do not suggest that one or the other party should prevail.

These instructions are provided to guide you on the calculation of damages in the event you find infringement of a valid patent claim and thus must address the damages issue.

In this case, Ericsson has sued D-Link, NETGEAR, Belkin, Acer, Gateway, Dell, and Toshiba.

Page 35

Intel has intervened in this case to deny its chips used by some of its customer defendants.

Accordingly, in answering Question No. 4, you will be determining what amount of money would fairly and reasonably compensate Ericsson for infringement, if any, by each Defendant, except Intel.

Any damages for Intel's infringement, if any, will be included in whatever damages, if any, you find for each of the customer defendants.

The amount of damages must be adequate to compensate Ericsson for the infringement, but it may not be less than a reasonable royalty.

At the same time, your damages determination must not include additional sums to punish the Defendants or to set an example. You may award compensatory damages only for the loss that Ericsson proves was more likely than not caused by the Defendants' infringement.

Moreover, because Ericsson has agreed that it is under an obligation to license the patents-in-suit on reasonable and non-discriminatory terms, what are referred to as RAND terms, you must ensure that any damages award is consistent with and does not exceed the amounts permitted under Ericsson's RAND obligations.

Page 36

9 (Pages 33 to 36)

Now, first with regard to the burden of proof with damages.

Where the parties dispute a matter concerning damages, it is Ericsson's burden to prove by a preponderance of the evidence that it is more probable than not that Ericsson's version is incorrect.

Ericsson -- excuse me -- that Ericsson's version is correct.

Ericsson must prove the amount of damages with reasonable certainty but need not prove the amount of damages with mathematical precision.

However, Ericsson is not entitled to damages that are too remote or speculative.

Now, with regard to when damages begin, the amount of damages Ericsson can recover is limited to those acts of infringement that occurred after Ericsson gave each Defendant notice that it infringed the patent.

Actual notice means that Ericsson communicated to the Defendants a specific charge of infringement of the patent by the accused products. This notice is effective as of the date given.

Your job is to calculate damages from the date that each Defendant received actual notice. You should not award damages for Ericsson against any infringement by a Defendant occurring before that

Page 37

Defendant first received actual notice.

Now let me define reasonable royalty for you.

If you find that any claim of the asserted patents is both valid and infringed, then Ericsson is entitled to damages adequate to compensate for the infringement of that patent; but in no event less than a reasonable royalty for the use made of the invention by the Defendant.

A royalty is the amount of money a licensee pays to a patent owner to make, use, or sell the patented invention.

A reasonable royalty is the amount of money a willing patent holder and a willing prospective licensee would have agreed upon at the time of the infringement for a license to make the invention.

This is what you've heard referred to as the hypothetical negotiation.

It is the royalty that would have resulted from an arms-length negotiation between a willing licensor and a willing licensee, assuming that both parties understood the patent to be valid and to be infringed and that the licensee would respect the patent.

Unlike a real-world negotiation, in the

Page 38

hypothetical negotiation, all parties are presumed to know that the patent is infringed and is valid.

The reasonable royalty you determine must be a royalty that would have resulted from this hypothetical negotiation and not simply a royalty either party would have preferred.

Evidence of things that happened after the infringement first began may be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation.

In making your determination of the amount of a reasonable royalty, it is important that you focus on the time period when the Defendant first infringed the patent and the facts that existed at that time.

Your determination does not depend on the actual willingness of the parties to this lawsuit to engage in such negotiations. Your focus should be on what the parties' expectations would have been had they entered a negotiation for royalties at the time of the infringing activity.

The Defendants' actual profits may or may not bear on the reasonableness of an award based on a reasonable royalty.

Page 39

In deciding what is a reasonable royalty that would have resulted from the hypothetical negotiation, you may consider the factors that the patent owner and the alleged infringer would consider in setting the amount the alleged infringer should pay.

I am now going to list for you a number of factors which you may consider. This is not an exhaustive list, and it doesn't list every possible factor, but it will give you an idea of the kinds of things you can use to consider in setting a reasonable royalty.

No. 1. The royalties received by the patentee for licensing of the patents-in-suit, providing -- proving or tending to prove an established royalty.

No. 2. Royalties paid for other patents comparable to the asserted patents.

No. 3. The nature and scope of the license, as to whether it's exclusive or non-exclusive; or restricted or nonrestricted in terms of its territory; or with respect to the parties to whom the product may be sold.

No. 4. Whether or not the licensor had an established policy and marketing program to maintain its patent exclusivity by not licensing others to use

Page 40

10 (Pages 37 to 40)

**A1675**

CASE PARTICIPANTS ONLY

the invention or by granting licenses under special conditions designed to preserve that exclusivity.

No. 5. The commercial relationship between the licensor and the licensee, such as whether they are competitors in the same territory and the same line of business or whether they are inventor and promoter.

No. 6. Whether being able to use the patented invention helps in making sales of other products or services.

No. 7. The duration of the patent and the term of the license.

No. 8. The profitability of the patented invention and whether or not it is commercially successful or popular.

No. 9. The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

No. 10. The nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention.

No. 11. The extent of the licensee's use of the patented invention and any evidence probative of that use.

Page 41

No. 12. The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

No. 13. The portion of the profits that is due to the patented invention, as compared to the portion of the profit due to other factors, such as unpatented elements or unpatented manufacturing processes or features or improvements developed by the licensee.

No. 14. Expert opinions as to what would be a reasonable royalty.

No. 15. The amount that a licensor and a licensee would have agreed upon if both sides had been reasonably and voluntarily trying to reach an agreement, that is, the amount which an accused infringer would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable to a patent owner if it would have been willing to create a license.

No. 16. Ericsson's obligation to license its technology on RAND terms.

No one factor is dispositive, and you can and should consider the evidence that has been presented to you in this case on each of these factors.

Page 42

The framework which you should use in determining a reasonable royalty is the hypothetical negotiation between normally prudent business people.

Next, a second way to calculate a royalty is to determine a one-time lump-sum payment that the infringer would have paid at the time of the hypothetical negotiation for a license covering all sales of the licensed product both past and future.

This differs from payment of an ongoing royalty where a royalty rate is applied against future sales as they occur. When a one-one -- one-time lump sum is paid, an infringer pays a single price for a license covering both past and estimated future infringing sales.

It is up to you to decide -- based on the evidence, to decide what type of royalty is appropriate in this case.

An infringer's net profit margin is not the ceiling by which a reasonable royalty is capped.

The infringer's selling price can be raised, if necessary, to accommodate a higher royalty rate. Requiring the infringer to do so, may be the only way to adequately compensate the patentee for the use of its technology.

Now, you must not award Ericsson more

Page 43

damages than are adequate to compensate for the infringement, nor shall you include any additional amount for the purpose of punishing a defendant or for setting an example. Nor may you include damages that are speculative, damages that are only possible, or damages that may be based -- based upon guesswork.

Now, that concludes my instructions with regard to the fourth issue, damages.

Now let my give you some general instructions regarding your deliberations, and we're about through.

You should perform your duties as jurors without bias or prejudices as to any party. The law does not permit you to be controlled by sympathy, prejudice, or public opinion.

All parties expect that you will carefully and impartially consider all of the evidence, follow the law as it is now being given to you, and reach a just verdict, regardless of the consequences.

You should consider and decide this case as a dispute between persons of equal standing in the community, of equal worth, and holding the same or similar stations in life.

A corporation is entitled to the same fair trial as a private individual. All persons,

Page 44

11 (Pages 41 to 44)

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 507    Filed: 03/31/2014

the results of their own infringement of Ericsson's patents.

Not only that, but you've heard Intel's witnesses suggest that the royalty they should have to pay for using Ericsson's patents is a penny; not 50 cents, but one cent. Actually a little less than one cent.

And you've also heard, if they can succeed in convincing you that a reasonable royalty is only one cent, Intel can pay that cent and then sell the chip to their customers who can then use Ericsson's patents for nothing.

That, Ladies and Gentleman, is why Intel is here. But again, none of these distractions are really evidence that will help you answer any of the questions that Judge Davis has asked you and you'll be considering during your deliberations.

So let's turn instead to the relevant questions in this case and talk about the relevant evidence that will help you in your deliberations.

There really are three of them, although Judge Davis has broken one of them out. The three are, first, do the Defendants infringe? Second, are two of the patents invalid? And, third, how much is a reasonable royalty?

Page 57

Now, what we'd like to do with the remainder of our evidence is not to talk about distractions but to talk one at a time about these questions that you'll be responsible for answering and to remind you of some of the evidence, both the testimony and the documents that you've heard that will help you answer these questions.

The first is, do the Defendants infringe?

And to help remind us of the evidence we've heard, at this time I'm going to ask Ted Stevenson to go through that.

MR. STEVENSON: Well, thank you.

And as Mr. Cawley stated, the central question is the legal definition of the invention. That's how you guys will be doing your jobs.

You will be taking the legal definition of the invention and applying it to the accused technology, and you'll find the legal definitions in the claim language first but also in the Court's claim constructions. And these are the legal, binding definitions of what Ericsson invented and has the rights to.

And you will also be receiving -- and you've received jury instructions on how to apply the law. And I'd like to refer to, through my remarks,

Page 58

those legal definitions and the jury instructions.

Let me begin with the '215 patent. You will remember that's the patent that deals with the variations in message types of the block acknowledgements that we've been talking about.

And in this case, the format and the structure of the block acknowledgement is really not in dispute. It's prescribed by the standard and all the Defendants follow it.

This is one of those block acknowledgement frames, and the block acknowledgement has a compartment in there called the BA control. We talked about that.

Within that there are two fields, a Multi-TID and a compressed bitmap field. Those are just a 1 and a 0 apiece. And those two numbers in tandem correlate to a chart where there are variations, three variants that are defined. The basic, the compressed, and the Multi-TID.

The Defendants use the compressed block acknowledgement, and I think their argument in this case is they don't infringe because their products transmit the compressed block acknowledgement.

However, they must comply with the format of this message. They must have the type identifier,

Page 59

and the type identifier when it is sent out is received by other units, and it's checked so that those units and the Defendants' own devices can verify what type of message they're receiving.

So the question to you is, does the Defendants' argument rise to the level of a non-infringement argument? And it doesn't, because of the Court's claim construction.

You have this in your jury notebooks, but the Court has given a definition, after hearing arguments from the parties and having a hearing, to this element.

And the Court defined it as: Responsive to the receiving step, generating a message field including a field that identifies the message type of the feedback response from a number of different message types.

This is the legal definition, and the way to apply it is to go through it step by step and see if it's true as to this accused function.

The accused devices do have a field that identifies the message type. It's this field right here (gestures). And the -- the field relates to a number of different message types which are contained in the chart.

Page 60

15 (Pages 57 to 60)

A1680

That's infringement, Ladies and Gentleman, because it meets directly all the elements of the claim.

And we asked Dr. Gibson about that, and Dr. Gibson testified that -- under the following question: And each block acknowledgement that is sent contains a field that indicates which one of the three variants are being sent, correct?

He said, That's correct.

That message has to have that field, right?

Yes.

It's mandatory, right?

Yes.

So he's admitted that there is a field that indicates which of the three variants are being sent.

Now, the Defendants' argument is really an attempt to narrow or to change the definition that the Court has already given you, and they can't do that.

What they want to argue is that the field should identify the message type of the feedback response message from a number of different message types that are contained in the product.

But that's not the legal scope of the

Page 61

invention as has been defined by the Court.

The variants are in the standard that are used by the Defendants for compressed block acknowledgement. Defendants can receive messages with other variants that they then have to deal with. And this infringes.

Moreover, Claim 2 specifically applies to the compressed bitmap variant that is being used by the Defendant -- or the Defendants. And as a result, this claim -- and these two claims are infringed.

Let's now turn to the '435. This patent deals with coordination between a transmitter and a receiver in a wireless network.

The issue here that's been raised by Defendants is they assert that their receivers do not compute the data packets that have been discarded by the transmitter. And as a result, they don't infringe. And that's an element of the claim. We've proved it is met in the devices and that there is infringement. And I'd like to go through the proof.

To be coordinated with the transmitter, the receiver has to, absolutely has to compute the packets that the transmitter has discarded, and it does it in two-ways. Or in two steps I should say.

The first is the transmitter and the

Page 62

receiver are in tandem, and then windows which are the windows of packets they're expecting to receive, or in the transmitter's case it's expecting to transmit, those windows move in tandem together.

In addition, the transmitter discards packets that are before its window.

So it was a necessary and logical result, whenever the receiver computes where its window is and what packets are behind it, which it does every time it moves, it is necessarily also determining and calculating and computing what packets the transmitter has discarded.

Dr. Nettles confirmed that that's the operation. We asked him the question: Do the receivers that are at issue in this case make that computation of packets the transmitter has discarded?

Answer: Oh, yes, sir, they have to.

Question: Will you please explain to us how they do that?

And the answer was: In these systems, there's both a receive window and a transmit window, and those two windows are coordinated. And when the receive window shifts, the receiver's actually, in addition to calculating what packets are below its window, it's also calculating what packets are below the transmitter's

Page 63

window.

And Dr. Nettles presented an animation to illustrate the coordination that occurs between the transmitter and the receiver.

You may recall seeing this. The transmitter is on the top, and the receiver is on the bottom.

What happens is when the transmitter, in this case, decides that it's not going to retransmit packet 2 that was lost, it's just going to move on and tolerate a little glitch in the video, its window shifts, and then it either sends a block -- it sends a block acknowledgement response, either implicit or explicit; and as soon as that's received by the receiver, the receiver window shifts. That operation occurs over and over again, thousands of times a minute.

The receiver knows where its window is and it knows it doesn't expect to receive packets 1 through 4. And because it's coordinated with the transmitter by the rules of the standard, it also has computed that packets 1, 2, 3 and 4 have been discarded by the transmitter.

The process then continues, goes on and on and on, and basically, as I said during the evidence, these two windows stream down the line like -- like drag

Page 64

16 (Pages 61 to 64)

**A1681**



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL )
                   DOCKET NO. 6:10cv473
   -vs-     )
                Tyler, Texas
          )
D-LINK CORPORATION, ET AL    June 12, 2013

SEALED PORTION NO. 8 FROM TRANSCRIPT OF TRIAL
MORNING SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas 75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas 78701

COURT REPORTERS:    MS. JUDITH WERLINGER
                MS. SHEA SLOAN
                shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California 90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California 94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas 75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

PROCEEDINGS

(Courtroom sealed.)

Page 3

1 (Pages 1 to 4)

**A1701**



(Off-the-record discussion.)

THE COURT: Yes.

We will unseal the courtroom at this time.

(Courtroom unsealed.)

Page 5

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.

/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.: 3081
Expiration Date: 12/31/14

/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.: 731
Expiration Date 12/31/14

Page 8

2 (Pages 5 to 8)

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL          )
                          DOCKET NO. 6:10cv473
    -vs-                       )
                          Tyler, Texas
                      )  1:50 p.m.
D-LINK CORPORATION, ET AL      June 12, 2013

TRANSCRIPT OF TRIAL
AFTERNOON SESSION
JURY NOTES AND BENCH TRIAL
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE, AND A JURY

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:      MS. JUDITH WERLINGER
                      MS. SHEA SLOAN
          shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Jury out.)

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  We have a Jury Note No. 1 that reads:  Can we see a copy of Plaintiff's Exhibit 208-D, Intel source code regarding MAC and LLC header?  Signed by the Jury Foreperson, Donna Mangrum.

Is that in their group that's been introduced?  Was that introduced, Ms. Ferguson?

COURTROOM DEPUTY:  It's 208 what?

THE COURT:  D.

COURTROOM DEPUTY:  Yes.  A through K was introduced.

THE COURT:  So that should be in there.

MR. CAWLEY:  Should be.

MR. CAMPBELL:  Should be.

THE COURT:  Are they arranged by exhibit number and everything?

MR. CAWLEY:  Our copy of it does.

THE COURT:  Let me see that.

MR. VAN NEST:  Are we sure?  The D letter, does that mean it's a demonstrative?

MR. CAMPBELL:  No.  It was source code.

MR. CAWLEY:  It's right here.

Page 3

THE COURT:  Is that a copy of 208-D?  Let me see that.

Let me have the note for Ms. Ferguson, please.

Did Defendant have a chance to see this?

MR. VAN NEST:  No.

THE COURT:  Please take a look at that.

Ms. Ferguson, if you would --

Ms. Ferguson, if you would hand that to -- let them take a look at that.

MR. VAN NEST:  Your Honor, is there a clean copy of this?  This has handwriting, I think, by counsel.

THE COURT:  Just that notation about how to answer Question No. 1.

[Laughter]

MR. VAN NEST:  That must have been some conference call you had.

MR. STEVENSON:  This is the one I did at the podium, which, I guess, turned it into a demonstrative; but it's the one I notated while I was --

MR. VAN NEST:  Can we --

THE COURT:  Yeah.

MR. VAN NEST:  Can we get a clean copy?

THE COURT:  We need one with -- just like

Page 4

1 (Pages 1 to 4)

A1703

CASE PARTICIPANTS ONLY

they have. Do you have an unmarked --

MR. STEVENSON: I have a limited supply. I know I produced one that is the copy that was in evidence, and I produced one to the Defendant that I also didn't get back, and I think that exhausted my --

MR. VAN NEST: I have mine, but it's across the street at our trial site, but I can get it here in just a few minutes.

COURTROOM DEPUTY: Judge, they should have it in there.

THE COURT: Let me have another note.

COURTROOM DEPUTY: We can go look.

THE COURT: All right.

All right. I'm just going to send this note in: You should have Plaintiffs' Exhibit 208-D in your exhibit box.

But if there is no objection, I will have Ms. Ferguson send the note in and see if she can help them locate it.

Is there any problem with that?

MR. VAN NEST: No problem, Your Honor.

MR. CAMPBELL: No problem.

THE COURT: All right, Ms. Ferguson. Here is the note and -- and if they can't -- if for some reason it's not there, come back and let me know, and we

Page 5

will get them another copy.

Be in recess.

COURT SECURITY OFFICER: All rise.

(Jury deliberations continue.)

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

All right. I understand everybody finally found a copy of 280-D, and we've sent that in with a note to the jury apologizing for taking so long; so, they have that now.

And I believe both sides had reviewed that, had you not?

MR. VAN NEST: Yes, we have Your Honor.

MR. STEVENSON: Yes, Your Honor.

THE COURT: Okay. All right. Who will be your first witness?

MR. DAUCHOT: Dr. Shoemake, Your Honor.

MR. DE VRIES: And, Your Honor, Defendants also have a list of agreed upon pre-admitted exhibits for the bench trial. With Your Honor's permission, I'd like to hand that up.

THE COURT: All right. All right. And what is that labeled?

MR. DE VRIES: It's Defendants' List of Pre-admitted Exhibits for June 12th, 2013, Bench Trial.

Page 6

THE COURT: Okay. Proposed pre-admitted?

MR. DE VRIES: That's correct.

THE COURT: Okay. I'm about to admit them.

All right. Any objection?

MS. MOORE: No, Your Honor.

THE COURT: All right. The exhibits on Plaintiffs' proposed exhibits for bench trial which we'll mark as Defendants -- I'm sorry Defendants' Exhibit list, we'll mark as Defendants' Exhibit No. 7 -- Exhibit List No. 7, and there being no objection, those exhibits are admitted for the bench trial only.

All right. Plaintiffs have a similar list?

MS. MOORE: Yes, Your Honor. It's titled Plaintiff's Pre-admitted Exhibit List for the June 12th, 2013, Bench Trial.

THE COURT: Okay. We'll mark that as Plaintiffs' Exhibit List No. 7.

And any objection to those exhibits?

MR. DE VRIES: No, Your Honor.

THE COURT: All right. They will be admitted for the bench trial only.

All right. You may proceed, Counsel.

MR. DE VRIES: Thank you, Your Honor.

Page 7

MATTHEW SHOEMAKE, Ph.D., DEFENDANTS' WITNESS,
PREVIOUSLY SWORN
DIRECT EXAMINATION

BY MR. DE VRIES:

Q. Good afternoon, sir.

A. Good afternoon.

Q. Would you please introduce yourself.

A. I'd be happy to. My name is Matthew Shoemake.

Q. Dr. Shoemake, please tell us about your background.

A. I'd be happy to. I am currently the CEO of Biscotti, Inc., in McKinney, Texas. I'm originally from the Texas area. And my educational background is, undergrad, I went to Texas A&M University in College Station, Texas. I received -- I double majored there in electrical engineering and computer science. I graduated with honors.

And after that, I went to Cornell University in Upstate New York and studied electrical engineering there, as well, and received a Master's degree and a Doctorate degree.

Q. Dr. Shoemake, have you been involved in the 802.11 standards development process?

A. I have.

Q. In -- in what way?

Page 8

2 (Pages 5 to 8)

A1704

A. Well, I was involved early on. I got involved in 802.11 in late 1997, 1998. I was involved in the 802.11a and "b" standards development activities.

I was also elected as the chairman of 802.11g, so I was the chairman of 802.11g from 2000 to 2003, and I was the first chairman of the 802.11n as well.

Q. Dr. Shoemake, have you had any experience working on 802.11 products?

A. I have.

THE COURT: Counsel, let me just stop you for a moment and inquire if Dr. Shoemake has been sworn.

MR. DE VRIES: I do not believe so, Your Honor.

THE COURT: All right. If you would raise your right hand to be sworn, please.

(Witness sworn.)

THE COURT: Was everything you just testified to true?

THE WITNESS: It was. And, Your Honor, I was sworn in on Monday as well.

THE COURT: Oh, you were?

THE WITNESS: I'm sorry.

THE COURT: You're doubly sworn.

THE WITNESS: Sorry.

THE COURT: All right. You may proceed.

Page 9

MR. DE VRIES: Thank you, Your Honor.

Q. (By Mr. De Vries) Now, Dr. Shoemake, I had asked you if you had experience working with 802.11 products?

A. Yes, I have.

Q. And what experience is that?

A. Well, I got involved in 802.11 products in 1997, and then in 1998, I joined a startup company in California. It's actually in the San Francisco Bay area. It was named Alantro Communications, and we built 802.11 products there.

That company was -- in 2000 was acquired by Texas Instruments, and I actually moved back to Texas then. And inside Texas Instruments' R&D center in Dallas, I ran a branch of their R&D center that specifically focused on wireless LAN or 802.11 Wi-Fi technology, and led a team of engineers there.

Q. And what type of 802.11 products did you work on at Alantro in TI?

A. Well, semiconductor chips specifically. So semiconductors compliant with the 802.11 standard.

Q. Now, your work at Biscotti, does that involve 802.11 in any way?

A. Well, it does. At Biscotti, we don't build the chips, we build an end-consumer product, a video

Page 10

calling camera. But we have two generations of products. They both include Wi-Fi technology.

The first generation includes 802.11g technology, and the current or second generation includes 802.11n technology.

Q. Now, Dr. Shoemake, I'd like to ask you about your time working in the 802.11 standards development process, including when you had leadership positions in that process.

What goals, if any, did the IEEE have in developing 802.11?

A. Well, we had several goals. One of the biggest goals was interoperability. In fact -- by the way, I have some slides on this. The -- and they're shown here.

One of the biggest goals was interoperability. One of the things that we -- we could not do unilaterally as companies was -- was -- to have interoperability, so we needed to come together in a standards body and work together to set a standard so we could have interoperability.

And by interoperability, you can see on this slide I mean being able to take your Wi-Fi and it -- it work in your home and in the office and in a restaurant and a hotel.

Page 11

Another one that was very important for us, it's shown as No. 2 on the slide, is to make sure we had enabled a solution that was -- that was very low cost.

And this was important to us so the technology could go into -- to a lot of places and a lot of different types of devices.

And related to that I have here No. -- No. 3, which is broad market accessibility, and that means we -- not only did we want the technology -- I show a blow-up here -- not only did we want the technology to go -- be able to be used around the world, we also wanted it to be used in a lot of different types of devices.

Q. Now, Dr. Shoemake, in your experience, are there any patents that are related to the 802.11 standards?

A. Oh, there are. I mean, in fact, I -- I'm inventor on patents that are essential to 802.11.

Q. And how does that fact relate to the IEEE's goal of broad accessibility in terms of 802.11?

A. Well, it's -- it's potentially an issue for us, because what we want to do is we want to come together, enable a standard, select technology, and then enable these goals that -- that I talked about; but standards can -- I'm sorry -- patents can be a barrier

Page 12

3 (Pages 9 to 12)

A1705

because a patent is a right to prohibit someone from -- from manufacturing or selling. So it actually is an issue for us.

Q. And how, if at all, did the IEEE address that issue?

A. Well, the IEEE has been addressing this for a long time, even before I -- I was involved. There's an IEEE patent policy and all members, it creates a duty for members to -- I have a slide on this as well. So it creates a duty on members to -- to abide by certain rules.

Q. And in general, what do those rules say?

A. Well, you can see in the slide here, on the bottom left side is actually the front cover of the IEEE Standards Association Patent Policy. And I've highlighted one thing here.

One of the things it does on -- and this is communicated regularly to members at meetings -- is that there is a -- a duty to -- to provide assurances, and we do this, you can see here, through your request, letters of assurance.

We have a -- on approved letter assurance form. And what that letter of assurance or promise does is it -- it requires members to license to an unlimited number of people that would like access to the patents

Page 13

on reasonable and non-discriminatory terms.

Q. In the document that your slide refers to as DX 550 -- is that right?

A. That's correct.

Q. Now, can you please explain to us, Dr. Shoemake, what a letter of assurance is?

A. Sure. And I have some examples in here as well.

But a letter of assurance is -- is basically a promise, it's an agreement, and the IEEE has a standard form for this. It makes it very easy. The IEEE is a very -- has a very open process, and -- and it's part of our open process.

We have a form that allows members and participants, and even people that don't participant, to easily comply with the policy. It allows the -- the -- the entity that -- that may have a patent or wants to provide an assurance, to list who they are and to -- and to actually officially state their assurance.

Q. Now, can a letter of assurance be revoked?

A. Oh, no, it cannot. In fact, in the IEEE Standards Association Bylaws, Section 6, this is specifically addressed; and it specifically states that, hey, a letter of assurance is irrevocable during the period that the standard is active.

Page 14

Q. Now, I'd like to ask you about Ericsson in particular.

Did Ericsson submit a letter of assurance for 802.11?

A. They did, and I have it in my slide deck here I believe.

Yes, this is it.

Q. Okay. Now, what, if anything, did Ericsson promise to do in its letter of assurance for 802.11 which has been marked as DX 19?

A. Sure. So, again, you can see on the left side here is actually the letter of assurance. It's smaller than what I've done, as I made some things larger so you can see them. So you can see that this is a -- a letter from Ericsson and you can see it release to 802.11n.

The answer to your question is actually on the second slide, so maybe we can go to that. This addresses your question which is what -- what was promised.

And so you can see that -- you can see that Ericsson selected a few things here. They selected Item 1 and they also selected sub-item b, and sub-item b, I think, addresses your question.

So they -- they promised that they would grant licenses at -- at reasonable rates, and I've underlined,

Page 15

too, an unrestricted number of applicants, and also on reasonable terms that are demonstrably free of unfair discrimination.

Q. Now I'd like to ask you about Ericsson's promise that you just referred to. Is that standard language from the IEEE?

A. It is. This is a standard form from the IEEE.

Q. Now, anywhere in Ericsson's letter of assurance for 802.11n did Ericsson say that it was not going to provide a license to chip makers?

A. No, they did not.

Q. Okay. And how would have -- how would the IEEE have reacted if Ericsson, in its letter of assurance, had said it was going to provide a license to its patent to an unrestricted number of applicants except for chip makers?

A. Well, I think that would have been met with a quite negative response. I think that it's very likely that the -- the letter would have been rejected and certainly the membership, the voting members of 802.11 would have resisted that. I actually think it would have brought 802.11 standards development to a halt until the issue was resolved.

Q. And why do you believe that, Dr. Shoemake?

A. Well, because you have to understand chip

Page 16

4 (Pages 13 to 16)

**A1706**

makers are a main contributor to 802.11 development.

802.11 technology ends up in the chips and they make significant contributions. They submit letters of assurance themselves, expecting to be able to participate in this agreement, this overall philosophy and -- and this policy, the IEEE's policy.

And the -- the thought that they would contribute to the standard in their IP and submit their letters and not be able to participate in that is -- is something that they would have objected to.

Q.  Is this an issue that you ever experienced while working on 802.11 chips yourself during the standards development process?

A.  Yes.

Q.  Please share with us.

A.  Well, I can give you one example. I mentioned before that I worked for Alantro Communications, a startup company in California, and I participated in the development of 802.11b and 802.11a and, in fact, have technology in 802.11b.

And again, IEEE is an open, consensus-based organization; and there was a point in time where we got over the 75 percent threshold, which was an important phase. And after that meeting, I went back to Alantro and had a discussion with our president, Eric Rossin,

Page 17

and he was specifically asking about the intellectual property agreements and the RAND statements, and -- and I reported back to him that we, as Alantro, would be able to depend on those RAND statements that had been submitted by other members.

Q.  And Alantro was a -- was a Wi-Fi chip maker at the time; is that correct?

A.  That's correct.

Q.  Is there any question in your mind, Dr. Shoemake, that when Ericsson submitted a letter of assurance to 802.11n promising to license its patents to an unrestricted number of applicants, is there any question that that promise to license also extended to chip makers?

A.  There's no question in my mind.

Q.  Now I'd like to briefly ask you about a couple of more things.

Do you understand that Ericsson has said that it's asking for a rate in -- of 50 cents in this case?

A.  I do.

Q.  I'd like to ask you about your experience in the 802.11 standards development process that, in terms of cost and performance in those tradeoffs, would you please share with us your experience with respect to that issue?

Page 18

A.  Well, I'd be happy to. I brought two, if not three, examples and I have some slides on this topic as well.

So in -- in general, we had a lot of decisions and options to -- to choose between at -- at -- at key stages of standard development. And remember, we had 50 to a 100, sometimes 200 engineers in the room with -- with a lot of ideas, and so the -- the trick for us was deciding what we were going to select, not coming up with options.

And so this example that I have on the screen right now is an example related to 802.11b. 802.11b started off with something like five or six proposals and got down to a few. One of them was a higher performance option named PBCC, but it was going to cost a bit more and -- and then there was one named CCK and it was lower performance, but it was lower complexity and thus lower cost.

And even though the cost difference was -- was small, the body decided to make CCK mandatory and went down that path.

Q.  And so the 802.11 made the CCK option mandatory and the PBCC option optional; is that right?

A.  That -- that's accurate.

Q.  And what is your best estimate of the

Page 19

difference in cost between those two approaches?

A.  Well, that was actually discussed in the development process and -- and various estimates were made. There were estimates of 50,000 gates, and I remember estimates of 40 to 80,000 gates. By the way, a gate you can think of as a -- as a -- as a device that's down on the chip that does computations. And so we as engineers would measure the complexity in gates.

And so the estimate at the time was that -- that 50,000 gates may have been a cost to add one -- one to two cents, in that ballpark.

Q.  Are you familiar, Dr. Shoemake, with circumstances in which the IEEE 802.11 standards body considered the cost of proposed -- proposed patent licenses?

A.  I am. I mentioned that I had a few examples. I have some examples on the next slide as well. Two examples. I'd be happy to go through them.

Q.  Please do.

A.  The first example is from the 1994/1995 time frame, so this is actually with the original 802.11 standard before even 802.11a and "b" were ratified.

There was a professor, a Dr. Feher, he was a professor at the University of California-Davis, and he came to 802.11 and proposed some technology, and he told

Page 20

5 (Pages 17 to 20)

**A1707**

the body that the -- the license fee would be 10 cents per unit if he decided -- if the body decided to adopt that technology.

And at that rate, the body actually decided not to adopt the technology into the standard.

The -- the second example I have up here is in a -- in a different time frame again, in the 802.11a time frame. So this is 1997 to 1999. Lucent proposed some technology into the 802.11a standard, and they suggested that their royalty rate would be 5 percent of the end cost of the product.

And just to be clear, 5 percent of the end cost, like the notebook computer and access point, rather than the cost of a component like the Wi-Fi chip where the technology is -- and in this example the members of 802.11 pushed back again and the result was that Lucent clarified its position, changed its position to say that any royalty would be attached to -- at the component or chip level rather than at the end product level.

Q. Now, how do the items that you just mentioned where 802.11 was considering the cost of the technology or patent impact, if at all, your beliefs about what it means for a rate to be reasonable under a letter of assurance?

Page 21

A. Well, it informs a lot of things. I have an opinion that necessarily a reasonable rate is a small number of cents, if not smaller. And it -- and also an opinion that the -- the rate should be attached kind of on the least common denominator where the -- where the technology is and these, I think, support that opinion in showing how the -- how the members behaved and how they looked at this as well.

Q. What is your belief, if any, about how the IEEE would have reacted if Ericsson had said at the time of standard adoption that it was going to charge 50 cents for its patents for the claims to be in the standard?

A. I have some slides on this topic as well. It's my opinion that they absolutely would have gone down an alternative path; and that 50 cents would not have been acceptable.

Q. Okay. I would like to ask you about two more items. First, how many different technologies are included in 802.11, roughly?

A. Well, I think conservatively hundreds, more likely thousands.

Q. Okay. Do you have an opinion about the percent of a Wi-Fi chip that is -- that is described by or mandated by 802.11?

Page 22

A. I do. I spent a significant amount of time developing these chips, and I have a slide related to this topic. I'd be happy to go through it for you.

Q. Please do.

A. Well, if -- if you look inside, for example, a typical product such as a notebook computer, you'll find a small card. That's the green card down at the -- the bottom.

You will find a chip, sometimes chips, but in this case I showed a single chip, that includes the technology that really implements 802.11 or Wi-Fi. There are a lot of technologies in that.

Just to point out, you can see I called out there input/outputs on the bottom. These tend to be connectors to allow the -- the chip to connect with the rest of the device it's in, such as a notebook computer.

Inside the chip there's semiconductor technology, and that semiconductor technology will have -- is implemented on what's called a die, there's a die, and it has different functions in it.

So, for example, there will be interface logic that is -- that allows the chip to communicate with the -- with the rest of the system. There will be memory. There also would be a radiofrequency or analog section that I've shown on the -- on the top.

Page 23

And then there would be a portion of the chip that relates to the -- that is actually specified by the 802.11 standard, and I've shown that here in blue.

Q. And what amount, if any, do you believe that the portion that's specified by 802.11 -- and I'm talking about the portion of the Wi-Fi chip, what portion do you believe that to be?

A. Well, based on my experience, it's typically about 35 percent of the chip, about a third of the chip.

Q. Now, is all of that 802.11 portion of the chip 802.11n?

A. Oh, no, it's not. 802.11 has been developed over about 23 years now, and 802.11n is just -- just a portion of that.

Q. And what portion of the 802.11 aspect of the Wi-Fi chip do you believe is related to 802.11n?

A. Well, I've looked at that and I looked at different factors and different metrics and -- and I think conservatively it's easy to say that less than half of the 802.11 specification relates to 802.11n.

Q. And that also is your estimate of the portion of the 802.11 aspect of the chip that relates to 802.11n.

A. Well, I've looked at different metrics. I've looked at everything from -- the answer to your question

Page 24

6 (Pages 21 to 24)

**A1708**

is yes, and I -- and I've looked at the -- the area and technology and even things like page count. They all indicate that it's well less than 50 percent.

Q. Now, Dr. Shoemake, have you analyzed how many patents are related to the 802.11n standard?

A. I have.

Q. What sources of information did you consider in conducting that analysis?

A. Well, I have some slides on this topic as well. Maybe we can go to them.

So I looked at market reports. There's some third-party market reports that -- that I looked at. I also did an independent search myself and even looked at 802.11n contributions as well.

Q. What market reports did you look at?

A. I looked at a couple of market reports. One of them is known as the Sunlight report and there's another one known as TechIPm.

Q. For the record, the Sunlight report is at DX 157 through 159, and DX 162 to 164; the TechIPm report is at DX 149.

How, if at all, did you analyze those reports, Dr. Shoemake?

A. Well, with respect to the Sunlight report, the Sunlight report you can see here listed over 4,000

Page 25

patents related to 802.11n; but since it was done by a third party, I wanted to verify that. So what I did was, I went myself through and chose patents randomly. I -- and analyzed them.

I was able to analyze 128 of them, and -- and to determine if I thought they were related to 802.11n.

I determined that about 85 percent of them that I -- that I looked at were actually related to 802.11n, so I think that's about thirty -- 3400.

And based on my -- my sampling, I think I calculated a confidence interval of about plus or minus 8 percent.

Q. Now, let me ask you about the independent search that you performed. Please describe that.

A. Well, what I did with the independent search is I wanted to kind of start from the beginning and -- and myself and -- and come to my own conclusions. So, with the independent search, I formed search strings.

And maybe I can back up.

The U.S. Patent & Trademark Office has a website. The website allows you to input search strings to look for patents. And they have an advance search which allows you to put in more complex criteria for doing searches. And so I used their -- their website, and I constructed search sequences that -- that in my

Page 26

experience and in my expertise would help me find patents related to -- to 802.11.

And then I did the search and then I looked at the patents and then I iterated and updated my -- my search string to try to increase the accuracy.

Q. Based on all the sources that you looked at, what opinion do you have about the number of 802.11n related patents?

A. Well, based on -- on my analysis and everything I looked at, I -- I think it's -- it's safe to say that there are over 3000 patents that -- that relate to 802.11n.

Q. Thank you, Dr. Shoemake.

MR. DE VRIES: I pass the witness.

THE COURT: All right. Cross-exam.

CROSS-EXAMINATION

BY MR. CAWLEY:

Q. Good afternoon, Dr. Shoemake. The draft 2.0 of the 802.11n standard was approved in 2007; is that right?

A. I believe that's correct.

Q. And then finalized in 2009?

A. Yes. Ratified in 2009.

Q. Okay. But it's true, isn't it, that you stopped attending 802.11 meetings in 2004?

Page 27

A. That's correct.

Q. And it's also true that your company that you're with now, Biscotti, doesn't have anyone that goes to the 802.11 meetings?

A. That's accurate.

Q. Now, when members of a 802.11 meeting group decide what to put into the standard, they may be aware that what they put in is patented, true?

A. Could you repeat the question?

Q. Yes, sir.

When members of an 802.11 meeting group decide what to put into the standard, they may be aware what they put in is patented?

A. There might be awareness.

Q. Okay. And, in fact, I know the time is short here, and we all want to move along. You showed us a document earlier, DX 550. You remember that? It's the -- it's the first textual page of the patent policy?

A. Yes.

Q. If I told you that that very first line of the patent policy cautions people that the standard may include essential patent claims, you wouldn't disagree with that, would you?

A. I would not.

Q. Now, you just testified that you undertook a

Page 28

7 (Pages 25 to 28)

**A1709**

CASE PARTICIPANTS ONLY

study and did some research to determine how many patents relate to the 802.11 standard, correct?

A. That's correct.

Q. And you concluded that thousands of patents relate to the standard, right?

A. That's correct.

Q. Did you try to determine how many patents are essential to the standard?

A. That's a much more difficult task. I did not.

Q. You did not do that. Okay.

Now, let's also -- I'd like to put in context just briefly the RAND obligation that you've testified about.

Now, the IEEE is not a governmental or a quasi governmental body, is it?

A. It's not. It's a U.S. not-for-profit organization.

Q. Okay. It doesn't have the ability to make laws, for example?

A. Not that I'm aware of.

Q. It doesn't have the ability to take people's property without their permission?

A. I don't think it does.

Q. So, the IEEE relies on agreements to comply with RAND terms. Would you agree?

Page 29

A. Yes, I would agree with that.

Q. And you agree that a party, such as Ericsson, could limit the commitment that it makes?

A. In -- potentially in -- in certain ways.

Q. Well, for example, could a party participating in the IEEE making a declaration of essential patent claims to the IEEE say, I'm going to make the letter of assurance applicable to certain patents but not others?

A. Well, I think the -- the IEEE right now, that would probably be difficult to do because the letter of assurance gives you a couple of options, and it sounded like that would be selecting two options, right? One to -- to not license and one to license, if I understood your -- your question correctly.

Q. Well, what's to stop a company from going to the IEEE and saying: You know what, I've got two patents and I'm going to give you a letter of assurance applicable to Patent No. 1, but I'm not giving you any assurance about Patent No. 2?

A. They could do that. It might require submitting two letters of assurance, one saying no and one saying yes.

Q. Okay.

A. But -- but it could potentially be done.

Q. So they could limit their commitment in that

Page 30

way. You agree?

A. Well, again, it would depend on -- I guess I'd have to see the exact example. But there's some things that the IEEE won't agree to such as letters being put in that -- that exclude parties or discriminatory but --

Q. Well, but we're not looking to the IEEE to agree, are we? We're looking to the extent to which the owner of the patent is willing to limit their patent rights by making an agreement, correct?

A. That -- that may be a question of law.

Q. Okay. That's fair enough.

But on the same subject, you do agree, for example, that a company like Ericsson could insist on reciprocity as a condition of licensing?

A. With respect to the standard letter at this time, I -- it's my understanding the IEEE does not allow that to be modified.

I do know that at a point in the past they would allow that, and I think you can actually find letters that -- that have that.

But with respect to the -- the current letters of assurance, such as the one that Ericsson -- Ericsson signed, I believe the IEEE encourages you to use that -- that exact form.

Q. Okay. But just to move this along, you

Page 31

remember when I asked you -- or I didn't ask you -- someone asked you that question in your deposition if -- if a patent holder could insist on reciprocity as a condition of licensing, and you agreed that they could, didn't you?

A. The -- I don't think that the IEEE, at least historically, has rejected letters based -- based on that.

Q. You don't think they historically have rejected letters?

A. I'm sorry. I used a double negative. I apologize. The -- the letters have been accepted with -- with that -- with that condition.

Q. Okay. Good.

So, in that sense, that commitment would be defined by what the patent owner is willing to commit to?

A. I'm sorry. I didn't follow your question. Could you restate it?

Q. Yes, sir. If the patent owner wants to qualify or limit its letter of assurance to require reciprocity, you've said that -- that that's happened in the past?

A. It has happened in the past, that's correct.

Q. Now, you -- you told us about the letter of

Page 32

8 (Pages 29 to 32)

A1710

assurance that Ericsson sent at the request of the IEEE in 2011. You remember that testimony?

A. Yes. I think you're talking about the -- the April letter, yes.

Q. Yes, sir. But that was a second letter of assurance that Ericsson had sent to the IEEE, wasn't it?

A. It was.

Q. They sent an earlier one in 2003, correct?

A. That's correct.

Q. And in that letter, they appended a statement limiting or at least qualifying the scope of their commitment, didn't they?

A. They -- they certainly attached a -- a letter. I'm not sure the -- the degree to which they -- they qualified or limited it.

Q. Okay. But we've seen that exhibit already. I won't take the time to pull it up now. But -- but you recognize that Ericsson, in addition to filling out the IEEE form, in that first letter of assurance had some other things to say about what they were committing to?

A. I agree with that in their 2000 letter, yes.

Q. All right, sir. And you also agree that it's the position of the IEEE that they may continue to rely on letters of assurance like that all the way through the standard setting process?

Page 33

A. Yes. Reliance on those letters is a -- is a key point.

Q. Okay. Now, one of the features of these letters of assurances to the IEEE is an assurance of non-discrimination, correct?

A. Yes, that's correct.

Q. Okay. And in this context, the RAND assurance of non-discrimination means that the intellectual property costs for products compliant with the standard will be equal to or no more burdensome than the cost of a competitor.

You agree with that, don't you, if you put it in your report?

A. Yes, I do.

Q. Okay. And you understand, just to put all this in context, that Ericsson has offered to license Intel? Have you heard that testimony?

A. I -- I've heard that -- that Ericsson has asked for a 50-cents license fee, so I assume that means they -- they've offered to license at that rate.

Q. Okay. What is the -- if you know, what is the current total royalty on Intel 802.11n chipsets?

A. I don't know.

Q. Thank you.

MR. CAWLEY: Pass the witness, Your

Page 34

Honor.

THE COURT: Any redirect?

MR. DeVRIES: Yes, Your Honor. Just briefly.

REDIRECT EXAMINATION
BY MR. DE VRIES:

Q. Dr. Shoemake, you were asked about leaving the 802.11 standards body in 2004. At that time, how many years had you been involved in developing the 802.11 standards?

A. About seven.

Q. And what was your position in 2004 when you stopped associating with the 802.11 standards body?

A. I was the chairman of the 802.11n task group.

Q. Now, you were asked about the analysis you conducted about the number of patents related to 802.11n. I just have one question for you.

Do you believe that your analysis of that issue is a reliable indicator of the number of patents that may be essential to 802.11n?

A. I do. I think it's a good proxy.

Q. Okay. Now, you were asked about a 2003 letter that Ericsson submitted to 802.11. Do you recall that?

A. Yes.

Q. Okay. Now, that's a different letter than the

Page 35

one that Ericsson submitted to 802.11n; isn't that right?

A. That's correct.

Q. Is there any limitation, Dr. Shoemake, in Ericsson's letter of assurance to 802.11n where Ericsson says: We are not going to license chip makers?

A. No, there's none there.

Q. Are you aware of any circumstance at the IEEE in which someone limited their letter of assurance to require a cross-license not from the party that's going to be licensed but from that party's customers?

A. I have never seen that.

Q. Okay. And is it fair to say that one of -- that one goal of the IEEE is that -- for any limitation on the RAND promise to be clearly spelled out so that that could be discussed and resolved at the time?

A. Yes. If it -- if it's not, it creates a problem for the -- the system. I mean, one of the things we're trying to do is create an environment where people can be free -- free to operate. And if the terms aren't called out at the time and votes are taken on it, that's quite problematic.

MR. DeVRIES: I have no further questions, Your Honor.

THE COURT: All right. Anything further?

Page 36

9 (Pages 33 to 36)

**A1711**

MR. CAWLEY: I have nothing further, Your Honor.

THE COURT: All right. Any members of the audience have a question for this witness?

[Laughter]

THE COURT: No?

All right. Thank you. You may step down.

THE WITNESS: All right. Thank you, Judge.

THE COURT: All right. Who will be next?

MR. ALPER: Your Honor, the Defendants call Dr. Chris Heegard.

THE COURT: Okay.

MS. MORGAN: Good afternoon, Your Honor. Christine Morgan on behalf of Defendants.

May I proceed?

THE COURT: Yes, you may.

CHRIS HEEGARD, Ph.D., DEFENDANTS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MS. MORGAN:

Q. Go afternoon, Dr. Heegard.

A. Good afternoon.

Q. You're here today to talk about certain

Page 37

alternatives to the accused features of the 802.11n standard; is that right?

A. That's right.

Q. And before you get into your opinions, have you made certain assumptions in reaching the opinions you're here to testify about today?

A. Yes, I have.

Q. What assumptions have you made?

A. So my understanding of the question that I'm addressing is that, although I may not personally believe the patents are being infringed, I have studied the Plaintiffs' arguments about how products are being infringed by 802.11.

And so I've looked at the question of how -- at the time the standard was being ratified, how the standard could have been designed to not infringe the alleged activities that -- that Ericsson says makes the products infringe.

Q. So you've assumed infringement for purposes of your analysis?

A. I've adopted the Plaintiffs' explanation of how the products infringe and used that as a basis to ask the question, well, if that is an infringing activity, what could you do to -- as an alternative to that.

Page 38

Q. And what are your opinions about whether there were non-infringing alternatives available at the time the standard was being developed?

A. My opinion is that for all five patents, there were viable alternatives that the standards body could have used at the time they were setting the standard that would not infringe.

Q. All right. And you testified during -- in front of the jury about your background and your company Alantro. Is it fair to say that based on your experience with Alantro, you're knowledgeable about how to design and make 802.11-compliant chips?

A. I think I am, yes.

Q. All right. Well, with that background in mind, let's turn to your opinions.

First of all, what did you consider to be the relevant timeframe for assessing whether non-infringing alternatives exist?

A. I used the timeframe of 2006 to 2007. That's when the 11n standard was really being put together.

Q. And the alternatives that you've identified, were those available during that timeframe?

A. Yes. They were all available at that timeframe.

Q. All right.

Page 39

MS. MORGAN: Let's on pull up Slide 2, if we could.

Q. (By Ms. Morgan) And can you tell us what work you did, Dr. Heegard, in arriving at your opinions?

A. Sure. I can do that.

I -- of course, I reviewed all the patents. I read the disclosures and studied the claims that were being asserted and the claim construction.

I listened to the arguments of the Plaintiff in terms of Ericsson's infringement contentions. And I read Dr. Nettles' reports. I reviewed prior art. As we know, I -- we discussed some of that the other day.

I, of course, reviewed the 802.11 standard, and in particular, 802.11n standard. And I spoke with Bill McFarland of Qualcomm Atheros --

Q. Okay.

A. -- how their parts work.

Q. Thank you.

MS. MORGAN: Could we have Slide No. 3, please?

Q. (By Ms. Morgan) How do the features of 802.11n that Ericsson has accused in this case fit into the overall 802.11n standard?

A. The material in all of those patents is, like, related to very minor aspects of 802.11.

Page 40

10 (Pages 37 to 40)

**A1712**

Q.  And -- and why do you say that?

A.  There are lots of reasons.

One reason is that the 802.11 standard has a lot of technology in it.  I was involved in developing a lot of the early technology; and I know, for example, in 802.11n, a lot of the excitement about 11n was to get the data rate up.  And so there was a lot of stuff on the physical layer that was very innovative.

The -- the patents at issue involved refinements to very well-known techniques, such as ARQ.  ARQ has been known for a really long time.

Aggregation of packets; block acknowledgement of packets; QoS and packet prioritization, all of those have been around well before the patents were even applied for.

Q.  All right.  Let's get right to it.

MS. MORGAN:  Let's pull up Slide No. 4 and talk first about the '215 patent.

Q.  (By Ms. Morgan) What is the non-infringing alternative you've identified with respect to features of 802.11 that Ericsson accuses of infringing the '215?

A.  Okay.  My understanding of the '215 is that Dr. Nettles has pointed to what's called the type identifier field in the packets as being the -- is it -- is it making noise?  Thank you.

Page 41

There's a requirement in the claim that there be a type identifier field, and he's pointed to two bits in the packet that are the compressed bitmap bit and the Multi-TID bitmap, and he's saying that that's the type identifier field.

So the -- the non-infringing alternative is really pretty simple.  Since the 802.11 body was interested in just doing compressed bitmap acknowledgements, they could have -- rather than going to the 11e standard and using what they -- had already been defined in the table and just saying let's use the third element of that table, they could have just said we're just going to use block -- compressed bitmap acknowledgements and not send those two bits.

Q.  All right.  And I think you have a couple of slides to describe how this alternative would have worked.

MS. MORGAN:  Can we pull up Slide 5, please?

A.  Right.  So this is indicating that they could have just not used this table, which was -- had already been developed because they were only going to use -- I guess it's the second element of that table.

And at the time they were writing the standard, they certainly could have just said, okay,

Page 42

we're going to just use compressed BlockAck because -- since that's all they wanted to use, and they would just not use this table, which would mean -- on the next slide --

MS. MORGAN:  Next slide.

A.  -- that you wouldn't send those two bits.  You would just -- if you look at the -- at this particular part to the MAC frame, there's nine reserve bits, and they could have just made those 11 reserve bits and not used those bits.

Q.  (By Ms. Morgan) Would --

MS. MORGAN:  Let's go back to Slide 4, please.

Q.  (By Ms. Morgan) Would using this alternative have affected performance?

A.  Not at all.

Q.  All right.  And why not?

A.  Because it would perform exactly the way the standard works now.  They only use the compressed bitmap acknowledgement, so there -- there really would be no change.

Q.  All right.  And what type of engineering effort would have been involved in implementing this alternative?

A.  Essentially, zero.

Page 43

Q.  And why would this alternative be non-infringing?

A.  Once you decided to not put those two bits into the packets, there's no type identifier field as required by the claim.

Q.  Thank you.

Let's move to the '223 patent.

MS. MORGAN:  And if I could have Slide 7, please.

A.  As part of the '223 patent, my understanding is, only the Intel chips are being accused of infringement and that the chips from four other -- maybe the four other parties that make chips here, Broadcom, Qualcomm, Realtek, and Ralink, none of those chips, in fact, infringe the patent.

Q.  All right.  And you were here when Dr. Nettles testified to that fact in the trial?

A.  Right.  Dr. Nettles admitted that those -- the chips from those four vendors do not infringe these patents -- this patent.

Q.  All right.  Let's move to the '568 patent.

MS. MORGAN:  And if I could have Slide 8, please.

Q.  (By Ms. Morgan) What is the non-infringing alternative you've identified with respect to the '568

Page 44

11 (Pages 41 to 44)

**A1713**

patent?

A.   It's similar to the -- to the previous one.

There is a -- some information that's encoded into the MAC header that need not be there.

In this particular case, there's something called -- well, first off, the claim requires a service type identifier.  And Dr. Nettles points to the TID subfield as providing the service type identifier.

And the TID field, under certain circumstances, basically, lists the priority of the data which is used to determine which queue it sends in.

I think there was a lot of discussion about those four queues, and the queue is determined from the TID field.

But, in fact, the prior -- the priority information that's in the TID field is not used, once it's left the transmitter.

So, although the standards body decided to include that in the header and send it, it really has no application.  So it would be very easy for them to just take it out.

Q.   All right.  And I think we have a picture on the next slide of how this would work in practice.  Can you explain this?

A.   Yeah.  When a packet was going to be

Page 45

transmitted, the priority number would be used -- it's a little confusing, because there are eight priorities and four queues, so there's some function that says, okay, a -- maps pairs of priorities to the same queue.

And so that function can occur.  It's all done at the transmitter; and rather than sending that priority number in the packet, it could have just not sent it.

Q.   All right.

MS. MORGAN:  And let's go back to Slide 8 for a minute.

Q.   (By Ms. Morgan) Why would this alternative be non-infringing?

A.   The claim requires that there be a service type identifier field in the packet that identifies something about the -- actually, the type of data in the -- in the payload.

And Dr. Nettles has pointed to the TID subfield, the information in that subfield that tells you the priority of the data as being the service type identifier; and by simply not transmitting that, you would not be infringing the claim.

Q.   And would this alternative have affected performance of the system?

A.   Not at all.

Page 46

Q.   And why is that?

A.   Because there's no real application I can think of or that anyone else has proposed for using that -- for having that in the packet, because all the -- the purpose of it is at the transmitter, and so it's -- it has no purpose really.

Q.   All right.  Can you move away from the mike a little bit.  Thank you.

A.   Okay.

Q.   What type of --

A.   Sorry.

Q.   That's all right.

What type of engineering effort would have been required to implement this alternative?

A.   Essentially, nothing.

Q.   Okay.

MS. MORGAN:  Let's turn to the '625 and '435 patents.  And if I could have Slide 10, please.

Q.   (By Ms. Morgan) For these two patents and the accused functionality of the standard, what non-infringing alternatives did you identify?

A.   I'm going to -- I actually found a number of them.  I'm going to discuss two of them.

Q.   And what are those two?

A.   The first one is to simply do aggregation and

Page 47

use the existing legacy 802.11 ARQ protocol, the same protocol that was in the original '97 standard and used through 11g.

The second alternative -- and that does not involve a window.

The second alternative is to do essentially the same as -- as one, but it's a refinement in that.

Rather than just doing an acknowledgement -- single acknowledgement, it has a block acknowledgement, which is not so -- also not a non-infringing idea because it preexisted the patent application.

Q.   Okay.  I think you meant to say it also is a non-infringing idea.

A.   Is a non-infringing idea.

Q.   You understand that Ericsson, during the course of this case, has claimed at various times that both A-MPDUs and BlockAck requests from the 802.11n standard infringed certain elements of these two patents?

A.   Right.

Q.   Do either of the two alternatives that you've identified use block acknowledgement requests?

A.   So that's a good point.  No.  The block acknowledgement request is an option in the standard.

And so for both of these alternatives, I

Page 48

12 (Pages 45 to 48)

**A1714**

assume they just took that out of the standard. It's really not needed. There are certain devices that don't even use it, and it's really not essential to the operation of 802.11n, so...

Q. All right.

MS. MORGAN: Let's pull up Slide 11, please.

Q. (By Ms. Morgan) And to give us some context for the alternatives you've identified for these two patents, let's discuss how the prior art 802.11 system worked.

First of all, did the prior art 802.11 legacy system use aggregation or BlockAck?

A. No. Aggregation and BlockAck wasn't in the original system. It's also not in the two patents.

Q. All right. And the prior art system that we're looking at on the slide here, this depiction of how it works, when was that system in place?

A. Well, this was developed and worked on by the original 802 group. And I've seen drafts from, say, 1995 that had it in it; but, in fact, it was ratified, I think, in the summer of '97.

Q. Okay. And can you explain how the prior art system worked?

A. Sure. In 802.11, what I'm calling the legacy,

Page 49

the -- is a pretty simple scheme. You send a packet.

So I'm illustrating here that X is being sent by the transmitter and the receiver receives X; and so it sends an acknowledgement telling the transmitter that I received X, which, by the way, is what's happening almost all the time.

We spent a lot of time trying to figure out what happens when things get lost; but when the system is working properly, most of the packets -- a large majority of the packets are just being sent across and being acknowledged.

However, in this kind of a scheme, there are situations where you need to do retransmission. So sometimes you send a packet, and it doesn't get acknowledged, and you send it again, and it acknowledges, and it goes through.

Sometimes you get in a situation where the channel is, for whatever reason, busy and multiple attempts to get the packet through are -- fail. And so there's something called a retry limit at the transmitter.

And if the number of retries hits the limit, then it's -- gives up on that packet and goes ahead to the next packet. And that's shown here.

Q. All right. Was there any deadlock issue in

Page 50

this prior art approach?

A. No. On this approach, since the receiver isn't expecting to receive anything, it's just taking what it's being sent. There's no deadlock situation where the receiver is expecting a packet that the transmitter has discarded.

And so there's no requirement of the receiver to tell the transmitter to -- or for the transmitter to tell the receiver to move on. It's just, by sending the next packet, it knows I'm moving along.

Q. And was there any requirement for a command to receive or a discard message in this system?

A. Since deadlock never occurs in here, there's no require -- there's no need for a solution to the problem, which is either commanding the receiver to receive something or to discard something or to calculate that something has been discarded at the transmitter.

Q. All right.

MS. MORGAN: Let's move to the next slide, please.

Q. (By Ms. Morgan) With that context of the prior art system, could you please describe the first non-infringing alternative you've identified, aggregation with single acknowledgement?

Page 51

A. So this Alternative 1 is actually part of 11n and is implemented and is not an accused method of doing aggregation.

So in this case, the packets coming into the MAC, the MSDUs, a number of them are put together and sent together on -- in one packet.

And then -- so that's illustrated here.

There's a transmission in blue that shows four packets going across the receiver. And in normal mode, it's received correctly with no errors, it sends an acknowledgement back saying, yeah, I got all the packets.

The exceptional case is when something is sent across, and there's a failure. For example, the second packet might not be -- might not arrive. And so the second packet is an error.

In this case, the receiver cannot -- will not acknowledge, because it didn't receive everything; and so it doesn't send the acknowledgement, which tells the transmitter, just like in the legacy one, to -- to send it again, and it sends all four packets again.

Q. All right. And what happens in this example we're looking at if the transmission of Packet No. 2 doesn't get through?

A. Well, it's -- if -- if the next transmission

Page 52

13 (Pages 49 to 52)

A1715

got -- gets through, there will be an acknowledgement.

If it doesn't get through, it will be sent again.

And so there will be a number of tries to send the four packets across. And if an acknowledgement is never received by the transmitter but the number of tries hits the retry limit, then the transmitter will give up on those four and go to the next four.

Q. And, again, was there any deadlock problem in this approach?

A. There's no deadlock problem.

Q. All right.

A. There's also -- there's no sliding window in this. There's no shifting window. It's my understanding that the arguments of Ericsson about infringing have to deal with the sliding window feature of 802.11n.

Q. Thank you.

MS. MORGAN: Can we move to the next slide, please?

Q. (By Ms. Morgan) What type of engineering effort would have been required to implement this alternative?

A. It's actually less complex, and it's actually part of the standard now, so people do it. So it's low.

Page 53

Q. All right. Are you aware of any products that actually use this approach?

A. There are products that have used and probably still use it.

Q. And would this alternative affect performance of the system?

A. It would not significantly reduce performance.

Q. All right.

MS. MORGAN: Let's go to the next slide, please.

Q. (By Ms. Morgan) Could you explain for us your second non-infringing alternative with respect to the '625/'435 patents, aggregation with BlockAck but without window?

A. Right. The -- this scheme is very similar, except it's a little more efficient in the sense that it doesn't send packets across the air that have already been received correctly.

So it's -- rather than aggregating MSDUs, which are the ones coming into the MAC, it aggregates MPDUs, which have, for example, sequence numbers attached to them from -- that the header -- the MAC assigns to them.

So now the packets have a number associated with them, so when they're sent across the channel -- so

Page 54

in this case, it sends packets 1 to 4 -- when no errors are received, the acknowledgement tells the transmitter 1, 2, 3, and 4 is received, and then it goes on.

However, if you're back in the scenario where you send the four packets across, and the second packet is received with error, the receiver tells the transmitter with an acknowledgement that I received 1, 3, and 4.

The transmitter now knows that you're -- that you need -- that you would like to get 2, and it only sends 2. It now knows -- since it knows you have 4, 3, and 1, it only sends you 2.

Q. All right. And so in this system, if any sub-blocks are missing, only those sub-blocks are retransmitted?

A. That's right. It's kind of a -- it works on this block and tries to narrow it down and hopefully gets everything through, through retries. Again, if -- after the number of attempts hits the retry limit, it will give up.

This is different than the way 11n works, because in 11n, it's a little more clever. It would say, okay, you need 2. I'm going to tack in some new information.

So in this transmission here that shows the

Page 55

single of 2, it would add in say 5, 6, and 7 to try to -- to send some information. And that's where the shifting of the window occurs, and that's the alleged infringement.

Q. All right. And in this example, it's prior art, and there is no window shifting, correct?

A. That's right.

Q. What type of engineering effort would have been required to implement this approach?

A. This is simpler than what's done with the shifting of the window, because it's just a block-based system. You don't have to have that complicated procedure to try to have one window sliding along and another one following it.

Q. And would this alternative affect performance?

MS. MORGAN: Could we go the next slide, please?

A. At most, some marginal amount.

Q. (By Ms. Morgan) All right. And for all of the alternatives you've just testified about for the five patents-in-suit, would the user experience be different if the alternatives were implemented?

A. Not at all.

Q. Okay. Thank you, Dr. Heegard.

A. Thank you.

Page 56

14 (Pages 53 to 56)

A1716

MS. MORGAN: Pass the witness.

THE COURT: Cross-exam.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q. Good afternoon, Dr. Heegard.

A. Good afternoon.

Q. I don't think we've had a chance to meet -- met -- meet. My name is John Campbell. I'm one of the attorneys for Ericsson.

A. John Campbell?

Q. That's correct.

A. Okay.

Q. Just a few questions for you.

On your direct, I didn't hear you provide any evidence of testing any of these non-infringing alternatives, did you?

A. No.

Q. And I also didn't hear you provide any evidence that the IEEE considered any of these non-infringing alternatives, did you?

A. No, I didn't.

Q. Now, do you -- you -- you've offered a number of non-infringing alternatives. Do you know if there are any patents related to the non-infringing alternatives?

Page 57

A. I don't know.

Q. Okay. You didn't do a search for that?

A. No.

Q. Okay. Let's talk about the '215.

The '215 has a Multi-TID frame variant for power save mode, correct?

A. 11n doesn't use that, as far as I know.

Q. Its in the standard, correct, sir?

A. It's in the 11e standard.

Q. It's in the 11n standard as well, correct?

A. It's not used.

Q. All right. I understand, sir. I'm asking you, is it in the 11n standard?

A. I don't think it is, actually.

Q. Okay.

A. I don't think if you -- if you make a product that does 11n, they don't use that; and so I don't really think it is part of 11n.

Q. So we won't find it in the 11n standard if we look at the IEEE 11n standard?

A. I think it came from the 11e, and they wanted that particular variant, and so they used the text from 11e.

Q. Maybe I'm not being very clear with my questions.

Page 58

If we look at the 11n standard, the document --

A. Okay.

Q. -- are we going to find a Multi-TID power save mode variant?

A. Well, the way the standard was written, those two numbers are sent. So it should be described in 11n.

Q. So it is in there; is that correct, sir?

A. The two bits that are used, the particular combination is in the standard, yes.

Q. Okay. And you understand that some members of the IEEE wanted to make that mandatory, correct, sir?

A. Wanted to make what mandatory?

Q. The Multi-TID variant or the power save mode.

A. I don't know.

Q. You talked to Mr. McFarland, correct, sir?

A. Okay.

Q. You have, right, sir?

A. Yeah.

Q. Okay. You understand he's testified that some members wanted to make that mandatory?

A. I don't recall that.

Q. Okay.

MR. CAMPBELL: Let's bring up Mr. McFarland depo at Page 38, Lines 10 to 17.

Page 59

Q. You said you had talked to Mr. McFarland, correct, sir?

A. I did talk to him, yeah.

Q. Okay.

QUESTION: If you look here, you can see the question is: So there was a movement to make the PSMP and the Multi-TID BlockAck mandatory?

ANSWER: Yes. There were definitely people who wished that it were mandatory.

QUESTION: And across how many meetings do you think this was discussed?

ANSWER: A fair number. This was, you know, three, four.

Q. (By Mr. Campbell) Did I read that right?

A. It looks right.

Q. Okay. Now, 802.11e used the basic BlockAck, correct, sir?

A. 802.11e, I think, defined the different types of block -- block acknowledgements.

Q. Okay. The device compliant with 802.11e, would it use basic BlockAck or the compressed?

A. Basic BlockAck is when you're doing aggregation with fragmentation; and when you're doing aggregation with fragmentation, you need to use the basic BlockAck. So yes.

Page 60

15 (Pages 57 to 60)

**A1717**

Q. So the answer is yes?

A. 802.11e.

Q. Now, is it important that the IEEE, for new versions of the standard, to provide backwards compatibility?

A. Of course.

Q. Okay. Let's talk about the '223 patent.

Would you agree that Intel's chips are probably the best in the industry?

A. I have no opinion on that.

Q. You don't have an opinion on that?

A. No.

Q. Do you think Intel's chips are regarded as the best in the industry?

A. I have no idea.

Q. Okay. Does Intel command a higher price than other chip makers in the industry?

A. I have no idea.

Q. All right. Now, Intel uses both a retry counter and a -- and a timer, correct, sir?

A. That's my understanding.

Q. Okay. Now, could Intel, if they removed the timer, still maintain interoperability?

A. You have to transmit the timer, if the question is whether you use it at the receiver, is my

Page 61

understanding. I have not written a report on non-infringement of the '223.

Q. You didn't just testify here as to a non-infringing alternative for the '223?

A. I simply stated a fact, that it -- that there are -- four of the five chips that have been discussed in this group, four of the five have been admitted by Dr. Nettles as not infringing the patent.

That's all I said. I didn't have an opinion about infringement or anything else. I simply stated that only Intel is being accused, and the four other vendors are the -- the other side has admitted they do not infringe, and that's all I -- that's all that slide says.

Q. Okay. So just to be clear, you don't have an opinion on a non-infringing alternative for the '223 patent; is that correct, sir?

A. I think you could play --

THE REPORTER: I'm sorry. I'm sorry. Could you --

THE COURT: You're getting a little too close to the microphone.

THE WITNESS: Okay.

THE COURT: If you'll push it back --

THE WITNESS: I'm sorry.

Page 62

THE COURT: -- and try to stay about that far away from it (indicating).

THE WITNESS: I'll try.

Q. (By Mr. Campbell) Let me -- let me ask my question again just to get us back on track.

Sir, yes or no, do you have a non-infringing alternative -- do you have an opinion on a non-infringing alternative for the '223 patent?

A. If I had a Ralink chip, that's not infringing.

Q. How does buying a Ralink chip make the Intel chip non-infringing?

A. The question is, are there non-infringing alternatives? Those chips are non-infringing. They're alternatives that are available now.

Q. Okay. Do you --

A. So you could -- that's the point.

Q. Sir, do you have an opinion about the Intel chip, a non-infringing alternative for the Intel chip?

A. That's not what I'm --

Q. The answer is no?

A. I don't have an opinion.

Q. You don't have an opinion. The answer is no.

A. (No response.)

Q. You don't have an opinion; is that correct, sir?

Page 63

A. There are non-infringing alternatives because four of the five chips don't infringe.

Q. Sir, do you have an opinion as to a non-infringing alternative for the Intel chip?

A. Intel could do what the other vendors do.

Q. Which is what?

A. It's a non-infringing alternative.

Q. Do they use the timer?

A. They don't use the timer.

Q. Okay. So could Intel remove the timer and still be interoperable?

A. Sure.

Q. They would still get Wi-Fi certification?

A. Sure.

Q. Thank you, sir.

Okay. On the '568, your non-infringing alternative is still identifying traffic priority, just in a different way; is that correct, sir?

A. My understanding of what -- what Ericsson says is infringing is when you send the traffic priority, which they're identifying as the type identify -- the TID as serving the role of the claim. It's the priority number. That's what I understand the -- Ericsson's argument is, the -- can we look at the slide? It's like --

Page 64

16 (Pages 61 to 64)

**A1718**

Q.  So --

A.  -- data type identifier or whatever it is in the claim.

Q.  So I don't have a lot of time.  Could I get you to answer my question?

A.  Sure.

Q.  Okay.  That would be great.

My question is:  Your non-infringing alternative still identifies traffic priority just in a different way, correct, sir?

A.  The traffic priority -- to infringe, you have to send in that MAC header something that tells you about the nature of the data.

And if you don't send the thing that's being accused, if the -- if the information that Ericsson says is providing that information is not sent, you're not infringing.

Q.  Sir, let's try a yes or no.

Your non-infringing alternative is still identifying traffic priority, just in a different way.

A.  No.

Q.  No?

A.  No.

Q.  You're not identifying traffic priority?

A.  I'm not sending an identification of the

Page 65

traffic priority.

Q.  That's not my question, sir.  Are you identifying traffic priority?

A.  There is traffic priority.

Q.  Thank you, sir.

And you need to identify that traffic priority because identifying traffic priority has value, correct, sir?

A.  At the transmitter.

Q.  The answer is yes?

A.  At the transmitter.

Q.  Yes?

A.  It has no value at the receiver, knowing that.

Q.  Okay.  The answer is yes, at the transmitter?

A.  It's useful at the transmitter.

Q.  There's no value, in your opinion, to sending the priority value to the receiver?

A.  That's right.

Q.  If I'm working in a local area network --

A.  Okay.

Q.  -- does the receiver use the priority value?

A.  Are you talking about the priority value that comes in the Ethernet packet, or are you talking about the priority value that's computed at the transmitter to determine which queue you're in?

Page 66

Those are two different priority values.  The value in the packet is still going to be sent, but -- because it's in the payload.

But if you're talking about the priority data that's used in 802.11 to determine which queue it's in, you don't need to send it, because it has no use further down the chain.

Q.  The receiver would not use that in a local area network?

A.  No.

Q.  Now, for the '625 and '435, the Alternative 1 --

A.  Okay.

Q.  -- you only acknowledge if the -- you only send an acknowledgement if the entire block is error free; is that correct?

A.  That's right.

Q.  And otherwise, you need to -- the transmitter will need to resend the entire block, correct?

A.  Right.

Q.  Okay.  So if -- the transmitter can't just send a lost packet; it's got to resend the entire block, correct?

A.  It sends the entire block.

Q.  Okay.  So there is some efficiency lost there

Page 67

in needing to send the entire block if only another packet is needed, correct, sir?

A.  Right, there is.

Q.  Okay.  And have you done any testing to determine how much efficiency is lost?

A.  I haven't, but it's very small.

Q.  You haven't done any testing to determine the amount, have you?

A.  I couldn't give you an exact figure, but if you send a thousand packets and one in a thousand you have a problem that you send some re -- packet -- some parts of it again, it doesn't really affect the through-put because you got 999 packets through.

So, it's only when you're in the error condition that it's -- there's a slight inefficiency.  But if you're having a lot of errors, then you have another problem and so you would back off.

So the reality of it is, is most transmission, there's no error; so, there's no -- it's perfectly efficient.  And it's only a very small fraction of the time would you have a slight inefficiency.

Q.  Let me ask my question again.  You haven't done any testing to test the efficiency loss, have you?

A.  I haven't tested it, no.

Q.  Okay.  Now, in Slide 15, you admit that

Page 68

17 (Pages 65 to 68)

**A1719**

alternative 2 has some performance degradation, correct, sir?

A. No, I don't. I said marginal.

Q. Okay. Marginal is not some performance degradation?

A. Marginal is insignificant.

Q. Have you done any testing to measure the marginal system performance degradation, sir?

A. No.

Q. Thank you, sir.

MR. CAMPBELL: Pass the witness.

THE COURT: All right. Redirect.

REDIRECT EXAMINATION

BY MS. MORGAN:

Q. Dr. Heegard, I believe you testified that -- in cross-examination that the alternatives you identified were not considered by the IEEE.

I think you may have been mistaken because wasn't the first approach you identified for the '435, '625 patents, isn't that part of the standard today?

A. That's true. I probably shouldn't have said blanket.

Q. Okay. And counsel asked you a number of questions about whether you tested these alternatives?

A. Right.

Page 69

Q. Did you feel it was necessary to test these alternatives?

A. No.

Q. Why not?

A. Because they're all pretty minor tweaks and they wouldn't really have a significant effect on any of the things. So, if whether you send two bits or not, or whether you acknowledge packets slightly differently, doesn't really affect the user experience in any significant way.

Q. Thank you.

THE COURT: All right. Any further questions?

MR. CAMPBELL: No, Your Honor.

THE COURT: All right. You may step down.

Who will be your next witness?

MR. ALPER: Your Honor, Defendants call Dr. Greg Leonard.

THE COURT: All right. Dr. Leonard.

Let me just, while he's coming up, advise the parties the jury had asked the Court Security Officer if they could quit at 4:00 today, and... I'll write them note.

COURTROOM DEPUTY: Your Honor, may I go

Page 70

ahead and swear in the witness?

THE COURT: Yes, you may.

(Witness sworn.)

THE COURT: All right. I'm going to send a note in to the jury that simply says: You may work at your desired schedule. You may quit at 4:00 p.m. or keep working as late as you wish.

Any objection to that note?

MR. STEVENSON: No objection.

MR. VAN NEST: No, Your Honor.

THE COURT: All right. Thank you.

Oh, let me add one more thing. I'm adding another sentence: Please let me know your plans.

All right. You may proceed, Counsel.

MR. MITCHELL: Thank you, Your Honor.

GREGORY LEONARD, Ph.D., DEFENDANTS' WITNESS, SWORN

DIRECT EXAMINATION

BY MR. MITCHELL:

Q. Please introduce yourself to the Court.

A. My name is Gregory Leonard.

Q. And, Dr. Leonard, did you prepare any slides to help walk the Court through your background and opinions today?

A. I did.

MR. MITCHELL: Let's pull up slide 2,

Page 71

please.

Q. (By Mr. Mitchell) I'd like to briefly review your qualifications. What do you do for a living?

A. I'm an economist and a partner at an economic consulting firm called Edgeworth Economics.

Q. And can you describe for the Court your formal education?

A. Yes. I received a Bachelor of Science degree in applied math and economics from Brown University and a Ph.D. in economics from MIT?

Q. Any teaching experience?

A. Yes. I was an assistant professor at Columbia University in the economics department.

Q. And have you done any publishing, particularly articles on economics?

A. Yes. Over the course of my career, I have published probably about 60 journal articles, book chapters, that kind of thing.

Q. And have you ever been cited?

A. My work on patent damages in particular has been cited both by the Federal Trade Commission, in a recent report it did on patent damages in other patent litigation issues, and by the Federal Circuit in its Uniloc opinion.

Q. And what was your assignment in this case,

Page 72

18 (Pages 69 to 72)

**A1720**

Dr. Leonard?

A. My assignment was to analyze the value of Ericsson's asserted patents, particularly in light of its RAND commitments.

Q. And how do you go about doing that?

A. Well, economists are widely agreed that the meaning of RAND, or at least a reasonable part of RAND, is that you should look at a royalty or value in terms of the -- the -- what the patented features provide over alternatives that might have been available at the time the standard was set.

Q. Before we jump into your opinions, can you briefly describe what information you considered or relied upon in formulating your opinion?

A. Yes. I reviewed documents produced by the parties in the case, deposition transcripts, the reports of the technical experts. I also talked to Dr. Shoemake and Heegard, and I also talked to employees of Qualcomm Atheros.

Q. And on the question of the value of Ericsson's patents, what is your opinion?

A. My opinion is that it's quite low.

Q. And can you elaborate a little further for us in terms of, you know, how you got to that opinion?

A. Yes. As we've just heard from Dr. Heegard,

Page 73

then put it together, you have the standard.

So, in the picture here I've illustrated that the industry is -- is sitting at a particular fork in the road. There are two different technologies that it could adopt to solve a particular problem that, you know, is part of what needs to be addressed by the standard.

There's a right fork in the road which would be to use a non-infringing alternative. There's a left fork in the road which would be to use Ericsson's technology. And the way I've drawn this it was -- it was deliberate. It says that whichever fork in the road you take, the length of the road you'd have to drive is the same. So that is to say the two technological choices are basically for all intents and purposes equivalent.

And in that kind of situation, then, if you think about Ericsson asking the industry to pay a toll for it's -- the use of its technology, that is to say a royalty, when the industry has the choice of taking that right-hand fork instead of paying Ericsson a toll, then what's going to happen is Ericsson's ability to charge a high royalty is going to be severely constrained, because the industry is going to say, you know, we're not going to pay you anything, Ericsson, because we can

Page 75

there were very good non-infringing alternatives that the standard could have used instead of the Ericsson technologies, and given that, then the value of the Ericsson technologies is low.

That's the definition of -- you know, that's how value is created. You have to provide something above the non-infringing alternatives, and in this case, that's not the case.

Q. And I'd like to turn now to the issue of patent hold-up. And can you describe that for the Court a little bit about that phenomenon?

MR. MITCHELL: And we can go ahead and bring up Slide 3.

A. Sure. So an important part of RAND and the whole idea of a RAND commitment that standard setting organizations ask their participants to make is to avoid what's called patent hold-up. And so to explain that, I've created this exhibit here.

And so the idea is, again, when this industry is a standard setting organization is -- is determining what the standard should look like. There are a bunch of technical problems that need to be solved, and for each one of those problems, there's often more than one alternative technology that could be used to solve the problem. And, of course, when you make that choice and

Page 74

just take the right-hand fork in the road and be on our way and without any hidden performance at all.

Q. (By Mr. Mitchell) And then so that was the before hold-up, right?

A. Right. So this is, again, when the industry is setting the standard, it's making the choices about what technologies to include, and it has complete flexibility to choose a non-infringing alternative, which in this case, again, as I've drawn it, is just as good as the Ericsson technology.

Q. And then let's turn to the next slide and tell --

THE COURT: Counsel, let me interrupt you for a moment. I have jury Note No. 2 from the jury that said -- says: We are not close to decisions. Would like to return tomorrow morning. Signed by the Foreperson.

And I propose to write back the following response -- response to jury note No. 2:

Very good. You are excused until 9:00 a.m. in the morning. Please remember my instructions while you are in recess. Once all eight of you are present in the morning, you may continue your deliberations. Have a good evening.

Is there any objection to that response?

Page 76

19 (Pages 73 to 76)

**A1721**

MR. STEVENSON: No objection.

MR. VAN NEST: No, Your Honor.

MR. STEVENSON: All right. Thank you.

All right. You may proceed.

Q. (By Mr. Mitchell) All right. Dr. Leonard, I think you were just going to introduce us to this next slide here. Why don't you go ahead and -- and walk us through what this slide illustrates?

A. So this illustrates the hold-up problem, and that can occur once the industry has already chosen which technology it's to incorporate into the standard.

It's already set the standard. It's already designed products that are compliant with the standard and started selling them in the marketplace. And that's represented on this diagram by the fact that the industry has already chosen the left fork, which was covered by Ericsson's technology, and is driven the full length of the road.

And it's only then that Ericsson stops the industry and says at this point we want to talk to you about royalties.

Now the difficulty in the comparison to the previous slide is at this point the industry has already committed down the left-hand fork in the road, even though it was no better than the right-hand fork.

Page 77

At this point to reverse that decision and go back and take the right fork would mean driving back all the way to the original fork in the road and then taking the right-hand path.

That would take time, that would cost money, you would have to redesign all your products. You actually have an installed base of products out there who would be left high and dry. So it's very, very unattractive.

So at that point in time, Ericsson, in principle, could ask for a fairly high royalty, but that royalty would not be reflecting the true economic value of their technology but instead the fact that the industry was locked in and could be held up.

Q. Okay. Thank you.

Now back to the question of the valuation of the Ericsson's patents. Did you determine an actual value that would be paid by Defendants for a license under Ericsson's patents?

A. I did under, again, RAND terms.

So, I'm excising out hold-up and I'm focusing just on the economic value of Ericsson patents relative to the non-infringing alternatives that could have been available or were available at the time and could have been adopted into the standard.

Page 78

Q. And let's turn to the next slide. And can you go ahead and summarize your opinion?

A. Yes. So, after talking to Dr. Heegard and understanding what the non-infringing alternatives were and understanding that there really wouldn't be any affect on performance to speak of, it's really then just a question of cost.

Would the -- the Ericsson technologies have been less costly to implement than the non-infringing alternatives?

And so what I did is I went and talked to the Qualcomm Atheros engineers about how much it would have cost to implement the non-infringing alternatives, and based on the information I received from them, I determined that the cost would have been about $190,000 per chip supplier; and that we have five chip suppliers in the case.

So if you multiply the 190,000 by five, you get about $950,000, so that's the total amount of cost that would be involved in implementing the non-infringing alternatives, and that really serves in an upper bound on what the appropriate RAND royalty would be for Ericsson's asserted patents.

Q. And we'll jump into the specific patent alternatives in a moment, but can you articulate the

Page 79

reasoning for your opinion on that maximum value of no more than 950,000 or so?

MR. MITCHELL: And we can turn to Slide 6.

A. Yes. Again, it really comes back to the non-infringing alternatives. This is what determines value.

Something has value only if it offers a benefit above and beyond whatever the alternative is; and in this case, as we just heard from Dr. Heegard, there were several alternatives to each of the features that have been accused by Ericsson.

Each alternative could have been adopted with, essentially, no loss of performance to speak of. And we also heard from him, he mentioned the cost of implementing the alternatives would have been minimal.

So for all those reasons, together the value of Ericsson's patents have to be low when looked at from a RAND perspective.

Q. (By Mr. Mitchell) And as you know, we just heard from Dr. Heegard regarding the details. But can you briefly walk us through the non-infringing alternatives and what your opinions are based?

MR. MITCHELL: And we can turn to the next slide.

Page 80

20 (Pages 77 to 80)

**A1722**

A. Yes. So just very quickly because we just did hear it.

But the -- for the '568 patent, my understanding is you would just omit any priority code in the TID subfield.

For the '215 patent, the idea would be that you would remove the subfield that really isn't used for anything and you would send only compressed BlockAck, which is what the industry actually already does anyway.

For the '223 patent, again, it's just the Intel chipsets that are accused here. So that means whatever Broadcom, Atheros, and the other suppliers are doing must not be infringing, so either Intel could have adopted that or the end product manufacturer such as Acer that use Intel chips could easily just have chosen Broadcom and Atheros chips instead.

And lastly, the '435 and '625 patents, which I understand can be treated together for this -- for this issue, the non-infringing alternative would be to use -- still using aggregation, still use block acknowledgement but just simply don't have the windows shifting.

Q. And the performance implications that -- that you noted?

A. Yes. Again, for the first three, I think the answer's no performance implications whatsoever. For

Page 81

the last one, as we heard, it's something that's so small that it's not even noticeable to a -- to a user and, therefore, completely irrelevant from the point of view of, you know, would the standard be successful, would it be adopted.

And, you know, that makes a lot of sense, too, when you consider the fact that the reason 802.11n, for instance, was a lot faster in terms of data through-put really had to do with, as Dr. Heegard just told us, things that had absolutely nothing to do -- you know, no one disagrees with this -- with the physical layer and other things that have nothing to do with Ericsson's patents.

Q. I think we'll -- we'll turn now to the numbers, but before we get to the actual numbers, can you explain the cost metrics you used to arrive at your opinions and why; and in particular, were your opinions based on the incremental cost of implementing the alternatives or the absolute cost?

A. Yes. So the right measure here would be, given that there are no performance effects to worry about, the right measure would be to use any incremental costs in implementing the non-infringing alternatives relative to what it would have cost to implement the Ericsson technologies.

Page 82

So that is to say if the non-infringing alternatives would have cost a little bit more, then somebody might have been willing to pay a royalty reflecting that cost difference to have access to the Ericsson technology because it would have saved money on the implementation side.

So that's the right measure, the incremental cost one.

But for the purposes of my analysis, it's a lot easier to figure out the absolute costs. Simply, how much would it have cost in an absolute sense to implement the non-infringing alternatives? And I used that as a conservative measure of the incremental cost, and the incremental costs necessarily must be less. And so I used that as -- as my measure. In that sense, it's quite conservative.

Q. And so let's now turn to those absolute costs that -- that you identified. Let's turn to Slide 8.

And can you explain how you tallied up the absolute costs of replacing the accused technologies with the alternatives?

A. Yes. So the first step was I talked to William McFarland from Atheros who's, I believe, the vice-president of technology, and James Cho who's an engineer at Qualcomm Atheros, and I had talked to them

Page 83

about the amount of time it would take and number of employees to implement the non-infringing alternatives both on the hardware side and the software side.

As it turns out there's some work that needs to be done in both areas. And what I determined is that at the absolute outside, it would have taken four months on each side. So four months of one person working on the hardware, four months of one person working on the software to implement the non-infringing alternatives.

And then I took those four months and multiplied them by an appropriately prorated salary for an engineer. And that number I got both from talking to Mr. Cho but then also checking it against some government bureau of labor statistics.

And then added on top of that some benefit costs because, of course, in addition to salary, you have to pay your engineers' benefits. Again, the data for that came from some -- some government public sources.

And then added up the money. And it ended and up being $189,934 and that's, again, for one chip supplier to implement the non-infringing alternatives.

Since we have five chip suppliers in the case, I multiplied the -- the per-chip supplier number by five and obtained the total number of $949,668. And this

Page 84

21 (Pages 81 to 84)

**A1723**

would represent again the appropriate RAND royalty payment that would cover all the Defendants in the case, and it would cover really all time. It's -- it's a one-time cost that would cover both past, as we're sitting here today, but also future.

Q. And now how does your valuation for these patents compare to Ericsson's demanded royalties and the opinions Mr. Bone offered?

A. Well, it's a lot lower than the number that Mr. Bone put forward, and it's a lot lower than I understand Ericsson has, for instance, you know, attempted to offer to Defendants.

Q. And what's your understanding on -- of what that is?

A. 50 cents a unit, or in that range.

MR. MITCHELL: Now we can go ahead and put up slide 9.

Q. (By Mr. Mitchell) If we choose the midpoint of the damages Ericsson is seeking here and what it claims is -- is compliant with RAND, $34 million, why does this slide illustrate why yours is right and Ericsson's is wrong?

A. Well, again thinking back to what RAND means -- RAND means, when the industry had a choice about what technologies to include in the standard, when

Page 85

it was sitting at the fork in the road, it's going to think about which fork to go down; and that's the right place to analyze how much could Ericsson have asked for in terms of a royalty and have the industry still be willing to take the left-hand fork in the road.

So since the right-hand fork would have cost the industry about a million dollars, the most Ericsson could have gotten is a million dollars. Otherwise, the industry would have said forget it, we're not going to use your technology, Ericsson. We're going to go on the right-hand fork in the road and only pay a million dollars.

So the idea that somehow the industry would ignore their -- you know, what was in their best interest and instead take the left-hand fork and pay $34 million, it just doesn't make economic sense, and in the context of RAND, you know, particularly as I've described here.

Q. And you reviewed Mr. Bone's reports and opinions, right?

A. I did.

Q. Okay. And did you identify any problems -- and I want to be brief, but -- with his opinions?

MR. MITCHELL: And we can turn up Slide 11.

Page 86

A. Well, in reviewing his analysis, I looked for him to say what are the benefits of Ericsson's technologies over the non-infringing alternatives that could have been used, and I saw absolutely nothing on that subject. It's an absolutely crucial subject because unless there are tremendous benefits, you can't get millions of dollars in royalties, certainly in the RAND context.

So, the fact that there was no analysis of the actual value of the patents-in-suit I think is the main problem.

And then the second problem is what Mr. Bone did look at was a set of license agreements, but those are just really all not comparable or not an appropriate source of information for determining the RAND royalty rate. And there's really two reasons for that.

One is that they're subject to the very hold-up that RAND is supposed to excise when we're trying to determine the RAND rate. Because all those license agreements were entered into well after the standard had been set and the industry was locked in.

So for that perspective, the licenses are just not a reasonable basis for determining RAND.

And, secondly, I think as we heard in numerous ways, those licenses are -- for instance, the HP license

Page 87

is a huge cross-license involving many patents, involving even a purchase of patents by Ericsson from HP.

When you have that kind of situation, it's very, very hard to isolate the value out of that big exchange of just the five asserted patents that are at issue. And in that kind of situation, any attempt to do that is very likely to be incorrect. And looking at what Mr. Bone did, I believe he made a number of mistakes.

Q. (By Mr. Mitchell) So, Dr. Leonard, what's your bottom-line opinion?

MR. MITCHELL: And we can turn to Slide 10.

A. Well, my bottom-line opinion, again, is if you look at what choices the industry had back when the standard was set and the -- they had very good alternatives to Ericsson's technologies.

At the most it would have cost a million dollars more to implement those alternatives instead of Ericsson's technologies.

And in that case, there's just simply no way that the industry would have paid a royalty more than about a million dollars; and so that, therefore, is the appropriate RAND rate for this case.

Page 88

22 (Pages 85 to 88)

**A1724**

Q. Thank you, Dr. Leonard.

MR. MITCHELL: Pass the witness.

THE COURT: All right. Cross-exam.

And let me inquire, Mr. Campbell, how long you would anticipate your cross will take.

MR. CAMPBELL: Five to 10 minutes.

THE COURT: All right. And let me inquire of Defendants what additional witnesses you have.

MR. MITCHELL: Your Honor, we have one additional witness, Dr. -- we'd call Dr. Ray Perryman, and I figure that's about 25 or 30 minutes.

THE COURT: All right.

And then will Plaintiff have witnesses?

MR. CAWLEY: One, Your Honor; be Mr. Brismark again, and I think I can put him on in 10 minutes.

MR. CAMPBELL: And Dr. Nettles.

MR. CAWLEY: Oh, and Dr. Nettles, that's right. And how long will he be?

MR. CAMPBELL: Dr. Nettles will probably be 10 minutes and Mr. Bone maybe five.

THE COURT: Okay. All right. Okay.

Thank you.

All right. You may proceed, Counsel.

Page 89

MR. CAMPBELL: Thank you, Your Honor.

Can we get his slide? Can you give me Slide 3?

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q. Good afternoon, Dr. Leonard.

A. Good afternoon.

Q. I want to go back to your Slide 3 here and look at the fork in the road.

The bottom fork in the road, do you know there's no patents on those non-infringing alternatives?

A. I'm certainly not aware of any patents.

Q. That's -- really wasn't my question. Do you know there's no patents on those non-infringing alternatives?

A. I think it's very hard to say with absolute certainty unless you have looked at every patent in the world that there's no patents, but I've certainly not heard that there are any patents on those alternatives.

Q. All right. Well, let me ask it differently.

Did you look to see if there were any patents on those alternative?

A. That's certainly something that I discussed with Dr. Heegard when we were talking about this, and -- and he wasn't aware of any.

Page 90

Q. Well, you heard Dr. Heegard just testify he didn't look for any, correct?

A. Well, I -- but I think he's also a very knowledgeable person in this industry who would be aware of -- of these kind of patents if there were.

There were -- a lot of these things we're talking about were prior art or they're things that are done right now. So, if there were some patents, they may have already come out of the woodwork.

Q. Okay. So you didn't do a search either; is that correct, sir?

A. I did not do a technical search, that's correct.

Q. Okay. So you don't know if there would be a toll on the bottom part of that road, do you, sir?

A. Well, I can't really say more than I just said, which is I'm certainly not aware that there are any patents.

Q. Okay. Now --

A. And, by the way, if there were -- and there were people in the standard setting organization, then, of course, they would also be subject to a RAND commitment.

Q. Now you're relying on others for their opinions on the qualities of the non-infringing

Page 91

alternatives, correct, sir?

A. What do you mean by "quality"?

Q. Well, you've got two forks in the road here, and they both end up in the same place. You don't know that this system would end up in the same place in terms of performance or quality, do you, sir?

A. Well, I think we do because -- well, first of all, in speaking to Dr. Heegard and his testimony just now, but also just looking -- since a lot of those alternatives are things -- for instance, compressed BlockAck -- that are already done and things seem to be working fine, I think that's a pretty good indication that -- you know, it's a market test. They're working. They're working fine.

It's the same thing, for instance, with the -- the alternative related to Intel versus the other suppliers. All the other suppliers are quite successful in the marketplace, and so Intel could have done what they did.

Q. Sir, you're not a technical expert, correct?

A. Those -- those are market outcomes, though.

Q. Sir, my question to you is, you're not a technical expert, correct?

A. I'm not a technical expert, that's fair.

Q. You're not qualified to make technical

Page 92

23 (Pages 89 to 92)

**A1725**

evaluations of non-infringing alternatives, are you?

A. Sure. That's why I talked to Dr. Heegard.

Q. Now, you would agree with me, correct, that the 802.11n standard was ratified in September 2009?

A. That's correct.

Q. Okay. Now, I want to see if you agree with a couple of things that Dr. Perryman said in his report.

He said that a draft standard is compiled and may undergo many revisions before being finalized.

Do you agree with that?

A. I mean, as a general statement, but since I think you have the word "may" in there, it's -- I think that's correct.

Q. Okay. He also said that because standards are living documents, that they would be modified or updated after publication.

Do you agree with that?

A. You know, again, in principle, but I think it's widely agreed that making major changes would be incredibly disruptive.

Q. So is that a yes or a no?

A. It's a sort of.

Q. Sort of. Okay.

Well, I'm just not getting yes or no answers to any questions today.

Page 93

Okay. But you agree that -- you understand -- or do you understand that NETGEAR was given notice of Ericsson's patents prior to the ratification of the 802.11n standard? Are you aware of that?

A. Yes, I believe that's correct.

Q. Okay. You're aware that Ericsson's entered into licenses with Option, Ascom, and RIM all before ratification of the 802.11n standard, correct, sir?

A. Yes. I'll point out that all those licenses, I believe, covered "g" as well, which, of course, the industry was locked into at the point those licenses were signed.

Q. I just can't get yes or no answers, can I? The answer was "yes," sir?

A. Sure. I'm -- yes.

Q. Thank you.

Now, you understand that the negotiations with Buffalo started prior to 802.11n being ratified, correct, sir?

A. I think that's correct, yes.

Q. Now, there's been no evidence that Option, Ascom, RIM, Buffalo, or NETGEAR have complained, or complained at the time, to the IEEE that Ericsson's RAND rate was too high, correct, sir?

A. I don't think I've seen anything to that

Page 94

effect.

Q. Okay. No evidence that Option, Ascom, RIM, Buffalo, or NETGEAR asked the IEEE to change the standard, correct, sir?

A. I don't think I've seen anything along those lines.

Q. Okay. Now, I just want to be clear. On the licenses that Ericsson has, is it your opinion that those licenses include the holdup value or have the potential to include holdup value?

A. They include holdup value.

Q. Okay. And how much of the value is holdup value?

A. The vast majority.

So if you take my lump-sum RAND royalty rate and turn it into a cents per unit, it's, you know, something on the order of 1 to 2 cents at most.

So if you take Mr. Bone's royalty rate of 50 cents and subtract the 1 to 2 cents, the remainder of that is holdup value.

Q. Well, let me be clear. I'm not asking about Mr. Bone's rate; I'm asking about the existing licenses.

You understand there's an existing license with Hewlett-Packard, RIM, Buffalo, Option, Ascom, Sonim. You understand that, correct, sir?

Page 95

A. Yes.

Q. Do those existing licenses include holdup value or the potential for holdup value?

A. They -- the ones that I've seen that Mr. Bone analyzed and came up with a per-unit royalty, those are all well above 1 to 2 cents, and so that would then include holdup value.

Q. Okay. So every -- any value in the effective royalty above 1 to 2 cents, in your opinion, is holdup value; is that correct?

A. If it's been properly attributed to the patents-in-suit, yes.

Q. Okay. Now, have you seen any evidence or any of these licensees have alleged they've been held up?

Yes or no, sir?

A. Well, I haven't seen -- well, I don't know. I'm not sure about RIM, but -- who were the others?

Q. Hewlett-Packard, RIM twice, Buffalo, Ascom, Option, Sonim. Have you seen any evidence that any of those licensees allege they were held up?

A. I haven't -- I don't think I've seen something like that one way or the other.

Q. Okay. You relied on Mr. Cho for a lot of your analysis, correct, sir?

A. Really I'd say it for the -- the cost-related

Page 96

24 (Pages 93 to 96)

A1726

information.

Q. Okay. And will we hear from Mr. Cho today?

A. I don't think so, but I'm not in charge of the witness list.

Q. Okay.

MR. CAMPBELL: Your Honor, I have about three or four questions that, unfortunately, relate to one of the license agreements, and I need to seal the courtroom, please.

THE COURT: All right. The courtroom will be sealed. If you're not covered by the protective order that has been entered in this case or a party to the protective order, you will need to leave the courtroom at this time and remain outside until we unseal the courtroom.

So please excuse yourself if you are not a party to or covered by the protective order in this case. If there's any doubt in your mind, please leave the courtroom.

(Pause in proceedings.)

(Courtroom sealed.)

(This is Sealed Portion No. 9 and filed under separate cover.)

(Courtroom unsealed.)

(Pause in proceedings.)

Page 97

MR. MITCHELL: Your Honor, may Dr. Leonard be excused?

THE COURT: Excuse me?

MR. MITCHELL: May Dr. Leonard be excused?

THE COURT: Yes, he may.

You may proceed.

MR. ALPER: Thank you, Your Honor.

RAY PERRYMAN, Ph.D., DEFENDANTS' WITNESS,

PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. ALPER:

Q. Good afternoon, Dr. Perryman.

A. Good afternoon.

Q. Thank you for joining us. We --

MR. ALPER: If we could display Slide No. 2, please, we'll get started.

Q. (By Mr. Alper) We heard a bit earlier in the case and from Dr. Leonard about the issues of patent holdup and lock-in in connection with standard-setting organizations and licensing of standard essential patents.

How does that relate to RAND licensing from your perspective, Dr. Perryman?

A. Well, the whole idea behind RAND licensing is

Page 98

to create interoperability where no matter what brand you're on, where your location is, you can use the various products.

In the case in particular of Wi-Fi, to do it at a very low cost, and that's done through the whole process of letters of assurance, people agreeing to license at reasonable rates.

And so when you have someone come along later and say, well, I want substantially more money than what's regarded as reasonable, that sort of really undermines the entire process.

Q. And RAND is the answer to that problem?

A. RAND is the answer, yes, sir. It's what -- it's what the standards associations have tried to do to address it.

Q. And did you calculate a RAND rate for Ericsson's 802.11 portfolio in this case?

A. I did, yes, sir.

Q. Now, what are some of our goals that we want to try to achieve when we're calculating a RAND rate in this context?

A. Well, we want to properly value the technology, based on its incremental contribution to the -- to the standard and to the products that we made from the standard, and do that in a way that doesn't

Page 99

include the holdup value that was just discussed.

We want to go back in time to the point just before this fork in the road and say, at that point in time, what was the technology worth.

THE COURT: All right. Counsel, the Court needs to take a recess for about 15 minutes, so we'll be in recess until 10 minutes till 5:00.

MR. ALPER: Thank you, Your Honor.

COURT SECURITY OFFICER: All rise.

(Recess.)

(Jury out.)

COURT SECURITY OFFICER: All rise.

THE COURT: Please be seated.

All right, Counsel. You may proceed.

MR. ALPER: Thank you very much, Your Honor.

Q. (By Mr. Alper) Dr. Perryman, when we left off, we were talking about some of the goals that you had in mind when you were calculating your RAND royalty. Is what -- does one of those goals have to do with putting the parties back in the position they would have been in at the time of standardization?

A. Exactly. Yes, sir.

Q. And why is that?

A. Well, that -- that's the whole idea is you

Page 100

25 (Pages 97 to 100)

A1727

CASE PARTICIPANTS ONLY

want -- you want people to be properly compensated for the technology and not for any extra value that's obtained just because it's included in the standard.

And a way to do that is to determine what it was worth just before the standard was issued.

Q. And is that extra value, is that referred to as lock-in value or patent hold-up value?

A. It is, yes, sir.

Q. And you're contrasting that with the actual value of the technology?

A. That's correct, yes, sir.

Q. Thank you, sir.

Now, yesterday when you testified, you walked through the Georgia-Pacific Factors and did a Georgia-Pacific Analysis?

A. Yes, sir, I did.

Q. Now, how does the Georgia-Pacific Analysis, from an economist's perspective, relate to the RAND analysis?

A. Well, they have a lot of similarities, but there's also some pretty important differences. There's some parts of Georgia-Pacific that are just different in RAND.

Q. Okay. Well, I'm going to present a couple of the factors to you and ask you from an economics

Page 101

perspective how those relate to RAND so --

A. Yes, sir.

Q. So, for instance, Factor 4 concerns the licensor's established policy and marketing program to maintain its patent monopoly. Are you familiar with that factor?

A. Yes, sir, I am.

Q. Now, is that factor applicable in the RAND context?

A. It's really not. Once -- once you've given a letter of assurance and you're participating in a standard, you've given up the -- the patent monopoly, so to speak. You've agreed to license it on reasonable and non-discriminatory terms to anyone that wants a license.

Q. Thank you.

Now let's take a look at Factor 5. Factor 5 involves the commercial relationship between the licensor and the licensee such as whether they are competitors.

Now, how does that factor relate to the RAND analysis?

A. Well, in that factor, typically if you have a situation where -- where you have competitors licensing one another, you may even have a lost profits type analysis because it's cannibalizing each other's sales

Page 102

and that sort of thing.

In -- in a RAND analysis, basically you've agreed to license everyone no matter what their station; competitor, supplier, whatever the case may be. You have agreed to license anyone who wants a license on fair and reasonable terms.

Q. So Factor 5 would not be applicable in the RAND context?

A. That's correct, yes, sir.

Q. Okay. And let's take a look at Factor 1. Factor 1 deals with the royalties received by the patent holder or the licensor. Are you familiar with that factor?

A. Yes, sir, I am.

Q. And you talked about that yesterday in your testimony?

A. I did, yes, sir.

Q. Okay. Now, is that factor relevant in the RAND context, and if so, how is it relevant?

A. Well, it can be relevant. If you have licenses that where both parties clearly knew there was a RAND agreement in place and you were negotiating under RAND terms, then under that situation they could be informative. If -- if you're not in that situation, they're not informative.

Page 103

Q. So when you're looking at Factor 1 or you're looking at licenses, you're looking for a clear understanding of the parties that a RAND obligation existed when they're entering into negotiations?

A. That's correct, yes, sir.

Q. Thank you very much.

Now, we heard Mr. Bone testify yesterday in connection with his damages analysis. Now, did he perform an independent RAND analysis?

A. He did not, no, sir.

Q. Okay. And I think we heard testimony to that effect yesterday?

A. Yes, sir.

Q. All right. Now, did he rely on the Georgia-Pacific Factors?

A. He did, yes, sir.

Q. And was that an unmodified, traditional Georgia-Pacific Analysis?

A. Yes, sir, it was.

Q. Now, as a result of that -- of that, can we rely in any way on Mr. Bone's analysis when it comes to determining a RAND rate?

A. No, sir. He used some licenses that have rates like a dollar and $1.20, at least by his calculations, which is well above even what was

Page 104

26 (Pages 101 to 104)

A1728

published to be the RAND rate here.

Q. Now, based on your review of Mr. Bone's report and his testimony in court and his deposition, have you seen any evidence that Mr. Bone attempted to establish that the parties to the licenses that he's relying on clearly understood their RAND obligations when entering into negotiations in executing those licenses?

A. No, sir, I have not.

Q. Thank you.

Let's take a step back and talk about where RAND obligations -- the RAND obligations in this case arise from.

Can you tell us where those come from in case?

A. Yes, sir. As has been said before, Ericsson entered two letters of assurance, one in 2003, one in 2011, that -- essentially the language is very similar, that agreed to license under reasonable rates to an unrestricted number of applicants under reasonable terms and free of any unfair discrimination.

Q. Okay. And have you seen -- in your review of the evidence in this case, have you seen any evidence from Ericsson confirming that it -- its belief that it has a contractual obligation as a result of these letters of assurance?

A. Yes, sir, I have.

Page 105

Q. If we can go to the next slide, you can tell us about that.

A. Yes, sir. This exhibit is an Ericsson document, and it says in it a RAND commitment is a contractual undertaking. And then in deposition testimony, Mr. Brismark was asked:

You see where it reads a RAND commitment is a contractual understanding?

He said yes.

He was asked if he agreed with that.

And he also said yes.

Q. Thank you very much, sir.

Now let's turn back to the calculation of the reasonable RAND royalty in this case. Can you -- can you walk us through your methodology?

A. Yes, sir, I can.

What I was seeking to do was get down to the -- what is the value of the technology itself. And to do that, you have to apportion the technology based on all the other technology that's out there to determine the appropriate amount to allocate.

In doing that, you have to consider the -- the risk of royalty stacking. And so you have to look at proportionality in the process.

As we've said before, go back to the time just

Page 106

before that fork in the road when -- when the -- before the standard's adopted and then -- and then from there just to try to perform the calculations appropriately.

Q. Thank you very much.

Well, I'd like to briefly walk through some of these steps and -- and I believe you did some -- you had some testimony yesterday, so we'll -- we'll try not to duplicate that.

First in terms of apportionment, what was the unit that stood -- what is the unit that's to be licensed in this case?

A. The unit to be licensed in this case is a Wi-Fi chip.

Q. And -- and what evidence did you rely on in coming to that conclusion?

A. Well, all the reports, depositions, technical experts I could talk to, every -- testimony I've listened to in court from both sides, everyone has agreed that the technology resides on the chip.

Q. Okay. Now, in terms of apportioning the value of the 802.11 and the 802.11n in comparison to all of the technologies on these chips, what -- what pro -- what portion did you arrive at?

A. Well, I used 35 percent for the proportion that was 802.11n on the chip, and 17.5 percent for

Page 107

802. -- or -- I'm sorry -- for 802.11 in its entirety, 35 percent; for 802.11n 17.5 percent.

We just heard Mr. Shoemake -- Dr. Shoemake talk about the analysis he went through to help me and walk me through to get to those numbers.

Q. And you base those conclusions on Dr. Shoemake's analysis?

A. I did, yes, sir.

Q. Okay. Thank you.

Now let's skip over to the next step in the analysis which you referred to as proportionality. Can you tell us what is a proportionality analysis?

A. Well, it's where you try to figure out once you -- once you figured out the base to start from, you need to figure out what percentage of all the technology that's out there rests with the -- the patents that you're talking about.

Q. Okay. And -- and how do you do -- go about doing that?

A. Well, you -- you try to look for indicia that you can find that will give you an idea. Obviously it's an imperfect process, but you try to get an idea of the percentage that is appropriately allocated. And when I do that type of analysis, I try to make assumptions in favor of -- of in this case the -- Ericsson.

Page 108

27 (Pages 105 to 108)

**A1729**

Q. And so you're going to -- in order to perform a proportionality analysis, you're going to go out and you're going to try to figure out what's Ericsson's share of the total number of patents out there on 802.11?

A. Yes, sir, that's correct.

Q. Okay. Now, if we go to the next slide, what can happen if we do not perform a proportionality analysis?

A. Well, if you don't perform a proportionality analysis very quickly, you can get to a point where the -- where the royalty doesn't make sense in relation to the price of the product.

Example here, very simple example. We know there are thousands of -- of pieces of technology in an 802.11 chip. We know they sell for, on average, $2.41.

If even 10 people ask for 50 cents, you're at $5.00; a hundred people ask for 50 cents, you're at $50.00. So very quickly you get to a point where you've exhausted the entire price of the chip, and ultimately to a point it's not feasible to make the chip anymore.

Q. All right. From an economics perspective, what happens if the cost of a royalty is double the price of a chip? For instance, in the example that you gave, if there are merely 10 patent holders?

Page 109

A. Well, Economics 101 tells that you produce until marginal revenue equals marginal cost; and if marginal revenue is $2.41 and marginal costs for technology licensing alone is $5.00, you don't make the product.

Q. Now in order to perform a proportionality analysis, do you need to know precisely the number of essential patents that are out there?

A. Oh, you can get close enough without knowing it precisely, because as has been talked about -- about by the technical experts, there's a lot of technology here. I don't think anyone knows exactly how many patents are in it.

Q. And what evidence did you rely on for your proportionality analysis?

A. Well, several things. With regard to 802.11n I -- some of them I talked about yesterday. I -- I looked at the Sunlight research report which identified about 4,017 patents.

I also looked at the report I talked about yesterday, the TechIPm report. It identified 1484 related patents only for the top 12 patent holders. So obviously there's a lot more, but just the top 12.

Dr. Shoemake analyzed the Sunlight report and said he felt like there were well over 3000, from

Page 110

analyzing the Sunlight report. Then he did his own independent analysis and came up with over 4600.

Q. Thank you, sir.

Now let's talk about Ericsson's share of the 802.11n-related patents out there.

A. Yes, sir.

Q. Can you tell us about your analysis of Ericsson's share in that context?

A. Yes, sir. Several things I was -- I was able to look at. Some of them we talked about yesterday.

One of them was the share of the letters of assurance and that turned out to be one out of 32, and so that was about 3.1 percent. I took a very conservative approach to estimating the number of patents by taking the average number in the letters that actually gave a list.

And the reason I say conservative is I applied that to all the letters which meant I -- it was about six patents, which meant I attributed six patents to Intel, six patents to Broadcom. We know they have dozens, scores, if not hundreds of patents. So I know it was very conservative. But looking at that with the claimed patents by Ericsson, I came up with a share of 3.43 percent.

The Sunlight report attributes a lot more

Page 111

patents that are related somehow to 802.11 to Ericsson, but it also finds a lot more patents, and Ericsson's percentage in that context was the 2.27 percent.

The TechIPm report, I think I mentioned the way I did that yesterday, even though they only claim eight patents I gave them the benefit of the doubt and said TI came in 12th with 44 patents. So let's say what if Ericsson had 43; in other words, if they just missed being on the list, which is the -- the maximum number they could have attributed to Ericsson, and with that came up with a percentage of 2.9 percent.

And then I was aware of an expert that -- in a case in Germany that had determined for Ericsson that -- an expert retained by Ericsson that their percentage of 802.11 technology was somewhere between 3 and 5 percent.

If you look at just patents, it was about 3.9 percent. If you look at patents and applications, it was about 3.1 percent. So, again, everything's just kind of lining up in the same pretty tight range here.

Q. And so Ericsson's own expert in litigation -- in another litigation determined that Ericsson had 3.1 percent of the patents and patent applications in 802.11n?

A. That's correct, yes, sir.

Q. And 3.9 percent of just the patents?

Page 112

28 (Pages 109 to 112)

A1730

A. Yes, sir.

Q. Thank you. Now, did you calculate Ericsson's share of 802.11 patents generally --

A. I did.

Q. -- not just "n" but 802.11?

A. I did, yes, sir.

Q. Okay. And if we can go to the next slide, can you tell us about that calculation?

A. Yes, sir. I think we've got the wrong slide up there.

But the -- Dr. Gibson in his analysis, he went through and looked at 802.11 and looked at all the pieces of it that might potentially be impacted by any technology Ericsson was claiming and came up with 1.6 percent. And so that was -- that was one data point I had was 1.6 percent. There's an illustration of it here.

I then repeated the analysis I did with the letters of assurance and the patents that I calculated in my very conservative way using the whole 802.11 portfolio. For that there were 274 letters of assurance of which Ericsson had two, so that's a little less than 1 percent. And then there were 933 patents I could identify that way, and Ericsson has claimed 18. So that's like dead on 2 percent.

Page 113

So I had one number around 1 percent, one number around 1.6 percent, one number around 2 percent, and so I used 2 percent in order to be conservative.

Q. Thank you.

Now, before we get to the actual RAND calculation, did you also consider the ex-ante value of the patented features?

A. Yes, sir.

Q. Okay. And can you describe your analysis there?

A. Well, when you -- when you start talking about the ex-ante value of the patented features, that's when you can begin to talk about non-infringing alternatives.

And obviously, we heard Dr. Leonard talk quite a bit about that.

In any analysis, I didn't penalize Ericsson for the fact there were non-infringing alternatives available, but I did -- I was aware of it and it was a part of my analysis.

Q. Okay. Thank you. And in -- in considering the ex-ante value of -- of the -- of the patented features, you looked at non-infringing alternatives?

A. Yes, sir.

Q. And you considered the testimony of Dr. Shoemake, Dr. Heegard, and -- and considered

Page 114

Dr. Leonard's testimony as well?

A. I did, yes, sir.

Q. Okay. And that acted as a check on your proportionality analysis?

A. Yes, sir, it did.

Q. And is it consistent with your proportionality analysis?

A. It's very consistent, yes, sir.

Q. All right. Thank you very much.

Well, let's get to the calculation of your royalty rates.

MR. ALPER: If we'll go to slide 12, please.

Q. (By Mr. Alper) Can you please walk us through the three calculations that you made in this case when it -- in connection with the RAND rate?

A. Yes, sir. And I'll -- I'll start with just -- in the order they're on here. All of 802.11. Average cost of a chip around 2.41. The 35 percent allocation from the chip down to 802.11, as we heard from Dr. Shoemake. And then the 2 percent that I just described as Ericsson's share of that, gives me 1.7 percent for that royalty.

I then did one for the entire 802.11n portfolio which again uses a 2.41 chip price. This

Page 115

times goes down to 17.5 cents -- I'm sorry -- 17.5 percent because of the additional allocation down to "n". Again, relying on Dr. Shoemake saying it would be at most that much.

And then I used a 3 percent number we just discussed. That one came out to 1.3 cents.

And then finally, the one that we talked about yesterday at some length, I used the 2.41 chip price, the 17.5 percent that was the 802.11n portion of the chip; and then brought the rate down from 3 percent to 2.25 percent just to account for the fact that all of Ericsson's 802.11n patents are not asserted here.

And in all cases, of course, by doing the whole cost of the chip, I made the assumption that all of the money could be allocated to paying -- for technology, which is a pretty conservative assumption in itself.

Put all that together and came up with the 0.9 cents that we discussed at some length yesterday.

Q. Thank you very much.

Now, how much is Ericsson seeking in this case?

A. 50 cents.

Q. Now, is that amount blatantly unreasonable in relation to the RAND royalty rates that you calculated

Page 116

29 (Pages 113 to 116)

**A1731**

Case: 13-1625   Case: 13-1625   Document: 179-1   Document: 177-1   Page: 540   Page: 540   Filed: 03/31/2014   Filed: 03/31/2014   (540 of 575)

CASE PARTICIPANTS ONLY

in this case?

A. Yes, sir.

Q. Okay. And is it, from an economist's perspective, a breach of Ericsson's RAND obligations to seek a rate that is 50 cents per unit?

A. Economically it certainly is. The only way you can get to a rate like that is with a lot of hold-up value.

Q. Now, is it your understanding that the 50 cents per unit is what Ericsson has purported to offer to the Defendants and Intel in this case?

A. Yes, sir.

Q. Okay. Now I'd like to switch gears briefly from the calculation of a reasonable rate to one of the other requirements of RAND that has to do with no discrimination.

A. Yes, sir.

Q. And I'd like to know, as an economist, what are the things that are forbidden by the no discrimination part of RAND?

A. Well, the biggest one is that -- that you can't refuse to license people, that you have to give everyone that requests a license, a license, and also under similar terms. You could certainly have a quantity discount if you had a huge one versus a small

Page 117

one or something like that that made economic sense, but basically you're giving everyone the same terms.

Q. Okay. Now, did you see any evidence in your review of the evidence in this case from Ericsson confirming that obligation?

A. Yes, sir, I do.

Q. Okay. Let's take a look at the next slide. And what do we see here, Dr. Perryman?

A. This is from a -- a brand -- or Ericsson pat -- licensing presentation, and one thing it says, there's no blocking patents, which means you can't put that toll sign there once the standard's already in place basically.

It says the overall royalty has to be reasonable cumulatively, taking into account all the technology. And it also says you're waiving the monopoly that the -- that a patent gives you in order to license it on RAND terms.

Q. And this in DX 78, this is Ericsson saying this?

A. That's correct, yes, sir.

Q. And did you --

A. It's in this document.

Q. And did you review any testimony from any Ericsson licensing personnel that also confirmed that --

Page 118

these obligations?

A. Yes, sir, I did.

MR. ALPER: And if we can take a look at that on the next slide, please. Actually, no. If you could skip to 15. Yes. Thank you.

Q. (By Mr. Alper) What do we see here?

A. Well, their chief intellectual property officer, Mr. Alfalahi, testified that -- he was asked: The RAND rate needs to be non-discriminatory, right?

He said, That's correct. He was asked, What does that mean?

And it says: It's important to offer a license which is fair and reasonable to the players in the industry without discriminating any player.

And then he was asked: Including chipset makers, right?

He says: Any player.

And then he was asked again: Including chipset makers?

And he said: Yes.

Q. So this is Ericsson's chief of intellectual property, right?

A. Yes, sir.

Q. And he's saying that it would be a violation of Ericsson's RAND obligations to exclude chipset

Page 119

manufacturers?

A. Yes, sir.

Q. Okay. Now, these are what Ericsson's obligations are. What -- what is their policy when it actually comes to dealing with the RAND obligations?

A. Well, the policy has been, until very recently, that they would not license to chip makers.

Q. Okay. And did you review any testimony from Ericsson in this case that confirmed that?

A. Yes, sir. Again, Mr. Brismark, who's with us, was asked: As a result, a component supplier of a component implementing a standard could not get a license from Ericsson?

And he said, Yes. So he was basically saying the component manufacturers, which in this case would be the chip manufacturers, would not be allowed to get a license.

Q. Okay. Now, on -- what was Ericsson's reason for wanting to block the chip makers from access to essential IP?

A. Well, one of the things that they testified to and I've seen in documents is simply that -- that they would get more money if they could capture some of the value from the products that were not -- that were bigger -- bigger products, had more stuff in them. They

Page 120

30 (Pages 117 to 120)

**A1732**

could capture some of that value rather than just the value of their technology.

Q. So we put up some testimony from Mr. Forslund. Can you tell us how that relates to what you just testified to?

A. Yes, sir. He was asked if one of the major advantages of Ericsson's policy was that it could demand a higher royalty income because these products are more expensive than, for example, Wi-Fi chips; is that right? And he concurred that was right.

Q. So Ericsson's goal in refusing to deal with chip makers is to make more money by licensing end products; is that right?

A. Certainly one of their goals from what I've seen, yes, sir.

Q. Now tell me, is that a legitimate economic justification for blocking chip makers from access to essential IP?

A. No, sir, it's not.

Q. Okay. And why is that?

A. Well, again, the whole concept of RAND letters of assurance and trying to get standards in place is that that sort of thing doesn't happen. You don't -- you get compensated based on the fair value of your technology.

Page 121

Q. And is there a real economic cost associated with that type of blocking behavior?

A. Oh, absolutely.

Q. And is a "more money" justification consistent with RAND obligations?

A. No, sir, it's not.

Q. All right. Well, Mr. Forslund was open with us in deposition in this case, but what does Ericsson say to the world when it comes to their policy and their justifications for -- for -- or their -- their approach to RAND?

A. Well, what they've said to the world is -- is basically they -- they -- they've had their two letters of assurance, which used a standard language for the letters of assurance, and say that they will license to -- to an unlimited -- unrestricted number of applicants to anyone that wants a license on fair and non-discriminatory terms.

Q. Now, I think we heard some testimony about this earlier today; but I'm just going to ask you, do these letters of assurance, either the 2003 letter or the 2011 letter, include any indication limiting Ericsson's obligations to license just the end products?

A. No, sir.

Q. Okay. And is -- does the public have a right

Page 122

to rely on the -- the words that Ericsson put in its letters of assurance?

A. Yes, sir. That's in every standard RAND letter.

Q. Okay. And I'm going to show you -- I'm just going to switch over to this real fast and zoom in here. This is from -- this is DX -- PX -- excuse me -- this is PX 294, Ericsson's 2011 letter of assurance. And what are we seeing here on the screen?

A. Well, paraphrasing, it basically says that by signing this letter you acknowledge that users and implementers of the proposed IEEE standard identified in part C are relying on and will rely on and may seek enforcement of the terms of this letter of assurance.

Q. Right. All right. So we have -- this includes users and implementers and they get to rely on Ericsson's letter of assurance?

A. Yes, sir.

Q. And do users and implementers include the chip makers?

A. Yes, sir.

Q. Okay. Thank you very much. Now, we've seen that Ericsson's policy is not consistent with RAND; it's not in the letters of

Page 123

assurance. What is Ericsson's justification for trying to block the chip makers, access to RAND?

A. Well, the first one I heard was actually sitting here in the -- in the trial, and Ms. Petersson said that a letter that accompanied their 2003 letter basically has the words "fully compliant" in it. And her testimony was that a -- that a -- someone who possessed a license would not be fully compliant unless they -- unless they -- or their product wouldn't be fully compliant unless they were actually used by the consumer.

Q. Okay. Now, what -- and this is a -- so this is a letter from Ericsson accompanying its 2003 letter of assurance --

A. Yes, sir.

Q. -- right? And it includes the words fully -- in fact, it includes the word "fully" in front of "compliant."

A. Yes, sir.

Q. And it's based on that word "fully" that Ms. Petersson testified at trial a couple of days ago that Ericsson only needs to license products that can actually be used by the consumer?

A. Yes, sir. That was her testimony.

Page 124

31 (Pages 121 to 124)

**A1733**

Q.  And that was the justification that Ericsson is raising in order to avoid licensing chip makers?

A.  Yes, sir.

Q.  Now, I just want to go back.

What we -- I think you testified a few moments ago that what we learned at trial was that the actual thing that was -- is that at issue in this case, the actual product that's at issue are the chips, right?

A.  Yes, sir.

Q.  And did Ericsson rely on the compliant nature of the chips in order to prove -- or attempt to prove infringement in this case?

A.  Yes, sir, they did.

Q.  And did you hear that from Dr. Nettles?

A.  Yes, sir, I did.

Q.  Okay.  So for infringement, Ericsson considers that it's enough to show that the chips are compliant; is that right?

A.  Yes, sir.

Q.  But when it comes to royalties, that's not enough.  What do they have to be, according to Ericsson?

A.  A new definition of fully compliant, which now means products used by consumers.

Q.  Okay.  So now that's the position now.  Did you see any evidence of what Ericsson actually thought

Page 125

about what its commitment required back 10 years ago when it submitted it?

A.  Yes, sir, I did.

Q.  Okay.

MR. ALPER:  If we could go to the next slide, 21.

Q.  (By Mr. Alper) If you would walk us through this.

A.  Yes, sir.  This is some testimony from Mr. Nordolf, who is strategy and business planning.

He's actually the individual that signed that 2003 letter.

And he was asked:  When you were signing the letter on behalf of Ericsson in 2003, it was not your intention to exclude chipset suppliers from receiving a FRAND license to patents that Ericsson considers to be essential to 802.11?

And he said:  No.  I had no such intention.

Q.  Okay.  So at the time of submitting this 2003 letter, along with its letter of assurance, Ericsson intended its letter of assurance to apply to everyone, including chip makers?

A.  According to the individual that signed the letter, yes, sir.

Q.  And now 10 years later, for the first time

Page 126

publicly ever, a couple of days ago, we hear that actually they didn't intend that; and by putting that word "fully" in that letter, that means that they're excluding chip makers?

A.  That's what was testified, yes, sir.

Q.  And that's supposed to be sufficient to put the world on notice of that?

A.  I'm -- that may be a legal opinion, but that's the only place I've ever heard it.

Q.  Okay.  But it could have -- could it -- from your perspective as an economist who's evaluated the evidence in this case, could Ericsson have been more clear when it comes to a very important obligation like a RAND obligation?

A.  Sure, absolutely.

Q.  And did you see evidence in this case that Ericsson thinks that they could have been more clear?

A.  Yes, sir.

Q.  Okay.

MR. ALPER:  And if we take a look at that.  Slide 22, please.

A.  Yes.

Q.  (By Mr. Alper) What are we seeing here?

A.  Yes, sir.  This is testimony from Ms. Johns, who's the director of patent licensing, and she

Page 127

basically was asked:  If Ericsson wanted to be clear with the world that it was excluding a license to chip makers through the alleged 802.11 patents, it could have actually just said that, right?

And she said:  That could have been clearly stated, yes.

Q.  Thank you, sir.

Now, in the couple of minutes I have left, I just want to touch on one other aspect of this blocking concept.

A.  Yes, sir.

Q.  Now, we've been talking about refusing to deal in the context of sitting down at the negotiating table and just refusing to sit down at the negotiating table with chip makers; but is there other forms of refusing to deal, for instance, with the chip makers?

A.  On, yes, sir.  Economically, refusing to deal is something that has the practical effect of refusing to deal.  It could be an injunction or seeking an injunction.  It could be a rate that's so exorbitant relative to the price of the product that no one would realistically be able to -- to negotiate on that basis, any number of things.

Q.  So let's talk about that last one for a second.

Page 128

32 (Pages 125 to 128)

A1734

You said you could refuse to deal with someone -- I think what you said is that you could refuse to deal with someone by charging a rate that's so high that it's just a non-starter to begin negotiating; is that right?

A. Exactly. Exactly, yes, sir.

Q. Okay. Now, have you seen any evidence in your review of the Ericsson documents confirming that that is just not allowed?

A. Yes, sir. In fact, Ericsson has stated that very thing.

Q. Okay.

MR. ALPER: Can we go to the next slide, please?

Q. (By Mr. Alper) And if you'll walk us through this document. This is DX 97.

A. Yes, sir. Just some highlighted portions, again, from this Ericsson presentation, and it says -- one thing it says is, anyone that they have to give a license on FRAND terms to anyone who requests a license, that it has to be aggregated reasonable terms, which means reasonable taking into account the overall licensing situation; and it also has to exhibit proportionality, which we talked about earlier, which they define as reflecting the patent holder's proportion

Page 129

of all essential patents.

Q. Now, these requirements that Ericsson is talking about, was that your methodology in this case for determining RAND?

A. Yes, sir, it was.

Q. Okay. Now, is Ericsson's 50-cent rate so high in relation to the chip price that from an economic perspective, it amounts to a refusal to deal?

A. Given all the technology in the chips, absolutely, yes, sir.

Q. And does Ericsson's 50-cent rate capture a lock-in value or a patent holdup value?

A. Virtually all of it is lock-in and patent holdup.

Q. And is that 50-cent rate reasonable?

A. No, it is not.

Q. Now, was Ericsson asked about whether that 50-cent rate is reasonable in the context of a chip price?

A. Yes, sir, they were.

Q. If we go to the next slide, could you tell us how Ericsson -- Ericsson's chief intellectual property officer answered that question?

A. Well, basically, he didn't answer it. Again, Mr. Alfalahi was asked: Is it your position from a

Page 130

FRAND perspective -- is it potentially reasonable to charge a 25- to 50-cent royalty on a 2-dollar product?

And his answer was: There's no yes or no answer to this question.

Q. Okay. Now, Dr. Perryman, as an economist, is there a yes or no answer to that question?

A. Yes, sir, there is.

Q. And what is the answer to that question?

A. The answer would be no.

Q. And one last question. Do you need to be an economist to know the answer to that question?

A. I certainly wouldn't think so.

Q. Thank you.

MR. ALPER: I pass the witness.

THE COURT: All right.

Cross-examination.

CROSS-EXAMINATION

BY MR. CAMPBELL:

Q. Good afternoon, Dr. Perryman.

A. Good afternoon, Mr. Campbell.

Q. Have you seen any evidence that HP, RIM, and Buffalo did not know of Ericsson's RAND obligations?

A. I don't think I've seen evidence one way or the other. Mr. Bone's calculations indicated rates that did not reflect it.

Page 131

Q. You haven't seen any evidence one way or the other? That was the answer to my question?

A. Not that I recall, no, sir.

Q. Okay. Now, you understand in this trial, Intel has said that there are indeed -- they've spent $2 billion in R&D, correct, sir?

A. That sounds about right.

Q. Okay.

A. Substantial amount of money.

Q. And you understand that Intel's 10-Ks say that their R&D budget includes licensing technology applicable to their R&D initiatives, correct, sir?

A. Yes, sir.

Q. Okay. You understand from reviewing the transcripts of depositions in this case that Broadcom has testified that the cost of the licenses don't impact the chips, correct, sir?

A. I don't recall that. I'll certainly take your word for it.

MR. CAMPBELL: Well, let's bring it up.

Do we have the Hurlston deposition, Page 103 on 5 to 13?

Q. (By Mr. Campbell) So Mr. Hurlston was asked: So you don't believe the cost of these licenses impact the cost of the chips; is that right?

Page 132

33 (Pages 129 to 132)

A1735

Case: 13-1625 Case: 13-1625 Document: 179-1 Page: 544 Filed: 03/31/2014 Document: 177-1 Page: 544 Filed: 03/31/2014 (544 of 575)

CASE PARTICIPANTS ONLY

And he answered: I can tell you definitively, I've never raised the price of a chip based on getting -- taking out a patent license.

Do you see that, sir?

A. Yes, sir. I would think -- I would think that the prices would be set by the market. I would think that would be the case, yes, sir.

Q. Now, you talked about the Sunlight reports, and I don't think we talked about the Sunlight reports yesterday, did we, sir?

A. No, sir.

Q. Okay. But the Sunlight reports don't measure whether a patent is -- what patents are standard essential, do they?

A. No, sir. It's 802.11n relevant or related or something of that nature.

Q. Right. So they expressly say they don't measure for standard essentiality, correct?

A. Absolutely, yes, sir. I thought I said that before, yes, sir.

Q. Now, you understand the Sunlight reports, at the time that 802.11n was ratified, indicated that Ericsson had more high-value patents than Intel, correct, sir?

A. Well, I'm aware it said that, but it turns out

Page 133

there was a mistake in the report; that they just actually made a mistake and attributed a high-value patent that actually belonged to Intel to Ericsson.

Q. But --

A. But -- but I'm aware that they did say that, yes, sir.

Q. Those reports aren't very reliable for what we're doing here, are they?

A. Well, they're not going to be perfect. As I said, you're not going to find a perfect number of patents or anything like that. Something that goes to that much effort to collect that much information under the standards they used, I think is something we can generally rely on in -- in relation to other sources in order to give us some useful information.

Q. Now, you understand that Dr. Harhoff has concluded that a FRAND royalty for Acer is 53 cents to $1.06, correct, sir?

A. I don't recall that.

Q. Do you know who Dr. Harhoff is?

A. It's not ringing a bell with me right now.

Q. Okay. You had it in your slides, this information from this German litigation. Do you recall that, sir?

A. Yes, sir.

Page 134

Q. But you don't know who wrote that?

A. You know, I don't -- I just don't recall. I read it all at one time. I had copies of it. But I don't recall the individual that wrote it.

Q. You've relied on it, but you didn't look to see who the individual was that wrote that report?

A. Oh, at the time, I knew. I was thinking Henkel was the person I was thinking about, but it could be someone else.

Q. So you understand that he concluded -- do you recall now that he concluded a FRAND royalty for Acer products is 53 cents to $1.06?

A. I would certainly take your representation yes, sir.

Q. Well, I can bring it up. It's DX 166.

A. What -- whatever your -- your pleasure is fine.

Q. Okay. It's at Page 12, Paragraph 58. It's actually in Euros of .4 and .8. Do you know what the conversion is?

A. That's about right, yes, sir.

Q. Okay. Now, you understand that Dr. Harhoff also said in his report that his attention was restricted to EP and WO patent applications, correct, sir?

Page 135

A. I believe that's correct, yes, sir. It's been a while since I looked at that report.

Q. Okay. Well, let's look at Page 20 of DX 166. Attention was then restricted to EP/WO applications

Do you see that, sir?

A. Yes, sir.

Q. You also understand that Dr. Harhoff stated that he believed his numbers underestimate the true share of Ericsson-owned patents in the relevant portfolio even focusing on EP/WO applications.

Do you understand that?

A. I don't recall that. Again, I have no reason to doubt you whatsoever.

Q. Okay. Well, you relied on that report, right, sir?

A. I was remembering a different expert, but I'll accept your representation.

Q. Well, you don't believe that's a report you relied on for the opinion on the share of Ericsson standard essential patents for 802.11?

A. It was one of the reports in the German litigation. That name is starting to ring a bell with me the more you say it. But in any case, it was -- it was Ericsson's expert in that litigation.

Q. I just need -- is that the report you were

Page 136

34 (Pages 133 to 136)

**A1736**

writing on --

A. Yes, sir.

Q. -- or is it some other report?

A. Yes, sir, I believe it was.

Q. Okay. Okay. Now, you understand that Qualcomm and Google have had a similar policy regarding licensing end-user products, correct, sir?

A. I am aware of that, yes, sir.

Q. Okay.

MR. CAMPBELL: If we look at PX 237, that's a letter from Google. And if we zoom in there on the middle paragraph, it says: Google understands that pursuant to IEEE rules, MMI -- MMI is Motorola Mobility, correct, sir?

A. Yes, sir.

Q. -- is prepared to grant licenses for essential patent claims with a maximum per-unit royalty of 2.25 percent of the net selling price for the relevant end product on a go-forward basis, subject to offsets for the value of any cross-licenses or other consideration received from the licensee.

You under -- do you see that, sir?

A. Yes, sir. I understand that's their stated policy, yes, sir, I do.

Q. Okay. And they define net -- net selling

Page 137

price refers to the selling price of a handset, tablet, or the other consumer device before application of any discounts or subsidies such as those provided by mobile operators to end consumers, correct, sir?

A. Yes, sir. Again, I am aware -- I'm very aware that's their stated policy.

Q. You understand that Ericsson's FRAND rate is 50 cents; or for some products, it's a half a percent, correct, sir?

A. Yes, sir, I believe that's correct.

Q. Okay. And if we look at the Qualcomm statement at PX 448, Qualcomm states on Page 2 that it will expect to charge royalties for a license under its standard essential LTE patents and/or standard essential WiMax patents for complete end-user subscriber devices; is that correct, sir?

A. I'm aware that's -- that's Qualcomm's policy with regard to cellular-type technology, yes, sir.

Q. It's also for a their WiMax technology, correct, sir?

A. Yes, sir.

Q. Now, do you have an opinion as to what the total aggregate royalty could be for an end-user product?

A. I'd have to have a lot more information than

Page 138

that to answer that question.

Q. Well, for 802.11, on an end-user product, like a router or a laptop, do you have an opinion as to the total aggregate royalty that could be paid?

A. Just on 802.11?

Q. Yes.

A. You know, I'd have to look at the profit margins of the companies and a lot of other information to give you that. Given the low price of the products, it's going to be a fairly low number, but that's not a calculation I've made.

Q. Okay. All right. Well, if we take a router that's a hundred dollars, and we say the aggregate royalty is 10 percent, and Ericsson's share of the patents is 3 to 5 percent, the royalty on that router would be 30 to 50 cents a unit, correct, sir?

A. Oh, I was talking about with regard to the chip inside the router. I -- I haven't done an analysis with regard to the full price of the end products.

Q. Okay. Well, was my math right there, if we walk through that?

A. I think your math was right. I'm not sure it was the right math.

Q. I understand you won't agree -- you won't agree with the analysis, sir. You've got a different

Page 139

view. But the math was correct, wasn't it?

A. I believe you did the multiplication correctly, yes, sir.

Q. Okay. I want to look at DX 78, which you looked at with your counsel on direct, about Ericsson's position.

MR. CAMPBELL: And if we could go to Page 7.

Q. (By Mr. Campbell) Ericsson has indicated that the FRAND context should be determined through a bilateral negotiation where the patent holder provides rationale for its rates.

Do you agree with that, sir?

A. That sounds reasonable to me. That's one of the things that goes into a negotiation, yes, sir.

Q. Okay. And you understand that Ericsson has said that's their pros -- is their process and was their process for negotiating with their current licensees.

Do you understand that, sir?

A. Yes, sir. They -- they've also said that that is supposed to be proportional to the totality of the technology.

Q. Well, let's look at Page 9, right? When they say proportionality, you can't do a straight bean count. It has to be reasoned.

Page 140

35 (Pages 137 to 140)

**A1737**

Do you agree with that, sir?

A. Oh, yes, sir, I agree. I could easily see where if you had some of the most important patents and the entire products, you might charge a little bit more for, and I can certainly understand that.

Q. Okay. And if you look at Page 11, the note here says: As always, the market determines the price.

Would you agree that that's a way to go?

A. I think I've said that several times.

Q. I think you have, too, sir. And I appreciate you confirming that.

MR. CAMPBELL: Okay. Your Honor, I hate to do this, but I have one or two questions that require me to talk about an Intel license, and I understand Intel wants the courtroom sealed for that.

THE COURT: All right. The courtroom will be sealed. If you're not protected by the Court's protective order, please leave the courtroom at this time.

(Courtroom sealed.)

(Pause in proceedings.)

(This is Sealed Portion No. 10, and it is

filed under separate cover.)

(Courtroom unsealed.)

(Pause in proceedings.)

Page 141

THE COURT: Please be seated.

All right. You may proceed, Mr. Cawley.

MR. CAWLEY: Thank you, Your Honor.

GUSTAV BRISMARK, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. CAWLEY:

Q. Mr. Brismark, good evening.

Has Ericsson taken steps to ensure that it complies with its RAND obligations in licensing its 802.11 patents?

A. Yes, we have.

Q. How has Ericsson dealt with the issue of royalty stacking?

A. We have -- when we set the rate for Ericsson's essential patents to 802.11, we also take into consideration the fact that there are other patent holders who may have essential patents. So that's the way we -- we take that into consideration.

Q. Now, when you say -- when you've taken it into consideration, has Ericsson employees, under your supervision, been asked to do research to try and determine how many other patent holders may hold patents to the 802.11 standard?

A. Yes.

Q. And have you -- you or they, under your

Page 142

supervision, compiled that research and tried to analyze, as best you can, the potential universe of those who may have 802.11 patents?

A. Yes. We -- when we set our initial RAND rate, we do such an investigation. And as we've been hearing throughout this -- the witnesses, it's difficult to identify all of the essential patents that are out there.

But we made an effort to analyze who are the patent holders and looked at the declaration that did indeed include identifying patents. We made an estimate as to what Ericsson's share of essential patents may be, and we used that in order to -- for us to set the starting point, which we felt would be in line with our RAND obligations.

Q. Is this something that Ericsson does once and never again, or is it an ongoing process?

A. We have an ongoing process, which is, after we have set the initial rate, we enter into negotiations.

So the way we re-evaluate our RAND rate being RAND or our rate being RAND in accordance to RAND, is that we take into account the feedback we get from negotiations, and we use that to update our RAND rate when necessary.

Q. How does Ericsson ensure that it does not

Page 143

discriminate?

A. We have a reference rate, and reference rate is the rate that Ericsson will offer a licensee, which has no value in a grant-back to Ericsson. So a licensee that has no patents, which has value for Ericsson's products, and that is -- is the reference we start with.

And whenever there are other terms and conditions where value is provided to Ericsson or it's a broader agreement, we will do an evaluation of all terms and conditions in order to make an effort to ensure that our RAND commitments are indeed still met.

Q. Now, remind us what your title is.

A. My title is vice president of strategy and portfolio management within Ericsson's licensing organization.

Q. And how many people working with you are in some way responsible for the activities you've just described of -- of trying to ensure that Ericsson complies with its FRAND and RAND commitments?

A. As to the 802.11 -- 802.11 standard, we -- we talk about five or six, seven people.

Q. Okay. And that's not the only standard body to which Ericsson has extended FRAND or RAND commitments, is it?

A. That's correct.

Page 144

36 (Pages 141 to 144)

**A1738**

Q. How many others?

A. There are several. One of the more important ones is ETSI, obviously, which is the standard body in Europe for cellular 2G, 3G, and 4G technologies.

Q. Has this issue of FRAND or RAND commitments, what they entail and what procedures are carried out to make sure that they are complied with, been a matter of concern for Ericsson over the past decade?

A. Yes, very much so.

Q. Has Ericsson participated in initiatives, both in Europe and the United states, to develop this policy?

A. Ericsson is a very active participant in those discussions, and we've been so for the past 10 to 15 years.

Whenever these discussions have been brought up again, Ericsson has been taking a lead in the industry in order to ensure that we continuously develop the meaning of FRAND and make sure that we have a system which can continue to support the standards and the ecosystems behind them.

Q. And what -- what kind of organizations or government entities has Ericsson worked with in helping to develop FRAND and RAND policy?

A. Recently, we have been working very actively in ETSI and ITU. And we've been working with regulators

Page 145

in Europe, as well as in the U.S.

We've been taking part in IEEE, actually, a meeting which is taking place right now in Europe, IEEE, discussing the IPR policy and so forth. There are numerous organizations, and we are present in most of them.

Q. Okay. When you traveled to this trial, did you come straight here from a meeting in Brussels to discuss these very issues?

A. Yes, I did.

Q. Now, we've heard that these negotiations can be complicated. If Ericsson finds itself engaged in a negotiation for a license that includes more than just 802.11, how does Ericsson ensure that it complies with its RAND obligations for 802.11 in an agreement that may cover a larger set of patents?

A. We would have a procedure where we look upon the values we see in that deal, and the different values accounted for Ericsson, the value we get from that deal from the other party; and we would also do a similar assessment as to the value Ericsson would provide to the other party.

And the aim is to ensure that these values meet and that we base them on -- on assumptions which are in line with our FRAND or RAND commitments.

Page 146

MR. CAWLEY: Let's take a quick look at Plaintiffs' Exhibit 238.

Q. (By Mr. Cawley) What is this document?

A. This is an example of a compilation I just talked about.

Q. Why was this document created?

A. This was created in order to evaluate the HP agreement, which has been discussed in this courtroom.

Q. And the HP agreement, as we've heard, involved not only Wi-Fi patents but also cellular patents?

A. Yes.

Q. Did Ericsson feel that it was important to analyze how much of that agreement was attributable to Wi-Fi?

A. Very much so.

Q. Why?

A. Because at the time -- and also the main value to HP was a license to Ericsson's Wi-Fi patents. HP also requested license to our cellular patents; but in order to make sure that we actually live up to our FRAND/RAND commitments, we had to put a cap on the cellular patents so that we could ensure that we did continue to meet our RAND commitment for the Wi-Fi and also our FRAND commitments for the cellular.

Q. All right. Mr. Brismark, as part of your

Page 147

responsibilities, do you stay informed of negotiations for licenses to Ericsson's Wi-Fi patents?

A. Yes. That's part of my daily job, yes.

Q. Okay. Have you ever heard that a licensee has complained that the rate it has agreed to pay Ericsson was as the result of lock-in?

A. No, I have not.

Q. Now, you've described previously Ericsson's policy of a number of years to license the makers of end-user products but not chip makers.

How does Ericsson view that policy as consistent with its FRAND commitments?

A. Excuse me. Could you repeat the question?

Q. Yes. Is that consistent with your FRAND commitments?

A. Yes.

Q. How so?

A. We -- when giving the commitment to IEEE, we commit to license fully compliant end-user products.

And by licensing the end-user products, we ensure that we give access to the whole ecosystem, including suppliers and so forth to these manufacturers of end-user products.

Q. Well, now, how could you give access to your technology to an entity like Intel if you've refused to

Page 148

37 (Pages 145 to 148)

**A1739**

Case: 13-1625 Case: 13-1625 Document: 179-1 Page: 548 Filed: 03/31/2014 Document: 177-1 Page: 548 Filed: 03/31/2014 (548 of 575)

CASE PARTICIPANTS ONLY

license Intel?

A. Our policy, which -- which is the main practice in industry, is to license end-user products.

And by licensing an unlimited number of companies manufacturing end-user products, we make sure that there is a license to the entire ecosystem, all the players, and there's also access to the technology for the suppliers, including chipset players.

And by doing so, we also ensure that we avoid double-dipping since you can only license once in the value chain.

Q. Has Ericsson made any effort to block chip makers from producing products that -- that read on Ericsson's patents?

A. Ericsson has never attempted to block any chipset player.

Q. Recently, though, has Ericsson offered to license Intel to its 802.11 patents?

A. Yes.

Q. Let me show you Plaintiffs' Exhibit 224. What's this?

A. This is a letter from Ericsson to Intel where we offer Intel a license to Ericsson's essential patents for 802.11 at a royalty rate of 50 cents per unit.

Q. And why did Ericsson make this offer that

Page 149

apparently is contrary to the long-standing policy you've described?

A. We decided to do so in order to make an effort and to resolve the issue found in this court, to find a way of settling.

Q. All right. Now, finally, Mr. Brismark, we've heard from the last several witnesses who have testified the suggestion that the IEEE could have simply selected alternative technologies to the technologies on which they actually selected that Ericsson holds essential patents.

In your view and your experience, what is the risk with that approach?

A. In my view, the --

MR. DAUCHOT: Objection, Your Honor, for the record. It calls for opinion testimony from this fact witness.

THE COURT: Overruled.

A. So in my view, having been part of standardization, I think that the -- the main criteria for selecting what goes into the standard based on technical merit ensures a standard which is continuously being developed to maintain its competitiveness on the market.

And I see a major risk, if you would, to go

Page 150

for second best alternative, time after the other, that that specific standard would become redundant or non-competitive and most likely be in competition with an alternative, which may put it out of the market.

Q. Thank you, Mr. Brismark.

MR. CAWLEY: I pass the witness, Your Honor.

THE COURT: All right. Any redirect or recross or cross?

[Laughter]

THE COURT: It's getting late. You're losing the Judge.

CROSS-EXAMINATION

BY MR. DAUCHOT:

Q. Well, good evening. Good evening, Mr. Brismark.

A. Good evening.

Q. You scared away Mr. Arovas, so I will be cross-examining you today. I'm Luke Dauchot, and we have not met; is that correct?

A. That is correct. And I apologize for scaring away Mr. Arovas.

Q. All right. We -- you sat through the entire trial, and I want to point to a couple of portions of the trial, beginning with some of Ms. Petersson's

Page 151

examination.

THE COURT: Counsel, before you proceed, let me just explain -- give both parties their time. Plaintiff has used 14 hours and 40 minutes, and Defendant has used 14 hours and 45 minutes. So proceed accordingly.

MR. DAUCHOT: I'll take that as a warning, Your Honor.

All right. Let's -- so let's hurry up. Mr. Brismark, please speak fast.

[Laughter]

THE WITNESS: May I read all the exhibits first?

[Laughter.]

MR. DAUCHOT: All right. No more laughing. We need to move.

Can you put up the trial transcript, day 6/4, Page 42, Lines 9 through 14.

And can you blow up Lines 9 through 14, please.

Q. (By Mr. Dauchot) All right. So the question put to Ms. Petersson was: So you're taking the position that the Intel chipset that is in the products being sold here by the Defendants does not comply with 802.11n?

Page 152

38 (Pages 149 to 152)

**A1740**

CASE PARTICIPANTS ONLY Document: 177-1 Page: 549 Filed: 03/31/2014

Answer: It complies.

Question: Okay.

Answer: It is not fully compliant.

Do you see that?

A. Yes, I do.

Q. Was Ms. Petersson being truthful?

A. Yes.

Q. All right.

MR. DAUCHOT: I'd like you to turn to Ms. Petersson's testimony.

Dave, can you put up the transcript at Page 51, Lines 2 through 12?

Q. (By Mr. Dauchot) Okay. Ms. Petersson testified at trial that Ericsson offered to license Intel.

Do you see that?

A. Yes, I do.

Q. And she said that the license was for 50 cents per chipset.

You see that?

A. I see that, yes.

Q. And that is truthful testimony?

A. That was the offer Ericsson made to Intel, yes.

Q. All right. Now, Ms. Petersson testified at

Page 153

Page 56, Lines 20 through 56 -- through 57/3.

MR. DAUCHOT: Dave, put that up.

Q. (By Mr. Dauchot) -- that the offer was made to Intel roughly eight weeks ago.

Is that consistent with your memory?

A. I think there was a first offer in a -- form of a letter, which was sent on March 8th. And then there was a complete agreement sent to Intel end of April.

Q. That's -- that's exactly right.

A. I suppose Ms. Petersson referred to the complete agreement.

Q. The complete agreement. Because you'll recall -- I don't know if you remember it -- in response to the March letter that you put up, there was a response from Intel -- and all of that will be submitted into the record -- to the effect that they'd like to see the entire agreement.

Do you recall that letter from Intel?

A. I do.

Q. And in response to that, Ericsson sent the April full agreement that you just testified to, correct?

A. That is correct.

Q. All right.

Page 154

MR. DAUCHOT: Let's put up PX 603.

Q. (By Mr. Dauchot) And that is the agreement that Ms. Petersson testified to the Court and jury under oath that constitutes an offer to license Intel chips, correct? Or chipsets.

A. I believe that's correct, yes.

Q. All right.

MR. DAUCHOT: Let's look at PX -- let's look at Section 2.1.

Dave, can you put up 2.1? And can you blow up the license grant?

Q. (By Mr. Dauchot) Okay. Now, the license grant is a grant Ericsson proposes to grant to Intel worldwide, non-transferable, et cetera, et cetera.

License under the licensed patents to make, have made, use, import, sell, and offer for sale and company products, right?

A. The license is for company products, yeah. This -- that is correct, yes.

Q. Okay. Good.

MR. DAUCHOT: Let's turn to Section 1.3 for the definition of company products. And can you blow that up.

Q. (By Mr. Dauchot) It says: Company products shall mean all products of company that are fully

Page 155

compliant.

Do you see that?

A. I see that.

Q. Now, you just testified five minutes ago that Ms. Petersson said that Intel's chips are not fully compliant.

A. That is correct.

Q. So this is a license to what? Illusory; license to nothing?

A. This is the first offer of a draft agreement to Intel, and I -- I would suspect that before this agreement would have been signed, would Intel be interested that an edit would have been --

Q. Yeah. Mr. Brismark, my question is this: Ms. Petersson testified to the Court and to the jury that eight weeks ago, there was a license made to Intel, to Intel chips.

And are you now testifying under oath that what Ms. Petersson testified, and the only offer in the record, is one that Ericsson would anticipate would maybe somehow get modified down the end of the road? Is that what you're testifying to under oath?

A. I think that Ms. Petersson testified --

Q. Sir, is that what you are saying under oath?

A. -- that based on --

Page 156

39 (Pages 153 to 156)

**A1741**

Q.   Yes or no.

A.   I would like to make a comment about that.

Q.   Can you answer my question yes or no?

A.   I cannot.

Q.   You cannot answer my question yes or no. You will agree, though, that this particular license, sir, the one Ms. Petersson testified to and the one that you just testified to two minutes ago is not a license to Intel chips, correct?

A.   I can testify --

Q.   Correct, sir?

A.   -- that an edit would have been found --

Q.   Sir, I'm not talking about --

A.   -- and the discussion would have continued.

THE REPORTER:  Excuse me.

THE COURT:  All right, Counsel.  The Court Reporter cannot write down both of you talking at the same time, so let's slow down, one at a time.

MR. DAUCHOT:  Fair point, Your Honor.

Q.   (By Mr. Dauchot) And, Mr. Brismark, I am not talking about edits to this agreement down the road.  I am talking about this exhibit.

This exhibit is not a license to Intel to manufacture chipsets; am I correct?  Am I correct?

A.   This exhibit may still contain edits, which

Page 157

would have been needed to correct before a complete license had been signed.

Q.   And that is not what Ms. Petersson testified to under oath to the jury and to the Court; am I correct?

Ms. Petersson testified to the Court and to the jury that there had been an offer made to Intel's chips eight weeks ago.

Do you recall that testimony?

A.   Yes.

Q.   And is that testimony accurate, sir?

A.   The intent of the letter was to offer a license to Intel --

Q.   All right, sir.

A.   -- based on these terms, and they may still continue (sic) some edits.

Q.   Now, the 2003 LOA, letter of agreement (sic), PX 293, you're familiar with that, correct?

A.   No.

Q.   PX 2 --

MR. DAUCHOT:  I'm sorry.  I'm sorry. PX 293, David, the letter of assurance.

A.   If I may see -- I may be familiar, but I have to look at it first.

Q.   (By Mr. Dauchot) Well, you're familiar with

Page 158

Ericsson's letter of assurance to Intel and others?

A.   Yes, I'm aware of this.

Q.   All right, sir.  Now, let's look -- it's your testimony that the fully compliant language is -- is --

MR. DAUCHOT:  Strike the question.

Q.   (By Mr. Dauchot) It is your testimony that under this agreement, this letter of assurance, Ericsson only has an obligation to license fully compliant products, correct?

A.   Yes, that's my testimony.

Q.   Correct.  And now, you agree that this letter of assurance does not define what fully compliant means; am I right?

A.   That is correct.

Q.   That is correct.

And Ms. Petersson testified that according to you-all at Ericsson, fully compliant means something that's used by consumers, correct?

A.   That would be one description, yes.

Q.   One of them?  Are there more?

A.   I think you could -- could maybe find other descriptions that are proper.  I think this is one description.

Q.   Well, where do I look?

A.   Excuse me?

Page 159

Q.   Where does Intel look?  Is there a book?

A.   I think that if you look up on the practice in the industry how licensing is being done, you would find that fully compliant and licensing at end-user level is --

Q.   My question is:  Where do we look for your definition of fully compliant?  Where does Intel look? Is there a book?  Is there an article?  Is there some -- something that would tell Intel:  Put everyone on notice what you-all mean by fully compliant?

A.   I am not aware of any book.

Q.   Okay.  Now, I'd like to show you -- and this is going to be -- this was submitted into -- into evidence here, Mr. Alfalahi's deposition, a clip from it.  Mr. Alfalahi is the person to whom you report, correct?

A.   That is correct.

Q.   All right.  Now, it is your position that the 203 -- the 2003 letter of assurance is limited to fully compliant products, correct?

A.   That is my understanding.

Q.   And fully compliant products, according to your definition, is basically end products, right?

A.   End product is a fully compliant product, yes.

Q.   Okay.  Now, let's show the Alfalahi clip,

Page 160

40 (Pages 157 to 160)

**A1742**

LB92, please. This is your boss.

(Video playing.)

QUESTION: So my question is: Where in this letter of assurance does it say that Ericsson's duty to extend a license to an unrestricted number of applicants applies only to applicants who make, sell, or use end product --

ANSWER: It doesn't --

QUESTION: -- as opposed to component products?

ANSWER: It doesn't say.

QUESTION: And the same is true of Exhibit 10, correct?

ANSWER: Yes.

(End of video clip.)

Q. (By Mr. Dauchot) Now, that's your boss, right?

A. Yes.

Q. That's the director of Ericsson's licensing program, correct?

A. Yes. And he has -- he delegates some responsibilities to me. For instance, looking after our FRAND commitment.

Q. Can we assume that Mr. Alfalahi knows what he's talking about when he's talking about the Ericsson letters of assurance?

Page 161

A. I think he trusts me to do a good job.

Q. Are you saying that you can't trust him?

A. I trust him.

Q. You trust him. All right.

Now, is a modem a consumer -- an end -- an end product?

A. It depends. If it's something that an end user could easily enable to work, then it's -- then it's an end product.

Q. Okay. So fully compliant product not only means a product that an end user can use, but it has to be one that an end user can easily use? Is that -- is that part of the definition of fully compliant, just so I have it?

A. As I said, there are many definitions, but "can use" is fine as well.

Q. I understand. You were telling me there are many definitions. I don't know where to look. Intel doesn't know where to look. In fact, no one knows where to look.

You just testified under oath that fully compliant, a modem, may or may not be fully compliant depending on how easily a consumer can use it. Is that what you just -- that's what you just said, right?

A. I said that it's fully compliant if the end

Page 162

user can easily install it, yes, I said that.

Q. Can easily install it?

A. Yeah. I could also say --

Q. Okay. Now, what if we take a consumer who's --

THE COURT: Counsel. Counsel.

MR. DAUCHOT: I'm sorry, Your Honor.

THE COURT: You're interrupting and cutting off the witness.

A. I could also have said that if an end user can install it, then it's fully compliant, and it's an end product.

Q. (By Mr. Dauchot) So if a consumer -- so we take consumer A, who's technically inept and can't install it, and take consumer B, who's technically proficient and can install it, the product is fully compliant as to the one who is technically capable and the one -- and not compliant as to the one who can't put it in? Is that -- is that what you're testifying to?

A. I'm testifying that if an end user can install a modem and use it, then it's an end product.

Q. All right. Now, you understand that you're -- okay. So it depends on the consumer, what the consumer can do?

A. It always does.

Page 163

Q. All right. Now, you said that the -- you testified --

MR. DAUCHOT: I'll strike that question.

I am now running out of time. Your Honor, if I could just have one second here to see if there's anything in particular that I wanted to touch on.

THE COURT: Certainly.

(Pause in proceedings.)

Q. (By Mr. Dauchot) Oh, one additional point, and I'll -- and then I'll wrap up.

You mentioned, in response to questioning, about the issue of aggregation?

A. Yes.

Q. And you said -- you testified that Ericsson's very careful about making sure that its rate complies with the aggregation concept, right?

A. I testified that we are very careful to ensure that our rates are in line with our FRAND or RAND commitments.

Q. Right. Now, you remembered Ms. Petersson testifying about that aggregation effort in the context of Defendants' Exhibit 65. Do you remember that, that chart that was put up?

A. May I see it?

Page 164

41 (Pages 161 to 164)

**A1743**

Q.  Well, do you recall it?

A.  I'd like to see it before I answer that question.

Q.  All right.

MR. DAUCHOT:  DX 65.  Dave, do you have it?

A.  Yes.

Q.  (By Mr. Dauchot) You recognize it?

A.  Yes, I recognize that.

Q.  And that is one of Ericsson's efforts to come up with accurate aggregation, right?

A.  This is an effort for Ericsson to ensure that when we set our initial rate, we believe that it's in line with the RAND commitment.

Q.  All right.  Now, you testified to -- you testified to other documents --

MR. DAUCHOT:  Well, strike the question.

No further questions.  Thank you.

THE COURT:  All right.  Redirect?

MR. CAWLEY:  Just a bit, Your Honor.

REDIRECT EXAMINATION

BY MR. CAWLEY:

Q.  Mr. Brismark, I just don't want there to be any confusion about the letter that Ericsson sent Intel and the draft license agreement.

Page 165

MR. CAWLEY:  First of all, let's look again at Plaintiffs' Exhibit 224.

Q.  (By Mr. Cawley) Now, tell us again what this is.

A.  This letter is sent from Ericsson to Intel to inform that Ericsson is willing to offer Intel a license without any grant-back at a rate of .50 dollar per device.

Q.  Okay.  That's what it says on the second paragraph of the -- or excuse me -- the second sentence of the letter, right?

A.  Yes.

Q.  Did you participate in the decision by Ericsson to make this offer to Intel?

A.  Yes.

Q.  And did Intel respond to it?

A.  Yes, they did.

Q.  What did they request?

A.  They requested Ericsson to send a complete draft agreement with all the terms and conditions.

Q.  And did Ericsson comply with that request?

A.  Yes, we did.

Q.  Did Ericsson have prepared by its counsel a proposed draft license agreement?

A.  Yes.

Page 166

Q.  And did Ericsson transmit that to Intel?

A.  Yes, we did.  And on April 25, I recall.

Q.  And was Ericsson prepared to have negotiations with Intel over the terms of that draft license agreement?

A.  Yes, we had.

Q.  Did Intel ever request that?

A.  No.

Q.  Did Intel ever respond to the proposed draft license agreement in any form?

A.  Not with any comments on the draft agreement, as far as I can recall.

Q.  Okay.  Thank you, sir.

MR. CAWLEY:  I'll pass the witness, Your Honor.

THE COURT:  All right.  Thank you.

Anything further?

MR. DAUCHOT:  One brief point, Your Honor.

RECROSS-EXAMINATION

BY MR. DAUCHOT:

Q.  Mr. Brismark, you do understand that there were -- that there has been a Court-ordered mediation in this case?

A.  Yes.

Page 167

Q.  And you understand that Intel and Ericsson have participated in that?

A.  Yes, I do.

Q.  Okay.  And those -- that stays confidential pursuant to a mediation privilege.

You understand that?

A.  That's my understanding, yes.

Q.  Thank you.

MR. DAUCHOT:  No further questions.

THE COURT:  All right.  Thank you.

Anything further?

MR. CAWLEY:  Nothing further, Your Honor.

THE COURT:  All right.  You may step down.

All right.  Who will Ericsson's next witness be?

MR. CAMPBELL:  Your Honor, we call Dr. Scott Nettles.

THE COURT:  All right.  Dr. Nettles.

All right.  You may proceed.

MR. CAMPBELL:  Thank you, Your Honor.

SCOTT NETTLES, Ph.D., PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. CAMPBELL:

Page 168

42 (Pages 165 to 168)

**A1744**

Q. Good evening, Dr. Nettles.

A. Good evening.

Q. Have you analyzed the non-infringing alternatives that were disclosed in Mr. -- or Dr. Heegard's report?

A. Yes, sir, I have.

Q. Do you believe that the alternatives he discussed today would have been available, acceptable and non-infringing in early 2007?

A. No, sir, I do not.

Q. Before we get into the specifics, let me ask you some general questions.

Have you seen any -- seen any evidence that the alternatives were actually proposed to the IEEE?

A. No, sir, with the exception of the alternative that Dr. Heegard clarified was actually part of the standard.

Q. Have you seen any evidence that the alternatives were actually considered by the IEEE, other than the one that's actually part of the standard?

A. No, sir.

Q. Are you aware of any testing done to confirm that these alternatives would work?

A. No, sir.

Q. Have you seen any evidence that the Defendants

Page 169

have actually implemented any of these alternatives?

A. Well, I'm not sure about the one that's in the standard. I haven't seen any specific evidence. But in general, no.

Q. Now, since the 802.11n standard came out, the IEEE has released a new 802.11 standard, correct?

A. Yes, sir.

Q. That was the 2012 version?

A. That's right.

Q. What did the 2012 version do?

A. It rolls up all the changes from 2007 up until 2012 into a new sort of single unified standard.

Q. And other than the one alternative that's in the standard, has the non-infringing alternatives that Dr. Heegard proposed been voted into that standard?

A. No, sir, they haven't.

Q. Have you seen any evidence that Intel or any other Defendant proposed any of Dr. Heegard's -- Dr. Heegard's alternatives for that standard?

A. No, sir.

Q. All right. Well, let's talk about the '215.

Do you understand that Dr. Heegard's alternative, proposes removing the Multi-TID and compressed BlockAck subfields?

A. Yes, sir, I understand that.

Page 170

Q. Would this be alternative -- would this alternative be available and acceptable?

A. No, sir, I don't think so.

Q. Why not?

A. Well, the BlockAck -- a compressed BlockAck bit, that lets you choose between the standard BlockAck and the compressed BlockAck. And eliminating that bit would create a backwards compatibility issue with respect to 802.11e.

Q. And why would that be a problem?

A. Because "e" has the normal uncompressed BlockAck. And so if you only had the com -- compressed BlockAck, then that would work in "e" products and wouldn't provide backward compatibility.

Q. So if someone had an 802.11e product, how would they be affected?

A. Well, it wouldn't work with the "n" standard. And in general, the 802.11 standards have been quite meticulous about providing backward compatibility.

Q. What about the Multi-TID BlockAck? What does that relate to?

A. That relates to the power save multi-poll feature of 802.11n.

Q. And how would that be impacted?

A. It would basically -- it's a key feature, the

Page 171

power save multi-poll. So it would effectively disable that mode.

Q. Was that important -- was the power save multi-poll feature important?

A. Well, it was included in the standard, and apparently, at least some people wanted to make it mandatory.

Q. Okay. Now, does -- does the '215 patent and the method that is used in the standard, does that allow for future growth?

A. Yes, sir, it does.

Q. How does it do that?

A. Well, there's still one choice left, the reserve field. And as we've heard, standards tend to evolve, and so that reserve field would provide for future growth.

Q. Okay.

MR. CAMPBELL: Let's turn to the '568 patent.

Q. (By Mr. Campbell) Do you understand Dr. Heegard's alternative for this patent is prioritizing packets at the transmitter without including a TID field in the packets?

A. I do.

Q. Would this alternative be available and

Page 172

43 (Pages 169 to 172)

**A1745**

acceptable?

A. No, sir.

Q. Why not?

A. Well, the reason it's not acceptable is because Dr. Heegard neglected the case where the receiver is also a transmitter. And that's an important case, because that's the case of the router when the router is -- is taking a communication from one terminal and then forwarding it to another terminal that's in the same local area network.

And in that case, if you don't transmit that traffic identifier, then the router doesn't know what priority to give to its transmission. And so as a result, the retransmissions from the router would not be prioritized.

And that would defeat the whole purpose of having these priorities. And, of course, the local case is an important one.

Q. Why is it important? Can you give me an example of when this might happen?

A. Imagine you want to stream video from your laptop to your television in your home. It's going to go through your router. I have streaming media that I use in my home to play music. Again, that goes through my router. This would eliminate the prioritization for

Page 173

those kinds of media.

Q. Okay. All right.

MR. CAMPBELL: Let's turn to the '625 and '435 patents.

Q. (By Mr. Campbell) You understand Dr. Heegard offered two alternatives for that. One was send a single ACK with no window, and a second was send a BlockAck with no window.

Do you recall that?

A. Yes, sir, I do.

Q. Did you review Dr. Heegard's report regarding these alternatives?

A. I did.

Q. Does the report provide enough detail to analyze these alternatives?

A. No, sir, not really.

Q. Does the report provide -- well, how much detail did the report provide on these alternatives?

A. Well, it's just a very brief sort of statement, very similar to the slides he gave, except the slides that he gave included a slide that clarified that the first alternative he intended to be very similar to the normal way that 802.11 packets worked before there was -- there was aggregation.

So there wasn't even that much detail in his

Page 174

set of proposals.

Q. So is it clear how these alternatives would fit into the 802.11n standard?

A. Not really.

Q. What information is missing?

A. Well, for example, it doesn't explain how the -- the receiver would deal with the case where it needed to move on, where something was missing and had been discarded at the transmitter. That wasn't clear.

It wasn't clear exactly when the transmitter would decide to retransmit things. It wasn't clear what the transmitter would do with respect to this moving-on issue. There was no code provided. It was just a very sort of high-level -- level sketch.

Q. Based on your best understanding of these alternatives, would they be available and acceptable?

A. No, sir, I don't think so.

Q. Are these alternatives non-infringing?

A. That -- that part is a little harder to analyze, especially with respect to the second one. It would depend on some of those design details, I believe.

Q. Okay. Well, let's take the first one: Sending a single ACK with no window. What are the problems with that alternative?

A. Well, that's the one that actually is

Page 175

incorporated into the current standard in the aggregated MSDU feature, and I'd note that none of the Defendants actually appear to implement that feature.

And the problem with that is that if there's any loss, the entire aggregated MSDU has to be retransmitted.

And one of the things that's important to understand is that when you aggregate, you make the packet, the thing you're going to transmit, longer.

That makes loss more likely, and it also makes it more expensive to retransmit the whole thing.

And so both of those factors tend to suggest that there would be a performance impact, especially if you make the aggregate large. And that's exactly the point of aggregation is to try to make the aggregate large.

Q. What about the lack of a window? How does that impact things?

A. Well, I think Dr. Heegard made it a little more clear today when he showed a slide. There the real question is: How do you deal with this issue of what if there's some loss that you want to move on beyond?

And I think that that was a little bit more clear, because he said, basically, do it the way we did it for single packets in the original 802.11 techniques.

Page 176

44 (Pages 173 to 176)

**A1746**

Q.  Okay.  What are the problems with the second alternative?

A.  The second alternative has many of the same problems.  And in fact, Dr. Heegard even admitted today when he testified that it would have performance issues.

The biggest issue is that, although you're going to retransmit sub-blocks, let's call them, there's still no way to move ahead in the process.

In the current standard, when you need to retransmit a sub-block, the window can move.  You can continue to accept new packets while the old packet is being retransmitted.

Here, his proposal wouldn't allow that to happen.  And it's not clear what the performance impact would be without some kind of -- some kind of study or testing.

Q.  Okay.  Let's finally talk about the '223 patent.

Do you understand that Dr. Heegard's alternative for that is to use non-Intel chips?

A.  That's -- that seemed to be his proposal.

Q.  And were there any reasons why the chips that don't implement the timer are inferior to the Intel chips that do implement the timer?

A.  Well, the timer gives you tighter control over

Page 177

when you're going to discard packets.  And clearly, since it was put into the standard, the -- the -- the standards body considered that to be an important feature.

So I would say that's -- that's evidence that it's inferior.

Q.  Is there -- are there actually two mechanisms in the standard to keep track of resending packets?

A.  Yes, sir.  There's a retry count, and then there's the timer.

Q.  And is there a benefit to using both mechanisms?

A.  Yes, sir.  Sometimes the retry count is going to give you a more precise idea about when to drop a packet, and sometimes the timer is going to give you a little more precise idea.

Q.  And do you understand Intel's chips are typically more expensive and at the high end of the market?

A.  I do.

MR. CAMPBELL:  Thank you, Dr. Nettles.

THE COURT:  All right.

Cross-examination.

MS. PIEPMEIER:  Thank you.

Sarah Piepmeier for Defendants, and I'm

Page 178

going to try to do a sub-30-second cross, which I've never done before.  So we'll see how that goes.

CROSS-EXAMINATION

BY MS. PIEPMEIER:

Q.  Good evening, Dr. Nettles.

You didn't do any testing to confirm any of the opinions you've just expressed with respect to any of the non-infringing alternatives that Dr. Heegard identified, correct?

A.  That's correct.

Q.  And today you didn't express an opinion on whether or not any of those non-infringing alternatives actually infringed.

A.  No, sir.  I think -- I mean, no, ma'am.  I believe that would require further analysis.

Q.  Thank you.

MS. PIEPMEIER:  Pass the witness.

THE COURT:  Very good job.

[Laughter]

THE COURT:  Redirect?

MR. CAMPBELL:  No, Your Honor.

THE COURT:  All right.  Thank you.

All right.  Who will be Plaintiffs' next witness?

MR. CAMPBELL:  Your Honor, the final

Page 179

witness, we call Mr. Bone.

THE COURT:  All right.  Mr. Bone.

JOHN BONE, PLAINTIFFS' WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. CAMPBELL:

Q.  Good evening, Mr. Bone.

A.  Good evening.

Q.  Let's get right to it.

You heard Dr. Leonard talk about holdup, correct, sir?

A.  I did.

Q.  As part of your analysis, did you find that any of Ericsson's actual agreements included holdup?

A.  No.

Q.  Can you tell us what you did to evaluate whether Ericsson's agreements included holdup?

A.  I considered -- excuse me -- a number of factors in connection with the actual real-world licenses to determine whether or not there was holdup.

Q.  Can you tell the Court what factors you considered?

A.  Sure.  Excuse me.

The first factor that I considered was Ericsson's long-term best interest.  And that is, Ericsson is a holder of a significant number of standard

Page 180

45 (Pages 177 to 180)

A1747

essential patents, as we've heard, not only -- excuse me -- in the cellular space, but also the Wi-Fi space.

And -- and they have those commitments. They have FRAND commitments as it relates to their cellular technology, and they have the RAND commitments as it relates to their Wi-Fi technology. And so as -- and they've not only done that historically, but they want to do that on a long-term basis.

And so -- excuse me -- in terms of credibility in the marketplace and their ability to not only license others but also to contribute technology to these very -- these standard-setting bodies, it is in their long-term best interest to not extract holdup value when they enter into agreements.

Another factor that I considered was the fact that each of Ericsson's licensees, except for one, was a publicly-traded company. So they had a fiduciary responsibility to make sure that they entered into agreements at rates that would maximize their share of the profits.

And so, therefore, it would not be consistent with their fiduciary responsibility to enter into agreements that contained holdup.

I also considered the fact that RIM and HP are very sophisticated licensees -- licensees. And they've

Page 181

entered into numerous license agreements with other parties, and it would not have been consistent with their abilities to negotiate, and they would want to negotiate their best deal in light of Ericsson's RAND obligations.

Also, Ericsson did, in fact, make RAND obligations; and as I understand it, the licensees were aware of Ericsson's RAND obligations when they entered into these agreements.

And --

Q. What about the range of the license rates?

A. Well, that is, I think, also instructive, in that the -- given the fact that all of these agreements, all these negotiations were bilateral negotiations, confidential negotiations between the parties, it is, I think, somewhat telling, when you look at the fact that the rates that the parties agreed to were -- are roughly in the same ballpark.

Q. What -- that about the timing of the agreements?

A. So a number of the agreements, I think at least four of them -- you have the Option agreement -- excuse me -- the RIM agreement, Ascom, and Buffalo were all either agreed to; or as it relates to the Buffalo agreement, were in the process of being negotiated

Page 182

before the 802.11n standard was finalized or adopted.

And so if at any time prior to that the licensees believed that Ericsson was extracting holdup value, they could have gone to the IEEE and complained that Ericsson was extracting holdup.

There is no evidence that any of the licensees went to the IEEE and complained that Ericsson was, in fact, extracting holdup.

Q. Is there a name for the type of agreement where the license is entered into before the standard is adopted?

A. Yes. Those are ex-ante license agreements.

Q. Mr. Bone, in your opinion, do the rates reflected in Ericsson's licenses account for its RAND commitment?

A. In my opinion, they do.

Q. What else do the actual market rates reflect?

A. I covered a little bit of this in my testimony last week, and that was the market rates take into account a number of factors, one of which is the fact that the -- Ericsson's technology, the rates that people were willing to pay -- considered the value of Ericsson's technology, in light of all the other technology that's embedded in the machine, whether it's a laptop or a router; and that would include other

Page 183

standard essential patents that may exist.

So it addresses the stacking issue. In other words, the licensees would have been aware of the stacking issue, yet still entered into these rates.

It also factors in -- the market rates factor in non-infringing alternatives. And so we've heard some theories on some possible non-infringing alternatives.

The rates that other companies were willing to pay take into account what other companies would be willing or could have done.

And it would suggest that if there were alternatives, as Dr. Leonard would suggest, then these would be irrational licensees by willing -- by the fact that they entered into these agreements with Ericsson at the rates they did.

Q. What about the cost of the component, such as the price of the chip?

A. So market rates also take into account the fact that the chip itself can sell as low as $1 to $2 per chip, and so the fact that the market rates -- people were willing to pay Ericsson's rate, despite the fact that the chips were only a dollar to $2 at times.

Q. Now, Defendants have suggested that a number of these agreements are broad cross-licenses or include rights to other technology, and therefore, the rates

Page 184

46 (Pages 181 to 184)

**A1748**

reflect something more than just for the patents-in-suit.

Are they right?

A. Well, the agreements do include other technology. However, if you look at the agreements, the agreement -- the terms of the agreements are structured in such a way that you can identify the specific value associated with the 802.11 patents in most cases.

In some cases, you have to go beyond the actual four corners of the agreement and look at supporting documentation that would suggest what the parties were -- in this case, that relates -- at least as it relates to the HP agreement, what Ericsson believed was an appropriate rate.

Q. So were you able to isolate the value attributable to the 802.11 portfolio?

A. Yes, I was.

Q. Now, Defendants' claim that the royalty should be limited to the price of the chip, are there any reasons why that is not appropriate?

A. Well, that's -- I don't believe it would be appropriate for a number of reasons.

One, that's not what we see in practice. We don't see the agreements entered into. And the rates that other people were willing to pay do not suggest

Page 185

that it would be limited to just the price of the chip.

Also, there is evidence that Intel and Broadcom and others, to the extent they do pay for technology, for IP rights, that's included in their R&D expense.

And so as we've heard during the trial, Intel has spent well over $2 billion in R&D. So whatever royalty they would pay, more than likely would be wrapped up into the 2-billion-dollar R&D expense and not necessarily burdened on to the chip.

Q. Okay. Now, did you -- do you agree that the cost of a design-around is an appropriate input in determining the price of the Ericsson's portfolio?

A. Well, it can be, if you have alternatives that are viable, that are acceptable, and that are non-infringing.

From what I understand is that there is not consensus or agreement on these non-infringing alternatives. So while it can be, in this case, I don't think it is appropriate.

Q. And would the actual real-world licenses have taken that into account?

A. Absolutely.

MR. CAMPBELL: No further questions.

THE COURT: All right. Thank you.

Page 186

Cross-examination.

MR. JONES: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. JONES:

Q. Three questions.

First, would a 50-cent royalty on all 802.11n products for these five patents over the life of these patents result in the payments of billions of dollars in royalties?

A. I don't think I understand your question.

Q. I'll try again.

A. Okay.

Q. Would a 50-cent royalty payment --

A. Yep.

Q. -- on all 802.11n products for these five patents, over the life of these patents, result in the payment of billions of dollars in royalties?

A. I don't know. I haven't done that calculation.

Q. Thank you, sir.

Number two, can you cite us to any documents that show us that either RIM, HP, Option, Ascom, Sonim, or Buffalo brought up Ericsson's LOAs and Ericsson's RAND obligations in their negotiations of the licenses you find instructive on your rate?

Page 187

A. None that come to mind as I sit here, no.

Q. Thank you, sir.

And then finally, does the concept of smallest saleable patent-practicing units have any implications on RAND obligations on the part of Ericsson?

A. It -- it could. It may. I think more instructive here is the market rates that people were willing to pay which take into consideration the smallest saleable unit.

Q. Okay. Did you -- do you believe that concept has any application, as far as a downward trend or impact, upon the RAND rates applicable to Ericsson's five patents-in-suit?

A. Does what?

Q. Has a downward impact on the applicable RAND rate?

A. Does the smallest saleable unit?

Q. That concept.

A. Not in this case; not given the facts.

Q. Thank you, sir.

MR. JONES: I pass the witness, Your Honor.

THE COURT: Thank you, Mr. Jones. Redirect?

REDIRECT EXAMINATION

Page 188

47 (Pages 185 to 188)

**A1749**

BY MR. CAMPBELL:

Q. Mr. Bone, the letters of assurance to the IEEE from Ericsson, those are public, correct, sir?

A. They are.

Q. Any reason you can think of that HP, RIM, Buffalo would not have been aware of those?

A. Not that I can think of.

Q. Thank you, sir.

THE COURT: All right. Thank you. You may step down.

Who will be your next witness?

MR. CAMPBELL: That's all our witnesses, Your Honor.

We rest.

THE COURT: Plaintiffs finally close?

MR. CAMPBELL: Yes.

THE COURT: Defendants finally close?

MR. DAUCHOT: Yes, Your Honor.

THE COURT: All right.

MR. DAUCHOT: Do we have the exhibits in evidence?

Your Honor, with your permission, I'd just like to read into the record the slide numbers just so that that's clear.

THE COURT: Well, let me do this before

Page 189

you do that: Your final exhibit list and your demonstrative list, I understand that you've handed those to Ms. Ferguson; but if you would, let's offer those on the record as we have previously, and then we'll take up your matter if this doesn't solve it. Okay.

MS. MOORE: Yes, Your Honor.

I have Plaintiff Ericsson's Final Admitted Trial Exhibit List. And just one housekeeping matter, this exhibit list includes Plaintiffs' Exhibit 71, which, although it was discussed during testimony, and I believe Defendants originally had raised an objection that Your Honor overruled, I don't know that we got confirmation it was admitted into the record; and I would just like to clarify that.

THE COURT: All right. Any objection to those exhibits?

MR. DE VRIES: No objection, Your Honor.

THE COURT: All right. That will be marked as Plaintiffs' Exhibit List No. 8, and those exhibits are admitted.

MS. MOORE: I also have Plaintiff Ericsson's Demonstrative Evidence Trial Exhibit List.

THE COURT: All right. And have you exchanged that with counsel?

Page 190

MS. MOORE: Yes, Your Honor.

THE COURT: Any objections to those demonstratives?

MR. DE VRIES: No, Your Honor.

THE COURT: All right. They will be marked as demonstratives, as shown on the list, and that will be Demonstrative Exhibit List No. --

COURTROOM DEPUTY: 9.

THE COURT: -- 9.

MS. MOORE: The last thing, Your Honor, I have photographs of all the demonstrative boards that were used during trial with Plaintiffs' demonstrative exhibit numbers just for the ease of the Court.

THE COURT: All right. Are those included on the list that you had?

MS. MOORE: Yes, Your Honor.

THE COURT: All right. Those will be included with the demonstratives.

All right. Do Defendants have an exhibit list they wish to offer?

MR. DAUCHOT: We do, Your Honor.

Defendants have Defendants' Admitted Trial Exhibit List.

THE COURT: All right. It will be marked as Defendants' Exhibit List No. 8.

Page 191

Is there any objection to the exhibits contained thereon? Is there any objection, Counsel?

MS. MOORE: No, Your Honor.

THE COURT: Be admitted.

All right. Anything further?

MR. DE VRIES: Yes, Your Honor. We have two lists of admitted demonstrative exhibits. We have Defendants' List of Admitted Demonstrative Exhibits. That's the same list from earlier today.

We also have a supplemental list that includes the demonstratives that were used during the bench trial. That's Defendants' List of Admitted Demonstrative Exhibits, June 12th, 2013, Bench Trial.

THE COURT: All right. Those will be marked as Defendants' Exhibit Lists 9 and 10 respectively, and the demonstratives are so marked.

Okay. Anything further?

MR. DE VRIES: And I would just note for the record, Your Honor, we handed up a pre-admit list at the beginning of the bench trial. I believe that that list is reflected on the admitted trial list that I'm about to hand up.

With Your Honor's permission, I would like the opportunity, if I'm incorrect about that, to submit a supplemental that does include that.

Page 192

48 (Pages 189 to 192)

**A1750**

THE COURT: All right. When would you know that?

MR. DE VRIES: Probably in about five minutes.

THE COURT: All right. As long as you get it in by 7:00 o'clock, it will be received unless there's some objection. If there is an objection, let me know, and I'll come back in.

Anything further?

MR. DE VRIES: No, Your Honor.

THE COURT: Anything further from the Plaintiff?

MR. CAMPBELL: Your Honor, there were some exhibits that I rattled off too quickly today for the bench trial that weren't on our bench trial pre-admit list.

THE COURT: Uh-huh.

MR. CAMPBELL: Do we need to make a list to get those in?

THE COURT: I admitted those, didn't I?

MR. CAMPBELL: You did.

THE COURT: Okay. Just give us an updated list tomorrow of all of them, including those, just so we'll have it for the record, if you would.

And Defendants can do likewise, if you

Page 193

have any in that category.

All right. Anything else before we adjourn for the evening?

MR. CAMPBELL: No, Your Honor.

THE COURT: All right. We are way past the cocktail hour, and we will be adjourned until tomorrow.

COURT SECURITY OFFICER: All rise.

THE COURT: Oh, let me give the parties their final times. It's amazing how this comes out.

Plaintiffs have used 15 hours and 1 minute, and Defendants have used 15 hours and 2 minutes.

So congratulations.

(Court adjourned.)

Page 194

CERTIFICATION

I HEREBY CERTIFY that the foregoing is a true and correct transcript from the stenographic notes of the proceedings in the above-entitled matter to the best of our abilities.


/s/ Shea Sloan
SHEA SLOAN, CSR
Official Court Reporter
State of Texas No.: 3081
Expiration Date: 12/31/14


/s/ Judith Werlinger
JUDITH WERLINGER, CSR
Deputy Official Court Reporter
State of Texas No.: 731
Expiration Date 12/31/14

Page 195

49 (Pages 193 to 195)

A1751

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                DOCKET NO. 6:10cv473
   -vs-              )
                Tyler, Texas
              )
D-LINK CORPORATION, ET AL      June 12, 2013

SEALED PORTIONS NOS. 9 AND 10 FROM TRANSCRIPT OF
BENCH TRIAL
AFTERNOON SESSION
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE

A P P E A R A N C E S

FOR THE PLAINTIFFS:

MR. THEODORE STEVENSON, III
MR. DOUGLAS A. CAWLEY
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201

MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701

COURT REPORTERS:      MS. JUDITH WERLINGER
         MS. SHEA SLOAN
         shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.

Page 1

FOR THE DEFENDANT:

MR. GREGORY S. AROVAS
KIRKLAND & ELLIS, LLP
601 Lexington Avenue
New York, New York 10022

MR. LUKE DAUCHOT
KIRKLAND & ELLIS, LLP
333 S. Hope Street
29th Floor
Los Angeles, California  90071

MR. ADAM ALPER
KIRKLAND & ELLIS, LLP
555 California St.
24th Floor
San Francisco, California  94104

MR. MICHAEL E. JONES
POTTER MINTON, PC
110 N. College, Ste. 500
P.O. Box 359
Tyler, Texas  75710-0359

MR. ROBERT A. VAN NEST
KEKER & VAN NEST, LLP
633 Sansome St.
San Francisco, California 94111

Page 2

P R O C E E D I N G S

(Courtroom sealed.)

(Pause in proceedings.)

(This is Sealed Portion No. 9.)

Page 3

1 (Pages 1 to 4)

CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED



2 (Pages 5 to 8)

A1753

**CONFIDENTIAL MATERIAL FILED UNDER SEAL REDACTED**





CASE PARTICIPANTS ONLY   Document: 177-1   Page: 564   Filed: 03/31/2014

1

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION


ERICSSON, INC., ET AL            )
                                 DOCKET NO. 6:10cv473
   -vs-                          )
                                 Tyler, Texas
                              )  9:00 a.m.
D-LINK CORPORATION, ET AL        July 16, 2013


TRANSCRIPT OF POST-TRIAL MOTION HEARING
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE


            A P P E A R A N C E S

    (SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES.)


                    PRESENTERS


FOR THE PLAINTIFF:


MR. THEODORE STEVENSON, III
McKOOL SMITH
300 Crescent Court, Ste. 1500
Dallas, Texas  75201


MR. JOHN B. CAMPBELL, JR.
McKOOL SMITH
300 W. 6th Street, Suite 1700
Austin, Texas  78701


COURT REPORTER:        MS. SHEA SLOAN
                       shea_sloan@txed.uscourts.gov


Proceedings taken by Machine Stenotype; transcript was
produced by a Computer.


**A1789**

CASE PARTICIPANTS ONLY    Document: 177-1    Page: 565

5

MR. DeVRIES: That's exactly right, Your Honor. The parties are in substantial agreement. The defendants have filed several post-trial motions that are challenging the jury verdict. And to the extent, however, that those motions are overruled, we have no additional objection to entry of the ongoing royalty in the amount of the jury verdict, subject, of course, to the arguments we raised in those other motions.

The parties are also in agreement that the amount of the jury verdict should not be increased on a going-forward basis beyond what the jury found, and that is 15 cents a unit. The reason for that is the RAND obligation. But I think it is an easy one.

THE COURT: All right. So to be sure I'm clear, if the Court were to overrule the JMOLs, then both sides agree that an ongoing royalty of 15 cents would be appropriate, and there is no need for a period of time to negotiate and then another hearing and all of that stuff?

MR. DeVRIES: That's correct, Your Honor, subject to and without waiver of positions in those other motions --

THE COURT: Understood.

MR. DeVRIES: -- that's correct.

MR. CAMPBELL: Yes, Your Honor.

**A1793**

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TYLER DIVISION

ERICSSON, INC., ET AL.   )(

)(  CIVIL DOCKET NO.

)(  6:10-CV-473-LED-KFG

VS.              )(  Tyler, TEXAS

)(

D-LINK CORPORATION,   )(  MAY 23, 2013

ET AL.         )(  9:00 A.M.

PRE-TRIAL CONFERENCE

BEFORE THE HONORABLE JUDGE LEONARD E. DAVIS

UNITED STATES DISTRICT JUDGE


APPEARANCES:


FOR THE PLAINTIFFS:  (See attached sign-in sheet.)


FOR THE DEFENDANTS:  (See attached sign-in sheet.)


COURT REPORTER:    MS. SHELLY HOLMES, CSR

Deputy Official Court Reporter

2593 Myrtle Road

Diana, Texas 75640

(903) 663-5082


(Proceedings recorded by mechanical stenography, transcript produced on a CAT system.)

## Page 2

I N D E X


May 23, 2013

Page

Appearances                1

Hearing                    3

Court Reporter's Certificate      136

## Page 3

COURT SECURITY OFFICER:  All rise.

THE COURT:  Please be seated.

All right.  Ms. King, if you'll call the case, please.

COURTROOM DEPUTY:  The Court calls Case No. 6:10-CV-473, Ericsson, Inc., et al., versus D-Link Corporation, et al.

THE COURT:  Okay.  Announcements?

MR. STEVENSON:  Good morning, Your Honor. Ted Stevenson with McKool Smith for Ericsson, Inc., and LM Ericsson.  With me here today are Justin Nemunaitis, Warren Lipschitz, John Campbell, Sam Baxter, and Ashley Moore, and we're ready to proceed.

THE COURT:  All right.

MR. JONES:  Your Honor, for Intel, Mike Jones, Greg Arovas, Luke Dauchot, Tim Majors, Adam Alper, Sarah Piepmeier, Michael DeVries, and also Mr. Ben Ostapuk from Intel.

THE COURT:  Okay.

MR. JONES:  Thank you, Your Honor.  We're ready to proceed.

THE COURT:  Okay.  Thank you.

MR. VAN NEST:  Your Honor, Bob Van Nest, Keker & Van Nest, for Defendants Acer, D-Link, and NETGEAR.  Good morning, Your Honor.

## Page 4

THE COURT:  Good morning.

MR. YAGURA:  Good morning, Your Honor.  Ryan Yagura with O'Melveny & Myers on behalf of Belkin, and with me are Dawn Sestito and Kevin Murray.

THE COURT:  Okay.

MS. DACUS:  Good morning, Judge.  Shannon Dacus here on behalf of Dell.  I have with me at counsel table Frank Smith.  Also with me are Mike Newton, Brady Cox, and Lauren Hoffer.  We're ready to proceed.

THE COURT:  Thank you.

MR. HARRISON:  Your Honor, Guy Harrison on behalf of Toshiba.  I'm with John Feldhaus and Kevin Malaney from Foley and Lardner.

THE COURT:  Thank you.  Is that it?

All right.  A good looking jury over there this morning.

All right.  We've got our pre-trial this morning.  We have quite a few things.

Did the -- have the parties discussed how they'd like to proceed?  Maybe what's most important first or --

MR. STEVENSON:  Yes, Your Honor.  From the Plaintiffs' perspective, we have four things on the agenda that we'd like to request the Court take up.

The first is there's a partial summary

Pages 1 to 4

**A1881**

## Page 5

judgment motion on Dell's license defense.

Secondly, there's the resumption of the Daubert motion on -- I think Mr. Cabello, the defense expert on willfulness, that was partially argued at the motions hearing.

The third is there's an issue regarding source code availability during trial under the Court's protective order.

And then, lastly, of course, motions in limine. I'm pleased to announce we've reached agreement on several more of the motions in limine that we can present to the Court when we get there.

THE COURT: All right.

MR. STEVENSON: And in addition, a couple other agreement I just wanted to inform the Court of. The first is we've reached agreement on narrowing claims and prior art. The Plaintiff has narrowed down to 15 claims to present, and the Defendants have agreed to narrow it down to four discreet prior art theories per reference by this Saturday at 5:00 p.m.

THE COURT: Is that correct? Anybody disagree with that from the Defendants?

MR. VAN NEST: No, Your Honor. It's four references per claim, just to be clear.

MR. STEVENSON: Right.

## Page 6

MR. VAN NEST: But, no, we agree with that.

THE COURT: Okay.

MR. STEVENSON: And there -- we've also reached an agreement on trial disclosure between the parties with regard to demonstratives, exhibits, and that's memorialized in writings between the parties. If the Court would like to hear it, I can read it, but if the Court would like to dispense, it's the typical agreement we have in these sorts of cases.

THE COURT: I'm glad you agree. That's fine.

MR. STEVENSON: Thank you.

THE COURT: Okay. Defendants have any particular order or anything they -- is the order that Mr. Stevenson outlined satisfactory to Defendants?

MR. VAN NEST: I think the order that counsel's outlined is fine, Your Honor.

THE COURT: Okay. Well, let's start with Ericsson's motion for partial summary judgment and/or to exclude Dell's license defenses, Docket No. 431.

MR. STEVENSON: The basis of this partial summary judgment and the crux of it is basically that Dell found a clause in an old purchase agreement between a Dell subsidiary and an Ericsson subsidiary, neither of whom are parties to this case that Dell claims gives

## Page 7

them a license defense.

Now, that clause has nothing to do with patents. It's not a license at all. And neither of the two Ericsson party Plaintiffs, LM Ericsson or Ericsson, Inc., are signatories or parties to that purchase agreement.

So let me start with the relevant timeline which begins in February of 2008. Back in February of 2008, Dell Products LP, the subsidiary of Dell, Inc., wanted to buy cellular modules to put in its computers, and these have nothing to do with 802.11. They're cellular modules. And Dell Products LP has nothing to do with this case. It's not a party, and there's no allegations of infringement against it.

The products Dell Products LP selected were from Ericsson AB, as its supplier. And Ericsson AB is not a party here either. It doesn't own and has never had any ownership interest in the patents-in-suit. The patents-in-suit were directly assigned by the employees at Ericsson who invented them to LM Ericsson, publicly traded company, that is the parent corporation within the Ericsson affiliates.

THE COURT: They didn't go through AB?

MR. STEVENSON: No, the employees -- some of the employees work for AB, some of the employees work

## Page 8

for Ericsson, Inc., some of the employees work for other -- Ericsson Germany and other Ericsson companies, but they executed assignments direct to LM Ericsson, not -- it wasn't Ericsson AB and then Ericsson AB to LM Ericsson.

And the parent, LM Ericsson, at all relevant times has owned the patents-in-suit and really virtually all the patents owned by Ericsson as a result of its activities.

Now, when the parties agreed Dell Products LP and Ericsson AB on this purchase agreement for cellular modules, Dell Products sent one of its standard form master purchase agreements to Ericsson AB.

THE COURT: I was going to ask, who -- who drafted that master agreement?

MR. STEVENSON: It's a -- it's a Dell form. And you can tell by looking at the bottom, it's Dell confidential, and then it says, template revision 12/14/2005 on the bottom footer.

THE COURT: Is there any evidence of negotiation, or was it just the form sent and signed?

MR. STEVENSON: No evidence of negotiation in the record.

THE COURT: Okay. All right.

MR. STEVENSON: This was signed by a

Pages 5 to 8

**A1882**

CASE PARTICIPANTS ONLY

## Page 9

business person for Ericsson AB who was not involved in patent licensing or patent assertion, as you would expect in a deal such as this.

Now, after the ink was dry on this deal, the parties went about their business and Dell Products LP brought cellular modules from Ericsson AB. And then we fast forward to where Dell's involvement in this lawsuit begins, and that's two years later, in March of 2000 --

THE COURT: And let me be sure this purchase agreement, it was just for products, it did not involve patents at all?

MR. STEVENSON: Correct. There wasn't any patent license in this. There were some indemnity provisions -- to be very complete in answer to your question, there were some indemnity provisions in here that provide if Ericsson's products that they're selling to Dell infringe somebody else's patents, there may be an indemnity to that, but there's -- there's no discussion of, you know, patent licenses or a patent agreement from Ericsson to Dell.

THE COURT: All right.

MR. STEVENSON: Now, two years after the ink is dry on this, March of 2010, Dell's involvement in this lawsuit began. It started out when Ericsson, Inc., a subsidiary of LM Ericsson, and a completely separate

## Page 10

company from Ericsson AB, sent Dell, Inc., the parent company, a demand letter for patents involved in this lawsuit.

Several months later, in September of 2010, we filed this lawsuit, but because -- and LM Ericsson and Ericsson, Inc., were the Plaintiffs -- but because Ericsson was still negotiating with Dell over a potential resolution, they weren't included in the original filing. When the negotiations reached impasse, in June of 2011, we amended this complaint to add Dell, Inc., to the lawsuit as a Defendant and Dell answered but said nothing about this February 2008 agreement. So it's completely silent on it.

Now, if we fast forward to a year later -- more than a year later, August 13, 2012, after Dell had been in this suit for 14 months, it sent a letter to Ericsson attaching a copy of this February 2008 master purchase agreement and suggesting that it barred Ericsson from pursuing its claims in this matter. So when we got that letter, we, of course, quickly looked at this document. The first thing that jumped out was it's an agreement between Dell Products LP -- LP and Ericsson AB, neither of which are parties to this suit.

The other thing that jumped out was the -- and -- and Dell directed our attention to the portion

## Page 11

that it claims is the promise that bars the suit, and that's on Page 3 at Paragraph 12.

And this is a dispute resolution clause. Dell points to 12.1(a), which says, supplier will not commence any lawsuit -- and supplier is Ericsson AB, and it is defined as Ericsson AB and does not include any affiliates. It's just Ericsson AB. It says, supplier will not commence any lawsuit or seek judicial order affecting Dell. And Dell in this agreement, Your Honor, is defined as Dell Products LP, plus its affiliates.

THE COURT: And that's in Paragraph 1.0?

MR. STEVENSON: Yes, exactly.

So that -- that's the -- the -- the distinction. Dell was described as affiliates. Ericsson AB is never -- as supplier is never defined as including affiliates.

So it says, supplier will not commence any lawsuit or seek any judicial order affecting Dell or add Dell as a party to any pending legal or administrative proceeding that is not directly related to Dell's purchase of products or that may prevent Dell from shipping any Dell or third-party products.

And Dell's position in the letter was this is a broad covenant not to sue. In other words, AB can't sue any Dell company for anything that isn't the

## Page 12

purchase of products, which presumably would include if somebody at Dell hacked into Ericsson's computers and stole a bunch of trade secret information. And I think it's an overbroad reading, but that's the reading they put in their letter.

I'll also observe that Paragraph D on the next column contains an arbitration provision that says, any breaches of this agreement should be resolved by arbitration.

And then 12.2 contains a survival clause which purportedly states that these promises, including the one in Paragraph 12, will survive any termination or expiration of this agreement. And I would suggest that Dell may be taking the position that this is a perpetual deal.

Now, eight days after receiving the letter from Dell, Ericsson responded, and we sent them back a letter saying, this MPA, master purchase agreement, it only applies to AB, it doesn't apply to Ericsson, Inc. It doesn't apply to LM Ericsson. They're not signatories, and it has no bearing on this case.

And then we heard nothing from Dell for over four months, while this case was going on, nothing. And then in December 20th, 2012, after the close of discovery, Dell filed a motion for leave to amend its

**A1883**

## Page 13

answer to assert this master purchase agreement as a defense in this case. And at the motion hearing, the Court granted that and we filed this summary judgment motion.

There were five grounds, Your Honor, that I think independently compel a grant of summary judgment here.

THE COURT: Before -- before you leave the facts --

MR. STEVENSON: Yes.

THE COURT: -- explain to me basically the relationship between Ericsson AB and Ericsson LM and in what ways they operate separately or jointly.

MR. STEVENSON: LM Ericsson is the publicly traded parent corporation.

THE COURT: It's what?

MR. STEVENSON: The publicly traded parent corporation.

THE COURT: All right.

MR. STEVENSON: LM Ericsson owns virtually all the patents that the Ericsson activities generate. They're assigned directly to LM Ericsson. Ericsson, Inc., is the United States sales subsidiary of LM Ericsson. It also has an exclusive enforcement rights regarding in the United States the patents in this suit.

## Page 14

Ericsson AB is a Swedish company that is a subsidiary of LM Ericsson. And -- and when I say, subsidiary, it may be through intermediate subsidiaries, but, ultimately, it's underneath LM Ericsson in the chain of command.

THE COURT: Okay. Thank you.

Do -- do -- I mean, can you expand on what ways they operate separately or jointly?

MR. STEVENSON: They operate separately in terms of LM Ericsson owns the patents. It has the right to sue and bring suit under the patents. There are employees of Ericsson AB, as well as other companies within Ericsson who have assigned patents to LME. In addition, some of the witnesses in this case who have been deposed by the Defendants are Ericsson AB employees. They're involved in licensing. They're involved in patent assertion. In other words, preparing the letters and the assertions for patent rights across the whole portfolio that go out. Some of them are Ericsson AB employees that they go in and do patent assertions for the patents that are owned by LM Ericsson.

THE COURT: And what -- where are these corporate entities located?

MR. STEVENSON: Eric -- LM Ericsson is

## Page 15

headquartered in Sweden. Ericsson, Inc., is headquartered in Plano, in the United States. Ericsson AB, I believe, is headquartered in Sweden. I'll check that, but I -- they're a Swedish company.

THE COURT: All right. Okay. Go ahead.

MR. STEVENSON: So there -- there's five, I think, independent grounds for summary judgment here.

The first is -- and -- and it's the rather clear one which is neither LM Ericsson nor Ericsson, Inc., are signatories to this contract. Neither one of them, the party Plaintiffs, have ever contracted not to file a suit against Dell. And so they can't be bound to this covenant as a non-signatory.

Now, secondly, Dell asserts an agency theory as a way of binding or attempting to bind LM Ericsson, the parent. And the agency theory they assert is basically that -- and it's -- they're very pointed about it in their papers, and it's actually I think a little bit backwards from what you would expect.

They assert that LM Ericsson, the parent, is actually the agent of the subsidiary Ericsson AB. And they assert that because LM Ericsson is the agent of the subsidiary Ericsson AB for purposes of asserting patents, that a LM -- LM Ericsson is a non-signatory because they're -- the agent can be bound by this

## Page 16

contract. That's their theory.

But the problem with that theory is it fails as a matter of law because Ericsson AB never had the authority to file a lawsuit on these patents. It doesn't -- it doesn't own the patents. It wouldn't have standing to bring a suit. So the question is how can Ericsson AB, as the principal, possibly have authorized LM Ericsson, as the agent, to do something that AB never had the authority to do? I mean, a principal can't vest an agent with power that the principal has never possessed.

Third, even if we could get over that legal problem, the Plaintiffs -- excuse me, the Defendants have got to come forward with proof of agency. Agency is a contract. It's an agreement between two people to have a principal-agent relationship, and there's no evidence of any such contract or agreement by which Ericsson AB appointed LM Ericsson as its agent. There's nothing in the record about that.

What the Defendants would do -- what Dell would do was infer that agency is premised on a parent-subsidiary relationship, the fact that some employees of Ericsson AB are involved in licensing and enforcement activities for patents owned by LM Ericsson, and that some employees have appeared as witnesses in

**A1884**

## Page 17

this suit.

But that doesn't make LM Ericsson an agent of Ericsson AB, and there's no proof of any agreement. And we've cited a case that's right on point here, Your Honor. It's the Merrill Lynch versus Optibase case. That's a Second Circuit case arising from New York. New York law governs this agreement. And that was a case where there was a disgruntled investor of Merrill Lynch who filed an arbitration against several Merrill Lynch affiliates, and one of those affiliates actually went into District Court and tried to get an injunction and succeeded in getting an injunction that it didn't have to participate and go forward in the arbitration because it wasn't a signatory to the arbitration agreement.

The disgruntled investor tried to enforce that arbitration agreement in Court against that Merrill Lynch affiliate, and it went all the way up to the Second Circuit, and the Second Circuit held it couldn't enforce it. And the facts in that case are very similar to this one. The investor made the same arguments Dell is making here. The affiliate was an agent of other Merrill Lynch companies, that they are owned and controlled by the same parent, that they had overlapping officers, that the brokers of one affiliate offered the products and services of other affiliates, and that the

## Page 18

Merrill Lynch companies presented to the public the image of the single integrated firm. And the Second Circuit found that was insufficient to show an agency relationship and thereby binding on a signatory to an arbitration contract.

Fourth -- or, excuse me, the -- the fourth argument, Dell's own summary judgment response at Page 10 says that for a parent authority of an agent, they have to show that Dell reasonably believed there was no -- there was an agency relationship between the two companies, and they say that at Page 10 for parent authority. But Dell has wholly failed to come forward with any evidence showing that at the time of the 2008 deal, they believed or reasonably believed that LM Ericsson was an agent of the company they were dealing with, Ericsson AB.

The only evidence they put in is an evident -- is a declaration from their in-house counsel on patent matters saying he believed -- or people at Dell believed they were dealing with a monolithic entity. That's insufficient as a matter of law to create a parent authority. He doesn't cite any facts. And, in fact, the person who signed the declaration wasn't involved in any of the negotiations.

And, finally, fifth, this provision isn't

## Page 19

even a license. It doesn't raise a license defense. At most, it's a contractual promise not to sue. And at most, if you accept as true that there was an agency relationship and you can't find that from the facts, at most, it would create in Dell a breach of contract claim against Ericsson AB, but it doesn't create a license defense because this is not a license, and a covenant not to sue and a license are different. A covenant not to sue is personal. A license runs with products.

And, finally, in closing, lest there be -- be any doubt about whether Dell even really believes in this defense, they waited a long time to -- to raise it. And in addition, during the pendency of this lawsuit, in December 2011, Dell, Inc., signed a cellular license agreement with Ericsson -- LM Ericsson covering cellular patents that Eric -- LM Ericsson owned. There would have been no need for them to do that if they believed they already had such a license by virtue of this deal. But they signed that license anyway. They -- they paid substantial consideration, and the parties expressly carved out of that anything having to do with this case.

So as a result, I think the Court should grant partial summary judgment on this defense.

THE COURT: All right. Thank you. Response?

## Page 20

MR. SMITH: Yes, sir. May it please the Court. Frank Smith on behalf of Dell.

Mr. Dacus could not be here today, so he passed the baton to me for this issue.

And the issue is, is there evidence in the record from which a reasonable jury could find that LM Ericsson is the agent of Ericsson AB for purposes of Dell's defense under the master purchase agreement in that AB made LM its agent for purposes of this litigation.

Mr. Stevenson referred the Court to Section 12.1 of the master purchase agreement. His characterization, while correct, is, I think, incomplete. That document -- that clause clearly provides a covenant not to sue, running from AB to Dell, Dell being broadly defined to include all affiliates. A covenant not to sue under the law from the Federal Circuit is the equivalent of a limited license, and a license extending to Dell would preclude Ericsson, the Plaintiffs, and their agents from bringing suit against Dell.

Now --

THE COURT: Let me ask you this, counsel. How do you get around Paragraph 1.0, which, again -- and I -- I take it do you -- well, let me ask you first, do

**A1885**

## Page 21

you have any response to Ericsson's statement to me a moment ago that there is no evidence that this -- other than that this was a form contract that was sent to Ericsson and signed by an employee, as opposed to -- and that it was drafted by Dell?

MR. SMITH: Your Honor, I think it's fair to say from the record, it was drafted by Dell. There's no evidence in the record one way or another as to whether there were negotiations over the document or not. What we do know is that Ericsson AB accepted the provisions of this document in 2008.

THE COURT: Okay. Well, let me ask you then about Paragraph 1.0 where apparently Dell, the drafter of the document, defined itself, Dell, as being Dell Products LP and its affiliates, collectively Dell, but then when it gets to supplier, it -- it has no such -- it doesn't refer to Ericsson AB as -- and its affiliates. It just says, the supplier.

MR. SMITH: There's no question Your Honor's reading and Mr. Stevenson's reading of that paragraph is correct. The issue, however, is do other Ericsson entities -- in particular the ones that have brought this suit, LM, are they agents of AB under New York law? There's --

THE COURT: Okay. So -- you -- you're --

## Page 22

you're conceding, in essence, that the contract, as it sits, does not expressly refer to affiliates?

MR. SMITH: With regard to Ericsson's side of the equation, that's unquestionably correct.

THE COURT: All right.

MR. SMITH: Now, the parties do agree that this document is governed by New York law. Under New York law, there's a three-part test as to whether one company is the agent of another for purposes of contractual relationships and obligations that flow from those contracts. And there's no dispute between the parties about that. We both cite to the same case law.

The Second Circuit decision in Commercial Union Insurance and the Southern District of New York's decision in Allstate Insurance in that three-part test is this, first, did the principal, which is AB, manifest an intent to give authority to the agent in this case, LM?

Number two, did the agent accept that authority?

And, number three, did the principal maintain control at some level over the subsequent relationship? That's the word the Courts used. Here it means, I think, the litigation.

And the answer to each of those questions is

## Page 23

unquestionably yes. And while Mr. Stevenson's recitation of the facts was essentially correct, it, again, was incomplete because the part that he left out is that within AB resides a group called IPR, Intellectual Property Rights Group, and that group is responsible for all aspects of management of Ericsson, broadly defined, its IP. And that is within Ericsson AB. That group is responsible for developing the portfolio, for deciding which patents to assert and against whom, for negotiating licenses, and ultimately, for deciding whom to sue.

And the evidence here, and it's not controverted, is that the head of that group, Mr. Kasim Alfalahi, directed that this lawsuit be commenced against Dell. That testimony is clear in the record, and it is unequivocal. And that establishes the first part of a commercial union test. Did the principal direct the agent to act? And the answer, again, from the testimony in the record, and it comes from the deposition of Ms. Anna Johns and from Mr. Alfalahi, is Alfalahi, within IPR at AB, directed LM to act. And that is no dispute about that.

Did AB -- I'm sorry, did LM accept that from Mr. Alfalahi? Obviously, they did, they filed suit. Did AB continue to be involved in the relationship, that

## Page 24

is to say the litigation? Again, unquestionably yes. They helped draft the complaint. They worked with the lawyers. They came up with the claim charts that were used to assert infringement against the Dell products. And they have provided at least 10 witnesses as 30(b)(6) designees in this case on behalf of the named Plaintiffs.

So on those facts, it is clear that a reasonable jury could find an agency relationship between AB on the one hand, which is the operating company, and LM on the other hand, which is described as the holding company, albeit the one that has the right to actually bring the lawsuit. So AB is directing LM to act. LM says, fine.

THE COURT: But aren't they directing them to act as to a property right which they don't own?

MR. SMITH: The answer to that question, Your Honor, is, yes, but I don't think that matters because it's clear, or at least can easily be inferred by a reasonable jury, that LM took action as a result of the direction of Mr. Alfalahi, and as such, satisfies the first prong of the Commercial Union test.

And it's also clear that in both Commercial Union and in Allstate Insurance that what we have are situations in which a non-signatory to a contract is

**A1886**

Page 25

being held responsible for the actions of someone who signed the contract. In Commercial Union, it was a freight forwarder who signed the contract. The Second Circuit said on the specific facts before it that the airline that actually shipped the product was -- could be sued, even though it was no signatory for the contract.

And the Allstate Insurance case, the result was different. In other words, no agency was found on the facts before the Court, but, nonetheless, the analysis was the same. And that's what we have here. And I would respectfully submit to the Court that this is a jury issue as to whether LM was acting as AB's agent for purposes of bringing this lawsuit against Dell, and that our defense is based on the contract which was signed in 2008.

Ericsson wants to focus on the relevant timing being who's an agent of whom at this time when the contract was signed. I would submit that the relevant time frame is who was acting as whose agent when the lawsuit was filed at Mr. Alfalahi's direction. And when you focus on that time frame, it's clear that a jury could find that LM, the holding company, was the agent of AB, which is the active operating company.

And if the Court's got any questions, I'll

Page 26

be glad to try and address them. But, Your Honor, I do submit that this is clearly a jury issue.

THE COURT: You might respond as to why Dell waited so long to assert this defense.

MR. SMITH: Yes, sir.

The bottom line, sir, is that we really didn't. When we filed our answer, we included within that an affirmative defense of license. And at that point, we were aware of the MPA and put out our license defense.

Now, we were no more specific at that point in time because we hadn't had any discovery, and we didn't know what was going on within the Ericsson group of companies. And as you've heard, Ericsson presented itself to us -- and this is, again, really not in dispute -- as sort of a monolithic entity. And as discovery progressed, we began to see what was going on behind the scenes, who held the -- who held the intellectual property rights and that sort of thing.

And so in the summer of 2012, the correspondence that Mr. Stevenson referenced took place. As further discovery developed, we brought the motion to amend, which Your Honor granted last week -- two weeks ago. And even after that point, we were still painting deposition discovery by agreement of the parties. And

Page 27

that's when Ms. Johns testified on January the 25th of 2013 that it was Mr. Alfalahi, the head of IP -- IPR at AB who directed LM to commence the litigation. And that's the sequence of events. I mean, we noted the issue from the beginning. And as discovery began to develop over time, concluding ultimately with Ms. Johns' deposition, we learned the full story and the full scope of the agency relationship for purposes of this motion and this defense between AB on the one hand and LM on the other.

THE COURT: Okay. Thank you.

Response?

MR. STEVENSON: Just a few responses, Your Honor.

First, I -- I don't think there is a fact issue on agency, but even if there was an agency relationship, as a matter of law, you can't bind LM Ericsson as a non-signatory because LM Ericsson always owned the patents-in-suit. AB never owned them. So AB, as the principal, could never have directed its alleged agent, LM Ericsson, and authorized them to do something that AB didn't have the power to do. That's first.

Secondly, what Dell points to as the fact issue on agency is nothing different than happened in the Merrill Lynch case before the Second Circuit where

Page 28

they found no agency relationship and nothing different that happens in every corporation, probably Dell itself, that has multiple subsidiaries. And what that is, is people in one business unit make recommendations to another business unit.

In this case, Dell asserts Mr. Alfalahi directed the litigation. He didn't. What he did is as a member of AB, recommended to the patent owner, LM Ericsson, that they file suit. But it was always LM Ericsson's decision and Ericsson, Inc.'s, decision as the United States's exclusive licensee and enforcement agent to bring the suit. So there's a very big distinction there between creating an agency relationship by agreement on the one hand, and as Merrill Lynch points out in that case, the typical give and take within a company between employees who deal with employees in other companies.

And then, third, as far as the timing goes, when this got originally raised by Dell in their answer, it was a boilerplate license defense. And then they moved to amend to add these allegations about the MPA. But the MPA is not a license. At most, it's a contractual provision. And if Dell is aggrieved under this, which I don't think they are, their remedy is not to have a license. Their remedy is that Dell has a

Pages 25 to 28

**A1887**

## Page 29

breach of contract claim against AB that it can bring in the form of its choice, but not here because AB is not a party and because this contract doesn't give Dell a license.

THE COURT: Okay. Thank you.

MR. SMITH: Your Honor, if I may?

THE COURT: Yes, Mr. Smith.

MR. SMITH: Very, very quickly. I think Mr. Stevenson put his finger on why this is a jury issue. The jury can either choose to believe the first argument he just made about the extent of AB's authority to direct LM, or the jury can believe Ms. Johns' testimony. And the testimony which is attached as Exhibit E to our brief is only about four or five lines long, and it reads as follows:

Question: Who makes the decisions to transition from licensing discussions to assertions to litigation?

Answer: Ultimately, Mr. Alfalahi.

And so when Ericsson's discussions with Dell were escalated to litigation, Mr. Alfalahi would have made that decision to commence the litigation?

Answer: Right.

And there's your jury issue.

THE COURT: Well, respond, if you would, to

## Page 30

Ericsson's argument that even if you assume an agency relationship, how can one -- how can AB authorize someone to do something which it doesn't have the -- the -- the -- the power to do?

MR. SMITH: Well, respectfully, I don't --

THE COURT: It couldn't -- it couldn't have sued on its own?

MR. SMITH: Beg your pardon?

THE COURT: It could not have sued on its own?

MR. SMITH: It could not have sued on its own, but based on this testimony, it certainly had the ability, which it exercised, to direct LM to commence the litigation because the authority over Ericsson's intellectual property rights resided in this IPR group, which was within AB, which was headed by Mr. Alfalahi, and who, according to this testimony, directed that the litigation be commenced against Dell.

THE COURT: Okay. All right. Thank you.

All right. I will get you a ruling on this just as soon as possible.

All right. Next will be Ericsson's motion to strike David Cabello.

MR. NEMUNAITIS: Your Honor, Justin Nemunaitis for Ericsson.

## Page 31

After the last hearing, the parties conferred on this motion and narrowed it down to two discrete issues for the Court to decide.

The first issue deals with expert reports. The Defendants intend to have Mr. Cabello testify that Defendants' expert report demonstrates that there was no objectively high risk that the Defendants infringed the patents-in-suit.

This is a problem for two reasons. The first is that Mr. Cabello is not a person of ordinary skill in the art, and so he's not qualified to address the expert opinions at all.

The other issue is that he can only testify as to the subjective prong of the willfulness standard. And so that goes to what sort of actions did the Defendants take after they had the pre-suit notice of the patents and before the lawsuit was filed? Because these expert reports were prepared during the litigation, that just should have no bearing on his non-willfulness opinions, and so that's why we believe that Mr. Cabello shouldn't testify as to any of Defendants' expert reports or expert opinions.

THE COURT: Okay. Responses to that one?

MR. AROVAS: Yes, Your Honor, Greg Arovas.

As Your Honor may recall when we talked

## Page 32

about these issues last time, one of the points I made, I think it's very important when looking at the willfulness issue is to look at the context in which Mr. Cabello is talking about and how he is looking at the facts overall that were presented to the Defendants.

The issue here, as we discussed last time, the allegations made by Ericsson are that the Defendants -- the Defendants continued to make product, and because they continued to make product, they're therefore willful.

So the question that the jury has to decide is the reasonableness of the decision of the Defendants to continue making the products. When you look at the evidence that's going to be presented, the role that Dr. -- that Mr. Cabello is playing, and as we talked last time, he has extensive experience in negotiating, including negotiating over standards practice, is to look at the allegations made over time, the fact that these are standards essential patents, and why is it that commercially it was reasonable for these patentees to continue making product?

Now, talking about, right, the positions of the parties, what Mr. Cabello would say is because these are standards essential patents, and we can't divorce each of these facts from -- from each other, because

Pages 29 to 32

**A1888**

CASE PARTICIPANTS ONLY   Document: 177-1   Page: 574   Filed: 03/31/2014

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

ERICSSON, INC., ET AL        )
                DOCKET NO. 6:10cv473
  -vs-                       )
                Tyler, Texas
                )  9:05 a.m.
D-LINK CORPORATION, ET AL        May 9, 2013

TRANSCRIPT OF MOTION HEARING
BEFORE THE HONORABLE LEONARD DAVIS,
UNITED STATES CHIEF DISTRICT JUDGE

A P P E A R A N C E S

(SEE SIGN-IN SHEETS DOCKETED IN THE MINUTES OF THE HEARING)

COURT REPORTER:      MS. SHEA SLOAN
        shea_sloan@txed.uscourts.gov

Proceedings taken by Machine Stenotype; transcript was produced
by a Computer.

Page 1

PROCEEDINGS

THE COURT:  Please be seated.

All right.  Ms. Ferguson, if you will call the case, please.

THE COURT:  Court calls Case No. 6:10cv473, Ericsson, Inc. v. D-Link Corporation.

THE COURT:  All right.  Announcements.

MR. STEVENSON:  Good morning, Your Honor, Ted Stevenson with McKool Smith for Ericsson.  Also at Counsel table that will be presenting is Justin Nemunaitis and Warren Lipschitz.  We are ready to proceed.

THE COURT:  Very good.

MR. JONES:  Your Honor, for Defendant Intel, Mike Jones and John Bufe.  Presenting for Intel will be Mr. Greg Arovas, Mr. Luke Dauchot, and Mr. Adam Alper.  Also here on behalf of Intel Mr. Allan Stabinsky and Mr. Ben Ostapuk.

THE COURT:  Okay.

MR. JONES:  Thank you, Your Honor.

MR. DACUS:  Good morning, Judge.  Deron Dacus on behalf of Dell, here with Mike Newton and Frank Smith of Alston & Bird and also with Lauren Hoffer for Dell.  We are ready to proceed.

THE COURT:  Okay.  Thank you.

MR. VAN NEST:  Good morning, Your Honor.  Bob Van Nest from Keker & Van Nest here on behalf of Acer, D-Link,

Page 2

and NETGEAR.  Along with me at Counsel table is Jonah Mitchell from Reed Smith, who will be presenting on behalf of our clients and the Defense Group, and here from Keker & Van Nest also is Eugene Paige and Matan Shacham.

MR. SHACHAM:  Good morning.

THE COURT:  Thank you, good morning.

All right.  I appreciate everyone coming in this morning.  I noticed we had quite a few motions, so I thought we would get as many of those prior to the actual pretrial as we can with this case set in June.

So let's start with -- well, let me just start, I will invite both sides to give me any kind of brief five-minute opening, if you would like to, as far as what you think is important and what you think I need to do about this case and trial, that type of thing.

Do you have anything you wish to say, Mr. Stevenson?

MR. STEVENSON:  Nothing prepared, Your Honor, other than this is a case that involves six patents that are essential to the 802.11 Wi-Fi standard.

THE COURT:  Is it a meritorious case?

MR. STEVENSON:  A very meritorious case, yes.

THE COURT:  I thought you might say that.

MR. STEVENSON:  And we are asserting those patents against a number of providers of laptops that have

Page 3

Wi-Fi capability, as well as routers that have Wi-Fi capability.

In the middle of this case, or early in the case, Intel, one of the chipset providers to these customers moved to intervene, and the Court allowed that intervention as to the devices in this case.

Currently before the Court are seven motions.  There are two summary judgment motions; one filed by Ericsson that deals with summary judgment that certain prior art references are not -- do not qualify as 102 publications, and one by the defendants dealing with non-infringement of two of the six patents.

There are two Daubert motions, one dealing with -- our Daubert motion dealing with the willfulness expert of the defendants, and one defense Daubert dealing with our damages expert and application of the EMVR.  And then there are three motions to strike; two filed by the defendants and one filed by Ericsson.

Our suggestion was going to be -- we are happy to take these up, obviously in any order that suits the Court, but we had conferred in advance and thought if we could present the summary judgments first, followed by the Dauberts and followed by the strikes and knock them out in that order; we do one, they do one, that might may be a good way to proceed.  But happy to yield to however the Court wants to do them.

Page 4

1 (Pages 1 to 4)

**A1915**

EMV.

Your Honor, the Federal Circuit, LaserDynamics says, no, no, if you are going to try to deal with this issue in the context of the value of the end product, you must, you must demonstrate that what you are bringing to the table in terms of patent technology at issue in the case drives demand for the end product because if you don't, if you don't, first of all, you have got an apportionment problem; and, moreover, second, you run right into the situation where you are inviting these jurors automatically, merely by virtue of the context, merely by virtue of the context of the discussion, we are inviting the jury to look at this in the context of the laptop.

If you could flip to Slide 10, please.

THE COURT: All right. Counsel, we are about to run out of time here today. So let me hear a response from plaintiff, and then I will take this under advisement.

MR. NEMUNAITIS: Quick response, Your Honor. On the apportionment issue, Mr. Bone is apportioned. The only way that Counsel has tried to distinguish that is by trying to say, well, look, some of these licenses don't really add up. There is some problems with them. He talks about the HP license. Doesn't mention RIM. Doesn't mention Buffalo. Doesn't mention Ascom. Doesn't mention some of the other licenses that are in the record before Your Honor.

And just to back up a little bit on this, we

Page 89

talked about that HP license. The way that Ericsson starts out these licensing discussions is it provides a reference rate. It uses that reference rate to ensure that it complies with its RAND obligations to make sure it is offering a reasonable range of rates for all of the companies that it deals with.

Ericsson's rate is half a percent capped at 50 cents. So if you sell a laptop for $500, your rate is 50 cents. If you sell a laptop for a thousand dollars, your rate is 50 cents. If you sell a laptop for a hundred dollars, your rate is 50 cents. So that reference rate, that is the starting point for these negotiations, doesn't rely on the entire market value of the products. It just relies on that initial part of the value.

HP's license per unit rate is consistent with that. The other licenses that Mr. Bone relies on is consistent with that, so there is no risk here that we are accounting for the entire market value in an inappropriate sort of way.

On the entire market value issue, the only case that Counsel talked about was LaserDynamics read a quick quote from that case because it did not address this issue.

What LaserDynamics said about licenses is that actual licensing evidence is highly probative of the patented invention's economic value in the marketplace and the form that a hypothetical license agreement would have taken. In that case the Court criticized the expert for ignoring the entire

Page 90

market value rule and for ignoring the licenses that were consistent with those problems that the Court raised discussing the entire market value rule.

When you look at the cases that address this issue of the potential conflict between the entire market value rule and the importance of licenses, the parties have only found three that attack it head on. They all say that when there is this potential for conflict, the importance of the licenses has to trump the entire market value rule.

One of those cases is from this district. It is a Judge Everingham opinion. It is the Mondis opinion that is cited in the brief. The reason he explained for why that licensing evidence has to trump the entire market value rule concern is that these licenses provide direct evidence of the value that other companies put on the patents at issue, and that is the best evidence for determining what the value of a reasonable royalty should be in a patent case.

THE COURT: All right. Thank you.

MR. DAUCHOT: Your Honor, if I could just add one point if the Court would indulge me.

THE COURT: All right. Uh-huh.

MR. DAUCHOT: Can you put Slide 15 up, please? And this is a key distinction --

Or 16.

Key distinction --

Page 91

16, please.

Key distinction between the cases that Counsel is pointing to. For example, this case is a RAND case, Your Honor. And so if you look at the licenses on which they are relying, none of them, none of them are with a chip maker.

Mr. Bone affirmatively in his report states that the hypothetical negotiation keeps Intel out of the room. What happens if Intel is in the room? And that is why we have the anomalous, to say the least, Your Honor, situation where Intel here is a defendant in this case, and there is no damage claim against Intel.

They are not asserting a damage claim against Intel. Why? If you look at Exhibit C to the reply, it is Mr. Major's declaration Exhibit C, there is an internal Ericsson document where they say exactly what is going on here. That is, keep the chip maker out of the equation because once you bring the chip maker to the table, here is what happens.

Next slide, please.

What happens is -- oh, that has been redacted, too.

Actually next two slides, please. That one.

Here is what happens, Intel is at the table. Intel sells a two-buck chip, or for that matter any chip maker, and they are negotiating on the two or three-dollar price of the chip.

Page 92

23 (Pages 89 to 92)

A1937